ANTONIO L. CORTÉS
Law Office of Antonio L. Cortés
233 Julale Center
424 West O'Brien Drive
P.O. Box BV
Hagåtña, Guam 96932
Telephone No.: (671) 477-1930
Facsimile No.: (671) 477-1933

Attorney for Plaintiff Rhino Builders, Inc.



FILED
DISTRICT COURT OF GUAM
MAY 22 2003
MARY L. M. MORAN
CLERK OF COURT
135

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC., and AMERICAN HOME ASSURANCE CO., <br><br> Defendants. | CIVIL CASE NO.02-00008 <br><br> **DECLARATION OF COUNSEL** |
| BIOGENESIS PACIFIC, INC., <br><br> Counter-Plaintiff, <br><br> vs. <br><br> RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, and JOHN DOES 1-10, <br><br> Counter-Defendants. | |
| AMERICAN HOME ASSURANCE CO., <br><br> Cross-Claimant, <br><br> vs. <br><br> BIOGENESIS PACIFIC, INC., <br><br> Cross-Claim Defendant. | |

ORIGINAL

I, Antonio L. Cortes, duly declare and say:

1.      I am an attorney licensed to practice law in Guam, and have been since October 21, 1997. I have personal knowledge of the matters stated herein, except those stated on information and belief, and as to those matters I believe them to be true. If called upon to do so, I could and would competently so testify.

2.      I was retained by Plaintiff Rhino Builders, Inc. on May 10, 2002. Around that date, I spoke with Rhino's prior attorneys, Carlsmith Ball LLP, on approximately five or more occasions about the change in representation. To the best of my recollection, I spoke to approximately four Carlsmith attorneys regarding the change in representation. None of them mentioned to me that Carlsmith represented any affiliates of AIG Technical Services. To the best of my recollection, one or more of the Carlsmith attorneys with whom I spoke regarding the change in representation affirmatively indicated to me that Carlsmith did not represent any AIG-affiliated entities by saying that the firm had a "business conflict" or words to that effect, and that the firm had "no conflict of interest," or words to that effect. To the best of my recollection such statements were made to me by one or more of the following three attorneys: Terry Thomason, Amy Self, or Sinforoso Tolentino.

3.      On or about April 10, 2003 I was informed by Rhino that a Carlsmith attorney or attorneys, including Mr. Thomason, had stated to Rhino officials that Carlsmith might have been contacted by an entity that was affiliated with

2

AIG and/or AHAC, or by AIG and/or AHAC directly or through that entity, and asked or instructed to discontinue its representation of Plaintiff in this action.

4.    Attached hereto as  Exhibits 1 through 4 are true and correct copies of the transcript excerpts cited in the accompanying Joinder in Motion to Modify Scheduling Order and Discovery Plan, in the order in which they are first cited in that brief..

I declare under penalty perjury that the foregoing is true and correct.

Executed this 22nd day of May 2003.

_____
ANTONIO L. CORTÉS

1    A.   For Rhino's rent?

2    Q.   Yes.

3    A.   I was the one.  I am the one.

4    Q.   You prepared the check?

5    A.   Yes.

6    Q.   And who would sign the check?

7    A.   Mr. Allen.

8    Q.   Was Mr. Allen the only person allowed to sign off on

9  Rhino checks?

10   A.   That's -- that's what I know.

11   Q.   Okay.  And Mr. Avilla, was he permitted to sign off

12 on -- I'm sorry.  Let me take that back.  Do you know Richard

13 Avilla?

14   A.   Yes.

15   Q.   Did you ever see him sign off on Rhino checks?

16   A.   When I get there, no.

17   Q.   Okay.  And you've already testified that you spoke

18 or you know of Mr. Alfred Garthe.  Have you ever seen him

19 sign off on Rhino checks?

20   A.   Not when I started there.

21   Q.   Okay.  And you started there in January of 2001?

22   A.   Yes.

23   Q.   January 10, I believe?

24   A.   Yes.

25   Q.   And one of the first jobs or orders that you were

1   ordered to do or instructed to do was to, I guess, compile or

2   clean up all the documents; right?

3       A.   Yes.

4       Q.   And when you say clean up the documents, you mean

5   just like separate them and place them in order; right?

6       A.   Yes.

7       Q.   Okay.  And why were you instructed to do that?  Was

8   the office in disarray?  Was it messy?  The documents were

9   not compiled correctly?

10      A.   Yes.

11      Q.   All of those?

12      A.   Very messy.

13      Q.   Very messy.  Okay.  And when you first moved in or

14  when you first began your job there, do you know where all

15  the checks were at?  The Rhino checks?

16      A.   It's Mr. Garthe -- Mr. Allen, the project manager,

17  that is holding it.

