1  Arthur B. Clark, Esq.
   Janalynn M. Cruz, Esq.
2  CALVO AND CLARK, LLP
   Attorneys at Law
3  655 South Marine Drive, Suite 202
   Tamuning, Guam 96911
4  Telephone:    (671) 646-9355
   Facsimile:    (671) 646-9403
5
   Attorneys for Defendant
6  Biogenesis Pacific, Inc.
7
8
9

10  UNITED STATES OF AMERICA FOR USE      )   CIVIL CASE NO. 02-00008
    AND BENEFIT OF RHINO BUILDERS, INC., )
11                                         )
                           Plaintiff,      )
12            vs.                          )   **DECLARATION OF JANALYNN M.**
                                           )   **CRUZ**
13  BIOGENESIS PACIFIC, INC.,              )
    AIG TECHNICAL SERVICES, INC., and      )
14  AMERICAN HOME ASSURANCE                )
    COMPANY                                )
15                         Defendants.     )
                                           )
16  ─────────────────────────────         )
    BIOGENESIS PACIFIC INC.,               )
17                                         )
                           Counter-Plaintiff, )
18                                         )
              vs.                          )
19                                         )
    RHINO BUILDERS, INC., MICHAEL          )
20  O'CONNELL, MICHAEL DANFORTH,           )
    AND JOHN DOES 1-10,                    )
21                                         )
                           Counter-Defendants. )
22  ─────────────────────────────         )
    AMERICAN HOME ASSURANCE                )
23  COMPANY,                               )
                                           )
24                         Cross-Claimant, )
                                           )
25            vs.                          )
                                           )
26  BIOGENESIS PACIFIC INC.,               )
                                           )
27                         Cross-Claim Defendant. )
    ─────────────────────────────         )
28

**DISTRICT COURT OF GUAM**

**TERRITORY OF GUAM**

FILED
DISTRICT COURT OF GUAM
MAY 23 2003
MARY L. M. MORAN
CLERK OF COURT

137

ORIGINAL

DECLARATION OF JANALYNN M. CRUZ
B030623-327-0001-CT (JMC Decl. Reply to Opp Scheduling Order).wpd

Case 1:02-cv-00008   Document 140   Filed 05/23/2003   Page 1 of 22

1

1    I, JANALYNN M. CRUZ, do declare as follows:

2         1.    I am an attorney duly licensed to practice in Guam and before this Court, an

3    associate of the law firm of Calvo and Clark, LLP, and counsel for BioGenesis Pacific, Inc.

4         2.    The following depositions have been taken:

5              a.    BioGenesis Pacific Inc., by and through Mr. Gerald Lam, its President

6    on February 19, 2003.

7              b.    Rhino Builders, Inc., by and through Mr. Michael O'Connell, its

8    President, and  Mr. Michael O'Connell in his individual capacity, on February 20, 2003 and

9    continued on March 13, 2003 and continued on April 17, 2003.

10             c.    Mr. Michael Danforth on February 21, 2003.

11             d.    Rhino Builders, Inc., by and through Mr. Eugene O'Connell, its

12   Controller on April 11, 2003 and continued on April 21, 2003.

13             e.    BioGenesis Pacific, Inc., by and through Mr. Richard Avilla, its Guam

14   Operations Manager on April 10, 2003.

15             f.    Mr. Alfred Garthe, III, on April 3, 2003 and continued on April 4,

16   2003.

17             g.    Ms. Herminia Redolozo, employee of Rhino on April 21, 2003.

18        3.    Attached as Exhibit "A" are true and correct copies of pages 151 through 153

19   of the transcript of the deposition of Mr. Eugene O'Connell taken on April 11, 2003.

20        4.    Attached as Exhibit "B" are true and correct copies of pages 228 and 330

21   through 333 of the transcript of the deposition of Mr. Michael O'Connell taken on March 13, 2003.

