ANTONIO L. CORTÉS
Law Office of Antonio L. Cortés
233 Julale Center
424 West O'Brien Drive
P.O. Box BV
Hagåtña, Guam 96932
Telephone No.: (671) 477-1930
Facsimile No.: (671) 477-1933



FILED
DISTRICT COURT OF GUAM

MAY 29 2003

MARY L. M. MORAN
CLERK OF COURT

142

Attorney for Plaintiff Rhino Builders, Inc.

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., | ) CIVIL CASE NO.02-00008 ) ) ) **DECLARATION OF COUNSEL** |
| Plaintiff, | ) |
| vs. | ) ) |
| BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC., and AMERICAN HOME ASSURANCE CO., | ) ) ) ) |
| Defendants. | ) |
| BIOGENESIS PACIFIC, INC., | ) ) |
| Counter-Plaintiff, | ) ) |
| vs. | ) ) |
| RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, and JOHN DOES 1-10, | ) ) ) ) |
| Counter-Defendants. | ) |
| AMERICAN HOME ASSURANCE CO., | ) ) |
| Cross-Claimant, | ) ) |
| vs. | ) ) |
| BIOGENESIS PACIFIC, INC., | ) ) |
| Cross-Claim Defendant. | ) |

# ORIGINAL

I, Antonio L. Cortes, duly declare and say:

1.  I am an attorney licensed to practice law in Guam, and have been since October 21, 1997. I have personal knowledge of the matters stated herein, except those stated on information and belief, and as to those matters I believe them to be true. If called upon to do so, I could and would competently so testify.

2.  I was retained by Plaintiff Rhino Builders, Inc. ("Rhino") on May 10, 2002. Around that date, I spoke with Rhino's prior attorneys, Carlsmith Ball LLP, on approximately five or more occasions about the change in representation. To the best of my recollection, I spoke to approximately four Carlsmith attorneys regarding the change in representation. None of them mentioned to me that Carlsmith represented any affiliates of AIG Technical Services. To the best of my recollection, one or more of the Carlsmith attorneys with whom I spoke regarding the change in representation affirmatively indicated to me that Carlsmith did not represent any AIG-affiliated entities by saying that the firm had a "business conflict" or words to that effect, and that the firm had "no conflict of interest," or words to that effect. To the best of my recollection such statements were made to me by one or more of the following three attorneys: Terry Thomason, Amy Self, or Sinforoso Tolentino.

3.  On or about April 10, 2003 I was informed by Rhino that a Carlsmith attorney or attorneys, including Mr. Thomason, had stated to Rhino officials that Carlsmith might have been contacted by an entity that was affiliated with

2

AIG and/or AHAC, or by AIG and/or AHAC directly or through that entity, and asked or instructed to discontinue its representation of Plaintiff in this action.

4.     Attached hereto as Exhibits 1 through 3 are true and correct copies of the transcript excerpts of Alfred Garthe III, Gerald N.Y.C. Lam, and Michael Lamar Danforth, respectively, that are cited in the accompanying Points and Authorities Supporting Motion for Leave to Amend Complaint to Conform to Facts Ascertained During Discovery.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of May 2003.

ANTONIO L. CORTÉS

3



IN THE DISTRICT COURT OF GUAM

1

2

3 UNITED STATES OF AMERICA FOR )
   USE AND BENEFIT OF RHINO )
4 BUILDERS, INC., )
                                    ) CIVIL CASE NO. 02-00008
5          Plaintiff, )
                                    )
6          vs. )          DEPOSITION OF
                                    )       ALFRED GARTHE III
7 BIOGENESIS PACIFIC, INC. and )   APRIL 03 & 04, 2003
   AIG TECHNICAL SERVICES, INC. )
8                                  )
           Defendants. )
9 _____)

10       The deposition of Alfred Garthe III, called for
11 examination by the Plaintiff, pursuant to Notice and pursuant
12 to the Rules of Civil Procedure, taken at the law office of
   Antonio Cortes, 233 Julale Center, 424 West O'Brien Drive,
13 Hagatna, Guam, on Thursday, the 3rd day of April, 2003, at the
   hour of 9:15 a.m. and Friday, the 4th day of April, 2003, at
14 the hour of 10:10 a.m., respectively.
15
         That at said time and place there transpired the
16 following:

17                 A P P E A R A N C E S:

18 For the Plaintiff          Antonio Cortes, Esq.

19 For Defendant
   BioGenesis Pacific         Arthur B. Clark, Esq.
20                            Calvo & Clark

21 For Defendant
   AIG Technical Services, Inc.
22 And American Home Assurance  Louie Yanza, Esq. (4/03/03)
                                 McKeown Vernier Price & Maher
23                                     A N D
                                 Steven Tom, Esq. (4/04/03)
24                                (Telephonic attendance)

25 For the Deponent            Cesar Cabot, Esq.

                         Cecilia F. Flores
                   Freelance Stenotype Reporter

1  said, no, no, no, forget it. He said, that's okay. He says,
2  you know, I'll just take my chances.

