1 | Arthur B. Clark, Esq.
Janalynn M. Cruz, Esq.
2 | CALVO AND CLARK, LLP
Attorneys at Law
3 | 655 South Marine Drive, Suite 202
Tamuning, Guam 96911
4 | Telephone:    (671) 646-9355
Facsimile:    (671) 646-9403
5 |
Attorneys for Defendant
6 | Biogenesis Pacific, Inc.

FILED
DISTRICT COURT OF GUAM
JUN 27 2003
MARY L. M. MORAN
CLERK OF COURT

150

7 | DISTRICT COURT OF GUAM

8 | TERRITORY OF GUAM

9 |
10 | UNITED STATES OF AMERICA FOR USE ) CIVIL CASE NO. 02-00008
AND BENEFIT OF RHINO BUILDERS, INC., )
11 |                                     )
                    Plaintiff,          )
12 |          vs.                        )   **DECLARATION OF JANALYNN M.**
                                        )   **CRUZ IN SUPPORT DEFENDANT**
13 | BIOGENESIS PACIFIC, INC.,           )   **BIOGENESIS PACIFIC, INC.'S**
AIG TECHNICAL SERVICES, INC., and      )   **OPPOSITION TO PLAINTIFF'S MOTION**
AMERICAN HOME ASSURANCE               )   **FOR LEAVE TO AMEND COMPLAINT**
14 | COMPANY                             )   **TO CONFORM TO FACTS**
                    Defendants.         )   **ASCERTAINED DURING DISCOVERY**
15 | _____ )
                                        )
16 | BIOGENESIS PACIFIC INC.,            )
                                        )
17 |          Counter-Plaintiff,         )
                                        )
18 |          vs.                        )
                                        )
19 | RHINO BUILDERS, INC., MICHAEL       )
O'CONNELL, MICHAEL DANFORTH,           )
20 | AND JOHN DOES 1-10,                 )
                                        )
21 |          Counter-Defendants.        )
                                        )
22 | AMERICAN HOME ASSURANCE            )
COMPANY,                               )
23 |                                     )
                    Cross-Claimant,     )
24 |                                     )
          vs.                           )
25 |                                     )
BIOGENESIS PACIFIC INC.,               )
26 |                                     )
                    Cross-Claim Defendant. )
27 | _____ )

28 |

**DECLARATION OF JANALYNN M. CRUZ IN SUPPORT**
**DEFENDANT  BIOGENESIS PACIFIC, INC.'S OPPOSITION**
**TO PLAINTIFF'S MOTION  FOR LEAVE TO AMEND COMPLAINT**
**TO CONFORM TO FACTS ASCERTAINED DURING DISCOVERY**
B030625.327-0001.CT (Decl of JMC - Opposition to Motion to Amend).wpd

ORIGINAL

1

# DECLARATION

I, Janalynn M. Cruz, do declare as follows:

1. I am an associate with the law firm of Calvo and Clark, LLP, legal counsel for Defendant, Biogenesis Pacific, Inc.

2. Attached hereto and incorporated herein by this reference are true and correct copies of the cover page and pages 26, 27, 31, 32, 93, 95, 96, and 124 through 127 from the deposition transcript of Michael Danforth taken at the law offices of WHITE & TOM, 820 Mililani Street, Suite 711, Honolulu, Hawaii, on February 21, 2003.

3. Attached hereto and incorporated herein by this reference are true and correct copies of the cover page and pages 91, 94, 140 and 141 from the deposition transcript of Michael O'Connell taken at the law offices of White & Tom, 820 Mililani Street, Suite 711, Honolulu, Hawaii, on February 20, 2003.

4. Attached hereto and incorporated herein by this reference are true and correct copies of the cover page and pages 274, 275 from the deposition transcript of Michael O'Connell taken at the law offices of White & Tom, 820 Mililani Street, Suite 711, Honolulu, Hawaii, on March 13, 2003.

5. Attached hereto and incorporated herein by this reference are true and correct copies of the cover page and pages 72, 103, 111, 112, 156, and 157 from the deposition transcript of Gerald Lam taken at the offices of Rhino Builders, Inc. 87-1610 Ulehawa Road, Waianae Hawaii, on February 19, 2003.

6. Attached hereto and incorporated herein by this reference is a true and correct copy of the July 11, 2001 letter to Alfred Garthe III from Michael N. O'Connell, produced by Plaintiff on December 30, 2002, in response to Defendant AIG Technical Services and American Home Assurance Company's Request for Production of Documents.

7. Attached hereto and incorporated herein by this reference is a true and correct copy of Rhino Builders, Inc.'s Special Board of Directors Meeting Minutes dated December 27, 2000 produced by Plaintiff on February 7, 2003, in response to Defendant BioGenesis Pacific Inc.'s Request for Production of Documents.

DECLARATION OF JANALYNN M. CRUZ IN SUPPORT
DEFENDANT BIOGENESIS PACIFIC, INC.'S OPPOSITION
TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT
TO CONFORM TO FACTS ASCERTAINED DURING DISCOVERY
B030625.327-0001.CT (Decl of JMC - Opposition to Motion to Amend).wpd

2

Case 1:02-cv-00008    Document 153    Filed 06/27/2003    Page 2 of 44

8. Attached hereto and incorporated herein by this reference is a true and correct copy of the December 29, 2000 letter to Gerald Lam from Michael O'Connell, produced by Plaintiff on February 7, 2003, in response to Defendant BioGenesis Pacific Inc.'s Request for Production of Documents.

9. Attached hereto and incorporated herein by this reference is a true and correct copy of the November 14, 2000 email to Gerald Lam from Michael O'Connell, produced by Plaintiff on December 30, 2002, in response to Defendant AIG Technical Services and American Home Assurance Company's Request for Production of Documents.

I declare under penalty of perjury under the laws of Guam (6 G.C.A. § 4308) that the foregoing is true and correct.

Executed this 27th day of June, 2003, in Tamuning, Guam.

CALVO AND CLARK, LLP
Attorneys At Law
Attorneys for Defendant
Biogenesis Pacific, Inc.

