1 | James Lawhn
OLIVER LAU LAWHN OGAWA & NAKAMURA
2 | 707 Richard Street, Suite 600
Honolulu, Hawaii 96813
3 | Telephone No.: (808) 533-3999
Facsimile No.: (808) 533-0144
4 |
5 | Stephen D. Tom
WHITE & TOM
820 Mililani Street, Suite 711
6 | Honolulu, Hawaii 96813-2972
Telephone No.: 808 547 5151
7 | Facsimile No.: 808 599 4517

8 | Louie J. Yanza
VERNIER & MAHER, LLP
9 | 115 Hesler Place, Ground Floor
Governor Joseph Flores Building
10 | Hagåtña, Guam 96910
Telephone No.: (671) 477-7059
11 | Facsimile No.: (671) 472-5487

12 | Attorney for Defendants AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY

FILED
DISTRICT COURT OF GUAM
OCT 29 2003
MARY L. M. MORAN
CLERK OF COURT

224

13 | UNITED STATES DISTRICT COURT OF GUAM

14 | UNITED STATES OF AMERICA FOR USE )  CIVIL CASE NO. 02-00008
15 | AND BENEFIT OF RHINO BUILDERS, INC., )
      )
16 |              Plaintiff,              )
                                         )  **DECLARATION OF LOUIE J. YANZA IN**
      vs.                                )  **SUPPORT OF DEFENDANTS AIG**
17 |                                     )  **TECHNICAL SERVICES, INC. AND**
18 | BIOGENESIS   PACIFIC,   INC.,   AIG )  **AMERICAN HOME ASSURANCE**
      TECHNICAL   SERVICES,   INC.  and )  **COMPANY'S MOTION TO COMPEL**
      AMERICAN     HOME      ASSURANCE )
19 | COMPANY,                            )
                                         )
20 |            Defendants.              )
                                         )
21 | BIOGENESIS PACIFIC, INC.,           )
                                         )
22 |            Counterclaimant,         )
                                         )
      vs.                                )
23 |                                     )
24 | RHINO    BUILDERS,   INC.,  MICHAEL )
      O'CONNELL, MICHAEL DANFORTH, AND )
25 | JOHN DOES 1-10,                     )
                                         )
              Counter-Defendant.         )

1

ORIGINAL

| | |
|---|---|
| AMERICAN HOME ASSURANCE COMPANY | ) |
| | ) |
| Cross-Claimant, | ) |
| | ) |
| vs. | ) |
| | ) |
| BIOGENESIS PACIFIC, INC. | ) |
| | ) |
| Cross-Claim Defendant. | ) |
| | ) |

I, LOUIE J. YANZA, hereby declare as follows:

1.  I make this declaration on personal knowledge, having personal knowledge of the facts herein contained, and am competent to testify if called upon as a witness at trial of the within entitled-action.

2.  I am an individual over the age of 18. I am an attorney licensed to practice law within Guam and before the U.S. District Court of Guam.

3.  I am an attorney with the law firm of VERNIER & MAHER, LLP, local counsel for Defendants AMERICAN HOME ASSURANCE COMPANY ("AMERICAN HOME") and AIG TECHNICAL SERVICES, INC. ("AIGTS").

4.  Attached hereto as Exhibit "A" is a true and correct copy of Terry E. Thomason's October 22, 2003 letter to Defendant AMERICAN HOME.

5.  Attached hereto as Exhibit "B" is a true and correct copy of AIGTS' Mark Titherington's October 30, 2001 letter to Carlsmith Ball, LLP (Honolulu).

6.  Attached hereto as Exhibit "C" is a true and correct copy of Amy G. Self's January 9, 2002 letter to Mark Titherington.

2

7. Attached hereto as Exhibit "D" is a true and correct copy of AIGTS' Bruce Kahn's January 17, 2002 letter to Carlsmith Ball, LLP (Honolulu).

8. Attached hereto as Exhibit "E" is a true and correct copy of Bruce Kahn's February 21, 2002 letter to Carlsmith Ball, LLP (Honolulu).

9. Attached hereto as Exhibit "F" is a true and correct copy of Amy G. Self's March 11, 2003 letter to Bruce Kahn.

10. Attached hereto as Exhibit "G" is a true and correct copy of Judeth Granville's March 19, 2002 email to Carlsmith Ball, LLP's David Ledger stating that AMERICAN HOME ASSURANCE COMPANY is the "insurer."

11. Attached hereto as Exhibit "H" is a true and correct copy of Terry E. Thomason's April 9, 2002 letter, with redactions, to Michael O'Connell, advising Mr. O'Connell that Carlsmith is withdrawing from representing RHINO BUILDERS, INC.

12. Attached hereto as Exhibit "I" is a true and correct copy of AIGTS' Bruce Kahn's June 21, 2002 letter to Carlsmith Ball, LLP (Honolulu).

13. Attached hereto as Exhibit "J" is a true and correct copy of Plaintiff's Response to Defendant AIG Technical Services and American Home Assurance Company's Second Request for Production of Documents.

14. Attached hereto as Exhibit "K" is a true and correct copy of Plaintiff's Responses to Defendants' AIG Technical Services, Inc. and American Home Assurance Company's Second Set of Interrogatories.

3

15. Attached hereto as Exhibit "L" is a true and correct copy of Terry E. Thomason's transcript of his deposition taken on October 6, 2003, in the above-entitled case.

16. Attached hereto as Exhibit "M" is a true and correct copy of Hawaii Insurance Commissioner's website which shows AMERICAN HOME as a foreign company registered to do business as a surety with insurance companies.

17. Attached hereto as Exhibit "N" is a true and correct copy of the SEC 10K filing of American International Group, Inc.

18. Attached hereto as Exhibit "O" is a true and correct copy of several pages printed from American International Group, Inc.'s website which shows that AMERICAN HOME is an insurer. The web page was pulled by the Carlsmith attorneys.

19. Attached hereto as Exhibit "P" is a print out of the U.S. Department of Treasury's Listing of Approved Sureties, from the Department's website, for federal bond approving officers and persons required to give bonds to the United States. Nowhere in the Treasury List is AIGTS registered as a surety.

20. Attached hereto as Exhibit "Q" is a true and correct copy of FAC 5252.228-9305 requiring sureties to be on the Treasury List to be approved for a federal project as surety.

21. Attached hereto as Exhibit "R" is a true and correct copy of the Payment Bond, Bond No. 20-80-88.

4

22. Attached hereto as Exhibit "S" is a true and correct copy of the Performance Bond, Bond No. 20-80-88.

23. Attached hereto as Exhibit "T" is a true and correct copy of the Declaration of Custodian of Records of Carlsmith Ball, LLP (Guam).

24. Attached hereto as Exhibit "U" is a true and correct copy of the Submission of Affidavit of Amy G. Self filed September 4, 2002.

25. Attached hereto as Exhibit "V" is a true and correct copy of a Certificate issued by the Department of Revenue and Taxation, Government of Guam, certifying that AMERICAN HOME is a foreign corporation duly registered to transact business on Guam.

26. Attached hereto as Exhibit "W" is a true and correct copy of a Certificate issued by the Department of Revenue and Taxation, Government of Guam, certifying that it has no record, either past, present or pending on AIGTS being authorized to conduct any business on Guam.

I declare under penalty of perjury under the laws of Guam (6 GCA §4308) that the foregoing is true and correct.

Dated this 29th day of October, 2003, in Hagåtña, Guam.

LOUIE J. YANZA

5

U.S. District Court of Guam
Civil Case No. 02-00008


Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.


# EXHIBIT "A"


Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities

OCT 2 6 2001
BOND DEPT.

# CARLSMITH BALL LLP

A LIMITED LIABILITY LAW PARTNERSHIP

PACIFIC TOWER, SUITE 2200
1001 BISHOP STREET
HONOLULU, HAWAII 96813
TELEPHONE (808) 523-2500   FAX (808) 523-0842
WWW.CARLSMITH.COM

DIRECT DIAL NO.
(808) 523-2527

E-MAIL TET@CARLSMITH.COM

OUR REFERENCE NO.
053705-00001

October 22, 2001

**BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

American Home Assurance Company
121 Spear Street
San Francisco, California 94105

Re:   Ref. Bond No. 20-80-88 - BioGenesis Pacific, Inc., Prime Contractor on
      Contract No. N62766-99-D-0425

Dear Sirs:

On behalf of our client, Rhino Builders, Inc., we are forwarding this enclosed matter for your consideration and action.

Enclosed with this letter is a Miller Act Notice which this firm caused to be sent to your attention, whereby Rhino Builders, Inc. gives notice it intends to enforce its rights under the Miller Act. Contrary to your understanding, BioGenesis Pacific, Inc. is the prime contractor on Contract No. N62766-99-D-0425, and Rhino Builders, Inc. provided all labor and materials supporting its claim pursuant to an oral subcontract between Rhino Builders Inc. and BioGenesis Pacific, Inc.

As the attorneys for Rhino Builders, Inc., we hereby request that American Home Assurance Company provide us a copy of its Miller Act Proof of Claim form, and forward any and all future communications to my attention at the above address.

HONOLULU   ·   KAPOLEI   ·   HILO   ·   KONA   ·   MAUI   ·   GUAM   ·   SAIPAN   ·   LOS ANGELES   ·   WASHINGTON, D.C.   ·   MEXICO


Exhibit
A

Your immediate attention to this matter is appreciated.

Very truly yours,
Carlsmith Ball L.L.P.

*Jerry E. Thomason*
Terry E. Thomason

Enclosures

cc:   Rhino Builders, Inc.

1433798.1

# NOTICE OF CLAIM ON BOND
## (Miller Act 40 U.S.C. Section 270(a) to 270(e))

**Public Agency:** Officer in Charge of Construction
Ms. Bennett Terlaje, Contracting Officer
NAVFACENGCOM Contracts Marianas
PSC455, Box 175
FPO AP 96540-2200

**Bonding Company:** American Home Assurance Company
121 Spear Street
San Francisco, California 94105

**Prime Contractor:** BioGenesis Pacific, Inc.
1604 Ulualana Place
Kailua, Hawaii 96734

NOTICE IS HEREBY GIVEN, that Rhino Builders, Inc., the undersigned subcontractor to BioGenesis Pacific, Inc. and Claimant, has not been paid in full and is looking to the Prime Contractor for payment of the following claim. This notice is intended as written notice pursuant to 40 U.S.C. Section 270.

Claimant, whose address is: 87-1610 Ulehawa Road, Waianae, Hawaii 96792, has a claim in the amount of $245,664.43 (not including service charges or interest as allowed by law and at the maximum legal charges or interest as allowed by law and at the maximum legal rate) for labor performed and materials provided for the public work of improvement commonly known as Navy Housing Roofing, Various Locations; Contract No. N62766-99-D-0425, upon which BioGenesis Pacific, Inc. is the Prime Contractor.

WE ARE LOOKING TO THE PRIME CONTRACTOR FOR PAYMENT OF THESE DEBTS.

    1.    The total amount of the claim is $245,664.43.

    2.    The name of the party for whom the labor and materials were provided is: BioGenesis Pacific, Inc.

    3.    Rhino Builders, Inc. provided such labor and materials directly to BioGenesis Pacific, Inc. pursuant to an oral subcontract between Rhino Builders, Inc. and BioGenesis Pacific, Inc.

    In support of its claim, Claimant submits the following documents:
    1.    Claimant's initial invoice, which includes a breakdown of reimbursable costs and profit share (Exhibit 1);



1433756.1

2.    Claimant's final invoice in the amount of $245,664.43 for BioGenesis Pacific, Inc.'s unpaid billings on all work Claimant performed on Contract No. N62766-99-D-0425 with attached mail receipts reflecting BioGenesis Pacific, Inc.'s refusal to accept business mail sent by Rhino Builders, Inc. (Exhibit 2);

3.    A copy of Rhino Builders, Inc.'s Assertion of Nonpayment under FAR 32.112-1 to Ms. Bennett Terlaje, Contracting Officer (Exhibit 3); and

4.    A copy Payment Bond No. 20-80-88 sent to Claimant from Ms. Bennett Terlaje, Contracting Officer in charge of construction for Contract No. N62766-99-D-0425 (Exhibit 4).

To the unpaid balance of $245,664.43 (plus penalties and interest), if not paid, Claimant shall also seek attorneys fees and interest at the maximum legal rate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 0 day of October, 2001.

Michael O'Connell
Rhino Builders, Inc.

"Claimant"

1433756.1

⑥

U.S. District Court of Guam
Civil Case No. 02-00008

Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

# EXHIBIT "B"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities



**AIG Technical Services, Inc.**
175 Water Street
New York, NY 10038
212.770.7000
Direct Dial: (212) 458-1282

October 30, 2001

**VIA REGULAR MAIL**

Carlsmith Ball LLP
Pacific Tower, Suite 2200
1001 Bishop Street
Honolulu, HI 96813
**Attention: Terry E. Thomasen**

| | | |
|---|---|---|
| Re: | Principal: | **BioGenesis Pacific, Inc.** |
| | Bond No.: | **000-20-80-88** |
| | Claim No.: | **388-005037-001-0001** |
| | Project: | **Contract No. N62766-99-D-0425 - Navy Housing - Guam and various locations** |
| | Surety: | **American Home Assurance Co.** |
| | Claimant: | **Rhino Builders, Inc.** |

Dear Mr. or Ms. Thomasen:

This will acknowledge receipt of your client's claim in the amount of $245,664.43 for labor and/or materials furnished in connection with the above referenced project.

You will please find enclosed a Proof of Claim form for your client's use in documenting their claim against the above bond. This form should be completed in as much detail as possible, and include the last date that their company either performed the work or supplied materials claimed for on the above project. The Proof of Claim form should then be photocopied twice (to make three sets). Separate copies of documentation supporting the claim should be annexed to each form. Documentation supporting the claim in this instance would include copies of any subcontracts, signed purchase orders, signed invoices, signed delivery tickets, etc. Upon completion, two (2) of these forms in original (signed and notarized by an authorized representative of your client's company), with copies of supporting documentation annexed to each, should be returned to my attention (the third form is for your own records).

Please be advised that this action is taken at this time without waiver of or prejudice to any of the rights and defenses, past or present, known or unknown which either the above referenced Surety or Principal may have in this matter.

Truly yours,

Mark Titherington

Enc.

cc:    BioGenesis Pacific, Inc.

A Member Company of
American International Group, Inc

1



Exhibit
B

U.S. District Court of Guam
Civil Case No. 02-00008

Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

# EXHIBIT "C"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities

# CARLSMITH BALL LLP

### A LIMITED LIABILITY LAW PARTNERSHIP

PACIFIC TOWER, SUITE 2200

1001 BISHOP STREET

HONOLULU, HAWAII 96813

TELEPHONE (808) 523-2500    FAX (808) 523-0842

www.carlsmith.com

DIRECT DIAL NO.
(808) 523-2527

E-MAIL TET@CARLSMITH.COM

OUR REFERENCE NO.
053705-00001

## January 9, 2002

**BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

**RECEIVED**

JAN 1 5 2002

**Surety Bond Claims**

Mark Titherington
American Home Assurance Company
175 Water Street, 6th Floor
New York, New York 10038

Re:    Supplement to Miller Act Claim; Ref. Bond No. 20-80-88 - BioGenesis
       Pacific, Inc., Prime Contractor on Contract No. N62766-99-D-0425

Dear Mr. Titherington:

In behalf of our client, Rhino Builders, Inc. ("Rhino"), we provide the following materials for your consideration and actions as surety for BioGenesis Pacific, Inc. ("BPI") on Navy Contract No. N62766-99-D-0425 ("the Contract").

AIG Technical Services, Inc.'s Proof of Claim form is attached to this letter as Enclosure 1. Rhino's final Contract Invoice to BPI, dated December 19, 2001, is attached to this letter as Enclosure 2. BPI's letter in response to Rhino's final Contract Invoice, dated December 22, 2001, is attached to this letter as Enclosure 3.

BPI has failed to pay Rhino for its work as a subcontractor on the Contract. BPI's response to Rhino's final Contract Invoice is a rejection and refusal to pay Rhino. See Enclosure 3. Specifically, BPI's letter refuses to address payment unless Rhino produces a copy of the executed subcontract, in addition to numerous other irrelevant documents not material to Rhino's subcontract with BPI. The demand for a copy of the executed subcontract is disingenuous because Gerald Lam, President of BPI, refused to

HONOLULU · KAPOLEI · HILO · KONA · MAUI · GUAM · SAIPAN · LOS ANGELES · WASHINGTON, D.C.

Exhibit

**C**

sign any subcontract with Rhino as he had initially promised. Further, the absence of a written subcontract is meaningless and not required for recovery under the Miller Act. There was, in fact and law, a subcontract between Rhino and BPI. Mr. Lam acknowledges the existence of such subcontract and even reiterates the terms of the subcontract in a letter to Michael O'Connell, President of Rhino, dated January 2, 2001. A copy of Mr. Lam's letter is attached to this letter as Enclosure 4.

Under the circumstances here, BPI's December 22, 2001 letter is nothing more than a frivolous, calculated, and deliberate ploy to avoid paying Rhino. As discussed below, the parties' agreement, and legally binding contract, was that Rhino would receive its costs, plus fifty percent (50%) of profits resulting from Rhino's work on the Contract. See Enclosure 4.

## A. BPI FAILED TO PAY RHINO FOR WORK PERFORMED

Rhino and BPI entered into an oral subcontract whereby Rhino agreed to perform such Contract work as the Navy might assign to BPI on individual task orders under the Contract. Rhino completed the work on task order numbers 0001 through 0018 of the contract and invoiced BPI for payment. The Navy accepted all of Rhino's work on the Contract and made full payment to BPI. As discussed below, BPI has never paid Rhino for any of the work performed on the Contract, even though all of the work was performed by Rhino employees using Rhino equipment, and BPI received full payment.

### 1. Terms Of The Subcontract

The subcontract agreement was that BPI would pay Rhino's costs of performance plus 50% of BPI's profit upon completion of each task order. See Enclosure 4. In addition, the oral agreement was necessary initially only because the Contract award date had not afforded BPI sufficient time to establish a written subcontract with Rhino. Both BPI and Rhino agreed that the oral agreement between BPI and Rhino would later be reduced to writing to conform to accepted federal government contract practice.

During the time Rhino was performing work on the Navy's assigned Task Orders 1 through 4, Rhino engaged a consultant experienced in federal procurement to prepare a written subcontract agreement to formalize the relationship between Rhino and

BPI. The consultant drafted a proposed subcontract agreement consistent with the terms under which Rhino accepted BPI's offer to perform subcontract work on the Contract. The consultant provided his initial drafts to BPI for comment and finally submitted the full document to BPI for review on November 17, 2000. A copy of the consultant's facsimile transmittal letter to BPI and the draft subcontract are attached to this letter as Enclosure 5.

At this point, BPI refused to pay for Rhino's work to date on the Contract and refused to enter into a formal written subcontract with Rhino. Under the circumstances, Rhino's Chief Executive Officer ("CEO") informed Rhino's Guam office manager to cease performance on the oral agreement with BPI. Rhino's decision to stop work was due to BPI's failure to fulfill its obligation to pay for work performed and refusal to negotiate an acceptable written subcontract. Subsequently, Rhino's CEO learned that BPI was continuing to use Rhino resources on the Contract without payment. Accordingly, Rhino's CEO issued a December 14, 2000 official company notice forbidding BPI's use of Rhino resources to perform its work on the Contract. A copy of the December 14, 2000 notice is attached to this letter as Enclosure 6.

In response to Rhino's action, BPI wrote the January 2, 2001 letter (Enclosure 4) to Rhino, which states in relevant part:

> [Rhino's] subcontract was subject to a verbal agreement which provided that 50% of the net profits would be determined after all actual costs to both [BPI] and Rhino. In return you represented that Rhino was capable and would front all the needed facilities, personnel, financing and bonding through the term of each task order. Furthermore, Rhino was consistently given clear and specific instructions not to cause any task orders to be accepted from the Navy unless Rhino was certain that each specific task order would result in a profit or break even at worst under our said agreement. If there was any doubt, Rhino was not to cause any task order to be accepted. BPI relied upon Rhino for the acceptance of each task order.
>
> BPI has been disappointed by Rhino's affirmative and specific actions to repudiate and breach its subcontract with

BPI. This has been especially damaging since upon Rhino's urgings BPI had wholly relied on Rhino's management and facilities on Guam.

The above quoted BPI letter shows unmistakably that an oral agreement existed and that Rhino was to receive at least 50% of the profit from revenues on each work order. Further, the BPI letter shows that Rhino performed all work on the Contract work orders including "all the needed facilities, personnel, financing, and bonding through the term of each work order." As additional proof that the work was performed by Rhino personnel, attached are copies of Rhino's payroll records as Enclosure 7 to this letter. In effect, BPI envisioned the subcontract as a brokered contract with a *de facto* assignment of the Contract to Rhino. BPI did nothing more than obtain award of the Contract and then attempt to transfer all performance requirements to Rhino while refusing to pay for work performed.

2.  Rhino's Work Was Accepted By The Navy And BPI Was Paid Without Incurring Any Costs

All of the work performed by Rhino on task orders 0001 through 0018 of the Contract was accepted by the Navy. The Navy paid BPI a total of ONE MILLION EIGHT HUNDRED FIFTY TWO THOUSAND SEVEN HUNDRED EIGHTY EIGHT AND .38/100 DOLLARS ($1,852,788.38) for all of Rhino's work on the Contract. A break down of the Navy's payments to BPI for each task order and the payments owed by BPI to Rhino is attached to this letter as Enclosure 8. BPI incurred no costs on the Contract because all of the work was performed by Rhino personnel using Rhino's equipment and Rhino's facilities. Rhino, on the other hand, incurred direct costs and overhead costs totaling THREE HUNDRED TEN THOUSAND NINE HUNDRED SEVENTY FIVE AND .23/100 DOLLARS ($310,975.23). See Enclosure 8.

In addition to the parties' agreement, BPI guaranteed payment to Rhino for all completed and accepted work. A copy of an e-mail from BPI to Rhino reflecting BPI's guarantee to pay Rhino for all completed and accepted work is attached to this letter as Enclosure 9. Although Rhino completed its work and its work was accepted by the Navy, BPI has yet to pay Rhino anything. All of the Navy documents showing acceptance of Rhino's work, confirming payment to BPI, and supporting the payments owed to Rhino are attached to this letter as Enclosure 10. As a result of BPI's breach of

its subcontract with Rhino, Rhino has incurred an enormous debt that has jeopardized Rhino's financial existence.

    B.    <u>Conclusion</u>.

        Rhino provided all labor and materials to perform work orders 0001 through 0018 of the contract pursuant to an oral subcontract between Rhino and BPI. BPI received full payment for the Rhino work the Navy accepted. However, BPI continues to refuse to pay Rhino for its costs plus fifty percent (50%) of BPI's profits on the Contract as agreed between the parties. Therefore, Rhino intends to enforce its rights under the Miller Act. Accordingly, Rhino hereby submits this letter, along with all its enclosures, as a supplement to its Proof of Claim against BPI's surety, AIG Technical Services, Inc.

        Your immediate attention to this matter is appreciated.

        Very truly yours,

        CARLSMITH BALL LLP

        *Amy D. Self*

        Terry E. Thomason
        Amy G. Self

1441107.1.053705-00001
Enclosures

cc:    Rhino Builders, Inc.



# AIG Technical Services, Inc.
175 Water Street
New York, NY 10038
212.770.7000

## *Proof of Claim : Construction Contract*

AIG Technical Services, Inc.

State of __Territory of Guam__

**Bond Number:** 000-20-80-88
**Claim Number:** 388-005037-001-0001

County of _____

I, __Michael O'Connell__ ,the __CEO__ of __Rhino Builders, Inc.__
    (Name of Affiant)      (Position in Firm)      (Name of Claimant)

of __87-1610 Ulehawa Road, Waianae, HI 96792__ on behalf of said firm, hereby state under oath that
    (Address)

said firm between the dates of ___May 2000___ and ___December 2000___ furnished, sold,

and delivered __roofing installation & repairs &__ materials to __BioGenesis Pacific, Inc.__ for the
    (describes services or material)      (Name of contractor or subcontractor if any)

construction of __Contract No. N62766-99-D-__ 0425 in accordance with an __oral__ Subcontract☒☒

described in __Prime__ (Identify Contract)

__Contractor letter__ Purchase order. Dated __January 2, 2001__ , a copy of which is attached hereto, for the agreed

price of __$1,081,881.80__ , none of which has been paid except ___$0___ and leaving a statement

balance due of __$1,081,881.80__. Attached hereto are ___1___ Invoices, __NA__ delivery tickets

showing the deliveries or progress estimates furnished __BioGenesis Pacific, Inc.__
    (Contractor)

and the amount due to claimant therefore; that said firm served notice of said balance due it by Registered Mail dated :

_____ on Surety, __Dec. 20, 2001__ on Contractor, __NA__ on Owner, (copies

attached), that there is no just credit nor offset due against said balance and that said firm made no assignment of any

part of said balance except to ___NA___

and that there are no liens or encumbrances against said balance except that of ___NA___

_____ ; that said firm has paid in full for all labor and material

furnished and supplied it for said job except the claims of the persons or firms whose names and addresses and amounts

due to them are as follows:

    NA

The foregoing information is furnished to the surety in support of affiant's claim and it is understood that the furnishing of
his from or the acceptance and/or retention thereof by the surety does not constitute a waiver or any of the terms of the
Surety's bond nor of any defenses the Surety may have, nor admission of liability thereunder.
Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal
or civil penalties.

Sworn to and subscribed before me

this __9th__ MIKO SHIMA day of __January__ 20 __02__

Notary Public State of Hawaii
Signed: My commission expires: 6/24/02      (Affiant's Signature)

STATE OF HAWAII

A Member Company of
American International Group, Inc.

U.S. District Court of Guam
Civil Case No. 02-00008

Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

# EXHIBIT "D"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities



**AIG** **AIG Technical Services, Inc.**
175 Water Street
New York, NY 10038
212.770.7000

Direct Dial: (212) 458-~~2901~~ 2901

January 17, 2002

<u>VIA REGULAR MAIL</u>

Carlsmith Ball LLP
Pacific Tower, Suite 2200
1001 Bishop Street
Honolulu, HI 96813
**Attention: Terry E. Thomasen, Esq.**

Re:    **Principal:**       **BioGenesis Pacific, Inc.**
       **Bond No.:**        **000-20-80-88**
       **Claim No.:**       **388-005037-001-0001**
       **Project:**         **Contract No. N62766-99-D-0425 – Navy Housing – Guam and various
                            locations**
       **Surety:**          **American Home Assurance Co.**
       **Claimant:**        **Rhino Builders, Inc.**

Dear Mr. Thomasen:

This will acknowledge receipt of your Proof of Claim forms in reference to the above captioned matter.

At this time, I am immediately taking this matter up with the above referenced Principal, in order to ascertain their position on your claim as presented. I will be in contact with you in due course regarding their position on the Proof of Claim as presented by your company on the above referenced bond.

Please be advised that this action is taken at this time without waiver of or prejudice to any of the rights and defenses, past or present, known or unknown which either the above referenced Surety or Principal may have in this matter.

Very truly yours,

Bruce Kahn

cc:    BioGenesis Pacific, Inc.
       The Sundt Companies, Inc.

A Member Company of
American International Group, Inc.

Exhibit

D

U.S. District Court of Guam
Civil Case No. 02-00008


Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

E

# EXHIBIT "E"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities



**AIG Technical Services, Inc.**
175 Water Street
New York, NY 10038
212.770.7000

Direct Dial: (212) 458-2901

February 21, 2002

<u>VIA REGULAR MAIL</u>

Carlsmith Ball LLP
Pacific Tower, Suite 2200
1001 Bishop Street
Honolulu, HI 96813
Attention: Terry E. Thomasen, Esq.

Re:     Principal:     BioGenesis Pacific, Inc.
        Bond No.:      000-20-80-88
        Claim No.:     388-005037-001-0001
        Claimant:      Rhino Builders, Inc. ("Rhino")
        Project:       Contract No. N62766-99-D-0425 - Navy Housing - Guam and various
                       locations
        Surety:        American Home Assurance Co.

Dear Mr. Thomasen:

The above referenced surety has reviewed the Proof of Claim and supporting documentation (collectively, the "Proof of Claim") which you submitted on or about January 9, 2002 in support of your client's claim against the referenced bond. The Proof of Claim has been reviewed in connection with the relevant bond language, your client's purported Miller Act Notice dated October 22, 2001, and the federal Miller Act, 40 U.S.C. § 270a et seq. which governs claims against payment bonds issued for federal projects such as the above.

Section 270b(b) of the Miller Act, among other things, expressly states that a payment bond claimant is time barred from bringing suit to enforce its claim unless such an action is brought within one year of the day on which the last of the labor was performed or material was provided by them.

I note that the sworn affidavit of Michael O'Connell, identified as claimant's chief executive officer, included in the Proof of Claim, admits and conclusively establishes that the last day claimant performed labor or provided material on the above project was on or before December 31, 2000. In order to have been timely, suit to enforce the claim would have had to have been commenced within one year of that date. As such, the above referenced claim appears to be time barred by the statute of limitations contained in 40 U.S.C. § 270b(b). Accordingly, the claim must be denied.

If you have any other documents or information you believe would be helpful for the Surety to review please feel free to provide them to the undersigned.

A Member Company of
American International Group, Inc.

Exhibit

**E**

 **AIG Technical Services, Inc.**
175 Water Street
New York, NY 10038
212.770.7000

Please be advised that this action is taken at this time without waiver of or prejudice to any of the rights and defenses, past or present, known or unknown which either the above referenced Surety or Principal may have in this matter.

Very truly yours,

Bruce Kahn

cc.: BioGenesis Pacific, Inc.

A Member Company of
American International Group, Inc.

2

U.S. District Court of Guam
Civil Case No. 02-00008


Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.


**F**


# EXHIBIT "F"


Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities

# CARLSMITH BALL LLP

A LIMITED LIABILITY LAW PARTNERSHIP

PACIFIC TOWER, SUITE 2200
1001 BISHOP STREET
HONOLULU, HAWAII 96813
TELEPHONE (808) 523-2500    FAX (808) 523-0842
WWW.CARLSMITH.COM

DIRECT DIAL NO.
(808) 523-2527

E-MAIL TET@CARLSMITH.COM

OUR REFERENCE NO.
053705-00001

March 11, 2002

**RECEIVED**

MAR 1 9 2002

**Surety Bond Claims**

**BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Mr. Bruce Kahn
AIG Technical Services, Inc.
175 Water Street
New York, New York 10038

Re:     Miller Act Claim; Ref. Bond No. 20-80-88 - BioGenesis Pacific, Inc.,
        Prime Contractor on Contract No. N62766-99-D-0425

Dear Mr. Kahn:

We are in receipt of your letter of February 21, 2002, in which you state the claim submitted by our client, Rhino Builders, Inc. ("Rhino"), is time barred under the Miller Act.

We ask that you reconsider your position. Under the Miller Act, the one year limitation period begins on the last day the claimant provides labor or material for use on the project. As you may recall in our January 9, 2002 supplemental letter to Rhino's claim, we explained that BioGenesis Pacific ("BPI") "was continuing to use Rhino resources on the Contract without payment." This use of Rhino materials on the Contract continues even today, even though Rhino's present claim for payment is only for labor and materials supplied to BPI on the Contract through December 2000. See the attached Affidavit of Michael O'Connell. As discussed below, Rhino's claim is well within the Miller Act's one year limitation period.

HONOLULU · KAPOLEI · HILO · KONA · MAUI · GUAM · SAIPAN · LOS ANGELES · WASHINGTON/D.C. · MEXICO

**Exhibit**

**F**

Mr. Bruce Kahn
March 11, 2002
Page 2

A.    The Ninth Circuit's Interpretation of the Miller Act

The purpose of the Miller Act is "to provide broad protection for persons supplying labor and material for the construction of federal public projects." General Electric Co. v. Southern Construction Co., Inc., 383 F.2d 135, 139 (5th Cir. 1967). See also Taylor Construction Inc. v. ABT Service Corp. Inc., 163 F.3d 1119 (9th Cir. 1998) (explaining that "[t]he policy behind the Act is 'to provide a surety who, by force of the Act, must make good the obligations of a defaulting contractor to his suppliers of labor and material'") (quoting United States ex rel. Sherman v. Carter, 353 U.S. 210, 217 (1957); United Bonding Ins. Co. v. Catalytic Construction Co., 533 F.2d 469, 473 (9th Cir. 1976) (holding that the "purpose of the Miller Act is to protect those who would have materialmen's and workmen's liens under state law if they were not working on a structure exempt as a federal public work or building"). Thus, courts have traditionally given the Miller Act liberal construction and application in order "to protect those whose labor and materials go into public projects." Taylor Construction, 163 F.3d at 1122 (quoting Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co., 322 U.S. 102 (1944)). See also United Bonding, 533 F.2d. at 473 (interpreting the Miller Act liberally, in light of its legislative history, to protect laborers and suppliers).

1.    Statute of Limitations Under the Miller Act

Section 270(b) of the Miller Act provides in pertinent part that a payment bond action "shall be commenced after the expiration of one year after the day on which the last of the labor was performed or material was supplied by [the claimant]." 40 U.S.C. § 270(b). The Act's "one-year period begins to run [either] on the day when the labor ceases or when the last material was supplied." J.D. Fields & Co., Inc. v. Gottfried Corp., et al., 272 F.3d 692, 698 (5th Cir. 2001). See, e.g., Interform Co. v. Mitchell, 575 F.2d 1270 (9th Cir. 1978); United States ex rel. Carter-Schneider-Nelson, Inc. v. Campbell, 293 F.2d 816 (9th Cir. 1961); Mike Bradford & Co. v. F.A. Chastain Constr., Inc., 387 F.2d 942 (5th Cir. 1968).

In applying the Act's one-year limitations period to suppliers of equipment, the Ninth Circuit has held that the period begins to run "on the date 'the equipment was last available for use on the project.'" United States for the Use of Pippin v. J.R. Youngdale Construction Co., Inc., 923 F.2d 146 (9th Cir. 1991) (quoting United States ex rel. Miller & Bentley Equip. Co. v. Kelley, 327 F.2d 590, 591 (9th Cir. 1964). See also Campbell, 293 F.2d at 820 (holding that when the claimant provides equipment by lease

Mr. Bruce Kahn
March 11, 2002
Page 3

or rental, the one-year limitations period begins on the date "the equipment was last available for use on the project"); <u>Interform Co.</u>, 575 F.2d at 1280 (explaining that under the Miller Act, "a furnisher of rental equipment continues to supply such equipment through the entire rental period; the date of last supply occurs not at the beginning of a job but at the end or at the time the equipment is last available for use on the job").

