James H. Lawhn
OLIVER LAU LAWHN OGAWA & NAKAMURA
707 Richard Street, Suite 600
Honolulu, Hawaii 96813
Telephone No.: (808) 533-3999
Facsimile No.: (808) 533-0144

Stephen D. Tom
WHITE & TOM
820 Mililani Street, Suite 711
Honolulu, Hawaii 96813-2972
Telephone No.: 808 547 5151
Facsimile No.: 808 599 4517

Louie J. Yanza
VERNIER & MAHER, LLP
115 Hesler Place, Ground Floor
Governor Joseph Flores Building
Hagåtña, Guam 96910
Telephone No.: (671) 477-7059
Facsimile No.: (671) 472-5487



FILED
DISTRICT COURT OF GUAM
DEC 05 2003
MARY L. M. MORAN
CLERK OF COURT

**Attorney for Defendants AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY**

### UNITED STATES DISTRICT COURT

### DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC. and AMERICAN HOME ASSURANCE COMPANY, <br><br> Defendants. | ) CIVIL CASE NO. 02-00008 <br> ) <br> ) <br> ) <br> ) **DEFENDANTS AIG TECHNICAL** <br> ) **SERVICES, INC. AND AMERICAN HOME** <br> ) **ASSURANCE COMPANY'S MOTION** <br> ) **FOR DISMISSAL OF PLAINTIFF'S BAD** <br> ) **FAITH CAUSE OF ACTION FOR** <br> ) **FAILURE TO STATE A CLAIM; OR, IN** <br> ) **THE ALTERNTAIVE, FOR SUMMARY** <br> ) **JUDGMENT** <br> ) <br> ) **[ORAL ARGUMENT REQUESTED]** <br> ) <br> ) |

# ORIGINAL

BIOGENESIS PACIFIC, INC., )
)
              Counterclaimant, )
        vs. )
)
RHINO BUILDERS, INC., MICHAEL )
O'CONNELL, MICHAEL DANFORTH, )
AND JOHN DOES 1-10, )
)
            Counter-Defendant. )
AMERICAN HOME ASSURANCE )
COMPANY )
)
            Cross-Claimant, )
        vs. )
)
BIOGENESIS PACIFIC, INC. )
)
            Cross-Claim Defendant. )
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## <u>NOTICE OF HEARING MOTION</u>

TO:      JANALYNN M. CRUZ, ESQ.
           Calvo & Clark, LLP
           First Savings & Loan Bldg.
           655 South Marine Drive, Ste. 202
           Tamuning, Guam 96913

CATHERINE M. BEJERANA, ESQ.
Berman O'Connor Mann & Shklov
Bank of Guam Bldg.
111 Chalan Santo Papa, Ste. 503
Hagåtña, Guam 96910

ANTONIO L. CORTES, ESQ.
Attorney at Law
233 Julale Center
424 West O'Brien Drive
Post Office Box BV
Hagåtña, Guam 96932

FREDERICK J. KERLEY, ESQ.
Reflection Center Building
222 Chalan Santo Papa, Ste. 202
Hagåtña, Guam 96910

NOTICE IS HEREBY GIVEN that Motion of AIG Technical Services, Inc. and

American Home Assurance Company for Dismissal of Plaintiff's Bad Faith Cause of Action

for Failure to State a Claim; or in the Alternative, for Summary Judgment shall come on for

hearing before the Honorable <u>John S. Unpingco</u>, Judge of the

above-entitled Court, in his or her courtroom in the United States Courthouse located at

<u>520 West Soledad Ave., Hagatna, GU  96910</u>, on <u>January 9, 2004</u>,

~~2003~~, at <u>10:00</u> a .m., or as soon thereafter as counsel may be heard.

DATED:  Honolulu, Hawaii, November 21, 2003.

Of Counsel:
OLIVER, LAU, LAWHN,
    OGAWA & NAKAMURA

JAMES H. LAWHN
Attorney for Defendants
AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY

3

# UNITED STATES DISTRICT COURT

## DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC. and AMERICAN HOME ASSURANCE COMPANY, <br><br> Defendants. <br>———————————————— <br> BIOGENESIS PACIFIC, INC., <br><br> Counterclaimant, <br><br> vs. <br><br> RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, AND JOHN DOES 1-10, <br><br> Counter-Defendant. <br>———————————————— <br> AMERICAN HOME ASSURANCE COMPANY, <br><br> Cross-Claimant, <br><br> vs. <br><br> BIOGENESIS PACIFIC, INC., <br><br> Cross-Claim Defendant. <br>———————————————— | CIVIL CASE NO. 02-00008 <br><br> **MOTION OF AIG TECHNICAL SERVICES, INC. AND AMERICAN HOME ASSURANCE COMPANY FOR DISMISSAL OF PLAINTIFF'S BAD FAITH TORT CAUSE OF ACTION FOR FAILURE TO STATE A CLAIM; OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT** |

3852-10

## MOTION OF AIG TECHNICAL SERVICES, INC. AND AMERICAN HOME ASSURANCE COMPANY FOR DISMISSAL OF PLAINTIFF'S BAD FAITH TORT CAUSE OF ACTION FOR FAILURE TO STATE A CLAIM; OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

AIG Technical Services Inc. ("AIGTS") and American Home Assurance Company ("AHAC") move as follows:

A.     For partial dismissal of Plaintiff's Second Amended Complaint under FRCP Rule 12(b) for failure to state a claim upon which relief may be granted with respect to Plaintiff's allegations of a bad faith tort cause of action against AIGTS/AHAC; or in the alternative;

B.     For partial summary judgment upon Plaintiff's Second Amended Complaint pursuant to FRCP Rule 56(b) with respect to Plaintiff's allegations of a bad faith tort cause of action against AIGTS/AHAC.

This motion addresses the issues of (i) whether or not Guam will extend tort liability to a breach of the implied covenant of good faith and fair dealing in an action arising out of a Miller Act payment bond; and (ii) if so, whether the conduct of AIGTS and/or AHAC met the requisite standard of care as a matter of law.

DATED:  Honolulu, Hawaii, November 21, 2003.

Of Counsel:
OLIVER, LAU, LAWHN,
   OGAWA & NAKAMURA

JAMES H. LAWHN
Attorney for Defendants
AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY

2

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    iii

I.    THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

II.   FACTS RELATING TO PLAINTIFF'S SUBMISSION OF ITS
      MILLER ACT CLAIM, AND DENIAL OF THE CLAIM  . . . . . . . . . . . .    2

III.  GUAM WILL NOT RECOGNIZE A TORT CAUSE OF
      ACTION FOR BAD FAITH ARISING OUT OF A MILLER ACT
      PAYMENT BOND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

      1.   Guam's Insurance Code And Relevant Decisions,
           Distinguish Between Insurance Policies and Surety
           Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

      2.   The Findings And Conclusions Of The Texas And
           California Supreme Courts Are Consistent With The
           Structure Of Guam's Insurance Code And The
           Ninth Circuit Markowitz Decision . . . . . . . . . . . . . . . . . . . . . . .    8

      3.   Decision From Other Jurisdictions Allowing Tort
           Recovery Are Predicated Upon Legislation Either
           Non-Existent In Guam Or Differing In Material
           Respect From Guam's Insurance Code  . . . . . . . . . . . . . . . . .    15

      4.   Public Policy Does Not Require That Tort Liability Be
           Extended To Miller Act Payment Bonds  . . . . . . . . . . . . . . . . .    18

      5.   To Require A Surety To Honor A Claim  Where There Is
           A Genuine Issue Of Material Fact, Denies The Surety
           The Right Of Trial Granted By Congress Under The
           Miller Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

      6.   Even If Guam Recognizes A Tort Bad Faith Cause Of
           Action On A Miller Act Payment Bond, The Conduct
           Of AIGTS/AHAC Met The Standard Of Care As A
           Matter Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

           A.   AIGTS/AHAC Had The Right To Deny The Claim
                Under Any Applicable Standard . . . . . . . . . . . . . . . . . . .    24

i

B.    The Specific Allegations Of Bad Faith Are Not
Supported By Fact Or Law . . . . . . . . . . . . . . . . . . . . . . .   27

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

## TABLE OF AUTHORITIES

CASES                                                                    Page

Brinderson et.al. v. Pacific Erectors, Inc. et.al.,
    971 F.2d 272, 283 (9th.Cir 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

Cates Const. v. Talbot Partners et.al.,
    980 P.2d 407, 418-419, 421, 423-424, 427 (Cal. 1999) . . . . . . . .    11, 12, 13,
                                                      14, 15, 16,
                                                     18, 20, 22,
                                                     25

Dodge v. F&D of Maryland,
    778 P.2d 1240, 1242 (Ariz. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . .    16, 18

Ehmcke Sheet Metal Works v. Wausau Ins. Co.,
    755 F.Supp. 906, 911, 912-913 (N.D. Cal. 1991) . . . . . . . . . . . . .    18, 22

Ellwein v. Hartford Accident & Indem. Co.,
    15 P.3d. 640 (Wash. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

Fraley v. Allstate Ins. Co.,
    97 Cal.Rptr. 2d 386 (Ct.App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . .    25

General Ins. Co. of America v. Mammoth Vista Owners Assoc.,
    174 Cal. App.3d 810 (Cal.App. 1985) . . . . . . . . . . . . . . . . . . . . . . .    15, 16

Great American Ins. Co. v. North Austin Mun. Utility Dist.,
    908 S.W.2d 415, 419-420 (Tex. 1995) . . . . . . . . . . . . . . . . . . . . . .    7, 8, 9, 10,
                                                      15, 20

Guebara v. Allstate Ins. Co.,
    237 F.3d 987, 992 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

Hoye v. Westfield Ins. Co.,
    487 N.W.2d 838 (Mich.App. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . .    28

KW Industries v. Nat'l Surety Corp.,
    754 P.2d 502, 505 (Mont. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . .    15, 16

K-W Industries v. National Surety Corp.,
    855 F.2d 640 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

CASES (cont.)                                                    Page

Lee v. Aiu,
    936 P.2d 655 (Haw. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32

Nat'l Sav. Life Ins. Co.,
    419 So.2d 1357 (Ala. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

Odom v. Lee,
    999 P.2d 755 (Alaska 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32

Pearlman v. Reliance Ins. Co.,
    371 U.S. 132, 140 n. 19 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

Reliance Ins. Co. v. Barile Excavating & Pipeline,
    685 F.Supp. 839, 840 (DCND Fla. 1988) . . . . . . . . . . . . . . . . . . . .    25

Roberto v. Aguon,
    519 F.2d 754, 755 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . .    7

Sessions v. Whitcomb,
    329 S.W.2d 470 (Tex.App. 1959) . . . . . . . . . . . . . . . . . . . . . . . . .    28

State Athletic Commission of California v. Massachusetts Bonding
 & Insurance Co.,
    46 Cal.App.2d 823, 829 (Cal. Ct. App. 1941) . . . . . . . . . . . . . . .    7

Szarkowski v Reliance Insurance Company,
    404 N.W.2d 502, 505 (ND 1987) . . . . . . . . . . . . . . . . . . . . . . . . . .    15, 16

Transamerica Premier Ins. Co. v. Brighton School Dist.,
    940 P.2d 348, 352 (Col. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

Trust Corporation of Montana v. Piper Aircraft Corp.,
    701 F.2d 85 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

US ex rel. Ehmcke Sheet Metal v. Wausau Ind. Co.,
    755 F.Supp. 906, 911-913 (E.D. Cal. 1991) . . . . . . . . . . . . . . . .    14, 19, 20

US ex.rel. Seaboard Surety v. Joseph Morton Company,
    817 F.2d 956 (2nd.Cir 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

USA f/b/o Celanese Coatings Co. v. Gullard,
    504 F.2d 466,468, fn. 48 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . .    24

<u>CASES</u> (cont.)                                                                  <u>Page</u>


<u>USA f/b/o Getz v. Markowitz et.al.</u>,
        383 F.2d 595 (9th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7, 11, 17

<u>USA f/b/o Siegal Const. Co. v. Atul Const. Co.</u>,
        85 F.Supp.2d 414 (D.C.N.J. 2000)  . . . . . . . . . . . . . . . . . . . . . . . .    18, 19



        <u>STATUTES AND RULES</u>


Administrative Rules & Regulations of the Government of Guam
        Rule 12, §1110 (Vol 3, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

Federal Acquisition Regulations
        §32.112-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

Federal Rules of Civil Procedure
        Rule 9(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33
        Rule 11   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24
        Rule 54(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33
        Rule 56  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

18 Guam Code Annotated
        §31101-32401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6, 9, 12

20 Guam Code Annotated
        §2120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

28 Guam Code Annotated
        §18308 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

TREATISES                                                      Page

Restatement (Second) of Torts
    §773 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32

47 Me.L.Rev. (1995) The Surety's Liability for "Bad Faith":
Claims For Extra-Contractual Damages By An Obligee Under
The Payment Bond
    §389 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

Volume XXVII, Number 3 Tort & Ins. Law Journal (1992)
    §665-677 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

**MEMORANDUM IN SUPPORT OF MOTION OF AIG TECHNICAL SERVICES, INC. AND AMERICAN HOME ASSURANCE COMPANY FOR DISMISSAL OF PLAINTIFF'S BAD FAITH TORT CAUSE OF ACTION FOR FAILURE TO STATE A CLAIM; OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

In this action, Plaintiff seeks recovery upon a Miller Act payment bond based upon an alleged oral subcontract between Plaintiff and Defendant Biogenesis Pacific Inc. ("Biogenesis"); the terms and conditions of which are not evidenced by any contemporaneous writing signed by Biogenesis; the exact nature of which is hotly contested by Biogenesis; and with respect to which there is a genuine issue of material fact regarding whether or not Plaintiff has properly invoked the jurisdiction of this Court by filing its Miller Act suit within the one year jurisdictional limit of the Miller Act.

Defendant AIGTS/AHAC denied Plaintiff's Miller Act claim, and Plaintiff filed suit upon the Miller Act payment bond seeking recovery under the Miller Act for labor and materials, and also seeking compensatory and punitive damages based upon the alleged tortious breach of the implied covenant of good faith and fair dealing by AIGTS/AHAC.

The issue in this motion is whether or not Guam will extend tort liability to alleged breaches of the implied covenant of good faith and fair dealing in cases involving Miller Act payment bonds. And, if so, what is the standard of care to be imposed upon the surety in such cases, and did the surety in this case meet that standard as a matter of law.

I.     **THE PARTIES**

Plaintiff alleges that it is a subcontractor to Biogenesis with respect to a prime contract between Biogenesis and the United States for work to be performed under Navy Contract No. 62766-99-D-0425 (Navy Housing Various Locations On Guam) (the "Prime Contract").

1

Defendant Biogenesis is the prime contractor under the Prime Contract as described above and is the Principal under the Miller Act bond at issue in this case.

AHAC is a commercial surety which, jointly with Biogenesis, issued the Miller Act payment bond for the Prime Contract.

AIGTS is a technical services subsidiary of AIG (the parent company of AHAC) which investigates and administers claims arising out of bonds issued by AHAC. AIGTS is not a surety or insurer and does not issue bonds or insurance policies.

## II.    FACTS RELATING TO PLAINTIFF'S SUBMISSION OF ITS MILLER ACT CLAIM, AND DENIAL OF THE CLAIM

Set forth below in chronological order are what AIGTS/AHAC believe to be the undisputed facts regarding the submission and denial of Plaintiff's Miller Act claim.

| Date | Event | Exhibit |
|------|-------|---------|
| 10-18-01 | Plaintiff's counsel (Ms. Self of Carlsmith-Hawaii) had a telephone conversation with AIGTS' Mr. Titherington asking for a Miller Act Claim form. She was advised by Mr. Titherington to send a notice of nonpayment to him at his office. | Kahn Dec., EX. A, P. 1 |
| 10-22-01 | Plaintiff's counsel (Mr. Thomason of Carlsmith-Hawaii) sent a letter dated 10-22-01 to AHAC's San Francisco underwriting office, transmitting a document entitled "Notice Of Claim On Bond" and requesting a Miller Act Proof of Claim form. | Kahn Dec., EX. B |
| 10-26-01 | The 10-22-01 letter of Plaintiff's counsel was forwarded from AHAC's San Francisco underwriting office to Mr. Titherington at AIGTS in New York. | Kahn Dec., EX. C |
| 10-30-01 | Mr. Titherington of AIGTS responded to Plaintiff's counsel by letter of 10-30-01 acknowledging receipt of the claim and transmitting a Proof of Claim form. | Kahn Dec., EX. D |

2

| 10-30-01 | Mr. Titherington of AIGTS notified its Principal [Biogenesis] of Plaintiff's claim; transmitted a copy of the claim to Biogenesis; and asked for Biogenesis' response within 10 days. | Kahn Dec., EX. E |
|---|---|---|
| 10-30-01 | Mr. Titherington of AIGTS received a telephone call from Mr. Lam, President of Biogenesis, in which Mr. Lam advised Mr. Titherington that he had sent Mr. Titherington a response to Plaintiff's claim and that the claim is refuted. | Kahn Dec., EX. A, P. 1 |
| 11-02-01 | Mr. Titherington of AIGTS received a 5 page letter dated 10-25-01 from Mr. Lam of Biogenesis stating that at best Plaintiff had only an informal oral contract which never matured and enclosing copies of letters from Mr. Lam to Plaintiff dated 1-02-01 and 9-08-01 citing numerous reasons why Plaintiff is not entitled to any money from Biogenesis. | Kahn Dec., EX. A, P. 2; EX. F; EX. G |
| 11-05-01 | Mr. Titherington of AIGTS received a telephone call from Plaintiff's counsel (Ms. Self) asking when the Proof of Claim form would be sent, and Mr. Titherington advised her that he had mailed it on 10-30-01. | Kahn Dec., EX. A, P. 3 |
| 01-01-02 | Responsibility for administering the claim at AIGTS was transferred from Mr. Titherington to Mr. Kahn. | Kahn Dec., Par. 6 |
| 01-15-02 | AIGTS received a letter dated 1-09-02 from Plaintiff's counsel (Mr. Thomason) transmitting the Proof Of Claim form and disagreeing with the position taken by Biogenesis in its letters of 1-02-01 and 12-22-01. The Proof Of Claim affirmatively states that Plaintiff furnished the labor and materials "between the dates of May 2000 and December 2000". | Kahn Dec., EX. J |
| 01-17-02 | AIGTS' Mr. Kahn acknowledged receipt of Plaintiff's Proof of Claim and advised Plaintiff's counsel (Mr. Thomason) that the matter is being taken up with [Biogenesis] to ascertain their position with respect to the claim. | Kahn Dec., EX. K |

3

| | | |
|---|---|---|
| 02-21-02 | AIGTS' Mr. Kahn wrote Plaintiff's counsel advising that the Proof Of Claim states that the labor and materials were last furnished in December 2000 and that therefore the claim was denied due to a failure to file suit within the one year limit prescribed by the Miller Act which would have expired December 31, 2001 based upon the data contained in Plaintiff's Proof Of Claim. | Kahn Dec., EX. M |
| 03-19-02 | AIGTS received a letter dated 3-12-02 from Plaintiff's counsel (Mr. Thomason) asking that the 02-21-02 denial be re-examined based on claims by Plaintiff that: | Kahn Dec., EX. N |

(i) it leased a truck to Biogenesis which was available for use on the project until -03-20-01;

(ii) it supplied another truck to Biogenesis which was available for use on the project until 01-17-02; and

(iii) Biogenesis has continued to use Plaintiff's safety equipment and various other types of equipment.

| | | |
|---|---|---|
| Unknown | Thomason's 3-12-02 letter was referred to counsel (Mr. Tom) for investigation | Kahn Dec., Par. 18 |
| 05-14-02 | AIGTS received a report from its counsel, (Mr. Tom) relating the substance of an interview of Mr. Lam of Biogenesis, and enclosing a copy of a memo prepared by Mr. Lam of Biogenesis refuting the claims made in the 03-12-02 letter from Plaintiff's counsel. In the interview with Mr. Tom and in his memo, Mr. Lam (i) denies that Biogenesis ever used any of Plaintiff's equipment without payment; (ii) denies that the flatbed truck was provided or supplied for use on the Prime Contract, but instead claims that the invoice relates to rental for a test run of the vehicle prior to making a decision on whether to purchase it; and (iii) claims that the Reliable Towing Services invoice had nothing to do with the Prime Contract, and that instead it represented towing charges incurred to remove a pick up from the back yard of a former employee named Aaron Williams. Mr. Lam's memo also questioned the conclusions and arguments of Plaintiff's counsel; specifically denied the existence of any subcontract; and reiterated various reasons why Biogenesis contends that Plaintiff is entitled to no payment. | Kahn Dec., EX. O |

4

| 06/21/02 | AIGTS' Mr. Kahn advised Plaintiff's counsel that it had reviewed the 03-12-02 letter and its enclosures and continued to believe that the claim was time barred under the Miller Act, and accordingly the AIGTS maintained its position denying the claim. | Kahn Dec., EX. P |
| | At no time did anyone on behalf of AIGTS or AHAC ever object to Carlsmith's representation of Rhino in this matter, or ever ask anyone to make an inquiry of Carslmith on the matter. | Kahn Dec., Par. 21 |
| | At no time prior to filing the Complaint on March 20, 2001 did anyone from Carlsmith or Rhino ever ask for clarification as to the identity of the surety, nor at anytime did anyone on behalf of AIGTS or AHAC ever tell anyone from Carlsmith or Rhino that the surety was AIGTS and not AHAC. Prior to March 20, 2001 AIGTS told Carlsmith three times in writing that the surety was AHAC. | Kahn Dec., Par. 22 |

## III.  GUAM WILL NOT RECOGNIZE A TORT CAUSE OF ACTION FOR BAD FAITH ARISING OUT OF A MILLER ACT PAYMENT BOND

This is a case of first impression involving interpretation of Guam law. In the Ninth Circuit, the question of whether or not a bad faith tort cause of action exists on a Miller Act surety bond is an issue of state [territorial] law, K-W Industries v. National Surety Corp. 855 F.2d 640 (9th Cir. 1988).

With limited exception, the jurisdictions which have adopted a bad faith cause of action in cases involving surety bonds have done so based in large part upon legislation regulating insurance companies and sureties which is either non-existent in Guam or is inconsistent with Guam. On the other hand, the jurisdictions declining to extend the tort of bad faith to surety bonds have legislation regulating insurance companies and sureties which is substantially similar to Guam, or identical in some respects. As will be shown by a review of the decisions, there is no basis in Guam's insurance code to infer a legislative intent that sureties be subjected to the same type of tort liability as insurers, nor do the

5

policy concerns applicable to the insurer-insured relationship compel extension of tort liability in the context of a Miller Act payment bond.

### 1. Guam's Insurance Code And Relevant Decisions, Distinguish Between Insurance Policies and Surety Contracts

Although Guam's insurance code defines "Fidelity and Surety Insurance", it is clear that Guam's legislature has drawn a distinction between "insurers" and "sureties".

For example, Guam has not enacted any version of the Uniform Unfair Settlement Practices Act under which sureties are classified as "insurers" within the meaning of the act. In addition, Guam requires "insurers" to file copies of their policies and obtain administrative approval before issuing them [28 GCA Sec. 18308]. This requirement affords a measure of protection to insureds from unfair policy provisions which might occur through unequal bargaining power. Sureties are, however, expressly excluded from this requirement [See 12 G.A.R. Sec. 1110 (Vol 3, 1997)]. This is reflective of a recognition that suretyship differs significantly from insurance, and that the parties to a contract of suretyship, do not require the same protection as Insureds under a policy of insurance.

In further recognition of the differences between the suretyship relationship and the relationship between an insurer and its insured, Guam has enacted legislation setting forth certain rights of a surety, the most significant of which for purpose of a bad faith analysis is 18 GCA 32302 under which Guam's legislature, like Texas and California, has made a policy decision that:

"A surety may require his creditor to proceed against the principal."

6

Guam adopted this statute from California, and California decisions interpreting this statute say that it was intended to grant relief from the common law doctrine which permitted the creditor to proceed directly against the surety without reference to the principal.[1] _State Athletic Commission of California v. Massachusetts Bonding & Insurance Co._, 46 Cal.App.2d 823, 829 (Cal. Ct. App. 1941). Extension of the tort of bad faith to sureties is inconsistent with this statutory right [See discussion in Great American Ins. Co. v. North Austin Mun. Utility Dist. 908 S.W.2d 415 (Tex. 1995), infra.].

In addition, the Ninth Circuit has held that a contract of suretyship is not a "policy", nor is a surety an "insurer" for purposes of Guam's insurance code, USA f/b/o Getz v. Markowitz et.al. 383 F.2d 595 (9th Cir. 1967). Markowitz quoted from Pearlman v. Reliance Ins. Co. 371 U.S. 132 (1962) "the usual view, grounded in commercial practice, that suretyship is not insurance", Id @ 140 n.19.

Thus, although "Fidelity and Surety Insurance" is included within Guam's insurance code for certain regulatory purposes, it is clear that Guam's legislature and the Ninth Circuit acknowledge that the relationship between an insurer and its insured differs from that between a surety, its principal and its obligee, and accordingly a surety is exempted from obligations otherwise imposed upon an "insurer" and is granted rights not otherwise granted to an "insurer". The distinctions between sureties and insurers in Guam's insurance code, and the absence of any version of any Uniform Unfair Settlement Practices Act under which sureties are classified as "insurers" with respect to resolution of

---

[1] The construction placed upon the borrowed statute by the courts of the original jurisdiction is adopted along with the statute and treated as incorporated into it. _Roberto v. Aguon_, 519 F.2d 754, 755 (9th Cir. 1975) (prior cases controlling, subsequent cases persuasive).

7

claims on bonds, leads to the inevitable conclusion that although Fidelity & Surety Insurance is regulated for some purposes under Guam's insurance code, surety bonds are not "insurance" for all purposes under Guam law. Thus the syllogistic logic that "sureties are insurers, insurers are subject to tort liability, therefore sureties are subject to tort liability" applied by the majority of jurisdictions extending tort liability to sureties does not apply with respect to Guam because the underlying premise that "sureties are insurers" is incorrect so far as Guam's statutory regulation of sureties is concerned. To the contrary, the decisions from those jurisdictions finding that "sureties are not insurers" for all purposes and declining to extend the tort of bad faith to surety bonds are more analogous to Guam's regulation of surety bonds.

2.    **The Findings And Conclusions Of The Texas And California Supreme Courts Are Consistent With The Structure Of Guam's Insurance Code And The Ninth Circuit Markowitz Decision**

In  Great American Ins. Co., 908 S.W.2d 415, Texas declined to extend the tort of bad faith to surety bonds. The Great American court examined the factors relied upon by Texas courts to extend tort liability to insurers and found that none of these factors exist in the suretyship relationship. There was no unequal bargaining power because the surety had no control over the form of the bond because the case [like the instant case] involved a public works project and the form of the bond was prescribed by law and approved by the Attorney General. Concerns over the potential for abuse of the claims resolution process ignored the fundamental differences between a liability insurance contract and a surety bond. While a liability insurance contract involves only two parties, the insurer and the insured, suretyship involves a tripartite relationship between a surety, its principal, and the bond obligee, in which the obligation of the surety is intended to

8

supplement an obligation of the principal owed to the bond obligee. [citation omitted] Unlike a liability insurance contract, in which the obligation of the insurer to the insured is the primary obligation of indemnity to the insured for loss, the obligation of a surety to a bond obligee is secondary to the obligation owed by its principal. A party sustaining a loss covered under a liability insurance contract can look only to its insurer for recourse. A bond obligee has a remedy against its principal.

In addition, the Great American court noted "[a]nother significant difference between sureties and an insurer is that sureties traditionally are entitled to rely upon all defenses available to their principal as to the debt owed to the bond obligee. [citations omitted] ". The court then referred to the Texas statute which, [similar to Guam's 18 GCA Sec. 32302], allows the surety to compel the obligee to sue the principal, and the court concluded that "[i]mposing a duty on a surety because it is allegedly in a position to delay paying claims could directly contravene a surety's express statutory right to require an obligee to file suit against the principal, obtain a judgment, and execute on that judgment." Great American, at 419. The court found that imposition of a common law duty similar to that imposed on insurers would be inconsistent with the rights available to a surety under the Texas statute. Id.

The Great American court then examined whether sureties were included in the "business of insurance" for purposes of Texas' Deceptive Trade Practices Act forming a part of Texas' insurance code. After examining the legislative history, intent and the fundamental structure of Texas' insurance code, the Texas court concluded that "... the express inclusion or exclusion of suretyship as the "business of insurance" in other sections of the Code is not determinative of the scope of [the Deceptive Trade Practices

9

Act"]. The court held that sureties are not within the scope of the Texas Deceptive Trade

Practices Act, reasoning that:

> "Given the unique character, rights and obligations of suretyship, and the complexities that would result by the imposition of liability under [the Deceptive Trade Practices Act] we cannot conclude that the Legislature intended to include suretyship in the definition of the business of insurance under [the Act]. Absent a clear legislative directive, we conclude that suretyship, as historically understood in the insurance and surety fields, does not constitute the business of insurance under [the Act]."

The <u>Great American</u> court concluded:

> "We recognize that some jurisdictions have imposed a duty of good faith and fair dealing upon commercial sureties in favor of bond obligees.

> \*     \*     \*     \*

> We conclude in Section III, infra, that the Texas Legislature did not intend to include suretyship as the "business of insurance" for all purposes under the Insurance Code.   The differences between suretyship and insurance merit consideration, and we therefore find the reasoning of Dodge and similar cases unpersuasive.

> \*     \*     \*

> The contract between [the Obligee] and [the Principal] in this case was an arm's length transaction, entered into after an open bidding process.  No special relationship between [the Obligee] and [the Principal] exists.  The derivative nature of a surety's liability and its right to rely upon the defenses of its principal compel the conclusion that a surety, like its principal, should be able to test the merits of an obligee's claim without the imposition of extracontractual duties to the bond obligee."
> <u>Great American</u>, supra at 419-420

California reached a similar conclusion in <u>Cates Const. v. Talbot Partners et.al.</u> 980 P.2d 407 (Cal. 1999).

The <u>Cates</u> court first noted that, with only one exception, breach of the implied covenant of good faith and fair dealing has been limited to contractual remedies rather than tort remedies. The one exception is for breach of the covenant in cases involving insurance policies with respect to which, extension of tort remedies to contracts of insurance is justified by a variety of policy reasons.

Before addressing the public policy issues, the <u>Cates</u> court considered whether inclusion of suretyship in California's insurance code was dispositive of the matter. The court referred to the definition of surety insurance [which is strikingly similar to Guam's], and like the Ninth Circuit in <u>Markowitz</u>, the <u>Cates</u> court noted, by italicizing the phrase "other than insurance policies" (see fn 11 at 418), that the legislature had drawn a distinction between contracts of suretyship and insurance policies. The <u>Cates</u> court referred to the definition of "insurance" which [like Guam's] defines insurance as a contract to "indemnify", whereas the court noted that a contract of suretyship is a contract whereby one promises to answer for the debt, default of miscarriage of another." <u>Id</u> @ 418. The <u>Cates</u> court noted that sureties are entitled to certain rights and defenses not enjoyed by insurers in the typical insurance relationship, including (i) the right of subrogation against its insured even if the negligence of its insured contributed to the losses; (ii) the right of reimbursement for its losses from its principal; (iii) the right to assert all defenses available to its principal; (iv) the right to assert its own independent defenses unique to sureties such as discharge due to material alteration of the bonded obligation. <u>id</u> @ 418-419. The court noted that many of these unique aspects of the surety relationship are included within

11

California's Civil Code provisions [in a manner similar to Guam's 18 GCA §31101-32401]. The Cates court then noted that sureties are exempted from a variety of regulations applicable to traditional insurers.

In response to an argument that despite the fact that surety bonds have been distinguished from insurance policies in statutory, regulatory and decisional law, tort remedies are appropriate simply because surety bonds are categorized and regulated as a class of insurance under the insurance code, the Cates court reviewed various treatises and decisions on the subject and concluded:

> "In short, the mere inclusion of surety arrangements in the Insurance Code should not be determinative of the issue before us. Rather, we must evaluate whether the policy considerations recognized in the common law support the availability of tort remedies in the context of a performance bond." Id at 421.

The Cates court then examined the policy reasons which have justified extension of tort remedies to policies of insurance.

> "... tort recovery is considered appropriate in the insurance policy setting because such contracts are characterized by elements of adhesion and unequal bargaining power, public interest and fiduciary responsibility." Id at 421.

Regarding adhesion and unequal bargaining power, the Cates court noted that while most insurance policies are written on a "take it or leave it basis" obligees generally have the right to negotiate the terms of a bond, or may negotiate more favorable terms and conditions in the underlying contract. The typical bond bears no indicia of adhesion or unequal bargaining power that might support tort recovery.

12

Regarding public interest, the _Cates_ court drew a distinction between obtaining a policy of insurance to protect against accidental and generally unforeseeable losses caused by a calamitous or catastrophic event, and obtaining a bond under which the surety "merely lends its credit so as to guarantee payment in the event that the principal defaults" on the contract. The court contrasted the situation faced by an insured who cannot go to the marketplace to obtain insurance for a loss already incurred, with the situation in which breach of a commercial contract merely has adverse financial significance to the nonbreaching party. "A contracting party's unjustified failure or refusal to perform is a breach of contract, and cannot be transmuted into tort liability by claiming that the breach detrimentally affected the promisee's business." _Cates_, at 423 (additional citations omitted). Unlike insureds whose sole right of recovery may be against the insurer, an obligee has a right of recovery against its principal which is meaningful due to the practice of withholding retention. Consequently, it should not be common for an [obligee] to confront the sort of economic dilemma that an insured faces after a catastrophic loss or accident, or for an [obligee] to be particularly vulnerable to a surety's inaction, Id at 424. Regarding fiduciary responsibility, the Cates court found that the conditional nature of the surety's obligation, and its right to assert the defenses of its principal distinguish the surety-obligee relationship from the insurer-insured relationship. In addition, whereas the insurer assumes the defense of its insured and control of the settlement negotiations, the surety has no such duty or right. Thus, the _Cates_ court concluded that the factors supporting a fiduciary relationship in the typical insurer/insured setting are not present in the suretyship relationship.

13

The court noted that other courts have attempted to justify imposition of tort liability on sureties by finding that imposition "compels sureties to handle claims responsibly" and that "contract damages do not compensate for the sureties misconduct and have no deterrent effect to prevent such misconduct in the future." The Cates court concluded that extension of tort liability to surety bonds was not necessary to achieve the desired results, noting (i) the absence of the type of unequal bargaining power found in traditional insurance policies, and the ability to negotiate terms for attorney fees and interest in the underlying contracts; (ii) in commercial transactions, contract remedies providing for damages within the contemplation of the parties or which were foreseeable provide adequate compensation for breach of the bond; (iii) the potential of administrative sanctions and potential suspension or revocation of a surety's license encourages the surety to administer claims in a responsible manner; (iv) the typical construction disputes involves claims, counterclaim, charges and countercharges and [s]eldom will any party be altogether in the right; and (v) the imposition of tort liability would allow obligees to pressure sureties into paying more on properly contested claims because sureties will be reluctant to risk the outcome of tort litigation, citing US ex rel. Ehmcke Sheet Metal v. Wausau Ind. Co. 755 F.Supp. 906 (E.D. Cal. 1991) [finding the potential for unwarranted settlement demands and inflated settlements in the context of tortious breach actions premised upon federal Miller Act surety bonds]. The Cates court concluded:

> "After carefully reviewing the foregoing authorities, we find ourselves unpersuaded by the decisions that allow tort recovery, for they fail to give appropriate consideration to the material differences between insurance policies and the performance bonds and the differing relations between the parties thereto. In addition, many of the decisions place undue emphasis upon statutes regulating suretyship as a class of insurance.

14

*          *          *

..... A construction performance bond is not an insurance
policy.  Nor is it a contract otherwise marked by elements of
adhesion, public interest or fiduciary responsibility, such that
an extracontractual remedy is necessitated in the interests of
social policy.  Obligees have ample power to protect their
interests through negotiation, and sureties, for the most part,
are deterred from acting unreasonably by the threat of stiff
statutory and administrative sanctions and penalties, including
license suspension." Cates, supra at 427.

A brief review of the decisions from jurisdictions extending the tort of bad

faith to sureties will show that the reasoning and conclusions in Great American and

Cates are the more persuasive with respect to Miller Act payment bonds.

   3.   **Decision From Other Jurisdictions Allowing Tort Recovery Are
        Predicated Upon Legislation Either Non-Existent In Guam Or Differing
        In Material Respect From Guam's Insurance Code**

        In 1987 North Dakota extended tort liability to sureties based upon North

Dakota's version the Unfair Settlement Practices Act.  "We conclude that (North Dakota's

Unfair Settlement Practices Act) is applicable to Reliance in its transaction of insurance

and bonding business within this State, including its dealings with the performance bonds

involved in this case".  Szarkowski v Reliance Insurance Company 404 N.W.2d 502, 505

(ND 1987).  In addition, the Szarkowski court quoted, adopted and relied upon California's

General Ins. Co. of America v. Mammoth Vista Owners Assoc. 174 Cal. App.3d 810

(Cal.App. 1985) decision, the reasoning of which was subsequently rejected  by the

California supreme court in Cates .  The next year (1988) Montana, in KW Industries v.

Nat'l Surety Corp., 754 P.2d 502 (Mont. 1988) and invoking similar logic, held that "It

follows therefore that if a surety, transacting the business of insurance, violates the

provisions of [Montana's Unfair Settlement Practices Act] the claimant, in addition to his

                                        15

or her contract remedies, may be compensated under tort law."Id at 505, and also adopted, quoted and relied upon the subsequently rejected reasoning in California's General Ins. Co. decision. The following year (1989) Arizona, in Dodge v. F&D of Maryland 778 P.2d 1240 (Ariz. 1989) decided that because "surety insurance" is a kind of insurance included within Arizona's insurance code, and included within the defined scope of transaction of insurance business within Arizona, the Arizona legislature intended to include sureties within the coverage of the insurance statutes.   Like KW Industries and Szarkowski, the Dodge court quoted and adopted the following reasoning of California's  General Ins. decision which was specifically rejected in Cates:

> "We recognize liability insurance is not identical in every
> respect with suretyship.  But we are not concerned with the
> differences between suretyship and liability insurance. We are
> concerned with whether the Legislature included suretyship
> among the classes of business it intended to regulate under
> the Insurance Code.  It clearly did so."  Id at 1242 .

KW Industries and Szarkowski are predicated upon a statute not enacted in Guam with respect to sureties, (the Uniform Unfair Settlement Practices Act) and are therefore distinguishable.  In addition, both decisions attempt to bootstrap their result by favorably citing and quoting from the now rejected California General Ins. Co. decision. Dodge is likewise distinguishable because it rests upon a finding that Arizona's legislature intended that contracts of suretyship be regulated in the same manner as insurance policies for all purposes, and also rests upon reasoning adopted from California's General Ins. Co. decision  which was subsequently rejected by the California supreme court in Cates.

16

Transamerica Premier Ins. Co. v. Brighton School Dist. 940 P.2d 348 (Col. 1997) [a split 3-2 decision with a strong dissenting opinion], is likewise distinguishable because it is founded upon express findings of (i) "a legislative intent to include sureties as part of the regulatory scheme governing insurance; (ii) the inclusion of "surety" within the definition of "insurer"; (iii) the inclusion of "surety agreements" within the terms "insurance policy" and "insurance agreement"; (v) Colorado's Deceptive Practices Act and its express application to commercial sureties; and (vi) the legislature's provision in the insurance code for a jury instruction regarding bad faith in actions against an insurance company. With this background it is not surprising that the Transamerica court found that "[t]hese statutes indicate persuasive legislative support for treating a commercial surety contract as a form of insurance agreement and for treating a commercial surety which fails to settle its obligations in good faith in the same way our tort law treats insurers who process a claim in bad faith." Id., at 352. None of the factors relied upon by the foregoing courts are present with respect to Guam's insurance code. Guam does not have an Unfair Settlement Practices Act applicable to sureties; Guam's insurance code does not include surety contracts within the definition of "insurance" and limits the definition of "insurance" to contracts for indemnity against contingent or unknown events; Guam distinguishes between surety contracts and insurance policies in its regulation of the forms of policies; unlike the foregoing jurisdictions, but similar to California, Guam's legislature has granted special rights to a surety; Guam, like California and Texas, but unlike any of the foregoing jurisdictions allows a surety to require that an action be brought against its principal; and the Ninth Circuit, in the Markowitz decision, unlike any decision from the supreme courts

17

of those other jurisdictions, has held that a contract of suretyship is not an insurance policy within the meaning of Guam's insurance code.

Thus the syllogistic logic adopted in Dodge, and expressly or implicitly by the other foregoing courts, that "sureties are insurers; insurers are subject to bad faith tort liability; therefore sureties are subject to bad faith tort liability." does not apply with respect to Guam. In Guam it is clear that, like California and Texas, the mere inclusion of suretyship in the insurance code for certain regulatory purposes is not determinative of the issue. To paraphrase the language of the Cates court, the issue must be determined by an evaluation of whether the policy considerations which justify extension of tort liability to insurers in the context of the insurer-insured relationship, justify extension of tort liability to sureties in the context of Miller Act payment bonds.

### 4. Public Policy Does Not Require That Tort Liability Be Extended To Miller Act Payment Bonds

The court is invited to compare the reasoning in Ehmcke Sheet Metal Works v. Wausau Ins. Co. 755 F.Supp. 906 (N.D. Cal. 1991) declining to extend tort liability to Miller Act payment bonds, with the reasoning in USA f/b/o Siegal Const. Co. v. Atul Const. Co. 85 F.Supp.2d 414 (D.C.N.J. 2000) predicting that New Jersey law would extend tort liability to Miller Act payment bonds. In Atul, the court justified its decision upon (i) a finding that New Jersey's insurance code defined "insurance", "insurance policy" or "insurance contract" to include surety bonds, and "Policy of insurance" to include guaranty and surety bonds; and (ii) an implicit finding (without any detailed discussion) that surety bonds are analogous to insurance contracts, and the purpose of the bond would be defeated if a surety could refuse to respond to a legitimate claim in a timely fashion and incur liability

18

solely for the amount of the bond plus interest. Compare the absence of any significant policy analysis in Atul with Ehmcke in which the court examined the various policy reasons justifying tort liability on insurance policies, and found them inapplicable to Miller Act payment bonds. Ehmcke found that (i) extending bad faith tort claims to Miller Act payment bonds could create multiple lawsuits; (ii) the threat of punitive damages, inherent in a bad faith claim, could induce litigants to assert unwarranted settlement demands, and ultimately coerce inflated settlements, something which would increase bonding costs and run contrary to the public interest in protecting against increased costs of bonding; (iii) such a cause of action would create an unresolvable conflict of interest for the surety by causing it to prefer the interests of the claimant over that of its principal; (iv) extending tort liability to Miller Act bonds is not necessary to effect the purposes of the Miller Act, and if additional remedies are required, such remedies should be by the Congress, not the individual state courts; and (iv) finally, and perhaps most importantly, there is no compelling reason to extend tort liability in the context of surety bonds on federal projects. "... there is a regulatory scheme in place to sanction bad faith conduct by sureties towards subcontractors. First, the surety is subject to administrative sanctions by federal agencies for failing to properly perform its duties on the bond. [citation omitted] United States Treasury Department regulations require surety companies to be certified, to promptly resolve claims, to be licensed in the State where the bond is executed, and to be subject to Treasury Department review if unfavorable reports are received. [citation omitted] The Secretary of the Treasury has authority to revoke or refuse to renew a surety's certificate of authority to engage in government contract bonds when the surety fails to properly

19

perform. [citation omitted] Moreover, the surety is subject to further oversight by state insurance regulators in the state where it is licensed. [citation omitted]" *Ehmke*, at 911.

In addition, Ehmcke court also considered whether a "special relationship" existed with respect to surety bonds, and concluded, after examining the criteria established by earlier California cases for determining a "special relationship", that although suretyship is treated as "insurance" in some respects, the factors for determining a "special relationship" stress vulnerability, and a noncommercial context and motivation. These factors do not exist with respect to the typical claimant on a Miller Act payment bond. *Id.*, at 912-913.

The policy examinations in Ehmcke, Cates and Great American highlight the significant differences between the insurer-insured relationship and suretyship relationship and support the conclusion that a claimant under a Miller Act payment bond does not require the special protection that an insured requires under a policy of insurance. Unlike insurance policies, the Miller Act payment bond is a statutory bond, the form and contents of which are prescribed by statute or regulation. There is no negotiation on the form of the bond, and hence no unequal bargaining power in the hands of the surety with respect to its terms and conditions. Indeed it is the claimant under the bond which has the upper hand in this respect. The claimant has the opportunity to negotiate attorney fee, interest and damages clauses in the contract pursuant to which the labor or materials are furnished, as well as the price to be paid to the claimant. The surety has no participation or control in these negotiations. The elements of adhesion or unequal bargaining power are absent with respect to Miller Act payment bonds.

20

The typical Miller Act claimant does not buy the bond for a non profit motive such as peace of mind. The Miller Act payment bond is not intended as insurance against an unknown or unforeseeable calamity. The Miller Act surety lends its credit so as to guarantee payment if the principal defaults. The Miller Act bond comes as a legislatively mandated incident of doing federal construction, and the typical Miller Act claimant, to the extent it relies upon the existence of the bond in furnishing its labor or materials, does so out of a pure commercial motive.

The Miller Act claimant does not face the "economic dilemma" resulting resulting from accidental and generally unforeseeable losses caused by a calamitous or catastrophic event that an insured faces when denied benefits under a policy of insurance. To the contrary, a Miller Act claimant is assured that, assuming its claim is valid and timely, it will be paid the price agreed to be paid; plus interest either at the rate stipulated in the contract or the rate specified by state law; and attorney fees if so stipulated in the contract. In addition, whereas an insured can only look to its insurer, a Miller Act claimant can also look to the party with which it contracted for the goods and services for recovery of damages arising from non payment. In addition, a Miller Act claimant is afforded special remedies under the Federal Acquisition Regulations ("FAR"). Under FAR §32.112-1, a claimant is given the right to invoke assistance of the Contracting Officer in obtaining payment. Indeed Rhino availed itself of this right (see Kahn Dec., Ex. B, PP. 30-36). Thus, while delayed payment under a Miller Act payment bond might have adverse economic consequences, the plight of an insured faced with refusal of payment by its insurer is simply not analogous to that faced by a Miller Act payment bond claimant who (i) may obtain assistance of the Contracting Officer in obtaining payment; (ii) is assured of

21

payment for a timely, valid claim, plus interest, and perhaps attorney fees, and (iii) may pursue other remedies against the party with whom it contracted.

Nor, is there any basis for finding any fiduciary or quasi fiduciary status. Unlike an insurer, a Miller Act payment bond surety has no right or duty to defend a claimant, nor does the Miller Act surety control any settlement negotiations between the claimant and any third parties.

The surety's right to rely upon any defenses of its principal distinguishes the surety-claimant relationship from the insurer-insured relationship. This case highlights the observation in <u>Cates</u> that construction disputes typically involve claims, counterclaims, charges and countercharges and are complicated enough to resolve when all parties are on a level playing field. In this case, Plaintiff's Miller Act claim is based upon an alleged oral subcontract, the terms of which are disputed and uncertain, and the performance of which is contested; and with respect to which the facts regarding Plaintiff's timeliness of filing suit are disputed. As the court in <u>Ehmcke</u> found, the potential of tort liability on the Miller Act payment bond surety may make it easier for claimants, such as Plaintiff in this case, to pressure sureties into paying questionable claims, or paying more on properly disputed claims because the surety is reluctant to risk the outcome of tort litigation. This is not good policy. It is inconsistent with the surety's right to assert all defenses of its principal; inconsistent with the surety's statutory right in Guam [like California and Texas] to require the claimant to proceed against the principal; and ultimately increases the cost of public works through increased bond premiums.

A Miller Act surety needs no inducement to handle claims reasonably beyond that provided by the Miller Act and federal law and regulations relating to

22

procurement. There are sufficient safeguards in place through the federal regulation of sureties to provide adequate encouragement for a surety to act reasonably in its administration of Miller Act claims. The claimant's right to seek assistance of the Contracting Officer in obtaining payment coupled with the potential of being de-listed by the US Treasury, and thus being disqualified from writing bonds on any US Gov't. project, are powerful inducements to encourage reasonable conduct with respect to valid, timely claims.

A comprehensive discussion of the foregoing cases and policy issues in the context of a surety payment bond is found in 47 Me.L.Rev. 389 (1995) <u>The Surety's Liability for "Bad Faith": Claims For Extra-Contractual Damages By An Obligee Under The Payment Bond</u>. In the article, the author concludes that Maine will not extend the tort of bad faith to payment bond sureties.

Therefore, AIGTS/AHAC requests that this court rule that the tort of bad faith does not apply with respect to Miller Act payment bonds, and that Plaintiff's Second Amended Complaint fails to state a claim upon which relief may be granted to the extent it seeks recovery against AIGTS/AHAC based thereon.

### 5. To Require A Surety To Honor A Claim Where There Is A Genuine Issue Of Material Fact, Denies The Surety The Right Of Trial Granted By Congress Under The Miller Act

Congress, in enacting the Miller Act, granted the Miller Act claimant, as well as the surety the right of trial in the US District Court. Nothing in the Miller Act or its legislative history indicates that the surety's right of trial with respect to disputed facts was intended to be any greater or less than the right of the claimant. This is particularly true

23

with respect to the statutory requirement that suit be brought by the claimant within one year after last furnishing the labor or materials. In the Ninth Circuit failure to comply with this statutory requirement is jurisdictional in nature and there is no presumptive truthfulness to the plaintiff's allegations. USA f/b/o Celanese Coatings Co. v. Gullard 504 F.2d 466,468, fn. 48 (9th Cir. 1974). Nothing in the Miller Act can be read to require the surety to honor a claim where there is a genuine dispute over the timeliness of the claimant's suit. Rule 56 in conjunction with Rule 11 are the governing standards, and any other criteria denies the surety of its right of trial granted by the statute and wrongfully shifts the burden of proof on this jurisdictional issue.

6.     **Even If Guam Recognizes A Tort Bad Faith Cause Of Action On A Miller Act Payment Bond, The Conduct Of AIGTS/AHAC Met The Standard Of Care As A Matter Of Law**

In many jurisdictions which have adopted a bad faith cause of action, courts have expressed concerns over preserving the insurer/surety's "right to be wrong" - a right to challenge coverage and lose without being found automatically to have acted in bad faith. This has led most jurisdictions to adopt varying tests of reasonableness to rein in bad faith claims and to allow methods for their summary disposition.

A.     **AIGTS/AHAC Had The Right To Deny The Claim Under Any Applicable Standard**

By far, the test adopted by most jurisdictions is the "Dutton Rule", sometimes called the "Directed Verdict" rule, Nat'l Sav. Life Ins. Co. 419 So.2d 1357 (Ala. 1982). Simply stated, the Dutton Rule requires summary dismissal of a bad faith cause of action unless the claimant/insured is entitled to a directed verdict on coverage, Ellwein v. Hartford Accident & Indem. Co. 15 P.3d. 640 (Wash. 2001). The Dutton Rule is discussed in

24

Volume XXVII, Number 3 Tort & Ins. Law Journal, 1992 at 665-677. As shown by the Appendix in the article, as of the date of writing the article (1992), the Dutton Rule was applied in one form or another in 32 jurisdictions.

A somewhat similar test is the "Genuine Issue" rule. This test is applied in California, Fraley v. Allstate Ins. Co. 97 Cal.Rptr. 2d 386 (Ct.App. 2000) and by the Ninth Circuit interpreting California law, "[u]nder California law, a bad faith claim can be dismissed on summary judgment if the defendant can show that there was a genuine dispute as to coverage:" Guebara v. Allstate Ins. Co., 237 F.3d 987, 992 (9th Cir. 2001). Under the Genuine Issue rule, the insurer is entitled as a matter of law, to summary judgment on the bad faith claim if a "genuine issue as to the insurer's liability" exists. The Genuine Issue rule arguably differs from the Dutton Rule in that the Genuine Issue rule allows the insurer to obtain dismissal of a bad faith claim by affirmatively demonstrating issues of disputed fact with regard to any grounds for denial of coverage, irrespective of whether or not the grounds were relied upon by the insurer.

In Florida, the surety is entitled to summary judgment if the claim is "fairly debatable". "A claim is not "fairly debatable" only where there is an absence of a reasonable basis for denial of policy benefits." Reliance Ins. Co. v. Barile Excavating & Pipeline, 685 F.Supp. 839, 840 (DCND Fla. 1988). (Underscore added)

As applied to sureties, the Ninth Circuit's decision in Brinderson et.al. v. Pacific Erectors, Inc. et.al. 971 F.2d 272 (9th.Cir 1992), interpreting California law prior to the Cates decision illustrates the application of these rules. In Brinderson, the surety was confronted with conflicting versions regarding interpretation of the bonded contract. The surety, after a limited investigation, determined that a genuine dispute existed concerning

25

interpretation of the contract, and refused to pay the claim until liability was established. The obligee brought suit claiming that the surety had acted in bad faith because it adopted its principal's version of the contract. As it turned out, the trial court sided with the obligee on the contract interpretation issue. However, as to the bad faith issue, the Ninth Circuit affirmed the trial court's directed verdict in favor of the surety, stating:

> Once [the surety] understood [its principal's] interpretation of the contract, and a genuine dispute over liability existed, [the surety] was under no further obligation to investigate [the obligee's] claim on the bond.
>
> *  *  *
>
> We agree that [the surety's and its principal's] interpretation of the contract is incorrect. As a matter of law, however, the interpretation is not so unreasonable as to be a mere pretext for avoiding further investigation; a genuine issue did exist concerning liability. *Brinderson*, at 283.

As applied to the instant case, the undisputed facts show that at the time the claim was denied, AIGTS/AHAC was faced with genuine issues of material fact regarding not only the merits of the claim, but its timeliness as well. Plaintiff's Proof Of Claim (Kahn Dec., Ex. J, page 6) stated on its face that materials were last furnished in Dec. 2002 which required suit to have been filed no later than Dec. 31, 2002, a date which had passed. When confronted with this, (Kahn Dec., Ex. M) Plaintiff then contended that the one year limitation had been extended by certain equipment alleged to have been rented for the project (Kahn Dec., Ex. N). In response to Plaintiff's contention, Defendant Biogenesis adamantly denied Plaintiff's contention that the subject equipment was furnished or used on the project. See, Kahn Dec. Ex. O.

Regarding the merits of Plaintiff's claim, a comparison of the contentions offered by Carlsmith on behalf of Plaintiff in its letters (Kahn Dec., Ex. J and N) with the

26

contentions of Biogenesis in its letters (Kahn Dec., Ex. F, G, and J @ PP. 10-11) illustrate the genuine issues of material fact regarding (i) what the terms and conditions of the alleged oral subcontract between Plaintiff and Defendant Biogenesis really were, (ii) whether Plaintiff performed its part of the bargain; and (iii) how much, if anything, Plaintiff is entitled to under the Miller Act.

Under these circumstances, Plaintiff would not have been entitled to either a directed verdict or summary judgment on coverage under the Miller Act bond, whether one applies the Dutton Rule, the Genuine Issue Rule, the Fairly Debatable Rule or the <u>Brinderson</u> standard. Therefore, as a matter of law, AIGTS/AHAC had every right to deny the claim and require that these factual disputes be put to the trier of fact for resolution.

**B.    The Specific Allegations Of Bad Faith Are Not Supported By Fact Or Law**

As explained above, Plaintiff's allegations (2ᵈ Am. Comp., Paras. 34 and 37) that AIGTS acted in bad faith by denying Plaintiff's claim despite its timeliness cannot survive summary disposition because of the genuine issues of material fact regarding the timeliness and merits of Plaintiff's claim.

Plaintiff alleges (2ᵈ Am. Comp., Par. 33) that AIGTS lacked authority to deny Plaintiff's claim. This is factually incorrect. AIGTS had authority to deny the claim on behalf of AHAC. (Kahn Dec., Par. 3).

Plaintiff alleges (2ᵈ Am. Comp., Par. 37) that AIGTS acted in bad faith by filing a motion to dismiss and citing arguably distinguishable authority. The allegation lacks factual merit. AIGTS is not the surety on the bond. AIGTS is not a surety nor is it an insurer. It is a claims servicing entity of American International Group Inc.. (Kahn Dec.

27

Par. 3 & 4). AIGTS' motion was well brought. If Plaintiff believes that improper authority was cited, the remedy is Rule 11 sanctions, not a cause of action for tortious breach of the implied covenant of good faith and fair dealing.

Plaintiff's alleges that AHAC acted in bad faith be referring the claim to AIGTS ($2^d$ Am. Comp., Par. 36); and that AIGTS acted in bad faith by allegedly inducing Plaintiff to file suit against AIGTS instead of AHAC ($2^d$ Am. Comp., Par. 37). A surety's referral of a claim to a claims adjuster, followed by a denial of that claim, does not constitute bad faith. US ex.rel. Seaboard Surety v. Joseph Morton Company, 817 F.2d 956 ($2^{nd.Cir}$ 1987). These allegations are relevant to the issue of whether or not Plaintiff filed suit within the one year limitation of the Miller Act and are equitable estoppel defenses to AHAC's reliance on the one year limitation period of the Miller Act, not a cause of action. "Estoppel is a protective and not an offensive weapon and it is not a cause of action and does not give or create one;" Sessions v. Whitcomb 329 S.W.2d 470 (Tex.App. 1959); accord, Hoye v. Westfield Ins. Co. 487 N.W.2d 838 (Mich.App. 1992). Nor do the underlying facts raise any inference of "oppression, fraud or malice" as required under 20 GCA §2120 to justify exemplary damages. What happened is that Carlsmith sued AIGTS instead of AHAC because the Carlsmith attorney (Amy Self) assumed, from a telephone conversation with a representative of AIGTS that AIGTS and AHAC were the same corporation after being told that they were part of the AIG group of companies. The Carlsmith attorney (Self) had just graduated from law school, was not licensed at the time of the telephone conversation, and she was supposed to have been working under the supervision of a senior attorney (Thomason) with substantial experience in federal procurement law (Lawhn Dec. Ex. 1 ; Thomason Depo., @ p. 6-8). There is no evidence

28

that she discussed her assumption with her supervisor (Thomason), who always believed that the surety was AHAC (Thomason Depo., @ p. 16 ).   Nor, does it appear that the Carlsmith attorney (Self) conducted any independent factual research to verify her assumption  despite there being a wealth of resources available to her.

1.      There is no evidence that she ever discussed the issue with her supervising attorney (Thomason) who was experienced in federal procurement law, and who always believed that AHAC was the surety;

2.      She did not call AIGTS and ask what the correct corporate identity of the surety was (Kahn Dec. Par. 22);

3.      There is no evidence that she discussed the three letters from AIGTS to Carlsmith with her supervising attorney (Thomason), all of which specifically identify the surety as AHAC, not AIGTS; all of which call the readers attention to "the above referenced surety"; and in the bottom left corner of all three letters identify AIGTS as "A Member Company of American International Group, Inc." (Kahn Dec., EXHS. D, K, M);

4.      There is no evidence that she consulted the Treasury List (of which the Carlsmith supervising attorney (Thomason) was aware) and which shows that AHAC but not AIGTS were approved to write Miller Act bonds (See printout of portions of Treasury List as printed on Treasury website, Lawhn Dec., Ex. 2 );

5.      There is no evidence that she consulted the records of the insurance commissioners of Hawaii or Guam which show that  AHAC but not AIGTS were licensed as sureties (Lawhn Dec., Ex. 3);

29

6.     There is no evidence that she consulted the SEC 10K filing, which Carlsmith itself (Egesdal) consulted in connection with its decision to withdraw, and which shows that AHAC is a subsidiary of AIG, and is a New York corporation (See printout of SEC 10K contained in documents produced by Carlsmith, Lawhn Dec. Ex. 4);

7.     There is no evidence that she consulted AIG's website, another resource which Carlsmith consulted in connection with this matter and which shows that AHAC is an insurer, and AIGTS is a claims handling entity (See printout of AIG's website contained in documents produced by Carlsmith, Lawhn Dec., Ex. 5, p. 7 & 14);

8.     There is no evidence that she was even aware of the Mar. 28, 2001 email from Ledger of Carlsmith's Guam office to Granville of an AIG related entity, asking about the relationship of AIGTS to another AIG related entity, and Granville's Mar. 30, 2001 reply to the Carlsmith firm (Ledger) advising that AHAC described as ("insurer") and AIGTS were "member companies of the American International Group" (Lawhn Dec., Ex. 6).

Instead, the Carlsmith attorney (Self) claims to have been led to believe that AIGTS and AHAC were part of the same corporation based upon a telephone conversation (Self Affidavit, Par. 19 , copy attached as EX. 7 to Lawhn Dec.), and without there being any evidence at all that she did even minimal factual research to verify her assumption, or that she ever discussed her assumption with her supervising attorney who admittedly knew AHAC was the surety.   She drafted the Complaint which named AIGTS and not AHAC,

and it was filed Mar. 20, 2001 because of a perceived statute of limitations problem (Ledger Depo. @ p. 15 ).

There is no evidence that anyone from AIGTS (or any AIG related entity) ever specifically told the Carlsmith lawyer (Self) that AIGTS and AHAC were part of the same corporation.   To the contrary, all of the written evidence authored on behalf of AHAC or AIGTS  specifically identifies the surety as AHAC, not AIGTS (the bond and the three AIGTS letters to Carlsmith) and all three of the letters from AIGTS to Carlsmith specifically state that AIG Technical Services, Inc. is a "Member Company of American International Group, Inc."   (See Ex. D, K & M to Kahn Depo., lower left corner).   Use of the phrase "Inc." is sufficient to charge an attorney with notice that a corporate entity is being referred to.   The Carlsmith lawyer (Self) made an incorrect assumption without reviewing all of the available facts and without making further inquiry.    There is no factual or legal basis for any type of affirmative bad faith, or punitive damages claim to be made against AIGTS or AHAC under these facts.   Whether there is a case to be made for equitable estoppel with regard to the one year limitation period is a matter which will be dealt with in another motion.

Plaintiff alleges (2$^d$ Am. Comp., Par. 38) that AIGTS/AHAC induced the Carlsmith firm's withdrawal by claiming a conflict of interest.  This claim never should have been brought.   Even if an AIG entity had inquired into whether Carlsmith's prior or current representation of an AIG entity required withdrawal from the instant litigation, the inquiry would not be actionable because it is privileged.  A client is entitled to object to an attorney representing an opposing party on the grounds of conflict of interest. *Trust Corporation of Montana v. Piper Aircraft Corp.*, 701 F.2d 85 (9th Cir. 1983).  AIGTS/AHAC, have been

31

unable to find any reported case in which a court has imposed liability upon clients [or former clients] for asking a lawyer who has represented them in the past whether or not there is a potential of a conflict of interest. By analogy, decisions on interference with contractual relationships recognize that the existence of privilege (justification) precludes liability Odom v. Lee 999 P.2d 755 (Alaska 2000); Lee v. Aiu 936 P.2d 655 (Haw. 1997). Asserting in good faith one's legally protected interests is not improper interference, Restatement (Second) of Torts §773. A client's right to inquire into the potential of a conflict of interest is a legally protected interest, the exercise of which must be protected. Nor do the facts support the allegation. All of the Carlsmith attorneys have testified that no one on behalf of any AIG entity even inquired into the possibility of a conflict, and certainly did not ask Carlsmith to withdraw from this case, nor did any AIG entity pressure Carlsmith into withdrawing. It was Carlsmith which made the inquiry in-house after Ledger of Carlsmith in Guam raised the issue of a possible conflict, and it was Carlsmith which made the decision to withdraw. Neither AIGTS nor AHAC had anything to do with it (See Thomason Depo. @ p. 56; Ledger Depo. @ p. 1-17 and Egesdal Depo. @ p. 5-11). The claim was legally improper to start with; has been found to be absolutely untrue through discovery; and should have been voluntarily dismissed.

## IV.    CONCLUSION

For the foregoing reasons AIGTS and AHAC request this court:

1.    To rule as a matter of law that Guam will not extend tort liability to the implied contractual covenant of good faith and fair dealing in the context of a Miller Act payment bond, and accordingly AIGTS and AHAC are entitled to dismissal of Plaintiff's claims seeking punitive and tort damages (Count II);

32

2.     Alternatively, if this court rules that Guam will extend tort liability to Miller Act payment bonds, to rule that because the undisputed facts show that there are genuine issues of material fact regarding (i) the timeliness of Plaintiff's suit and (ii) the existence, interpretation, terms and performance of Plaintiff's alleged oral subcontract with BioGenesis, AIGTS and AHAC are entitled as a matter of law to summary dismissal of Plaintiff's tort allegations and claims for punitive and tort damages (Counts II and III);

3.     To rule that Defendants AIGTS and AHAC are entitled to judgment on the specific allegations of Par. 32 through 38 of the Second Amended Complaint;

4.     To the extent Plaintiff may be alleging fraud against AIGTS or AHAC, to dismiss any such allegation for failure to plead with particularity as required by FRCP Rule 9(b); or in the alternative to grant summary judgment in favor of AIGTS and AHAC ;

5.     To dismiss Plaintiff's claims for exemplary or punitive damages against Defendants AIGTS and AHAC; and

4.     To rule that there is no just reason for delay and enter final judgment pursuant to FRCP Rule 54(b).

DATED: Honolulu, Hawaii, November 21, 2003.

Of Counsel:
OLIVER, LAU, LAWHN,
    OGAWA & NAKAMURA

_____
JAMES H. LAWHN
Attorney for Defendants
AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY

RECYCLED PAPER MADE FROM 20% POST CONSUMER CONTENT

AVERY ™

UNITED STATES DISTRICT COURT

DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC. and AMERICAN HOME ASSURANCE COMPANY, <br><br> Defendants. <br> ———————————— <br> BIOGENESIS PACIFIC, INC., <br><br> Counterclaimant, <br><br> vs. <br><br> RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, AND JOHN DOES 1-10, <br><br> Counter-Defendant. <br> ———————————— <br> AMERICAN HOME ASSURANCE COMPANY, <br><br> Cross-Claimant, <br><br> vs. <br><br> BIOGENESIS PACIFIC, INC., <br><br> Cross-Claim Defendant. | CIVIL CASE NO. 02-00008 <br><br> **DECLARATION OF BRUCE KAHN** |

3852-10

## DECLARATION OF BRUCE KAHN

I, Bruce Kahn, hereby declare pursuant to 28 U.S.C. §1746 as follows:

1.      I am a Bond Claims Analyst for AIG Technical Services Inc. ("AIGTS").

2.      I have personal knowledge of the facts set forth herein, and am competent to testify with regard thereto.

3.      AIGTS is the claims servicing entity of the American International Group ("AIG") with authority to investigate and respond to claims on behalf of the various sureties owned by AIG including the American Home Assurance Company ("AHAC").

4.      AIGTS is not a surety nor is it an insurer. AIGTS does not issue bonds or insurance policies of any type.

5.      Effective January 01, 2002 responsibility for the claim of Rhino Builders Inc. against the Miller Act payment bond No. 000-20-80-88 issued jointly by AHAC as surety and BioGenesis Pacific, Inc. as principal, was assigned to me.

6.      Prior to January 01, 2002 Rhino's claim had been handled by Mr. Mark Titherington, who at that time was also a Bond Claims Analyst with AIGTS.

7.      Upon transfer of Rhino's claim to me, I reviewed the claim file which included (among other things) the following documents kept in the ordinary course of business by AIGTS:

(i)      Electronic diary maintained by Mr. Titherington (Exhibit A);

(ii)     Letter dated 10-22-01 from Mr. Thomason of the Carlsmith law firm addressed to AHAC's San Francisco underwriting office

2

transmitting a document entitled "Notice Of Claim On Bond", together with four (4) exhibits, and requesting a Miller Act Proof Of Claim Form (Exhibit B);

(iii)     Memo dated 10-26-01 from AHAC's San Francisco underwriting office transmitting Exhibit B to AIGTS in New York along with a copy of the Miller Act payment bond (Exhibit C);

(iv)     AIGTS letter dated 10-30-01 to Carlsmith transmitting a Proof Of Claim Form (Exhibit D);

(v)     AIGTS letter dated 10-30-01 to BioGenesis notifying them of Rhino's claim and requesting a response (Exhibit E);

(vi)     Letter dated 10-25-01 from BioGenesis to AIGTS stating reasons why BioGenesis contends Rhino's claim is invalid (Exhibit F);

(vii)     Letter dated 01-02-01 from BioGenesis to Rhino disputing Rhino's claim (Exhibit G);

(viii)     Letters dated 11-19-01 and 11-26-01 and 12-07-01 from AHAC's indemnitor (The Sundt Companies) regarding its intent to investigate the claim and retention of counsel (Exhibit H);

(ix)     Letter dated 12-21-01 from AIGTS to the Contracting Officer consenting to counsel's investigation of the claim (Exhibit I).

8.     On 01-15-02 I received Rhino's executed Proof Of Claim form which included a Carlsmith letter of 01-09-02, a final invoice from Rhino; a 12-22-01 letter from BioGenesis to Rhino; and a 01-02-01 letter from BioGenesis to Rhino (Exhibit J).

3

9.      I acknowledged receipt of the Proof Of Claim by letter dated 01-17-02 to Carlsmith (Exhibit K) and forwarded a copy to AHAC's indemnitor (Sundt) on the same date (Exhibit L).

10.      In reviewing the data submitted by Carlsmith on behalf of Rhino, and the data submitted on behalf of BioGenesis, it became apparent to me that Rhino's claim is based upon an alleged oral subcontract the exact terms of which are not evidenced by any writing signed by both parties; the exact scope of work is uncertain; the obligations to be performed by Rhino are disputed; and with respect to which BioGenesis claims that Rhino breached its obligations causing BioGenesis to incur extra costs.

11.      In addition, although Rhino's Notice Of Claim (Exhibit B) did not state the date when labor or materials were last furnished, Rhino's Proof Of Claim (Exhibit J) stated that the labor or materials were furnished "between the dates of May 2000 and December 2000".

12.      The December 2000 date seemed to be confirmed by the representation made under FAR 32.112-1 by Carlsmith to the Contracting Officer on behalf of Rhino that Rhino had ceased performance in late November 2000 due to a dispute over payment.

13.      As I understand the Miller Act, suit must be filed within one year following the date labor or materials were last furnished.  Therefore, it was my understanding that Rhino must file suit prior to December 31, 2000.

14.      It was my intent to have counsel review the government's project records to see what they showed regarding Rhino's scope, and dates of work, but

4

despite a FOIA request having been made, as of 02-14-02 the Contracting Officer had not produced the project records.

15.     Since the data submitted on behalf of Rhino showed on its face that the labor and materials were last furnished in December 2000, and since Rhino had not filed suit within one year thereafter, I concluded that the claim had to be denied, subject to allowing Rhino to submit further data regarding the dates.

16.     Accordingly, I sent letter dated 02-21-02 to Carlsmith denying the claim on the basis of failure to file suit within one year, and requesting Carlsmith to submit any further documents or information which Carlsmith felt might help in reviewing the claim.  (Exhibit M)

17.     On 03-19-02 I received Carlsmith's 03-11-02 letter (Exhibit N) in which Rhino claimed that the one year suit limitation period had been extended by certain equipment (trucks) which Rhino contended were available for use on the project through May 2001 and through BioGenesis' alleged use of safety and other equipment.

18.     I requested counsel to investigate the contentions raised in Carlsmith's 03-11-02 letter, and I received a report from counsel dated 05-14-02 (Exhibit O, redacted to delete counsel's impressions, opinions and professional advice) which summarized counsel's interview of Mr. Lam of BioGenesis and also attached a letter from Mr. Lam (Exhibit O, Pages 3-5) expressly refuting the contentions raised in the Carlsmith 03-11-02 letter regarding the equipment.

19.     Since the explanations and data supplied by Mr. Lam on behalf of BioGenesis  placed into question the accuracy of Rhino's contentions that it had made equipment available for use on the project up through May 2001 and thereby extended

the date for filing suit, I concluded that the data was insufficient to establish that the claim was timely. I therefore sent Carlsmith a letter dated 06-21-02 (Exhibit P) affirming our earlier denial of the claim.

20. At the time I sent my 06-21-02 letter (Exhibit P) Carlsmith had not advised me that it had already filed suit three months earlier on 03-20-02, and I did not learn that suit had been filed until the end of June, 2002.

21. Regarding the potential that the Carlsmith firm may have had a conflict of interest in its representation of Rhino, an objection of this nature is something which our normal business practice would require to be documented. I have searched the files of AIGTS and AHAC on this matter and can find no evidence that anyone from AIGTS or AHAC ever objected to Carlsmith's representation of Rhino, nor asked anyone to make an inquiry of Carlsmith on the matter.

22. At no time prior to Carlsmith's filing the complaint on March 20, 2002 did anyone from Carlsmith or Rhino ever ask me for clarification as to the identity of the surety, nor at any time did I tell anyone from Carlsmith or Rhino that the surety was AIGTS and not AHAC. To the contrary, prior to Carlsmith's filing of the complaint on March 20, 2002, either myself or Mr. Titherington of AIGTS had told Carlsmith three times in writing that the surety was AHAC (Ex. D, K, & M).

Executed in New York, New York, on _October 3, 2003_.

_Br w Kah_

BRUCE KAHN

6

A

rk Titherington
t 30 2001
General Note

On 10-18-01 I had received a telephone call from Amy Self @ (808) 523-2578 advising of this claim and stating that she was Claimant's attorney and requesting "Miller Act Claim Form." I advised her to send a notice of nonpayment to this office.
Received via underwriting letter from Claimant's attorney dated 10-22-01 stating claim on bond and enclosing notice of claim on bond dated 10-20-01 in amount of $245,664.43 on this bond with a penal limit of $250,000. Also enclosed are contract invoices etc. and a letter to the Obligee dated 8-15-01 asserting nonpayment. Letter from Claimant's attorney dated 10-22-01 states that Claimant had an oral contract with the Principal.
Sent letter to Claimant's attorney acknowledging receipt of claim and requesting proof  of claim with copies to Principal and with letter requesting response. Spoke to Kevin Dwyer @ Sundt Construction (I was advised by underwriting that this Principal is a joint venturer with one of Sundt's subsidiaries) and advised him of claim. He said that he had no knowledge of this project or Principal.
Received phone call from Gerry Lam, President of Principal, who said that he had sent me a response to this claim and that it is refuted. He also said that his company is not connected with Sundt andthat his company is a disadvantaged business entity working on this project. He said that his company had a prior association with Sundt on another project.
Called Kevin Dwyer to advise of the above.
Sent e-mail to Joe Maurer in underwriting to advise of the above.

EXHIBIT A - PAGE 1

sured: SUNDT CONSTRUCTION INC.

Imant: Rhino Builders, Inc.

ranch: 388   Case: 005037   Symbol: 001   SubFile: 0001

nted on  07-09-2003 @ 04:04:36 PM  by  Kahn   Bruce

rk Titherington
v  5 2001
eneral Note

11-2-01 Received a five-page letter dated 10-25-01 in response to this claim from Gerry Lam of Principal, stating that the Claimant at best can only claim to have had an informal oral contract with the Principal that never matured. The letter refutes that claim, encloses copies of letters to Claimant dated 1-2-01 and 9-8-01, and cites numerous reasons why Claimant is not entitled to any contract funds from Principal.

EXHIBIT A - PAGE 2

sured: **SUNDT CONSTRUCTION INC.**
aimant: **Rhino Builders, Inc.**

anch: **388**   Case: **005037**   Symbol: **001**   SubFile: **0001**

ted on **07-09-2003 @ 04:04:36 PM** by **Kahn Bruce**

rk Titherington
5 2001
eneral Note

Received voicemail from Amy Self, Claimant's attorney, inquiring as to when she can expect to received proof of claim form. Called and left voicemail for Ms. Self advising that I had mailed proof of claim form to her office 10-30-01.

EXHIBIT A - PAGE 2

sured: SUNDT CONSTRUCTION INC.
mant: Rhino Builders, Inc.

ranch: 388   Case: 005037   Symbol: 001   SubFile: 0001

ted on 07-09-2003 @ 04:04:36 PM by Kahn  Bruce

---

k Titherington
ov 27 2001
eneral Note

Received 11-19-01 letter from Kevin Dwyer @ Sundt
Construction stating that it had agreed to be an
indemnitor on this bond and had contemplated a teaming
agreement with the Principal on a bid solicitation.
The letter states that a subcontract based on the
teaming agreement was never signed, and the Principal
did not inform Sundt it had been awarded the contract.
The letter states that due to its agreement to
indemnify the Surety that it has hired an attorney to
investigate the claim: Stephen Tom in Hawaii @ (808)
547-5151.

EXHIBIT A - PAGE 4

sured: **SUNDT CONSTRUCTION INC.**
imant: **Rhino Builders, Inc.**

ranch: **388**   Case: **005037**   Symbol: **001**   SubFile: **0001**

ited on **07-09-2003 @ 04:04:36 PM by Kahn  Bruce**

k Titherington
  21 2001
eneral Note

Examined letter of intent from Kevin Dwyer e-mailed to me in order that I may send it to Owner stating that Surety authorizes Sundt (indemnitor for Principal) to investigate this matter. Sent letter to Owner, with copies to Sundt and Sundt's lawyer via fax and regular mail. Fax failed to Owner in Guam - phone rings but gives a message that "this call cannot be completed as dialed ... 20P." Called Principal and Principal's attorney and advised them that the letter has been sent by regular mail, but fax failed.

EXHIBIT __A__ - PAGE 5

B

# CARLSMITH BALL LLP

### A LIMITED LIABILITY LAW PARTNERSHIP

PACIFIC TOWER, SUITE 2200
1001 BISHOP STREET
HONOLULU, HAWAII 96813
TELEPHONE (808) 523-2500    FAX (808) 523-0842
WWW.CARLSMITH.COM

DIRECT DIAL NO.
(808) 523-2527

E-MAIL  TET@CARLSMITH.COM

OUR REFERENCE NO.
053705-00001

October 22, 2001

**BY CERTIFIED MAIL**
 **RETURN RECEIPT REQUESTED**

American Home Assurance Company
121 Spear Street
San Francisco, California 94105

Re:    Ref. Bond No. 20-80-88 - BioGenesis Pacific, Inc., Prime Contractor on
        Contract No. N62766-99-D-0425

Dear Sirs:

On behalf of our client, Rhino Builders, Inc., we are forwarding this enclosed matter for your consideration and action.

Enclosed with this letter is a Miller Act Notice which this firm caused to be sent to your attention, whereby Rhino Builders, Inc. gives notice it intends to enforce its rights under the Miller Act.  Contrary to your understanding, BioGenesis Pacific, Inc. is the prime contractor on Contract No. N62766-99-D-0425, and Rhino Builders, Inc. provided all labor and materials supporting its claim pursuant to an oral subcontract between Rhino Builders Inc. and BioGenesis Pacific, Inc.

As the attorneys for Rhino Builders, Inc., we hereby request that American Home Assurance Company provide us a copy of its Miller Act Proof of Claim form, and forward any and all future communications to my attention at the above address.

EXHIBIT D - PAGE 1

HONOLULU  ·  KAPOLEI  ·  HILO  ·  KONA  ·  MAUI  ·  GUAM  ·  SAIPAN  ·  LOS ANGELES  ·  WASHINGTON, D.C.  ·  MEXICO

Your immediate attention to this matter is appreciated.

Very truly yours,
Carlsmith Ball L.L.P.

*Jerry E. Thomason*
Terry E. Thomason

Enclosures

cc:     Rhino Builders, Inc.

1433798.1

## NOTICE OF CLAIM ON BOND
### (Miller Act 40 U.S.C. Section 270(a) to 270(e))

**Public Agency:**      Officer in Charge of Construction
Ms. Bennett Terlaje, Contracting Officer
NAVFACENGCOM Contracts Marianas
PSC455, Box 175
FPO AP 96540-2200

**Bonding Company:**      American Home Assurance Company
121 Spear Street
San Francisco, California 94105

**Prime Contractor:**      BioGenesis Pacific, Inc.
1604 Ulualana Place
Kailua, Hawaii 96734

NOTICE IS HEREBY GIVEN, that Rhino Builders, Inc., the undersigned subcontractor to BioGenesis Pacific, Inc. and Claimant, has not been paid in full and is looking to the Prime Contractor for payment of the following claim. This notice is intended as written notice pursuant to 40 U.S.C. Section 270.

Claimant, whose address is: 87-1610 Ulehawa Road, Waianae, Hawaii 96792, has a claim in the amount of $245,664.43 (not including service charges or interest as allowed by law and at the maximum legal charges or interest as allowed by law and at the maximum legal rate) for labor performed and materials provided for the public work of improvement commonly known as Navy Housing Roofing, Various Locations; Contract No. N62766-99-D-0425, upon which BioGenesis Pacific, Inc. is the Prime Contractor.

WE ARE LOOKING TO THE PRIME CONTRACTOR FOR PAYMENT OF THESE DEBTS.

    1.    The total amount of the claim is $245,664.43.

    2.    The name of the party for whom the labor and materials were provided is: BioGenesis Pacific, Inc.

    3.    Rhino Builders, Inc. provided such labor and materials directly to BioGenesis Pacific, Inc. pursuant to an oral subcontract between Rhino Builders, Inc. and BioGenesis Pacific, Inc.

    In support of its claim, Claimant submits the following documents:
    1.    Claimant's initial invoice, which includes a breakdown of reimbursable costs and profit share (Exhibit 1);

1433756.1

**EXHIBIT  D  - PAGE  3**

2.      Claimant's final invoice in the amount of $245,664.43 for BioGenesis Pacific, Inc.'s unpaid billings on all work Claimant performed on Contract No. N62766-99-D-0425 with attached mail receipts reflecting BioGenesis Pacific, Inc.'s refusal to accept business mail sent by Rhino Builders, Inc. (Exhibit 2);

3.      A copy of Rhino Builders, Inc.'s Assertion of Nonpayment under FAR 32.112-1 to Ms. Bennett Terlaje, Contracting Officer (Exhibit 3); and

4.      A copy Payment Bond No. 20-80-88 sent to Claimant from Ms. Bennett Terlaje, Contracting Officer in charge of construction for Contract No. N62766-99-D-0425 (Exhibit 4).

To the unpaid balance of $245,664.43 (plus penalties and interest), if not paid, Claimant shall also seek attorneys fees and interest at the maximum legal rate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 0 day of October , 2001.

Michael O'Connell
Rhino Builders, Inc.

"Claimant"

1433756.1

EXHIBIT 12 - PAGE 4

# CONTRACT INVOICE #1313

EXHIBIT 1

EXHIBIT D - PAGE 5



**Rhino Builders, Inc.**
**87-1610 Ulehawa Road**
**Waianae, HI 96792**

# CONTRACT INVOICE

Invoice#: 1313
Invoice Date: 11/14/2000
Due Date: 11/29/2000
Order:

License # C-19515

TO  BioGenesis Pacific, Inc.
1604 Ulualana Place
Kailua, Hawaii 96734

PROJECT 69801
N62766-99-D-0425
**Navy Housing**
**Various Locations**
**Guam**

| Description | Amount |
|---|---|
| | 89668.58 |

Billing for Job Cost & Overhea

Description: Summary of invoicing to BioGenesis through October 31, 2000

Invoicing based on verbal agreement for all Delivery Orders executed under prime contract no. N62766-99-D-0425 of: 1) Payment reimbursement for total cost and overhead to execute work and 2) 50/50 split of profits.

| | |
|---|---|
| A) Original Delivery Order price under the Prime Contract for Delivery Orders 1, 2, 3 and 4: | $138,189.74 |
| B) Change Orders: | 0.00 |
| C) Adjusted Contract Price: | $138,189.74 |
| D) Value of completed work complete: | |
| D. O. 0001 = 100% of $12,129.10 | |
| D. O. 0002 = 100% of $26,445.10 | |
| D. O. 0003 = 100% of $42,454.60 | |
| D. O. 0004 = 90% of $57,160.94 | $132,473.65 |
| E) Less Direct Cost, Attachment A: | $ 49,854.58 |
| F) Less Direct Cost Overhead, Attachment B: | $ 31,202.82 |
| G) Net Delivery Order (1 through 4) profit : D-(E+F) | $ 51,416.25 |
| H) Rhino profit share (50%) | $ 25,708.13 |

EXHIBIT **D** - PAGE **11**

| | |
|---|---|
| Sales Tax: $ | 0.00 |
| Invoice Total: $ | 89,668.58 |
| Retention: $ | 0.00 |
| Amount Paid: $ | 0.00 |

*Please Pay This Amount* | $ 89,668.58

*Terms: All invoices are due and payable within 15 days of receipt.*
*A service charge of  % per annum will be computed on all amounts overdue on regular statement*
*dates. Please make checks payable to Rhino Builders, Inc.. Thank you for your prompt payment*

# Contract Invoice
*Continued...*

Description | Amount
---|---

**TOTAL Balance due:**      $106,765.53

**Previously invoiced (invoice no. 1288, dated 09/13/00)**      $ 17,096.95

**TOTAL Amount due this invoice:**      $ 89,668.58

EXHIBIT _b_ - PAGE 1

# STATEMENT of Account

EXHIBIT 6 - PAGE 8



# Rhino Builders, Inc.
87-1610 Ulehawa Road
Waianae, HI 96792

License # C-19515

| TO | BioGenesis Pacific, Inc.<br>1604 Ulualana Place<br>Kailua, Hawaii 96734 | PROJECT | N62766-99-D-0425<br>Navy Housing<br>Various Locations<br>Guam |
|---|---|---|---|

| Job# | Name | | | | | |
|---|---|---|---|---|---|---|
| | Rec# | Invoice# | Due Date | Description | Amount | Balance |
| 69801 | N62766-99-D-0425 | | | | | |
| | 432 | 1288 | 09/28/00 | Labor Billing Only | 17096.95 | 17096.95 |
| | 470 | 1313 | 11/29/00 | Billing for Job Cost & | 89668.58 | 89668.58 |
| | | | | Job Totals: | 106765.53 | 106765.53 |
| | | | | Grand Totals: | 106765.53 | 106765.53 |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | 91+ Days | Retention |
|---|---|---|---|---|---|
| 89668.58 | 0.00 | 17096.95 | 0.00 | 0.00 | 0.00 |

### *Please Pay This Amount* 106765.53

| Contract Summary | | |
|---|---|---|
| Original Contract Amount | | 327981.00 |
| Net Changes to Date | | 0.00 |
| New Contract Amount | | 327981.00 |
| Total Invoiced to Date | | 106765.53 |
| Remaining Balance on Contract | | 221215.47 |

Terms: *All invoices are due and payable within 15 days of receipt. A service charge of %
per anum will be computed on all amounts overdue on regular statement dates. Please make checks payable
to Rhino Builders, Inc.. Thank you for your prompt payment.*

PAGE 9   EXHIBIT D

# Allocation of Indirect Costs to The Work

Allocation cost to Biogenesis
July - October

| | | |
|---|---|---|
| Richard Wages w/burden | 14198.78 | |
| Rent @ 1100 x 4 months | 4400.00 | |
| Small Tools | 859.90 | |
| | | $ 19,458.68 |

| | | |
|---|---|---|
| 50% shared overhead | | |
| Communications (phones, cellphones, pages, etc.) | 4673.67 | |
| Postage and Freight | 2733.74 | |
| Other Outside Serv. (Yard Cleaning) | 1490.00 | |
| Maintenance and Repairs | 265.00 | |
| Overhead Insurance | 2252.84 | |
| Office Supplies | 1067.45 | |
| Other Office Exp | 700.00 | |
| Equipment Lease & Rental @ 902 x 4 | 3608.00 | |
| Overhead Labor w/burden less Richard | 3056.99 | |
| Vehicle Maintenance and Repair | 2659.20 | |
| Vehicle Fees | 83.50 | |
| Fuel | 309.25 | |
| Utilities | 588.62 | |
| Guam Overhead less depreciation | $ 23,488.27 | |
| 50% of Overhead | | $ 11,744.14 |
| Total Overhead Biogenesis Share from July to October | | $ 31,202.82 |

EXHIBIT D - PAGE 11



*Payroll Totals*

## Rhino Builders, Inc.

Totals Page, Employee # 8 Richard Avilla
Check Date 07/12/2000 to 11/17/2000

| | | |
|---|---|---:|
| Gross Payroll: | | 12,599.98 |
| Add-Ons: | | |
| Total Add-Ons: | | |
| Total Gross + Adds: | | 12,599.98 |
| Deductions: | | |
| Employee Fica | 781.14 | |
| Employee Medicare | 182.73 | |
| Federal Income Tax | 2,087.66 | |
| Total Deductions: | | 3,051.53 |
| Net Pay: | | 9,548.45 |
| Advances: | | |
| Net + Advances: | | 9,548.45 |
| Overhead: | | |
| State Disablility (SDI) | 17.46 | |
| Workers Comp Ins | 283.56 | |
| Employer FICA | 781.14 | |
| Employer Medicare | 182.73 | |
| State Unemployment (SUI) | 333.91 | |
| Total Overhead: | | 1,598.80 |
| Total Cost of Payroll: | | 14,198.78 |

**Funds received through 11/17/2000 – earned through 11/11/2000**

EXHIBIT ___ - PAGE ___



**Payroll Checks**

# Rhino Builders, Inc.

Long Form, Employee # 8 Richard Avilla
Check Date 07/12/2000 to 11/17/2000, Tax State GU

| Rec | Check | Date | Period | Type | ID# | Employee | | | |
|-----|-------|------|--------|------|-----|----------|---|---|---|
| | Regular | Ovrtime | Premium | Sick | Vactn | Holiday | Piece | PerDiem | Misc |

588 9745    07/14/00 07/08/00 Regular     8 Richard Avilla
Hrs                                                      Total Hrs:
Pay
   Gross:   500.00  Add/On:          Deduct:  105.61   NetPay:    394.39
Employee Fica    31.00 Employee Medicar    7.25 Federal Income T    67.36
State Disablili    1.95 Workers Comp Ins   11.25 Employer FICA    31.00
Employer Medica    7.25 State Unemployme   13.25

605 9750    07/21/00 07/15/00 Regular     8 Richard Avilla
Hrs                                                      Total Hrs:
Pay
   Gross:   500.00  Add/On:          Deduct:  105.61   NetPay:    394.39
Employee Fica    31.00 Employee Medicar    7.25 Federal Income T    67.36
State Disablili    1.95 Workers Comp Ins   11.25 Employer FICA    31.00
mployer Medica    7.25 State Unemployme   13.25

624 9755    07/28/00 07/22/00 Regular     8 Richard Avilla
Hrs                                                      Total Hrs:
Pay
   Gross:   500.00  Add/On:          Deduct:  105.61   NetPay:    394.39
Employee Fica    31.00 Employee Medicar    7.25 Federal Income T    67.36
State Disablili    1.95 Workers Comp Ins   11.25 Employer FICA    31.00
Employer Medica    7.25 State Unemployme   13.25

639 9757    08/04/00 07/29/00 Regular     8 Richard Avilla
Hrs                                                      Total Hrs:
Pay
   Gross:   500.00  Add/On:          Deduct:  105.61   NetPay:    394.39
Employee Fica    31.00 Employee Medicar    7.25 Federal Income T    67.36
State Disablili    1.95 Workers Comp Ins   11.25 Employer FICA    31.00
Employer Medica    7.25 State Unemployme   13.25

676 9778    08/11/00 08/05/00 Regular     8 Richard Avilla
Hrs                                                      Total Hrs:
Pay
   Gross:   500.00  Add/On:          Deduct:  105.61   NetPay:    394.39
mployee Fica    31.00 Employee Medicar    7.25 Federal Income T    67.36
ate Disablili    1.95 Workers Comp Ins   11.25 Employer FICA    31.00
mployer Medica    7.25 State Unemployme   13.25

EXHIBIT D - PAGE 12

| lec | Check | Date | Period | Type | | ID# | Employee | | | |
|-----|-------|------|--------|------|--|-----|----------|--|--|--|
| | Regular | Ovrtime | Premium | Sick | Vactn | Holiday | Piece | PerDiem | | Misc |

702 9797    08/18/00 08/12/00 Regular        8 Richard Avilla
Hrs                                                      Total Hrs:
Pay

| Gross: | 500.00 | Add/On: | | Deduct: | 105.61 | NetPay: | 394.39 |
|--------|--------|---------|--|---------|--------|---------|--------|
| Employee Fica | 31.00 | Employee Medicar | | 7.25 | Federal Income T | | 67.36 |
| State Disablili | 1.95 | Workers Comp Ins | | 11.25 | Employer FICA | | 31.00 |
| Employer Medica | 7.25 | State Unemployme | | 13.25 | | | |

735 9819    08/25/00 08/19/00 Regular       8 Richard Avilla
Hrs                                                      Total Hrs:
Pay

| Gross: | 738.46 | Add/On: | | Deduct: | 185.99 | NetPay: | 552.47 |
|--------|--------|---------|--|---------|--------|---------|--------|
| Employee Fica | 45.78 | Employee Medicar | | 10.71 | Federal Income T | | 129.50 |
| State Disablili | 2.88 | Workers Comp Ins | | 16.62 | Employer FICA | | 45.78 |
| Employer Medica | 10.71 | State Unemployme | | 19.57 | | | |

763 9838    09/01/00 08/26/00 Regular        8 Richard Avilla
Hrs                                                      Total Hrs:
Pay

| Gross: | 738.46 | Add/On: | | Deduct: | 185.99 | NetPay: | 552.47 |
|--------|--------|---------|--|---------|--------|---------|--------|
| mployee Fica | 45.78 | Employee Medicar | | 10.71 | Federal Income T | | 129.50 |
| State Disablili | 2.88 | Workers Comp Ins | | 16.62 | Employer FICA | | 45.78 |
| Employer Medica | 10.71 | State Unemployme | | 19.57 | | | |

794 9853    09/08/00 09/02/00 Regular        8 Richard Avilla
Hrs                                                      Total Hrs:
Pay

| Gross: | 738.46 | Add/On: | | Deduct: | 185.99 | NetPay: | 552.47 |
|--------|--------|---------|--|---------|--------|---------|--------|
| Employee Fica | 45.78 | Employee Medicar | | 10.71 | Federal Income T | | 129.50 |
| State Disablili | | Workers Comp Ins | | 16.62 | Employer FICA | | 45.78 |
| Employer Medica | 10.71 | State Unemployme | | 19.57 | | | |

808 9856    09/12/00 09/09/00 Regular       8 Richard Avilla
Hrs    40.00                                              Total Hrs:    40.00
Pay

| Gross: | 738.46 | Add/On: | | Deduct: | 185.99 | NetPay: | 552.47 |
|--------|--------|---------|--|---------|--------|---------|--------|
| Employee Fica | 45.78 | Employee Medicar | | 10.71 | Federal Income T | | 129.50 |
| Workers Comp In | 16.62 | Employer FICA | | 45.78 | Employer Medicar | | 10.71 |
| State Unemploym | 19.57 | | | | | | |

824 9858    09/18/00 09/16/00 (Void)       8 Richard Avilla
857 9876    09/26/00 09/23/00 Regular       8 Richard Avilla
s                                                         Total Hrs:
_ay

| Gross: | 738.46 | Add/On: | | Deduct: | 185.99 | NetPay: | 552.47 |
|--------|--------|---------|--|---------|--------|---------|--------|

EXHIBIT D PAGE 4

| Rec | Check | Date | Period | Type | ID# Employee | | | | |
|-----|-------|------|--------|------|--------------|---|---|---|---|
| | Regular | Ovrtime | Premium | Sick | Vactn Holiday | Piece | PerDiem | | Misc |

Employee Fica 45.78 Employee Medicar 10.71 Federal Income T 129.50
Workers Comp In 16.62 Employer FICA 45.78 Employer Medicar 10.71
State Unemploym 19.57

871 9880 10/10/00 09/30/00 Regular 8 Richard Avilla
Hrs Total Hrs:
Pay
Gross: 738.46 Add/On: Deduct: 185.99 NetPay: 552.47
Employee Fica 45.78 Employee Medicar 10.71 Federal Income T 129.50
Workers Comp In 16.62 Employer FICA 45.78 Employer Medicar 10.71
State Unemploym 19.57

891 9884 10/13/00 10/07/00 Regular 8 Richard Avilla
Hrs Total Hrs:
Pay
Gross: 738.46 Add/On: Deduct: 185.99 NetPay: 552.47
Employee Fica 45.78 Employee Medicar 10.71 Federal Income T 129.50
Workers Comp In 16.62 Employer FICA 45.78 Employer Medicar 10.71
State Unemploym 19.57

914 9893 10/20/00 10/14/00 Regular 8 Richard Avilla
Hrs Total Hrs:
Pay
Gross: 738.46 Add/On: Deduct: 185.99 NetPay: 552.47
Employee Fica 45.78 Employee Medicar 10.71 Federal Income T 129.50
Workers Comp In 16.62 Employer FICA 45.78 Employer Medicar 10.71
State Unemploym 19.57

919 9858 09/22/00 09/16/00 Regular 8 Richard Avilla
Hrs Total Hrs:
Pay
Gross: 738.46 Add/On: Deduct: 185.99 NetPay: 552.47
Employee Fica 45.78 Employee Medicar 10.71 Federal Income T 129.50
Workers Comp In 16.62 Employer FICA 45.78 Employer Medicar 10.71
State Unemploym 19.57

949 9895 10/27/00 10/21/00 Regular 8 Richard Avilla
Hrs Total Hrs:
Pay
Gross: 738.46 Add/On: Deduct: 185.99 NetPay: 552.47
Employee Fica 45.78 Employee Medicar 10.71 Federal Income T 129.50
Workers Comp In 16.62 Employer FICA 45.78 Employer Medicar 10.71
State Unemploym 19.57

EXHIBIT 12 PAGE 2

# CONTRACT INVOICE #1288

EXHIBIT 12 - PAGE 111



**Rhino Builders, Inc.**
87-1610 Ulehawa Road
Waianae, HI 96792

# CONTRACT INVOICE

Invoice#:    1288
Invoice Date: 09/13/2000
Due Date:    09/28/2000
Order:

License # C-19515

TO  BioGenesis Pacific, Inc.
1604 Ulualana Place
Kailua, Hawaii 96734

PROJECT 69801
N62766-99-D-0425
Navy Housing
Various Locations
Guam

| Description | Amount |
|---|---|
| Labor Billing Only | 17096.95 |

Original Contract Price...........$  Open

Delivery Orders:
DO #_____1    $ 8,774.49
DO #_____2    $ 7,901.08
DO #_____3    $   179.87
DO #_____4    $   241.51

Adjusted Contract Price...........$  17,096.95

Open  % Work Completed.............$ 17,096.95

Less Retainage (0.00%)............$

Less Previous Billed...............$

Payment Due.......................$  17,096.95

EXHIBIT 15  PAGE 11

| | |
|---|---|
| Sales Tax: $ | 0.00 |
| Invoice Total: $ | 17,096.95 |
| Retention: $ | 0.00 |
| Amount Paid: $ | 0.00 |

*Please Pay This Amount*  | $ 17,096.95

erms: *All invoices are due and payable within 15 days of receipt.*
*A service charge of % per annum will be computed on all amounts overdue on regular statement*
*dates. Please make checks payable to Rhino Builders, Inc.. Thank you for your prompt payment*



*Income Statement*

## Rhino Builders, Inc.

GUAM Income Statement, Period 7 to 10

*GUAMS. OVER HEAD Cost*

Operating Income

| | | |
|---|---|---|
| 40000 | Contract Income HI | 1,420.90 |
| 40006 | Contract Income Guam | 518,097.27 |
| | Total Operating Income: | 519,518.17 |

Other Income

| | |
|---|---|
| Total Other Income: | |
| Total Income: | 519,518.17 |

Direct Expense

| | | |
|---|---|---|
| 50001 | Material | 36,151.48 |
| 50004 | Subcontracted | 165,319.88 |
| 50005 | Other Job Expense | 2,419.65 |
| 50007 | Bonding | 8,266.00 |
| 50010 | HI/GU Sales Tax | 1,813.83 |
| 50400 | Direct Labor | 23,263.46 |
| 50410 | D/l Payroll Taxes | 1,779.32 |
| 50420 | D/l Workers' Comp | 1,284.90 |
| 50440 | D/l Liab Insurance | 1,115.14 |
| | Total Direct Expense: | 241,413.66 |

Shop Expense

| | |
|---|---|
| Total Shop Expense: | |
| Total Operating Expense: | 241,413.66 |
| Gross Profit: | 278,104.51 |

erhead Expense

EXHIBIT D - PAGE 18

| Code | Description | Amount |
|------|-------------|--------|
| 60000 | Rent | 5,100.00 |
| 60010 | Office Supplies | 1,067.46 |
| 60020 | Utilities | 588.62 |
| 60030 | Communications | 4,673.67 |
| 60050 | Postage & Freight | 2,733.74 |
| 60120 | Other Outside Serv. | 1,490.00 |
| 60150 | Consulting Fees | 4,000.00 |
| 60190 | Gov't License Fees | -50.00 |
| 60200 | Travel Expense | 785.76 |
| 60250 | Dues & Subscript'n | 150.00 |
| 60260 | Continuing Educ | 100.00 |
| 60270 | Seminars | 1,100.00 |
| 60300 | Maintenance & Rep | 265.00 |
| 61000 | Insurance | 2,252.84 |
| 61400 | Other Office Exp | 700.00 |
| 61500 | Equip. Rental/Lease | 631.40 |
| 62000 | Plan Fees | 623.22 |
| 62010 | Blue Print Copies | 228.48 |
| 62100 | Bonding Fees | 5,599.00 |
| 64000 | Overhead Labor | 15,501.43 |
| 64010 | O/H Payroll Taxes | 1,185.52 |
| 64020 | O/H Workers' Comp | 266.88 |
| 64040 | O/H Liab Insur | 301.94 |
| 65000 | Vehicle Maint | 2,911.28 |
| 65100 | Vehicle Fees | 83.50 |
| 65200 | Fuel | 309.25 |
| 65300 | Vehicle Repair | -252.08 |
| 66000 | Small Tools | 859.90 |
| 68100 | Vehicle Dep'n Exp | 3,643.32 |
| 68400 | Office Dep'n Exp | 456.15 |

Total Overhead Expense:     57,306.28

**Admin Expense**

| Code | Description | Amount |
|------|-------------|--------|
| 74000 | Admin Salaries | 6,023.02 |
| 74010 | Admin Payroll Tax | 460.77 |
| 74020 | Admin Workers' Cmp | 135.54 |
| 74040 | Admin Liab Insur | 183.05 |
| 77020 | Bank Service Fees | 144.40 |
| 77880 | Misc. Expense | -0.20 |

Total Admin Expense:     6,946.58

Total Indirect Expense:     64,252.86

EXHIBIT D - PAGE 19

Net Profit Before Tax:             213,851.65

After Tax Income/Expense

- - - - - - - - - - - - -

Total After Tax Income/Expense:

==============

Net Profit After Tax:             213,851.65

EXHIBIT D - PAGE 22

| Rec | Check | Date | Period | Type | | ID# | Employee | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Regular | Ovrtime | Premium | Sick | Vactn | Holiday | | Piece | PerDiem | | Misc |

986 9900    11/03/00 10/28/00 Regular     8 Richard Avilla
Hrs                                         Total Hrs:
Pay
   Gross:    738.46   Add/On:          Deduct:    185.99    NetPay:     552.47
Employee Fica     45.78 Employee Medicar    10.71 Federal Income T   129.50
Workers Comp In    16.62 Employer FICA         45.78 Employer Medicar    10.71
State Unemploym    19.57

996 9903    11/10/00 11/04/00 Regular   ----8 Richard Avilla
Hrs                                          Total Hrs:
Pay
   Gross:    738.46   Add/On:          Deduct:    185.99    NetPay:     552.47
Employee Fica     45.78 Employee Medicar    10.71 Federal Income T   129.50
Workers Comp In    16.62 Employer FICA         45.78 Employer Medicar    10.71
State Unemploym    19.57

1013 9910    11/17/00 11/11/00 Regular     8 Richard Avilla
Hrs                                          Total Hrs:
Pay
   Gross:    738.46   Add/On:          Deduct:    185.99    NetPay:     552.47
Employee Fica     45.78 Employee Medicar    10.71 Federal Income T   129.50
Workers Comp In    16.62 Employer FICA         45.78 Employer Medicar    10.71
State Unemploym    19.57

EXHIBIT __D__ - PAGE 2

# ORDER FOR SUPPLIES OR SERVICES

(Contractor: submit four copies of invoice.)

07001    7540

Form Approved
OMB No. 0701-0187
Expires Aug 31, 1992

PAGE 1 OF 1

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send your completed form to the procurement official identified in item 6.

| 1. CONTRACT/PURCH ORDER NO. | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER | 4. REQUISITION/PURCH REQUEST NO. | 5. CERTIFIED FOR NATIONAL DEFENSE UNDER DMS REG 1 |
|---|---|---|---|---|
| N62766-99-D-0425 | 0001 | 5/15/00 | | |

| 6. ISSUED BY | CODE C2766 | 7. ADMINISTERED BY (if other than 6) | CODE | |
|---|---|---|---|---|

**6. ISSUED BY**
Officer in Charge of Construction
NAVFACENGCOM Contracts, Marianas
PSC 455, Box 175
FPO AP 96540-2200

8. DELIVERY FOB
[X] DEST.
[ ] OTHER
(See Schedule if other)

| 9. CONTRACTOR | CODE | FACILITY CODE | 10. DELIVER TO FOB POINT (Date) | 11. MARK IF BUSINESS |
|---|---|---|---|---|
| | | | 15 JUN 2000 | [ ] SMALL |

**9. CONTRACTOR**
NAME AND ADDRESS
BioGenesis Pacific, Inc.
Corporate & Programs Control
1604 Ulualana Place
Kailua, HI  96734
(TEL: 637-9426 Richard Avilla)
8(a) Contractor

COPY

12. DISCOUNT TERMS
NET 30

13. MAIL INVOICES TO
SEE BLOCK 6

[ ] SMALL DISADV
[ ] WOMEN-OWNED

| 14. SHIP TO | CODE | 15. PAYMENT WILL BE MADE BY | CODE | MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER |
|---|---|---|---|---|

**15. PAYMENT WILL BE MADE BY**
Defense Finance & Accounting Service
Operating Location Oakland, Code FPV
P. O. Box 23870
Oakland, CA  94623-3870

| 16. TYPE OF ORDER | |
|---|---|
| [X] DELIVERY | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. |
| [ ] PURCHASE | Reference your _____ Furnish the following on terms specified herein. ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME. |

| NAME OF CONTRACTOR | SIGNATURE | TYPED NAME AND TITLE | DATE SIGNED |
|---|---|---|---|
| BioGenesis | Richard Avilla | Richard Avilla  Operation Manager | 5/1 |

[ ] If this box is marked, supplier must sign Acceptance and return the following number of copies.

## ACCOUNTING AND APPROPRIATION DATA

| 17. ITEM NO. | APPROPRIATION SYMBOL AND SUBHEAD | OBJECT CLASS | BUREAU CONT. NO. | SUB-ALLOT | AUTH'N ACCTG. ACTY | TRANS TYPE | PROPERTY ACCT ACTY | COUN-TRY | COST CODE | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| AA | 1701804.70FA | 250 | 61755 | 0 | 045924 | 2D | COM109 | | 61755046M71Q | $12,129. |

| 18. ITEM NO. | 19. SCHEDULE OF SUPPLIES/SERVICE | 20. QUANTITY ORDERED/ ACCEPTED | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| | W/R 31973, COMNAVMAR | 7540 | | | |
| 0001 | Roof Repairs at BQ1 through BQ20, COMNAVMAR, Guam | | | | |
| 0002AD | Reseal Construction Joints | 4,080 | LF | $ 0.98 | $ 3,998.40 |
| 0002AE | Replace Expansion Joint Assembly, To 2" Space, Stainless Steel | 140 | LF | $ 13.26 | $ 1,856.40 |
| 0015AA | Miscellaneous Items: Waterblast Roof Surface in Accordance with Section 07672 | 4,080 | SF | $ 0.15 | $ 612.00 |
| 0017AA | Seal Joints and Penetrations 6" Wide | 4,080 | LF | $ 0.56 | $ 2,284.80 |
| 0021AA | Re-secure Metal Flashing (Spot Repair) | 850 | SF | $ 3.69 | $ 3,136.50 |
| 0022AA | Trim/Dispose Tree Branches Obstructing Roofing Operation | 100 | LF | $ 2.41 | $ 241.00 |

| 17 If quantity accepted by the Government is same as quantity ordered, indicate X. If different, enter actual quantity accepted below quantity ordered and encircle. | 24. UNITED STATES OF AMERICA | 25. TOTAL |
|---|---|---|
| | L. A. Guzman  BY: L. A. GUZMAN | $ 12,129.10 |
| | Contracting Officer , Tel 339-5120  guzmana@pwcguam.navy.mil | 29. DIFFERENCES |

| 26. QUANTITY IN COLUMN 20 HAS BEEN | 27. SHIP NO. | 28. D. O. VOUCHER NO. | 30. INITIALS |
|---|---|---|---|
| [ ] INSPECTED [ ] RECEIVED [ ] ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | [ ] PARTIAL [ ] FINAL | 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |

| DATE | SIGNATURE OF AUTHORIZED COVER | 31. PAYMENT | 34. CHECK NUMBER |
|---|---|---|---|
| | | [ ] | |

35. I certify this account is correct and proper for payment

BILL OF LADING NO.

Post-it® Fax Note 7671  Date 05/15/00  # of pages ▶ 5
To Eugene    From Alvin
Co./Dept. Rhino    Co. Rhino (Guam)
Phone #    Phone #

| DATE | SIGNATURE AND TITLE OF CE |
|---|---|
| 37. RECEIVED AT | 38. RECEIVED BY |

39. VOUCHER NO.

CD Form 1155 (BPR-MAY 90)

1540

# ORDER FOR SUPPLIES OR SERVICES
*(Contractor must submit four copies of invoices.)*

PAGE 1 OF 3

| ITEM NO. | APPROPRIATION SYMBOL AND SUBHEAD | OBJECT CLASS | BUREAU CONT. NO. | SUB ALLOT | ALLTN ACTTY | TRANS TYPE | PROPERTY ACC'T ACTTY | COUNTRY | COST CODE | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| AA | 1701804.70FA | 250 | 61755 | 0 | 045924 | 2D | CUM118 | | 61755046M59Q | $26,445.10 |

**1. CONTRACT/PURCH ORDER NO.** N62766-96-D-0425
**2. DELIVERY ORDER NO.** DD02
**3. DATE OF ORDER** 29 JUNE 2000
**4. REQUISITION/PURCH REQUEST NO.** W/R 31036

Officer in Charge of Construction
NAVFACENGCOM Contracts, Marianas
PSC 455, Box 175
FPO AP 96540-2200

**8. CONTRACTOR**
BioGenesis Pacific, Inc.
Corporate & Programs Control
1604 Ulualana Place
Kailua, HI 96734
(TEL: 637-9436 Richard Avila)

03 AUGUST 2000

Defense Finance & Accounting Service
Operating Location Oakland, Code FPV
P. O. Box 23970
Oakland, CA 94623-3870

BioGenesis — Richard Avila — Operations Manager — 6-30-00

## SCHEDULE OF SUPPLIES/SERVICES

| ITEM NO. | | QUANTITY ORDERED/ACCEPTED | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | Roof Repairs to Bldg. 4433, Haeumitall Court at Points M, (TSMN&VMAR, Guam | 790 | SF | $6.99 | $5,522.10 |
| 0002AU | Repair Concrete Roof Deck Surface Per Section 03930 and 07072C Grout Depressed Areas | 6,300 | DF | $1.89 | $11,907.00 |
| 0003AU | Install Roof Insulation in Accordance with Section 08220: Tapered Insulation 1/16, 1/8, ¼ Per Ft. | 400 | LF | $2.74 | $1,096.00 |
| 0013AA | Install Roofing System Accessories: Treated Wood Cants, Nailers and Fasteners for 1 Line Item 0006 Through 0012 Above | 1,200 | SF | $0.15 | $ 180.00 |
| 0015AA 0017AC | Miscellaneous Items: Water blast Roof Surface in Accordance with Section 07572 Fluid Applied Roofing Membrane in Accordance with Section 07540: 6½ Mils Thick Roof Membrane | 1,200 | SF | $3.45 | $7,590.00 |

Attached is Statement of Work dated 30 May 2000

**26 TOTAL** $26,445.10

UNITED STATES OF AMERICA
BY: BRIAN M. GILLIGAN, Contracting Officer
(671) 336-2385

DD Form 1155 (8PT), MAY 80

7440    7540

## ORDER FOR SUPPLIES OR SERVICES

*(Contractor must submit four copies of invoice.)*

| Form Approved OMB No. 0701-0187 Expires Aug 31, 1993 | PAGE 1 OF 3 |

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send your completed form to the procurement official identified in item 5.

| 1. CONTRACT/PURCH ORDER NO. | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER | 4. REQUISITION/PURCH REQUEST NO. | 5. CERTIFIED FOR NATIONAL DEFENSE UNDER DMS REG 1 |
|---|---|---|---|---|
| N62766-99-D-0425 | CODE C2766 0008 | 19 JULY 2000 | W/R 31970 | |

| 6. ISSUED BY | CODE |
|---|---|
| Officer in Charge of Construction<br>NAVFACENGCOM Contracts, Marianas<br>PSC 455, Box 175<br>FPO AP 96540-2200 | |

| 7. ADMINISTERED BY (If other than 6) | CODE |

| 8. DELIVERY FOB |
| DEST |
| OTHER (See Schedule if other) |

| 9. CONTRACTOR | CODE | 10. DELIVER TO FOB POINT (ON) | MARK IF BUSINESS IS: |
|---|---|---|---|
| NAME AND ADDRESS | BioGenesis Pacific, Inc.<br>Corporate & Programs Control<br>1604 Ulualana Place<br>Kailua, HI 96734<br>(TEL: 637-9426 Richard Avilla) | 17 SEP 2000 | SMALL |
| | | 11. DISCOUNT TERMS | SMALL DISADVANT. |
| | | | WOMEN-OWNED |
| | | 12. MAIL INVOICES TO: SEE BLOCK 6 | |

| 13. SHIP TO | CODE | 14. PAYMENT WILL BE MADE BY | CODE |
|---|---|---|---|
| | | Defense Finance & Accounting Service<br>Operating Location Oakland, Code FPU<br>P. O. Box 23870<br>Oakland, CA 94623-3870 | MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER |

| 15. DELIVERY/TYPE OF ORDER | X | DELIVERY — This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. |
| PURCHASE | | Reference your _____ furnish the following on terms specified herein. ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED SUBJECT TO ALL THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME. |

| NAME OF CONTRACTOR | SIGNATURE | TYPED NAME AND TITLE | DATE SIGNED |
| ☐ If this box is marked, supplier must sign Acceptance and return the following number of copies. | | | |

## ACCOUNTING AND APPROPRIATION DATA

| ITEM NO. | APPROPRIATION SYMBOL AND SUBHEAD | OBJECT CLASS | BUREAU CONT. NO. | SUB ALLOT | AUTH B ACTY | TRANS TYPE | PROPERTY ACCT ACTY | COUNTRY | COST CODE | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| A A | 97X4930.NEIC | UUU | 77777 | 0 | 062395 | 2F | 062395 | | 62395RC05135 | $42,454.60 |

| ITEM NO. | SCHEDULE OF SUPPLIES/SERVICES | QUANTITY ORDERED/ACCEPTED | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | Roof Systems Installation and Repairs to Bldg. 1, 3 and 5, Dental Clinic, CONNAVMAR, Guam | | | | |
| 0001AC | Demolish and Dispose Roofing System Per Sections 02220; 13281 and 13282: Single or Multi-Ply Membrane System with Insulation Over 3" Thick | 15,220 | SF | $0.71 | $10,806.20 |
| 0001AD | Demolish and Dispose Roofing System Per Sections 02220; 13281 and 13282: Roof Flashing, (Jackets, Downspouts, Hatches or Skylights | 178 | SF | $1.49 | $265.22 |
| 0005AH1 | Install Roof Insulation in Accordance with Section 07220: 2" to 1" Thick (LABOR AND EQUIPMENT ONLY) | 15,219 | LF | $0.80 | $12,175.20 |
| 0014AC | Sheet Metal Flashing, Downspout, Gutter, Trim and Fasteners in Accordance with Section 07600: .015 Thick | 178 | SF | $5.31 | $ 945.18 |
| 0017AC1 | Fluid Applied Roofing Membrane in Accordance with Section 07540; 62 Mils Thick Roof Membrane (LABOR AND EQUIPMENT ONLY) | 15,219 | SF | $1.20 | $18,262.80 |

| 16. UNITED STATES OF AMERICA | | 24. TOTAL | $42,454.60 |
|---|---|---|---|

| 17. If quantity accepted by the Government is same as quantity ordered, indicate X. If different, enter actual quantity accepted below quantity ordered and encircle. | BY | *John M. Mendiola*<br>JOHANNA G. MENDIOLA   TEL: (671) 339-8096<br>mendiolaj@ocguam.navy.mil<br>Contracting Officer | 25. DIFFERENCES |

| 26. QUANTITY IN COLUMN 20 HAS BEEN ☐ INSPECTED ☐ RECEIVED ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | 27. SHIP NO. ☐ PARTIAL ☐ FINAL | 28. D.O. VOUCHER NO. | 32. INITIALS |
| | 29. PAID BY | 30. AMOUNT VERIFIED CORRECT FOR |
| DATE   SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | 31. PAYMENT ☐ COMPLETE ☐ PARTIAL ☐ FINAL | 34. CHECK NUMBER |
| 36. I certify this account is correct and proper for payment. | | 35. BILL OF LADING NO. |
| DATE   SIGNATURE AND TITLE OF CERTIFYING OFFICER | | |
| 37. RECEIVED AT | 38. RECEIVED BY | 39. DATE RECEIVED | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |

DD Form 1155 (SPT), MAY 90    Previous editions are obsolete    S/N 0102-LF-011-4700

EXHIBIT 12 - PAGE 81

# ORDER FOR SUPPLIES OR SERVICES
(Contractor must submit four copies of invoice.)

Form Approved
OMB No. 0101-0187
Expires Aug 31, 1982

PAGE 1 OF: **1**

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Washington Headquarters Services, Directorate for Information Operation and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send your completed form to the procurement official identified in item 6.

| 1. CONTRACT/PURCH ORDER NO. | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER | 4. REQUISITION/PURCH REQUEST NO. | 5. CERTIFIED FOR NATIONAL DEFENSE UNDER DMS REG 1 |
|---|---|---|---|---|
| N62766-99-D-0428 | 0004 | 01 AUG 2000 | W/R 31965 | |

| 6. ISSUED BY | CODE | C2766 | 7. ADMINISTERED BY (If other than 6) | CODE | 8. DELIVERY FOB |
|---|---|---|---|---|---|

6. ISSUED BY
Officer in Charge of Construction
NAVFACENGCOM Contracts, Marianas
PSC 455, Box 175
FPO AP 96540-2200

8. DELIVERY FOB
[X] DEST
[ ] OTHER
(See Schedule if other)

| 9. CONTRACTOR | CODE | FACILITY CODE | 10. DELIVER TO FOB POINT (Date) | 11. THIS IS BUSINESS IS |
|---|---|---|---|---|

NAME AND ADDRESS
BioGenesis Pacific, Inc.
Corporate & Programs Control
1604 Ukualana Place
Kailua, HI 96734
(Tel: 637-9426 Richard Avilla)

10. DELIVER TO FOB POINT (Date)
31 OCT 2000

12. DISCOUNT TERMS

13. MAIL INVOICES TO
SEE BLOCK 6

11. THIS IS BUSINESS IS
[ ] SMALL
[ ] SMALL DISADVANTA
[ ] WOMEN-OWNED

| 14. SHIP TO | CODE | 15. PAYMENT WILL BE MADE BY |
|---|---|---|

15. PAYMENT WILL BE MADE BY
Defense Finance & Accounting Service
Operating Location Oakland, Code FPV
P. O. Box 29570
Oakland, CA 94623-3870

MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER

| 16. TYPE OF ORDER | DELIVERY [X] | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. |
|---|---|---|
| | PURCHASE | Reference your ___ . ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME. |

BioGenesis Pacific, Inc _Richard Avilla_ Richard Avilla Oper. Mng _8-13-00_
NAME OF CONTRACTOR          SIGNATURE          TYPED NAME AND TITLE          DATE SIGNED

[ ] If this box is marked, supplier must sign Acceptance and return the following number of copies.

### ACCOUNTING AND APPROPRIATION DATA

| 17. ITEM NO. | 18. APPROPRIATION SYMBOL AND SUBHEAD | OBJECT CLASS | BUREAU CONT. NO. | SUB ALLOT | AUTH/ACCT'G ACT'Y | TRANS TYPE | PROPERTY ACCT ACT'Y | COUNTRY | COST CODE | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| AA. | 97X4930 NBBC | 000 | 77777 | 0 | 062395 | 2F | 062395 | | 62395RC05145 | $57,160.94 |

| ITEM NO. | SCHEDULE OF SUPPLIES/SERVICE | QUANTITY ORDERED/ACCEPTED | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | Replace metal roof at Bldg 521, Camp Covington | | | | |
| 0003AC | Repair metal roof system: Remove and replace with 22 US Std gage per Section 07410: Remove and replace metal support frame | 1,884 | LB | $2.06 | $3,881.04 |
| 0014AD | Sheet Metal Flashing, Downspout, Gutter, Trim and Fastener in accordance with Section 07600: Galvanised steel 24ga | 1,350 | SF | $2.81 | $3,793.50 |
| NON-PRICED | Repair metal roof system: Remove and replace with 22 US Std gage per Section 07410: Corrugated roofing panels to include demo (labor, material and equipment); Fiberglass krafted insulation to 3-1/2" thick (labor and material); Preparation and painting metal surface, 1 coat primer and 1 finish coat (labor and material) | 7,880 | SF | $6.28 | $49,486.40 |

If quantity accepted by the Government is same as quantity ordered, indicate X. If different, enter actual quantity accepted below quantity ordered and encircle.

19. UNITED STATES OF AMERICA
BY: _Johan M. Mendiola_
JOHANNA G. MENDIOLA    TEL: (671) 339-8098
Contracting Officer    mendiolaj@pwcgum.navy.mil

| 20. TOTAL | $57,160.94 |
|---|---|
| DIFFERENCES | |

| 21. QUANTITY IN COLUMN 20 HAS BEEN | | 27. SHIP NO. | 28. D.O. VOUCHER NO. | INITIALS |
|---|---|---|---|---|
| [ ] INSPECTED [ ] RECEIVED | ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | [ ] PARTIAL [ ] FINAL | | 33. AMOUNT VERIFIED CORRECT FOR |
| | | 31. PAYMENT | 32. PAID BY | |
| ___DATE  SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | | [ ] COMPLETE [ ] PARTIAL [ ] FINAL | | 34. CHECK NUMBER |
| 30. I certify this account is correct and proper for payment. | | | | 35. BILL OF LADING NO. |
| ___DATE  SIGNATURE AND TITLE OF CERTIFYING OFFICER | | | | |
| 37. RECEIVED AT | 38. RECEIVED BY | 39. DATE RECEIVED | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |

DD Form 1155 (SPT), MAY 98    Previous editions are obsolete    S/N 0102-LF-011-4700

EXHIBIT 12 - PAGE 12

7040

# ORDER FOR SUPPLIES OR SERVICES
*(Contractor must submit four copies of invoice)*

| | | | | | I am Approval OMB No. 0701-0187 Expires Aug 31, 1993 | PAGE 1 OF |
|---|---|---|---|---|---|---|
| | | | | | | 1 |

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send your completed form to the procurement official identified in item 6.

| 1. CONTRACT/PURCH ORDER NO. N62766-99-D-0425 | 2. DELIVERY ORDER NO. 0005 | | 3. DATE OF ORDER 08 August 2000 | 4. REQUISITION/PURCH REQUEST NO. W/R 31119 | | 5. CERTIFIED FOR NATIONAL DEFENSE UNDER DMS REG 1 |
|---|---|---|---|---|---|---|
| 6. ISSUED BY Officer in Charge of Construction NAVFACENGCOM Contracts, Marianas PSC 455, Box 175 FPO AP 96540-2200 | | CODE C2766 | 7. ADMINISTERED BY (if other than 6) | | CODE | DO 8. DELIVERY FOB [X] DEST OTHER (See Schedule if other) |
| 9. CONTRACTOR NAME AND ADDRESS BioGenesis Pacific, Inc. Corporate & Programs Control 1604 Ulualana Place Kailua, HI 96734 (Tel: 637-9426 Richard Avilla) | | CODE | FACILITY CODE | 10. DELIVER TO FOB POINT BY (date) 06 NOV 2000 | | 11. MARK IF BUSINESS IS [ ] SMALL [ ] SMALL DISADVANTA [ ] WOMEN-OWNED |
| | | | | 12. DISCOUNT TERMS | | |
| | | | | 13. MAIL INVOICES TO SEE BLOCK 6 | | |
| 14. SHIP TO | | CODE | 15. PAYMENT WILL BE MADE BY Defense Finance & Accounting Service Operating Location Oakland, Code FFV P. O. Box 23870 Oakland, CA 94623-3870 | CODE | | MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER |

| 16. TYPE OF ORDER | DELIVERY [X] | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. | | |
|---|---|---|---|---|
| | PURCHASE | Reference your ___ ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME. | | furnish the following on terms specified herein. |

| BioGenesis Pacific Inc. | *Richard Avilla* | Richard Avilla Operations Manager | 8-9-00 |
|---|---|---|---|
| NAME OF CONTRACTOR | SIGNATURE | TYPED NAME AND TITLE | DATE SIGNED |

[ ] If this box is marked, supplier must sign Acceptance and return the following number of copies.

## ACCOUNTING AND APPROPRIATION DATA

| 17. ITEM NO. | APPROPRIATION SYMBOL AND SUBHEAD | OBJECT CLASS | BUREAU CONT. NO. | SUB ALLOT | AUTH OR ACC'G ACTY | TRANS TYPE | PROPERTY ACC "ACT" | COUN TRY | JOINT FORM | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| AA | 97X4930 NRSC | 000 | 77777 | 0 | 062395 | 2F | 062395 | | 62395RC05146 | $226,501.96 |

| 18. ITEM NO. | 19. SCHEDULE OF SUPPLIES/SERVICE | 20. QUANTITY ORDERED/ ACCEPTED* | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| 0001 | Repair roof with fluid applied membrane 60 MILS at Bldg. 3100, NSFU-1, COMNAVMAR, Guam | | | | |
| 0001AA | Demolish and dispose roofing system per Sections 02220, 13281 and 13282: Single or multi-ply membrane without insulation | 54,826 | SF | 8.51 | $27,981.26 |
| 0001AB | Demolish and dispose roofing system per Sections 02220, 13281 and 13282: Roof flashing. Gutters: Downspouts. Hatches or skylights | 2,100 | SF | $1.49 | $3,129.00 |
| 0016AA | Single component acrylic latex, elastomeric paint for bare concrete roof 45 MILS DFT (3 coats) | 1,010 | SF | $6.20 | $6,262.00 |
| 0017AC | Fluid applied roofing membrane in accordance with Section 07540: 60 MILS thick roof membrane | 54,826 | SF | $3.45 | $189,149.70 |

| | | 24. TOTAL | $226,501.96 |
|---|---|---|---|

| *If quantity accepted by the Government is same as quantity ordered, indicate X. If different, enter actual quantity accepted below quantity ordered and encircle. | 25. UNITED STATES OF AMERICA *[signature]* BY: BRIAN M. GILLIGAN, LT, CEC, USN TEL: (671) 349-3366 Contracting Officer Email: gilligab@nwccguam.navy.mil | | 26. TOTAL $226,501.96 |
|---|---|---|---|
| | | | 27. DIFFERENCES |

| 28. QUANTITY IN COLUMN 20 HAS BEEN [ ] INSPECTED [ ] RECEIVED [ ] ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | 27. SHIP NO. [ ] PARTIAL [ ] FINAL | 29. D.O. VOUCHER NO. | 31. AMOUNT VERIFIED CORRECT FOR |
|---|---|---|---|
| | 30. INITIALS | 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |
| DATE ___ SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | 31. PAYMENT [ ] COMPLETE [ ] PARTIAL [ ] FINAL | | 34. CHECK NUMBER |
| 36. I certify this account is correct and proper for payment. | | | 35. BILL OF LADING NO. |
| DATE ___ SIGNATURE AND TITLE OF CERTIFYING OFFICER | | | |
| 37. RECEIVED AT | 38. RECEIVED BY | 39. DATE RECEIVED | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |

S/N 0102-LF-011-4700

DD Form 1155 (3PT), MAY 90    Previous editions are obsolete

EXHIBIT D - PAGE 211



**Rhino Builders, Inc.**
87-1610 Ulehawa Road
Waianae, HI 96792

# CONTRACT INVOICE

| | |
|---|---|
| Invoice#: | 1366 |
| Invoice Date: | 06/28/2001 |
| Due Date: | 07/13/2001 |
| Order: | |

License # C-19515

TO  BioGenesis Pacific, Inc.
    1604 Ulualana Place
    Kailua, Hawaii 96734

PROJECT  69801
N62766-99-D-0425 - Roofing
Navy Housing
Various Locations
Guam

| Description | | Amount |
|---|---|---|
| Total Billing | | 245664.43 |
| Total Billing for Delivery Orders # 1 -18 | | |
| **Direct Cost** | | |
| Materials | 34,088.17 | |
| Equipment Rental | 9,081.16 | |
| Subcontracted | 1,796.89 | |
| Other Job Exp. | 11,353.96 | |
| Guam GRT | 9,448.63 | |
| Direct Labor w/Burden | 85,346.49 | |
| Interest on Bank Loan | 20,988.33 | |
| Contract Negotiations | 8,250.00 | |
| Total Direct Cost | | 180,353.63 |
| Total Overhead | 130,621.60 | |
| BPI's Share @ 50% | | 65,310.80 |
| Total Due from BPI | | 245,664.63 |

| | | |
|---|---|---|
| Sales Tax: $ | | 0.00 |
| Invoice Total: $ | | 245,664.43 |
| Retention: $ | | 0.00 |
| Amount Paid: $ | | 0.00 |

*Please Pay This Amount*   |   **$ 245,664.43**

*Terms:  All invoices are due and payable within 15 days of receipt.*
*A service charge of % per annum will be computed on all amounts overdue on regular statement*
*dates. Please make checks payable to Rhino Builders, Inc.. Thank you for your prompt payment*

**EXHIBIT** 

*(right margin, vertical)* EXHIBIT ___ - PAGE ___

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

BIOGENESIS PACIFIC INC
1604 ULUA LANA PLACE
KAILUA HAWAII 96734

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)   B. Date of Delivery

C. Signature
X                                        ☐ Agent
                                         ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☐ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

   Restricted Delivery? (Extra Fee)          ☐ Yes

                                    102595-00-M-0952

EXHIBIT __ - PAGE __

---

**CERTIFIED MAIL**



UNCLAIMED

Rhino Builders, Inc.
87-1610 Ulehawa Road
Waianae, HI 96792

License # C-19515

2nd Notice

UNCLAIMED Return

TO  BioGenesis Pacific, Inc.
    1604 Uluaiana Place
    Kailua, Hawaii 96734



2099 3220 0002 6687 7749



U.S. POSTAGE
PAID
HONOLULU, HI
96820
JUL __ '01
AMOUNT
$3.94
000079071-

96792

RETURN RECEIPT

1st NOTICE  7/4/01
2nd NOTICE



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

BIOGENESIS PACIFIC INC
245 B KAYEN TRAMIAHU ST
DEDEDO, GUAM 96912

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)   B. Date of Delivery

C. Signature
X
☐ Agent
☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Copy from service label)
7099 3220 0002 6687 7763

PS Form 3811, July 1999    Domestic Return Receipt    102595-00-M-0952

EXHIBIT D - PAGE 81



CERTIFIED MAIL

Columbian® — CO158
Dubl-Vue® Check Envelope

RETURN RECEIPT
REQUESTED

245 B KAYEN TRAMIAHU ST.
DEDEDO, GUAM 96912

7099 3220 0002 6687 7763

U.S. POSTAGE
PAID
HONOLULU HI
96820
JUL ... 01
AMOUNT
$3.94

96929/6902



# CARLSMITH BALL LLP

A LIMITED LIABILITY LAW PARTNERSHIP

PACIFIC TOWER, SUITE 2200
1001 BISHOP STREET
HONOLULU, HAWAII 96813
TELEPHONE (808) 523-2500    FAX (808) 523-0842
WWW.CARLSMITH.COM

DIRECT DIAL NO.
(808) 523-2527

E-MAIL TTHOMASON@CARLSMITH.COM

OUR REFERENCE NO.
053705-00001

August 15, 2001

Officer in Charge of Construction
ATTN: Ms. Bennett Terlaje, Contracting
  Officer
NAVFACENGCOM Contracts Marianas
PSC455, Box 175
FPO AP 96540-2200

Re:    Subcontractor Assertion of Non-Payment Under FAR 32.112-1; Contract
       No. N62766-99-D-0425; Navy Housing Roofing, Various Locations

Dear Ms. Terlaje:

This is to follow up on our telephone conversation of August 7, 2001 concerning our client, Rhino Builders, Inc. ("Rhino") and its assertion of non-payment by BioGenesis Pacific, Inc. ("BPI"), the prime contractor on the subject contract.

A.    Requested Actions.

Pursuant to Federal Acquisition Regulation ("FAR") 32.112-1, Rhino asserts that it has not been paid $245,664.43 for work performed as a subcontractor to BPI on the Contract No. N62766-99-D-0425; Navy Housing Roofing, Various Locations (the "Contract"). Accordingly, Rhino requests that the contracting officer do the following:

1.    Address BPI's failure to make payment and assist to the extent possible to ensure BPI fulfills its contractual obligations; and

2.    In accordance with FAR 28.106-6, provide the following information to Rhino if BPI fails to provide proof of full payment to Rhino by September 14, 2001:

EXHIBIT D - PAGE 20

a.  The name and address of the surety on this contract;

b.  The penal amount of the bond for this contract; and

c.  A copy of the payment bond for this contract.[1]

B.  Additional Background Information.

As you requested, we provide the following information to assist you in addressing BPI's failure to pay Rhino's invoiced amounts for work performed. We have also included information on other issues you asked us to cover. Please contact me directly at the above phone and facsimile numbers if you have further questions.

1.  Rhino's Status as a Small and Disadvantaged Contractor Under Section 8(a) of the Small Business Act.

This portion of our letter is to respond to your concerns about Rhino's separate contract with the Navy and the information you received concerning Rhino's status as an 8(a) contractor. For your information and reference, I have attached as Enclosure 1 a copy of the Small Business Administration ("SBA") regulations governing minority ownership of a business to qualify as an 8(a) Program participant. The regulations provide for 8(a) Program participation by small businesses owned by an individual disadvantaged person or a group of disadvantaged persons. Ownership as described in the SBA regulations is satisfied if the individual disadvantaged person or group of disadvantaged persons owns 51% or more of the small business. The regulations state that an 8(a) Program participant must be "at least 51% unconditionally and directly owned by one or more socially and economically disadvantaged individuals who are citizens of the United States." [13 CFR § 124.105; attached as Enclosure 1].

In Rhino's case, the SBA has determined that Mr. Michael O'Connell is a disadvantaged citizen of the United States who is of Hawaiian descent. Further the corporate records also show that he owns unconditionally and directly 51% of the shares of Rhino. Based upon SBA's determination that Mr. O'Connell is a qualified disadvantaged individual who owns unconditionally 51% of Rhino, the SBA certified Rhino as an 8(a) contractor.

As I mentioned in our conversation, there is a current question of the ownership of the remaining 49% of Rhino's shares. The question concerning ownership

---

[1]  Rhino agrees to pay reasonable copying costs for the reproduction of the bond in this matter.

EXHIBIT 2 - PAGE 21

of the 49% interest in Rhino arose because the record owner of these shares may have transferred his 49% interest in a manner contrary to the controlling Shareholder Agreement. The Shareholder Agreement required the owner of the 49% interest to affording Rhino a "right of first refusal" to purchase these shares before the shares could be transferred to another person. Accordingly, the only open question about ownership in Rhino relates to a minority shareholder and does not affect Rhino's status as an 8(a) Program participant. Mr. O'Connell remains the 51% owner of the shares of Rhino and no action related to the questioned transfer of 49% interest alters that fact or can in any way deprive Rhino of its status as a qualified 8(a) contractor.

In the event anyone raises this question again, we request you require them to provide documentation to demonstrate a reasonable basis for questioning Rhino's status as an 8(a) contractor. In addition, we request that you inform us so that we may take appropriate action with the individuals involved to resolve the matter.

2.     BPI's Failure To Pay Rhino For Work Performed.

Rhino and BPI entered into an informal, oral subcontract whereby Rhino agreed to perform such Contract work as the Navy might assign to BPI on individual task orders under the Contract. The subcontract agreement was that BPI would pay Rhino's costs of performance plus 50% of BPI's profit upon completion of each task order. In addition, the oral agreement was necessary initially only because the Contract award date had not afforded BPI sufficient time to establish a written subcontract with Rhino. Both BPI and Rhino agreed that the oral agreement between BPI and Rhino would later be reduced to writing to conform to accepted federal government contract practice.

Rhino has insufficient information or knowledge to address any Navy concerns that BPI may have failed to disclose Rhino as its subcontractor or that, at the time, BPI may not have had adequate manpower, equipment, or financial resources to be a responsible contractor eligible for award of the contract. Based upon the information available to Rhino at the time, the subcontract BPI offered in this case was solely a business opportunity, and Rhino expected that BPI (as the prime contractor through SBA) would fulfill all contract administration responsibilities it had with the Navy.

Rhino performed the Navy assigned Task Orders 1 through 4, and on November 16, 2000, Rhino forwarded its initial invoice for its work on the first four Navy assigned work orders. Rhino's invoice included a breakdown of reimbursable costs and profit share. I have attached a copy of Rhino's November 16, 2000 invoice as Enclosure 2 to this letter.

EXHIBIT D . PAGE 39

During the time Rhino was performing work on the Navy's assigned Task Orders 1 through 4, Rhino engaged a consultant experienced in federal procurement to prepare a written subcontract agreement to formalize the relationship between Rhino and BPI. The consultant drafted a proposed subcontract agreement consistent with the terms under which Rhino accepted BPI's offer to perform subcontract work on the Contract. The consultant provided his initial drafts to BPI for comment and finally submitted the full document to BPI for review on November 17, 2000. I have attached a copy of the consultant's facsimile transmittal letter to BPI and the draft subcontract as Enclosure 3 to this letter.

At this point, BPI failed to pay for Rhino's work to date on the Contract. BPI also refused to enter into a formal written subcontract with Rhino. Under the circumstances, Rhino's Chief Executive Officer ("CEO") informed Rhino's Guam office manager to cease performance on the oral agreement with BPI. Rhino's decision to stop work was due to BPI's failure to fulfill its obligation to pay for work performed and refusal to negotiate an acceptable written subcontract. Subsequently, Rhino's CEO learned that BPI was continuing to use Rhino resources on the Contract without payment. Accordingly, Rhino's CEO issued a December 14, 2000 official company notice forbidding BPI's use of Rhino resources to perform its work on the Contract. I have attached a copy of the December 14, 2000 notice as Enclosure 4 to this letter.

In response to Rhino's action, BPI wrote a January 2, 2001 letter to Rhino which I have attached for your review as Enclosure 5 to this letter. In the January 2 letter, BPI stated in relevant part:

> [Rhino's] subcontract was subject to verbal agreement which provided that 50% of the net profits would be determined after all actual costs to both [BPI] and Rhino. In return you represented that Rhino was capable and would front all the needed facilities, personnel, financing and bonding through the term of each task order. Furthermore, Rhino was consistently given clear and specific instructions not to cause any task orders to be accepted from the Navy unless Rhino was certain that each specific task order would result in a profit or break even at worst under our said agreement. If there was any doubt, Rhino was not to cause any task order to be accepted. BPI relied upon Rhino for the acceptance of each task order.

EXHIBIT 2 - PAGE 22

BPI has been disappointed by Rhino's affirmative and
specific actions to repudiate and breach its subcontract with
BPI. This has been especially damaging since upon Rhino's
urgings BPI had wholly relied on Rhino's management and
facilities on Guam.

The above quoted BPI letter shows unmistakably that an oral agreement
existed and that Rhino was to receive at least 50% of the profit from revenues on each
work order. Further, the BPI letter shows that Rhino performed all work on the Contract
work orders including "all the needed facilities, personnel, financing, and bonding
through the term of each work order." In effect, BPI envisioned the subcontract as a
brokered contract with a *de facto* assignment of the Contract to Rhino. BPI did nothing
more than obtain award of the Contract and then attempt to transfer all performance
requirements to Rhino while refusing to pay for work performed.

>    3.    <u>BPI's Description of Subcontract Terms Is Contrary To Federal</u>
<u>Contracting Procedures</u>.

BPI's above description of the subcontract was contrary to Rhino's
understanding of the relationship. Instead of affirming a valid subcontractor relationship,
BPI's own letter shows that BPI was attempting, after the fact, to shift full responsibility
for all contract work to Rhino. Apparently through inexperience in government
contracting, BPI was also demanding that Rhino reject any potentially unprofitable Navy
assignments of task orders. Based upon the BPI letter, it is apparent that BPI was
insisting on shifting all Contract risks and demanding that Rhino "not . . . cause any
[potentially unprofitable] task order to be accepted" even though such an act would
thereby breach the Navy Contract. If Rhino fulfilled the Navy's assigned work order
requirements on any task order BPI found unprofitable, BPI was seeking to require that
Rhino shoulder all costs without reimbursement while BPI received full payment from
the Navy for Rhino's work.

BPI's efforts to evade all Contract work obligations are further confirmed
where BPI's letter states that "BPI relied upon Rhino for the acceptance of each task
order" and that BPI "had wholly relied upon Rhino's management and facilities in
Guam." In effect, BPI did nothing to accomplish the Contract work, and "relied" on
Rhino to do everything the Navy required. BPI sought to establish its role in the venture
solely as the collector of Navy contract payments with no responsibility to perform
Contract work or to pay its subcontractor for performance of the Navy Contract.

BPI's January 2, 2001 letter is clear evidence of an improper effort to assign all Contract responsibilities to a subcontractor without providing notice and obtaining approval of the contracting agency. BPI's letter also improperly demands that the subcontractor work for free or purposely breach the Navy Contract to prevent any loss of profit to BPI. BPI's contention that Rhino "repudiated or breached" the subcontract is patently absurd. Rhino was unwilling to continue work after BPI breached the contract by failing to make payments due. Rhino was also unwilling to remain in the relationship when BPI breached its duty to act in good faith by refusing to commit to a written contract that defined the rights and obligations of the parties.

4.    BPI Continues To Act In Bad Faith.

Rhino asks that you review carefully BPI's January 2, 2001 letter and consider whether BPI's view of the oral agreement with Rhino is reasonable or consistent with public contract law practice. We believe that the letter itself demonstrates that BPI does not meet the minimum standards of FAR 9.104-1. Although BPI's actions are probably based upon ignorance or inexperience in federal government contracting, BPI's treatment of Rhino here must be corrected.

BPI has continued its failure to pay on any of Rhino's invoices. To resolve BPI's failure to pay Rhino for work Rhino performed, Rhino forwarded its final consolidated invoice by U.S. mail to BPI's headquarters on July 21, 2001. However, BPI refused to accept the mailed invoice, and the invoice was returned as unclaimed.

Rhino also attempted to hand deliver its final invoice to BPI's Guam office. BPI officials there informed Rhino's Guam office manager that they were not authorized to accept the Rhino invoice and that Rhino must submit its invoice to the BPI headquarters address from which the earlier mailed invoice was returned unclaimed. The BPI Guam office also refused to accept delivery of the Rhino mailed invoice.

Attached as Enclosure 6 to this letter is Rhino's final invoice in the amount of $245,664.43 for BPI's unpaid billings on all work Rhino performed on the Contract. Also at Enclosure 6 are the relevant mail receipts reflecting BPI's failure to claim its business mail.

C.    Conclusion.

Because BPI refuses to accept mailed invoices and fails to respond to calls to discuss BPI's failure to make payment, Rhino asks that you address this matter with

EXHIBIT 2 - PAGE 32

BPI. We also ask that you assist in referring the matter to BPI's surety if BPI continues
to fail to pay for work Rhino performed on the Navy Contract. Please call me directly if
you have any questions of further requirements.

Very truly yours,

Terry E. Thomason

TET:shl
Enclosures
1424206-1

cc:    Rhino Builders, Inc.

EXHIBIT __ - PAGE __

Bond No. 20-80-88

| **PERFORMANCE BOND**<br>*(See instructions on reverse)* | DATE BOND EXECUTED (Must be same or later than date of contract)<br>October 6, 1999 | OMB No.: 9000-0045 |
|---|---|---|

Public reporting burden for this collection of information is estimated to average 25 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVR), Federal Acquisition Policy Division, GSA, Washington, DC 20405.

| PRINCIPAL (Legal name and business address)<br><br>BIOGENESIS PACIFIC, INC.<br>1604 Ulualana Place<br>Kailua, Hawaii   96734 | TYPE OF ORGANIZATION ("X" one) |
|---|---|

☐ INDIVIDUAL        ☐ PARTNERSHIP

☐ JOINT VENTURE    ☒ CORPORATION

STATE OF INCORPORATION
Hawaii

| SURETY(IES) (Name(s) and business address(es))<br><br>AMERICAN HOME ASSURANCE COMPANY<br>121 Spear Street<br>San Francisco, California   94105 | PENAL SUM OF BOND | | | |
|---|---|---|---|---|
| | MILLION(S) | THOUSAND(S) | HUNDRED(S) | CENTS |
| | | 500 | 000 | 00 |
| | CONTRACT DATE<br>09/29/99 | CONTRACT NO.<br>N62766-99-D-0425 | | |

**OBLIGATION:**

We, the Principal and Surety(ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

**CONDITIONS:**

The Principal has entered into the contract identified above.

THEREFORE:

The above obligation is void if the Principal -

(a)(1) Performs and fulfills all the undertakings, covenants, terms, conditions, and agreements of the contract during the original term of the contract and any extensions thereof that are granted by the Government, with or without notice to the Surety(ies), and during the life of any guaranty required under the contract, and (2) performs and fulfills all the undertakings, covenants, terms conditions, and agreements of any and all duly authorized modifications of the contract that hereafter are made. Notice of these modifications to the Surety(ies) are waived.

(b)   Pays to the Government the full amount of the taxes imposed by the Government, if the said contract is subject to the Miller Act, (40 U.S.C. 270a-270e), which are collected, deducted, or withheld from wages paid by the Principal in carrying out the construction contract with respect to which this bond is furnished.

**WITNESS:**

The Principal and Surety(ies) executed this performance bond and affixed their seals on the above date.

| | PRINCIPAL | | | |
|---|---|---|---|---|
| SIGNATURE(S) | BIOGENESIS PACIFIC, INC.<br>By *(signature)* | 2. (Seal) | 3. (Seal) | Corporate Seal |
| NAME(S) &<br>TITLE(S)<br>(Typed) | 1.<br>GERALD NYC. LAM<br>President | 2. | 3. | |

| | INDIVIDUAL SURETY(IES) | |
|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) |
| NAME(S)<br>(Typed) | 1. | 2. |

| | | CORPORATE SURETY(IES) | | |
|---|---|---|---|---|
| SURETY A | NAME &<br>ADDRESS | AMERICAN HOME ASSURANCE<br>COMPANY, San Francisco, CA | STATE OF INC.<br>New York | LIABILITY LIMIT<br>$ |
| | SIGNATURE(S) | By *(signature)* | 2. | Corporate Seal |
| | NAME(S) &<br>TITLE(S)<br>(Typed) | 1.<br>Swan Lee,<br>Attorney in Fact | 2. | |

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition not usable

**EXHIBIT 4**

STANDARD FORM 25 (REV. 5-96)
Prescribed by GSA-FAR (48 CFR) 53.228(b)

Case 1:02-cv-00008    Document 260    Filed 12/05/2003    Page 95 of 235

Bond No. 20-80-88

| PAYMENT BOND<br>(See instructions on reverse) | DATE BOND EXECUTED (Must be same or later than date of contract)<br>October 6, 1999 | OMB No.:9000-0045 |
|---|---|---|

Public reporting burden for this collection of information is estimate to average 25 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVR), Federal Acquisition Policy Division, GSA, Washington DC 20405

| PRINCIPAL (Legal name and business address) | TYPE OF ORGANIZATION ("X" one) |
|---|---|
| BIOGENESIS PACIFIC, INC.<br>1604 Ulualana Place<br>Kailua, Hawaii  96734 | ☐ INDIVIDUAL      ☐ PARTNERSHIP<br>☐ JOINT VENTURE   ☒ CORPORATION<br>STATE OF INCORPORATION<br>Hawaii |

| SURETY(IES) (Name(s) and business address(es)) | PENAL SUM OF BOND | | |
|---|---|---|---|
| AMERICAN HOME ASSURANCE COMPANY<br>121 Spear Street<br>San Francisco, California  94105 | MILLION(S) | THOUSAND(S) | HUNDRED(S) | CENT(S) |

| MILLION(S) | THOUSAND(S)<br>250 | HUNDRED(S)<br>000 | CENT(S)<br>00 |
|---|---|---|---|

| CONTRACT DATE<br>09/29/99 | CONTRACT NO.<br>N62766-99-D-0425 |
|---|---|

## OBLIGATION:

We, the Principal and Surety(ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

## CONDITIONS:

The above obligation is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal or a subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work provided for in the contract identified above, and any authorized modifications of the contract that subsequently are made. Notice of those modifications to the Surety(ies) are waived.

## WITNESS:

The Principal and Surety(ies) executed this payment bond and affixed their seals on the above date.

| | PRINCIPAL | | | |
|---|---|---|---|---|
| SIGNATURE(S) | 1. BIOGENESIS PACIFIC, INC.<br>By _[signature]_ (Seal) | 2. (Seal) | 3. (Seal) | Corporate Seal |
| NAME(S) & TITLE(S) (Typed) | 1. GERALD N.X.C. LAM<br>President | 2. | 3. | |

| | INDIVIDUAL SURETY(IES) | |
|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) |
| NAME(S) (Typed) | 1. | 2. |

| | | CORPORATE SURETY(IES) | | |
|---|---|---|---|---|
| Surety A | NAME & ADDRESS | AMERICAN HOME ASSURANCE COMPANY, San Francisco, CA | STATE OF INC.<br>New York | LIABILITY LIMIT<br>$ |
| | SIGNATURE(S) | 1. By _[signature]_ | 2. | Corporate Seal |
| | NAME(S) & TITLE(S) (Typed) | 1. Swan Lee,<br>Attorney in Fact | 2. | |

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is usable

STANDARD FORM 25A (REV. 10-98)
Prescribed by GSA-FAR (48 CFR) 53.2228(c)

EXHIBIT D — PAGE 96

C

**M E M O**

American International Companies
SAN FRANCISCO BOND OFFICE
Two Rincon Center
San Francisco, California 94105
TEL: 415/836-2700
Facsimile: 415/836-3158
Direct Dial: 415/836-2695

Date:   October 26, 2001

To:    Mark Titherington, AIG Claims

From:  Joe Maurer, S.F. Region Senior Surety Underwriter

Re:    **BioGenesis Pacific, Inc.  Bond #20-80-88**

Mark:

Per my phone message with you today Please find the following:

1)  Copy of Sundt/BioGenesis Pacific, Inc. Agreement of Indemnity
2)  Copy of Bond #20-80-88
3)  Copy of Notice of Claim by attorney for Rhino Builders, Inc.

Please expedite claim procedure as you would, please note that they are asking for a Miller Act proof of claim form. I don't think that this exists and you may want to forward our proof of claim form if appropriate. Please let me know if you need anything further from me.

Joe

**RECEIVED**

**OCT 2 9 2001**

**Surety Bond Claims**

EXHIBIT 2 . PAGE 1

D

October 30, 2001

**VIA REGULAR MAIL**

Carlsmith Ball LLP
Pacific Tower, Suite 2200
1001 Bishop Street
Honolulu, HI 96813
**Attention: Terry E. Thomasen**

| Re: | Principal: | **BioGenesis Pacific, Inc.** |
|---|---|---|
| | Bond No.: | **000-20-80-88** |
| | Claim No.: | **388-005037-001-0001** |
| | Project: | **Contract No. N62766-99-D-0425 - Navy Housing - Guam and various locations** |
| | Surety: | **American Home Assurance Co.** |
| | Claimant: | **Rhino Builders, Inc.** |

Dear Mr. or Ms. Thomasen:

This will acknowledge receipt of your client's claim in the amount of $245,664.43 for labor and/or materials furnished in connection with the above referenced project.

You will please find enclosed a Proof of Claim form for your client's use in documenting their claim against the above bond. This form should be completed in as much detail as possible, and include the last date that their company either performed the work or supplied materials claimed for on the above project. The Proof of Claim form should then be photocopied twice (to make three sets). Separate copies of documentation supporting the claim should be annexed to each form. Documentation supporting the claim in this instance would include copies of any subcontracts, signed purchase orders, signed invoices, signed delivery tickets, etc. Upon completion, two (2) of these forms in original (signed and notarized by an authorized representative of your client's company), with copies of supporting documentation annexed to each, should be returned to my attention (the third form is for your own records).

Please be advised that this action is taken at this time without waiver of or prejudice to any of the rights and defenses, past or present, known or unknown which either the above referenced Surety or Principal may have in this matter.

Truly yours,

*Mark Titherington*

Mark Titherington

Enc.

cc:     BioGenesis Pacific, Inc.

A Member Company of
American International Group, Inc.

EXHIBIT 2 - PAGE 1

1

E



**AIG Technical Services, Inc.**
175 Water Street
New York, NY 10038
212.770.7000

Direct Dial: (212) 458-1282

October 30, 2001

**VIA REGULAR MAIL**

BioGenesis Pacific, Inc.
1604 Ulualana Place
Kailua, HI 96734-4401

| Re: | | |
|---|---|---|
| | **Principal:** | **BioGenesis Pacific, Inc.** |
| | **Bond No.:** | **000-20-80-88** |
| | **Claim No.:** | **388-005037-001-0001** |
| | **Project:** | **Contract No. N62766-99-D-0425 - Navy Housing - Guam and various locations** |
| | **Surety:** | **American Home Assurance Co.** |
| | **Claimant:** | **Rhino Builders, Inc.** |

Dear Sirs/Mesdames:

This letter is to advise you that American Home Assurance Co., as surety, has received notification from the above referenced claimant setting forth a claim against your bond. A copy of that notification is attached for your records.

In order that our mutual interests may be served, it is important that we have your responsive position within ten (10) days of the date of this letter. If the claim is not in dispute, please advise us why it has not been paid.

As a reminder, we will look to you as our Principal and to our Indemnitors to hold us harmless in this matter.

Truly yours,

*Mark Titherington*

Mark Titherington

cc:     Sundt Construction, Inc.

A Member Company of
American International Group, Inc.

EXHIBIT _____ - PAGE _____

1

F



A Native Hawaiian Company
**BioGenesis Pacific, Inc.**

Mark Titherington
American Home Assurance Company
175 Water Street, 6th Floor
New York, New York 10038

October 25, 2001

RE:     <u>Ref. Bond No. 20-80-88 –BioGenesis Pacific, Inc. (BPI):   Attempted claim by Rhino
Builders, Inc. (Rhino)</u>

Dear Mr. Titherington,

      I have just received a copy of the attempted claim in the above matter by Rhino. There
is no substance to Rhino's claims. There has neither existed a contract, nor a promise for a
written contract. Rhino's attorney's representations to the Navy Contracting Officer and to you
are grossly misleading and irresponsible. There is no oral contract that subjects BPI to any
liability. All representations and solicitations took place privately between Michael O'Connell,
president of Rhino, and me. At no time were there any others present. O'Connell strenuously
marketed himself to gain entrance onto BPI's worksites – a "foot in the door" effort. O'Connell
only proposed to provide work from time to time purely on a <u>completion basis</u>. I had defined my
expectation of "<u>completion basis</u>" to O'Connell repeatedly at the time. In O'Connell's words,
BPI would owe him nothing unless he completed a task on a turnkey basis under BPI's budget.
O'Connell repeatedly proposed that there would be no completed contract until he had
successfully completed his task and BPI was paid by the Navy. I defined specifically my
conditions and expectations that would allow him onto BPI's jobsites from time to time (see
below). I explained to O'Connell that although Rhino was responsible to BPI to complete work,
BPI would not be liable to Rhino in return until Rhino fully met certain conditions. I would not
allow Rhino to work on BPI's jobsites otherwise and that I was not interested in negotiating a
project subcontract with O'Connell until Rhino first proved itself to my satisfaction. O'Connell
agreed wholeheartedly.

      Rhino's attorney now at best claims having an "informal, oral contract." However, an
actual contract pursuant to an "informal, oral" understanding never matured. The following
conditions common to federal construction contracting were all proposed by O'Connell.

1.  O'Connell represented that Rhino already had $500,000 in completion and payment
bonds and $1,000,000 in liability insurance and agreed to provide certificates of bonding
and insurance to BPI before performing work and billing. Though I repeated requested
for certificates, Rhino never provided any, and later, I discovered that Rhino in fact never
had such coverage in this matter.

EXHIBIT ____ - PAGE ____

2.  O'Connell represented that Rhino had up to $5 million of construction financing available and would fully finance its work.  After repeated requests, O'Connell failed to show proof of financing and I later discovered this representation of financing for use on BPI's project not to be true.

3.  O'Connell represented that Rhino had already had prior approved  project plans, i.e. safety, accident, quality control and quality assurance plans.  He promised that such plans were already in place.  I stated that they were an absolute condition and he agreed.  After repeated requests, Rhino failed to provide these plans and I later discovered that Rhino did not have such relevant plans for the project in place.

4.  O'Connell represented that he had surplus workers and office facilities for the same work performed under the prior Prime Contractor and would utilize them now that BPI had taken over the project.  That this would give BPI more time to mobilize its own workforce on Guam.  And, since Rhino had performed all the work under the prior Prime contractor, "Rhino had the bonding, insurance, and financing in place and wholeheartedly accepted the total risk of its own costs and full completion of its jobs" (O'Connell's own words).  Rhino remained fully responsible for paying all costs of any allocated work that exceeded BPI's budget.  O'Connell also promised to be responsible for any delays and delinquency fees for any work that BPI authorized Rhino to begin but failed to complete. O'Connell also told me that Rhino would even pay BPI for its excess costs to finish any job that Rhino failed to complete.

5.  O'Connell also offered that if Rhino failed to finish any work, BPI owed Rhino nothing. O'Connell vehemently repeated this offer.  He went on to offer that the Navy Quality Assurance Officer must sign off on the work, the Navy must then pay BPI, Rhino would first submit full accounting of its costs and labor, and BPI would first approve Rhino's costs all before Rhino could submit an invoice.   I then defined what a qualified invoice would be.  O'Connell agreed that there could be no submittal of invoices unless first qualified by BPI.  O'Connell agreed that a qualified invoice would be based upon BPI's satisfaction of:

   a)   Rhino's certified payroll and its supervisor's collaborating daily site record,
   b)   Rhino's ongoing compliance with its bonding, insurance and site plans (safety, accident, and quality),
   c)   BPI's prior approval of Rhino's accounting method, cost items, and allocable burdens of overhead and indirects,
   d)   Rhino's provided financial documents showing its company wide administrative and management costs,
   e)   BPI's prior approval of Rhino's list of proposed direct costs,
   f)   Rhino's financial officer's representation assuring accuracy of receipts and accounting.

I made many requests for this information, but Rhino had repeatedly failed to provide them.

**BioGenesis Pacific, Inc.**

EXHIBIT F - PAGE 2

6. I repeatedly stated specifically answering O'Connell's solicitations over the year preceding actual work that a contract would only mature between BPI and Rhino when and if Rhino actually completed all its work undertaken, the Navy signed off on the work, BPI was paid by the Navy, and BPI did not suffer any late fees or damages. Furthermore, Rhino must provide full bonding, insurance coverage, financing and assume full responsibility for all costs exceeding BPI's budget price for the work. When a completed contract came into existence after Rhino's successful performance without penalties, and its costs were approved and below BPI's budget price, only then would BPI split the net profit of that allocable work with Rhino. Work was assigned on a case by case basis at BPI's discretion. I specifically stated that these were all <u>conditions precedent</u> to a completed contract. I explained that conditions precedent meant that all conditions must be satisfied before BPI would have any liability to Rhino. But until full satisfaction, there would be no contract with Rhino even though Rhino otherwise had full responsibility to BPI for finishing its work before then. That is because BPI would have had to rely upon Rhino once Rhino had been allowed to start a job.

7. Initially, Rhino was authorized to provide services as such on the first 2 task orders only. However, Rhino failed to pay its creditors on time and caused liquidated damages in delays. Rhino then failed to meet my requests for certificates of bonding and insurance and proof of financial capacity. Rhino entered upon BPI's other worksites without approval and authorization and upset and caused confusion in BPI's sitework and efforts to establish BPI's office and laborforce.

8. I have strong reason to believe that O'Connell early on had directly stated to his managers in Guam his plan for Rhino to present itself on all of BPI's worksites taking over the work. And then, at a critical time, Rhino would stop work and cause BPI to fail and since Rhino was a Section 8(a) company, Rhino could take over BPI's contract with the Navy. In fairness, this is yet part of my ongoing investigation and a legal matter now under consideration with my legal counsel.

Rhino's claim is baseless. It's invoices are not in compliance with the required conditions. There is no certification of its payroll, no proof of its summary costs, no relationship to specific work performed, if any, no proof of payment of materials costs, and no record of which materials and what quantities were used for stated jobs. Allocation of general administration and overhead are incompetent and unapproved. Furthermore, there are indiscriminate costs for interest on financing and premiums for insurance and bonds which certificates were never provided. I have enclosed copies of two letters to Rhino dated January 2, 2001 and September 8, 2001 for your reference.

Rhino did have contract obligations to BPI to complete performance of jobs that BPI had authorized under the first 2 task orders. Although BPI was at risk and had to rely upon Rhino, BPI had no liability to Rhino until Rhino had completed its contract obligations (discussed above). Rhino entered upon BPI's other task orders without authorization, affirmatively caused stop-work orders without notice, authorization or approval, and harassed BPI's workforce and office staff. Subsequently, Rhino's managing agent, Mr. Michael Danforth personally claimed to

**BioGenesis Pacific, Inc.**

EXHIBIT 5 - PAGE 2

me countless of times that Rhino "did not have any subcontract with BPI,.. never did,.. and therefore, did not owe BPI any work…but, if BPI would like a subcontract with Rhino, Rhino would be happy to present BPI with a written draft for a 5 year exclusive subcontract…and, until Rhino had a contract with BPI, Rhino would not resume work."

I point out that Mr. Danforth was an executive project manager for Allstar-SAB (Sundt-Actus) in Hawaii and intimately involved with BPI in bidding this particular contract 15 months prior to his employ with Rhino. BPI collaborated with Allstar-SAB via Mr. Danforth on designing, strategizing and bidding this contract *purely* because Allstar-SAB proposed to include BPI as the lead Section 8(a) bidder for the upcoming Navy Aliamanu Reservation Maintenance Solicitation where Allstar was then the incumbent. Allstar-SAB had recanted some of its main promises in the Aliamanu teaming effort and BPI nicely stepped aside without complaint significantly benefiting Allstar-SAB. Though an insider with proprietary knowledge, Mr. Danforth months later joined and actively represented Rhino against BPI's interests in this particular matter.

Rhino had caused BPI to accrue liquidated damages due to missing completion deadlines. BPI has financially satisfied those damages with the Navy and has performed excellently notwithstanding. BPI has protected your company from Rhino's and Mr. Danforth's interference and has honorably met its obligations with Allstar-SAB in the collateral matters. However, BPI does intend to fairly pursue its issues with any misconduct attributable to Rhino's and Mr. Danforth's actions.

O'Connell aggressively solicited BPI for over a year prior to any work. BPI never once solicited, approached or initiated discussions with Rhino in any way. Rhino's counsel now takes extreme liberty in arguing his case to the Navy Contract Officer and now to you. Legal suit to collect on such frivolous invoicing is alarmingly thin, and I believe that Rhino's counsel chooses to more safely resort to a complaint to the Navy contracting officer and indirectly to your company. I have had no contact, formal inquiry, notice of collection, or legal complaint from Rhino or their counsel. As you can see, Rhino and their attorneys have ignored my simple and fair requests for substantiation of Rhino's claims.

I feel bad that Rhino and its counsel have irresponsibly availed themselves upon you. As you may have extrapolated from the materials Rhino's attorney supplied to you, Rhino's true motivation perhaps stems from its private internal squabble over control of its stock shares. So far I have remained quiet and patient with their internal problems that do not concern BPI. However, should their efforts unfortunately escalate into a more appropriate legal suit for collection, I do intend to pursue action against O'Connell, Rhino, Mr. Danforth, a second Rhino project manager and their attorneys for conspiracy and violations under RICO, frivolous prosecution and damages.

**BioGenesis Pacific, Inc.**

EXHIBIT $\underline{4}$ - PAGE $\underline{4}$

Please do not hesitate to contact me should you have any questions or need to discuss these matters further.

Very truly yours,

Gerald N.Y.C. Lam
President

cc:   B. Terlaje, OICC Guam
      M. Youth, SBA Hawaii

EXHIBIT F - PAGE 5

**G**



**A Native Hawaiian Company**
*BioGenesis Pacific, Inc.*

Eugene O'Connell
Rhino Builders, Inc.
790 North Marine Drive
Box 959
Tumon, Guam 96911

January 2, 2001

RE: Invoices 1313, 1288

Dear Mr. O'Connell

We are in receipt of your correspondence concerning your Guam subcontract with our company. Your subcontract was subject to a verbal agreement which provided that 50% of the net profits would be determined after all actual costs to both BioGenesis Pacific, Inc. (BPI) and Rhino. In return, you represented that Rhino was capable and would front all the needed facilities, personnel, financing and bonding through the term of each task order. Furthermore, Rhino was consistently given clear and specific instructions not to cause any task orders to be accepted from the Navy unless Rhino was certain that each specific task order would result in a profit or break even at worst under our said agreement. If there was any doubt, Rhino was not to cause any task order to be accepted. BPI relied upon Rhino for the acceptance of each task order.

BPI has been disappointed by Rhino's affirmative and specific actions to repudiate and breach its subcontract with BPI. This had been especially damaging since upon Rhino's urgings BPI had wholly relied upon Rhino's management and facilities on Guam. You ordered all work stopped midway during performance of task orders that caused BPI to default on its general contract with the Navy incurring liquidated damages. Next, without notice or warning, you ordered all equipment to be shutdown, including equipment owned by BPI located at your facilities. And then, you even attempted to evict BPI from the office facilities without proper legal notice. That you have perniciously breached your subcontract with BPI causing much damage it clear.

For these reasons, your invoices are unacceptable as well as premature. I am shocked over your actions for it seems obvious that you intended to cause BPI to fail with the Navy allowing Rhino to succeed in the Navy roofing contract? While I hope this is not the case, BPI has to first determine the actual costs after completion of the all task orders. Secondly, BPI must determine Rhino's performance on its subcontracting. Then BPI must determine fair damages incurred by Rhino's breaches.

As BPI yet looks forward to an amicable relationship, any misunderstandings must be settled and matters handled fairly.

Very truly yours,

Gerald Lam

**EXHIBIT 6 - PAGE 1**

---

Corporate and Programs Control • 1604 Ulualana Place • Kailua, Hawaii 96734 USA • 808-263-7777 • FAX 808-263-0002

H



## SUNDT
### CONSTRUCTION, INC.

Monday, November 19, 2001

Mark Titherington
AIG Technical Services, Inc.
175 Water Street
New York, New York 10038

NOV 2 7 2001

Re:     Principal:       Sundt Construction, Inc.
        Bond No.:        000-20-80-88
        Claim No.:       388-005037-001-0001
        Project:         Contract No. N62766-99-D-0425 - Navy Housing - Guam and
                         various locations
        Surety:          American Home Assurance Co.
        Claimant:        Rhino Builders, Inc.

Dear Mr. Titherington:

Sundt Construction, Inc. has received your letter dated October 30, 2001 regarding the
$245,664.73 bond claim filed by Rhino Builders, Inc. (Rhino).

The principal on the payment bond under which Rhino is making its claim is BioGenesis
Pacific, Inc. (BioGenesis). The penal sum of the bond is $250,000. Under an Agreement
of Indemnity dated December 17, 1998, The Sundt Companies, Inc. (Sundt) agreed to be
an indemnitor on the bond. (A performance bond with a penal sum of $500,000 was also
issued under the Agreement of Indemnity.)

All Star/SAB Pacific Group Joint Venture (All Star/SAB) and BioGenesis signed a
Teaming Agreement effective as of June 7, 1999 to submit a proposal in response to
Solicitation No. N62766-99-D-0425 relating to maintenance and repair of Navy Roofing
Systems at Guam, M.I. (Project). According to Exhibit A of the Teaming Agreement, All
Star/SAB was to provide bonds, input on the technical proposal, mentoring to
BioGenesis, computer expertise regarding IDIQ contracting, and contract start-up
facilities.

The Teaming Agreement contemplated that All Star/SAB would execute a subcontract
with BioGenesis as the Prime Contractor if the team was the successful bidder. Although
a subcontract was drafted, it was not signed.

BioGenesis did not inform All Star/SAB or Sundt that it was awarded the contract for the
Project and has not kept All Star/SAB or Sundt informed of the status of the work on the

EXHIBIT **H** - PAGE **1**

4101 E. IRVINGTON ROAD · TUCSON, AZ (85714) · P.O. BOX 26685 (85726) · (520) 748.7555 · FAX (520) 747.9673

CONTRACTOR LICENSES    ARIZONA  068012-A    068014-1-09  078799-1-37  076101-1-11  CALIFORNIA   NEVADA
                                 068012-1-1            22861           270672-A-1

Project. Neither All Star/SAB nor Sundt has any knowledge of Rhino or work that Rhino claims it provided on the Project.

In view of the foregoing and the obligation to indemnify the surety, All Star/SAB, with the knowledge and consent of Sundt, has hired Stephen D. Tom of White & Tom to investigate Rhino's claim as well as the status of the work on the Project. Contact information for Mr. Tom follows:

Stephen D. Tom
White & Tom
Haseko Center
820 Mililani St., Suite 701
Honolulu, HI 96813-2972
(808) 547-5151
FAX: (808) 599-4517

All Star/SAB's primary contact is Buck Bland. Contact information for Mr. Bland follows:

Buck Bland
All Star/SAB Pacific Group Joint Venture
4101 East Irvington Drive
Tucson, Arizona 85714
(520) 750-6277

Mr. Tom and Mr. Bland will let you know the results of their investigation by December 31, 2001. If you have questions or comments, please let us know. Thank you.

Sincerely,

SUNDT CONSTRUCTION, INC.

Kevin T. Dwyer
Senior Paralegal

cc:     Buck Bland, All Star/SAB Pacific Group Joint Venture
        John Junge, All Star/SAB Pacific Group Joint Ventur
        Stephen D. Tom, White & Tom
        Doug Pruitt, Sundt Construction, Inc.
        Ray Bargull, Sundt Construction, Inc.
        Kevin Burnett, Sundt Construction, Inc.
        Pete Johnson, Sundt Construction, Inc.

EXHIBIT H - PAGE 7



**SUNDT**
CONSTRUCTION, INC.

Monday, November 26, 2001

Mark Titherington
AIG Technical Services, Inc.
175 Water Street
New York, New York 10038

Re:   Principal:      Sundt Construction, Inc.
      Bond No.:       000-20-80-88
      Claim No.:      388-005037-001-0001
      Project:        Contract No. N62766-99-D-0425 - Navy Housing - Guam and
                      various locations
      Surety:         American Home Assurance Co.
      Claimant:       Rhino Builders, Inc.

Dear Mr. Titherington:

In my letter of November 19, 2001 regarding the $245,664.73 bond claim filed by Rhino Builders, Inc. (Rhino), I stated (in the fifth paragraph), "BioGenesis did not inform All Star/SAB or Sundt that it was awarded the contract for the Project and has not kept All Star/SAB or Sundt informed of the status of the work on the Project."

This is not entirely correct. According to Buck Bland, BioGenesis did inform All Star/SAB that BioGenesis was awarded the contract. Subsequently, All Star/SAB asked AIG through its broker to issue the Miller Act bonds. However, BioGenesis never notified All Star/SAB that it received a "notice to proceed" with the Project. In addition, BioGenesis did not keep All Star/SAB continually informed as to the status of the project.

Stephen Tom and Buck Bland will let you know the results of their investigation by December 31, 2001. If you have questions or comments, please let us know. Thank you.

Sincerely,
SUNDT CONSTRUCTION, INC.

Kevin T. Dwyer
Senior Paralegal

cc:   Buck Bland, All Star/SAB Pacific Group Joint Venture
      John Junge, All Star/SAB Pacific Group Joint Venture
      Stephen D. Tom, White & Tom
      Pete Johnson, Sundt Construction, Inc.

RECEIVED

NOV 29 2001

Surety Bond Claims

EXHIBIT H - PAGE 2

4101 E. IRVINGTON ROAD · TUCSON, AZ (85714) · P.O. BOX 26685 (85726) · (520) 748.7555 · FAX (520) 747.9673

# THE SUNDT COMPANIES, INC.

Friday, December 07, 2001

Mark Titherington
AIG Technical Services, Inc.
175 Water Street
New York, New York 10038

Re:  Principal:      BioGenesis Pacific, Inc.
     Indemnitor:     The Sundt Companies, Inc.
     Bond No.:       000-20-80-88
     Claim No.:      388-005037-001-0001
     Project:        Contract No. N62766-99-D-0425 - Navy Housing - Guam and
                     various locations
     Surety:         American Home Assurance Co.
     Claimant:       Rhino Builders, Inc.

Dear Mr. Titherington:

On Saturday, December 1, 2001, Buck Bland of All Star/SAB Pacific Group Joint
Venture (All Star/SAB) and Stephen Tom, the attorney hired by All Star/SAB, met with
Gerry Lam, the president of BioGenesis Pacific, Inc. in Honolulu, Hawaii to discuss the
bond claim filed by Rhino Builders, Inc. Mr. Bland also met with others in Hawaii to
discuss the progress on the contract and the allegations made by Rhino.

To further the investigation, Mr. Tom would like to meet with the owner (United States
Navy) to discuss the status of the contract and to review and copy relevant documents.
Based on past experience, the owner will require evidence that the bonding company has
authorized Mr. Tom to investigate the bond claim and review documents.

A proposed form of letter is attached. The Sundt Companies, Inc. and All Star/SAB
request that American Home Assurance Co. issue a similar letter (on its letterhead) and
fax it to the owner at (671) 339-7077 and mail a hard copy to:

Officer in Charge of Construction
Ms. Bennett Terlaje, Contracting Officer
NAVFACENGCOM Contracts Marianas
PSC455, Box 175
FPO AP 96540-2200

Please fax copies of the letter to us at (520) 750-6266 and to Mr. Tom at (808) 599-4517.

EXHIBIT 4 - PAGE 4

4101 E. IRVINGTON ROAD · TUCSON, AZ (85714) · P.O. BOX 26685 (85726) · (520) 748.7555 · FAX (520) 747.9673

Case 1:02-cv-00008    Document 260    Filed 12/03/2003    Page 115 of 235

Mr. Bland and Mr. Tom plan to submit a report to you by December 31, 2001 regarding the results of their investigation.

Please note for your records that "The Sundt Companies, Inc." was the indemnitor on the bond (not "Sundt Construction, Inc."). In the Re: information above, we have indicated that BioGenesis Pacific, Inc. is the principal and The Sundt Companies, Inc. is the indemnitor.

If you have questions or comments, please let me know. Thank you.

Sincerely,

THE SUNDT COMPANIES, INC.

Peter Johnson
Senior Vice President
General Counsel

cc:    Buck Bland, All Star/SAB Pacific Group Joint Venture
       John Junge, All Star/SAB Pacific Group Joint Venture
       Stephen D. Tom, White & Tom
       Doug Pruitt, The Sundt Companies, Inc.
       Ray Bargull, The Sundt Companies, Inc.
       Kevin Burnett, The Sundt Companies, Inc.

EXHIBIT ____ - PAGE 5

I

**AIG** AIG Technical Services, Inc.
175 Water Street
New York, NY 10038
212.770.7000

Direct Dial: (212) 458-1282

December 21, 2001

<u>VIA Facsimile to (671) 339-7077</u>
<u>and REGULAR MAIL</u>

Officer in Charge of Construction
Ms. Bennett Terlaje, Contracting Officer
NAVFACENGCOM Contracts Marianas
PSC455, Box 175
FPO AP 96540-2200

Re:   **Principal:**   **BioGenesis Pacific, Inc.**
       **Bond No.:**   **000-20-80-88**
       **Claim No.:**   **388-005037-001-0001**
       **Project:**   **Contract No. N62766-99-D-0425 - Navy Housing - Guam and various locations**
       **Surety:**   **American Home Assurance Co.**
       **Claimant:**   **Rhino Builders, Inc.**

Dear Ms. Terlaje:

American Home Assurance Co., as surety, issued payment bond 20-80-88 in the penal sum of $250,000 to BioGenesis Pacific, Inc. (BioGenesis), as principal, on the above contract.

By letter dated October 22, 2001, Rhino Builders, Inc. (Rhino) filed a $245,664.43 claim against the payment bond for labor and materials supplied to BioGenesis.

The Sundt Companies, Inc. as part of its ongoing relationship with All Star/SAB Pacific Group Joint Venture (All Star/SAB) was an indemnitor on the payment bond.

All Star/SAB has hired Stephen D. Tom of White & Tom, Haseko Center, 820 Mililani St., Suite 701, Honolulu, Hawaii 96813-2672; (808) 547-5151; FAX: (808) 599-4517 to investigate all aspects of Rhino's claim.

American Home Assurance Co. acknowledges Mr. Tom's representation of All Star/SAB and authorizes Mr. Tom to inquire into all matters regarding the progress of the work and the bond

**AIG** A Member Company of
American International Group, Inc.

1

EXHIBIT **1** . PAGE **1**

Truly yours,

*Mark Titherington*

Mark Titherington

Enc.

cc:    Stephen D. Tom @ White & Tom
        The Sundt Companies, Inc.

EXHIBIT __1__ · PAGE __2__

2

J

# CARLSMITH BALL LLP

A LIMITED LIABILITY LAW PARTNERSHIP

PACIFIC TOWER, SUITE 2200

1001 BISHOP STREET
HONOLULU, HAWAII 96813
TELEPHONE (808) 523-2500    FAX (808) 523-0842
www.carlsmith.com

DIRECT DIAL NO.
(808) 523-2527

E-MAIL TET@CARLSMITH.COM

OUR REFERENCE NO.
053705-00001

January 9, 2002

RECEIVED

JAN 1 5 2002

Surety Bond Claims

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mark Titherington
American Home Assurance Company
175 Water Street, 6th Floor
New York, New York 10038

Re:    Supplement to Miller Act Claim; Ref. Bond No. 20-80-88 - BioGenesis
       Pacific, Inc., Prime Contractor on Contract No. N62766-99-D-0425

Dear Mr. Titherington:

In behalf of our client, Rhino Builders, Inc. ("Rhino"), we provide the following materials for your consideration and actions as surety for BioGenesis Pacific, Inc. ("BPI") on Navy Contract No. N62766-99-D-0425 ("the Contract").

AIG Technical Services, Inc.'s Proof of Claim form is attached to this letter as Enclosure 1. Rhino's final Contract Invoice to BPI, dated December 19, 2001, is attached to this letter as Enclosure 2. BPI's letter in response to Rhino's final Contract Invoice, dated December 22, 2001, is attached to this letter as Enclosure 3.

BPI has failed to pay Rhino for its work as a subcontractor on the Contract. BPI's response to Rhino's final Contract Invoice is a rejection and refusal to pay Rhino. See Enclosure 3. Specifically, BPI's letter refuses to address payment unless Rhino produces a copy of the executed subcontract, in addition to numerous other irrelevant documents not material to Rhino's subcontract with BPI. The demand for a copy of the executed subcontract is disingenuous because Gerald Lam, President of BPI, refused to

HONOLULU  ·  KAPOLEI  ·  HILO  ·  KONA  ·  MAUI  ·  GUAM  ·  SAIPAN  ·  LOS ANGELES  ·  WASHINGTON, D.C.  ·  MEXICO

sign any subcontract with Rhino as he had initially promised. Further, the absence of a written subcontract is meaningless and not required for recovery under the Miller Act. There was, in fact and law, a subcontract between Rhino and BPI. Mr. Lam acknowledges the existence of such subcontract and even reiterates the terms of the subcontract in a letter to Michael O'Connell, President of Rhino, dated January 2, 2001. A copy of Mr. Lam's letter is attached to this letter as Enclosure 4.

Under the circumstances here, BPI's December 22, 2001 letter is nothing more than a frivolous, calculated, and deliberate ploy to avoid paying Rhino. As discussed below, the parties' agreement, and legally binding contract, was that Rhino would receive its costs, plus fifty percent (50%) of profits resulting from Rhino's work on the Contract. See Enclosure 4.

### A.   BPI FAILED TO PAY RHINO FOR WORK PERFORMED

Rhino and BPI entered into an oral subcontract whereby Rhino agreed to perform such Contract work as the Navy might assign to BPI on individual task orders under the Contract. Rhino completed the work on task order numbers 0001 through 0018 of the contract and invoiced BPI for payment. The Navy accepted all of Rhino's work on the Contract and made full payment to BPI. As discussed below, BPI has never paid Rhino for any of the work performed on the Contract, even though all of the work was performed by Rhino employees using Rhino equipment, and BPI received full payment.

### 1.   Terms Of The Subcontract

The subcontract agreement was that BPI would pay Rhino's costs of performance plus 50% of BPI's profit upon completion of each task order. See Enclosure 4. In addition, the oral agreement was necessary initially only because the Contract award date had not afforded BPI sufficient time to establish a written subcontract with Rhino. Both BPI and Rhino agreed that the oral agreement between BPI and Rhino would later be reduced to writing to conform to accepted federal government contract practice.

During the time Rhino was performing work on the Navy's assigned Task Orders 1 through 4, Rhino engaged a consultant experienced in federal procurement to prepare a written subcontract agreement to formalize the relationship between Rhino and

EXHIBIT ___ - PAGE 2

BPI. The consultant drafted a proposed subcontract agreement consistent with the terms under which Rhino accepted BPI's offer to perform subcontract work on the Contract. The consultant provided his initial drafts to BPI for comment and finally submitted the full document to BPI for review on November 17, 2000. A copy of the consultant's facsimile transmittal letter to BPI and the draft subcontract are attached to this letter as Enclosure 5.

At this point, BPI refused to pay for Rhino's work to date on the Contract and refused to enter into a formal written subcontract with Rhino. Under the circumstances, Rhino's Chief Executive Officer ("CEO") informed Rhino's Guam office manager to cease performance on the oral agreement with BPI. Rhino's decision to stop work was due to BPI's failure to fulfill its obligation to pay for work performed and refusal to negotiate an acceptable written subcontract. Subsequently, Rhino's CEO learned that BPI was continuing to use Rhino resources on the Contract without payment. Accordingly, Rhino's CEO issued a December 14, 2000 official company notice forbidding BPI's use of Rhino resources to perform its work on the Contract. A copy of the December 14, 2000 notice is attached to this letter as Enclosure 6.

In response to Rhino's action, BPI wrote the January 2, 2001 letter (Enclosure 4) to Rhino, which states in relevant part:

> [Rhino's] subcontract was subject to a verbal agreement which provided that 50% of the net profits would be determined after all actual costs to both [BPI] and Rhino. In return you represented that Rhino was capable and would front all the needed facilities, personnel, financing and bonding through the term of each task order. Furthermore, Rhino was consistently given clear and specific instructions not to cause any task orders to be accepted from the Navy unless Rhino was certain that each specific task order would result in a profit or break even at worst under our said agreement. If there was any doubt, Rhino was not to cause any task order to be accepted. BPI relied upon Rhino for the acceptance of each task order.
>
> BPI has been disappointed by Rhino's affirmative and specific actions to repudiate and breach its subcontract with



EXHIBIT — PAGE 2

BPI. This has been especially damaging since upon Rhino's urgings BPI had wholly relied on Rhino's management and facilities on Guam.

The above quoted BPI letter shows unmistakably that an oral agreement existed and that Rhino was to receive at least 50% of the profit from revenues on each work order. Further, the BPI letter shows that Rhino performed all work on the Contract work orders including "all the needed facilities, personnel, financing, and bonding through the term of each work order." As additional proof that the work was performed by Rhino personnel, attached are copies of Rhino's payroll records as Enclosure 7 to this letter. In effect, BPI envisioned the subcontract as a brokered contract with a *de facto* assignment of the Contract to Rhino. BPI did nothing more than obtain award of the Contract and then attempt to transfer all performance requirements to Rhino while refusing to pay for work performed.

2.  <u>Rhino's Work Was Accepted By The Navy And BPI Was Paid Without Incurring Any Costs</u>

All of the work performed by Rhino on task orders 0001 through 0018 of the Contract was accepted by the Navy. The Navy paid BPI a total of ONE MILLION EIGHT HUNDRED FIFTY TWO THOUSAND SEVEN HUNDRED EIGHTY EIGHT AND .38/100 DOLLARS ($1,852,788.38) for all of Rhino's work on the Contract. A break down of the Navy's payments to BPI for each task order and the payments owed by BPI to Rhino is attached to this letter as Enclosure 8. BPI incurred no costs on the Contract because all of the work was performed by Rhino personnel using Rhino's equipment and Rhino's facilities. Rhino, on the other hand, incurred direct costs and overhead costs totaling THREE HUNDRED TEN THOUSAND NINE HUNDRED SEVENTY FIVE AND .23/100 DOLLARS ($310,975.23). See Enclosure 8.

In addition to the parties' agreement, BPI guaranteed payment to Rhino for all completed and accepted work. A copy of an e-mail from BPI to Rhino reflecting BPI's guarantee to pay Rhino for all completed and accepted work is attached to this letter as Enclosure 9. Although Rhino completed its work and its work was accepted by the Navy, BPI has yet to pay Rhino anything. All of the Navy documents showing acceptance of Rhino's work, confirming payment to BPI, and supporting the payments owed to Rhino are attached to this letter as Enclosure 10. As a result of BPI's breach of

EXHIBIT 9 - PAGE 4

its subcontract with Rhino, Rhino has incurred an enormous debt that has jeopardized Rhino's financial existence.

    B.    <u>Conclusion</u>.

    Rhino provided all labor and materials to perform work orders 0001 through 0018 of the contract pursuant to an oral subcontract between Rhino and BPI. BPI received full payment for the Rhino work the Navy accepted. However, BPI continues to refuse to pay Rhino for its costs plus fifty percent (50%) of BPI's profits on the Contract as agreed between the parties. Therefore, Rhino intends to enforce its rights under the Miller Act. Accordingly, Rhino hereby submits this letter, along with all its enclosures, as a supplement to its Proof of Claim against BPI's surety, AIG Technical Services, Inc.

    Your immediate attention to this matter is appreciated.

    Very truly yours,

    CARLSMITH BALL LLP

    *Amy D. Self*

    Terry E. Thomason
    Amy G. Self

1441107.1.053705-00001
Enclosures

cc:    Rhino Builders, Inc.

EXHIBIT — PAGE 5



# AIG Technical Services, Inc.
175 Water Street
New York, NY 10038
212.770.7000

## *Proof of Claim : Construction Contract*

AIG Technical Services, Inc.

State of ___Territory of Guam___

Bond Number: 000-20-80-88
Claim Number: 388-005037-001-0001

County of _____

I,___Michael O'Connell___,the___CEO___ of ___Rhino Builders, Inc.___
  (Name of Affiant)           (Position in Firm)             (Name of Claimant)
of _87-1610 Ulehawa Road, Waianae, HI 96792_ on behalf of said firm, hereby state under oath that
          (Address)
said firm between the dates of ___May 2000___ and ___December 2000___ furnished, sold,

and delivered __roofing installation & repairs &__ materials to __BioGenesis Pacific, Inc.___ for the
          (describes services or material)  0425      (Name of contractor or subcontractor if any)
construction of _Contract No. N62766-99-D-___ in accordance with an _oral_ Subcontract or
described in Prime (Identify Contract)
__Contractor letter__ Purchase order. Dated _January 2, 2001_, a copy of which is attached hereto, for the agreed
price of _$1,081,881.80_, none of which has been paid except ___$0___ and leaving a statement
balance due of $1,081,881.80. Attached hereto are ___1___ Invoices, __NA__ delivery tickets

showing the deliveries or progress estimates furnished ___BioGenesis Pacific, Inc.___
                                                              (Contractor)
and the amount due to claimant therefore; that said firm served notice of said balance due it by Registered Mail dated :
_____ on Surety, _Dec. 20, 2001_ on Contractor, __NA__ on Owner, (copies
attached), that there is no just credit nor offset due against said balance and that said firm made no assignment of any
part of said balance except to ___NA___
and that there are no liens or encumbrances against said balance except that of ___NA___
_____; that said firm has paid in full for all labor and material
furnished and supplied it for said job except the claims of the persons or firms whose names and addresses and amounts
due to them are as follows:
      NA

The foregoing information is furnished to the surety in support of affiant's claim and it is understood that the furnishing of
this from or the acceptance and/or retention thereof by the surety does not constitute a waiver or any of the terms of the
Surety's bond nor of any defenses the Surety may have, nor admission of liability thereunder.
Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal
or civil penalties.
Sworn to and subscribed before me
this _9th_ AIKO SHIMA day of _January_ 20_02_

Notary Public State of Hawaii
Signed: My commission expires: 6/24/02      (Affiant's Signature)

STATE OF HAWAII

EXHIBIT ___ - PAGE ___



**Rhino Builders, Inc.**
87-1610 Ulehawa Road
Waianae, HI 96792

# CONTRACT INVOICE

Invoice#:      1400
Invoice Date: 12/19/2001
Due Date:     01/03/2002
Order:

License # C-19515

TO  BioGenesis Pacific, Inc.
1604 Ulualana Place
Kailua, Hawaii 96734

PROJECT 69801
N62766-99-D-0425 - Roofing
Navy Housing
Various Locations
Guam

| Description | Amount |
|---|---|
| Final Invoice including profit | 1081881.80 |

See Attached Breakdown

Certified Mail: 7099 3220 0002 6687 5868
Date Mailed: December 20, 2001

| | |
|---|---|
| Sales Tax: $ | 0.00 |
| Invoice Total: $ | 1,081,881.80 |
| Retention: $ | 0.00 |
| Amount Paid: $ | 0.00 |

### *Please Pay This Amount*   $1,081,881.80

*Terms: All invoices are due and payable within 15 days of receipt.*
*A service charge of % per annum will be computed on all amounts overdue on regular statement*
*dates. Please make checks payable to Rhino Builders, Inc.. Thank you for your prompt payment*

**ENCLOSURE 2**

EXHIBIT — PAGE

## Payments to BioGenesis Pacific, Inc. for Task Orders # 0001 - 0018

| Task Order # | Payments Made To BPI | Total Payment to BPI |
|---|---|---|
| 0001 | $ 12,129.00 | $ 12,129.00 |
| 0002 | $ 26,445.10 | $ 26,445.10 |
| 0003 | $ 23,832.60<br>$ 26,192.00 | $ 50,024.60 |
| 0004 | $ 43,997.98<br>$ 13,162.96 | $ 57,160.94 |
| 0005 | $ 95,583.83<br>$ 79,456.04<br>$ 49,197.09<br>$ 2,265.00 | $226,501.96 |
| 0006 | $127,618.01<br>$260,278.69 | $387,896.70 |
| 0007 | $ 5,280.00 | $ 5,280.00 |
| 0008 | $ 98,784.78 | $ 98,784.78 |
| 0009 | $ 3,332.24<br>$ 68,340.37<br>$ 15,882.37<br>$ 2,499.00 | $ 90,053.98 |
| 0010 | $ 52,841.45<br>$ 39,376.13<br>$ 7,635.63<br>$ 3,934.00 | $103,787.21 |
| 0011 | $ 7,219.52<br>$ 9,399.55<br>$ 3,673.75 | $ 20,292.82 |
| 0012 | $ 39,652.68 | $ 39,652.68 |
| 0013 | $ 36,259.86 | $ 36,259.86 |
| 0014 | $ 23,287.60 | $ 23,287.60 |



EXHIBIT - PAGE

| 0015 | $ 41,989.28 | $ 41,989.28 |
|------|-------------|-------------|
| 0016 | $ 62,158.84<br>$173,497.24<br>$145,209.16<br>$205,546.32 | $586,411.56 |
| 0017 | $ 34,339.97 | $ 34,339.97 |
| 0018 | $ 12,490.34 | $ 12,490.34 |
| **TOTALS** | **$1,852,788.38** | **$1,852,788.38** |

Total paid to BPI on Contract #N62766-99-D-0425    =    $1,852,788.38
Rhino's total direct costs                          =    - 180,353.63
Rhino's total overhead                              =    - 130,621.60
Total Profit on Contract #N62766-99-D-0425          =    $1,541,813.15
                                                         x      50%
Rhino's 50% share of profit                         =    $  770,906.57


Rhino's total direct costs                          =    $ 180,353.63
Rhino's total overhead                              =      130,621.60
Rhino's 50% share of profit                         =      770,906.57
Total owed to Rhino under subcontract with BPI      =    $1,081,881.80

EXHIBIT — PAGE 1



**A Native Hawaiian Company**
**BioGenesis Pacific, Inc.**

Rhino Builders, Inc.
87-1610 Ulehawa Road
Waianae, HI 96792

*Certified Mail 7001 1940 005 4510 7787*

December 22, 2001

RE: Invoicing

Sirs,

We have received your proposed incvice dated 12-19-01 for $1,081,881.80. We have no record of your contract provisos on the stated Project N62766-99-D-0425. There is no contract submittals from your company on record nor is there a certified account determining your summary claim in your invoicing.

To first establish a proper invoice and approval for invoicing you must first provide *all of* the following:

1. Copy of your executed Subcontract;

2. Insurance Certificates or Insurer's Letter dated for the periods in issue for your performance and payment bonds listing Biogenesis Pacific, Inc. and the U.S. Navy – Guam as additional insured;

3. Insurance Certificates dated for the periods in issue for your general liability insurance in the amount of $1,000,000 showing your coverage limits listing Biogenesis Pacific, Inc. and the U.S. Navy-Guam with a written attached endorsement specifically on Project N62766-99-D-0425;

4. Insurance Certificates dated for the periods in issue for your workmen's compensation insurance policy showing your coverage limits listing Biogenesis Pacific, Inc. and the U.S. Navy-Guam with a written attached endorsement specifically on Project N62766-99-D-0425;

5. Rhino's Safety, Health and Accident Plan as then approved by Biogenesis Pacific Inc.'s project manater;

6. Rhino's Quality Control Plan as then approved by Biogenesis Pacific Inc.'s project manager;

7. Copies of Rhino's OSHA reports showing the date submitted to Biogenesis Pacific Inc . at that time;

---

Corporate and Programs Control 1604 Uiualana Place • Kailua, Hawaii 96734 USA 808-263-7777 FAX 808-263-0002

**ENCLOSURE 3**

EXHIBIT — PAGE 10

8.     Copy of each Notice and Authority to Proceed from Biogenesis Pacific, Inc. for each Task Order;

9.     Originals of the Daily Progress Reports as approved by Biogenesis Pacific Inc.'s project manager for each Task Order;

10.     Originals of the certified payrolls for each Task Order as approved by Biogenesis pacific Inc.'s project manager;

11.     Copies of all receipts for materials, proof of satisfaction of payment to vendors, and original records of inventory tracking signed off by Biogenesis Pacific Inc.'s project officer for all materials for each Task Order;

12.     Full and complete accounting for every charge item and its numerical reference to allowable charges under subcontract line items for each Task Order;

13.     Original Notice of Completion received by Rhino from the Navy Contract Officer or Navy QA for each Task Order;

14.     Record of timely submittal of all relevant documents (above-described) to Biogenesis Pacific, Inc.;

15.     Record of Biogenesis Pacific Inc. receipt of said relevant documents (above-described) and its notice to Rhino to invoice accordingly;

16.     Properly certified invoicings for each Task Order.

Once these items have been received, we will review them and account from our records accordingly. Until that time, however, we have no choice but to reject your invoicing as improper, incoherent and unsubstantiated.

Very truly yours,

Gerald Lam
President

BioGenesis Pacific, Inc.

EXHIBIT _____ PAGE ___

**K**



**AIG** AIG Technical Services, Inc.
175 Water Street
New York, NY 10038
212.770.7000

Direct Dial: (212) 458-2901

January 17, 2002

**VIA REGULAR MAIL**

Carlsmith Ball LLP
Pacific Tower, Suite 2200
1001 Bishop Street
Honolulu, HI 96813
**Attention: Terry E. Thomasen, Esq.**

Re: **Principal:      BioGenesis Pacific, Inc.**
**Bond No.:      000-20-80-88**
**Claim No.:      388-005037-001-0001**
**Project:      Contract No. N62766-99-D-0425 - Navy Housing - Guam and various**
**locations**
**Surety:      American Home Assurance Co.**
**Claimant:      Rhino Builders, Inc.**

Dear Mr. Thomasen:

This will acknowledge receipt of your Proof of Claim forms in reference to the above captioned matter.

At this time, I am immediately taking this matter up with the above referenced Principal, in order to ascertain their position on your claim as presented. I will be in contact with you in due course regarding their position on the Proof of Claim as presented by your company on the above referenced bond.

Please be advised that this action is taken at this time without waiver of or prejudice to any of the rights and defenses, past or present, known or unknown which either the above referenced Surety or Principal may have in this matter.

Very truly yours,

Bruce Kahn

cc:    BioGenesis Pacific, Inc.
The Sundt Companies, Inc.

BCC : STEVE TOM

**AIG** A Member Company of
American International Group, Inc.

1

EXHIBIT __A__ - PAGE __1__

L

# AIG

**AIG Technical Services, Inc.**
175 Water Street
New York, NY 10038
212.770.7000

Direct Dial: (212) 458-9201

January 17, 2002

**VIA OVERNIGHT DELIVERY**

Sundt Construction, Inc.
4101 East Irvington Road
Tucson, AZ 85714
**Attention: Kevin T. Dwyer**

Re: | **Principal:** | **BioGenesis Pacific, Inc.**
--- | --- | ---
 | **Bond No.:** | **000-20-80-88**
 | **Claim No.:** | **388-005037-001-0001**
 | **Project:** | **Contract No. N62766-99-D-0425 - Navy Housing - Guam and various locations**
 | **Surety:** | **American Home Assurance Co.**
 | **Claimant:** | **Rhino Builders, Inc.**

Dear Mr. Dwyer:

Enclosed please find a copy of Rhino Builders, Inc.'s Proof of Claim dated January 9, 2002.

As I am new to this matter please give me a call at your earliest convenience so that I can be brought up to speed on the status of this claim.

Very truly yours,

*Bill*

Bruce Kahn

Enc.

cc: BioGenesis Pacific, Inc.
White & Tom

A Member Company of American International Group, Inc.

EXHIBIT ___ . PAGE ___

1

**M**

**AIG** **AIG Technical Services, Inc.**
175 Water Street
New York, NY 10038
212.770.7000

Direct Dial: (212) 458-2901

February 21, 2002

**VIA REGULAR MAIL**

Carlsmith Ball LLP
Pacific Tower, Suite 2200
1001 Bishop Street
Honolulu, HI 96813
**Attention: Terry E. Thomasen, Esq.**

| Re: | Principal: | BioGenesis Pacific, Inc. |
|---|---|---|
| | Bond No.: | 000-20-80-88 |
| | Claim No.: | 388-005037-001-0001 |
| | Claimant: | Rhino Builders, Inc. ("Rhino") |
| | Project: | Contract No. N62766-99-D-0425 - Navy Housing - Guam and various locations |
| | Surety: | American Home Assurance Co. |

Dear Mr. Thomasen:

The above referenced surety has reviewed the Proof of Claim and supporting documentation (collectively, the "Proof of Claim") which you submitted on or about January 9, 2002 in support of your client's claim against the referenced bond. The Proof of Claim has been reviewed in connection with the relevant bond language, your client's purported Miller Act Notice dated October 22, 2001, and the federal Miller Act, 40 U.S.C. § 270a et seq. which governs claims against payment bonds issued for federal projects such as the above.

Section 270b(b) of the Miller Act, among other things, expressly states that a payment bond claimant is time barred from bringing suit to enforce its claim unless such an action is brought within one year of the day on which the last of the labor was performed or material was provided by them.

I note that the sworn affidavit of Michael O'Connell, identified as claimant's chief executive officer, included in the Proof of Claim, admits and conclusively establishes that the last day claimant performed labor or provided material on the above project was on or before December 31, 2000. In order to have been timely, suit to enforce the claim would have had to have been commenced within one year of that date. As such, the above referenced claim appears to be time barred by the statute of limitations contained in 40 U.S.C. § 270b(b). Accordingly, the claim must be denied.

If you have any other documents or information you believe would be helpful for the Surety to review please feel free to provide them to the undersigned.

**AIG** A Member Company of
American International Group, Inc..

1

EXHIBIT **M** - PAGE **1**



**AIG Technical Services, Inc.**
175 Water Street
New York, NY 10038
212.770.7000

Please be advised that this action is taken at this time without waiver of or prejudice to any of the rights and defenses, past or present, known or unknown which either the above referenced Surety or Principal may have in this matter.

Very truly yours,

Bruce Kahn

cc.: BioGenesis Pacific, Inc.

A Member Company of
American International Group, Inc.

2

EXHIBIT ___ . PAGE ___

N

# CARLSMITH BALL LLP

### A LIMITED LIABILITY LAW PARTNERSHIP

PACIFIC TOWER, SUITE 2200

1001 BISHOP STREET

HONOLULU, HAWAII 96813

TELEPHONE (808) 523-2500    FAX (808) 523-0842

WWW.CARLSMITH.COM

DIRECT DIAL NO.
(808) 523-2527

E-MAIL TET@CARLSMITH.COM

OUR REFERENCE NO.
053705-00001

### March 11, 2002

**BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

**RECEIVED**

MAR 1 9 2002

Surety Bond Claims

Mr. Bruce Kahn
AIG Technical Services, Inc.
175 Water Street
New York, New York 10038

Re:    Miller Act Claim; Ref. Bond No. 20-80-88 - BioGenesis Pacific, Inc.,
Prime Contractor on Contract No. N62766-99-D-0425

Dear Mr. Kahn:

We are in receipt of your letter of February 21, 2002, in which you state the claim submitted by our client, Rhino Builders, Inc. ("Rhino"), is time barred under the Miller Act.

We ask that you reconsider your position. Under the Miller Act, the one year limitation period begins on the last day the claimant provides labor or material for use on the project. As you may recall in our January 9, 2002 supplemental letter to Rhino's claim, we explained that BioGenesis Pacific ("BPI") "was continuing to use Rhino resources on the Contract without payment." This use of Rhino materials on the Contract continues even today, even though Rhino's present claim for payment is only for labor and materials supplied to BPI on the Contract through December 2000. See the attached Affidavit of Michael O'Connell. As discussed below, Rhino's claim is well within the Miller Act's one year limitation period.

HONOLULU · KAPOLEI · HILO · KONA · MAUI · GUAM · SAIPAN · LOS ANGELES · WASHINGTON, D.C. · MEXICO

EXHIBIT 2 - PAGE 1

A.    The Ninth Circuit's Interpretation of the Miller Act

The purpose of the Miller Act is "to provide broad protection for persons supplying labor and material for the construction of federal public projects." General Electric Co. v. Southern Construction Co., Inc., 383 F.2d 135, 139 (5th Cir. 1967). See also Taylor Construction Inc. v. ABT Service Corp. Inc., 163 F.3d 1119 (9th Cir. 1998) (explaining that "[t]he policy behind the Act is 'to provide a surety who, by force of the Act, must make good the obligations of a defaulting contractor to his suppliers of labor and material'") (quoting United States ex rel. Sherman v. Carter, 353 U.S. 210, 217 (1957); United Bonding Ins. Co. v. Catalytic Construction Co., 533 F.2d 469, 473 (9th Cir. 1976) (holding that the "purpose of the Miller Act is to protect those who would have materialmen's and workmen's liens under state law if they were not working on a structure exempt as a federal public work or building"). Thus, courts have traditionally given the Miller Act liberal construction and application in order "to protect those whose labor and materials go into public projects." Taylor Construction, 163 F.3d at 1122 (quoting Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co., 322 U.S. 102 (1944)). See also United Bonding, 533 F.2d. at 473 (interpreting the Miller Act liberally, in light of its legislative history, to protect laborers and suppliers).

1.    Statute of Limitations Under the Miller Act

Section 270(b) of the Miller Act provides in pertinent part that a payment bond action "shall be commenced after the expiration of one year after the day on which the last of the labor was performed or material was supplied by [the claimant]." 40 U.S.C. § 270(b). The Act's "one-year period begins to run [either] on the day when the labor ceases or when the last material was supplied." J.D. Fields & Co., Inc. v. Gottfried Corp., et al., 272 F.3d 692, 698 (5th Cir. 2001). See, e.g., Interform Co. v. Mitchell, 575 F.2d 1270 (9th Cir. 1978); United States ex rel. Carter-Schneider-Nelson, Inc. v. Campbell, 293 F.2d 816 (9th Cir. 1961); Mike Bradford & Co. v. F.A. Chastain Constr., Inc., 387 F.2d 942 (5th Cir. 1968).

In applying the Act's one-year limitations period to suppliers of equipment, the Ninth Circuit has held that the period begins to run "on the date 'the equipment was last available for use on the project.'" United States for the Use of Pippin v. J.R. Youngdale Construction Co., Inc., 923 F.2d 146 (9th Cir. 1991) (quoting United States ex rel. Miller & Bentley Equip. Co. v. Kelley, 327 F.2d 590, 591 (9th Cir. 1964). See also Campbell, 293 F.2d at 820 (holding that when the claimant provides equipment by lease

EXHIBIT 2 - PAGE 7

or rental, the one-year limitations period begins on the date "the equipment was last available for use on the project"); Interform Co., 575 F.2d at 1280 (explaining that under the Miller Act, "a furnisher of rental equipment continues to supply such equipment through the entire rental period; the date of last supply occurs not at the beginning of a job but at the end or at the time the equipment is last available for use on the job").

The court in Youngdale Construction explained that unlike a supplier of materials whose obligation ends upon delivery, a supplier of equipment under lease or rental "must allow the equipment to remain in the hands of the lessee for such time as is specified by the lease arrangement." Youngdale Construction, 923 F.2d at 149 (quoting Campbell, 293 F.2d at 820). Thus, "the lessor continues to supply the equipment until the date that the equipment is no longer available for use by the [contractor] on the project." Id. at 149-150. The Act's one-year limitations period, therefore, begins on the date the equipment was last available for use on the project. Id. at 149.

B.      Rhino's Miller Act Claim is Not Barred by the One-Year Limitations Period

Rhino's Miller Act claim is not time barred because Rhino has continued to supply equipment to BPI for use on the project. See attached Affidavit of Michael O'Connell. The time period from May 2000 to December 2000, as entered in the Proof of Claim, is the inclusive period during which Rhino supplied labor and materials to BPI for which Rhino is claiming non-payment by BPI. However, subsequent to December 2000, Rhino continued to supply equipment to BPI as late as January 2002. See attached Affidavit of Michael O'Connell.

Specifically, Rhino supplied a truck leased by Rhino to BPI which was available for use by BPI on the project until March 20, 2001, the date on which the lease expired. See Exhibit A of the Affidavit of Michael O'Connell. Rhino also supplied another truck to BPI which was available for use by BPI on the project until May 2001, the date the truck was returned to Rhino. See attached Affidavit of Michael O'Connell. In addition, Rhino supplied another truck to BPI which was available for use by BPI on the project until January 17, 2002, the date on which Rhino paid to have the truck towed to Rhino's premises. See Exhibit B of the Affidavit of Michael O'Connell. Finally, BPI has continued to use and is presently using Rhino's safety equipment and various other types of equipment. See attached Affidavit of Michael O'Connell. The one-year limitations period will not begin until the date such equipment is no longer available for

EXHIBIT 2 - PAGE 3

use by BPI on the project. <u>See</u> <u>Youngdale Construction</u> <u>supra</u>. Therefore, Rhino's claim is not time barred under the Miller Act.

C.  <u>Conclusion</u>.

The purpose of the Miller Act is to provide broad protection for companies like Rhino that supply labor and material for the construction of federal public works projects. Rhino's claim against BPI under the Miller Act is for all labor and materials it supplied to BPI from May 2000 to December 2000 only, even though Rhino has continued to supply equipment to BPI for the project. Because such equipment is still available to BPI for use on the project, Rhino's claim is not time barred by the Miller Act's statute of limitations.

Rhino asks for prompt resolution of its claim before it is compelled to bring civil suit.

Very truly yours,

CARLSMITH BALL LLP

Terry E. Thomason
Amy G. Self

1450480.1.053705-00001
Enclosures

cc:  Rhino Builders, Inc.

EXHIBIT 12 - PAGE 4

# AFFIDAVIT OF MICHAEL O'CONNELL

STATE OF HAWAII                          )
                                         ) SS.
CITY AND COUNTY OF HONOLULU              )

MICHAEL O'CONNELL, being duly sworn upon oath, deposes and states:

1.      All statements made in this Affidavit are based on my personal knowledge, unless otherwise expressly stated.

2.      I am presently the President and CEO of Rhino Builders, Inc. ("Rhino"). I have been Rhino's President and CEO since 1992.

3.      Rhino performed work as the subcontractor to BioGenesis Pacific, Inc. ("BPI") on the Contract No. N62766-99-D-0425; Navy Housing Roofing, Various Locations (the "Contract").

4.      On January 9, 2002, I submitted a Proof of Claim to AIG Technical Services, Inc. ("AIG") on behalf of Rhino.

5.      In the Proof of Claim, I stated under oath that Rhino furnished, sold, and delivered roofing installation and repairs between the dates of May 2000 and December 2000 in accordance with an oral subcontract with BPI.

6.      On February 26, 2002, I received a letter indicating AIG misinterpreted the December 2000 date included in the Proof of Claim as the last day Rhino performed labor or provided material on the project.

1450096.1.053705-00001

EXHIBIT 12 - PAGE 5

7. The time period from May 2000 to December 2000, as entered in the Proof of Claim, states the inclusive period during which Rhino provided materials and labor to BPI on the Contract and for which BPI failed to make payment.

8. Subsequent to December 2000, Rhino has continued to provide materials to BPI for work on the project in the form of equipment either owned or leased by Rhino as late as January 2002.

9. More specifically, Rhino continued to supply a truck leased by Rhino for the project to BPI through March 20, 2001. See a true and correct copy of a Rhino Invoice to BPI, dated March 21, 2001, reflecting a truck rented to BPI by Rhino for the project attached hereto and incorporated herein as Exhibit A.

10. Rhino continued to supply a truck owned by Rhino to BPI for the project until BPI finally returned the truck to Rhino in May 2001.

11. Rhino continued to supply another truck owned by Rhino to BPI for the project until January 17, 2002, at which time Rhino had to pay $65.00 to have its truck towed to Rhino's premises to regain lawful control of its truck from BPI. See a true and correct copy of a receipt for towing services dated January 17, 2002, indicating that Rhino paid $65.00 to have its truck towed from BPI to Rhino attached hereto and incorporated herein as Exhibit B.

12. Prior to May 2001, BPI had refused to return any of Rhino's trucks to Rhino.

2

EXHIBIT 2 - PAGE 1

13. In addition, BPI has continued to use and is presently using Rhino's safety equipment and various other types of equipment for the project.

FURTHER AFFIANT SAYETH NAUGHT.

_____
MICHAEL O'CONNELL

Subscribed and sworn to before me
this 7th day of *March*, 2002

_____
Notary Public, State of Hawaii
NORIKO SHIMBO
My commission expires: 6/24/02

NOTARY PUBLIC
STATE OF HAWAII

3

1450096.1.053705-00001

EXHIBIT 2 - PAGE 1

## AFFIDAVIT OF MICHAEL O'CONNELL

STATE OF HAWAII                    )
                                          ) SS.
CITY AND COUNTY OF HONOLULU    )

MICHAEL O'CONNELL, being duly sworn upon oath, deposes and states:

1.     All statements made in this Affidavit are based on my personal knowledge, unless otherwise expressly stated.

2.     I am presently the President and CEO of Rhino Builders, Inc. ("Rhino"). I have been Rhino's President and CEO since 1992.

3.     Rhino performed work as the subcontractor to BioGenesis Pacific, Inc. ("BPI") on the Contract No. N62766-99-D-0425; Navy Housing Roofing, Various Locations (the "Contract").

4.     On January 9, 2002, I submitted a Proof of Claim to AIG Technical Services, Inc. ("AIG") on behalf of Rhino.

5.     In the Proof of Claim, I stated under oath that Rhino furnished, sold, and delivered roofing installation and repairs between the dates of May 2000 and December 2000 in accordance with an oral subcontract with BPI.

6.     On February 26, 2002, I received a letter indicating AIG misinterpreted the December 2000 date included in the Proof of Claim as the last day Rhino performed labor or provided material on the project.

1450096.1.053705-00001

EXHIBIT **2** - PAGE **1**

7. The time period from May 2000 to December 2000, as entered in the Proof of Claim, states the inclusive period during which Rhino provided materials and labor to BPI on the Contract and for which BPI failed to make payment.

8. Subsequent to December 2000, Rhino has continued to provide materials to BPI for work on the project in the form of equipment either owned or leased by Rhino as late as January 2002.

9. More specifically, Rhino continued to supply a truck leased by Rhino for the project to BPI through March 20, 2001. See a true and correct copy of a Rhino Invoice to BPI, dated March 21, 2001, reflecting a truck rented to BPI by Rhino for the project attached hereto and incorporated herein as Exhibit A.

10. Rhino continued to supply a truck owned by Rhino to BPI for the project until BPI finally returned the truck to Rhino in May 2001.

11. Rhino continued to supply another truck owned by Rhino to BPI for the project until January 17, 2002, at which time Rhino had to pay $65.00 to have its truck towed to Rhino's premises to regain lawful control of its truck from BPI. See a true and correct copy of a receipt for towing services dated January 17, 2002, indicating that Rhino paid $65.00 to have its truck towed from BPI to Rhino attached hereto and incorporated herein as Exhibit B.

12. Prior to May 2001, BPI had refused to return any of Rhino's trucks to Rhino.

2

1450096.1.053705-00001

EXHIBIT 2 - PAGE 1

13.   In addition, BPI has continued to use and is presently using Rhino's safety equipment and various other types of equipment for the project.

FURTHER AFFIANT SAYETH NAUGHT.

_____
MICHAEL O'CONNELL

Subscribed and sworn to before me
this 7th day of March , 2002

_____
Notary Public, State of Hawaii
NORIKO SHIMBO
My commission expires: 6/26/02

NOTARY PUBLIC
STATE OF HAWAII

3

EXHIBIT 12 - PAGE 10

# RHINO BUILDERS HUBZone & 8 (a) SBA CERTIFIED

790 North Marine Drive, P. O. Box 959, Tamon, Guam, 96911, (671) 632-7653,
(671) 637-9618 fax, Rhinogwa@ite.net
85-841 B Farrington Highway, Waianae, Hawaii, 96792, (808) 668-8878,
(808) 668-7024 fax, Rhinol@Hawaii.rr.com

## INVOICE

| | | | |
|---|---|---|---|
| **TO** | BIOGENESIS PACIFIC, INC. | **NO.** | 0301-002 |
| | 790 NORTH MARINE DRIVE #303 | **DATE** | MAR. 21, 2001 |
| | TUMON, GUAM 96911 | **SHIP VIA** | |
| **ATTN** | BOBBIE SALAS | **YOUR NO.** | |
| **TEL** | 637-9633/35  FAX  637-9634 | **OUR NO.** | |
| | | **TERMS** | DUE UPON RECEIPT |

This is to bill you as follows:

| QUANTITY | DESCRIPTION | UNIT PRICE | TOTAL |
|---|---|---|---|
| | ISUZU FLATBED RENTAL | | |
| 1 WEEK | MONDAY-SATURDAY<br>MAR. 12-17, 2001 | 584.00  /WK. | $    584.00 |
| 2 DAYS | MONDAY-TUESDAY<br>MAR. 19-20, 2001 | 130.00  /DAY | $    260.00 |

*Recieved by Bsalas 3-22-01*

| | | Amount due | $    844.00 |

RHINO BUILDERS, INC.

Please show invoice number on your remittance.

By: _____

**FILE COPY**   **EXHIBIT** A

EXHIBIT 2 - PAGE 11

# RELIABLE
## TOWING SERVICES 2655

P.O. Box 8455, Tamuning, GU 96931 • Tel: 646-2TOW (2869) • Fax: 646-4890

| DATE 01/17/02 | TIME 2:00 | REQUESTED BY SAME | | P.O. NO. |
|---|---|---|---|---|

**NAME** RHINO ROOFING & REPAIRS **PHONE** 632-7153

**ADDRESS**

| CITY | | STATE | ZIP |
|---|---|---|---|

**LOCATION OF VEHICLE** GOAT

| YEAR/MAKE/MODEL 85 NISSAN UP 4X4 | COLOR Black | DRIVER KEN L.G. |
|---|---|---|

| STATE | LIC. PLATE NO. 1845 TTL | VEHICLE I.D. NO. | REGISTERED OWNER |
|---|---|---|---|

| MILEAGE | SERVICE TIME | EXTRA PERSON |
|---|---|---|
| FINISH W/KEY | FINISH | FINISH |
| START | START | START |
| TOTAL | TOTAL | TOTAL |

**REASON FOR TOW**

- ☐ ACCIDENT
- ☐ ARREST
- ☐ UNREGISTERED
- ☐ TOW ZONE
- ☐ SNOW REMOVAL
- ☐ ABANDONED
- ☐ STOLEN CAR
- ☑ BREAK DOWN
- ☐ LOCK OUT
- ☐ START
- ☐ FLAT TIRE
- ☐ OUT OF GAS
- ☐ IMPOUNDED
- ☑ REP.
- ☐ SINGLE LINE WINCHING
- ☐ DOUBLE LINE WINCHING
- ☐ SNATCH BLOCKS
- ☐ SCOTCH BLOCKS
- ☐ DOLLY

**SPECIAL EQUIPMENT**

**TYPE OF TOW**

- ☐ SLING/HOIST TOW
- ☐ FLAT BED/RAMP
- ☑ WHEEL LIFT
- ☐

**TOWED PER ORDER OF**

- ☐ STATE POLICE
- ☐ LOCAL POLICE
- ☑ OWNER
- ☐ DEALER

**VEHICLE TOWED TO**

FIRST TOW Harmon Pago

SECOND TOW

| STORAGE FROM | | TOWING CHARGE | $165.00 |
|---|---|---|---|
| _____ TO _____ DATE BY _____ | | MILEAGE CHARGE | |
| PAID BY | | EXTRA PERSON | |
| ☑ CASH ☑ CHECK DRIVER CH 1419 | | SPECIAL EQUIPMENT | |
| ☐ CREDIT CARD ☐ MC ☐ VISA ☐ AMEX EXP. DATE | | LABOR CHARGE | |
| CC NO. | | STORAGE | |
| OPERATORS SIGNATURE DATE 01/17/02 | | | |
| TRUCK NO. | | SUB-TOTAL | |
| AUTHORIZED SIGNATURE DATE | | TAX | |
| VEHICLE RELEASED TO Mario Cruz DATE 1/17/02 | | TOTAL | $165. |

Not responsible for loss or damage to vehicle
in case of fire, theft or any other cause beyond our control

**Thank You**

# EXHIBIT B



80000 SERIES
30% P.C.W.

RECYCLED

O

# *White & Tom*

### Attorneys At Law
**A Law Corporation**
*820 Mililani Street, Suite 711*
*Honolulu, Hawaii 96813*
*Telephone: (808) 547-5131*
*Fax: (808) 599-4517*

*Emmet White
Stephen D. Tom

*Retired

Aimee H. Oyasato
Darren M. Suzuki

## M E M O R A N D U M

TO:        Bruce Kahn, Esq.          *By Facsimile Transmission*

FROM:      Stephen D. Tom, Esq.

DATE:      May 14, 2002

RE:        Principal:    *BioGenesis Pacific, Inc.*
           Bond No.      *000-20-80-88*
           Claim No.     *388-005037-001-0001*
           Claimant:     *Rhino Builders, Inc.*
           Project:      *Contract No. N62766-99-D-0425 Navy Housing -Guam and*
                         *Various Locations*
           Surety:       *American Home Assurance Co.*

---

### Introduction/Recommendation

     This memorandum will report the results of our investigation and research into the points raised by attorney Terry E. Thomason of the Carlsmith Ball law firm in his letter to you of March 11, 2002 ("March 11 Letter").

*Redacted*

### Discussion

*Redacted*

     As a start point, BioGenesis Pacific denies it has a contract (either oral or written) with Rhino Builder's to perform any services on this project not withstanding Rhino's attorney's repeated reference to an oral contract. The March 11 Letter conveniently expands the term of the alleged oral contract in hopes that it extends the applicable Statute of Limitations. However, it does not, and even assuming arguendo that the term of the alleged oral agreement would include 2001 and 2002, the two invoices attached to the March 11 Letter make no reference to the alleged

EXHIBIT 0 - PAGE

oral contract or the subject project. In fact, by Gerald Lam's account, the two exhibits attached to the March 11 Letter have nothing to do with any Rhino Builder work on the Guam project. Exhibit A - Invoice 0301-002 dated March 21, 2001 relates to an independent rental of a flat bed truck by BioGenesis Pacific from Rhino for nine days as a test run of the vehicle. BioGenesis Pacific was interested in purchasing the vehicle and wanted to check it out. Eventually, BioGenesis Pacific did purchase the vehicle in April 2001.

Exhibit B - Reliable Towing Services Invoice dated 1/17/02 for $65. Per Gerald Lam, this towing invoice had nothing to do with the subject Guam project. This invoice reflected the towing charge incurred by Rhino Builders to have one of its pick up trucks towed from the back yard of a former employee named Aaron Williams.

I met with Gerald Lam on April 24, 2002. I had previously provided him the proof of claim letter from Carlsmith Ball dated January 9, 2002 and the March 11 Letter and asked him to comment on attorney Thomason's allegations.

At the April 24, 2000 meeting, Gerald Lam handed me the attached three-page memorandum and proceeded to explain its contents on it in detail for the next two hours.

*Redacted*

He emphatically denied that BioGenesis Pacific used any safety equipment or equipment owned by Rhino Builders on the project except for the flat bed truck rented separately from Rhino Builders in March 2001. Without question, Gerald Lam would deny Rhino Builder's claim.

*Redacted*

Enclosure
cc:  Mr. Buck Bland
     Mr. Kevin Dwyer

-2-

EXHIBIT 2 - PAGE 2



*A Native Hawaiian Company*
**BioGenesis Pacific, Inc.**



*received from*
*Gerry Lam*
*4/24/02*

1. Mr. Thomason's claim of a binding oral contract to sign a written federal subcontract is a ridiculous sham and he should know better. He advertises being a legal expert on Federal contract practice and gives legal seminars in the industry. There is no such thing as an informal oral contract concerning Federal contracting. Simply, if critical terms of a contract are not agreed upon, there is no contract. Federal contracting is very specific and follows regulations and regulatory guidelines. Rhino failed to provide requirements pursuant to any such guidelines, i.e. provide payment and performance bond certificates, liability insurance certificates, safety plan, quality control plan, task plans, and pricing proposals. Mr. Thomason shamefully claims that <u>oral and written</u> contracts can exist notwithstanding. To substantiate this, Mr. Thomason points to my explanations written to third parties of various exploratory and nonbinding discussions with O'Connell.

2. Rhino sent an invoice to BPI with amounts not only ne<u>ver unauthorized</u>, but also suspect, i.e. there are charges for bond premiums, liability insurance premiums, and various payroll. yet, Rhino never arranged project bonding, project liability coverage, nor kept certified payrolls and site material delivery and inventory records. Rhino had no clearance or authority to proceed in any manner for which it now claims recovery. In fact. Rhino's activities, if true, unduly put BPI in jeopardy and liability risk without notice.

3. Rhino was never given authority to proceed with work on task orders 1–18. Mike O'Connell asked permission for his personnel to enter the project and discourse with the Navy personnel in order to investigate the potential tasks and provide specific proposals to BPI. O'Connell was further told beforehand that Rhino was on site at its own financial risk and for the very limited purpose to allow it to gather information to formulate proposals to BPI. O'Connell understood that Rhino was not only responsible for its own expenses, but since their presence onsite was gratuitous, Rhino would have to indemnify BPI for any damages and incursions with the Navy. For if because of Rhino's investigation, the Navy held BPI liable for any task orders, Rhino would have to indemnify BPI. O'Connell had claimed to have had vast facilities and capacity active on Guam. Further, if a task plan with price proposal was ever accepted, Rhino had to have all its assurances (bonding, insurance, safety and quality plans, etc.) filed with BPI *prior* to acceptance of any offer for a task order subcontract. Mr. Thomason's claim of actual performance on Task Orders 1–18 is baseless and without merit. BPI's own personnel accepted and performed the task orders. BPI alone was liable and responsible to the Navy for the completion of all task orders. Simply. Rhino was never contracted nor did it perform.

4. Rhino engaged Mr. Michael Danforth as its consultant. Mr. Danforth was an integral in-house bid preparer with BPI on this very federal contract. Mr. Danforth had full access to all of BPI's corporate plans, financial and proprietary information and even attended a few

Corporate and Programs Control • 1604 Ulualana Place • Kailua, Hawaii 96734 USA • 808-263-7777 • FAX 808-263-0002

EXHIBIT □ - PAGE 3

of my early meetings with O'Connell during the bidding term prior to contract award when O'Connell actively solicited me for business. About 2 years later, Mr. Danforth prepared a written subcontract proposal for Rhino without notice or permission. He has been in serious conflict. The proposed subcontract purportedly gave Rhino a full 5 year turnkey position with all the financial risks on BPI. Mr. Danforth approached BPI with an absolute demand to sign or be ousted from its own contract. It was an incompetent approach that was further incomprehensible.

5. O'Connell solicited BPI. We did not solicit Rhino. I had agreed to allow Rhino personnel onsite (above discussed) in or about April 2001. At about that time, unknown to me, O'Connell instructed his managers in Guam to put Rhino to work on BPI's project and then after awhile stop work and cause BPI to fail and the Navy to terminate BPI's contract. In that way, Rhino could succeed to BPI's contract. I only discovered this matter in November 2001 shortly after Rhino ordered its personnel to "cease work" on BPI's project that they weren't authorized to be working on in the first place. As I had never been on Guam at any time, I had no enforcement security on the project. Guam is a small town where everyone knows everyone, laborers work like musical chairs, and it is easy to gain access without permission.

6. As part of its incredulous "cease work" debacle, Rhino's Guam general manager, George Allen, trespassed into BPI's office and feloniously rifled files and computer data. Mr. Allen further attempted to lock BPI out of its own office where Rhino was not a lessor. Mr. Allen fraudently claimed $25,000 in supplies and materials given to BPI and threatened a lien on the project. Mr. Allen never provided proof of such materials purportedly supplied.

7. Because of O'Connell's unauthorized directives to his Guam managers to put Rhino laborers to work on BPI's project for the purpose of impeding BPI's performance, and the laid back unquestioning lifestyle typical to Guam, BPI incurred financial damages which it has yet to pursue. Mr. Thomason's claim that Rhino performed all the work of task orders 1-18 at its own expense to which BPI took full benefit is unconscionably irresponsible and unstudied.

8. Rhino's Proof of Claim notarized January 9, 2002 is a fraudulent submitting.

9. March 11, 2002 Letter. BPI never used any Rhino equipment or resources without payment. Also, Rhino was prohibited from the project site in September 2001. After that date, my specific instructions were that no Rhino personnel, materials or equipment be allowed on the project. BPI did not and therefore has no record of ordering, purchasing, or engaging any materials or resources of Rhino accordingly. Accordingly, but for a self-serving and suspicious invoice, Rhino has no credible documentation showing BPI requested or authorized Rhino materials and resources. Mr. O'Connell's affidavits are fraudulent.

BPI knew that Rhino was in default with Bank of Hawaii concerning a flatbed truck on Guam. BPI paid Rhino for rent of the truck while BPI pursued purchasing it from Bank

BioGenesis Pacific, Inc.

of Hawaii. Rhino did not provide or supply the truck to the project. BPI rented the truck while pursing its purchase since Rhino was in serious default with the Bank of Hawaii, lienholder. As an understanding with the Bank of Hawaii, BPI paid Rhino for truck rental in March 2001. In early April 2001, BPI purchased and received title to the truck from Bank of Hawaii and remains titleholder today

Reliable Towing Services invoice of 01/17/02 seems to be a towing bill sent or given to Rhino. I presume that it must be for BPI's truck as I can't imagine why Mr. Thomason would submit Rhino's towing bill here. Reliable Towing must have mistakenly presumed that the truck was still owned by Rhino. Should that's the case, then BPI and not Rhino is responsible to Reliable Towing Services. On the other hand, I'm not sure if Mr. Thomason is otherwise suggesting that Rhino contracted a third party vendor, Reliable Towing Service, to perform work on BPI's project in January 2002. If he is, then Mr. Thomason seems to be experiencing shrinkage in the upper latitude as well.

Mr. Thomason's use of these two invoices as the primary proof to substantiate his request for reconsideration is shamefully unstudied, unconfirmed and unethical.

10.     Where there is such a complete lack of credible receipts, writings and proof of acknowledgments, a large claim against a surety bond is irresponsible without a prior court judgment establishing contractual liability and damages. There is no credible suit here, and therefore, as well, no credible surety claim.

**BioGenesis Pacific, Inc.**

EXHIBIT D - PAGE 5

P

80000 SERIES
30% P.C.W.
WILSON JONES
RECYCLED



**AIG Technical Services, Inc.**
175 Water Street
New York, NY 10038
212.770.7000

Direct Dial: (212) 458-2901

June 21, 2002

**VIA REGULAR MAIL**

Carlsmith Ball LLP
Pacific Tower, Suite 2200
1001 Bishop Street
Honolulu, HI 96813
**Attention: Terry E. Thomasen**

| Re: | | |
|---|---|---|
| | **Principal:** | **BioGenesis Pacific, Inc.** |
| | **Bond No.:** | **000-20-80-88** |
| | **Claim No.:** | **388-005037-001-0001** |
| | **Project:** | **Contract No. N62766-99-D-0425 - Navy Housing - Guam and various locations** |
| | **Surety:** | **American Home Assurance Co.** |

Dear Mr. Thomasen:

The Surety has reviewed your letter of March 11, 2002 along with the enclosed documents. The Surety continues to believe that the Miller Act claim asserted by Rhino Builders, Inc. is time barred by the statute of limitations contained in 40 U.S.C. § 270b(b) and, accordingly, we maintain our position denying your client's claim as set forth in our letter dated February 21, 2002.

Please be advised that this action is taken at this time without waiver of or prejudice to any of the rights and defenses, past or present, known or unknown which either the above referenced Surety or Principal may have in this matter.

Very truly yours,

*Bruce Kahn*

Bruce Kahn

cc.:    BioGenesis Pacific, Inc.

BCC: Steve Tom
Kevin Dwyer

EXHIBIT 1 - PAGE 1

1

A Member Company of
American International Group, Inc.

# UNITED STATES DISTRICT COURT

## DISTRICT OF GUAM

UNITED STATES OF AMERICA FOR
USE AND BENEFIT OF RHINO
BUILDERS, INC.,

Plaintiff,

vs.

BIOGENESIS PACIFIC, INC., AIG
TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE
COMPANY,

Defendants.

_____

BIOGENESIS PACIFIC, INC.,

Counterclaimant,

vs.

RHINO BUILDERS, INC., MICHAEL
O'CONNELL, MICHAEL DANFORTH,
AND JOHN DOES 1-10,

Counter-Defendant.

_____

AMERICAN HOME ASSURANCE
COMPANY,

Cross-Claimant,

vs.

BIOGENESIS PACIFIC, INC.,

Cross-Claim
Defendant.

_____

CIVIL CASE NO. 02-00008

**DECLARATION OF JAMES H.
LAWHN; EXHIBITS "1"-"6" AND
EXTRACTS OF DEPOSITION
TESTIMONY OF THOMASON,
EGESDAL AND LEDGER**

3852-10

# DECLARATION OF JAMES H. LAWHN

James H. Lawhn declares under the penalties of perjury as follows:

1.    I am admitted pro hac vice as counsel for American Home Assurance Company and AIG Technical Services Inc. with regard to the bad faith allegations in this action.

2.    Attached are true and correct copies of the following:

| Exhibit | Document |
|---|---|
| 1 | Print of the Martindale Hubble listing for Amy Self obtained from the Martindale.com website. |
| 1 | Note of a telephone inquiry to the clerk of the Hawaii supreme court advising that Amy Self was licensed Nov. 1, 2001. |
| 2 | Print of the "A" listings of sureties approved by the Dept. Of The Treasury obtained from the U.S. Treasury's website showing American Home as an approved surety, but no listing for AIG Technical Services, Inc. |
| 3 | Print of inquiries to the website of the Hawaii Insurance Commissioner showing American Home registered as a surety, but no registration for AIG Technical Services Inc. |
| 4 | Copy of that portion of the SEC 10K registration of AIG showing subsidiaries of AIG as obtained from the records of Carlsmith in this action. |
| 5 | Prints of AIG's website as of 2001 as obtained from the records of Carlsmith in this action , briefly explaining the business of American Home and AIG Technical Services Inc. |
| 6 | Copy of a Mar. 18, 2002 email from Ledger to Granville re "AIG Technical Services" and Granville's Mar. 19, 2002 reply to Ledger, as obtained from the records of Carlsmith in this action. |

2

| Exhibit | Document |
|---------|----------|
| 7 | Copy of the Affidavit of Amy Self. |

3.    Also attached are true and correct copies of extracts from the

following depositions taken in this matter:

| Deponent | Transcript Pages |
|----------|------------------|
| Terry Thomason of the Carlsmith law firm | Pages 6, 7, 8, 13-16 & 56 |
| Steve Egesdal of the Carlsmith law firm | Pages 5 through 11 |
| David Ledger of the Carlsmith law firm | Pages 4 through 17 |

EXECUTED this  21st  day of _____November_____, 2003.

_____

JAMES H. LAWHN

3

# martindale.com
## Lawyer Locator

Terms of Use | Services | Products | Contact Us | About Us | Site Info | Home

Quick

**Lawyer Locator**
Search Lawyer Locator
  By Lawyer
  By Location/Area of Practice
  By Firm
  By Corporate Law Departments
  By US Government
  By US Law Faculty
Join the Legal Network
Request a Listing
About Lawyer Locator

**Legal Articles**

**Dispute Resolution**

**Experts and Services**

**Legal Personnel**

**Legal Careers**

**Professional Resources**

**Customer Service**

LexisNexis
Martindale-Hubbell®

FEEDBACK ))

More resources...
  lawyers.com
  Practice Development Center
  Counsel to Counsel Forums
  corporate.martindale.com
  eAttorney
  LexisNexis™
  LawCommerce.com℠
  LawyerLocator.Co.Uk
  Anwalt24.de

This attorney or firm has articles published on martindale.com

## Search the Lawyer Locator

New Search

**Amy G. Self**
Associate
Carlsmith Ball LLP
Suite 2200, Pacific Tower, 1001 Bishop Street, P.O. Box 656
Honolulu, Hawaii 96809-0656
(Honolulu Co.)
Telephone: 808-523-2500
Fax: 808-523-0842
Email: Send an Email

**Admitted:** 2001, Hawaii and U.S. District Court, District of Hawaii

**Law School:** University of Hawaii, J.D., 2000.

**College:** Appalachian State University, B.S., 1979.

**Member:** Hawaii Women Lawyers.

**Biography:** (Resident at Hilo, Hawaii Office)

**Born:** Hickory, North Carolina, March 21, 1957.

**ISLN:** 916021816

**Web Site:** http://www.carlsmith.com

**Other Offices:**
Hilo, Hawaii

*[handwritten note:]* Gail
Admitted to Hawaii bar
Nov 1, 2001
50 7628

New Search

▲ top

Lawyer Locator | Legal Articles | Dispute Resolution | Experts and Services
Legal Personnel | Legal Careers | Professional Resources | Customer Service

Home | Contact Us | About Us | Site Info | Products | Services
Media Room | Banner Sponsorships

Copyright | Terms & Conditions | Privacy Policy

EXHIBIT ____ • PAGE ____

**2**



U.S. Department of

Search FMS

**Financial Management Service**
*Uncle Sam's Money Manager*



FMS Home | Q&A | Calendar | Publications & Guidance | Programs & Systems

## Surety Bonds

# Department of the Treasury's Listing of Approved Sureties (Department Circular 570)

Overview

**Sureties Listing**

Admitted Reinsurers
Not for Federal Bonds

Getting Started

Forms

Regulations & Guidance

Correspondence

Background

Contacts

Search for:

Located in:
Surety Bonds

▼ Certified Companies
▼ Certified Reinsurer Companies
▼ Footnotes
▼ Notes
▼ States Insurance Departments

► See List of Changes for recent update.



4810-35

### DEPARTMENT OF THE TREASURY

**FISCAL SERVICE**
**(Dept. Circular 570; 2003 Revision)**

**COMPANIES HOLDING CERTIFICATES OF AUTHORITY AS ACCEPTABLE SURETIES ON FEDERAL BONDS AND AS ACCEPTABLE REINSURING COMPANIES**

**Effective July 1, 2003**

This Circular is published annually, solely for the information of Federal bond-approving officers and persons required to give bonds to the United States. Copies of the Circular and interim changes may be obtained directly from the Internet or from the Government Printing Office (202) 512-1800. (Interim changes are published in the FEDERAL REGISTER and on the Internet as they occur.) Other information pertinent to Federal sureties may be obtained from the U.S. Department of the Treasury, Financial Management Service, Surety Bond Branch, 3700 East West Highway, Room 6F07, Hyattsville, MD 20782, Telephone (202) 874-6850 or Fax (202) 874-9978.

The most current list of Treasury authorized companies is always available through the Internet at http://www.fms.treas.gov/c570. In addition,

EXHIBIT 2 - PAGE 1

applicable laws, regulations, and application information are also available at the same site.

Please note that the underwriting limitation published herein is on a per bond basis but this does not limit the amount of a bond that a company can write. Companies are allowed to write bonds with a penal sum over their underwriting limitation as long as they protect the excess amount with reinsurance, coinsurance or other methods as specified at 31 CFR 223.10-11. Please refer to footnote (b) at the end of this publication.

The following companies have complied with the law and the regulations of the U.S. Department of the Treasury. Those listed in the front of this Circular are acceptable as sureties and reinsurers on Federal bonds under Title 31 of the United States Code, Sections 9304 to 9308 [See Note (a)]. Those listed in the back are acceptable only as reinsurers on Federal bonds under 31 CFR 223.3(b) [See Note (e)]. If we can be of any assistance, please feel free to contact the Surety Bond Branch at (202) 874-6850.

Judith R. Tillman
Assistant Commissioner
Financial Operations
Financial Management Service

***IMPORTANT INFORMATION IS CONTAINED IN THE NOTES AT THE END OF THIS CIRCULAR. PLEASE READ THE NOTES CAREFULLY.***

Return to the top

## Certified Companies

Updated July 1, 2003

**Acadia Insurance Company (NAIC #31325)**
BUSINESS ADDRESS: P.O. BOX 9010, WESTBROOK, ME 04098-5010. PHONE: (207) 772-4300. UNDERWRITING LIMITATION b/: $3,102,000. SURETY LICENSES c,f/: AZ, CO, CT, DE, DC, KY, ME, MD, MA, MS, MO, NH, NY, OK, PA, RI, TX, UT, VT, VA. INCORPORATED IN: Maine.

**ACCREDITED SURETY AND CASUALTY COMPANY, INC. (NAIC #26379)**
BUSINESS ADDRESS: 400 S. PARK AVENUE, SUITE 320, WINTER PARK, FL 32789. PHONE: (407) 629-2131. UNDERWRITING LIMITATION b/: $1,092,000. SURETY LICENSES c,f/: AL, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WY. INCORPORATED IN: Florida.

EXHIBIT 2 - PAGE 2

**ACSTAR INSURANCE COMPANY (NAIC #22950)**
BUSINESS ADDRESS: P.O. BOX 2350, NEW BRITAIN, CT 06050-2350. PHONE: (860) 224-2000. UNDERWRITING LIMITATION b/: $1,900,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Illinois.

**Aegis Security Insurance Company (NAIC #33898)**
BUSINESS ADDRESS: P.O. BOX 3153, HARRISBURG, PA 17105. PHONE: (717) 657-9671 x-3051. UNDERWRITING LIMITATION b/: $2,852,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Pennsylvania.

**Affiliated FM Insurance Company (NAIC #10014)**
BUSINESS ADDRESS: P.O. BOX 7500, JOHNSTON, RI 02919-0500. PHONE: (401) 275-3000. UNDERWRITING LIMITATION b/: $16,985,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, PR, RI, SC, SD, TN, TX, UT, VT, VA, VI, WA, WV, WI, WY. INCORPORATED IN: Rhode Island.

**ALL AMERICA INSURANCE COMPANY (NAIC #20222)**
BUSINESS ADDRESS: 800 SOUTH WASHINGTON STREET, VAN WERT, OH 45891. PHONE: (419) 238-5551 x-2350. UNDERWRITING LIMITATION b/: $5,384,000. SURETY LICENSES c,f/: AZ, CA, CT, GA, IL, IN, IA, KY, MA, MI, NV, NJ, NY, NC, OH, OK, TN, TX, VA. INCORPORATED IN: Ohio.

**Allegheny Casualty Company (NAIC #13285)**
BUSINESS ADDRESS: P.O. BOX 1116, MEADVILLE, PA 16335-7116. PHONE: (814) 336-2521. UNDERWRITING LIMITATION b/: $1,230,000. SURETY LICENSES c,f/: AL, AR, CA, DC, FL, HI, ID, IL, IN, IA, KS, KY, LA, MD, MI, MS, MO, NV, NJ, NM, NY, NC, OH, OK, PA, SC, SD, TN, TX, VA, WA, WV, WI, WY. INCORPORATED IN: Pennsylvania.

**AMCO Insurance Company (NAIC #19100)**
BUSINESS ADDRESS: 701 FIFTH AVENUE, DES MOINES, IA 50391-2007. PHONE: (800) 532-1436. UNDERWRITING LIMITATION b/: $37,956,000. SURETY LICENSES c,f/: AZ, CA, CO, ID, IL, IN, IA, KS, KY, MI, MN, MO, MT, NE, NV, NM, ND, OH, OR, SD, TN, TX, UT, VA, WA, WI, WY. INCORPORATED IN: Iowa.

**AMERICAN ALTERNATIVE INSURANCE CORPORATION (NAIC #19720)**
BUSINESS ADDRESS: 555 COLLEGE ROAD EAST - P.O. BOX 5241, PRINCETON, NJ 08543. PHONE: (609) 243-4200. UNDERWRITING LIMITATION b/: $10,968,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, MD, MA, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Delaware.

**American Automobile Insurance Company (NAIC #21849)**
BUSINESS ADDRESS: 777 SAN MARIN DRIVE, NOVATO, CA 94998. PHONE: (800) 243-9622. UNDERWRITING LIMITATION b/: $8,185,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VA, WA, WV, WI, WY. INCORPORATED IN: Missouri.

**AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA (NAIC #10111)**
BUSINESS ADDRESS: 11222 QUAIL ROOST DRIVE, MIAMI, FL 33157. PHONE: (305) 253-

EXHIBIT 2 - PAGE 2

2244 x-37014. UNDERWRITING LIMITATION b/: $21,288,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, PR, RI, SC, SD, TN, TX, UT, VT, VA, VI, WA, WV, WI, WY. INCORPORATED IN: Florida.

### American Casualty Company of Reading, Pennsylvania (NAIC #20427)
BUSINESS ADDRESS: CNA PLAZA, CHICAGO, IL 60685. PHONE: (800) 262-2255. UNDERWRITING LIMITATION b/: $8,286,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, PR, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Pennsylvania.

### AMERICAN CONTRACTORS INDEMNITY COMPANY (NAIC #10216) 1
BUSINESS ADDRESS: 9841 Airport Boulevard., 9th Floor, Los Angeles, CA 90045. PHONE: (310) 649-0990. UNDERWRITING LIMITATION b/: $1,863,000. SURETY LICENSES c,f/: AL, AZ, AR, CA, CO, CT, DE, DC, FL, GA, GU, HI, ID, IN, IA, KS, KY, LA, ME, MD, MN, MS, MO, MT, NE, NV, NJ, NM, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VA, WA, WV, WI, WY. INCORPORATED IN: California.

### American Economy Insurance Company (NAIC #19690)
BUSINESS ADDRESS: SAFECO PLAZA, SEATTLE, WA 98185. PHONE: (800) 332-3226. UNDERWRITING LIMITATION b/: $37,404,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NM, NY, NC, ND, OH, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Indiana.

### American Fire and Casualty Company (NAIC #24066)
BUSINESS ADDRESS: 9450 SEWARD ROAD, FAIRFIELD, OH 45014. PHONE: (513) 603-2400. UNDERWRITING LIMITATION b/: $11,244,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, ID, IN, IA, KS, KY, LA, MD, MA, MI, MN, MS, MO, MT, NE, NV, NJ, NM, NY, NC, ND, OH, OR, PA, RI, SC, SD, TN, TX, UT, VA, WA, WV, WI, WY. INCORPORATED IN: Ohio.

### American Guarantee and Liability Insurance Company (NAIC #26247)
BUSINESS ADDRESS: 1400 AMERICAN LANE, TOWER I, 19TH FLOOR, SCHAUMBURG, IL 60196-1056. PHONE: (800) 382-2150. UNDERWRITING LIMITATION b/: $8,766,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: New York.

### American Hardware Mutual Insurance Company (NAIC #13331)
BUSINESS ADDRESS: 471 EAST BROAD STREET, COLUMBUS, OH 43215. PHONE: (800) 876-6642. UNDERWRITING LIMITATION b/: $8,207,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Ohio.

### American Home Assurance Company (NAIC #19380)
BUSINESS ADDRESS: 70 PINE STREET, NEW YORK, NY 10270. PHONE: (212) 458-7018. UNDERWRITING LIMITATION b/: $288,331,000. SURETY LICENSES c,f/: AL, AK, AZ, CA, CO, CT, DE, DC, FL, GA, GU, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: New York.

### American Insurance Company (The) (NAIC #21857)

EXHIBIT 2 - PAGE 4

BUSINESS ADDRESS: 777 SAN MARIN DRIVE, NOVATO, CA 94998. PHONE: (800) 243-9622. UNDERWRITING LIMITATION b/: $29,641,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VA, WA, WV, WI, WY. INCORPORATED IN: Nebraska.

## AMERICAN INTERNATIONAL INSURANCE COMPANY OF PUERTO RICO (NAIC #31674)
BUSINESS ADDRESS: P O BOX 10181, SAN JUAN, PR 00908. PHONE: (787) 767-6400. UNDERWRITING LIMITATION b/: $9,177,000. SURETY LICENSES c,f/: PR, VI. INCORPORATED IN: Puerto Rico.

## American International Pacific Insurance Company (NAIC #23795)
BUSINESS ADDRESS: 70 PINE STREET, NEW YORK, NY 10270. PHONE: (212) 458-7018. UNDERWRITING LIMITATION b/: $2,728,000. SURETY LICENSES c,f/: AK, CO, CT, DC, IA, ME, MD, MA, MS, MT, NE, NH, ND, RI, SD, UT, VT, WV, WY. INCORPORATED IN: Colorado.

## American Re-Insurance Company (NAIC #10227)
BUSINESS ADDRESS: 555 COLLEGE ROAD EAST - P.O. BOX 5241, PRINCETON, NJ 08543. PHONE: (609) 243-4200. UNDERWRITING LIMITATION b/: $223,003,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Delaware.

## AMERICAN RELIABLE INSURANCE COMPANY (NAIC #19615)
BUSINESS ADDRESS: 8655 EAST VIA DE VENTURA, SCOTTSDALE, AZ 85258. PHONE: (480) 483-8666. UNDERWRITING LIMITATION b/: $6,018,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Arizona.

## AMERICAN ROAD INSURANCE COMPANY (THE) (NAIC #19631)
BUSINESS ADDRESS: THE AMERICAN ROAD, DEARBORN, MI 48121-6027. PHONE: (313) 594-1914. UNDERWRITING LIMITATION b/: $29,396,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Michigan.

## American Safety Casualty Insurance Company (NAIC #39969)
BUSINESS ADDRESS: 1845 THE EXCHANGE, SUITE 200, ATLANTA, GA 30339. PHONE: (770) 916-1908. UNDERWRITING LIMITATION b/: $2,953,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MI, MN, MS, MO, MT, NE, NV, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Delaware.

## American States Insurance Company (NAIC #19704)
BUSINESS ADDRESS: SAFECO PLAZA, SEATTLE, WA 98185. PHONE: (800) 332-3226. UNDERWRITING LIMITATION b/: $46,962,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Indiana.

## American Surety Company (NAIC #31380)
BUSINESS ADDRESS: 3905 VINCENNES ROAD, SUITE 200, INDIANAPOLIS, IN 46268. PHONE: (317) 875-8700. UNDERWRITING LIMITATION b/: $654,000. SURETY LICENSES

EXHIBIT ___ - PAGE 5

c,f/: AL, AK, CA, CT, DE, FL, HI, ID, IN, IA, KS, LA, ME, MD, MN, MS, MO, NE, NV, ND, OH, PA, SC, SD, TN, TX, UT, VA, WA, WY. INCORPORATED IN: California.

**Amerisure Mutual Insurance Company (NAIC #23396)**
BUSINESS ADDRESS: P. O. BOX 2060, FARMINGTON HILLS, MI 48333-2060. PHONE: (248) 615-9000 x-67968. UNDERWRITING LIMITATION b/: $30,185,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: Michigan.

**Antilles Insurance Company (NAIC #10308)**
BUSINESS ADDRESS: PO BOX 9023507, SAN JUAN, PR 00902-3507. PHONE: (787) 721-4900. UNDERWRITING LIMITATION b/: $3,912,000. SURETY LICENSES c,f/: PR. INCORPORATED IN: Puerto Rico.

**Arch Reinsurance Company (NAIC #10348)**
BUSINESS ADDRESS: 55 Madison Avenue, P.O. Box 1988, Morristown, NJ 07962-1988. PHONE: (973) 898-9575. UNDERWRITING LIMITATION b/: $35,922,000. SURETY LICENSES c,f/: GA, IL, IN, MD, MI, NE, NY, PA, UT. INCORPORATED IN: Nebraska.

**Associated Indemnity Corporation (NAIC #21865)**
BUSINESS ADDRESS: 777 SAN MARIN DRIVE, NOVATO, CA 94998. PHONE: (800) 243-9622. UNDERWRITING LIMITATION b/: $4,013,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY. INCORPORATED IN: California.

**Atlantic Bonding Company, Inc. (NAIC #41114)**
BUSINESS ADDRESS: SUITE 212, HILTON PLAZA, PIKESVILLE, MD 21208. PHONE: (410) 484-3100. UNDERWRITING LIMITATION b/: $845,000. SURETY LICENSES c,f/: MD. INCORPORATED IN: Maryland.

**Atlantic Mutual Insurance Company (NAIC #19895)**
BUSINESS ADDRESS: 140 BROADWAY, NEW YORK, NY 10005-1101. PHONE: (800) 999-4762. UNDERWRITING LIMITATION b/: $45,564,000. SURETY LICENSES c,f/: AL, AK, AS, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, PR, RI, SC, SD, TN, TX, UT, VT, VA, VI, WA, WV, WI, WY. INCORPORATED IN: New York.

**Auto-Owners Insurance Company (NAIC #18988)**
BUSINESS ADDRESS: P.O. BOX 30660, LANSING, MI 48909-8160. PHONE: (517) 323-1200. UNDERWRITING LIMITATION b/: $285,250,000. SURETY LICENSES c,f/: AL, AZ, CO, FL, GA, IL, IN, IA, KS, KY, MI, MN, MS, MO, NE, NV, NM, NC, ND, OH, OR, PA, SC, SD, TN, TX, UT, VA, WA, WI. INCORPORATED IN: Michigan.

**Berkley Insurance Company (NAIC #32603)**
BUSINESS ADDRESS: 475 STEAMBOAT ROAD, GREENWICH, CT 06830. PHONE: (203) 542-3800. UNDERWRITING LIMITATION b/: $36,744,000. SURETY LICENSES c,f/: AL, AK, AR, CA, CO, DE, DC, FL, ID, IL, IN, IA, KY, LA, MD, MI, MN, MS, NE, NV, NM, NY, NC, ND, OH, OK, OR, PA, RI, SD, TN, TX, UT, VT, WA, WV, WI. INCORPORATED IN: Delaware.

**Berkley Regional Insurance Company (NAIC #29580)**
BUSINESS ADDRESS: P. O. Box 1594, Des Moines, IA 50306, IA 50306. PHONE: (203) 629-3000. UNDERWRITING LIMITATION b/: $32,390,000. SURETY LICENSES c,f/: AL, AK, AZ, AR, CA, CO, CT, DE, DC, FL, GA, HI, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS,

EXHIBIT 26 - PAGE 11

**3**



# License Name Search Details

**To start new license search, click here-->**

## License

License No: 100106             Vendor ID: 100124
Vndr Name: AMERICAN HOME ASSURANCE COMPANY
Trade Name:
License Status: ACTIVE           Effective Date: 07-16-1953
License Type: Insurance Company Foreign/Alien    Expiration Date: 08-16-2004

## License Classes

| Class | Subclass | Class Status | Effective Date |
| --- | --- | --- | --- |
| Accident and Health or Sickness | ALL | ACTIVE | 04-16-1956 |
| Casualty | ALL | ACTIVE | 04-16-1956 |
| Marine | ALL | ACTIVE | 04-16-1956 |
| Property | ALL | ACTIVE | 04-16-1956 |
| Surety | ALL | ACTIVE | 04-16-1956 |
| Vehicle | ALL | ACTIVE | 04-16-1956 |

## Current Representatives

Click the Vndr Id to get rep classes details.

| Vndr Id | Vendor Name | Effective Date |
| --- | --- | --- |
| N/A | | |

## Appointed By

| License No | Name | License Type | Class | Subclass | Effective Date |
| --- | --- | --- | --- | --- | --- |
| N/A | | | | | |

## Appointment To

EXHIBIT 3 - PAGE 1

# Department of Commerce and Consumer Affairs

P O. Box 3614
Honolulu. HI
96811-3614
250 S. King St.
5th Flr
Honolulu. HI 96813
Tel 808.586.2700

## Hawaii
# Insurance
### division
## License Name Search

Feedback

- **Your search did not find any matches!**
**Please try to search by proper name of the
individual or by trade name.**

- **Direct Search by <u>License Number</u>**

- **Direct Search by <u>License Type</u>**

- **Browse with the <u>Business Island or State</u>
Search**

- **Browse with the <u>Insurance Companies Search</u>**

Search by **Proper Name** of an individual

First Name:

Last Name:

Or search by **Company Name**

Company Name:

AIG Technical Services

Or search by **Trade Name**

Trade Name:

*Data Information is Current As Of*
*( Database updated at 8:00am ET )*


EXHIBIT 2 - PAGE 4



# Company Name Search Results

Click the License Number to get the details.

There were 8 matches to your search!

| License Number | Company Name | Status | License Type | Vendor ID |
|---|---|---|---|---|
| 100792 | AIG ANNUITY INSURANCE COMPANY | ACTIVE | Insurance Company Foreign/Alien | 100786 |
| 100000 | AIG HAWAII INSURANCE COMPANY, INC. | ACTIVE | Insurance Company Domestic | 100000 |
| 100056 | AIG LIFE INSURANCE COMPANY | ACTIVE | Insurance Company Foreign/Alien | 100055 |
| 313799 | AIG MARKETING, INC. | ACTIVE | Nonresident Producer | 210048 |
| 100028 | AIG NATIONAL INSURANCE COMPANY, INC. | ACTIVE | Insurance Company Foreign/Alien | 100028 |
| 100240 | AIG SUNAMERICA LIFE ASSURANCE COMPANY | ACTIVE | Insurance Company Foreign/Alien | 100166 |
| 306866 | AIG WARRANTY SERVICES AND INSURANCE AGENCY, INC. | ACTIVE | Service Contract Provider | 203338 |
| 306909 | AIG WARRANTYGUARD, INC. | ACTIVE | Service Contract Provider | 203381 |

*Data Information is Current As Of October 13, 2003*

Copyright © 2003 Hawaii Insurance Division
***Disclaimer***

**Hawaii State Homepage || DCCA**



**4**

VIEW DOCUMENT

## AMERICAN INTERNATIONAL GROUP INC
### 10-K - EX-21, EX-21 SUBSIDIARIES OF REGISTRANT filed 04/02/01

☐ Review Settings

View Filing

**Page 1 – 10-K – EX-21 – Filed by AMERICAN INTERNATIONAL GROUP INC**

1

Exhibit 21

Subsidiaries of Registrant

| Name of Corporation(1) | Jurisdiction of Incorporation | % of Voting Securities Owned by its Immediate Parent(2) |
|---|---|---|
| American International Group, Inc. (Registrant) | Delaware | (3) |
| AIG Aviation, Inc. | Georgia | 100% |
| AIG Bulgaria Insurance and Reinsurance Company AD | Bulgaria | 100% |
| AIG Capital Corp. | Delaware | 100% |
| AIG Capital Management Corp. | Delaware | 100% |
| AIG Claim Services, Inc. | Delaware | 100% |
| AIG Consumer Finance Group, Inc. | Delaware | 100% |
| AIG Bank Polska S.A. | Poland | 97.23% |
| AIG Credit S.A. | Poland | 100% |
| Compania Financiera Argentina S.A. | Argentina | 95.62% |
| AIG Credit Corp. | Delaware | 100% |
| A.I. Credit Corp. | New Hampshire | 100% |
| Imperial Premium Finance, Inc. | California | 100% |
| Imperial Premium Finance, Inc. | Delaware | 100% |
| AIG Finance Holdings, Inc. | New York | 100% |
| AIG Finance (Hong Kong) Limited | Hong Kong | 100% |
| AIG Financial Products Corp. | Delaware | 100% |
| AIG Matched Funding Corp. | Delaware | 100% |
| Banque AIG | France | 90%(4) |
| AIG Funding, Inc. | Delaware | 100% |
| AIG Global Investment Group, Inc. | Delaware | 100% |
| AIG Capital Partners, Inc. | Delaware | 100% |
| AIG Global Investment Corp. | New Jersey | 100% |
| AIG Global Real Estate Investment Corp. | Delaware | 100% |
| AIG Global Trade & Political Risk Insurance Company | New Jersey | 100% |
| AIG Golden Insurance Ltd. | Israel | 50.1% |
| AIG Life Insurance Company | Delaware | 78.9%(5) |
| AIG Life Insurance Company of Canada | Canada | 100% |
| AIG Life Insurance Company of Puerto Rico | Puerto Rico | 100% |
| AIG Marketing, Inc. | Delaware | 100% |
| AIG Memsa, Inc. | Delaware | 100% |
| Tata AIG General Insurance Company Ltd. | India | 26% |
| AIG Private Bank Ltd. | Switzerland | 100% |
| AIG Risk Management Inc. | New York | 100% |
| AIG Trading Group Inc. | Delaware | 100% |
| AIG International Inc. | Delaware | 100% |
| AIU Insurance Company | New York | 52%(6) |
| AIU North America, Inc. | New York | 100% |
| American Home Assurance Company | New York | 100% |

CBHNL000032

EXHIBIT - PAGE

2

3

| | | |
|---|---|---|
| AIG Hawaii Insurance Company, Inc. | Hawaii | 100% |
| American International Insurance Company | New York | 100% |
| American International Insurance Company of California, Inc. | California | 100% |
| American International Insurance Company of New Jersey | New Jersey | 100% |
| Minnesota Insurance Company | Minnesota | 100% |
| American International Realty Corp. | Delaware | 31.47%(7) |
| Pine Street Real Estate Holdings Corp. | New Hampshire | 31.47%(8) |
| Transatlantic Holdings, Inc. | Delaware | 33.77%(9) |
| Transatlantic Reinsurance Company | New York | 100% |
| Putnam Reinsurance Company | New York | 100% |
| Trans Re Zurich | Switzerland | 100% |

II-10

**Page 2 — 10-K — EX-21 — Filed by AMERICAN INTERNATIONAL GROUP INC**

2

Subsidiaries of Registrant -- (continued)

| Name of Corporation(1) | Jurisdiction of Incorporation | % of Voting Securities Owned by its Immediate Parent(2) |
|---|---|---|
| American International Group Data Center, Inc. | New Hampshire | 100% |
| American International Life Assurance Company of New York | New York | 77.52%(10 |
| American International Reinsurance Company Limited | Bermuda | 100% |
| American International Assurance Company, Limited | Hong Kong | 100% |
| American International Assurance Company (Australia) Limited | Australia | 100% |
| American International Assurance Company (Bermuda) Limited | Bermuda | 100% |
| American International Assurance Co. (Vietnam) Limited | Vietnam | 100% |
| Tata AIG Life Insurance Company Ltd. | India | 26% |
| Nan Shan Life Insurance Company, Ltd. | Taiwan | 95% |
| American International Underwriters Corporation | New York | 100% |
| American International Underwriters Overseas, Ltd. | Bermuda | 100% |
| AIG Europe (Ireland) Ltd. | Ireland | 100% |
| AIG Europe (U.K.) Limited | England | 100% |
| AIG Interamericana Compania de Seguros Gerais (Brazil) | Brazil | 50% |
| Universal Insurance Co., Ltd. | Thailand | 100% |
| La Seguridad de Centroamerica, Compania de Seguros, Sociedad Anonima | Guatemala | 100% |
| American International Insurance Company of Puerto Rico | Puerto Rico | 100% |
| La Interamerica Compania de Seguros Generales S.A | Colombia | 100% |
| American International Underwriters G.m.b.H | Germany | 100% |
| Underwriters Adjustment Company, Inc. | Panama | 100% |
| American Life Insurance Company | Delaware | 100% |
| AIG Life (Bulgaria) Z.D. A.D. | Bulgaria | 100% |
| AIG Participacoes do Brasil, S.A. | Brazil | 100% |
| ALICO, S.A. | France | 89% |
| American Life Insurance Company (Kenya) Limited | Kenya | 100% |
| Pharaonic American Life Insurance Company | Egypt | 71.6% |
| American Security Life Insurance Company, Ltd. | Switzerland | 99.8% |
| American Security Life Insurance Company, Ltd. | Lichtenstein | 100% |
| Birmingham Fire Insurance Company of Pennsylvania | Pennsylvania | 100% |
| China America Insurance Company, Ltd. | Delaware | 50% |
| Commerce and Industry Insurance Company | New York | 100% |
| Commerce and Industry Insurance Company of Canada | Ontario | 100% |
| Delaware American Life Insurance Company | Delaware | 100% |
| Hawaii Insurance Consultants, Ltd. | Hawaii | 100% |
| HSB Group, Inc. | Delaware | 100% |
| The Hartford Steam Boiler Inspection and Insurance Company | Connecticut | 100% |
| Allen Insurance Company Ltd. (Bermuda) | Bermuda | 100% |
| The Hartford Steam Boiler Inspection and Insurance Company of Connecticut | Connecticut | 100% |
| The Hartford Steam Boiler Inspection and Insurance Company of Texas | Texas | 100% |
| HSB Engineering Insurance Limited | England | 100% |
| The Boiler Inspection and Insurance Company of Canada | Canada | 100% |
| The Insurance Company of the State of Pennsylvania | Pennsylvania | 100% |
| Landmark Insurance Company | California | 100% |
| Mt. Mansfield Company, Inc. | | 100% |

CBHNL000033

EXHIBIT 4 . PAGE 26

| | | |
|---|---|---|
| National Union Fire Insurance Company of Pittsburgh, Pa. | Pennsylvania | 100% |
| American International Specialty Lines Insurance Company | Alaska | 70%(11 |
| International Lease Finance Corporation | California | 100% |
| Lexington Insurance Company | Delaware | 70%(11 |
| JI Accident & Fire Insurance Co. Ltd. | Japan | 50% |

II-11

Page 3 - 10-K - EX-21 - Filed by AMERICAN INTERNATIONAL GROUP INC

3

Subsidiaries of Registrant--(continued)



| Name of Corporation | Jurisdiction of Incorporation | % of Voting Securities Owned by its Immediate Parent(2) |
|---|---|---|
| National Union Fire Insurance Company of Louisiana | Louisiana | 100% |
| 21st Century Insurance Group | California | 33.07%(12) |
| 21st Century Insurance Company | California | 100% |
| 21st Century Casualty Company | California | 100% |
| Starr Excess Liability Insurance Company, Ltd. | Delaware | 100% |
| Starr Excess Liability Insurance International Limited | Ireland | 100% |
| MHIG Holding Corp. | Delaware | 100% |
| Audubon Insurance Company | Louisiana | 100% |
| Audubon Indemnity Company | Mississippi | 100% |
| Agency Management Corporation | Louisiana | 100% |
| The Gulf Agency, Inc. | Alabama | 100% |
| New Hampshire Insurance Company | Pennsylvania | 100% |
| AIG Europe, S.A | France | (13) |
| A.I. Network Corporation | New Hampshire | 100% |
| American International Pacific Insurance Company | Colorado | 100% |
| American International South Insurance Company | Pennsylvania | 100% |
| Granite State Insurance Company | Pennsylvania | 100% |
| New Hampshire Indemnity Company, Inc. | New York | 100% |
| AIG National Insurance Company, Inc. | Illinois | 100% |
| Illinois National Insurance Co. | New Hampshire | 100% |
| New Hampshire Insurance Services, Inc. | Egypt | 90% |
| Pharaonic Insurance Company, S.A.E. | Philippines | 99% |
| The Philippine American Life and General Insurance Company | California | 100% |
| Pacific Union Assurance Company | Philippines | 100% |
| The Philippine American General Insurance Company, Inc. | Philippines | 100% |
| Philam Insurance Company, Inc. | Delaware | 100% |
| Risk Specialist Companies, Inc. | Delaware | 100% |
| SunAmerica Inc. | Georgia | 100% |
| SunAmerica Investments, Inc. | Maryland | 100% |
| SunAmerica Financial Network, Inc. | New York | 100% |
| Advantage Capital Corp. | Delaware | 100% |
| FSC Securities, Inc. | California | 100% |
| Sentra Securities Corp. | California | 100% |
| Spelman & Co., Inc. | Delaware | 100% |
| SunAmerica Securities, Inc. | Colorado | 100% |
| Resources Trust Company | Arizona | 100% |
| SunAmerica Life Insurance Company | New York | 100% |
| First SunAmerica Life Insurance Company | Arizona | 100% |
| Anchor National Life Insurance Company | Delaware | 100% |
| Royal Alliance Associates, Inc. | Delaware | 100% |
| SunAmerica Asset Management Corp. | Delaware | 100% |
| SunAmerica Capital Services, Inc. | Arizona | 51%(14) |
| 21st Century Insurance Company of Arizona | | |

CBHNL000034

EXHIBIT 1 - PAGE 2

4

Subsidiaries of Registrant--(continued)

| Name of Corporation | Jurisdiction of Incorporation | % of Voting Securities Owned by its Parent(2) |
|---|---|---|
| United Guaranty Corporation | North Carolina | 36.31%(15) |
| United Guaranty Insurance Company | North Carolina | 100% |
| United Guaranty Mortgage Insurance Company | North Carolina | 100% |
| United Guaranty Mortgage Insurance Company of North Carolina | North Carolina | 100% |
| United Guaranty Residential Insurance Company of North Carolina | North Carolina | 100% |
| United Guaranty Residential Insurance Company | North Carolina | 75%(16) |
| United Guaranty Commercial Insurance Company of North Carolina | North Carolina | 100% |
| United Guaranty Mortgage Indemnity Company | North Carolina | 100% |
| United Guaranty Credit Insurance Company | North Carolina | 100% |
| United Guaranty Services, Inc. | North Carolina | 100% |

----------

(1) All subsidiaries listed are consolidated in the accompanying financial statements. Certain subsidiaries have been omitted from the tabulation. The omitted subsidiaries, when considered in the aggregate as a single subsidiary, do not constitute a significant subsidiary.

(2) Percentages include directors' qualifying shares.

(3) The common stock is owned 13.6 percent by SICO, 2.0 percent by Starr and 2.7 percent by The Starr Foundation.

(4) Also owned 10 percent by AIG Matched Funding Corp.

(5) Also owned 21.1 percent by Commerce & Industry Insurance Company.

(6) Also owned 8 percent by The Insurance Company of the State of Pennsylvania, 32 percent by National Union, and 8 percent by Birmingham.

(7) Also owned by 11 other AIG subsidiaries

(8) Also owned by 11 other AIG subsidiaries

(9) Also owned 26.19 percent by American International Group, Inc.

(10) Also owned 22.48 percent by American Home.

(11) Also owned 20 percent by The Insurance Company of the State of Pennsylvania and 10 percent by Birmingham.

(12) Also owned 16.87 percent by American Home, 6.34 percent by Commerce & Industry Insurance Company and 6.34 percent by New Hampshire.

(13) 100 percent to be held with other AIG companies.

CBHNL000035

(14) Also owned 49 percent by 21st Century Insurance Group.

(15) Also owned 19.38 percent by National Union, 16.05 percent by New Hampshire

EXHIBIT ___ . PAGE ___

**5**



## AIG
**WORLD LEADERS IN INSURANCE AND FINANCIAL SERVICES**

Login Broker Zone
Username:

Password:

go

# Welcome
## Your entry into the world of AIG Austi

American Home Assurance Company is a member company of American International Group, Inc. American International Group, Inc. (AIG) is the worlds leading U.S.-based international insurance and financial services organization, the largest underwriter of commercial and industrial insurance in the United States, and the second-largest U.S. life insurer. Its member companies write a wide range of general insurance and life insurance products for commercial, institutional and individual customers through a variety of distribution channels in approximately 130 countries and jurisdictions throughout the world.

AIG's global businesses also include financial services, savings and asset management. AIG financial service include aircraft leasing, financial products, trading and making and consumer finance. AIG has one of the larg retirement savings businesses in the United States and in asset management for individual and institutional m specialized investment management capabilities in equ income, alternate investments and real estate. AIG c is listed on the New York Stock Exchange, as well as th exchanges in London, Paris, Switzerland and Tokyo.

- Home
- What's New
- Products
- Services
- Claims
- Broker Zone
- Q & A
- About AIG
- Careers
- Contact Us

**Are you looking for insurance?**

Category Type: Select...

**Do you have a claim to make?**

Claim Form: Select...



**Introduction To Political Risk Insurance**
Do you have a great deal in a difficult country?

Political Risk Insurance is a specialised line of insurance which provides financial protection for equity investments, loans and trade transactions against arbitrary or discriminatory government actions and/or acts of politically motivated violence that have an adverse impact on these transactions. AIG's Political Risk Division has been in the business of insuring political risks for over twenty years.

**Managing The Risks Of Being A Compliance Committee Member**
The introduction of the Managed Investments Act 1998 created a new role the Compliance Committee member. The members of Compliance Committee face a unique range of exposures that may not always be addressed by traditional forms of insurance. This paper discusses these exposures and explores how they may be appropriately addressed through risk management and insurance

- Privacy
- Terms of Use

Last Updated: Saturday, 24 August 2002

Copyright ©2001, American International Group, Inc.



CBHNL000036

EXHIBIT 5 - PAGE 1

# AIG Technical Services, Inc.(AIGTS)

AIG Technical Services, Inc. (AIGTS) Contact Information
A.I. Management and Professional Liability Claim Adjusters (AIMPLICA)

For information on AIGTS' Home Office Property, American Home or Healthcare Malpractice
Claims Services divisions, please call (212) 458-1796 or (212) 458-1797. E-mail inquiries can
be sent to messagecenter@aig.com

**AIMPLCA Contacts**

**DIRECTORS & OFFICERS**

**Corporate Directors and Officers Complex**
*Servicing complex claims for Corporate Directors and Officers and General Partnerships.*
**David Gilfillan, Assistant Vice President**
175 Water Street, 5th Floor
New York, NY 10038
(212) 458-1511
Fax: (212) 458-1476
dave.gilfillan@aig.com

**Corporate Directors and Officers Complex**
*Servicing claims for Middle Market/Non-Profit Directors and Officers and all Pension
Trust/Fiduciary.*
**Ted Borowiec, Assistant Vice President**
175 Water Street, 9th Floor
New York, NY 10038
(212) 458-1523
Fax: (212) 458-1045
ted.borowiec@aig.com

**Corporate Directors and Officers Mainstream**
*Servicing claims for Corporate Directors and Officers and General Partnerships.*
**Lucy Ann Galioto, Assistant Vice President**
175 Water Street, 5th Floor
New York, NY 10038
(212) 458-1520
Fax: (212) 458-1476
lucyann.galioto@aig.com

**Middle Market Directors and Officers - East**
*Servicing claims for Corporate Directors and Officers and Employment Practices claims of
Middle Market and Not-for-Profit Entities in the Eastern Regions.*
**Vincent Ciampi, Assistant Vice President**
175 Water Street, 9th Floor
New York, NY 10038
(212) 458-1055
Fax: (212) 458 - 1045
vincent.ciampi@aig.com

CBHNL000037

**Middle Market Directors and Officers - West**
*Servicing claims for Corporate Directors and Officers and Employment Practices claims of*

*Middle Market and Not-for-Profit Entities in the Western Regions.*
**Douglas Poetzsch, Assistant Vice President**
175 Water Street, 9th Floor
New York, NY 10038
(212) 458-1097
Fax: (212) 458-1045
douglas.poetzsch@aig.com

## ERRORS & OMISSIONS (E&O)

**James Lotz, Senior Vice President**
175 Water Street, 7th Floor
New York, NY 10038
(212) 458-1201
Fax: (212) 458-1259
jim.lotz@aig.com

**Lawyers Professional Liability Complex**
*Servicing complex claims for Lawyers Professional Liability.*
**Vincent Biancamano, Vice President**
175 Water Street, 7th Floor
New York, NY 10038
(212) 458-1250
Fax: (212) 458-1259
vincent.biancamano@aig.com

**Lawyers Professional Liability Mainstream**
*Servicing claims for Law and Accounting Firms, Patent Law Firms, the Judges Program, and the Minet Lineslip Program.*
**Patricia Murnane, Assistant Vice President**
175 Water Street, 7th Floor
New York, NY 10038
(212) 458-1597
Fax: (212) 458-1349 or 1259
patty.murnane@aig.com

**Specialty Professional Liability Complex**
*Servicing complex claims for Specialty Professional Liability.*
**Raymond Hampel, Vice President**
175 Water Street, 8th Floor
New York, NY 10038
(212) 458-1139
Fax: (212) 458 - 1137
ray.hampel@aig.com

**Specialty Professional Liability**
*Servicing claims for Public Officials, School Leaders, Land Surveyors, Electronic Data Processors, Third Party Administrators, Miscellaneous Professional Liability, Association Professional Liability and Real Estate Agents and Brokers, Multi-Media Professional Liability, Internet Service Providers E&O.*
**William Powell, Assistant Vice President**
175 Water Street, 8th Floor
New York, NY 10038
(212) 458-1142

CBHNL000038

EXHIBIT 2 - PAGE 2

Fax: (212) 458-1135
bill.powell@aig.com

**Program Professional Liability**
*Servicing claims for American Collectors Association, Travel Agents, Security Guards, Management Consultants, Home Inspectors, Social Workers, Marriage and Family Therapists, Social Service Agencies, Temporary Help Agencies, Employment Agencies, Tanning Salon, CAP Program, Interior Designers, Alternative Staffing Services, Professional Employers Organization, Aestheticians, Electrologists and Home Health Aides.*
**Christopher M. Sharp, Assistant Vice President**
175 Water Street, 7th Floor
New York, NY 10038
(212) 458-5640
Fax: (212) 458-2708
chris.sharp@aig.com

## FINANCIAL INSTITUTIONS

**Raymond DeCarlo, Senior Vice President**
175 Water Street, 4th Floor
New York, NY 10038
(212) 458-1576
Fax: (212) 458-1697
ray.decarlo@aig.com

**Financial Institutions - Middle Market Complex Claims**
*Servicing complex Directors & Officers and Professional Liability claims for Insurance Agents, Insurance Companies, Investment Advisors, Mutual Funds, Mortgage Bankers, Mortgage Brokers, Securities Brokers/Dealers, Banks and Credit Unions, and Finite Risk.*
**Robert Amendola, Vice President**
175 Water Street, 4th Floor
New York, NY 10038
(212) 458-1552
Fax: (212) 458-1649, (212) 458-1650
bob.amendola@aig.com

**Financial Institutions - National Accounts Complex Claims**
*Servicing Directors & Officers and Professional Liability claims for Insurance Agents, Insurance Companies, Investment Advisors, Mutual Funds, Securities Brokers/Dealers, and Banks.*
**Bonnie Hoffman, Assistant Vice President**
175 Water Street, 4th Floor
New York, NY 10038
Phone: (212) 458-1593
Fax: (212) 458-1649, (212) 458-1650
bonnie.hoffman@aig.com

**Financial Institutions - Middle Market Mainstream Claims**
*Servicing Directors & Officers and Professional Liability claims for Insurance Agents, Insurance Companies, Investment Advisors, Mutual Funds, Mortgage Brokers, Mortgage Bankers, Securities Brokers/Dealers, and Banks and Credit Unions.*
**Raymond Tiburzi, Assistant Vice President**
175 Water Street, 4th Floor
New York, NY 10038
(212) 458-1580

CBHNL000039

EXHIBIT: 5 - PAGE 4

Fax: (212) 458-1649 or 1650
ray.tiburzi@aig.com

Financial Institutions - National Accounts Mainstream Claims
*Servicing Directors & Officers and Professional Liability claims for Insurance Agents, Insurance
Companies, Investment Advisors, Mutual Funds, Securities Brokers/Dealers, and Banks.*
**Michael P. Fried, Assistant Vice President**
175 Water Street, 4th Floor
New York, NY 10038
(212) 458-1722
Fax: (212) 458-1649 or 1650
mike.fried@aig.com

**Financial Institutions - Risk Finance Claims**
*Serving claims under various alternative-financing programs, including loss portfolio transfers,
residual value insurance, Finite Risk insurance, and other credit enhancement programs.*
**Richard Yonezuka - Brown, Assistant Vice President**
70 Pine Street, 5th floor
New York, NY 10270
(212) 770-8323
Fax: (212) 943-4054
richard.brown@aig.com

## FIDELITY BOND CLAIMS

*Servicing Fidelity Bond Claims.*
**Joseph Perry, Vice President**
175 Water Street, 9th Floor
New York, NY 10038
(212) 458-1050
Fax: (212) 458-1048
joseph.perry@aig.com

**Brian Bornstein, Assistant Vice President**
(212) 458-1104
Fax: (212) 458-1048
brian.borsntein@aig.com

## SURETY BOND CLAIMS

*Servicing Construction Performance and Commercial Surety Claims.*
**David Koziel, Vice President**
175 Water Street, 6th Floor
New York, NY 10038
(212) 458-1262
Fax: (212) 458-1659
david.koziel@aig.com

**Mark Pessolano, Assistant Vice President**
(212) 458-1264
Fax: (212) 458-1659
mark.pessolano@aig.com

CBHNL000040

EXHIBIT 5 - PAGE 5

||

## MERGERS & ACQUISITIONS

*Provides claim service to merchant banks, private equity funds, and strategic partners and their acquired companies.*
**Marsha Landau, Assistant Vice President**
175 Water Street, 12th Floor
New York, NY 10038
(212) 458-1190
Fax: (212) 458-1136
marsha.landau@aig.com

Top of Page

A Division of AIG Technical Services, Inc.
AIMPLCA Contacts
Last Updated: September 30, 1999

Copyright © 2000, American International Group, Inc. All Rights Reserved. Disclaimer | Privacy

CBHNL000041

EXHIBT 2 . PAGE 11

12

# GENERAL INSURANCE

AIG's General Insurance business is comprised of the Domestic Brokerage Group, Domestic Personal Lines, United Guaranty Corporation, Foreign General and Transatlantic Holdings, Inc. AIG's worldwide General Insurance operations reported a 14.7 percent increase in net premiums written to a record $20.10 billion. General Insurance pretax income before realized capital gains (losses) for the year 2001 was $2.98 billion, compared to $3.49 billion last year. Excluding World Trade Center losses, pretax income before realized capital gains (losses) was $3.75 billion, 7.6 percent above last year.

| General Insurance (in millions, except ratios) | 2001* | 2001** | 2000 |
|---|---|---|---|
| Net Premiums Written | $20,100.9 | $20,100.9 | $17,526.3 |
| Adjusted Underwriting Profit | 88. | 857.3 | 785.0 |
| Net Investment Income | 2,892.6 | 2,892.6 | 2,700.8 |
| Income Before Realized Capital Gains | 2,980.9 | 3,749.9 | 3,485.8 |
| Realized Capital Gains (Losses) | (127.7) | (127.7) | 38.4 |
| Operating Income | 2,851.2 | 3,620.2 | 3,524.2 |
| Net Reserves for Losses and Loss Expenses | 25,895. | 25,895. | 24,951.6 |
| Combined Ratio | 100.71 | 96.74 | 96.73 |

\* including WTC losses.

\*\* excluding WTC losses.

The principal units of the **Domestic Brokerage Group (DBG)** provide the widest available range of commercial and industrial coverages in the United States.
- National Union Fire Insurance Company of Pittsburgh, Pa. is the leading provider of directors and officers liability and fiduciary liability insurance, as well as a leader in employment practices liability, fidelity and surety coverages.
- American Home Assurance Company is a premier domestic provider of commercial umbrella/excess liability and primary and excess workers' compensation insurance.
- AIG Environmental is the leading U.S. provider of environmental coverages and services.

CBHNL000042

EXHIBIT 5 - PAGE 1

13

- Lexington Insurance Company is the largest U.S.-based excess and surplus lines carrier, specializing in difficult-to-place property and casualty risks.
- HSB Group, Inc. is the parent company of Hartford Steam Boiler Inspection and Insurance Company (HSB), one of the world's leading providers of equipment breakdown insurance.
- AIG Risk Management provides casualty risk management products and services to Fortune 1,000 and other large commercial customers.
- DBG also includes many specialty business divisions that draw on the worldwide resources of AIG's insurance and financial services companies to meet client needs in aviation, transportation, construction and energy industries, risk finance, mergers and acquisitions, cross-border operations, eBusiness, and accident and health.

AIG's growing **Domestic Personal Lines** operations provide auto, homeowners and high-net-worth individual coverages through the Mass Marketing and Specialty Auto Divisions, 21st Century Insurance Group and the AIG Private Client Group.

**United Guaranty Corporation** subsidiaries write residential mortgage guaranty insurance and reinsurance for financial institutions and mortgage investors.

The **Foreign General Group** comprises the international property-casualty operations of AIG and HSB.

- American International Underwriters (AIU) manages AIG's overseas property-casualty operations, the most extensive foreign network of any insurance organization. Stretching across Asia and the Pacific to Latin America, Europe, Africa, and the Middle East, AIU markets a full range of property-casualty products to both consumer and commercial clients.

**Transatlantic Holdings, Inc. (Transatlantic)** is the largest publicly traded, U.S.-based reinsurance organization. Beginning in 2001, Transatlantic's results are reported as a separate segment within General Insurance.

The **Domestic Brokerage Group (DBG)** markets property-casualty insurance products and services through brokers to corporate buyers and commercial customers ranging from large multinationals to small businesses. DBG companies offer some of the largest capacity available in the marketplace, write a broad array of insurance products, and are leaders in many specialty and difficult-to-place classes of business. The Triple-A ratings that the DBG companies hold for insurer financial strength, combined with product innovation, superior claim handling and service excellence, are key competitive assets.

| Domestic Brokerage Group† (in millions, except ratios) | 2001* | 2001** | 2000 |
|---|---|---|---|
| Net Premiums Written | $10,196.5 | $10,196.5 | $7,934. |
| Income Before Realized Capital Gains (Losses) | 1,488.4 | 2,032.4 | 1,790.7 |
| Combined Ratio | 104.42 | 98.85 | 100.54 |

† Excluding the results of Transatlantic's domestic operations.

* including WTC losses.

CBHNL000043

EXHIBIT 2 - PAGE 8

14

** excluding WTC losses.

In a rapidly changing business and economic environment, the strength of DBG's distribution network and its unmatched flexibility in product offerings allow DBG to meet the needs of customers of all sizes. As an example, DBG launched the AIG Small Business Underwriting Center during 2001 to serve one of the fastest growing segments in the domestic market. The center gives businesses with less than $10 million in revenue - and the brokers that serve them - efficient access to top-quality risk management resources and solutions.



Domestic Brokerage Group — Net Premiums Written
(millions of dollars)

After the terrorist attacks of September 11, an urgent need developed for both aviation insurance and property terrorism insurance. On October 4, AIG member companies introduced a co-insurance facility making available aviation war risk and hijacking liability coverage totaling $1 billion per airline. AIG member companies have also made available an acts-of-terrorism property facility, which provides up to $150 million in insurance for property damage and business interruption losses due to terrorism. The year-end renewal season brought significant new business to DBG. Industry capacity was reduced, and DBG benefited as companies sought coverage from the strongest insurers.

EXHIBIT 2 . PAGE 1

CBHNL000044

15



Anheuser-Busch, the world's largest brewer, operates 12 breweries in the United States and two overseas. In one of the most competitive beverage industry categories, Anheuser-Busch's Budweiser is the world's best-selling beer, with distribution in more than 70 countries. This worldwide market presence and high corporate profile, along with significant additional operations focused on adventure park entertainment and packaging, present the brewer's key decision makers with a variety of management liability risks and exposures. Anheuser-Busch works closely with National Union to develop a management liability insurance program incorporating elements of directors and officers, fiduciary and fidelity coverages. The Clydesdales pictured above have served as the unmistakable symbol of both Anheuser-Busch and Budweiser for generations.

In 2001, **National Union** continued to build on its record of leadership in the directors and officers (D&O) and management liability marketplace, despite the competitive challenges this sector faced. National Union had good results relying on a strategy that emphasized strict underwriting controls, detailed account knowledge, pricing improvements and greater risk sharing mechanisms. With numerous downgrades and "under review" ratings for many carriers, National Union experienced an influx of new business as D&O customers sought to buy coverages from the industry's strongest company. National Union's innovative product development proved to be a competitive asset again in 2001. The company successfully introduced many new management and professional liability offerings including a comprehensive, specially tailored program - endorsed by the U.S. Chamber of Commerce - to meet the needs of small business owners. National Union also introduced enhanced management liability programs for venture capital funds and managers, as well as a package of products for small and midsize companies, which allows insureds to combine a variety of coverages into a single policy.

In the fiduciary liability area, National Union launched a new ERISA policy with expanded coverage for more types of plans including foreign and domestic pension and welfare benefit plans, qualified and non-qualified plans, cafeteria plans, fringe benefit programs, voluntary employee's beneficiary associations and others.

Counting the vast majority of the Fortune 500 as clients, **American Home**'s excess casualty division continued to be a leader in the commercial umbrella market with its traditional core strengths - the ability to underwrite complex exposures and superior claims expertise. The division enhanced its Web-based quote and bind system and it also expanded its family of crisis

EXHIBIT 5 - PAGE 10

CBHNL000045

management products. Maintaining an emphasis on underwriting and pricing discipline, as well as on new business development, American Home's workers' compensation division had strong premium growth in 2001. and its Internet product and distribution strategy was a key component of its success. In a market that has experienced many insurance company failures, the division benefited from a flight to quality and established itself as a lead provider of monoline workers' compensation coverages for small and midsize businesses.

**AIG Environmental** had excellent premium growth in 2001. AIG Environmental's transaction-related business accounted for much of its success, as the trend continued among contracting parties to use environmental insurance in mergers and acquisitions, transfer of power industry assets and military base redevelopment projects. AIG Environmental experienced good growth in the pollution legal liability segment, specifically in the real estate investment trust area where large property holders are increasingly concerned about environmental exposures. Likewise, sales of secured creditor policies, which protect lenders from financial loss due to defaults accompanied by environmental contamination, continued to achieve good growth.



In the United States, the redevelopment of brownfields, or inactive industrial sites, has had the dual impact of revitalizing inner-city areas while reducing urban sprawl. Pictured above, in its early stages, is the cleanup and subsequent construction of the Los Angeles Media Tech/Taylor Yard Project, which was formerly a 241-acre temporary staging area for rail freight cars. The project's developer is AMB Property Corporation, a leading owner and operator of industrial real estate nationwide. For AMB, protection from potential liability arising from environmental conditions at the site was essential. The company turned to AIG Environmental to provide insurance on the redevelopment project, including coverage for cleanup cost overruns that could result from environmental conditions encountered during remediation and construction.

**Lexington** maintained its leadership position in 2001 as one of the largest providers of multi-line and specialty property-casualty programs to a wide range of businesses. While the healthcare marketplace underwent significant change during 2001, Lexington emerged as one of the industry's leading providers, offering insurance to hospital systems, long-term care and other healthcare facilities. Lexington's business benefited from an improved pricing environment for property, product liability, general casualty and transportation classes. While the September 11 terrorist attacks had an impact on many of Lexington's markets, the company was quick to respond to customer needs through the development of a property terrorism product including

CBHNL000046

threat assessment services.



Lexington is a leading provider of insurance programs for the healthcare industry, specializing in professional liability and related coverages for individual practitioners and healthcare organizations across a range of disciplines. The laser vision correction surgery being performed above took place at Dartmouth-Hitchcock Medical Center, a Lexington customer for more than 25 years. Dartmouth-Hitchcock comprises Northern New England's most extensive healthcare network and is a leader in patient care, research and education. Throughout the duration of its relationship with Lexington, Dartmouth-Hitchcock has relied upon Lexington's expertise in current healthcare issues and on its ability to help manage and keep abreast of the risks that accompany medical innovation, as well as industry change.

**Hartford Steam Boiler Inspection and Insurance Company (HSB)** had strong growth in 2001 in its U.S. equipment breakdown insurance business. The company achieved excellent results through engineering-based risk assessment, selective underwriting, appropriate pricing strategies, and assistance to clients worldwide in loss prevention and loss reduction. Separately, HSB provides equipment breakdown coverage and other specialty insurance through reinsurance arrangements with approximately 200 property-casualty insurers. Its domestic growth strategy focuses on expanding these reinsurance relationships and offering new products and services developed in collaboration with other AIG member companies. HSB is also leveraging AIG's global network to access international markets and expand its engineering consulting business by offering equipment breakdown insurance and technical expertise through AIU and international reinsurance arrangements.

As a leading provider of captive, self-insured retention and risk financing alternatives, **AIG Risk Management (AIGRM)** was particularly well positioned in 2001 to capitalize on the increased demand for alternative risk programs that emerged throughout the marketplace. AIGRM also provides specialty risk management programs to the construction, transportation and energy industries, and to public entities. During 2001, AIGRM's construction division, in concert with the Global Energy Division, introduced a "wrap-up" program specifically designed for power plant builders and developers. AIG was among the first insurance organizations to

EXHIBIT 2 - PAGE 20

CBHNL000047

introduce the wrap-up, or insurance package concept, more than 20 years ago as an option for controlling costs on large construction projects. Today, it has over 85 such programs in-force on some of the country's largest construction initiatives. The transportation division had strong premium growth in 2001. In a market characterized by increased pricing and reduced capacity for the airline and trucking industries, AIGRM successfully responded with creative risk management program development.

**AIG Aviation, Inc.** is the largest U.S.-based provider of aviation insurance. It offers insurance facilities to a broad client base, from commercial airlines to individually owned aircraft and nearly half of all major U.S. airports. AIG Aviation took a leading role in the post-September 11 environment, offering on behalf of the co-insurance market, coverage totaling $1 billion for war risk and hijacking. This facility enabled airlines to have the necessary insurance to maintain operations in an unprecedented environment. Over 200 airlines around the world have purchased this coverage.

The **AIG WorldSource Division** continued to establish itself as a market leader providing global programs for companies of all sizes with international operations. As the events of September 11 heightened the awareness among the global business community that people, assets and investments must be adequately protected, WorldSource proved to be a valuable resource for companies with a variety of coverage requirements. WorldSource's casualty group had strong results, particularly through innovative proprietary programs. Specialty products were a growth area for WorldSource as it was in a position to offer some of the industry's most expert capabilities and comprehensive coverages in crisis management, kidnap and ransom, malicious product tampering, trade credit and political risk - all AIG strong suits.

The **AIG Risk Finance Division**, a market leader in the design and implementation of innovative risk financing solutions, serves clients typically requiring the most advanced risk management capabilities. Drawing on the worldwide resources of AIG's insurance and financial services companies, AIG Risk Finance provides programs that feature a blend of financial, insurance and capital market strategies to enhance balance sheet strength, address solvency and liquidity concerns, and help manage strategic risks. In 2001, AIG Risk Finance benefited from the diminishing capacity and more restrictive terms in the marketplace. Many corporations opted for alternative coverage solutions to replace more conventional ones. Counterparty financial strength is a top priority in this new environment and has become a clear advantage for AIG Risk Finance.

The **AIG Mergers and Acquisitions Division** works with DBG companies, American International Underwriters and AIG Global Investment Group, Inc., as well as with external distribution channels, to provide companies in the United States and abroad with insurance solutions for transaction-specific liabilities including those associated with mergers, acquisitions and divestitures. During 2001, the division structured cutting-edge insurance programs that contributed to the completion of a number of very large corporate transactions, by helping to minimize or eliminate what otherwise might have been deal-breaking exposures.

The **AIG eBusiness Risk Solutions Division (AIGeBRS)**, which serves the risk management needs of companies that conduct business on the Internet, had excellent premium growth. The division has established itself as the leader of the cyber-risk and Internet security insurance market. AIGeBRS launched several new products including a Web-based credit and risk management system, and coverages that offer identity theft and credit card fraud protection to

EXHIBIT 5 - PAGE 12

CBHNL000048

online merchants, as well as consumers. It also extended its reach globally, offering coverages in select markets in Europe, Asia and South America. Together with Dun & Bradstreet, the division also launched an online system that facilitates real-time trading credentials and credit decisions for B2B marketplaces.

In 2001, AIG transferred the **Domestic Accident & Health Division** to DBG, positioning the division to take better advantage of cross-marketing opportunities with AIG's domestic property-casualty businesses and opening additional avenues for growth. The division has initiated a cooperative venture with the AIG Small Business Underwriting Center, included an accident insurance component in all D&O policies, and has begun to add accident coverages to programs underwritten by Lexington Insurance Company.

**AIG Reinsurance Advisors, Inc. (AIG Re)** specializes in non-traditional reinsurance and retrocessional coverage, structuring and underwriting reinsurance products to satisfy the risk transfer, leverage and long-term financial planning objectives of reinsurance buyers worldwide. AIG Re's expertise facilitates reinsurance transactions that optimize capital usage for its clients. AIG Re works closely with AIG's financial services companies and Transatlantic to provide additional resources to its clients. The company reported increased premium volume in 2001, as reinsurance buyers placed greater emphasis on AIG Re's ability to tailor products to meet specific needs, as well as on AIG's financial strength and security.

**Starr Excess Liability Insurance Company, Ltd. (Starr Excess)**, a global leader in the excess liability market, provides coverage for large limit excess casualty and excess financial lines programs through operations in the United States, Bermuda and London. In 2001, Starr Excess had solid growth in net premiums written as a result of an improved underwriting environment, and increased its customer base among Fortune 2,000 companies, its target market.

**AIG Claim Services, Inc. (AIGCS) and AIG Technical Services, Inc. (AIGTS)**, the two claim companies for domestic operations, are dedicated to providing the highest level of service and specialized claim expertise.

AIGCS provides cost containment and claim management services to AIG clients for workers' compensation and property-casualty lines of business. These include integrated disability management, loss prevention, litigation management, investigative services and industry-specific claim management for construction, entertainment, transportation and product recall claims. In 2001, AIGCS expanded its portfolio, assuming responsibility for domestic accident and health claims and AIG employee medical benefits claims.

AIGTS is responsible for specialty claims and litigation management. Specialized claim units handle directors and officers liability, environmental, excess casualty, financial institutions, healthcare and medical malpractice, high-exposure property, professional liability, surety bond, fidelity bond and toxic tort. AIGTS claim units work with underwriters to help evaluate, develop, market and price both new products and existing accounts. The excess casualty claim group created a casualty loss mitigation unit in 2001 dedicated to identifying and evaluating opportunities for customers to shift responsibility for managing past casualty and litigation events to AIGTS. Other units were created to support DBG's small business efforts. The property claim group's ability to handle disaster-related claims promptly and efficiently enabled

CBHNL000049

**EXHIBIT 5 - PAGE 4**

2C

AIG customers to recover quickly from catastrophes including the Seattle earthquake and Tropical Storm Allison. Its crisis response to the September 11 terrorist attacks included the immediate reestablishment of contact with business partners, the development of temporary claim reporting processes for AIG's customers and brokers, and the formation of dedicated teams to recreate destroyed client claim files. The litigation management group is coordinating emerging risk areas such as mold and eCommerce, including the formation of defense law firm specialist groups to handle these claims.

**AIG Consultants, Inc.** supports AIG's claim and underwriting operations by providing technical consulting services worldwide in environmental, healthcare, safety and property areas. It offers customers professional, practical and cost-effective methods to mitigate losses. In early 2001, AIG Consultants' reputation for providing quality service was recognized as it was awarded ISO9001-2000 certification.

AIG's **Domestic Personal Lines** operations consist of the Mass Marketing and Specialty Auto Divisions, 21st Century Insurance Group and the AIG Private Client Group. Overall, net premiums written decreased 2.2 percent in 2001 as AIG reduced its participation in the involuntary insurance market. However, net premiums for the core voluntary auto and homeowners business increased $140 million to over $2.43 billion.

| Domestic Personal Lines (in millions, except ratios) | 2001 | 2000 |
| --- | --- | --- |
| Net Premiums Written | $2,453.6 | $2,509. |
| Income Before Realized Capital Gains (Losses) | 21.7 | 76.5 |
| Combined Ratio | 104.89 | 100.84 |

In 2001, Domestic Personal Lines businesses filed for the rate increases necessary to provide adequate returns in what continues to be an extremely challenging operating environment. Domestic Personal Lines operating income was adversely impacted by $70 million of charges unrelated to current operations. These charges represent an increase in the provision for losses, following the unprecedented decision by the state of California to require all insurers to reopen claims in connection with the Northridge earthquake, nearly eight years after the occurrence.

The **Mass Marketing Division** had good premium growth in 2001. Voluntary auto and homeowners premiums grew by 15 percent over the prior year. In a significant move, the division reached a compromise with the state of New Jersey that provides for a much needed increase in automobile insurance rates for 2002. The division deployed technology enhancements throughout its operations, achieving efficiencies and curtailing expense growth.

The **Specialty Auto Division**, a provider of non-standard automobile risks through independent agents, significantly reduced premiums written in states where the regulatory environments precluded obtaining necessary rate increases. However, Specialty Auto's overall premiums were within 4 percent of the prior year, as a result of growth in other states. The division's proprietary desktop underwriting software package, designed to create greater efficiencies in the application process, was delivered to 16 state markets, with the remainder scheduled for rollout in 2002.

**21st Century Insurance Group** operates on a direct basis and provides coverages primarily in

EXHIBIT 2 . PAGE 5

CBHNL000050

California, where it has a 6 percent share of the personal auto market. 21st Century implemented necessary rate increases in 2001 and continued to maintain one of the lowest expense ratios among all auto insurers. The Internet plays an important role in new business development at 21st Century. During 2001, more than 30 percent of premium quotes for prospective customers were provided online. 21st Century exited the homeowners insurance business on January 1, 2002, and its existing book of homeowners business has been reinsured.

The **AIG Private Client Group**, a provider of comprehensive insurance products and services to high-net-worth individuals, experienced a good start in 2001, its first full year of operation. The Group has quickly established a reputation for exemplary service and achieved a 100 percent client satisfaction rating for all claims it handled in 2001.

The coverages provided by United Guaranty Corporation (UGC) subsidiaries protect lenders and investors against loan losses resulting from borrower default and foreclosure. UGC's strong 2001 results marked the 13th consecutive year of record financial performance, with operating income of $417.4 million.

| **United Guaranty** (in millions, except ratios) | 2001 | 2000 |
|---|---|---|
| Net Premiums Written | $494.4 | $453.4 |
| Income Before Realized Capital Gains (Losses) | 417.4 | 363.1 |
| Combined Ratio | 36.90 | 40.92 |

UGC had an excellent year. Despite weak economic conditions, housing finance remained one of the few strong sectors, reaching a record $2 trillion in residential mortgage originations and refinances, the highest loan volume ever for the industry. Against this backdrop, UGC achieved a solid market position built on $36.3 billion in new insurance business.

While UGC had record results in new insurance written and operating income, its portfolio performance experienced a modest decline in the second half of the year, as mortgage delinquencies increased from 2.08 percent at year-end 2000 to 2.57 percent at year-end 2001 - still well below mortgage insurance industry norms. United Guaranty's sound risk management policies, supported by product innovation and leadership in risk-sharing structures with lender customers, have resulted in superior performance compared to the industry.

UGC added 10 products, ranging from home buyer education seminars, to mortgage processing support, to its Internet eBusiness gateway. Designed to improve efficiencies for mortgage lenders, the gateway has resulted in a significant increase in UGC's Web-based commerce. Electronic transactions now account for 83.4 percent of new insurance applications. Centre Capital Group, Inc., UGC's mortgage conduit subsidiary, nearly doubled its loan purchases in 2001, and UGC's international operations posted substantial premium growth for the year.

AIG's **Foreign General Insurance Group** is the most extensive worldwide network of any

CBHNL000051

EXHIBIT ___ PAGE ___

22

insurance organization. Its operations encompass over 70 countries in Asia, the Pacific Rim, Latin America, Europe, Africa and the Middle East. The Group markets a full range of property-casualty products to both consumers and commercial clients.

| Foreign General Insurance[†]<br>(in millions, except ratios) | 2001* | 2001** | 2000 |
| --- | --- | --- | --- |
| Net Premiums Written | $5,050.8 | $5,050.8 | $4,970.3 |
| Income Before Realized Capital Gains (Losses) | 1,063.6 | 1,088.6 | 943.7 |
| Combined Ratio | 92.18 | 91.66 | 92.40 |

[†]Excluding the results of Transatlantic's domestic operations.
*including WTC losses.
**excluding WTC losses.

With market terms and conditions improving throughout 2001, American International Underwriters (AIU) had a good year. Across its global network - one that would be virtually impossible to replicate - AIU benefited from a flight to quality and capitalized on its innovative product range and multiple distribution channels. The Group's operations are by many standards the most efficient in the industry. Reflecting an ongoing commitment to deliver consistently superior service to customers, Foreign General launched the Performance Management Program (PMP), which has provided excellent results in AIG's domestic operations. The objective of PMP is to stimulate continuous improvements in service delivery, quality and process.



AIG's General Insurance operations in Japan had a good year in a very difficult economic environment. AIU Japan continued to capitalize on opportunities created in the recently deregulated market. In 2001, AIU Japan completed distribution alliances with several major Japanese banks and financial services organizations. These alliances complement AIU Japan's strong agency operation, recognized as one of the most professional in the industry. The

CBHNL000052

EXHIBIT 5 - PAGE 11

23

Japanese branch of American Home Assurance Company retained its leadership position among direct marketing insurers for auto and accident and health (A&H) products, and achieved growth fueled by its reputation for excellent claim and service capabilities. American Home began offering its products through AIG Star Life's 4,300-member agency force, a significant new distribution channel. South Korean operations experienced good growth through increased brand awareness, a rapidly expanding agency force and branch network, and the introduction of direct marketing programs.



Barclays PLC, a U.K.-based global financial services group engaged in banking, investment banking and investment management, has been an AIU client through its London office since 1994. Barclays initially turned to AIU for its expertise in creating specialized solutions for financial institutions. In recent years, Barclays has expanded this relationship to include property and excess casualty coverages. A long-time leader in the U.K. retail banking industry, Barclays' current corporate growth plan involves developing its operations in Europe and expanding globally in select businesses. The bank has relied upon AIU's expertise and worldwide network to assist in its expansion.

The U.K./Ireland Division had an excellent year both in premium growth and operating income. The division expanded its market penetration of the United Kingdom's top 500 companies and continued to capitalize on growth opportunities in the Irish market. The division launched new products in financial lines, A&H, and in its multi-line unit. In the aftermath of September 11, the aviation terrorism and war liability facility initiated and led by AIG was coordinated out of the London office. AIG launched its first Lloyd's syndicate in 2001. Managed by Ascot Underwriting Limited, the syndicate had a very promising start.

Paris-based AIG Europe S.A., which serves Continental Europe, continued to expand many of its key specialty lines of business. AIG Europe had all of its systems and financial changes in place for the euro conversion well in advance of the new currency's January 1, 2002 introduction. The Central Europe and Commonwealth of Independent States Division had a good year, reporting solid growth and earnings. The division's Baku, Azerbaijan operation became fully owned by AIG in 2001.

The Middle East, Mediterranean and South Asia Division generated strong premium growth.

EXHIBIT 5 · PAGE 18

During 2001, the division fully integrated Pharaonic AIG Insurance Company (S.A.) into its established Egyptian business. In India, Tata AIG General Insurance Company Limited was launched in 2001 and now operates in India's six largest metropolitan markets. Operations in Israel had excellent growth. Earnings in the Africa Division improved substantially with growth in A&H, commercial lines and risk finance portfolios.

The Southeast Asia and Greater China Divisions had good premium growth, benefiting from their success in developing alternative distribution channels. The Shanghai office became the first in China to offer a fully integrated Internet-based marine insurance and loss engineering service, and American Home Assurance Company in Hong Kong was honored with the "General Insurance Company of the Year" award at the 2001 Asia Insurance Industry Awards. The Australasia Division benefited from improved market terms and conditions, which resulted in production growth across many business classes.



A pioneer in its market, AIU Hong Kong celebrated its 70th year of operations in 2001. During these seven decades, the company has prospered in tandem with Hong Kong, and AIU Hong Kong is widely recognized for its early and ongoing contributions to the insurance industry of Southeast Asia. Along the waterfront of Hong Kong Harbor (above) are the offices of several companies with which AIU Hong Kong has longstanding general insurance relationships, including Jardines Matheson Group, a conglomerate with a long history in Hong Kong. In 2001, AIU Hong Kong's market leadership was recognized when American Home Assurance Company was named the "General Insurance Company of the Year" in Hong Kong by the Asia Insurance Industry Awards.

The Latin American Division had a good year, with solid premium growth, and AIG's joint venture with Unibanco in Brazil also performed well. Operations in Argentina reported strong growth and profitability despite the country's economic and political turmoil. Mexico and Chile also had strong results.

**Transatlantic Holdings, Inc. (Transatlantic)**, through its subsidiaries Transatlantic Reinsurance Company, Trans Re Zurich and Putnam Reinsurance Company, offers reinsurance capacity on both a treaty and facultative basis, structuring traditional and non-traditional

CBHNL000054

EXHIBIT 5 - PAGE 19

25

programs for a full range of property-casualty products, with an emphasis on specialty risks.

| Transatlantic<br>(in millions, except ratios) | 2001* | 2001** | 2000 |
|---|---|---|---|
| Net Premiums Written | $1,905.6 | $1,905.6 | $1,658.6 |
| Income Before Realized Capital Gains (Losses) | (33.5) | 226.5 | 235.0 |
| Combined Ratio | 114.87 | 100.35 | 99.87 |

\*including WTC losses and Enron surety bond losses.
\*\*excluding WTC losses and Enron surety bond losses.

Transatlantic, which is majority-owned by AIG, is headquartered in New York and has a network of offices located in the United States, Canada, Latin America, Europe and Asia. Despite the impact of losses associated with September 11 and Enron surety bonds, Transatlantic's financial condition and business franchise remain among the strongest in the reinsurance industry.

In the United States, Transatlantic had excellent premium growth, largely fueled by increases in general casualty, automobile, and certain professional liability classes of business. Transatlantic is the largest broker-market reinsurer in the United States, and a recognized leader and innovator in specialty casualty classes including medical malpractice and A&H, as well as professional, directors and officers (D&O), and environmental impairment liability. The increased loss severity reported in medical malpractice and D&O liability classes, and the general reduction in risk appetite on the part of other reinsurers as they assessed the overall impact of September 11, resulted in thinning market capacity and improved pricing for these classes. Transatlantic also benefited from heightened market awareness of the need to obtain reinsurance from financially strong companies.

Transatlantic's international business accounted for about half of its total net premiums written. International operations reported solid growth in net premiums written, led by its London office and Trans Re Zurich subsidiary. Capitalizing on its local market expertise and full range of resources, Transatlantic further expanded its global reach in 2001 with the opening of a representative office in Sydney.

CBHNL000055

EXHIBIT 2 . PAGE 26

26

**6**

**From:**      "Granville, Judeth" <Judeth.Granville@AIG.com>
**To:**        'David Ledger' <dledger@carlsmith.com>, "Granville, Judeth"
<Judeth.Granville@AIG.com>
**Date:**      3/19/02 6:42AM
**Subject:**   RE: AIG Technical Services

David:

American Home Assurance Company (the insurer), American International Marine
Agency (from whose account your fees are paid), and A I Marine Adjusters,
Inc. are each member companies of American International Group, as is AIG
Technical Services.

So, yes we are all AIG companies.

Trust that this answers your question..

Regards,
Judeth Granville
A I Marine Adjusters, Inc, - San Francisco


> ------Original Message-----
> From:      David Ledger
> Sent:      Monday, March 18, 2002 11:25 PM
> To:   judeth.granville@aig.com
> Cc:   Donald Calvo; Sinforoso Tolentino; Terry Thomason
> Subject:   AIG Technical Services
>
> Judeth - Is AIG Technical Services a company related to the company which
> is paying our fees for our defense of the insured Casamar?  I ask because
> a sub contractor client of ours seeks to sue a general contractor and its
> bonding company, apparently AIG Technical Services, for non-payment.   If
> you are able to reply, time is of the essence.  Thank you.
>
> David Ledger
> dledger@carlsmith.com
> Tel: 671-472-6813
> Fax: 671-477-4375

CC:            Donald Calvo <dcalvo@carlsmith.com>, Sinforoso Tolentino
<stolentino@carlsmith.com>, Terry Thomason <tthomason@carlsmith.com>

CBHNL000099

EXHIBIT ____ . PAGE ____

THOMASON
DEPOSITION TESTIMONY

1         THE REPORTER:  Our disclosure is complete and

2  available for everyone to review.  It will be attached to the

3  deposition transcript.

4         TERRY E. THOMASON,

5     called as a witness on behalf of the

6  Defendants, after having been first duly sworn to

7  tell the truth, the whole truth, and nothing but the

8  truth, was examined and testified as follows:

9           EXAMINATION

10  BY MR. LAWHN:

11     Q    Would you state your name and spell your last name

12  for the reporter.

13     A    Terry Thompson, spelled T-H-O-M-A-S-O-N.

14     Q    And what is your occupation?

15     A    I'm an attorney.

16     Q    How long have you been licensed as a lawyer?

17     A    Since 1978.

18     Q    Where were you first licensed?

19     A    Nebraska.

20     Q    And when did you move to Hawaii?

21     A    I was licensed in Hawaii in 1990.  I lived here in

22  '78 to '81.  I returned here permanently in 1993.

23     Q    At one time were you employed by the Carlsmith

24  Ball law firm?

25     A    Yes.

Thomason - 6

1     Q   And what years was that?

2     A   Beginning 1996 until 1 October 2003, I was a

3 partner at Carlsmith.

4     MR. CORTES:  Can I just ask, this is Antonio Cortes for

5 the record, that you just take a little bit longer between

6 the question and the answer to give my slow mind a chance to

7 make any objections that might be needed.

8 BY MR. LAWHN:

9     Q   Okay.  What did you do prior to coming to

10 Carlsmith?

11    A   I was an attorney for the federal government.

12    Q   And in what division?

13    A   Department of the Army.

14    Q   Procurement?

15    A   Procurement.

16    Q   Were you stationed at Schofield?

17    A   I was stationed at Fort Shafter, but headquarters

18 U.S. Army Pacific.

19    Q   Have we run into each other out there?

20    A   I think we have.

21    Q   Not literally.

22    MR. GRIMMER:  Sounds like it was memorable.

23 BY MR. LAWHN:

24    Q   What about Amy Self, do you know a person named

25 Amy Self?

Thomason - 7

1    A    Yes, I do.

2    Q    Was she an employee of the Carlsmith law firm, or

3  is she an employee of the Carlsmith law firm?

4    A    She is now and was while I was at Carlsmith an

5  associate, and prior to that a paralegal.

6    Q    I pulled her up on Martindale Hubble and on the

7  Internet.  It says that she was admitted in Hawaii in 2001,

8  and that then we checked with the Supreme Court and it's

9  November 1, 2001.  Does that jibe with the dates that you

10  recall when she became a licensed lawyer in Hawaii?

11    A    It's very difficult for me to remember.  She was a

12  paralegal, she went to law school.  While she was in law

13  school, she was a summer associate, and then she came fully

14  employed.  So, I -- I honestly don't know when she was

15  admitted to the bar.

16    Q    Was she working under your direction at the law

17  firm at Carlsmith?

18    A    In -- in some instances, yes.

19    Q    Was she physically in the Honolulu office or in

20  the Hilo office?

21    A    At the time I worked with her she was physically

22  in Honolulu -- the Honolulu office.

23    Q    And what time period would that be?

24    A    I'd say January 2002.  I -- I can't recall

25  specifically.

Thomason - 8

1    A    No.

2    Q    Would you care to consult with Mr. Cortes?

3    A    Yeah.

4    MR. CORTES:  Yeah.  As far as any communications with

5    the surety, of course, that's not a privileged communication

6    in the first place.

7    A    What she reported to me was that she was gathering

8    accounting records with the assistance of Mr. Michael

9    O'Connell and Mr. Eugene Patten that would support a billing

10   against the prime and additional records that I needed to

11   evidence some form of contractual agreement.  That's what I

12   recall Miss Gutierrez's effort was focused on.

13   BY MR. LAWHN:

14   Q    Then I take it from the absence of any reference

15   to a contact with the surety, that you have no recollection

16   of her advising you that she ever had any contact with the

17   surety?

18   A    She never told me and I never asked her to.

19   Q    How was it that Miss Self got involved then on

20   this case if you had Miss Gutierrez working on it?

21   A    Miss Gutierrez's period of training ended at

22   the -- I can't recall the exact date.  She was scheduled to

23   return to Guam to her position in our Guam -- in Carlsmith's

24   Guam office.  I continued to need help with Rhino because we

25   were having a lot of trouble getting the account data to --

Thomason - 13

1  to have a viable invoice claim, so I asked for a new person,

2  I was assigned Miss Self.

3      Q    Do you remember the month or time frame when this

4  happened?

5      A    No, I'm sorry, I do not.

6      Q    Did you ask Miss Self to contact American Home

7  Assurance Company or AIG Technical Services?

8      A    I asked Miss Self to contact the contracting

9  officer to obtain the surety's name.  When circumstances led

10  me to leave that BioGenesis, the prime contractor, was not

11  going to be willing to pay Rhino for the work it performed,

12  so I asked her to contact the contracting officer.

13     Q    Did she do that?

14     A    Yes, she did.

15     Q    And what did she report back to you?

16     A    She received a fax transmission -- transmittal of

17  the -- of the identification of the surety.

18     Q    Did she get a copy of the Miller Act bond as well

19  at that time?

20     A    I never -- I can't recall the timing.  The first

21  thing we got was the identification of the surety.  At some

22  point soon thereafter, we received the bond documentation.

23     Q    Do you recall what the name of the surety was that

24  was included in the fax transmission from the contracting

25  officer?

**Thomason - 14**

1      A    My recollection, it was American Home Assurance.

2      Q    There's a declaration that Amy Self prepared in

3 this case. It might help us short cut this a little bit if

4 I can find it.

5       Did you ask Miss Self to contact the

6 surety and find out what the procedures for making

7 the claim on the bond would be?

8      A    I asked her to contact the surety to obtain a

9 Proof of Claim form and provide -- and any instructions on

10 submission.

11      Q    And to the best of your knowledge, did she do

12 that?

13      A    To the best of my knowledge, she did.

14      Q    Did she report back to you the results of the

15 communications that she had with the surety?

16      A    She -- she reported to me in a series of steps the

17 progression of her efforts to obtain the forms I had asked

18 her to get. Eventually, she told me that she had received

19 the Proof of Claim form and that she was preparing the

20 backup documentation. My recollection, it was fairly quick

21 between when I asked her and when she had actually received

22 the form.

23      Q    And to put this in perspective vis-a-vis the

24 submission claim, was this prior to your preparation of what

25 has been entitled the Notice of Claim as opposed to Proof of

**Thomason - 15**

1    Claim form?

2         A    I honestly can't recall.  The normal sequence was

3    we would be given a notice, and then we would submit the

4    proof.

5         Q    Did she report to you anything that indicated to

6    you at that point in time that she believed the identity of

7    the surety was AIG Technical Services?

8         A    I never understood that the surety was anyone

9    other than American Home Assurance through that entire time.

10   I do not recall anybody raising the name until we

11   actually -- I signed a letter that went to AIG Technical

12   Services requesting reconsideration of their action on the

13   claim.

14        Q    I found the affidavit.

15        A    Okay.

16        Q    Well, take a second and just peruse it, let me

17   know when you're done.

18        A    I've reviewed it.

19        Q    Have you ever seen --

20        MR. GRIMMER:  Wait.  Let me just object because it's

21   not complete.

22                         (Whereupon, Exhibit 1 was marked

23                          for identification.)

24   BY MR. LAWHN:

25        Q    I think we're going to find that throughout a

Thomason - 16

1    Did you see the response from Miss

2 Granville to David Ledger?  It's at the top of page

3 four of Exhibit 11.

4    A    I don't recall seeing that response.

5    Q    Let me shift gears, shift your focus a little bit

6 away from this identity of the surety issue to the withdrawl

7 issue.

8    At any time did anybody from any of the

9 AIG group of companies ask you to withdraw from the

10 representation of Rhino in this matter?

11    A    No.

12    Q    At any time did any representative of the AIG

13 group of companies even suggest to you that Carlsmith should

14 withdraw from this case?

15    A    Not to me, no.

16    Q    Are you aware of any economic pressure being put

17 on the Carlsmith firm by any of the AIG group of companies

18 to encourage Carlsmith to withdraw from the representation

19 of Rhino in this case?

20    A    I'm not aware of any, no.

21    MR. LAWHN:  Mr. Cortes, that's all I have this

22 afternoon.  I do, of course, want to reserve my right in the

23 event that Judge Unpingco says I can ask the questions that

24 have been objected to ask instructed not to answer.

25    MR. CORTES:  If the judge instructs us to answer any

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

STEVEN M. EGESDAL, ESQ.,

called as a witness by Defendant AIG TECHNICAL SERVICES, INC.

and AMERICAN HOME ASSURANCE COMPANY, being first duly sworn, was

examined and testified as follows:

EXAMINATION

BY MR. LAWHN:

Q.    State your name and spell your last name.

A.    Steven M. Egesdal.  Last name, E-g-e-s-d-a-l.

Q.    And what is your occupation?

A.    I'm an attorney.

Q.    Where are you employed?

A.    Carlsmith Ball, LLP.

Q.    At some point in time in the course of your

employment, did you become involved with the Rhino versus

Biogenesis case pending in the U.S. District Court in Guam?

A.    Yes.

Q.    And what was the nature of your involvement?

A.    I was subpoenaed to be a 30(b)(6) representative.

Q.    And what's your understanding of the scope of

testimony you're to give as a 30(b)(6) representative?

A.    Well, we're in somewhat of an interesting situation in

that the person who best can speak to the issues in the subpoena

is Terry Thomason who is no longer with our firm.  After Terry

Thomason, it would be Amy Self.

I was involved because my role at Carlsmith is to make

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii  (808) 524-2090
Case 1:02-cv-00008    Document 260    Filed 12/05/2003    Page 214 of 235

Egesdal - 5

1   decisions on conflicts.  So in 1992 about, I want to say in the

2   spring of -- I'm sorry -- 2002, spring of 2002, I was involved

3   in trying to determine whether there was a conflict between

4   Terry Thomason's client and David Ledger's client or John

5   Osborne's client.  It was a Guam insurance client.

6       Q.   And who did you understand Terry Thomason's client to

7   be?

8       A.   Terry represented Rhino Builders, a construction firm.

9       Q.   And who did you understand Mr. Ledger's client to be?

10      A.   I understood that David represented an insurance

11  company.  I think it was AIG, but I don't recall the exact name.

12      Q.   Is Mr. Ledger in the Carlsmith office in Guam?

13      A.   Yes, he is.

14      Q.   Do you have an understanding of how the issue of a

15  possibility of a conflict of interest arose?

16      A.   You know, I don't remember whether I got a call from

17  Guam first or whether Terry Thomason came to my office first.

18  They were roughly contemporaneous.

19           I think Terry might have come to my office and said we

20  have an issue that you need to look at, and he explained that he

21  represented a construction company that he'd done a conflicts

22  check.  Normally in our firm when we bring in a new client, we

23  do a conflicts check and we get a printout that shows if the new

24  client is adverse to any existing client.

25           Terry had done that and no name had come up because

Egesdal - 6

1  when David had entered the name of his client, the insurance

2  company, hadn't put in certain affiliates, one of which was a

3  surety that Terry Thomason's client was going to sue in a Miller

4  Act claim in Guam.  And so the conflicts check didn't show up

5  the surety as an affiliate.  So Terry thought it was fine and

6  was proceeding along to work on a complaint in this Miller Act

7  action.

8          And at some point he sent, I think he sent the

9  complaint to Guam, and then the alarm bell went off.  He got a

10  call, I think from David, saying that's a client, that's a

11  current client.  And that's when Terry came to my office.  He

12  wanted me to sort things out.

13     Q.   And any time in the scope of your work on this issue,

14  did anyone tell you that anyone associated with AIG had made

15  some type of objection to your firm's representation of Rhino

16  Builders?

17     A.   No.  No.  Basically what happened was for me to

18  determine whether there's a conflict, I need to find out if

19  they're affiliates, if they're corporate affiliates, how closely

20  related they are.  So I contacted David, I'm pretty sure it was

21  by phone, I don't think it was by e-mail.  I know I had several

22  phone calls with him.

23          And I said look, I need to find out:  One, if this is

24  an affiliate; and two, if it is an affiliate, how closely

25  related it is.  I did independent research.  I got on the SEC

1  database -- EDGAR I think it was -- and I looked at a 10-K for

2  the insurance company and found out that it looked as though

3  there was an affiliate relationship.

4  So I said to David, I've got to know such things as:

5  Is there an overlapping board?  Is there shared management?  Are

6  there shared resources between your client and the surety that

7  Terry wants to sue?  That was the question I posed to David.

8  Q.  Did you get an answer to that question?

9  A.  I never got an answer from David as far as facts that

10  I needed to make the determination, no.

11  Q.  To the best of your knowledge, did anyone from AIG or

12  any of its affiliates ever put any type of pressure on the

13  Carlsmith firm to withdraw from this action?

14  A.  Not that I know of.  I didn't speak to anybody from

15  the insurance company.  I don't think Terry did.  I think that

16  Amy Self spoke to somebody in the affiliate, in that family, to

17  determine who to sue.  But none of the people that I talked to

18  ever said the insurance company was pressuring us to withdraw.

19  And frankly, if the insurance company had said we want

20  you to withdraw and I was able to make the determination that

21  under the ABA formal opinion 95-390 if the factors show that

22  they were separate enough, that we wouldn't have withdrawn.  We

23  can't do that.

24  Q.  But apparently you were never put in a position where

25  you had to make that determination?

1    A.    No.  And our firm wouldn't have.  I mean, if an

2   insurance company would have tried to push us to withdraw, we

3   wouldn't have withdrawn.

4    Q.    At some point in time, April 9th, 2002, Mr. Thomason

5   sent a withdrawal letter -- it's marked as Exhibit 10.  And

6   Mr. Cortes, if you don't mind, can we just use the exhibit

7   number rather than having a new exhibit to his deposition?

8        MR. CORTES:  Save a tree?

9        MR. LAWHN:  Save a tree?  Yes.

10        MR. CORTES:  Exhibit 10 to Terry Thomason's?

11        MR. LAWHN:  That's correct.  It's the Carlsmith Ball

12   letter dated April 9, 2002 to Rhino Builders where Mr. Thomason

13   notifies Rhino Builders that Carlsmith will be withdrawing, that

14   Rhino should get new counsel.

15    Q.    Let me show you the letter, and Mr. Egesdal, ask you

16   if you seen the letter?

17    A.    I saw this letter before Terry was going to send it.

18   He came up.  He showed it to me.  I reviewed it and said it

19   looked fine to me, and he sent it after my review.  There's

20   material that's redacted out of it that isn't in the letter, but

21   I did look at this.  I did see this letter.

22    Q.    Well --

23    A.    Does that answer your question?

24    Q.    Had you made a determination as to whether or not an

25   actual conflict existed as of the time Exhibit 10 was sent out?

**Egesdal - 9**

A.    No.  I had not done so and I never did so.  I never did find there was an actual conflict.

Q.    Then if you know, why did the Carlsmith firm withdraw from the representation of Rhino?

A.    Terry made the determination.  He thought it was in the best interests of the client to withdraw.

Q.    The client being who?

A.    Rhino Builders.  I think that he explains it in the letter.  He says we do not believe that an actual conflict has arisen, and that's the truth.  We never made that determination.  And he says right here we are concerned that the surety could challenge Carlsmith of Rhino during the suit.

So I think Terry thought, and what we spoke about at the time, is that this was a solid claim against the surety and that it would be in the best interest of the client Rhino to just get on with the suit, hire a good lawyer in Guam, and do it.  He thought that it was a solid claim and just to move, just get on with it.

Q.    To the best of your knowledge, did the surety ever question Carlsmith's representation of Rhino during the pendency of this action?

A.    No, not to my knowledge.

Q.    And as I understand your testimony, you yourself never talked with any representative of AIG or any AIG entity on this issue?

A.    No, I did not.    I was depending on David Ledger to contact his client and give me the information I needed to make the determination, and it never happened.

Q.    Did Mr. Ledger tell you that he had ever had any contact with a representative of AIG on this issue?

A.    You know, I'm not sure.    I think he came back with something general that they're related, and I think I asked him I need specific information.    I think before he came back with any more information, Terry was, had made the decision that he thought it would be best to withdraw.

Q.    Let me show you what's marked as Exhibit 11 to Mr. Thomason's deposition and call your attention to page 4, which is an e-mail transmission from Mr. Ledger to a Judith Granville at AIG.com and a reply by Ms. Granville, and ask you if you've seen this e-mail transmission before?    The top part is the answer; the bottom part is the original message.

A.    I have seen this recently because I think Rosi, Rosi Tolentino produced this.    But I don't recall seeing this at the time.    I think that -- on the phone I think David told me that they were in the same, quote, "family of companies."    And that's family of companies, unquote.

But I don't recall seeing this.    If I'm not on the cc, I probably didn't see it at the time.

MR. LAWHN:    Thank you.    That's all I have.    Thank you.

EXAMINATION

Exhibit M: Letter from Bruce Kahn to Mr. Thomason, 2-21-02

Exhibit N: Letter from Mr. Thomason to Bruce Kahn, 3-11-02

Exhibit O: Letter from Bruce Kahn to Mr. Thomason, 6-21-02

Exhibit P: Letter from Mr. Tolentino to Mr. Yanza & Mr. Cortes, 6-20-03

4

1                       DAVID P. LEDGER,

2     was thereupon called as a witness on behalf of the

3     Defendants, and after having been first duly sworn, was

4     examined and testified as follows:

5

6                       DIRECT EXAMINATION

7     BY MR. YANZA:

8         Q    Good afternoon, Mr. Ledger.

9         A    Good afternoon.

10        Q    Many name is Louie Yanza, I represent American Home

11    Assurance Company and AIG Technical Services, Inc. in this

12    lawsuit that's been filed by Rhino Builders.  Are you

13    employed by Carlsmith in Guam?

14        A    Yes, I am.

15        Q    Your office or your firm was served with a Subpoena

16    about two weeks ago, is that correct?

17        A    That's correct.

Ledger - 4

18    Q    I'll give you Deposition Exhibit A, which is a copy

19    of the Subpoena served upon your office.  Is that the

20    document that was served upon your office?

21    A    Yes, it is.

22    Q    Are you the 30(b)(6) designee to testify on behalf

23    of, and to bind, Carlsmith in certain matters?

24    A    Yes, I am.

25    Q    In the Subpoena, Mr. Ledger, I've had five

5

1    categories of 30(b)(6) designees and I would like to go

2    through each one of them, just so we can understand what your

3    knowledge is concerning this case.  On Page 2, Number 1, are

4    you the person most knowledgable concerning the preparation

5    and submission of Rhino Builders' claims to American Home

6    Assurance Company on October 22, 2001 and subsequent claims

7    thereafter?

8    A    No, I'm not.

9    Q    Who would be the person to be most knowledgable?

10    A    I don't know the person that would be the most

11    knowledgable.  I know that some attorneys in our Honolulu

12    office worked on Rhino Builders' initial Complaint.  I think

13    you're aware there's Terry Thomason and I think Amy -- Amy

14    Self, but I don't know that they have been designated, but I

15    do know that those two attorneys worked on the case.

16    Q    Have any of your Guam attorneys here in Guam worked

17    on this case, other than you, concerning 30(b)(6) designee

18    Number 1, Paragraph 1?

19    A    The only thing I -- what was done here in Guam, to

20    my knowledge, was limited to a Carlsmith attorney signing --

21    signing the Complaint that was prepared in Honolulu.   There

22    may have been more, but that's all that I'm aware of.

23    Q    Do you know who that lawyer is?

24    A    I think it was Dana Gutierrez.

25    Q    What about Don Calvo?

1    A    I don't know what Don's involvement in the case

2    consisted of.  Actually, until two or three days ago, I

3    thought Don was the person that signed the Complaint; I

4    wasn't aware that it was Dana until -- it was either --

5    either early this week or last week that I learned that Don

6    had not signed the Complaint.

7    Q    Okay.  What was your understanding about Don not

8    signing the Complaint?

9    A    I don't have any.

10    Q    Did anyone tell you that Don did not sign the

11    Complaint?

12    A    Well, not exactly, what it -- instead of -- it's the

13    opposite; what someone told me was that Dana had signed the

**Ledger - 6**

14  Complaint, and that was the first I knew that Don had not.

15      Q    Who told you that Dana Gutierrez was the one who

16  signed the Complaint?

17      A    Rossi -- Rossi Tolentino.

18      Q    Did Don tell you that he did not sign the Complaint?

19      A    No, he did not.

20      Q    Did Don tell you that Dana Gutierrez signed the

21  Complaint?

22      A    No.

23      Q    Have you spoken to Don about this case since then?

24      A    Since?

25      Q    Since two months ago.

1       A    No, I have not.

2       Q    Two weeks ago?

3       A    I have not.

4       Q    Have you spoken to Don since last week?

5       A    No.

6       Q    Have you spoken to Don at all regarding this case?

7       A    Yes.

8       Q    When?

9       A    Before the Complaint was filed.

10      Q    What was the subject matter of that discussion?

11      A    Well, it was very limited.  It involved -- see, Don

**Ledger - 7**

12    was the person that came in and asked me if our firm had any

13    connection with an organization he referred to as AIG, and

14    that was -- there was -- so there wasn't any substantive

15    discussion about Rhino Builders' claims or the preparation of

16    the Complaint.  It was more like, hey, David, you know, does

17    the firm have a relationship with a company called AIG?  Or

18    he may have said something to the effect of, I think we have

19    a relationship with AIG and what do you think about this,

20    meaning this case.  So that was the context.

21        Q    What was your response?

22        A    My response was yes, I -- you know, I think that we

23    have done work either directly for AIG as an insurer of some

24    of our clients.  And I said that John Osborne in our Saipan

25    office may also have a relationship with AIG or an AIG

8

1    company.  It was a very brief conversation with Don.  And I

2    think I finished up by saying, you know, let me think about

3    it and I'll get back to you.  And that's been my only

4    conversation with Don Calvo.

5        Q    Well, did you think about it and talk to him later?

6        A    I did think about it, but I didn't talk to Don about

7    -- you know, the results of my thinking about it and the

8    results of what I did subsequent to that conversation --

9    those were -- because those issues involved potential

10    conflicts.  My interaction with other partners in the firm

11    was limited to those partners who deal with those kinds of

12    issues.

13        Q    Okay, so let me step back here, Mr. Ledger.  You

14    thought about it, you did some research, and you did come to

15    a conclusion?

16        A    I came -- yes, I did some research and I -- I'll

17    make this easy for you, and easy on me.  At the time that Don

18    asked me that question, I was representing a company called

19    AI Marine Insurers, and the unique thing about that

20    particular representation was that the insured was Casamar

21    Guam and AI Marine Insurance Company was their liability

22    carrier.  And when that case was assigned to me by AI Marine

23    Insurance, they specifically questioned that they, together

24    with Casamar, be identified as a Carlsmith client as opposed

25    to the typical situation where you're representing an insured

9

1     and an insurance company may be paying the cost of the

2     defense, but the insurance company is not your client.

3         Q    Right.

4         A    In this instance, they made a specific request that

5     we include them in our engagement letter and identify them as

6     a client, and we had done that.  So what I did after Don

7     brought this to my attention was I asked my contacts --

8    Q    Excuse me, Mr. Ledger.  So this AI Marine Insurance

9    Company was already ongoing when Don had approached you?

10    A    Correct.

11    Q    Okay.

12    A    It was ongoing for quite sometime.  So what I did

13    after Don came in and raised that -- raised that issue with

14    me, I contacted my person at AI Marine Insurance --

15    Q    Who was that?

16    A    Judith Granville, it's v-i-l-l-e at the end,

17    Granville.  Judith Granville was the person in charge of my

18    case and she's located in San Francisco.  And so I asked her

19    if AI Marine Insurance Adjusters or Company, I'm not sure, I

20    know it was AI Marine, I asked her if AI Marine Insurance was

21    an AIG company and -- and she said yes.  And then the next

22    thing that I asked her was whether or not she knew if AIG

23    Technical Services was also a company under the AIG umbrella,

24    and she also said yes to that question.  And at that point,

25    like I mentioned earlier, I basically turned over the

1    potential conflict issue and the analysis of what we should

2    or should not do to lawyers in our firm who are tasked with

3    making that determination.

4    Q    And which lawyers are those?

5    A    Primarily Jim Polish.

6      Q     Jim Polish.  From where?

7      A     He's in our Los Angeles office.

8      Q     When you spoke to -- Ms. Granville?

9      A     Granville.

10     Q     Did she say anything to you to the extent that

11  Carlsmith Ball should withdraw from representing Rhino?

12     A     No, she did not.

13     Q     Did she ever raise that issue about Carlsmith Ball

14  having some conflict of interest?

15     A     No.  She simply responded to the questions that I

16  posed to her.  And I think the only other thing -- she said

17  yes to both of those questions that I posed to her, and then

18  she said -- she identified another entity that -- she told me

19  that AI Marine Insurance was one more step removed from AIG,

20  the parent company, and she identified the intermediary

21  company and it was AI Marine-something.  And so that was the

22  chain between AI Marine Adjusters that I was working for and

23  the parent company, AIG; and that's all she said to me.  And

24  I could tell from the response that she was just -- she said,

25  here's the information, you decide what you need to do.


11


1      Q     Did you tell Ms. Granville that Rhino Builders had

2  filed a claim against AIG Technical Services, Inc?

3      A     No, I didn't because I didn't know the names at that

4    point.  What I recall telling Ms. Granville the purpose of my

5    -- I explained to her why I was asking questions, and what I

6    told her was that a client of Carlsmith had a potential claim

7    that would name or directly involve as a Defendant and surety

8    company that may also be an AIG company.

9         Q    Okay.  And what did she say to that?

10        A    What did she say to that?

11        Q    Yes.

12        A    She didn't say anything.  I was just providing that

13   to her as background so she would understand why I was asking

14   if AI Marine Insurance was an AIG company.

15        Q    You said a potential claim against a surety.  Who,

16   in your knowledge, was the surety at that time when you spoke

17   to Ms. Granville?

18        A    I didn't know.

19        Q    But didn't Mr. Calvo tell you that it was perhaps

20   AIG Technical Services, Inc?

21        A    No, he wasn't that specific.  That's why I just

22   answered your question by saying that the only thing I knew

23   at that point was the surety -- in my mind, there was a

24   chance that the surety may have been an AIG company, and

25   that's what I was trying to figure out.

12

1         Q    This conversation with Ms. Granville, was it -- is

2    it Granville?

3        A    Granville.

4        Q    Was it memorialized in writing?

5        A    Actually, it was a conversation -- it was an

6    exchange of e-mails.

7        Q    Do you have those e-mails?

8        A    Do I have them with me?

9        Q    Not with you now --

10       A    No.

11       Q    -- but is it still in your computer?

12       A    Yes.  Actually, they're -- Mr. Tolentino has them.

13   The printouts.

14       Q    Okay.

15       A    I think there was -- there was one from me, one back

16   from Judy, and maybe one more.

17       Q    Okay.

18       A    I know there was the question and then there was the

19   answer.

20       Q    So the e-mail was supposed to be provided to us

21   yesterday, but that was still being, I guess, reviewed by

22   your LA office?

23       A    I'm not sure if it's the LA office that's reviewing

24   them -- reviewing the documents.  Rossi Tolentino has been

25   designated as the Guam Carlsmith attorney that is -- that's

13

Ledger - 12 cont'd

1    been tasked with responding to the question for documents.

2        Q    Okay.

3        A    And he and other lawyers in the firm will make a
4    determination which ones can be produced.  Mr. Cortes, as you
5    know, has waived his client's privilege to a certain extent;
6    and we're also analyzing the other documents in the file for
7    privileged -- content of privileged information.

8        Q    Did you tell Ms. Granville that Rhino Builders was
9    filing a claim, or just a potential client?

10       A    Just a potential client; and I didn't -- it was
11   sometime after that conversation that I first heard the name
12   Rhino Builders.  And at that point I spoke to Ms. Granville,
13   I think -- and I just used the words like a Carlsmith client
14   or a lawyer in one of our other offices representing a client
15   has this potential claim that they may bring in Guam.  It was
16   very, very general and very vague because I just didn't know
17   anything at the time.

18       Q    When was this conversation or this e-mail
19   correspondence?

20       A    I think the best way to put it in -- you would know
21   when we filed the Complaint, and I would say it took place
22   within 60 days, and I'm being -- I'm being very generous with
23   that.

24       Q    Sure.

25       A    It may have been within the 30 days prior to when

1    the Complaint was filed. I don't think it would have been

2    beyond 60 days before the Complaint was filed.

3    Q    Okay. Let me represent to you, Mr. Ledger, that

4    here in Exhibit B is a copy of the Complaint filed by your

5    law firm. Okay?

6    A    Okay.

7    Q    So your conversation or your e-mail correspondence

8    with Ms. Granville took place 30 days before the filing?

9    A    It would have been March 20th, 2000, and it probably

10    would have been -- a reasonable estimate would have been

11    between, I'll say February 20th, 2002 and March 20th, 2002.

12           MR. CORTES: I'm sorry, I didn't get the Exhibit

13    B.

14           MR. YANZA: It's in the packet. I took it out

15    of order, Mr. Cortes.

16    A    But it might have been -- you know, it might have

17    been before February 20th.

18           MR. YANZA: Okay.

19    A    But that's the time frame.

20    BY MR. YANZA: (Continuing)

21    Q    Were you aware when the Complaint was filed? In

22    other words, when the Complaint was filed by your office, did

23    you know which lawyer was taking care of the case and when

24    they filed it?

25    A    No, I didn't. I had -- had no reason to know. I

1    think the only -- the only -- the only thing I knew about the

2    filing of the Complaint is that there was -- there was a

3    concern over a time bar.  And so even though our firm was

4    engaged in a conflict analysis in deciding whether we could

5    continue on the case for Rhino, there was a decision made to

6    protect the interest --

7                MR. CORTES:  Can I just interject here?  I think

8    I'd like to strike the testimony about the concern over the

9    time bar, and object to anything, you know, except the extent

10   of our waiver as outlined in the September 22nd letter.

11   BY MR. YANZA: (Continuing)

12        Q    Okay, so anyway, you still proceeded to file the

13   Complaint?

14        A    Yes, it was obviously filed, but I did not -- I was

15   not involved in that personally.

16        Q    So you were not involved with the decision to file

17   the Complaint?

18        A    I was not.

19        Q    Were you involved with the decision to withdraw from

20   representing Rhino Builders?

21        A    I was not.

22        Q    Who was involved with the decision to withdraw from

23   representing Rhino Builders?  And I'm talking about the Guam

Ledger - 15

24    office.

25         A    Oh, in the Guam office?  I don't think anybody in

1     the Guam office was involved because we wouldn't make that

2     determination here; that would be made in Honolulu or Los

3     Angeles.

4          Q    Okay.  Who was involved with the decision to

5     withdraw from representing Rhino Builders in LA or in

6     Honolulu?

7          A    Well, I mentioned Jim Polish who was our firm

8     general counsel and -- the only other person that I'm aware

9     of, and it's because of the letter that Mr. Cortes just

10    recently provided to us, is Terry Thomason.  He apparently

11    wrote a letter to his then client or our then client, which

12    Mr. Cortes provided in redacted form, and I read that letter

13    for the first time when Mr. Cortes provided it to me just a

14    couple of days ago.  So that's the basis of my answer.

15         Q    Okay.  Since March 20th, 2002, has any AIG -- for

16    example, American Home Assurance Company, AIG Technical

17    Services, Inc. or any AIG affiliated entity approached you

18    about terminating your representation of Rhino Builders?

19         A    Never.

20         Q    Would you happen to know if those entities I just

21    named approached any of your members of your law firm here in

22    Guam or in Hawaii or in LA to terminate representing Rhino

23    Builders?

24        A    Could you ask your question again?

25        Q    Sure.

1        A    Okay.

2        Q    Did American Home Assurance Company, AIG Technical

3    Services, Inc. or any AIG affiliated company, to your

4    knowledge, speak to or communicate with your law firm in

5    terminating Carlsmith Ball's representation of Rhino

6    Builders?

7        A    Not to my knowledge.

8        Q    Okay.  Do you think you would know who would have

9    knowledge of that matter?

10       A    Is your question if that had happened, would I have

11   learned about it?

12       Q    No.  If it had happened, who do you think in your

13   law firm would know about it?

14       A    Oh.  Well, my best answer would be Terry Thomason

15   because the relationship with Rhino Builders, he was

16   essentially their lawyer within the firm as far as I knew.

17       Q    Have you represented Rhino Builders before?

18       A    Personally?

19       Q    Yes.

Ledger - 17