BERMAN O'CONNOR MANN & SHKLOV
DANIEL J. BERMAN, ESQ.
MICHAEL J. BERMAN, ESQ.
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagatna Guam 96910

Attorneys for Defendant/Counter-Defendant:
*MICHAEL DANFORTH*

FILED
DISTRICT COURT OF GUAM
DEC 1 5 2003
MARY L. M. MORAN
CLERK OF COURT

268

IN THE UNITED STATES DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC., and AMERICAN HOME ASSURANCE COMPANY, <br><br> Defendants. <br><br> BIOGENESIS PACIFIC INC., <br><br> Counter-Plaintiff, <br><br> vs. <br><br> RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, AND JOHN DOES 1-10, <br><br> Counter-Defendants, <br><br> AMERICAN HOME ASSURANCE COMPANY, <br><br> Cross-Claimant, <br><br> vs. <br><br> BIOGENESIS PACIFIC, INC., <br><br> Cross-Claim Defendant. | CIVIL CASE NO.: 02-00008 <br><br> **COUNTER-DEFENDANT MICHAEL DANFORTH'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | BACKGROUND OF THE CASE | 1 |
|  | (A) The Pleadings | 1 |
|  | (B) Retention of Maxx Management Corporation by Rhino | 2 |
|  | (C) MMC's Evaluation of Task Orders and Recommendations | 3 |
|  | (D) Work Stoppage by Rhino on Task Orders | 6 |
| II. | ARGUMENT | 6 |
|  | (A) Standards for Judgment | 6 |
|  | (B) Danforth Did Not Interfere With a Subsisting Contract | 7 |
|  | (C) BPI Cannot Establish a *Prima Facie* Case for Use of "Improper Means" by Danforth in Evaluating the Task Orders and Advising Rhino of His Opinions | 8 |
|  | (D) As an Agent for MMC, BPI Must Establish that Danforth Acted "Solely" to Benefit Himself or Outside the Scope of his Authority | 9 |
|  | (E) Danforth is Entitled to an Award of Attorney's Fees and Costs Costs Pursuant to Rule 11, Fed. R. Civ. Proc | 11 |
|  | (F) In the Alternative, Partial Summary Judgment Should be Granted on the Prayer for Punitive Damages | 13 |
| III. | CONCLUSION | 14 |

# TABLE OF AUTHORITIES

Cases:

Security and Exchange Commission v. Murphy, 626 F. 2d 633,
640 (9th Cir. 1980) .................................................. 6

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 at 587,
89 L.Ed. 2d 538, 106 S. Ct. 1348 (1986) ............................ 7

Locricchio v. Legal Services Corp., 833 F.2d 1252 (9th Cir. 1987) ........ 7

Shaw v. Santa Monica Bank, 920 F. Supp. 1080 (D. Haw. 1996) ............. 7

Beaulieu v. Northrup Grumman Corp., 161 F. Supp. 2d 1135 (D. Haw. 2000)
aff'd 23 Fed. Appx. 811 ............................................. 7

Gartner v. Etnyre, 1992 U.S. Lexis 17166 (ND Ill. 1992) ................. 9

Felsen v. Sol Café Mfg. Corp., 24 N.Y. 2d 682, 249 N. E. 2d 459,
301 N.Y.S. 2d 610 (1969) ............................................ 9

Gastineau v. Home Depot, 1996 U.S. App. 1665 (9th Cir. 1996) ............ 9

Sadri v. Spectrum Properties, Inc., 1995 U.S. App. Lexis 34268 (9th Cir. 1995) .. 10

Wanland v. Los Gatos Lodge, 230 Cal. App. 3d 1507 at 1552,
281 Cal. Rptr. 890 (1991) ........................................... 10

Security Farms v. International Brotherhood of Teamsters, Chauffers,
Warehousemen & Helpers, 124 F.3d 999 at 1016 (9th Cir. 1997) ........ 12

Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 at 399, 110 L.Ed. 2d 359,
110 S. Ct. 2447 (1990) .............................................. 12

