ORIGINAL

James Lawhn
OLIVER LAU LAWHN OGAWA & NAKAMURA
707 Richard Street, Suite 600
Honolulu, Hawaii 96813
Telephone No.: (808) 533-3999
Facsimile No.: (808) 533-0144

Stephen D. Tom
WHITE & TOM
820 Mililani Street, Suite 711
Honolulu, Hawaii 96813-2972
Telephone No.: 808 547 5151
Facsimile No.: 808 599 4517

Louie J. Yanza
VERNIER & MAHER, LLP
115 Hesler Place, Ground Floor
Governor Joseph Flores Building
Hagåtña, Guam 96910
Telephone No.: (671) 477-7059
Facsimile No.: (671) 472-5487

Attorney for Defendants AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY

# UNITED STATES DISTRICT COURT OF GUAM

UNITED STATES OF AMERICA FOR USE ) CIVIL CASE NO. 02-00008
AND BENEFIT OF RHINO BUILDERS, INC., )

          Plaintiff,

    vs.

BIOGENESIS PACIFIC, INC., AIG
TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE
COMPANY,

          Defendants.

BIOGENESIS PACIFIC, INC.,

          Counterclaimant,

    vs.

RHINO BUILDERS, INC., MICHAEL
O'CONNELL, MICHAEL DANFORTH, AND
JOHN DOES 1-10,

          Counter-Defendant.

DECLARATION OF LOUIE J. YANZA IN
SUPPORT OF DEFENDANTS AIG
TECHNICAL SERVICES, INC. AND
AMERICAN HOME ASSURANCE
COMPANY'S MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFF'S
MILLER ACT CLAIMS



FILED
DISTRICT COURT OF GUAM
DEC 15 2003
MARY L. M. MORAN
CLERK OF COURT

| | |
|---|---|
| AMERICAN HOME ASSURANCE COMPANY | ) |
| | ) |
| Cross-Claimant, | ) |
| | ) |
| vs. | ) |
| | ) |
| BIOGENESIS PACIFIC, INC. | ) |
| | ) |
| Cross-Claim | ) |
| Defendant. | ) |
| | ) |

I, LOUIE J. YANZA, hereby declare pursuant to 28 U.S.C. §1746, as follows:

1.      I make this declaration on personal knowledge of the facts herein contained, and am competent to testify if called upon as a witness at trial of the within entitled-action.

2.      I am an individual over the age of 18. I am an attorney licensed to practice law within Guam and before the U.S. District Court of Guam.

3.      Defendants AIG TECHNICAL SERVICES, INC. ("AIGTS") and AMERICAN HOME ASSURANCE COMPANY ("AMERICAN HOME") have retained the law office of VERNIER & MAHER, LLP as local counsel in the above-entitled action.

4.      Attached hereto as Exhibit "A" are true and correct copies of pertinent pages of Richard Avilla's transcript of his deposition taken on April 10, 2003 in the above-entitled matter.

5.      Attached hereto as Exhibit "B" are true and correct copies of pertinent pages of Richard Avilla's transcript of his deposition taken on August 20, 2003 in the above-entitled matter.

6.    Attached hereto as Exhibit "C" are true and correct copies of pertinent pages of Michael O'Connell's transcript of his deposition taken on February 20, 2003 in the above-entitled matter.

7.    Attached hereto as Exhibit "D" are true and correct copies of pertinent pages of Gerald N.Y.C. Lam's transcript of his deposition taken on February 19, 2003 in the above-entitled matter.

8.    Attached hereto as Exhibit "E" is a true and correct copy of Delivery Order No. 0001 dated May 15, 2000 for Contract/Purch Order No. N62766-99-D-0425 provided to me by RHINO's counsel during discovery.

9.    Attached hereto as Exhibit "F" is a true and correct copy of Delivery Order No. 0002 dated June 29, 2000 for Contract/Purch Order No. N27766-99-D-0425 provided to me by RHINO's counsel during discovery.

10.    Attached hereto as Exhibit "G" is a true and correct copy of Delivery Order No. 0007 dated August 21, 2000 for Contract/Purch Order No. N62766-99-D-0425 provided to me by RHINO's counsel during discovery.

11.    Attached hereto as Exhibit "H" are true and correct copies of receipts for administrative and overhead expenses provided by RHINO's counsel during discovery.

RHINO's counsel provided the discovery as part of its Initial Disclosures and in response to Defendants AMERICAN HOME and AIGTS' Second Request Production of Documents.

12.    Attached hereto as Exhibit "I" is a true and correct copy of Defendants AMERICAN HOME and AIGTS' Second Request for Production of Documents to Plaintiff RHINO, wherein Defendants requested documents from RHINO for its administrative and overhead expenses.

13.    Attached hereto as Exhibit "J" is a true and correct copy of Defendant Biogenesis Pacific, Inc.'s Response to Plaintiff Rhino Builders, Inc.'s Second Request for Production of Documents. BIOGENESIS' responses indicate its costs of labor and materials for Delivery Orders 1, 2 and 7.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 15th day of December, 2003, in Hagåtña, Guam.



LOUIE J. YANZA

COPY

IN THE DISTRICT COURT OF GUAM

UNITED STATES OF AMERICA FOR USE
AND BENEFIT OF RHINO BUILDERS,
INC.,

       Plaintiff,

vs.

AIG TECHNICAL SERVICES, INC.,
and AMERICAN HOME ASSURANCE
COMPANY,

       Defendants.

) CIVIL CASE NO. 02-00008

DEPOSITION OF
RICHARD AVILLA
APRIL 10, 2003

BIOGENESIS PACIFIC, INC.,

       Counter-Plaintiff

vs.

RHINO BUILDERS, INC., MICHAEL
O'CONNELL, MICHAEL DANFORTH,
and JOHN DOES 1-10,

       Counter-Defendants,

AMERICAN HOME ASSURANCE
COMPANY,

       Cross-Claimant,

vs.

BIOGENESIS PACIFIC, INC.,

       Cross-Claim Defendant.

RECEIVED

McKEOWN, V'BRDC
PRCI, MARC
DATE: 5/22/03
TIME: 2:03 p.m.

BY: _____

Cecilia F. Flores
Freelance Stenotype Reporter
Tel: (671) 632-0727
Fax: (671) 632-5353

Exhibit
A

1   Q.   Okay.  Because of the late start?

2   A.   Uhm, yeah, 'cause it was late started.

3   Q.   Did that delivery order get completed?

4   A.   Yes, it did.

5   Q.   BioGenesis completed it?

6   A.   Yes.

7   Q.   Did Rhino do any work on that delivery order?

8   A.   No.

9   Q.   Other than attending the pre-con meeting, I should

10  say.

11  A.   No work.  After October Rhino never do any work.

12  Q.   Actual physical labor on the project?

13  A.   Yeah.

14  Q.   But Mr. Garthe and yourself were still on the

15  Rhino payroll at that point; correct?

16  A.   Yeah.

17  Q.   Did you attend the pre-con meeting for delivery

18  order 10?

19  A.   Yeah.

20  Q.   To the best of your recollection, did Mr. Garthe

21  attend it?

22  A.   Yeah.

23  Q.   How about Aaron Williams?  Did he attend the pre-

24  con meeting?

25  A.   Some pre-con meeting he attended and some he

Richard Avilla: April 10, 2003

1   when they were doing some work for Biogenesis?

2   A.   Yes.

3   Q.   Okay.  Do you know how many delivery orders did

4   Rhino perform for Western?

5   A.   Uhm, I don't know exactly -- what delivery orders.

6   I think they were -- it wasn't an IDIQ contract.  It was an

7   emergency repair, so -- it was -- I think it was -- it's a

8   task orders.  And I'm not sure how many, but they were --

9   giving mostly square footages instead of -- like we were --

10  went by square footages.

11  Q.   Okay.

12  A.   The billing was square footages.

13  Q.   Okay.  But as far as the amount of work that Rhino

14  did then, so it was as assigned by Western; is that right?

15  A.   Yeah.

16  Q.   Okay, so to the best of your knowledge was there a

17  subcontract in place that required Western Pacific to give

18  Rhino any amount of work?

19  A.   No; I don't know.

20  Q.   Okay.  And this Navy contract, the roofing

21  contract that Biogenesis acquired and was awarded, do you

22  know when that was awarded to Biogenesis?

23  A.   I don't know when.  I think in '99.

24  Q.   The Biogenesis -- when they got the award?

25  A.   Yeah.

Richard Avilla: April 10, 2003

1  Q. Okay, but didn't you find out about it through the
2  OICC; is that right?
3  A. Yeah.
4  Q. Okay, can you tell me how you found out about it?
5  A. We went down there. Al and I went -- Al and
6  I was going in. Rhino bid the same contract, and then we was
7  going in to see -- you know, if we won the contract.
8  Q. Okay.
9  A. So we was going in every day. And then -- we went
10 in and they said that -- they told us that the thing was
11 awarded and who they awarded 'em to.
12 Q. And this was OICC that told you?
13 A. Yeah.
14 Q. And they told you at that time it was awarded to
15 Biogenesis?
16 A. Yeah.
17 Q. Okay. What did you and Mr. Garthe do upon finding
18 that out?
19 A. We got back to the office, Al called Mike right
20 away.
21 Q. And what did -
22 A. He told Mike --
23 Q. I'm sorry. Were you there during that phone
24 conversation -
25 A. Yeah.

Richard Avilla: April 10, 2003

1   Q.   -- between Al and Mike?
2   A.   Yeah.
3   Q.   Okay, you're talking about Michael O'Connell?
4   A.   Yeah.
5   Q.   Okay. And what did Mr. Garthe tell Mr. O'Connell?
6   A.   Well, Mike told him who won the -- the contract.
7   Q.   I'm sorry, Al told him?
8   A.   Yeah. Al told Mike who won the contract. And
9        he'll get in touch with -- Gerald Lam.
10  Q.   Okay, so it was Al that instructed Mr. O'Connell
11       to get in touch with Gerald Lam?
12  A.   Yeah.
13  Q.   Okay. And did you have occasion to hear back from
14       Mr. O'Connell about whether he in fact got in touch with Mr.
15       Lam?
16  A.   Yeah.
17  Q.   Okay. And when did you hear back from Mr.
18       O'Connell?
19  A.   Before Christmas.
20  Q.   Okay. And what did he tell you?
21  A.   He said he was gonna have -- dinner -- spend
22       Christmas at Gerald Lam's house.
23  Q.   Okay. And he said he was going to have dinner?
24  A.   Yeah.
25  Q.   For what purpose?

Richard Avilla: April 10, 2003

1    A.    About trying to get this contract.

2    Q.    Okay.  So then at least by Christmas of '99, to

3    the best of your knowledge, Mr. O'Connell was still trying to

4    get a subcontract agreement with Gerald Lam; is that right?

5    A.    Yeah.

6    Q.    And did you hear back from Mr. O'Connell after

7    Christmas of '99 about whether or not he had --

8    A.    Yeah.

9    Q.    -- met with Mr. Lam?

10    A.    Yeah.

11    Q.    Okay.  And did he tell you then what had happened?

12    A.    That he worked a deal out with Gerald Lam.

13    Q.    Okay.  Did he tell you what that deal was?

14    A.    That we'd be doing all the work and that --

15    I'd be working for Biogenesis, representing Biogenesis on

16    Guam, and Rhino would be doing all the subcontract work, and

17    that they would split the profits 50-50.

18    Q.    Okay, and he told you this in January of 2000; is

19    that right?

20    A.    Yeah.

21    Q.    Okay.  Did Mr. Lam ever talk to you about being a

22    representative for Biogenesis?

23    A.    No.  Not at that time.

24    Q.    Can you tell me, when is the first time you ever

25    spoke to Mr. Lam?

Richard Avilla: April 10, 2003

Civil Case No. 02-00008

```
 1        A.  September.
 2        Q.  Of what year?
 3        A.  2000.
 4        Q.  Okay.  Let's see if I can find one of Louie's
 5   exhibits here.  I'm looking for Delivery Order Number 1.
 6        MR. YANZA:  Exhibit Number 5.
 7        MR. CLARK:  Okay; I have 5 right here.  Can we go
 8   off the record for a second?
 9        (Off the record.)
10        (Back on the record.)
11        BY MR. CLARK:  (Continuing)
12        Q.  Okay, Mr. Avilla, could you look at Exhibit Number
13   5 please.  I think we have established that this is delivery
14   Order Number 1.  The date on the order, you'll notice in Box
15   Number 3, is May 15th.  And it looks like your signature --
16   it's hard to see the date, but I think other copies reflect
17   that date as being May 16th, 2000.
18        Is that right, to the best of your recollection?
19   would that be about the time you would have signed this
20   delivery order?
21        A.  Yes.
22        Q.  Okay.  Well, again, let me backup a little bit.
23   You said you didn't speak to Mr. Lam until September.  Before
24   you spoke to Mr. Lam in September, had you ever spoken to
25   anybody else who was working for Biogenesis?
```

Richard Avilla: April 10, 2003

1   A.   No.

2   Q.   So getting back to this Exhibit Number 5, so at

3   the time you signed this delivery order on or about May 16th of

4   2000, you had not spoken to Mr. Lam about accepting this

5   delivery order; is that right?

6   A.   No.

7   Q.   Okay.  Can you tell me then how is it you

8   understood or believed that you were authorized by BioGenesis

9   to go ahead and accept this delivery order?

10   A.   I was told by Mike O'Connell.

11   Q.   Okay.  What did Michael O'Connell tell you?

12   A.   That Bio had the contract and we had to go-ahead

13   and accept it.

14   Q.   Okay, so he instructed you to accept this delivery

15   order –

16   A.   Yeah.

17   Q.   -- on behalf of BioGenesis?

18   A.   Yeah.

19   Q.   Okay.  And he informed you that that was okay with

20   BioGenesis?

21   A.   Yeah.  I was -- yeah.

22   Q.   Can you refer to Exhibit Number 6 please.  Okay,

23   this appears to be delivery order number 2, and it looks like

24   it was accepted by you again, on June 30, 2000.  Same question.

25   Can you tell me what gave you the understanding that you were

Richard Avilla: April 10, 2003

1  authorized to sign off on this delivery order?  Or who gave you

2  that understanding?

3      A.   Uhm, I never get the -- you know, approval one at a

4  time.  I just -- from the beginning I was under the impression

5  that I was -- doing the work.

6      Q.   Okay, so you're saying after Michael O'Connell

7  informed you the first time to accept Delivery Order Number 1,

8  you understood that you were now authorized to accept all the

9  rest?

10     A.   Yes.

11     Q.   Okay.  Could you look at Exhibit Number 7.    This

12  references -- the first sentence says:  I had sent letters of

13  appointment previously and am sending another pursuant to your

14  latest request.

15          You said during Mr. Cortés' questioning that you

16  were aware of earlier letters of appointment; is that right?

17     A.   Yeah.  Earlier ones.

18     Q.   Okay, do you know when that would have been about?

19     A.   Uhm, maybe a month before.

20     Q.   Okay, so maybe sometime in June?

21     A.   Yeah.

22     Q.   Okay, could you refer to Exhibit Number 9 please;

23  Delivery Order Number 4.  I think you had stated in questioning

24  by Mr. Cortés that you believe this delivery order was

25  completed in January of 2001.

Richard Avilla: April 10, 2003

1   A.  No, not completed.
2   Q.  Oh, I'm sorry.  So when do you think this was —
3   A.  It was started.
4   Q.  Oh, it was started in January, 2001?
5   A.  Yeah.
6   Q.  Actually, I think the word you said was "done," so
7   I wanted to clarify that.  So if it was started in January,
8   2001 —
9   A.  Yeah.
10  Q.  — when do you think it was completed?  To the
11  best of your recollection.
12  A.  It went way past the — completion date on this
13  one — by about — uhm, maybe May; May or June.
14  Q.  Okay, can I get you to look at Exhibit Number 12
15  please.  I think you said you were familiar with this e-mail.
16  It looks like Mr. Lam, in writing this e-mail, was asking you
17  to respond urgently.  I see, the word "please" is in caps,
18  all capitals, ASAP, three exclamation points.
19       Do you know why he would have been under some
20  impression that there was an urgency involved as far as your
21  responding?
22  A.  Yeah.  We needed materials.  We were — the job
23  had gotten behind because we never had materials.  And he
24  needed funds to buy the materials.
25  Q.  Okay.  And that's why —

1  A.     He needed this information to present to the
2  SBA people so that they would approve the loan.
3  Q.     So you understood that he was trying to close the
4  loan when he refers to the loan with SBA.  So he was trying
5  to close the loan necessary to finance, the going forward
6  with the Navy project; is that right?
7  A.     Right.
8  Q.     Okay.  This letter is also dated on September
9  11th, 2000, I think that's about the time you said that you
10 first spoke to Mr. Lam?
11 A.     Yeah.
12 Q.     Was this letter before or after you talked to Mr.
13 Lam?
14 A.     After.
15 Q.     Okay.  Well, actually can you tell me what
16 happened, what was discussed in your first conversation with
17 Mr. Lam?
18 A.     I needed materials.  I needed materials -- Rhino
19 didn't have money to buy materials, it was going behind.  I
20 was responsible for the job, so I finally called Gerald Lam
21 directly, and told him we needed materials.
22 Q.     Okay.  And what was his response?
23 A.     Well, he was all right with that, you know.  And
24 he gave me a contact number -- Russell Fong.  Gave me Russell
25 Fong's contact number.  And he told me to get in touch with

Richard Avilla: April 10, 2003

1    Russell Fong, give Russell Fong all the information that was
2    needed.
3        Q.    Was Mr. Lam aware at the time that you called him
4    that Rhino had actually started working on –
5        A.    No.  No.  I told him that we had completed --
6    Rhino had completed -- two delivery orders and they never had
7    money for -- for -- uhm -- to proceed.
8        Q.    And what was his response or reaction when you
9    told him Rhino had finished two delivery orders?
10       A.    He was surprised.
11       Q.    Okay, what did he say?
12       A.    Not much.
13       Q.    Okay, but what did he say that –
14       A.    He just said, what?
15       Q.    Just like that?  What?
16       A.    Yeah.
17       Q.    And so he informed you at that point that he
18   hadn't known that Rhino had started?
19       A.    Yeah.  Yeah, he wanted some information.  So I
20   gave him some information.  And he was supposed to get in
21   touch with Eugene and Mike.
22       Q.    Okay.  I want to clarify something you said with
23   respect to your pay.  You said that you were being paid
24   Thirty-two hundred Dollars a month by Rhino in the year 2000;
25   is that right?

Richard Avilla: April 10, 2003

1    A.    Yeah, it was Gerald Lam.

2    Q.    And do you know what the percentage was that they

3    came up with?

4    A.    Seven percent.  Not more than seven percent on the

5    total of the contract.

6    Q.    Okay.  So you're saying that Michael Danforth

7    and George Allen had concluded that Biogenesis would get

8    seven percent of the contract?

9    A.    Not more than seven percent.

10   Q.    Not more than seven percent, of the profits?

11   A.    Stressed that.  Michael Danforth stressed that to

12   Mike O'Connell several times.

13   Q.    Okay, could you just elaborate on that a little

14   bit more, what you recall about that conversation?

15   A.    Well, we was in the -- they called us into the

16   office there, that office, they had two computers set up.

17   And they called us in, and went in there.

18   And they started working on the computer and they

19   started explaining to Mike that -- what they was doing.  And

20   they went delivery order by delivery order.

21   Q.    They were explaining to Mike O'Connell?

22   A.    Telling Mike O'Connell what they was doing.

23   Q.    Okay.  Who was doing the talking at this point?

24   A.    Mike Danforth.

25   Q.    Mike Danforth; okay.

Richard Avilla: April 10, 2003

1   A.     And then when -- sometimes George Allen would
2   elaborate on something that they was doing, so they would go
3   delivery order by delivery order, and they would have some
4   discussion between each other as to what percentage of that
5   delivery order should they go.
6          And they were discussing, well, maybe we should do
7   this, we should do that.  Okay.  They're discussing it back
8   and forth like that -- then when they agreed on something
9   they put that number there.  Then they went to the next
10  delivery order.
11  Q.     Okay, so they were coming up with -- this number
12  that they were coming up with, this is the number that was
13  supposed to go into a subcontract agreement with BioGenesis?
14  or --
15  A.     Yeah.  You know, that was gonna be part of the
16  presentation to Gerald -- Russell -- Gerald.  Gerald.
17  Q.     Okay.  But you said they stressed repeatedly, not
18  more than seven percent?
19  A.     Right.  Because like sometimes they said, okay,
20  let's go 28 percent over here.  Let's go 15 percent over
21  here, you know.  They went, working down.  Okay, let's give
22  you 10 percent over here.  But they had to explain to Mike --
23  that the bottom line will be that they gonna -- Gerald Lam
24  was gonna end up with no more than seven percent.
25  Q.     Okay.  So 28 percent or 10 percent, then that

Richard Avilla: April 10, 2003

1   would be for the smaller delivery orders?

2   A.    Yeah. Whichever way they worked it out.

3   Q.    Okay. So per delivery order it might have been

4   more than seven percent, but when they --

5   A.    The average amount.

6   Q.    -- when you add it all up at the end --

7   A.    It would be seven percent.

8   Q.    Okay. And they thought that that's how much

9   Biogenesis should make from the contract?

10  A.    Yeah.

11  Q.    Okay.

12  A.    That was what they gonna give.

13  MR. CORTES:    Would that be seven percent of the

14  contract, of the contract value, or the task order value, or

15  what?

