FILED
DISTRICT COURT OF GUAM

DEC 15 2003

MARY L. M. MORAN
CLERK OF COURT

278

1 Arthur B. Clark, Esq.
Janalynn M. Cruz, Esq.
2 CALVO AND CLARK, LLP
Attorneys at Law
3 655 South Marine Drive, Suite 202
Tamuning, Guam 96911
4 Telephone: (671) 646-9355
Facsimile: (671) 646-9403
5
Attorneys for Defendant/Counter-Plaintiff
6 BioGenesis Pacific, Inc.

7

8                    IN THE DISTRICT COURT OF GUAM

9 UNITED STATES OF AMERICA FOR USE    )  CIVIL CASE NO. 02-00008
  AND BENEFIT OF RHINO BUILDERS, INC., )
10                          Plaintiff,   )
                                         )
11              vs.                      )  **DEFENDANT/COUNTER-PLAINTIFF**
                                         )  **BIOGENESIS PACIFIC, INC.'S MOTION**
12 BIOGENESIS PACIFIC, INC.,             )  **FOR SUMMARY JUDGMENT**
   AIG TECHNICAL SERVICES, INC., and    )
   AMERICAN HOME ASSURANCE              )
13 COMPANY                              )
                          Defendants.   )
14 _____ )
                                         )
15 BIOGENESIS PACIFIC INC.,              )
                                         )
16              Counter-Plaintiff,       )
                                         )
17              vs.                      )
                                         )
18 RHINO BUILDERS, INC., MICHAEL         )
   O'CONNELL, MICHAEL DANFORTH,         )
19 AND JOHN DOES 1-10,                  )
                                         )
20              Counter-Defendants.      )
   _____ )
21 AMERICAN HOME ASSURANCE               )
   COMPANY,                             )
22                                       )
                Cross-Claimant,          )
23                                       )
                vs.                      )
24                                       )
   BIOGENESIS PACIFIC INC.,             )
25                                       )
                Cross-Claim Defendant.   )
26 _____ )

27

28

**DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS**
**PACIFIC, INC.'S MOTION FOR SUMMARY JUDGMENT**
summary judgment memo v3.wpd

# TABLE OF AUTHORITIES

## CASES

*Allen v. City of Beverly Hills,*
911 F.2d 367, 374 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Bonin v. Calderon,*
59 F.3d 815, 845 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Celotex Corp. v. Catrett,*
477 U.S. 317, 323, 106 S.Ct. 2548, 2558 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Consol. Elec. & Mech., Inc. v. Biggs Gen. Contracting, Inc.,*
167 F.3d 432, 435-36 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Gabrielson v. Montgomery Ward & Co.,*
785 F.2d 762, 766 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Gulf States Ent., Inc. v. R.R. Way, Inc.,*
938 F.2d 583, 587 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Hawpe Constr., Inc. v. United States,*
2001 WL 638450 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Hawpe Constr., Inc. v. United States,*
46 Fed. Cl. 571 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Ibex Indust. Inc. v. Coast Line Waterproofing,*
563 F.Supp. 1142 (D.C. D.C. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re GlenFed, Inc. Sec. Litigation*
42 F.3d 1541, 1548 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Johnson v. American Airlines, Inc.,*
834 F.2d 721, 724 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kaiser Cement Corp. v. Fischbach and Moore, Inc.,*
793 F.2d 1100, 1104 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Kirchdorfer, Inc. v. Aegis/zublin J.V.,*
869 F.Supp. 387 (E.D.Va. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Magna Masonry, Inc. v. R.T. Woodfield, Inc.,*
709 F.2d 249, 251 (4th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

*Mai Steel Service Inc., a Kansas Corp. v. Blake Const. Co.,*
981 F.2d 414 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Mattson v. U.S. West Communications, Inc.*
967 F.2d 259 (8th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1  *McGrath v. Travelers Indem. Co.,*
   253 F.Supp. 330 (D.C.Az. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __8__, __9__
2
   *Naas v. Stolman,*
3  130 F.3d 892, 893 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __7__

4  *Nat'l Lawn Sprinklers, Inc. v. Aim Const. & Contracting Corp.,*
   2000 WL 1290599 (E.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __8__, __9__
5
6  *Noland Co. v. Andrews,*
   406 F.2d 790 (4th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __8__

7  *Otis Elevator Co. v. Piracci Constr. Co.,*
   405 F.Supp. 908, 910 (D.D.C.1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __11__
8
   *Partington v. Bugliosi,*
9  56 F.3d 1147, 1162 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __14__

10 *Robert Defilippis Crane Service, Inc. v. William L. Crow Const. Co.,*
   826 F.Supp. 647, 654 (E.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __8__, __9__
11
   *Roth v. Garcia Marquez,*
12 942 F.2d 617, 628 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __14__

13 *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Assn.,*
   809 F.2d 626, 630 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __6__
14
   *Transamerica Premier Ins. Co. v. Ober,*
15 894 F.Supp. 47 (D.C.Me.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __11__

16 *United States ex rel. Celanese Coating Co. v. Bullard*
   504 F.2d 466 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __7__
17
   *United States ex rel. Lee v. SmithKline Beecham, Inc.,*
18 245 F.3d 1048 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __13__

19 **STATUTES**

20 40 U.S.C. § 270b(b) (re-codified as 40 U.S.C. §3133 in 2002) . . . . . . . . . . . . . . . . . . . . . . . . __7__

21 **RULES**

22 Federal Rules of Civil Procedure, Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __11__

23 Federal Rules of Civil Procedure, Rule 12(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __11__

24 Federal Rules of Civil Procedure, Rule 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __6__, __12__

25 Federal Rules of Civil Procedure, Rule 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . __13__, __15__

26 **OTHERS**

27 2 James Wm. Moore Et Al., Moore's Fed. Pract. §12.38 (3d. ed) . . . . . . . . . . . . . . . . . . . . . __12__

28

**DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS**
**PACIFIC, INC.'S MOTION FOR SUMMARY JUDGMENT**
summary judgment memo v3.wpd                                                                                        ii

Case 1:02-cv-00008     Document 281     Filed 12/15/2003     Page 3 of 24

# I. BACKGROUND

On September 29, 1999, BioGenesis Pacific, Inc., a Hawaii corporation, ("BioGenesis") was awarded a contract with the U.S. Department of Defense for certain roofing work and repairs at the U.S. Naval Base on Guam (the "Navy Contract"). (Ex. A to the Declaration of Arthur B. Clark ("Clark Decl."), filed herewith.) The Navy Contract was a one-year contract with four one-year options. The first base year's work was divided into ten task orders and the first option year was divided into eight task orders.

When the Navy Contract came up for bid in 1999, Rhino Builders, Inc., also a Hawaii corporation, ("Rhino") submitted a bid as general contractor, which it lost to BioGenesis. (Ex. B to the Clark Decl.) Upon discovering that BioGenesis had been awarded the Navy Contract, Rhino's CEO, Michael O'Connell, contacted BioGenesis to discuss subcontracting services to BioGenesis under the Navy Contract.[1]

Start of the Navy Contract was delayed due to a bid protest by Hawpe Construction Company. (Ex. 1, p. 171 to the Clark Decl.) This protest was not resolved by the Federal Court of Claims until May 5, 2000, and not by the Federal Circuit Court of Appeals until June 2001. *See Hawpe Constr., Inc. v. United States*, 46 Fed. Cl. 571 (2000); *Hawpe Constr., Inc. v. United States*, 2001 WL 638450 (Fed. Cir. 2001). In the interim, BioGenesis started negotiating a potential subcontract with Rhino. Rhino advised BioGenesis that BioGenesis would need to have a duly authorized representative on Guam to interact with the Navy while the bid protest was pending. Rhino suggested that one of its employees, Richard Avilla, be designated as BioGenesis' representative for those purposes, though Mr. Avilla would continue to be an employee of Rhino. (Ex. 2, pp. 47-48 to the Clark Decl.) BioGenesis appointed Richard Avilla as its Guam representative. (Ex. D to the Clark. Decl.)