18      Q.   Okay.  So he had all the checks?

19      A.   Yes.

20      Q.   Okay.  And the checks were stored in where?

21      A.   In a volt.

22      Q.   In a volt.  And who had access to that volt?

23      A.   Mr. Allen.

24      Q.   Okay.  Did you ever see Mr. Alfred Garthe go into

25  that room and use or take some of the checks?

1   A.     Uh-huh.

2   Q.     Okay.  Now, we're talking of a difference of

3   $840,000.  Can you explain to me --

4          MR. EUGENE O'CONNELL:  Excuse me.  80,000 not

5   800.

6          MR. CLARK:  840,000.

7          MR. EUGENE O'CONNELL:  Oh, I'm sorry.  Excuse

8   me.

9   Q.     (BY MR. CLARK)  Can you explain to me how

10  Rhino Builders' claim went from $245,000 on October 20,

11  2001 to $1,081,000 in January, 2002?

12  A.     By that time, we -- we had a -- we had a lot

13  of our -- my recollection of this -- on this one right

14  here, my brother, Eugene, was trying to get

15  information -- all our records are -- employee records,

16  all our invoices, our computers, our safety system was

17  all gone from the office.  Our electronic data was all

18  stolen.  Our invoices was all gone.

19  Q.     Okay.  So, are you saying that Rhino lost

20  $840,000 worth of material?  And that's -- I'm sorry.

21  That's the difference -- that's the difference between

22  the two numbers, approximate difference.

23  A.     Rhino's -- Gene's -- when Gene -- my --

24  Eugene was doing the accounting as of this date, he was

25  trying to find out all the invoices and documentations

RALPH ROSENBERG COURT REPORTERS, INC.

**EXHIBIT 2**

1        MR. CLARK: Objection. I'm sorry, I think –

2        MR. CORTÉS: The plan he discussed earlier before

3    lunch.

4        MR. CLARK: Okay, I didn't know he characterized it

5    as a plan.

6        MR. CORTÉS: Well, Mr. Lam was going to help him

7    out.

8        MR. CLARK: Okay. So, that's my objection, it's a

9    little vague; can you be more specific on what plan you're

10   referring to?

11       MR. CORTÉS: Okay. Unless you've got a real

12   pressing concern, I'd appreciate an opportunity to question

13   this guy without objections that suggest an answer.

14       MR. CLARK: Well, no, I'm objecting because you're

15   assuming facts not in evidence. You referenced some "plan".

16   Either that, or your question was vague, so --

17       MR. CORTÉS: Okay.

18       MR. CLARK: I mean, I'd like to understand what the

19   question is so I can understand his answer.

20       MR. CORTÉS: Why don't you let him answer first, and

21   then we can discuss what you need to understand, so we can get

22   this deposition over with.

23   BY MR. CORTÉS: (Continuing)

24       Q.    Earlier today you testified that you transferred

25   your shares to Mr. Lam; is that correct?

Alfred Garthe III: April 03 and 04, 2003

EXHIBIT 3

1    A.    Yes.

2    Q.    And the reason you gave for that was what?

3    A.    The reason I did that because -- I needed help to

4    protect my shares.

5    Q.    And Mr. Lam was going to help you protect those

6    shares by holding your shares for you; is that correct?

7    A.    Yeah.

8    Q.    And you had an arrangement by which you believed

9    that you would have the opportunity to get these shares back

10   later; correct?

11   A.    That was an option.

12   Q.    Okay.  So as part of this arrangement, whatever it

13   is, of which that was an option, my question to you is, was

14   Mr. Lam going to Notice a Special Meeting of the Shareholders

15   of Rhino Builders?

16         And I believe your answer to that before Mr. Clark

17   objected was, yes.  Is that correct?

18   A.    Yes.  I think it was more on -- he was going to go

19   in on my behalf.  I was getting nowhere with, I wasn't getting

20   anywhere with my partner.

21   Q.    At this point in time, would you expect Mr. Lam to

22   believe that he owns the shares that you transferred to him?

23   A.    I don't believe that he thinks he owns them; no.

24   But if he did, I signed them over.

25         (Plaintiff's Exhibit 18 was marked for

Alfred Garthe III: April 03 and 04, 2003

```
12:31   1        A.    No.

12:31   2              MR. TUHY:  I don't think the witness is

12:31   3   assuming the date, though, Counsel.  I understood your

12:31   4   response to be you recall the meeting but not responsive

12:31   5   to the question on December the 8th --

12:32   6              THE WITNESS:  That's correct.

12:32   7              MR. TUHY:  -- of 2000.

12:32   8        A.    I don't recall the exact date.

12:32   9        Q.    (BY MR. CLARK)  Okay.  But you recall meeting

12:32  10   in the first part of December, 2000?

12:32  11        A.    Yes.

12:32  12              MR. CORTES:  It's 12:30.

12:32  13              MR. CLARK:  We're almost done.

12:32  14              MR. CORTES:  Okay.  I'm going to want to ask

12:32  15   a few questions about this as well.

12:32  16              MR. CLARK:  Okay.  Well, then, you know, if

12:32  17   you want to break for lunch when I'm done but --

12:32  18              MR. CORTES:  Okay.

12:32  19              MR. CLARK:  -- I'm right at the end.

12:32  20              MR. CORTES:  All right.  Go for it.

12:32  21              MR. CLARK:  My goal isn't to have him go

12:32  22   hungry and slip up.  It's just to get done here.  We're

12:32  23   almost there.

12:32  24              MR. CORTES:  Okay.  Good.

12:32  25        Q.    (BY MR. CLARK)  Can you tell me what
```