22        5.    Attached as Exhibit "C" are true and correct copies of pages 24 through 28 of

23   the transcript of the deposition of Ms. Herminia Redolozo taken on April 21, 2003.

24   //

25   //

26   //

27   //

28   //

DECLARATION OF JANALYNN M. CRUZ

1          6.     Attached as Exhibit "D" are true and correct copies of pages 193 through 198

2    of the transcript of the deposition of Mr. Eugene O'Connell taken on April 11, 2003.

3          I declare under penalty of perjury under the laws of Guam that the foregoing is true

4    and correct.

5          Executed this 23rd day of May, 2003, in Tamuning, Guam.

6                                  CALVO AND CLARK, LLP
                              Attorneys at Law

7                                  Attorneys for Defendant
                              Biogenesis Pacific, Inc.

8

9                      By:                        

10                           JANALYNN M. CRUZ

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    A.   I believe that was the time, yes.

2    Q.   I'm sorry, Mr. O'Connell, let me get my questions

3 out just so we don't mix up the reporter here.

4    A.   Okay.

5    Q.   Okay, so he asked for permission in February to use

6 it and to rent it?

7    A.   Yes.

8    Q.   Before that then, you're saying that he was using it

9 on his own permission?

10   A.   I believe so.

11        MR. CORTES:  Wait just a minute so I have time to

12 object, okay?  Because I need time to think about whether it's

13 a fair characterization of your prior testimony, especially

14 whenever he asks you about your prior testimony.  I need to

15 think about it for a second, so just give me a minute to think

16 about it and make an objection before you give your answer,

17 please.

18 BY MR. CLARK:  (Continuing)

19   Q.   In March of 2001, was this Al Garthe again who came

20 in and asked for permission to rent the vehicle?

21   A.   Yes.

22   Q.   I'm going to show you an invoice here, I want you to

23 take a look at.

24   A.   I believe it was Al Garthe, I'm not sure whether

25 it was Richard Avilla or Al Garthe.

Eugene O'Connell: April 11, 2003

**EXHIBIT "A"**

1      MR. CLARK: I'll get this marked as the next

2 exhibit.

3      (Defendant's Exhibit "M" was marked.)

4 BY MR. CLARK: (Continuing)

5      Q.   Have you seen this document before?

6      A.   Yes.

7      MR. CLARK: Actually again, there appears to be two

8 attachments to it. You guys can pull out the second page, I'm

9 going to make that the next exhibit. So Exhibit "M" itself is

10 just one page.  It appears to be an invoice from Rhino

11 Builders to BioGenesis, okay?

12 BY MR. CLARK: (Continuing)

13     Q.   So it's your understanding then that Al Garthe or

14 Richard Avilla rented this truck from Rhino Builders between

15 March 12th and March 20th; is that correct?

16     A.   Yes.

17     Q.   Do you know who would have rented it to him?

18     A.   George Allen.

19     Q.   Do you know whose signature that is at the bottom

20 where it says "By"?

21     A.   George Allen, I believe that's his signature.

22     Q.   Did you participate in the preparation of Rhino's

23 responses to BioGenesis' Interrogatories?

24     A.   Yes.

25     Q.   I believe that the response that was provided to the

Eugene O'Connell: April 11, 2003

1  Interrogatory as to who had prepared this was it was Herminia
2  Redolozo. Do you remember giving that response or preparing
3  that response?

4      A.   I believe Herminia made out the invoice at George
5  Allen's request, and that he authorized it and signed for it.
6  That's my understanding.

7      Q.   Do you know what this vehicle was rented for or why
8  it was rented by BioGenesis?

9      A.   My understanding is that they had some materials to
10 take to the job site.

11     Q.   As of this time period in question, March 21, 2001,
12 what was the relationship between Rhino Builders and
13 BioGenesis? Did Rhino Builders believe it still had a SOC
14 contract with BioGenesis?