3    Q. Okay.

4    A. And so that's kind of where things started. And
5  then -- I don't know, just other things just kind of popped up
6  and --

7    Q. So when was the first time you discussed your
8  shareholdings or, you know, some kind of share transaction
9  with Mr. Lam?

10   A. Okay. When? Well, it was well after that. I'm not
11 really sure but the idea behind -- when I approached Mr. Lam
12 it was, it was about that situation and then I asked him what
13 -- if there was something that I could do, or what I needed to
14 do because I knew that he was an attorney.

15         And I believe that he suggested that, that I could
16 sign the shares over to protect the shares. Because I figured
17 if Mike was -- actually, it wasn't just Gerald.

18         I mean, I went to Gerald for help. It was more
19 talking to John DeVito and I think Warren Nobles. And they
20 were, they were thinking the same thing that I was thinking.

21   Q. So it was Mr. Lam that suggested assigning the
22 shares to him?

23   A. He said that was one way we can do it.

24   Q. To do what?

25   A. To protect, to protect -- I guess protect me, from

Alfred Garthe III: April 03 and 04, 2003

1  $30,000.00? Where did that go? Oh, it was consulting fees.

2           And I go, what? And he -- I panicked. He says, I

3  don't know. I'll get back to you; I'll talk to Eugene. Well,

4  he didn't.

5           And the more I -- and then I never got another,

6  another sheet from him. And so I started writing letters

7  telling them that I wanted to do an audit on the company, and

8  they really panicked. I mean, things just went bad.

9      Q.   How much money was Mr. Lam going to give you for

10 your shares?

11     A.   Nothing. They weren't worth anything.

12     Q.   Well, why didn't you just keep them?

13     A.   Well, I could have kept them and got an attorney or

14 something. Or, I don't know. Mike -- you know -- I guess I

15 was just -- legally I don't think that -- I could have went to

16 an attorney or something but I didn't have the money.

17     Q.   Well, if they're worth nothing, why would you be

18 afraid of losing them?

19     A.   Why?

20     Q.   Yes.

21     A.   Because that was my company. I mean, basically I

22 started Rhino. Mike and I started it -- and I started it.

23 And really at that point I didn't want to let go.

24     Q.   But if you gave them to Mr. Lam you were losing them

25 as well; isn't that right?


Alfred Garthe III: April 03 and 04, 2003

1      A.    No, I **wasn't** losing -- basically for the -- when we
2      had talked about, **about** getting them back, later on we could
3      get them back, buy **them** back or whatever.

4      Q.    So you were going to give them to him for nothing,
5      then buy them back?

6              MR. CABOT:  Objection; argumentative, and leading
7      question.  If we could have the question rephrased please.

8      BY MR. CORTÉS: (Continuing)

9      Q.    Okay, was the deal between you and Mr. Lam that you
10     were going to assign him the shares for nothing, and then at
11     a later time you'd be able to buy them back for money?

12     A.    That was part of it, because I was going to give him
13     the shares and he was going to give me -- well, he was going
14     to -- he was going to help me start another company.

15     Q.    A roofing company?

16     A.    (Witness nodded head.)

17     Q.    In Guam?

18     A.    Yeah.

19     Q.    So when I said roofing company, you nodded your head
20     "Yes"?

21     A.    Yes.  Or, yeah, actually here normally I'm a general
22     contractor so I could really start what I wanted, but roofing
23     is my expertise.

24     Q.    So did you execute documents transferring the shares
25     to Mr. Lam?

Alfred Garthe III: April 03 and 04, 2003

1    A.    Yes

2    Q.    And did he prepare those documents?

3    A.    No.

4    Q.    Who prepared those?

5    A.    I had Warren Nobles help me with that.

6    Q.    And Mr. Lam didn't give you any money for your

7    signing that assignment?