By: _____
JANALYNN M. CRUZ

DECLARATION OF JANALYNN M. CRUZ IN SUPPORT
DEFENDANT BIOGENESIS PACIFIC, INC.'S OPPOSITION
TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT
TO CONFORM TO FACTS ASCERTAINED DURING DISCOVERY
B030625.327-0001.CT (Decl of JMC - Opposition to Motion to Amend).wpd

3

1          IN THE DISTRICT COURT OF GUAM

2

UNITED STATES OF AMERICA    ) CIVIL CASE NO. 02-00008
3  FOR USE AND BENEFIT OF     )
RHINO BUILDERS, INC.,        )
4          Plaintiff,         )
vs.                          )
5  BIOGENESIS PACIFIC, INC.,  )
AIG TECHNICAL SERVICES,      )
6  INC., and AMERICAN HOME    )
ASSURANCE COMPANY,           )
7          Defendants.        )
_____)
8  BIOGENESIS PACIFIC INC.,   )
           Counter-Plaintiff, )
9          vs.                )
RHINO BUILDERS, INC.,        )
10  MICHAEL O'CONNELL, MICHAEL )
DANFORTH, AND JOHN           )
11  DOES 1-10,                )
           Counter-Defendants.)
12  _____)
AMERICAN HOME ASSURANCE      )
13  COMPANY,                  )
           Cross-Claimant,    )
14         vs.                )
BIOGENESIS PACIFIC INC.,     )
15         Cross-Claim        )
           Defendant.         )
16  _____)

17

            DEPOSITION OF MICHAEL LAMAR DANFORTH

18

19  Taken on behalf of the Defendant, Counter-Plaintiff and

20  Cross-Claim Defendant at White & Tom, 820 Mililani

21  Street, Suite 711, Honolulu, Hawaii, commencing at

22  9:34 a.m. on Friday, February 21, 2003, pursuant to

23  Notice.

24

25  BEFORE:    SHARON L. ROSS, CSR No. 432

10:20 1      Q.    Okay.  Did you assist BioGenesis --

10:20 2      A.    May I make a clarification?

10:20 3      Q.    Sure.

10:20 4      A.    You say "All Star."  That had to mean All

10:20 5  Star/SAB or a part -- one of those arrangements.

10:20 6      Q.    Okay.

10:20 7      A.    Okay.

10:20 8      Q.    Sure.  Okay.  Did you assist BioGenesis in

10:20 9  preparing the proposal for that roofing contract?

10:20 10     A.    The assistance was in the form of preparing

10:20 11  All Star's portion of the technical proposal.

10:20 12     Q.    Do you know if that portion which you

10:20 13  prepared on behalf of All Star was included in the

10:20 14  proposal that was submitted to the Navy?

10:20 15     A.    I believe so.

10:21 16     Q.    Do you know when the proposal was submitted

10:21 17  to the Navy?

10:21 18     A.    I don't recall.

10:21 19     Q.    Okay.  Would it have been in '99?

10:21 20     A.    I believe so.

10:21 21     Q.    Okay.  Do you know whether that proposal was

10:21 22  eventually awarded to BioGenesis?

10:21 23     A.    I discovered that in October of 2000.

10:21 24     Q.    Can you tell me how you discovered that?

10:21 25     A.    Yes.  I was -- I traveled to Guam at the

10:21 1  direction of Michael O'Connell to Maxx Management to

10:21 2  assist in the startup of a separate contract called the

10:22 3  SOC contract, Solution Order Contract.  And while there,

10:22 4  Mike O'Connell requested that I look at the roofing

10:22 5  contract that was ongoing with BioGenesis.

10:22 6      Q.    This SOC contract that you referred to,

10:22 7  that's a contract separate and apart from the roofing

10:22 8  contract?

10:22 9      A.    Correct.

10:22 10     Q.    Was the SOC contract with the Navy also?

10:22 11     A.    Correct.

10:22 12     Q.    Okay.  You mentioned that you were instructed

10:22 13  by Michael O'Connell to go to Guam.  Was he acting in

10:23 14  his capacity as an officer of Rhino Builders?

10:23 15     A.    Correct.

10:23 16     Q.    So, had Maxx Management been hired by Rhino

10:23 17  Builders as a consultant?

10:23 18     A.    Yes.

10:23 19     Q.    Okay.  Can you tell me when that happened?

10:23 20     A.    I believe the agreement between Maxx

10:23 21  Management and Rhino Builders was dated July, August of

10:23 22  2000, in that range.

10:23 23          MR. TUHY:  Counsel, may I interject --

10:23 24          MR. CLARK:  Sure.

10:23 25          MR. TUHY:  -- on that last question?  Prior

10:28  1    stated that you prepared All Star's portion of the

10:28  2    technical data for BioGenesis' proposal?

10:29  3         A.    Later on -- later on I realized that.

10:29  4         Q.    When did you realize that?

10:29  5         A.    When Michael and Al Garthe provided me the

10:29  6    task orders, when they said, "here, take a look at this"

10:29  7    and when I looked at the contract number, I realized

10:29  8    what it was.

10:29  9         Q.    Okay.  When was that?

10:29  10        A.    In October, 2000.

10:29  11        Q.    Okay.  So, in October, 2000, you realized

10:29  12   that the roofing contract to which Rhino referred -- the

10:29  13   one that it said it was working on with BioGenesis --

10:29  14   was the same roofing contract that you had prepared All

10:29  15   Star's portion of the proposal?

10:29  16        A.    Correct.

10:29  17        Q.    Okay.  Did you tell Mr. O'Connell or any

10:29  18   other representative of Rhino that you had worked on All

10:29  19   Star's portion of the proposal for that --

10:29  20        A.    When I had discovered it was the same one,

10:29  21   yes.

10:29  22        Q.    And that was in October of 2000?

10:30  23        A.    Correct.

10:30  24        Q.    And who specifically at Rhino did you relay

10:30  25   that information to?

10:30 1    A.    Michael O'Connell and Al Garthe at the same

10:30 2    time.  They were in the room at the same time.  And

10:30 3    George Allen, he was in the room at the same time.  And

10:30 4    Richard Avilla, he was in the room at the same time.

10:30 5    Q.    And you advised them that you prepared a

10:30 6    portion of that bid on All Star's behalf; is that

10:30 7    correct?

10:30 8    A.    That's incorrect.

10:30 9    Q.    Okay.

10:30 10   A.    We didn't prepare a bid.

10:30 11   Q.    Okay.  Well, All Star's portion?

10:30 12   A.    All Star's portion of the technical proposal.

10:30 13   Q.    Of the technical proposal.  You advised them

10:30 14   that you prepared All Star's portion of the technical

10:31 15   proposal?

10:31 16   A.    Correct.

10:31 17   Q.    After Maxx Management was hired by Rhino

10:31 18   Builders, were you ever provided with a copy of

10:31 19   BioGenesis' proposal for that roofing contract by anyone

10:31 20   at Rhino?

10:32 21   A.    Ask that question again.

10:32 22   Q.    Okay.  After Maxx Management was hired by

10:32 23   Rhino Builders, did anyone at Rhino Builders ever give

10:32 24   you a copy of BioGenesis' proposal for that roofing

10:32 25   contract?

12:33  1     Q.    Okay.  Please, continue.

12:34  2     A.    At that time I just -- I commented.  I said,

12:34  3  "Stop.  You're threatening this man."