The court in <u>Youngdale Construction</u> explained that unlike a supplier of materials whose obligation ends upon delivery, a supplier of equipment under lease or rental "must allow the equipment to remain in the hands of the lessee for such time as is specified by the lease arrangement." <u>Youngdale Construction</u>, 923 F.2d at 149 (quoting <u>Campbell</u>, 293 F.2d at 820). Thus, "the lessor continues to supply the equipment until the date that the equipment is no longer available for use by the [contractor] on the project." <u>Id.</u> at 149-150. The Act's one-year limitations period, therefore, begins on the date the equipment was last available for use on the project. <u>Id.</u> at 149.

B.  <u>Rhino's Miller Act Claim is Not Barred by the One-Year Limitations Period</u>

Rhino's Miller Act claim is not time barred because Rhino has continued to supply equipment to BPI for use on the project. See attached Affidavit of Michael O'Connell. The time period from May 2000 to December 2000, as entered in the Proof of Claim, is the inclusive period during which Rhino supplied labor and materials to BPI for which Rhino is claiming non-payment by BPI. However, subsequent to December 2000, Rhino continued to supply equipment to BPI as late as January 2002. See attached Affidavit of Michael O'Connell.

Specifically, Rhino supplied a truck leased by Rhino to BPI which was available for use by BPI on the project until March 20, 2001, the date on which the lease expired. See Exhibit A of the Affidavit of Michael O'Connell. Rhino also supplied another truck to BPI which was available for use by BPI on the project until May 2001, the date the truck was returned to Rhino. See attached Affidavit of Michael O'Connell. In addition, Rhino supplied another truck to BPI which was available for use by BPI on the project until January 17, 2002, the date on which Rhino paid to have the truck towed to Rhino's premises. See Exhibit B of the Affidavit of Michael O'Connell. Finally, BPI has continued to use and is presently using Rhino's safety equipment and various other types of equipment. See attached Affidavit of Michael O'Connell. The one-year limitations period will not begin until the date such equipment is no longer available for

Mr. Bruce Kahn
March 11, 2002
Page 4

use by BPI on the project. See Youngdale Construction supra. Therefore, Rhino's claim
is not time barred under the Miller Act.

    C.    <u>Conclusion</u>.

    The purpose of the Miller Act is to provide broad protection for companies
like Rhino that supply labor and material for the construction of federal public works
projects. Rhino's claim against BPI under the Miller Act is for all labor and materials it
supplied to BPI from May 2000 to December 2000 only, even though Rhino has
continued to supply equipment to BPI for the project. Because such equipment is still
available to BPI for use on the project, Rhino's claim is not time barred by the Miller
Act's statute of limitations.

    Rhino asks for prompt resolution of its claim before it is compelled to bring
civil suit.

        Very truly yours,

        CARLSMITH BALL LLP

        Terry E. Thomason
        Amy G. Self

1450480.1.053705-0000!
Enclosures

cc:   Rhino Builders, Inc.

# RHINO BUILDERS HUBZone & 8 (s) SBA CERTIFIED

790 North Marine Drive, P. O. Box 959, Tumon, Guam, 96911, (671) 632-7653,
(671) 637-9618 fax, Rhinews@ite.net
85-841 B Farrington Highway, Waianae, Hawaii, 96792, (808) 668-8878,
(808) 668-7024 fax, Rhinel@Hawaii.rr.com

## INVOICE

| | |
|---|---|
| TO BIOGENESIS PACIFIC, INC. | NO. 0301-002 |
| 790 NORTH MARINE DRIVE #303 | DATE MAR. 21, 2001 |
| TUMON, GUAM 96911 | SHIP VIA |
| ATTN BOBBIE SALAS | YOUR NO. |
| TEL 637-9633/35 FAX 637-9634 | CUR NO. |
| | TERMS DUE UPON RECEIPT |

This is to bill you as follows:

| QUANTITY | DESCRIPTION | UNIT PRICE | | TOTAL |
|---|---|---|---|---|
| | ISUZU FLATBED RENTAL | | | |
| 1 WEEK | MONDAY-SATURDAY MAR. 12-17, 2001 | 584.00 /WK. | $ | 584.00 |
| 2 DAYS | MONDAY-TUESDAY MAR. 19-20, 2001 | 130.00 /DAY | $ | 260.00 |

*Recieved by [signature] 3-22-01*

|  | Amount due | $ | 844.00 |
|---|---|---|---|

RHINO BUILDERS, INC.

Please show invoice number on your remittance.

By: [signature]

## FILE COPY     EXHIBIT A

U.S. District Court of Guam
Civil Case No. 02-00008

Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

# EXHIBIT "G"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities

**From:** "Granville, Judeth" <Judeth.Granville@AIG.com>
**To:** 'David Ledger' <dledger@carlsmith.com>, "Granville, Judeth" <Judeth.Granville@AIG.com>
**Date:** 3/19/02 6:42AM
**Subject:** RE: AIG Technical Services

David:

American Home Assurance Company (the insurer), American International Marine Agency (from whose account your fees are paid), and A I Marine Adjusters, Inc. are each member companies of American International Group, as is AIG Technical Services.

So, yes we are all AIG companies.

Trust that this answers your question..

Regards,
Judeth Granville
A I Marine Adjusters, Inc, - San Francisco


> -----Original Message-----
> **From:** David Ledger
> **Sent:** Monday, March 18, 2002 11:25 PM
> **To:** judeth.granville@aig.com
> **Cc:** Donald Calvo; Sinforoso Tolentino; Terry Thomason
> **Subject:** AIG Technical Services
>
> Judeth - Is AIG Technical Services a company related to the company which
> is paying our fees for our defense of the insured Casamar?  I ask because
> a sub contractor client of ours seeks to sue a general contractor and its
> bonding company, apparently AIG Technical Services, for non-payment.   If
> you are able to reply, time is of the essence.  Thank you.
>
> David Ledger
> dledger@carlsmith.com
> Tel: 671-472-6813
> Fax: 671-477-4375


**CC:** Donald Calvo <dcalvo@carlsmith.com>, Sinforoso Tolentino <stolentino@carlsmith.com>, Terry Thomason <tthomason@carlsmith.com>

CBHNL000099

Exhibit
G

U.S. District Court of Guam
Civil Case No. 02-00008


Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.


# EXHIBIT "H"


Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities

# CARLSMITH BALL LLP

A LIMITED LIABILITY LAW PARTNERSHIP

PACIFIC TOWER, SUITE 2200

1001 BISHOP STREET

HONOLULU, HAWAII 96813

TELEPHONE (808) 523-2500    FAX (808) 523-0842

www.carlsmith.com

DIRECT DIAL NO.
(808) 523-2527

E-MAIL TTHOMASON@CARLSMITH.COM

OUR REFERENCE NO.
053705-00001

April 9, 2002

**CONFIDENTIAL**
**ATTORNEY-CLIENT PRIVILEGE**
**VIA FACSIMILE & U.S. MAIL**

Mr. Michael O'Connell
President
Rhino Builders, Inc.
85-841 Farrington Highway #B
Waianae, Hawaii 96792

Re:   Status of Work and Recommendations

Dear Mr. O'Connell:

Mr. Michael O'Connell
April 9, 2002
Page 2

2. <u>Transfer Of The Miller Act Claim</u>.

We also have advised Rhino to transfer the BPI Miller Act claim to another firm in Guam. Our recommendation arose from the discovery of a possible challenge the surety may assert against Carlsmith's involvement in the case.

a. <u>Potential Challenge To Carlsmith</u>.

This potential challenge would be based upon the rule of professional conduct for attorneys that precludes an attorney or law firm from representing one client in a matter that conflicts with the interests of another client. We are concerned that BPI's surety may claim that it is one of Carlsmith's clients and that Carlsmith cannot represent Rhino in the suit.

The potential challenge grows from the complex nature of the surety's corporate structure. In Rhino's Miller Act claim, the surety has identified itself as AIG Technical Services. AIG Technical Services is reportedly related in some manner to American International Group, Inc.

American International Group, Inc. is a very large company with one-hundred and thirty-six reported subsidiaries. For your review and information, we have enclosed a printout of the American International Group, Inc. reported list of subsidiaries as filed with the U.S. Securities and Exchange Commission.

BPI's supposed surety, AIG Technical Services is not listed among American International Group, Inc.'s subsidiaries, but it may be owned by one of the subsidiaries. In the Miller Act suit, Rhino's claim against BPI must also be asserted against AIG Technical Services as the surety for BPI. If BPI fails to pay Rhino for proven contract obligations, the surety must pay in BPI's place. Consequently, Rhino's interests and the interests of AIG Technical Services are adverse to each other.

At the time of our filing of Rhino's complaint, a company doing business in Guam under the name of A I Marine Adjusters was using the services of one of our trial attorneys in Guam. The services consisted of the defense of marine insurance claims. Although A I Marine Adjusters is also not listed on the American International Group, Inc.'s list of subsidiaries, a representative of A I Marine Adjusters told our trial attorney that A I Marine Adjusters is related in some way to American International Group.

The exact relationship among AIG Technical Services, Inc., A I Marine Adjusters and the various other companies of American International Group, Inc. remains unclear. Before an actual conflict would arise, A I Marine Adjusters and AIG Technical Services, Inc. must have shared management officials, boards of directors, or otherwise be so closely affiliated that Carlsmith would need to treat them as a single client.

We do not believe that an actual conflict has arisen. However, we are concerned that the surety could challenge Carlsmith's representation of Rhino during the suit. Such a challenge could come at any time, and Rhino should anticipate that the surety would use the challenge at the most inopportune time for Rhino to delay and increase the expenses of the suit. Even though the court may find no conflict exists, the presence of the issue could significantly increase Rhino's costs in pursuing the suit.

    b.   <u>Recommendation To Avoid The Problem.</u>

Questions concerning whether one law firm or another may represent Rhino in this suit are completely irrelevant to Rhino's Miller Act claim. Fighting the potential conflict issue will not promote Rhino's chances of recovery, and will do nothing more than impose an unnecessary cost of litigation. Because Rhino had planned to transfer the

litigation of the case to different attorneys in Carlsmith's Guam office anyway, the transfer to another attorney (not from within Carlsmith) will not cause any significant disruption or delay. Carlsmith remains prepared to ensure all case files, evidence and other materials in Carlsmith's Honolulu office are delivered without delay to an attorney outside of Carlsmith that Rhino may select.

Under the circumstances, we recommend Rhino transfer the Miller Act claim to another Guam attorney to avoid unnecessary litigation and expense. As we have informed you, Anita Arriola is prepared to take the Miller Act claim if you elect to transfer the case to her. Ms. Arriola is a very experienced and highly qualified Guam litigation attorney. At this stage of the case, we believe transfer of the case to Ms. Arriola is in Rhino's best interests.

Mr. Michael O'Connell
April 9, 2002
Page 6

Mr. Michael O'Connell
April 9, 2002
Page 7

D.    Conclusion.

For the foregoing reasons, we recommend Rhino:

~~1.    Retain Anita Arriola as soon as possible to pursue Rhino's Miller~~
Act Claim;

Please call if you have any questions concerning the above matters.

Very truly yours,

*Terry E Thomason*

Terry E. Thomason

TET:shl
Enclosure
1454296-1

## VIEW DOCUMENT

## AMERICAN INTERNATIONAL GROUP INC
10-K - EX-21, EX-21 SUBSIDIARIES OF REGISTRANT filed 04/02/01

VIEW  EMAIL  PRINT  SAVE  Review Settings

View Filing

Page 1 – 10-K – EX-21 – Filed by AMERICAN INTERNATIONAL GROUP INC

1

Exhibit 21

Subsidiaries of Registrant

| Name of Corporation(1) | Jurisdiction of Incorporation | % of Voting Securities Owned by its Immediate Parent(2) |
|---|---|---|
| American International Group, Inc. (Registrant) | Delaware | (3) |
| AIG Aviation, Inc. | Georgia | 100% |
| AIG Bulgaria Insurance and Reinsurance Company AD | Bulgaria | 100% |
| AIG Capital Corp. | Delaware | 100% |
| AIG Capital Management Corp. | Delaware | 100% |
| AIG Claim Services, Inc. | Delaware | 100% |
| AIG Consumer Finance Group, Inc. | Delaware | 97.23% |
| AIG Bank Polska S.A. | Poland | 100% |
| AIG Credit S.A. | Poland | 95.62% |
| Compania Financiera Argentina S.A. | Argentina | 100% |
| AIG Credit Corp. | Delaware | 100% |
| A.I. Credit Corp. | New Hampshire | 100% |
| Imperial Premium Finance, Inc. | California | 100% |
| Imperial Premium Finance, Inc. | Delaware | 100% |
| AIG Finance Holdings, Inc. | New York | 100% |
| AIG Finance (Hong Kong) Limited | Hong Kong | 100% |
| AIG Financial Products Corp. | Delaware | 100% |
| AIG Matched Funding Corp. | Delaware | 90%(4) |
| Banque AIG | France | 100% |
| AIG Funding, Inc. | Delaware | 100% |
| AIG Global Investment Group, Inc. | Delaware | 100% |
| AIG Capital Partners, Inc. | Delaware | 100% |
| AIG Global Investment Corp. | New Jersey | 100% |
| AIG Global Real Estate Investment Corp. | Delaware | 100% |
| AIG Global Trade & Political Risk Insurance Company | New Jersey | 100% |
| AIG Golden Insurance Ltd. | Israel | 50.1% |
| AIG Life Insurance Company | Delaware | 78.9%(5) |
| AIG Life Insurance Company of Canada | Canada | 100% |
| AIG Life Insurance Company of Puerto Rico | Puerto Rico | 100% |
| AIG Marketing, Inc. | Delaware | 100% |
| AIG Memsa, Inc. | Delaware | 26% |
| Tata AIG General Insurance Company Ltd. | India | 100% |
| AIG Private Bank Ltd. | Switzerland | 100% |
| AIG Risk Management, Inc. | New York | 100% |
| AIG Trading Group Inc. | Delaware | 100% |
| AIG International Inc. | New York | 52%(6) |
| AIU Insurance Company | New York | 100% |
| AIU North America, Inc. | New York | 100% |

| Name | Jurisdiction | % |
|---|---|---|
| AIG Hawaii Insurance Company, Inc. | Hawaii | 100% |
| American International Insurance Company | New York | 100% |
| American International Insurance Company of California, Inc. | California | 100% |
| American International Insurance Company of New Jersey | New Jersey | 100% |
| Minnesota Insurance Company | Minnesota | 100% |
| American International Realty Corp. | Delaware | 31.47%(7) |
| Pine Street Real Estate Holdings Corp. | New Hampshire | 31.47%(8) |
| Transatlantic Holdings, Inc. | Delaware | 33.77%(9) |
| Transatlantic Reinsurance Company | New York | 100% |
| Putnam Reinsurance Company | New York | 100% |
| Trans Re Zurich | Switzerland | 100% |

II-10

2

Subsidiaries of Registrant -- (continued)

| Name of Corporation(1) | Jurisdiction of Incorporation | % of Voting Securities Owned by its Immediate Parent(2) |
|---|---|---|
| American International Group Data Center, Inc. | New Hampshire | 100% |
| American International Life Assurance Company of New York | New York | 77.52%(10 |
| American International Reinsurance Company Limited | Bermuda | 100% |
| American International Assurance Company, Limited | Hong Kong | 100% |
| American International Assurance Company (Australia) Limited | Australia | 100% |
| American International Assurance Company (Bermuda) Limited | Bermuda | 100% |
| American International Assurance Co. (Vietnam) Limited | Vietnam | 100% |
| Tata AIG Life Insurance Company Ltd. | India | 26% |
| Nan Shan Life Insurance Company, Ltd. | Taiwan | 95% |
| American International Underwriters Corporation | New York | 100% |
| American International Underwriters Overseas, Ltd. | Bermuda | 100% |
| AIG Europe (Ireland) Ltd. | Ireland | 100% |
| AIG Europe (U.K.) Limited | England | 100% |
| AIG Interamericana Compania de Seguros Gerais (Brazil) | Brazil | 50% |
| Universal Insurance Co., Ltd. | Thailand | 100% |
| La Seguridad de Centroamerica, Compania de Seguros, Sociedad Anonima | Guatemala | 100% |
| American International Insurance Company of Puerto Rico | Puerto Rico | 100% |
| La Interamerica Compania de Seguros Generales S.A | Colombia | 100% |
| American International Underwriters G.m.b.H | Germany | 100% |
| Underwriters Adjustment Company, Inc. | Panama | 100% |
| American Life Insurance Company | Delaware | 100% |
| AIG Life (Bulgaria) Z.D. A.D. | Bulgaria | 100% |
| AIG Participacoes do Brasil, S.A. | Brazil | 100% |
| ALICO, S.A. | France | 89% |
| American Life Insurance Company (Kenya) Limited | Kenya | 100% |
| Pharaonic American Life Insurance Company | Egypt | 71.6% |
| American Security Life Insurance Company, Ltd. | Switzerland | 99.8% |
| American Security Life Insurance Company | Lichtenstein | 100% |
| Birmingham Fire Insurance Company of Pennsylvania | Pennsylvania | 100% |
| China America Insurance Company, Ltd. | Delaware | 50% |
| Commerce and Industry Insurance Company | New York | 100% |
| Commerce and Industry Insurance Company of Canada | Ontario | 100% |
| Delaware American Life Insurance Company | Delaware | 100% |
| Hawaii Insurance Consultants, Ltd. | Hawaii | 100% |
| HSB Group, Inc. | Delaware | 100% |
| The Hartford Steam Boiler Inspection and Insurance Company | Connecticut | 100% |
| Allen Insurance Company Ltd. (Bermuda) | Bermuda | 100% |
| The Hartford Steam Boiler Inspection and Insurance Company of Connecticut | Connecticut | 100% |
| The Hartford Steam Boiler Inspection and Insurance Company of Texas | Texas | 100% |
| HSB Engineering Insurance Limited | England | 100% |
| The Boiler Inspection and Insurance Company of Canada | Canada | 100% |
| The Insurance Company of the State of Pennsylvania | Pennsylvania | 100% |
| Landmark Insurance Company | California | 100% |
| Mt. Mansfield Company, Inc. | Vermont | 100% |

| | | |
|---|---|---|
| National Union Fire Insurance Company of Pittsburgh, Pa. | Pennsylvania | 100% |
| American International Specialty Lines Insurance Company | Alaska | 70% (11 |
| International Lease Finance Corporation | California | 100% |
| Lexington Insurance Company | Delaware | 70% (11 |
| JI Accident & Fire Insurance Co. Ltd. | Japan | 50% |

II-11

3

Subsidiaries of Registrant-- (continued)

| Name of Corporation | Jurisdiction of Incorporation | % of Voting Securities Owned by its Immediate Parent(2) |
|---|---|---|
| National Union Fire Insurance Company of Louisiana | Louisiana | 100% |
| 21st Century Insurance Group | California | 33.07% (12) |
| 21st Century Insurance Company | California | 100% |
| 21st Century Casualty Company | California | 100% |
| Starr Excess Liability Insurance Company, Ltd. | Delaware | 100% |
| Starr Excess Liability Insurance International Limited | Ireland | 100% |
| NHIG Holding Corp. | Delaware | 100% |
| Audubon Insurance Company | Louisiana | 100% |
| Audubon Indemnity Company | Mississippi | 100% |
| Agency Management Corporation | Louisiana | 100% |
| The Gulf Agency, Inc. | Alabama | 100% |
| New Hampshire Insurance Company | Pennsylvania | 100% |
| AIG Europe, S.A | France | (13) |
| A.I. Network Corporation | New Hampshire | 100% |
| American International Pacific Insurance Company | Colorado | 100% |
| American International South Insurance Company | Pennsylvania | 100% |
| Granite State Insurance Company | Pennsylvania | 100% |
| New Hampshire Indemnity Company, Inc. | Pennsylvania | 100% |
| AIG National Insurance Company, Inc. | New York | 100% |
| Illinois National Insurance Co. | Illinois | 100% |
| New Hampshire Insurance Services, Inc. | New Hampshire | 100% |
| Pharaonic Insurance Company, S.A.E. | Egypt | 90% |
| The Philippine American Life and General Insurance Company | Philippines | 99% |
| Pacific Union Assurance Company | California | 100% |
| The Philippine American General Insurance Company, Inc. | Philippines | 100% |
| Philam Insurance Company, Inc. | Philippines | 100% |
| Risk Specialist Companies, Inc. | Delaware | 100% |
| SunAmerica Inc. | Delaware | 100% |
| SunAmerica Investments, Inc. | Georgia | 100% |
| SunAmerica Financial Network, Inc. | Maryland | 100% |
| Advantage Capital Corp. | New York | 100% |
| FSC Securities, Inc. | Delaware | 100% |
| Sentra Securities Corp. | California | 100% |
| Spelman & Co., Inc. | California | 100% |
| SunAmerica Securities, Inc. | Delaware | 100% |
| Resources Trust Company | Colorado | 100% |
| SunAmerica Life Insurance Company | Arizona | 100% |
| First SunAmerica Life Insurance Company | New York | 100% |
| Anchor National Life Insurance Company | Arizona | 100% |
| Royal Alliance Associates, Inc. | Delaware | 100% |
| SunAmerica Asset Management Corp. | Delaware | 100% |
| SunAmerica Capital Services, Inc. | Delaware | 100% |
| 21st Century Insurance Company of Arizona | Arizona | 51% (14) |

II-12

4

Subsidiaries of Registrant--(continued)

[VIEW THIS TABLE IN EXCEL]

| Name of Corporation | Jurisdiction of Incorporation | % of Voting Securities Owned by its Immediate Parent(2) |
|---|---|---|
| United Guaranty Corporation | North Carolina | 36.31%(15) |
| United Guaranty Insurance Company | North Carolina | 100% |
| United Guaranty Mortgage Insurance Company | North Carolina | 100% |
| United Guaranty Mortgage Insurance Company of North Carolina | North Carolina | 100% |
| United Guaranty Residential Insurance Company | North Carolina | 100% |
| United Guaranty Residential Insurance Company of North Carolina | North Carolina | 75%(16) |
| United Guaranty Commercial Insurance Company of North Carolina | North Carolina | 100% |
| United Guaranty Mortgage Indemnity Company | North Carolina | 100% |
| United Guaranty Credit Insurance Company | North Carolina | 100% |
| United Guaranty Services, Inc. | North Carolina | 100% |

----------

(1) All subsidiaries listed are consolidated in the accompanying financial statements. Certain subsidiaries have been omitted from the tabulation. The omitted subsidiaries, when considered in the aggregate as a single subsidiary, do not constitute a significant subsidiary.

(2) Percentages include directors' qualifying shares.

(3) The common stock is owned 13.6 percent by SICO, 2.0 percent by Starr and 2.7 percent by The Starr Foundation.

(4) Also owned 10 percent by AIG Matched Funding Corp.

(5) Also owned 21.1 percent by Commerce & Industry Insurance Company.

(6) Also owned 8 percent by The Insurance Company of the State of Pennsylvania, 32 percent by National Union, and 8 percent by Birmingham.

(7) Also owned by 11 other AIG subsidiaries

(8) Also owned by 11 other AIG subsidiaries

(9) Also owned 26.19 percent by American International Group, Inc.

(10) Also owned 22.48 percent by American Home.

(11) Also owned 20 percent by The Insurance Company of the State of Pennsylvania and 10 percent by Birmingham.

(12) Also owned 16.87 percent by American Home, 6.34 percent by Commerce & Industry Insurance Company and 6.34 percent by New Hampshire.

(13) 100 percent to be held with other AIG companies.

(14) Also owned 49 percent by 21st Century Insurance Group.

(15) Also owned 45.88 percent by National Union, 16.95 percent by New Hampshire

```
Transmission Report
```

Date/Time
Local ID
Local Name
Company Logo

4- 9-02; 4:26PM
808 5230842
CARLSMITH BALL HONO

This document was confirmed.
(reduced sample and details below)
Document Size Letter-S

## CARLSMITH BALL LLP

A LIMITED LIABILITY LAW PARTNERSHIP

PACIFIC TOWER, SUITE 2200
1001 BISHOP STREET
HONOLULU, HAWAII 96813
TELEPHONE (808) 523-2500    FAX (808) 523-0842
WWW.CARLSMITH.COM

### FACSIMILE TRANSMISSION

UNLESS OTHERWISE INDICATED OR OBVIOUS FROM THE NATURE OF THE TRANSMITTAL, THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED BELOW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR OR ARE NOT SURE WHETHER IT IS PRIVILEGED, PLEASE IMMEDIATELY NOTIFY US BY COLLECT TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE AT OUR EXPENSE.  THANK YOU.

DATE:    April 9, 2002

### CONFIDENTIAL
### ATTORNEY-CLIENT PRIVILEGE

| TO: | Name | Fax No. | Phone No. |
|---|---|---|---|
| | Michael O'Connell | 663-7024 | 668-8578 |
| | President, Rhino Builders, Inc. | | |

FROM:    Terry E. Thomason

NUMBER OF PAGES INCLUDING THIS COVER SHEET: ~~X~~ 13
CASE NAME:    Rhino Builders, Inc.
CASE NUMBER:    053705-00001

[x] ORIGINAL/COPY WILL BE MAILED    [ ] ORIGINAL/COPY WILL NOT BE MAILED

MESSAGE:    Please see the attached correspondence of today's date.

1451049

If problems occur, please call our facsimile operator at (808) 523-2500, or Shawne H.
Lopes at (808) 523-2651.

Total Pages Scanned : 13' Total Pages Confirmed : 13'

| No. | Doc | Remote Station | Start Time | Duration | Pages | Mode | Comments | Results |
|---|---|---|---|---|---|---|---|---|
| 1 | 084 | 6687024 | 4- 9-02; 4:21PM | 4'42" | 13/ 13 | EC | | CP 14400 |

```
* Notes **
C:  Error Correct       RE: Resend              PO: Polled by Remote     MB: Receive to Mailbox
BC: Broadcast Send       MP: Multi-Poll          PG: Polling a Remote     PI: Power Interruption
CP: Completed            RM: Receive to Memory   DR: Document Removed     TM: Terminated by User
S:  Local Scan           LP: Local Print         FO: Forced Output        WT: Waiting Transfer
```

U.S. District Court of Guam
Civil Case No. 02-00008

Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

# EXHIBIT "I"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities



**AIG Technical Services, Inc.**
175 Water Street
New York, NY 10038
212.770.7000

JUL 0 3 20[...]

Direct Dial: (212) 458-2901

June 21, 2002

**VIA REGULAR MAIL**

Carlsmith Ball LLP
Pacific Tower, Suite 2200
1001 Bishop Street
Honolulu, HI 96813
**Attention: Terry E. Thomasen**

| Re: | Principal: | **BioGenesis Pacific, Inc.** |
|---|---|---|
| | Bond No.: | **000-20-80-88** |
| | Claim No.: | **388-005037-001-0001** |
| | Project: | **Contract No. N62766-99-D-0425 - Navy Housing - Guam and various locations** |
| | Surety: | **American Home Assurance Co.** |

Dear Mr. Thomasen:

The Surety has reviewed your letter of March 11, 2002 along with the enclosed documents. The Surety continues to believe that the Miller Act claim asserted by Rhino Builders, Inc. is time barred by the statute of limitations contained in 40 U.S.C. § 270b(b) and, accordingly, we maintain our position denying your client's claim as set forth in our letter dated February 21, 2002.

Please be advised that this action is taken at this time without waiver of or prejudice to any of the rights and defenses, past or present, known or unknown which either the above referenced Surety or Principal may have in this matter.

Very truly yours,

Bruce Kahn

cc.:     BioGenesis Pacific, Inc.

A Member Company of
American International Group, Inc.

Exhibit

U.S. District Court of Guam
Civil Case No. 02-00008

Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

# EXHIBIT "J"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities

ANTONIO L. CORTÉS
Law Office of Antonio L. Cortés
233 Julale Center
424 West O'Brien Drive
P.O. Box BV
Hagåtña, Guam 96932
Telephone No.: (671) 477-1930
Facsimile No.: (671) 477-1933

Attorneys for Plaintiff Rhino Builders, Inc.

RECEIVED
10:12 a.m. MAIL
SEP 15 2003
VERNIER &
MAHER, LLP

IN THE DISTRICT COURT

OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., <br><br> Plaintiff, <br><br> BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC., and AMERICAN HOME ASSURANCE CO., <br><br> Defendants. | CIVIL CASE NO.02-00008 <br><br> **PLAINTIFF'S RESPONSE TO DEFENDANT AIG TECHNICAL SERVICES and AMERICAN HOME ASSURANCE COMPANY'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS** |

Plaintiff Rhino Builders, Inc. ("Plaintiff") responds to Defendants AIG

Technical Services, Inc. and American Home Assurance Company's ("Defendants

AIGTS and AHAC") Second Request for Production of Documents, served July 29,

2003 ("the document Requests"), as follows:

**GENERAL OBJECTIONS**

Insofar as the Document Requests request any privileged information,

Plaintiff objects on that ground and will not produce documents containing privileged

Exhibit
J

information except to the limited extent the attorney-client privilege is waived. The scope of that proffered waiver is that Rhino will reveal <u>all</u> written and oral privileged communications between Carlsmith Ball LLP and Rhino that directly addressing the subjects of: (1) any conflicts or relationships with entities other than Rhino that prompted Carlsmith to insist that Rhino find other counsel to represent it in this matter; (2) the identity of any Carlsmith clients who Carlsmith indicated it might represent that might cause an actual or potential conflict; and (3) the expense Oor injury incurred by Plaintiff in changing counsel. Rhino will not reveal that information pre-trial, however, unless and until the other parties agree that Rhino's waiver of the privileged nature of its communications with Carlsmith is limited to communications on those three subjects, or until the Court so orders, so that the other parties will not harass Rhino by contending that Rhino has waived the attorney-client privilege with regard to all its communications with Carlsmith.

Plaintiff generally objects that AHAC and AIGTS, in continued bad faith denial of Plaintiff's claim at issue in this case, are using the discovery process in this action to successfully make it economically impossible for Plaintiff to realize the protection Congress intended it to have pursuant to the Miller Act. AHAC and AIGTS's tactics in this regard include, but are not necessarily limited to: repeatedly purporting to require Rhino to pay its attorneys to provide unnecessary information and information it has already provided and refusing to provide Plaintiff legitimately

2

needed information available or known to AHAC and AIGTS without which Plaintiff cannot adequately pursue the remedies to which it is entitled.

Accordingly, Plaintiff generally objects to Defendants' AIGTS and AHAC's Document Requests because they are overly broad, unduly burdensome, vexatious, harassing, and to some extent, request information that is neither relevant to this case nor reasonably calculated to lead to admissible evidence. Plaintiff specifically objects to all the document requests because they purport to require production of "all," "any," or "any and all" documents, or "each and every" document, supporting or relating to a particular allegation or portion of the complaint and are therefore unduly burdensome and overly broad. Plaintiff objects to, and does not respond to, requests for identification of documents as those requests must be made under Rule 33 and be limited in number as required by that rule.

## RESPONSES

DOCUMENT REQUEST NO. 1: On August 15, 2001, your former attorney, Carlsmith Ball LLP, wrote a letter to Ms. Bennette Terlaje, Contracting Oficer for Contract No. N62766-D-0425, requesting documents and other information. Please identify and produce any and all responses, documents, invoices, correspondence and/or other information that the Unites States Navy provided to your as a result of the above-reference August 15, 2001 correspondence.

RESPONSE: Subject to its general objects, Rhino responds as follows: To the extent, if any, such documents have not already been produced, Rhino will make

documents available for inspection and copying if and when AIGTS and AHAC adequately respond to Rhino's July 18, 2003 discovery requests.

DOCUMENT REQUEST NO. 2: In paragraph 38 of your Second Amended Complaint, you allege that "approximately 2 or 3 weeks before this action was filed by Plaintiff's former counsel of record, an entity connected with Defendants Surety and/or an attorney representing Defendants Surety, contacted Plaintiff's former counsel and communicated to it that it should withdraw from its former representation of Plaintiff for conflict-of-interest reasons. . . ." Please identify and produce all e-mail, letters, correspondence, memoranda and documents supporting your allegation.

RESPONSE: Plaintiff specifically objects that this request is for documents protected by the attorney-client privilege. Pursuant to its general and specific objections, Plaintiff is willing to provide such privileged documents or portions of privileged documents that directly address the subjects of: (1) any conflicts or relationships with entities other than Rhino that prompted Carlsmith to insist that Rhino find other counsel to represent it in this matter; (2) the identity of any Carlsmith clients who Carlsmith indicated it might represent that might cause an actual or potential conflict; and (3) the expense injury and incurred by Plaintiff in changing counsel, all on the conditions specified in the foregoing general objections. Any documents produced will be redacted as necessary to preserve privileged information not included in the scope of that waiver.

4

DOCUMENT REQUEST NO. 3:  Please identify and produce any and all e-mail, correspondence, letters, memoranda, statements and documents authored by Carlsmith Ball, LLP addressed to you, informing you of their intent and reasons for withdrawing from their representation of you in this matter.

RESPONSE:   Plaintiff specifically objects that this request is for documents protected by the attorney-client privilege.  Pursuant to its general and specific objections, Plaintiff is willing to provide such privileged documents or portions of privileged documents that directly address the subjects of:  (1) any conflicts or relationships with entities other than Rhino that prompted Carlsmith to insist that Rhino find other counsel to represent it in this matter; (2) the identity of any Carlsmith clients who Carlsmith indicated it might represent that might cause an actual or potential conflict; and  (3) the expense and injury incurred by Plaintiff in changing counsel, all on the conditions specified in the foregoing general objections. Any documents produced will be redacted as necessary to preserve privileged information not included in the scope of that waiver.

DOCUMENT REQUEST NO. 4:  In paragraph 38 of your Second Amended Complaint, you allege that you have incurred additional expenses, difficulty and risks in pursuing this claim, as a result of Carlsmith Ball's withdrawal from representing you.  Please identify and produce all e-mail, notes, memoranda, diary, correspondence from your former attorneys concerning their withdrawal from representation of you, your correspondence to other counsel seeking their services to represent you, in

5

addition to any and all billings, time sheets, cancelled check, statements, invoices and documents supporting your allegation.