Sure Safe Industries, Inc. v. C&R Pier Mfg., 152 F.R.D. 625 at 627-29
(SD Cal. 1993) ...................................................... 13

United States v. 89 Skyline Terrace, 26 F.3d 923 at 929 (9th Cir. 1994) ..... 13

Other Authorities:

Rule 56(c), Federal Rules of Civil Procedure ........................... 6

Restatement of the Law, Second, TORTS, §766 ............................ 7

Rule 11, Fed. R. Civ. Proc ............................................ 11

20 G.C.A. Sec. 2120 ................................................... 13

## I. BACKGROUND OF THE CASE

### (A) The Pleadings

This action was commenced as one under the Miller Act for recovery against a bond issued for a Navy procurement contract for an indefinite delivery and indefinite quantity ("IDIQ") of materials and labor for Navy housing roofing system installation and repair. The contract was awarded to BIOGENESIS PACIFIC, INC. ("BPI") and is identified as Navy Contract No. N62766-99-D-0425 (herein the "Roof Contract").

Plaintiff RHINO BUILDERS, INC. ("Rhino") alleges in the Second Amended Complaint that on or before May, 2000 it entered into an oral subcontract with BPI to perform the Roof Contract, and seeks recovery for the reasonable value of the labor and materials expended in doing so, and to recover 50% of the profit to be realized by BPI under that oral agreement (Second Amended Complaint at Paras. 11, 17 and 18). Rhino also seeks recovery against the co-Defendant sureties under the Miller Act, and for bad faith in the handling of Rhino's claims against the bond they issued.

BPI has answered the Second Amended Complaint and filed a Counterclaim[1] which, as to matters pertinent to Movant MICHAEL DANFORTH'S ("Danforth") liability, alleges that Danforth, as "Rhino's representative", contacted BPI to advise BPI that Rhino had caused delivery orders to be accepted from the Navy under the Roof Contract, but that because Rhino had no subcontract that Rhino would cease to accept delivery of orders, "...causing [BPI] to suffer liquidated damages under the Contract unless [BPI] executed a written exclusive five year subcontract with Rhino. (Counterclaim at Paras. 29-30). BPI then asserts that after it refused to execute a subcontract, "...Rhino caused its workers to cease working on the

---

[1] The original "counterclaim" was filed at the time of the Answer to the Amended Complaint on October 2, 2002, and a summons was issued to the "Counterclaim Defendants", to which they responded. Rhino moved for and was granted leave to file the present Second Amended Complaint, but BPI filed both an Answer to that and a new and expanded counterclaim on July 30, 2003 without leave of court or stipulation of the parties. Movant reserves its right to contend that this new counterclaim is not allowed by the Federal Rules of Civil Procedure, but wishes to raise in the present Motion the more substantive issues of liability and proper parties defendant.

delivery orders in order to further bring about [BPI's] breach of the Contract..."[2] (Para. 31), and that <u>both</u> Rhino and Danforth told BPI that liens would be placed on the project unless BPI paid Rhino $25,000[3]. Rhino concludes that Danforth, O'Connell and Rhino did thereby cause BPI to suffer liquidated damages of **$3,820** and should also recover exemplary damages for malicious and willful conduct in intentionally seeking to cause BPI to breach the Roof Contract.

**(B)      Retention of Maxx Management Corporation by Rhino**

Danforth was employed by Actus Sundt Group in Florida, and in 1996 was requested to go to Hawaii to be project manager for contracts his employer had acquired as a joint venturer in an entity known as All Star/ASB[4]; he had in 1999 become aware that Mr. Gerald Lam of BPI came to All Star/ASB to propose the Roof Contract, because BPI was qualified as a Section 8(a) Small Business Administration entity, and sought to have All Star/ASB act as the "prime subcontractor" to BPI for that purpose. <u>See</u>, Danforth Deposition Excerpts, taken February 21, 2003, p. 24-25, Exhibit "A" to Counter-Defendant Michael Danforth's Designation of Record in Support of Motion. Danforth did not, however, become aware that any contract had been let to BPI until he went to Guam on behalf of Maxx Management Corporation ("MMC") in October, 2000. Danforth Depo. at p. 26-27. His work for All Star/ASB was not to prepare a proposal to the Navy or estimate a proposal, but only to work on his employer's portion of the technical proposal. Danforth Depo. at pp. 23-24 and 32[5].