16  A.    I think the year -- the year of that -- 18, I

17  think at the time it was 17 delivery orders, and they was

18  talking -- all of those delivery orders.

19  MR. YANZA:    Combined?

20  A.    Yeah.

21  MR. YANZA:    All of them combined?

22  A.    All of 'em combined. And that Gerald Lam would

23  just end up with seven percent. Per delivery order, which he

24  would -- reflect -- you know. But in the end of that 17

25  delivery orders he would end up with seven percent of

Richard Avilla: April 10, 2003

1    the profits.
2    BY MR. CLARK: (Continuing)
3        Q.   And this is what they proposed to put in this
4    subcontract that Michael Danforth was drafting?
5        A.   Yeah, this is the proposal they gave -- that they
6    send to -- Gerald.
7        Q.   To Gerald Lam, okay.
8        MR. CORTES: was it seven percent of the profits?
9    Or seven percent of the gross -- you know, the contract
10   amount?
11       A.   They said seven percent profit. Gerald Lam would
12   just get seven percent profit.
13   BY MR. CLARK: (Continuing)
14       Q.   Okay. When did Rhino -- well, let me backup. I
15   think you weren't present during Mr. Garthe's deposition, but
16   he stated that Rhino started laying off its employees in
17   about September of 2000. Do you recall that?
18       A.   Yeah.
19       Q.   Okay. Is that accurate that Rhino laid off its
20   employees then?
21       A.   (witness nodded head.)
22       Q.   Okay. Do you know why they laid off their
23   employees?
24       A.   No work.
25       Q.   No work?

Richard Avilla: April 10, 2003

1    A.   No work; no money.
2    Q.   Okay.  Well, did they lay everybody off, or did
3    they keep some employees?
4    A.   They laid everybody off.
5    Q.   Okay.  But they kept George Allen; is that right?
6    A.   No.  George Allen wasn't -- wasn't there.
7    Q.   In September?
8    A.   In September.
9    Q.   He didn't show up until October?
10   A.   Yeah.
11   Q.   Okay.  But you still stayed on the payroll?
12   A.   Yeah.
13   Q.   Okay.  And Al Garthe?
14   A.   Yeah.
15   Q.   Okay.  In Guam.  Was there anybody else?
16   A.   Uhm, the secretary.
17   Q.   Secretary; okay.  When these employees were laid
18   off, do you know if there was any understandings that these
19   employees were laid off so that they could go work for
20   BioGenesis?
21   A.   No.  No.  They was laid off because they didn't
22   have work.  And they was free to go where they wanted to go.
23   Q.   Okay.
24   A.   But we also told 'em that that we was gonna be
25   starting up again, I mean -- but we -- we advised the men not

Richard Avilla: April 10, 2003

1    to turn down any job opportunities. If they come cross a job
2    -- we told 'em, don't be waiting for us.
3        Q.   Okay, how many employees did Rhino have in
4    September that they laid off, to the best of your knowledge?
5        A.   Went -- it went up and down.
6        Q.   Well, during that month; I mean, how many people
7    got laid off during that month?
8        A.   In September?
9        Q.   Yes.
10       A.   We did -- we did -- we only had -- in that month I
11   think we laid off 25 people.
12       Q.   25 people?
13       A.   If we had that many people. We had One and Two
14   going -- we had the crew on One, and we had crew on Two, and
15   as one got done, we had to lay the men off.
16       Q.   Okay.
17       A.   And then as Two got done we had to lay them off.
18       Q.   Okay, I understand. Well, I'm looking for it but
19   I can't find it right now; do you recall receiving or seeing
20   a letter, or being instructed by Michael Danforth to stop
21   work? Do you recall that?
22       A.   I read this letter in here, yeah.
23       Q.   Yes. I'll see if I can find it. Okay, well let's
24   go ahead and proceed without it.
25       But you recall being instructed to stop work by

Richard Avilla: April 10, 2003

1  Michael Danforth?

2  A.  No.

3  Q.  By whom?

4  A.  I would -- I -- George Allen.

5  Q.  When did George Allen instruct you to stop work?

6  A.  When they had that phone conversation with --

7  Gerald, when they proposed -- they was trying to work out

8  this proposal.

9  Q.  This was in the end of October, 2000?

10  A.  I don't know exactly when.

11  Q.  Okay.

12  A.  But at that time.  When -- after that -- after

13  they discussed the proposal,' cause they e-mailed him, they

14  e-mailed Gerald information.  And it was discussed on the

15  phone, he was sitting around on the phone, the phone

16  conference --

17  And then Mike Danforth was negotiating with Gerald

18  and then Gerald was asking questions, going back and forth,

19  and we was just sitting there listening.

20  And then when Gerald agreed to spend -- to send the

21  money over, you know, put money in the account, and then --

22  and he needed to look over the proposal so he can give an

23  answer.  He was -- Mike Danforth was pushing for him to give

24  him a commitment, and Gerald was a gentleman that wasn't

25  putting something to decide or not -- 'cause he needed to

1    look at all the factors.

2        So they had a very promising -- down the road.

3    And then George Allen jumped on the contract, and then -- on

4    the phone, and he told him -- he started telling him that now

5    that he was taking over that he would make -- Mr. Lam's

6    reputation sterling.

7        And then he hung up, and he looked at me and he

8    said, I don't want you to do anything for BioGenesis.

9    Q.    Okay.  So in other words he instructed you to stop

10   working on the Navy project?   Is that what you understood?

11   A.    Whatever BioGenesis --

12   Q.    Oh.  Stop doing any work at all for BioGenesis?

13   A.    Yeah.

14   Q.    Okay.  And were you ever instructed by Michael

15   O'Connell to stop doing any work on the Navy contract?

16   A.    Yeah.

17   Q.    And do you remember about when that would have

18   been?

19   A.    In September.

20   Q.    In September.  So this was before the -- before

21   you were told by -

22   A.    Yeah.

23   Q.    Okay.  And did Mr. O'Connell tell you in September

24   why he wanted you to stop working for BioGenesis?

25   A.    Well, he said that he was informed by somebody

Richard Avilla: April 10, 2003

1   higher up that if Biogenesis lost the contract Rhino would

2   get it.

3        Q.   Okay.  So you understood that to mean that he

4   wanted you to stop working so that –

5        A.   Yeah.

6        Q.   -- Biogenesis would lose the contract?

7        A.   He said, don't go into -- don't go into pre-cons,

8   don't accept jobs, don't do anything for Bio.

9        Q.   And he told you that was so Biogenesis would lose

10   the contract; is that right?

11        A.   No, he never say that.  He never tells us for that

12   reason.  He just said -- he just explained to me what would

13   happen if Biogenesis lost the contract, and he told me not to

14   go in.

15        Q.   Let's get back to the later time you were

16   instructed by -- actually, let me backup to that conversation

17   with Michael O'Connell.

18             What was your response to that?  Or did you

19   respond to that?

20        A.   I didn't.  Not to him.

21        Q.   Okay.  After George Allen told you to stop working

22   for Biogenesis, did you stop?

23        A.   No.

24        Q.   Okay; why not?

25        A.   I was entrusted to do a job.  I explained to Mike,

Richard Avilla: April 10, 2003

Exhibit

IN THE DISTRICT COURT OF GUAM

UNITED STATES OF AMERICA FOR      ) CIVIL CASE NO. 02-00008
USE AND BENEFIT OF RHINO          )
BUILDERS, INC.,                   )
                                  )
          Plaintiff,              )
                                  )
     vs.                          )
                                  )
BIOGENESIS PACIFIC, INC., AIG     )
TECHNICAL SERVICES, INC., and     )
AMERICAN HOME ASSURANCE COMPANY,  )
                                  )
          Defendants.             )
_____)
BIOGENESIS PACIFIC, INC.,         )
                                  )
          Counterclaimant         )
                                  )
     vs.                          )
                                  )
RHINO BUILDERS, INC., MICHAEL     )
O'CONNELL, MICHAEL DANFORTH, AND  )
JOHN DOES 1-10,                   )
                                  )
          Counter-Defendants.     )
_____)
AMERICAN HOME ASSURANCE COMPANY,  )
                                  )
          Cross-Claimant,         )
                                  )
     vs.                          )
                                  )
BIOGENESIS PACIFIC, INC.,         )
                                  )
          Cross-Claim Defendant.  )
_____)

DEPOSITION OF RICHARD AVILLA

Taken on behalf of the Defendants AIG Technical Services and
American Home Assurance Company

          BE IT REMEMBERED That, pursuant to the Guam
Rules of Civil Procedure, the Deposition of RICHARD AVILLA
was taken before Veronica Flores, Registered Professional
Reporter, on Wednesday, the 20th day of August 2003, at 9:06
a.m. in the Law Offices of Vernier & Maher, 115 Hesler Place,
Ground Floor, Governor Joseph Flores Building, Hagatna, Guam
96910.

Veronica A. Flores, CSR, RPR
Certified Shorthand Reporter
Tel: (671) 734-1041 * Fax: (671) 734-1045
E-mail: floreron@hotmail.com

ORIGINAL

1 racquetball project?

2 A. No.

3 Q. Or in the second project? Second delivery order?

4 A. No.

5 Q. And the third you don't know how much labor was

6 expended?

7 A. No.

8 Q. But from your recollection, the racquetball costs

9 between twenty to thirty thousand dollars in materials?

10 A. No, the cost of the contract.

11 Q. Oh. So labor and materials altogether?

12 A. Yeah. The cost of the contract was thirty-some

13 thousand.

14 Q. Twenty to thirty-some thousand dollars?

15 A. Yeah.

16 Q. And then the second delivery order, roughly about

17 seventeen thousand dollars?

18 A. No. Second delivery order was something like -- the

19 contract cost was about six or seven thousand.

20 Q. What about the third?

21 A. Wait. Wait now. The first delivery order was about

22 seventeen thousand. That was the Breezeways. That was the

23 first. Then the second delivery order was a racquetball

24 court. That was about twenty, thirty thousand dollars. And

25 then the third delivery order was DRMO building. That was

1 about six or seven thousand. Total of the contract.

2 Q. I'm going to show you the Plaintiff's Deposition

3 Exhibit No. 5 which is an exhibit to your deposition which

4 was on April 10, 2003. Do you recognize this document,

5 Mr. Avilla?

6 A. Yeah, this is delivery order one.

7 Q. Did Rhino Builders work on that project?

8 A. Yes.

9 Q. And how much was that project?

10 A. Twelve thousand.

11 Q. So was that the Breezeways?

12 A. Yes.

13 Q. I'm going to show you Plaintiff's Deposition Exhibit

14 No. 6 which is an exhibit to your previous deposition. Do

15 you recognize the document, Mr. Avilla?

16 A. Yeah.

17 Q. And did Rhino Builders work on that project?

18 A. Yes, they did.

19 Q. Delivery order number two?

20 A. Two.

21 Q. And what was the price or the contract price?

22 A. Twenty-six thousand.

23 Q. And this is the racquetball?

24 A. What's that?

25 Q. This is the racquetball?

1    A.    Racquetball court.

2    Q.    And previously you testified that you believe it was

3    number five they worked on?

4    A.    The DRMO, yeah.

5    Q.    And I'll show you Plaintiff's Exhibit No. 10 which

6    is an exhibit previous to your deposition.  Do you recognize

7    that?

8    A.    I'm trying to see.  No, this isn't it.  Try delivery

9    order seven.

10    Q.    Delivery order number seven?

11    A.    Seven.

12    Q.    So in delivery order number five, it's your

13    recollection that Rhino Builders did not work on delivery

14    order number five?

15    A.    No.

16    Q.    No, it's not your recollection or no, they did not?

17    A.    They did not.

18    Q.    I'll have to pull it out later.  Mr. Avilla, this

19    is delivery order number seven which is Plaintiff's Exhibit

20    No. 46 to your previous deposition.

21    A.    Yeah.

22    Q.    This is it?

23    A.    (Witness nodded head.)

24    Q.    So it's your testimony today that Rhino Builders

25    worked on delivery orders number one, two and seven?

A. (Witness nodded head.)

MR. CLARK: Could you say that out loud, please?

A. Yes.

BY MR. YANZA: (Continuing)

Q. And how much was the contract?

A. Five thousand two hundred.

Q. This is the DRMO Building?

A. Yes.

Q. As far as you recall, did Rhino Builders work on any other part of this IDIQ contract?

A. No.

Q. Just three projects?

A. Yeah.

Q. Or three delivery orders?

A. (Witness nodded head.)

MR. CLARK: You have to speak out loud, Richard.

BY MR. YANZA: (Continuing)

Q. Yes?

A. Yes.

Q. Why after November 30th or November of 2000 did you begin reporting to Mr. Russell Fong rather than to the O'Connells?

A. Why?

Q. Yeah, why?

A. Actually, because I had my notice into Rhino.

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

## RALPH ROSENBERG COURT REPORTERS, INC.
1001 Bishop Street
2460 Pacific Tower
Honolulu, HI 96813
Phone: (808) 524-2090
FAX: (808) 524-2596

Exhibit
C

## Page 97

(1) facts not in evidence that there was just one presented
(2) to BioGenesis.
(3) Q. (BY MR. CLARK) Okay. Oh, okay. Which one
(4) or both?
(5) MR. TOM: Well, why don't we keep the record
(6) straight? I mean, we have an Exhibit 1 that's in front
(7) of you, Mr. O'Connell; and his question to you was: Did
(8) you approve Exhibit 1 to be presented to BioGenesis?
(9) That was his question. So, then you got off on a
(10) question about a second draft. So, if we'll just stick
(11) with the -- this Exhibit 1, maybe we'll be better off.
(12) MR. CLARK: Yeah, that's a good point.
(13) Q. (BY MR. CLARK) Well, maybe you can refer to
(14) the fax cover sheet, the first page. Okay. You can see
(15) that it's a fax cover sheet from Michael Danforth to
(16) Gerald Lam --
(17) A. Uh-huh.
(18) Q. -- dated November 17th?
(19) A. Yes.
(20) Q. And it says, "Gerry, please find the
(21) subcontract agreement with attachments for your review."
(22) Okay. So, would you agree based upon what you see on
(23) this exhibit that this is the subcontract that was
(24) presented to BioGenesis?
(25) A. I would say yes. Yeah, the contents is, yes.

## Page 98

(1) Q. Okay. And you said you reviewed this
(2) subcontract with Maxx Management?
(3) A. Right.
(3) Q. Okay. We discussed it,
(4) and he said he had to make some more drafting on it with
(5) Gerry Lam.
(6) Q. Okay. Did you see this draft before it was
(7) presented to Gerry Lam?
(8) A. I might have.
(9) Q. Okay. And might you have also approved it if
(10) you did?
(11) A. Yes, I might have.
(12) Q. Okay. So, Mr. Danforth would have -- since
(13) he's your consultant, would have gotten your
(14) authorization, first before he would have presented a
(15) subcontract to Mr. Lam; is that correct?
(16) A. Yes.
(17) Q. Okay. You said there was another draft that
(18) was prepared?
(19) A. Yeah.
(20) Q. After this?
(21) A. Yes, because Gerry and Mike was going over
(22) it. And I relied on Gerry -- on Gerry to find out what
(23) he wanted to change and stuff because he changed some of
(24) it.
(25) Q. Okay.

## Page 99

(1) A. Okay?
(2) Q. Okay. But as for the terms that are
(3) contained in this subcontract in this draft, do these
(4) terms reflect what you believed to be the agreement --
(5) the oral agreement with BioGenesis?
(6) A. Well, let me read it.
(7) Q. Okay. Well, let me ask --
(8) A. Let me read it.
(9) Q. Well, let me ask you, at the time that you
(10) were reviewing this and approving it with Mr. Danforth,
(11) do you recall whether at that time you thought, okay,
(12) this contract reflects the oral agreement I have with
(13) Gerry Lam?
(14) A. I can't answer you until I -- I don't know.
(15) Q. You don't recall that? Okay. Well, do you
(16) want to take a little time to read it? Go ahead.
(17) MR. CORTES: Could we go off the record for a
(18) minute?
(19) MR. CLARK: Sure.
(20) (Discussion off the record.)
(21) Q. (BY MR. CLARK) Okay. Mr. O'Connell, then,
(22) before we address the written subcontract agreement,
(23) let's talk about the oral subcontract agreement --
(24)
(25) Q. -- that you believe you had.

## Page 100

(1) A. Right.
(3) Q. Okay. You said that you had a conversation
     with Mr. Lam on September 29th --
(4) A. Yes.
(5) Q. -- 1999?
(6) A. Yes.
(7) Q. Okay. And in this conversation you said that
(8) you reached an agreement with Mr. Lam?
(9) A. Yes.
(10) Q. Correct? Okay.
(11) A. And also February 7th we had a long talk on
(12) that -- if Rhino was still interested and our agreement
(13) was still good. So, I said yes.
(14) Q. Okay. Let's talk about the September 29th
(15) conversation.
(16) A. Okay.
(17) Q. What specific terms do you recall
(18) agreeing on?
(19) A. The terms? I recall that Rhino -- Rhino was
(20) supposed to share an office. Rhino would supply a
(21) project manager, which Rhino would get pay for all his
(22) direct and indirect costs.
(23) Q. I'm sorry. Direct and indirect costs?
(24) A. Yes.
(25) Q. So, that's a reimbursement?

Case 1:02-cv-00008    Document 277    Filed 12/15/2003    Page 32 of 117

**Page 105**

(1) he would be paying for the materials on the job site.
(2) We would -- Rhino would give him all the material costs
(3) or the breakdown of what materials to order. He
(4) supposed to order those materials. What else the
(5) supposed to do? We had quite a few -- whatever the
(6) management -- you know, management -- administration
(7) office was supposed to do.
(8) Q. Okay. That was 1999, September?
(9) A. September and February, 2000.
(10) Q. Okay. So, in February, 2000, you said you
(11) added new terms to the 1999 September discussion that
(12) Rhino would hire a secretary for the contract?
(13) A. Yeah, we would -- we was going to add on a
(14) secretary, yes.
(15) Q. Okay. And how was the secretary's cost
(16) supposed to be allocated?
(17) A. To the job site.
(18) Q. So, that's just a direct cost off the
(19) contract then?
(20) A. Actually that's -- the secretary -- well, let
(21) me get it straight. Let me -- Rhino had a secretary in
(22) the office, and we would help split the costs for the
(23) secretary of the job.
(24) Q. Split 50/50?
(25) A. Yes.

**Page 106**

(1) Q. Okay. And then you also said that upon
(2) completion of the project, the Rhino workers would be
(3) employed -- or reemployed by Rhino?
(4) A. Yes.
(5) Q. So, those were the workers that BioGenesis
(6) was going to pick up and put on their payroll?
(7) A. Yes.
(8) Q. Okay. Anything else?
(9) A. No, not that I can think of. That was it.
(10) Q. Okay. There's also -- earlier there was a
(11) discussion about Richard Avilla?
(12) A. Okay.
(13) Q. Okay. So, what was your understanding about
(14) Mr. Avilla?
(15) A. My understanding, Richard Avilla was to be
(16) picked up partial -- or half his pay was to be picked up
(17) on BioGenesis' payroll. He would get reimbursed for all
(18) costs that he expends on the job.
(19) Q. And you talked about that in September of
(20) '99?
(21) A. Yes. We talked about that I have a project
(22) manager to be picked up. The discussion was in
(23) February.
(24) Q. Okay. So, you suggested Mr. Avilla to
(25) BioGenesis, correct?

**Page 107**

(1) A. Because he needed a project manager. He
(2) asked me if I had any. I said yes.
(3) Q. Okay. Do you know if Mr. Lam indicated that
(4) he knew Mr. Avilla?
(5) A. I don't know. I don't recall that.
(6) Q. In your conversation when you mentioned
(7) Richard Avilla, did he tell you, "Oh, I know Richard"?
(8) A. No, I don't recall that.
(9) Q. To the best of your knowledge, did
(10) Mr. Lam know Mr. Avilla before September, 1999?
(11) A. I don't know. I don't recall. I don't know
(12) if he did or not.
(13) Q. Okay. In February, 2000, you had these
(14) additional terms. You said there was a later
(15) conversation, and I want to talk about conversations
(16) before this November subcontract agreement. Were there
(17) later conversations concerning the subcontract terms?
(18) A. Subcontract terms.
(19) MR. CORTES: Did you say subcontract or SOC
(20) contract?
(21) MR. CLARK: I said subcontract. I'm sorry.
(22) A. No, I don't know.
(23) Q. (BY MR. CLARK) I'm sorry. Which one?
(24) A. I don't recall.
(25) Q. Okay. Has Rhino -- before this contract, has

**Page 108**

(1) Rhino ever acted as a subcontractor based upon an oral
(2) agreement only?
(3) A. Based upon an oral agreement written up as
(4) sub afterwards, that's what you're talking about?
(5) Q. No, I'm talking about complete through the
(6) project, oral agreement only.
(7) A. No.
(8) Q. Okay. Has Rhino ever started a subcontract
(9) on an oral agreement, other than this contract, and had
(10) a written agreement generated later?
(11) A. Yes.
(12) Q. Okay. How often has Rhino done that?
(13) A. Couple of times, yeah.
(14) Q. Do you remember what contracts those were?
(15) A. No, I don't recall.
(16) Q. Do you recall what -- do you recall when they
(17) were?
(18) A. I'm trying to find out the guy's name. Hold
(19) on a second. In fact, yeah, in the -- on the -- I
(20) don't know who was the general at that time, but on the
(21) 1998 -- oh, on one of our Bishop Estate project we --
(22) Q. Which project?
(23) A. One of our Bishop Estate projects. I not
(24) sure which con -- what contract. We might go on the job
(25) and start working on the project and say, "Sure, it's

## Page 101

(1) A. Yes.
(2) Q. For --
(3) A. Direct and indirect costs.
(4) Q. Can you break that down a little bit
(5) to me or was it -- actually you don't need to break it
(6) down for me. Was it broken down in any more detail than
(7) that in your conversation?
(8) A. No. Rhino would supply the mans and his
(9) equipment. Rhino -- Gerry would be picking up some of
(10) our mans in his payroll. What else? Rhino would be doing
(11) the administration work with the submittals. Rhino
(12) would assist him in helping with the submittals.
(13) Q. Okay. Anything else that you can recall?
(14) A. On that date, no, but we had -- we have a lot
(15) of discussions on February, too.
(16) Q. Okay.
(17) A. The same thing but we add on, like, the phone
(18) lines, cellular phones, gas cards.
(19) Q. Okay. That's all right. We'll get to the
(20) February, 2000 discussion. You talked about
(21) reimbursement for direct and indirect costs?
(22) A. Right.
(23) Q. Okay. Would these have to be project-related
(24) costs?
(25) A. Would be project-related costs.