---

[1] As to who contacted whom first, this issue is in dispute. Rhino contends that it was BioGenesis that contacted them first. Rhino's contention is contradicted by its Vice President, Alfred Garthe. Mr. Garthe, who was Rhino's Guam head of operations, stated that he was personally checking with the OICC Office on a daily basis to see whether Rhino was awarded the bid. On the day the bid was awarded to BioGenesis, Mr. Garthe contacted Rhino's CEO, Michael O'Connell, and informed Mr. O'Connell of the award. Mr. Garthe then recommended that Mr. O'Connell initiate contact with BioGenesis. (Ex. 1, pp. 114-116 to the Clark Decl.)

In February 2000, BioGenesis authorized Rhino's employees to inspect the future work sites so that Rhino could prepare a quotation or an estimate as part of its continuing subcontract negotiations with BioGenesis. (Ex. E; Ex. 2, pp. 144-145 to the Clark Decl.) In its authorization, BioGenesis designated Rhino's employees as "subcontractor consulting representatives." (Ex. E to the Clark Decl.) As explained by Biogenesis' CEO, Gerald Lam, he identified Rhino's employees as "consulting representatives" because he did not want to create the impression that Rhino was a subcontractor, since they were still negotiating a potential subcontract. (Ex.3, p. 43 to the Clark Decl.)

Because of the Hawpe protest, BioGenesis did not rush to finalize a subcontract with Rhino, thus the negotiations continued for months but were never finalized. (Ex. 3, p. 150 to the Clark Decl.) Rhino, however, contends that the parties agreed to a subcontract in the very first conversation between Biogenesis and Rhino, who were essentially strangers to each other, during a telephone call on September 29, 1999, the very day BioGenesis was awarded the Navy Contract and apparently before the award letter from Guam even had a chance to make it to Hawaii. (Ex. 2, pp. 45-47; Ex. 1, pp. 115-116 to the Clark Decl.)

Rhino claims that it continued under this alleged oral subcontract for over a year (until November, 2000), despite the fact that oral subcontracts on federal projects are contrary to what Rhino admits to be the "accepted federal government contract practice" of having written subcontracts. (Second Amended Complaint ¶14.) Rhino's allegation of having an oral subcontract further contradicts Rhino's own standard and practice in its six years' existence of almost always having a written agreement in place for all of its subcontracts. (Ex. 2, pp. 8, 30, 39-42, 107-108 to the Clark Decl.) The only prior exceptions to Rhino's standard practice of first securing a written subcontract were two oral subcontracts on projects for the Bishop Estate in Hawaii, the trustee for which was the uncle of Rhino's CEO and controller, although in both instances a written subcontract was executed within two weeks of starting work. (Ex. 2, pp. 107-109; Ex. 4, p. 7 to the Clark Decl.) As for federal projects, Rhino cannot recall ever having started work without first securing a written subcontract. (Ex. 2, p. 110 to the Clark Decl.)

Rhino's allegation of having an oral subcontract further contradicts a credit line agreement Rhino had with Citibank. Rhino has testified that under its agreement Rhino could not

access the credit line for any subcontract unless it first executed a written subcontract and assigned the proceeds to its lender. Rhino admits that it breached the credit line agreement and was accused by its lender of having "misappropriated" funds by utilizing the credit line to provide materials and supplies for the Navy Contract. (Ex. 7, pp. 53-59; Ex. 8 pp. 48-50 to the Clark Decl.)

In late August or early September 2000, BioGenesis first became aware that Rhino had started work on the Navy Contract when it received a telephone call from a material supplier who had not been paid. (Ex. 3, pp. 127-129 to the Clark Decl.) After receiving the call, BioGenesis spoke with Rhino's employee, Mr. Avilla, who then advised BioGenesis that he had been instructed by Rhino's CEO, Michael O'Connell, to start accepting task orders on BioGenesis' behalf. (Ex. 3, pp. 127-128; Ex. 5, pp. 139-140 to the Clark Decl.) During the conversation, BioGenesis discovered that Mr. Avilla had started accepting the task orders in May 2000. (Ex. 5, p. 142-143 to the Clark Decl.) Mr. Avilla has confirmed that he never received any direct instructions from BioGenesis to start accepting task orders, and that he was instructed by his employer and Rhino's CEO, Mr. O'Connell, to start accepting the task orders. (Ex. 5, pp. 139-140 to the Clark Decl.) Rhino claims that it had written authorization from BioGenesis to accept task orders, although Rhino has failed to produce it in discovery. (Ex. 2, pp. 146-147 to the Clark Decl.) And, although it is Rhino's custom and practice to invoice a general contractor on a monthly basis, Rhino admits that the first invoice, which would have given BioGenesis written notice that Rhino had started accepting task orders, was not sent until September, 2000, <u>after</u> BioGenesis discovered through its own initiative that Rhino had already started working on the Navy Contract. (Ex. C, Ex. 4, p. 56 to the Clark Decl.)

Because Mr. Avilla accepted the task orders at Rhino's instruction, the Navy Contract officially commenced in May, 2000. However, Rhino was so unprepared to start the task orders that the Navy Contract became subject to liquidated damages for delay. (Ex. 6, p. 69; Ex. 3, pp. 57, 133-136 to the Clark Decl.) At the time, BioGenesis had not mobilized and was unprepared to start working on the Navy Contract. (Ex. 3, pp. 135-136, 150 to the Clark Decl.) Fearing that Rhino's delay in completing the task orders already started would lead to a default and termination of the entire Navy Contract, BioGenesis was faced with either kicking Rhino off the job and risk losing the entire Navy

1  Contract or letting Rhino finish the work it had already started in order to avoid losing the Navy
2  Contract. BioGenesis chose the latter option. (Ex. 3, pp. 133-135 to the Clark Decl.)

3          On or about August 2000, Rhino hired Michael Danforth to consult with Rhino on a
4  different contract. (Ex. F, p to the Clark Decl.) Later, this relationship expanded to include consultation
5  services on the Navy Contract. (Ex. 6, pp. 26-27 to the Clark Decl.) Mr. Danforth was designated as
6  Rhino's point of contact for subcontract negotiations. (Ex. 3, p. 270; Ex. G to the Clark Decl.)

7          Rhino claims it stopped working on the Navy Contract in late October or early
8  November, 2000, however, according to the certified payrolls provided in Rhino's proof of claim filed
9  with American Home Assurance Company, most employee labor appears to have stopped by the middle
10  of September 2000. (Ex. 2, pp. 156-157; Ex. 5, p. 53; Ex. H to the Clark Decl.) On October 29, 2000,
11  during a phone conference between BioGenesis and Rhino representatives, including Mr. Danforth, the
12  parties agreed that Rhino would continue working only on the task orders it had already started. (Ex.
13  I and J to the Clark Decl.) In the meantime, the parties were also to continue negotiating a subcontract
14  to see whether they could set aside their differences and eventually arrive at a written agreement. In an
15  internal Rhino communique, Mr. Danforth writes that the only task orders commenced by Rhino were
16  task orders 1, 2, 3, 4 and 7. (Ex. I to the Clark Decl.) Although BioGenesis believes that Rhino had
17  in fact only started working on task orders 1, 2 and 7.[2] (Ex. 5, p. 176 to the Clark Decl.)