EXHIBIT 4

12:32 1    happened -- can you tell me what the conversations were

12:32 2    during this meeting?  What was said?

12:32 3         A.    Yes.  In part, this was a meeting that was at

12:32 4    the request of Mr. Lam.

12:32 5         Q.    Okay.  How did he make this request?

12:32 6         A.    To me through the phone.

12:32 7         Q.    Okay.

12:32 8         A.    His conversation to me was he asked me not to

12:32 9    attend.  I do not know how he communicated to Michael

12:33 10   O'Connell.

12:33 11        Q.    Okay.  But you understood that Michael

12:33 12   O'Connell -- that Gerry Lam contacted Michael O'Connell

12:33 13   about the meeting?

12:33 14        A.    Michael O'Connell contacted me after Gerald

12:33 15   Lam and I spoke, and Michael asked me to attend.

12:33 16        Q.    Okay.  And can you tell me what transpired at

12:33 17   the meeting?

12:33 18        A.    The initial opening of the meeting was, to

12:33 19   me, very disturbing.  The initial opening of the meeting

12:33 20   was by Mr. Lam; and it began with, "I'm a judge.  I'm an

12:33 21   attorney and what you've done to me under this contract,

12:33 22   I can sue you.  I can bankrupt you.  I can take

12:33 23   everything you own."

12:33 24        Q.    To whom was he speaking?

12:33 25        A.    Michael O'Connell.

12:33  1          Q.     Okay.  Please, continue.

12:34  2          A.     At that time I just -- I commented.  I said,

12:34  3     "Stop.  You're threatening this man."

12:34  4          Following that, Gerry produced -- I recall

12:34  5     two documents, one being an exchange of shares or an

12:34  6     assignment of shares from Al Garthe to Gerald Lam of

12:34  7     Rhino Builders or Rhino Roofing d/b/a Rhino Builders;

12:34  8     and the other, I don't remember the form.  I think the

12:34  9     other was a letter written -- and I may be corrected,

12:34  10    but I believe that's a letter written by Al Garthe to

12:34  11    Michael O'Connell telling him to accept the first

12:35  12    letter.

12:35  13         Q.     Okay.  Was that all that happened at the

12:35  14    meeting?

12:35  15         A.     The letters were handed to Michael O'Connell,

12:35  16    and he read them.  He handed them to me.  I looked at

12:35  17    the documents.

12:35  18         Michael -- Michael's response was first -- he

12:35  19    was scared.  He says, "I'm afraid.  I'm scared of you.

12:35  20    I'm not an attorney.  You know, I'm a simple guy."  And

12:35  21    he says, "I've got to read it.  I don't know."  I mean,

12:35  22    he didn't know what to say.

12:35  23         The conversation ended fairly soon after

12:35  24    Michael's statement.  There was not much more

12:35  25    conversation there.  I recall on -- that's all I truly

12:36  1   can recall as far as points standing out in my mind.

12:36  2        Q.    Okay.  About how long was the meeting?

12:36  3        A.    I would say the meeting was less than 30

12:36  4   minutes.

12:36  5        Q.    Okay.  Can you tell me when you personally

12:36  6   last did any work for Rhino?

12:36  7        A.    I never did work personally for Rhino.

12:36  8        Q.    Okay.  Well, what I meant by personally is

12:36  9   you in your capacity as a representative of Maxx

12:36 10   Management because I don't know if Maxx Management may

12:36 11   have continued a contract relationship with them

12:36 12   afterwards.  My question is when you stopped working.

12:36 13        A.    "You" being Maxx Management?

12:36 14        Q.    No, "you" being Michael Danforth.

12:36 15        A.    I stopped working at the direction of Maxx

12:36 16   Management --

12:36 17        Q.    When?

12:36 18        A.    -- somewhere about February -- February of

12:37 19   that -- of 2001 maybe.  It was either February or maybe

12:37 20   March.

12:37 21        Q.    And I think you said earlier that you stopped

12:37 22   working on the roofing contract sometime in -- was it

12:37 23   November or -- I think -- actually we were looking at a

12:37 24   November 10th e-mail, and you said that shortly after

12:37 25   that you stopped working on the roofing contract.