15     A.   No.

16     Q.   Was Rhino Builders still doing any work on the Navy
17 project?

18     A.   Besides the use of the equipment that they were
19 using?

20     Q.   No, that's not my question. My question was, was
21 Rhino Builders doing any work on the project?

22     A.   You mean employees?

23     Q.   Employees.

24     A.   No. I'm sorry, let me take a step back there.
25 During this time period before March, Mr. Garthe was still

Eugene O'Connell: April 11, 2003

1        IN THE DISTRICT COURT OF GUAM

2
   UNITED STATES OF AMERICA      ) CIVIL CASE NO. 02-00008
3  FOR USE AND BENEFIT OF        )
   RHINO BUILDERS, INC.,         )
4           Plaintiff,           )
        vs.                      )
5  BIOGENESIS PACIFIC, INC.,     )
   AIG TECHNICAL SERVICES,       )
6  INC., and AMERICAN HOME       )
   ASSURANCE COMPANY,            )
7           Defendants.          )
   _____)
8  BIOGENESIS PACIFIC INC.,      )
           Counter-Plaintiff,    )
9         vs.                    )
   RHINO BUILDERS, INC.,         )
10 MICHAEL O'CONNELL, MICHAEL    )
   DANFORTH, AND JOHN            )
11 DOES 1-10,                    )
           Counter-Defendants.)  )
12 _____)
   AMERICAN HOME ASSURANCE       )
13 COMPANY,                      )
           Cross-Claimant,       )
14        vs.                    )
   BIOGENESIS PACIFIC INC.,      )
15         Cross-Claim           )
           Defendant.            )
16 _____)

17

18      DEPOSITION OF MICHAEL NAWAIKI O'CONNELL
                    VOLUME II

19

20 Taken on behalf of the Defendant, Counter-Plaintiff and
   Cross-Claim Defendant at White & Tom, 820 Mililani
21 Street, Suite 711, Honolulu, Hawaii, commencing at
   12:46 p.m. on Thursday, March 13, 2003, pursuant to
22 Notice.

23
   BEFORE:    SHARON L. ROSS, CSR No. 432
24

25

EXHIBIT "B"

1  as -- I think there are three remaining e-mails.  I'm

2  not going to introduce those into exhibits.  So, if you

3  want to just go ahead and pull those out and discard

4  them or whatever; but we can move on to the next, I

5  guess, separator which is marked "Truck."

6          MR. TOM:  Yeah, I'm with you.  You want me to

7  take out the first exhibit in that area?

8          MR. CLARK:  Yeah.  Could you, please?

9          MR. TOM:  All right.  This exhibit is a --

10  appears to be a invoice on Rhino Builders' stationery to

11  BioGenesis Pacific, an Invoice No. 0301-002 dated

12  March 21st, 2001.

13          (O'Connell Exhibit No. 51 marked.)

14      Q.    (BY MR. CLARK)  Are you familiar with this

15  document, Mr. O'Connell?

16      A.    Yes.

17      Q.    Okay.  There's a signature on the bottom

18  right-hand corner of this first page.  Do you recognize

19  that signature, Mr. O'Connell?

20      A.    Yes.

21      Q.    Is that George Allen's signature?

22      A.    Yes.

23      Q.    Okay.  This purports to be an invoice from

24  Rhino Builders to BioGenesis dated March 21, 2001.  Does

25  this appear to be an accurate invoice, to the best of

1   your knowledge, Mr. O'Connell?

2       A.    Yes.

3       Q.    Okay.  Were you aware on or about March 12

4   through March 20th, 2001, that BioGenesis --

5       A.    12 --

6       Q.    -- was apparently renting a flatbed truck

7   from Rhino Builders?

8       A.    No.

9       Q.    Okay.  When did you first become aware of

10  this invoice, Mr. O'Connell?

11      A.    In the later part of 2001.

12      Q.    Okay.  Do you know whether Rhino -- I'm

13  sorry.