8    A.    No.

9    Q.    Did he make any promises to you to give you some

10   kind of value or benefit for your doing this?

11   A.    Well, to help me, to help me to start a company and

12   later on there was talks of -- if I wanted the shares back I

13   could have them back.

14   Q.    Was he going to help you financially to start that

15   company?

16   A.    I don't know; it never got that far.

17   Q.    Did Mr. Lam ever agree to void the assignment of the

18   shares to him?

19   A.    Yeah, at one point he told me, he says that the

20   shares, the shares were mine because Rhino never recognized,

21   never recognized him as a shareholder anyway. So that's why

22   when you asked me if I owned 49 percent I said, yes.

23   Q.    And Mr. Lam has acknowledged to you that he's not a

24   shareholder of Rhino?

25   A.    Yes.


Alfred Garthe III: April 03 and 04, 2003

1    A.    Uh-huh; yes.

2    Q.    What are the good ideas that you refer to in the

3    last sentence?

4    A.    Where?

5    Q.    The last sentence.

6    A.    Oh.

7    Q.    Is that Gerry Lam that you're mentioning Gerry in

8    the last sentence?

9    A.    Yes.

10   Q.    And what were his good ideas that you're referring

11   to?

12   A.    I don't remember.  I think I believed that that

13   Gerry had helped Rhino.

14   Q.    Did Mr. Lam tell you that he could help Rhino?

15   A.    Well, there was a point when, when we started out,

16   that I thought that he could.

17   Q.    What sort of help did you think that Rhino needed?

18   A.    Well, Rhino wasn't doing well.  When Rhino left

19   Hawaii and started working in Guam, it was -- we came to Guam

20   for -- because Rhino was failing in Hawaii.  Rhino was not

21   doing well.  This was like an opportunity to survive, for

22   Rhino to survive.

23             (Plaintiff's Exhibit 20 was marked for

24   identification.)

25   Q.    Do you recognize this document?


Alfred Garthe III: April 03 and 04, 2003

```
 1              IN THE DISTRICT COURT OF GUAM

 2

   UNITED STATES OF AMERICA    ) CIVIL CASE NO. 02-00008
 3 FOR USE AND BENEFIT OF      )
   RHINO BUILDERS, INC.,       )
 4          Plaintiff,         )
            vs.                )
 5 BIOGENESIS PACIFIC, INC.,   )
   AIG TECHNICAL SERVICES,     )
 6 INC., and AMERICAN HOME     )
   ASSURANCE COMPANY,          )
 7          Defendants.        )
   _____ )
 8 BIOGENESIS PACIFIC INC.,    )
            Counter-Plaintiff, )
 9          vs.                )
   RHINO BUILDERS, INC.,       )
10 MICHAEL O'CONNELL, MICHAEL  )
   DANFORTH, AND JOHN          )
11 DOES 1-10,                  )
            Counter-Defendants.)
12 _____ )
   AMERICAN HOME ASSURANCE     )
13 COMPANY,                    )
            Cross-Claimant,    )
14          vs.                )
   BIOGENESIS PACIFIC INC.,    )
15          Cross-Claim        )
            Defendant.         )
16 _____ )

17

18           DEPOSITION OF GERALD N.Y.C. LAM

19 Taken on behalf of the Plaintiff and Counter-Defendant

20 at the offices of Rhino Builders, Inc., 87-1610 Ulehawa

21 Road, Waianae, Hawaii, commencing at 9:20 a.m. on

22 Wednesday, February 19, 2003, pursuant to Notice.

23

24 BEFORE:    SHARON L. ROSS, CSR No. 432

25
```

EXHIBIT 2

14:34  1      A.      Yeah, it was something -- yeah, I remember

14:34  2  this pretty well.

14:34  3              (Lam Exhibit No. 33 marked.)

14:34  4      Q.      (BY MR. CORTES)  All right.  Do you recall

14:35  5  writing -- or do you recognize Exhibit 33?

14:35  6      A.      Yes, I do.

14:35  7      Q.      Is that your signature?

14:35  8      A.      Yes, it is.

14:35  9      Q.      Okay.  At the -- on the date of this -- you

14:35 10  did send the letter on December 21st as it indicates?

14:35 11      A.      Yes.

14:35 12      Q.      At that time did you believe you were a

14:35 13  shareholder in Rhino Builders, Inc.?