12:34  4     Following that, Gerry produced -- I recall

12:34  5  two documents, one being an exchange of shares or an

12:34  6  assignment of shares from Al Garthe to Gerald Lam of

12:34  7  Rhino Builders or Rhino Roofing d/b/a Rhino Builders;

12:34  8  and the other, I don't remember the form.  I think the

12:34  9  other was a letter written -- and I may be corrected,

12:34 10  but I believe that's a letter written by Al Garthe to

12:34 11  Michael O'Connell telling him to accept the first

12:35 12  letter.

12:35 13     Q.    Okay.  Was that all that happened at the

12:35 14  meeting?

12:35 15     A.    The letters were handed to Michael O'Connell,

12:35 16  and he read them.  He handed them to me.  I looked at

12:35 17  the documents.

12:35 18     Michael -- Michael's response was first -- he

12:35 19  was scared.  He says, "I'm afraid.  I'm scared of you.

12:35 20  I'm not an attorney.  You know, I'm a simple guy."  And

12:35 21  he says, "I've got to read it.  I don't know."  I mean,

12:35 22  he didn't know what to say.

12:35 23     The conversation ended fairly soon after

12:35 24  Michael's statement.  There was not much more

12:35 25  conversation there.  I recall on -- that's all I truly

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii     (808) 524-2090
Case 1:02-cv-00008   Document 153    Filed 06/27/2003    Page 10 of 44

12:37　1　　　　　We know that at least through November 17 and

12:37　2　some days after that you were still working on drafts.

12:37　3　Was the last thing you did with respect to the roofing

12:37　4　contract that -- the final version of that draft that

12:37　5　was Bates stamped 7902 to 7914?

12:37　6　　　　A.　　No.　There was one other thing that I

12:37　7　participated in, and that was a phone call.

12:37　8　　　　Q.　　Okay.

12:37　9　　　　A.　　And it was -- it occurred sometime in

12:38　10　December, middle of December.

12:38　11　　　　Q.　　Okay.

12:38　12　　　　A.　　And it was a phone call that I made to Gerald

12:38　13　Lam, and I made that phone call because Mike O'Connell

12:38　14　came in -- I walked into Rhino's office this morning

12:38　15　finishing up a proposal on another project.　And he came

12:38　16　to me and says, "Do you know that BioGenesis hired my

12:38　17　employees and are using my equipment?"

12:38　18　　　　　And I said, "No.　What are you talking

12:38　19　about?"　I said, "Well, let's just call Gerry."　So, I

12:38　20　dialed Gerry, had him on speaker; and Gerry -- and I

12:38　21　asked him.　I said, "Gerry, do you know about this?"

12:38　22　　　　　He said, "No, I don't know anything about

12:38　23　it."

12:38　24　　　　　And I said, "Well, are you going to complete

12:38　25　a subcontract agreement with Rhino?"

12:38  1          He says -- he says, "I don't know."  He

12:38  2  says --

12:38  3          Q.    I'm sorry.  This was after the Zippy's

12:39  4  meeting?

12:39  5          A.    Yes, it was.

12:39  6          Q.    Okay.  Please, continue.

12:39  7          A.    And I said -- you know, I said, "I'm" -- "you

12:39  8  know, I've always relied on your word; but, you know,

12:39  9  what's going on?"

12:39  10          And we never had a hard conversation

12:39  11  complete -- there was never really any pertinent

12:39  12  information exchanged after that except at the end of

12:39  13  that conversation, Gerald -- because I kept pressing.  I

12:39  14  kept saying, "Well, there's a subcontract agreement that

12:39  15  you and I reviewed and commented on.  It's in Michael's

12:39  16  hands.  Why haven't you talked to him to complete it?

12:39  17  Why haven't you discussed this?"

12:39  18          And he finally said, "Well, I can't.  I've

12:39  19  got an agreement with All Star/SAB.  I can't sign

12:39  20  another agreement."

12:39  21          Q.    And that's the last involvement you had --

12:39  22  outside of this litigation, but the last involvement you

12:40  23  had with respect to the roofing contract?

12:40  24          A.    To my recollection, that's correct.

12:40  25          Q.    Did Maxx Management or you ever assist Rhino

15:10 1   in Florida, George Allen called me and said he had spoke

15:10 2   to Gerald Lam and had asked him the condition of the

15:10 3   contract. Where was it? What's going on?

15:10 4         And George had informed me that Gerry told

15:10 5   him that the pricing was fair, that the contract was

15:10 6   good, and that he was just waiting on me to return to

15:10 7   execute the contract.

15:10 8       Q.   Now, turning back to the phone call to

15:10 9   Mr. Lam, the what's-going-on phone call in December,

15:11 10   2000, if I recall, earlier you testified that you kept

15:11 11   pressing. There's a subcontract agreement or something

15:11 12   like that. You kept pressing him about a subcontract

15:11 13   agreement and that Mr. Lam responded, "I can't sign the

15:11 14   subcontract. I've got a contract with All Star/SAB."

15:11 15   Is that -- did I understand that correctly?

15:11 16       A.   Uh-huh.

15:11 17       Q.   What was your reaction to hearing him say

15:11 18   that he had a contract with All Star/SAB?

15:11 19       A.   I hung up the phone. I ended the

15:11 20   conversation immediately.

15:12 21       Q.   Well, I guess what I'm asking is: What did

15:12 22   you think of that -- that comment?

15:12 23       A.   It actually made me feel a fool because it --

15:12 24   it reminded me that my original efforts with All Star in

15:12 25   generating a technical proposal for that contract, that

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii     (808) 524-2090
Case 1:02-cv-00008   Document 153    Filed 06/27/2003    Page 13 of 44

15:12 1 there was one in place; and I hadn't even thought about

15:12 2 it until this time until it was mentioned, had not

15:12 3 remembered it, had not thought about it. And then when

15:12 4 it came out, I felt a total fool because of the efforts

15:12 5 that, if I had remembered, I would have advised Rhino,

15:12 6 "There's already agreement in place. What are you

15:12 7 doing?"

15:13 8     Q.    Well, is there some reason that Rhino could

15:13 9 not enter into a subcontract agreement if -- with

15:13 10 BioGenesis if there was already a similar agreement in

15:13 11 place with All Star/SAB?

15:13 12     MR. TUHY: I'll object to the form of the

15:13 13 question. I think it calls for at least potentially a

15:13 14 legal conclusion as far as his personal knowledge. I

15:13 15 have no objection to you answering.

15:13 16     Q.    (BY MR. CORTES) Yeah, just to the best of

15:13 17 your knowledge.

15:13 18     A.    Ask the question again, please.