RESPONSE: Plaintiff specifically objects that this request is for documents protected by the attorney-client privilege. Pursuant to its general and specific objections, Plaintiff is willing to provide such privileged documents or portions of privileged documents that directly address the subjects of: (1) any conflicts or relationships with entities other than Rhino that prompted Carlsmith to insist that Rhino find other counsel to represent it in this matter; (2) the identity of any Carlsmith clients who Carlsmith indicated it might represent that might cause an actual or potential conflict; and (3) the expense injury and incurred by Plaintiff in changing counsel, all on the conditions specified in the foregoing general objections. Any bills or other documents produced will be redacted as necessary to preserve privileged information not included in the scope of that waiver.

DOCUMENT REQUEST NO. 5: Please identify and produce any and all receipts, purchase orders, invoices, memoranda, accounts, payrolls, payables, reports, statements and documents supporting the costs and expenses you incurred as reflected in your Direct Expense and Overhead Expense Sheet and other costs contained in Exhibit "A" of your Second Amended Complaint filed in the above-reference action.

RESPONSE: Plaintiff specifically objects to this request as overly broad, unduly burdensome, vexatious, harassing, and intended to prevent Plaintiff from being economically able to bring this case to trial. Plaintiff has already produced much of

6

the information requested here, but AHAC and AIGTS have roundly criticized Plaintiff for doing so. Plaintiff further objects that the scope of this request exceeds what could be fairly, justly, or reasonably required of Plaintiff considering the needs of this case, and AHAC and AIGTS's disinclination to adequately respond to Plaintiff's discovery. Accordingly, Plaintiff will consider producing such documents of this sort as AHAC and AIGTS may reasonably require if and when the request is stated with the requisite specificity and tailored to address the legitimate discovery needs of this action and AIGTS and AHAC adequately respond to Plaintiff's discovery.

DOCUMENT REQUEST NO. 6: Please identify and produce any and all bank statements and cancelled checks drawn from RHINO BUILDERS, INC's three (3) accounts at the Bank of Hawaii, Guam branch(es), for the period of November 1, 2000 to April 30, 2001, evidencing and/or memorializing the purchase of materials used in BIOGENESIS PACIFIC, INC.'s IDIQ Contract with the U. S. Navy, Contract No. N62766-D-0425.

RESPONSE: To the extent Plaintiff has not already produced documents described in this request, Plaintiff specifically objects to this request as overly broad, unduly burdensome, vexatious, harassing, and intended to prevent Plaintiff from being economically able to bring this case to trial. Plaintiff has already produced much of the information requested here, but AHAC and AIGTS have roundly criticized Plaintiff for doing so. Plaintiff further objects that the scope of this request exceeds

7

what could be fairly, justly, or reasonably required of Plaintiff considering the needs

of this case, and AHAC and AIGTS's disinclination to respond to Plaintiff's

discovery. Accordingly, Plaintiff will consider producing documents of this sort as

AHAC and AIGTS may reasonably require if and when the request is stated with the

requisite specificity and tailored to address the legitimate discovery needs of this

action and AIGTS and AHAC adequately respond to Plaintiff's discovery.

DOCUMENT REQUEST NO. 7: Please identify and produce any and all notes,

memoranda, diaries, and documents memorializing all conversations and discussions

you had with Messrs. Gerald Lam and Alfred Garthe, III.

RESPONSE: Subject to its general objections, Plaintiff will produce documents of

this sort.

Dated:   September 11, 2003.

LAW OFFICE OF ANTONIO L. CORTÉS
Attorney for Plaintiff Rhino Builders, Inc.

By:   _____
ANTONIO L. CORTÉS

U.S. District Court of Guam
Civil Case No. 02-00008

Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

# EXHIBIT "K"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities

ANTONIO L. CORTÉS
Law Office of Antonio L. Cortés
233 Julale Center
424 West O'Brien Drive
P.O. Box BV
Hagåtña, Guam 96932
Telephone No.: (671) 477-1930
Facsimile No.: (671) 477-1933

Attorney for Plaintiff Rhino Builders, Inc.

## IN THE DISTRICT COURT
## OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC., and AMERICAN HOME ASSURANCE CO., <br><br> Defendants. | CIVIL CASE NO.02-00008 <br><br> **PLAINTIFF'S RESPONSES TO DEFENDANTS' AIG TECHNICAL SERVICES, INC. and AMERICAN HOME ASSURANCE COMPANY'S SECOND SET OF INTERROGATORIES** |
| BIOGENESIS PACIFIC, INC., <br><br> Counter-Plaintiff, <br><br> vs. <br><br> RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, and JOHN DOES 1–10, <br><br> Counter-Defendants. | |



RECEIVED
9:35 a.m
SEP 2 9 2003
VERNIER &
MAHER, LLP

Plaintiff Rhino Builders, Inc. (hereinafter "Plaintiff") hereby submits

their responses to Defendants AIG Technical Services, Inc. and American Home



Exhibit
K

Assurance Company ("Defendants AIGTS & AHAC") Second Set of

Interrogatories, served July 29, 2003.

## GENERAL OBJECTIONS

Insofar as the Interrogatories request any privileged information,

Plaintiff objects on that ground and will not provide answers revealing privileged

information except to the limited extent the attorney-client privilege is waived. The

scope of that waiver is that Rhino will reveal <u>all</u> written and oral privileged

communications between Carlsmith Ball LLP and Rhino directly addressing the

subjects of: (1) any conflicts or relationships with entities other than Rhino that

prompted Carlsmith to insist that Rhino find other counsel to represent it in this

matter; (2) the identity of any Carlsmith clients who Carlsmith indicated it might

represent that might cause an actual or potential conflict; and (3) the expense or injury

incurred by Plaintiff from any such conflict or in changing counsel. Rhino will not

reveal that information pre-trial, however, unless and until the other parties agree that

Rhino's waiver of the privileged nature of its communications with Carlsmith is

limited to communications on those two subjects, or until the Court so orders, so that

the other parties will not further harass Rhino by contending that Rhino has waived

the attorney-client privilege with regard to all its communications with Carlsmith.

Plaintiff generally objects that AHAC and AIGTS, in continued bad

faith denial of Plaintiff's claim at issue in this case, are using the discovery process in

this action to successfully make it economically impossible for Plaintiff to realize the

protection Congress intended it to have pursuant to the Miller Act. AHAC and

2

AIGTS's tactics in this regard include, but are not necessarily limited to: repeatedly purporting to require Rhino to pay its attorneys to provide unnecessary information and information it has already provided and refusing to provide Plaintiff legitimately-needed information available or known to AHAC and/or AIGTS without which Plaintiff cannot adequately pursue the remedies to which it is entitled.

Accordingly, Plaintiff generally objects to Defendants' AIGTS and AHAC's Interrogatories as overly broad, unduly burdensome, vexatious, harassing, and to some extent, request information that is neither relevant to this case nor reasonably calculated to lead to admissible evidence. Plaintiff specifically objects to all the document requests because they purport to require production of "all," "any," or "any and all" documents, or "each and every" document, supporting or relating to a particular allegation or portion of the complaint and are therefore unduly burdensome and overly broad. Plaintiff objects to, and does not respond to, requests for identification of documents as those requests must be made under Rule 33 and be limited in number as required by that rule.

## RESPONSES TO INTERROGATORIES

<u>INTERROGATORY NO. 1</u>:        In paragraph 38 of your Second Amended Complaint, you allege that "approximately 2 or 3 weeks before this action was filed by Plaintiff's former counsel of record, an entity connected with Defendants Surety and/or an attorney representing Defendants Surety, contacted Plaintiff's former counsel and communicated to it that it should withdraw from its former representation

3

of Plaintiff for conflict-of-interest reasons. . . ."   Please identify the "entity", by name and address, that contacted your former counsel.

SPECIFIC OBJECTION TO INTERROGATORY NO. 1:

Plaintiff specifically objects to this interrogatory as vexatious and harassing as the same information was requested from you July 18, 2003, and thus obviously no known to Plaintiff, who continues to believe it is known to you or could readily be discovered by you from your affiliated entities.

ANSWER TO INTERROGATORY NO. 1:

Subject to its general and specific objections, Rhino responds that it is not sure of the name of the entity, but that it may have been AI Marine.

INTERROGATORY NO. 2:      Please identify, by name, address, and contact numbers, the Carlsmith Ball LLP ("Carlsmith Ball") attorney that advised you that he/she was contacted by an "entity" connected with Defendant Surety, as alleged in paragraph 38 of your Second Amended Complaint.

SPECIFIC OBJECTION TO INTERROGATORY NO. 2:

Plaintiff specifically objects that this interrogatory mischaracterizes the allegations of paragraph 38 of the Second Amended Complaint to the extent that requiring an answer to the interrogatory would be vexatious and harassing.  It is argumentative and assumes facts that Rhino does not allege.

/ / /

/ / /

4

## ANSWER TO INTERROGATORY NO. 2.

To the best of Rhino's knowledge, it was not contacted by a Carlsmith attorney who advised it that he or she was contacted by an entity connected with AIGTS or AHAC.

INTERROGATORY NO. 3: Please identify, by name, address and contact numbers, those attorneys in Carlsmith Ball that assisted you in filing your claim against AMERICAN HOME ASSURANCE COMPANY

## ANSWER TO INTERROGATORY NO. 3:

Terry Thomason and Amy Self of Carlsmith's Honolulu office. 808-523-2500. More contact information is listed in Martindale Hubbell.

INTERROGATORY NO. 4: On April 21, 2003, your Treasurer, Eugene O'Connell testified in a deposition that he received a letter from a Carlsmith Ball attorney advising that there was a possible conflict-of-interest in Carlsmith Ball's representation of you in this matter. Please answer the following:

a. The date of that letter;

b. The author of that letter to you;

c. Who is in possession of that letter; and

d. What were the reasons that created the conflict-of-interest as relayed to you by your Carlsmith Ball attorney?

## SPECIFIC OBJECTION TO INTERROGATORY NO. 4:

5

Plaintiff specifically objects to part "d" of the interrogatory because it requests information protected by the attorney-client privilege. Plaintiff will respond to that part as indicated in its general objections.

RESPONSE TO INTERROGATORY NO. 4:

    a.    April 9. 2002.

    b.    Terry Thomason

    c.    Antonio L Cortes

    d.    I don't know

INTERROGATORY NO. 5:     On April 21, 2003, your Treasurer, Eugene O'Connell testified that AIG contacted one of its subsidiaries in Guam, and told the Carlsmith Ball attorney that there may be a conflict. Please answer the following:

    a. Who is the subsidiary in Guam, which was contacted by AIG?

    b. Who was the Carlsmith Ball attorney?

    c. Who was the employee, officer or person of that subsidiary that contacted your Carlsmith Ball attorney?

    d. When did that employee, officer or person of that subsidiary contact your Carlsmith Ball attorney?

SPECIFIC OBJECTION TO INTERROGATORY NO. 5:

Plaintiff specifically objects to this interrogatory because it requests information protected by the attorney-client privilege. Plaintiff specifically objects that this interrogatory mischaracterizes Mr. O'Connell's testimony to the extent that requiring an answer to the interrogatory would be vexatious and harassing. It is

argumentative and assumes facts not in evidence. Plaintiff will respond to it as indicated in its general objections.

ANSWER TO INTERROGATORY NO. 5.

    a.    We don't know. It may have been an entity named AI Marine.

    b.    We don't know.

    c.    We don't know.

    d.    Some time between Christmas 2001 and April 2002.

INTERROGATORY NO. 6:    Please identify all your Carlsmith Ball attorneys, in Guam, Hawaii, California, or wherever he/she is presently located, who you personally communicated with, regarding their representation of you in this matter.

ANSWER TO INTERROGATORY NO. 6:

    Terry Thomason and Amy Self.

INTERROGATORY NO. 7:    In regards to the oral subcontract you allege existed between you and the Defendant BIOGENESIS PACIFIC, INC. ("BIOGENESIS"), was it your understanding that both you and Defendant BIOGENESIS were to equally share in the losses, if any?

ANSWER TO INTERROGATORY NO. 7

    We did not expect losses. A deal is a deal though, so if the profits were a negative number they would have been shared equally, the same as if they were a positive number.

INTERROGATORY NO. 8:    When did Mr. Richard Avilla assume the position of Project Manager of BIOGENESIS.

7

<u>SPECIFIC OBJECTION TO INTERROGATORY NO. 8</u>

Plaintiff specifically objects to this interrogatory as it calls for a conclusion of law regarding a complex set of facts thoroughly discovered during hours of depositions. It is vexatious and harassing for this reason.

<u>ANSWER TO INTERROGATORY NO. 8:</u>

Subject to its general and specific objections, Rhino responds as follows: Either in January or February of 2000.

<u>INTERROGATORY NO. 9</u>: Please explain in detail the circumstances surrounding the employment of Mr. Avilla as Project Manager of BIOGENESIS.

<u>SPECIFIC OBJECTION TO INTERROGATORY NO. 9</u>:

Plaintiff specifically objects to this interrogatory as vexatious and harassing as this information has been the subject of extensive deposition testimony and has been asked and answered by the persons who would obviously have knowledge of it far superior to that of Plaintiff.

<u>ANSWER TO INTERROGATORY NO. 9:</u>

Subject to its general and specific objections, Rhino responds as follows: Rhino does not really know, but states that it is not sure that Biogenesis is being candid about its employment of and communication with Mr. Avilla. According to Mr. Warren Nobles, Mr. Garthe, at least, was on Biogenesis' payroll while still working for Rhino. The same might be true of Mr. Avilla. Without relying on such information, it is difficult for Rhino to know exactly what transpired between Mr. Avilla and his present employer, Biogenesis.

8

INTERROGATORY NO. 10:     Who made the decision to employ Mr. Richard

Avilla as the Project Manager of BIOGENESIS?

ANSWER TO INTERROGATORY NO. 10:

       Gerald Lam.

INTERROGATORY NO. 11:     From May 2000 to November 30, 2000, was Mr.

Richard Avilla reporting to the Hawaii Office of RHINO BUILDERS on the progress

and extent of BIOGENESIS's project with the U.S. Navy, Project No. N62766-D-

042?.

SPECIFIC OBJECTION TO INTERROGATORY NO. 11:

       Plaintiff specifically objects to this interrogatory as vague in that the

word "reporting" is not sufficiently specific to define the meaning of the inquiry, and

vexatious and harassing as this information has been the subject of extensive

deposition testimony and has been asked and answered.

ANSWER TO INTERROGATORY NO. 11:

       Subject to its general and specific objections, Rhino responds as

follows: Mr. Avilla provided some information such as payroll and copies of task

orders, but no detailed information was provided that would show Rhino what the

weekly progress was on the various task orders. When Mr. Avilla or Mr. Garthe

provided information, it was, on many occasions, untimely and missing details,

causing Rhino to have to call for the information that it needed to properly account for

the expense and work being done. It was not until September or October of 2000 that

<div align="center">9</div>

Rhino's Hawaii office was informed that some of the delivery orders had been completed.

INTERROGATORY NO. 12:     On or about March 2001, did you and BIOGENESIS enter into an agreement wherein you were to sell the Isuzu flatbed truck to BIOGENESIS on the condition that BIOGENESIS was given the opportunity to first test-drive the flatbed truck?

ANSWER TO INTERROGATORY NO. 12:

Subject to its general objections, Rhino responds as follows:  No.

INTERROGATORY NO. 13:     On or about March 2001, did BIOGENESIS make rental payments for the rental of the Isuzu flatbed truck?

SPECIFIC OBJECTION TO INTERROGATORY NO. 13:

Plaintiff specifically objects to this interrogatory as vexatious and harassing as this information has been the subject of extensive deposition testimony and has been asked and answered

ANSWER TO INTERROGATORY NO. 13:

Subject to its general and specific objections, Rhino responds as follows:  Yes.  Biogenesis rented the truck twice and paid once

DATED this _24_ day of September 2003.

PLAINTIFF RHINO BUILDERS, INC.

By: _____
EUGENE O'CONNELL
It's Authorized Representative

10

**AS TO OBJECTIONS**:

DATED this 25th day of September 2003.

LAW OFFICE OF ANTONIO L. CORTÉS

By: _____
Antonio L. Cortés, Attorney for Plaintiff
Rhino Builders, Inc.

11

U.S. District Court of Guam
Civil Case No. 02-00008

Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

# EXHIBIT "L"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF GUAM

3

4        UNITED STATES OF AMERICA FOR   CIVIL CASE NO. 02-00008
         USE AND BENEFIT OF RHINO
5        BUILDERS, INC.,

6                         Plaintiff,

7            vs.

8        BIOGENESIS PACIFIC, INC., AIG
         TECHNICAL SERVICES, INC. and
9        AMERICAN HOME ASSURANCE
         COMPANY,
10
                         Defendants.
11        _____

12       BIOGENESIS PACIFIC, INC.,

13                        Counterclaimant,

14           vs.

15       RHINO BUILDERS, INC., et al.,

16                        Counter-Defendant.
          _____
17       AMERICAN HOME ASSURANCE COMPANY,

18                        Cross-Claimant,

19           vs.

20       BIOGENESIS PACIFIC, INC.,

21                        Cross-Claim
                          Defendant.
22        _____

23

24                DEPOSITION OF TERRY E. THOMASON

25

                  RALPH ROSENBERG COURT REPORTERS, INC.
                            (808) 524-2090

Exhibit
L

2

1          Taken on behalf of Defendants, at the Law Offices of

2     Oliver, Lau, Lawhn, Ogawa & Nakamura, 600 Ocean View
Center,

3     707 Richards Street, Honolulu, Hawaii, commencing at 2:00

4     p.m., on Monday, October 6th, 2003, pursuant to Notice.

5

6

7

8          BEFORE:          HEDY COLEMAN,  CSR  NO. 116
                            Notary Public, State of Hawaii
9                           Certified Shorthand Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

3

```
 1    APPEARANCES:

 2    For Plaintiff:        ANTONIO L. CORTES, ESQ.
                            233 Julale Center
 3                          424 West O'Brien Drive
                            Post Office Box BV
 4                          Hagatna, Guam 96932

 5
       For Defendant:       JAMES H. LAWHN, ESQ.
 6                          Oliver, Lau, Lawhn,
                              Ogawa & Nakamura
 7                          707 Richards Street
                            600 Ocean View Center
 8                          Honolulu, Hawaii 96813

 9
       For Witness:         GARY GRIMMER, ESQ.
10                          Carlsmith Ball, LLP
                            1001 Bishop Street
11                          2200 American Savings Tower
                            Honolulu, Hawaii 96813
12

13      Also present:       Eugene Patten
                            Michael O'Connell
14

15

16

17

18

19

20

21

22

23

24

25
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

4

```
 1                    I N D E X
 2    EXAMINATION BY:                          PAGE
 3    Mr. Lawhn                                  5
 4
 5    Mr. Cortes                                57
 6
 7
 8           EXHIBITS MARKED FOR IDENTIFICATION
 9
10    Exhibit 1 AFfidavit of Amy G. Self.        16
11    Exhibit 2 Letter dated 10-22-01 to         25
12        American Home Assurance Company from
13        Terry E. Thomason with attachments.
14    Exhibit 3 Letter dated 10-30-01 to Mr. or  28
15        Ms. Thomasen from Mark Titherington,
16        one page.
17    Exhibit 4 Letter dated 1-9-02 to Mark      33
18        Titherington from Terry T. Thomason and
19        Amy G. Self with enclosures.
20    Exhibit 5 Letter dated 1-17-02 to Terry e. 35
21        Thomasen, Esq. at Carlsmith Ball, LLP
22        from Bruce Kahn.
23    Exhibit 6 Letter dated 2-21-02 to Terry E. 36
24        Thomasen, Esq. at Carlsmith Ball, LLP
25        from Bruce Kahn.
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

5

1   Exhibit 7 Letter dated 3-11-02 to Mr.              39
2       Bruce Kahn from Terry E. Thomason and
3       Amy G. Self with Affidavit of Michael
4       O'Connell and other attachments.
5   Exhibit 8 Letter dated 6-21-02 to Terry E.         40
6       Thomasen from Bruce Kahn.
7   Exhibit 9 Complaint in the District Court          40
8       of Guam, Civil Case No. 02-00008,
9       United States of America For Use And
10      Benefit of Rhino Builders, Inc. vs.
11      Biogenesis Pacific, Inc. and AIG
12      Technical Services, Inc.
13  Exhibit 10 Letter dated 4-9-02 to Mr.              44
14      Michael O'Connell fromTerry E. Thomason
15      with attachments.
16  Exhibit 11 Series of e-mails, first is             55
17      from David Ledger to dvc, dated 3-19-02
18      re AIG.
19
20
21
22
23
24
25

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

6

THE REPORTER:  Our disclosure is complete

and

2    available for everyone to review.  It will be attached to

the

3    deposition transcript.

4                    TERRY E. THOMASON,

5            called as a witness on behalf of the

6    Defendants, after having been first duly sworn to

7    tell the truth, the whole truth, and nothing but the

8    truth, was examined and testified as follows:

9                    EXAMINATION

10   BY MR. LAWHN:

11        Q    Would you state your name and spell your last

name

12   for the reporter.

13        A    Terry Thompson, spelled T-H-O-M-A-S-O-N.

14        Q    And what is your occupation?

15        A    I'm an attorney.

16        Q    How long have you been licensed as a lawyer?

17        A    Since 1978.

18        Q    Where were you first licensed?

19        A    Nebraska.

20        Q    And when did you move to Hawaii?

21        A    I was licensed in Hawaii in 1990.  I lived here

in

22   '78 to '81.  I returned here permanently in 1993.

23        Q    At one time were you employed by the Carlsmith

24   Ball law firm?

25        A    Yes.

1    Q    And what years was that?

2    A    Beginning 1996 until 1 October 2003, I was a

3    partner at Carlsmith.

4        MR. CORTES:  Can I just ask, this is Antonio Cortes

for

5    the record, that you just take a little bit longer between

6    the question and the answer to give my slow mind a chance

to

7    make any objections that might be needed.

8    BY MR. LAWHN:

9        Q    Okay.  What did you do prior to coming to

10   Carlsmith?

11       A    I was an attorney for the federal government.

12       Q    And in what division?

13       A    Department of the Army.

14       Q    Procurement?

15       A    Procurement.

16       Q    Were you stationed at Schofield?

17       A    I was stationed at Fort Shafter, but headquarters

18   U.S. Army Pacific.

19       Q    Have we run into each other out there?

20       A    I think we have.

21       Q    Not literally.

22       MR. GRIMMER:  Sounds like it was memorable.

23   BY MR. LAWHN:

24       Q    What about Amy Self, do you know a person named

25   Amy Self?

RALPH ROSENBERG COURT REPORTERS, INC.

1    A    Yes, I do.

2    Q    Was she an employee of the Carlsmith law firm, or

3    is she an employee of the Carlsmith law firm?

4    A    She is now and was while I was at Carlsmith an

5    associate, and prior to that a paralegal.

6    Q    I pulled her up on Martindale Hubble and on the

7    Internet. It says that she was admitted in Hawaii in 2001,

8    and that then we checked with the Supreme Court and it's

9    November 1, 2001. Does that jibe with the dates that you

10   recall when she became a licensed lawyer in Hawaii?

11   A    It's very difficult for me to remember. She was

12   paralegal, she went to law school. While she was in law

13   school, she was a summer associate, and then she came fully

14   employed. So, I -- I honestly don't know when she was

15   admitted to the bar.

16   Q    Was she working under your direction at the law

17   firm at Carlsmith?

18   A    In -- in some instances, yes.

19   Q    Was she physically in the Honolulu office or in

20   the Hilo office?

21   A    At the time I worked with her she was physically

22   in Honolulu -- the Honolulu office.

23   Q    And what time period would that be?

24   A    I'd say January 2002. I -- I can't recall

25   specifically.

1    Q    In this case there is evidence of a telephone

2 conversation between her and an employee of AIG Technical

3 Services in October of 2001.  Does that refresh your

4 recollection as to whether she was in Honolulu office at

5 that time?

6    A    I don't remember.  I -- I would trust the

7 Carlsmith records.  They can say specifically when she was

8 employed.

9    MR. CORTES:  This was October 2001, Jim?

10    MR. LAWHN:  October 18, 2001.

11    Q    At the time you were at the Carlsmith firm in
late

12 October 2001, early 2002, did you have access to the

13 Internet on your computer?

14    A    I think I did.

15    Q    And do you know whether or not Amy Self had
access

16 to the Internet on her computer?

17    A    I do not know.

18    Q    Are you aware of a publication by the federal

19 government called the Treasury List?

20    A    No.

21    Q    Have you done Miller Act work before, prior to

22 this present litigation?

23    A    Yes.

24    Q    And you've never run into the Tresury List?

25    A    I've never used it, no.


RALPH ROSENBERG COURT REPORTERS, INC.

1    Q    Are you aware that it exists?

2    A    I used -- the Federal Acquisition Regulation

3    periodically publishes a list of approved sureties, that's

4    what I use.  Now, if it's called the Treasury List, I'm not

5    aware of it.

6    Q    That's Circular 570, that's the Treasury List?

7    A    Okay.

8    Q    At some point in time did the Rhino firm retain

9    you with regard to the project in Guam to collect some
money

10   they claim is due?

11   A    Yes.

12   Q    And when did that occur?

13   A    I do not recall the specific dates.

14   Q    Was it prior to October 2001?

15   A    I think so.

16   Q    Did you ask Amy Self to help you?

17   A    Yes, I did.

18   Q    At what point in time following the retention did

19   you ask Amy Self to help you?

20   A    Miss Self was assigned to help me on that case by

21   her section chief Analitos Lee, partner in Carlsmith,

22   immediately after she was employed at Carlsmith.  The first

23   associate that I was assigned to help was a lady named Dana

24   Gutierrez, who is an attorney in Guam office, who was

25   present in Honolulu office for training.  So, the initial

1   assistance I received was from Dana Gutierrez, and then Amy

2   Self.

3     Q   Without getting into any attorney-client
privilege

4   issues, can you tell me what it is that Miss Gutierrez did

5   to help you with the case.

6     A   I could not hear what you said.

7     Q   I'm excluding matters covered by the

8   attorney-client privilege in the scope of my question.  And

9   I would like to know, in general, what it is that

10   Miss Gutierrez did to assist you with the Rhino case?

11     A   Miss Gutierrez was a licensed Guam attorney.  She

12   knew the people that Rhino had in Guam, the folks that
would

13   have the information related to whether work was performed,

14   whether payment was received, and those related matters.

15     My recollection is our first problem was

16   Rhino had not billed the prime contractor, and we

17   needed to have a billing that hopefully would

18   receive -- would receive a payment.  If no payment,

19   then we would go on further and pursue the Miller

20   Act claim.

21     Q   Did you give Miss Gutierrez any assignments with

22   regard to the pursuit of the Miller Act claim?

23     A   Yes.  I asked --

24   MR. CORTES:  That was a yes or no question.

25   MR. GRIMMER:  Yeah, just stay with yes or no for now.

RALPH ROSENBERG COURT REPORTERS, INC.

1    A    Yes.

2    BY MR. LAWHN:

3    Q    The next question is what did you ask her to do?

4    A    I asked her --

5    MR. CORTES:  I think whether or not the answer to that

6    is a privileged communication is difficult for me to know

7    until it's answered.

8    MR. GRIMMER:  So take a break and go confer with
Terry.

9    MR. CORTES:  You could do it that way or you could

10    ask -- if you have something specific on your mind, you

11    could ask that way, give me a chance to object, and we can

12    go from there, either way you like.

13    MR. LAWHN:  Let me withdraw the question then.

14    Q    Did you ask Miss Gutierrez to contact the surety?

15    A    No, because there had been no billings to the

16    prime yet.

17    Q    As far as you know, did Miss Gutierrez have any

18    contact at all with either AIG Technical Services or

19    American Home Assurance Company regarding this matter?

20    A    I don't know.

21    Q    You don't know?

22    A    I -- I do not know.

23    Q    Now, do you have a recollection of Miss Gutierrez

24    telling you that she had some contact with a representative

25    of the surety?

13

        1       A    No.

        2       Q    Would you care to consult with Mr. Cortes?

        3       A    Yeah.

        4       MR. CORTES:  Yeah.  As far as any communications with

        5   the surety, of course, that's not a privileged communication

        6   in the first place.

        7       A    What she reported to me was that she was gathering

        8   accounting records with the assistance of Mr. Michael

        9   O'Connell and Mr. Eugene Patten that would support a billing

       10   against the prime and additional records that I needed to

       11   evidence some form of contractual agreement.  That's what I

       12   recall Miss Gutierrez's effort was focused on.

       13   BY MR. LAWHN:

       14       Q    Then I take it from the absence of any reference

       15   to a contact with the surety, that you have no recollection

       16   of her advising you that she ever had any contact with the

       17   surety?

       18       A    She never told me and I never asked her to.

       19       Q    How was it that Miss Self got involved then on

       20   this case if you had Miss Gutierrez working on it?

       21       A    Miss Gutierrez's period of training ended at

       22   the -- I can't recall the exact date.  She was scheduled to

       23   return to Guam to her position in our Guam -- in Carlsmith's

       24   Guam office.  I continued to need help with Rhino because we

       25   were having a lot of trouble getting the account data to --

14

1     to have a viable invoice claim, so I asked for a new
person,

2     I was assigned Miss Self.

3      Q    Do you remember the month or time frame when this

4     happened?

5      A    No, I'm sorry, I do not.

6      Q    Did you ask Miss Self to contact American Home

7     Assurance Company or AIG Technical Services?

8      A    I asked Miss Self to contact the contracting

9     officer to obtain the surety's name. When circumstances
led

10     me to leave that BioGenesis, the prime contractor, was not

11     going to be willing to pay Rhino for the work it performed,

12     so I asked her to contact the contracting officer.

13      Q    Did she do that?

14      A    Yes, she did.

15      Q    And what did she report back to you?

16      A    She received a fax transmission -- transmittal of

17     the -- of the identification of the surety.

18      Q    Did she get a copy of the Miller Act bond as well

19     at that time?

20      A    I never -- I can't recall the timing. The first

21     thing we got was the identification of the surety. At some

22     point soon thereafter, we received the bond documentation.

23      Q    Do you recall what the name of the surety was
that

24     was included in the fax transmission from the contracting

25     officer?

1    A   My recollection, it was American Home Assurance.

2    Q   There's a declaration that Amy Self prepared in

3  this case.  It might help us short cut this a little bit if

4  I can find it.

5         Did you ask Miss Self to contact the

6  surety and find out what the procedures for making

7  the claim on the bond would be?

8    A   I asked her to contact the surety to obtain a

9  Proof of Claim form and provide -- and any instructions on

10  submission.

11    Q   And to the best of your knowledge, did she do

12  that?

13    A   To the best of my knowledge, she did.

14    Q   Did she report back to you the results of the

15  communications that she had with the surety?

16    A   She -- she reported to me in a series of steps
the

17  progression of her efforts to obtain the forms I had asked

18  her to get.  Eventually, she told me that she had received

19  the Proof of Claim form and that she was preparing the

20  backup documentation.  My recollection, it was fairly quick

21  between when I asked her and when she had actually received

22  the form.

23    Q   And to put this in perspective vis-a-vis the

24  submission claim, was this prior to your preparation of
what

25  has been entitled the Notice of Claim as opposed to Proof
of

1   Claim form?

2       A    I honestly can't recall.  The normal sequence was

3   we would be given a notice, and then we would submit the

4   proof.

5       Q    Did she report to you anything that indicated to

6   you at that point in time that she believed the identity of

7   the surety was AIG Technical Services?

8       A    I never understood that the surety was anyone

9   other than American Home Assurance through that entire

time.

10  I do not recall anybody raising the name until we

11  actually -- I signed a letter that went to AIG Technical

12  Services requesting reconsideration of their action on the

13  claim.

14      Q    I found the affidavit.

15      A    Okay.

16      Q    Well, take a second and just peruse it, let me

17  know when you're done.

18      A    I've reviewed it.

19      Q    Have you ever seen --

20      MR. GRIMMER:  Wait.  Let me just object because it's

21  not complete.

22                          (Whereupon, Exhibit 1 was marked

23                           for identification.)

24  BY MR. LAWHN:

25      Q    I think we're going to find that throughout a

1    number of the exhibits because had we included all the

2    exhibits to the exhibits, the pile would have been quite

3    substantial, so --

4        MR. GRIMMER:  Yeah.

5        MR. LAWHN:  -- we have not included them.

6        Q    Anyway, Mr. Thomason, have you seen Exhibit 1

7    prior to today?

8        A    Yes, I have.

9        Q    Under what circumstances and when did you see it?

10       A    After I was given notice of this deposition or

11    after I received the subpoena for this deposition, I asked

12    Carlsmith to assign me an attorney to accompany me to this

13    litigation or to this deposition.  Mr. Grimmer was that

14    attorney and he suggested that I should look at the file

and

15    the file contained this affidavit.

16       Q    I take it then from your answer that you did not

17    assist Amy Self in the preparation of this affidavit?

18       A    Oh, no.  No, I did not.

19       Q    On paragraph three of the affidavit, Exhibit 1,

20    she states "pursuant" to her assistance or "our assistance

21    to Rhino, on or about October 2001, I called long

distance,"

22    et cetera, and I'm not going to read it.

23         Now, was that work being done under your

24    supervision?

25       A    At my direction, yes.

18

1     Q     Can you be a little bit more definitive as to
when

2     in October 2001 Amy Self called long distance directory

3     assistance.

4     A     No, I did not sit and watch her, and I don't know

5     what day she made this call.

6     Q     And if you'll turn the page of Exhibit 1, going
to

7     paragraphs four through 11, were you a party to any of the

8     telephone conversations that she references on page two of

9     Exhibit 1?

10    A     No.

11    Q     Did she prepare any kind of written memorandum to

12    the file or to you perhaps that documents these telephone

13    conversations?

14    A     She prepared handwritten notes that were appended

15    to the -- to the file.  I don't know if they've covered

16    these specific phone calls.

17    MR. CORTES:  Can I go off the record for just a
second?

18    MR. LAWHN:  Sure.

19              (Discussion held off the record.)

20    BY MR. LAWHN:

21    Q     Look at paragraph 19, page four.  I think it's

22    page -- yeah, it's page four.

23    A     (Witness complies.)

24    Q     She refers to a process in which Mr. Titherington

25    and everyone she spoke to at American International

1   Companies, et cetera, led her to believe that American Home

2   and AIG Technical Services were all part of the same

3   corporation.

4         Now, how many telephone calls is she

5   referring to in this paragraph 19, if you know?

6      A   I do not know.

7      Q   Do you recall ever being told by her as to how

8   many telephone calls were made between her and the AIG

9   entities, if you want to use it as a group?

10     A   I don't know a specific number.  I know that

11   Miss Self was very frustrated and did express to me her

12   views that this was a ridiculous runaround, that she had

13   talked to a number of people.

14     Q   Do you recall on what dates the telephone calls

15   occurred?