---

[2] It is of significance that nowhere does BPI allege or advance any evidence that Danforth caused any work stoppage on the Roof Contract orders at any time, and its fraud allegations in the new counterclaim are directed only to Mr. O'Connell and Rhino.

[3] This is false; George Allen, who worked for Rhino, told Mr. Gerald Lam on November 7, 2000 that Rhino needed $25,000 of what BPI owed to get back to work on a limited basis (Ex. A-1 at p. 16), and asked Danforth if this was OK; Danforth responded that he did not agree to this demand because he had no accounting reports to determine what Rhino was owed (Ex. A-1 at p. 17). Moreover, George Allen testified that this $25,000 was illusory because BPI caused the funds to be deposited into an account over which only BPI's employees had access (Ex. B-Allen Depo. at pp. 44-50). Because there is no claim for damages against Danforth on this false premise, it is unnecessary to address the truth of the allegation in this Motion.

[4] Exhibit "A" Excerpts from the Deposition of Michael Danforth at pp. 10-12. References to Mr. Danforth's deposition testimony will be to "Danforth Depo. at p___".

[5] Danforth's uncontroverted testimony was that he did not see the proposal presented to the Navy for the Roof Contract by BPI other than an initial submission before the RFP was awarded. BPI at Paragraph 8 of its Counterclaim alleges that Messrs.

Maxx Management Corporation is a Nevada Corporation, of which Danforth was neither a director, shareholder nor officer[6]; MMC entered into a Services Agreement for Contracting and Estimating Services with Rhino. See, Services Agreement, Ex. A-1, Designation of Record. Danforth was asked by Mr. O'Connell to assist in Rhino's start up of a separate Solution Order Contract with the Navy ("SOC Contract") in Guam. Danforth Depo. at pp. 27 and 41. It was only for the SOC Contract that Danforth came to Guam in October, 2000 when he was later requested by Mr. O'Connell of Rhino to evaluate the Roof Contract and provide his suggestions and impressions on the condition of the task orders. Id. at p. 35. Danforth in undertaking this evaluation was doing so in his capacity as a representative of MMC[7] for Rhino.

The Services Agreement under which MMC was retained by Rhino delineates the services MMC will provide (Ex. "A-1" at p. 2) which, germane to the SOC Contract and, later, with the Roof Contract, were to provide preliminary analysis of the requirements of the contracts. See, Declaration of Danforth, at Paragraph 3, Designation of Record. Neither MMC, nor Danforth acting on its behalf, engaged, nor were they contracted to engage, in the performance or oversight of any Navy contracts, a distinction which is essential to the present issues.

**(C)  MMC's Evaluation of Task Orders and Recommendations**

Danforth worked for Rhino on the SOC contract and, by extension of its Service Agreement, the Roof Contract for a total of about eleven (11) days from approximately October 20-31, 2000.

MMC was directed to by Rhino to evaluate what was then seventeen (17) task orders which were part of the Roof Contract. Danforth Depo. at p. 54. MMC's job was to advise Rhino of what was

---

Danforth and George Allen were "directly and significantly involved in the preparation and submittal of [BPI's] bid for the contract", which is demonstrably false, but more importantly nowhere assert that any such "involvement" is causally related or relevant to the assertion that there was an intentional interference with the Roof Contract by Danforth.

[6] Mr. Danforth was a director only at the very inception of Maxx Management, Corporation and later, including in 2000, was an authorized representative of that company with duties to act as consultant for various projects it had, which were primarily federal construction contract management matters. Danforth Depo. at pp. 20-21.

[7]  Q:  (By Mr. Clark) Okay. Were you asked to look at the roofing contract in your capacity as a representative of Maxx Management?
A: Correct.
Q: And were you ever asked to look at the roofing contract in any other capacity?
A: No."

required under the terms of the Roof Contract, the status of the task orders and make recommendations; MMC did exactly, and only, that.