## Page 102

(1) Q. Okay. And you weren't any more detailed on
(2) what those costs were?
(3) A. No, just was the costs of the job.
(4) Q. Okay. So, if Rhino was working on other jobs
(5) and had to expend overhead for other jobs, that was
(6) going to be separated or allocated between this Navy
(7) contract and any other jobs Rhino was working on?
(8) A. Yeah. Well, the overhead would be lower.
(9) (Discussion off the record.)
(10) Q. (BY MR. CLARK) Okay. Let's -- let's talk
(11) about February, 2000. So, you had another conversation
(12) over the phone with Mr. Lam --
(13) A. Yeah.
(14) Q. -- concerning the subcontract?
(15) A. Yes. He asked if we were -- since the Hawpe
(16) case was going, he said, hey, I got my first task -- two
(17) task orders. He faxed it over, and we discussed it
(18) for -- I don't know how much hours, but we discussed the
(19) same agreement we had, the same conversation we had.
(20) And I told him that he -- you know, whatever it would
(21) take to do the job, we would do it.
(22) Q. I'm sorry. What does that mean?
(23) A. Whatever it would -- we discussed the same
(24) thing we discussed on September where he would be
(25) picking up some of our mans in his payroll -- some or

## Page 103

(1) all of it. We discussed -- what else we -- we discussed
(2) everything was in September and --
(3) Q. And you said that that's still a good deal?
(4) A. Yeah.
(5) Q. Okay. Did you add new terms, any
(6) understanding?
(7) A. Yes.
(8) Q. Okay. What?
(9) A. We was going to support -- give him a
(10) secretary in the office. Also --
(11) Q. I'm sorry. This is a --
(12) A. Yeah, a secretary for the -- for that
(13) project, that specific project.
(14) Q. This is on BioGenesis' payroll?
(15) A. Yeah. No, on -- for that contract. We would
(16) add our own secretary for that contract.
(17) Q. Rhino would on?
(18) A. Yeah. Also, I asked him straight out -- I
(19) said, "Hey, after this job done, all the workers come
(20) back?"
(21) He said "yes," because some of the workers
(22) was going to be under his payroll; and Rhino wanted --
(23) wants it back after the contract is done. And we -- I
(24) was talking about the five-year contract, going to five
(25) years.

## Page 104

(1) Q. Okay. In September, '99, did you talk about
(2) the other option years?
(3) A. We -- actually we talked about the whole
(4) contract -- whatever the contract, the $14 million, we
(5) talked about.
(6) Q. So, you believed back in September, '99 that
(7) your terms of agreement here were going to include all
(8) the option years on the contract also?
(9) A. Yes.
(10) Q. You know, one thing that you didn't mention
(11) on -- about your September, '99 meeting is how were the
(12) profits going to be divided?
(13) A. Oh, whatever the cost -- indirect costs for
(14) the job, his overhead, my overhead, the writing of the
(15) job.
(16) Q. Okay. And then your leftover were profits?
(17) A. Yeah.
(18) Q. And how was that going to be allocated?
(19) A. Split down the middle, 50/50.
(20) Q. Okay. So, on February, 2000, you had this
(21) discussion and discussed the same terms?
(22) A. Yeah. I think so in September, also, he
(23) would use our -- we had our vendors accounts up there
(24) already established. We had our credit line already
(25) established, and he would -- he would be supporting --

Case 1:02-cv-00008 Document 277 Filed 12/15/2003 Page 34 of 117

xMAX(39/39)

## Page 153

(1) quality control and safety plan approved. He said he
(2) have to call the contracting office. He need help.
(3) Q. Okay. When was that?
(4) A. I don't know. It was before the contract, I
(5) guess.
(6) Q. Okay. I'm not talking about before June.
(7) I'm talking about after June, 2000.
(8) A. After June, 2000? After June?
(9) Q. Yes.
(10) A. I don't know.
(11) Q. Okay.
(12) A. After June.
(13) Q. Aside from work on delivery orders 1 and 2,
(14) what other delivery orders did Rhino start working on?
(15) A. What you mean "working on," mens or --
(16) Q. Your men, exactly.
(17) A. Physical work or submittals and
(18) documentation?
(19) Q. Physical work.
(20) A. I would say all of them. Because Gerry asked
(21) me to turn back my mans back to us after the contract.
(22) We had an agreement of 50/50 split.
(23) Q. Okay. All of them -- they're 18 delivery
(24) orders we're talking about? Is that it?
(25) A. Yeah, after -- after -- yeah, 18 delivery

## Page 154

(1) orders.
(2) Q. Okay. So, it's your position that Rhino
(3) started working on all 18 delivery orders?
(4) A. My -- my mans did. My equipment did.
(5) Q. Okay. Your men did. These are men on
(6) Rhino's payroll?
(7) A. No, on Gerry's payroll.
(8) Q. Well, how were they your men?
(9) A. Because I have an agreement before that the
(10) mans going be turned over.
(11) Q. Well --
(12) A. I -- that's -- shucks.
(13) Q. Okay. Let me rephrase. I'm sorry. Let me
(14) rephrase. Let me the start all over.
(15) A. Okay. Men on Rhino's payroll started working
(16) on other delivery orders other than 1 or 2. Which
(17) delivery orders were those?
(18) A. Good question. I don't know.
(19) Q. Okay. So, later when you said all 18, you're
(20) not talking about men who were employed by Rhino.
(21) You're talking about men who were on BioGenesis'
(22) payroll; is that correct?
(23) A. After he took the office, yeah, in
(24) November -- December, yes.
(25) Q. So, after December of 2000, as far as you

## Page 155

(1) know, all of the work that was being done on the Navy
(2) contract were being done by men employed on the payroll
(3) of BioGenesis?
(4) A. On the payroll by BioGenesis. It was in
(5) November if you're talking about on the payroll of
(6) BioGenesis.
(7) Q. Okay. So, from November, 2000, the only
(8) employees working on the Navy contracts were employees
(9) on BioGenesis' payroll? Is that what you're saying?
(10) A. I guess so, yes.
(11) Q. Okay.
(12) A. And, also, Al Garthe was working on our
(13) payroll.
(14) A. Our agreement was that he would be taking over
(15) the payroll.
(16) Q. So, your --
(17) A. And that was in November when we talked to
(18) Gerry Lam about -- I think so the 2nd or 3rd that
(19) Rhino's -- he was going to be put on the payroll because
(20) he didn't have the money to support the contract.
(21) That's the part that -- we add the payroll money.
(22) A. Yeah, we -- Al Garthe was on our payroll.
(23) Q. So, you're saying Al Garthe is the exception?
(24) A. Yeah.
(25) Q. Again, I'm talking about employees on

## Page 156

(1) Rhino's payroll; and now, let's talk about the employees
(2) other than Al Garthe who we've listed as an exception.
(3) When did the employees on Rhino's payroll stop working
(4) on the Navy contract physically?
(5) A. Physically stop working? We ran out of
(6) materials in September, October. We ran out of
(7) materials, never had no materials, waiting for the
(8) materials on job site. November 1st to stop -- we
(9) started mobilizing some safety equipment and things like
(10) that, as far as I recall.
(11) Q. Okay. So, this is 2000?
(12) A. Yeah.
(13) Q. So, when you ran out of materials in
(14) September or October of 2000, you're saying that is
(15) when your employees physically stopped working on the
(16) Navy contracts?
(17) A. The employees, yes.
(18) Q. And, I'm sorry, you said something about
(19) mobilizing in November. Could you say that again?
(20) A. We mobilized -- we had a couple guys doing
(21) just mobilization. They set up safety equipment, setted
(22) up the documentation.
(23) Q. Set up safety equipment on the premises?
(24) A. Yes.
(25) Q. On the job site?

**Page 157**

(1) A. Uh-huh.
(2) Q. That was in November, 2000?
(3) A. Yes.
(4) Q. And then you also said doing documentation?
(5) A. We was doing all the MSD data sheet, the --
(6) Q. I'm sorry.
(7) A. MSD data sheets.
(8) Q. MSD?
(9) A. MSD data sheets, hazardous analysis and
(10) scheduling.
(11) Q. And that continued until November, 2000?
(12) A. Yes.
(13) Q. Did it continue after November, 2000?
(14) A. No, that's when Gerry took over the company.
(15) Q. Okay. Through October, 2000, was Richard
(16) Avilla still the project manager for Rhino; is that
(17) correct?
(18) A. Yeah, on couple projects, yes.
(19) Q. Now, earlier we were looking at Exhibit 1,
(20) the draft subcontract; and there was a provision in
(21) there that said that you would invoice Rhino — I'm
(22) sorry -- Rhino would invoice BioGenesis on a monthly
(23) basis. Do you remember that provision?
(24) A. On a monthly basis?
(25) Q. Yes. Do you remember that provision? Do we

**Page 158**

(1) need to go back and look at that? Referring back to
(2) Exhibit 1, Section 4, which was "Payments," go down to
(3) the third paragraph.
(4) A. Yeah.
(5) Q. Okay. It says -- and I'm going down ellipse
(6) some of the part -- some of the sentence; but it says
(7) partial payments will be made to the subcontractor
(8) provided the subcontractor has submitted a subcontract
(9) request for payment to the contractor's office on or
(10) before the 25th day of each month. And you said that
(11) monthly invoicing was a standard subcontract term?
(12) A. Yes.
(13) Q. Okay. From the time the Rhino started physically
(14) working on the project in July, 2000, did it send any
(15) monthly invoices to BioGenesis? Did it send one in
(16) July?
(17) A. In July, I don't recall.
(18) Q. Okay. Did it send one in August of 2000?
(19) A. I don't recall.
(20) Q. Did it send one in September of 2000?
(21) A. I don't recall.
(22) Q. Okay. Did it send one in October of 2000?
(23) A. I don't recall.
(24) Q. And what about November, 2000?
(25) A. I don't recall.

**Page 159**

(1) Q. Okay. Aside from this written subcontract,
(2) Exhibit 1, were there any other contract documents --
(3) actually, you have to excuse me. I keep referring to
(4) this as the only one because it's the only one I've
(5) seen.
(6) Aside from a written subcontract agreement in
(7) whatever version we may be talking about, were there any
(8) other written contracts between BioGenesis and Rhino
(9) with respect to this Navy contract?
(10) MR. CORTES: Written contracts or drafts?
(11) A. Or drafts.
(12) Q. (BY MR. CLARK) Written contracts, executed,
(13) signed written contracts. For example, was there an
(14) equipment lease contract?
(15) A. Equipment lease contract?
(16) Q. Yes.
(17) A. For Rhino for our equipment?
(18) Q. Yes.
(19) A. For our equipment?
(20) Q. Yes.
(21) A. I don't know whether we had one. I don't
(22) know whether we had one. I don't recall any.
(23) MR. CLARK: Okay. Could I get that marked,
(24) please?
(25) (O'Connell Exhibit No. 2 marked.)

**Page 160**

(1) Q. (BY MR. CLARK) I'm handing to you
(2) Exhibit No. 2.
(3) MR. CORTES: Are you going to provide us
(4) copies of these exhibits today?
(5) MR. CLARK: Yeah. Actually, we can give you
(6) these here when we're done.
(7) MR. CORTES: Oh, I can look on with him now,
(8) if you want.
(9) MR. TOM: Exhibit 3? Which one is this one.
(10) 2?
(11) MR. CLARK: No. 2.
(12) MR. TOM: Yes.
(13) (The witness and Mr. Cortes confer.)
(14) MR. CORTES: Did we produce this to you
(15) inadvertently?
(16) MR. CLARK: It was produced. I don't know if
(17) it was inadvertent.
(18) MR. CORTES: Well, it was. This is a
(19) privileged document on our privilege log; and we would
(20) like it returned, all copies.
(21) MR. CLARK: Well, it was -- it was produced
(22) during discovery. I believe that the privilege has been
(23) waived.
(24) MR. CORTES: It was inadvertently produced
(25) during discovery. So, we would like it returned. That

**Page 173**

(1) Q. Okay. As of the date purported to be on this
(2) invoice, November 14, 2000, as of that date, would that
(3) be an accurate assessment of how much of the work was
(4) completed on those four particular delivery orders?
(5) A. I don't recall.
(6) Q. Okay. You do recall, though, you stated
(7) earlier that Rhino did complete delivery orders 1 and 2,
(8) correct?
(9) A. Uh-huh.
(10) Q. Okay. Do you know if Rhino completed
(11) delivery order No. 3?
(12) A. No, I don't know.
(13) Q. Okay. Do you know if Rhino completed
(14) delivery order No. 4?
(15) A. No, I don't know. That's in Guam.
(16) Q. Okay. Aside from these four delivery orders,
(17) do you know of any other delivery orders that Rhino
(18) started working on?
(19) A. In fact, we're doing all the delivery orders
(20) according to plan -- not quality but the hazard analysis
(21) plan, initial phases.
(22) Q. Okay. Can you -- let me ask --
(23) A. We weren't physical on the job.
(24) Q. You weren't physically on the job?
(25) A. Yeah, that's what you're talking about.

**Page 174**

(1) Q. Well, actually, no. I would like to follow up
(2) on what you're talking about as far as the hazard
(3) analysis and --
(4) A. Yeah, we submitted that. We --
(5) Q. Okay. For all 18 delivery orders?
(6) A. I think we did, yes.
(7) Q. Okay.
(8) A. And also the -- yes, we did, I think.
(9) Q. Okay. And when did you last submit those
(10) documents
(11) A. Scheduling -- I think it was in -- if I not
(12) mistaken, in late -- I would say in November, late part
(13) November.
(14) Q. 2000?
(15) A. Yeah, I think late part November. I have to
(16) go look at the books.
(17) Q. Okay. So, to the best of your knowledge?
(18) A. To the best of my knowledge.
(19) Q. Okay. And when did Rhino submit
(20) any other hazardous analysis or quality control plans?
(21) A. No, I don't think so --
(22) Q. Okay.
(23) A. -- to the best of my knowledge.
(24) Q. Okay. So, when you say Rhino worked on all
(25) 18 delivery orders, by working on the delivery orders,

**Page 175**

(1) you're including the hazardous analysis and the quality
(2) control plans that you submitted on November, 2000?
(3) A. Yes.
(4) Q. Okay. Aside from the documentation and after
(5) November, 2000, did Rhino work on any of the other
(6) delivery orders other than 1, 2, 3 and 4?
(7) A. You mean physically working or --
(8) Q. Or document.
(9) A. I'm -- me and Gerry had an agreement of the
(10) contract, and I believe we did submit all the
(11) submittals. I wasn't in Guam, but -- I know it was
(12) submitted for us.
(13) Q. Okay. I'm sorry. You submitted those -- you
(14) said you last submitted those in November of 2000.
(15) After November, 2000, did you submit any other
(16) documents? And I think you said no?
(17) A. After November, 2 -- yeah, I -- I don't have
(18) control of the company.
(19) Q. Okay. So, my question is: After November,
(20) 2000, what other work, document work or physical on-site
(21) work, did Rhino do on the Navy contract?
(22) A. I don't know. I don't know if we did any
(23) work. He took -- you know....
(24) Q. Is it possible you didn't -- that Rhino
(25) didn't do any work?

**Page 176**

(1) A. You mean pay for all labors and everything?
(2) Q. No, I mean work on the project.
(3) A. No. After December -- after November, 2000,
(4) Rhino did not work on the project.
(5) Q. Okay. Thank you.
(6) A. But either December -- we supplied a lot of equipment
(7) still yet on the job --
(8) Q. Okay.
(9) A. -- that they took out of the Matson
(10) containers, also, vehicles all the way to the -- like,
(11) the last vehicle we brought it back was January, 2002,
(12) black Nissan where BioGenesis -- one black Nissan
(13) turning back for one of BioGenesis' employees, I guess
(14) you call it.
(15) Q. Okay. We'll get to those. Can you turn to
(16) the next page on Exhibit 4, Page 97. Do you see
(17) where the number there is at the top is 106,765.53?
(18) A. Uh-huh.
(19) Q. Okay. As of the date of this invoice, which
(20) is November 14, 2000, do you believe that that was the
(21) amount owed by BioGenesis for the delivery orders?
(22) A. I don't know.
(23) Q. Okay.
(24) MR. CORTES: Which delivery orders are you
(25) speaking of, the ones listed on the invoice?

Case 1:02-cv-00008 Document 277 Filed 12/15/2003 Page 38 of 117

# DEPOSITION OF GERALD N.Y.C. LAM TAKEN ON 2-19-03

***Page 1 to Page 164***

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

RALPH ROSENBERG COURT REPORTERS, INC.
1001 Bishop Street
2460 Pacific Tower
Honolulu, HI 96813
Phone: (808) 524-2090
FAX: (808) 524-2596

Exhibit
D

## Page 125

(1) just assuming that George was a Rhino official because
(2) he was using their e-mail system?
(3) A. Correct.
(4) Q. And that he was associated with -- with --
(5) A. All Star.
(6) Q. what do you call it?
(7) A. Oh, All Star?
(8) Q. (BY MR. CORTES) Yeah.
(9) A. Well, I would hope All Star wasn't involved
(10) in that.
(11) Q. Okay.
(12) A. Which would put a new wrinkle into
(13) everything.
(14) Q. I don't know what the significance is. I'm
(15) just trying to understand this -- what the problem is.
(16) A. Well, the problem is that -- is that where it
(17) is understood and known that there is a business that is
(18) being conducted from a specific location that is
(19) earmarked for that business.
(20) Q. Okay.
(21) A. I don't care if that business, me or
(22) otherwise, is paying rent or is not paying rent, is
(23) behind in rent or not. There is a legal right of
(24) privacy; and if intruded upon, even by a landlord or
(25) even by somebody that wants rent or the like but has

## Page 126

(1) recognized and has allowed that place to be there,
(2) that's a criminal trespass.
(3) Q. That would be true of a possessory interest
(4) in real estate, correct?
(5) A. I am not talking real estate law.
(6) Q. Well, trespass is real estate law. You have
(7) to have -- you have to be the --
(8) A. Excuse me. I'm talking about criminal law.
(9) Q. Yeah, criminal trespass, you are trespassing
(10) against --
(11) A. It's not real estate law. It's criminal law.
(12) Q. I know it's criminal law, but what do you
(13) trespass upon? You trespass upon --
(14) MR. CLARK: Okay. Let me object. Let's just
(15) get on --
(16) A. Well --
(17) Q. (BY MR. CORTES) So, I was just wondering
(18) what was -- my question is -- that was preface to a
(19) question. Is there a written document that supports
(20) your setting aside this space for BioGenesis' use --
(21) exclusive use?
(22) A. No.
(23) Q. Was there at the time of the trespass?
(24) A. I don't know if there was at the time of the
(25) trespass.