18          On November 14, 2000, Rhino prepared an invoice for all the work it claims to have
19  performed, specifically for 100% completion of task orders 1, 2 and 3, and for 90% completion of task
20  order 4. (Ex. K to the Clark Decl.) The total of the invoice was $89,658.58, which included profit and
21  reimbursement for direct cost and overhead cost. BioGenesis paid Rhino $25,000 under its agreement
22  to let Rhino finish the work it had already started. (Ex. 3, pp. 129-130 to the Clark Decl.) Rhino has
23  admitted receiving this payment. (Second Amended Complaint ¶17). Despite the $25,000 payment,
24  Rhino did not proceed to do any further work on the task orders. In an internal communique in
25
26
       _____
27          [2] Mr. Danforth's e-mail was from him to Rhino's officers. Although it constitutes an admission
   by Rhino, there is no admission or acquiescence by BioGenesis to Rhino's claim that it had started task
28  orders 3 and 4.

**DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS**
**PACIFIC, INC.'S MOTION FOR SUMMARY JUDGMENT**
summary judgment memo v3.wpd                                                    4

1 │ November 2000, Rhino's General Manager, George Allen, admitted that Rhino was doing next to
2 │ nothing on the Navy Contract and suggested that Rhino should do just enough to give the appearance
3 │ of working on the task orders. (Ex. L to the Clark Decl.)

4 │ Despite continued negotiations the parties were unable to agree on a written subcontract.
5 │ The parties agree that by December 2000, BioGenesis had mobilized its own work force and was
6 │ performing work on the Navy Contract without Rhino. (Ex. 2, pp. 154-155 to the Clark Decl.) On
7 │ December 14, 2000, Rhino sent an official company to Al Garthe confirming that Rhino was to cease
8 │ devoting any resources to the Navy Contract since there was no subcontract with BioGenesis. (Ex. M
9 │ to the Clark Decl.)

10 │ Later, in February 2001, BioGenesis rented a flatbed pickup truck from Rhino. (Ex. Q
11 │ to the Clark Decl.) Rhino invoiced BioGenesis for this rental, and BioGenesis paid this invoice. Rhino
12 │ further claims that BioGenesis rented the flatbed pickup truck again in March 2001, with the last date
13 │ of rental being March 20, 2001. (Ex. P to the Clark Decl.) BioGenesis disputes this assertion. (Ex. 5,
14 │ pp. 161-62 to the Clark Decl.)

15 │ On December 22, 2001, Rhino filed a claim with BioGenesis' surety, American Home
16 │ Assurance Company ("AHAC"). (Ex. N to the Clark Decl.) In its claim, Rhino states that it is owed
17 │ $245,664.43, contrary to Rhino's final invoice stating that the amount owing was $89,668.48 and
18 │ despite having received BioGenesis' $25,000 payment. (Id.) Rhino's CEO and controller have testified
19 │ that Rhino's claim increased from $89,668.48 (which amount actually should have been $64,668.48
20 │ after application of the $25,000 payment) to $245,664.43 because they were advised by legal counsel
21 │ to include all overhead expenses that they felt was even remotely related to the Navy Contract. (Ex. 2,
22 │ pp. 171-172 to the Clark Decl.) Rhino has included in its claim expenses dating back to as early as
23 │ 1998 and including, among other things, Rhino's capital equipment and utilities bill, even though
24 │ Rhino's AHAC claim alleges to be for all labor and materials provided between May and December
25 │ 2000. (Ex. 2, pp. 170-172; Ex. 4, pp. 193-197; Ex. 8, pp. 20-27 to the Clark Decl.)

26 │ On January 9, 2002, Rhino filed an amended claim against BioGenesis' surety. (Ex. O
27 │ to the Clark Dec.) This time, the claim increased from $245,664.43 to $1,081,881.80. In this case, the
28 │

1  increase is the result of a claim for lost profits, despite that such damages are not permitted under the

2  Miller Act. Rhino filed this lawsuit on March 20, 2002.

3      Based upon the undisputed facts of this case, it is clear Rhino's claim includes charges

4  for capital equipment and lost profits, none of which is allowed under the Miller Act. It is also appears

5  that Rhino's lawsuit was brought outside the Miller Act's one-year statute of limitation. In addition,

6  Rhino's claims of bad faith and fraud against BioGenesis fail for several reasons argued below.

7      Based upon the defects in Rhino's claims, BioGenesis hereby respectfully requests that

8  summary judgment be granted in BioGenesis' favor and that Rhino's claim be dismissed in its entirety.

9  In addition, Rhino's fourth cause of action should be dismissed on the pleadings, and the fifth cause of

10  action should be dismissed for failing to plead fraud with particularity.

11                    **II. THE STANDARD FOR A SUMMARY JUDGMENT**

12      Under Rule 56(c) of the Federal Rules of Civil Procedure ("FRCP"), summary judgment

13  "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions

14  on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and

15  that the moving party is entitled to judgment as a matter of law." A party seeking summary judgment

16  "always bears the initial responsibility of informing the district court of the basis for its motion, and

17  identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on

18  file, together with affidavits, if any' which it believes demonstrates the absence of a genuine issue of

19  material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2558 (1986). This burden

20  may be discharged by showing to the court "that there is an absence of evidence to support the

21  nonmoving party's case." 477 U.S. at 325, 106 S.Ct. at 2554.

22      Once the initial burden is met by the movant, "the nonmoving party must set forth by

23  affidavit, or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for

24  trial." *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Assn.*, 809 F.2d 626, 630 (9th Cir. 1987).

25  The nonmoving party may not rely on allegations in the pleadings, nor the statement that "it will

26  discredit the moving party's evidence at trial and proceed in the way of evidence to support its claim."

27  *Id.* "The resisting party must respond with more than mere hearsay and legal conclusions." *Kaiser*

28  *Cement Corp. v. Fischbach and Moore, Inc.*, 793 F.2d 1100, 1104 (9th Cir. 1986). The non-moving

1  party must produce at least some "significant probative evidence tending to support the complaint."

2  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986).

### III. ARGUMENT

#### A. Statute of Limitations

5       Title 40 U.S.C. § 270b(b) (re-codified as 40 U.S.C. §3133 in 2002) acts as a statute of

6  limitations, and any action not timely brought is barred. *See United States ex rel. Celanese Coating Co.*

7  *v. Bullard* 504 F.2d 466 (9th Cir. 1974) ("As an integral part of the statute creating the remedy, the one

8  year limitation in 40 U.S.C. §270b is jurisdictional. Compliance with the limitation period is a

9  condition precedent to maintaining an action under that section."); *Magna Masonry, Inc. v. R.T.*

10  *Woodfield, Inc.*, 709 F.2d 249, 251 (4th Cir. 1983).

11       Even if we accept *arguendo* Rhino's contention that BioGenesis rented a flatbed truck

12  from Rhino on March 20, 2001 (Ex. P to the Clark Decl.), the Miller Act provides that no "suit shall

13  be commenced after the expiration of one year after the day on which the last of the labor was

14  performed or material was supplied." If, as Rhino alleges, the last day that BioGenesis rented the

15  flatbed truck was March 20, one year after that date would have expired on March 19 of the following

16  year, and the suit could not have commenced after that date.