14          Do you know whether BioGenesis ever paid this

15  invoice, Mr. O'Connell?

16      A.    I don't know.

17      Q.    Do you know who would know?

18      A.    Our accountant.

19      Q.    And who was that?  Was that Gene?

20      A.    Yes.

21      Q.    And I'm assuming since George Allen was in

22  Guam during this time, that Mr. Allen would also know?

23  Would that be right?

24      A.    Yes.

25      Q.    Okay.  Can you tell me who at Rhino Builders

1 was authorized to lease equipment to BioGenesis at this

2 time?

3     A.    Al Gar -- I think so would be Al Garthe and

4 George Allen.

5     Q.    Do you know whether Rhino ever had a written

6 lease equipment -- or equipment lease agreement with

7 BioGenesis to rent this truck, Mr. O'Connell?

8     A.    No.

9     Q.    No, you don't know or, no, they never had

10 one?

11     A.    No, I don't know.

12     Q.    Do you know how this truck was used by

13 BioGenesis, Mr. O'Connell?

14     A.    At this time or at a later time did I find

15 out?  What do you mean?

16     Q.    At -- well, at any time.  So, just use

17 this -- this invoice says that the truck was rented

18 between March 12 and March 20.  Do you know -- did you

19 know then or do you know now what -- how this truck was

20 used by BioGenesis?

21     A.    No, I don't know how this truck was used,

22 just on -- just on BioGenesis' job.

23     Q.    Okay.  Do you know who at BioGenesis would

24 have come in to lease the truck?

25     A.    No.

1      Q.     Okay.  Do you know who would know?

2      A.     Yeah.

3      Q.     Who is that?

4      A.     Al Garthe, Richard Avilla and George Allen

5  and....

6             MR. CLARK:  Okay.  Actually, Stephen, that

7  Exhibit 51 --

8             MR. TOM:  Uh-huh, yes.

9             MR. CLARK:  -- are two pages.

10             MR. TOM:  Correct.

11             MR. CLARK:  Is it one or two pages?

12             MR. TOM:  It's two pages.

13             MR. CLARK:  Okay.  Actually that should be

14  one.  Just the first page should be marked Exhibit 51.

15  Could we separate the two pages and make the next one

16  Exhibit 52?

17             MR. TOM:  Okay.  The next exhibit is --

18  appears to be a slip with -- on the letterhead of

19  Reliable Towing Service and it's got the No. 2655 on the

20  upper right-hand corner.

21             (O'Connell Exhibit No. 52 marked.)

22             MR. TOM:  Mr. O'Connell is going to go out

23  for a minute to get some more water.

24             MR. CLARK:  I tell you what, I need to use

25  the restroom.  So, why don't we go ahead and take a

1          MR. CORTES:  I guess two objections.  One, it's

2  leading and second, it's vague.  I don't know what you mean

3  by a normal vehicle.

4  BY MS. CRUZ: (Continuing)

5      Q.   What kind of truck is this?

6      A.   It's a truck that you put things in there.

7      Q.   Is it a flatbed truck?

8      A.   Yes.  Flatbed.

9      Q.   Okay.  Did Rhino ever rent that flat -- Isuzu

10 flatbed truck to other people or companies?

11     A.   Rented it?

12     Q.   Yes.  Leased it to others?

13     A.   Only when I made an invoice to BioGenesis.

14     Q.   And do you remember when that was?

15     A.   I have the invoice but I don't really remember.

16     Q.   I have a copy here.  Let's see if you --

17     A.   I have two invoices.

18     Q.   Okay.  We'll go ahead and mark this one --

19                         (Exhibit 1 marked.)