14:35 14      A.      Yeah, I had reason to believe that I had

14:35 15  shareholder rights at least.

14:36 16      Q.      Can you just give us a brief synopsis of how

14:36 17  you came into the position where you thought you had

14:36 18  shareholder rights in Rhino?

14:36 19      A.      Well, there seemed to have been some

14:36 20  difficulty with Al Garthe down in Guam.  And I have no

14:36 21  personal knowledge of the difficulties he had with his

14:36 22  partner, Michael O'Connell; but it seems like they were

14:36 23  having difficulties that just -- not -- as if --

14:36 24      Q.      So --

14:36 25      A.      It wasn't as if they were a big secret or

14:36  1    something, but I had no personal knowledge.

14:37  2                And so, Al Garthe in -- during this period of

14:37  3    time seemed to not be happy with his situation in Rhino,

14:37  4    of which I refused to get involved with.  And he asked

14:37  5    if his shares were worth anything.

14:37  6         Q.    He asked you?

14:37  7         A.    Yeah.  And not as if he asked me if I was

14:37  8    interested or the like; but he asked if they're worth

14:37  9    anything, just asking about business in general.

14:37  10               And I said that I have no idea.  You would

14:37  11   have to go and check it out yourself; and because you're

14:37  12   a private corporation, you would just have to go do your

14:38  13   own accounting book work to see exactly what the value

14:38  14   of your shares were but I had no idea.

14:38  15               And then he expressed his displeasure and

14:38  16   that he was unhappy, and I never questioned him or asked

14:38  17   him -- I told him I don't want to get involved in any

14:38  18   disputes or troubles that any of the Rhino people had

14:38  19   with each other.

14:38  20               And so, it came to the point where he asked

14:38  21   again about how does he find out how his shares are

14:38  22   valued and worth; and I told him he just has to go up

14:38  23   and he has to go talk to his partner and he has to go

14:38  24   sit down with the accountant with the books and figure

14:39  25   it out.

14:39 1    And I discovered that it was a Subchapter S

14:39 2 corporation, and then I told him that that means that

14:39 3 there may be shareholder -- personal liabilities on

14:39 4 shareholders with taxes and other things of which I have

14:39 5 no idea; but at least with Subchapter S corporations,

14:39 6 you kind of have to be careful.  So, I told him I have

14:39 7 no idea.  And it's coming towards the end of the year;

14:39 8 and so, you've just got to find out for yourself.

14:39 9    In the process of this, he mentioned in

14:39 10 effect that he was just overwhelmed by all of these

14:39 11 business things that he didn't know; and I told him

14:39 12 that, you know, I could help out perhaps if Rhino needed

14:40 13 help, if Rhino needed some internal management or

14:40 14 marketing or whatever the case would be and any kind of

14:40 15 shareholder conferencing, healing, dispute resolution,

14:40 16 whatever, and that if it weren't a liability to me or

14:40 17 it's not going to take away significantly from my time,

14:40 18 that I would be able to help.

14:40 19    And if it was so over his head, then what I

14:40 20 would do is that I would offer to purchase and buy his

14:40 21 stock from him but that I didn't want to be saddled with

14:40 22 any debt.  I didn't want to be saddled with any surprise

14:40 23 debt down the line by virtue of owning the stock and

14:41 24 that I didn't want to be sucked into any of their

14:41 25 internal problems that would be just over my head.

14:41 1          And so, I told him that I would be willing to

14:41 2    buy the stock, buy the shares and be willing to pitch in

14:41 3    and to go in-house with Rhino and help them with

14:41 4    business to do things or to go get new business or

14:41 5    whatever it is to make it a better company; and I would

14:41 6    be willing then -- if that's the case and I found value,

14:41 7    then I would do either of two things.

14:41 8          I would pay him the value of the stock which

14:41 9    cannot be determined until there was a full accounting

14:41 10   and a due diligence of Rhino; and it was subject to me

14:41 11   being able to unload the stock back to him if there were

14:41 12   hidden debts and hidden liabilities that were just way

14:42 13   over my head that he would have known about or should

14:42 14   have known about.  And my only intent was to go in and

14:42 15   to constructively help out if they were having so many

14:42 16   internal problems, which I didn't have any personal

14:42 17   knowledge of or have any -- or had no personal

14:42 18   participation in.