15:13 19     Q.    I don't need a legal analysis here. I'm just

15:13 20 saying, in your own mind, was there some reason that

15:13 21 having -- BioGenesis having a contract with All Star/SAB

15:13 22 was highly inconsistent with it attempting to enter into

15:14 23 a subcontract with Rhino?

15:14 24     A.    I hate to be a pest, but your question is --

15:14 25 I don't know how to answer your question.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808) 524-2090
Case 1:02-cv-00008    Document 153    Filed 06/27/2003    Page 14 of 44

15:14  1      Q.    Okay.  Well, let me see if I can try a few

15:14  2   other forms and maybe we can hit on one that I can

15:14  3   verbalize and you can understand here.

15:14  4            I'm just trying to understand more, as a

15:14  5   person who does not do a lot of federal contract work,

15:14  6   exactly why you would feel like a fool upon realizing or

15:14  7   recalling that there was a contract between BioGenesis

15:14  8   and All Star/SAB -- actually that's not exactly what I'm

15:15  9   asking.

15:15 10            Let me just ask this:  To the best of your

15:15 11   knowledge, can BioGenesis have a valid contract with All

15:15 12   Star/SAB and still have a -- have Rhino be its

15:15 13   subcontractor?

15:15 14      A.    I felt foolish at my statement because in the

15:15 15   origination of this arrangement between All Star/SAB and

15:15 16   BioGenesis, I was involved in the drafting of that --

15:15 17   drafting of that teaming agreement.  The draft -- and

15:15 18   Gerald Lam and myself were involved in doing that.

15:15 19            And at the conclusion of our draft, we

15:15 20   submitted that to Buck Bland of the SAB company; and

15:15 21   then it was sent to the attorneys, the corporate

15:15 22   attorneys.  The draft was legalesed, if you will, placed

15:16 23   in legal terminology and so forth.

15:16 24            My -- the intent of that draft was that All

15:16 25   Star/SAB was the supporting team member to BioGenesis,

15:16 1  BioGenesis being the prime, and All Star/SAB named as

15:16 2  the prime sub.

15:16 3         I felt foolish because in that arrangement,

15:16 4  all subcontracting work had to go through All Star/SAB.

15:16 5  There would be one contract, subcontract written to All

15:16 6  Star/SAB from BioGenesis; and all other subcontracts

15:16 7  would have to go through All Star/SAB.

15:16 8         Q.    Did you have certain knowledge that the All

15:16 9  Star/SAB subcontract with BioGenesis had been

15:16 10 consummated?

15:16 11        A.    I never saw the executed copy.  I did witness

15:17 12 Mr. Lam executing an indemnity agreement to Sundt Corp.,

15:17 13 I believe it was written out, an indemnity agreement

15:17 14 personally and corporately to Sundt Corp. for the

15:17 15 production of the bid bond; and the production of the

15:17 16 bid bond was one of the terms of the teaming agreement.

15:17 17        Q.    So, that would be kind of evidence that it --

15:17 18 the teaming agreement had gone into effect?

15:17 19        A.    It was evidence to me it existed and was

15:17 20 executed.

15:17 21        Q.    Okay.  But if I understand your remarks about

15:17 22 the terms of the teaming agreement, then, wouldn't the

15:17 23 mere existence of a verbal agreement between -- the

15:17 24 verbal agreement between BioGenesis and Rhino be

15:18 25 inconsistent with the teaming agreement?

```
 1              IN THE DISTRICT COURT OF GUAM

 2
    UNITED STATES OF AMERICA    ) CIVIL CASE NO. 02-00008
 3  FOR USE AND BENEFIT OF      )
    RHINO BUILDERS, INC.,       )
 4          Plaintiff,          )
          vs.                   )
 5  BIOGENESIS PACIFIC, INC.,   )
    AIG TECHNICAL SERVICES,     )
 6  INC., and AMERICAN HOME     )
    ASSURANCE COMPANY,          )
 7          Defendants.         )
    _____)
 8  BIOGENESIS PACIFIC INC.,    )
            Counter-Plaintiff,  )
 9          vs.                 )
    RHINO BUILDERS, INC.,       )
10  MICHAEL O'CONNELL, MICHAEL  )
    DANFORTH, AND JOHN          )
11  DOES 1-10,                  )
            Counter-Defendants.)
12  _____)
    AMERICAN HOME ASSURANCE     )
13  COMPANY,                    )
            Cross-Claimant,     )
14          vs.                 )
    BIOGENESIS PACIFIC INC.,    )
15          Cross-Claim         )
            Defendant.          )
16  _____)

17
              DEPOSITION OF MICHAEL NAWAIKI O'CONNELL
18

19  Taken on behalf of the Defendant, Counter-Plaintiff and

20  Cross-Claim Defendant at White & Tom, 820 Mililani

21  Street, Suite 711, Honolulu, Hawaii, commencing at

22  9:24 a.m. on Thursday, February 20, 2003, pursuant to

23  Notice.

24

25  BEFORE:    SHARON L. ROSS, CSR No. 432
```

11:56 1          (Discussion off the record.)

11:57 2          (O'Connell Exhibit No. 1 marked.)

11:57 3     Q.   (BY MR. CLARK)  Okay.  Mr. O'Connell, I just

11:57 4  handed to you Exhibit 1 which purports to be a facsimile

11:57 5  transmittal from Michael Danforth to Gerald Lam dated

11:57 6  November 17th, 2000, containing what appears to be a

11:57 7  draft subcontract agreement.  Have you seen this

11:57 8  document before?

11:57 9     A.   Yes.

11:57 10    Q.   Okay.  Can you tell me when you first saw

11:57 11 this document?

11:57 12    A.   I think it was November, 2 -- November, 2000.

11:58 13    Q.   Okay.  Is this the subcontract agreement --

11:58 14 the written subcontract agreement that Rhino presented

11:58 15 to BioGenesis?

11:58 16    A.   This was the written subcontract agreement

11:58 17 that Maxx Management and Gerry worked on, yes.

11:58 18    Q.   Okay.  Let's talk about Maxx Management.  Who

11:58 19 or what is Maxx Management?

11:58 20    A.   Maxx Management is a person named Mike

11:58 21 Danforth.  He was my consultant.

11:58 22    Q.   Okay.  You said it's a person.  Do you know

11:58 23 if he's a --

11:58 24    A.   It's a cor -- Maxx Management is a

11:58 25 corporation.  I'm sorry.

12:01  1        A.    Yeah, All Star.

12:01  2        Q.    Okay.  What was his position at that time

12:01  3   with All Star, to the best of your knowledge?

12:01  4        A.    I think he was a project manager.  I not too

12:01  5   sure.

12:01  6        Q.    What project were you working on?

12:01  7        A.    I don't recall at this time.

12:01  8        Q.    Okay.  That's fine.  Was he the person at All

12:01  9   Star to whom you reported?