16     A   I don't -- I don't know.

17     MR. CORTES:  That's kind of asked and answered.

18   BY MR. LAWHN:

19     Q   When Miss Self expressed her frustration, did you

20   give her any guidance as to what factual research she might

21   be able to do to clarify in her mind who the surety was?

22     MR. CORTES:  I think I'll object on privileged basis.

23   Are you asking for communications between two attorneys on

24   how they were going to conduct the representation?

25     MR. LAWHN:  That's exactly what I'm asking with regard

1   to identifying the surety, which obviously was misidentified

2   in the complaint.

3       MR. GRIMMER:  Well, let me object to that

4   characterization and conclusion.

5       MR. CORTES:  Object, and I instruct him.  Yeah, I'm not

6   going to let Mr. Thomason answer that question.  Rhino has

7   not waived the attorney-client privilege except for a very

8   limited waiver in this case, which does not include that

9   question.

10  BY MR. LAWHN:

11      Q   Mr. Thomason, did you ask her to consult the list

12  issued by the Treasury department to see whether or not

13  American Home or AIG Technical Services was listed as an

14  approved surety?

15      MR. CORTES:  Same objection, instruct the witness not

16  to answer.

17  BY MR. LAWHN:

18      Q   Did you consult the list?

19      A   I did not.

20      Q   Why not?

21      MR. CORTES:  Attorney thought process.

22      MR. LAWHN:  Which I'm going to go over this fairly

23  thoroughly on a number of different items, and I assume

24  you're going to be objecting and instructing.  The only

25  thing I'd put on the record is we obviously will file a

Mr.

1    motion on this, and it's going to be an inconvenience to

2    Thomason, perhaps, but if we prevail, then I'll come back

3    and do the deposition over again.

4        MR. CORTES:  Well, did you get a copy of our letter to

5    Carlsmith Ball?  I sent one to Louie Yanza, outlining the

6    waiver of the -- the scope of the waiver of the privilege

7    that we've made in this case.  And that is the scope of the

8    waiver that my client has authorized me to make of the

9    attorney-client privilege and the privileged nature of its

10   communications.

11       MR. LAWHN:  I saw the letter, I saw Mr. Yanza's reply

12   disagreeing with the scope.  If that's what your clients

13   have directed you to do, then we simply have to go forward.

14   And if Judge Unpingco upholds the privilege, then we lose;

15   and if he says the waiver is broader, then you lose.

16       MR. CORTES:  I think that the principle here is that

an

17   attorney thought process -- just simply because an

18   allegation is made in a complaint, the attorney's thought

19   process with respect to that allegation is not waived, any

20   more than your thought -- than Rhino's attorney's thought

21   process with respect to the identity of the surety is not

22   waived, any more than your thought process is waived with

23   respect to the allegations you've made in your counterclaim

24   against BioGenesis Pacific.

25           And we need to be careful to produce to

RALPH ROSENBERG COURT REPORTERS, INC.

1   you every scintilla of evidence that we have,

2   privileged or not, that is within the scope of the

3   waiver, but we are quite concerned not to produce or

4   disclose anything of a privileged nature outside the

5   waiver because we don't want you to claim that we've

6   made a broader waiver than we have.

7         MR. LAWHN:  I understand your argument, disagree with

8   it, and will take it up with the judge at the right time.

9         MR. GRIMMER:  The only thing I would add then is if we

10  are concerned with inconvenience, as you've already stated,

11  Mr. Lawhn, then please go through the record making that

you

12  got to make as quickly as possible, because I think the

13  concept of what's waived and isn't waived isn't that

14  complicated.

15  BY MR. LAWHN:

16        Q    When Miss Self expressed her frustration to you,

I

17  had asked about what I called the Treasury List, and you

18  were directed not to answer.  Remember that?

19        A    That's correct.

20        Q    Let me ask the same question with regard to the

21  registration of American Home Assurance Company or AIG

22  Technical Services as a surety within the state of Hawaii,

23  with our insurance commissioner.

24              Did you instruct Miss Self to check with

25  Hawaii's Insurance Commissioner to see if one or

RALPH ROSENBERG COURT REPORTERS, INC.

1   other or both of the companies was a registered

2   surety in Hawaii?

3       MR. CORTES:  Same objection, instruct the witness not

4   to answer.

5   BY MR. LAWHN:

6       Q    Did --

7       MR. GRIMMER:  And I would add relevance since the job

8   was in Guam.

9   BY MR. LAWHN:

10      Q    Did you check with the Hawaii insurance

11  commissioner?

12      MR. CORTES:  Hold on a minute.

13      MR. GRIMMER:  I make the same objection.

14      MR. CORTES:  Yeah, same objection.

15  BY MR. LAWHN:

16      Q    And with regard to the insurance commissioner in

17  Guam, when Miss Self expressed her frustration --

18      MR. CORTES:  Same objection.

19  BY MR. LAWHN:

20      Q    -- did you instruct her to check with Guam's

21  insurance commissioner to see if American Home and/or AIG

TS

22  were registered as a surety of Guam?

23      MR. CORTES:  Same objection.  I'm going to try to cut

24  this short if possible by just saying that we're going to

25  object to any question where you're asking what Mr.

1    Thomason's instructions to Amy Self were unless they were

2    instructions regarding a contact by your clients to

3    Carlsmith or a representation by your clients to Carlsmith

4    that AIG Technical Services and/or American Home Assurance

5    Company is sufficiently connected to a Carlsmith Ball

client

6    that Carlsmith had withdrawn from its former representation

7    of Rhino; or, if the question requests communication

8    regarding Carlsmith's ultimate refusal to continue to

9    represent Rhino in this matter, any other communication

10    between Rhino's attorneys, we're going to object to as

11    privileged.

12    MR. LAWHN:  I understand your objection, we disagree

13    with it, and I'm going to continue my questioning.

14    Q    I've asked you about the Treasury List, the

Hawaii

15    Insurance Commissioner, the Guam Insurance Commissioner.

16    Did you instruct Miss Self to do any research on the

17    Internet to find out what the American International group

18    or American International companies were and how AIG TS or

19    American Home Assurance company would -- fits into that

20    group?

21    MR. CORTES:  Same objection.

22    MR. LAWHN:  And same instruction, I assume.

23    MR. CORTES:  Same instruction not to answer.

24    BY MR. LAWHN:

25    Q    Did you yourself do any research on the Internet

RALPH ROSENBERG COURT REPORTERS, INC.

25

1    to determine where American Home Assurance Company and AIG

2    Technical Services fit into the American insurance

3    companies?

4        MR. CORTES:  Same objection, same instruction.

5    BY MR. LAWHN:

6        Q    At some point in time you prepared or, excuse me,

7    Miss Self prepared a letter, according to her affidavit,

for

8    you which was sent to American Home Assurance Company.

It's

9    dated October 22, 2001.  And, I'm sorry, we're going to

have

10   to mark this Exhibit 2, and you, Mr. Grimmer and I will

have

11   to share a copy.

12                    (Whereupon, Exhibit 2 was marked

13                     for identification.)

14   BY MR. LAWHN:

15       Q    Do you recognize Exhibit 2, Mr. Thomason?

16       A    I recognize my signature, yes.

17       Q    Did you prepare Exhibit 2?

18       A    No.

19       Q    Who prepared it?

20       A    I believe Miss Self prepared it.

21       Q    And was it Miss Self who addressed the letter

22   Exhibit 2 to American Home Assurance Company or was that

23   you?

24       A    It would have been Miss Self.

25       Q    You'll notice there's some exhibit numbers in the

1    lower right-hand corner and page numbers on this Exhibit 2.

2        A    Yes.

3        Q    Now, go to what is marked page three.  And do you

4    recognize page three, it's entitled "Notice of Claim On

5    Bond?"

6        A    Yes.

7        Q    Who prepared the "Notice of Claim On Bond," which

8    is pages three and four?

9        A    Miss Self.

10       Q    Did you have any input in the preparation of the

11   "Notice of Claim On Bond?"

12       A    I reviewed it after she had prepared it in draft.

13       Q    I notice on page three that the "Notice of Claim

14   On Bond" identifies the bonding company as American Home

15   Assurance Company.  Did she do that or was that you?

16       A    It was not me.

17       Q    Was there any discussion between you and Miss

Self

18   with regard to the preparation of Exhibit 2 as to whether

it

19   should be addressed to American Home Assurance Company or

20   AIG Technical Services?

21       MR. CORTES:  Same objection, same instruction.

22   BY MR. LAWHN:

23       Q    At the time that Exhibit 2 was being prepared,

did

24   Miss Self express any concerns, doubts, uncertainty as to

25   the identity of the surety?

1    MR. CORTES:  Same objection, same instruction.

2    BY MR. LAWHN:

3    Q    Was there any doubt in your mind at the time

4    Exhibit 2 was prepared that the surety was American Home

5    Assurance Company?

6    MR. CORTES:  That's a work product -- attorney work

7    product, attorney thought process; instruct the witness not

8    to answer.

9    BY MR. LAWHN:

10    Q    If you look at page -- the Miller Act -- page 37

11    and 38, the Performance Bond is 37, the Payment Bond is 38.

12    Last page.

13         At the time you signed Exhibit 2, did you

14    take a look at page 38, which is the Payment Bond,

15    to confirm that the surety was American Home

16    Assurance Company?

17    MR. CORTES:  Hold on just a minute, let me think about

18    that.

19    MR. GRIMMER:  Isn't it consistent with --

20    MR. CORTES:  Yeah, you're asking what they did and did

21    not do in the course of the representation.  I think that's

22    work product.  And the document speaks for itself with

23    respect to who the surety is, and I don't think that

24    Carlsmith is on trial here.  I don't see why you're asking

25    all these questions.

28

1      MR. LAWHN:  Let's mark the next exhibit, which is a

2  letter dated October 30, 2001 from AIG Technical Services
to
3  Mr. Thomason.

4                    (Whereupon, Exhibit 3 was marked

5                     for identification.)

6  BY MR. LAWHN:

7      Q    Now, in Exhibit 2, Mr. Thomason, you asked for a

8  Proof of Claim form --

9      A    Yes.

10      Q    -- among other things.  Now, Exhibit 3 is the

11  letter from AIG Technical Services which purports to

12  transmit the Proof of Claim form.  Do you recall receiving

13  Exhibit 3?

14      A    Yes.

15      Q    Do you recall noticing that the surety is

16  identified as American Home Assurance Company on Exhibit 3?

17      MR. CORTES:  We're not going to object to that because

18  you're asking.

19      MR. GRIMMER:  What he observed.

20      MR. CORTES:  That's a fact -- you're asking him as a

21  percipient witness, I suppose, the noticing, and you're not

22  asking for thought process.  I just want to make a record
of
23  our rationale -- my rationale in making these objections.

24  So, I think that that's not attorney work product because

25  you're not asking for his thought processes in the
rendering

1   of services for his client.

2       A    Yes, it was my understanding that American Home

3   Assurance Company was the surety.

4   BY MR. LAWHN:

5       Q    At the time that you received Exhibit 3?

6       MR. CORTES:  Could I just ask him, Mr. Thomason, to

7   please be careful that he just responds, because what he

8   really asked you was did you notice this, and I guess
that's
9   a yes or no question.  Try to keep it to yes or no when
it's
10  a yes or no question.

11      MR. LAWHN:  I'll try not to ask yes or no questions.

12      Q    At the time you received Exhibit 3 --

13      A    I noticed that the document said American Home

14  Assurance Company was the surety.

15      Q    Now, at the time you received Exhibit 3, which

16  would have been sometime after October 30, 2001, were you

17  aware of any confusion in Amy Self's mind as to who the

18  surety was?

19      MR. CORTES:  Hold off a minute.  I think that's --
I'll
20  go ahead and allow that one.

21      MR. GRIMMER:  No, no, no.  It's privileged.  To me
it's
22  the same.

23      MR. CORTES:  Same question?

24      MR. GRIMMER:  Same question, same rational that you've

25  been using.

1   MR. CORTES:  Okay, you're probably right.  It's just

2 that confusion in her mind isn't really -- but that is her

3 thought process, I think you're correct.

4   MR. GRIMMER:  It's her thought process and what he

5 would have only found out from her.

6   MR. CORTES:  I think we have to stick with our

7 objection to keep with waiving everything in that subject.

8 BY MR. LAWHN:

9  Q At the time that you received Exhibit 3, had she

10 told you that she thought the surety was AIG Technical

11 Services?

12  A No.

13  Q When was the first time you found out that Miss

14 Self apparently thought the surety was AIG Technical

15 Services?

16   MR. CORTES:  I guess that assumes facts not in

17 evidence, and I suppose it's speculative.  The fact that it

18 assumes in evidence is Miss Self's thought process as an

19 attorney in rendering services for Rhino, so I don't think

20 we can really go there.

21 BY MR. LAWHN:

22  Q Did she ever tell you she thought the surety was

23 AIG Technical Services?

24   MR. CORTES:  Same objections, same instruction.

25   MR. LAWHN:  You're instructing him not to answer that

1    on the basis of work product?

2         MR. CORTES:  What she thought?  Let's go off the
record

3    for a little bit.

4         MR. LAWHN:  Okay.

5              (Discussion held off the record.)

6         MR. CORTES:  Instruct him not to answer.

7    BY MR. LAWHN:

8         Q    When was the first time you learned that AIG

9    Technical Services had been identified as the surety by

10   anyone in the Carlsmith firm?

11        MR. CORTES:  Could you clarify that question so I know

12   whether I have an objection, because do you mean in the

13   complaint or --

14        MR. LAWHN:  In the complaint.

15        MR. CORTES:  -- internally within Carlsmith?

16        MR. LAWHN:  Any writing.

17        MR. CORTES:  We object to any response to that
question

18   that reveals the state of mind of anyone at Carlsmith with

19   respect to that question except as reflected in the

20   complaint, which is a public record.

21   BY MR. LAWHN:

22        Q    We obviously feel we have the right to go beyond

23   the complaint.  This is an estoppel issue, basically.

24   Whether there is a right to reasonably rely on whatever

25   communications may have occurred I think has to be flushed

1   out by examination of all of the facts, including dialog

2   that a first-year associate might have had with her

3   supervisor regarding the issue, or perhaps didn't have with

4   her supervisor regarding the issue.

5       In any event, let's continue on, because

6   if he's going to be instructed, let's just not to

7   answer, let's just get it on the record.

8       MR. GRIMMER:  The one thing you can examine on is what

9   Amy may have told him about what -- well, you correct me if

10   I'm wrong -- what she heard from people at AIG or American

11   Home Assurance.

12       MR. LAWHN:  We'll get to that.

13       MR. CORTES:  That's correct, and that's the sole basis

14   of our allegation.

15       MR. GRIMMER:  Okay.

16       MR. LAWHN:  But I want to lay a whole -- I want this

17   audit trail very carefully laid out for the judge when we go

18   in on the motion --

19       MR. GRIMMER:  Yeah.

20       MR. LAWHN:  -- so let me give you the next.

21       MR. GRIMMER:  Do it whatever way you want.

22       MR. LAWHN:  The next letter, Mr. Thomason, is a letter

23   dated January 9, 2002 from your firm to Mr. Titherington and

24   we'll mark this Exhibit 4.

25           (Whereupon, Exhibit 4 was marked

1                    for identification.)

2    BY MR. LAWHN:

3       Q    Have you had a chance to look at Exhibit 4?

4       A    Yes, I have.

5       Q    Do you recognize Exhibit 4?

6       A    Yes, I do.

7       Q    Who prepared Exhibit 4?

8       A    Amy Self.

9       Q    And would it be accurate then to state that Amy

10   Self is the one who addressed the letter to Mark

11   Titherington at American Home Assurance Company?  Did she

do

12   that or was that done at your direction?

13      A    I directed her to complete the claims process.

14   She prepared this letter, that's -- that's all I know.

15      Q    At the time you signed the letter, had the

16   addressee of the letter already been typed in?

17      A    I don't think I signed this letter.

18      Q    Did you review the letter before it went out?

19      A    Yes, I did.  I did not sign this letter.

20      Q    That's correct, Amy Self signed the letter.

21   Again, I would ask a series of questions regarding whether

22   or not Amy Self expressed to you any uncertainty as to the

23   identity of the surety at the time Exhibit 4 was prepared

24   and sent out.

25      MR. CORTES:  We'll object to all those questions and

1    instruct the witness not to answer them.

2    BY MR. LAWHN:

3        Q    At the time Exhibit 4 was sent out, were you
aware

4    of any uncertainty in Amy Self's mind regarding the
identity

5    of the surety?

6            Again, I expect you'll object to that.

7        MR. CORTES:  It's the same objection.  You're asking

8    for the attorney's thought process of one of Rhino's

9    attorneys.  It's a simple matter of you're asking for the

10   attorney's thought processes that went into a non-
privileged

11   communication.  The non-privileged nature of this

12   communication is simply not privileged, and the attorney's

13   thought processes are not accessible.

14   BY MR. LAWHN:

15       Q    The letter Exhibit 4 is signed by Amy Self,

16   correct, as you recall?

17       MR. CORTES:  You're asking him?

18       MR. GRIMMER:  For the third time.

19       MR. CORTES:  You're asking him if he recognizes her

20   signature?

21       A    Yeah, I recognize that signature to be the

22   signature of Amy Self.

23   BY MR. LAWHN:

24       Q    At the time Exhibit 4 went out, did she tell you

25   she believed the surety was American Home Assurance
Company?

1       MR. CORTES:  Same objection, same instruction.

2                   (Whereupon, Exhibit 5 was marked

3                   for identification.)

4    BY MR. LAWHN:

5       Q    Next exhibit, Exhibit 5 is a letter dated January

6    7, 2002.  Do you have Exhibit 5 in front of you?

7       A    I do.

8       Q    And do you recall receiving Exhibit 5?

9       A    Yes.

10      Q    You'll notice it identifies the surety as
American

11   Home Assurance Company in the heading.  Do you see that?

12      A    I see that.

13      Q    Did you give Exhibit 5 to Amy Self?

14      A    Yes, I did.

15      Q    At what point in time did you give --

16      MR. CORTES:  Slow down here.  I guess we're going to

17   make an objection to that.

18      MR. GRIMMER:  Yeah.

19      MR. LAWHN:  Would you like to move to strike the

20   answer?

21      MR. CORTES:  I would, move to strike it as an

22   inadvertent disclosure of privileged information.  And on

23   that note, I think it's about time that I object to your

24   continuing to go over all of these questions that we've

25   already told you we're going to object to, and I'm sure
that

1    you understand that we're going to object to.

2         And, you know, one of the reasons that I

3    object to your continuing like this and working on

4    the basis that it's vexatious and harassing,

5    possibly even a continued -- what we would view as a

6    continued effort to litigate in bad faith, is that

7    if you keep asking these questions, some privileged

8    information is going to slip out and we're going to

9    have to have it stricken.

10        So, I think you understand the scope of

11   our position on the scope of the waiver, and I think

12   that there's plenty of information on the record if

13   you want to go to the judge with it.

14       MR. LAWHN:  I'm going to continue to ask my questions,

15   lay my record.  I will give you every opportunity, hopefully

16   before Mr. Thomason replies, to interpose your objection and

17   your instruction.

18       MR. LAWHN:  The next exhibit is a letter from AIG

19   Technical Services dated February 21, 2002, and that will be

20   Exhibit 6.

21                      (Whereupon, Exhibit 6 was marked

22                       for identification.)

23   BY MR. LAWHN:

24       Q    Do you recall receiving Exhibit 6?

25       A    Yes.

1   Q   And, again, Exhibit 6 identifies the surety as

2   American Home Assurance Company in the heading, doesn't it?

3       MR. CORTES:  Objection; the document speaks for
itself.

4   BY MR. LAWHN:

5       Q   Do you see that?

6       A   Yes.

7       Q   Now, please give Mr. Cortes a chance to object
and

8   instruct you before you answer.

9           Did you give a copy of Exhibit 6 to Amy

10  Self upon your receipt of Exhibit 6?

11      MR. CORTES:  Same objection, same instruction.

12      MR. LAWHN:  And if I were to ask the witness as to

13  whether at the time Exhibit 6 was received he was aware of

14  any ambiguity regarding the identity of the surety, either

15  in his mind or Amy Self's mind, Mr. Cortes, would you

16  instruct him not to answer as well?

17      MR. CORTES:  That's correct.

18      MR. GRIMMER:  One way we can do this is you could just

19  leave, and then you can put them all on the record if you

20  want to.

21      MR. LAWHN:  Well, there's others that he will probably

22  be able to answer.

23      MR. GRIMMER:  Okay.

24      MR. LAWHN:  For example, there's an e-mail that just

25  cropped up this morning that I got from Guam that I don't

RALPH ROSENBERG COURT REPORTERS, INC.

1    understand.

2         MR. GRIMMER:  Okay.  Well, go ahead then.

3         MR. LAWHN:  I need to find out whether -- I don't
think

4    it even got to him.

5         MR. GRIMMER:  Okay.

6         MR. LAWHN:  What I'm trying to do is take this

7    chronologically as it occurred.

8         MR. GRIMMER:  I know, but my only point was we can

9    leave and you can do it anyway, since we're not going to

10   answer them.

11        MR. LAWHN:  One of the problems you got with that, in

12   some of the courts, unless you specifically ask the

13   question, the courts will not allow you to pursue a Motion

14   to Compel an answer, and that's why I'm asking the question

15   and giving you the opportunity to give the instruction.

16        MR. GRIMMER:  Okay.

17        MR. LAWHN:  I don't know about Guam, frankly, but I do

18   know some courts require you to specifically ask the

19   question and have a specific instruction not to answer.

20        MR. GRIMMER:  Okay.

21        MR. CORTES:  I don't know either what Judge Unpinko's

22   practice is on that.  However, one way we could do it is I

23   think that if judge overrules our objection for some

24   unforeseen reason, and I don't think he should, then we're

25   going to need to continue the deposition anyway.

1          And you will still be in a position of
2   having that ruling.  And once that ruling is made,
3   if it is made in your favor, and I do not think it
4   should be, then we would at that time not make the
5   objection, and you can ask Mr. Thomason the question
6   if you felt you still needed to.
7       MR. LAWHN:  Let's get up through the filing of the
8   complaint.
9          Next exhibit, March 11, 2002, Carlsmith
10  letter to AIG Technical Services, Exhibit 7.
11                    (Whereupon, Exhibit 7 was marked
12                    for identification.)
13      MR. LAWHN:  Exhibit 7 bears Amy Self's signature.
14  You'll see that on page four.
15      Q    Did you prepare Exhibit 7 and have her sign it or
16  did she prepare it and sign it herself?
17      A    I did not prepare the letter.
18      Q    Did you review the letter before it went out?
19      A    I think I did.  I do not recall.
20      MR. LAWHN:  Okay, let's go to the next exhibit.  It's
a
21  letter dated June 21, 2002, Exhibit 8, from AIG Technical
22  Services to Mr. Thomason.
23                    (Whereupon, Exhibit 8 was marked
24                    for identification.)
25  BY MR. LAWHN:

1    Q   Do you recall receiving Exhibit 8?

2    A   Yes.

3    Q   This is dated June 21st, 2002.  Do you see that?

4    A   Yes.

5    Q   By that time the complaint had already been filed?

6    A   Yes.

7            (Whereupon, Exhibit 9 was marked

8            for identification.)

9  BY MR. LAWHN:

10    Q   The Complaint, according to the one that we have,

11  was filed on March 20, Guam time, 2002, and it names AIG

12  Technical Services as the surety.  Who drafted Exhibit 9?

13    A   My recollection is that Miss Self and Mr. Calvo

14  worked together to write the complaint.

15    Q   Mr. Calvo's in Guam, isn't he?

16    A   Yes, he is.

17    Q   Was Miss Self in Guam at the time?

18    A   No, she was in Honolulu.

19    Q   How did they communicate with each other, assuming

20  that they did?

21    A   We frequently spoke by telephone and with using

22  e-mail.  My understanding was that they were working by

23  telephone and e-mail.

24    Q   Was the Complaint reviewed by you prior to its

25  being filed?

41

1    A    My recollection is that I showed Miss Self
Moore's

2    Federal Practice Form for the Miller Act claim.

3        MR. CORTES:  Could you just answer the question.  I'm

4    sorry, just -- the question was did --

5        A    Did I review the form?

6        MR. CORTES:  No.  What was your question again,
please?

7    BY MR. LAWHN:

8        Q    The question was did you review Exhibit 9 prior
to

9    Exhibit 9 being filed in the U.S. District Court of Guam?

10       A    I do not recall.

11       Q    Were you aware at the time that Exhibit 9 was

12   being drafted that AIG Technical Services, Inc. was being

13   named or identified as the surety in the Complaint?

14       MR. CORTES:  I'll instruct him not to answer; that's

15   attorney thought process in the course of rendering legal

16   services for the client.

17   BY MR. LAWHN:

18       Q    Did you instruct anybody to name AIG Technical

19   Services, Inc. as a defendant in Exhibit 9?

20       MR. CORTES:  Same objection, same instruction.

21   BY MR. LAWHN:

22       Q    When was the first time you became aware that AIG

23   Technical Services, Inc. had been identified as the surety

24   in Exhibit 9?

25       A    I'm going to answer.  When I saw the file form.

1    Q    You mean the form with the file mark stamp on the

2    front?

3    A    When I saw the filed Complaint.

4    Q    That would have been sometime after March 20,

5    2002, I'm assuming?

6    A    I was -- I was aware -- I learned, I believe the

7    day preceding, that there was a concern.

8    MR. CORTES:  Excuse me.

9    A    This is going to be -- I need to talk to my

10   counsel.

11    MR. CORTES:  Can we go off the record for a little

bit.

12    MR. LAWHN:  Sure.

13    MR. CORTES:  Okay.

14           (Discussion held off the record.)

15           (Record read.)

16    A    After consulting with counsel, I learned that

17   there was a question about the name of the surety when I

18   received a telephone call at my home from Rossi Tolentino,

19   an attorney in the Guam office.  Mr. Tolentino told me that

20   there was a conflict between AIG Technical Services and one

21   of my partner's clients, a company named   A I Marine,

22   because they're all part of AIG.

23          My response was that I didn't understand

24   that because the surety was American Home Assurance,

25   and that my understanding was that would be the

43

1    surety in this case.  But because Mr. Tolentino

2    assured me they checked into it, it was the same

3    company, I went back to my firm to consult with our

4    internal counsel about resolution of the conflict.

5          I learned only when I received a copy of

6    the filed Complaint that only AIG Technical Services

7    had been named.

8    BY MR. LAWHN:

9       Q    Can you give us a time frame?

10      A   It was very close to March 20th, the filing date

11   that we were facing under the -- to assert the Miller Act

12   claim.

13          I want to make sure my answer is clear,

14   that the telephone was shortly before March 20th.  I

15   received a copy of the filed complaint shortly after

16   March 20th.

17      Q   Was any consideration given at that point in
time,

18   March 20th, simply amending the Complaint to name as a

19   defendant both AIG Technical Services and American Home

20   Assurance Company?

21      MR. CORTES:  Same objection.

22      MR. LAWHN:  Same instruction?

23      MR. CORTES:  Instruction not to answer.

24      MR. LAWHN:  The next exhibit has attorney-client

25   privileged stuff on it.  Excuse me while I purge the file

44

1    from the attorney-client privileged matter.

2        MR. CORTES:  This is your attorney-client privileged

3    matter?

4        MR. LAWHN:  Apparently.

5            (Discussion held off the record.)

6        MR. LAWHN:  Let me give you what will be marked as

7    Exhibit 10, the April 9, 2002 withdrawl letter that was

8    written in this matter.

9                (Whereupon, Exhibit 10 was

10               marked for identification.)

11    BY MR. LAWHN:

12        Q    Did you prepare Exhibit 10?

13        A    Yes I did.

14        Q    Exhibit 10, on page two -- excuse me, I guess
it's

15    page three because page two is all redacted.  Under the

16    heading "Potential Challenge to Carlsmith," second
paragraph

17    starts the "potential challenge," do you see that
paragraph?

18        A    Yes.

19        Q    There's a sentence in here that reads -- that

20    shows "the surety has identified itself as AIG Technical

21    Services."  Do you see that --

22        A    Yes.

23        Q    -- sentence?  What was the basis of your making

24    that statement?

25        A    My understanding from Mr. Tolentino and Miss Self

1    was that AIG Technical Services had said or led them to

2    believe that they were the surety.

3        Q    Can you tell me exactly what Mr. Tolentino and

4    Miss Self told you with regard to statements allegedly made

5    on behalf of AIG Technical Services.

6        A    No, I can't.

7        Q    Did they give you any specifics other than what

8    you've just told me?

9        A    The essence of my conversations with them were

10    generally that AIG Technical Services had -- was the
surety.

11    It was satisfied that they were the surety.

12        Q    Did you explain to them the correspondence that
we

13    have reviewed in this deposition that shows AIG -- excuse

14    me -- American Home's identified as the surety?

15    MR. CORTES:  I need to back up here and let me think

16    about that last exchange.  I'm really unclear from his

17    answer.  I did not object because he was talking about a

18    conversation that he had with other Carlsmith lawyers on
the

19    subject of conflict that led to Carlsmith's withdrawl as

20    Rhino's counsel.

21          And, of course, any identification by AIG

22    TS as the surety would not be a privileged

23    communication within Carlsmith because that was

24    outside -- it's not a privileged communication

25    because it's a communication from AIG TS.  So, I

1    guess we have no objection.

2        MR. LAWHN:  Let's back up a little bit.

3        Q    Mr. Tolentino and Miss Self told you that AIG

4    Technical Services led them to believe that AIG Technical

5    Services was the surety.  Is that what you testified to?

6        A    That's my recollection.

7        Q    Did Mr. Tolentino or Miss Self tell you whether

8    this representation was oral or in writing?

9        A    I don't think they told me.  I don't recall being

10   told exactly what it was.

11       Q    Did you ask them to show you anything that they

12   might have received from AIG Technical Services in writing

13   which identifies the surety as American Home?

14       A    No.

15       Q    Excuse me, as AIG Technical Services?  The answer

16   didn't --

17       A    I did not ask them, no.

18       Q    At the time that Miss Self and Mr. Tolentino told

19   you this, did you mention to Miss Self and Mr. Tolentino
the

20   letters that you had received from AIG Technical Services

21   which identified the surety as American Home Assurance

22   Company?

23       A    No.

24       MR. CORTES:  You know, we're getting -- that one
should

25   have been objected to.

RALPH ROSENBERG COURT REPORTERS, INC.

47

```
 1        MR. CORTES:  I think I will object to that and ask for
 2   it to be stricken.  And the reason is because we're getting
 3   away from the reason to withdraw, and we're getting back
 4   into the state of mind of Mr. Thomason and Carlsmith
 5   attorneys, their communications in the course of rendering
 6   the representation.  And those communications are not
```
within
```
 7   the scope of discussing the conflict.  That's simply you
 8   digging into attorney thought processes regarding who the
 9   surety wasp, or Carlsmith's analysis of who the surety was,
10   which was an analysis they may or may not have made.
11        MR. LAWHN:  We disagree with that.  We feel that the
12   opportunity to correct the mistake was on the table on or
13   about March 20th.  And under mitigation theory, had it been
14   brought up, perhaps they could have amended the Complaint,
15   properly named the surety within 24 hours.
16        MR. GRIMMER:  Well, we don't --
17        MR. LAWHN:  And that's a mitigation theory.  That's a
18   mitigation theory.  But, you know, we don't even begin with
19   the beginning theory, which is that it matters.
20        MR. LAWHN:  I'm not so sure it matters, either.
21        MR. GRIMMER:  Okay.
22        MR. LAWHN:  But we're here, and at some point in time
23   we're going to to have to get to the bottom of it.
24        MR. GRIMMER:  Okay.
25        MR. CORTES:  So I think that last response, we would
```

Case 1:02-cv-00008    Document 227    Filed 10/29/2003    Page 117 of 221

48

1 like to waive it as an inadvertent waiver of the

2 privilege -- of the privileged nature of the communication

3 described.

4 BY MR. LAWHN:

5     Q    In Exhibit 10, your withdrawl letter, you attach
a

6 printout of the 10-K which is filed on behalf of the

7 American International Group of Securities And Exchange

8 Commission.  The pages aren't numbered.  If you'll go

9 through that, you'll find it.

10     MR. GRIMMER:  Yeah.

11 BY MR. LAWHN:

12     Q    And you make reference to it in the body of

13 Exhibit 10.  Do you see the 10-K?

14     A    Yes, sir.

15     Q    How did you get the 10-K?

16     A    Mr. Steve Egesdal, a partner in the law firm of

17 Carlsmith Ball, showed it to me.

18     Q    And if you look at the first page of the 10-K,
you

19 see the name American Home Assurance Company has a circle

20 drawn around it.

21     A    This has extra pages, and I -- it's not part of
my

22 letter.

23     MR. CORTES:  The fifth-to-the-last page is a

24 transmission report.  It comes under the waiver of the

25 privilege because this is the letter by which --

49

1        MR. GRIMMER:  Okay.  So the --

2        MR. CORTES:  -- Carlsmith withdrew.  So, we waive the

3    privilege with respect to the fifth-to-the-last page.  The

4    last four pages are other documents.

5        MR. LAWHN:  It's all irrelevant to my questioning.
You

6    want to pull it off, that's fine.

7        A    Yeah.

8        MR. GRIMMER:  Okay, so we'll pull it off.

9    BY MR. LAWHN:

10        Q    What I'm asking about is on the 10-K.  Someone's

11    drawn a circle around American Home Assurance.

12        A    I drew those circles.

13        Q    And why did you draw the circles?

14        A    This issue was presented to me as a conflicts

15    issue.  And I circled American Home Assurance when I

16    reviewed the document that Mr. Egesdal had provided me.

17        A    I recognized it, I circled it.

18        Q    What relevance did it have to you, if any?

19        MR. GRIMMER:  Keep --

20        MR. CORTES:  I'll instruct him not to answer the

21    question unless he had acceptance except insofar as it had

22    relevance to the conflict.

23        MR. LAWHN:  Well, my question goes to the identity of

24    the surety, actually.

25        MR. CORTES:  And we object to that.


RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1    MR. LAWHN:  Let me ask the question, and you can
object

2  and instruct him not to answer.

3    Q    Did it have any relevance to you insofar as the

4  identity of the surety?  Please don't answer till Mr.
Cortes

5  has a chance to object.

6    MR. GRIMMER:  Just object and instruct not to answer.

7    MR. CORTES:  Yeah, we object on the privilege.  It's

8  privileged, asks for attorney thought process, instruct the

9  witness not to answer.