While in Guam, Danforth reviewed the Rhino files to determine what had been and still needed to be done on the task orders, and produced a summary Id. at 57; Ex. A-3. Danforth also prepared a memorandum entitled "Issues to Consider and Task Responsibility" (Ex. A-4) which pointed out, first, the exposure to liquidated damages on currently issued task orders and the need to address that with the Navy immediately; Rhino's time for performance commences on the date of the task order, and for many of the task orders, BPI had not done what was required in the way of submission of material safety and data sheets and completion of activity hazard analysis. Danforth Depo. at pp. 57-63. These summaries were shared with Rhino and BPI personnel. Id. at p. 69.

Issue #6 of this memorandum (Ex. A-4) was the necessity to create and execute a Master Subcontract between BPI and Rhino which Danforth contended had to exclude any liability on Rhino for liquidated damages for the issued task orders. Gerald Lam, BPI's principal (and an attorney admitted to the Hawaii bar) undertook to address the liquidated damages matter with the Navy's contracting officer. Id. at p. 69; Ex. A-9. Danforth advised Rhino not to move forward on the Master Subcontract Agreement until that had been accomplished Id. at p. 70.

This concern over liquidated damages was the subject of considerable correspondence between Danforth, Rhino and BPI. Following up Lam's agreement to resolve that issue, Danforth wrote to him and Richard Avilla, the project manager for the Roof Contract, inquiring on the status of their efforts to have liquidated damages waived. See, Ex. A-5 at pp. 9, 11, 12, 18. He made it abundantly clear to Lam that there would be no Master Subcontract agreement unless and until Lam remediated the liquidated damages issue as stated in an e-mail from Danforth to Lam on November 10, 2000:

> I have forwarded my last e-mail to you to remind everyone that I am still waiting on you to confirm that NO Liquidated Damages will be assessed from the Government to BPI on Task Orders 1 through 17. Your guarantee not to assess LDs on RBI is not enough. You and I both know that if the Government assesses LDs you will not get the money and therefore RBI will not get the money and this situation only leaves RBI in a legal situation with BPI. You did respond to this e-mail; however, your response indicated that you have NOT performed as you agreed to do.

> On 29 October 2000, we (Rhino and You) agreed that Rhino will finish all Task Orders started and we identified those Task Orders specifically **AND that no other work will be performed by Rhino until a Subcontract Agreement was in place**. In addition, you agreed to call the Contracting Officer to remediate those Task Orders in liquidated damages and those pending liquidated damages. To my knowledge, you have NOT performed your part of this agreement. As I made it clear, until you (BPI) remediate the Task Orders pending LD damages, a subcontract agreement will not be written.
>
> If you have complied with the preceding, let me know so George can verify with the Government such remedy is in place. (Emphasis in original.)

See, Exhibit A-15, Designation of Record.

Mr. Lam responded to Danforth on November 12, 2000 acknowledging that he had "apparently misunderstood" the conversation and that he would inquire further with the contracting officer and, understanding Rhino's position (as expressed by Danforth), "I have no choice but to keep following up on LDs with the contracting officer." See, Ex. A-5 at p. 20. The following day, Danforth acknowledged the response and confirmed that the Master Subcontract Agreement would be prepared, but pending conclusion of the liquidated damage issue with the Navy. See, Ex. A-5 at p. 21.

On November 15, 2000, Danforth advised Lam that he had completed the draft of the Master Subcontract Agreement but needed certain information, and would look to complete it by the next day. Ex. A-5 at p. 29, which he did (Ex. A-16), and Lam acknowledged receiving it. See, Ex. A-5 at p. 33.