## Page 127

(1) Q. You don't know whether there was a written
(2) document giving BioGenesis exclusive domain over that
(3) area?
(4) A. Correct.
(5) Q. Okay.
(6) A. I don't even know if there's a written
(7) document giving Rhino exclusive domain over the area
(8) either.
(9) Q. Okay. We'll move on then.
(10) A. I want to make note for the record that a
(11) murder on land is real estate law.
(12) Q. I didn't know that.
(13) A. Well, I mean, it's on land.
(14) Q. So, next question, what payments did Rhino
(15) withhold to supplier of said task orders? Second to
(16) the last -- second to -- the third last line of Page 1.
(17) A. I'm sorry. Again, where is this?
(18) MR. CLARK: Right here (indicating).
(19) A. I was alerted initially down to Guam --
(20) my attention focusing to Guam, I think, was that I
(21) received some phone calls from suppliers; and I got a
(22) phone call, I think, from HPI -- I think that's who it
(23) was. They are a supplier of materials in San Francisco.
(24) This was either in late August or September
(25) and they were asking for payment and I have no idea what

## Page 128

(1) they were talking about. And I think the person who I
(2) spoke to said that you promised to make payment and that
(3) it was late. I have no idea what they were talking
(4) about. He said it was for Guam; and I said, "What's in
(5) Guam?" And he said they had sent materials and
(6) supplies over there.
(7) And so, speaking with them further, I think
(8) they did send us an invoice or copy of an invoice; and
(9) that's when I had called down and asked Guam what was
(10) going on and did we have supplies -- if there were
(11) supplies down there.
(12) And I was being threatened by liens by the
(13) supplier which would have really made it look awful to
(14) the Navy. And so, I ended up having to agree with the
(15) supplier to pay for those supplies that he said he sent
(16) to Guam; and I had to go follow up on it.
(17) this is that without payments to suppliers of task
(18) orders, that it was this; and there may have been
(19) others.
(20) Q. So, this guy -- you believed the suppliers
(21) that they actually had sent supplies?
(22) A. Well, yeah, it seemed like they had. He sent
(23) me the invoices and --
(24) Q. What kind of supplies were they?

## Page 129

(1) A. Probably something -- roofing supplies of
(2) some sort.
(3) Q. And do you have any reason to doubt that
(4) those were used on the contract?
(5) A. I hope they were used on the contract because
(6) I paid for them.
(7) Q. All right. You paid for those; and then you
(8) got paid for the contract as well, right?
(9) A. Well, by the Navy?
(10) Q. Right.
(11) A. Sure. I didn't order those. I just paid for
(12) them.
(13) Q. All right. Rhino ordered them for you.
(14) correct?
(15) A. Rhino ordered them for Rhino.
(16) Q. But Rhino didn't make any money off the deal,
(17) did they?
(18) MR. CLARK: Objection. I don't think he
(19) knows that. I think that's speculative, and it's
(20) starting -- we're getting argumentative now.
(21) MR. CORTES: Well -- okay. I don't mean to
(22) be argumentative, but I just am curious.
(23) Q. (BY MR. CORTES) What did you -- did you pay
(24) Rhino for -- on this contract?
(25) A. Nothing, as far as I know.

## Page 130

(1) MR. CLARK: I'm sorry. Can we clarify?
(2) There was a -- actually the letter starts out the
(3) "explanation concerning the funds from BioGenesis
(4) Pacific wired to your Guam account."
(5) A. I'm sorry. Well, there was 25,000 that was
(6) sent over.
(7) Q. (BY MR. CORTES) And what that account was that --
(8) that was sent to the Guam account of --
(9) A. Correct.
(10) Q. -- Biogenesis and --
(11) A. Yes.
(12) Q. Of Rhino? And who writes the checks on the
(13) Guam account at the time that payment was sent?
(14) A. You're asking me?
(15) Q. You're asking me who writes the checks on
(16) Rhino's account?
(17) A. I'm just wondering -- okay. At the time you
(18) made that payment -- when did you make that payment?
(19) Q. Let's just take it that way.
(20) A. It probably would have been sometime in
(21) around November or the like, I would imagine. I mean,
(22) give or take, but in 2000.
(23) Q. November, 2000?
(24) A. Around there, if I can remember.

## Page 131

(1) Q. Maybe late November, 2000?
(2) A. (Witness nods head.)
(3) Q. So, you're complaining here that Rhino did
(4) not pay for the materials that were used on the task --
(5) said task orders, correct?
(6) A. Why are you --
(7) Q. Without -- you're saying that you're
(8) complaining that Rhino withheld its payments to
(9) suppliers of said task orders?
(10) A. Rhino withheld its payments to suppliers of
(11) said task orders, correct. That's what I wrote.
(12) Q. So -- and you're complaining about that.
(13) correct? You're holding that against Rhino; is that
(14) correct?
(15) A. Yeah.
(16) Q. How did Rhino impede BioGenesis' ability to
(17) access Navy project sites?
(18) A. Well, from what I can remember, I think the
(19) passes or whatever that was used for them to access the
(20) BioGenesis sites were either kept or taken so that
(21) anyone that would have been BioGenesis wouldn't have
(22) access to those passes. They couldn't get onto the
(23) base. That's all I can remember about this.
(24) Q. But Richard Avilla could access the base?
(25) A. I don't know if he could or not. I mean,

## Page 132

(1) I -- thinking back, I'm not -- I don't know.
(2) Q. Well, who is it that could not access the
(3) base?
(4) A. Well, it would be the workers -- whatever
(5) workers that I would have to have to go in and to go
(6) access the base for work.
(7) Q. Didn't you get those passes for Richard
(8) Avila and Al Gaethe and Tarko Tanisio and Aaron
(9) Williams by writing to Jean Tarlton in February?
(10) A. I -- yes, prob -- yes.
(11) Q. So, did you have any reason to think that
(12) those four people didn't have those passes anymore?
(13) A. Well, I think it takes more than four people
(14) to work on the project if there's any work going on. I
(15) mean, do you think that these four people were doing all
(16) the work on the projects?
(17) Q. Those passes came from your effort, correct?
(18) A. Those four passes.
(19) Q. But what was to stop you from contacting the
(20) contracting officer and requesting any passes you needed
(21) for your employees?
(22) A. Which I would have to and do that, I guess;
(23) and it could have taken a lot of time. And it's
(24) probably what had to be done. That's probably what we
(25) did.

## Page 133

1 Again, I ask you, is it your --
2 question that, therefore, these four passes was all that
3 was necessary to doing any kind of work with Rhino
4 claimed it was doing? I'd like to understand that.
5 Q. I don't understand that.
6 Now, on Page 2, first complete sentence, it
7 says that "Mr. Michael Danforth of Rhino compelled the
8 exclusive five-year subcontract." Which five-year
9 subcontract is that?
10 A. All of the forms of the subcontracts that he
11 was putting before me that he had wanted me to execute.
12 Q. What is that sentence -- can you explain
13 better to me the sentence in the middle of the second --
14 the first full paragraph on Page 2? It says, "Mr. Allen
15 next promised to release Rhino's personnel as soon as
16 $25,000 was received in Guam."
17 A. Yes. I had -- I had discussions with
18 Mr. Danforth during that previous time when he first
19 came to my office and requested that I sign a five-year
20 subcontract with Rhino and told me that Rhino's workers
21 would stop work on all their work and I would suffer a
22 lot of liquidated damages and, unless I wanted that not
23 to occur, that I would have to negotiate and sign a
24 subcontract for five years with Rhino.
25 And as the matters went on, I had told

## Page 134

1 Michael Danforth that I would agree to allow Rhino to go
2 forward on the projects on just those task orders that
3 they had been working on if he can show me which task
4 orders they're working on and only those task orders
5 they're working on.
6 And because George was complaining that they
7 had already spent money on materials and supplies and
8 actual materials that were used on the project, I had
9 told George and Michael Danforth -- and George seemed to
10 be going back and forth as well as Mr. Danforth -- that
11 I would be willing to pay for -- at the moment, for just
12 the actual materials that were used on the project
13 because they were materials -- and if they would give me
14 an accounting -- a full accounting of the specific items
15 in inventory that were used and actually used as well as
16 Richard Avilla's $7,500 that I had agreed with Michael
17 O'Connell that I would pay.
18 And at this time it was a real difficult time
19 because I was being pressured by Mr. Danforth. I was
20 being threatened by Mr. Danforth of BioGenesis failing
21 because of liquidated damages and that the only solution
22 to the problem was to get Rhino back up there because I
23 had nobody down there that could do that work. I
24 couldn't get on because the base passes -- it would take
25 a week or two weeks to process; and that that would be

## Page 135

1 deadly, that it took six weeks for materials to be sent
2 and to be arriving in Guam -- so, that had to be
3 arranged right away -- and that if I didn't get this
4 $25,000 over to them, that I wouldn't be able to do
5 anything.
6 Q. So, basically --
7 A. Basically I felt like I was being held
8 hostage.
9 Q. I was just going to say, it sounds like
10 Danforth is holding you hostage -- he's having a work
11 stoppage is what you're saying; and if you don't sign
12 the whole five-year contract, we're going to stop on the
13 work we're doing right now?
14 A. That is Danforth's representation. That was
15 his whole tact with me.
16 When I called up Michael O'Connell to ask and
17 to try and speak to him, he referred me right back to
18 Mr. Danforth telling me that he speaks for Rhino and
19 it's all in his hands and he's going to handle
20 everything.
21 But Mr. Danforth was pressuring and he was --
22 he was, in a very, very expert way, extorting and
23 holding me hostage in that regard. I'm not down in
24 Guam. I've never been to Guam. It was a surprise to me
25 that these matters were occurring. I had recently found

## Page 136

1 out. I had found out through complaints from suppliers
2 that I didn't really even know existed. I have no
3 financing in place. I wasn't even prepared for that. I
4 hadn't prepared for the work.
5 I had only understood that I had agreed to
6 have Richard go down, sign on as agent and be there as
7 agent so that Rhino would be able to go on site and go
8 look and figure out things and get back to me and give
9 me a price, give me the proposal or whatever and give me
10 the cost and fill all the required documents and
11 deliverables that with me so that I can answer on the Navy
12 and then go from there but that work was going on and
13 the like.
14 I had Mr. Danforth in my office showing me
15 all of these things, showing me a list of potential
16 liquidated damages in the hundreds of thousands of
17 dollars that would take place probably by November or at
18 least by end of December, January, and told me for me to
19 take.
20 five-year subcontract like a turnkey subcontract handing
21 everything over to Rhino. It was a bit much for me to
22 take.
23 Q. But under that subcontract wouldn't you still
24 have had discretion over what work got accepted? I
25 mean, couldn't you just -- when the base passes about
the CLINS, didn't you have the ability to say "We won't

## Page 137

(1) take any more CLINS after this" and then just kind of
(2) phase out the whole project? I see, but it would impede
(3) your ability to hire another subcontractor other than
(4) Rhino, correct?
(5) A. That's correct.
(6) Q. Would — under the agreement that you were —
(7) that Danforth was putting forward, would BioGenesis be
(8) able to do the work with no subcontractor?
(9) A. No.
(10) Q. So, you were forced to use Rhino as a
(11) subcontractor?
(12) A. Well, Rhino was the exclusive subcontractor
(13) for the whole project.
(14) Q. So, it was not only exclusive as to — I'm
(15) sorry. You have to educate me. I'm sorry. It was not
(16) only exclusive as to BioGenesis' right to use any other
(17) subcontractor, but it also excluded BioGenesis from
(18) doing the work itself; is that correct?
(19) A. Well, that's what I understood it to be
(20) because of the nature of the negotiations and the terms
(21) of which you presented to me that task orders, as would
(22) be asked by the Navy, would have to be presented to
(23) Rhino, and Rhino would have exclusive administration
(24) over them with my being able to have the relevant
(25) project positions and the like which is really program

## Page 138

(1) management.
(2) Q. So, Danforth was basically threatening you
(3) with — if I understand you correctly you were if you
(4) didn't — that he was going to — he was saying we have
(5) this work stoppage and this is going to stop performing
(6) unless you say that you can never use any other
(7) subcontractor under this agreement or perform the
(8) agreement with your own employees; is that correct?
(9) A. What he was putting before me is the kind of
(10) subcontract legal document —
(11) Q. Uh-huh.
(12) A. — that if I went out to take on another
(13) subcontractor, then I could probably be — I mean, look
(14) at this. Can you imagine?
(15) Q. You would be in breach if you went —
(16) A. Or at least Rhino would think so. It only
(17) takes a little bitty iota for Rhino to think that
(18) somebody is in breach.
(19) Q. I'm not going to respond to that.
(20) Have you ever had an attorney/client
(21) relationship with Al Fred Ganther?
(22) A. No.
(23) (Recess from 3:55 p.m. to 4:01 p.m.)
(24) (BY MR. CORTES) So, aside from Richard
(25) Avilla, what other employees did BioGenesis hire to work

## Page 139

(1) in Guam in the year 2000?
(2) A. I don't — I have to go look.
(3) Q. Might there be none?
(4) A. No, I think we did hire at least in --
(5) maybe November and December, 2000.
(6) Q. Approximately how many would that be?
(7) A. I don't know. I left it up to
(8) Richard to find what the suitable employment would need
(9) to be.
(10) Q. So, we can ask Richard?
(11) A. Yeah.
(12) Q. Okay.
(13) A. Or I can find out for you from our records.
(14) I can give it to you --
(15) MR. CORTES: We haven't done any document
(16) requests from you guys?
(17) MR. CLARK: I don't think so, not yet.
(18) Q. (BY MR. CORTES) Okay. Prior to
(19) December 1st, 2000, what equipment did BioGenesis have
(20) in Guam that was suitable for performing the Navy
(21) contract, the roofing contract?
(22) A. Prior to December 1st?
(23) Q. Yeah, the day you hired Richard.
(24) A. I don't know. I would say prior to September
(25) or so, we probably didn't have anything. November, I'm

## Page 140

(1) not sure if we picked up anything, but I'm safe to say I
(2) feel confident that September or prior to that I don't
(3) believe BioGenesis had anything.
(4) Q. All right. What other legal proceedings, if
(5) any, have you been involved in where you've given
(6) testimony?
(7) A. Where I've given testimony?
(8) Q. In a deposition or at trial.
(9) A. In a trial?
(10) Q. Either one, testimony under oath in a legal
(11) proceeding. Start with Hawaii if there are any.
(12) A. Probably Hunsaker versus BioGenesis.
(13) Q. What court was that in?
(14) A. That was in Circuit Court.
(15) Q. Circuit Court, a Hawaii State Court?
(16) A. Yes, First Circuit.
(17) Q. I'm not familiar with the system here. First
(18) Circuit. Do you recall how to spell Hunsaker?
(19) A. H-U-N-S-A-K-E-R.
(20) Q. And what was the approximate time frame for
(21) that case?
(22) A. Oh, the last — within the last couple years.
(23) Q. What sort of case was that?
(24) A. That was assumpsit.
(25) Q. And did you testify at a deposition in that

Case 1:02-cv-00008    Document 277    Filed 12/15/2003    Page 43 of 117

# ORDER FOR SUPPLIES OR SERVICES

(Contra... submit four copies of invoice.)

Form Approved
OMB No. 0704-0187
Expires Aug 31, 1992

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send your completed form to the procurement official identified in Item d.

| 1 CONTRACT/PURCH ORDER NO. | 2 DELIVERY ORDER NO. | 3 DATE OF ORDER | 4 REQUISITION/PURCH REQUEST NO. | 5 CERTIFIED FOR NATIONAL DEFENSE DMS REG 1 |
|---|---|---|---|---|
| N62766-99-D-0425 | 0001 | 5/15/00 | | |

| 6. ISSUED BY | CODE C2766 | 7 ADMINISTERED BY (If other than 6) | CODE |
|---|---|---|---|
| Officer in Charge of Construction | | | |
| NAVFACENGCOM Contracts, Marianas | | | |
| FBC 455, Box 175 | | | |
| FPO AP 96540-2200 | | | |

**8. CONTRACTOR** CODE
BioGenesis Pacific, Inc.
Corporate & Programs Control
1604 Ulualana Place
Kailua, HI 96734
(TEL: 637-9426 Richard Avilla)
NAME AND ADDRESS

**9. FACILITY CODE**

**10. DELIVER TO FOB POINT BY (Date)**
15 JUN 2000

**11. MARK IF BUSINESS IS**
- [ ] SMALL
- [ ] SMALL DISADVANTAGE
- [ ] WOMEN-OWNED

**12 DISCOUNT TERMS**
NET 30

**13. MAIL INVOICES TO**
SEE BLOCK 6

**14. SHIP TO** CODE
● (a)s Contractor

**15 PAYMENT WILL BE MADE BY** CODE
Defense Finance & Accounting Service
Operating Location Oakland, Code FPV
P. O. Box 23870
Oakland, CA 94623-3870

MARK ALL PACKAGES AND PAPERS WITH ORDER NUMBER

**16.**
TYPE OF ORDER
- DELIVERY [X] The delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract
- PURCHASE Reference No. furnish the following on terms specified herein
  ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME

Bio Genesis
NAME OF CONTRACTOR

_Richard Avilla, Contracts_ (signature)
Richard Avilla Contracts
TYPED NAME AND TITLE

5/16
DATE SIGNED

If this box is marked, supplier must sign Acceptance and return the following number of copies.

**17. ACCOUNTING AND APPROPRIATION DATA**

| ITEM NO. | APPROPRIATION SYMBOL AND SUBHEAD | OBJECT CLASS | BUREAU CONT. NO. | SUB-ALLOT | AUTH'N ACCTG ACTY | TRANS TYPE | PROPERTY ACCT'G ACTY | COUN-TRY | COST CODE | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| AA | 1701804.70FA | 250 | 61755 | 0 | 045924 | 2D | 61755 | | 617SS0464M710 | $12,129.10 |

| ITEM NO. 20 | SCHEDULE OF SUPPLIES/SERVICE 21 | QUANTITY ORDERED/ ACCEPTED* | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|

W/R 31973, COMNAVMAR

| 0001 | Roof Repairs at BQ1 through BQ20, COMNAVMAR, Guam | | | | |
| 0002AD | Reseal Construction Joints | 4,080 | LF | $ 0.98 | $ 3,998.40 |
| 0002AE | Replace Expansion Joint Assembly, To 2" Space, Stainless Steel | 140 | LF | $ 13.26 | 1,856.40 |
| 0015AA | Miscellaneous Items: Waterblast Roof Surface in Accordance with Section 07672 | 4,080 | SF | 0.15 | 612.00 |
| 0017AA | Seal Joints and Penetrations 6" Wide | 4,080 | LF | 0.56 | 2,284.80 |
| 0021AA | Re-secure Metal Flashing (Spot Repair) | 858 | SF | 3.69 | 3,136.50 |
| 0022AA | Trim/Dispose Tree Branches Obstructing Roofing Operation | 100 | LF | 2.41 | 241.00 |

24 UNITED STATES OF AMERICA

BY: L. A. GUZMAN
_L.A. Guzman_ (signature)
Contracting Officer; Tel: 339-5120
guzmana@pwcguam.navy.mil

If quantity accepted by the Government is same as quantity ordered, indicate by X. If different, enter actual quantity accepted below quantity ordered and encircle.

| 25. TOTAL | $ 12,129.10 |
|---|---|

26. QUANTITY IN COLUMN 20 HAS BEEN
- [ ] INSPECTED
- [ ] RECEIVED
- [ ] ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED

27 SHIP NO
28 D. O. VOUCHER NO

29. DIFFERENCES

30.
INITIALS

31 PAYMENT
- [ ] PARTIAL
- [ ] FINAL

32. PAID BY

33. AMOUNT VERIFIED CORRECT FOR

34. CHECK NUMBER

35. BILL OF LADING NO.

36. I certify this account is correct and proper for payment.
DATE          SIGNATURE AND TITLE OF CERTIFYING OFFICER

31 PAYMENT
- [ ] COMPLETE
- [ ] PARTIAL
- [ ] FINAL

DATE          SIGNATURE OF OR AUTHORIZED GOVERNMENT REPRESENTATIVE

| 37. RECEIVED AT | 38. RECEIVED BY | 39. DATE RECEIVED | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |
|---|---|---|---|---|---|

DD Form 1155 (BPT), MAY 90    Previous editions are obsolete    S/N 0102-LF-011-4700

Exhibit 3
E
ENCLOSURE 10

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE: C — PAGE 1 OF 2 PAGES

2. AMENDMENT/MODIFICATION NO.: Task Order No. 00010
3. EFFECTIVE DATE: SEE BLOCK 16C
4. REQUISITION/PURCHASE REQ. NO.: Work Request No. 31973
5. PROJECT NO. (If applicable):

6. ISSUED BY — CODE: 62766
Officer in Charge of Construction
NAVFACENGCOM Contracts, Marianas
PSC 455, Box 175 FPO AP 96540-2200

7. ADMINISTERED BY (If other than Item 6) — CODE:

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)
BioGenesis Pacific, Inc.
Corporate & Programs Control
1634 Ulupalana Place
Kailua, HI 96734
(TEL: 637-9428 Richard Avila)

9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (SEE ITEM 11)
X 10A. MODIFICATION OF CONTRACT/ORDER NO.: N62766-99-D-0425 / T.O 0001
10B. DATED (SEE ITEM 13): 15 May 2000

CODE — FACILITY CODE

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ___ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)
N/A

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

X C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
FAR Clause 52.249-10 DEFAULT (FIXED PRICE CONSTRUCTION) (APR 1984)

D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 2 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

CONTRACT N62766-99-D-0425, ROOFING SYSTEM INSTALLATION AND REPAIR, COMNAVMARIANAS, GUAM, M.I. / Task Order 0001, Roof System Installation and Repairs at BQ1 through BQ20, COMNAVMARIANAS, Guam

(CONTINUED ON PAGE 2 OF 2)

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print): Richard Avila Operation Manager
16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print): DORIS R. CASTRO, Contracting Officer

15B. CONTRACTOR/OFFEROR: Richard Avila (Signature of person authorized to sign)
15C. DATE SIGNED: 8/8/00
16B. UNITED STATES OF AMERICA BY: Doris R. Castro (Signature of Contracting Officer)
16C. DATE SIGNED: 09 AUG 00

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE
30-105
Computer Generated
STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

(a) The purpose of this modification is for time extension only. The completion date is extended 90 calendar days from 15 June 2000 to 13 September 2000, due to Government delay.