17       Although there are conflicting interpretations on the calculation of the one year period,

18  the Eight Circuit Court of Appeals has affirmed that a statute of limitations commences on the date that

19  the action accrues and ends 365 days thereafter. Thus, if Rhino's action accrued on March 20, 2001,

20  its deadline to file the lawsuit would have been March 19, 2002. *See Mattson v. U.S. West*

21  *Communications, Inc.* 967 F.2d 259 (8th Cir. 1992) (rejecting argument that FRCP Rule 6(a) should be

22  used in computing the expiration of statute of limitations and holding that a lawsuit for cause of action

23  that accrued on November 27, 1979 should have been brought by November 26, 1980). *See also Naas*

24  *v. Stolman*, 130 F.3d 892, 893 (9th Cir. 1997) (accepting the conclusion in *Mattson*, though not

25  specifically addressing the application of FRCP Rule 6(a)); *cf Hart v. United States of America*, 817

26  F.2d 78 (9th Cir. 1974).

27       In addition, both BioGenesis and Rhino have confirmed that any agreement to allow

28  Rhino to work on the Navy Contract was terminated by either or both parties by December 2000. (Ex.

1    M, Ex. O and Ex. Z to the Clark Decl.) Therefore, the flatbed rental in 2001 was subject to a separate,
2    independent contract between the parties. Courts have held that when there are multiple contacts
3    between a contractor and a subcontractor, the one-year statute of limitation under the Miller Act
4    commences at the end of each contract. *See Robert Defilippis Crane Service, Inc. v. William L. Crow
5    Const. Co.*, 826 F.Supp. 647, 654 (E.D.N.Y. 1993) ('[S]ection 270b(a) gives the supplier 90 days from
6    that date in which to present its notice of claim. The supplier could not present its notice of claim based
7    on this contract more than four and a half years later, even if the supplier continued to furnish
8    equipment to the same subcontractor under subsequent contracts"); *McGrath v. Travelers Indem. Co.*,
9    253 F.Supp. 330 (D.C.Az. 1966); *cf Noland Co. v. Andrews*, 406 F.2d 790 (4th Cir. 1969). Although
10   other jurisdictions have chosen not to adopt this rule, there is a compelling basis in this case to adopt
11   the ruling in *Defilippis* and *McGrath*.

12           Rhino contends that it was a subcontractor throughout most of 2000. In 2001, however,
13   it is clear that Rhino did nothing more than provide equipment. Under the Miller Act, courts have noted
14   that the rights of an equipment provider or materialman is significantly different from the rights of a
15   subcontractor. "The distinction between a 'subcontractor' and a 'materialman' turns on the
16   substantiality and importance of the relationship between the middle party and the prime contractor.
17   Only a middle party who has taken responsibility for a large and definable part of the construction
18   project is a 'subcontractor.' Otherwise, he is a 'materialman.'" *Gulf States Ent., Inc. v. R.R. Way, Inc.*,
19   938 F.2d 583, 587 (5th Cir. 1991). Although the distinction is applicable to claims of a direct contract
20   with the prime contractor, the distinction is nonetheless important because in this case it serves to
21   clarify that the 2000 and 2001 agreements were separate and distinct.

22           In *Nat'l Lawn Sprinklers, Inc. v. Aim Const. & Contracting Corp.*, 2000 WL 1290599
23   (E.D.N.Y.), that court held: "If . . . it is determined that prior to May 7, 1998 (1 year prior to the filing
24   of the complaint) that National knew or reasonably should have known that the subcontract was
25   terminated and that it was not going to resume work on May 11, 1998, the present litigation will be time
26   barred. Under these circumstances, neither the inventory taken on May 9, 1998, nor the removal of the
27   equipment and trailer on May 12, 1998, would constitute 'furnishing or supplying' labor or materials
28   under the Miller Act."

1  Courts have also noted for purposes of determining the limitations period under the

2  Miller Act that "the applicable legal test ... is 'whether the work was performed and the material

3  supplied as a 'part of the original contract' or for the 'purpose of correcting defects, or making repairs

4  following inspection of the project.'" *Magna Masonry*, 709 F.2d 251. In the latter case, the minor work

5  and materials would not extend the statute of limitations period. *Accord Nat'l Lawn Sprinklers*, 2000

6  WL 1290599.

7  In summary, Rhino had no reasonable expectation that any agreement terminated in

8  December 2000 was revived by the 2001 flatbed truck rental. Accordingly, under the rule adopted in

9  *Defilippis* and *McGrath*, Rhino should have filed its action no later than December 2001. In addition,

10  under the rule stated in *Mattson*, Rhino should have filed its lawsuit no later than March 19, 2001.

11  Rhino's failure to timely bring its lawsuit warrants the granting of summary judgment in BioGenesis'

12  favor with respect to the Miller Act claim. Moreover, if dismissed, then Rhino's entire complaint

13  should be dismissed since the Court would no longer have plenary or diversity jurisdiction to hear the

14  controversy.

15  **B.  Rhino's Miller Act Claim Should Be Limited to $4,667.70**

16  In its Miller Act claim, Rhino claims that it entitled to $1,264,694.47 in damages.

17  (Second Amended Complaint Prayer ¶1). However, there is no factual or legal basis to support its claim

18  since Rhino's first cause of action includes claims for lost profit and capital equipment, which are

19  legally impermissible under the Miller Act. Partial summary judgment should be granted to reduce the

20  value of Rhino's Miller Act claim to $4,667.70, subject to proof, as argued below.

21  On November 14, 2000, Rhino prepared an invoice totaling $89,668.58. (Ex. K to the

22  Clark Decl.) Rhino's invoice states that Rhino completed 100% of the work on task orders 1, 2 and 3,

23  and 90% of the work on task order 4.

24  In October, 2000, Rhino's agent, Michael Danforth, confirmed the status of Rhino's

25  work on all task orders. (Ex. 6, p. 36; Ex. R to the Clark Decl.) Per the status report, work on task

26  orders 3 and 4 had not yet commenced. Task order 3 was identified as being a "project delayed by

27  government," and the start date for task order 4 was not scheduled until October 31, 2000. (Ex. R to

28  the Clark Decl.) In addition, the Navy has confirmed that task order 3 was not completed until March

1   15, 2001, and task order 4 on April 4, 2001. (Ex. S and Ex. T, respectively, to the Clark Decl.)
2   Accordingly, both the start dates noted by Rhino's agent and the completion dates noted by the Navy
3   make it indisputable that Rhino had not even started task order 3 or 4, much less completed them.

4           Based upon this indisputable evidence, Rhino's Miller Act claim should be limited to
5   Delivery Orders 1, 2 and 7. The total value of these three delivery orders is $43,854.20. (Ex. U, V and
6   W to the Clark Decl.) Per the declaration of BioGenesis' controller, Russell Fong, BioGenesis paid
7   $14,186.50 for the materials provided in task orders 1 and 2. (Ex. X to the Clark Decl.) Subtracting
8   the material cost from the contract value of task orders 1, 2 and 7 leaves a balance of $29,667.70.