20 This is the February 2001 invoice.

21 BY MS. CRUZ: (Continuing)

22     Q.   Are you familiar with this invoice?

23     A.   Yes.  I was the one who made it.

24     Q.   And who's signature is that at the bottom?

25     A.   Mr. Allen.

Case 1:02-cv-00008   Document 146   Filed 05/23/2003   EXHIBIT "C"   Page 12 of 22

1      Q.   And can you tell me about who -- how you started or

2   who directed you to --

3      A.   Mr. Allen.

4      Q.   Okay.  Were you involved at all in the rental of

5   this vehicle to BioGenesis?

6      A.   What do you mean involved?

7      Q.   The person who came in to rent it, did they speak to

8   you or did they speak to Mr. Allen?

9      A.   To Mr. Allen.

10     Q.   Okay.

11          MR. CORTES:  A moment ago, Ms. Cruz asked you,

12   George Allen told her to...and then you went ahead and

13   answered before she finished the sentence, so I guess I

14   should ask Ms. Cruz, was the question, who told her to make

15   the invoice?

16          MS. CRUZ:  Who directed her to prepare the

17   invoice.

18          MR. CORTES:  Okay.  So it's a good idea for you

19   wait until she finishes asking the questions before you

20   answer so we have a good record.

21   BY MS. CRUZ:  (Continuing)

22     Q.   Was there a separate rental agreement signed by

23   BioGenesis?

24     A.   Rental agreement?  No, I don't remember we have

25   rental agreement.

1      Q.    Okay.  Did you prepare this invoice --

2      A.    Yes.

3      Q.    -- prior to or after the rental?

4      A.    After.

5      Q.    Do you know who from BioGenesis came over to rent

6   the vehicle?

7      A.    I don't know.  It's Mr. Allen -- Mr. Allen controls

8   -- you know, controls the job.  And if there is someone who

9   wants to, you know, rent or something, I told them to

10  communicate directly to Mr. Allen since he is the project

11  manager.

12     Q.    Okay.  Did anyone from BioGenesis ask you initially

13  to rent the vehicle?

14     A.    No.

15     Q.    Okay.  Do you know where this flatbed truck was

16  being parked at the time of this rental?

17     A.    Where is it parked?

18     Q.    Yes.

19     A.    Sometimes it's at the side of the building,

20  sometimes it's at the back.

21     Q.    Okay.

22     A.    There is no particular place.

23     Q.    No particular place?

24     A.    (Witness nodded head.)

25     Q.    So you were not involved at all in turning over the

1  keys to BioGenesis or receiving the keys to the vehicle upon

2  the return?

3     A.    No.

4     Q.    Mr. Allen handled all of that?

5     A.    Yes.

6     Q.    Okay.  Who delivered this invoice to BioGenesis?

7     A.    Me.

8     Q.    Okay.  And how did you go about doing that?

9     A.    I just knock on their door and give it to the

10 secretary there.

11    Q.    Bobbie Salas?

12    A.    Yes.

13    Q.    Do you remember when this vehicle was rented?

14    A.    There was a time in --

15                        (Witness pointed to document.)

16    Q.    But do you remember though?  I mean, the event

17 itself?  BioGenesis -- do you remember BioGenesis taking

18 possession of the car?  Or the truck, I'm sorry.

19    A.    I -- what do you mean, ma'am?

20    Q.    Do you remember seeing them driving -- BioGenesis

21 employees driving the vehicle --

22    A.    Without any agreement yet?

23    Q.    No, as part of this agreement.

24    A.    I basically stay at the office, you know, and it's

25 closed so I don't see them, you know, driving.  Sometimes on

1  the road.

2     Q.   Was the vehicle used on other occasions when it

3  wasn't being rented by BioGenesis?  Was it used by

4  BioGenesis?

5     A.   I really don't know.

6     Q.   Okay.  Was payment made on this invoice by

7  BioGenesis?

8     A.   Yes.

9     Q.   And who accepted payment?

10    A.   I don't remember if I was the one or somebody in our

11 office receive it, but I was the one who deposited the check

12 on our account.

13    Q.   Do you remember another occasion when BioGenesis

14 rented this white Izuzu truck?