14:42 19         And so, upon that, he agreed upon this and

14:42 20   that I would then take the stock and that I would -- he

14:42 21   would have the option later that I would either pay him

14:42 22   for the value of the stock when I actually made a

14:42 23   valuation of Rhino, went in-house and found out exactly

14:42 24   what it was, and if I had the opportunity to help Rhino

14:42 25   build and build into profitability and then if it

14:42 1  increased the value, then I would either give him that

14:43 2  stock and he would be able to purchase it back or he

14:43 3  would be able to acquire it back or he could have

14:43 4  whatever financing or cash of value that would come from

14:43 5  that stock and so, with that, executed an assignment of

14:43 6  his stock and all his rights and stock shares over to

14:43 7  me.   And I think that's the gist of it.

14:43 8       Q.    Prior to sending this letter to

14:43 9  Mr. O'Connell, Exhibit 33, did you have a meeting with

14:43 10  Mr. O'Connell --

14:43 11       A.    Yes.

14:43 12       Q.    -- about this?

14:44 13       A.    Yes, we did.

14:44 14       Q.    Would that have been at Zippy's Restaurant?

14:44 15       A.    Yes, it was.   I called Mr. O'Connell to

14:44 16  arrange that meeting on the telephone.

14:44 17       Q.    Would that be approximately December 8th?

14:44 18       A.    Probably so.

14:44 19       Q.    2000, correct?

14:44 20       A.    Yes.

14:44 21       Q.    And to the best of your recollection, what

14:44 22  did you tell Mr. O'Connell at the meeting?

14:44 23       A.    Well, I told Mr. O'Connell on the telephone

14:44 24  that there's a matter that I would like to discuss with

14:44 25  him that I think would be of interest to him and I think

14:44 1 it would be of benefit to him. I didn't tell him what.

14:44 2 And I asked him that he be alone, especially

14:44 3 that he not be with Mr. Danforth; and Mr. O'Connell told

14:44 4 me -- and agreed to it -- that he would meet me. We

14:45 5 intended to meet at Zippy's; and I told him again that,

14:45 6 please, for certain reasons that you just have to trust

14:45 7 me, that I ask you not to bring Mr. Danforth and that

14:45 8 just you and I meet, an owner of a business and an owner

14:45 9 of a business, together.

14:45 10 And so, we had the meeting at Zippy's. I met

14:45 11 him in the morning. Both Mr. Danforth and Mr. O'Connell

14:45 12 were there in Zippy's waiting before I got there. So,

14:45 13 by the time I got there, they were already seated and

14:45 14 actually, I think, maybe having breakfast already.

14:45 15 Q. What transpired after that?

14:45 16 A. Mr. Danforth actually took over and led the

14:45 17 conversation, which is what I expected would occur if he

14:45 18 had attended; and he initially brought up the troubles

14:45 19 that BioGenesis Pacific was having in Guam. He reminded

14:46 20 me that I was facing serious problems with the Navy.

14:46 21 Mr. Danforth reminded me again that we've got

14:46 22 to have a signed contract -- subcontract with Rhino or

14:46 23 else my company is probably going to fail. He also

14:46 24 reminded me again that we have no subcontract and I

14:46 25 better sign one because time is wasting and I'm having

```
 1              IN THE DISTRICT COURT OF GUAM

 2

   UNITED STATES OF AMERICA    ) CIVIL CASE NO. 02-00008
 3 FOR USE AND BENEFIT OF       )
   RHINO BUILDERS, INC.,        )
 4         Plaintiff,           )
            vs.                 )
 5 BIOGENESIS PACIFIC, INC.,    )
   AIG TECHNICAL SERVICES,      )
 6 INC., and AMERICAN HOME      )
   ASSURANCE COMPANY,           )
 7         Defendants.          )
   _____)
 8 BIOGENESIS PACIFIC INC.,     )
            Counter-Plaintiff, )
 9         vs.                  )
   RHINO BUILDERS, INC.,        )
10 MICHAEL O'CONNELL, MICHAEL   )
   DANFORTH, AND JOHN           )
11 DOES 1-10,                   )
            Counter-Defendants.)
12 _____)
   AMERICAN HOME ASSURANCE      )
13 COMPANY,                     )
            Cross-Claimant,     )
14         vs.                  )
   BIOGENESIS PACIFIC INC.,     )
15         Cross-Claim          )
            Defendant.          )
16 _____)

17

18        DEPOSITION OF MICHAEL LAMAR DANFORTH

19 Taken on behalf of the Defendant, Counter-Plaintiff and

20 Cross-Claim Defendant at White & Tom, 820 Mililani

21 Street, Suite 711, Honolulu, Hawaii, commencing at

22 9:34 a.m. on Friday, February 21, 2003, pursuant to

23 Notice.

24

25 BEFORE:    SHARON L. ROSS, CSR No. 432
```

EXHIBIT 3

12:31  1        A.    No.