12:01 10        A.    I don't recall.  They had so much people.

12:01 11              THE REPORTER:  "I don't recall" --

12:01 12              THE WITNESS:  They had so much people.

12:01 13        Q.    (BY MR. CLARK)  Do you remember how many

12:01 14   times you would have met with him before this March, '99

12:01 15   meeting?

12:01 16        A.    No, I don't recall.

12:01 17        Q.    More than one?

12:01 18        A.    I don't recall.

12:01 19        Q.    Okay.  So, you said that you hired Maxx

12:01 20   Management as a consultant?

12:01 21        A.    Yes.

12:01 22        Q.    When did you hire Maxx Management?

12:02 23        A.    Oh, that -- I think so it was in October,

12:02 24   2000 regarding the SOC contract.  We had put a proposal

12:02 25   in for a SOC.

14:51 1    A.    Can we take a break?

14:51 2    Q.    Yeah, let's go ahead and let's take a recess,

14:52 3  please.

14:52 4    A.    Because he threaten me.  Mike Danforth stop

14:52 5  him.

14:58 6          (Recess from 2:52 p.m. to 2:58 p.m.)

14:58 7    Q.    (BY MR. CLARK)  Okay.  Before we broke,

14:58 8  Mr. O'Connell, you were explaining what Mr. Lam said to

14:58 9  you about why he would not sign a later version of the

14:58 10 subcontract.  Can you continue, please?

14:58 11   A.    At Zippy's Restaurant, Gerry Lam -- okay.

14:58 12 Let me take one step back.  On December 5th or 6th, he

14:59 13 called me up; and he said, "Mike, let's have a meeting.

14:59 14 I'm ready to sign the contract.  Let's talk about other

14:59 15 opportunities."

14:59 16         Then I met with him on December 8th, 2000.

14:59 17 When Gerry -- I'm sorry.  When Gerry -- Gerry came, he

14:59 18 sat down with me and Mike Danforth.  Gerry Lam put three

14:59 19 papers down, pointed his finger at me and said, "You've

14:59 20 been notified.  You know I'm a" -- "you know I'm a

14:59 21 lawyer and a judge.  I own your business, your house,

14:59 22 your car.  I can bankrupt you any time."

14:59 23         Gerry -- and I looked at him long time; and I

14:59 24 told Gerry, "I'm very scared of you."  And Mike

14:59 25 Danforth -- Mike Danforth at that time stop everything.

14:59  1          I was -- my head was buzzing.  Gerry was

15:00  2   going on.  I couldn't comprehend it all.  And maybe

15:00  3   about 15 minutes later, 20 minutes, I said, "I got to

15:00  4   leave.  I cannot comprehend.  I have to go.  I cannot

15:00  5   think."  And I left.

15:00  6          Q.    Okay.  At this meeting did he tell you why he

15:00  7   would not sign the later version of the subcontract?

15:00  8          A.    He put down he own my company, stock

15:00  9   certificates.  He put down three papers that he own my

15:00 10   company, that he own 49 percent of the company.

15:00 11          Q.    So, I -- I'm sorry.  I don't understand how

15:00 12   that answers my question.  Did he tell you why he would

15:00 13   not sign it?

15:00 14          A.    Yeah.

15:00 15              MR. CORTES:  Asked and answered.

15:00 16              MR. CLARK:  No, it wasn't.

15:00 17              MR. CORTES:  I say it was, but go ahead.

15:00 18          Q.    (BY MR. CLARK)  I mean, if it's -- did he

15:00 19   specifically say, "I will not sign this because" and

15:00 20   then explain it?

15:00 21          A.    Gerry threatened me.  He own my company.  He

15:01 22   going bankrupt me.

15:01 23          Q.    And you're saying he told you that that was

15:01 24   the reason why he would not sign the subcontract?

15:01 25          A.    He never pay nothing.  His intent was to own

1          IN THE DISTRICT COURT OF GUAM

2

UNITED STATES OF AMERICA      ) CIVIL CASE NO. 02-00008
3  FOR USE AND BENEFIT OF        )
RHINO BUILDERS, INC.,         )
4          Plaintiff,           )
        vs.                   )
5  BIOGENESIS PACIFIC, INC.,     )
AIG TECHNICAL SERVICES,       )
6  INC., and AMERICAN HOME       )
ASSURANCE COMPANY,            )
7          Defendants.          )
_____)
8  BIOGENESIS PACIFIC INC.,      )
        Counter-Plaintiff,   )
9          vs.                  )
RHINO BUILDERS, INC.,         )
10 MICHAEL O'CONNELL, MICHAEL    )
DANFORTH, AND JOHN            )
11 DOES 1-10,                    )
        Counter-Defendants.) 
12 _____)
AMERICAN HOME ASSURANCE       )
13 COMPANY,                      )
        Cross-Claimant,      )
14         vs.                  )
BIOGENESIS PACIFIC INC.,      )
15         Cross-Claim          )
        Defendant.           )
16 _____)

17

18          DEPOSITION OF MICHAEL NAWAIKI O'CONNELL
                     VOLUME II

19

20 Taken on behalf of the Defendant, Counter-Plaintiff and
Cross-Claim Defendant at White & Tom, 820 Mililani
21 Street, Suite 711, Honolulu, Hawaii, commencing at
12:46 p.m. on Thursday, March 13, 2003, pursuant to
22 Notice.

23

BEFORE:    SHARON L. ROSS, CSR No. 432
24

25

1  Guam Roofing Contract - Various" dated 11-14-2000,

2  10:07:50 a.m. West Pacific Standard Time from "Rhino1"

3  to "russ@hgea.org."

4          (O'Connell Exhibit No. 20 marked.)

5      Q.    (BY MR. CLARK)  Are you familiar with this

6  document, Mr. O'Connell?

7      A.    Yes.

8      Q.    Okay.  Have you -- well, actually, let me ask

9  you.  Is this a document that you sent, Mr. O'Connell?

10     A.    Yes.

11     Q.    That would have been on or about November 14,

12  2000?

13         MR. CORTES:  Wait.  It just seems like

14  this -- he sent to who?

15         MR. CLARK:  He sent -- it's addressed from

16  "Rhino1" which is Michael O'Connell to Russ who we've

17  established is Russell Fong, and BPI Hawaii would be

18  Gerry Lam.

19         MR. CORTES:  Okay.  I thought --

20         MR. CLARK:  It's kind of confusing because

21  this is one of the few times where that header box is

22  actually relevant to the e-mail itself.

23     Q.    (BY MR. CLARK)  But, okay, Mr. O'Connell, you

24  said that you recall sending this e-mail; is that

25  correct?

1    A.    Yeah, I -- it looks like it, yes.

2    Q.    Okay.  On or about November 14, 2000; is that

3  correct?