10  BY MR. LAWHN:

11    Q    You, in your Exhibit 10, where you say the surety

12  identified itself as AIG Technical Services, you told me

13  about Mr. Tolentino and Miss Self discussing this with you

14  insofar as what they believe AIG Technical Services had
told

15  them.  Was it your understanding that Mr. Tolentino had
some

16  type of contact with a representative of AIG Technical

17  Services?

18    A    No.

19    Q    Well, then how would he know?

20    A    He's responsible in the Guam office for

21  addressing, resolving conflicts of interest, professional

22  conflicts, and he brought it to my attention as a conflict

23  issue, saying we could not sue any of these parties because

24  they were all part of AIG, and he had checked.

25         That sentence is a -- my understanding

1    based upon what I was told by Miss Self and

2    Mr. Tolentino concerning the conflict and our

3    inability to go forward with the case.

4        Q    Well, tell me to the best of your recollection

5    exactly what Miss Self told you.

6        MR. GRIMMER:  What Miss Self told Terry?

7        MR. CORTES:  About what?

8        MR. LAWHN:  About the surety having identified itself

9    as AIG Technical Services.

10       MR. GRIMMER:  Okay, okay.

11       A    I can't recall exactly what she said.

12   BY MR. LAWHN:

13       Q    Did she tell you that someone from AIG Technical

14   Services had told her that the surety was AIG Technical

15   Services?

16       A    My understanding from several conversations with

17   her was that AIG Technical Services was either part of or

in

18   the same corporation as the surety --

19       Q    Okay?

20       A    -- as a conflict matter.

21       Q    Did she tell you, though, that AIG Technical

22   Services had told her that the surety was AIG Technical

23   Services and not American Home Assurance Company?

24       MR. CORTES:  Why don't you just --

25       A    No.

52

| | |
|---|---|
| 1 | MR. CORTES: -- avoid, you know, confusing the |
| 2 | privilege issue, why don't you just ask Miss Self these |
| 3 | questions, and then we won't get into the possibility that |
| 4 | we're waiving something by allowing Mr. Thomason to answer, |
| 5 | you know, what the communications were between Miss Self |

and

| | |
|---|---|
| 6 | him on the this subject. Because the communication between |
| 7 | AIG and Miss Self is not a privileged communication, and |
| 8 | that way you can ask -- if you ask her, then we won't have |

a

| | |
|---|---|
| 9 | problem with any risk that someone might claim that we've |
| 10 | waived the privilege with respect to communications on the |
| 11 | subject of who the surety is. |
| 12 | MR. LAWHN: We may well have to depose Miss Self on |
| 13 | this. |
| 14 | Q Did Miss Self tell you whether these alleged |
| 15 | representations on behalf of AIG Technical Services were |
| 16 | oral, in writing, or perhaps some combination of the two? |
| 17 | MR. CORTES: Same objection. I think we have to |

object

| | |
|---|---|
| 18 | to that. Well, slow down. I'm sorry. Can you repeat the |
| 19 | question. |
| 20 | MR. LAWHN: I'm trying to find out whether the alleged |
| 21 | representations were made orally or were they made in |
| 22 | writing or perhaps is it a combination of both. |
| 23 | MR. CORTES: Okay. That's within the scope of the |
| 24 | waiver then. |
| 25 | A My understanding was that they were oral. |

1 BY MR. LAWHN:

2     Q    And were they made face-to-face or were they made

3 on a telephone call? What is your understanding?

4     MR. CORTES: No, I'm sorry, I have to correct myself.

5 Are you asking about the communications -- which

6 communications are you asking about?

7     MR. LAWHN: The communication --

8     MR. GRIMMER: Miss Self or the AIG?

9     MR. LAWHN: Communications -- AIG Technical Services

10 and Amy Self, the communications where the discussion that

11 Mr. Thomason had with Amy Self which were the basis of his

12 comment and withdrawl letter which is Exhibit 10.

13     MR. GRIMMER: It's okay.

14     MR. CORTES: Okay.

15     A    My understanding they were oral.

16 BY MR. LAWHN:

17     Q    Was it a telephone call or face-to-face, as far

as

18 you know?

19     A    I don't know.

20     Q    Did you ever have any oral discussions with any

21 representative of AIG Technical Services regarding this

22 claim?

23     A    No.

24     Q    Did you ever have any discussions with anybody

25 from American Home Assurance Company regarding this claim?

1    A    An attorney whose name I cannot recall at this

2    moment came to visit Carlsmith to discuss our claim.

3    Q    That was after the Complaint was filed?

4    A    No, this was well before, several months before

5    when we initially filed.  My recollection is that he was an

6    attorney for -- he represented himself as being an attorney

7    for a cosigner.  Miss Self and I both talked with this

8    attorney.  And that's the only contact I had with any

9    representative or any person who said they represented any

10   party to this claim.

11   Q    Did this attorney say anything to you which led

12   you to believe that the surety was AIG Technical Services

13   and not American Home Assurance Company?

14   A    No, it was an informal meeting.  He told me that

15   he wanted to make peace between Rhino Builders and

16   BioGenesis.  He had relationship with Gerald Lam, the owner

17   of BioGenesis, that's the only reason I talked to him.

18   MR. LAWHN:  The next exhibit is a series of e-mails

19   which we obtained in Guam from the Carlsmith office that I

20   got this morning.  I'm just going to have the whole package

21   marked, if we could.

22   A    While you're doing that, may I take a brake.

23   MR. LAWHN:  Of course.  Let's go off the record.

24        (At 3:33 p.m., a recess was taken until 3:36 p.m.)

25                    (Whereupon, Exhibit 11 was

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1                    marked for identification.)

2    BY MR. LAWHN:

3        Q    Have you got Exhibit 11 in front of you?

4        A    No, I don't.

5        Q    It's pretty thick.

6        A    Oh.

7        Q    Mr. Thomason, Exhibit 11 is a series of e-mails

8    that were produced by Carlsmith's firm's office in Guam.

9    And if you go to page four, look in the lower right-hand

10   corner, do you see the 004?

11       A    Yeah.

12       Q    And you see an e-mail from David Ledger.  Now, is

13   David Ledger an employee in the Guam office of Carlsmith?

14       A    David Ledger is a partner in the Guam office of

15   Carlsmith.

16       Q    Have you ever seen the e-mail that's under the

17   heading "Original Message" at the bottom of page four of

18   Exhibit 11?

19       A    Yes, I saw that.

20       Q    Now, at the top of page four of Exhibit 11,

21   there's a response from Judy Granville at AIG dot com to

22   David Ledger.  And in the response, Ms. Granville tells

23   Mr. Ledger that American Home Assurance Company, the

24   insurer, identifies it as the insurer, and then goes over

25   various other AIG entities.

1          Did you see the response from Miss

2     Granville to David Ledger?  It's at the top of page

3     four of Exhibit 11.

4          A     I don't recall seeing that response.

5          Q     Let me shift gears, shift your focus a little bit

6     away from this identity of the surety issue to the
withdrawl

7     issue.

8          At any time did anybody from any of the

9     AIG group of companies ask you to withdraw from the

10    representation of Rhino in this matter?

11         A     No.

12         Q     At any time did any representative of the AIG

13    group of companies even suggest to you that Carlsmith
should

14    withdraw from this case?

15         A     Not to me, no.

16         Q     Are you aware of any economic pressure being put

17    on the Carlsmith firm by any of the AIG group of companies

18    to encourage Carlsmith to withdraw from the representation

19    of Rhino in this case?

20         A     I'm not aware of any, no.

21         MR. LAWHN:  Mr. Cortes, that's all I have this

22    afternoon.  I do, of course, want to reserve my right in
the

23    event that Judge Unpingco says I can ask the questions that

24    have been objected to ask instructed not to answer.

25         MR. CORTES:  If the judge instructs us to answer any

1  questions, of course, then we won't make any objections

2  contrary to his ruling.

3      I would suggest, however, that if you

4  think that we've objected improperly, that we meet

5  and confer at least via mail.  And I think that it

6  would be fair in this instance if we exchanged the

7  authority that we based our positions on prior to

8  bringing the motion.

9      MR. LAWHN:  I think the rules may require us to do

10  something along those lines.

11      MR. CORTES:  And the rules require us to meet and

12  confer, and I don't think the judge would really appreciate

13  it if we don't bother him unnecessarily.

14      MR. LAWHN:  We'll do our best to comply with the
spirit

15  and the literal wording of the rules.  Off the record.

16          (Discussion held off the record. )

17              EXAMINATION

18  BY MR. CORTES:

19      Q    Mr. Thomason, thank you for being here today.

20  Toward the end of your testimony, you testified, according

21  to my notes, something to the effect that an attorney whose

22  name you cannot recall came to visit Carlsmith Ball, an

23  attorney for the cosigner on the bond, I believe.

24      A    (Witness nods head.)

25      Q    Could that have been Steven Tom?

58

| 1 | A | That's -- I think that's correct. |

1    A    That's -- I think that's correct.

2    Q    Okay.  You think so?

3    A    Yes, I do.

4    Q    And earlier you also said that you had arranged

5 for Mr. Grimmer to come to defend you in this matter.  Do

6 you have a formal attorney-client relationship with

7 Mr. Grimmer or with Carlsmith Ball with respect to this

8 deposition?

9    A    No, I have not signed an engagement letter.

10    Q    Turning to -- what was the last exhibit number?

11    MR. GRIMMER:  Eleven.

12 BY MR. CORTES:

13    Q    Turning to pages that are Bates numbered nine, 10

14 and 11 of Exhibit 11, do you recognize these?

15    A    Yes.

16    Q    What are they?

17    A    These are the results of computerized searches

18 that the Carlsmith business office runs to assist attorneys

19 in questions concerning conflicts in matters.

20    Q    Do you have any knowledge about when this

21 particular conflicts check was run?

22    A    No, I don't.  No, I don't.

23    Q    And then on page one of Exhibit 11, this is an

24 e-mail dated March 19, 2002.  Do you know who Vince would
be

25 that's referred to in the second sentence there?  Would
that

59

1    be Vince Leon Guerrero?

2        A    Yes, Vince Leon Guerrero.  He was an attorney

3    affiliated in the Guam office.

4        Q    Is he still at Carlsmith, do you know?

5        A    My understanding is that he -- he has since gone

6    to another firm.

7        Q    Do you know what sort of practice Mr. Leon

8    Guerrero had at Carlsmith?

9        A    I believe he was primarily commercial litigation

10   attorney.

11       Q    Do you have any knowledge of Mr. Leon Guerrero

12   representing any AIG entities -- AIG-affiliated entities

13   while at Carlsmith?

14       A    I do not, no.

15       MR. CORTES:  That's all I have.

16       MR. LAWHN:  No further questions.

17           (The deposition was concluded at 3:46 p.m.)

18                        -o0o-

19

20

21

22

23

24

25

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

60

1

2                        C E R T I F I C A T E

3

4
                          I, HEDY COLEMAN, CSR, in and for
5    the State of Hawaii, do hereby certify:

6                          That I was acting as shorthand
     reporter in the foregoing matter on the 6th day of
7    October, 2003;

8                          That the proceedings were taken
     down in machine shorthand by me and were thereafter
9    reduced to typewriting by me; that the foregoing
     represents, to the best of my ability, a correct
10   transcript of the proceedings had in the foregoing
     matter;
11

12
                          I further certify that I am not
13   counsel for any of the parties hereto, nor in any
     way interested in the outcome of the cause named in
14   the caption.

15

16

17

18

19

20          DATED:_____

21

22

23          _____
            HEDY COLEMAN, CSR #116
24          Notary Public, State of Hawaii
            My commission expires: 9-14-05
25


                 RALPH ROSENBERG COURT REPORTERS, INC.
                           (808) 524-2090

61

1                   C E R T I F I C A T E

2              I, TERRY E. THOMASON, do hereby certify
that I

3       have read the foregoing pages 1 through 61, inclusive, and

4       corrections, if any, were noted by me; and that same is now
a

5       true and correct transcript of my testimony.

6                   Dated
_____

7

8
_____
                        TERRY E. THOMASON
9

10

11           Signed before me this _____

12       day of _____, 2003.

13

14

15           _____

16

17

18

19

20

21

22       United States of America For Use And Benefit of Rhino

23       Builders, Inc. vs. BioGenesis Pacific, Inc,  et al, Civil
No.

24       02-00008, Hedy Coleman, 10-6-03.

25

U.S. District Court of Guam
Civil Case No. 02-00008


Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.


# EXHIBIT "M"


Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities



## License Name Search Details

**To start new license search, click here-->**

### License

License No: 100106                     Vendor ID: 100124
Vndr Name: AMERICAN HOME ASSURANCE COMPANY
Trade Name:
License Status: ACTIVE                  Effective Date: 07-16-1953
License Type: Insurance Company Foreign/Alien    Expiration Date: 08-16-2004

### License Classes

| Class | Subclass | Class Status | Effective Date |
|---|---|---|---|
| Accident and Health or Sickness | ALL | ACTIVE | 04-16-1956 |
| Casualty | ALL | ACTIVE | 04-16-1956 |
| Marine | ALL | ACTIVE | 04-16-1956 |
| Property | ALL | ACTIVE | 04-16-1956 |
| Surety | ALL | ACTIVE | 04-16-1956 |
| Vehicle | ALL | ACTIVE | 04-16-1956 |

### Current Representatives

Click the Vndr Id to get rep classes details.

| Vndr Id | Vendor Name | Effective Date |
|---|---|---|
| N/A | | |

### Appointed By

| License No | Name | License Type | Class | Subclass | Effective Date |
|---|---|---|---|---|---|
| N/A | | | | | |

### Appointment To

http://www.ehawaiigov.org/serv/hils?_action=Details&_from=NAMELIST&licno=100106&hlvid

**Exhibit**

**M**

## Department of Commerce and Consumer Affairs

P O. Box 3614
Honolulu, HI
96811-3614
250 S. King St.
5th Flr
Honolulu, HI 96813
Tel 808.586.2790

# Hawaii
# Insurance
### division
## License Name Search

Feedback

• **Your search did not find any matches!**
Please try to search by proper name of the
individual or by trade name.

• Direct Search by <u>License Number</u>

• Direct Search by <u>License Type</u>

• Browse with the <u>Business Island or State
Search</u>

• Browse with the <u>Insurance Companies Search</u>

Search by **Proper Name** of an individual

First Name:
_____

Last Name:
_____

Or search by **Company Name**

Company Name:
| AIG Technical Services |

Or search by **Trade Name**

Trade Name:
_____

*Data Information is Current As Of
( Database updated at 8:00am ET )*

http://www.ehawaiigov.org/serv/hils                    10/14/2003



# Hawaii Insurance division

## Company Name Search Results

Click the License Number to get the details.

There were 8 matches to your search!

| License Number | Company Name | Status | License Type | Vendor ID |
|---|---|---|---|---|
| 100792 | AIG ANNUITY INSURANCE COMPANY | ACTIVE | Insurance Company Foreign/Alien | 100786 |
| 100000 | AIG HAWAII INSURANCE COMPANY, INC. | ACTIVE | Insurance Company Domestic | 100000 |
| 100056 | AIG LIFE INSURANCE COMPANY | ACTIVE | Insurance Company Foreign/Alien | 100055 |
| 313799 | AIG MARKETING, INC. | ACTIVE | Nonresident Producer | 210048 |
| 100028 | AIG NATIONAL INSURANCE COMPANY, INC. | ACTIVE | Insurance Company Foreign/Alien | 100028 |
| 100240 | AIG SUNAMERICA LIFE ASSURANCE COMPANY | ACTIVE | Insurance Company Foreign/Alien | 100166 |
| 306866 | AIG WARRANTY SERVICES AND INSURANCE AGENCY, INC. | ACTIVE | Service Contract Provider | 203338 |
| 306909 | AIG WARRANTYGUARD, INC. | ACTIVE | Service Contract Provider | 203381 |

*Data Information is Current As Of October 13, 2003*

Copyright © 2003 Hawaii Insurance Division
***Disclaimer***

**Hawaii State Homepage || DCCA**

http://www.ehawaiigov.org/serv/hils          10/14/2003

U.S. District Court of Guam
Civil Case No. 02-00008


Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.



# EXHIBIT "N"



Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities

N

| VIEW DOCUMENT |

# AMERICAN INTERNATIONAL GROUP INC
## 10-K - EX-21, EX-21 SUBSIDIARIES OF REGISTRANT filed 04/02/01

☐ Review Settings

View Filing

Page 1 – 10-K – EX-21 – Filed by AMERICAN INTERNATIONAL GROUP INC

1

Exhibit 21

Subsidiaries of Registrant

| Name of Corporation(1) | Jurisdiction of Incorporation | % of Voting Securities Owned by its Immediate Parent(2) |
|---|---|---|
| American International Group, Inc. (Registrant) | Delaware | (3) |
| AIG Aviation, Inc. | Georgia | 100% |
| AIG Bulgaria Insurance and Reinsurance Company AD | Bulgaria | 100% |
| AIG Capital Corp. | Delaware | 100% |
| AIG Capital Management Corp. | Delaware | 100% |
| AIG Claim Services, Inc. | Delaware | 100% |
| AIG Consumer Finance Group, Inc. | Delaware | 100% |
| AIG Bank Polska S.A. | Poland | 97.23% |
| AIG Credit S.A. | Poland | 100% |
| Compania Financiera Argentina S.A. | Argentina | 95.62% |
| AIG Credit Corp. | Delaware | 100% |
| A.I. Credit Corp. | New Hampshire | 100% |
| Imperial Premium Finance, Inc. | California | 100% |
| Imperial Premium Finance, Inc. | Delaware | 100% |
| AIG Finance Holdings, Inc. | New York | 100% |
| AIG Finance (Hong Kong) Limited | Hong Kong | 100% |
| AIG Financial Products Corp. | Delaware | 100% |
| AIG Matched Funding Corp. | Delaware | 100% |
| Banque AIG | France | 90%(4) |
| AIG Funding, Inc. | Delaware | 100% |
| AIG Global Investment Group, Inc. | Delaware | 100% |
| AIG Capital Partners, Inc. | Delaware | 100% |
| AIG Global Investment Corp. | New Jersey | 100% |
| AIG Global Real Estate Investment Corp. | Delaware | 100% |
| AIG Global Trade & Political Risk Insurance Company | New Jersey | 100% |
| AIG Golden Insurance Ltd. | Israel | 50.1% |
| AIG Life Insurance Company | Delaware | 78.94%(5) |
| AIG Life Insurance Company of Canada | Canada | 100% |
| AIG Life Insurance Company of Puerto Rico | Puerto Rico | 100% |
| AIG Marketing, Inc. | Delaware | 100% |
| AIG Memsa, Inc. | Delaware | 100% |
| Tata AIG General Insurance Company Ltd. | India | 26% |
| AIG Private Bank Ltd. | Switzerland | 100% |
| AIG Risk Management, Inc. | New York | 100% |
| AIG Trading Group Inc. | Delaware | 100% |
| AIG International Inc. | Delaware | 100% |
| AIU Insurance Company | New York | 52%(6) |
| AIG North America, Inc. | New York | 100% |
| American Home Assurance Company | New York | 100% |

CBHNL000032

(2)

Exhibit N

| | | |
|---|---|---|
| AIG Hawaii Insurance Company, Inc. | Hawaii | 100% |
| American International Insurance Company | New York | 100% |
| American International Insurance Company of California, Inc. | California | 100% |
| American International Insurance Company of New Jersey | New Jersey | 100% |
| Minnesota Insurance Company | Minnesota | 100% |
| American International Realty Corp. | Delaware | 31.47%(7) |
| Pine Street Real Estate Holdings Corp. | New Hampshire | 31.47%(8) |
| Transatlantic Holdings, Inc. | Delaware | 33.77%(9) |
| Transatlantic Reinsurance Company | New York | 100% |
| Putnam Reinsurance Company | New York | 100% |
| Trans Re Zurich | Switzerland | 100% |

---

II-10

---

**Page 2 -- 10-K -- EX-21 -- Filed by AMERICAN INTERNATIONAL GROUP INC**

---

2

Subsidiaries of Registrant -- (continued)

| Name of Corporation(1) | Jurisdiction of Incorporation | % of Voting Securities Owned by its Immediate Parent (2) |
|---|---|---|
| American International Group Data Center, Inc. | New Hampshire | 100% |
| American International Life Assurance Company of New York | New York | 77.52%(10 |
| American International Reinsurance Company Limited | Bermuda | 100% |
| American International Assurance Company, Limited | Hong Kong | 100% |
| American International Assurance Company (Australia) Limited | Australia | 100% |
| American International Assurance Company (Bermuda) Limited | Bermuda | 100% |
| American International Assurance Co. (Vietnam) Limited | Vietnam | 100% |
| Tata AIG Life Insurance Company Ltd. | India | 26% |
| Nan Shan Life Insurance Company, Ltd. | Taiwan | 95% |
| American International Underwriters Corporation | New York | 100% |
| American International Underwriters Overseas, Ltd. | Bermuda | 100% |
| AIG Europe (Ireland) Ltd. | Ireland | 100% |
| AIG Europe (U.K.) Limited | England | 100% |
| AIG Interamericana Companhia de Seguros Gerais (Brazil) | Brazil | 50% |
| Universal Insurance Co., Ltd. | Thailand | 100% |
| La Seguridad de Centroamerica, Compania de Seguros, Sociedad Anonima | Guatemala | 100% |
| American International Insurance Company of Puerto Rico | Puerto Rico | 100% |
| La Interamerica Compania de Seguros Generales S.A | Colombia | 100% |
| American International Underwriters G.m.b.H | Germany | 100% |
| Underwriters Adjustment Company, Inc. | Panama | 100% |
| American Life Insurance Company | Delaware | 100% |
| AIG Life (Bulgaria) Z.D. A.D. | Bulgaria | 100% |
| AIG Participacoes do Brasil, S.A. | Brazil | 100% |
| ALICO, S.A. | France | 100% |
| American Life Insurance Company (Kenya) Limited | Kenya | 89% |
| Pharaonic American Life Insurance Company | Egypt | 71.9% |
| American Security Life Insurance Company, Ltd. | Switzerland | 99.8% |
| American Security Life Insurance Company | Lichtenstein | 100% |
| Birmingham Fire Insurance Company of Pennsylvania | Pennsylvania | 100% |
| China America Insurance Company, Ltd. | Delaware | 50% |
| Commerce and Industry Insurance Company | New York | 100% |
| Commerce and Industry Insurance Company of Canada | Ontario | 100% |
| Delaware American Life Insurance Company | Delaware | 100% |
| Hawaii Insurance Consultants, Ltd. | Hawaii | 100% |
| HSB Group, Inc. | Delaware | 100% |
| The Hartford Steam Boiler Inspection and Insurance Company | Connecticut | 100% |
| Allen Insurance Company Ltd. (Bermuda) | Bermuda | 100% |
| The Hartford Steam Boiler Inspection and Insurance Company of Connecticut | Connecticut | 100% |
| The Hartford Steam Boiler Inspection and Insurance Company of Texas | Texas | 100% |
| HSB Engineering Insurance Limited | England | 100% |
| The Boiler Inspection and Insurance Company of Canada | Canada | 100% |
| The Insurance Company of the State of Pennsylvania | Pennsylvania | 100% |
| Landmark Insurance Company | California | 100% |
| Mt. Mansfield Company, Inc. | Vermont | 100% |

CBHNL000033

| | | |
|---|---|---|
| National Union Fire Insurance Company of Pittsburgh, Pa. | Pennsylvania | 100% |
| American International Specialty Lines Insurance Company | Alaska | 70%(11 |
| International Lease Finance Corporation | California | 100% |
| Lexington Insurance Company | Delaware | 70%(11 |
| JI Accident & Fire Insurance Co. Ltd. | Japan | 50% |

II-11

3

## Subsidiaries of Registrant--(continued)

| Name of Corporation | Jurisdiction of Incorporation | % of Voting Securities Owned by its Immediate Parent(2) |
|---|---|---|
| National Union Fire Insurance Company of Louisiana | Louisiana | 100% |
| 21st Century Insurance Group | California | 33.07%(12) |
| 21st Century Insurance Company | California | 100% |
| 21st Century Casualty Company | California | 100% |
| Starr Excess Liability Insurance Company, Ltd. | Delaware | 100% |
| Starr Excess Liability Insurance International Limited | Ireland | 100% |
| WHIG Holding Corp. | Delaware | 100% |
| Audubon Insurance Company | Louisiana | 100% |
| Audubon Indemnity Company | Mississippi | 100% |
| Agency Management Corporation | Louisiana | 100% |
| The Gulf Agency, Inc. | Alabama | 100% |
| New Hampshire Insurance Company | Pennsylvania | 100% |
| AIG Europe, S.A | France | (13) |
| A.I. Network Corporation | New Hampshire | 100% |
| American International Pacific Insurance Company | Colorado | 100% |
| American International South Insurance Company | Pennsylvania | 100% |
| Granite State Insurance Company | Pennsylvania | 100% |
| New Hampshire Indemnity Company, Inc. | Pennsylvania | 100% |
| AIG National Insurance Company, Inc. | New York | 100% |
| Illinois National Insurance Co. | Illinois | 100% |
| New Hampshire Insurance Services, Inc. | New Hampshire | 100% |
| Pharaonic Insurance Company, S.A.E. | Egypt | 90% |
| The Philippine American Life and General Insurance Company | Philippines | 99% |
| Pacific Union Assurance Company | California | 100% |
| The Philippine American General Insurance Company, Inc. | Philippines | 100% |
| Philam Insurance Company, Inc. | Philippines | 100% |
| Risk Specialist Companies, Inc. | Delaware | 100% |
| SunAmerica Inc. | Delaware | 100% |
| SunAmerica Investments, Inc. | Georgia | 100% |
| SunAmerica Financial Network, Inc. | Maryland | 100% |
| Advantage Capital Corp. | New York | 100% |
| FSC Securities, Inc. | Delaware | 100% |
| Sentra Securities Corp. | California | 100% |
| Spelman & Co., Inc. | California | 100% |
| SunAmerica Securities, Inc. | Delaware | 100% |
| Resources Trust Company | Colorado | 100% |
| SunAmerica Life Insurance Company | Arizona | 100% |
| First SunAmerica Life Insurance Company | New York | 100% |
| Anchor National Life Insurance Company | Arizona | 100% |
| Royal Alliance Associates, Inc. | Delaware | 100% |
| SunAmerica Asset Management Corp. | Delaware | 100% |
| SunAmerica Capital Services, Inc. | Delaware | 100% |
| 21st Century Insurance Company of Arizona | Arizona | 51%(14) |

CBHNL000034

II-12

5

4

Subsidiaries of Registrant--(continued)

| Name of Corporation | State or Other Jurisdiction of Incorporation | % of Voting Securities Owned by its Immediate Parent [2] |
|---|---|---|
| United Guaranty Corporation | North Carolina | 36.31% [15] |
| United Guaranty Insurance Company | North Carolina | 100% |
| United Guaranty Mortgage Insurance Company | North Carolina | 100% |
| United Guaranty Insurance Company of North Carolina | North Carolina | 100% |
| United Guaranty Residential Insurance Company of North Carolina | North Carolina | 100% |
| United Guaranty Residential Insurance Company | North Carolina | 75% [16] |
| United Guaranty Commercial Insurance Company of North Carolina | North Carolina | 100% |
| United Guaranty Mortgage Indemnity Company | North Carolina | 100% |
| United Guaranty Credit Insurance Company | North Carolina | 100% |
| United Guaranty Services, Inc. | North Carolina | 100% |

----------

(1)  All subsidiaries listed are consolidated in the accompanying financial statements. Certain subsidiaries have been omitted from the tabulation. The omitted subsidiaries, when considered in the aggregate as a single subsidiary, do not constitute a significant subsidiary.

(2)  Percentages include directors' qualifying shares.

(3)  The common stock is owned 13.6 percent by SICO, 2.0 percent by Starr and 2.7 percent by The Starr Foundation.

(4)  Also owned 10 percent by AIG Matched Funding Corp.

(5)  Also owned 21.1 percent by Commerce & Industry Insurance Company.

(6)  Also owned 8 percent by The Insurance Company of the State of Pennsylvania, 32 percent by National Union, and 8 percent by Birmingham.

(7)  Also owned by 11 other AIG subsidiaries

(8)  Also owned by 11 other AIG subsidiaries

(9)  Also owned 26.19 percent by American International Group, Inc.

(10)  Also owned 22.48 percent by American Home.

(11)  Also owned 20 percent by The Insurance Company of the State of Pennsylvania and 10 percent by Birmingham.

(12)  Also owned 16.87 percent by American Home, 6.34 percent by Commerce & Industry Insurance Company and 6.34 percent by New Hampshire.

(13)  100 percent to be held with other AIG companies.          CBHNL000035

(14)  Also owned 49 percent by 21st Century Insurance Group.

(15)  Also owned 45.88 percent by National Union, 16.95 percent by New Hampshire

6

U.S. District Court of Guam
Civil Case No. 02-00008

Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

# EXHIBIT "O"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities



**AIG**  WORLD LEADERS IN
INSURANCE AND
FINANCIAL SERVICES

Login Broker Zone
Username:
Password:

go

Home
What's New
Products
Services
Claims
Broker Zone
Q & A
About AIG
Careers
Contact Us

# Welcome
## Your entry into the world of AIG Austr

American Home Assurance Company is a member company of American International Group, Inc. American International Group, Inc. (AIG) is the world's leading U.S.-based international insurance and financial services organization, the largest underwriter of commercial and industrial insurance in the United States, and the second-largest U.S. life insurer. Its member companies write a wide range of general insurance and life insurance products for commercial, institutional and individual customers through a variety of distribution channels in approximately 130 countries and jurisdictions throughout the world.

AIG's global businesses also include financial services, savings and asset management. AIG financial service include aircraft leasing, financial products, trading and making and consumer finance. AIG has one of the larg retirement savings businesses in the United States and in asset management for individual and institutional m specialized investment management capabilities in equi income, alternate investments and real estate. AIG c is listed on the New York Stock Exchange, as well as th exchanges in London, Paris, Switzerland and Tokyo.

**Are you looking for insurance?**

Category Type: Select...    Go

**Do you have a claim to make?**

Claim Form: Select...



**Introduction To Political Risk Insurance**
Do you have a great deal in a difficult country?

Political Risk Insurance is a specialised line of insurance which provides financial protection for equity investments, loans and trade transactions against arbitrary or discriminatory government actions and/or acts of politically motivated violence that have an adverse impact on these transactions. AIG's Political Risk Division has been in the business of insuring political risks for over twenty years.

**Managing The Risks Of Being A Compliance Committee Member**
The introduction of the Managed Investments Act 1998 created a new role the Compliance Committee member. The members of Compliance Committee face a unique range of exposures that may not always be addressed by traditional forms of insurance. This paper discusses these exposures and explores how they may be appropriately addressed through risk management and insurance

Privacy
Terms of Use

Last Updated: Saturday, 24 August 2002

Copyright ©2001, American International Group, Inc.



CBHNL000036


Exhibit

# GENERAL INSURANCE

AIG's General Insurance business is comprised of the Domestic Brokerage Group, Domestic Personal Lines, United Guaranty Corporation, Foreign General and Transatlantic Holdings, Inc. AIG's worldwide General Insurance operations reported a 14.7 percent increase in net premiums written to a record $20.10 billion. General Insurance pretax income before realized capital gains (losses) for the year 2001 was $2.98 billion, compared to $3.49 billion last year. Excluding World Trade Center losses, pretax income before realized capital gains (losses) was $3.75 billion, 7.6 percent above last year.

| General Insurance (in millions, except ratios) | 2001* | 2001** | 2000 |
|---|---|---|---|
| Net Premiums Written | $20,100.9 | $20,100.9 | $17,526.3 |
| Adjusted Underwriting Profit | 88. | 857.3 | 785.0 |
| Net Investment Income | 2,892.6 | 2,892.6 | 2,700.8 |
| Income Before Realized Capital Gains | 2,980.9 | 3,749.9 | 3,485.8 |
| Realized Capital Gains (Losses) | (127.7) | (127.7) | 38.4 |
| Operating Income | 2,851.2 | 3,620.2 | 3,524.2 |
| Net Reserves for Losses and Loss Expenses | 25,895. | 25,895. | 24,951.6 |
| Combined Ratio | 100.71 | 96.74 | 96.73 |

\* including WTC losses.

\*\* excluding WTC losses.

The principal units of the **Domestic Brokerage Group (DBG)** provide the widest available range of commercial and industrial coverages in the United States.
- National Union Fire Insurance Company of Pittsburgh, Pa. is the leading provider of directors and officers liability and fiduciary liability insurance, as well as a leader in employment practices liability, fidelity and surety coverages.
- American Home Assurance Company is a premier domestic provider of commercial umbrella/excess liability and primary and excess workers' compensation insurance.
- AIG Environmental is the leading U.S. provider of environmental coverages and services.

CBHNL000042



- Lexington Insurance Company is the largest U.S.-based excess and surplus lines carrier, specializing in difficult-to-place property and casualty risks.
- HSB Group, Inc. is the parent company of Hartford Steam Boiler Inspection and Insurance Company (HSB), one of the world's leading providers of equipment breakdown insurance.
- AIG Risk Management provides casualty risk management products and services to Fortune 1,000 and other large commercial customers.
- DBG also includes many specialty business divisions that draw on the worldwide resources of AIG's insurance and financial services companies to meet client needs in aviation, transportation, construction and energy industries, risk finance, mergers and acquisitions, cross-border operations, eBusiness, and accident and health.

AIG's growing **Domestic Personal Lines** operations provide auto, homeowners and high-net-worth individual coverages through the Mass Marketing and Specialty Auto Divisions, 21st Century Insurance Group and the AIG Private Client Group.

**United Guaranty Corporation** subsidiaries write residential mortgage guaranty insurance and reinsurance for financial institutions and mortgage investors.

The **Foreign General Group** comprises the international property-casualty operations of AIG and HSB.
- American International Underwriters (AIU) manages AIG's overseas property-casualty operations, the most extensive foreign network of any insurance organization. Stretching across Asia and the Pacific to Latin America, Europe, Africa, and the Middle East, AIU markets a full range of property-casualty products to both consumer and commercial clients.

**Transatlantic Holdings, Inc. (Transatlantic)** is the largest publicly traded, U.S.-based reinsurance organization. Beginning in 2001, Transatlantic's results are reported as a separate segment within General Insurance.