On November 20, 2000, Danforth and Lam met in person in Honolulu, and agreed upon all of the terms of the Subcontract Agreement except for the matter of pricing which Danforth sought from George Allen (Ex. A-5 at p. 42) and some revisions which were discussed at this meeting. Danforth Depo. at p. 89. Danforth was assigned only the job of evaluating the task orders, and did not and could not stop any actual work on the task orders, nor did he recommend to Rhino that it stop additional work on the Roof Contract. Danforth Depo. at p. 73 and pp. 147-148; Danforth Declaration at Para. 4; O'Connell Declaration at Para. 3. A meeting in early December, 2000 at a restaurant with Messrs. Michael O'Connell, Danforth and Lam resulted in threats being made by Mr. Lam, and upon the last contact with

Lam, Danforth was advised that the Master Subcontract still had not been executed. Danforth Depo. at pp. 95-96.

### (D) Work Stoppage by Rhino on Task Orders

George Allen was retained by Rhino in September or October, 2000 as a consultant with the job description of director of operations in Guam. See, George Allen Depo. at p. 17, Ex. B, Designation. Allen worked under the direction of Mr. Michael O'Connell. At Mr. O'Connell's direction, he drafted a letter to Rhino dated November 9, 2000 notifying them, *inter alia*, that Rhino employees would no longer be utilized to perform any work for BPI, and that Rhino would terminate the building Rhino shared with BPI near the project. Allen Depo. at pp. 35-37, Ex. B.

The decision to cause any work stoppage by Rhino was exclusively that of its President, Mr. Michael O'Connell. O'Connell Declaration at Paragraph 4, Exhibit "D", Designation. Mr. Allen carried out the termination of Rhino workers in late December, 2000 who had been performing BPI's work. Allen Depo. at pp. 81-82. Mr. Allen also confirmed that Danforth did not give <u>any</u> direction to Rhino's crews relative to any work on the Roof Contract task orders, but only to evaluate the status of those orders. Allen Depo. at pp. 72-73.

## II. ARGUMENT

### (A) Standards for Summary Judgment

A motion for summary judgment should be granted where, from the record, there is no genuine issue as to any material fact and the moving party demonstrates it should prevail as a matter of law. Rule 56(c), Federal Rules of Civil Procedure.

While the movant has the initial burden of establishing the absence of a genuine issue of material fact, once satisfied, this burden then "shifts to the opponent to come forward with specific facts showing that there remains a genuine issue for trial". Security and Exchange Commission v. Murphy, 626 F.2d 633,

640 (9th Cir. 1980). No genuine issue of fact exists where the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 at 587, 89 L.Ed. 2d 538, 106 S. Ct. 1348 (1986).

**(B)    Danforth Did Not Interfere With a Subsisting Contract**

Utilizing the language of the Restatement of the Law, Second, TORTS, Courts have stated the elements of the tort of Intentional Interference with Contract as (1) the existence of a contract (between BPI and the Navy), (2) knowledge of that contract by Mr. Danforth, (3) intentional acts by him designed to disrupt that relationship, (4) actual disruption and (5) damages proximately caused thereby. Locricchio v. Legal Services Corp., 833 F.2d 1352 (9th Cir. 1987); Shaw v. Santa Monica Bank, 920 F. Supp. 1080 (D. Haw. 1996). In addition, the Plaintiff must also prove that there was no justification for taking such actions as he did. Beaulieu v. Northrup Grumman Corp., 161 F. Supp.2d 1135 (D. Haw. 2000) aff'd 23 Fed. Appx. 811.

§766 of Restatement of the Law, Second, TORTS states:

Intentional Interference with Performance of Contract by Third Person

**One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another person and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.**

In Comment (h), the Restatement authors delineate what is intended by the "inducing or otherwise causing" language above:

> The word "inducing" refers to situations in which A causes B to choose one course of conduct rather than another. Whether A causes the choice by persuasion or by intimidation, B is free to choose the other course if he is wiling to suffer the consequences. Inducement operates on the mind of the person induced. The phrase "otherwise causing" refers to the situations in which A leaves B no choice, as, for example, when A imprisons or commits such a battery upon B that he cannot perform his contract with C...The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability

> under this rule even if it has the unintended effect of deterring the third person from dealing with the other.