**TIME: 90 CALENDAR DAYS**

(b) Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for any time and money and for any and all costs, impact, effect, and for delays and disruptions arising out of, or related to, the work as herein revised.

SUBMIT INVOICES TO:   SAME AS BLOCK 6

PAYMENT WILL BE MADE BY: DEFENSE FINANCE AND ACCOUNTING SERVICE
OPERATION LOCATION OAKLAND
ATTN: CODE FPV
P.O. BOX 182870
OAKLAND, CA 94623-3870

CHANGE ORDER CODE:   TIME

```
                                                        01DEC07 19:22:12
1 OF 2                          VIEW INVOICE                    H18K7V31
USER CODE        : P
FUND USAGE NUM: 277484     CNT/NSD NUM: N6276699D0425     D.O.NUM: 0001
CONTR/INV NUM : B69801-01-A        CNT AWD CODE: E     INVOICE NUM: 1
==========================================================================
CONTRACTOR NAME: BIOGENESIS PACIFIC, INC.
PAYEE NAME: BIOGENESIS PACIFIC, INC.           TIN              : 990307736
            CORPORATE & PROGRAMS CONTROL       IRS 1099 IDR     : C
& ADDRESS   1604 ULUALANA PLACE
            KAILUA             HI US 96734
DISTRIBUTION TYPE   : 2   1)AUTO DIST 2)BY ACRN   CONTRACTOR INV DATE: 000922
INVOICE PMNT TYPE   : F   INV STATUS      : PAD   INVOICE RECVD  DATE: 000925
PAYMENT AUTHORIZED  : Y   EDA INDICATOR   : Y     MAT/SVC RECVD  DATE: 000922
LATE REASON CODE    :     RESPONSIBLE UIC:        MAT/SVC ACCPTD DATE: 000928
CLAIM/DISAGREE(Y/N): N    PROMPT PMT TERM: 01     DEFECT  RETURN DATE:
CHECK NUM:    6044247     MICROFILM NUM:          CORCTD INV RCVD DTE:
CERTIFIER NME:   D CASTRO                         CONS ACCEPT    DATE:
RECOMMEND PAY AMT:        12,129.00               INVOICE PAID   DATE: 001026
INVOICE    INT AMT:                               INVOICE DUE    DATE: 001028
DISCOUNT PCT/DAYS:                                CNT FINAL RLS  DATE:
PRESS ENTER TO CONTINUE TO NEXT SCREEN, OR PF2 TO EXIT.
PROC: K07 SVC: 4       PF8 - GET NEXT SELECTED INVOICE       PF6 - VIEW D.O.S
```

# ORDER FOR SUPPLIES OR SERVICES

*(Contractor must submit four copies of invoice.)*

Form Approved
OMB No. 0701-0187
Expires Aug 31, 1992

PAGE 1 OF 3

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send your completed form to the procurement official identified in Item 6.

| 1. CONTRACT/PURCH ORDER NO. | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER | 4. REQUISITION/PURCH REQUEST NO. | 5. CERTIFIED FOR NATIONAL DEFENSE UNDER DMS REG 1 |
|---|---|---|---|---|
| N62766-99-D-0435 | 0002 | 29JUNE2000 | S 31036 | |

| 6. ISSUED BY | CODE | C2766 |
|---|---|---|

Officer in Charge of Construction
NAVFACENGCOM Contracts, Marianas
PSC 455, Box 175
FPO AP 96540-2200

| 7. ADMINISTERED BY (If other than 6) | CODE | C2766 |
|---|---|---|

| 8. DELIVERY FOB |
|---|
| DEST |
| OTHER *(See Schedule if other)* |

| 9. CONTRACTOR | CODE | | FACILITY CODE | |
|---|---|---|---|---|

NAME AND ADDRESS
BioGenesis Pacific, Inc.
Corporate & Programs Control
1604 Ulualana Place
Kailua, HI 96734
(TEL: 637-9426 Richard Avilla)

| 10. DELIVER TO FOB POINT (Date) | 11. MARK IF BUSINESS IS |
|---|---|
| 03 AUGUST 2000 | SMALL / SMALL DISADVANTA / WOMEN-OWNED |

| 12. DISCOUNT TERMS |
|---|

| 13. MAIL INVOICES TO | SEE BLOCK 6 |
|---|---|

| 14. SHIP TO | CODE | | 15. PAYMENT WILL MADE BY | CODE |
|---|---|---|---|---|

Defense Finance & Accounting Service
Operating Location Oakland, Code FPV
P. O. Box 23570
Oakland, CA 94623-3870

MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER

| 16. TYPE OF ORDER |
|---|
| DELIVERY — The delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. **X** |
| PURCHASE — Reference your ____. Furnish the following on terms specified herein. |

ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME.

| NAME OF CONTRACTOR | SIGNATURE | TYPED NAME AND TITLE | DATE SIGNED |
|---|---|---|---|

*If this box is marked, supplier must sign Acceptance and return the following number of copies.*

## ACCOUNTING AND APPROPRIATION DATA

| ITEM NO. | APPROPRIATION SYMBOL AND SUBHEAD | OBJECT CLASS | BUREAU CONT. NO. | SUB-ALLOT | AUTHRN ACCTG ACTY | TRANS TYPE | PROPERTY ACCOUNT | COUN-TRY | COST CODE | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| AA | 1701804.70FA | 250 | 61755 | 0 | 61755 | 2D | 045924 | | COM118 | 61755046M590 | $26,445.10 |

| 18. ITEM | 19. SCHEDULE OF SUPPLIES/SERVICE. | 20. QUANTITY ORDERED/ ACCEPTED* | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| 1000 | Roof Repairs to Bldg. 4433, Racquetball Court at Polaris Pt., COMNAVMAR. Guam | | | | |
| 0002AC | Repair Concrete Roof Deck Surface Per Section 03930 and 07920: Grout | 790 | SF | $6.99 | $5,522.10 |
| 0005AC | Install Roof Insulation in Accordance with Section 08220: Tapered Insulation 1/16, Depressed Areas | 6,300 | BF | $1.89 | $11,907.00 |
| 0013AA | Install Roofing System Accessories: Treated Wood Cants, Nailers and Fasteners for Line Items 0006 Through 0012 Above 1/8, 3/4 Per Ft. | 400 | LF | $2.74 | $1,096.00 |
| 0015AA | Miscellaneous Items: Water Blast Roof Surface In Accordance with Section 07572 | 2,200 | SF | $0.15 | $ 330.00 |
| 0017AC | Fluid Applied Roofing Membrane in Accordance with Section 07540: 60 Mils Thick Roof Membrane | 2,200 | SF | $3.45 | $7,590.00 |

*If quantity accepted by the Government is same as quantity ordered, indicate X. If different, enter actual quantity accepted below quantity ordered and encircle.*

| 24. UNITED STATES OF AMERICA | 25. TOTAL | $26,445.10 |
|---|---|---|

BY: BRIAN M. GILIGAN
(671) 339-2365
Contracting Officer
gilliganb@prmcamin.navy.mil

Attached is Statement of Work dated 30 May 2000

| 26. DIFFERENCES |
|---|

| 27. SHIP NO. | 28. D. O. VOUCHER NO. | 29. |
|---|---|---|
| PARTIAL / FINAL | | INITIALS |

| 28. QUANTITY IN COLUMN 20 HAS BEEN | INSPECTED | RECEIVED | ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED |
|---|---|---|---|

| 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |
|---|---|

| 31. PAYMENT | COMPLETE / PARTIAL / FINAL | 34. CHECK NUMBER | 35. BILL OF LADING NO. |
|---|---|---|---|

36. I certify this account is correct and proper for payment.

| SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | DATE |
|---|---|

| SIGNATURE AND TITLE OF CERTIFYING OFFICER | DATE |
|---|---|

| 37. RECEIVED AT | 38. RECEIVED BY | 39. DATE RECEIVED | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. SR VOUCHER NO. |
|---|---|---|---|---|---|

DD Form 1155 (8PT), MAY 90    Previous editions are obsolete    S/N 0102-LF-011-4700

Exhibit F

01DEC07 19:29:50

1 OF 2                          VIEW INVOICE                          H18K7V31
USER CODE        : P
FUND USAGE NUM: 280548        CNT/NSD NUM: N62766990425        D.O.NUM: 0002
CONTR/INV NUM : B69801-02-A        CNT AWD CODE: E        INVOICE NUM: 1
==============================================================================
CONTRACTOR NAME: BIOGENESIS PACIFIC, INC.
PAYER NAME: BIOGENESIS PACIFIC, INC.        TIN : 9903077736        IRS 1099 IDR : C
                                CORPORATE & PROGRAMS CONTROL
& ADDRESS        1604 ULUALANA PLACE
                 KAILUA        HI US 96734
DISTRIBUTION TYPE : 2        1)AUTO DIST 2)BY ACRN        CONTRACTOR INV DATE: 000922
INVOICE PMNT TYPE : F        INV STATUS : PAD        INVOICE RECVD DATE: 000926
PAYMENT AUTHORIZED : Y        EDA INDICATOR : Y        MAT/SVC RECVD DATE: 000926
LATE REASON CODE  :          RESPONSIBLE UIC:          MAT/SVC ACCPTD DATE: 000926
CLAIM/DISAGREE(Y/N) : N      PROMPT PMT TERM: 01        DEFECT RETURN DATE:
CHECK NUM: 6043946        MICROFILM NUM:        CORCTD INV RCVD DTE:
CERTIFIER NME: D CASTRO                       CONS ACCEPT. DATE:
RECOMMEND PAY AMT:        26,445.10           INVOICE PAID DATE: 001024
INVOICE INT AMT:                              INVOICE DUE DATE: 001026
DISCOUNT PCT/DAYS:                            CNT FINAL RLS DATE:
PRESS ENTER TO CONTINUE TO NEXT SCREEN, OR PF2 TO EXIT.
PROC: K07 SVC: 4        PF8 - GET NEXT SELECTED INVOICE        PF6 - VIEW D.O.S

Case 1:02-cv-00008    Document 277    Filed 12/15/2003    Page 48 of 117

# ORDER FOR SUPPLIES OR SERVICES

PAGE 1 OF 1

| Contract/Purch Order No. | Delivery Order No. | Date of Order | Requisition/Purch Request No. |
|---|---|---|---|
| N62766-99-D-0435 | 0007 | 21 AUG 2000 | W/R 31029 |

Issued by: Code C2786
Officer In Charge of Construction
NAVFACENGCOM Contracts, Marianas
PSC 455, Box 175
FPO AP 96540-2200

Deliver to FOB point by (Date): 20 SEP 2000

Contractor:
BioGenesis Pacific, Inc.
Corporate & Programs Control
1604 Ulunianu Place
Kailua, HI 96734
(Tel: 689-7653 Richard Avilla)
Email: richagrm@ltc.net

Payment will be made by:
Defense Finance & Accounting Service
Operating Location Oakland, Code FPV
P. O. Box 23870
Oakland, CA 94623-3870

Mark all packages and papers with contract and/or order numbers.

Invoice to: SEE BLOCK 6

BioGenesis Pacific, Inc. Richard Avilla Operations Manager 5-25-01

| Acct. | Appropriation | | | | | | | | | Cost Code | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AA | 1701804 | 70BA | 250 | 61783 | 0 | 048924 | 2D | C00128 | | 61735046E11Q | $6,280.00 |

| Item No. | Schedule of Supplies/Services | Quantity Ordered | Unit | Unit Price | Amount |
|---|---|---|---|---|---|
| 0201 | Roof repair at Bldg 631, DRMO southeast corner of office spaces | | | | |
| 02011AA | Demolish and dispose roofing system per Sections C2220 13281, and 13282: Single or multi-ply membrane without insulation. | 520 | SF | $.51 | $265.20 |
| 02024C | Repair concrete roof deck surface per Section 03930 and C7920: Grout depressed areas | 520 | SF | $6.59 | $3,495.20 |
| 02154A | Miscellaneous Items: Water blast roof surface in accordance with Section C7572 | 520 | SF | $ 15 | $78.20 |
| 02175E | Fluid applied roofing membrane in accordance with Section 07542: 45 mils thick roof membrane | 520 | SF | $2.91 | $1,456.00 |

Total: $6,280.00

United States of America
By: JOHANNA G. MENDIOLA TEL: (671) 339-8236
Contracting Officer mendiol@[illegible].navy.mil

DD Form 1155 (EF), MAY 90

Exhibit G

**Exhibit H**





NON-NEGOTIABLE

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 4/24/00 | K & L Driving School * Wayne Josler | $100.00 |

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

NON-NEGOTIABLE

⑆001881⑆ ⑈121150181⑈ 0045⑉009483⑊

⌐ Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU 96913

RHINO ROOFING & REPAIRS INC.
790 N. MARINE DR. BOX 969
TUMON, GU 96911

101-501/12134

DATE 10/24/00

PAY TO THE
ORDER OF    K & L Driving School    $ 100.00

One Hundred Only    DOLLARS

1884



**RHINO ROOFING & [illegible]PAIRS INC.**
790 N. MARINE DR. BOX 959
TUMON, GU 96911

1856

101-501/1214
45

DATE Sept. 19, 2000

PAY TO THE ORDER OF Guam Contractor's Association $ 1,100.00

***One Thousand One Hundred Only*** DOLLARS

Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU 96915

NON-NEGOTIABLE

⑈001856⑈ ⑆121405018⑆ 0045⑈009483⑈

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 09/19/00 | OSHA [illegible] Course x 2 | $1,100.00 |

FAXED

NON-NEGOTIABLE

NON-NEGOTIABLE

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 06/30/00 | Treasurer of Guam *(Guam Contractors License Board) License Renewal. | $455.00 |

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW.
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED.

⑈001758⑈ ⑆121405018⑆ 005⑈0004⑇8⑈

NON-NEGOTIABLE

RHINO ROOFING & REPAIRS INC.
780 N. MARINE DR. BOX 969
TUMON, GU 96911

1758

DATE June 30, 2000

PAY TO THE
ORDER OF     Treasurer of Guam          $   455.00

Four Hundred Fifty-Five and 00/100**************************************DOLLARS

Jh Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU 96910



**RHINO ROOFING & REPAIRS INC.**
790 N. MARINE DR. BOX 950
TUMON, GU 96911

1944

DATE December 7, 2000

PAY TO THE ORDER OF Guam Waterworks Authority $ 108.29

One Hundred eight dollars and 29/100 DOLLARS

**Bank of Hawaii**
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈001944⑈ ⑆121405018⑆ 0045⑉009463⑈

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
| --- | --- | --- |
| 12/7/00 | Water Bill for Sept-Nov Invoice 0011031738<br>bill: 11-27-2000<br>Acct. W9801274 (245 B) | $108.29 |

NON-NEGOTIABLE

NON-NEGOTIABLE

Acct # W9801274 (245B)
bill : 11-21-2000

Water Bill for Sept-Nov Invoice#0011031738    $108.29
DATE 12/7/00    DESCRIPTION    AMOUNT

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED
RHINO ROOFING & AIMS INC.
TUMON, GU 96911

NON-NEGOTIABLE

Jh Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU 96913

PAY TO THE ORDER OF — Guam Waterworks Authority

One Hundred eight dollars and 29/100    DOLLARS

$ 108.29

DATE December 7, 2000

1944

RHINO ROOFING & AIMS INC.
790 N. MARINE DR. BOX 956
TUMON, GU 96911















**RHINO ROOFING & REPAIRS INC.**
790 N. MARINE DR. BOX 9
TUMON, GU 96911

1815

101-601/1214
45

DATE August 14, 2000

PAY TO THE ORDER OF IT & E $ 29.95

*****Twenty-Nine and 95/100***** DOLLARS

**Bank of Hawaii**
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈001815⑈ ⑆121405018⑆ 0045⑈009483⑈

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 08/14/00 | Payment for Internet monthly charge | $29.95 |

**POSTED**

NON-NEGOTIABLE

**RHINO ROOFI[illegible] REPAIRS INC.**
790 N. MARINE DR. BOX 859
TUMON, GU 96911

1723

DATE 3/27/00

101-501/1234

PAY TO THE ORDER OF Jaime Manosa $ 1700.00

One thousand seven hundred*************** DOLLARS

**Bank of Hawaii**
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈001723⑈ ⑆121405018⑆ 0045⑈009483⑈

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 3/27/00 | Jaime Manosa (Purchase WaterBlaster)<br>Equipment Purchase | $1700.00 |

NON-NEGOTIABLE

NON-NEGOTIABLE

JAIME MANOSA (MECHANIC)

REPAIR COMPUTER VEHICLE # 7 $270.00

5-16-2000

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

NON-NEGOTIABLE

⑈"001736⑈ ⑉:121450018⑉: 0045609⑈48⑊⑈

Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU 96913

Two Hundred Seventy Only ——————— DOLLARS

PAY TO THE
ORDER OF    Jaime MANOSA                          $ 270.00

DATE 5-16-2000
101-001/1214
45

RHINO ROOFING REPAIRS INC.
790 N. MARINE DR. BOX 966
TUMON, GU 96911

1736



**RHINO ROOFING & REPAIRS INC.**
790 N. MARINE DR. BOX 959
TUMON, GU 96911

1886

DATE October 25, 2000 101-601/1214

PAY TO THE ORDER OF Mark Burke $ 130.00

One Hundred Thirty and 00/100************************************ DOLLARS

Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈001886⑈ ⑆121405018⑆ 0045⑈009483⑈

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 10/25/00 | Technical Support<br>*Working on Richard's computer to change heading on Fax machine. | $130.00 |

NON-NEGOTIABLE

IMPORTANT: The back of this document has been printed with a patented security process in order to deter check fraud. If you do not clearly see the words "Original Document" and the Security Weave pattern, or the word VOID appears to the right of this message, do not cash. U.S. Patent No. 5,510,199

ROOFING & REPAIRS INC.
BOX 969
GU 96911

1905

DATE November 99, 2000 101-601/1214

TO Neng, Zhi Yi

$ 2,100.00

Two Thousand One Hundred and 0/00 DOLLARS

Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈001905⑈ ⑆121405018⑆ 0845⑉009483⑈

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 11-9000 | George Allen living expense | $2,100.00 |
| | security deposit $1,050.00 | |
| | first month rent $1,050.00 | |

NON-NEGOTIABLE

IMPORTANT: The face of this document has been printed with a patented security process to help prevent check fraud.
If you do not clearly see the words "Original Document" and the Security Weave pattern, or the word VOID appears to the right of this message, do not cash.
U.S. Patent No. 5,510,199

RHINO ROOFING & REPAIRS INC.
790 N. MARINE DR. BOX 969
TUMON, GU 96911

17744

DATE June 1, 2000

PAY TO THE
ORDER OF    Shell Guam, Inc.                    $ 159.01

One Hundred Fifty-Nine and 01/100 -------------------------------- DOLLARS

jfi Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈00⑈744⑈ ⑈⑆⑈⑈⑈⑈⑈⑆⑈⑈⑈⑈⑈⑈⑈⑈⑆ ⑈0045⑈00948⑈⑈

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 06/01/00 | Gasoline | $159.01 |

NON-NEGOTIABLE

NON-NEGOTIABLE
FAXED

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 09/11/00 | Cartridge Toner | $90.00 |

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW.
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

⑈00184⑈ ⑆121050518⑆ 0045⑈00494083⑈

NON-NEGOTIABLE

Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU 96913

DOLLARS

Nin ty an d no/100

PAY TO THE
ORDER OF   Quality Business Systems

$ 90.00

DATE 09/11/00

101-501/7214
45

1844

RHINO ROOFING & REPAIRS INC.
790 N. MARINE DR. BOX 959
TUMON, GU 96911





**RHINO ROOFING & REPAIRS INC.**
790 N. MARINE DR. BOX 959
TUMON, GU 96911

1876

DATE October 19, 2000 101-501/1214 45

PAY TO THE ORDER OF Guam Telephone Authority $ 67.10

[illegible] DOLLARS

**Bank of Hawaii**
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈001876⑈ ⑆121405018⑆ 0045⑈009483⑈

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
| --- | --- | --- |
| 10/19/00 | Apply for commercial phone line for 245A Unit Kayen Tramohu Street Perez Gardens, Machanao | 67.10 |

NON-NEGOTIABLE

**RHINO ROOFING & REPAIRS INC.**
790 N. MARINE DR. BOX 959
TUMON, GU 96911

1874

DATE October 19, 2000 101-501/1214 45

PAY TO THE ORDER OF Guam Power Authority $ 10.00

Ten and 00/100 DOLLARS

**Bank of Hawaii**
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈001874⑈ ⑆121405018⑆ 0045⑈009483⑈

RHINO ROOFING & REPAIRS INC
TUMON, GU 96911

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 10/19/00 | Applying for Power for 245A Unit Kayen Trahohu Street Perez Gardens, Machanao. | $10.00 |

NON-NEGOTIABLE

**RHINO ROOFING & REPAIRS INC.**
790 N. MARINE DR. BOX 959
TUMON, GU 96911

1877

DATE October 19, 2000 101-501/1214 45

PAY TO THE ORDER OF Joe Delgado $ 500.00

*****Five Hundred and no/100***** DOLLARS

**Bank of Hawaii**
DFOFDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈001877⑈ ⑆121405018⑆ 0045⑈009483⑈

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 10/19/00 | Security deposit for unit245A. | $500.00 |