9           Rhino alleges to have had an oral subcontract with BioGenesis to split profits. By its
10  own admission, Rhino's controller has stated that there is no way for a Small Business Act §2[8](a)
11  federal contractor (an "8(a)" contractor) to lose money on a federal project. See 15 U.S.C.A. §637(a)
12  (Ex. 4, p. 164 to the Clark Decl.). Even if BioGenesis were to give Rhino 100% of the profits from task
13  orders 1, 2 and 7, the most it could claim is the value of three delivery orders less BioGenesis' cost for
14  materials.

15          The parties do not dispute that BioGenesis paid Rhino $25,000. (Second Amended
16  Complaint ¶17). Subtracting this amount from the value of the three delivery orders, after deducting
17  the cost of materials, leaves a balance of $4,667.70. This should be the maximum amount of Rhino's
18  claim under the Miller Act, though Rhino may not even be entitled to that much.

19          The evidence is clear and convincing: Rhino did not complete task order 3 and 90% of
20  task order 4 as the November 14 invoice falsely claims. Accordingly, BioGenesis requests that partial
21  summary judgment be granted in BioGenesis' favor as to Rhino's first cause of action and that the value
22  of the claim be reduced accordingly.

23                          C.      **Lost Profit and Capital Equipment Claims
                                    Are Not Allowed Under the Miller Act**
24
25          Rhino's excessive claim for over a million dollars admittedly includes a claim for lost
26  profit and for capital equipment, neither of which are allowed under the Miller Act. *See Ibex Indust.
27  Inc. v. Coast Line Waterproofing*, 563 F.Supp. 1142 (D.C. D.C. 1983) (holding that wheelbarrows, goss
    burner, ladder vator, gravel hopper, tolls, brush and hose, axes, hoses, goggles, hammer, and mop
28

1   handle constitute equipment which could not be claimed under the Miller Act); *Transamerica Premier*

2   *Ins. Co. v. Ober*, 894 F.Supp. 47 (D.C.Me.1995) (capital equipment not recoverable under Miller Act);

3   *Kirchdorfer, Inc. v. Aegis/zublin J.V.*, 869 F.Supp. 387 (E.D.Va. 1994) (same) *citing United States ex*

4   *rel. Sunbelt Pipe Corp. v. United States Fidelity and Guaranty Co.*, 785 F.2d 468, 470 (4th Cir.1986).

5   (Ex. 4, pp. 193-197, 208-210 to the Clark Decl.)

6         On the issue of lost profits, the Ninth Circuit Court has held that: "A claim for profits

7   does not involve actual outlay and thus 'falls outside both the letter and the spirit of the [Miller] Act.'

8   We therefore limit the amount Molnick's may recover from Aetna to Molnick's out-of-pocket labor and

9   material costs incurred in completing the hospital's framework and decking contracts." *Mai Steel*

10   *Service Inc., a Kansas Corp. v. Blake Const. Co.*, 981 F.2d 414 (9th Cir. 1992) (citations omitted).

11   *Accord Consol. Elec. & Mech., Inc. v. Biggs Gen. Contracting, Inc.*, 167 F.3d 432, 435-36 (8th Cir.

12   1999) (citations omitted) ("Decisions of the Fifth, Ninth, and Eleventh Circuits . . . hold that the Miller

13   Act does not contemplate lost profits. . . We agree with the reasoning of these latter cases.");

14   *Kirchdorfer* 869 F.Supp. 394 ("[T]he Miller Act does not establish an unlimited means of recovery

15   against a surety. . . . [L]ost profits are not recoverable from the surety in an action on the Miller Act

16   payment bond." (*Citing United States ex rel. Pertun Constr. Co. v. Harvesters Group, Inc.*, 918 F.2d

17   915, 917 (11th Cir.1990), and *United States ex rel. Moran Towing Corp. v. Hartford Acc. & Indem. Co.*,

18   204 F.Supp. 353 (D.R.I.1962)); *Otis Elevator Co. v. Piracci Constr. Co.*, 405 F.Supp. 908, 910

19   (D.D.C.1975) ("Lost profit is precisely the type of breach of contract damage courts have consistently

20   held to fall outside the scope of the Miller Act"). Even in the few jurisdictions outside the Ninth Circuit

21   that allow recovery of lost profit, the profit is limited to the work done, which in Rhino's case would

22   be limited to task orders 1, 2 and 7. There is no theory under which Rhino can claim all alleged profits

23   for all task orders for all years. Therefore, summary judgment should be granted in BioGenesis' favor

24   as to Rhino's first cause of action.

25         **Rhino's Bad Faith Claim Fails to State a Cause of Action**

26         Rhino's fourth cause of action is a claim for bad faith. Rhino's pleading fails to state

27   any facts giving rise to any act of bad faith and should be dismissed on the pleading itself. FRCP Rule

28   12(c). The standard for dismissal under Rule 12(c) is the same as for Rule 12(b)(6) ("As with Rule

1  12(b)(6), under Rule 12(c) the court must accept the nonmovant's allegations as true; viewing the facts
2  'in the light most favorable to the nonmoving party.'"). 2 James Wm. Moore Et Al., Moore's Fed.
3  Pract. §12.38 (3d. ed). BioGenesis is further entitled to summary judgment pursuant to FRCP Rule 56.

4        Rhino alleges that BioGenesis secretly negotiated to acquire a 49% ownership interest
5  in Rhino in order to intimidate Plaintiff into quiescence with respect to a take over of Rhino's Guam
6  facilities in order to deprive Rhino of its profits under the alleged subcontract. (Second Amended
7  Complaint ¶¶52, 53). Rhino's bad faith claim is inherently defective for four reasons.

8        First, even if BioGenesis had acquired an ownership interest in Rhino and were able to
9  force the transfer of Rhino's Guam facilities, such a transfer could <u>only</u> be made effective if duly
10  authorized by the corporation itself. Thus, since BioGenesis would have been limited to acting within
11  the bounds of formal corporate authority, it could not have been acting in bad faith.

12        Second, Rhino's alleges that BioGenesis was negotiating to acquire a <u>minority</u> interest
13  in Rhino. Thus, even if BioGenesis was successful in acquiring 49% of the shares of Rhino, it would
14  not have had enough control to force the corporation to do anything.

15        Third, all parties have agreed that any transfer of shares to BioGenesis was subject to
16  the approval of the directors and other shareholders of the corporation, which approval was specifically
17  denied, thus the transfer could never have happened without Rhino's prior approval. (Ex. 3, pp. 103-
18  104; Ex. Y to the Clark Decl.)

19        Finally, Rhino claims that BioGenesis' attempted acquisition of shares in Rhino
20  "prevented Plaintiff from being able to perform its duties under the subcontract agreement and
21  effectively stopped it from doing so." (Second Amended Complaint ¶54). This statement is patently
22  false. Rhino admits to having stopped working on the Navy Project by November 2000. Rhino's CEO
23  testified that by December 2000, BioGenesis had mobilized and started working on the Navy Contract.
24  Rhino first become aware of the alleged stock acquisition on December 8, 2000 during a meeting at
25  Zippy's in Hawaii. (Ex. 2, pp. 139-141; Ex. AA and BB to the Clark Decl.) Thus, there is no nexus
26  between the termination of the alleged subcontract and BioGenesis' attempt to purchase a minority
27  interest in Rhino. Accordingly, the fourth cause of action should be dismissed for failing to state a
28  claim upon which relief may be granted.