15    A.   Yes.

16    Q.   Okay.  When was that?

17    A.   I really don't remember the date.

18    Q.   Okay.

19    A.   But I -- as I said, I have another invoice for that.

20    Q.   Okay.  And we'll go ahead and mark this number two.

21                       (Exhibit 2 marked.)

22 And this is a Rhino Builders invoice for -- dated March 21,

23 2001.  Is this the other invoice that you're talking about?

24    A.   Yes.

25    Q.   I'm sorry?

1   A.   For what -- yes, yes.

2   Q.   What does other job expense mean, $11,353.00?

3   A.   That could be miscellaneous consumable items, items
4   that when they reported to me, it could be even some
5   miscellaneous tools.  Let's see, it varies depending on what
6   they provide to me.  It could also include probably towing, if
7   there were any towing charges, or something of that nature,
8   but I don't believe so, not on the direct cost expense.

9   Q.   Can you explain how the number jumps up from the
10  November of 2000 invoice from 89,000 to the June, 2001 invoice
11  to $245,000.00?  That's a difference of about $155,000.00.

12  A.   Right.  Well, part of the cost which was allocated
13  to the overhead as a fifty-fifty split, I moved over to direct
14  cost.   I believe that's under, let me see, the equipment
15  rental for the white Isuzu flatbed.   I brought that more to
16  the top there, since that was -- most of the costs were being
17  allocated, or BioGenesis was using that -

18  Q.   Hold on a second, let's talk about that.  $9,000.00
19  for rental of the flatbed?

20  A.   Yes.

21  Q.   Can you tell me what periods we're talking about
22  that the flatbed was being rented?

23  A.   I believe I started off from February when we first
24  was contacted, or second contact by Gerald Lam, and that
25  Richard Avilla was starting to inspect the job sites for him.

Eugene O'Connell: April 11, 2003

EXHIBIT "D"

1    Q.    This is February, 2000?

2    A.    Yes.

3    Q.    So all the costs associated with your lease, with

4  Rhino's lease of the flatbed from February, 2000 through when?

5    A.    I'm not sure.  That might be to December.

6    Q.    Of 2000?

7    A.    Yes.

8    Q.    Is this 50 percent of the lease price or 100

9  percent?

10    A.    100 percent.  And there's some other equipment

11  leases that they made during that time as well.

12    Q.    I thought you stated that you guys were going to be

13  splitting the cost, so why did you pass 100 percent of the

14  lease expense on to BioGenesis?

15    A.    Because most of the usage was by BioGenesis.

16    Q.    Okay.

17    A.    So I decided to reallocate the cost back up there.

18    Q.    Did BioGenesis use the vehicle in February, 2000?

19    A.    I don't know.

20    Q.    Did they use it in March of 2000?

21    A.    I don't know.

22    Q.    Was Rhino working on the project in March of 2000?

23    A.    They were inspecting the different job sites.

24    Q.    And they were using the vehicle every work day eight

25  hours a day, to the best of your knowledge, in the month of

Eugene O'Connell: April 11, 2003

1    March, 2000?

2         A.    I don't know.

3         Q.    April of 2000?

4         A.    I don't know.

5         Q.    Then how do you know they were using the vehicle

6    then?

7         A.    I don't.

8         Q.    So what prompted you to put that number in your

9    invoice, or who prompted you?

10        A.    Actually, I did it myself.

11        Q.    Nobody instructed you to pass that cost on?

12        A.    No.

13        Q.    You prepared the payroll reports, certified payroll

14   reports, so you know that the field laborers were working on

15   the project from maybe as early as June of 2000, but at least

16   from July of 2000 through September or October of 2000, right?

17        A.    Yes.

18        Q.    Outside of those months, July through October of

19   2000, do you have any reason to believe that BioGenesis was

20   using this flatbed Isuzu pickup truck?

21        A.    I'm sorry, can you rephrase that question or ask it

22   again?