12:31  2              MR. TUHY:  I don't think the witness is

12:31  3  assuming the date, though, Counsel.  I understood your

12:31  4  response to be you recall the meeting but not responsive

12:31  5  to the question on December the 8th --

12:32  6              THE WITNESS:  That's correct.

12:32  7              MR. TUHY:  -- of 2000.

12:32  8        A.    I don't recall the exact date.

12:32  9        Q.    (BY MR. CLARK)  Okay.  But you recall meeting

12:32 10  in the first part of December, 2000?

12:32 11        A.    Yes.

12:32 12              MR. CORTES:  It's 12:30.

12:32 13              MR. CLARK:  We're almost done.

12:32 14              MR. CORTES:  Okay.  I'm going to want to ask

12:32 15  a few questions about this as well.

12:32 16              MR. CLARK:  Okay.  Well, then, you know, if

12:32 17  you want to break for lunch when I'm done but --

12:32 18              MR. CORTES:  Okay.

12:32 19              MR. CLARK:  -- I'm right at the end.

12:32 20              MR. CORTES:  All right.  Go for it.

12:32 21              MR. CLARK:  My goal isn't to have him go

12:32 22  hungry and slip up.  It's just to get done here.  We're

12:32 23  almost there.

12:32 24              MR. CORTES:  Okay.  Good.

12:32 25        Q.    (BY MR. CLARK)  Can you tell me what

12:32  1   happened -- can you tell me what the conversations were

12:32  2   during this meeting?  What was said?

12:32  3       A.    Yes.  In part, this was a meeting that was at

12:32  4   the request of Mr. Lam.

12:32  5       Q.    Okay.  How did he make this request?

12:32  6       A.    To me through the phone.

12:32  7       Q.    Okay.

12:32  8       A.    His conversation to me was he asked me not to

12:32  9   attend.  I do not know how he communicated to Michael

12:33 10   O'Connell.

12:33 11       Q.    Okay.  But you understood that Michael

12:33 12   O'Connell -- that Gerry Lam contacted Michael O'Connell

12:33 13   about the meeting?

12:33 14       A.    Michael O'Connell contacted me after Gerald

12:33 15   Lam and I spoke, and Michael asked me to attend.

12:33 16       Q.    Okay.  And can you tell me what transpired at

12:33 17   the meeting?

12:33 18       A.    The initial opening of the meeting was, to

12:33 19   me, very disturbing.  The initial opening of the meeting

12:33 20   was by Mr. Lam; and it began with, "I'm a judge.  I'm an

12:33 21   attorney and what you've done to me under this contract,

12:33 22   I can sue you.  I can bankrupt you.  I can take

12:33 23   everything you own."

12:33 24       Q.    To whom was he speaking?

12:33 25       A.    Michael O'Connell.

12:33 1        Q.    Okay.  Please, continue.

12:34 2        A.    At that time I just -- I commented.  I said,

12:34 3    "Stop.  You're threatening this man."

12:34 4            Following that, Gerry produced -- I recall

12:34 5    two documents, one being an exchange of shares or an

12:34 6    assignment of shares from Al Garthe to Gerald Lam of

12:34 7    Rhino Builders or Rhino Roofing d/b/a Rhino Builders;

12:34 8    and the other, I don't remember the form.  I think the

12:34 9    other was a letter written -- and I may be corrected,

12:34 10   but I believe that's a letter written by Al Garthe to

12:34 11   Michael O'Connell telling him to accept the first

12:35 12   letter.

12:35 13       Q.    Okay.  Was that all that happened at the

12:35 14   meeting?

12:35 15       A.    The letters were handed to Michael O'Connell,

12:35 16   and he read them.  He handed them to me.  I looked at

12:35 17   the documents.

12:35 18            Michael -- Michael's response was first -- he

12:35 19   was scared.  He says, "I'm afraid.  I'm scared of you.

12:35 20   I'm not an attorney.  You know, I'm a simple guy."  And

12:35 21   he says, "I've got to read it.  I don't know."  I mean,

12:35 22   he didn't know what to say.