4    A.    Yes.

5    Q.    Okay.  In the first paragraph -- well, first

6  of all, this is addressed to BPI Hawaii, "Gerry."  Would

7  that be Gerry Lam, Mr. O'Connell?

8    A.    Yes.

9    Q.    Okay.  And the first paragraph, the third

10  sentence, it starts, "From now on."  Do you see that

11  sentence, Mr. O'Connell?

12    A.    Yes.

13    Q.    Okay.  It says, "From now on, Mike Danforth

14  is POC contract for all info on roof contract."  Does

15  that "POC" stand for point of contact, Mr. Danforth --

16  Mr. O'Connell?

17    A.    Yeah, pertaining to the written of the

18  contract, yes.

19    Q.    I'm sorry.  Could you repeat that?

20    A.    Pertaining to the written of the proposal,

21  the contract between Gerry and Rhino.

22    Q.    Okay.  So, you meant he was the point of

23  contact for the written subcontract agreement which he

24  was preparing?  Is that what you're saying?

25    A.    Yeah, him and Gerry was preparing, yes.

1          IN THE DISTRICT COURT OF GUAM

2

UNITED STATES OF AMERICA    ) CIVIL CASE NO. 02-00008
3 FOR USE AND BENEFIT OF      )
RHINO BUILDERS, INC.,        )
4          Plaintiff,         )
           vs.               )
5 BIOGENESIS PACIFIC, INC.,   )
AIG TECHNICAL SERVICES,      )
6 INC., and AMERICAN HOME     )
ASSURANCE COMPANY,           )
7          Defendants.        )
_____)
8 BIOGENESIS PACIFIC INC.,    )
          Counter-Plaintiff, )
9          vs.               )
RHINO BUILDERS, INC.,        )
10 MICHAEL O'CONNELL, MICHAEL )
DANFORTH, AND JOHN           )
11 DOES 1-10,                 )
          Counter-Defendants.)
12 _____)
AMERICAN HOME ASSURANCE      )
13 COMPANY,                   )
          Cross-Claimant,     )
14          vs.               )
BIOGENESIS PACIFIC INC.,     )
15          Cross-Claim       )
           Defendant.         )
16 _____)

17

18          DEPOSITION OF GERALD N.Y.C. LAM

19 Taken on behalf of the Plaintiff and Counter-Defendant

20 at the offices of Rhino Builders, Inc., 87-1610 Ulehawa

21 Road, Waianae, Hawaii, commencing at 9:20 a.m. on

22 Wednesday, February 19, 2003, pursuant to Notice.

23

24 BEFORE:    SHARON L. ROSS, CSR No. 432

25

11:46 1   on at that time.  So, I cannot tell you why there were
11:46 2   conflicts in one or the other because Mr. Danforth was
11:46 3   doing that; but I can tell you that that's how he was
11:46 4   trying to negotiate a contract with me.
11:46 5         And it occurred between he and I personally
11:46 6   and Michael O'Connell was not involved because Michael
11:46 7   Danforth was doing that for Rhino and Michael O'Connell
11:46 8   did not want to get involved and referred me directly a
11:46 9   number of times to Michael Danforth during this whole
11:46 10  period of time.
11:47 11        Q.    How many employees did BioGenesis have in
11:47 12  Guam at this time?  Well, let's say in October, 2000.
11:47 13        A.    I don't know.  If we had any, it would have
11:47 14  been a few or none.
11:47 15        Q.    And what sort of roofing machinery did you
11:47 16  have, you know, the tools and the materials that you
11:47 17  needed to accomplish these contracts in Guam at that
11:47 18  time?
11:47 19        A.    I don't know.  I would have to check to see,
11:47 20  if we had purchased any, if anything was purchased -- I
11:47 21  don't know.
11:47 22        Q.    It might be none?
11:47 23        A.    I'm sorry?
11:47 24        Q.    It might be none?
11:47 25        A.    I don't know.

14:52 1   was totally incorrect.

14:52 2          The effect is that after that meeting,

14:52 3   shortly thereafter, I got a -- a fax notice from

14:52 4   Mr. O'Connell -- this was sent to him personally as a

14:52 5   shareholder under Hawaii Revised Statutes.  It was

14:52 6   notice, and he sent back to me personally -- I remember

14:52 7   getting a fax -- I can't remember if it was from him or

14:52 8   his company; but whatever it was, it said that Rhino or

14:52 9   he, something like that, doesn't recognize the validity,

14:52 10  or something like that, of the stock transfer or

14:53 11  assignment of stock and, therefore, they don't recognize

14:53 12  it and there will be no shareholder meeting.

14:53 13         So, with that, I just left it.  It wasn't my

14:53 14  intent to acquire Rhino or any problems of the like.  It

14:53 15  was only my intent to help out; and if they didn't want

14:53 16  it, they didn't want it, period.

14:53 17      Q.    So -- and after that, what further dealings

14:53 18  did you have with Mr. Garthe, if any, about this stock?

14:53 19      A.    After that -- well, I told Mr. Garthe that

14:53 20  Rhino didn't recognize the validity of the assignment,

14:53 21  and I told him that.  But he did assign his rights and

14:54 22  everything to me, but Rhino didn't recognize that.  And

14:54 23  so, it was between he and Rhino on that matter and --

14:54 24      Q.    It was between him and Rhino?

14:54 25      A.    Yes.  I wasn't going to take the effort to --

15:04 1      A.    Objection noted.

15:04 2           MR. CORTES:  I note your objection.  I'll

15:04 3  note to your counsel that you don't want to answer the

15:04 4  question, but I'm asking you the question.

15:04 5      Q.    (BY MR. CORTES)  Do you intend to go forward

15:04 6  and assert your shareholder rights, if any?

15:04 7      A.    Well, I recognize your objection; and I

15:04 8  overrule it.  How's that?  Can I do that?

15:04 9           MR. CLARK:  It's our objection.  I think --

15:04 10          MR. CORTES:  You made your objection for the

15:04 11 record.

15:04 12          MR. CLARK:  We made an objection for the

15:04 13 record.

15:04 14          MR. CORTES:  It's a deposition.  We'll argue

15:04 15 the admissibility in trial.  I would like to have the

15:04 16 answer.

15:04 17     A.    No.  You know, at this point, I really don't

15:04 18 care.  I mean, I don't want it to sound like I really

15:04 19 don't care about them or Rhino or anything else.  At

15:04 20 this point, I got -- I got so many other more important

15:04 21 things to do, that I really don't care.  And right now,

15:04 22 I really don't think my help I'm going to give or offer

15:04 23 is even going to be appreciated by Rhino in any case,

15:05 24 let alone wanting to come out and to go help out with --

15:05 25     Q.    (BY MR. CORTES)  So, your answer is, no,

15:05 1  you're not going to assert your shareholder rights?