The **Domestic Brokerage Group (DBG)** markets property-casualty insurance products and services through brokers to corporate buyers and commercial customers ranging from large multinationals to small businesses. DBG companies offer some of the largest capacity available in the marketplace, write a broad array of insurance products, and are leaders in many specialty and difficult-to-place classes of business. The Triple-A ratings that the DBG companies hold for insurer financial strength, combined with product innovation, superior claim handling and service excellence, are key competitive assets.

| Domestic Brokerage Group†<br>(in millions, except ratios) | 2001* | 2001** | 2000 |
|---|---|---|---|
| Net Premiums Written | $10,196.5 | $10,196.5 | $7,934. |
| Income Before Realized Capital Gains (Losses) | 1,488.4 | 2,032.4 | 1,790.7 |
| Combined Ratio | 104.42 | 98.85 | 100.54 |

† Excluding the results of Transatlantic's domestic operations.

\* including WTC losses.

CBHNL000043

14



** excluding WTC losses.

In a rapidly changing business and economic environment, the strength of DBG's distribution network and its unmatched flexibility in product offerings allow DBG to meet the needs of customers of all sizes. As an example, DBG launched the AIG Small Business Underwriting Center during 2001 to serve one of the fastest growing segments in the domestic market. The center gives businesses with less than $10 million in revenue - and the brokers that serve them - efficient access to top-quality risk management resources and solutions.



**Domestic Brokerage Group — Net Premiums Written**
(millions of dollars)

After the terrorist attacks of September 11, an urgent need developed for both aviation insurance and property terrorism insurance. On October 4, AIG member companies introduced a co-insurance facility making available aviation war risk and hijacking liability coverage totaling $1 billion per airline. AIG member companies have also made available an acts-of-terrorism property facility, which provides up to $150 million in insurance for property damage and business interruption losses due to terrorism. The year-end renewal season brought significant new business to DBG. Industry capacity was reduced, and DBG benefited as companies sought coverage from the strongest insurers.

CBHNL000044

15



Anheuser-Busch, the world's largest brewer, operates 12 breweries in the United States and two overseas. In one of the most competitive beverage industry categories, Anheuser-Busch's Budweiser is the world's best-selling beer, with distribution in more than 70 countries. This worldwide market presence and high corporate profile, along with significant additional operations focused on adventure park entertainment and packaging, present the brewer's key decision makers with a variety of management liability risks and exposures. Anheuser-Busch works closely with National Union to develop a management liability insurance program incorporating elements of directors and officers, fiduciary and fidelity coverages. The Clydesdales pictured above have served as the unmistakable symbol of both Anheuser-Busch and Budweiser for generations.

In 2001, **National Union** continued to build on its record of leadership in the directors and officers (D&O) and management liability marketplace, despite the competitive challenges this sector faced. National Union had good results relying on a strategy that emphasized strict underwriting controls, detailed account knowledge, pricing improvements and greater risk sharing mechanisms. With numerous downgrades and "under review" ratings for many carriers, National Union experienced an influx of new business as D&O customers sought to buy coverages from the industry's strongest company. National Union's innovative product development proved to be a competitive asset again in 2001. The company successfully introduced many new management and professional liability offerings including a comprehensive, specially tailored program - endorsed by the U.S. Chamber of Commerce - to meet the needs of small business owners. National Union also introduced enhanced management liability programs for venture capital funds and managers, as well as a package of products for small and midsize companies, which allows insureds to combine a variety of coverages into a single policy.

In the fiduciary liability area, National Union launched a new ERISA policy with expanded coverage for more types of plans including foreign and domestic pension and welfare benefit plans, qualified and non-qualified plans, cafeteria plans, fringe benefit programs, voluntary employee's beneficiary associations and others.

Counting the vast majority of the Fortune 500 as clients, **American Home**'s excess casualty division continued to be a leader in the commercial umbrella market with its traditional core strengths - the ability to underwrite complex exposures and superior claims expertise. The division enhanced its Web-based quote and bind system and it also expanded its family of crisis

CBHNL000045

management products. Maintaining an emphasis on underwriting and pricing discipline, as well as on new business development, American Home's workers' compensation division had strong premium growth in 2001 and its Internet product and distribution strategy was a key component of its success. In a market that has experienced many insurance company failures, the division benefited from a flight to quality and established itself as a lead provider of monoline workers' compensation coverages for small and midsize businesses.

**AIG Environmental** had excellent premium growth in 2001. AIG Environmental's transaction-related business accounted for much of its success, as the trend continued among contracting parties to use environmental insurance in mergers and acquisitions, transfer of power industry assets and military base redevelopment projects. AIG Environmental experienced good growth in the pollution legal liability segment, specifically in the real estate investment trust area where large property holders are increasingly concerned about environmental exposures. Likewise, sales of secured creditor policies, which protect lenders from financial loss due to defaults accompanied by environmental contamination, continued to achieve good growth.



In the United States, the redevelopment of brownfields, or inactive industrial sites, has had the dual impact of revitalizing inner-city areas while reducing urban sprawl. Pictured above, in its early stages, is the cleanup and subsequent construction of the Los Angeles Media Tech/Taylor Yard Project, which was formerly a 241-acre temporary staging area for rail freight cars. The project's developer is AMB Property Corporation, a leading owner and operator of industrial real estate nationwide. For AMB, protection from potential liability arising from environmental conditions at the site was essential. The company turned to AIG Environmental to provide insurance on the redevelopment project, including coverage for cleanup cost overruns that could result from environmental conditions encountered during remediation and construction.

**Lexington** maintained its leadership position in 2001 as one of the largest providers of multi-line and specialty property-casualty programs to a wide range of businesses. While the healthcare marketplace underwent significant change during 2001, Lexington emerged as one of the industry's leading providers, offering insurance to hospital systems, long-term care and other healthcare facilities. Lexington's business benefited from an improved pricing environment for property, product liability, general casualty and transportation classes. While the September 11 terrorist attacks had an impact on many of Lexington's markets, the company was quick to respond to customer needs through the development of a property terrorism product including

CBHNL000046

threat assessment services.



Lexington is a leading provider of insurance programs for the healthcare industry, specializing in professional liability and related coverages for individual practitioners and healthcare organizations across a range of disciplines. The laser-vision correction surgery being performed above took place at Dartmouth-Hitchcock Medical Center, a Lexington customer for more than 25 years. Dartmouth-Hitchcock comprises Northern New England's most extensive healthcare network and is a leader in patient care, research and education. Throughout the duration of its relationship with Lexington, Dartmouth-Hitchcock has relied upon Lexington's expertise in current healthcare issues and on its ability to help manage and keep abreast of the risks that accompany medical innovation, as well as industry change.

**Hartford Steam Boiler Inspection and Insurance Company (HSB)** had strong growth in 2001 in its U.S. equipment breakdown insurance business. The company achieved excellent results through engineering-based risk assessment, selective underwriting, appropriate pricing strategies, and assistance to clients worldwide in loss prevention and loss reduction. Separately, HSB provides equipment breakdown coverage and other specialty insurance through reinsurance arrangements with approximately 200 property-casualty insurers. Its domestic growth strategy focuses on expanding these reinsurance relationships and offering new products and services developed in collaboration with other AIG member companies. HSB is also leveraging AIG's global network to access international markets and expand its engineering consulting business by offering equipment breakdown insurance and technical expertise through AIU and international reinsurance arrangements.

As a leading provider of captive, self-insured retention and risk financing alternatives, **AIG Risk Management (AIGRM)** was particularly well positioned in 2001 to capitalize on the increased demand for alternative risk programs that emerged throughout the marketplace. AIGRM also provides specialty risk management programs to the construction, transportation and energy industries, and to public entities. During 2001, AIGRM's construction division, in concert with the Global Energy Division, introduced a "wrap-up" program specifically designed for power plant builders and developers. AIG was among the first insurance organizations to

CBHNL000047

18

introduce the wrap-up, or insurance package concept, more than 20 years ago as an option for controlling costs on large construction projects. Today, it has over 85 such programs in-force on some of the country's largest construction initiatives. The transportation division had strong premium growth in 2001. In a market characterized by increased pricing and reduced capacity for the airline and trucking industries, AIGRM successfully responded with creative risk management program development.

**AIG Aviation, Inc.** is the largest U.S.-based provider of aviation insurance. It offers insurance facilities to a broad client base, from commercial airlines to individually owned aircraft and nearly half of all major U.S. airports. AIG Aviation took a leading role in the post-September 11 environment, offering on behalf of the co-insurance market, coverage totaling $1 billion for war risk and hijacking. This facility enabled airlines to have the necessary insurance to maintain operations in an unprecedented environment. Over 200 airlines around the world have purchased this coverage.

The **AIG WorldSource Division** continued to establish itself as a market leader providing global programs for companies of all sizes with international operations. As the events of September 11 heightened the awareness among the global business community that people, assets and investments must be adequately protected, WorldSource proved to be a valuable resource for companies with a variety of coverage requirements. WorldSource's casualty group had strong results, particularly through innovative proprietary programs. Specialty products were a growth area for WorldSource as it was in a position to offer some of the industry's most expert capabilities and comprehensive coverages in crisis management, kidnap and ransom, malicious product tampering, trade credit and political risk - all AIG strong suits.

The **AIG Risk Finance Division**, a market leader in the design and implementation of innovative risk financing solutions, serves clients typically requiring the most advanced risk management capabilities. Drawing on the worldwide resources of AIG's insurance and financial services companies, AIG Risk Finance provides programs that feature a blend of financial, insurance and capital market strategies to enhance balance sheet strength, address solvency and liquidity concerns, and help manage strategic risks. In 2001, AIG Risk Finance benefited from the diminishing capacity and more restrictive terms in the marketplace. Many corporations opted for alternative coverage solutions to replace more conventional ones. Counterparty financial strength is a top priority in this new environment and has become a clear advantage for AIG Risk Finance.

The **AIG Mergers and Acquisitions Division** works with DBG companies, American International Underwriters and AIG Global Investment Group, Inc., as well as with external distribution channels, to provide companies in the United States and abroad with insurance solutions for transaction-specific liabilities including those associated with mergers, acquisitions and divestitures. During 2001, the division structured cutting-edge insurance programs that contributed to the completion of a number of very large corporate transactions, by helping to minimize or eliminate what otherwise might have been deal-breaking exposures.

The **AIG eBusiness Risk Solutions Division (AIGeBRS)**, which serves the risk management needs of companies that conduct business on the Internet, had excellent premium growth. The division has established itself as the leader of the cyber-risk and Internet security insurance market. AIGeBRS launched several new products including a Web-based credit and risk management system, and coverages that offer identity theft and credit card fraud protection to



CBHNL000048

19

online merchants, as well as consumers. It also extended its reach globally, offering coverages in select markets in Europe, Asia and South America. Together with Dun & Bradstreet, the division also launched an online system that facilitates real-time trading credentials and credit decisions for B2B marketplaces.

In 2001, AIG transferred the **Domestic Accident & Health Division** to DBG, positioning the division to take better advantage of cross-marketing opportunities with AIG's domestic property-casualty businesses and opening additional avenues for growth. The division has initiated a cooperative venture with the AIG Small Business Underwriting Center, included an accident insurance component in all D&O policies, and has begun to add accident coverages to programs underwritten by Lexington Insurance Company.

**AIG Reinsurance Advisors, Inc. (AIG Re)** specializes in non-traditional reinsurance and retrocessional coverage, structuring and underwriting reinsurance products to satisfy the risk transfer, leverage and long-term financial planning objectives of reinsurance buyers worldwide. AIG Re's expertise facilitates reinsurance transactions that optimize capital usage for its clients. AIG Re works closely with AIG's financial services companies and Transatlantic to provide additional resources to its clients. The company reported increased premium volume in 2001, as reinsurance buyers placed greater emphasis on AIG Re's ability to tailor products to meet specific needs, as well as on AIG's financial strength and security.

**Starr Excess Liability Insurance Company, Ltd. (Starr Excess)**, a global leader in the excess liability market, provides coverage for large limit excess casualty and excess financial lines programs through operations in the United States, Bermuda and London. In 2001, Starr Excess had solid growth in net premiums written as a result of an improved underwriting environment, and increased its customer base among Fortune 2,000 companies, its target market.

**AIG Claim Services, Inc. (AIGCS) and AIG Technical Services, Inc. (AIGTS)**, the two claim companies for domestic operations, are dedicated to providing the highest level of service and specialized claim expertise.

AIGCS provides cost containment and claim management services to AIG clients for workers' compensation and property-casualty lines of business. These include integrated disability management, loss prevention, litigation management, investigative services and industry-specific claim management for construction, entertainment, transportation and product recall claims. In 2001, AIGCS expanded its portfolio, assuming responsibility for domestic accident and health claims and AIG employee medical benefits claims.

AIGTS is responsible for specialty claims and litigation management. Specialized claim units handle directors and officers liability, environmental, excess casualty, financial institutions, healthcare and medical malpractice, high-exposure property, professional liability, surety bond, fidelity bond and toxic tort. AIGTS claim units work with underwriters to help evaluate, develop, market and price both new products and existing accounts. The excess casualty claim group created a casualty loss mitigation unit in 2001 dedicated to identifying and evaluating opportunities for customers to shift responsibility for managing past casualty and litigation events to AIGTS. Other units were created to support DBG's small business efforts. The property claim group's ability to handle disaster-related claims promptly and efficiently enabled

CBHNL000049

AIG customers to recover quickly from catastrophes including the Seattle earthquake and Tropical Storm Allison. Its crisis response to the September 11 terrorist attacks included the immediate reestablishment of contact with business partners, the development of temporary claim reporting processes for AIG's customers and brokers, and the formation of dedicated teams to recreate destroyed client claim files. The litigation management group is coordinating emerging risk areas such as mold and eCommerce, including the formation of defense law firm specialist groups to handle these claims.

**AIG Consultants, Inc.** supports AIG's claim and underwriting operations by providing technical consulting services worldwide in environmental, healthcare, safety and property areas. It offers customers professional, practical and cost-effective methods to mitigate losses. In early 2001, AIG Consultants' reputation for providing quality service was recognized as it was awarded ISO9001-2000 certification.

AIG's **Domestic Personal Lines** operations consist of the Mass Marketing and Specialty Auto Divisions, 21st Century Insurance Group and the AIG Private Client Group. Overall, net premiums written decreased 2.2 percent in 2001 as AIG reduced its participation in the involuntary insurance market. However, net premiums for the core voluntary auto and homeowners business increased $140 million to over $2.43 billion.

| **Domestic Personal Lines** (in millions, except ratios) | 2001 | 2000 |
|---|---|---|
| Net Premiums Written | **$2,453.6** | $2,509. |
| Income Before Realized Capital Gains (Losses) | **21.7** | 76.5 |
| Combined Ratio | **104.89** | 100.84 |

In 2001, Domestic Personal Lines businesses filed for the rate increases necessary to provide adequate returns in what continues to be an extremely challenging operating environment. Domestic Personal Lines operating income was adversely impacted by $70 million of charges unrelated to current operations. These charges represent an increase in the provision for losses, following the unprecedented decision by the state of California to require all insurers to reopen claims in connection with the Northridge earthquake, nearly eight years after the occurrence.

The **Mass Marketing Division** had good premium growth in 2001. Voluntary auto and homeowners premiums grew by 15 percent over the prior year. In a significant move, the division reached a compromise with the state of New Jersey that provides for a much needed increase in automobile insurance rates for 2002. The division deployed technology enhancements throughout its operations, achieving efficiencies and curtailing expense growth.

The **Specialty Auto Division**, a provider of non-standard automobile risks through independent agents, significantly reduced premiums written in states where the regulatory environments precluded obtaining necessary rate increases. However, Specialty Auto's overall premiums were within 4 percent of the prior year, as a result of growth in other states. The division's proprietary desktop underwriting software package, designed to create greater efficiencies in the application process, was delivered to 16 state markets, with the remainder scheduled for rollout in 2002.

**21st Century Insurance Group** operates on a direct basis and provides coverages primarily in

CBHNL000050

21

California, where it has a 6 percent share of the personal auto market. 21st Century implemented necessary rate increases in 2001 and continued to maintain one of the lowest expense ratios among all auto insurers. The Internet plays an important role in new business development at 21st Century. During 2001, more than 30 percent of premium quotes for prospective customers were provided online. 21st Century exited the homeowners insurance business on January 1, 2002, and its existing book of homeowners business has been reinsured.

The **AIG Private Client Group**, a provider of comprehensive insurance products and services to high-net-worth individuals, experienced a good start in 2001, its first full year of operation. The Group has quickly established a reputation for exemplary service and achieved a 100 percent client satisfaction rating for all claims it handled in 2001.

The coverages provided by United Guaranty Corporation (UGC) subsidiaries protect lenders and investors against loan losses resulting from borrower default and foreclosure. UGC's strong 2001 results marked the 13th consecutive year of record financial performance, with operating income of $417.4 million.

| United Guaranty<br>(in millions, except ratios) | 2001 | 2000 |
|---|---|---|
| Net Premiums Written | $494.4 | $453.4 |
| Income Before Realized Capital Gains (Losses) | 417.4 | 363.1 |
| Combined Ratio | 36.90 | 40.92 |

UGC had an excellent year. Despite weak economic conditions, housing finance remained one of the few strong sectors, reaching a record $2 trillion in residential mortgage originations and refinances, the highest loan volume ever for the industry. Against this backdrop, UGC achieved a solid market position built on $36.3 billion in new insurance business.

While UGC had record results in new insurance written and operating income, its portfolio performance experienced a modest decline in the second half of the year, as mortgage delinquencies increased from 2.08 percent at year-end 2000 to 2.57 percent at year-end 2001 - still well below mortgage insurance industry norms. United Guaranty's sound risk management policies, supported by product innovation and leadership in risk-sharing structures with lender customers, have resulted in superior performance compared to the industry.

UGC added 10 products, ranging from home buyer education seminars, to mortgage processing support, to its Internet eBusiness gateway. Designed to improve efficiencies for mortgage lenders, the gateway has resulted in a significant increase in UGC's Web-based commerce. Electronic transactions now account for 83.4 percent of new insurance applications. Centre Capital Group, Inc., UGC's mortgage conduit subsidiary, nearly doubled its loan purchases in 2001, and UGC's international operations posted substantial premium growth for the year.

AIG's **Foreign General Insurance Group** is the most extensive worldwide network of any

CBHNL000051

22

insurance organization. Its operations encompass over 70 countries in Asia, the Pacific Rim, Latin America, Europe, Africa and the Middle East. The Group markets a full range of property-casualty products to both consumers and commercial clients.

| Foreign General Insurance[†] (in millions, except ratios) | 2001* | 2001** | 2000 |
|---|---|---|---|
| Net Premiums Written | $5,050.8 | $5,050.8 | $4,970.3 |
| Income Before Realized Capital Gains (Losses) | 1,063.6 | 1,088.6 | 943.7 |
| Combined Ratio | 92.18 | 91.66 | 92.40 |

[†]Excluding the results of Transatlantic's domestic operations.
*including WTC losses.
**excluding WTC losses.

With market terms and conditions improving throughout 2001, American International Underwriters (AIU) had a good year. Across its global network - one that would be virtually impossible to replicate - AIU benefited from a flight to quality and capitalized on its innovative product range and multiple distribution channels. The Group's operations are by many standards the most efficient in the industry. Reflecting an ongoing commitment to deliver consistently superior service to customers, Foreign General launched the Performance Management Program (PMP), which has provided excellent results in AIG's domestic operations. The objective of PMP is to stimulate continuous improvements in service delivery, quality and process.



AIG's General Insurance operations in Japan had a good year in a very difficult economic environment. AIU Japan continued to capitalize on opportunities created in the recently deregulated market. In 2001, AIU Japan completed distribution alliances with several major Japanese banks and financial services organizations. These alliances complement AIU Japan's strong agency operation, recognized as one of the most professional in the industry. The

CBHNL000052

23

Japanese branch of American Home Assurance Company retained its leadership position among direct marketing insurers for auto and accident and health (A&H) products, and achieved growth fueled by its reputation for excellent claim and service capabilities. American Home began offering its products through AIG Star Life's 4,300-member agency force, a significant new distribution channel. South Korean operations experienced good growth through increased brand awareness, a rapidly expanding agency force and branch network, and the introduction of direct marketing programs.



Barclays PLC, a U.K.-based global financial services group engaged in banking, investment banking and investment management, has been an AIU client through its London office since 1994. Barclays initially turned to AIU for its expertise in creating specialized solutions for financial institutions. In recent years, Barclays has expanded this relationship to include property and excess casualty coverages. A long-time leader in the U.K. retail banking industry, Barclays' current corporate growth plan involves developing its operations in Europe and expanding globally in select businesses. The bank has relied upon AIU's expertise and worldwide network to assist in its expansion.

The U.K./Ireland Division had an excellent year both in premium growth and operating income. The division expanded its market penetration of the United Kingdom's top 500 companies and continued to capitalize on growth opportunities in the Irish market. The division launched new products in financial lines, A&H, and in its multi-line unit. In the aftermath of September 11, the aviation terrorism and war liability facility initiated and led by AIG was coordinated out of the London office. AIG launched its first Lloyd's syndicate in 2001. Managed by Ascot Underwriting Limited, the syndicate had a very promising start.

Paris-based AIG Europe S.A., which serves Continental Europe, continued to expand many of its key specialty lines of business. AIG Europe had all of its systems and financial changes in place for the euro conversion well in advance of the new currency's January 1, 2002 introduction. The Central Europe and Commonwealth of Independent States Division had a good year, reporting solid growth and earnings. The division's Baku, Azerbaijan operation became fully owned by AIG in 2001.

The Middle East, Mediterranean and South Asia Division generated strong premium growth.

CBHNL000053



During 2001, the division fully integrated Pharaonic AIG Insurance Company (S.A.) into its established Egyptian business. In India, Tata AIG General Insurance Company Limited was launched in 2001 and now operates in India's six largest metropolitan markets. Operations in Israel had excellent growth. Earnings in the Africa Division improved substantially with growth in A&H, commercial lines and risk finance portfolios.

The Southeast Asia and Greater China Divisions had good premium growth, benefiting from their success in developing alternative distribution channels. The Shanghai office became the first in China to offer a fully integrated Internet-based marine insurance and loss engineering service, and American Home Assurance Company in Hong Kong was honored with the "General Insurance Company of the Year" award at the 2001 Asia Insurance Industry Awards. The Australasia Division benefited from improved market terms and conditions, which resulted in production growth across many business classes.



A pioneer in its market, AIU Hong Kong celebrated its 70th year of operations in 2001. During these seven decades, the company has prospered in tandem with Hong Kong, and AIU Hong Kong is widely recognized for its early and ongoing contributions to the insurance industry of Southeast Asia. Along the waterfront of Hong Kong Harbor (above) are the offices of several companies with which AIU Hong Kong has longstanding general insurance relationships, including Jardines Matheson Group, a conglomerate with a long history in Hong Kong. In 2001, AIU Hong Kong's market leadership was recognized when American Home Assurance Company was named the "General Insurance Company of the Year" in Hong Kong by the Asia Insurance Industry Awards.

The Latin American Division had a good year, with solid premium growth, and AIG's joint venture with Unibanco in Brazil also performed well. Operations in Argentina reported strong growth and profitability despite the country's economic and political turmoil. Mexico and Chile also had strong results.

**Transatlantic Holdings, Inc. (Transatlantic)**, through its subsidiaries Transatlantic Reinsurance Company, Trans Re Zurich and Putnam Reinsurance Company, offers reinsurance capacity on both a treaty and facultative basis, structuring traditional and non-traditional

CBHNL000054

25

programs for a full range of property-casualty products, with an emphasis on specialty risks.

| Transatlantic (in millions, except ratios) | 2001* | 2001** | 2000 |
|---|---|---|---|
| Net Premiums Written | $1,905.6 | $1,905.6 | $1,658.6 |
| Income Before Realized Capital Gains (Losses) | (33.5) | 226.5 | 235.0 |
| Combined Ratio | 114.87 | 100.35 | 99.87 |

*including WTC losses and Enron surety bond losses.
**excluding WTC losses and Enron surety bond losses.

Transatlantic, which is majority-owned by AIG, is headquartered in New York and has a network of offices located in the United States, Canada, Latin America, Europe and Asia. Despite the impact of losses associated with September 11 and Enron surety bonds, Transatlantic's financial condition and business franchise remain among the strongest in the reinsurance industry.

In the United States, Transatlantic had excellent premium growth, largely fueled by increases in general casualty, automobile, and certain professional liability classes of business. Transatlantic is the largest broker-market reinsurer in the United States, and a recognized leader and innovator in specialty casualty classes including medical malpractice and A&H, as well as professional, directors and officers (D&O), and environmental impairment liability. The increased loss severity reported in medical malpractice and D&O liability classes, and the general reduction in risk appetite on the part of other reinsurers as they assessed the overall impact of September 11, resulted in thinning market capacity and improved pricing for these classes. Transatlantic also benefited from heightened market awareness of the need to obtain reinsurance from financially strong companies.

Transatlantic's international business accounted for about half of its total net premiums written. International operations reported solid growth in net premiums written, led by its London office and Trans Re Zurich subsidiary. Capitalizing on its local market expertise and full range of resources, Transatlantic further expanded its global reach in 2001 with the opening of a representative office in Sydney.



CBHNL000055

26





# AIG Technical Services, Inc.(AIGTS)

AIG Technical Services, Inc. (AIGTS) Contact Information
A.I. Management and Professional Liability Claim Adjusters (AIMPLICA)

For information on AIGTS' Home Office Property, American Home or Healthcare Malpractice Claims Services divisions, please call (212) 458-1796 or (212) 458-1797. E-mail inquiries can be sent to messagecenter@aig.com

**AIMPLCA Contacts**

**DIRECTORS & OFFICERS**

**Corporate Directors and Officers Complex**
*Servicing complex claims for Corporate Directors and Officers and General Partnerships.*
**David Gilfillan, Assistant Vice President**
175 Water Street, 5th Floor
New York, NY 10038
(212) 458-1511
Fax: (212) 458-1476
dave.gilfillan@aig.com

**Corporate Directors and Officers Complex**
*Servicing claims for Middle Market/Non-Profit Directors and Officers and all Pension Trust/Fiduciary.*
**Ted Borowiec, Assistant Vice President**
175 Water Street, 9th Floor
New York, NY 10038
(212) 458-1523
Fax: (212) 458-1045
ted.borowiec@aig.com

**Corporate Directors and Officers Mainstream**
*Servicing claims for Corporate Directors and Officers and General Partnerships.*
**Lucy Ann Galioto, Assistant Vice President**
175 Water Street, 5th Floor
New York, NY 10038
(212) 458-1520
Fax: (212) 458-1476
lucyann.galioto@aig.com

**Middle Market Directors and Officers - East**
*Servicing claims for Corporate Directors and Officers and Employment Practices claims of Middle Market and Not-for-Profit Entities in the Eastern Regions.*
**Vincent Ciampi, Assistant Vice President**
175 Water Street, 9th Floor
New York, NY 10038
(212) 458-1055
Fax: (212) 458 - 1045
vincent.ciampi@aig.com

CBHNL000037

7 **Middle Market Directors and Officers - West**
*Servicing claims for Corporate Directors and Officers and Employment Practices claims of*

8

AIG Technical Services, Inc.(AIG TS)

*Middle Market and Not-for-Profit Entities in the Western Regions.*
**Douglas Poetzsch, Assistant Vice President**
175 Water Street, 9th Floor
New York, NY 10038
(212) 458-1097
Fax: (212) 458-1045
douglas.poetzsch@aig.com


## ERRORS & OMISSIONS (E&O)

**James Lotz, Senior Vice President**
175 Water Street, 7th Floor
New York, NY 10038
(212) 458-1201
Fax: (212) 458-1259
jim.lotz@aig.com

**Lawyers Professional Liability Complex**
*Servicing complex claims for Lawyers Professional Liability.*
**Vincent Biancamano, Vice President**
175 Water Street, 7th Floor
New York, NY 10038
(212) 458-1250
Fax: (212) 458-1259
vincent.biancamano@aig.com

**Lawyers Professional Liability Mainstream**
*Servicing claims for Law and Accounting Firms, Patent Law Firms, the Judges Program, and the Minet Lineslip Program.*
**Patricia Murnane, Assistant Vice President**
175 Water Street, 7th Floor
New York, NY 10038
(212) 458-1597
Fax: (212) 458-1349 or 1259
patty.murnane@aig.com

**Specialty Professional Liability Complex**
*Servicing complex claims for Specialty Professional Liability.*
**Raymond Hampel, Vice President**
175 Water Street, 8th Floor
New York, NY 10038
(212) 458-1139
Fax: (212) 458 - 1137
ray.hampel@aig.com

**Specialty Professional Liability**
*Servicing claims for Public Officials, School Leaders, Land Surveyors, Electronic Data Processors, Third Party Administrators, Miscellaneous Professional Liability, Association Professional Liability and Real Estate Agents and Brokers, Multi-Media Professional Liability, Internet Service Providers E&O.*
**William Powell, Assistant Vice President**
175 Water Street, 8th Floor
New York, NY 10038
(212) 458-1142



CBHNL000038

Fax: (212) 458-1135
bill.powell@aig.com

**Program Professional Liability**
*Servicing claims for American Collectors Association, Travel Agents, Security Guards, Management Consultants, Home Inspectors, Social Workers, Marriage and Family Therapists, Social Service Agencies, Temporary Help Agencies, Employment Agencies, Tanning Salon, CAP Program, Interior Designers, Alternative Staffing Services, Professional Employers Organization, Aestheticians, Electrologists and Home Health Aides.*
**Christopher M. Sharp, Assistant Vice President**
175 Water Street, 7th Floor
New York, NY 10038
(212) 458-5640
Fax: (212) 458-2708
chris.sharp@aig.com

## FINANCIAL INSTITUTIONS

**Raymond DeCarlo, Senior Vice President**
175 Water Street, 4th Floor
New York, NY 10038
(212) 458-1576
Fax: (212) 458-1697
ray.decarlo@aig.com

**Financial Institutions - Middle Market Complex Claims**
*Servicing complex Directors & Officers and Professional Liability claims for Insurance Agents, Insurance Companies, Investment Advisors, Mutual Funds, Mortgage Bankers, Mortgage Brokers, Securities Brokers/Dealers, Banks and Credit Unions, and Finite Risk.*
**Robert Amendola, Vice President**
175 Water Street, 4th Floor
New York, NY 10038
(212) 458-1552
Fax: (212) 458-1649, (212) 458-1650
bob.amendola@aig.com

**Financial Institutions - National Accounts Complex Claims**
*Servicing Directors & Officers and Professional Liability claims for Insurance Agents, Insurance Companies, Investment Advisors, Mutual Funds, Securities Brokers/Dealers, and Banks.*
**Bonnie Hoffman, Assistant Vice President**
175 Water Street, 4th Floor
New York, NY 10038
Phone: (212) 458-1593
Fax: (212) 458-1649, (212) 458-1650
bonnie.hoffman@aig.com

**Financial Institutions - Middle Market Mainstream Claims**
*Servicing Directors & Officers and Professional Liability claims for Insurance Agents, Insurance Companies, Investment Advisors, Mutual Funds, Mortgage Brokers, Mortgage Bankers, Securities Brokers/Dealers, and Banks and Credit Unions.*
**Raymond Tiburzi, Assistant Vice President**
175 Water Street, 4th Floor
New York, NY 10038                          CBHNL000039
(212) 458-1580



off

off

off

## MERGERS & ACQUISITIONS

*Provides claim service to merchant banks, private equity funds, and strategic partners and their acquired companies.*
**Marsha Landau, Assistant Vice President**
175 Water Street, 12th Floor
New York, NY 10038
(212) 458-1190
Fax: (212) 458-1136
marsha.landau@aig.com

**Top of Page**

A Division of AIG Technical Services, Inc.
AIMPLCA Contacts
Last Updated: September 30, 1999

Copyright © 2000, American International Group, Inc. All Rights Reserved. Disclaimer | Privacy

CBHNL000041

U.S. District Court of Guam
Civil Case No. 02-00008


Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.



# EXHIBIT "P"



Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities



**Financial Management Service**
*Uncle Sam's Money Manager*

U.S. Department of

Search FMS

| FMS Home | Q&As | Calendar | Publications & Guidance | Programs & Systems |

## Surety Bonds

Overview

**Sureties Listing**

Admitted Reinsurers
Not for Federal Bonds

Getting Started

Forms

Regulations & Guidance

Correspondence

Background

Contacts

Search for:

[                ]

Located in:

[ Surety Bonds ]

# Department of the Treasury's Listing of Approved Sureties (Department Circular 570)

▼ Certified Companies
▼ Certified Reinsurer Companies
▼ Footnotes
▼ Notes
▼ States Insurance Departments

► See List of Changes for recent update.

---

### 4810-35

### DEPARTMENT OF THE TREASURY

### FISCAL SERVICE
### (Dept. Circular 570; 2003 Revision)

### COMPANIES HOLDING CERTIFICATES OF AUTHORITY AS ACCEPTABLE SURETIES ON FEDERAL BONDS AND AS ACCEPTABLE REINSURING COMPANIES

#### Effective July 1, 2003

This Circular is published annually, solely for the information of Federal bond-approving officers and persons required to give bonds to the United States. Copies of the Circular and interim changes may be obtained directly from the Internet or from the Government Printing Office (202) 512-1800. (Interim changes are published in the FEDERAL REGISTER and on the Internet as they occur.) Other information pertinent to Federal sureties may be obtained from the U.S. Department of the Treasury, Financial Management Service, Surety Bond Branch, 3700 East West Highway, Room 6F07, Hyattsville, MD 20782, Telephone (202) 874-6850 or Fax (202) 874-9978.

The most current list of Treasury authorized companies is always available through the Internet at http://www.fms.treas.gov/c570. In addition,

Exhibit

P

applicable laws, regulations, and application information are also available at the same site.

Please note that the underwriting limitation published herein is on a per bond basis but this does not limit the amount of a bond that a company can write. Companies are allowed to write bonds with a penal sum over their underwriting limitation as long as they protect the excess amount with reinsurance, coinsurance or other methods as specified at 31 CFR 223.10-11. Please refer to footnote (b) at the end of this publication.

The following companies have complied with the law and the regulations of the U.S. Department of the Treasury. Those listed in the front of this Circular are acceptable as sureties and reinsurers on Federal bonds under Title 31 of the United States Code, Sections 9304 to 9308 [See Note (a)]. Those listed in the back are acceptable only as reinsurers on Federal bonds under 31 CFR 223.3(b) [See Note (e)]. If we can be of any assistance, please feel free to contact the Surety Bond Branch at (202) 874-6850.