Danforth engaged in no conduct that can reasonably be deemed an interference with the BPI Roof Contract by "causing" Rhino to stop its work on the task orders. To the contrary, Rhino's President decided to halt work by his crews on the BPI project because Rhino was not being paid and BPI refused to enter into a Master Subcontract. That written subcontract between BPI and Rhino to perform the work was required by federal regulations and bringing this **true** fact to Rhino's (and BPI's) attention did not "induce" or "otherwise cause" any breach of agreement by BPI of the Roof Contract. Because BPI cannot establish the threshold requirement for any interference, summary judgment is appropriate.

**(C)** **BPI Cannot Establish a *Prima Facie* Case for Use of "Improper Means" by Danforth in Evaluating the Task Orders and Advising Rhino of His Opinions**

The <u>Restatement of the Law</u>, <u>Second</u>, TORTS sets out the factors in determining whether interference is "improper":

> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
>
> (a)　the nature of the actor's conduct,
>
> (b)　the actor's motive,
>
> (c)　the interests of the other with which the actor's conduct interferes,
>
> (d)　the interests sought to be advanced by the actor,
>
> (a)　the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f)　the proximity or remoteness of the actor's conduct to the interference and
>
> (g)　the relations between the parties.

Whether stated as an "element" of the cause of action[8], or as a "privilege", conduct which otherwise would be actionable is not if the actor is acting to protect an interest which the law deems to be of equal or greater value than the Plaintiff's contract rights[9]. Gartner v. Etnyre, 1992 U.S. Lexis 17166 (ND Ill. 1992); Felsen v. Sol Cafe Mfg. Corp., 24 N.Y.2d 682, 249 N.E.2d 459, 301 N.Y.S.2d 610 (1969); Gastineau v. Home Depot, 1996 U.S. App. 1665 (9th Cir. 1996) [applying Arizona law].

Applying these principles, Danforth was retained to protect the interests of Rhino, which included advising it of the necessity for a written contract between Rhino and BPI which had, before his arrival in Guam in October, 2000, never been prepared, although the parties contemplated ultimately doing so. A number of the task orders were already subject to liquidated damages, and BPI's (and specifically Mr. Lam's) failure to address them jeopardized the ability to generate income to BPI necessary to support the Roof Contract and reimburse Rhino for its labor and materials[10]. The social importance of MMC, through Danforth, carrying out its own contractual obligations to Rhino are certainly of equal or greater importance than BPI insisting on Rhino continuing to operate without payment on the Roof Contract.

Because there is no material issue of fact on whether Danforth acted "improperly" or by improper means, summary judgment should be granted.

**(D)   As an Agent for MMC, BPI Must Establish that Danforth Acted "Solely" to Benefit Himself or Outside the Scope of His Authority**

Danforth was engaged by MMC to work on the SOC contract for Rhino. Despite being fully aware of the agency status of Danforth, BPI has continued its counterclaim against him personally and has

---

[8] See Environmental Planning & Information Council v. Superior Court, 36 Cal.3d 188 at 193-4, 680 P.2d 1086, 203 Cal. Rptr. 127 where the California Court discusses the Restatement's abandonment of the terms "privilege" or "justification" in favor of inclusion of those concepts within the meaning of "improperly interferes", and confirmed the principal that whether an intentional interference is justifiable depends on balancing the social or private importance of the objective advanced by the interference against the importance of the interest interfered with.

[9] Comment (b) to the Restatement of the Law, Second, Torts §767 also projects the need to weigh the relative significance of the factor involved.

[10] Comment (c) to §767 of the Restatement addresses the "Nature of the Actor's Conduct", which is considered a "chief factor". If the means used is merely persuasion or even offers of benefits, it is not tortious and would militate against finding an improper means.

not joined MMC in these proceedings.