NON-NEGOTIABLE

RHINO ROOFING & REPAIRS INC.
790 N. MARINE DR. BOX 659
TUMON, GU 96911

1770

DATE 07/07/00

101-501/1214
45

PAY TO THE ORDER OF Treasurer of Guam $ 36.00

Thirty Six and 00/100 DOLLARS

Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈001770⑈ ⑆121405018⑆ 0045⑈009483⑈

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 07/07/00 | Registration renewal for vehicles | |

NON-NEGOTIABLE

ORIGINAL DOCUMENT ORIGINAL DOCUMENT ORIGINAL DOCUMENT ORIGINAL DOCUMENT ORIGINAL DOCUMENT ORIGINAL DOCUMENT ORIGINAL DOCUMENT ORIGINAL DOCUMENT

IMPORTANT: Hold this document to the light to verify the Security Watermark. If you do not see the words "Original Document" appearing on the right. The message do not cash.
U.S. Patent No. 5,570,109



NON-NEGOTIABLE

DATE 6-9-2000

U-Bix Corporation          179.00

TONER  HP 1100

DESCRIPTION          AMOUNT

IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

NON-NEGOTIABLE

JH Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU  96915

⑆0617696⑆ ⑈121405018⑈ 004500748⑆

RHINO ROOFING & REPAIRS INC.
790 N. MARINE DR. BOX 969.
TUMON, GU  96911

1749

DATE 6-9-2000

PAY TO THE
ORDER OF  U-Bix Corporation          $ 179.00

Seventy-Nine Only          DOLLARS

NON-NEGOTIABLE



**RHINO ROOFING & REPAIRS INC.**
790 N. MARINE DR. BOX [illegible]
TUMON, GU 96911

1881

DATE 10-26-2000 101-501/1214

PAY TO THE ORDER OF U-BIX CORPORATION $ 79.00

SEVENTY-NINE ONLY DOLLARS

Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈001881⑈ ⑆121405018⑆ 0045⑈009485⑈

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| | U-BIX CORPORATION | |
| 10-26-2000 | HP LASER, 1100 DRY INK CARTRIDGE | $79.00 |

NON-NEGOTIABLE

**RHINO ROOFING & REPAIRS INC.**
790 N. MARINE DR. BOX 959
TUMON, GU 96911

1952

DATE December 13, 2000 181-591/1214 45

PAY TO THE ORDER OF Wayne Lasater $ 61.16

sixty one dollars and 16/100 DOLLARS

Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈001952⑈ ⑆121405018⑆ 0045⑈009483⑈

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/13/00 | reimburstment for Wayne<br>Standard Office Supply- Whiteboard | $61.16 |

NON-NEGOTIABLE

ORIGINAL DOCUMENT

IMPORTANT: The face of this document has been printed using a patented security process in order to deter check fraud. If you do not clearly see the words "Original Document" and the Security Weave" pattern, or the word VOID appears to the right of this message, do not cash. U.S. Patent No. 5,510,199

ORIGINAL DOCUMENT

NON-NEGOTIABLE

| DESCRIPTION | AMOUNT |
|---|---|
| Office supply | $24.72 |

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

⑈00₁953⑈ ⑆₁2₁402018⑆ 0615=009₄83⑈

NON-NEGOTIABLE

1th Bank of Hawaii
DEDDO BRANCH
HAGATNA/TAMUNING, GU 96913

Twenty four dollars and 72/00                    DOLLARS

PAY TO THE ORDER OF        Wayne Easter

$24.72

DATE December 14 2000                    VP-601/1218

1053

RHINO ROOFING & PAINT
790 N. MARINE DR. BOX 895
TUMON, GU 96911





NON-NEGOTIABLE

3-31-2000

TARKO TANISIRO

Employee Loan

$50.00

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY, NO RECEIPT DESIRED

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

DESCRIPTION          AMOUNT          DATE

NON-NEGOTIABLE

"001724" ⑆121105018⑆ 0045=0069183"

RHINO ROOFING & REPAIRS INC.
DEDEDO BRANCH
UPPER TUMON, GU 96913
Hi Bank of Hawaii

Fifty & 00/100                                    DOLLARS

PAY TO THE
ORDER OF        TARKO TANISIRO                    $ 50.00

DATE 3-31-2000

1724

RHINO ROOFING & REPAIRS INC.
780 N. MARINE DR. BOX 9
TUMON, GU 96911

101-501/1214
46





**RHINO ROOFING & REPAIRS INC**
790 N MARINE DR BOX 959
TAMUNING, GUAM 96911

1031

DATE JAN. 12, ~~2000~~ 2001    101-501/1214 45

PAY TO THE ORDER OF *** JOE DELGADO ***    $ 3,600.00

*** THREE THOUSAND SIX HUNDRED & 00/100 *** DOLLARS

**Bank of Hawaii**
DEDEDO BRANCH
UPPER TUMON, GU 96913

~~NON-NEGOTIABLE~~

⑈001031⑈ ⑆121405018⑆ 0045⑈010961⑈

RHINO ROOFING & REPAIRS INC
TAMUNING, GUAM 96911

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

1031

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 1-12-2001 | replacement for check ς1023 (nosignature) | $3,600.00 |
| | rental payment fro Dec. 00 245A = 700.00 | |
| | 245B = 1,100.00 | |
| | for Jan. 01 245A = 700.00 | |
| | 245B = 1,100.00 | |

**RECEIPT** DATE Dec. 19 2000    7020

RECEIVED FROM Rhino Builders

ADDRESS

Thirty Six hundred DOLLARS $ 3600.00

FOR 245 A + 245 B
Dec. 2000 + Jan. 2001 T.T. (transferred)

| ACCOUNT | | | HOW PAID | | |
|---|---|---|---|---|---|
| AMT. OF ACCOUNT | | | CASH | | |
| AMT. PAID | | | CHECK | | |
| BALANCE DUE | | | MONEY ORDER | | |

BY [signature]

Joe Delgado 734-1901

TOPS FORM 4580S

**RHINO ROOFING & REPAIRS INC.**
790 N. MARINE DR. BOX 959
TUMON, GU 96911

1714

101-501/1214
45

DATE 3-2-2000

PAY TO THE ORDER OF TARKO TANISIRO $ 100.00

ONE HUNDRED ONLY DOLLARS

Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈001714⑈ ⑆121405018⑆ 0045⑉009483⑈

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 3-2-2000 | TARKO TANISIRO | $100.00 |
| | REPAIR WATERBLASTER | |

NON-NEGOTIABLE

NON-NEGOTIABLE

POSTED

Consultation

Warren Nobles

$ 200.00

8-9-2000

DESCRIPTION

AMOUNT

DATE

RHINO ROOFING & REPAIRS INC.

TUMON GU. 96911

DETACH THIS BEFORE DEPOSITING THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED ABOVE.
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED.

⑈00180⑈ ⑈121⑈050181⑈ 0045⑈0091⑈3

NON-NEGOTIABLE

JH Bank of Hawaii

AGANA BRANCH
TAMUNING, GU. 96913

NON-NEGOTIABLE

Two Hundred Only

DOLLARS

PAY TO THE
ORDER OF        Warren Nobles

$ 200.00

DATE  8-9-2000

101-0817/8L

1802

RHINO ROOFING & REPAIRS INC.

790 N. MARINE DR., BOX 959
TUMON GU. 96911

# LEASE AGREEMENT

**DELIVERY TICKET NO.:** 03517

TODO MAULEG PORTA TOILET RENTAL hereby leases to the customer, portable restroom facilities and service at the rate and terms shown. TODO MAULEG has delivered to lessee's control at the location mentioned, and will furnish said unit(s) with all necessary supplies and services. Lessee agrees to pay or reimburse lessor for all breakage and damage to said unit(s) (other than ordinary wear) and any other damage or loss (except acts of God), while in lessee's control. Lessee agrees not to remove the leased property from this location and will not sublease same to other persons. Lessee agrees to order sufficient service so as not to overtax the restroom unit(s) designed capacity. Rental service charges continue until lessee has promptly notified TODO MAULEG to stop service. Lessee's responsibility for equipment continues for a reasonable time until pick-up is made. It is acknowledged that the described leased property is in good order and repair. In the event this account is referred to an attorney or collection agency, customers agrees to pay attorney's fees, collection fees and court costs.

## LONG TERM CUSTOMERS:

Monthly rental is on a 28 day period. Lessee will be billed one month plus any fraction thereof in advance.

Payment is due on or before the 20th of each month. Delinquent accounts will be charged 2% per month on the overdue balance.

---

**RECEIVED BY:**

**SIGNATURE**
Allen Williams

**PRINT NAME**

**Date:** 12-1-00

---

## PORTA TOILET RENTAL

**Todo Mauleg**

P.O. BOX 127 • HAGATNA, GUAM 96932
PHONE: 477-3369 • 477-PUMP (7867)
FAX: 477-0823

| | | |
|---|---|---|
| **NAME:** | | |
| Pino Builders | | |
| **S.S. #** | | **HOME PH:** |
| **FAX PH:** | | **WORK PH:** (632-7653 |
| **MAILING ADDRESS:** | | 740 N. MARINE DR |
| Bay 959 Tumon-Gu 96911 | | |
| **CONTACT PERSON:** | | |
| RICHARD AVILA 688-1309 | | |
| **LOCATION / PROJ. NAME:** | | |
| BARRACKS 2 @ NAVAL STATION | | |

| NO. OF UNIT(s) | UNIT NO(s). | REG. |
|---|---|---|
| | ✓ TOILET 170 | IREG. |

| STARTING DATE: | TERMINATION DATE: |
|---|---|
| DEC. 1, 2000 | open |

**SERVICE FREQUENCY:**
1x a week

| PRICE PER MONTH / DAY PER UNIT: | $ 60.- |
|---|---|
| | TO BE BILLED |

**DELIVERY FEE:** ⊘

**LONG TERM:** ☒   **SHORT TERM:** ☐

**C.O.D. AMOUNT:** $ 130.- TO BE BILLED

**DELIVERED BY:** KEN

**DATE:** DEC. 1, 2000

| BUSINESS LIC. # | P.O. # |
|---|---|





**RHINO ROOFING [illegible] EPAIRS INC.**
790 N. MARINE DR. BOX 959
TUMON, GU 96911

4094

1887

DATE October 25, 2000 101-501/1[illegible]

PAY TO THE ORDER OF Bank of Hawaii $ 1,000.00

*****One Thousand and no/100***** DOLLARS

**Bank of Hawaii**
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈001887⑈ ⑆121405018⑆ 0045⑉009483⑈

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
| --- | --- | --- |
| 10/25/00 | Used to open General Account - SOC Contract | $1,000.00 |

NON-NEGOTIABLE

# ACE HARDWARE

P.O. BOX CB-25 AGANA GUAM 96932

ACE Hardware Guam

| ANIGUA | TAMUNING | SINAJANA | YIGO |
|---|---|---|---|
| 472-ACES | 649-ACES | 477-ACES | 653-ACES |
| 472-8364 | 646-ACES | 477-1642 | 653-1117 |
| FAX: 477-2636 | FAX: 646-1429 | FAX: 472-3266 | FAX: 653-0369 |

| TYPE OF TRANSACTION | DOCUMENT NUMBER | TRANSACTION DATE | ACCT NUMBER | PAGE |
|---|---|---|---|---|
| HOUSE | 10517199 25 | 03/15/00 12:16:23 | 18028 | 1 |

***** RECEIPT REPRINT *****

BILL TO:
RHINO ROOFING & REPAIRS
ATTN: ACCOUNTS PAYABLE
790 N. MARINE DR. #959
TUMON GU 96911

SHIP TO:
RHINO ROOFING & REPAIRS
ATTN: ACCOUNTS PAYABLE
790 N. MARINE DR. #959
TUMON GU 96911

PURCHASER: CASHIER: PO #: TERMS: SALESMAN:

RICHARD AVILLA 57640 NARCY D. CROOKSHANKS GOO-007

| QUANTITY | ITEM NUMBER | DESCRIPTION | | PRICE/UNIT | AMOUNT |
|---|---|---|---|---|---|
| 1 | 15000139 | SOFT N GENTLE 24RL | T | 6.990N | 6.99 |
| 2 | 14010612 | QUILTED NORTHERN 24ROLLS | T | 8.990N | 17.98 |
| 2 | 15011942 | GAIN POWDER 83OZ/42LD | T | 13.990N | 27.98 |
| 1 | 14001737 | NIAGARA SPRAY STARCH | T | 1.290N | 1.29 |
| 2 | 12173 | BLEACH CLOROX LIQ GAL | T | 1.990N | 3.98 |

Save your receipts!
In case you want to return your purchase we MUST have a receipt. Items must be in original packaging and returned within 7 [illegible] Returns after 7 days are charged 1[illegible] [illegible]andling. Absolutely NO REFUNDS after 30 days.

HOUSE 58.22

| | |
|---|---|
| | .00 |
| | .00 |
| | 58.22 |
| SUB-TOTAL | 58.22 |
| | |
| TOTAL | 58.22 |

X
232119
RECEIVED THE ABOVE IN GOOD CONDITION

**RHINO ROOFING & REPAIRS INC.**
780 N. MARINE DR. BOX 959
TUMON, GU 96911

1759

DATE June 30, 2000 101-501/1214

PAY TO THE ORDER OF Guamcell Communications $ 695.19

Six Hundred Ninet[illegible]d 19/100****************************** DOLLARS

Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈001759⑈ ⑆121405018⑆ 0045⑈009483⑈

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 06/30/00 | Monthly phone charges | $696.19 |

NON-NEGOTIABLE

ENDORSE HERE

IMPORTANT: The back of this document has been printed with a patented security process in order to deter check fraud. If you do not clearly see the words "Original Document" and the Security Weave" pattern, or the word VOID appears to the right of this message, do not cash.
U.S. Patent No. 5,510,199

NON-NEGOTIABLE

Guam Cell

$482.85

6-13-2000

RHINO ROOFING & REPAIRS INC.
780 N. MARINE DR., BOX 969
TUMON, GU 96911

1752

DATE 6-12-2000

PAY TO THE ORDER OF  Guam Cell      $ 482.85

FOUR HUNDRED EIGHTY-TWO AND 85/100      DOLLARS

jh Bank of Hawaii
DEDEDO BRANCH
UPPER TUMON, GU 96913

RHINO ROOFING & REPAIRS INC.
UPPER TUMON, GU 96911

NON-NEGOTIABLE

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW.
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED.

DATE | DESCRIPTION | AMOUNT

Guam Cell

$482.85





RHINO ROOFING REPAIRS INC.
790 N. MARINE DR. BOX 969
TUMON, GU 96911

1801

DATE 8-5-00

PAY TO THE ORDER OF Harold Hereio

$ 200.00

Two Hundred No/100 DOLLARS

iii Bank of Hawaii
TUMON BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

Rhino Roofing

⑈001801⑈ ⑆121140501⑈ 0045⑉009483⑈

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

DATE 8-5-00

DESCRIPTION Repair Wall Photo

AMOUNT $200.00

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

POSTED

NON-NEGOTIABLE





**RHINO ROOFING & REPAIRS INC.**
MARINE DR. BOX
TUMON, GU 96911

1853

DATE 9-16-2000

101-501/1214
45

PAY TO THE ORDER OF K MART $ 152.04

ONE HUNDRED FIFTY-TWO + 04/100 DOLLARS

**Bank of Hawaii**
DEDEDO BRANCH
UPPER TUMON, GU

NON-NEGOTIABLE

⑈001853⑈ ⑆121405018⑆ 0045⑈00948

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW.
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED.

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 9-16-2000 | K MART<br>OFFICE FANS<br>OIL FOR 91 GMC | 152.04 |

FAXED

NON-NEGOTIABLE

**RHINO ROOFING & REPAIRS INC.**
790 N. MARINE DR. BOX 959
TUMON, GU 96911

1830

101-561/1214
45

DATE 8-25-2000

PAY TO THE
ORDER OF  ORIES  A  DOUGLAS                    $ 250.00

Two Hundred Fifty Only _____ DOLLARS

**Bank of Hawaii**
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈801830⑈ ⑉121405018⑈ 0045⑈009483⑈

---

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 8-25-2000 | ORIES A. DOUGLAS EMPLOYEE LOAN TO FIX / TRUCK. | $250.00 |

POSTED

NON-NEGOTIABLE





**RHINO ROOFING & REPAIRS INC.**
790 N. MARINE DR. BOX 969
TUMON, GU 96911

1829

DATE August 24, 2000

101-501/1214
45

PAY TO THE
ORDER OF _____ Paul Lukan _____ $ 300.00

*****Three Hundred Only*****

DOLLARS

**Bank of Hawaii**
DEDEDO BRANCH
UPPER TUMON, GU 96913

NON-NEGOTIABLE

⑈001829⑈ ⑆1214050183⑆ 0045⑈009483⑈

---

RHINO ROOFING & REPAIRS INC.
TUMON, GU 96911

**DETACH AND RETAIN THIS STATEMENT**
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 08/24/00 | Employee Loan | $300.00 |

POSTED

NON-NEGOTIABLE





ROOFING

1732

DATE 4/27/00

PAY TO THE
ORDER OF _____ POSTMASTER _____ $ 9.80

_____ and 80/100 _____ DOLLARS

Bank of Hawaii

NON-NEGOTIABLE

⑆009 1732⑆ ⑆121160501B⑈ 0045-00RL83⑆

A DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 4/27/00 | Postmaster stamps, money order, priority, more | $ 9.80 |

NON-NEGOTIABLE





RECEIVED
JUL 2 9 2003

1   Louie J. Yanza
2   VERNIER & MAHER, LLP
    115 Hesler Place, Ground Floor
3   Governor Joseph Flores Building
    Hagåtña, Guam 96910
4   Telephone No.: (671) 477-7059
    Facsimile No.: (671) 472-5487

    BERMAN O'CONNOR
    MANN & SHKLOV

5   Stephen D. Tom
6   WHITE & TOM
7   820 Milliani Street, Suite 711
    Honolulu, Hawaii 96813-2972
8   Telephone No.: (808) 547-5151
    Facsimile No.: (808) 599-4517
9   Attorneys for Defendants
10  AIG TECHNICAL SERVICES, INC. and
    AMERICAN HOME ASSURANCE COMPANY

11              UNITED STATES DISTRICT COURT
12                  DISTRICT OF GUAM

13  UNITED STATES OF AMERICA FOR USE   ) CIVIL CASE NO. 02-00008
    AND BENEFIT OF RHINO BUILDERS, INC.,  )
14                                       )
            Plaintiff,                   )
15                                       )
        vs.                              )
16  BIOGENESIS   PACIFIC,   INC.,   AIG  ) DEFENDANTS AIG TECHNICAL
    TECHNICAL   SERVICES,   INC.,   and  ) SERVICES, INC. AND AMERICAN HOME
17                                       ) ASSURANCE COMPANY'S SECOND
    AMERICAN      HOME      ASSURANCE    ) REQUEST FOR PRODUCTION OF
18  COMPANY,                             ) DOCUMENTS TO PLAINTIFF RHINO
                                         ) BUILDERS, INC.
19          Defendants.                  )
                                         )
20                                       )
                                         )
21  BIOGENESIS PACIFIC, INC.,            )
                                         )
22          Plaintiff,                   )
                                         )
23      vs.                              )
                                         )
24  RHINO BUILDERS, INC., MICHAEL        )
    O'CONNELL, MICHAEL DANFORTH, AND     )
25  JOHN DOES 1-10,                      )
                                         )
        Counter-Defendant.               )

Exhibit

I

AMERICAN HOME ASSURANCE
COMPANY )
)
Cross-Claimant, )
)
vs. )
)
BIOGENESIS PACIFIC, INC. )
)
Cross-Claim Defendant. )

PROPOUNDING PARTY: Defendants AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY

RESPONDING PARTY: Plaintiff RHINO BUILDERS, INC.

SET: SECOND

**YOU ARE HEREBY REQUESTED**, pursuant to Rule 34 of the Federal Rules of Civil Procedure, to make available thirty (30) days after service is made upon you to Defendants AIG TECHNICAL SERVICES, INC. ("AIGTS") and AMERICAN HOME ASSURANCE COMPANY ("AHAC") (collectively "Defendants") for inspection and copying at the law offices of VERNIER & MAHER, LLP, 115 Hesler Place, Ground Floor, Governor Joseph Flores Building, Hagåtña, Guam 96910, the documents described herein.

## DEFINITIONS

1. "Documents" means the original and any non-identical copy of all "writings," "recordings" and "photographs" as those terms are defined in Title 6 of the Guam Code Annotated including, but not limited to, letters, facsimile communications,

telegraphs, electronic mail (email), cablegrams, telexes, memoranda, notes, records, reports, studies, calendars, diaries, agenda, minutes, books, pamphlets, periodicals, newspaper clippings, graphs, indexes, charts, tabulations, statistical accumulations, ledgers, financial statements, accounting entries, press releases, contracts, affidavits, transcripts, legal documents, records of meetings and conferences, records of conversation and telephone calls, still photographs, video tapes, motion pictures, tape recordings, microfilms, punch cards, programs, printouts, polygraph examination recordings, recordings made through data processing techniques, and the written information necessary to understand and use such films and records.