## D. Rhino's Claim of Fraud Lacks Particularity Required by FRCP Rule 9(b)

Rhino's fifth cause of action (misnumbered as the third cause of action) is a claim for fraud. This claim should be dismissed for failing to state the fraud with particularity. In addition, summary judgment should also be granted in BioGenesis' favor as Rhino's claim lacks any genuine issue of material fact.

Pursuant to FRCP Rule 9(b), all claims for fraud must be stated with particularity. Rhino alleges that when Rhino and BioGenesis supposedly entered into a subcontract, BioGenesis "intended not to honor any agreement to compensate Plaintiff. . . ." (Second Amended Complaint ¶60.) Further, Rhino claims that BioGenesis "concealed" that intent from Rhino. (Second Amended Complaint ¶61.)

Rhino's claims fails to state with particularity how, or what facts create the inference that, BioGenesis intended not to honor this supposed agreement or how it concealed this intent. In summarizing FRCP Rule 9(b)'s requirement for particularity, the Ninth Circuit Court has held:

> In *Moore v. Kayport Package Express,* we observed that plaintiff must include statements regarding the time, place, and *nature* of the alleged fraudulent activities, and that "mere conclusory allegations of fraud are insufficient." Similarly, in *Semegen v. Weidner,* we held that it was insufficient to "set forth conclusory allegations of fraud ... punctuated by a handful of neutral facts." And in *Blake v. Dierdorff,* we required plaintiffs to set forth "specific descriptions of the representations made, [and] *the reasons for their falsity.*" To allege fraud with particularity, a plaintiff must set forth *more* than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading.

*In re GlenFed, Inc. Sec. Litigation* 42 F.3d 1541, 1548 (9th Cir. 1994) (citations omitted). In *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048 (9th Cir. 2001), the plaintiff alleged that the defendant "'knowingly. . . changed control numbers [on various tests] to wrongfully represent. . .laboratory results.'" In response to this allegation, the Ninth Circuit held that:

> This broad claim had no factual support – [Plaintiff] did not specify the types of tests implicated in the alleged fraud, identify the [Defendant] employees who performed the tests, or provide any dates, times, or places the tests were conducted. Rule 9(b) may not require [Plaintiff] to allege, in detail, all facts supporting each and every instance of false testing over a multi-year period. . . . However, [Plaintiff's] first amended complaint is not "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged

1    so that they can defend against the charge and not just deny that they
2    have done anything wrong." The complaint therefore fails to satisfy
     Rule 9(b).

3    245 F.3d at 1051 - 1052 (citations omitted).

4         Biogenesis' alleged lack of payment by itself does not qualify as a particular statement,

5    otherwise every breach of contract claim would be subject to a claim for fraud. Also, Rhino's claim

6    that BioGenesis intended not to honor an agreement is merely conclusory.

7         Although there is a policy that favors allowing parties to amend their pleadings, a court

8    may properly deny a motion for leave to amend if it would be futile to permit the amendment. *See*

9    *Partington v. Bugliosi*, 56 F.3d 1147, 1162 (9th Cir. 1995). Courts have repeatedly held that futility

10   of an amendment can, by itself, justify the denial of a motion for leave to amend. *See Bonin v.*

11   *Calderon*, 59 F.3d 815, 845 (9th Cir. 1995); *Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir.

12   1990); *Roth v. Garcia Marquez*, 942 F.2d 617, 628 (9th Cir. 1991); *Johnson v. American Airlines, Inc.*,

13   834 F.2d 721, 724 (9th Cir. 1987); and *Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 766 (9th

14   Cir. 1986) ("any amendment would have been futile in that it could be defeated on a motion for

15   summary judgment").

16        It is obvious from Rhino's own pleadings that there is no basis to support Rhino's claim

17   of fraud, thus it would be futile to permit Rhino to amend its allegation. Rhino's claim that BioGenesis

18   never intended to pay Rhino is clearly contradicted by Rhino's own allegation that BioGenesis paid

19   Rhino $25,000. (Second Amended Complaint ¶17).

20        In addition, Rhino alleges that BioGenesis caused Rhino to lose its credit line as a result

21   of the alleged fraud, which resulted in lost profits. However, Rhino's CEO has testified that Rhino lost

22   its credit line because Rhino breached its agreement with its lender when it used credit line funds for

23   the Navy Contract. (Ex. 7, pp. 57-59; Ex. 8, pp. 48-50 to the Clark Decl.) Under its credit line

24   agreement, Rhino could not use the credit line funds for any particular contract unless it first assigned

25   the proceeds from that contract to the lender, which Rhino could not do for the alleged BioGenesis

26   subcontract since there was no written subcontract. Rhino never advised its lender that it was utilizing

27   the credit line in breach of its credit agreement until "after the fact," to which Rhino's lender advised

28

1  Rhino that it had "misappropriated" the funds, thus, resulting in Rhino's loss of its credit line. (Ex.7,
2  pp. 57-59 to the Clark Decl.)

3          In summary, Rhino's claim lacks the level of particularity required by Rule 9(b) and
4  should be dismissed on that basis. Further, although courts may grant leave to amend to allow a
5  plaintiff to re-plead a defective fraud allegation, the Court is not required to permit such leave when it
6  would be futile to do so. Rhino's own statement of facts makes it evident that Rhino would not be able
7  to prevail on an alleged claim of fraud. Accordingly, Rhino's fifth cause of action should be dismissed
8  with prejudice.

9  ## IV. CONCLUSION

10          Rhino has failed to bring its action within the statute of limitation period. Rhino's claim
11  for over a million dollars includes claims for capital equipment, lost profit and overhead expenses pre-
12  dating the alleged subcontract by at least a year-and-a-half, none of which is permitted under the Miller
13  Act. As for those charges that may be claimed under the Miller Act, Rhino's November 14, 2000
14  invoice for labor and materials its patently false. Rhino claims to have completed work before work
15  was scheduled to start and four to five months prior to when the Navy confirms the work was
16  completed. And finally, Rhino's allegations of bad faith and fraud are inherently defective.
17  Accordingly, BioGenesis respectfully requests that this Court grant summary judgment in BioGenesis'
18  favor.

19          Dated this 15th day of December, 2003.

20                      CALVO AND CLARK, LLP
                       Attorneys at Law
21                      Attorneys for Defendant/Counter-Plaintiff
                       BioGenesis Pacific, Inc.
22
23
24              By: _____
25                     ARTHUR B. CLARK
26
27
28

10 Fed.Appx. 957
**(Cite as: 10 Fed.Appx. 957, 2001 WL 638450 (Fed.Cir.))**

**H**
This case was not selected for publication in the Federal Reporter.

NOTE: Pursuant to Fed.Cir.R. 47.6, this order is not citable as precedent. It is public record.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Federal Circuit Rule 47.6. (FIND CTAF Rule 47.6.)

United States Court of Appeals,
Federal Circuit.

**HAWPE** CONSTRUCTION, INC.,
Plaintiff-Appellant,
v.
UNITED STATES, Defendant-Appellee.

**No. 00-5103.**

June 8, 2001.

Unsuccessful bidder brought bid protest regarding award by United States, under competitive procurement pursuant to Small Business Administration (SBA) program, of contract for installation and repair of roofs at Navy public works center. The Court of Federal Claims, 46 Fed.Cl. 571, granted summary judgment for United States. Bidder appealed. The Court of Appeals for the Federal Circuit, Schall, Circuit Judge, held that any error of United States in awarding contract to bidder whose bid did not comply with requirement in Request for Proposals (RFP) that bidders have formal Standard Industrial Classification (SIC) size certification was not prejudicial to unsuccessful bidder.