23        Q.    Okay.    You prepared payroll reports to show that

24   Rhino's laborers were working on the Navy contract in the

25   months of July through September of 2000, maybe as early as

Eugene O'Connell: April 11, 2003

1  June, maybe as late as October. In the year 2000, except for
2  those periods where you had field laborers getting paid, and
3  we're talking February, March, April, May, parts of June,
4  parts of October, November, and December of 2000, that's nine
5  months out of the year where your employees, or eight months
6  out of the year where your employees were not getting paid at
7  least, there was no payroll reports to show them working on
8  the BioGenesis project, so how can you tell me that during
9  these eight months out of the year, BioGenesis was using the
10 flatbed pickup truck for the project?

11          MR. CORTES: My objection is twofold. It assumes
12 facts not in evidence, and it's argumentative. The fact
13 you're assuming it's not in evidence, in fact the evidence is
14 contrary to it, is there's no Rhino employees working on the
15 BioGenesis project, which is not true. The testimony of all
16 the witnesses has been that there were two Rhino employees
17 working on it the entire year, all the work it was doing. The
18 second --

19          MR. CLARK: I'm sorry, which two employees?

20          MR. CORTES: Richard Avilla and Alfred Garthe. And
21 the --

22          MR. CLARK: I'm not aware of that testimony, but go
23 ahead. That Al Garthe was working on the project for the
24 entire year?

25          MR. CORTES: Well I mean, I think what you're doing

Eugene O'Connell: April 11, 2003

1   here is, and the reason it's argumentative is you're basing

2   your question on the argumentative assumption that only actual

3   labor where people are out there scraping the roofs and

4   putting stuff on them counts, and that the equipment that's

5   necessary to keep the office running should not be included,

6   and I think that's --

7             MR. CLARK:  Well, we're talking about the flatbed

8   truck.  That's what I'm talking about specifically.

9   BY MR. CLARK: (Continuing)

10       Q.   My question is, if your laborers are only going to

11  the job site from the months of July through October of 2000,

12  how did you get the impression or where did you get the idea

13  that you were going to charge rental for the flatbed truck or

14  the leased price for the flatbed truck for the entire year?

15            MR. CORTES:  Because they had to have a --

16            MR. CLARK:  I'm sorry, I'm not asking you to

17  testify.  That's my question to your client.  Do you have an

18  objection with that question?

19            MR. CORTES:  No, go ahead and answer the question.

20  That's my objection.  I made the objection.  It's on the

21  record.  You can go ahead and answer the question.

22       A.   I believe that based upon the fact that we were

23  supposed to split the costs, that they should be sharing the

24  cost as well.

25  BY MR. CLARK: (Continuing)


Eugene O'Connell: April 11, 2003

1    Q.   But you just told me that you weren't splitting or

2    sharing the cost, but you were charging 100 percent of the

3    cost to BioGenesis, at least that's the number that's

4    reflected in this item here "Equipment Rental"; is that right?

5    A.   Yes.

6    Q.   So --

7    A.   Why did I do that?

8    Q.   No, that's fine.  That's good enough for me.  Let's

9    look at other job expense?  What was that?

10   A.   That was a lot of miscellaneous items.  I believe

11   some of that included some cement that they purchased,

12   brushes, some other minor things.  It varies.  I don't have

13   a --

14   Q.   Guam GRT?

15   A.   That is the estimated GRT I would have to pay on the

16   contract based upon the dollar value.

17   Q.   Direct Labor with Burden, would that be all the man-

18   hours associated with the BioGenesis project?

19   A.   Yes.

20   Q.   And that number is supported by the certified

21   payroll reports that you prepared; is that right?

22   A.   Certified payroll, Mr. -- or job cost sheets that

23   was provided to you today, also Mr. Garthe's payroll as well

24   as Mr. Avilla's, a portion of their payrolls were associated

25   to that.


Eugene O'Connell: April 11, 2003