12:35 23            The conversation ended fairly soon after

12:35 24   Michael's statement.  There was not much more

12:35 25   conversation there.  I recall on -- that's all I truly

12:36 1 can recall as far as points standing out in my mind.

12:36 2    Q.    Okay.  About how long was the meeting?

12:36 3    A.    I would say the meeting was less than 30

12:36 4 minutes.

12:36 5    Q.    Okay.  Can you tell me when you personally

12:36 6 last did any work for Rhino?

12:36 7    A.    I never did work personally for Rhino.

12:36 8    Q.    Okay.  Well, what I meant by personally is

12:36 9 you in your capacity as a representative of Maxx

12:36 10 Management because I don't know if Maxx Management may

12:36 11 have continued a contract relationship with them

12:36 12 afterwards.  My question is when you stopped working.

12:36 13    A.    "You" being Maxx Management?

12:36 14    Q.    No, "you" being Michael Danforth.

12:36 15    A.    I stopped working at the direction of Maxx

12:36 16 Management --

12:36 17    Q.    When?

12:36 18    A.    -- somewhere about February -- February of

12:37 19 that -- of 2001 maybe.  It was either February or maybe

12:37 20 March.

12:37 21    Q.    And I think you said earlier that you stopped

12:37 22 working on the roofing contract sometime in -- was it

12:37 23 November or -- I think -- actually we were looking at a

12:37 24 November 10th e-mail, and you said that shortly after

12:37 25 that you stopped working on the roofing contract.

12:37 1        We know that at least through November 17 and

12:37 2 some days after that you were still working on drafts.

12:37 3 Was the last thing you did with respect to the roofing

12:37 4 contract that -- the final version of that draft that

12:37 5 was Bates stamped 7902 to 7914?

12:37 6      A.    No.  There was one other thing that I

12:37 7 participated in, and that was a phone call.

12:37 8      Q.    Okay.

12:37 9      A.    And it was -- it occurred sometime in

12:38 10 December, middle of December.

12:38 11      Q.    Okay.

12:38 12      A.    And it was a phone call that I made to Gerald

12:38 13 Lam, and I made that phone call because Mike O'Connell

12:38 14 came in -- I walked into Rhino's office this morning

12:38 15 finishing up a proposal on another project.  And he came

12:38 16 to me and says, "Do you know that BioGenesis hired my

12:38 17 employees and are using my equipment?"

12:38 18        And I said, "No.  What are you talking

12:38 19 about?"  I said, "Well, let's just call Gerry."  So, I

12:38 20 dialed Gerry, had him on speaker; and Gerry -- and I

12:38 21 asked him.  I said, "Gerry, do you know about this?"

12:38 22        He said, "No, I don't know anything about

12:38 23 it."

12:38 24        And I said, "Well, are you going to complete

12:38 25 a subcontract agreement with Rhino?"

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii     (808) 524-2090
Case 1:02-cv-00008   Document 145   Filed 05/29/2003   Page 22 of 23

12:38 1          He says -- he says, "I don't know."  He

12:38 2    says --

12:38 3          Q.    I'm sorry.  This was after the Zippy's

12:39 4    meeting?

12:39 5          A.    Yes, it was.

12:39 6          Q.    Okay.  Please, continue.

12:39 7          A.    And I said -- you know, I said, "I'm" -- "you

12:39 8    know, I've always relied on your word; but, you know,

12:39 9    what's going on?"

12:39 10          And we never had a hard conversation

12:39 11   complete -- there was never really any pertinent

12:39 12   information exchanged after that except at the end of

12:39 13   that conversation, Gerald -- because I kept pressing.  I

12:39 14   kept saying, "Well, there's a subcontract agreement that

12:39 15   you and I reviewed and commented on.  It's in Michael's

12:39 16   hands.  Why haven't you talked to him to complete it?

12:39 17   Why haven't you discussed this?"

12:39 18          And he finally said, "Well, I can't.  I've

12:39 19   got an agreement with All Star/SAB.  I can't sign

12:39 20   another agreement."

12:39 21          Q.    And that's the last involvement you had --

12:39 22   outside of this litigation, but the last involvement you

12:40 23   had with respect to the roofing contract?

12:40 24          A.    To my recollection, that's correct.

12:40 25          Q.    Did Maxx Management or you ever assist Rhino