15:05 2      A.    At this moment I don't have any interest to

15:05 3  do so.

15:05 4      Q.    But you may in the future?

15:05 5      A.    I have no idea, I mean....

15:05 6      Q.    You don't know?

15:05 7      A.    Yeah, that's what I said.

15:05 8      Q.    Okay.

15:05 9      A.    I have no intention of doing so.

15:05 10      Q.    Okay.  That's a good answer.

15:05 11      A.    I don't care to do so.

15:05 12      Q.    Okay.  So, what value could you get from

15:05 13  being a Rhino shareholder with respect to this contract?

15:05 14      A.    Which contract?

15:05 15      Q.    The Navy contract that's at issue in this

15:05 16  lawsuit.

15:05 17      A.    Nothing.

15:05 18      Q.    Well, isn't it true that at the time that you

15:06 19  made your deal with Mr. Garthe, Rhino owned materials in

15:06 20  Guam that you needed to -- or that you could use to

15:06 21  complete your -- use to perform on your Navy contract?

15:06 22      A.    No, it was my belief that they didn't have

15:06 23  anything in Guam.  That could be a mistaken belief; but

15:06 24  that's what I believed, they didn't have any materials

15:06 25  in Guam.

16:32  1          MR. CORTES:  Actually I would like to --

16:32  2   maybe we can go off the record for a second and wait for

16:32  3   Mr. Cortes.

16:32  4               (Brief recess.)

16:32  5               (Requested portion was read.)

16:32  6      A.      -- along with a Faith Kaupu and a George

16:32  7   Allen.

16:32  8      Q.      (BY MR. CORTES)  Could you spell "Kaupu"?

16:32  9      A.      K-A-U-P-U.  And All Star was first referred

16:33 10   to me by Mr. Mike O'Neil of the SBA Section 8(a)

16:33 11   division for a potential teaming relationship.  I was

16:33 12   one of a number of companies referred to All Star.  All

16:33 13   Star was looking for a Section 8(a) company to team up

16:33 14   with.

16:33 15               In our meeting, apparently All Star's owners

16:33 16   and -- along with those three that I had mentioned, in

16:33 17   discussions, I guess, chose -- chose BioGenesis Pacific;

16:33 18   and so, I started in a teaming relationship with All

16:33 19   Star.

16:33 20               And this was sometime about the year before

16:33 21   this Guam contract.  So, it would have been about 1998,

16:34 22   I think, is when we started getting together with All

16:34 23   Star.

16:34 24               Michael Danforth and Faith Kaupu were the

16:34 25   ones primarily responsible to develop the relationship

16:34 1 between All Star/SAB with BioGenesis Pacific and myself.

16:34 2 So, we had a team agreement that was drawn up and

16:34 3 negotiated between the owners which was drafted by

16:34 4 Mr. Danforth and Faith Kaupu as well.

16:34 5 And it ended up that BioGenesis Pacific

16:34 6 started doing some subcontract work for All Star/SAB on

16:34 7 military bases performing multitrade and job order

16:34 8 contract type of work, which is construction renovation,

16:35 9 a lot of roofing and the like as well as preparing bids

16:35 10 for multitrade and drop contracts with All Star.

16:35 11 These were bids that were Section 8(a)

16:35 12 set-asides, and I prepared the bids with All Star.  The

16:35 13 person that prepared the bid for All Star with me was

16:35 14 Michael Danforth.  So, Michael Danforth worked in-house

16:35 15 in our BioGenesis facilities as well as I worked

16:35 16 in-house with All Star's facilities for preparing

16:35 17 extensive bids.

16:35 18 Q.    Would this also include the bid for this

16:35 19 particular Navy contract in question?

16:35 20 A.    It includes the bid for this Guam contract.

16:35 21 Q.    Okay.

16:35 22 A.    And this Guam contract actually -- Michael

16:35 23 Danforth and myself were the only ones to prepare this.

16:35 24 I had invited All Star to be a primary contractor and a

16:36 25 team member to bid for this contract because we were

# Rhino Builders, Inc. SBA Certified 8 (a) & HUBZone Business

► **CORPORATE OFFICE:** 85-841 B Farrington Highway, Waianae, Hawaii 96792
   Phone: (808) 668-8878 - Fax: (808) 668-7024 - Email: Rhino1@Hawaii.rr.com

► 790 North Marine Drive, Box 959, Tumon, Guam 96911
   Phone: (671) 632-7653 - Fax: (671) 637-9618 - Email: Rhinogwa@ite.net

July 11, 2001

Mr. Alfred Garthe III
142 Lilac Court
Mangilao, Guam 96923

RE: Certified Mail # 7000 1670 0000 4878 9287

Dear Mr. Garthe III,

This letter is to inform you of your termination with Rhino Builders, Inc. This termination is effective immediately. Henceforth you are no longer authorized to represent Rhino Builders, Inc., its subsidiaries or divisions in any capacity.

As you know, Rhino Builders, Inc. has a pending dispute with Bio-Genesis, Inc. because of Bio Genesis's failure to make payments to Rhino for work performed. We asked you numerous times to provide information concerning the work Rhino did for Bio Genesis. We also asked you to provide other information concerning related matters. However, you have repeatedly filed to provide the requested information. We are still waiting for this information, and your failure to provide it has damaged Rhino's ability to obtain payment for work performed.

We also directed you to retrieve Rhino Builders property held by Bio-Genesis, Inc and to cease all dealings with Mr. Gerald Lam of Bio-Genesis. Contrary to our instructions to you, you have continued to allow Mr. Lam and Bio Genesis to hold and use Rhino Builders, Inc. property without compensating Rhino for such use. Finally, you used Bio Genesis letterhead to correspond to me concerning internal Rhino Builders business.

Your actions in this regard are in breach of your duty of loyalty to rhino Builder's, and you have purposely acted to Rhino's injury in its dealings with Bio Genesis.

Because of your actions your employment with Rhino Builders, Inc. is terminated.
As President of Rhino Builders, Inc., I am forced to take this action to fulfill my
fiduciary responsibility to both the shareholders and creditors of Rhino Builders,
Inc.

I ask that you immediately deliver all Rhino Builders, Inc. keys, papers, property,
and equipment you have in your possession to Rhino Builders, Inc. I sincerely
regret that you have chosen to purposely injure Rhino in this manner and forced
me to act to protect Rhino from your shift in loyalties.

Regards,

Michael N. O'Connell
President and CEO
Rhino Builders, Inc.

Cc: Employee file

**2**

# Special Board of Directors Meeting
## Of
## Rhino Builders, Inc.
### December 27, 2000

Location: 87-1610 Ulehawa Road, Waianae, Hawaii 96792

Mr. Alfred Garthe III opened the meeting with a prayer.