Judith R. Tillman
Assistant Commissioner
Financial Operations
Financial Management Service

***IMPORTANT INFORMATION IS CONTAINED IN THE NOTES AT THE END OF THIS CIRCULAR. PLEASE READ THE NOTES CAREFULLY.***

Return to the top

---

## Certified Companies

**Updated July 1, 2003**

### Acadia Insurance Company (NAIC #31325)
BUSINESS ADDRESS: P.O. BOX 9010, WESTBROOK, ME 04098-5010. PHONE: (207) 772-4300. UNDERWRITING LIMITATION b/: $3,102,000. SURETY LICENSES c,f/: AZ, CO, CT, DE, DC, KY, ME, MD, MA, MS, MO, NH, NY, OK, PA, RI, TX, UT, VT, VA. INCORPORATED IN: Maine.

### ACCREDITED SURETY AND CASUALTY COMPANY, INC. (NAIC #26379)
BUSINESS ADDRESS: 400 S. PARK AVENUE, SUITE 320, WINTER PARK, FL 32789. PHONE: (407) 629-2131. UNDERWRITING LIMITATION b/: $1,092,000. SURETY LICENSES c,f/: AL, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WY. INCORPORATED IN: Florida.

Case 1:02-cv-00008    Document 227    Filed 10/29/2003    Page 164 of 221

**ACSTAR INSURANCE COMPANY (NAIC #22950)**
BUSINESS ADDRESS: P.O. BOX 2350, NEW BRITAIN, CT 06050-2350. PHONE: (860) 224-2000. UNDERWRITING LIMITATION b/: $1,900,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Illinois.

**Aegis Security Insurance Company (NAIC #33898)**
BUSINESS ADDRESS: P.O. BOX 3153, HARRISBURG, PA 17105. PHONE: (717) 657-9671 x-3051. UNDERWRITING LIMITATION b/: $2,852,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Pennsylvania.

**Affiliated FM Insurance Company (NAIC #10014)**
BUSINESS ADDRESS: P.O. BOX 7500, JOHNSTON, RI 02919-0500. PHONE: (401) 275-3000. UNDERWRITING LIMITATION b/: $16,985,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, PR, RI, SC, SD, TN, TX, UT, VT, VA, VI, WA, WV, WI, WY. INCORPORATED IN: Rhode Island.

**ALL AMERICA INSURANCE COMPANY (NAIC #20222)**
BUSINESS ADDRESS: 800 SOUTH WASHINGTON STREET, VAN WERT, OH 45891. PHONE: (419) 238-5551 x-2350. UNDERWRITING LIMITATION b/: $5,384,000. SURETY LICENSES c,f/: AZ, CA, CT, GA, IL, IN, IA, KY, MA, MI, NV, NJ, NY, NC, OH, OK, TN, TX, VA. INCORPORATED IN: Ohio.

**Allegheny Casualty Company (NAIC #13285)**
BUSINESS ADDRESS: P.O. BOX 1116, MEADVILLE, PA 16335-7116. PHONE: (814) 336-2521. UNDERWRITING LIMITATION b/: $1,230,000. SURETY LICENSES c,f/: AL, AR, CA, DC, FL, HI, ID, IL, IN, IA, KS, KY, LA, MD, MI, MS, MO, NV, NJ, NM, NY, NC, OH, OK, PA, SC, SD, TN, TX, VA, WA, WV, WI, WY. INCORPORATED IN: Pennsylvania.

**AMCO Insurance Company (NAIC #19100)**
BUSINESS ADDRESS: 701 FIFTH AVENUE, DES MOINES, IA 50391-2007. PHONE: (800) 532-1436. UNDERWRITING LIMITATION b/: $37,956,000. SURETY LICENSES c,f/: AZ, CA, CO, ID, IL, IN, IA, KS, KY, MI, MN, MO, MT, NE, NV, NM, ND, OH, OR, SD, TN, TX, UT, VA, WA, WI, WY. INCORPORATED IN: Iowa.

**AMERICAN ALTERNATIVE INSURANCE CORPORATION (NAIC #19720)**
BUSINESS ADDRESS: 555 COLLEGE ROAD EAST - P.O. BOX 5241, PRINCETON, NJ 08543. PHONE: (609) 243-4200. UNDERWRITING LIMITATION b/: $10,968,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, MD, MA, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Delaware.

**American Automobile Insurance Company (NAIC #21849)**
BUSINESS ADDRESS: 777 SAN MARIN DRIVE, NOVATO, CA 94998. PHONE: (800) 243-9622. UNDERWRITING LIMITATION b/: $8,185,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VA, WA, WV, WI, WY. INCORPORATED IN: Missouri.

**AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA (NAIC #10111)**
BUSINESS ADDRESS: 11222 QUAIL ROOST DRIVE, MIAMI, FL 33157. PHONE: (305) 253-

Case 1:02-cv-00008     Document 227     Filed 10/29/2003     Page 165 of 221

2244 x-37014. UNDERWRITING LIMITATION b/: $21,288,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, PR, RI, SC, SD, TN, TX, UT, VT, VA, VI, WA, WV, WI, WY. INCORPORATED IN: Florida.

### American Casualty Company of Reading, Pennsylvania (NAIC #20427)
BUSINESS ADDRESS: CNA PLAZA, CHICAGO, IL 60685. PHONE: (800) 262-2255. UNDERWRITING LIMITATION b/: $8,286,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, PR, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Pennsylvania.

### AMERICAN CONTRACTORS INDEMNITY COMPANY (NAIC #10216) 1
BUSINESS ADDRESS: 9841 Airport Boulevard., 9th Floor, Los Angeles, CA 90045. PHONE: (310) 649-0990. UNDERWRITING LIMITATION b/: $1,863,000. SURETY LICENSES c,f/: AL, AZ, AR, CA, CO, CT, DE, DC, FL, GA, GU, HI, ID, IN, IA, KS, KY, LA, ME, MD, MN, MS, MO, MT, NE, NV, NJ, NM, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VA, WA, WV, WI, WY. INCORPORATED IN: California.

### American Economy Insurance Company (NAIC #19690)
BUSINESS ADDRESS: SAFECO PLAZA, SEATTLE, WA 98185. PHONE: (800) 332-3226. UNDERWRITING LIMITATION b/: $37,404,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NM, NY, NC, ND, OH, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Indiana.

### American Fire and Casualty Company (NAIC #24066)
BUSINESS ADDRESS: 9450 SEWARD ROAD, FAIRFIELD, OH 45014. PHONE: (513) 603-2400. UNDERWRITING LIMITATION b/: $11,244,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, ID, IN, IA, KS, KY, LA, MD, MA, MI, MN, MS, MO, MT, NE, NV, NJ, NM, NY, NC, ND, OH, OR, PA, RI, SC, SD, TX, UT, VA, WA, WV, WI, WY. INCORPORATED IN: Ohio.

### American Guarantee and Liability Insurance Company (NAIC #26247)
BUSINESS ADDRESS: 1400 AMERICAN LANE, TOWER I, 19TH FLOOR, SCHAUMBURG, IL 60196-1056. PHONE: (800) 382-2150. UNDERWRITING LIMITATION b/: $8,766,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: New York.

### American Hardware Mutual Insurance Company (NAIC #13331)
BUSINESS ADDRESS: 471 EAST BROAD STREET, COLUMBUS, OH 43215. PHONE: (800) 876-6642. UNDERWRITING LIMITATION b/: $8,207,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Ohio.

### American Home Assurance Company (NAIC #19380)
BUSINESS ADDRESS: 70 PINE STREET, NEW YORK, NY 10270. PHONE: (212) 458-7018. UNDERWRITING LIMITATION b/: $288,331,000. SURETY LICENSES c,f/: AL, AK, AZ, CA, CO, CT, DE, DC, FL, GA, GU, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: New York.

### American Insurance Company (The) (NAIC #21857)

Case 1:02-cv-00008    Document 227    Filed 10/29/2003    Page 166 of 221

BUSINESS ADDRESS: 777 SAN MARIN DRIVE, NOVATO, CA 94998. PHONE: (800) 243-9622. UNDERWRITING LIMITATION b/: $29,641,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VA, WA, WV, WI, WY. INCORPORATED IN: Nebraska.

### AMERICAN INTERNATIONAL INSURANCE COMPANY OF PUERTO RICO (NAIC #31674)
BUSINESS ADDRESS: P O BOX 10181, SAN JUAN, PR 00908. PHONE: (787) 767-6400. UNDERWRITING LIMITATION b/: $9,177,000. SURETY LICENSES c,f/: PR, VI. INCORPORATED IN: Puerto Rico.

### American International Pacific Insurance Company (NAIC #23795)
BUSINESS ADDRESS: 70 PINE STREET, NEW YORK, NY 10270. PHONE: (212) 458-7018. UNDERWRITING LIMITATION b/: $2,728,000. SURETY LICENSES c,f/: AK, CO, CT, DC, IA, ME, MD, MA, MS, MT, NE, NH, ND, RI, SD, UT, VT, WV, WY. INCORPORATED IN: Colorado.

### American Re-Insurance Company (NAIC #10227)
BUSINESS ADDRESS: 555 COLLEGE ROAD EAST - P.O. BOX 5241, PRINCETON, NJ 08543. PHONE: (609) 243-4200. UNDERWRITING LIMITATION b/: $223,003,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Delaware.

### AMERICAN RELIABLE INSURANCE COMPANY (NAIC #19615)
BUSINESS ADDRESS: 8655 EAST VIA DE VENTURA, SCOTTSDALE, AZ 85258. PHONE: (480) 483-8666. UNDERWRITING LIMITATION b/: $6,018,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Arizona.

### AMERICAN ROAD INSURANCE COMPANY (THE) (NAIC #19631)
BUSINESS ADDRESS: THE AMERICAN ROAD, DEARBORN, MI 48121-6027. PHONE: (313) 594-1914. UNDERWRITING LIMITATION b/: $29,396,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Michigan.

### American Safety Casualty Insurance Company (NAIC #39969)
BUSINESS ADDRESS: 1845 THE EXCHANGE, SUITE 200, ATLANTA, GA 30339. PHONE: (770) 916-1908. UNDERWRITING LIMITATION b/: $2,953,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MI, MN, MS, MO, MT, NE, NV, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Delaware.

### American States Insurance Company (NAIC #19704)
BUSINESS ADDRESS: SAFECO PLAZA, SEATTLE, WA 98185. PHONE: (800) 332-3226. UNDERWRITING LIMITATION b/: $46,962,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Indiana.

### American Surety Company (NAIC #31380)
BUSINESS ADDRESS: 3905 VINCENNES ROAD, SUITE 200, INDIANAPOLIS, IN 46268. PHONE: (317) 875-8700. UNDERWRITING LIMITATION b/: $654,000. SURETY LICENSES

Case 1:02-cv-00008     Document 227     Filed 10/29/2003     Page 167 of 221

c,f/: AL, AK, CA, CT, DE, FL, HI, ID, IN, IA, KS, LA, ME, MD, MN, MS, MO, NE, NV, ND, OH, PA, SC, SD, TN, TX, UT, VA, WA, WY. INCORPORATED IN: California.

**Amerisure Mutual Insurance Company (NAIC #23396)**
BUSINESS ADDRESS: P. O. BOX 2060, FARMINGTON HILLS, MI 48333-2060. PHONE: (248) 615-9000 x-67968. UNDERWRITING LIMITATION b/: $30,185,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Michigan.

**Antilles Insurance Company (NAIC #10308)**
BUSINESS ADDRESS: PO BOX 9023507, SAN JUAN, PR 00902-3507. PHONE: (787) 721-4900. UNDERWRITING LIMITATION b/: $3,912,000. SURETY LICENSES c,f/: PR. INCORPORATED IN: Puerto Rico.

**Arch Reinsurance Company (NAIC #10348)**
BUSINESS ADDRESS: 55 Madison Avenue, P.O. Box 1988, Morristown, NJ 07962-1988. PHONE: (973) 898-9575. UNDERWRITING LIMITATION b/: $35,922,000. SURETY LICENSES c,f/: GA, IL, IN, MD, MI, NE, NY, PA, UT. INCORPORATED IN: Nebraska.

**Associated Indemnity Corporation (NAIC #21865)**
BUSINESS ADDRESS: 777 SAN MARIN DRIVE, NOVATO, CA 94998. PHONE: (800) 243-9622. UNDERWRITING LIMITATION b/: $4,013,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: California.

**Atlantic Bonding Company, Inc. (NAIC #41114)**
BUSINESS ADDRESS: SUITE 212, HILTON PLAZA, PIKESVILLE, MD 21208. PHONE: (410) 484-3100. UNDERWRITING LIMITATION b/: $845,000. SURETY LICENSES c,f/: MD. INCORPORATED IN: Maryland.

**Atlantic Mutual Insurance Company (NAIC #19895)**
BUSINESS ADDRESS: 140 BROADWAY, NEW YORK, NY 10005-1101. PHONE: (800) 999-4762. UNDERWRITING LIMITATION b/: $45,564,000. SURETY LICENSES c,f/: AL, AK, AS, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, PR, RI, SC, SD, TN, TX, UT, VT, VA, VI, WA, WV, WI, WY. INCORPORATED IN: New York.

**Auto-Owners Insurance Company (NAIC #18988)**
BUSINESS ADDRESS: P.O. BOX 30660, LANSING, MI 48909-8160. PHONE: (517) 323-1200. UNDERWRITING LIMITATION b/: $285,250,000. SURETY LICENSES c,f/: AL, AZ, CO, FL, GA, IL, IN, IA, KS, KY, MI, MN, MS, MO, NE, NV, NM, NC, ND, OH, OR, PA, SC, SD, TN, TX, UT, VA, WA, WI. INCORPORATED IN: Michigan.

**Berkley Insurance Company (NAIC #32603)**
BUSINESS ADDRESS: 475 STEAMBOAT ROAD, GREENWICH, CT 06830. PHONE: (203) 542-3800. UNDERWRITING LIMITATION b/: $36,744,000. SURETY LICENSES c,f/: AL, AK, AR, CA, CO, DE, DC, FL, ID, IL, IN, IA, KY, LA, MD, MI, MN, MS, NE, NV, NM, NY, NC, ND, OH, OK, OR, PA, RI, SD, TN, TX, UT, VT, WA, WV, WI. INCORPORATED IN: Delaware.

**Berkley Regional Insurance Company (NAIC #29580)**
BUSINESS ADDRESS: P. O. Box 1594, Des Moines, IA 50306, IA 50306. PHONE: (203) 629-3000. UNDERWRITING LIMITATION b/: $32,390,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS,

U.S. District Court of Guam
Civil Case No. 02-00008

Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

# EXHIBIT "Q"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities

in the Federal Register in notice form, and these notices may be obtained from any Office of Federal Contract Compliance Programs office.

(c) The Contractor's compliance with Executive Order 11246, as amended, and the regulations in 41 CFR 60-4 shall be based on (1) its implementation of the Equal Opportunity clause, (2) specific affirmative action obligations required by the clause entitled "Affirmative Action Compliance Requirements for Construction," and (3) its efforts to meet the goals. The hours of minority and female employment and training must be substantially uniform throughout the length of the contract, and in each trade. The Contractor shall make a good faith effort to employ minorities and women evenly on each of its projects. The transfer of minority or female employees or trainees from Contractor to Contractor, or from project to project, for the sole purpose of meeting the Contractor's goals shall be a violation of the contract, Executive Order 11246, as amended, and the regulations in 41 CFR 60-4. Compliance with the goals will be measured against the total work hours performed.

(d) The Contractor shall provide written notification to the Deputy Assistant Secretary for Federal Contract Compliance, U.S. Department of Labor, within 10 working days following award of any construction subcontract in excess of $10,000 at any tier for construction work under the contract resulting from this solicitation. The notification shall list the –

> (1) Name, address, and telephone number of the subcontractor;
> (2) Employer's identification number of the subcontractor;
> (3) Estimated dollar amount of the subcontract;
> (4) Estimated starting and completion dates of the subcontract; and
> (5) Geographical area in which the subcontract is to be performed.

(e) As used in this Notice, and in any contract resulting from this solicitation, the "covered area" is Guam.

1.13   FAC 5252.228-9305, NOTICE OF BONDING REQUIREMENTS (JAN 1996)

Within 10 days after receipt of award, the bidder to whom the award is made shall furnish the following bond(s) each with satisfactory security:

X   A Performance Bond (Standard Form 25). The performance bond shall be $500,000.00.

X   A Payment Bond (Standard Form 25A). The payment bond shall be 50% of the performance bond.

Any surety company holding a certificate of authority from the Secretary of Treasury as an acceptable Surety on Federal bonds will be accepted. Individual sureties will be permitted as prescribed in FAR 28.203 and FAC 5252.228-9300. Alternative types of surety in lieu

Exhibit

Q

U.S. District Court of Guam
Civil Case No. 02-00008


Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

R

# EXHIBIT "R"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities

Bond No. 20-80-88

| PAYMENT BOND<br>*(See instructions on reverse)* | DATE BOND EXECUTED *(Must be same or later than date of contract)*<br><br>October 6, 1999 | OMB No.:9000-0045 |
|---|---|---|

Public reporting burden for this collection of information is estimate to average 25 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVR), Federal Acquisition Policy Division, GSA, Washington, DC 20405

| PRINCIPAL *(Legal name and business address)*<br><br>BIOGENESIS PACIFIC, INC.<br>1604 Ulualana Place<br>Kailua, Hawaii 96734 | TYPE OF ORGANIZATION *("X" one)*<br><br>☐ INDIVIDUAL     ☐ PARTNERSHIP<br><br>☐ JOINT VENTURE   ☒ CORPORATION<br>STATE OF INCORPORATION<br>Hawaii |
|---|---|

| SURETY(IES) *(Name(s) and business address(es))*<br><br>AMERICAN HOME ASSURANCE COMPANY<br>121 Spear Street<br>San Francisco, California 94105 | PENAL SUM OF BOND |||| 
|---|---|---|---|---|
| | MILLION(S) | THOUSAND(S) | HUNDRED(S) | CENTS |
| | | 250 | 000 | 00 |
| | CONTRACT DATE<br>09/29/99 | CONTRACT NO.<br>N62766-99-D-0425 |||

**OBLIGATION:**

We, the Principal and Surety(ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

**CONDITIONS:**

The above obligation is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal or a subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work provided for in the contract identified above, and any authorized modifications of the contract that subsequently are made. Notice of those modifications to the Surety(ies) are waived.

**WITNESS:**

The Principal and Surety(ies) executed this payment bond and affixed their seals on the above date.

| PRINCIPAL ||||| 
|---|---|---|---|---|
| SIGNATURE(S) | 1. BIOGENESIS PACIFIC, INC.<br>By | 2. *(Seal)* | 3. *(Seal)* | Corporate Seal |
| NAME(S) & TITLE(S) *(Typed)* | 1. | 2. | 3. | |

| INDIVIDUAL SURETY(IES) ||| 
|---|---|---|
| SIGNATURE(S) | 1. | 2. |
| NAME(S) *(Typed)* | 1. *(Seal)* | 2. *(Seal)* |

| | CORPORATE SURETY(IES) |||| 
|---|---|---|---|---|
| SURETY A | NAME & ADDRESS | AMERICAN HOME ASSURANCE COMPANY, San Francisco, CA | STATE OF INC.<br>New York | LIABILITY LIMIT<br>$ | |
| | SIGNATURE(S) | 1. By | 2. | | Corporate Seal |
| | NAME(S) & TITLE(S) *(Typed)* | 1. Swan Lee,<br>Attorney in Fact | 2. | | |

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is usable

STANDARD FORM 25A (REV. 10-98)
Prescribed by GSA-FAR (48 CFR) 53.228(c)

Exhibit
R

U.S. District Court of Guam
Civil Case No. 02-00008


Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

# EXHIBIT "S"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities

Bond No. 20-80-88

| PERFORMANCE BOND (See instructions on reverse) | DATE BOND EXECUTED (Must be same or later than date of contract) October 6, 1999 | OMB No.: 9000-0045 |
|---|---|---|

Public reporting burden for this collection of information is estimated to average 25 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVR), Federal Acquisition Policy Division, GSA, Washington, DC 20405

PRINCIPAL (Legal name and business address)

BIOGENESIS PACIFIC, INC.
1604 Ulualana Place
Kailua, Hawaii   96734

TYPE OF ORGANIZATION ("X" one)

☐ INDIVIDUAL     ☐ PARTNERSHIP

☐ JOINT VENTURE    ☒ CORPORATION

STATE OF INCORPORATION

Hawaii

SURETY(IES) (Name(s) and business address(es))

AMERICAN HOME ASSURANCE COMPANY
121 Spear Street
San Francisco, California   94105

PENAL SUM OF BOND

| MILLION(S) | THOUSAND(S) | HUNDRED(S) | CENTS |
|---|---|---|---|
| | 500 | 000 | 00 |

| CONTRACT DATE | CONTRACT NO. |
|---|---|
| 09/29/99 | N62766-99-D-0425 |

OBLIGATION:

We, the Principal and Surety(ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

CONDITIONS:

The Principal has entered into the contract identified above.

THEREFORE:

The above obligation is void if the Principal -

(a)(1) Performs and fulfills all the undertakings, covenants, terms, conditions, and agreements of the contract during the original term of the contract and any extensions thereof that are granted by the Government, with or without notice to the Surety(ies), and during the life of any guaranty required under the contract, and (2) performs and fulfills all the undertakings, covenants, terms conditions, and agreements of any and all duly authorized modifications of the contract that hereafter are made. Notice of these modifications to the Surety(ies) are waived.

(b) Pays to the Government the full amount of the taxes imposed by the Government, if the said contract is subject to the Miller Act (40 U.S.C. 270a-270e), which are collected, deducted, or withheld from wages paid by the Principal in carrying out the construction contract with respect to which this bond is furnished.

WITNESS:

The Principal and Surety(ies) executed this performance bond and affixed their seals on the above date.

PRINCIPAL

| | BIOGENESIS PACIFIC, INC. | | | |
|---|---|---|---|---|
| SIGNATURE(S) | By    (Seal) 1. | 2. (Seal) | 3. (Seal) | Corporate Seal |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | 3. | |

INDIVIDUAL SURETY(IES)

| | | | |
|---|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. | (Seal) |
| NAME(S) (Typed) | 1. | 2. | |

CORPORATE SURETY(IES)

| | NAME & ADDRESS | AMERICAN HOME ASSURANCE COMPANY, San Francisco, CA | STATE OF INC. New York | LIABILITY LIMIT $ | |
|---|---|---|---|---|---|
| SURETY A | SIGNATURE(S) | By | 1. | 2. | Corporate Seal |
| | NAME(S) & TITLE(S) (Typed) | 1. Swan Lee, Attorney in Fact | | 2. | |

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition not usable

STANDARD FORM 25 (REV. 5-96)
Prescribed by GSA-FAR (48 CFR) 53.228(b)

** TOT    **Exhibit**   **S**

U.S. District Court of Guam
Civil Case No. 02-00008

Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

# EXHIBIT "T"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities

CARLSMITH BALL LLP

SINFOROSO M. TOLENTINO
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., | CIVIL CASE NO. 02-00008 |
| Plaintiff, | **DECLARATION OF CUSTODIAN OF RECORDS OF GUAM BRANCH OFFICE OF CARLSMITH BALL LLP** |
| vs. | |
| BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC. AND AMERICAN HOME ASSURANCE COMPANY, | |
| Defendants. | |
| BIOGENESIS PACIFIC, INC., | |
| Counterclaimant, | |
| vs. | |
| RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH AND JOHN DOES 1-10, | |
| Counter-Defendants. | |



4823-4064-7936.1

AMERICAN HOME ASSURANCE
COMPANY,

            Cross-Claimant,

    vs.

BIOGENESIS PACIFIC, INC.,

            Cross-Defendant.

            SINFOROSO M. TOLENTINO, under penalty of law, hereby declares as follows:

1.     I am over the age of eighteen (18) years.

2.     I am an attorney at law licensed to practice before the Courts of Guam and before this Court. I am a Partner with the law firm of Carlsmith Ball LLP.

3.     If called as a witness, I would and could competently testify thereto to all facts within my personal knowledge except where stated upon information and belief.

4.     I am the designated Custodian of Records for the Guam branch office of Carlsmith Ball LLP, and, as such, I am charged with the care, custody and control of records for the Carlsmith Ball LLP Guam branch office.

5.     I have reviewed the files maintained in the Guam branch office related to the firm's representation of Rhino Builders, Inc.

6.     Attached hereto as Exhibit A are documents responsive to the Deposition Subpoena Duces Tecum dated September 3, 2003 served by Vernier & Maher, LLP, Attorneys for Defendants AIG Technical Services, Inc. and American Home Assurance Company.

7.     The documents attached hereto as Exhibit A have been reviewed by Antonio Cortes, attorney for Plaintiff Rhino Builders, Inc., and contain redactions that were requested by Attorney Cortes.

//
//
//
//
//
//
//

4823-4064-7936.1

2.

8.      I am in possession of other documents maintained in the Guam branch office related to the firm's representation of Rhino Builders, Inc.  I have reviewed such other documents and deem them not responsive to the Subpoena Duces Tecum.

DATED: Hagåtña, Guam, October ___, 2003.

CARLSMITH BALL LLP

SINFOROSO M. TOLENTINO

4823-4064-7936.1

3.

**From:**        David Ledger
**To:**          dvc
**Date:**        3/19/02 4:19PM
**Subject:**     AIG

Don, pls fill me in on the situation.  Vince said you had a question regarding a case against AIG?

001

**EXHIBIT A**

**From:**      Donald Calvo
**To:**        Ledger, David
**Date:**      3/19/02 5:11PM
**Subject:**   Re: AIG

Terry and Amy from the Hono office requested that I as well as Dana assist them in connection with a
Miller Act Claim that is to be filed no later than tomorrow in District Court. Our client in the matter is Rhino
Builders out of Hawaii. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In talking with Terry and Amy, we
inquired as to whether a conflicts check was done with regards to AIG as the name sounded familiar to
me. It appears that we do represent AIG in other matters so I believe Terry, Rossi, John Osborn, and
Michele Imata are attempting to resolve the issue. For now, I am just waiting further info.

Hope this info helps.

>>> David Ledger 03/19/02 04:19PM >>>
Don, pls fill me in on the situation. Vince said you had a question regarding a case against AIG?

**From:**      David Ledger
**To:**        i:judeth.granville@aig.com
**Date:**      3/19/02 5:25PM
**Subject:**   AIG Technical Services

Judeth - Is AIG Technical Services a company related to the company which is paying our fees for our defense of the insured Casamar? I ask because a sub contractor client of ours seeks to sue a general contractor and its bonding company, apparently AIG Technical Services, for non-payment. If you are able to reply, time is of the essence. Thank you.

David Ledger
dledger@carlsmith.com
Tel: 671-472-6813
Fax: 671-477-4375

**CC:**        dvc; Thomason, Terry; Tolentino, Sinforoso

035

**From:** "Granville, Judeth" <Judeth.Granville@AIG.com>
**To:** 'David Ledger' <dledger@carlsmith.com>, "Granville, Judeth" <Judeth.Granville@AIG.com>
**Date:** 3/20/02 2:42AM
**Subject:** RE: AIG Technical Services

David:

American Home Assurance Company (the insurer), American International Marine Agency (from whose account your fees are paid), and A I Marine Adjusters, Inc. are each member companies of American International Group, as is AIG Technical Services.

So, yes we are all AIG companies.

Trust that this answers your question..

Regards,
Judeth Granville
A I Marine Adjusters, Inc, - San Francisco


> -----Original Message-----
> From:        David Ledger
> Sent:        Monday, March 18, 2002 11:25 PM
> To:        judeth.granville@aig.com
> Cc:        Donald Calvo; Sinforoso Tolentino; Terry Thomason
> Subject:        AIG Technical Services
>
> Judeth - Is AIG Technical Services a company related to the company which
> is paying our fees for our defense of the insured Casamar?  I ask because
> a sub contractor client of ours seeks to sue a general contractor and its
> bonding company, apparently AIG Technical Services, for non-payment.   If
> you are able to reply, time is of the essence.  Thank you.
>
> David Ledger
> dledger@carlsmith.com
> Tel:  671-472-6813
> Fax: 671-477-4375


**CC:**        Donald Calvo <dcalvo@carlsmith.com>, Sinforoso Tolentino <stolentino@carlsmith.com>, Terry Thomason <tthomason@carlsmith.com>

004

**EXHIBIT A**

**From:**     Donald Calvo
**To:**       Self, Amy;  Thomason, Terry
**Date:**     3/20/02 5:31PM
**Subject:**  Rhino Builders v. AIG

The complaint has been filed as per your instructions. We will not serve the complaint until such time that you have advised us to do so. It is our understanding that the conflicts issue is being addressed and that possibly a conflict does not exist in this matter. The complaint has been filed on this basis.

We will await your further instruction in this matter.

Regards,
Don Calvo
CARLSMITH BALL, LLP
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagatna, Guam 96932-5027
Tel:  (671) 472-6813
Fax: (671) 477-4375

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CONFIDENTIALITY STATEMENT:
This message from the law firm of Carlsmith Ball LLP contains information which is privileged and confidential and is solely for the use of the intended recipient. If you are not the intended recipient, any review, disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this in error, please destroy immediately and please notify us immediately at (671) 472-6813. Thank you

**CC:**       Gutierrez, Dana

| | |
|---|---|
| From: | Donald Calvo |
| To: | Self, Amy;  Thomason, Terry |
| Date: | 3/20/02 9:58AM |
| Subject: | Rhino Builders v. AIG |

It is my further understanding that the firm will continue to address the conflicts matter and until such time that the matter is cleared, we are to refrain from filing the complaint on Rhino's behalf.

We await further instruction.

Regards,
Don Calvo
CARLSMITH BALL, LLP
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagatna, Guam 96932-5027
Tel:  (671) 472-6813
Fax: (671) 477-4375

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CONFIDENTIALITY STATEMENT:
This message from the law firm of Carlsmith Ball LLP contains information which is privileged and confidential and is solely for the use of the intended recipient.  If you are not the intended recipient, any review, disclosure, copying, distribution, or use of the contents of this message is strictly prohibited.  If you have received this in error, please destroy immediately and please notify us immediately at (671) 472-6813.  Thank you

CC:                  Gutierrez, Dana

**EXHIBIT A**

**From:** David Ledger
**To:** Imata, Michelle
**Date:** 3/20/02 6:46AM
**Subject:** Fwd: RE: AIG Technical Services

Hello Michelle - Welcome back to the office..... The potential lawsuit against AIG Technical Services must, apparently, be filed today in Guam ███████████████████████ Nonetheless, it seems that by CB doing so, we would place ourselves in the position of shooting bullets – a direct lawsuit – at the same company who is currently paying our fees. This seems to be a much different situation than representing one client against another when the other might have insurance to pay a successful claim. Last fiscal year, through it's Guam-based adjusters GIA, Inc. (AIG spelled backwards) AIG Insurance Group paid us $42,269.00 in fees. I though you should know this in connection with the matter before us. As for the time bar consideration, Rossi told me yesterday that he has two Guam law firms standing by to step in. Thank you.

**CC:**    dvc;  Osborn, John;  Thomason, Terry;  Tolentino, Sinforoso

U06-A

**EXHIBIT A**

**From:** Terry Thomason
**To:** Calvo, Donald; Self, Amy
**Date:** 3/20/02 6:12AM
**Subject:** Re: Hi Terry and Amy:

Don:

   I spoke to Michelle about the conflicts issue. We will do a conference call to iron out John Osborn's questions. It is a little troubling because we all did conflicts checks and the litigation division has 4 active matters where AIG is an adverse party.



Terry

Terry E. Thomason (tthomason@carlsmith.com)
Carlsmith Ball LLP (www.carlsmith.com)
1001 Bishop Street
Pacific Tower, Suite 2200
Honolulu, HI 96813

Telephone: (808) 523-2527
Facsimile: (808) 523-0842

IMPORTANT/CONFIDENTIAL: This message from the law firm of Carlsmith Ball LLP contains information which may be confidential, privileged, and/or exempt from disclosure under applicable law. If you are not the addressee (or authorized to receive for the addressee), you are hereby notified that the copying, use or distribution of any information or materials transmitted in or with this message is strictly prohibited. If you received this message in error, please immediately notify me (the sender) by replying to this email, then promptly destroy the original message. Thank you.