In Sadri v. Spectrum Properties, Inc., 1995 U.S. App. Lexis 34268 (9th Cir. 1995) the plaintiff, who held an option to purchase property from Spectrum Properties, sued the optionor and its real estate agent, alleging they had interfered with his option rights by improperly failing to deliver the option agreement to the Plaintiff and misstated to the optionor that he needed more time to exercise the option. In affirming summary judgment by the district court, the Ninth Circuit, applying Oregon law, stated:

> Sadri asserts that [agent's] actions evidence an improper purpose or motive. An agent...acts under an improper motive where he acts (1) with the sole purpose to benefit himself; or (2) outside the scope of his authority [citing case]. `An agent is not liable to a third party for intentional interference with contract even if the agent acts with "mixed motives" to benefit himself or another principal as well' [citing case].
>
> [Plaintiff] has not produced any evidence supporting his claim that [agent] acted solely out of selfish motives or outside the scope of his agency. At worst, [Plaintiff] has shown only that [agent] had an incentive to act with "mixed motives" to benefit himself and Spectrum, his principal. The district court therefore properly granted summary judgment in favor of [agent] on this claim.

Sadri v. Spectrum Properties, supra, at pp 2-3 of opinion.

Related to this proposition is the qualified privilege extended to a manager of an entity to himself terminate a contract to which the entity is a party if the manager "reasonably believes" that the contract is harmful to the entity's best interests. Wanland v. Los Gatos Lodge, 230 Cal. App.3d 1507 at 1522, 281 Cal. Rptr. 890 (1991).

Danforth was clearly acting within the scope and course of his agency for MMC and there is complete dearth of evidence that he was acting solely for selfish motives. Danforth drew on his extensive experience in federal contracting and opined that a written subcontract was necessary and should not initially be executed until the liquidated damages applicable were removed. When MMC's client was satisfied that liquidated damages could likely be waived, Danforth **did** prepare the Master Subcontract, which was agreed to in principal by Mr. Lam. Because Danforth's advice and recommendations to Rhino were motivated to forward the best interests of Rhino, summary judgment should be granted.

### (E) Danforth is Entitled to an Award of Attorney's Fees and Costs Pursuant to Rule 11, Fed. R. Civ. Proc.

On March 12, 2003, counsel for Danforth wrote to BPI's counsel to request that it dismiss Danforth within twenty one (21) days pursuant to the "safe harbor" provisions of Rule 11, Fed. R. Civ. Proc., pointing out that the suit was improperly directed to Danforth personally, although BPI knew from Danforth's deposition on February 21, 2003, that MMC was the entity providing the consulting services to Rhino on the Roof and SOC contracts, and because he did not, and could not, have directed work stoppage on any aspects of of BPI's responsibilities to the Navy. See, Declaration of Alan H. Tuhy. Although BPI's counsel initially agreed to such dismissal on certain conditions, it reneged and has now created considerable additional expense in Danforth's return to active involvement in discovery and other pretrial matters all over a claim to actual damages of $3,820.

The claim for interference with contract against Danforth is not based in fact or law at very elemental levels. BPI argues in the case in chief that it had no enforceable contract at all with Rhino; it is disingenuous to simultaneously argue that MMC or Danforth caused BPI to be in default on the Roof Contract by removing Rhino crews from task orders, despite BPI's own claim of a lack of contract to perform that work and the complete failure to pay Rhino for its hard costs for labor and material incurred in reliance on an oral agreement.

Rule 11, Fed. R. Civ. Proc . provides in pertinent part:

Rule 11. Signing of Pleadings, Motions, and Other Papers; Representations to Court; Sanctions

    (A)    Signature. Every pleading. . . shall be signed by at least one attorney of record in the attorney's individual name. . .

    (B)    Representations to Court. By presenting to the court. . . pleading, written motion or other paper, an attorney. . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,

        (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

> (2) the claims, defenses and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief. . ."

The "safe harbor" provision of Rule 11 provides that a request for sanctions thereunder ". . .shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation or denial is not withdrawn or appropriately corrected."

Pursuant to that provision, Danforth's counsel sent to BPI's counsel a letter on March 12, 2003. See, Declaration of Alan H. Tuhy, Paragraph 5. Therein, Danforth requested that the Counterclaim against Danforth be dismissed because it was contrary to the facts and law. Rather than dismiss, BPI filed a new counterclaim on July 30, 2003 asserting new allegations, but maintaining the demonstrably false premise that Danforth personally and actively interfered in the BPI contract with the Navy.