2. A document "relating to" or that "relates to" any given subject means any document that, in whole or in any part, constitutes, contains, embodies, reflects, identifies, refers to, deals with, or is in any way pertinent to that subject, including without limitation, documents concerning the preparation of other documents.

3. The term "you" or "yours" refers to each party responding to this request for production, their attorneys, agents and representatives.

## INSTRUCTIONS

1. Under Rule 34 of the Federal Rules of Civil Procedure, Plaintiff is required to produce the documents as they are kept in the usual course of business or to organize and label them to correspond with the categories of this request. Accordingly, whenever a document or group of documents is taken out of a file folder, file drawer, file box, or notebook, before the same is produced, Plaintiff is requested to

attach thereto a copy of the label on the file folder, file drawer, file box, or notebook

from which the document or group of documents was removed.

2.    For each document responsive to this request that is withheld under a

claim of privilege or work-product immunity, provide a statement under oath by a

person having knowledge setting forth as to each document or portion withheld:

(a)    The number and subject of each paragraph of this request that

seeks its production;

(b)    The name and title of the author(s);

(c)    The name and title of each person to whom the document was

addressed;

(d)    The name and title of each person to whom a copy of the

document was sent;

(e)    The date of the document;

(f)    The number of pages;

(g)    A brief description of the nature and subject matter of the

document;

(h)    The identity of each person to whom the document, its contents,

or any portion thereof is known or has been disclosed;

(i)    The exact location of the original and each copy as of the date of

receipt of this request; and

(j)    If the document is withheld on any ground other than privilege,

each basis that the responding party contends justifies its withholding.

4

For purposes of this instruction, persons shall be identified by giving their title and business address both at the time the document was generated by or made available to them and at the present, as well as their name and present home address, to the extent known.

4. If you are aware of any document otherwise responsive to these requests, which document is no longer in your custody or control, identify the name and title of the author, the name and title of the addressee, the date of the document, the subject matter of documents, the last date on which the document was in your control, the person(s) or entity, now in control of the document, the reasons for your disposition or release of the document, all persons who have knowledge of the circumstances surrounding its disposition, and state what knowledge each such person has regarding such document.

5. Reference to the singular includes the plural and reference to the plural includes the singular.

6. This production request shall be deemed to be continuing under the provisions of Rule 26(e) of the Federal Rules of Civil Procedure.

## DOCUMENTS REQUESTED

Plaintiff RHINO BUILDERS, INC. is requested to produce the following documents:

1. On August 15, 2001, your former attorney, Carsmith Ball, LLP, wrote a letter to Ms. Bennette Telaje, Contracting Officer for Contract No. N62766-99-D-0425, requesting documents and other information.

Please identify and produce any and all responses, documents, invoices, correspondence and/or other information that the United States Navy provided to you as a result of the above-referenced August 15, 2001 correspondence.

2. In paragraph 38 of your Second Amended Complaint, you allege that "approximately 2 or 3 weeks before this action was filed by Plaintiff's former counsel of record, an entity connected with Defendants Surety and/or an attorney representing Defendants Surety, contacted Plaintiff's former counsel and communicated to it that it should withdraw from its former representation of Plaintiff for conflict-of-interest reasons...." Please identify and produce all e-mail, letters, correspondence, memoranda and documents supporting your allegation.

3. Please identify and produce any and all e-mail, correspondence, letters, memoranda, statements and documents authored by Carlsmith Ball, LLP, addressed to you, informing you of their intent and reasons for withdrawing from their representation of you in this matter.

4. In Paragraph 38 of your Second Amended Complaint, you allege that you have incurred additional expenses, difficulty and risks in pursuing this claim, as a result of Carlsmith Ball's withdrawal from representing you. Please identify and produce any and all e-mail, notes, memoranda, diary, correspondence from your former attorneys concerning their withdrawal from representation of you, your correspondence to other counsel seeking their services to represent you, in addition to any and all

billings, time sheets, cancelled checks, statements, invoices and

5. Please identify and produce any and all receipts, purchase orders, documents supporting your allegation.

invoices, memoranda, accounts, payrolls, payables, reports, statements and documents supporting the costs and expenses you incurred as reflected in your Direct Expense and Overhead Expense Sheet and other costs contained in Exhibit "A" of your Second Amended Complaint filed in the above-referenced action.

6. Please identify and produce any and all bank statements and cancelled checks drawn from RHINO BUILDERS, INC.'s three (3) accounts at the Bank of Hawaii, Guam branch(es), for the period of November 1, 2000 to April 30, 2001, evidencing and/or memorializing the purchase of materials used in BIOGENESIS PACIFIC, INC.'s IDIQ Contract with the U.S. Navy, Contract No. N62766-99-D-0425.

7. Please identify and produce any and all notes, memoranda, diaries, and documents memorializing all conversations and discussions you had with Messrs. Gerald Lam and Alfred Garthe, III.

Dated this 29th day of July, 2003.

VERNIER & MAHER, LLP
Attorneys for Defendants
AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY

BY: _____
LOUIE J. YANZA

7

# CERTIFICATE OF SERVICE

I, LOUIE J. YANZA, hereby certify that on the 29th day of July, 2003, I caused a

copy of the annexed Defendants AIG Technical Services, Inc. and American Home

Assurance Company's Second Request for Production of Documents to Plaintiff

Rhino Builders, Inc. to be served upon the parties hereto, by delivering and leaving a

copy of same to their attorneys of record, as follows:

**Ms. Janalynn M. Cruz**
CALVO & CLARK, LLP
Suite 202, First Savings & Loan Bldg.
655 South Marine Drive
Tamuning, Guam 96911

**Ms. Monica Valle**
BERMAN O'CONNOR MANN & SHKLOV
Suite 503, Bank of Guam Bldg.
Suite 503, Bank of Guam Bldg.
111 Chalan Santo Papa
Hagåtña, Guam 96910

**Mr. Antonio L. Cortes**
Attorney At Law
233 Julale Center
424 West O'Brien Drive
Post Office Box BV
Hagåtña, Guam 96932-8973

**Mr. Frederick J. Kerley**
Reflection Center Building, Suite 202
222 Chalan Santo Papa
Hagåtña, Guam 96910

Executed this 29th day of July, 2003.

VERNIER & MAHER, LLP
Attorneys for Defendants
AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY

BY

LOUIE J. YANZA

8



RECEIVED
OCT 24 2003
4:46 P.M.
VERNIER & MAHER, LLP



Arthur B. Clark, Esq.
Janalynn M. Cruz, Esq.
CALVO AND CLARK, LLP
Attorneys at Law
Suite 202, 655 South Marine Drive
Tamuning, Guam 96913
Telephone: (671) 646-9355
Facsimile: (671) 646-9403

Attorneys for Defendant BioGenesis Pacific, Inc.

## IN THE DISTRICT COURT OF GUAM

UNITED STATES OF AMERICA FOR USE
AND BENEFIT OF RHINO BUILDERS, INC.,

  Plaintiff,

  vs.

BIOGENESIS PACIFIC, INC., and
AIG TECHNICAL SERVICES, INC., and
AMERICAN HOME ASSURANCE
COMPANY

  Defendants.

CIVIL CASE NO. 02-00008

DEFENDANT BIOGENESIS PACIFIC,
INC.'S RESPONSE TO PLAINTIFF
RHINO BUILDERS, INC.'S SECOND
REQUEST FOR PRODUCTION OF
DOCUMENTS

BIOGENESIS PACIFIC INC.,

  Counter-Plaintiff,

  vs.

RHINO BUILDERS, INC., MICHAEL
O'CONNELL, MICHAEL DANFORTH,
AND JOHN DOES 1-10,

  Counter-Defendants.

AMERICAN HOME ASSURANCE
COMPANY,

  Cross-Claimant,

  vs.

BIOGENESIS PACIFIC INC.,

  Cross-Claim Defendant.

DEFENDANT BIOGENESIS PACIFIC, INC.'S RESPONSE TO
PLAINTIFF RHINO BUILDERS, INC.'S SECOND REQUEST FOR
PRODUCTION OF DOCUMENTS
B031010.327-0001.CT (Response to Rhino's 2nd RPOD) final.wpd

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

B031010.327-0001.CT (Response to Rhino's 2nd RPOD) final.wpd
PRODUCTION OF DOCUMENTS
PLAINTIFF RHINO BUILDERS, INC.'S SECOND REQUEST FOR
DEFENDANT BIOGENESIS PACIFIC, INC.'S RESPONSE TO

1      Defendant Biogenesis Pacific, Inc. ("BPI") submits these Responses and Objections in

2      Response to Plaintiff Rhino Builders, Inc.'s ("Rhino") Second Request for Production of Documents.

3

4                              **GENERAL OBJECTIONS**

5         1.     BPI objects to each and every instruction, definition and Request for Production

6      to the extent that it purports to impose any requirement or discovery obligation on BPI greater or

7      different than those imposed by the Federal Rules of Civil Procedure and the applicable Rules and

8      Orders of this Court.

9         2.     BPI objects to each and every Request for Production to the extent that it seeks

10     information protected by the attorney-client privilege, the attorney work product doctrine, or any other

11     applicable privilege.

12        3.     BPI objects to Rhino's definitions of "you" and "your" to the extent that those

13     definitions purport to include personnel who are no longer or who have never been within the control

14     of BPI and to the extent that it purports to include entities over which BPI has no control.

15        4.     BPI objects to Rhino's definition of "document" to the extent that it purports to

16     include documents that are not now within BPI's possession, custody, or control, to the extent that it

17     purports to expand the meaning of the word document beyond the scope with which the word is used

18     in the Federal Rules of Civil Procedure and the Federal Rules of Evidence, and to the extent that it

19     purports to require the production of documents which do not exist.

20        5.     BPI objects to each and every Request insofar as and to the extent that it seeks

21     the divulgence of trade secret or proprietary information of BPI.

22        6.     BPI objects to each Request to the extent that it seeks production of "all

23     documents" responsive to the Request on the grounds that such Requests are overly broad, unduly

24     burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to

25     this general objection, BPI will use reasonable diligence to locate documents in BPI's possession,

26     custody, or control based upon an examination of those files reasonably expected to yield responsive

27     documents. BPI's Responses should not be construed as a representation that each and every document

28

DEFENDANT BIOGENESIS PACIFIC, INC.'S RESPONSE TO
PLAINTIFF RHINO BUILDERS, INC.'S SECOND REQUEST FOR
PRODUCTION OF DOCUMENTS
B031010.327-0001.CT (Response to Rhino's 2nd RPOD) final.wpd

3

1     in the possession of BPI has been examined in connection with these Responses or with any production

2     pursuant thereto.

3     7.     BPI has not yet completed its investigation of the facts relating to this case, has

4     not yet completed discovery in this action, and has not yet completed preparation for trial. The

5     following Responses and objections are given without prejudice to BPI's right to revise its Responses

6     based on any subsequent investigation.

7     8.     BPI objects to each and every Request to the extent that it purports to require BPI

8     to produce private information about individual non-parties.

9     9.     BPI objects to each and every Request to the extent that it purports to require BPI

10     to produce documents not in its possession, custody or control or to the extent that it purports to require

11     BPI to produce the documents of another entity.

12     **RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS**

13     **Request No. 1.** All checks issued by you, Gerald Lam, or Russell Fong, made payable to Alfred

14     Garthe III or Richard Avila, and issued or made at any time between January 1999 and June 2001.

15     **Response:** BPI objects to the request as overbroad and to the extent that it seeks information

16     that is not relevant to this case. Subject to and without waiving the foregoing objections, documents

17     that may be relevant are in storage and BPI will need an additional 2 to 3 weeks to collect, review and

18     copy the documents, if necessary. BPI believes that its response to Request No. 2 is responsive to this

19     Request and requests to confer with Plaintiff's counsel if he feels it is not.

20

21     **Request No. 2.** All records, including account statements, that refer to or document the existence

22     or nonexistence of any checks made payable to Alfred Garthe III or Richard Avila, and issued or made

23     at any time between January 1999 and June 2001.

24     **Response:** Documents responsive to this Request are attached as Exhibit A.

25

26     **Request No. 3.** All documents recording any communications by you informing Rhino that you

27     did not have a subcontract agreement with Rhino.

28

1   **Response:**    BPI specifically objects to this Request insofar as it requests "all documents" as

2   unduly burdensome and overbroad.    Subject to and without waiving the foregoing objections,

3   documents responsive to this Request are already in the possession, custody and control of Rhino, to

4   wit:

5   Letter from BPI to Rhino dated March 15, 2001 Re: Guam: Wire Payment Deposit for project materials

6   Letter from BPI to Rhino dated January 2, 2001 Re: Invoices 131, 1288

7   Letter from BPI to Rhino dated September 8, 2001 Re: Guam Roofing Task Orders

8   Letter from BPI to Rhino dated December 22, 2001 Re: Invoicing

9

10   **Request No. 4.**    All documents recording any communications by you informing Rhino that you

11   expected Rhino to instruct Richard Avilla not to accept delivery orders for Biogenesis or to prevent

12   Richard Avilla from accepting delivery orders or that you considered Richard Avilla not to be an

13   employee of Biogenesis prior to November 30, 2000.

14   **Response:**    Since BPI never instructed Richard Avilla to accept delivery orders under the

15   Navy Contract, there would not be any reason to document a non-instruction. Accordingly, BPI does

16   not have any documents in its custody or control that are responsive to this Request.

17

18   **Request No. 5.**    In paragraph 14 of your counterclaim, you allege that you allowed "Rhino" to

19   enter the project site. Produce any document supporting that allegation.

20   **Response:**    Documents responsive to this Request are already in the possession, custody and

21   control of Rhino, to wit:

22   Email from Bpihawaii@aol.com to tarl[on]@pwceguam.navy.mil dated February 8, 2000 Subject: Site

23   Visit: Roof Repair N62766-99-D-0425

24

25   **Request No. 6.**    All correspondence between you, Gerald Lam, or Richard Fong, on the one hand,

26   and Alfred Garthe III, Richard Avilla, or Rhino, on the other hand.

27   **Response:**    BPI objects to this Request as overbroad and vague. This Request is vague and overbroad

28   because it requests "all correspondence" and does not specify what subject matter and thus includes

5

DEFENDANT BIOGENESIS PACIFIC, INC.'S RESPONSE TO
PLAINTIFF RHINO BUILDERS, INC.'S SECOND REQUEST FOR
PRODUCTION OF DOCUMENTS
B031010.327-0001.CT (Response to Rhino's 2nd RPOD) final.wpd

1  subject matters that are not relevant to this action. This Request is overbroad because it does not specify

2  a time period and thus includes time periods that are not relevant to this action. This Request is

3  overbroad because it requests documents from non-parties, namely Gerald Lam, Richard Fong, Alfred

4  Garthe III, and Richard Avilla. Subject to those objections, documents responsive to this Request are

5  already in the possession, custody and control of Rhino, to wit:

6  Email from "Richard Avilla" <bpiguam@guamcell.net> to "Russell Fong" <Russ@hgea.org> sent

7  December 14, 2000 Subject: Fw: Requested Quotation

8  Email from "Richard Avilla" <bpiguam@guamcell.net> to <Bpihawaii@aol.com> sent November 9,

9  2000 Subject: Re: CQC Plan, Safety Plan

10  Email from "Richard Avilla" <thinogunm@ite.net> to <Bpihawaii@aol.com> sent September 1, 2000

11  Subject DO 0001

12  Email from "Richard Avilla" <thinogunm@ite.net> to <Bpihawaii@aol.com> sent September 13, 2000

13  Subject: Pictures of DO 0001-0002

14  Email from "Richard Avilla" <thinogunm@ite.net> to <russ@hgea.org> sent September 3, 2000

15  Subject: List of Tools and Equipment

16  Email from "Richard Avilla" <bpiguam@guamcell.net> to <Bpihawaii@aol.com> sent November 13,

17  2000 Subject: Re: CQC Plan, Safety Plan

18  Email from "R.Fong" <russ@hgea.org> to "Richard Avilla" <bpiguam@guamcell.net> sent October

19  5, 2000 Subject: Re: Revised Resume

20  Email from <Bpihawaii@aol.com> to <thinogunm@ite.net> sent September 12, 2000 Subject Re: DO

21  0001

22  Email from "R.Fong" <russ@hgea.org> to "Richard Avilla" <bpiguam@guamcell.net> sent December

23  18, 2000 Subject: Resident Agent Letter

24

25  **Request No. 7.**    Any and all documents supporting your claim that Rhino's statements to Mr.

26  Avilla to the effect that you had a subcontract agreement with Rhino were false.

27  **Response:**  Please see response to Request No. 3.

28

6

DEFENDANT BIOGENESIS PACIFIC, INC.'S RESPONSE TO
PLAINTIFF RHINO BUILDERS, INC.'S SECOND REQUEST FOR
PRODUCTION OF DOCUMENTS
B031010.327-0001.CT (Response to Rhino's 2nd RPOD) final.wpd

**Request No. 8.**     Any and all documents that support your responses to Interrogatories served herewith.

**Response:** BPI specifically objects to this Request insofar as it requests "all documents" as unduly burdensome and overbroad. Documents responsive to this Request, subject to the objections stated in BPI's response to Rhino's Second Set of Interrogatories, are attached as Exhibit B.

**Request No. 9.**     Any documents you intend to offer at trial to prove the damages prayed for as relief from the alleged facts stated in your counterclaim.

**Response:** BPI objects to this request as premature. BPI' preparation of this case is ongoing and BPI reserves the right to supplement or amend its responses as necessary. Subject to those objections, BPI responds as follows: All documents previously produced by BPI and all documents produced herein. BPI' response should not be deemed to be a statement that there are no additional documents that BPI intends to introduce as evidence at trial.

**Request No. 10.**     Any documents you intend to offer at trial to prove Rhino or Michael O'Connell defrauded you.

**Response:** BPI objects to this request as premature. BPI' preparation of this case is ongoing and BPI reserves the right to supplement or amend its responses as necessary. Subject to those objections, BPI responds as follows: All documents previously produced by BPI and all documents produced herein. BPI' response should not be deemed to be a statement that there are no additional documents that BPI intends to introduce as evidence at trial.

**Request No. 11.**     Any documents you intend to offer at trial to prove that Rhino interfered with your contractual relationship with the Navy.

**Response:** BPI objects to this request as premature. BPI' preparation of this case is ongoing and BPI reserves the right to supplement or amend its responses as necessary. Subject to those objections, BPI responds as follows: All documents previously produced by BPI and all documents produced herein.

DEFENDANT BIOGENESIS PACIFIC, INC.'S RESPONSE TO
PLAINTIFF RHINO BUILDERS, INC.'S SECOND REQUEST FOR
PRODUCTION OF DOCUMENTS
B031010.327-0001.CT (Response to Rhino's 2nd RPOD) final.wpd

7

1    BPI response should not be deemed to be a statement that there are no additional documents that BPI

2    intends to introduce as evidence at trial.