Affirmed.

West Headnotes

**[1] Federal Courts ☞766**
170Bk766 Most Cited Cases

Court of Appeals for the Federal Circuit reviews a grant of summary judgment upon the administrative record without deference to the Court of Federal Claims.

**[2] United States ☞64.55(1)**
393k64.55(1) Most Cited Cases

To prevail in its bid protest in the Court of Federal Claims, unsuccessful bidder was required to show that significant errors occurred in the procurement process and that those errors were prejudicial.

**[3] United States ☞64.40(1)**
393k64.40(1) Most Cited Cases

To be erroneous, the government's actions during the procurement process must be such that they do not evince rational reasoning and consideration of relevant factors.

**[4] United States ☞64.55(1)**
393k64.55(1) Most Cited Cases

For an error in the procurement process to be prejudicial, the disappointed bidder must establish that there was a substantial chance it would have received the contract award but for that error.

**[5] United States ☞64.40(2)**
393k64.40(2) Most Cited Cases

When the government solicits a bid on a contract, it is deemed to have entered into an implied-in-fact contract with the bidders to have their bids considered fairly and honestly.

**[6] United States ☞64.55(1)**
393k64.55(1) Most Cited Cases

Any error of United States in awarding, under competitive procurement pursuant to Small Business Administration (SBA) program, contract for installation and repair of roofs at Navy public works center to bidder whose bid did not comply with requirement in Request for Proposals (RFP) that bidders have formal Standard Industrial Classification (SIC) size certification, was not prejudicial to unsuccessful bidder; by the time the bid was awarded, SBA regulations required bidders only to meet SIC qualifications and no longer required formal certification, United States had ultimate authority to determine bidder's size, and new bid solicitation would not provide unsuccessful bidder with fair consideration of its bid, because new bidding would be conducted without the size certification requirement. Small Business Act, § 2[2](f)(2)(A,B), 15 U.S.C.A. § 631(f)(2)(A,B); 13 C.F.R. § 124.402; 48 C.F.R. § 219.800.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*958 Before CLEVENGER, <u>SCHALL</u>, and <u>BRYSON</u>, Circuit Judges.

## DECISION

<u>SCHALL</u>, Circuit Judge.

**1 **Hawpe** Construction Inc. **("Hawpe")** appeals the decision of the United States Court of Federal Claims that granted summary judgment on the administrative record in favor of the United States in **Hawpe's** bid protest action. *Hawpe v. United States*, 46 Fed.Cl. 571 (2000). In its protest, **Hawpe** challenged the award to **Biogenesis** Pacific, Inc. ("BPI") of a contract for the installation and repair of roofs at the Navy Public Works Center in Guam ("PWC"). The PWC contract was awarded under a competitive procurement pursuant to the Small Business Administration's ("SBA's") 8(a) program. *See* 15 U.S.C. §§ 631(f)(2)(A) and (B) (1994). We *affirm*.

## DISCUSSION
### I.

[1] We review a grant of summary judgment upon the administrative record without deference to the Court of Federal Claims. *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed.Cir.2000). A bid protest in the Court of Federal Claims is considered under the Administrative Procedure Act's ("APA's") standard of review. 28 U.S.C. § 1491(b)(4) (1994); *Advanced Data Concepts*, 216 F.3d at 1057. Under the APA standard, a court must determine whether the government's actions were arbitrary, capricious, abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations; or without observance of procedure required by law. 5 U.S.C. § 706(2) (1994).

[2][3][4][5] To prevail on its action in the Court of Federal Claims, **Hawpe** was required to show that significant errors occurred in the procurement process and that those errors were prejudicial. *Advanced Data Concepts*, 216 F.3d at 1057; *Alfa Laval v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999). To be erroneous, the government's actions during the procurement process must be such that they do not evince "rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058. If such an error is found, for it to be prejudicial, the disappointed bidder must establish that "there was a substantial chance it would have received the contract award but for that error." *Statistica Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996). When the

government solicits a bid on a contract, it is deemed to have entered into an implied-in-fact contract with the bidders to have their bids considered fairly and honestly. *Southfork Systems, Inc. v. United States*, 141 F.3d 1124, 1132 (Fed.Cir.1998).

### II.

The Court of Federal Claims determined that the government's award of the PWC contract to BPI was a breach of the solicitation, the reason being that BPI did not have the SBA SIC Code 1761 that was required in the Request for Proposals ("RFP"). *Hawpe*, 46 Fed.Cl. at 579; *see also* 10 U.S.C. § 2305(b)(1) ( "The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."). The court concluded, however, that while the government's choice of a contractor without an SIC Code 1761 was a breach of the RFP, the breach was not material and **Hawpe** suffered no prejudice. *Hawpe*, 46 Fed.Cl. at 580. By the *959 time the RFP for the PWC contract was awarded, however, the SBA had removed the requirement that a small business have a formal SIC Code certification in order to bid on an 8(a) contract. 13 C.F.R. § 124.402 (1999). Rather, the small businesses only needed to meet the qualifications set forth in the SIC Code. The court noted that the SBA was to make the ultimate determination as to size eligibility when it reviewed the potential contractors. The court reasoned that, under these circumstances, while the government "did technically violate the terms of its own RFP, it did so in a manner that did not harm consideration of **[Hawpe's]** bid, and considered [BPI's] bid in accordance with federal regulation and law. This fact, coupled with the realization that the SBA had the ultimate decision on size determination, including the requirement for SIC Code 1761 certification, prevents the court from granting **[Hawpe's]** request for permanent injunction." *Hawpe*, 46 Fed.Cl. at 582.

### III.

**2 [6] We see no error in the decision of the Court of Federal Claims. **Hawpe** failed to show prejudice from the violation of the RFP. As the trial court noted, *Id.* at 579, **Hawpe** was on notice that the SBA had changed the SIC Code provision requirement through its announcement of the change in the Federal Register and through the Code of Federal Regulations, both which give legal notice of their content. *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384-85, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Additionally, as in all small business contract procurements, either directly through the government agency or via the SBA, the SBA had the ultimate decision on size determinations. The SBA

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

retains the ultimate right to determine whether its size requirements have been met. 48 C.F.R. § 219.800 (1999). Because BPI met the requirements for this procurement, the SBA would have found BPI eligible for the award, with or without SIC certification. As the trial court determined, a new bid solicitation would fail to provide **Hawpe** with a fairer consideration of its bid because both BPI and **Hawpe** would be competing under current SBA standards which do not require SIC Code 1761. _Hawpe_ 46 Fed. Cl. at 579. Without the error in the RFP, **Hawpe** stands the same chance of obtaining the contract as it did in the initial procurement.

This case is unlike that of _Alfa Laval,_ upon which **Hawpe** relies. There, the government waived a testing requirement for one specific bidder. The plaintiff in _Alfa Laval_ was prejudiced because he was one of only two bidders; "but for" the waiver of the testing requirement, the plaintiff in _Alfa Laval_ would have been assured of the award. In contrast, **Hawpe** has not shown that it was prejudiced by the government's consideration of its bid.

For the foregoing reasons, the decision of the Court of Federal Claims is affirmed.

No costs.

10 Fed.Appx. 957, 2001 WL 638450 (Fed.Cir.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
**(Cite as: 2000 WL 1290599 (S.D.N.Y.))**
C
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

UNITED STATES, for the use and benefit of National Lawn Sprinklers, Inc.,
Plaintiff,
v.
AIM CONSTRUCTION & CONTRACTING CORPORATION and HARTFORD FIRE INSURANCE
COMPANY,
Defendants.