At 3:10 pm HST Mr. Michael O'Connell, Chair, called the meeting to order, and made a roll call of all Directors

Directors Present: Michael O'Connell, Yumi O'Connell and Eugene O'Connell
Directors Present via Phone: Alfred Garthe III and Michelle Garthe

### Agenda

1. Adoption of the minutes from October 8, 1998 meeting.
2. Treasurer and Secretary's functions.
3. Guam Operations
4. Stock Acquisitions Agreement
5. Change Corporation to C-Corp.

*Item 1 of Agenda: Adoption of the minutes from October 8, 1998 meeting.*
The Chair requested that Mr. Eugene O'Connell, read the minutes of October 8, 1998.
After the reading of the October 8, 1998 minutes, the Chair asked if any additions or deletions. No additions or deletions were made.
Mrs. Yumi O'Connell moved that, the minutes of October 8, 1998 be accepted as read.
Mr. Eugene O'Connell seconded the motion.
Discussion (See exhibit 1)
Motion was carried

*Item 2 of Agenda: Treasurer and Secretary's functions.*
Mr. Eugene O'Connell provided a several reasons for the Treasurers and Secretary's functions to be centralized in Hawaii, from dealing with the SBA, State and Federal Agencies and creditors.
Mrs. Yumi O'Connell moved that, Mr. Eugene O'Connell to be appointed as Treasurer and Secretary effective immediately.
Mr. Eugene O'Connell seconded the motion.
Discussion (See exhibit 2)
Motion was carried

*Item 3 of Agenda: Guam Operations*
Mr. George Allen was called into the meeting room to report about his upcoming Job Order Contract work on Guam. After answering questions, Mr. Allen was asked to leave the room.

Case 1:02-cv-00008    Document 153    Filed 06/27/2003    Page 39 of 44

Mr. Alfred Garthe was asked about working with BioGenesis Pacific, Inc. (BPI) and the use of Rhino's equipment being used by BPI without a formal written contract. Mr. Garthe was directed by the Board to provide to Mr. Eugene O'Connell the bank statements of Guam's accounts and vendor invoices.

*Item 4 of Agenda: Stock Acquisition Agreement*
The Chair directed Mr. Eugene O'Connell to read excerpts of the Stock Acquisition Agreement to Mr. and Mrs. Garthe to inform them that the actions of Mr. Garthe in attempting to sell his shares to Mr. Gerald Lam was in violation of the Stock Acquisition Agreement that he signed on February 11, 1994.
The Chair notified Mr. Garthe that the Board expressed an interest in complying with Mr. Garthes request to sell his share, however the shares must first be offered to the Corporation based upon the Corporations right of first refusal.
Mr. Eugene O'Connell suggested to Mr. Garthe that he have the Board reject the offer to Mr. Gerald Lam.
Mr. Eugene O'Connell moved that the Directors reject the offer and the following letters as presented to the President of Rhino; the Letter of Intent, the Directions to the President & Treasurer, and the Certificate of Transfer of Stock as signed by Mr. Alfred Garthe III.
Mr. Alfred Garthe III seconded the motion.
Discussion
Motion was carried unanimous decision

*Item 5 of Agenda: Change Corporation to C-Corp.*
The Corporation's CPA advised as to the benefits of changing the corporation over from an S-Corp to a C-Corp.
Mr. Eugene O'Connell moved that Rhino Builders, Inc be changed from a S-Corporation to a C-Corp.
Mr. Alfred Garthe III seconded the motion
Discussion
Motion carried by voice vote unanimous decision.

The Chair called for a motion to adjourn the meeting
A motion was made to adjourn the meeting
The motion was seconded
Discussion
Motion carried by voice vote unanimous decision.

Eugene O'Connell
Secretary
Rhino Builders, Inc.



# RHINO BUILDERS

87-1610 Ulehawa Road, Waianae, HI 96792 Ph: 808 668-8878 Fax: 808 668-7024

U.S.POSTAL CERTIFIED RECEIPT NUMBER: 7099 3400 0018 4698 8163

December 29, 2000

Gerald N.Y.C. Lam
1604 Ulu Alana Place
Kailua, Hawaii 96734

Aloha Mr. Lam,

We are in receipt of your December 21, 2000 letter calling for a shareholders meeting. At our Board of Directors meeting on December 27, 2000 the matter of Alfred Garthe's transfer of his shares was discussed. The Board by unanimous decision found that said transfer was not in compliance with our Stock Acquisition Agreement.

Mahalo,

Michael Nawaiki O'Connell
CEO/President

Cc: Board of Directors
Cc: Shareholder's

Subj:    **Guam Roofing Contract - Various**
Date:    11/14/00 10:07:50 AM West Pacific Standard Time
From:    rhino1@hawaii.rr.com (Michael O'Connell)
To:      russ@hgea.org, bpihawaii@aool.com
CC:      rhinogum@ite.net (Richard Avilla), RhinoGWA@ite.net (George Allen - Guam), Maxxmgt@aol.com

Gerry;

I have worked with Mike D today and Al regarding the Guam contract. It look
like good new about jobs and schedule. From now on, Mike Danford is POC
contract for all info on roof contract. All leters and calls will be give to
Mike D.

Rhino prepareing invoice to BPI tomorrow for all work todate. Invoice will
be on agree that cost is paid and split profit. I can send 1 invoice or
separate.  Let me know.

Mike


---------------------- Headers ----------------------------
Return-Path: <rhino1@hawaii.rr.com>
Received: from rly-yb05.mx.aol.com (rly-yb05.mail.aol.com [172.18.146.5]) by air-yb04.mail.aol.com (v76_r1.23)
with ESMTP; Mon, 13 Nov 2000 19:07:50 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yb05.mx.aol.com (v76_r1.19) with
ESMTP; Mon, 13 Nov 2000 19:07:39 -0500
Received: from mike ([24.94.90.15]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.447.44);
    Mon, 13 Nov 2000 14:07:30 -1000
Message-ID: <001701c04dcf$91610ec0$0f5a5e18@hawaii.rr.com>
From: "Michael O'Connell" <rhino1@hawaii.rr.com>
To: <russ@hgea.org>, <bpihawaii@aool.com>
Cc: "Richard Avilla" <rhinogum@ite.net>,
    "George Allen - Guam" <RhinoGWA@ite.net>, <Maxxmgt@aol.com>
Subject: Guam Roofing Contract - Various
Date: Mon, 13 Nov 2000 14:12:25 -1000
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4133.2400
Disposition-Notification-To: "Michael O'Connell" <rhino1@hawaii.rr.com>
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4133.2400

Wednesday, December 20, 2000 America Online: Maxxmgt