>>> Donald Calvo 03/18/02 09:25PM >>>
Hi Terry and Amy:

Just in case the conflicts issue is cleared, we thought it would be prudent to address all matters pertaining to the complaint

007



Thanks,
Don Calvo
CARLSMITH BALL, LLP
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagatna, Guam 96932-5027
Tel: (671) 472-6813
Fax: (671) 477-4375

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CONFIDENTIALITY STATEMENT:
This message from the law firm of Carlsmith Ball LLP contains
information which is privileged and confidential and is solely for the
use of the intended recipient. If you are not the intended recipient,
any review, disclosure, copying, distribution, or use of the contents of
this message is strictly prohibited. If you have received this in
error, please destroy immediately and please notify us immediately at
(671) 472-6813. Thank you

CC:                  Gutierrez, Dana;  Lopes, Shawne;  Self, Amy

U08

EXHIBIT A



## Search Criteria Results

| | Type | | Matter/Subject | | | | |
|---|---|---|---|---|---|---|---|
| ✓ | CL | CLOSE - Close | AIG Aviation Insurance Svcs | DAB | Daniel A. Bent | 050896 | AIG Aviation Ins |
| ✓ | CL | CLOSE - Close | AIG Hawaii | SYM | Stanley Y. Muka | 015310 | AIG Hawaii |
| ✓ | CL | CLOSE - Close | Aig Realty, Inc. | GG | Gary G. Grimmer | 017652 | Aig Realty, Inc. |
| ✓ | MA | CLOSE - Close | AIG Aviation Ins-Macaw | JDO | John D. Osborn | 050896 | AIG Aviation Ins |
| ✓ | MA | CLOSE - Close | AIG HI-General | MR | Michael Rosenth- | 015310 | AIG Hawaii |
| ✓ | MA | CLOSE - Close | AIG HI-McMurtry | TCL | Tom C. Leutenel | 015310 | AIG Hawaii |
| ✓ | MA | CLOSE - Close | AIG HI-Prepaid Health | PHJ | Patrick H. Jones | 015310 | AIG Hawaii |
| ✓ | MA | CLOSE - Close | AIG HI-Rainbow Ranch | TCL | Tom C. Leutenel | 015310 | AIG Hawaii |
| ✓ | MA | CLOSE - Close | AIG HI-Shannon | PHJ | Patrick H. Jones | 015310 | AIG Hawaii |
| ✓ | MA | CLOSE - Close | AIG Rlty-Loden | GG | Gary G. Grimmer | 017652 | Aig Realty, Inc. |
| ✓ | MA | CLOSE - Close | AIG-AUDIT LETTER | MJM | Michael J. Mede | 023612 | American Intern |
| ✓ | MA | CLOSE - Close | Visitacion,J v AIG HI Ins | RHE | Randall H. Endc | 050811 | Randall H. Endc |
| | | | | | | 019987 | Court Appointed |
| ✓ | MP | Adverse | AIG | | | | |
| ✓ | MP | Adverse | AIG FP or A I G  F P Funding Cayman | RES | Robert E. Stranc | 010028 | Bank of Hawaii |
| ✓ | MP | Adverse | AIG Hawaii Insurance Company | GG | Gary G. Grimmer | 054324 | Kaahanui, Davi |
| ✓ | MP | Adverse | AIG or A I G | GG | Gary G. Grimmer | 030004 | Honolulu Ford, I |
| ✓ | MP | Adverse | AIG or A I G FP Funding Cayman Limi | RES | Robert E. Stranc | 010028 | Bank of Hawaii |
| ✓ | MP | Adverse | AIG or A I G FP Special Finance Cayr | RES | Robert E. Stranc | 010028 | Bank of Hawaii |
| ✓ | MP | Adverse | AIG or A I G Hawaii Insurance Co Inc | GG | Gary G. Grimmer | 053361 | Michelle R. Roc |





## Search Criteria Results

| Pri | Type | Status | Adverse/Matter/Party | Resp Atty | | |
|---|---|---|---|---|---|---|
| ✓ | MP | Adverse | AIG Hawaii Insurance Company | GG | Gary G. Grimmer | 054324 Kaahanui, Davi |
| ✓ | MP | Adverse | AIG or A I G | GG | Gary G. Grimmer | 030004 Honolulu Ford, |
| ✓ | MP | Adverse | AIG or A I G FP Funding Cayman Limi | RES | Robert E. Strand | 010028 Bank of Hawaii |
| ✓ | MP | Adverse | AIG or A I G FP Special Finance Cayr | RES | Robert E. Strand | 010028 Bank of Hawaii |
| ✓ | MP | Adverse | AIG or A I G Hawaii Insurance Co Inc | GG | Gary G. Grimmer | 053361 Michelle R. Rog |
| ✓ | MP | Adverse | AIG or A I G Hawaii Insurance Co Inc | GG | Gary G. Grimmer | 053362 Yoshihiro Kitand |
| ✓ | MP | Adverse | AIG or A I G Insurance | DAB | Daniel A. Bent | 050454 Charles Howard |
| ✓ | MP | Adverse | AIG or A I G Matched Funding Corp | RES | Robert E. Strand | 010028 Bank of Hawaii |
| ✓ | MP | Adverse | AIG or A I G Special Finance | RES | Robert E. Strand | 010028 Bank of Hawaii |
| ✓ | MP | Client | AIG Hawaii or A I G Hawaii | MR | Michael Rosenth | 015310 AIG Hawaii |
| ✓ | MP | Client | AIG Hawaii or A I G Hawaii | PHJ | Patrick H. Jones | 015310 AIG Hawaii |
| ✓ | MP | Client | AIG Hawaii or A I G Hawaii | PHJ | Patrick H. Jones | 015310 AIG Hawaii |
| ✓ | MP | Client | AIG Hawaii or A I G Hawaii | TCL | Tom C. Leutenel | 015310 AIG Hawaii |
| ✓ | MP | Client | AIG Hawaii or A I G Hawaii | TCL | Tom C. Leutenel | 015310 AIG Hawaii |
| ✓ | MP | Client | AIG or A I G | PHJ | Patrick H. Jones | 031297 American Interna |
| ✓ | MP | Client | AIG or A I G Aviation Insurance Svcs | JDO | John D. Osborn | 050896 AIG Aviation Ins |
| ✓ | MP | Client | AIG Realty Inc or A I G Realty Inc | GG | Gary G. Grimmer | 017652 Aig Realty, Inc. |
| ✓ | MP | Neutral | AIG | | | 019987 Court Appointed |
| ✓ | MP | Neutral | AIG Hawaii | TCL | Tom C. Leutenel | 038319 Lowell D. Chatb |

0.0



**Search Criteria Results**

| ✓ | MP | Client | AIG Hawaii or A I G Hawaii | PHJ | Patrick H. Jones | 015310 | AIG Hawaii |
|---|----|--------|---------------------------|-----|------------------|--------|------------|
| ✓ | MP | Client | AIG Hawaii or A I G Hawaii | TCL | Tom C. Leutenel | 015310 | AIG Hawaii |
| ✓ | MP | Client | AIG Hawaii or A I G Hawaii | TCL | Tom C. Leutenel | 015310 | AIG Hawaii |
| ✓ | MP | Client | AIG or A I G | PHJ | Patrick H. Jones | 031297 | American Intern |
| ✓ | MP | Client | AIG or A I G Aviation Insurance Svcs | JDO | John D. Osborn | 050896 | AIG Aviation Ins |
| ✓ | MP | Client | AIG Realty Inc or A I G Realty Inc | GG | Gary G. Grimmer | 017652 | Aig Realty, Inc. |
| ✓ | MP | Neutral | AIG | | | 019987 | Court Appointed |
| ✓ | MP | Neutral | AIG Hawaii | TCL | Tom C. Leutenel | 038319 | Lowell D. Chatb |
| ✓ | MP | Neutral | AIG or A I G Hawaii Insurance Co Inc | RHE | Randall H. Endo | 050811 | Randall H. Endo |
| ✓ | MP | Potentially Adv | AIG or A I G Asset Management Intl | JCK | John C. Khil | 009999 | CB Converted C |
| ✓ | MP | Potentially Adv | AIG or A I G Hawaii | KGL | Katherine G. Led | 019987 | Court Appointed |
| ✓ | MP | Unknown | AIG Insurance Co or A I G Insurance | BML | B. Martin Luna | 039244 | Karl A. & Vicky |
| ✓ | MP | Unknown | AIG Risk Management Inc | GRP | Gary R. Phillips | 021830 | National Union |
| ✓ | NA | - | Aig Europe Filial Av | | | | |
| ✓ | NA | - | AIG or A I G Asset Management Intl | | | | |
| ✓ | NA | - | AIG or A I G Asset Management Intl | | | | |
| ✓ | VR | G - General | AIG Hawaii Insurance Company, Inc. | | | | |

031

**EXHIBIT A**

Case 1:02-cv-00001 Document 227    Filed 10/29/2003    Page 190 of 221



EXHIBIT A

012

**From:**      Terry Thomason
**To:**         Gutierrez, Dana
**Date:**      5/2/02 8:27AM
**Subject:**   Re: Rhino Builders

Dana:

I have met with Michael to emphasize the need to move quickly to retain Anita. I also called him last week. I called again this morning and faxed the Notice you had forwarded to me.

I will follow-up as aggressively as I can. Mike and Uncle Henry are obviously not happy with us. I also am not particularly happy with us, but I will do all I can to get Uncle Henry to make a decision and get the case transferred to Anita.

Terry

> > > Dana Gutierrez 04/30/02 07:32PM > > >
HI, Terry.

I spoke to Anita Arriola today and she informed me that she sent her firm's retainer agreement to Rhino but has not received anything back from them. She stated that she has tried at least once a week to get a hold of them. She stated that she spoke to Moana yesterday, and Moana told her that Mike and Eugene are out sick. Anita is concerned about the amount of time that has passed at this point.

Please advise.

Thanks.
Dana


Please

CC:         Calvo, Donald;  Lopes, Shawne;  Tolentino, Sinforoso

013

**From:**      Dana Gutierrez
**To:**          Terry Thomason
**Date:**      5/1/02 3:32PM
**Subject:**   Rhino Builders

Hi, Terry. ██████████████████

I spoke to Anita Arriola today and she informed me that she sent her firm's retainer agreement to Rhino but has not received anything back from them. She stated that she has tried at least once a week to get a hold of them. She stated that she spoke to Moana yesterday, and Moana told her that Mike and Eugene are out sick. Anita is concerned about the amount of time that has passed at this point.

████████████████████████

Please advise.

Thanks.
Dana


Please

CC:             Donald Calvo;  Sinforoso Tolentino

EXHIBIT A

**From:** Terry Thomason
**To:** Rhino1@hawaii.rr.com
**Date:** 4/5/02 2:24PM
**Subject:** Transfer of Miller Act Claim

CONFIDENTIAL AND PRIVILEGED

Michael:

I neglected to include Ms. Arriola's phone number in my earlier e-mail. Call her at (671) 477-9731.

Regards,

Terry

Terry E. Thomason (tthomason@carlsmith.com)
Carlsmith Ball LLP (www.carlsmith.com)
1001 Bishop Street
Pacific Tower, Suite 2200
Honolulu, HI 96813

Telephone: (808) 523-2527
Facsimile: (808) 523-0842

IMPORTANT/CONFIDENTIAL: This message from the law firm of Carlsmith Ball LLP contains information which may be confidential, privileged, and/or exempt from disclosure under applicable law. If you are not the addressee (or authorized to receive for the addressee), you are hereby notified that the copying, use or distribution of any information or materials transmitted in or with this message is strictly prohibited. If you received this message in error, please immediately notify me (the sender) by replying to this email, then promptly destroy the original message. Thank you.

**CC:** Aarriola@ite.net; Gutierrez, Dana; Lopes, Shawne; Self, Amy

015

**From:** Terry Thomason
**To:** Rhino1@hawaii.rr.com
**Date:** 4/5/02 11:15AM
**Subject:** Transfer of Miller Act Claim

CONFIDENTIAL AND PRIVILEGED

Michael:

Per our conversation, I spoke today with Ms. Anita Arriola in Guam. She is prepared to talk with you concerning Rhino engaging her firm to pursue the Miller Act Claim against BioGenesis.

I have added Ms. Arriola's email address to this e-mail so that you can arrange via-email for a time to call with assurance that she will be available.

If you and Ms. Arriola agree to an engagement, please inform me or Amy Self immediately. Amy will ensure that all the case files are transferred to Ms. Arriola as soon as you authorize us to do so.

Regards,

Terry

Terry E. Thomason (tthomason@carlsmith.com)
Carlsmith Ball LLP (www.carlsmith.com)
1001 Bishop Street
Pacific Tower, Suite 2200
Honolulu, HI 96813

Telephone: (808) 523-2527
Facsimile: (808) 523-0842

IMPORTANT/CONFIDENTIAL: This message from the law firm of Carlsmith Ball LLP contains information which may be confidential, privileged, and/or exempt from disclosure under applicable law. If you are not the addressee (or authorized to receive for the addressee), you are hereby notified that the copying, use or distribution of any information or materials transmitted in or with this message is strictly prohibited. If you received this message in error, please immediately notify me (the sender) by replying to this email, then promptly destroy the original message. Thank you.

**CC:** Aarriola@ite.net; Gutierrez, Dana; Lopes, Shawne; Self, Amy

010

**EXHIBIT A**

**From:** Dana Gutierrez
**To:** aarriola@ite.net
**Date:** 4/5/02 10:34AM
**Subject:** Contact Information for Rhino

The following is contact information for Rhino:

Michael O'Connell, President
Rhino Builders
87-1610 Ulehawa Road
Waianae, Hawaii  96792
Telephone: (808) 668-8878
Fax:  (808) 668-7024
Email: rhino1@hawaii.rr.com

Regards,
Dana Gutierrez

**CC:**        Terry Thomason

**EXHIBIT A**

017

**From:**        Sinforoso Tolentino
**To:**          Terry Thomason
**Date:**        4/4/02 11:54PM
**Subject:**     Rhino Builders

I talked to Anita Arriola. She is available for a telephone conference between 9 and 11 Guam time, 4/5/02 (Hono time 1-3 pm).

I will be at a Chamber program tomorrow morning. By this email I am asking Dana, or my secretary Debbie to arrange the telephone conference between you and Anita.

I am sending a copy of this email to Anita Arriola. Anita's phone number is 671-477-9731.

Mr. Sinforoso M. Tolentino
Carlsmith Ball LLP
P.O. Box BF
Hagatna, Guam 96932
Telephone 671-472-6813
Facsimile 671-477-4375
smt@carlsmith.com

IMPORTANT/CONFIDENTIAL: This message from the law firm of Carlsmith Ball LLP contains information which may be confidential, privileged, and/or exempt from disclosure under applicable law. If you are not the addressee (or authorized to receive for the addressee), you are hereby notified that the copying, use or distribution of any information or materials transmitted in or with this message is strictly prohibited. If you received this message in error, please immediately notify me (the sender) by replying to this email, then promptly destroy the original message. Thank you.

CC:            acalaw@ite.net;  Dana Gutierrez;  Debbie Irizarry

u13

**From:** Dana Gutierrez
**To:** Donald Calvo; Sinforoso Tolentino
**Date:** 5/7/02 10:30AM
**Subject:** Fwd: Re: Rhino Miller Act Claim

Rossi--

I agree with Don. Please find time to meet with us this afternoon to discuss this case.

Thanks.
Dana

> > > Donald Calvo 05/07/02 09:51AM > > >
please see the attached. i'm starting to get uncomfortable being on this case. Dana and I offered our assistance in this matter as a favor to Terry and Amy ████████████████████████ When the conflict arose, we were instructed not to do anything until new counsel was obtained. as far as I'm concerned this is a "dump and run" situation. ███████████████████████████

████████████████ the decision was made that a business conflict existed so we have to move on and ensure the client obtain's new counsel. if I were Anita, given the looming deadlines and non-responsiveness of the client, I would definitely not want to get involved in this case.

this needs to be resolved as soon as possible. i don't plan to sign any further pleadings in this case. I'm sure Dana feels the same way.

**EXHIBIT A**

019

**From:**      Donald Calvo
**To:**        Tolentino, Sinforoso
**Date:**      5/7/02 9:51AM
**Subject:**   Fwd: Re: Rhino Miller Act Claim

please see the attached. i'm starting to get uncomfortable being on this case. Dana and I offered our assistance in this matter as a favor to Terry and Amy ▓▓▓▓▓▓▓▓▓▓ When the conflict arose, we were instructed not to do anything until new counsel was obtained. as far as I'm concerned this is a "dump and run" situation. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ the decision was made that a business conflict existed so we have to move on and ensure the client obtain's new counsel. if I were Anita, given the looming deadlines and non-responsiveness of the client, I would definitely not want to get involved in this case.

this needs to be resolved as soon as possible. i don't plan to sign any further pleadings in this case. I'm sure Dana feels the same way.

**CC:**        Gutierrez, Dana

**EXHIBIT A**

020

**From:** Anna Elento-Sneed
**To:** Donald Calvo
**Date:** 5/7/02 5:05AM
**Subject:** Re: Rhino Miller Act Claim

Don: I guess Rossi did not fill you in on this. Please go talk to him about this. Terry is <u>very aware</u> of what is going on and the problems. However, from his perspective, he feels this mess was created by the Guam office (not you). You guys need to figure out some way to stall this case .... I don't particularly care how. The stall cannot prejudice Rhino in any way. I will have Terry push on the client to get the signed retainer down to Anita this week.

NOTICE: This message contains confidential and privileged information. If it has been sent to you in error, please reply to inform the sender of the error and then delete this message.

>>> Donald Calvo 05/05/02 07:41PM >>>
Hi Terry,

It is my understanding that, as of yet, new counsel for Rhino has not been procured in connection with the above referenced case.

Given the nature of the case and the complexities concerning the underlying parties, we were instructed not to file the Complaint since it was anticipated that new counsel for Rhino would be obtained.

Since it has been determined that a business conflict prevents us from litigating this matter

021

I understand that much of the problem in this case has been in getting the client's response as to these matters. Nevertheless, given that deadlines are looming, action must be taken on our part one way or the other.

I look forward to your further instruction and please call me so that we may discuss any options.

**Regards,**
**Don Calvo**
**CARLSMITH BALL, LLP**
**134 West Soledad Avenue**
**Bank of Hawaii Bldg., Suite 401**
**P.O. Box BF**
**Hagatna, Guam 96932-5027**
**Tel: (671) 472-6813**
**Fax: (671) 477-4375**
**************************************************************

**CONFIDENTIALITY NOTICE: This message contains confidential and privileged information. If it has been sent to you in error, please reply to inform the sender of the error and then delete this message. Thank You.**
**************************************************************

**CC:**          SMT

**From:** Donald Calvo
**To:** Tolentino, Sinforoso
**Date:** 5/7/02 9:51AM
**Subject:** Fwd: Re: Rhino Miller Act Claim

please see the attached. i'm starting to get uncomfortable being on this case. Dana and I offered our assistance in this matter as a favor to Terry and Amy ⬛⬛⬛⬛⬛⬛⬛ When the conflict arose, we were instructed not to do anything until new counsel was obtained. as far as I'm concerned this is a "dump and run" situation. ⬛⬛⬛

⬛⬛⬛ the decision was made that a business conflict existed so we have to move on and ensure the client obtain's new counsel. if I were Anita, given the looming deadlines and non-responsiveness of the client, I would definitely not want to get involved in this case.

this needs to be resolved as soon as possible. i don't plan to sign any further pleadings in this case. I'm sure Dana feels the same way.

**CC:** Gutierrez, Dana

023

**EXHIBIT A**

| From: | Anna Elento-Sneed |
|---|---|
| To: | Donald Calvo |
| Date: | 5/7/02 5:05AM |
| Subject: | Re: Rhino Miller Act Claim |

Don: I guess Rossi did not fill you in on this. Please go talk to him about this. Terry is <u>very aware</u> of what is going on and the problems. However, from his perspective, he feels this mess was created by the Guam office (not you). You guys need to figure out some way to stall this case .... I don't particularly care how. The stall cannot prejudice Rhino in any way. I will have Terry push on the client to get the signed retainer down to Anita this week.

NOTICE: This message contains confidential and privileged information. If it has been sent to you in error, please reply to inform the sender of the error and then delete this message.

> > > Donald Calvo 05/05/02 07:41PM > > >
Hi Terry,

It is my understanding that, as of yet, new counsel for Rhino has not been procured in connection with the above referenced case.

Given the nature of the case and the complexities concerning the underlying parties, we were instructed not to file the Complaint since it was anticipated that new counsel for Rhino would be obtained.

Since it has been

determined that a business conflict prevents us from litigating this matter,

**EXHIBIT A**

024

I understand that much of the problem in this case has been in getting the client's response as to these matters. Nevertheless, given that deadlines are looming, action must be taken on our part one way or the other.

I look forward to your further instruction and please call me so that we may discuss any options.

Regards,
Don Calvo
CARLSMITH BALL, LLP
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagatna, Guam 96932-5027
Tel: (671) 472-6813
Fax: (671) 477-4375
**********************************************************
CONFIDENTIALITY NOTICE: This message contains confidential and privileged information. If it has been sent to you in error, please reply to inform the sender of the error and then delete this message.
Thank You.
**********************************************************

CC:        SMT

**EXHIBIT A**

025

**From:** Donald Calvo
**To:** Thomason, Terry
**Date:** 5/6/02 3:41PM
**Subject:** Rhino Miller Act Claim

Hi Terry,

It is my understanding that, as of yet, new counsel for Rhino has not been procured in connection with the above referenced case.

Given the nature of the case and the complexities concerning the underlying parties, we were instructed not to file the Complaint since it was anticipated that new counsel for Rhino would be obtained,

Since it has been determined that a business conflict prevents us from litigating this matter,

I understand that much of the problem in this case has been in getting the client's response as to these matters. Nevertheless, given that deadlines are looming, action must be taken on our part one way or the other.

I look forward to your further instruction and please call me so that we may discuss any options.

Regards,
Don Calvo

**EXHIBIT A**

**CARLSMITH BALL, LLP**
**134 West Soledad Avenue**
**Bank of Hawaii Bldg., Suite 401**
**P.O. Box BF**
**Hagatna, Guam 96932-5027**
**Tel: (671) 472-6813**
**Fax: (671) 477-4375**
**************************************************************

**CONFIDENTIALITY NOTICE:** This message contains confidential and privileged information. If it
has been sent to you in error, please reply to inform the sender of the error and then delete this
message. Thank You.
**************************************************************

CC:            Elento-Sneed, Anna;  Gutierrez, Dana;  Tolentino, Sinforoso

**EXHIBIT A**

027

U.S. District Court of Guam
Civil Case No. 02-00008

Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

# EXHIBIT "U"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities

ANTONIO L. CORTÉS
THEODORE S. CHRISTOPHER
Law Office of Antonio L. Cortés
233 Julale Center
424 West O'Brien Drive
P.O. Box BV
Hagåtña, Guam 96932
Telephone No.: (671) 477-1930
Facsimile No.: (671) 477-1933

FILED
DISTRICT COURT OF GUAM
SEP 04 2002
MARY L. M. MORAN
CLERK OF COURT

Attorneys for Plaintiff Rhino Builders, Inc.

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., | ) CIVIL CASE NO. 02-00008 )<br>) **SUBMISSION OF AFFIDAVIT**<br>) **OF AMY G. SELF** |
| Plaintiff, | ) )<br>) |
| BIOGENESIS PACIFIC, INC. and AIG TECHNICAL SERVICES, INC., | ) )<br>) |
| Defendants. | ) |

Plaintiff Rhino Builders, Inc. submits herewith the original of the

Affidavit of Amy G. Self attached as Exhibit E to the Declaration of Ann D. Borja

filed on August 30, 2002.

Respectfully submitted this 3rd day of September 2002.

LAW OFFICE OF ANTONIO L. CORTÉS
Attorneys for Plaintiff Rhino Builders, Inc.

By: _[signature]_
THEODORE S. CHRISTOPHER

RECEIVED

McKEOWN . VERNIER .
PRICE . MAHER
DATE: 9/10/02
TIME: 3:25 pm
BY: _[initials]_

cc: 9/10/02

Exhibit
U

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC. | CIVIL NO. 02-00008 |
| Plaintiff, | AFFIDAVIT OF AMY G. SELF |
| vs. | |
| BIOGENESIS PACIFIC, INC.; AIG TECHNICAL SERVICES, INC., | |
| Defendants. | |

## AFFIDAVIT OF AMY G. SELF

STATE OF HAWAII        )
                             )   SS.
CITY AND COUNTY OF HAWAII  )

AMY G. SELF, being first duly sworn on oath, deposes and says:

1.    All statements made in this affidavit are based on my personal knowledge unless otherwise expressly stated.

2.    I am an attorney with Carlsmith Ball LLP, and I am one of the attorneys who previously assisted RHINO BUILDERS, INC. ("Rhino") in pursuing payment for work performed on Rhino's subcontract with Biogenesis Pacific, Inc.

3.    Pursuant to our assistance to Rhino, on or about October 2001, I called long distance directory assistance to obtain the telephone number for American Home Assurance Company, the company named as Surety on United States Navy Payment Bond No. 20-80-88.

2020166.1.053705-00001

4.     The telephone number given to me by the operator for the American Home Assurance Company listing was (415) 836-2700.

5.     When I dialed the telephone number for American Home Assurance Company, the person answered "American International Companies."

6.     When I explained that I was calling for American Home Assurance Company, the person assured me that American Home Assurance Company was part of American International Companies.

7.     After establishing that I had in fact dialed the correct number, I requested a Miller Act Claim Form and was transferred to American International Companies' legal department.

8.     After being connected to various people, one of whom was an individual by the name of Joe Mauler, I was told that their office in New York, AIG Technical Services, Inc., handled all of the claims against surety bonds for American International Companies and was given the following telephone number: (212) 458-1264.

9.     After dialing the telephone number given to me by American International Companies for its office, AIG Technical Services, Inc., I was again connected to various people in response to my request for a Miller Act Claim form.

10.     Finally, I was connected to Mark Titherington, a claims analyst for AIG Technical Services, Inc., who indicated that he was the person who would handle a claim against the surety for Biogenesis Pacific, Inc.

11.     Mr. Titherington informed me that before he would send us a Miller Act Proof of Claim form, we would first have to send a Notice of Nonpayment to all parties.

2020166.1.053705-00001

12.     Pursuant to the Miller Act 40 U.S.C. Section 270(a) to 270(e) and Mr. Titherington's instructions, cn or about October 22, 2001, we sent a Notice of Claim On Bond (naming American Home Assurance Company as the bonding company) to Mr. Titherington, BioGenesis Pacific, Inc., and Bennett Terlaje, the U.S. Navy Contracting Officer, via certified mail, return receipt requested.

13.     Prior to sending the Notice of Claim On Bond to Mr. Titherington, I prepared a letter for Terry E. Thomason's signature, addressed to Mark Titherington at American Home Assurance Company, 175 Water Street, 6th Floor, New York, New York 10038, to which we attached the Notice of Claim On Bond.

14.     A true and correct copy of the letter to Mark Titherington, with the attached Notice of Claim On Bond and Certified Mail Receipt, is attached hereto and incorporated herein as Exhibit 1.

15.     On or about November 6, 2001, we received a Proof of Claim form from Mr. Titherington, attached to a letter from Mr. Titherington.

16.     On or about January 9, 2002, we sent the completed Proof of Claim form, executed by Michael O'Connell, President of Rhino Builders, Inc., to Mr. Titherington via certified mail, return receipt requested.

17.     On or about the last week of February, 2002, we received notice from Mr. Titherington that Rhino Builders, Inc.'s Miller Act Claim had been denied by AIG Technical Services, Inc.

18.     On or about March 20, 2002, we filed a Complaint against BioGenesis and AIG Technical Services, Inc. in the United States District Court, District of Guam.

2020166.1.053705-00001

19.     Throughout the foregoing process, Mr. Titherington and everyone I spoke to at American International Companies and AIG Technical Service, Inc. led me to believe that American Home Assurance Company and AIG Technical Services were all part of the same corporation, American International Companies.

20.     On or about August 23, 2002, I called the original number I was given for American Home Assurance Company and again, the person who answered verified that American Home Assurance and AIG Technical Service, Inc. are owned by American International Companies.

FURTHER AFFIANT SAYETH NAUGHT.

_____
AMY G. SELF

Subscribed and sworn to before me this
_28th_ day of _August_, 2002.

_____
Natalie X. Pacheco
Notary Public, State of Hawaii
My Commission expires: _1-24-06_

2020166.1.053705-00001

# CARLSMITH BALL LLP

A LIMITED LIABILITY LAW PARTNERSHIP

PACIFIC TOWER, SUITE 2200
1001 BISHOP STREET
HONOLULU, HAWAII 96813
TELEPHONE (808) 523-2500    FAX (808) 523-0842
WWW.CARLSMITH.COM

DIRECT DIAL NO.                E-MAIL  TET@CARLSMITH.COM                OUR REFERENCE NO.
(808) 523-2527                                                         053705-00001

October 22, 2001

**BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Mark Titherington
American Home Assurance Company
175 Water Street, 6th Floor
New York, New York 10038

> Re:    Ref. Bond No. 20-80-88 - BioGenesis Pacific, Inc., Prime Contractor on
> Contract No. N62766-99-D-0425

Dear Mr. Titherington:

On behalf of our client, Rhino Builders, Inc., we are forwarding this enclosed matter for your consideration and action.

Enclosed with this letter is a Miller Act Notice which this firm caused to be sent to your attention, whereby Rhino Builders, Inc. gives notice it intends to enforce its rights under the Miller Act. Contrary to your understanding, BioGenesis Pacific, Inc. is the prime contractor on Contract No. N62766-99-D-0425, and Rhino Builders, Inc. provided all labor and materials supporting its claim pursuant to an oral subcontract between Rhino Builders Inc. and BioGenesis Pacific, Inc.

As the attorneys for Rhino Builders, Inc., we hereby request that American Home Assurance Company provide us a copy of its Miller Act Proof of Claim form, and forward any and all future communications to my attention at the above address.

# EXHIBIT 1

HONOLULU  ·  KAPOLEI  ·  HILO  ·  KONA  ·  MAUI  ·  GUAM  ·  SAIPAN  ·  LOS ANGELES  ·  WASHINGTON, D.C.  ·  MEXICO

Your immediate attention to this matter is appreciated.

Very truly yours,
Carlsmith Ball L.L.P.

Terry E. Thomason

Enclosures

cc:    Rhino Builders, Inc.

# NOTICE OF CLAIM ON BOND
## (Miller Act 40 U.S.C. Section 270(a) to 270(e))

Public Agency:      Officer in Charge of Construction
Ms. Bennett Terlaje, Contracting Officer
NAVFACENGCOM Contracts Marianas
PSC455, Box 175
FPO AP 96540-2200

Bonding Company:      American Home Assurance Company
121 Spear Street
San Francisco, California 94105

Prime Contractor:      BioGenesis Pacific, Inc.
1604 Ulualana Place
Kailua, Hawaii 96734

NOTICE IS HEREBY GIVEN, that Rhino Builders, Inc., the undersigned subcontractor to BioGenesis Pacific, Inc. and Claimant, has not been paid in full and is looking to the Prime Contractor for payment of the following claim. This notice is intended as written notice pursuant to 40 U.S.C. Section 270.

Claimant, whose address is: 87-1610 Ulehawa Road, Waianae, Hawaii 96792, has a claim in the amount of $245,664.43 (not including service charges or interest as allowed by law and at the maximum legal charges or interest as allowed by law and at the maximum legal rate) for labor performed and materials provided for the public work of improvement commonly known as Navy Housing Roofing, Various Locations; Contract No. N62766-99-D-0425, upon which BioGenesis Pacific, Inc. is the Prime Contractor.

WE ARE LOOKING TO THE PRIME CONTRACTOR FOR PAYMENT OF THESE DEBTS.

    1.     The total amount of the claim is $245,664.43.

    2.     The name of the party for whom the labor and materials were provided is: BioGenesis Pacific, Inc.

    3.     Rhino Builders, Inc. provided such labor and materials directly to BioGenesis Pacific, Inc. pursuant to an oral subcontract between Rhino Builders, Inc. and BioGenesis Pacific, Inc.

    In support of its claim, Claimant submits the following documents:

    1.     Claimant's initial invoice, which includes a breakdown of reimbursable costs and profit share (Exhibit 1);

2.    Claimant's final invoice in the amount of $245,664.43 for BioGenesis Pacific, Inc.'s unpaid billings on all work Claimant performed on Contract No. N62766-99-D-0425 with attached mail receipts reflecting BioGenesis Pacific, Inc.'s refusal to accept business mail sent by Rhino Builders, Inc. (Exhibit 2);

3.    A copy of Rhino Builders, Inc.'s Assertion of Nonpayment under FAR 32.112-1 to Ms. Bennett Terlaje, Contracting Officer (Exhibit 3); and

4.    A copy Payment Bond No. 20-80-88 sent to Claimant from Ms. Bennett Terlaje, Contracting Officer in charge of construction for Contract No. N62766-99-D-0425 (Exhibit 4).

To the unpaid balance of $245,664.43 (plus penalties and interest), if not paid, Claimant shall also seek attorneys fees and interest at the maximum legal rate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20 day of October, 2001.

Michael O'Connell
Rhino Builders, Inc.

"Claimant"

1433756.1

SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly) | B. Date of Delivery
RECEIVED

C. Signature
X                                          ☐ Agent
                                           ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

1. Article Addressed to:

Mark Titherington
American Home Assurance Co
175 Water Street, 6th Floor
New York, New York  10038

3. Service Type
   ☒ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)

PS Form                                    102595-01-M-1424

---

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

AGS/TBT (053705-00001) 10

| | |
|---|---|
| Postage | $ 241 |
| Certified Fee | 210 |
| Return Receipt Fee (Endorsement Required) | 150 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 601 |

Recipient's Name (Please Print Clearly) (To be completed by mailer)
Mark Titherington

Street, Apt. No.; or PO Box No.
175 Water Street, 6th Floor

City, State, ZIP+4
New York, New York  10038

7000 0520 0001 3714 1184

PS Form 3800, February 2000                See Reverse for Instructions

U.S. District Court of Guam
Civil Case No. 02-00008

Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

# EXHIBIT "V"

V

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities



**Dipåttamenton Kontribusion yan Adu'ånå**
**DEPARTMENT OF**
# REVENUE AND TAXATION
**GOVERNMENT OF GUAM** **Gubetnamenton Guåhan**

FELIX P. CAMACHO, Governor  Maga'låhi
KALEO S. MOYLAN, Lt. Governor  Tiñente Gubetnadot

ARTEMIO B. ILAGAN,  Director
Direktot
JOSE R. GUEVARA, JR., Deputy Director

# CERTIFICATION

This is to certify that **AMERICAN HOME ASSURANCE COMPANY**, a New York Corporation was duly registered/admitted, **March 5, 1959** to transact business on Guam, **Registration No.: F-115**.

Said Foreign Corporation has not been withdrawn.

*Artemio B. Ilagan*
**ARTEMIO B. ILAGAN**
Director

By
**RAMONA D. SANTOS**, Supervisor
General Licensing & Registration Branch

DATE: **2 8 OCT 2003**



Exhibit

V

Post Office Box 23607, Guam Main Facility, Guam 96921 • Tel. / Telifon: (671) 475-1801/1785-89 • Fax / Faks: (671) 472-2643

U.S. District Court of Guam
Civil Case No. 02-00008

Rhino Builders, Inc. v. Biogenesis Pacific, Inc. et al.

# EXHIBIT "W"

Defendants AIG Technical Services, Inc. and
American Home Assurance Company's Motion to
Compel Responses to Second Request for
Production of Documents and for Disclosure of
Certain Privileged Information; Memorandum of
Points and Authorities

**Dipåttamenton Kontribusion yan Adu'ånå**

**DEPARTMENT OF**

# REVENUE AND TAXATION

**GOVERNMENT OF GUAM**    **Gubetnamenton Guåhan**

FELIX P. CAMACHO, Governor  Maga'låhi
KALEO S. MOYLAN, Lt. Governor  Tiñente Gubetnadot

ARTEMIO B. ILAGAN,  Director
Direktot

# C E R T I F I C A T I O N

I, **RAMONA D. SANTOS,** Supervisor of the General Licensing and Registration Branch, whose duties and responsibilities include: the registration of all Corporations both Domestic and Foreign and all other legal entities acting as a unit; the issuance of Business Licenses; and registration of tradenames, do hereby certify that this office has **NO RECORD** either past, present or pending on

**"AIG TECHNICAL SERVICES, INC."**

*Artemio B. Ilagan*
**ARTEMIO B. ILAGAN**
Director

By: **RAMONA D. SANTOS**, Supervisor
General Licensing & Registration Branch

**DATE**: 2 8 OCT 2003



Exhibit

**W**

Post Office Box 23607, Guam Main Facility, Guam 96921 • Tel. / Telifon: (671) 475-1801/1785-89 • Fax / Faks: (671) 472-2643