It is not sufficient to avoid sanctions that counsel simply plead good intentions and was ignorant of the law. Security Farms v. International Brotherhood of Teamsters, Chauffers, Warehousemen & Helpers, 124 F.3d 999 at 1016 (9th Cir. 1997). The court's inquiry is threefold; the court must consider (1) the factual questions regarding the nature of the attorney's pre-filing inquiry and the factual basis of the pleading or other paper, (2) the legal inquiry involving consideration of whether the pleading at issue is "warranted by existing law or a good faith argument" for changing the law and whether the attorney's conduct violated Rule 11 and (3) the court must exercise its discretion to tailor an appropriate sanction. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 at 399, 110 L.Ed.2d 359, 110 S.Ct. 2447 (1990). The court may in its discretion impose sanctions upon the attorneys, law firms or parties that are responsible for the violation.

*See* Sure Safe Industries, Inc. v. C&R Pier Mfg., 152 F.R.D. 625 at 627-29 (SD Cal. 1993) (ordering Plaintiffs and plaintiffs' attorneys to pay attorneys' fees and costs to defendants after bringing a frivolous motion to compel production of documents). It is clear that the Court has wide discretion in awarding attorneys fees, including a restitutionary award to compensate the opposing party for unnecessary litigation expenses. United States v. 87 Skyline Terrace, 26 F.3d 923 at 929 (9th Cir. 1994).

At the time of filing of the original counterclaim, BPI and its counsel can certainly be charged with having made inquiry as to whom was retained by Rhino, MMC or Danforth individually. The original Complaint was filed on March 3, 2002, and BPI requested additional time in which to respond to the Complaint by motion filed on June 24, 2002. This was followed by hearing on a Motion to Dismiss and later an Amended Complaint filed on September 10, 2002. BPI filed its Answer to Amended Complaint and Counterclaim (against Danforth, Rhino and O'Connell), and the summons therefore was issued on October 8, 2002.

In addition to having adequate "after the fact" discovery time, BPI was warned in writing by Danforth's counsel that its claims were frivolous and not supported by any existing law or valid argument for an extension thereof.

In this case, where a non-resident has been put to the significant expense of defending before this court a claim twice asserted for $3,800 without factual support, sanctions are appropriate. Counsel for Danforth respectfully requests that the Court rule on the matter of sanctions if the Counterclaim against Danforth is not withdrawn prior to hearing, and permit the same to be submitted by way of declaration following hearing.

(F) **In the Alternative, Partial Summary Judgment Should be Granted on the Prayer for Punitive Damages**

In its new Counterclaim, BPI again seeks punitive damages without pleading the extraordinary circumstance which would justify them. The law on such damages is codified in 20 GCA Sec. 2120:

> In an action for the breach of an obligation *not arising from contract*, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may

> recover damages for the sake of example and by way of punishing the defendant. (Emphasis added.)

Here, Danforth would argue that no punitive damages are available because the Counterclaim is an action "arising from a contract." As such, no authority exists for such an award.

There is no evidence whatsoever that Danforth acted with malice, and it is neither alleged nor is there any factual support for finding that he is guilty of oppression or fraud. To the contrary, he was forthright in confronting both BPI and Rhino with his conclusions to the point that he terminated his own relationship (if temporarily) with Rhino because Rhino was not listening to his advice. See, Ex. A-14. Insisting that BPI comply with federal regulations by having a written Master Subcontract is a far cry from the type of conduct punitive damages seeks to deter.

On this issue as well as the liability issue, BPI has proceeded against Danforth without factual or legal bases, and sanctions under Rule 11 are appropriate if partial summary judgment is granted on this basis.

### III. CONCLUSION

Counter-Defendant Danforth's Motion for Summary Judgment and Sanctions should be granted.

Dated this **12** day of December, 2003.

**BERMAN O'CONNOR MANN & SHKLOV**
Attorneys for Defendant/Counter-Defendant
*MICHAEL DANFORTH*

By: /s/ Daniel J. Berman
DANIEL J. BERMAN