3

4    DATED this 24th day of October, 2003.

5                 CALVO AND CLARK, LLP
                 Attorneys At Law

6                  Attorneys for Defendant
                 BioGenesis Pacific, Inc.

7

8          By: 

9              JANALYNN M. CRUZ

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit "A"

BioGenesis Pacific, Inc.
Vendor QuickReport
All Transactions

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| **GU - Alfred Garthe III** | | | | | | | |
| Check | 04/19/2001 | 1035 | | 1025 - Checking - GUAM (BOH) | √ | 4516 - Supplies | -40.00 |
| Check | 06/08/2001 | 1114 | | 1025 - Checking - GUAM (BOH) | √ | 4516 - Supplies | -165.00 |
| Check | 06/29/2001 | 1143 | | 1025 - Checking - GUAM (BOH) | √ | 4516 - Supplies | -185.20 |
| | | | | | | | |
| **GU - Richard Avilla** | | | | | | | |
| Check | 02/07/2001 | 65 | Reimb | 1025 - Checking - GUAM (BOH) | √ | 4516 - Supplies | -930.31 |
| Check | 03/05/2001 | 1012 | Reimb | 1025 - Checking - GUAM (BOH) | √ | 4516 - Supplies | -770.09 |
| Check | 03/22/2001 | 1024 | Reimb | 1025 - Checking - GUAM (BOH) | √ | 4516 - Supplies | -624.35 |
| Check | 04/18/2001 | 1054 | Reimb | 1025 - Checking - GUAM (BOH) | √ | 4516 - Supplies | -432.98 |
| Check | 04/30/2001 | 1074 | Reimb | 1025 - Checking - GUAM (BOH) | √ | 4516 - Supplies | -177.39 |
| Check | 05/11/2001 | 1087 | Reimb | 1025 - Checking - GUAM (BOH) | √ | 4516 - Supplies | -186.98 |
| Check | 05/14/2001 | 1090 | Reimb | 1025 - Checking - GUAM (BOH) | √ | 4516 - Supplies | -214.00 |
| Check | 06/08/2001 | 1115 | Reimb | 1025 - Checking - GUAM (BOH) | √ | 4516 - Supplies | -214.00 |
| Check | 06/15/2001 | 1125 | Reimb | 1025 - Checking - GUAM (BOH) | √ | 4516 - Supplies | -247.69 |
| Check | 06/28/2001 | 1140 | Reimb | 1025 - Checking - GUAM (BOH) | √ | 4516 - Supplies | -161.00 |

**BioGenesis Pacific, Inc.**
**Employee QuickReport**
All Transactions

| Type | Date | Num | Memo | Account | Clr | Amount |
|------|------|-----|------|---------|-----|--------|

**Avilla, Richard J. 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**

| Type | Date | Num | Memo | Account | Clr | Amount |
|------|------|-----|------|---------|-----|--------|
| Paycheck | 12/15/2000 | 14809 | GU - PPE:12/10/2000 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 567.97 |
| Paycheck | 12/22/2000 | 14810 | GU - PPE:12/17/2000 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 567.96 |
| Paycheck | 01/19/2001 | 15110 | GU-PPE:1/14/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.97 |
| Paycheck | 01/26/2001 | 15184 | GU-PPE:1/21/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.98 |
| Paycheck | 02/02/2001 | 15258 | GU - PPE:1/28/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.98 |
| Paycheck | 02/09/2001 | 15337 | GU-PPE:2/04/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.96 |
| Paycheck | 02/16/2001 | 15421 | GU-PPE:2/11/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.97 |
| Paycheck | 02/23/2001 | 15506 | GU-PPE:2/18/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.96 |
| Paycheck | 03/02/2001 | 15591 | GU-PPE:2/25/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.98 |
| Paycheck | 03/09/2001 | 15682 | GU-PPE:3/04/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.96 |
| Paycheck | 03/16/2001 | 15775 | GU-PPE:3/11/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.97 |
| Paycheck | 03/23/2001 | 15866 | GU-PPE:3/18/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.96 |
| Paycheck | 03/30/2001 | 15955 | GU-PPE:3/25/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.98 |
| Paycheck | 04/06/2001 | 16042 | GU-PPE:4/01/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.97 |
| Paycheck | 04/13/2001 | 16129 | GU-PPE:04/08/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.96 |
| Paycheck | 04/20/2001 | 16218 | GU-PPE:4/15/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.97 |
| Paycheck | 04/27/2001 | 16308 | GU-PPE:4/22/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.96 |
| Paycheck | 05/04/2001 | 16397 | GU-PPE:4/29/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.98 |
| Paycheck | 05/11/2001 | 16483 | GU-PPE:5/06/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.96 |
| Paycheck | 05/18/2001 | 16571 | GU-PPE:5/13/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.97 |
| Paycheck | 05/25/2001 | 16648 | GU-PPE:5/20/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.96 |
| Paycheck | 06/01/2001 | 16773 | GU-PPE:5/27/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.98 |
| Paycheck | 06/08/2001 | 16781 | GU-PPE:6/03/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.97 |
| Paycheck | 06/15/2001 | 16848 | GU-PPE:6/10/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.96 |
| Paycheck | 06/22/2001 | 16912 | GU-PPE:6/17/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 569.97 |
| Paycheck | 06/29/2001 | 16990 | GU-PPE:6/24/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 690.24 |
| Paycheck | 06/27/2003 | 5181 | GU-PPE:06/22/2003 | 1025 · Checking - GUAM (BOH) | | 330.61 |

**Total Avilla, Richard J.**

15,266.04

**Garthe III, Alfred 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**

| Type | Date | Num | Memo | Account | Clr | Amount |
|------|------|-----|------|---------|-----|--------|
| Paycheck | 03/30/2001 | 15952 | GU-PPE:3/18/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 631.97 |
| Paycheck | 03/30/2001 | 15961 | GU-PPE:3/25/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 631.96 |
| Paycheck | 04/06/2001 | 16048 | GU-PPE:4/01/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 631.98 |
| Paycheck | 04/13/2001 | 16135 | GU-PPE:04/08/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 631.96 |
| Paycheck | 04/20/2001 | 16224 | GU-PPE:4/15/2001 | 1020 · Checking - Kaho-Payroll (BOH) | √ | 631.97 |

Case 1:02-cv-00008    Document 277    Filed 12/15/2003    Page 107 of 117

**BioGenesis Pacific, Inc.**
**Employee QuickReport**
All Transactions

| Type | Date | Num | Memo | Account | Clr | Amount |
|------|------|-----|------|---------|-----|--------|
| Paycheck | 04/27/2001 | 16312 | GU-PPE:4/22/2001 | 1020 · Checking - Kaho-Payroll (BOH) | ✓ | 631.96 |
| Paycheck | 05/04/2001 | 16404 | GU-PPE:4/29/2001 | 1020 · Checking - Kaho-Payroll (BOH) | ✓ | 631.98 |
| Paycheck | 05/11/2001 | 16490 | GU-PPE:5/06/2001 | 1020 · Checking - Kaho-Payroll (BOH) | ✓ | 631.98 |
| Paycheck | 05/18/2001 | 16574 | GU-PPE:5/13/2001 | 1020 · Checking - Kaho-Payroll (BOH) | ✓ | 631.97 |
| Paycheck | 05/25/2001 | 16649 | GU-PPE:5/20/2001 | 1020 · Checking - Kaho-Payroll (BOH) | ✓ | 631.96 |
| Paycheck | 06/01/2001 | 16775 | GU-PPE:5/27/2001 | 1020 · Checking - Kaho-Payroll (BOH) | ✓ | 631.98 |
| Paycheck | 06/08/2001 | 16783 | GU-PPE:6/03/2001 | 1020 · Checking - Kaho-Payroll (BOH) | ✓ | 631.97 |
| Paycheck | 06/15/2001 | 16849 | GU-PPE:6/10/2001 | 1020 · Checking - Kaho-Payroll (BOH) | ✓ | 631.96 |
| Paycheck | 06/22/2001 | 16915 | GU-PPE:6/17/2001 | 1020 · Checking - Kaho-Payroll (BOH) | ✓ | 631.97 |
| Paycheck | 06/29/2001 | 16995 | GU-PPE:6/24/2001 | 1020 · Checking - Kaho-Payroll (BOH) | ✓ | 810.08 |
| **Total Garthe III, Alfred** | | | | | | **9,657.63** |
| **TOTAL** | | | | | | **24,923.67** |

Exhibit "B"

OMB Approval 0700-0042

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | | PAGE | OF | PAGES |
|---|---|---|---|---|
| D | | 1 | | 2 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (if applicable) |
|---|---|---|---|
| T.O. Mod 0010-03 | See Block 16 | | |

| 6. ISSUED BY | CODE | | 7. ADMINISTERED BY (If other than Item 6) | CODE | |
|---|---|---|---|---|---|
| Officer in Charge of Construction<br>NAVFACENGCOM Contracts, Marianas<br>PSC 455, Box 175<br>FPO AP 96540-2200 | | | | | |

6. NAME AND ADDRESS OF CONTRACTOR (No., Street, county, State and ZIP Code)

BioGenesis Pacific, Inc.
Corporate & Programs Control
1604 Uliuliana Place
Kailua, HI 96734

| | (✓) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| | | 9B. DATED (SEE ITEM 11) |
| X | | 10A. MODIFICATION OF CONTRACT/ORDER NO. |

N62766-99-D-0425 / 0010

10B. DATED (SEE ITEM 13)

1 September 2000

| CODE | | FACILITY CODE | |
|---|---|---|---|

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

AA 1701804.70FA 250 61755 0 045924 2D CBGM11 617550BQB270 ($2,000.00)

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (✓) | | |
|---|---|---|
| A. | | THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| B. | | THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| C. | | THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | FAR Clause 52.243-4, "Changes (Fixed Price Construction)" (Apr 1984) |
| D. | | OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return ____1____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

CONTRACT N62766-99-D-0425, INDEFINITE DELIVERY INDEFINITE QUANTITY CONTRACT FOR ROOFING SYSTEM INSTALLATION AND REPAIR, GUAM, M.I. / Task Order No. 0010,
Replace Roofing System at BEQ 7, COMNAVMARIANAS, Guam.

## (CONTINUED ON PAGE 2 OF 2)

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| Richard Avilla, District Manager | B. TERLAJE, Contracting Officer |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| Richard Avilla<br>(Signature of person authorized to sign) | 7-18-01 | BY<br>(Signature of Contracting Officer) | |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

Computer Generated

30-105

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

Case 1:02-cv-00008    Document 277    Filed 12/15/2003    Page 110 of 117

(a) The purpose of this modification is to extend the contract completion date due to delays associated with 10 rain days and 10 calendar days to repair additional line cracks on the roof at no cost to the government. This modification also assesses liquidated damages due to late completion from 5 March 2001 to 15 March 2001 (10 days x $200/day = $2,000.00)

**AMOUNT: ($2,000.00)**          **TIME: 20 CALENDAR DAYS**

(b) The completion date for Task Order Number 0010 of 12 February 2001 is extended 20 calendar days to and including 4 March 2001 and the Task Order is assessed LD's in the amount of $2,000.00, thereby decreasing the contract amount from $101,853.21 to $99,853.21.

(c) Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for both time and money and for any and all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised.

**MODIFICATION CODE:          LJQD**

OMB Approval 2700-0042

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | | | PAGE | OF | PAGES |
|---|---|---|---|---|---|
| | | | 1 | | 2 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (if applicable) |
|---|---|---|---|
| T.O. Mod 0003-04 | SEE BLOCK 16C | | |

| 6. ISSUED BY | CODE | C7766 | 7. ADMINISTERED BY (if other than Item 6) | CODE | |
|---|---|---|---|---|---|
| Officer in Charge of Construction NAVFACENGCOM Contracts, Marianas PSC 455, Box 175, FPO AP 96540-2200 | | | | | |

8. NAME AND ADDRESS OF CONTRACTOR (No. Street, county, State and ZIP Code)

BioGenesis Pacific, Inc.
Corporate & Programs Control
1604 Ulualana Place
Kailua, HI 96734

| | (✓) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| | | 9B. DATED (SEE ITEM 11) |
| X | | 10A. MODIFICATION OF CONTRACT/ORDER NO. N62766-99-D-0425 / 0003 |
| | | 10B. DATED (SEE ITEM 13) 19 July 2000 |

| CODE | | FACILITY CODE | |
|---|---|---|---|

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment your desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

AB 97X4930.NE1C 000 77777 0 062395 2F 062395 6239SRC05135 ($1,820.00)

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (✓) | | |
|---|---|---|
| A. | | THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| B. | | THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| C. | | THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | | FAR Clause 52.211-12, "Liquidated Damages – Construction" (Apr 1984) |
| D. | | OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return _____ 1 _____ copy to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

CONTRACT N62766-99-0-0425, INDEFINITE DELIVERY INDEFINITE QUANTITY CONTRACT FOR ROOFING SYSTEM INSTALLATION AND REPAIR, GUAM, M.I. / Task Order No. 0003, Repair Roofing System at Dental Clinic Bldgs. 1, 2, and 4, COMMNAVMARIANAS, GUAM, M.I.

(Continued on Page 2 of 2)

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| Richard Avilla, Dist. Manager | B. TERLAJE, Contracting Officer |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| _Richard Avila_ (Signature of person authorized to sign) | | BY _____ (Signature of Contracting Officer) | |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE
30-105
Computer Generated

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

(a) The purpose of this modification is extend the contract completion date due to delays associated with 15 rain days. This modification also assesses liquidated damages due to 13 late days from 3 March 2001 to 15 March 2001 (13 days x $140/day = $1,820.00)

AMOUNT: ($1,820.00)          TIME: 15 CALENDAR DAYS

(b) The completion date for Task Order Number 0003 of 15 February 2001 is extended 15 calendar days to and including 2 March 2001. The Task Order is assessed LDs in the amount of $1,820.00, thereby decreasing the contract amount from $51,844.60 to $50,024.60.

(c) Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for both time and money and for any and all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised.

MODIFICATION CODE:          LJOD

BioGenesis Pacific, Inc. - Guam Project
Profit & Loss by Job (Accrual Basis)
All Transactions

| | Office - GUAM Proj. (Guam-Roof Job) | D.O. 0001 (Guam-Roof Job) | D.O. 0002 (Guam-Roof Job) | D.O. 0003 (Guam-Roof Job) | D.O. 0004 (Guam-Roof Job) | D.O. 0005 (Guam-Roof Job) | D.O. 0006 (Guam-Roof Job) | D.O. 0007 (Guam-Roof Job) | D.O. 0008 (Guam-Roof Job) | D.O. 0009 (Guam-Roof Job) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | | |
| **Income** | | | | | | | | | | |
| 4040 - Construction | 0.00 | 12,129.10 | 28,445.10 | 50,024.80 | 57,160.94 | 226,501.96 | 387,998.70 | 5,280.00 | 107,757.99 | 50,053.98 |
| **Total Income** | 0.00 | 12,129.10 | 28,445.10 | 50,024.80 | 57,160.94 | 226,501.96 | 387,998.70 | 5,280.00 | 107,757.99 | 50,053.98 |
| **Cost of Goods Sold** | | | | | | | | | | |
| 4590 - Cost of Construc | 650,954.77 | 3,278.50 | 10,908.00 | 22,949.11 | 22,786.54 | 116,471.09 | 55,909.17 | 0.00 | 41,005.73 | 42,612.35 |
| **Total COGS** | 650,954.77 | 3,278.50 | 10,908.00 | 22,949.11 | 22,786.54 | 116,471.09 | 55,909.17 | 0.00 | 41,005.73 | 42,612.35 |
| **Gross Profit** | -650,954.77 | 8,850.60 | 15,537.10 | 27,075.69 | 34,374.40 | 110,030.87 | 331,988.53 | 5,280.00 | 66,752.26 | 47,441.63 |
| **Expense** | | | | | | | | | | |
| 6231 - Interest Expense - Lease oblige | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6530 - Advertising | 283.58 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6875 - Bond Expense | 3,400.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6110 - Automobile Expense | 852.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6130 - Bank Service Charges | 2,677.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6150 - Depreciation Expense | 45,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6160 - Dues and Subscriptions | 111.56 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6170 - Equipment Rental | 2,189.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6180 - Insurance | 2,812.77 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6250 - Interest Expense | 13,901.33 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6230 - Licenses and Permits | 980.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6260 - Miscellaneous | 8,533.51 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6280 - Postage and Delivery | 744.87 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6270 - Professional Fees | 67,171.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6271 - Professional / Consultants | -80.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,000.00 | 0.00 |
| 6285 - Medical Expense | 5,362.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6290 - Repairs | 2,377.66 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6340 - Telephone | 411.90 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6345 - Freight & Delivery | 8.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6347 - Fuel | 1,462.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6350 - Travel & Ent | 24,059.95 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6560 - Salary Expense | 4,434.78 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6564 - Salary & Wages | 533,182.64 | 153.00 | 1,057.80 | 18,475.00 | 19,181.13 | 19,974.00 | 33,049.38 | 910.58 | 18,877.00 | 12,846.25 |
| 6660 - Payroll Expenses | 33,053.93 | 11.71 | 0.00 | 1,413.35 | 1,497.25 | 1,527.99 | 2,528.22 | 69.65 | 1,444.12 | 982.72 |
| 6561 - Gross Receipts Tax - Guam | 172,587.65 | 465.16 | 0.00 | 653.30 | 1,798.92 | 8,969.48 | 15,515.87 | 211.20 | 3,951.39 | 2,066.89 |
| 6999 - Uncategorized Expenses | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Expense** | 946,310.37 | 649.87 | 1,057.80 | 20,541.65 | 22,406.30 | 30,471.47 | 51,093.47 | 1,191.35 | 32,272.51 | 15,894.86 |
| **Net Ordinary Income** | -1,796,265.74 | 8,200.73 | 14,479.30 | 6,533.84 | 11,968.10 | 79,559.40 | 280,895.06 | 4,088.65 | 34,479.75 | 30,746.77 |

# BioGenesis Pacific, Inc. - Guam Project
## Profit & Loss by Job (Accrual Basis)
### All Transactions

| | Office - GUAM Proj. (Guam-Roof Job) | D.O. 0001 (Guam-Roof Job) | D.O. 0002 (Guam-Roof Job) | D.O. 0003 (Guam-Roof Job) | D.O. 0004 (Guam-Roof Job) | D.O. 0005 (Guam-Roof Job) | D.O. 0006 (Guam-Roof Job) | D.O. 0007 (Guam-Roof Job) | D.O. 0008 (Guam-Roof Job) | D.O. 0009 (Guam-Roof Job) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Other Income/Expense** | | | | | | | | | | |
| Other Expense | | | | | | | | | | |
| 8915 · Income Tax - Guam | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Other Expense** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Net Other Income** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Net Income** | -1,799,265.14 | 8,398.73 | 14,479.30 | 6,233.84 | 11,966.19 | 79,558.40 | 289,895.96 | 4,986.65 | 34,475.75 | 34,746.77 |

1/22/03

## BioGenesis Pacific, Inc. - Guam Project
## Profit & Loss by Job (Accrual Basis)
### All Transactions

| | D.O. #910 (Guam-Roof Job) | D.O. #911 (Guam-Roof Job) | D.O. #912 (Guam-Roof Job) | D.O. #913 (Guam-Roof Job) | D.O. #914 (Guam-Roof Job) | D.O. #915 (Guam-Roof Job) | D.O. #916 (Guam-Roof Job) | D.O. #917 (Guam-Roof Job) | D.O. #918 (Guam-Roof Job) |
|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | |
| **Income** | | | | | | | | | |
| 4940 · Construction | 103,767.21 | 20,292.82 | 39,652.68 | 36,259.86 | 23,287.60 | 41,989.28 | 661,050.24 | 34,339.97 | 12,490.34 |
| **Total Income** | 103,767.21 | 20,292.82 | 39,652.68 | 36,259.86 | 23,287.60 | 41,989.28 | 661,050.24 | 34,339.97 | 12,490.34 |
| **Cost of Goods Sold** | | | | | | | | | |
| 4999 · Cost of Contracts | 63,498.72 | 5,159.25 | 13,008.58 | 7,846.67 | 10,037.55 | 13,557.59 | 256,954.75 | 9,317.64 | 0.00 |
| **Total COGS** | 63,498.72 | 5,159.25 | 13,008.58 | 7,846.67 | 10,037.55 | 13,557.59 | 256,954.75 | 9,317.64 | 0.00 |
| **Gross Profit** | 40,268.49 | 15,133.57 | 26,644.10 | 28,413.19 | 13,250.05 | 28,431.69 | 404,095.49 | 25,022.33 | 12,490.34 |
| **Expense** | | | | | | | | | |
| 6251 · Interest Expense - Loans oblige | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6038 · Advertising | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6075 · Bond Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6110 · Automobile Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6126 · Bank Service Charges | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6150 · Depreciation Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6165 · Dues and Subscriptions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6176 · Equipment Rental | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6160 · Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6264 · Interest Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6236 · Licenses and Permits | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6245 · Miscellaneous | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6250 · Postage and Delivery | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6270 · Professional Fees | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6272 · Professional / Commissions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16,000.00 | 0.00 | 0.00 |
| 6283 · Medical Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6360 · Repairs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6346 · Telephone | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6345 · Freight & Delivery | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6347 · Fuel | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6558 · Travel & Ent | 0.00 | 0.00 | 2,315.88 | 4,586.25 | 2,185.45 | 0.00 | 0.00 | 4,507.25 | 0.00 |
| 6560 · Office Supplies | 18,606.25 | 4,944.00 | 177.15 | 351.06 | 167.18 | 5,883.50 | 124,432.50 | 344.86 | 2,530.50 |
| 6580 · Salaries Expense | 1,270.37 | 376.30 | 1,586.11 | 1,469.39 | 931.50 | 450.06 | 9,510.33 | 1,373.59 | 192.76 |
| 6680 · Payroll Expenses | 3,688.71 | 664.77 | 0.00 | 0.00 | 0.00 | 1,679.57 | 25,133.39 | 0.00 | 499.84 |
| 6826 · Gross Receipts Tax - Guam | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 6899 · Uncategorized Expenses | 21,565.33 | 5,987.07 | 4,079.14 | 6,389.72 | 3,284.13 | 8,013.13 | 175,085.22 | 6,225.70 | 3,213.92 |
| **Total Expense** | 21,565.33 | 5,987.07 | 4,079.14 | 6,389.72 | 3,284.13 | 8,013.13 | 175,085.22 | 6,225.70 | 3,213.92 |
| **Net Ordinary Income** | 18,723.16 | 9,146.50 | 22,564.96 | 22,023.47 | 9,965.92 | 20,418.56 | 229,010.27 | 18,796.63 | 9,277.42 |

## BioGenesis Pacific, Inc. - Guam Project
## Profit & Loss by Job (Accrual Basis)
### All Transactions

| | D.O. 0910 (Guam-Roof Job) | D.O. 0911 (Guam-Roof Job) | D.O. 0912 (Guam-Roof Job) | D.O. 0913 (Guam-Roof Job) | D.O. 0914 (Guam-Roof Job) | D.O. 0915 (Guam-Roof Job) | D.O. 0916 (Guam-Roof Job) | D.O. 0917 (Guam-Roof Job) | D.O. 0918 (Guam-Roof Job) |
|---|---|---|---|---|---|---|---|---|---|
| **Other Income/Expense** | | | | | | | | | |
| **Other Expense** | | | | | | | | | |
| 8915 - Income Tax - Guam | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Other Expense** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Net Other Income** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Net Income** | 18,723.16 | 9,146.58 | 22,564.96 | 22,923.47 | 9,965.82 | 29,418.56 | 229,910.37 | 16,795.63 | 9,277.42 |