**No. 99 CIV. 3357(LMM).**

Sept. 13, 2000.

MEMORANDUM AND ORDER

MCKENNA , D.J.

INTRODUCTION

**\*1** Plaintiff, National Lawn Sprinklers, Inc. ("National"), brings this action against defendants, AIM Construction & Contracting Corporation and Hartford Fire Insurance Company (collectively referred to herein as "Aim"), under 40 U.S.C. §§ 270a , 270b , 270c and 270d (2000) , commonly known as the "Miller Act." National demands $258,566.66 from the defendants pursuant to a subcontract dated February 10, 1997. Presently before this Court is Aim's motion for summary judgment contending that National's claims are time barred under the Miller Act's one-year statute of limitations. For the reasons stated below, Aim's motion is denied.

FACTS

On February 10, 1997 Aim hired National as a subcontractor on a project to replace the sprinkler systems for five athletic fields at the United States Military Academy located in West Point, New York. On September 10, 1997 the Government accepted as complete, three of the five sprinkler systems. Work on the two remaining systems was either in the preliminary stages, or not yet started. However, on January 28, 1998, before any substantial work had been performed on either of the remaining systems, Aim sent a letter to National purportedly terminating the subcontract.

Despite the January 28 letter National believed that the contract was still in effect and that work was to resume on May 11, 1998. In fact, when National's surety, Hartford Fire Insurance Company ("surety"), prepared a Completion and Takeover Agreement to, in writing, establish the parties rights and obligations under the contract, Aim failed to execute it. Accordingly, National readied itself to continue performance pursuant to the original agreement. To that end, on April 10, 1998 National claims to have sent a crew of men over to the site to assemble the components of the

sprinkler systems to be installed on the two remaining fields on May 11, 1998. Further, National claims that on May 1, 1998 it ordered additional materials necessary for the completion of work to be delivered and used on May 11, 1998.

However, on May 7, 1998 Aim sent a letter to National stating not only that the contract "has been terminated since January 28, 1998" but that "[w]e have sent several notification requesting that you remove your trailer equipment and materials from the above job site. This is to advise you again that you have 3 days, upon receipt of this letter to remove same." Contrary to the text of the letter, National contends that the May 7 letter was the first notification that the contract was indeed terminated and that Aim wanted National to remove its trailer and equipment from the premises. Further, National contends that the letter was not received by facsimile (although the letter says "VIA Fax") on May 7, but sometime before May 9.

Two facts are vigorously contested between the parties: (1) whether National performed any work or supplied any labor to the project after January 28, 1998; and (2) whether the subcontract was indeed terminated on that date. Aim contends that the letter of January 28 terminated the subcontract, and that National did not perform any work or supply any labor after that date. National argues that the conduct between the parties subsequent to the letter of January 28 indicated that the contract was not terminated, and that National had a good faith and reasonable expectation that it would resume work on May 11, 1998.

## DISCUSSION

**\*2** Summary judgment should be granted only where the court determines that "there exists no genuine issues of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." _D'Amico v. City of New York,_ 132 F.3d 145, 149 (2d Cir.1998) . In resolving such a motion, all reasonable inferences are drawn, and all ambiguities resolved, in favor of the non-moving party. _See Chertkova v. Connecticut Gen. Life Ins. Co.,_ 92 F.3d 81, 86 (2d Cir.1996) .

The Miller Act requires that any contractor who is awarded a contract for "construction, alteration, or repair of any public building or public work of the United States" must provide a bond "for the protection of all persons supplying labor and material." 40 U.S.C. § 270b(a) . Courts are to "liberally construe" the Miller Act to effectuate the Congressional intention of providing security to persons contributing labor and material to public works projects. _T.M.S. Mechanical Contractors, Inc. v. Millers Mut. Fire Ins. Co.,_ 942 F.2d 946, 950, n. 9 (5th Cir.1991) (quoting _Standard Accident Ins. Co. v. United States ex rel. Powell,_ 302 U.S. 442, 444 (1938) ).

To state a viable claim under the Miller Act, a plaintiff not only must satisfy the substantive elements of the cause of action, but must comply with jurisdictional requirements as well. _See Dragone Bros. Inc. v. Moniaros Contracting Corp.,_ 882 F.Supp. 1267 (E.D.N.Y.1995) . One of these requirements is compliance with a one-year statute of limitations. The Miller Act provides that "no such suit shall be commenced after the expiration of one year after the day on which the last of the labor was performed or material was supplied." 40 U.S.C. § 270b(b) .

Aim's summary judgment motion contends, quite simply, that the contract was terminated on January 28, 1998, yet the lawsuit was not filed until May 7, 1999. According to Aim, the lawsuit should have been filed no later than January 28, 1999 in order to be considered timely. Other than this simple analysis, Aim's papers only contain a string cite of cases where the one-year statute of limitations has been upheld.

However, unlike any of the cases cited by Aim, this case is ripe with disputed material facts that pertain to the timeliness of this litigation. The only fact on which the parties seem to agree is that the complaint was filed on May 7, 1999. As noted above, National argues that until it received the May 7 termination letter it had a good faith reasonable expectation of continuing work pursuant to the original contract on May 11, 1998. On the other hand,

Aim contends that National had no good faith basis for believing the contract had not been terminated as of January 28, 1998.

Unfortunately, the Court cannot determine on the record before it whether National's belief that the contract was still viable from January 28, 1998 until May 7, 1998 was reasonable, or in good faith. Whether the parties conduct after the January 28, 1998 letter, purportedly terminating the contract, was sufficient to justify National's subsequent actions is a factual question rendering a grant of summary judgment inappropriate.

*3 If, however, it is determined that prior to May 7, 1998 (1 year prior to the filing of the complaint) that National knew or reasonably should have known that the subcontract was terminated and that it was not going to resume work on May 11, 1998, the present litigation will be time barred. Under these circumstances, neither the inventory taken on May 9, 1998, nor the removal of the equipment and trailer on May 12, 1998, would constitute "furnishing or supplying" labor or materials under the Miller Act.

The Court is persuaded by the logic set forth in *Gulf States Enter. V. R.R. Tway, Inc.*, 938 F.2d 583 (5th Cir.1991). In *Gulf States*, the Fifth Circuit Court of Appeals held that equipment left behind did not toll the statute of limitations. The court stated:
[L]eaving the [equipment] in place was a discretionary act. [Plaintiff] cannot use its own discretionary act to its advantage in tolling the running of the statute. Such an interpretation of the statute would totally defeat it by allowing suppliers like [Plaintiff] to prolong the tolling of the statute for an indeterminate time ....
*Id.* at 590. However, the case at bar is easily distinguishable from *Gulf States*. Unlike the plaintiff in *Gulf States*, National allegedly had a good faith reasonable expectation that work on the project would resume. In *Gulf States*, the plaintiff's actions were described as a "virtual abandonment of equipment." *Id.* at 589. Consequently, the rationale that would preclude a plaintiff from tolling the Miller Act's short statute of limitations because of equipment or materials left on site simply does not apply here unless National was not acting in good faith or with a reasonable expectation of resuming work.

CONCLUSION
For the reasons stated above, Aim's motion for summary judgment is denied.

SO ORDERED.

2000 WL 1290599 (S.D.N.Y.)

END OF DOCUMENT