1   BERMAN O'CONNOR MANN & SHKLOV

2   DANIEL J. BERMAN, ESQ.
    MICHAEL J. BERMAN, ESQ.
3   Suite 503, Bank of Guam Building
    111 Chalan Santo Papa
4   Hagatna Guam 96910

5   Attorneys for Counterclaim Defendant
    *MICHAEL DANFORTH*

FILED
DISTRICT COURT OF GUAM

DEC 1 5 2003

MARY L. M. MORAN
CLERK OF COURT

28L

6           IN THE UNITED STATES DISTRICT COURT OF GUAM

7   BIOGENESIS PACIFIC, INC.,        )
    AIG TECHNICAL SERVICES,          )
8   INC., and AMERICAN HOME          )
    ASSURANCE COMPANY,               )
9                                    )
                      Defendants.    )   DECLARATION OF ALAN H. TUHY
10  _____ )
                                     )
11  BIOGENESIS PACIFIC INC.,         )
                                     )
12        Counter-Plaintiff,         )
                                     )
13     vs.                           )
                                     )
14  RHINO BUILDERS, INC.,            )
    MICHAEL O'CONNELL, MICHAEL       )
15  DANFORTH, AND JOHN DOES          )
    1-10,                            )
16                                   )
          Counter-Defendants.        )
17  _____ )
                                     )
18  AMERICAN HOME ASSURANCE          )
    COMPANY,                         )
19                                   )
          Cross-Claimant,            )
20                                   )
       vs.                           )
21                                   )
    BIOGENESIS PACIFIC INC.,         )
22                                   )
       Cross-Claim Defendant.)
23  _____ )

24

25

## DECLARATION OF ALAN H. TUHY

2       I, ALAN H. TUHY, hereby declare as follows:

3       (1)     That I am one of the attorneys for the Third Party Defendant, MICHAEL

4    DANFORTH, and make this Declaration upon personal knowledge, and

5    having personal knowledge of the facts contained herein, and I am

6    competent to testify as a witness at the trial of this matter if

7    called upon.

8       (2)     I have prepared a DESIGNATION OF RECORD which includes

9    true and correct copies of exerpts from the Depositions of my

10   client, MICHAEL LAMAR DANFORTH, and of GEORGE ALLEN; that also

11   attached to said DESIGNATION OF RECORD are true and correct copies

12   of exhibits identified  by MICHAEL LAMAR DANFORTH at his deposition

13   taken on February 21, 2003, which have been marked as for this Court

14   as Exhibits A-1 through A-16.

15      (3)     Also attached to the DESIGNATION OF RECORD as Exhibit

16   "C" is the original of the Declaration of Michael Danforth.

17      (4)     Attached to the DESIGNATION OF RECORD as Exhibit

18   "D" is the DECLARATION OF MICHAEL O'CONNELL, the co-Third Party

19   Defendant which has to my knowledge been reviewed by him and which

20   he has stated will be executed, but the original has not yet been

21   received by our office.  Upon the receipt of the original of said

22   declaration signed by Mr. O'Connell, it will be submitted to this

23   Court.

24      (5)     Attached to this Declaration is a true and correct copy

25   of a letter I caused to be sent to the attorneys for the Defendant

1 and Third Party Plaintiff BIOGENESIS PACIFIC, INC., through their attorneys of record. In

2 response to this letter, their counsel, Mr. Clark, indicated that his client intended to dismiss my

3 client from the action subject to certain conditions; despite numerous attempts to obtain a stipulation

4 for dismissal, none was received. Instead, after our office had

5 foregone active participation in discovery in anticipation of being

6 dismissed, Mr. Clark advised that other evidence of which he had

7 become aware lead his client to decide not to dismiss Mr. Danforth

8 from these proceedings.

9     (6)   My client has been put to substantial expense in

10 attorneys fees and costs to defend this action; my research of the

11 facts indicates that there exists no legitimate factual basis on

12 Mr. Danforth can be held liable to BPI for interference with

13 contract, and well grounded legal theory on which such liability

14 can be established. I have been an active and practicing attorney

15 having been admitted to the Oregon State Bar in 1975, the Hawaii

16 State Bar in 1988, and admitted to the federal courts in Oregon,

17 Hawaii and the Ninth Circuit.

18     I declare under the penalties of perjury of Guam

19 6 GCA §4308) that the foregoing is true and correct.

20     DATED this 9th day of December, 2003

21

22

23     ALAN H. TUHY

24

25

LAW OFFICES OF

# ALAN H. TUHY

Licensed in Hawaii and Oregon
75-1000 Henry Street, Suite 201
Kailua-Kona, Hawaii 96740

(808) 329-5678  FAX (808) 329-5788
March 12, 2003

ARTHUR B. CLARK
CALVO AND CLARK, LLP
Suite 202, First Savings and Loan Bldg.
655 S. Marine Drive
Tamuning, Guam 96911

RE:  *United States of America fuba RHINO BUILDERS, INC.*
*CIVIL CASE NO. 02-00008*

Dear Mr. Clark:

This letter will serve as our demand on behalf of Counter-Defendant Michael Danforth that the claim as to him set out in the Amended Answer and Counterclaim be withdrawn under the safe harbor provisions of FRCP 11.  The basis for this demand is as follows.

The Counterclaim alleges that Mr. Danforth and George Allen "...were significantly involved in the preparation and submittal of BioGenesis's bid for the Contract..." (Paragraph 8).  Mr. Danforth testified that his involvement in the bid aspect of the Project was limited to his consultation on behalf of All Star/ASB for which BioGenesis sought a teaming agreement (Depo. at p. 24).  This teaming agreement never materialized.  After he did his work for All Star/ASB, he had no further involvement in any part of the bid process, and the pricing and apparent efforts to obtain the bid from the Navy came exclusively from your client's personel.  We are aware of no discovery to date which would support or evidence any access to financial records of BioGenesis by our client or any involvement in the bid submittal which Mr. Danforth testified he had no knowledge of until he met with Mr. O'Connell in Guam in October, 200 (Depo. pp. 30-32).

Paragraphs 9-19 allege certain acts allegedly taken by Messrs. Garthe, O'Connell, Avilla and Rhino; Paragraph 21 alleges that Mr. Danforth "...informed BioGenesis that because BioGenesis did not have a subcontract with Rhino, Rhino would have Rhino's workers cease work on the accepted delivery orders causing BioGenesis to suffer liquidated damages under the Contract unless BioGenesis executed a written exclusive five year subcontract with Rhino." Again this allegation is demonstrably false.

First, it was the concern over Rhino's liability for *already incurred* liquidated damages which generated much of the correspondence in October while Mr. Danforth was in Guam.

On October 25, 2000, Mr. Danforth sent an e-mail to Mr. Lam sending over a proposal which would estabish a basis for what BPI would require for the roofing contract (part of Ex. 5), and the subcontract proposal was revised (Bates stamped doc. # 7902-7914) in the presence and at the direction of Mr. Lam in his office on November 20, 2000 (Ex. 5, Item 39). The changes agreed to that day were highlighted, and confirmed by e-mail from Mr. Danforth to Mr. Lam later that same day (Ex. 5, Item 42).

Mr. Danforth testified that his role was to evaluate the health of the roofing contract and the performance of the task orders to give an opinion to his client, Rhino, and to generate a formal agreement between BioGenesis and Rhino (Depo. pp. 54-56). Mr. Danforth had no authority to "order" stoppage of any work and did not do so. (Depo. pp. 147-148). The Services Agreement between Maxx Management and Rhino was limited to the SOC contract, and Mr. Danforth's involvement in the roofing contract was extremely limited both in time and scope.

The allegation of breach is at Paragraph 22 of the Counterclaim; Mr. Danforth, however, did not direct any work to be performed or cease to be performed by Rhino. If there was a cessation of work, it was directed by others, and Mr. Avilla was the designated person in charge of performance of the contract on record with the Naval contracting officer.

To establish actionable interference with contract or economic advantage, your client must establish (1) the existence of a contract between it and the Navy, (2) knowledge of that contract by Mr. Danforth, (3) intentional acts by him designed to disrupt that relationship, (4) actual disruption and (5) damages proximately caused thereby. *Locricchio v. Legal Services Corp.*, 833 F.2d 1352 (9th Cir. 1987); *Shaw v. Santa Monica Bank*, 920 F. Supp. 1080 (D. Haw. 1996). In addition, your client must prove that there was no justification for Mr. Danforth taking such actions as he did. *Beaulieu v. Northrup Grumman Corp.*, 161 F. Supp.2d 1135 (D. Haw. 2000) *aff'd* 23 Fed. Appx. 811.

Mr. Danforth was called upon to give an evaluation and opinions based on his extensive experience in federal contracting, which he did; he was not an employee, officer or principal of Rhino and did not and could not direct any actions or cessation of work by Rhino on the task orders. All communications between Mr. Danforth and the representatives of BioGenesis were executed at the instance of Rhino. Under SBA and federal contracting rules, it was neither plausible nor lawful for Rhino to purport to act on behalf of the contractor awarded the bid under the "verbal" arrangement, if any, between Rhino and BPI.

Mr. Danforth correctly pointed out the absence of a written agreement which would authorize actions by Rhino on the task orders, and therefore your client cannot establish as part of its case in chief the absence of justification.

Finally, you have designated Mr. Danforth personally in this action although the undisputed evidence is that the sole relationship between Rhino and Mr. Danforth was by way of the Services Agreement between Rhino and Maxx Management. We believe it is a violation of Rule 11 to persist in a personal action against our client when any actions (or inaction) alleged to have occurred were actions of the corporate entity.

Please provide us with your written response to the above request within the 21 days allowed for you to withdraw under Rule 11, Federal Rules of Civil Procedure, or alternatively send us a copy of the Notice of Dismissal with prejudice of the Counterclaim as against our client. Your professional courtesies and timely response are appreciated.

Very truly yours,

ALAN H. TUHY

AHT: sa
cc:  client
     Daniel Berman, Esq.

**EXHIBIT "A";** Excerpts from the Deposition of Michael
  Danforth taken on February 21, 2003;

Exhibit A1; Services Agreement for Contracting
  and Estimating Services
Exhibit A2; Services Agreement Modification
Exhibit A3; BioGenesis Pacific Guam Roofing
  Contract
Exhibit A4; Issues to Consider and Task
  Responsibility
Exhibit A5; Various E-mails
Exhibit A6; 10-24-00 E-mail from R. Avilla to
  R. Fong
Exhibit A7; 10-30-00 E-mail from Maxx to M.
  O'Connell
Exhibit A8; 11-1-00 E-mail from Michael to
  Gerry Lam
Exhibit A9; 11-1-00 E-mail from Michael to
  Gerry Lam
Exhibit A10; Various E-mails
Exhibit A11; Various E-mails
Exhibit A12; 11-8-00 E-mail from G. Allen to
  M. Danforth
Exhibit A13; 11-9-00 E-mail from Michael to
  George
Exhibit A14; 11-10-00 E-mail from Michael to
  George, Al and Mike O
Exhibit A15; 11-10-00 E-mail from Michael to
  Gerry Lam
Exhibit A16; 11-17-00 Fax from M. Danforth to
  Gerry Lam

**EXHIBIT "B";** Excerpts from the Deposition of
  George Allen taken on 10/6/03

**EXHIBIT "C";** DECLARATION OF MICHAEL DANFOTH

**EXHIBIT "D";** DECLARATION OF MICHAEL O'CONNELL

# EXHIBIT

# "A"

1          IN THE DISTRICT COURT OF GUAM

2

UNITED STATES OF AMERICA   ) CIVIL CASE NO. 02-00008
3 FOR USE AND BENEFIT OF     )
RHINO BUILDERS, INC.,      )
4          Plaintiff,        )
          vs.              )
5 BIOGENESIS PACIFIC, INC.,  )
AIG TECHNICAL SERVICES,    )
6 INC., and AMERICAN HOME    )
ASSURANCE COMPANY,         )
7          Defendants.       )
_____)
8 BIOGENESIS PACIFIC INC.,   )
          Counter-Plaintiff, )
9          vs.              )
RHINO BUILDERS, INC.,      )
10 MICHAEL O'CONNELL, MICHAEL )
DANFORTH, AND JOHN         )
11 DOES 1-10,                 )
          Counter-Defendants.)
12 _____)
AMERICAN HOME ASSURANCE    )
13 COMPANY,                   )
          Cross-Claimant,     )
14          vs.              )
BIOGENESIS PACIFIC INC.,   )
15          Cross-Claim       )
          Defendant.        )
16 _____)

17

          DEPOSITION OF MICHAEL LAMAR DANFORTH
18

19 Taken on behalf of the Defendant, Counter-Plaintiff and

20 Cross-Claim Defendant at White & Tom, 820 Mililani

21 Street, Suite 711, Honolulu, Hawaii, commencing at

22 9:34 a.m. on Friday, February 21, 2003, pursuant to

23 Notice.

24

25 BEFORE:    SHARON L. ROSS, CSR No. 432

EXHIBIT "A"

```
 1   APPEARANCES:

 2
     For Plaintiff and Counter-Defendant, Rhino Builders,
 3   Inc.:

 4                      ANTONIO L. CORTES
                        Attorney at Law
 5                      233 Julale Center
                        424 West O'Brien Drive
 6                      P. O. Box BV
                        Hagatna, Guam  96932-8973
 7

 8   For Defendant, Counter-Plaintiff and Cross-Claim
     Defendant, BioGenesis Pacific, Inc.:
 9
                        ARTHUR B. CLARK
10                      Calvo and Clark, LLP
                        Suite 202, First Savings and Loan Bldg.
11                      655 S. Marine Drive
                        Tamuning, Guam  96911
12

13   For Defendant AIG Technical Services, Inc. and American
     Home Assurance:
14
                        STEPHEN D. TOM
15                      White & Tom
                        Suite 711
16                      820 Mililani Street
                        Honolulu, Hawaii  96813-2972
17

18   For the witness:

19                      ALAN H. TUHY, ESQ.
                        75-1000 Henry Street
20                      Kailua-Kona, Hawaii  96740

21
     Also Present:   GERALD LAM
22                   MIKE O'CONNELL

23

24

25
```

09:51 1  Excuse me.  Before that I worked for Prudential

09:51 2  Insurance Company in their computer operations, then for

09:51 3  the State of Florida in computer operations and then

09:51 4  into construction.

09:51 5      Q.    Okay.  What year did you get involved in

09:51 6  construction work?

09:52 7      A.    '79, '80, in that range.

09:52 8      Q.    Okay.  Doing what exactly?

09:52 9      A.    Originally I worked for a road-building

09:52 10  company in Florida, Dickerson, Incorporated, as an

09:52 11  estimator and later as their general superintendent.

09:52 12      Q.    Okay.  When did you become general

09:52 13  superintendent?

09:52 14      A.    '81, '82 maybe.

09:52 15      Q.    Okay.  And then?

09:52 16      A.    I worked for a residential developer.

09:52 17      Q.    What year would that be?

09:52 18      A.    '80 -- I'm guessing '84, '85.  I'm guessing.

09:53 19      Q.    Okay.  Doing what?

09:53 20      A.    As general manager.

09:53 21      Q.    Of a construction crew or --

09:53 22      A.    No.  It was a residential developer,

09:53 23  developed residential subdivisions, built homes, sold

09:53 24  homes.

09:53 25      Q.    Okay.  So, this was office work then

09:55 1     A.    Quality control manager.

09:55 2     Q.    Is this a construction company also?

09:55 3     A.    Yes.

09:55 4     Q.    Okay.  And you did this for how many years?

09:55 5     A.    I remember -- I recall about early -- or late

09:55 6 '93 or early '94.

09:55 7     Q.    Okay.  For how long?

09:55 8     A.    That was the end of the term, so, whatever

09:55 9 the difference.

09:55 10     Q.    Okay.  And after Coker Construction?

09:55 11     A.    Actus Sundt Group.

09:55 12     Q.    Could you spell that, please?

09:55 13     A.    A-C-T-U-S; Sundt, S-U-N-D-T.

09:55 14     Q.    Okay.  Again, in what capacity?

09:55 15     A.    Project manager.

09:56 16     Q.    Is Actus Sundt Group located in Florida?

09:56 17     A.    No, Napa, California.

09:56 18     Q.    And this would have been from 1994?

09:56 19     A.    Correct.

09:56 20     Q.    Okay.  And how long did you work for Actus

09:56 21 Sundt?

09:56 22     A.    Until approximately February of 2000.

09:56 23     Q.    Okay.  Were you a project manager during your

09:56 24 entire tenure at Actus Sundt?

09:56 25     A.    Correct.

10:07 1      A.      I don't understand the question.

10:07 2      Q.      (BY MR. CLARK)  Okay.  Do you know why they

10:07 3  didn't pay you is really what I'm getting at or maybe

10:07 4  you don't.  That's what I'm saying.  Maybe they just

10:07 5  didn't and --

10:07 6      A.      They just didn't.

10:07 7      Q.      Okay.  So, you left Youngbird sometime in

10:07 8  2000; and then where did you go to work?

10:08 9      A.      For Maxx Management Corporation.

10:08 10      Q.      Okay.  And when was that?

10:08 11      A.      Middle of July, 2000.

10:08 12      Q.      Okay.  Maxx Management is a Nevada

10:08 13  corporation; is that correct?

10:08 14      A.      Correct.

10:08 15      Q.      Are you a shareholder in Maxx Management?

10:08 16      A.      No.

10:08 17      Q.      Are you a director of Maxx Management?

10:08 18      A.      No.

10:08 19      Q.      Have you been a shareholder or a director of

10:08 20  Maxx Management?

10:08 21      A.      Not a shareholder.  I have been a director.

10:08 22      Q.      Okay.  When were you a director?

10:08 23      A.      At its conception.

10:08 24      Q.      How long were you a director?

10:08 25      A.      I don't recall, short period of time.

10:08  1         Q.    Did you hold any other titles with Maxx

10:09  2  Management?

10:09  3         A.    Yes.

10:09  4         Q.    Okay.  Can you tell me what that was?

10:09  5         A.    Vice-president.

10:09  6         Q.    Okay.  And are you still with Maxx

10:09  7  Management?

10:09  8         A.    Yes.

10:09  9         Q.    Are you still vice-president?

10:09 10         A.    No.

10:09 11         Q.    Okay.  What's your current title?

10:09 12         A.    Authorized representative.

10:09 13         Q.    Okay.  How long were you a vice-president of

10:09 14  Maxx Management?

10:09 15         A.    Same period of time I was a director.  It was

10:09 16  a short period of time.  I don't recall.

10:09 17         Q.    Okay.  Would that have ended in the year

10:09 18  2000?

10:09 19         A.    I don't recall.

10:10 20         Q.    After being vice-president, was your title

10:10 21  then authorized representative?

10:10 22         A.    I'm sorry?

10:10 23         Q.    Well, after you -- did you have any other

10:10 24  titles -- currently you said you were an authorized

10:10 25  representative and up through -- for a short period of

10:10  1  time in 2000 you were vice-president.  Between those

10:10  2  periods, now and when you stopped being vice-president,

10:10  3  did you have any other title?

10:10  4     A.    No.

10:10  5     Q.    Okay.  So, after you stopped being

10:10  6  vice-president, your title is authorized -- and has been

10:10  7  and still is authorized representative?

10:10  8     A.    Correct.

10:10  9     Q.    Okay.  And as an authorized representative,

10:10 10  what do you understand your authority to be with the

10:10 11  corporation?

10:10 12     A.    I understand my authority -- I have signatory

10:10 13  authority for the corporation.  I have the authority to

10:10 14  act as consultant.

10:11 15     Q.    I'm sorry.  Consultant to the corporation or

10:11 16  on the corporation's behalf?

10:11 17     A.    At -- on the corporation's behalf.  And I

10:11 18  have duties to manage some of the businesses -- business

10:11 19  activities.

10:11 20     Q.    Okay.  Can you describe for me what types of

10:11 21  businesses Maxx Management does?

10:11 22     A.    Since I have been with Maxx Management, it

10:11 23  has -- its work has been limited to consulting with

10:11 24  other small businesses and some large businesses.

10:11 25     Q.    Okay.  What type of consulting?

```
10:15   1        A.      No.

10:15   2        Q.      Okay.  Do you own any business or do you have

10:15   3   any interest in any other businesses?

10:15   4        A.      No.  The question "you" is me personally?

10:15   5        Q.      You personally.

10:15   6        A.      I answered personally.

10:15   7        Q.      Okay.  From the year 2000 to present, have

10:15   8   you owned a business personally or have you invested in

10:16   9   another business or corporation?

10:16  10        A.      No.

10:16  11        Q.      Okay.

10:16  12             MR. TUHY:  Does that include stock purchases,

10:16  13   that sort of thing; or you're talking about a closely

10:16  14   held company --

10:16  15             MR. CLARK:  Closely held --

10:16  16             MR. TUHY:  -- as opposed to buying stock of

10:16  17   an --

10:16  18             MR. CLARK:  As opposed to buying IBM stock or

10:16  19   over-the-counter stock.

10:16  20             MR. TUHY:  Okay.

10:16  21        Q.      (BY MR. CLARK)  Okay.  Are you familiar with

10:16  22   a Guam roofing contract, Contract No. N62766-99-D-0425?

10:16  23        A.      Yes.

10:16  24        Q.      Okay.  Can you tell me when you first became

10:16  25   aware of this contract?
```

10:17  1      A.    The first time I became aware of the contract

10:17  2  was October -- about October of 2000.

10:17  3      Q.    Okay.  What about the proposal for the

10:17  4  contract?

10:17  5      A.    I became aware of the proposal for the

10:17  6  contract, I believe, early 1999.

10:17  7      Q.    And would this -- your knowledge of this

10:17  8  contract, would this be related to your employment with

10:17  9  All Star/SAB?

10:17  10     A.    Correct.

10:17  11     Q.    Can you tell me how the proposal came to your

10:17  12  attention in early '99?

10:17  13     A.    Yes.  Gerald Lam/BioGenesis was introduced to

10:18  14  All Star/SAB by the SBA -- the local SBA administration.

10:18  15  BioGenesis/Gerald Lam presented the RFP to All Star as a

10:18  16  teaming arrangement.

10:18  17     Q.    This is the RFP for the --

10:18  18     A.    That's the --

10:18  19     Q.    -- same contract?

10:18  20     A.    Correct.

10:18  21     Q.    And actually, just for ease of reference from

10:18  22  this point forward, I'll just call it "the Navy

10:18  23  contract," okay, so we know what we're talking about.

10:18  24     A.    There's more than one.  We don't -- you can't

10:18  25  do that.

10:18  1      Q.    Well, I wanted to talk specifically about

10:18  2   this Navy contract.

10:18  3      A.    Can we call it the "roofing contract"?

10:18  4      Q.    The "roofing contract" then.  Okay.  Let's

10:18  5   call it the "roofing contract."  So, this is the RFP for

10:18  6   the roofing contract?

10:18  7      A.    Correct.

10:18  8      Q.    Okay.  So, you're saying Gerald

10:18  9   Lam/BioGenesis -- I'm sorry.  You mentioned a teaming

10:19 10   agreement.  Could you state that again?  Sorry.

10:19 11      A.    Yes.  BioGenesis wanted to propose this

10:19 12   project.  This project was assigned as an 8(a) program,

10:19 13   Small Business Administration set-aside.  BioGenesis

10:19 14   approached All Star/SAB to team with BioGenesis,

10:19 15   providing the bond and teaming together to propose

10:19 16   the -- make -- create the offer and propose.

10:19 17      Q.    Okay.  This teaming agreement, was this in a

10:19 18   joint venture capacity or in a prime

10:19 19   contractor/subcontractor capacity?

10:19 20      A.    I recall it being a prime/sub-prime

10:19 21   arrangement.

10:19 22      Q.    With BioGenesis being the prime?

10:19 23      A.    Correct.

10:19 24      Q.    All Star being the sub-prime?

10:19 25      A.    Correct.

10:20 1    Q.    Okay.  Did you assist BioGenesis --

10:20 2    A.    May I make a clarification?

10:20 3    Q.    Sure.

10:20 4    A.    You say "All Star."  That had to mean All

10:20 5  Star/SAB or a part -- one of those arrangements.

10:20 6    Q.    Okay.

10:20 7    A.    Okay.

10:20 8    Q.    Sure.  Okay.  Did you assist BioGenesis in

10:20 9  preparing the proposal for that roofing contract?

10:20 10    A.    The assistance was in the form of preparing

10:20 11  All Star's portion of the technical proposal.

10:20 12    Q.    Do you know if that portion which you

10:20 13  prepared on behalf of All Star was included in the

10:20 14  proposal that was submitted to the Navy?

10:20 15    A.    I believe so.

10:21 16    Q.    Do you know when the proposal was submitted

10:21 17  to the Navy?

10:21 18    A.    I don't recall.

10:21 19    Q.    Okay.  Would it have been in '99?

10:21 20    A.    I believe so.

10:21 21    Q.    Okay.  Do you know whether that proposal was

10:21 22  eventually awarded to BioGenesis?

10:21 23    A.    I discovered that in October of 2000.

10:21 24    Q.    Can you tell me how you discovered that?

10:21 25    A.    Yes.  I was -- I traveled to Guam at the

10:21 1  direction of Michael O'Connell to Maxx Management to

10:21 2  assist in the startup of a separate contract called the

10:22 3  SOC contract, Solution Order Contract.  And while there,

10:22 4  Mike O'Connell requested that I look at the roofing

10:22 5  contract that was ongoing with BioGenesis.

10:22 6      Q.    This SOC contract that you referred to,

10:22 7  that's a contract separate and apart from the roofing

10:22 8  contract?

10:22 9      A.    Correct.

10:22 10     Q.    Was the SOC contract with the Navy also?

10:22 11     A.    Correct.

10:22 12     Q.    Okay.  You mentioned that you were instructed

10:22 13 by Michael O'Connell to go to Guam.  Was he acting in

10:23 14 his capacity as an officer of Rhino Builders?

10:23 15     A.    Correct.

10:23 16     Q.    So, had Maxx Management been hired by Rhino

10:23 17 Builders as a consultant?

10:23 18     A.    Yes.

10:23 19     Q.    Okay.  Can you tell me when that happened?

10:23 20     A.    I believe the agreement between Maxx

10:23 21 Management and Rhino Builders was dated July, August of

10:23 22 2000, in that range.

10:23 23          MR. TUHY:  Counsel, may I interject --

10:23 24          MR. CLARK:  Sure.

10:23 25          MR. TUHY:  -- on that last question?  Prior

| | | |
|---|---|---|
| 10:23 | 1 | to the deposition, we provided to you, Mr. Clark, and a |
| 10:23 | 2 | copy to Mr. Cortes, documents which we Bates stamped |
| 10:23 | 3 | numbered 007759 through 008007, the first of which |
| 10:23 | 4 | documents is the Services Agreement for Contracting and |
| 10:24 | 5 | Estimating Services between Maxx Management and Rhino. |
| 10:24 | 6 | There is a modification to that. |
| 10:24 | 7 | I did simply want to note that those |
| 10:24 | 8 | documents had been supplied. Today we have just |
| 10:24 | 9 | supplemented our initial disclosures quite recently in |
| 10:24 | 10 | the litigation, so, just to note that and that counsel |
| 10:24 | 11 | does have copies of those, I believe. |
| 10:24 | 12 | MR. CLARK: Okay. Thank you. |
| 10:24 | 13 | Q. (BY MR. CLARK) I tell you what, |
| 10:24 | 14 | Mr. Danforth, let's go ahead and refer to the first |
| 10:24 | 15 | document in your supplemental disclosures here; And we |
| 10:24 | 16 | can go ahead and get this marked as an exhibit? |
| 10:24 | 17 | (Danforth Exhibit No. 1 marked.) |
| 10:24 | 18 | Q. (BY MR. CLARK) Okay. Could you take a |
| 10:25 | 19 | second to look at that exhibit, please? |
| 10:25 | 20 | A. I'm familiar with it. |
| 10:25 | 21 | Q. Okay. Is this the contract/agreement between |
| 10:25 | 22 | Rhino Builders and Maxx Management to which you were |
| 10:25 | 23 | earlier referring? |
| 10:25 | 24 | A. Correct. |
| 10:25 | 25 | Q. Is this, to the best of your knowledge, a |

10:25  1    accurate copy of the agreement?

10:25  2         A.    Yes, it is.

10:25  3         Q.    Okay.  Thank you.  Let's go ahead and refer

10:25  4    to the second document that was provided today and if I

10:25  5    could get that marked as an exhibit.

10:26  6              (Danforth Exhibit No. 2 marked.)

10:26  7         Q.    (BY MR. CLARK)  Take a second to look at

10:26  8    that.

10:26  9         A.    Yes.

10:26  10        Q.    Are you familiar with that document?

10:26  11        A.    Yes.

10:26  12        Q.    Okay.  That document purports to be an

10:26  13   amendment to Exhibit 1; is that right?

10:26  14        A.    Correct.

10:26  15        Q.    Okay.  And, to the best of your knowledge, is

10:26  16   that document accurate?

10:26  17        A.    Yes, it is.

10:26  18        Q.    Okay.  That's fine.  Thank you.  Okay.  Let's

10:26  19   talk about the roofing contract a little bit here.  You

10:26  20   said that you discovered in October of 2000 that the

10:26  21   roofing contract had been awarded to BioGenesis,

10:26  22   correct?

10:27  23        A.    Correct.

10:27  24        Q.    And you were informed by Mr. Michael

10:27  25   O'Connell that BioGenesis had been recently awarded that

10:27  1    contract; is that correct?

10:27  2        A.    No, no, that's not correct.  I was informed

10:27  3    by Michael O'Connell that Rhino was working with

10:27  4    BioGenesis on the contract, not that it had been awarded

10:27  5    or when.

10:27  6        Q.    Okay.  At that time in October of 2000 when

10:27  7    you first became aware of the Navy contract having been

10:27  8    awarded to BioGenesis, did you advise Mr. O'Connell or

10:27  9    any other representative of Rhino Builders that you had

10:28 10    participated in the preparation of All Star's portion?

10:28 11        A.    Yes.

10:28 12        MR. TUHY:  Just a minute.  I'm going to

10:28 13    object to the form of the question.  I think it assumes

10:28 14    facts not in evidence.  I think he testified that he

10:28 15    wasn't advised BioGenesis had been awarded the contract,

10:28 16    only that Mr. O'Connell had advised him that Rhino was

10:28 17    working in connection with the roofing contract by

10:28 18    BioGenesis.  So, I'm sorry, my objection is to the form

10:28 19    of the question because I think it assumes testimony not

10:28 20    given.

10:28 21        MR. CLARK:  Okay.  So noted.  Thank you.

10:28 22        Q.    (BY MR. CLARK)  When you became aware that

10:28 23    Rhino was working on the Navy -- the roofing contract

10:28 24    with BioGenesis, you understood that roofing contract to

10:28 25    be the same roofing contract for which you earlier

10:28  1  stated that you prepared All Star's portion of the

10:28  2  technical data for BioGenesis' proposal?

10:29  3        A.    Later on -- later on I realized that.

10:29  4        Q.    When did you realize that?

10:29  5        A.    When Michael and Al Garthe provided me the

10:29  6  task orders, when they said, "here, take a look at this"

10:29  7  and when I looked at the contract number, I realized

10:29  8  what it was.

10:29  9        Q.    Okay.  When was that?

10:29 10        A.    In October, 2000.

10:29 11        Q.    Okay.  So, in October, 2000, you realized

10:29 12  that the roofing contract to which Rhino referred -- the

10:29 13  one that it said it was working on with BioGenesis --

10:29 14  was the same roofing contract that you had prepared All

10:29 15  Star's portion of the proposal?

10:29 16        A.    Correct.

10:29 17        Q.    Okay.  Did you tell Mr. O'Connell or any

10:29 18  other representative of Rhino that you had worked on All

10:29 19  Star's portion of the proposal for that --

10:29 20        A.    When I had discovered it was the same one,

10:29 21  yes.

10:29 22        Q.    And that was in October of 2000?

10:30 23        A.    Correct.

10:30 24        Q.    And who specifically at Rhino did you relay

10:30 25  that information to?

10:30 1     A.     Michael O'Connell and Al Garthe at the same

10:30 2 time.   They were in the room at the same time.   And

10:30 3 George Allen, he was in the room at the same time.   And

10:30 4 Richard Avilla, he was in the room at the same time.

10:30 5     Q.     And you advised them that you prepared a

10:30 6 portion of that bid on All Star's behalf; is that

10:30 7 correct?

10:30 8     A.     That's incorrect.

10:30 9     Q.     Okay.

10:30 10     A.     We didn't prepare a bid.

10:30 11     Q.     Okay.   Well, All Star's portion?

10:30 12     A.     All Star's portion of the technical proposal.

10:30 13     Q.     Of the technical proposal.   You advised them

10:30 14 that you prepared All Star's portion of the technical

10:31 15 proposal?

10:31 16     A.     Correct.

10:31 17     Q.     After Maxx Management was hired by Rhino

10:31 18 Builders, were you ever provided with a copy of

10:31 19 BioGenesis' proposal for that roofing contract by anyone

10:31 20 at Rhino?

10:32 21     A.     Ask that question again.

10:32 22     Q.     Okay.   After Maxx Management was hired by

10:32 23 Rhino Builders, did anyone at Rhino Builders ever give

10:32 24 you a copy of BioGenesis' proposal for that roofing

10:32 25 contract?

10:32   1          A.      No.

10:32   2          Q.      Okay.  Did you ever see the proposal for that

10:32   3  roofing contract after Maxx Management was hired?

10:32   4          A.      You're speaking of the proposal that was

10:32   5  initially sent in; is that --

10:32   6          Q.      Yes, by BioGenesis.

10:32   7          A.      No, no.

10:32   8          Q.      Have you ever seen the proposal that was

10:32   9  initially sent in by BioGenesis?

10:32  10          A.      Since the initial submission?

10:32  11          Q.      Since the initial submission.

10:32  12          A.      No.

10:32  13          Q.      Okay.  Before the initial submission, did you

10:32  14  see the proposal?

10:32  15          A.      It didn't exist before the submission.

10:32  16          Q.      Well, actually, it would have to have existed

10:32  17  before it could be submitted.  So, in a draft form?

10:33  18          A.      In a draft form, correct.

10:33  19          Q.      In October, 2000, when you advised Rhino --

10:33  20  Rhino's representatives that you prepared All Star's

10:33  21  portion of the technical proposal -- I'm sorry.  That

10:33  22  was technical data or the technical information of the

10:33  23  proposal?

10:33  24          A.      (Witness nods head.)

10:33  25          Q.      Okay.

10:33 1          MR. TUHY:  You'll have to speak audibly so

10:33 2 the court reporter can get it down as opposed to a shake

10:33 3 of the head.  I'm sorry, Counsel.

10:33 4      A.    Yes.  Sorry.

10:33 5      Q.    (BY MR. CLARK)  Okay.  What was their

10:33 6 reaction?

10:33 7      A.    I don't recall.

10:34 8      Q.    Okay.  You said that when you went to Guam

10:34 9 you were asked to look at the roofing contract.  Can you

10:34 10 describe exactly what you were asked to do by Rhino with

10:34 11 respect to the roofing contract?

10:34 12      A.    Yes, I can.  The initial request was:  Would

10:34 13 you take a look at the first task orders and give us

10:34 14 your impression or suggestions of their condition?  So,

10:34 15 the first thing I did was just a basic evaluation.

10:34 16      Q.    Okay.  Were you requested to do anything else

10:34 17 with respect to the roofing contract?  And, I'm sorry,

10:34 18 let me back up a little bit.  When I say "you," are we

10:35 19 talking about All Star -- Maxx Management then?  Was

10:35 20 Maxx Management asked to look at the contract?

10:35 21      A.    You have to ask that question a different

10:35 22 way.  I don't understand that.

10:35 23      Q.    Okay.  Were you asked to look at the roofing

10:35 24 contract in your capacity as a representative of Maxx

10:35 25 Management?

| | | |
|---|---|---|
| 10:35 | 1 | A.     Correct. |
| 10:35 | 2 | Q.     And were you ever asked to look at the |
| 10:35 | 3 | roofing contract in any other capacity? |
| 10:35 | 4 | A.     No. |
| 10:35 | 5 | Q.     So, going forward from this point, if I refer |
| 10:35 | 6 | to "you" in the context of the work that you did on this |
| 10:35 | 7 | contract, then we'll assume it includes Maxx Management |
| 10:35 | 8 | then, okay, in its corporate capacity? |
| 10:35 | 9 | A.     (Witness nods head.) |
| 10:35 | 10 | MR. TUHY:  Out loud. |
| 10:35 | 11 | A.     Yes. |
| 10:35 | 12 | Q.     (BY MR. CLARK)  Okay.  Aside from looking at |
| 10:35 | 13 | the first task orders, were you asked to do anything |
| 10:35 | 14 | else with respect to the roofing contract? |
| 10:35 | 15 | A.     Yes.  I was asked to evaluate the task |
| 10:36 | 16 | orders, create an impression, basically, an evaluation. |
| 10:36 | 17 | The second step of that is to generate what I thought |
| 10:36 | 18 | were issues that needed addressing.  Third step is I was |
| 10:36 | 19 | provided all the task orders by Richard Avilla. |
| 10:36 | 20 | Q.     When you say "all the task orders," how many |
| 10:36 | 21 | are you talking about? |
| 10:36 | 22 | A.     There were 17 at that time numbered 1 through |
| 10:36 | 23 | 17. |
| 10:36 | 24 | Q.     Okay. |
| 10:36 | 25 | A.     And in their folder with supplementary |

10:36 1    information such as schedules, all the control plans,

10:36 2    activity hazard analysis, other supplemental submittals

10:36 3    that had or had not been turned in for each task order.

10:37 4        Q.    Okay.  Actually, I'm going to show you a

10:37 5    document here if we can get that marked as an exhibit.

10:37 6              (Danforth Exhibit No. 3 marked.)

10:37 7        Q.    (BY MR. CLARK)  Take a second to look at

10:37 8    that, please.

10:37 9        A.    Uh-huh, yes, I'm familiar with the document.

10:37 10       Q.    Can you tell me if you are the author of this

10:37 11   document?

10:37 12       A.    I am.

10:37 13       Q.    Can you tell me when you authored it?

10:37 14       A.    It was during my visit to Guam.

10:37 15       Q.    Okay.  You say you were in Guam in October of

10:37 16   2000.  How long were you in Guam at that time?

10:38 17       A.    Nine, ten days maybe, two weeks, in that

10:38 18   range.

10:38 19       Q.    So, it was during that two-week period you're

10:38 20   referring to?

10:38 21       A.    Correct.

10:38 22       Q.    Had you been to Guam before October, 2000?

10:38 23       A.    Never.

10:38 24       Q.    Can you tell me to whom this -- well, first

10:38 25   of all, is this a reproduction of an e-mail that you had

10:38  1    prepared?

10:38  2        A.    It does not appear to be.

10:38  3        Q.    Okay.  Can you tell me to whom you gave this

10:38  4    document?

10:38  5        A.    This document is the second of two documents

10:38  6    that I provided to Mr. Lam and to Mr. O'Connell,

10:38  7    Mr. Garthe, Mr. Avilla, Mr. Allen.

10:39  8            MR. TUHY:  Counsel, I would just note, if I

10:39  9    may, we have given you Bates stamp Nos. 7851 through

10:39 10    7853.  It is a three-page document which looks to be

10:39 11    identical with the absence of Page 2.  Exhibit 3 looks

10:39 12    to be incomplete.

10:39 13            MR. CLARK:  Actually -- good.  I wanted to

10:39 14    get into that because I noticed we jumped from task

10:39 15    order 6 to 13, and this is what I have in my files.  So,

10:39 16    I don't have a copy of that page.

10:39 17            MR. TUHY:  Yeah, we -- this is -- I'm sorry.

10:39 18    These are in the documents we gave you prior to the

10:39 19    deposition with Bates stamps 7851 through 7853

10:39 20    inclusive.

10:39 21            MR. CLARK:  Okay.  Great.  Thank you.  That

10:39 22    clarifies that issue.

10:39 23        Q.    (BY MR. CLARK)  Okay.  So, as you heard your

10:39 24    counsel, Mr. Danforth, and looking at Exhibit 3, would

10:39 25    you concur with his statement that it appears to be

10:39 1  missing the second page?

10:39 2      A.    It is.

10:39 3      Q.    Okay.  And the second page, as provided in

10:40 4  the supplemental disclosures, appears to contain

10:40 5  information related to, I assume, starting with task

10:40 6  order 6 through task order 12?

10:40 7          MR. TUHY:  Reference Bates stamp No. 7852.

10:40 8          MR. CLARK:  7852, yes.

10:40 9      Q.    (BY MR. CLARK)  Is that right?

10:40 10     A.    Correct.

10:40 11     Q.    Thank you.  Okay.  You said that you provided

10:40 12 this document to Gerry Lam and various Rhino

10:40 13 representatives.  How did you provide this document to

10:40 14 Gerry Lam?

10:40 15     A.    I don't recall.

10:40 16     Q.    How did you provide it to the Rhino

10:40 17 representatives?

10:40 18     A.    Hand-delivered.

10:40 19     Q.    On Guam?

10:40 20     A.    In Guam.

10:41 21     Q.    That would have been during your two-week

10:41 22 stay in October, November of 2000?

10:41 23     A.    Correct.

10:41 24     Q.    And when you provided it to Mr. Lam, would it

10:41 25 also have been in that period of time?

10:43 1    Q.    And when did you author this document?

10:43 2    A.    During that time frame that I was evaluating

10:43 3 the task orders in October -- sometime in October, 2000.

10:43 4    Q.    Okay.  And you can -- can you tell me to whom

10:43 5 you provided this document?

10:43 6    A.    Yes, to the same -- same distribution as this

10:44 7 document (indicating).

10:44 8         MR. TUHY:  Exhibit 3.

10:44 9         THE WITNESS:  Exhibit 3.

10:44 10    Q.    (BY MR. CLARK)  Okay.  And with respect to

10:44 11 the Rhino representatives, again, would you have

10:44 12 hand-delivered it to them?

10:44 13    A.    And the BioGenesis representatives.

10:44 14    Q.    Who are the BioGenesis representatives?

10:44 15    A.    Richard Avilla.

10:44 16         (The witness and Mr. Tuhy confer.)

10:44 17    Q.    (BY MR. CLARK)  Do you recall how you would

10:44 18 have gotten Exhibit 4 -- or how you would have delivered

10:44 19 Exhibit 4 to Mr. Lam?

10:44 20    A.    I don't recall the exact method.

10:44 21         MR. CLARK:  Okay.  Can I take a look, please?

10:45 22 That's the one I gave you.  I'm sorry, that one.

10:45 23 Exhibit 4, please.  Thank you.

10:45 24         MR. TUHY:  Showing the witness my 7850 if

10:45 25 that's okay.

10:45  1         MR. CLARK:  That's fine.  Okay.  I tell you

10:45  2  what, can we go off the record for a second?

10:48  3         (Discussion off the record.)

10:48  4    Q.  (BY MR. CLARK)  Okay.  Mr. Danforth, you said

10:48  5  that when you were sent to Guam initially, it was to

10:48  6  consult with Rhino Roofing on a SOC contract separate

10:48  7  and apart from the roofing contract?  That's correct?

10:48  8    A.    Correct.

10:48  9    Q.    When you were asked by Rhino to look at the

10:48 10  roofing contract issue, was that something that you

10:49 11  believed was included in the -- or something that -- I

10:49 12  guess, yeah, it was included in the services agreement

10:49 13  that Maxx Management had with Rhino?

10:49 14    A.    I considered it as an additional task.

10:49 15    Q.    Did you report to anybody at Maxx Management

10:49 16  that you were given this additional task to work on?

10:49 17    A.    Yes.

10:49 18    Q.    Okay.  To whom did you report?

10:49 19    A.    It would have been the president of the

10:49 20  corporation, and I don't recall at that time.

10:49 21    Q.    You don't recall what at that time?  I'm

10:49 22  sorry.

10:49 23    A.    Who the president was at that time.

10:49 24    Q.    Okay.  Can you tell me who the president was

10:50 25  when you started working for Maxx Management?

11:26 1    look at that, Mr. Danforth.

11:27 2        A.    (Witness complies.)

11:27 3        Q.    Since we -- I'm fairly certain that all of

11:27 4    the documents here that I'm going to go over as far as

11:27 5    this e-mail are also contained in Exhibit 5.  So, I'm

11:27 6    just going to ask you questions as if we've already

11:27 7    established the foundation for these documents.

11:27 8        A.    Okay.

11:27 9        Q.    So, if something jumps out at you or if it's

11:27 10   not in there, we'll find out -- we'll find out later;

11:27 11   but with respect to this Exhibit No. 6, if you refer to

11:27 12   the second sentence, it says, "I will propose a solution

11:27 13   for your consideration."  Can you tell me to what you

11:27 14   were referring, a solution to what?

11:28 15       A.    I was directed by Rhino Builders -- Maxx

11:28 16   Management was directed by Rhino Builders to evaluate

11:28 17   the 17 task orders at hand that were issued to

11:28 18   BioGenesis and Rhino was performing.

11:28 19             The second or third part of that

11:28 20   consideration, I was asked by Michael O'Connell to

11:28 21   generate some sort of formal agreement between

11:28 22   BioGenesis and Rhino.  It's my understanding there was

11:28 23   no formal agreement in place at that time.  "I will

11:28 24   propose a solution for your consideration" is the

11:28 25   opening to a formal agreement.

11:28  1      Q.    Okay.  So, it doesn't refer to a specific

11:28  2  problem that needed a solution?

11:28  3      A.    The specific problem was there was no formal

11:29  4  agreement --

11:29  5      Q.    Okay.

11:29  6      A.    -- in my opinion.

11:29  7      Q.    I'd like to go ahead and get this marked as

11:29  8  an exhibit.

11:29  9            (Danforth Exhibit No. 7 marked.)

11:30 10      A.    Okay.

11:30 11      Q.    (BY MR. CLARK)  Okay.  If you could refer to

11:30 12  the second paragraph down to the second line which

11:30 13  starts with "Notice."  If you move over to the next

11:30 14  sentence, it says, "Of special importance is the first

11:30 15  five TOs that Rhino has performed, task orders 1, 2, 3,

11:30 16  4 and 7."  This e-mail purports to be dated October 30,

11:30 17  2000.  Can you confirm that as of October 30, 2000,

11:30 18  Rhino had at that point performed on only those listed

11:30 19  five task orders?

11:30 20      A.    No.

11:30 21      Q.    Had they performed on any other task orders

11:30 22  as of that date?

11:30 23      A.    To my belief, they had performed on all of

11:30 24  them.

11:30 25      Q.    Okay.  When you say "performed," what's your

| 11:35 | 1 | Exhibit 3.  We're going to add to Exhibit 3, from |

Exhibit 3.  We're going to add to Exhibit 3, from

11:35  2  Mr. Danforth's supplemental disclosure, Bates stamp

11:35  3  No. 7852 which purports to be the missing second page of

11:35  4  Exhibit 3.  And so, we'll go ahead and modify; and if

11:35  5  everybody will stipulate for the record, that's okay.

11:35  6  Mr. Tuhy?

11:35  7          MR. TUHY:  So agreed.

11:35  8          MR. CORTES:  So agreed.

11:35  9          MR. TOM:  Fine with us.

11:35 10      Q.    (BY MR. CLARK)  So, looking at Exhibit 3 in

11:35 11  reference to Exhibit 7, okay, taking a look at this, I

11:36 12  see that you have in Exhibit 3 task order 1, 2, 3 listed

11:36 13  as -- well, actually maybe you could describe actually

11:36 14  how you have it listed there.  You have "Schedule,

11:36 15  product data, MSDS and AHA complete."  Could you explain

11:36 16  that, please?

11:36 17      A.    Exhibit 3 is a narrative that I produced of

11:36 18  my opinion of the health of the contract.  It was

11:36 19  strictly based on what I gleaned from reading the task

11:37 20  order and whatever I was provided by BioGenesis to

11:37 21  understand what the condition of the contract was.

11:37 22          For each task order to be -- if you reference

11:37 23  task order No. 1, "Schedule, product data" -- "MSDS" is

11:37 24  material safety and data sheets.  "AHA" is activity

11:37 25  hazard analysis complete.  "Acceptance and warranty

11:37 1  letter not received."  Acceptance and warranty letter

11:37 2  would be issued by the government.

11:37 3      Q.    I'm sorry.  What was AHA again?

11:37 4      A.    Activity hazard analysis.

11:37 5      Q.    Does this mean, then, that with the exception

11:37 6  of the Navy's acceptance and warranty letter that the

11:37 7  project itself was complete?  So, the work that was to

11:37 8  be performed by BioGenesis was done?

11:38 9      A.    It appears that's what this is saying.

11:38 10     Q.    Okay.  And that's the same for task order 2

11:38 11 and 3?

11:38 12     A.    Correct.

11:38 13     Q.    Okay.  You notice --

11:38 14     A.    Not correct.

11:38 15     Q.    I was going to refer to task order 3.  It

11:38 16 says, "Project delayed by government, waiting

11:38 17 modification on glue"?

11:38 18     A.    That was a note I picked up that, as I

11:38 19 recall, the project had been completed, had been

11:38 20 completed and had -- there was some extra work required;

11:38 21 and it appeared that there was a modification

11:38 22 forthcoming from the Navy on a different type of glue

11:38 23 or....

11:38 24     Q.    Kind of like a punch list item then?

11:38 25     A.    No.

11:43 1    performance had started with respect to those task

11:43 2    orders 8 through 17?

11:43 3         A.    The contract-required performance, which

11:43 4    begins with schedule, submission of material data safety

11:43 5    and data sheets, activity hazard analysis.  That is

11:44 6    performance.

11:44 7         Q.    But these says -- I'm sorry.  But Exhibit 3

11:44 8    says none of those were provided or produced apparently?

11:44 9         A.    It does say that.

11:44 10        Q.    So, I'm asking, what was the performance that

11:44 11   you were referring to with respect to task orders 8

11:44 12   through 17 when earlier you said Rhino had -- or

11:44 13   BioGenesis had commenced performance on all task orders?

11:44 14        A.    Where does that say?

11:44 15        Q.    No, you said that earlier in your

11:44 16   statement -- in your testimony.

11:44 17        A.    That statement comes from the dates from the

11:44 18   task order, the date of the order and the date of

11:44 19   delivery.  The date of the order, the prime contractor

11:44 20   is under performance.  The demand for performance begins

11:44 21   at the date of order.

11:44 22        Q.    Okay.  So, there was a demand for

11:44 23   performance; but looking at these -- at this list of

11:44 24   task orders in Exhibit 3, it doesn't appear that the

11:45 25   contractor or subcontractor in this case had actually

11:45  1   started to do any of the work required to be performed?

11:45  2       A.    It was not in the file.

11:45  3       Q.    Okay.  So, your earlier reference to

11:45  4   performance had commenced on all 17 task orders -- I'm a

11:45  5   little repetitive and I apologize but I just want to

11:45  6   make sure I understand what you're saying -- is based

11:45  7   upon your understanding that because the Navy had

11:45  8   provided a date of order or had, I guess, demanded work

11:45  9   to perform -- so, in your mind that constitutes the

11:45 10   commencement of performance?

11:45 11       A.    That's what the contract reads.

11:45 12       Q.    Okay.  If we can go back to Exhibit 7, if you

11:45 13   look at the last sentence in the second paragraph --

11:46 14   actually, I'll tell you what.  Let's start before that.

11:46 15           After the parenthetical of 1, 2, 3, 4 and 7,

11:46 16   it says, "Gene sent me the cost accounting which shows

11:46 17   the value of almost $50,900 expenditure; but look at the

11:46 18   revised Rhino pricing proposed to BPI.  Rhino's revenue

11:46 19   is $148,388.60.  If this is true, Rhino has made a

11:46 20   $95,000 gross profit.  Is this a correct picture?"

11:46 21           This letter purports to be addressed to

11:46 22   Michael O'Connell.  Did you receive a response from

11:46 23   Michael O'Connell to that question, "Is this a correct

11:46 24   picture?"

11:46 25       A.    I don't recall.

| | | |
|---|---|---|
| 11:50 | 1 | which of these he sent first because the second -- one |
| 11:50 | 2 | of them doesn't have a.m. or p.m. on it, I notice. |
| 11:50 | 3 | Q.    (BY MR. CLARK)  Well, to the extent you can |
| 11:50 | 4 | remember.  They both seem to say the same thing.  So, I |
| 11:50 | 5 | don't know if you would be able to distinguish which one |
| 11:50 | 6 | came first. |
| 11:50 | 7 | A.    I cannot. |
| 11:50 | 8 | MR. CORTES:  I guess it's not that important. |
| 11:50 | 9 | Sorry to interrupt. |
| 11:50 | 10 | MR. CLARK:  Okay.  Next exhibit. |
| 11:50 | 11 | (Danforth Exhibit No. 10 marked.) |
| 11:51 | 12 | (Discussion off the record.) |
| 11:51 | 13 | Q.    (BY MR. CLARK)  Actually, Mr. Danforth, I'll |
| 11:51 | 14 | ask you just to refer to the -- I guess the last e-mail |
| 11:51 | 15 | in that chain of e-mail there.  Okay.  I'm sorry.  The |
| 11:51 | 16 | last chronologically, I guess, would be the first e-mail |
| 11:51 | 17 | on the top of the page. |
| 11:52 | 18 | This e-mail, at least the last in the chain |
| 11:52 | 19 | there at the top of Page 1, now appears to be addressed |
| 11:52 | 20 | to "rhinogum@ite.net" and it's addressed to Richard. |
| 11:52 | 21 | Would that be Richard Avilla? |
| 11:52 | 22 | A.    Yes. |
| 11:52 | 23 | Q.    Okay.  And it reads, "Richard, as of now, |
| 11:52 | 24 | Gerry Lam has not responded to me regarding his |
| 11:52 | 25 | responsibility to clear up LD problem."  By "LD," are |

11:52 1  you referring to liquidated damages?

11:52 2       A.    Correct.

11:52 3       Q.    Okay.  "I recommend that Rhino does not move

11:52 4  ahead with anything else."  Okay.  Earlier you said that

11:52 5  you understood Mr. Avilla to be an employee or a

11:52 6  representative of BioGenesis; is that correct?

11:52 7       A.    Correct.

11:52 8       Q.    Okay.  This e-mail appears to be addressed to

11:52 9  Mr. Avilla in his capacity as a representative of Rhino.

11:52 10 Is that how you intended this letter?

11:52 11      A.    This is an informational letter.

11:53 12      Q.    Okay.  To Mr. Avilla in what capacity or

11:53 13 working for whom?

11:53 14      A.    At first I was told he was working as an

11:53 15 employee of BioGenesis.

11:53 16      Q.    Okay.

11:53 17      A.    Later, I discovered he was not.  He was still

11:53 18 an employee of Rhino on assignment to BioGenesis.

11:53 19      Q.    Okay.  Can you tell me who first told you he

11:53 20 was an employee of BioGenesis?

11:53 21      A.    He did.

11:53 22      Q.    Okay.  And would that be in October when you

11:53 23 first showed up on Guam?

11:53 24      A.    It was at the time I was asked to make an

11:53 25 evaluation.

| | | |
|---|---|---|
| 11:53 | 1 | Q. Okay. In October, 2000? |
| 11:53 | 2 | A. Correct. |
| 11:53 | 3 | Q. Okay. Did anybody else from Rhino advise you |
| 11:53 | 4 | that Mr. Avilla was working for BioGenesis? |
| 11:53 | 5 | A. That's how I was corrected. Michael |
| 11:53 | 6 | corrected me and said that he's on assignment, but then |
| 11:53 | 7 | I was handed a letter written by BioGenesis to the |
| 11:53 | 8 | Navy written by -- assigning Richard Avilla as their |
| 11:54 | 9 | project manager under the direction of Gerry Lam. |
| 11:54 | 10 | Q. Okay. When you said "Michael" corrected you, |
| 11:54 | 11 | is that Michael O'Connell? |
| 11:54 | 12 | A. Correct. |
| 11:54 | 13 | Q. Okay. And you said you were handed a letter |
| 11:54 | 14 | designating Mr. Avilla as the -- I'm sorry -- project |
| 11:54 | 15 | manager? |
| 11:54 | 16 | A. Project manager, uh-huh, either project |
| 11:54 | 17 | manager or representative of BioGenesis. |
| 11:54 | 18 | Q. Okay. And who gave you this letter? |
| 11:54 | 19 | A. Richard Avilla did. |
| 11:54 | 20 | Q. And can you tell me why he gave you this |
| 11:54 | 21 | letter? |
| 11:54 | 22 | A. No. |
| 11:54 | 23 | Q. Was it just in the context of your review? |
| 11:54 | 24 | A. Yes. |
| 11:54 | 25 | Q. Okay. Did Richard Avilla ever dispute |

11:54 1 | Mr. O'Connell's representation that he was an employee

11:54 2 | of Rhino working on assignment to BioGenesis?

11:54 3 |     A.    No.

11:54 4 |     Q.    Okay.  Did he ever confirm that?

11:54 5 |     A.    Never discussed it.

11:54 6 |     Q.    Okay.  When you say that "I recommend that

11:55 7 | Rhino does not move ahead with anything else," can you

11:55 8 | clarify what you meant by that?

11:55 9 |     A.    Yes.  The Exhibits 3 and 4 were documents

11:55 10 | that were issued to BioGenesis and Rhino collectively.

11:55 11 | Discussions were held with Rhino and BioGenesis at the

11:55 12 | same time regarding the health of the contract.  The

11:55 13 | overwhelming issue was liquidated damages on every task

11:55 14 | order -- or not every task order but the majority of

11:55 15 | them.

11:55 16 |     My recommendation to Rhino was that how can

11:55 17 | you make a contract -- a formal contract with BioGenesis

11:55 18 | when you will, in effect, be accepting a liability of

11:56 19 | the liquidated damages?

11:56 20 |     Q.    Okay.

11:56 21 |     A.    It was requested of Gerald Lam to go in and

11:56 22 | talk to the contracting officer, of which I recall

11:56 23 | e-mails from Mr. Lam at least twice saying that he did

11:56 24 | to try to clear up the liquidated damage issues and

11:56 25 | never got a firm answer on that.

11:56 1    Q.    Okay.  So, when you say, "I recommend that

11:56 2 Rhino does not move ahead with anything else," are you

11:56 3 referring to doing any more work on the roofing

11:56 4 contract?

11:56 5    A.    No, that recommendation is towards a formal

11:56 6 subcontract agreement.

11:56 7    Q.    So, you were recommending that Rhino not move

11:56 8 forward with the preparation of a subcontract agreement?

11:56 9 Is that what you're saying?

11:56 10    A.    Yes.

11:57 11    Q.    Do you know why the task orders were subject

11:57 12 to potential liquidated damages?

11:57 13    A.    No.

11:57 14          MR. CLARK:  Okay.  We can go to the next

11:57 15 exhibit.

11:57 16          (Danforth Exhibit No. 11 marked.)

11:57 17    Q.    (BY MR. CLARK)  Take a second to look at

11:57 18 that.

11:58 19    A.    Okay.

11:58 20    Q.    Okay.  The top portion purports to be a -- an

11:58 21 e-mail from George W. Allen to, amongst others,

11:58 22 yourself.  And it says, "Just got this from Gerry"; and

11:58 23 the third sentence says, "Obviously Richard didn't

11:58 24 follow my instructions not to tell BPI what we were

11:58 25 doing until we got our letter off."  Do you know to what

11:58 1  instructions he was referring in this letter?

11:58 2       A.    No.

11:58 3       Q.    Okay.  Do you know to what letter he was

11:58 4  referring in this letter?

11:58 5       A.    No.

11:58 6       Q.    Okay.  Do you know if "BPI" refers to

11:58 7  BioGenesis?

11:58 8       A.    Yes.

11:58 9       Q.    Okay.  Are you saying -- when you say you

11:58 10 don't know what the instructions or the letters are, are

11:59 11 you saying you can't recall or you're not aware?

11:59 12      A.    They're not here for me to read.  So, I

11:59 13 cannot recall.

11:59 14      Q.    Well, I don't know what they are.  That's

11:59 15 what I'm trying to figure out, what they are.

11:59 16      A.    I don't either.

11:59 17      Q.    Okay.  Go to the next exhibit.

12:00 18            (Danforth Exhibit No. 12 marked.)

12:00 19      A.    Okay.

12:00 20      Q.    (BY MR. CLARK)  Okay.  Again, this purports

12:00 21 to be a letter from George W. Allen addressed to you.

12:00 22 And it references a conversation that he apparently had

12:00 23 with Gerry Lam wherein he requested a payment of

12:00 24 $25,000.  Then he asks if you are okay with this.

12:00 25            And then I'm going to show you now

| 12:00 | 1 | Exhibit 13. |
| 12:01 | 2 | (Danforth Exhibit No. 13 marked.) |
| 12:01 | 3 | A. Okay. |
| 12:01 | 4 | Q. (BY MR. CLARK) Okay. Do you recall |
| 12:01 | 5 | receiving Exhibit 12 on or about November 8, 2000? |
| 12:01 | 6 | A. Yes. |
| 12:01 | 7 | Q. Okay. Is Exhibit 13 your response to |
| 12:01 | 8 | Exhibit 12? |
| 12:01 | 9 | A. Yes. |
| 12:01 | 10 | Q. Okay. If you can refer to the second |
| 12:01 | 11 | paragraph, "I do not agree to any amount because as of |
| 12:01 | 12 | this time I have waited for almost two weeks to get two |
| 12:02 | 13 | simple accounting reports from Rhino's office having to |
| 12:02 | 14 | do with this contract." From whom were you waiting for |
| 12:02 | 15 | the reports to be provided? |
| 12:02 | 16 | A. Rhino's office. |
| 12:02 | 17 | Q. So, no one in particular? |
| 12:02 | 18 | A. (Witness shakes head.) |
| 12:02 | 19 | Q. Who did you make the request to at Rhino for |
| 12:02 | 20 | the accounting reports? |
| 12:02 | 21 | A. It would have gone to Michael initially. |
| 12:02 | 22 | Q. And by "Michael," you mean Michael O'Connell? |
| 12:02 | 23 | A. Correct. |
| 12:02 | 24 | Q. Okay. If we go down to the next paragraph, |
| 12:02 | 25 | second sentence, second line, "BPI's urgency is not |

12:02 1 Rhino's urgency," can you explain to me what you meant

12:02 2 by that sentence?

12:02 3     A.    I had recommended to Rhino that a formal

12:02 4 subcontract agreement needed to be in place. That was

12:03 5 my recommendation. My recommendation also included

12:03 6 until all issues of the health of the contract were

12:03 7 under control, that they were to do -- my recommendation

12:03 8 is they were to do nothing else regarding formalizing an

12:03 9 agreement. That's what this means.

12:03 10     Q.    Okay. But did you ever make the

12:03 11 recommendation that they do nothing else with respect to

12:03 12 additional work on the roofing contract?

12:03 13     A.    No.

12:03 14     Q.    So, all your references to stop working was

12:03 15 relative to the preparation of the subcontract

12:03 16 agreement?

12:03 17     A.    That is the only duty I was assigned was to

12:03 18 evaluate the health of the contract and to formulate a

12:03 19 subcontract agreement between BioGenesis and Rhino.

12:03 20     Q.    Okay. Staying on that same line, the next

12:03 21 sentence, "Rhino's poor business judgment" -- and it

12:03 22 looks like a typo. I think that's "is" on -- oh, "in

12:04 23 this matter is the result of more problems." When you

12:04 24 refer to "poor business judgment," can you tell me to

12:04 25 what specifically you were referring?

12:04  1          A.      I was referring to operating under a verbal

12:04  2   agreement.

12:04  3          Q.      Do you recall as of October when you were

12:04  4   asked to look at the roofing contract how long Rhino had

12:04  5   been operating under a verbal agreement?

12:04  6          A.      I did not know.

12:04  7          Q.      Okay.  Did anyone at Rhino tell you that they

12:04  8   started with a verbal agreement always intending to

12:04  9   formalize it into a written agreement?

12:04 10          A.      Yes.

12:04 11          Q.      Okay.  And they told you that that was the

12:04 12   original intent?

12:04 13          A.      Yes.

12:04 14          Q.      Okay.  Who told you this?

12:04 15          A.      Michael O'Connell.

12:05 16          Q.      Did they tell you why one had not yet been

12:05 17   prepared as of October, 2000?

12:05 18          A.      No.

12:05 19          Q.      Did they tell you whose responsibility it was

12:05 20   prior to October, 2000, to prepare a written subcontract

12:05 21   agreement?

12:05 22          A.      No.

12:05 23                  MR. CLARK:  Next exhibit.

12:06 24                  (Danforth Exhibit No. 14 marked.)

12:06 25          Q.      (BY MR. CLARK)  I'm sorry.  Are you familiar

12:06 1   with this?

12:06 2        A.    Yes.

12:06 3        Q.    If you can refer to the second paragraph, it

12:06 4   says, "On 29 October, 2000 Al" -- would that be Al

12:06 5   Garthe?

12:06 6        A.    Correct.

12:06 7        Q.    "George," is that George Allen?

12:06 8        A.    Correct.

12:06 9        Q.    "Richard," Richard Avilla?

12:06 10       A.    Correct.

12:06 11       Q.    "And myself conversed with Gerry Lam and

12:06 12  agreed, one, RBI" -- is that Rhino?

12:06 13       A.    Correct.

12:06 14       Q.    -- "would complete all task orders that were

12:06 15  previously started"; and in parenthesis again you have

12:06 16  the same five task orders that were earlier referred to,

12:06 17  task orders 1, 2, 3, 4 and 7.  Okay?

12:06 18            So, as of November 10th, 2000, did you

12:07 19  understand that Rhino had only started working on those

12:07 20  five task orders?

12:07 21       A.    That appears to be what I'm saying.

12:07 22            MR. CORTES:  It doesn't appear.  Never mind.

12:07 23       Q.    (BY MR. CLARK)  Would that be exclusive of

12:07 24  the remaining 12 task orders then?

12:07 25       A.    All the information I provided in these

|          |    |    |                                                          |
|----------|----|----|----------------------------------------------------------|
| 12:10    | 1  | A. | At the end of the month --                               |
| 12:10    | 2  | Q. | Okay.                                                    |
| 12:10    | 3  | A. | -- or the first of the next month.                       |
| 12:10    | 4  | Q. | And did you return to Hawaii?                             |
| 12:10    | 5  | A. | Yes.                                                     |
| 12:10    | 6  | Q. | After returning to Hawaii, did you go back to            |

12:10  7  Guam?

|          |    |    |                                                          |
|----------|----|----|----------------------------------------------------------|
| 12:10    | 8  | A. | No.                                                      |
| 12:10    | 9  | Q. | Okay.  We have, as we stated earlier,                    |

12:10 10 correspondences and e-mail in Exhibit 5 through

12:10 11 December 10 of 2000.  So, from the time that you left

12:11 12 Guam and came back to Hawaii through December 10 of

12:11 13 2000, did you remain in Hawaii?

|          |    |    |                                                          |
|----------|----|----|----------------------------------------------------------|
| 12:11    | 14 | A. | Correct.                                                |
| 12:11    | 15 | Q. | Okay.                                                   |
| 12:11    | 16 | A. | No, no, I did not.                                       |
| 12:11    | 17 | Q. | Okay.                                                   |
| 12:11    | 18 | A. | I traveled during that time in November.                |
| 12:11    | 19 | Q. | Okay.  Where did you travel to?                          |
| 12:11    | 20 | A. | Florida.                                                |
| 12:11    | 21 | Q. | Okay.  So, let's go back to Exhibit 14.  So,             |

12:11 22 the conversation you had on October 29, 2000 with Gerry

12:11 23 Lam, Al, George, Richard and you were on Guam; and Gerry

12:11 24 Lam was on the telephone; is that correct?

|          |    |    |                                                          |
|----------|----|----|----------------------------------------------------------|
| 12:11    | 25 | A. | That is correct.  It's a telephone conference           |

12:27 1  generated in your review with Rhino before providing

12:27 2  this to BioGenesis?

12:27 3      A.    No.

12:27 4      Q.    Okay.  Did BioGenesis or Gerry Lam provide

12:27 5  you with any, I guess, instructions on what he wanted to

12:28 6  have incorporated into the first draft?

12:28 7      A.    Not in the first draft.  The first draft was

12:28 8  sent to him for his comments.

12:28 9      Q.    Now, you mentioned that this is the first

12:28 10 draft; and actually yesterday Mr. O'Connell said

12:28 11 apparently there were subsequent drafts which I haven't

12:28 12 seen or were provided with yet unless they're in these

12:28 13 initial disclosures?

12:28 14     A.    (Witness nods head.)

12:28 15     Q.    How many other drafts after this November 17

12:28 16 draft did you generate?

12:28 17     A.    To clarify the term "draft," I considered the

12:28 18 first draft the first issuance to BioGenesis.

12:28 19     Q.    Understood.

12:28 20     A.    Okay.  There was a second version, a revised

12:28 21 version, following my meeting with Mr. Lam at his office

12:28 22 where we read every paragraph, every section; and the

12:28 23 changes to each of those that Mr. Lam had commented on

12:28 24 in the second version are highlighted.

12:29 25     Q.    And that's -- it's highlighted in the

12:29  1    supplemental disclosures that you've provided to me?

12:29  2         A.    That's correct.

12:29  3              MR. TUHY:   Counsel, for your information,

12:29  4    those are Bates stamp Nos. 7902 through --

12:29  5              THE WITNESS:   That's part of it, uh-huh.

12:29  6              MR. TUHY:   -- 7914 inclusive.

12:29  7              MR. CLARK:   Thank you.

12:29  8              MR. TOM:   And for the record, Bates stamp

12:29  9    Pages 7902 to 7914, Mr. Danforth, you're calling that

12:29 10    your second draft?   Is that what you refer to those

12:29 11    pages -- how would you refer to it?

12:29 12         A.    No, I'm referring that to a final commented

12:29 13    proposal; and this final commented proposal was provided

12:29 14    back to Rhino for consideration.

12:29 15              MR. CLARK:   Okay.   And in case you missed it,

12:29 16    Steve; but I believe he called it also a second revised

12:30 17    version.

12:30 18              MR. TOM:   Okay.   I'm just trying to get us to

12:30 19    agree on what we're going to call it.   And he can call

12:30 20    it what he wants, and then we'll go with it that way.

12:30 21         Q.    (BY MR. CLARK)   Well, I'm going to ask if

12:30 22    that's the final version of the subcontract agreement

12:30 23    then.

12:30 24         A.    This is the final version that I was involved

12:30 25    with.

12:30  1      Q.      Okay.

12:30  2      A.      This is the --

12:30  3      Q.      I'm sorry.  By "this," for the record, we're

12:30  4  referring to the document Bates stamped 7902 to 7914?

12:30  5      A.      Correct, correct.  That is the production of

12:30  6  a document following my visit with Mr. Lam, and the --

12:30  7  all the comments were incorporated into this and

12:30  8  highlighted.

12:30  9      Q.      Okay.  Do you recall when you met with

12:30 10  Mr. Lam?

12:30 11      A.      It was following 11-17.

12:30 12      Q.      Okay.  A week following, days following?

12:31 13      A.      Days, days.

12:31 14      Q.      Do you recall participating in a meeting on

12:31 15  December 8th, 2000 at a Zippy's Restaurant in -- I

12:31 16  assume, in Honolulu?

12:31 17      A.      I recall meeting, yes, at Zippy's, yes.

12:31 18      Q.      With -- what city was that located in if not

12:31 19  Honolulu?

12:31 20      A.      Honolulu.

12:31 21      Q.      It was.  Okay.  With Michael O'Connell and

12:31 22  Gerry Lam?

12:31 23      A.      Correct.

12:31 24      Q.      Okay.  Was there anyone else present at this

12:31 25  meeting?

12:37 1          We know that at least through November 17 and

12:37 2 some days after that you were still working on drafts.

12:37 3 Was the last thing you did with respect to the roofing

12:37 4 contract that -- the final version of that draft that

12:37 5 was Bates stamped 7902 to 7914?

12:37 6     A.    No.  There was one other thing that I

12:37 7 participated in, and that was a phone call.

12:37 8     Q.    Okay.

12:37 9     A.    And it was -- it occurred sometime in

12:38 10 December, middle of December.

12:38 11     Q.    Okay.

12:38 12     A.    And it was a phone call that I made to Gerald

12:38 13 Lam, and I made that phone call because Mike O'Connell

12:38 14 came in -- I walked into Rhino's office this morning

12:38 15 finishing up a proposal on another project.  And he came

12:38 16 to me and says, "Do you know that BioGenesis hired my

12:38 17 employees and are using my equipment?"

12:38 18          And I said, "No.  What are you talking

12:38 19 about?"  I said, "Well, let's just call Gerry."  So, I

12:38 20 dialed Gerry, had him on speaker; and Gerry -- and I

12:38 21 asked him.  I said, "Gerry, do you know about this?"

12:38 22          He said, "No, I don't know anything about

12:38 23 it."

12:38 24          And I said, "Well, are you going to complete

12:38 25 a subcontract agreement with Rhino?"

He says -- he says, "I don't know."  He says --

Q.   I'm sorry.  This was after the Zippy's meeting?

A.   Yes, it was.

Q.   Okay.  Please, continue.

A.   And I said -- you know, I said, "I'm" -- "you know, I've always relied on your word; but, you know, what's going on?"

And we never had a hard conversation complete -- there was never really any pertinent information exchanged after that except at the end of that conversation, Gerald -- because I kept pressing.  I kept saying, "Well, there's a subcontract agreement that you and I reviewed and commented on.  It's in Michael's hands.  Why haven't you talked to him to complete it?  Why haven't you discussed this?"

And he finally said, "Well, I can't.  I've got an agreement with All Star/SAB.  I can't sign another agreement."

Q.   And that's the last involvement you had -- outside of this litigation, but the last involvement you had with respect to the roofing contract?

A.   To my recollection, that's correct.

Q.   Did Maxx Management or you ever assist Rhino

12:40 1  Builders in the preparation of any corporate documents?

12:40 2  And by that, I mean things related to the corporate

12:40 3  structure.

12:40 4      A.    No.

12:40 5      Q.    Did you ever tell either Al Garthe or Richard

12:40 6  Avila that if Rhino would stop or slow down or delay

12:40 7  work on the roofing contract, that the roofing contract

12:40 8  would be terminated by the Navy and -- I mean, Bio's

12:41 9  roofing contract would be terminated by the Navy and

12:41 10 Rhino could pick it up?

12:41 11     A.    No.

12:41 12         MR. CLARK:  Okay.  I think I'm....

12:41 13         MR. CORTES:  Why don't you think about it

12:41 14 over lunch?  Because I'm going to want to ask him some

12:41 15 questions.

12:41 16         MR. CLARK:  I tell you what, let's go ahead

12:41 17 and do that.  Let's -- we'll break for lunch and I'll

12:41 18 talk to my client and review my files and see if there's

12:41 19 anything else.  Otherwise, if not, I will go ahead and

12:41 20 conclude my deposition; and then we'll give it to

12:41 21 Antonio and Stephen to ask questions.

12:41 22         MR. TOM:  I don't think I have any questions.

14:20 23         (Lunch recess from 12:41 p.m. to 2:20 p.m.)

14:20 24     Q.    (BY MR. CLARK)  Okay.  Mr. Danforth, I just

14:20 25 have one or two follow-up questions; and then I'll turn

16:13 1    Q.    And a copy of that was sent to Mr. Lam?

16:13 2    A.    Yes.

16:13 3    Q.    Was any response given to you by Mr. Lam

16:13 4  indicating any inaccuracies contained in Item 42 of

16:13 5  Exhibit 5?

16:13 6    A.    No.

16:13 7         MR. CLARK:  I'm sorry, Mr. Tuhy.  Could you

16:13 8  identify that by date and time because it --

16:13 9         MR. TOM:  We didn't number the.

16:13 10        MR. TUHY:  Exhibit 5.

16:13 11        MR. CLARK:  The other copies weren't

16:13 12 numbered.  Yours was the only one.

16:13 13        MR. TUHY:  I'm sorry.  Okay.  It is dated

16:14 14 November 20, 2000, at the top of which it says "FW

16:14 15 subcontract agreement, BPI and RBI."

16:14 16        MR. CLARK:  Is there a time after that

16:14 17 November 20, 2000?

16:14 18        MR. TUHY:  6:33 a.m. -- up at the top.  I'm

16:14 19 sorry.  Oh, on the sent side, I'm sorry, November 20,

16:14 20 2:28 p.m.

16:14 21        MR. CLARK:  2:28 p.m.?

16:14 22        MR. TUHY:  Yeah, 2:28 p.m.

16:14 23   Q.    (BY MR. TUHY)  You had testified regarding --

16:14 24 in the e-mails that are before us in this deposition

16:14 25 regarding stopping further activities.  Let me ask you

16:14  1    first:   Who was in charge of directing the actual

16:14  2    performance of the task orders on the roofing project on

16:14  3    Guam?

16:15  4          A.    For whom?

16:15  5          Q.    Well, let's start out with in charge of any

16:15  6    activities taken by Rhino.

16:15  7          A.    Mr. Garthe.

16:15  8          Q.    Okay.   And with respect to BioGenesis,

16:15  9    putting it, again, in the period October and November of

16:15 10    the year 2000, for BioGenesis, who was in charge of the

16:15 11    actual contract performance of the roofing contract,

16:15 12    taking in task orders and having them executed?

16:15 13          A.    The letter of authority was Richard Avilla.

16:15 14          Q.    Okay.   Did you have any authority whatsoever

16:15 15    to order or cease any work with respect to the execution

16:15 16    of the task orders?

16:15 17          A.    No.

16:15 18          Q.    Did you, in fact, ever direct that any work

16:15 19    cease with respect to execution of any task orders that

16:15 20    had been undertaken by Rhino on the roofing project?

16:15 21          A.    No.

16:15 22          MR. TUHY:   I have nothing further.

16:15 23                              EXAMINATION

16:15 24    BY MR. CLARK:

16:15 25          Q.    Okay.   I have just a couple of follow-up



**Maxx Management Corporation**
**3885 South Decatur**
**Suite 2010**
**Las Vegas, Nevada**
**89103**

# SERVICES AGREEMENT

## FOR

## CONTRACTING AND ESTIMATING SERVICES

THIS SERVICES AGREEMENT FOR CONTRACTING AND ESTIMATING SERVICES is entered into on this 1ST day of August 2000 (the "Agreement") between **Maxx Management Corporation**, a Nevada Corporation with its registered head office at 3885 South Decatur, Suite 2010, Las, Vegas, Nevada, 89103 ("MMC") and Rhino Builders, Inc. dba Rhino Roofing and Repairs, Inc., a Hawaii Corporation with its registered head office at 85-841 Farrington Highway, Waianae, Hawaii 92792 (the "RHINO"). MMC and RHINO may each be referred to as a "Party," and together as the "Parties."

## W I T N E S S E T H :

WHEREAS, MMC is a Nevada Corporation is engaged in assisting small businesses with estimating and contracting services.

WHEREAS, RHINO is a small business operating as a Small Business Administration (SBA) Certified 8(a) and HUBZone construction business.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the Parties agree as follows:

1.        Engagement of MMC by RHINO

RHINO hereby engages MMC to perform Contracting and Estimating services. These services are selected by RHINO on a case-by-case basis (the "Targeted Projects") and assigned to MMC.



Danforth
EXHIBIT NO. 1
DATE 2-21-03
S.L. ROSS

307759

**EXHIBIT "A1"**



2.        **US Government Contracting Services**

2.1    Upon the payment of the service fee set forth in Section 3.1, MMC shall commence and conduct during the term of this Agreement the necessary public relations, research, analysis, preparations, estimating and management activities to pursue construction projects on behalf of RHINO.

2.2    With the direction, cooperation and assistance of RHINO, MMC shall take all actions and do all things reasonably necessary to pursue the Targeted Projects, including the following activities:

    2.2.1    Conduct preliminary analysis of the requirements and design of Targeted Projects;

    2.2.2    Prepare teaming agreements for Targeted Projects;

    2.2.3    Conduct pre-solicitation marketing of teaming agreements.

    2.2.4    Jointly with RHINO, prepare proposals/bids for Targeted Projects;

    2.2.5    Jointly with RHINO, submit and present proposals/bids for Targeted Projects;

    2.2.6    Jointly with RHINO, conduct pre-award contract negotiations for Targeted Projects;

    2.2.7    Jointly with RHINO, prepare and submit best and final offer for Targeted Projects;

    2.2.8    Defend or initiate bid protests, as the case may be, on Targeted Projects; and

    2.2.9    Jointly with RHINO, seek the advice of legal counsel during the process, especially on matters related to subcontracting and bid protests, if and when necessary. RHINO shall be responsible to pay for all legal assistance. MMC is not liable to pay for legal assistance.

3.        Payment of the Service Fee

3.1    RHINO shall pay to MMC a minimum service fee of THREE THOUSAND US DOLLARS (US$3,000.00) per month beginning September 1, 2000 for services performed in August 2000 and continue payment of services until otherwise providing a 60 day advanced notifice in writing. The fee may increase dependent on the volume of work asigned to MMC.

007760

3.2     This service fee is a non-refundable cash payment and constitutes the monetary consideration from RHINO to MMC. RHINO acknowledges that it is a reasonable estimate of the service fee to RHINO and RHINO relinquishes all claims to a refund or return of this service fee under any and all circumstances, including an early termination of this Agreement and/or failure to consummate any of the Targeted Projects. MMC shall have no obligation to account for or verify the costs and expenses since it may incur expenses as it deems appropriate in its sole discretion.

3.3     RHINO commits to MMC to negotiate an additional payment based on each Targeted Project Award as a percentage of the Gross receipts of the projects.

**4.**          **Grant of Exclusivity on Targeted Projects**

4.1     In consideration for the monthly service fee in Section 3.1 by RHINO to MMC, MMC shall work exclusively (project by project basis) with RHINO in bidding for the Projects that are appropriate to the Targeted Project. To the extent that MMC elects not to participate in a Targeted Project or determines that it cannot add the value necessary to win the Targeted Project, RHINO may at that point bid for the Targeted Project(s) alone or with others.

**5.**          **Performance of US Government Contracting Services**

5.1     RHINO acknowledges and agrees that MMC's obligations under this Agreement is to perform the US government contracting services described in Section 2 and that MMC cannot and does not guarantee the results of its efforts to obtain an award of a Targeted Project from any US government agencies.

**6.**          **Term**

6.1     The term of this Agreement shall commence on the date of this Agreement and shall continue for five years unless terminated or extended by the Parties.

**7.**          **Representations and Warranties**

7.1     Each Party represents and warrants that it is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the full corporate power and authority to enter into this Agreement and perform its agreements and covenants to be performed hereunder, subject to compliance with the laws of the United States.

7.2    Each Party represents and warrants that the execution and delivery of this Agreement and the performance by it of the covenants and agreements hereunder have been duly authorized by all necessary corporate action and, when executed and delivered by it, this Agreement shall constitute the valid and legally binding agreement of it, enforceable against it in accordance with its terms and conditions; and

7.3    Each Party represents and warrants that neither the execution and delivery of this Agreement nor the consummation or performance by it of the transactions contemplated herein will violate any provision of its articles of incorporation, any law, rule, regulation, writ, judgment, injunction, decree, determination, award, or other order of any court, government or governmental agency or instrumentality, domestic or foreign, or conflict with or result in any breach of any of the terms of or the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest or other charge or encumbrance of any nature pursuant to the terms of, any contract or agreement to which it is a Party or by which it, or any of its assets and properties, is bound.

8.    **Confidentiality**

8.1    In connection with this Agreement, RHINO has, and may in the future, disclose or make available to MMC, its shareholders, directors and officers, certain proprietary, secret and confidential business information, including, without limitation, research, experimental work, design details and specifications, renderings, engineering, financial information, procurement requirements, purchasing, customer lists, suppliers, investors, employees, business and contractual relationships, business forecasts, sales and merchandising, business plans, marketing plans and third party information, in whatever form or manner (collectively, "Confidential Information").

8.2    MMC acknowledges that RHINO has a material business and competitive interest and right in protection and continued protection, confidentiality and secrecy of the Confidential Information, and that MMC will not make such Confidential Information available to or otherwise disclose same to others without the consent of RHINO.

8.3    Notwithstanding anything to the contrary contained herein, Confidential Information shall not include information that the MMC can prove:

(a)    is, as of the time of its disclosure, or thereafter becomes part of the public domain through a source other than disclosure by the RHINO;

(b)    was available to the RHINO on a non-confidential basis prior to its disclosure to the MMC by RHINO or its agents, advisors or representatives; or

**067762**

        (c)     becomes available to the MMC on a non-confidential basis from a third party not under a confidentiality obligation to RHINO.

8.4     The MMC covenants and agrees:

        (d)     not to disclose, use, directly or indirectly, for the benefit of, or otherwise make available to, any third party any of the Confidential Information without the express written consent of RHINO;

        (e)     to hold the Confidential Information in strictest confidence and make such information available only to the senior management of MMC who have a need to know in furtherance of the bona fide good faith use of such Confidential Information; and

        (f)     to promulgate and implement a policy of having every person and entity receiving access to Confidential Information to sign a confidentiality and non-compete agreement in a form satisfactory to RHINO.

8.5     The RHINO covenants and agrees:

        (a)     to provide the same confidentiality to MMC as MMC covenants and agrees to RHINO.

9.       **Defaults**

9.1     This Agreement shall be terminable forthwith upon the sending of notice in writing upon the occurrence of one or more of the following events of material breach:

        (g)     by any party hereto, if the other party hereto shall commit a material breach of any of its obligations under this Agreement which is not remedied within thirty (30) days from the giving of written notice requiring said breach to be remedied:

        (h)     by any party hereto, if the other party hereto shall institute or otherwise become a party, voluntarily or involuntarily, to a proceeding alleging or pertaining to the bankruptcy, reorganization, composition or insolvency of such party, be placed in the hands of a receiver, and in this insolvency or bankruptcy context, transfer all or material proportion of its business or assets to, or be acquired by, merge into or be consolidated with another company; or



(i)    by any party hereto, if the other party hereto shall be or become incapable for a period of ninety (90) days of performing any of its obligations under this Agreement because of force majeure as defined hereinafter.

9.2    Upon termination of this Agreement, the Parties shall have no further rights or obligations towards each other than the confidentiality obligation under Section 8.

## 10.    General Terms and Conditions

10.1    Notice. All notices, requests or instructions hereunder shall be in writing and delivered personally, or facsimile with transmission confirmation, or e-mail with receipt confirmation, or international courier with receipt confirmation, or sent by registered or certified mail, return receipt requested, postage prepaid as follows:

If to RHINO:

Rhino Builders, Inc.
Attn: Mr. Michael O'Connell, President
85-841 B Farrington Highway
Waianae, Hawaii 96792
Phone:    (808) 668-6020
Facsimile:    (808) 668-7024 fax
E-Mail:    Rhino1@hawaii.rr.com

If to MMC:

Maxx Management Corporation
Attn: Michael Danforth
3885 South Decatur, Suite 2010
Las Vegas, Nevada 89103
Phone:    (808) 778-4614
Facsimile:    (808) 947-2479
E-Mail    Maxxmgt@aol.com

A party may change its address for purposes hereof by notice given in compliance with this Section 10.1.

10.2    Force Majeure. The Parties agree that no Party shall be deemed in default of its obligations under this Agreement to the extent that the performance of any such obligations shall have been prevented by circumstances outside of such Party's control, including, but not limited to, acts of God, fire, riot, war or government actions, but only to the extent of the duration of the circumstances comprising the basis for the operation of this force majeure provision.

007764

10.3 Merger and Integration. This Agreement represent the entire understanding of the Parties with respect to its subject matter and supersedes all prior agreements, written or oral, concerning the subject matter hereof, and may not be changed or modified in any regard except by an instrument in writing and signed by the Parties. No inference shall be drawn from any variance between this Agreement and any prior written negotiations or drafts of this Agreement. Each Party acknowledges that no representations, inducements, promises, commitments, or agreements, orally or otherwise, have been made by any Party, or anyone acting on behalf of any Party, which are not embodied herein.

10.4 Severability. It is expressly agreed that if any provision of this Agreement shall be determined by a court of competent jurisdiction to be void and of no effect, the provisions of this Agreement shall be deemed amended to modify or delete, as necessary, the offending provision, and this Agreement as so amended or modified shall not be rendered unenforceable or impaired but shall remain in force, to the fullest extent possible in keeping with the intention of the Parties hereto.

10.5 No Waiver. Failure of any Party at any time to require performance of any provision of this Agreement shall not affect the right of any Party to require full performance thereafter; a waiver by any Party of a breach of any provision of this Agreement shall not be taken or held to be a waiver of any further or similar breach or as nullifying the effectiveness of such provision.

10.6 Costs. Except as otherwise herein provided, each of the Parties hereto shall bear its own expenses in connection with this Agreement and the transactions contemplated herein.

10.7 Assignment. This Agreement may not be assigned, transferred or conveyed by the MMC without the prior written consent of RHINO. Any attempted or purported assignment, transfer or conveyance without such consent shall be null and void and shall constitute a material breach of this Agreement. In no event may the benefits of this Agreement be assigned to any competitors of RHINO.

10.8 Governing Law. This Agreement shall be governed by the laws of Nevada,
U. S. A.

10.9 MMC held harmless. RHINO holds MMC harmless from any liability regarding any actions taken by MMC except that of Confidentiality, Section 8 of this agreement. RHINO acknowledges that it shall not relie or depend solely on the information provided by or actions taken by MMC . RHINO acknowledges that it is solely responsible for its decissions and actions and that MMC shall be held harmless to those decissions and actions. RHINO declares that MMC shall not provide Errors and Ommissions Insurance and RHINO acknowledges that RHINO shall provide and pay for any legal reprersentation, as required by MMC,

007765

to protect and secure MMC form anyone/anything that challenges MMC's harmless state.

10.10 Disputes. All disputes arising in connection with this Agreement or its validity shall be settled through discussion among the Parties. In case when the Parties cannot resolve the disputes, such unresolved disputes shall be finally settled by the Parties by litigation in the federal courts of the State of Nevada. The language of the legal proceedings is English. The Parties hereby submit to the non-exclusive jurisdiction and venue of the federal courts of the State Nevada and waive all defenses.

10.11 Judgment. Any judgment rendered by the federal court having jurisdiction in the District of Nevada may, if necessary, be enforced by any court or other competent authority in any country.

10.12 Disclaimer of Agency. Nothing contained herein shall be deemed to constitute any Party hereto the agent of any other Party hereto, and no Party shall have any right, power or authority to create any obligation, expressed or implied, on behalf of any other Party.

10.13 Benefit. This Agreement, including any amendments or modifications hereto, shall inure to the benefit of and be binding on the Parties hereto, and their respective successors and permitted assigns.

10.14 Governing Language. The governing language of this Agreement shall be English.

IN WITNESS WHEREOF, this Agreement has been duly executed by the Parties hereto as of the date first written above.

Rhino Builders, Inc., (RHINO)          Maxx Management Corporation (MMC)

By: _____           By: _____

Title: President                        Title: Vice President

Print                                   Print
Name: Michael N. O'Connell              Name: Michael L. Danforth

007766



**Maxx Management Corporation**
**3885 South Decatur Blvd.**
**Suite 2010**
**Las Vegas, Nevada**
**89103**
**(702) 871-8535, Phone**
**(702) 871-8427, Facsimile**

# SERVICES AGREEMENT MODIFICATION

## between

**MMC:**    **Maxx Management Corporation**
3885 South Decatur Blvd.
Suite 2010
Las Vegas, Nevada
    Point of Contact: <u>Michael L. Danforth</u>
    Telephone:    702.871.8535
    Facsimile:    702.871.8427
    Email Address: Maxxmgt@aol.com

## and

Danforth
EXHIBIT NO. 2
DATE 2-21-03
S.L. ROSS

**RHINO:**    **Rhino Builders, Inc.**
85-841 Farrington Highway
Unit B
Waianae, Hawaii 96792
    Point of Contact:    <u>Michael N. O'Connell, President, and C. E. O.</u>
    Telephone:    808.668.8878
    Facsimile:    808.668.024
    Email Address: Rhino1@Hawaii.rr.com

| | |
|---|---|
| **Agreement Title:** | <u>Services Agreement for Contracting and Estimating Services</u> |
| **Modification Number:** | <u>0001</u> |
| **Date of Modification:** | <u>January 22, 2001</u> |
| **Date of Original Agreement:** | <u>August 1, 2000</u> |

    The above named Agreement Title, between Maxx Management Corporation and Rhino Builders, Inc., is hereby revised by this Services Agreement Modification (herein "Modification") to the extent described below, in accordance with the terms and conditions as stated below.

**The Scope of Agreement is modified as follows:**

Add the following Section 11 to the Services Agreement for Contracting and Estimating Services:

**007767**

11. **CHANGES/MODIFICATIONS**

The Parties reserve the right to make changes in the Agreement, or additions thereto or omissions wherefrom, upon written order (Services Agreement Modification) to the other Party. Any changes (modifications: additions or reductions) resulting from changes in this Agreement shall be agreed upon in writing by the Parties hereto, such agreement not being valid unless signed by the authorized representative of both Parties. The Modification is a bi-lateral agreement. No change, alteration or modification in the terms and conditions of this Agreement or in the term or manner of payment shall in any way exonerate or release, in whole or in part, any guarantee (verbal or written), and/or surety on any bond furnished by or on behalf of either Party.

**END:**

Unless specifically changed above by this Modification, all terms, conditions and provisions of the above referenced **SERVICES AGREEMENT FOR CONTRACTING AND ESTIMATING SERVICES** remain unchanged and in full effect.

IN WITNESS WHEREOF, the parties hereto have executed this **SERVICES AGREEMENT MODIFICATION** by their proper officers duly authorized herein.

**MMC:**

**Maxx Management Corporation**

By: _____

Title: Authorized Representative

Date: January 22, 2001

**RHINO:**

**Rhino Builders, Inc.**

By: _____

Title: President and C. E. O.

Date: January 22, 2001

**007768**

TO:   Rhino Builders, Inc., Michael O'Connell

From Maxx Management Corporation, Michael Danforth

Re:   Changes to Service Agreement

Michael –

Before we can modify the Agreement, we must first agree that the
Agreement allows for changes. So – I have created the first modification
that inserts a Section 11 for modifications. Please sign both originals
and I will sign originals. Following – I will create other changes as we
have discussed before.


Sincerely - Michael

**007769**

## BIOGENSIS PACIFIC INC.
### Guam Roofing Contract – N62766-99-D-0425

Please provide the following information so that I may provide an opinion of the "Health" of the contract.

1. True contract anniversary date. Based on "protest" delays and "others", the anniversary date cannot be the original Notice To Proceed date.
2. Seventeen (17) Task Orders are issued to date: Please provide the following:
    - List of project completed and their respective completions date(s). I am told that 3 are finished but I do not have the Contracting Officers acceptance. We must verify this.
    - Product data and other Task Order submittals such as shop drawings, schedule, etc.. I require information on which T. O. s are complete.
    - ˙Has BPI submitted for Stored materials?????????????

Task Order 0001:
Schedule, Product data, MSDS and AHA complete. <u>Acceptance and Warranty Letter not received.</u>

Task Order 0002:
Schedule, Product data, MSDS and AHA complete. <u>Acceptance and Warranty Letter not received.</u>

Task Order 0003:
Schedule, Product data, MSDS and AHA complete. <u>Acceptance and Warranty Letter not received.</u>
- <u>Project delayed by Government. Waiting modification on Glue.</u>

Task Order 0004:
- Schedule, Product data, MSDS and AHA complete.
- Pre-construction conference held.
- Gov't accepted extension of time until January 2, 2001. Revised start date is October 31, 2000. Time to install: 14 calendar days.
- *************Waiting on money to manufacture materials.************* Delivery of materials 14 to 21 days from 50% payment.

Task Order 0005: Order 8/8/00. Delivery Date: 11/6/00
- Product data & MSDS and AHA complete
- Pre-construction conference held.
- *********MATERIAL ORDERED ON 9/14 AND 9/7/2000 One month late****
- *************** NO SCHEDULE*************************
- ************ORDER AND DELIVERY OF SAFETY EQUIPMENT*****
- ************SUBMIT REVISED SCHEDULE*********************

Task Order 0006: Order 8/17/00. Delivery Date: 11/15/00



**EXHIBIT "A3"**

Danforth
EXHIBIT NO. 3
DATE 2-21-03
S.L. ROSS

- Product data. & MSDS complete.
- No AHA.
- No Schedule
- Materials ordered and received.
- *************REQUIRE REVISED END DATE********************

Task Order 0007: Date of Order: 8/21/00 Delivery Date: 9/20/00
- Schedule, Product data, MSDS and AHA complete.
- Pre-construction conference held.
- Project complete.
- **************PRE-FINAL INSPECTION NOT REQUESTED***********
- **************TIME EXTENSION REQUEST TO 10/30/00 AND VERBALLY GRANTED, EXTENSION NOT RECEIVED IN WRITING*****************

Task Order 0008: Date of Order: 9/14/00 Date of Delivery: 12/13/00
- ************NO PRODUCT AND MSDS*****************
- ************NO AHA*******************************
- ************NO SCHEDULE****************************
- ************NO ORDER OF MATERIALS***VENDOR WILL NOT SHIP UNTIL PAYMENT IS MADE ON OUTSTANDING ORDER*************

Task Order0009: Date of Order: 9/13/00 Date of Delivery: 12/12/00
- ************NO PRODUCT AND MSDS*****************
- ************NO AHA*******************************
- ************NO SCHEDULE****************************
- ************NO ORDER OF MATERIALS***VENDOR WILL NOT SHIP UNTIL PAYMENT IS MADE ON OUTSTANDING ORDER*************

Task Order 0010: Date of Order: 9/13/00 Date of Delivery: 12/12/00
- ************NO PRODUCT AND MSDS*****************
- ************NO AHA*******************************
- ************NO SCHEDULE****************************
************NO ORDER OF MATERIALS***VENDOR WILL NOT SHIP UNTIL PAYMENT IS MADE ON OUTSTANDING ORDER*************

Task Order 0011: Date of Order 9/29/00 Date of Delivery 10/29/00
- ************NO PRODUCT AND MSDS*****************
- ************NO AHA*******************************
- ************NO SCHEDULE****************************
- ************NO ORDER OF MATERIALS*************

Task Order 0012: Date of Order: 09/29/00 Date of Delivery: 11/28/00
- ************NO PRODUCT AND MSDS*****************
- ************NO AHA*******************************
- ************NO SCHEDULE****************************

007852

\*\*\*\*\*\*\*\*\*\*\*\*NO ORDER OF MATERIALS\*\*\*

Task Order 0013: Date of Order:  09/29/00 Date of Delivery: 11/28/00
- \*\*\*\*\*\*\*\*\*\*\*\*NO PRODUCT AND MSDS\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO AHA\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO SCHEDULE\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO ORDER OF MATERIALS\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Task Order 0014: Date of Order: 9/29/00 Date of Delivery: 11/28/00
- \*\*\*\*\*\*\*\*\*\*\*\*NO PRODUCT AND MSDS\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO AHA\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO SCHEDULE\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO ORDER OF MATERIALS\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Task Order 0015: Date of Order 9/29/00 Date of Delivery 11/28/00
- \*\*\*\*\*\*\*\*\*\*\*\*NO PRODUCT AND MSDS\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO AHA\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO SCHEDULE\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO ORDER OF MATERIALS\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Task Order 0016: Date of Order: 9/30/00 Date of Delivery: 3/29/01
- \*\*\*\*\*\*\*\*\*\*\*\*NO PRODUCT AND MSDS\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO AHA\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO SCHEDULE\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO ORDER OF MATERIALS\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Task Order 0017: Date of Order 9/30/00 Date of Delivery 9/29/00
- \*\*\*\*\*\*\*\*\*\*\*\*NO PRODUCT AND MSDS\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO AHA\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO SCHEDULE\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO ORDER OF MATERIALS\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# Guam Roofing Contract: N62766-99-D-0425

## Issues to Consider and Task Responsibility

Issues #1:
- Liquidated Damage exposure on currently issued Task Orders.

Responsibility 1:
- BioGenesis Pacific, Inc. (BPI) to address issues of delayed contract and other Gov't. Issues that directly affected financing, etc.

Issue and Responsibility #2:
- BPI to determine if BPI to pursue contract or let it go.

Issue #3:
- Completion of five (5) T. O. s that Rhino (RBI) has started or completed.

Responsibility #3:
- RBI to complete all necessary efforts for BPI to invoice and get paid 100% of contract values.
- BPI to pay RBI for work performed for same 5 T. O. s

Issue #4:
- Material stored on-site

Responsibility #4:
- BPI to invoice for Materials stored on site. Gov't pays 90%.

Issue #5:
- RBI pricing to BPI and what pricing includes.

Responsibility #5:
- Currently, RBI pricing to BPI includes all direct overhead costs (office, office equipment, QC, PM, Safety rep) Indirectly, RBI supplied contract administration will cover for BPI on-site needs).
- BPI and RBI to finalize negotiation of pricing for all CLIN items (all years) and percent of BPI mark-up over RBI pricing for non-prepriced proposals.

Issue #6:
- Create and execute Master Subcontract Agreement from BPI to RBI.

Responsibility #6:
- BPI to create agreement (agreement must <u>exclude</u> Liquidated damages for 1st 17 Task Orders)
- Agreement must include an assignment of funds clause that allows funds to be secured by RBI financing bank.



Danforth
EXHIBIT NO. 4
DATE 2-21-03
S.L. ROSS

007850

**EXHIBIT** "A4"

# Michael O'Connell

**From:** "Richard Avilla" <rhinogum@ite.net>
**To:** <akitad001@hawaii.rr.com>; <rhino1@hawaii.rr.com>;
**Sent:** Tuesday, October 24, 2000 11:49 AM
**Subject:** Richard Avilla - What date did Richard begin with BioGenesis

Good morning - I will resolce BPI and Rhino efforts today and tomorrow. To do so, I must have the following ASAP:

1. Complete (Detailed) cost for each project performed so far by Rhiono for BioGenesis. The cost report must be by project and also, I must have overhead ($dollar)expended during that time.

2. When did Richard go to BPI? What Date.?

3. I require dollar value, all monies paid to Richard, that BPI owes to Rhino. This is part of the negotiation.

Please have this information for me in 4 hours from now. I must prepared a negotiation proposal today and get it to BPI

Thank you for your assistance - Michael

Danforth
EXHIBIT NO. 5
DATE 2-21-03
S.L. ROSS

EXHIBIT "A5"

12/12/00

# Michael O'Connell

**From:** "Richard Avilla" <rhinogum@ite.net>
**To:** "R. Fong" <russ@hgea.org>; "Gerald Lam"
**Cc:** <RhinoGWA@ite.net>; <Rhino1@hawaii.rr.com>
**Sent:** Tuesday, October 24, 2000 10:52 PM
**Subject:** Guam Roofing Contract

Hi Gerry - Just received your e-mail.

I am meeting with Rhino's Owners tongiht regarding the contract and Rhino'proposal to you. I will propose a solution for your consideration. Yes - With Subcontract Agreement (Master Agreement) in place with Rhino, Rhino can go to Bank and finance the project.

Question - Does Rhino need to assist BPI is financing project Overhead?? If so, I believe that we can work something out.

I will call you tomorrow. It will be in the afternoon. Please call at your convenience. George's cell is (671)688-2030. We are 20 hours ahead of you.

Speak to you tomorrow. - Michael

*Richard*
*Meet*
*Rhino Owne*

**From:** "Richard Avila" <rhinogum@ite.net>
**To:** "R. Fong" <russ@hgea.org>;
**Cc:** <RhinoGWA@ite.net>; <Rhino1@hawaii.rr.com>
**Sent:** Wednesday, October 25, 2000 11:23 AM
**Attach:** Rhino Proposal Prices.xls; Rhino Proposal.doc
**Subject:** RE: Guam Roofing Contract

Good Morning Gerry;

Attached, please find a proposal from Rhino Builders. The purpose of this proposal is to establish the basis of what BPI requires to execute the roofing contract. An Excel file is also attached for your examination of all unit pricing for all work item descriptions, all years.

At your convenience, please call to discuss. It is very important for BPI and RBI to complete on discussions and negotiations today or no later than tomorrow.

On a personal note:

I have traveling a great deal. Doing consulting work with small businesses. I have to spend a lot of time with my mother. She had an emergency colon cancer operation. She is doing very well now.

Talk to you soon. I will return to Hawaii on 30 October. Place me. Cell 788-4614. Let's get together.

Mike O'Connell and I are awaiting your call. (671)632-7653 phone. fax: 637-9618

Mahalo - Michael
-----Original Message-----
From: Bpihawaii@aol.com [mailto:Bpihawaii@aol.com]
Sent: Thursday, October 26, 2000 4:39 AM
To: rhinogum@ite.net
Subject: Re: Guam Roofing Contract


Hey Michael,

I have already approved sufficient line of credit for materials and labor. Just got the word yesterday from Bank of Hawaii and the SBA. It was a bitch and expensive. I am also in good stead with Hawaii National which is my father's banking connection for all future projects and for Guam. I believe that I have enough to finance the work and the payments from the Navy should pick up the cash flow.

I had called you a number of times to plug you into some things but I understood that you were traveling and busy also with some personal matters. I've been in Hilo and Kona a lot the past several months. How long are you in Guam for?

12/12/00

# Michael O'Connell

**From:** "Richard Avilla" <rhinogum@ite.net>
**To:** "R. Fong" <russ@hgea.org>;
**Cc:** <RhinoGWA@ite.net>; <Rhino1@hawaii.rr.com>
**Sent:** Wednesday, October 25, 2000 11:23 AM
**Attach:** Rhino Proposal Prices.xls; Rhino Proposal.doc
**Subject:** RE: Guam Roofing Contract

Good Morning Gerry;

Attached, please find a proposal from Rhino Builders. The purpose of this proposal is to establish the basis of what BPI requires to execute the roofing contract. An Excel file is also attached for your examination of all unit pricing for all work item descriptions, all years.

At your convenience, please call to discuss. It is very important for BPI and RBI to complete on discussions and negotiations today or no later than tomorrow.

On a personal note:

I have traveling a great deal. Doing consulting work with small businesses. I have to spend a lot of time with my mother. She had an emergency colon cancer operation. She is doing very well now.

Talk to you soon. I will return to Hawaii on 30 October. Place me. Cell 788-4614. Let's get together.

Mike O'Connell and I are awaiting your call. (671)632-7653 phone. fax: 637-9618

Mahalo - Michael
-----Original Message-----
From: Bpihawaii@aol.com [mailto:Bpihawaii@aol.com]
Sent: Thursday, October 26, 2000 4:39 AM
To: rhinogum@ite.net
Subject: Re: Guam Roofing Contract

Hey Michael,

I have already approved sufficient line of credit for materials and labor. Just got the word yesterday from Bank of Hawaii and the SBA. It was a bitch and expensive. I am also in good stead with Hawaii National which is my father's banking connection for all future projects and for Guam. I believe that I have enough to finance the work and the payments from the Navy should pick up the cash flow.

I had called you a number of times to plug you into some things but I understood that you were traveling and busy also with some personal matters. I've been in Hilo and Kona a lot the past several months. How long are you in Guam for?

4

12/12/00

aloha,

gerry

5

12/12/00

# Michael O'Connell

**From:** "Richard Avilla" <rhinogum@ite.net>
**To:** "R. Fong" <russ@hgea.org>; "Gerald Lam"
**Cc:** <Rhino1@hawaii.rr.com>; <RhinoGWA@ite.net>
**Sent:** Thursday, October 26, 2000 9:08 PM
**Attach:** Request for Information.doc
**Subject:** Guam Roofing - Task Order checklist.

Gerry - Great speaking with you today. Attached, I submit my Task Order checklist. Lets use this list in our discussion scheduled for tomorrow at 0800 hours Guam Time.

I will place the call at exactly 0800 hours. That will be 1200 hours, Hawaii time on Friday, 10/27/00..

Yours truly - Michael

| From: | "Georfge Allen" <rhinoGWA@ite.net> |
|---|---|
| To: | "R. Fong" <russ@hgea.org>; "Gerald Lam" |
| Cc: | <Rhino1@hawaii.rr.com>; <Dakita@hawaii.rr.com> |
| Sent: | Friday, October 27, 2000 3:35 PM |
| Attach: | Guam Roofing Contract Status.doc |
| Subject: | Follow-up discussion with Gerald Lam 10/28/00 |

Gerry;

Attached is a simplified list of issues discussed this morning. I will
return to Hawaii Sunday night and be available to speak with you on Monday.
My new cell is 778-4614. I will look forwared to your call.

Michael

| | |
|---|---|
| Subj: | **Fw: BPI Evaluation (roofing contract)** |
| Date: | 1/29/01 6:43:35 AM Hawaiian Standard Time |
| *From:* | *maxxmgt@hawaii.rr.com (Maxx)* |
| *To:* | *maxxmgt@aol.com (Maxx Management)* |
| File: | **T O Price Evaluation REV.xls** (69632 bytes) DL Time (TCP/IP): < 1 minute |

----- Original Message -----
**From:** Maxx
**To:** O'Connell Michael
**Sent:** Monday, October 30, 2000 7:47 AM
**Subject:** BPI Evaluation (roofing contract)

Mike O -

I have attached another version of the BPI vs Rhino pricing of the Guam Roofing Contract. I finished this Sunday night in Guam.

Open the Excel spreadsheet and printout the "BPI Evaluation".
Notice that all 17 Task Orders are evaluated. Of special importance is the first 5 T Os that Rhino has performed. Task Orders 1, 2, 3, 4 and 7). Gene sent me the cost accounting, which shows the value of almost $50,900.00 expenditure. BUT LOOK, at the revised Rhino pricing proposed to BPI, Rhino's revenue is $145,388.60. If this is true, Rhino has made a $95,000.00 gross profit. Is this a correct picture??

I need for Gene to double check the cost accounting, make sure all journal entries are assigned. Some are not assigned and print this out again for us to discuss on Tuesday.

Also, please set up conference call with Al, you and I on our Tuesday (their Wednesday) as early as possible in the morning.

Michael

-------------------- Headers ------------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-yg04.mx.aol.com (rly-yg04.mail.aol.com [172.18.147.4]) by air-yg03.mail.aol.com (v77.31)
ESMTP; Mon, 29 Jan 2001 11:43:35 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yg04.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:42:54 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:42:39 -1000
Message-ID: <038901c08a12$3f850320$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: BPI Evaluation (roofing contract)
Date: Mon, 29 Jan 2001 06:40:54 -1000
MIME-Version: 1.0
Content-Type: multipart/mixed;
    boundary="----=_NextPart_000_0385_01C089BE.6DA81F20"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

9

| Subj: | **Fw: BPI Roofing Contract** |
|---|---|
| Date: | 1/29/01 6:41:50 AM Hawaiian Standard Time |
| From: | maxxmgt@hawaii.rr.com (Maxx) |
| To: | maxxmgt@aol.com (Maxx Management) |

—— Original Message ——
From: Maxx
To: Allen George - Guam
Sent: Wednesday, November 01, 2000 5:46 PM
Subject: Fw: BPI Roofing Contract

George - Make sure you call me tomorrow on this

Michael
—— Original Message ——
From: Maxx
To: rhinogum@ite.net
Cc: Allen George - Guam
Sent: Wednesday, November 01, 2000 5:38 PM
Subject: Re: BPI Roofing Contract

Richard - As of now, Gerry Lam has not responded to me regarding his responsibility to clear up LD problem.

I recommend that Rhino does NOT move ahead with anything else.

Michael

> —— Original Message ——
> From: Richard Avilla
> To: Maxx
> Sent: Wednesday, November 01, 2000 10:54 AM
> Subject: RE: BPI Roofing Contract
>
> Mike How are you.
> Everything taken care off, I had Warren N. doing paper work and submittals for me.he does have roofing, and
> administrative experience,just want to clear up some missunderstanding. Gov. wants Pre-Con meeting on two
> other T.O. Friday, 0013, 0015
> both have completion time past 10-29 I also feel I can get time extension on both, so no liquidated demages. I'll —
> keep you up.
> Would help if we could pay bills so I can order more,to move on.
> Richard
> -----Original Message-----
> From: Maxx [mailto:maxxmgt@hawaii.rr.com]
> Sent: Tuesday, October 31, 2000 10:39 AM
> To: rhinogum@ite.net
> Cc: O'Connell Michael
> Subject: Re: BPI Roofing Contract
>
>> Richard - Thanks for your response. Do not worry about Warren Nobles. I do not know why he is
>> evolved. He has no experience in roofing nor contractor administration. I read his resume. Please move
>> forward.
>>
>> Michael
>>
>>> —— Original Message ——
>>> From: Richard Avilla

9

**To:** Maxx
**Sent:** Monday, October 30, 2000 9:18 AM
**Subject:** RE: BPI Roofing Contract

Good Morning Mike
Spoke to Con-Raps of both Task Orders 1, 2 , I should get letter of acceptance soon, will check into, again today. They said I should have gotten it already. Did not submit revised schedule for T.O. 04 still haven't gotten in touch with Warren Nobles on what he submitted, will attempt to do so today. T.O. 07 need Inspection, submitted request, am waiting for reply from Con-Rap. Will inform you soon as things develops. I want to once again thank you, for your help in all matters.
Richard

    -----Original Message-----
    **From:** Maxx [mailto:maxxmgt@hawaii.rr.com]
    **Sent:** Tuesday, October 31, 2000 3:55 AM
    **To:** Rhinogum@ite.net
    **Cc:** O'Connell Michael; RhinoGWA@ite.net
    **Subject:** BPI Roofing Contract

    Richard - Please provide me with status of yesterday's meeting with government regarding Task Orders.

    1. Did government issue "Acceptance and Warranty" letters on Task Orders 1, 2 and 3??? If not, is the clock still ticking on Liquidated damages?

    2. Did you submit revised schedule for T. O. 0004?

    3. Please provide another update on T. O. #7.

    Thank you - Michael

--------------- Headers ----------------------------
eturn-Path: <maxxmgt@hawaii.rr.com>
eceived: from rly-yg02.mx.aol.com (rly-yg02.mail.aol.com [172.18.147.2]) by air-yg02.mail.aol.com (v77.31) with SMTP; Mon, 29 Jan 2001 11:41:50 -0500
eceived: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yg02.mx.aol.com (v77.27) with SMTP; Mon, 29 Jan 2001 11:41:16 -0500
eceived: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
  Mon, 29 Jan 2001 06:41:12 -1000
essage-ID: <035e01c08a12$0b3d8740$88fe1918@hawaii.rr.com>
rom: "Maxx" <maxxmgt@hawaii.rr.com>
o: "Maxx Management" <maxxmgt@aol.com>
ubject: Fw: BPI Roofing Contract
ate: Mon, 29 Jan 2001 06:39:26 -1000
IME-Version: 1.0
ontent-Type: multipart/alternative;
  boundary="----=_NextPart_000_035B_01C089BE.3966BDC0"
-Priority: 3
-MSMail-Priority: Normal
-Mailer: Microsoft Outlook Express 5.50.4522.1200
-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

Gerry - Did you contact the Contracting Officer for the Roofing contract in Guam and address the Liquidated Damages issue? If so, please let me know the result and following I will complete an outline for the subcontract agreement between Rhino and BPI.

If not, I will wait on you to clear the Liquidataed Damages issues.

Aloha, Michael

12/12/00

\l

**Michael O'Connell**

**From:** <Maxxmgt@aol.com>
**To:** <Bpihawali@aol.com>
**Sent:** Wednesday, November 01, 2000 1:26 PM
**Subject:** Guam Roof Contract

Gerry - Please let me know when you speak with the Contacting Officer on those Task Orders subject to liquadated damages.

I am waiting on you before I move forward with Rhino / BPI contract agreement.

Michael

12/11/01

**Michael O'Connell**

| | |
|---|---|
| **From:** | <Bpihawaii@aol.com> |
| **To:** | <Maxxmgt@aol.com> |
| **Cc:** | <russ@hgea.org> |
| **Sent:** | Monday, November 06, 2000 12:52 PM |
| **Subject:** | Re: Guam Roof Contract |

Mike,

Everything looks acceptable. I will also look forward to the breakdown of
Richard's costs (salary, lodging, vehicle). RBI shall not be responsible for
liquidated damages for TO 1 - 17. BPI shall guarantee payment to RBI for all
completed and accepted work.

The nature of assignment of payments as I understand would be as follows.
RBI is a subcontractor to BPI. RBI will need to take its subcontract and TO
to their bank. And the bank will need from BPI assignment of payments under
the subcontract direct to RBI's bank.

Gerry

12/12/00

# Michael O'Connell

**From:** <Maxxmgt@aol.com>
**To:** <Bpihawaii@aol.com>
**Cc:** <Rhino1@hawaii.rr.com>; <RhinoGum@ite.net>;
**Sent:** Friday, November 03, 2000 9:11 AM
**Subject:** Re: Guam Roof Contract

Gerry - Thanks for your reply. I held a conference with Mike O and Al yesterday. The following issues must be addressed in the Subcontract Agreement.

1) The Subcontract Agreement will be a "Master" with Task Orders issued from BPI to RBI imaging (except for unit pricing) the Task Order issued from the Government to BPI.

2) The Master Subcontract Agreement (MSA) will include (by attachment) the 17 task orders.

3) The MSA will include the unit pricing, base year and all option years, as proposed to BPI.

4) The MSA will include one-half (1/2) of all costs related to Richard, project manager for BPI. From your appointment letter date whereby Richard was acknowledged as BPI project manager, BPI has not paid for Richard's salary, lodging, car, cell, etc., Rhino has paid this. Al's original agreement with you is to share this costs 50/50. So, I am having this cost detailed and 1/2 of the cost and payment thereof, will be a part of the contract execution.

5) From the date of MSA execution, Richard must go on BPI payroll as BPI employee. RBI will not support any part if his salary. Lodging cost, vehicle cost, cell phone will be billed to BPI each month separately from the Task Orders invoicing.

6) Related to #5 supra, RBI unit pricing will be reduced to cover BPI project manager overhead. I will send another unit pricing schedule for RBI.

7} Task Orders 1 through 17 will not be subject to Liquidated Damages form the Government and BPI. Also, BPI must warranty/guarantee to RBI that payment for work in place will not be dependent on payment from Government to BPI and that financing is in place to make same payments.

8) Assignment of payments to Rhino's bank is necessary for RBI's financing.

9) Rhino will take MSA and Task Orders to bank for financing. Once financing is in place, RBI will purchase all stored materials form BPI thus relieving a complicated accounting system for work in place.

10) Payment to RBI will be 7 calendar days after receipt of payment from Owner by BPI except for Task Orders 1 through 17, where receipt of payment from Owner does not apply.

Gerry - Please provide your comments. I will be in Florida on Monday, but will continue to work on this until finished. I will wait on your comments before I begin.

Sincerely - Michael

**From:** "George W. A███" <rhinogwa@ite.net>
**To:** "Michael Dar███ (E-mail)" <Maxxmgt@aol.com>; "Michael O███nell (E-mail)" <rhino1@haw███rr.com>
**Sent:** Wednesday, November 08, 2000 2:30 PM
**Subject:** FW: Guam Roof Project

Just got this from Gerry, How do you want me to respond. Obviously, Richard didn't follow my instructions not to tell BPI what we were doing until we got our letter off.

George

-----Original Message-----
From: Bpihawaii@aol.com [mailto:Bpihawaii@aol.com]
Sent: Thursday, November 09, 2000 10:05 AM
To: rhinogwa@ite.net
Subject: Re: Guam Roof Project


George,

I have financing for materials. I am needing richard to do some work so as to placate the Navy. This option year work depends on the goodwill. Rhino won't be held to liq. damages nor for costs of necessary materials used for the roofs. I need to have Richard begin doing something. Michael is busy with his mother which is important. I have left messages for him.

Gerry
(808) 263-7777

12/12/00

15



| | |
|---|---|
| **From:** | "George W. Allen" <rhinogwa@ite.net> |
| **To:** | "Michael Danforth (E-mail)" <Maxxmgt@aol.com> |
| **Cc:** | "Michael O'Connell (E-mail)" |
| **Sent:** | Wednesday, November 08, 2000 8:37 PM |
| **Subject:** | BPI Contract |

Gerry called me after he talked to Michael O. I told him we could get back to work on alimited basis if he could pay Rhino $25,000 of what is owed by tomorrow with the idea that he will get with Michael D early next week (monday) to finalize the subcontract agreement.

russell is supposed to contact me tomorrow to confirm that they are able to get a check to Rhino.

Mike D I hope this is OK with you. We were unable to get you again, probably because of how late it was so we had to make a decision. Hope you're mom is OK. Catch me up tomorrow.

Really got some people upset with me today but it had to be done to force the issue. Need the letter of assignment and authority as soon as possible.

Meanwhile, I got further behind on the tank farm proposal with all the time i spent on BPI issues today. Hope I can concentrate on proposal tomorrow. Got one subcontract quote in today for about $259,000 but it excludes all of the pipe supports repais and welded patches.

regards

16

12/12/00

**From:** <Maxxmgt@aol.com>
**To:** <rhinogwa@ite.net>
**Cc:** <Rhino1@hawaii.rr.com>
**Sent:** Thursday, November 09, 2000 5:36
**Subject:** Response: Re: BPI Contract

George - NO, this is not OK with me, If I cannot be reached, just wait. We
are one day minus 9 hours difference, almost half way around the world.

I do not agree to any amount because, as of this time, I have waited for
almost two weeks to get 2 simple accounting reports from Rhino's office
having to do with this contract. (cost repsort up-to-date with all items
assigned - Al is to review his copy and make correction. Has this been
done???? and Richards cost form the time he dwent as BPI's manager). When you
cannot manage your finances and know where your money is, businessDEATH is a
staring you in the face.

I want the agreement to be finalized and all of us know where the money is.
BPI's urgency is not Rhinos urgency. Rhino's poor business judgment it this
matter is the result of more problems currently being experienced. We must
stop now and get control of it.

It is obvious that Richard lied to you and Al yesterday. In another e-mail I
will address what we agreed on the Saturday that we had a conference call
with BPI. Richard should be terminated immediately for lying and misuse of
Rhino's trust and funds!

Look for other e-mail entitled - "BPI Tentative Agreement"

Please printout a copy of this mail and hand deliver to Al.

Michael

17
12/12/00

| | |
|---|---|
| **From:** | <Maxxmgt@aol.com> |
| **To:** | <RhinoGWA@ite.net>; |
| **Sent:** | Friday, November 10, 2000 3:24 AM |
| **Subject:** | Guam Roof Project |

George / Al / Mike O;

I is evident form the latest mails that no one listens to my advice regarding
Gerry Lam, BioGenesis, Rhino and the Roofing contract.

On 29 October 2000, Al, George, Richard and myself conversed with Gerry Lam
and agreed: 1) RBI would complete all Task Orders that were previously
started (#1, #2, #3, #4 and #7). It was also agreed that Gerry Lam would call
the contracting officer and deal with those Task Orders that are or soon to
be in Liquidated Damages. Well guess what???? As predicted, Gerry Lam has
not completed his part or, at least, notified me of such. I do know that as
of last Friday, I received an e-mail form Gerry that stated he had left calls
to Johanna Mendeola (C. O. ), but no response. Now - It has been 2 weeks.
Do you believe him??

**BioGenesis has projects in liquidated damages with NO effort on Gerry's part
to remedy. How will BioGenesis pay for the work when the Government takes the
money from him for those damages??**

Rhino has no urgency! BioGenesis has all the urgency. Gerry must fix his own
problems, but no, Rhino jumps in and now has liability for those porblems
because Rhino will not get paid.

Rhino will not listen to my advice so, my advice stops. I will no longer
assist on the roofing project.

Michael

12/11/01

## Michael O'Connell

| | |
|---|---|
| **From:** | <Maxxmgt@aol.com> |
| **To:** | <Bpihawaii@aol.com>; <Keokialoha@aol.com>; |
| **Cc:** | <Rhino1@hawaii.rr.com> |
| **Sent:** | Friday, November 10, 2000 10:38 AM |
| **Attach:** | ATT00109.eml |
| **Subject:** | Fwd: Guam Roof Contract |

Gerry;

I have forwarded my last e-mail to you to remind everyone that I am still
waiting on you to confirm that NO Liquidated Damages will be assessed from
the Government to BPI on Task Orders 1 through 17. Your guarantee not to
assess LDs on RBI is not enough. You and I both know that if the Government
assesses LDs you will not get the money and therefore RBI will not get the
money and this situation only leaves RBI in a legal situation with BPI. You
did respond to this e-mail; however, your response indicated that you have
NOT performed as you agreed to do.

On 29 October 2000, we (Rhino and You) agreed that Rhino will finish all Task
Orders started and we identified those Task Orders specifically **AND that no
other work will be performed by Rhino until a Subcontract Agreement was in
place.** In addition, you agreed to call the Contracting Officer to remediate
those Task Orders in liquidated damages and those pending liquidated damages.
To my knowledge you have NOT performed your part of this agreement. As I made
it clear, until you (BPI) remediate the Task Orders pending LD damages, a
subcontract agreement will not be written.

If you have complied with the preceding, let me know so George can verify
with the Government such remedy is in place.

Yours truly;

Michael

12/11/01

1⁹

# Michael O'Connell

**From:** <Bpihawaii@aol.com>
**To:** <Maxxmgt@aol.com>
**Cc:** <Bpihawaii@aol.com>; <Keokialoha@aol.com>; <RhinoGum@ite.net>; <Rhino1@hawaii.rr.com>;
<russ@hgea.org>
**Sent:** Sunday, November 12, 2000 4:22 PM
**Subject:** Re: Guam Roof Contract

Michael,

I apparently misunderstood our conversation. It was my understanding that
Rhino's concern was not to be held responsible for LDs. My present
understanding is that the government will work with BPI on the LD issues
which I take to effectively mean no LD charges. However, I will need to
inquire further and get back to you. I had called the contracting officer
numerous times and left messages. I finally received a message directing me
to another officer.

Concerning your proposal then, the only possible avenue of getting to work
forthwith is for BPI to instead guarantee Rhino payment in an acceptable
manner. per the TOs in question. Alternatively, its still a waiting game on
BPI's part.

We agreed Rhino would finish the Task Orders with the intent of moving
forward right away. You have mentioned the items of LDs which may frustrate
that prior agreement that you and I discussed over specific TOs 1 - 17.
Therefore, you proposed a written subcontract of terms of which I awaited.
It was my understanding that BPI would agree not to have any LDs affect Rhino
who I had earlier relied upon during the course of dealing with the Navy CO.
IN MY ESTIMATION, I HAVE NOT FAILED TO PERFORM AS I AGREED. If it is Rhino's
concern that LDs on BPI will result in simultaneous damage to Rhino, I now
understand. NOW, You want a certification from the Navy CO that the NAVY
will not assess LDs on BPI. This position of yours was not clear to me.
Therefore, I have no choice but to keep following up on LDs with the
contracting officer.

Gerry Lam

12/12/00

**Michael O'Connell**

| | |
|---|---|
| **From:** | <Maxxmgt@aol.com> |
| **To:** | <Bpihawaii@aol.com> |
| **Cc:** | <RhinoGWA@ite.net>; <russ@hgea.org>; <RhinoGum@ite.net>; |
| **Sent:** | Monday, November 13, 2000 1:26 PM |
| **Subject:** | Response: Re: Guam Roof Contract |

Gerry;

Thank you for your response. I am glad that you now understand what we
expected from our conversation of 29 October 2000. Sorry for any
misunderstanding.

Rhino Builders, INc (RBI) is preceding to organize and prepare a Subcontract
Agreement that will inlcude the following: It will be prsent to you in
hardcopy form.

1. Agreement (Master with Task Order provisions)
2. 17 Task Orders (BPI to RBI) that represent the 17 Task Orders issued
todate.
3. Unit pricing schedule as presented previously to you on 29 October 2000.
4. Special Conditions that include details of what Rhino will provide to
BioGenesis (to inlcude: overhead expenditures of copying, faxing, e-mail,
phone, cell phones, QC and all his overhead, etc.)

If you have any anticipated exceptions to the information listed above,
please immediately notify me.

Liquadated Damage (LD) Issue;
Yesterday, Al and Richard attended a meeting with the government regarding
LDs and schedules. It is my understanding that Al (speaking strictly as
Rhino, BPI's subcontractor) defended BPI's position on delays from the
government and encouraged "partnering". Al reports that the Government was
upset; however, is willing to examine revised schedules that accurately
portray current status of T. O. s and Al also feels that the Government may
accept the revised schedules therefore eliminating potential L.D. posture.
If this occurs, we as well as you will know the result. The revised schedules
are due on Wednesday, 15 November 2000 GT.

Following the government's review and action, Rhino Builders will know what
to do. Hopefully, this will occur very soon so we can move on with a
simplyfied way of doing business and provide great service to the Government.

One issue is absolutely necessary. Richard must go on BioGenesis Payroll. As
stated before, RBI will provide BioGenesis with support for Richard which,
includes vehicle, cell, fuel, oil, insurance, etc), the cost of which, is
included in the unit pricing. Please prepare to take on this employee
(Richard) immediately upon execution of the Subcontract Agreement.

Yours truly;

Michael Danforth

12/12/00

| Subj: | **Guam Roofing Contract - Various** |
| Date: | 11/14/00 10:07:50 AM West Pacific Standard Time |
| From: | rhino1@hawaii.rr.com (Michael O'Connell) |
| To: | russ@hgea.org, bpihawaii@aool.com |
| CC: | rhinogum@ite.net (Richard Avilla), RhinoGWA@ite.net (George Allen - Guam), Maxxmgt@aol.com |

Gerry;

I have worked with Mike D today and Al regarding the Guam contract. It look
like good new about jobs and schedule. From now on, Mike Danford is POC
contract for all info on roof contract. All leters and calls will be give to
Mike D.

Rhino prepareing invoice to BPI tomorrow for all work todate. Invoice will
be on agree that cost is paid and split profit. I can send 1 invoice or
separate. Let me know.

Mike


------------------- Headers -----------------------
Return-Path: <rhino1@hawaii.rr.com>
Received: from rly-yb05.mx.aol.com (rly-yb05.mail.aol.com [172.18.146.5]) by air-yb04.mail.aol.com (v76_r1.23)
with ESMTP; Mon, 13 Nov 2000 19:07:50 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yb05.mx.aol.com (v76_r1.19) with
ESMTP; Mon, 13 Nov 2000 19:07:39 -0500
Received: from mike ([24.94.90.15]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.447.44);
    Mon, 13 Nov 2000 14:07:30 -1000
Message-ID: <001701c04dcf$91610ec0$0f5a5e18@hawaii.rr.com>
From: "Michael O'Connell" <rhino1@hawaii.rr.com>
To: <russ@hgea.org>, <bpihawaii@aool.com>
Cc: "Richard Avilla" <rhinogum@ite.net>,
    "George Allen - Guam" <RhinoGWA@ite.net>, <Maxxmgt@aol.com>
Subject: Guam Roofing Contract - Various
Date: Mon, 13 Nov 2000 14:12:25 -1000
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4133.2400
Disposition-Notification-To: "Michael O'Connell" <rhino1@hawaii.rr.com>
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4133.2400

| Subj: | **Fw: Guam Roof Files** |
|---|---|
| Date: | 1/29/01 6:38:10 AM Hawaiian Standard Time |
| *From:* | *maxxmgt@hawaii.rr.com (Maxx)* |
| *To:* | *maxxmgt@aol.com (Maxx Management)* |

----- Original Message -----
**From:** Maxx
**To:** keokialoha@aol.com
**Sent:** Wednesday, November 15, 2000 4:56 PM
**Subject:** Guam Roof Files

George - I am almost through with the Subcontract Agreement. Please e-mail the CLIN files and a way for me to print the 17 Task Orders as soon as possible.

Mail to my aol.com and hawaii.rr.com addresses.

Michael

------------------- Headers ----------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-yh03.mx.aol.com (rly-yh03.mail.aol.com [172.18.147.35]) by air-yh03.mail.aol.com (v77.31)
with ESMTP; Mon, 29 Jan 2001 11:38:10 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yh03.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:37:42 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:37:39 -1000
Message-ID: <02db01c08a11$8c5917a0$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Guam Roof Files
Date: Mon, 29 Jan 2001 06:35:53 -1000
MIME-Version: 1.0
Content-Type: multipart/alternative;
    boundary="----=_NextPart_000_02D8_01C089BD.BA8B75E0"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

| Subj: | **Fw: BPI Files** |
|---|---|
| Date: | 1/29/01 6:37:08 AM Hawaiian Standard Time |
| From: | *maxxmgt@hawaii.rr.com (Maxx)* |
| To: | *maxxmgt@aol.com (Maxx Management)* |
| File: | **Rhino Proposal Prices.xls** (38400 bytes) DL Time (TCP/IP): < 1 minute |

----- Original Message -----
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Sent: Wednesday, November 15, 2000 6:21 PM
Subject: Fw: BPI Files


>
> ----- Original Message -----
> From: "George W. Allen" <rhinogwa@ite.net>
> To: "Michael Danforth (E-mail)" <Maxxmgt@aol.com>
> Cc: <maxxmgt@hawaii.rr.com>
> Sent: Wednesday, November 15, 2000 5:39 PM
> Subject: BPI Files
>
>
> > I am attaching the excel file I told you about.
> >
>


------------------ Headers ------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-yd03.mx.aol.com (rly-yd03.mail.aol.com [172.18.150.3]) by air-yd05.mail.aol.com (v77.31)
ESMTP; Mon, 29 Jan 2001 11:37:08 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yd03.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:36:25 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
 Mon, 29 Jan 2001 06:36:13 -1000
Message-ID: <02b101c08a11$59350d20$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: BPI Files
Date: Mon, 29 Jan 2001 06:34:27 -1000
MIME-Version: 1.0
Content-Type: multipart/mixed;
    boundary="----=_NextPart_000_02AE_01C089BD.875FCA40"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

24

Subj: **Fw: Update on Email, Network, Phones, Warren Nobles, etc.**
Date: 1/29/01 6:36:01 AM Hawaiian Standard Time
From: *maxxmgt@hawaii.rr.com (Maxx)*
To: *maxxmgt@aol.com (Maxx Management)*

----- Original Message -----
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: <rhinogwa@ite.net>
Cc: "Maxx Management" <maxxmgt@aol.com>; "O'Connell Michael"
<Rhino1@hawaii.rr.com>; "Akita Dean" <deanakita@hawaii.rr.com>
Sent: Wednesday, November 15, 2000 7:22 PM
Subject: Re: Update on Email, Network, Phones, Warren Nobles, etc.

>´George -See my notes to each paragraph - Michael
>
> ----- Original Message -----
> From: "George W. Allen" <rhinogwa@ite.net>
> To: "Michael Danforth (E-mail)" <Maxxmgt@aol.com>; "Michael Road Runner
> Danforth (E-mail)" <maxxmgt@hawaii.rr.com>
> Sent: Wednesday, November 15, 2000 6:52 PM
> Subject: Update on Email, Network, Phones, Warren Nobles, etc.
>
>
> > Email - Just completed the last step in eliminating the email problems.
> It
> > has been frustrating to say the least.  Now, the Rhino network all dials
> out
> > through a used CPU ($300) which will also eventually serve as the
printer
> > server.  Biogenesis has a separate dial in to the ISP and I think it
uses
> > the BioGenesis phone on Richard's desk for that purpose.  Anyway, our
> system
> > can't get messed up when Richard dials in to guamcell.
> >
> > Phones - Right now, the only telephone communication we have is my cell
> > phone except that Aileen is using the Biogenesis phone to make outgoing
> > calls.  When you dial in to Rhino's number you get a busy signal.  When
> you
> > try to dial out you get a message that the service has been temporarily
> > disconnected due to non-payment.  I sent Aileen to the phone company
with
> a
> > SOC account check to pay the bill.
> GEORGE - FROM THE PAYMENT MADE BY SOC CHECK, DO YOU EXPECT THE PHONE TO BE
> BACK ON TOMORROW??
> >
> > Network - Richard is still hooked up to the network by cable so he can
get
> > to the drive that has programs on it but he can't get into the drive
that
> > has our sensitive data on it without a password which only Aileen, Mark
> and
> > I know.
> >
> > Forwarding email -  When we had the problem missing a SOC site visit
> because

2⁵

> > Richard didn't tell me about my email, I told Richard to forward any email
> > addressed to me. So far I have received none. As of right now, Richard
> > still hasn't told me that I got an email at his address. The email was
> from
> > Hawaii Pacific letting me know that they had received a check from
> > BioGenesis and thanking me for my assistance. He wants to know if we want
> > him to bill Biogenesis or Rhino in the future. I'll wait to answer him
> > after I confront Richard in front of Al and tell him that Ted at Hawaii
> > Pacific told me he had sent me an email at rhinogum@ite.net several days
> > ago.
> >
> > Warren Nobles - I will send the letter to Warren Nobles. I understand
> that
> > Richard has been trying to get copies of submittals, schedules, etc.
> Aileen
> > researched this for me and found that there is no purchase order, no
> > consulting agreement or any other document to support the payments that
> have
> > been made to Warren. She told me that this had come up preciously and
> > Eugene told them that was not proper but I guess it is still going. I am
> > going to have her go back through the check book and find each payment
> that
> > has been made by check and, hopefully we can find some way to tie all of
> > them to some job number. I suspect that he doesn't have a TIN and so we
> > would have to have his SS number, report his income to the IRS and send
> him
> > a 1099. I doubt that any of that has been done either. Could you please
> > have Dean get all of the rules and forms we need for hiring consultants
> and
> > send them to Aileen.
>
> GEORGE - AS I STATED BEFORE AND STATED IN THE COMPANY MEMO WRITTEN TODAY.
> (YOU DO NOT HAVE IT BECAUSE WE CAOULD NOT E-MAIL NOR FAX TO YOU) SEND LETTER
> TO DISMISS HIM AND NOTIFY THE NAVY THAT HE HAS NO FURTHER CONNECTION TO RBI.
> >
> > I have to make a time sheet. Aileen has nothing that will do for
> reporting
> > my time. Meanwhile, I will send Dean an email showing my time to make
> sure
> > that Lealani doesn't go through with her threat to not send me a
> paycheck.
> > This brings up another subject, she quoted some Rhino rules that said an
> > employee will not be paid without a time sheet. I have checked with
> > everyone here and there are no employee work rules or any other rules. We
> > both know we would be hard pressed to enforce any rules that have never
> been
> > delivered to the employees. If there are some there, we would really
> > appreciate getting a copy.
>
> GEORGE - A NEW TIME SHEET WAS CREATED TODAY. COULD NOT FAX NOR E -MAIL TO
> YOU - SO, I WILL TRY TOMORROW MORNING. DO NOT BOTHER CREATING ONE YOURSELF.
>
> >

26

> > We didn't get the package from Hawaii today so no paychecks yet and no
> > authorization letter. I am going to wait to send my notice to the
> employees
> > so I can attach the authorization letter.
>
> GEORGE - I WILL FIND OUT WHAT IS  AND LET YOU KNOW.
>
> >
> > Please confirm that you got the BPI files I sent you.
>
> YES - I RECEIVED THE FILES. THANK YOU VERY MUCH. I SHOULD HAVE ALL THE
> INFORMATION NECESSARY NOW TO PUT THE AGREEMENT TOGETHER. FIND OUT STATUS ON
> REVISED SCHEDULES THAT RICHARD WAS TO SUBMIT. WILL THE GOVERNMENT ACCEPT
> THEM?
>
> >
> > George
> >
> >
> >
> >
> >
> >
>

------------------ Headers ------------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from  rly-yh05.mx.aol.com (rly-yh05.mail.aol.com [172.18.147.37]) by air-yh04.mail.aol.com (v77.31) with ESMTP; Mon, 29 Jan 2001 11:36:01 -0500
Received: from  hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yh05.mx.aol.com (v77.27) with ESMTP; Mon, 29 Jan 2001 11:35:36 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com  with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:35:34 -1000
Message-ID: <02a001c08a11$4231a200$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Update on Email, Network, Phones, Warren Nobles, etc.
Date: Mon, 29 Jan 2001 06:33:49 -1000
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

## Michael O'Connell

**From:** "Michael O'Connell" <rhino1@hawaii.rr.com>
**To:** "Gerald Lam" <BPIHawaii@aol.com>; "Russ Fong" <Russ@HGEA.org>
**Cc:** "Michael Danforth" <Maxxmgt@aol.com>; "Richard Avilla" <rhinogum@ite.net>; "George Allen - Guam" <RhinoGWA@ite.net>; "Eugene O'connell" <geneo@pixie.com>; "Akita Dean" <deanakita@hawaii.rr.com>
**Sent:** Wednesday, November 15, 2000 11:02 AM
**Subject:** Richard Avilla - BPI employee

Dear Gerry;

Rhino Builders, Inc. will continue to carry Mr. Richard Avilla on their Guam office payroll until November 30, 2000 at close of business.

If BioGenesis Pacific, Inc, has not employeed Mr. Richard Avilla on or before 30 Nov 2000, Rhino Builders will relocate Mr. Avilla to Rhino's Operation in Hawaii.

Sincerely;

Mike N. O'Connell

$2^8$

12/12/00

Subj.: Fw: Guan Roof Subcontract agreement
Date: 1/29/01 6:37:53 Hawaiian Standard Time
From: maxxmgt@hawaii.. )m (Maxx)
To: maxxmgt@aol.com (Maxx Management)

—--- Original Message —---
From: Maxx
To: Russ Fong ; Gerry Lam
Cc: Allen George - Guam ; O'Connell Michael
Sent: Wednesday, November 15, 2000 5:07 PM
Subject: Guan Roof Subcontract agreement

Gerry - I am finished with the agreement for presentation to you except for the following:

1. Date of Prime Contract.
2, Correct name/title of prime contract

I have assigned the subcontract number of: BPI-0425-0001 to the Subcontract Agreement. If this is not satisfactory, please provide one that works for BPI.

The Agreement will include, a) under Attachment A, Rhino's CLIN unit pricing for all years, b) 17 Task Orders for simultaneous execution with the Agreement, c) request for payment for 50% of Richard costs from 12 July 200 to current.

Of course, if you decide to execute this agreement, any prior invoicing from Rhino for the work will be null and void except for Richard's costs.

The Agreement will also include a provision for Rhino to buy from BPI all stored materials. Following, Rhino will invoice BPI for stored materials and BPI can get paid for 90% of stored material value.

Please respond to me at maxxmgt@aol.com. It is imperative that I finish this work tomorrow by 12 noon or it will be delayed for a long time.

Michael


—---------------- Headers —--------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-yh03.mx.aol.com (rly-yh03.mail.aol.com [172.18.147.35]) by air-yh05.mail.aol.com (v77.31) with ESMTP; Mon, 29 Jan 2001 11:37:53 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yh03.mx.aol.com (v77.27) with ESMTP; Mon, 29 Jan 2001 11:37:23 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
   Mon, 29 Jan 2001 06:37:19 -1000
Message-ID: <02d101c08a11$80b9a0e0$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Guan Roof Subcontract agreement
Date: Mon, 29 Jan 2001 06:35:34 -1000
MIME-Version: 1.0
Content-Type: multipart/alternative;
   boundary="---=_NextPart_000_02CE_01C089BD.AEEBFF20"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200


Wednesday, January 31, 2001 America Online: Maxxmgt

## Michael O'Connell

| | |
|---|---|
| From: | "Maxx" <maxxmgt@hawaii.rr.com> |
| To: | <Bpihawaii@aol.com> |
| Cc: | "O'Connell Michael" |
| Sent: | Wednesday, November 15, 2000 7:24 PM |
| Subject: | Re: Guan Roof Subcontract agreement |

Hey Gerry - You already have the CLINS. I faxed them to you on October 26th

I will fax another set to you tomorrow along with the subcontract agreement of you provide the prime contract date and correct title.

Michael

----- Original Message -----
From: <Bpihawaii@aol.com>
To: <maxxmgt@hawaii.rr.com>
Sent: Wednesday, November 15, 2000 6:23 PM
Subject: Re: Guan Roof Subcontract agreement


> Michael,
>
> I just logged on and received the messages.  Please email me the subcontract
> so that I can review it asap and review the CLINs, costs and other terms with
> you right away.
>
> aloha,
>
> Gerry

12/12/00

| Subj: | **Fw: Guan Roof Subcontract agreement** |
|---|---|
| Date: | 1/29/01 6:35:38 AM Hawaiian Standard Time |
| From: | maxxmgt@hawaii.rr.com (Maxx) |
| To: | maxxmgt@aol.com (Maxx Management) |

—— Original Message ——
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: <Bpihawaii@aol.com>
Cc: "O'Connell Michael" <Rhino1@hawaii.rr.com>
Sent: Wednesday, November 15, 2000 7:24 PM
Subject: Re: Guan Roof Subcontract agreement


> Hey Gerry - You already have the CLINS. I faxed them to you on October
26th
>
> I will fax another set to you tomorrow along with the subcontract
agreement
> of you provide the prime contract date and correct title.
>
> Michael
>
>
> —— Original Message ——
> From: <Bpihawaii@aol.com>
> To: <maxxmgt@hawaii.rr.com>
> Sent: Wednesday, November 15, 2000 6:23 PM
> Subject: Re: Guan Roof Subcontract agreement
>
>
> > Michael,
> >
> > I just logged on and received the messages.  Please email me the
> subcontract
> > so that I can review it asap and review the CLINs, costs and other terms
> with
> > you right away.
> >
> > aloha,
> >
> > Gerry
>


———————— Headers ————————
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from  rly-zc05.mx.aol.com (rly-zc05.mail.aol.com [172.31.33.5]) by air-zc04.mail.aol.com (v77.31) with
ESMTP; Mon, 29 Jan 2001 11:35:37 -0500
Received: from  hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-zc05.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:35:12 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com  with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:35:11 -1000
Message-ID: <029a01c08a11$3426a980$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Guan Roof Subcontract agreement
Date: Mon, 29 Jan 2001 06:33:25 -1000

Wednesday, January 31, 2001 America Online: Maxxmgt

3\

MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

FAX TRANSMITTAL



TO:        Michael Danforth, Rhino Builders, Inc.

ATTN:      FAX: 808-668-7024

FROM:      Gerald Lam

DATE:      November 16, 2000

RE:        Guam: Subcontract Agreement and Attachments

Voice Call Back (808) 263-7777.  Fax Back (808) 263-0002

Total Pages including cover sheet:   1

Mike,

Mahalo for faxing a copy of the proposed subcontract and attachments. I just received them though I am off to a meeting this afternoon. I will review the documents right away thereafter. It is my practice to accept provisions by affirmative action than by acts of omission. I trust you understand that these past 2 weeks have especially been busy for me because of off island commitments and my mother's hospitalization.

*BioGenesis Pacific, Inc.*

1604 Ulualana Place • Kailua, Hawaii 96734 USA • 808-263-7777 • FAX 808-263-0002

| Subj: | **Fw: Guan Roof Subcontract agreement** |
|---|---|
| Date: | 1/29/01 6:34:50 AM Hawaiian Standard Time |
| From: | *maxxmgt@hawaii.rr.com (Maxx)* |
| To: | *maxxmgt@aol.com (Maxx Management)* |

----- Original Message -----
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: <Bpihawaii@aol.com>
Sent: Thursday, November 16, 2000 5:05 AM
Subject: Re: Guan Roof Subcontract agreement

> Gerry - Not the contract number, I have that. The Prime contract date and
> title. - Michael
>
>
> ----- Original Message -----
> From: <Bpihawaii@aol.com>
> To: <maxxmgt@hawaii.rr.com>
> Sent: Thursday, November 16, 2000 1:15 AM
> Subject: Re: Guan Roof Subcontract agreement
>
>
> > Thanks Michael. I'll dig into my files for the contract number.
> >
> > gerry
>

------------------ Headers ------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-ye01.mx.aol.com (rly-ye01.mail.aol.com [172.18.151.198]) by air-ye01.mail.aol.com (v77.35)
with ESMTP; Mon, 29 Jan 2001 11:34:50 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-ye01.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:34:38 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:34:35 -1000
Message-ID: <029001c08a11$1ec555a0$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Guan Roof Subcontract agreement
Date: Mon, 29 Jan 2001 06:32:49 -1000
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

34

From:       "George W. Allen" <rhinogwa@ite.net>
To:         "Michael Danforth (E-mail)" <Maxxmgt@aol.com>; "Michael O'Connell (E-mail)"
            <rhino1@hawaii.rr.com>; "Michael Road Runner Danforth (E-mail)" <maxxmgt@hawaii.rr.com>
Sent:       Saturday, November 18, 2000 6:05 PM
Subject:    Update

Regarding BPI:

Work continues with Al's approval. When I tried to get Al to sing the
$25,000 check to transfer funds from the Guam General Account to Hawaii, he
said he would have to make sure we had that much left since he had been
spending some on the BPI jobs. Don't go ballistic, I really think right now
is a time for us to tread lightly with the BPI work and for me to tread
lightly with Al. While I agree that BPI's urgency is not necessarily our
urgency, it does seem prudent to put forth a limited amount of resources to
keep the Navy from becoming agitated enough to just stop the contract. And,
I understand that one of the jobs is for a high ranking officer the OICC was
very interested in seeing go ahead. By all appearances, we are not putting
that much into the jobs since the labor is being paid by BPI and the bulk
materials are coming from BPI.

Regarding the Reaction Invoice, maybe BPI should pay that one rather than
Rhino. Al agrees with this idea as well.

Regarding Richard:

Richard told me last Tuesday that the previous Saturday was his last day on
Rhino's payroll. Al seemed to confirm this the other day. I really don't
know what's going on but I do know that no employee action terminating
Richard has been filled out. This is all confusing since I understand from
your end that Richard is to stay on our payroll until the end of the month.

Would somebody tell me exactly what the situation is? Is Richard still
working for Rhino or not?

If he quit last Saturday then we need to fill out a termination notice to
that effect and get it in the files. Richard's employment status is also
critical to our health insurance.

For my part, I would like to see him gone now. As much as I have tried to
make things as pleasant as possible under the circumstances Richard does not
seem inclined to do so. I am getting more than a little tired of the crap.
In my estimation, Rhino is taking a big risk keeping him around, having him
in our offices and as a signatory on our bank accounts. He has been
dishonest and has shown a complete disloyalty to Rhino in favor of his
loyalty to BPI. He communicated things with BPI that could have seriously
damaged Rhino in our efforts to negotiate. He has constantly thrown a
monkey wrench into my efforts to get things done and get things organized
around here and has gotten us into trouble on the SOC contract. I have no
doubt from the reactions I have seen that he has done a lot of harm to my
standing with other employees.

11/26/00

Richard took me to task in front of a full office for having read his "BPI email" about the wire transfer. I don't know who told him that I did so but I really don't appreciate him knowing about it. Is it impossible for me to do things and communicate them to Rhino without Richard knowing about them? It is amazing how he can take something he did that was so absolutely wrong (the wire transfer and not forwarding my mail to me) and try to turn it around to where I did something wrong. I told him I was looking for any messages that had been sent to me via Rhinogum, which I was, and he said it wasn't under Rhinogum. The fact is that the employer had the right to review anything any employee puts on the employer's computer. Unfortunately, I don't know if Richard is an employee although I had been told that he was when I looked at his computer.

I asked Al to talk privately and told him I was depending on him to help make sure that Richard and I could coexist peacefully. I showed him the email I had printed from Richards computer and it was clearly addressed to George Allen at Rhinogum@ite.net. I remind all of you that our letterhead and all of the information on our SOC proposal shows the email address as Rhinogum@ite.net. While we notified OICC of the change of address, we have no assurance that they will not accidentally send an important communication to the Rhinogum address so we must be able to depend on getting any mail sent to that address. I also remind you that Richard failed to pass messages on to me and has done so again with this latest message. Two full days had gone by from the time he received this message until he became aware of the fact that I had gotten it myself but he never mentioned it or forwarded it to me. I am going to have Mark set the Rhinogum address to forward to Rhinogwa and change the password so Richard will no longer be able to use it. Richard needs to be informed of this move so he can make arrangements to notify his correspondents of his change of address.

Al has not intervened once when Richard has gotten on his high horse with me in his presence. Even when Richard lied about the purpose of the stanchions, Al didn't say a word although I am sure at the time that Al knew Richard was lying. When Richard asked, in Al's presence, if I was in charge of everything, Al didn't say a word although that would have been the perfect opportunity for Al to clear up the question once and for all. When Richard took me to task for reading his email, Al didn't say a word. He has failed to take advantage of any of these opportunities to show his support of me and I am sure that makes all of the other employees doubt that I have his support.

Bank Accounts:

The Guam general account has not been transferred to the SOC account and Richard has not been removed from the signature card for the General account and Payroll account. I have no way to do this myself since I have no signatory authority over those accounts. Also, as of this Friday, Al is still co-signing the paychecks since he has not turned in the new signature card for the Payroll account with Michael O'Connell and Dean Akita on it. When you guys bring this up with Al, would you please put it as a question

3b

11/26/00

and try to keep me from o▮▮ again being the informant in the midd▮▮

Health Insurance:

Al and I agreed that Rhino will provide health insurance to it's employees.
The coverage will be for administrative and management employees and Rhino
will only pay the premium for the employee. Spouse and family coverage will
be available to the employees at group rates. The difference between
Employee coverage and Spouse/Family coverage will be paid by the employee
through payroll deduction. Hourly, casual employees (those hired on and
laid off for projects) can buy health insurance by payroll deduction after
completing a thirty day (maybe we should make it 60 day) probationary
period. I think we could make our written policy with a provision that
hourly employees could sign up again without the thirty day probationary
period if it has been less than 90 days (something like that) since they
were laid off.

We have chosen a health insurance carrier that gives us both the best
coverage and the lowest premiums. We are turning in health insurance
applications for Al, Aileen, Wayne and me on Monday (the final deadline to
get insurance effective 1 Dec). I thought Richard would be included and
then be dropped thirty days after he leaves here at the end of November,
however, I understand from Aileen that Richard is not turning in an
application because he doesn't work for Rhino. I am not sure if we will
have a deal without Richard since the quote from the insurance company was
for five employees and that may be the minimum. This is just another
example of how Richard continues to throw a monkey wrench into our efforts
by making decisions and doing things without our knowledge. Basic business
logic: a situation where you have no control or jurisdiction over an
employee is a potentially costly and disruptive situation.

For me personally, this would be very bad because my cancer problem may end
up being a pre-existing condition if the insurance does not go into effect
on 1 Dec since my DZB coverage ran out on 31 Oct. (being covered during the
preceding 60 days keeps it from being pre-existing) This problem has the
potential for costing as much as $50,000 a year. I have already put this
off longer than I should have. To delay until the first of January would be
way too risky. If anything is going to queer this deal going into effect on
1 Dec, then I am going to apply individually without the group rate. I
can't even get an appointment right now without the insurance coverage. I
remind you that Rhino is to cover the cost of my health insurance, with or
without group coverage. I already had to spend $267 on medical expenses
unrelated to by cancer checkup.

Office Move:

I issued a purchase order yesterday to get Lito (the phone system guy) to
setup cables and outlets for the phones in the new office space. The
outlets will have provisions for computers too. He was supposed to do this
today so we could do our next step on Monday but he hasn't done it so far.
Mark is supposed to be here Monday to install the computer cables. We need

11/26/00

another desk so we are going to get one for Aileen on Monday ($400) along
with a decent desk chair for me. Then, we would be ready to move everything
anytime after Monday. This move is critical to our operation. We can't get
organized and avoid the continued loss of incoming messages until we have a
properly set up office space.

11/26/00

Subj:       **Fw: Schedule**
Date:       1/29/01 6:34:21 AM Hawaiian Standard Time
From:   *maxxmgt@hawaii.rr.com (Maxx)*
To:     *maxxmgt@aol.com (Maxx Management)*

---- Original Message ----
From: Maxx
To: Allen George - Guam
Sent: Monday, November 20, 2000 6:13 AM
Subject: Schedule

George - I will be at Gerry Lam's office at 0800 hours this morning. Gerry confirmed last night. I did not hear back from you about if the Government called the contract or bought revised schedules.

I am going to negotiate substance of Agreement with Gerry. ON pricing, if he has differences, that is Al's department working with you, All in all, I must finish my part today.

George / Mike O - I will call you when I finish with Gerry and let you know how it went.

Michael


---------------------- Headers ----------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-yg05.mx.aol.com (rly-yg05.mail.aol.com [172.18.147.5]) by air-yg01.mail.aol.com (v77.31)
ESMTP; Mon, 29 Jan 2001 11:34:21 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yg05.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:33:54 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:33:31 -1000
Message-ID: <026801c08a10$f888d240$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Schedule
Date: Mon, 29 Jan 2001 06:31:45 -1000
MIME-Version: 1.0
Content-Type: multipart/alternative;
    boundary="----=_NextPart_000_0265_01C089BD.26B208C0"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

29

Subj:  **Fw: Regarding Update**
Date:  1/29/01 6:33:47 AM Hawaiian Standard Time
From:  maxxmgt@hawaii.rr.com (Maxx)
To:  maxxmgt@aol.com (Maxx Management)

----- Original Message -----
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: <rhinogwa@ite.net>
Cc: "O'Connell Michael" <Rhino1@hawaii.rr.com>
Sent: Monday, November 20, 2000 2:23 PM
Subject: Re: Regarding Update

> I explained this to you yesterday.  Mike O explained to me that if
> BioGenesis hires Richard, he stays in Guam strictly on BPI's payroll.  If
> BPI does not hire Richard, he is transferred to Guam, So, you do not have
to
> consider him for insurance.
>
> Michael
> ----- Original Message -----
> From: "George W. Allen" <rhinogwa@ite.net>
> To: "Michael Danforth (E-mail)" <Maxxmgt@aol.com>; "Michael Road Runner
> Danforth (E-mail)" <maxxmgt@hawaii.rr.com>; "Michael O'Connell (E-mail)"
> <rhino1@hawaii.rr.com>
> Sent: Monday, November 20, 2000 10:22 AM
> Subject: Regarding Update
>
>
> > In my email of 11/19 I asked for clarification on Richard's status as a
> > Rhino employee.  Please respond.  must know today for health insurance
> > reasons.
> >
>

------------------ Headers ------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-ye05.mx.aol.com (rly-ye05.mail.aol.com [172.18.151.202]) by air-ye02.mail.aol.com (v77.35)
with ESMTP; Mon, 29 Jan 2001 11:33:47 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-ye05.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:33:10 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:33:09 -1000
Message-ID: <025a01c08a10$eb781840$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Regarding Update
Date: Mon, 29 Jan 2001 06:31:23 -1000
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

Wednesday, January 31, 2001 America Online: Maxxmgt

4C

41

| Subj: | **Fw: Subcontract Agreement BPI and RBI** |
|---|---|
| Date: | 1/29/01 6:33:05 AM Hawaiian Standard Time |
| From: | *maxxmgt@hawaii.rr.com (Maxx)* |
| To: | *maxxmgt@aol.com (Maxx Management)* |

—— Original Message ——
**From:** Maxx
**To:** Allen George - Guam
**Cc:** Gerry Lam ; O'Connell Michael
**Sent:** Monday, November 20, 2000 2:28 PM
**Subject:** Subcontract Agreement BPI and RBI

George - Gerry lam and myself went through the subcontract agreement and everything is agreed upon (changes are highlighted in Yellow) except for the pricing.

For the pricing - Please price a full time QC Manager and Safety Officer. Use what is commonly paid in Guam plus labor burdens. Divide the total yearly costs of the QCM and SO by 2. They will work for both companies. Get two pay checks per week. IF 1/2 the price is, let's say $50K then based on 2.5M per year total gross Delivery Orders, what is percentage. Then reduce all CLIN items unit price by that percentage.

Revise all years. E-mail to me and BPI.

Michael

------------------- Headers -------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-zc01.mx.aol.com (rly-zc01.mail.aol.com [172.31.33.1]) by air-zc04.mail.aol.com (v77.31) with ESMTP; Mon, 29 Jan 2001 11:33:05 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-zc01.mx.aol.com (v77.27) with ESMTP; Mon, 29 Jan 2001 11:32:44 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51); Mon, 29 Jan 2001 06:32:42 -1000
Message-ID: <025401c08a10$db865e60$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Subcontract Agreement BPI and RBI
Date: Mon, 29 Jan 2001 06:30:57 -1000
MIME-Version: 1.0
Content-Type: multipart/alternative;
    boundary="----=_NextPart_000_0251_01C089BD.09BA4340"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

47

bj:    **RE: Richard Avilla**
Date:    11/22/00 12:28:44 PM West Pacific Standard Time
From:  rhinogwa@ite.net (George W. Allen)
oly-to: rhinogwa@ite.net
    Maxxmgt@aol.com, Bpihawaii@aol.com
   DeanAkita@hawaii.rr.com, russ@hgea.org

Mike, Gerry-I have reviewed the planned change regarding the safety officer and believe it should be eliminate
i ze neither contract requires a dedicated safety officer, therefore, there is not a person paid full time for thes
lssues. For example, I am the safety officer on the SOC contract and the Roofing contract allows for a
uperintendent, project manager, etc. to be the safety officer.

.t. me know so I can finalize the numbers. Dean should be giving me the labor burden to add by tomorrow
norning.

3 ry - Call me about this at (671) 727-8668.

rnks

-----Original Message-----
**From:** Maxxmgt@aol.com [mailto:Maxxmgt@aol.com]
**Sent:** Tuesday, November 21, 2000 2:29 PM
**To:** Bpihawaii@aol.com
**Cc:** DeanAkita@hawaii.rr.com; RhinoGWA@ite.net; russ@hgea.org
**Subject:** Richard Avilla

Dear Gerry - Thanks very much for your kind asistance in the development of a
fair agreement with Rhino (RBI).

George is developing another st of unit CLIN pricing sheets, all years, to
accomodate BPI's overhead for one-half of a Quality Control Manager (QCM) and
a Safety Officer (SO). As we agreed today, the QCM and SO will be employed by
both companies. Payment will be baed on their employee time sheets for work
hours for either company.

Gerry, based on the payment to RBI for 1/2 of Richard from 12 July through 17
Nov, **BPI must employ Richard begining 18 November 2000**. If you cannot do
this, please call George (671) 727-8668 so the confusion will not continue.
**GEORGE - PLEASE CALL GERRY TO FINSIH THIS SUBJECT.**

The only other thing I changed in the subcontract agreement is that I remove
attachment 3, cost details for Richard.

Thank you again Gerry for your assistance. Please make every effort to finish
with GEORGE in the next two day so Rhino can move forward very quickly.

Michael

------------------ Headers ------------------
P rn-Path: <rhinogwa@ite.net>
    ived: from rly-ye05.mx.aol.com (rly-ye05.mail.aol.com [172.18.151.202]) by air-ye01.mail.aol.com (v77.1
v h ESMTP; Tue, 21 Nov 2000 21:28:44 -0500
Received: from ite.net (ite02.ite.net [205.230.132.3]) by rly-ye05.mx.aol.com (v76_r1.19) with ESMTP; Tue, 2
Nov 2000 21:07:32 -0500
F ceived: from rhinoserver (ppp119.JJ.ite.net [202.123.134.119] (may be forged))
  by ite.net (8.10.0/8.10.0) with SMTP id eAM2D1w26448;

43

| Subj: | (no subject) |
|---|---|
| Date: | 11/23/00 3:50:58 PM Hawaiian Standard Time |
| From: | Maxxmgt |
| To: | RhinoGWA@ite.net, Bpihawaii |
| CC: | DeanAkita@Hawaii.rr.com, Rhino1@hawaii.rr.com, russ@hgea.org |
| BCC: | Keokialoha |

George - Thank you for your detailed report. I have copied a portion of the report for copy to BPI (Gerry and Russ) and will comment on that portion so Gerry and Russ and benefit for the same information rather than mouth to mouth relay. NOTE: Original message written in "BLUE" type. My comments written in "BLACK" type.

Wednesday I left a phone message for Gerry and sent him an email so we could talk about this but haven't heard back from him on either message. I plan to pursue only deducting for the proportionate amount of one half the QCM fully burdened salary, based on 2.5 million annual volume, no more. This should be fairly easy since I only have to change the base year. The option years are automatic calculated from the base year. Note: This sounds easy enough. FYI - BPI is now into their 1st option year as of 29 September 2000. Gerry allowed me to see the government letter for approval of the 1st option year

On a further update. Everything is squared away regarding Richard's employment status so that where we are in reality is the same as what you and Michael O have stated. He has decided that he will stay with BPI if he can work things out with them, (I take this to mean that BPI has not negotiated with Richard at the time of your correspondence. All received an e-mail that BPI must pick up BPI on their payroll starting 18 November 2000. Gerry - Please respond on this) that he would live in the house next to our office (where he is now) and that his (BPI's) office will be there. One thing I would like to have your blessing on is the idea that Richard and the shared QCM would be on Rhino's group health insurance. ( I have no problem with this and I will let Mike O make the final decision. By doing so, the insurance rates will be lowered for all. Rhino can invoice BPI for the direct cost) I think this can be done without violating the contractor/subcontractor relationship since the premium would be paid by RBI for the full monthly amount then billed to BPI. This would not be factored into the price adjustment since it would be billed monthly as a recovery to keep the contractor/subcontractor relationship clean. The premium for the QCM will be part of the burden so it will be factored into the price adjustments. The only other change I would like to suggest in the way you worked things out is that we simply split the hours 50/50 (I have no problem with this. We must has BPI's approval. Gerry - Do you approve??) on the QCM since this is the way it is being factored in the price adjustment rather than trying to do each pay check based on actual timesheet hours.

Office update - Our phones are installed in the new office so we have the ability to use phones system in either place for now and can move as soon as everyone else is in place.. Cabling for the computers will be done this weekend and we should be able to move early next week. Richard will stay behind where he has a dedicated phone line (paid by BPI) and his computer is not connected to our network. The only connection to RBI will be that one of our phone system extensions will be on his desk (to allow us to provide secretarial support to BPI.

Gerry - Please address the matters at hand via e-mail, if you choose or simply call George. I would prefer e-mail so there is no confusiion on what is determined and agreed upon.

I heard from my mother that you tried to call me in Florida. I am traveling abroad (difficult to use the phone) and have my laptop with me so please fell free to e-mail me at maxxmgt@aol.com . I check my mail at least tiwce a day.

I sense that we are close to an agreement. Please expedite with George.

Have you heard from the Government on approved revised schedules?

Yours truly - Michael

Wednesday, December 20, 2000 America Online: Maxxmgt

44

# Michael O'Connell

**From:** <Maxxmgt@aol.com>
**To:** <Bpihawaii@aol.com>
**Cc:** <Rhino1@hawaii.rr.com>; <RhinoGWA@ite.net>; <DeanAkita@hawaii.rr.com>;
**Sent:** Monday, November 27, 2000 1:13 PM
**Attach:** ATT00650.eml
**Subject:** Adjusted CLIN Prices

Gerry - No one has heard form you since I left. Please contract George
(671)727-8668 to finalize on Wed, 28th.

Michael

4S

12/12/00

| | |
|---|---|
| Subj: | **Adjusted Prices** |
| Date: | 11/28/00 7:40:52 AM West Pacific Standard Time |
| From: | rhinogwa@ite.net (George W. Allen) |
| Reply-to: | rhinogwa@ite.net |
| To: | Bpihawaii@aol.com |
| CC: | Maxxmgt@aol.com (Michael Danforth (E-mail)), rhino1@hawaii.rr.com (Michael O'Connell (E-mail)) |
| File: | **RBI to BPI Pricing 28 Nov.xls** (114688 bytes) DL Time (TCP/IP): < 1 minute |

Gerry,

I am attaching the spreadsheet with adjusted RBI to BPI prices. The new
prices are reduced to credit BPI with 50% of the burdened cost of the
Quality Control Manager based on an assumed annual volume of $2,500,000.
The burdened QCM was based on $22.50 per hour for 2080 hours per year plus
15% burden which is $26,910.

The tab "Price Calcs" shows the calculations with our original proposed
prices and adjusted prices for the base year and then the adjusted prices
for all option years. The average total increase in the BPI percentage is
1.08% which results in an increase of $27,000 in the BPI annual net based on
$2,500,000 annual volume.

I convinced Michael Danforth, and I hope you will agree that the Safety
Officer should not be included in this adjustment because there is no
requirement for a full time dedicated Safety Officer for the contract. The
Safety Officer can be a collateral duty of someone such as the Project
Manager. Considering this, there will not be a single person for whom 40
hours per week is attributed to Safety Officer. On our SOC contract, I am
the Safety Officer and I seldom clock 3 hours per week in that capacity.

We also feel that it will be much cleaner if we simply do 50% of the CQM
time on BPI payroll and 50% on RBI payroll rather than trying to account for
actual hours since the price adjustment is based on an assumed 50% each.
Not to mention the potential accounting nightmare.

I need your concurrence on the adjusted prices as soon as possible so I can
recalculate the BPI to RBI delivery orders for D.O. 0001 through 0017 and
send them to you for approval. The tabs "Base Year", "Option Year 1",
"option Year 2", "Option Year 3", "Option Year 4" will become attachments to
the master agreement between BPI and RBI.

If you have any questions or need to discuss, please call me at (671)
632-9653 or on my cell at (671) 727-8668.

Thanks,

George

------------------ Headers ------------------------
Return-Path: <rhinogwa@ite.net>
Received: from rly-zc04.mx.aol.com (rly-zc04.mail.aol.com [172.31.33.4]) by air-zc04.mail.aol.com (v77.14) with
ESMTP; Mon, 27 Nov 2000 16:40:51 -0500
Received: from ite.net (ite02.ite.net [205.230.132.3]) by rly-zc04.mx.aol.com (v76_r1.19) with ESMTP; Mon, 27
Nov 2000 16:39:28 -0500
Received: from rhinoserver (ppp226.JJ.ite.net [202.123.134.226] (may be forged))

Wednesday, December 20, 2000 America Online: Maxxmgt

Cc: "Michael Danforth (E-mail)" <Maxxmgt@aol.com>
Subject: RE: Richard's employment transition to BPI
Date: Wed, 29 Nov 2000 18:11:04 +1000
Message-ID: <000301c059db$ebdfda80$0300a8c0@rhinoserver>
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3 (Normal)
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook CWS, Build 9.0.2416 (9.0.2910.0)
X-MimeOLE: Produced By Microsoft MimeOLE V5.00.2615.200
Importance: Normal
In-Reply-To: <7e.d8073aa.27558144@aol.com>

47

| Subj: | **Re: (no subject)** |
|---|---|
| Date: | 11/29/00 6:56:07 AM West Pacific Standard Time |
| From: | Bpihawaii |
| To: | Maxxmgt |
| CC: | rhinogwa@ite.net |

I just returned from the Big Island and am going over my email. The following is my input to your 11-23-00 discussion.

1. BPI had earlier come to an agreement with Richard as to employment. Aslo Mike O'Connell had notified me earlier that Rhino would be covering Richard until November 30, afterwhich Richard will be either taken up by BPI or else shipped home to Rhino's oiffice in Hawaii. Based upon this, I had agreed with Mike and Richard to take on Richard into BPI.

2. Please arrange for Richard's health insurance under Rhino's policy and invoice BPI accordingly.

3. I have not heard (myself) about the Navy's rescheduling of work as of yet. I don't foresee or expect any difficulties at all if Al and Richard are given the discretion and freedom to "malama" the situation which is to everyone's benefit.

I'll call into George by phone.

Mahalo,

Gerry

Michael,

I have been on the Big Island on some emergencies. I just concluded a landmark negotiation successfully the importance of which is significant for me. I just downloaded the spreadsheet and have replied to George and the prior emails. Things with Richard are squared away okay. Mike O had notified me awhile ago that Rhino would be covering Richard to Nove 30 and BPI should take over from there. I cleared that with Richard earlier this month and finalized that long ago.

Though I haven't reveiwed it yet, I don't foresee having any problem with the CLINs and also trust that shoud we need to adjust it fairly for BPI or Rhino that we would be able to do so.

aloha,

Gerry

Subj:      **RE: Richard's employment transition to BPI**
Date:      11/29/00 6:15:36 PM West Pacific Standard Time
From:      rhinogwa@ite.net (George W. Allen)
Reply-to:  rhinogwa@ite.net
To:        Bpihawaii@aol.com
CC:        Maxxmgt@aol.com (Michael Danforth (E-mail))

I am going to address all of your emails in this one answer.

Glad to hear everything is coming along. I am pleased that Richard will
continue as BPI's project manager. As for timing of transition, that is up
to you, Michael O'Connell and Richard. The health insurance is a done deal.

Look over the spreadsheet I sent you as it is the last thing that needs top
be accomplished to finalize the agreement and enable me to produce the BPI
to RBI delivery orders. Again, what the revised prices accomplish is an
increase in BPI's annual net of $27,000 (1/2 QCM) on a volume of $2,500,000.

Al and Richard continue to do the roofing jobs unimpeded. We have hired a
new experienced Quality Control Manager today who will be working part time
for us while working out two weeks notice to current employer so we should
be able to provide additional support in that area.

Looking forward to a profitable and pleasant association.

George

-----Original Message-----
From: Bpihawaii@aol.com [mailto:Bpihawaii@aol.com]
Sent: Wednesday, November 29, 2000 7:45 AM
To: rhinogwa@ite.net
Subject: Richard's employment transition to BPI

George,

I had agreed awhile ago with Mike O'Connell's directive that Rhino would
cover Richard to Nov 30 and expect BPI to pick up Richard thereafter.
Richard should be covered by Rhino to Nov. 30. BPI will pick it up
thereafter. I had later agreed with Michael D. to foot $7,500 concerning
Richard's service since July.

Gerry

----------------- Headers -------------------
Return-Path: <rhinogwa@ite.net>
Received: from rly-zd03.mx.aol.com (rly-zd03.mail.aol.com [172.31.33.227]) by air-zd04.mail.aol.com (v77.14)
with ESMTP; Wed, 29 Nov 2000 03:15:36 -0500
Received: from ite.net (ite02.ite.net [205.230.132.3]) by rly-zd03.mx.aol.com (v76_r1.19) with ESMTP; Wed, 29
Nov 2000 03:15:08 -0500
Received: from rhincserver (ppp238.JJ.ite.net [202.123.134.238] (may be forged))
   by ite.net (8.10.0/8.10.0) with SMTP id eAT8Khn24495;
   Wed, 29 Nov 2000 18:20:43 +1000 (GST)
Reply-To: <rhinogwa@ite.net>
From: "George W. Allen" <rhinogwa@ite.net>
To: <Bpihawaii@aol.com>

Wednesday, December 20, 2000 America Online: Maxxmgt



Cc: "Michael Danforth (E-mail)" <Maxxmgt@aol.com>
Subject: RE: Richard's employment transition to BPI
Date: Wed, 29 Nov 2000 18:11:04 +1000
Message-ID: <000301c059db$ebdfda80$0300a8c0@rhinoserver>
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3 (Normal)
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook CWS, Build 9.0.2416 (9.0.2910.0)
X-MimeOLE: Produced By Microsoft MimeOLE V5.00.2615.200
Importance: Normal
In-Reply-To: <7e.d8073aa.27558144@aol.com>

5\

From: &lt;Maxxmgt@aol.com&gt;
To: &lt;Bpihawaii@aol.com&gt;
Cc: &lt;RhinoGWA@ite.net&gt;; &lt;DeanAkita@hawaii.rr.com&gt;; &lt;russ@hgea.org&gt;;
Sent: Wednesday, November 29, 2000 3:58 PM
Subject: Response to your communique`

Gerry - Thanks for the reply.

The only comment I have is that since Mike O'Connell stated to you the 30th,
we must adjust the reimbursement dollar amount for Richard to 30th Nov.
Cut-off we used is 18 Nov.

Thank you - I will be in Hawaii on Thursday.

Mahalo - Michael

12/12/00

| Subj: | **BPI Contract Summary** |
|---|---|
| Date: | 12/2/00 12:43:25 PM West Pacific Standard Time |
| From: | rhinogwa@ite.net (George W. Allen) |
| Reply-to: | rhinogwa@ite.net |
| To: | Maxxmgt@aol.com (Michael Danforth (E-mail)), maxxmgt@hawaii.rr.com (Michael Road Runner Danforth (E-mail)) |
| File: | **BPI & RBI CLIN Useage.xls (1060864 bytes) DL Time (TCP/IP): < 3 minutes** |

Just to let you know.

I have completed all of the BPI to RBI Delivery Orders with the new prices adjusted to account for the QCM. I have run a check and a cross check on these and everything seems to be right.
I have entered the data into my summary sheet and found that BPI's total take from the first 17 D.O.s is 3.95%. There are many CLINs that went over the limit for the base year. I have seen no contract modification(s) to make these changes although I think we heard that BPI agreed to hold the prices (silly move).

I am sending you the raw summary sheet for your info.

When you say, I will send the delivery orders to BPI.


-------------------- Headers --------------------
Return-Path: <rhinogwa@ite.net>
Received: from  rly-yc01.mx.aol.com (rly-yc01.mail.aol.com [172.18.149.33]) by air-yc05.mail.aol.com (v77.14) with ESMTP; Fri, 01 Dec 2000 21:43:05 -0500
Received: from  ite.net (ite02.ite.net [205.230.132.3]) by rly-yc01.mx.aol.com (v76_r1.19) with ESMTP; Fri, 01 Dec 2000 20:48:12 1900
Received: from rhinoserver (ppp118.JJ.ite.net [202.123.134.118] (may be forged))
    by ite.net (8.10.0/8.10.0) with SMTP id eB21p2201237;
    Sat, 2 Dec 2000 11:51:02 +1000 (GST)
Reply-To: <rhinogwa@ite.net>
From: "George W. Allen" <rhinogwa@ite.net>
To: "Michael Danforth (E-mail)" <Maxxmgt@aol.com>,
    "Michael Road Runner Danforth (E-mail)" <maxxmgt@hawaii.rr.com>
Subject: BPI Contract Summary
Date: Sat, 2 Dec 2000 11:40:57 +1000
Message-ID: <000401c05c00$eb6cb7e0$0300a8c0@rhinoserver>
MIME-Version: 1.0
Content-Type: multipart/mixed;
    boundary="----=_NextPart_000_0005_01C05C54.BD18C7E0"
X-Priority: 3 (Normal)
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook CWS, Build 9.0.2416 (9.0.2910.0)
Importance: Normal
X-MimeOLE: Produced By Microsoft MimeOLE V5.00.2615.200

| | |
|---|---|
| Subj: | **Fw: Gerry - Please call me - I am back in Hawaii** |
| Date: | 1/29/01 6:31:24 AM Hawaiian Standard Time |
| *From:* | *maxxmgt@hawaii.rr.com (Maxx)* |
| *To:* | *maxxmgt@aol.com (Maxx Management)* |

----- Original Message -----
**From:** Maxx
**To:** Gerry Lam
**Cc:** Fong Russ
**Sent:** Sunday, December 03, 2000 4:20 PM
**Subject:** Gerry - Please call me - I am back in Hawaii

Gerry - I received your message on my cell when I returned to Hawaii. Please call me as soon as you can. Cell 778-4614 or home 942-7569.

My cell does not work abroad. I left with you my laptop e-address: maxxmgt@aol.com

I will be at Rhino's office tomorrow morning. 778-6020.

Michael

------------------- Headers -------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-yh03.mx.aol.com (rly-yh03.mail.aol.com [172.18.147.35]) by air-yh05.mail.aol.com (v77.31) with ESMTP; Mon, 29 Jan 2001 11:31:24 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com 24.25.227.33]) by rly-yh03.mx.aol.com (v77.27) with ESMTP; Mon, 29 Jan 2001 11:30:59 1900
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:30:54 -1000
Message-ID: <021201c08a10$9b331560$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Gerry  - Please call me - I am back in Hawaii
Date: Mon, 29 Jan 2001 06:29:09 -1000
MIME-Version: 1.0
Content-Type: multipart/alternative;
    boundary="----=_NextPart_000_020F_01C089BC.C95C4BE0"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

54

| | |
|---|---|
| Subj: | Fw: Guam Roofing CLINs |
| Date: | 1/29/01 6:29:45 AM Hawaiian Standard Time |
| From: | maxxmgt@hawaii.rr.com (Maxx) |
| To: | maxxmgt@aol.com (Maxx Management) |

----- Original Message -----
**From:** Maxx
**To:** Gerry Lam
**Cc:** Allen George - Guam
**Sent:** Wednesday, December 06, 2000 10:52 AM
**Subject:** Fw: Guam Roofing CLINs

Gerry - this is George's response. I also spoke with him yesterday and realized that the original premise, incorporated in the latest Clines is to provide whatever support the contract requires. So - Rhino will support BPI with secretarial support. If Aileen, George's secretary, cannot keep up, then another will be brought on to maintain solid support.

Michael
----- Original Message -----
**From:** George W. Allen
**To:** 'Maxx'
**Cc:** 'Gerry Lam'
**Sent:** Tuesday, December 05, 2000 5:32 PM
**Subject:** RE: Guam Roofing CLINs

The only thing that changed from the original proposed prices to the ones dated 28 Nov is that 1/2 of the QCM was deducted from our prices (based on assumed annual volume of 2,500,000). My understanding was that the original prices included all administrative support, virtually everything, except the cost of the Project Manager's compensation package.

Is that right?

> -----Original Message-----
> **From:** Maxx [mailto:maxxmgt@hawaii.rr.com]
> **Sent:** Wednesday, December 06, 2000 11:03 AM
> **To:** Allen George - Guam
> **Cc:** Gerry Lam
> **Subject:** Guam Roofing CLINs
>
> George - I spoke to Gerry (BPI) at length today. Please quickly outline for us what the CLINs as recently presented by you represent in Overhead. For example: 1/2 QCM. 1/2 Safety Officer, 1/2 secretary, etc.
>
> The questions is: Can you spare Aileen 1/2 time for the SOC & Other contracts and 1/2 time for BPI???
>
> If not, please calculate a full time secretary's time and deduct form CLINs. Produce the new excel file with current date so we know which file is latest. If possible, please send new file (CLINs) by Friday, HT.
>
> Michael

-------------------- Headers --------------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-zd01.mx.aol.com (rly-zd01.mail.aol.com [172.31.33.225]) by air-zd05.mail.aol.com (v77.31) with ESMTP; Mon, 29 Jan 2001 11:29:45 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-zd01.mx.aol.com (v77.27) with ESMTP; Mon, 29 Jan 2001 11:29:12 -0500

Wednesday, January 31, 2001 America Online: Maxxmgt

55

Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:29:09 -1000
Message-ID: <01bb01c08a10$5c6f9420$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Guam Roofing CLINs
Date: Mon, 29 Jan 2001 06:27:23 -1000
MIME-Version: 1.0
Content-Type: multipart/alternative;
    boundary="----=_NextPart_000_01B8_01C089BC.8AA1F260"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

56

Subj: **Fw: Guam Roofing CLINs**
Date: 1/29/01 6:30:28 AM Hawaiian Standard Time
From: *maxxmgt@hawaii.rr.com (Maxx)*
To: *maxxmgt@aol.com (Maxx Management)*

----- Original Message -----
**From:** Maxx
**To:** Allen George - Guam
**Cc:** Gerry Lam
**Sent:** Tuesday, December 05, 2000 3:02 PM
**Subject:** Guam Roofing CLINs

George - I spoke to Gerry (BPI) at length today. Please quickly outline for us what the CLINs as recently presented by you represent in Overhead. For example: 1/2 QCM. 1/2 Safety Officer, 1/2 secretary, etc.

The questions is: Can you spare Aileen 1/2 time for the SOC & Other contracts and 1/2 time for BPI???

If not, please calculate a full time secretary's time and deduct form CLINs. Produce the new excel file with current date so we know which file is latest.  If possible, please send new file (CLINs) by Friday, HT.

Michael

-------------------- Headers --------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-xd01.mx.aol.com (rly-xd01.mail.aol.com [172.20.105.166]) by air-xd04.mail.aol.com (v77.31) with ESMTP; Mon, 29 Jan 2001 11:30:28 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com 24.25.227.33]) by rly-xd01.mx.aol.com (v77.27) with ESMTP; Mon, 29 Jan 2001 11:30:09 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
   Mon, 29 Jan 2001 06:30:08 -1000
Message-ID: <01ef01c08a10$7f6f8a20$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Guam Roofing CLINs
Date: Mon, 29 Jan 2001 06:28:22 -1000
MIME-Version: 1.0
Content-Type: multipart/alternative;
   boundary="----=_NextPart_000_01EC_01C089BC.ADA1E860"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

57

| | |
|---|---|
| Subj: | **Fw: Fw: Guam Roofing CLINs** |
| Date: | 1/29/01 6:29:29 AM Hawaiian Standard Time |
| *From:* | *maxxmgt@hawaii.rr.com (Maxx)* |
| *To:* | *maxxmgt@aol.com (Maxx Management)* |

----- Original Message -----
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: <Bpihawaii@aol.com>
Cc: "Allen George - Guam" <RhinoGWA@ite.net>
Sent: Thursday, December 07, 2000 11:39 AM
Subject: Re: Fw: Guam Roofing CLINs


> Gerry - I understand. You want a full time secretary on BPI's payroll.
>
> George - Please adjust CLINs for the above.
>
> Michael
>
> --- Original Message ----
> From: <Bpihawaii@aol.com>
> To: <maxxmgt@hawaii.rr.com>
> Sent: Thursday, December 07, 2000 10:04 AM
> Subject: Re: Fw: Guam Roofing CLINs
>
>
> > Mike,
> >
> > The reality is that I cannot expect to have a Program Manager on the
> Guam
> > Contract without a secretary to man the office.  It is a bad precedent
> and
> a
> > classic mistake of management to have Richard depend upon another
> > company's
> > secretary.  Also, I don't Richard or anyone will be able to effectively
> > function without a secretary.
> >
> > I think it more practical that the Guam contract have a dedicated
> > secretary.
> > If BPI has to make her parttime then it will have to be.  But if work
> > increases, then BPI has a full time available.  This will also keep BPI
> > easier in meeting SBA regulations of work performance II can title the
> > secretary anything).  Moreso, being long distance, the less worry I have
> the
> > better.  The secretary can plug into George and vice-versa for BPI's
> > matters.
> >
> > Gerry
>


-------------------- Headers --------------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-za05.mx.aol.com (rly-za05.mail.aol.com [172.31.36.101]) by air-za03.mail.aol.com (v77.31)
with ESMTP; Mon, 29 Jan 2001 11:29:28 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-za05.mx.aol.com (v77.27) with

58

ESMTP; Mon, 29 Jan 2001 11:28:39 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:28:37 -1000
Message-ID: <01a301c08a10$49a60220$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Fw: Guam Roofing CLINs
Date: Mon, 29 Jan 2001 06:26:52 -1000
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

59

Wednesday, January 31, 2001 America Online: Maxxmgt

| Subj: | **Fw: Fw: Guam Roofing CLINs** |
| Date: | 1/29/01 6:28:14 AM Hawaiian Standard Time |
| From: | maxxmgt@hawaii.rr.com (Maxx) |
| To: | maxxmgt@aol.com (Maxx Management) |

—— Original Message ——
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: <rhinogwa@ite.net>
Sent: Friday, December 08, 2000 8:09 AM
Subject: Re: Fw: Guam Roofing CLINs


> George - We adjust the CLINs because we have stated to Gerry that RBI will
> supply all Project Office Overhead except Richard.
>
> Michael
> —— Original Message ——
> From: "George W. Allen" <rhinogwa@ite.net>
> To: "'Maxx'" <maxxmgt@hawaii.rr.com>
> Sent: Thursday, December 07, 2000 4:51 PM
> Subject: RE: Fw: Guam Roofing CLINs
>
>
> > OK. I understand that Gerry wants a full time secretary but why do we
> > adjust the CLINs. In assessing cost, we would have based our annual
cost
> of
> > providing secretarial support on an average of 3 hours per day which is
> > about what Aileen puts in on strictly BPI work. If Gerry chooses to
have
> a
> > full time secretary for his own purposes, rather than just as is
necessary
> > to support the BPI Project Manager then shouldn't that be his cost? I
can
> > also see more office space, furniture, equipment, computers, etc., etc.,
> > being loaded onto us with this move. Do we really want to do this? At
> > best, I think we should credit back $1,600.00 which is the cost of
> secretary
> > for 3 hours per day at $9 per hour. That would mean an adjustment of
> .065%
> > which won't even change most CLINs.
> >
> > Let me know how you want top do it. This last minute change has already
> > cost us because we have paid to have telephones, etc. set up so Aileen
could
> > answer Richard's phone from our office. But, this will be a positive
for
> > me. If BPI has their own secretary then I can recover two of the Rhino
> > phones and use them in our office although now I will have one too many
> > since I just bought another for $350.
> >
> > —— Original Message ——
> > From: Maxx [mailto:maxxmgt@hawaii.rr.com]
> > Sent: Friday, December 08, 2000 7:40 AM
> > To: Bpihawaii@aol.com
> > Cc: Allen George - Guam
> > Subject: Re: Fw: Guam Roofing CLINs

> >
> >
> > Gerry - I understand. You want a full time secretary on BPI's payroll.
> >
> > George - Please adjust CLINs for the above.
> >
> > Michael
> >
> > — Original Message —
> > From: <Bpihawaii@aol.com>
> > To: <maxxmgt@hawaii.rr.com>
> > Sent: Thursday, December 07, 2000 10:04 AM
> > Subject: Re: Fw: Guam Roofing CLINs
> >
> >
> > > Mike,
> > >
> > > The reality is that I cannot expect to have a Program Manager on the
> > Guam
> > > Contract without a secretary to man the office. It is a bad precedent
> > and
> > a
> > > classic mistake of management to have Richard depend upon another
> > company's
> > > secretary. Also, I don't Richard or anyone will be able to
> > effectively
> > > function without a secretary.
> > >
> > > I think it more practical that the Guam contract have a dedicated
> > secretary.
> > > If BPI has to make her parttime then it will have to be. But if work
> > > increases, then BPI has a full time available. This will also keep
> > BPI
> > > easier in meeting SBA regulations of work performance II can title the
> > > secretary anything). Moreso, being long distance, the less worry I
> > have
> > the
> > > better. The secretary can plug into George and vice-versa for BPI's
> > matters.
> > >
> > > Gerry
> >
> >

------------------- Headers -----------------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-ye03.mx.aol.com (rly-ye03.mail.aol.com [172.18.151.200]) by air-ye03.mail.aol.com (v77.35)
with ESMTP; Mon, 29 Jan 2001 11:28:14 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com 24.25.227.33]) by rly-ye03.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:27:54 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:27:52 -1000
Message-ID: <017c01c08a10$2eb38280$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Fw: Guam Roofing CLINs
Date: Mon, 29 Jan 2001 06:26:07 -1000
MIME-Version: 1.0

6\

Wednesday, January 31, 2001 America Online: Maxxmgt

Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

Subj:     **Fw: Fw: Guam Roofing CLINs**
Date:     1/29/01 6:28:10 AM Hawaiian Standard Time
From:    *maxxmgt@hawaii.rr.com (Maxx)*
To:      *maxxmgt@aol.com (Maxx Management)*

----- Original Message -----
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Sent: Sunday, December 10, 2000 9:15 AM
Subject: Fw: Fw: Guam Roofing CLINs


>
> ----- Original Message -----
> From: "George W. Allen" <rhinogwa@ite.net>
> To: "'Maxx'" <maxxmgt@hawaii.rr.com>
> Sent: Friday, December 08, 2000 12:29 PM
> Subject: RE: Fw: Guam Roofing CLINs
>
>
> > OK. But, in my estimation, our cost for providing secretarial support
to
> > BPI would be far short of a full-time secretary with furniture,
computer,
> > etc., etc. Keep in mind that the lion's share of secretarial work being
> > done for Richard right now will cease when Rhino is hiring all of the
> > workers, buying all of the materials, paying all of the bills, etc. Our
> > plan was that our secretary would do the BPI work along with our work
with
> > only about 2 - 3 hours per day of her time (based on Aileen's input) and
> we
> > would need no extra office furniture, computer, fax machine, copy
machine,
> > transportation, etc., etc. Now, if BPI wishes, for their own purposes,
to
> > have a full-time secretary shouldn't BPI bear that cost? Why don't we
> > suggest that we make the adjustment to the original proposed prices as
> > follows:
> >
> > QCM @ 22.50/hr x 2080 hours x 1.15 (burden) = 53,820
> >
> > Secretary @ 9.00/hr x 2080 hours x 1.15 (burden) = 21,528
> >
> > 53,820 + 21,528 = 74,808 / 2 = 37,404 (each company's 50% share of the
> total
> > cost for both people)
> >
> > 37,404 / 2,500,000 (assumed annual volume) = 1.5% increase in BPI annual
> > net.
> >
> > This only addresses costs for burdened wages, not equipment, furniture,
> > etc., etc. If BPI is going to have a full-time secretary who is going
to
> > provide office furniture, computer, fax machine, copy machine, printer,
> > transportation, etc., etc.? We need to be in agreement on these details
> > before we sign an agreement. This (not for general distribution) is
> because
> > I can see Richard starting to flex his muscles and make demands for more

> and
> > more. Trust me, it is coming. My observation is that he thinks he should
> > be getting everything that I am getting.
> >
> > Let me know what you want to do.
> >
> > Actually, I am pleased with the idea that we will gain this separation and
> > not be sharing secretaries. It is just that there will be a lot of cost
> > involved in the duplication of facilities. While we are at it, I want to
> > make sure that you and Gerry are on board with the idea that BPI should
> > not
> > share our telephone system since they have their own telephone. The only
> > reason I had planned to have one of our extensions on Richard's desk was
> > so
> > he could communicate with Aileen for his secretarial work without walking
> > next door.
> >
> > George
> >
> > ——Original Message——
> > From: Maxx [mailto:maxxmgt@hawaii.rr.com]
> > Sent: Saturday, December 09, 2000 4:09 AM
> > To: rhinogwa@ite.net
> > Subject: Re: Fw: Guam Roofing CLINs
> >
> >
> > George - We adjust the CLINs because we have stated to Gerry that RBI will
> > supply all Project Office Overhead except Richard.
> >
> > Michael
> > —— Original Message ——
> > From: "George W. Allen" <rhinogwa@ite.net>
> > To: "'Maxx'" <maxxmgt@hawaii.rr.com>
> > Sent: Thursday, December 07, 2000 4:51 PM
> > Subject: RE: Fw: Guam Roofing CLINs
> >
> >
> > > OK. I understand that Gerry wants a full time secretary but why do we
> > > adjust the CLINs. In assessing cost, we would have based our annual cost
> > > of
> > > providing secretarial support on an average of 3 hours per day which is
> > > about what Aileen puts in on strictly BPI work. If Gerry chooses to have
> > > a
> > > full time secretary for his own purposes, rather than just as is necessary
> > > to support the BPI Project Manager then shouldn't that be his cost? I can
> > > also see more office space, furniture, equipment, computers, etc., etc.,
> > > being loaded onto us with this move. Do we really want to do this? At
> > > best, I think we should credit back $1,600.00 which is the cost of

64

> > secretary
> > > for 3 hours per day at $9 per hour. That would mean an adjustment of
> > > .065%
> > > which won't even change most CLINs.
> > >
> > > Let me know how you want top do it. This last minute change has
already
> > > cost us because we have paid to have telephones, etc. set up so Aileen
> > could
> > > answer Richard's phone from our office. But, this will be a positive
> for
> > > me. If BPI has their own secretary then I can recover two of the
Rhino
> > > phones and use them in our office although now I will have one too
many
> > > since I just bought another for $350.
> > >
> > > -----Original Message-----
> > > From: Maxx [mailto:maxxmgt@hawaii.rr.com]
> > > Sent: Friday, December 08, 2000 7:40 AM
> > > To: Bpihawaii@aol.com
> > > Cc: Allen George - Guam
> > > Subject: Re: Fw: Guam Roofing CLINs
> > >
> > >
> > > Gerry - I understand. You want a full time secretary on BPI's payroll.
> > >
> > > George - Please adjust CLINs for the above.
> > >
> > > Michael
> > >
> > > --- Original Message ---
> > > From: <Bpihawaii@aol.com>
> > > To: <maxxmgt@hawaii.rr.com>
> > > Sent: Thursday, December 07, 2000 10:04 AM
> > > Subject: Re: Fw: Guam Roofing CLINs
> > >
> > >
> > > > Mike,
> > > >
> > > > The reality is that I cannot expect to have a Program Manager on the
> > Guam
> > > > Contract without a secretary to man the office. It is a bad
precedent
> > and
> > > > a
> > > > classic mistake of management to have Richard depend upon another
> > > company's
> > > > secretary. Also, I don't Richard or anyone will be able to
> effectively
> > > > function without a secretary.
> > > >
> > > > I think it more practical that the Guam contract have a dedicated
> > > secretary.
> > > > If BPI has to make her parttime then it will have to be. But if
work
> > > > increases, then BPI has a full time available. This will also keep
> BPI
> > > > easier in meeting SBA regulations of work performance II can title
the
> > > > secretary anything). Moreso, being long distance, the less worry I

> have
> > > the
> > > > better. The secretary can plug into George and vice-versa for BPI's
> > > matters.
> > > >
> > > > Gerry
> > >
> >
>


———————— Headers ————————
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-yh03.mx.aol.com (rly-yh03.mail.aol.com [172.18.147.35]) by air-yh03.mail.aol.com (v77.31)
with ESMTP; Mon, 29 Jan 2001 11:28:09 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yh03.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:27:31 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:27:26 -1000
Message-ID: <016301c08a10$1ec1c8a0$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Fw: Guam Roofing CLINs
Date: Mon, 29 Jan 2001 06:25:40 -1000
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

66

# Michael O'Connell

**From:** "Richard Avilla" <rhinogum@ite.net>
**To:** "R. Fong" <russ@hgea.org>; "Gerald Lam"
**Cc:** <RhinoGWA@ite.net>; <Rhino1@hawaii.rr.com>
**Sent:** Tuesday, October 24, 2000 10:52 PM
**Subject:** Guam Roofing Contract

Hi Gerry - Just received your e-mail.

I am meeting with Rhino's Owners tongiht regarding the contract and
Rhino'proposal to you. I will propose a solution for your consideration.
Yes - With Subcontract Agreement (Master Agreement) in place with Rhino,
Rhino can go to Bank and finance the project.

Question - Does Rhino need to assist BPI is financing project Overhead?? If
so, I believe that we can work something out.

I will call you tomorrow. It will be in the afternoon. Please call at you.
convenience. George's cell is (671)688-2030. We are 20 hours ahead of you.

Speak to you tomorrow. - Michael

Richard
meet
Rhino Owner



EXHIBIT "A"

Danforth
EXHIBIT NO. 6
DATE 2-21-03
B.L. ROSS
12/12/00

| Subj: | **Fw: BPI Evaluation (roofing contract)** |
|---|---|
| Date: | 1/29/01 6:43:35 AM Hawaiian Standard Time |
| *From:* | *maxxmgt@hawaii.rr.com (Maxx)* |
| *To:* | *maxxmgt@aol.com (Maxx Management)* |
| File: | **T O Price Evaluation REV.xls** (69632 bytes) DL Time (TCP/IP): < 1 minute |

—— Original Message ——
**From:** <u>Maxx</u>
**To:** <u>O'Connell Michael</u>
**Sent:** Monday, October 30, 2000 7:47 AM
**Subject:** BPI Evaluation (roofing contract)

Mike O -

I have attached another version of the BPI vs Rhino pricing of the Guam Roofing Contract. I finished this Sunday night in Guam.

Open the Excel spreadsheet and printout the "BPI Evaluation".
Notice that all 17 Task Orders are evaluated. Of special importance is the first 5 T Os that Rhino has performed. Task Orders 1, 2, 3, 4 and 7). Gene sent me the cost accounting, which shows the value of almost $50,900.00 expenditure. BUT LOOK, at the revised Rhino pricing proposed to BPI, Rhino's revenue is $145,388.60. If this is true, Rhino has made a $95,000.00 gross profit. Is this a correct picture??

I need for Gene to double check the cost accounting, make sure all journal entries are assigned. Some are not assigned and print this out again for us to discuss on Tuesday.

Also, please set up conference call with Al, you and I on our Tuesday (their Wednesday) as early as possible in the morning.

Michael

———————— Headers ————————
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-yg04.mx.aol.com (rly-yg04.mail.aol.com [172.18.147.4]) by air-yg03.mail.aol.com (v77.31)
ESMTP; Mon, 29 Jan 2001 11:43:35 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yg04.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:42:54 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
   Mon, 29 Jan 2001 06:42:39 -1000
Message-ID: <038901c08a12$3f850320$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: BPI Evaluation (roofing contract)
Date: Mon, 29 Jan 2001 06:40:54 -1000
MIME-Version: 1.0
Content-Type: multipart/mixed;
   boundary="——=_NextPart_000_0385_01C089BE.6DA81F20"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

Danforth
EXHIBIT NO. 7
DATE 2-21-03
S.L. ROSS



EXHIBIT "A7"

**Michael O'Connell**

From: &lt;Maxxmgt@aol.com&gt;
To: &lt;Bpihawaii@aol.com&gt;
Cc: &lt;Rhino1@hawaii.rr.com&gt;; &lt;RhinoGum@ite.net&gt;;
Sent: Wednesday, November 01, 2000 7:43 AM
Subject: Guam Roofing Contract

Gerry - Did you contact the Contracting Officer for the Roofing contract in Guam and address the Liquidated Damages issue? If so, please let me know the result and following I will complete an outline for the subcontract agreement between Rhino and BPI.

If not, I will wait on you to clear the Liquidataed Damages issues.

Aloha, Michael



Danforth
EXHIBIT NO. 8
DATE 2-21-03
S.L. ROSS

12/12/00

EXHIBIT "A8"

## Michael O'Connell

**From:** <Maxxmgt@aol.com>
**To:** <Bpihawaii@aol.com>
**Sent:** Wednesday, November 01, 2000 1:26
**Subject:** Guam Roof Contract

Gerry - Please let me know when you speak with the Contacting Officer on those Task Orders subject to liquadated damages.

I am waiting on you before I move forward with Rhino / BPI contract agreement.

Michael

Danforth
EXHIBIT NO. 9
DATE 2-21-03
S.L. ROSS

EXHIBIT "A9" 12/12/00

| Subj: | Fw: BPI Roofing Contract |
|---|---|
| Date: | 1/29/01 6:42:__ AM Hawaiian Standard Time |
| From: | maxxmgt@hawe....rr.com (Maxx) |
| To: | maxxmgt@aol.com (Maxx Management) |

—— Original Message ——
From: Maxx
To: rhinogum@ite.net
Cc: Allen George - Guam
Sent: Wednesday, November 01, 2000 5:38 PM
Subject: Re: BPI Roofing Contract

Richard - As of now, Gerry Lam has not responded to me regarding his responsibility to clear up LD problem.

I recommend that Rhino does NOT move ahead with anything else.

Michael

> —— Original Message ——
> From: Richard Avilla
> To: Maxx
> Sent: Wednesday, November 01, 2000 10:54 AM
> Subject: RE: BPI Roofing Contract
>
> Mike How are you.
> Everything taken care off, I had Warren N. doing paper work and submittals for me.he does have roofing, and
> administrative experience.just want to clear up some missunderstanding. Gov. wants Pre-Con meeting on two
> other T.O. Friday, 0013, 0015
> both have completion time past 10-29 I also feel I can get time extension on both, so no liquidated demages. I'll
> keep you up.
> Would help if we could pay bills so I can order more,to move on.
> Richard
> ——Original Message——
> From: Maxx [mailto:maxxmgt@hawaii.rr.com]
> Sent: Tuesday, October 31, 2000 10:39 AM
> To: rhinogum@ite.net
> Cc: O'Connell Michael
> Subject: Re: BPI Roofing Contract
>
>> Richard - Thanks for your response. Do not worry about Warren Nobles. I do not know why he is
>> evolved. He has no experience in roofing nor contractor administration. I read his resume. Please move
>> forward.
>>
>> Michael
>>
>>> —— Original Message ——
>>> From: Richard Avilla
>>> To: Maxx
>>> Sent: Monday, October 30, 2000 9:18 AM
>>> Subject: RE: BPI Roofing Contract
>>>
>>> Good Morning Mike
>>> Spoke to Con-Raps of both Task Orders 1, 2 , I should get letter of acceptance soon, will check into,
>>> again today. They said I should have gotten it already. Did not submit revised schedule for T.O. 04 still
>>> haven't gotten in touch with Warren Nobles on what he submitted, will attempt to do so today. T.O. 07
>>> need Inspection, submitted request, am waiting for reply from Con-Rap. Will inform you soon as things

Wednesday, January 31, 2001 America Online: Maxxmgt

(13)

Danforth
EXHIBIT NO. 10
DATE 2-21-03
S.L. ROSS

EXHIBIT "A10"

develops. I want ~~once again thank you, for your help in all matt~~
Richard

-----Original Message-----
**From:** Maxx [mailto:maxxmgt@hawaii.rr.com]
**Sent:** Tuesday, October 31, 2000 3:55 AM
**To:** Rhinogum@ite.net
**Cc:** O'Connell Michael; RhinoGWA@ite.net
**Subject:** BPI Roofing Contract

Richard - Please provide me with status of yesterday's meeting with government regarding Task Orders.

1. Did government issue "Acceptance and Warranty" letters on Task Orders 1, 2 and 3??? If not, is the clock still ticking on Liquidated damages?

2. Did you submit revised schedule for T. O. 0004?

3. Please provide another update on T. O. #7.

Thank you - Michael

---

----------------- Headers -------------------
etum-Path: <maxxmgt@hawaii.rr.com>
eceived: from rly-yc04.mx.aol.com (rly-yc04.mail.aol.com [172.18.149.36]) by air-yc04.mail.aol.com (v77.31)
ith ESMTP; Mon, 29 Jan 2001 11:42:42 -0500
eceived: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yc04.mx.aol.com (v77.27) with
SMTP; Mon, 29 Jan 2001 11:41:42 -0500
eceived: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
 Mon, 29 Jan 2001 06:41:39 -1000
essage-ID: <036801c08a12$1b2f4120$88fe1918@hawaii.rr.com>
rom: "Maxx" <maxxmgt@hawaii.rr.com>
o: "Maxx Management" <maxxmgt@aol.com>
ubject: Fw: BPI Roofing Contract
ate: Mon, 29 Jan 2001 06:39:53 -1000
 IME-Version: 1.0
ontent-Type: multipart/alternative;
 boundary="----=_NextPart_000_0365_01C089BE.49619F60"
-Priority: 3
-MSMail-Priority: Normal
-Mailer: Microsoft Outlook Express 5.50.4522.1200
-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

Wednesday, January 31, 2001 America Online: Maxxmgt

---



**From:** "George W. Allen <rhinogwa@ite.net>

**To:** "Michael Danforth (E-mail)" <Maxxmgt@aol.com>; "Michael O'Connell (E-mail)" <rhino1@hawaii.rr.com>

**Sent:** Wednesday, November 08, 2000 2:30 PM

**Subject:** FW: Guam Roof Project

Just got this from Gerry, How do you want me to respond. Obviously, Richard didn't follow my instructions not to tell BPI what we were doing until we got our letter off.

George

-----Original Message-----
From: Bpihawaii@aol.com [mailto:Bpihawaii@aol.com]
Sent: Thursday, November 09, 2000 10:05 AM
To: rhinogwa@ite.net
Subject: Re: Guam Roof Project

George,

I have financing for materials. I am needing richard to do some work so as to placate the Navy. This option year work depends on the goodwill. Rhino won't be held to liq. damages nor for costs of necessary materials used for the roofs. I need to have Richard begin doing something. Michael is busy with his mother which is important. I have left messages for him.

Gerry
(808) 263-7777

12/12/00



Danforth
EXHIBIT NO. 11
DATE 2-21-03
S.L. ROSS

EXHIBIT "A"

From: "George W. Allen" <rhinogwa@ite.net>
To: "Michael Danfo (E-mail)" <Maxomgt@aol.com>
Cc: "Michael O'Co (E-mail)"
Sent: Wednesday, Nuember 08, 2000 8:37 PM
Subject: BPI Contract

Gerry called me after he talked to Michael O. I told him we could get back to work on alimited basis if he could pay Rhino $25,000 of what is owed by tomorrow with the idea that he will get with Michael D early next week (monday) to finalize the subcontract agreement.

russell is supposed to contact me tomorrow to confirm that they are able to get a check to Rhino.

Mike D I hope this is OK with you. We were unable to get you again, probably because of how late it was so we had to make a decision. Hope you're mom is OK. Catch me up tomorrow.

Really got some people upset with me today but it had to be done to force the issue. Need the letter of assignment and authority as soon as possible.

Meanwhile, I got further behind on the tank farm proposal with all the time i spent on BPI issues today. Hope I can concentrate on proposal tomorrow. Got one subcontract quote in today for about $259,000 but it excludes all of the pipe supports repais and welded patches.

regards

12/12/00


Danforth
EXHIBIT NO. 12
DATE 2-21-03
S.L. ROSS

EXHIBIT "A12"

From: &lt;Ma...t@aol.com&gt;
To: &lt;rhino...a@ite.net&gt;
Cc: &lt;Rhino1@hawaii.rr.com&gt;
Sent: Thursday, November 09, 2000 5:36
Subject: Response: Re: BPI Contract

George - NO, this is not OK with me, If I cannot be reached, just wait. We
are one day minus 9 hours difference, almost half way around the world.

I do not agree to any amount because, as of this time, I have waited for
almost two weeks to get 2 simple accounting reports from Rhino's office
having to do with this contract. (cost repsort up-to-date with all items
assigned - Al is to review his copy and make correction. Has this been
done???? and Richards cost form the time he dwent as BPI's manager). When you
cannot manage your finances and know where your money is, businessDEATH is a
staring you in the face.

I want the agreement to be finalized and all of us know where the money is.
BPI's urgency is <u>not Rhinos urgency.</u> Rhino's poor business judgment it this
matter is the result of more problems currently being experienced. We must
stop now and get control of it.

It is obvious that Richard lied to you and Al yesterday. In another e-mail I
will address what we agreed on the Saturday that we had a conference call
with BPI. Richard should be terminated immediately for lying and misuse of
Rhino's trust and funds!

Look for other e-mail entitled - "BPI Tentative Agreement"

Please printout a copy of this mail and hand deliver to Al.

Michael

12/12/00

Danforth
EXHIBIT NO. 13
DATE 2-21-03
S.L. ROSS


EXHIBIT "A13"

# Michael O'Connell

**From:** <Maxxmgt@aol.com>
**To:** <RhinoGWA@ite.net>;
**Sent:** Friday, November 10, 2000 3:24 AM
**Subject:** Guam Roof Project

George / Al / Mike O;

I is evident form the latest mails that no one listens to my advice regarding
Gerry Lam, BioGenesis, Rhino and the Roofing contract.

On 29 October 2000, Al, George, Richard and myself conversed with Gerry Lam
and agreed: 1) RBI would complete all Task Orders that were previously
started (#1, #2, #3, #4 and #7). It was also agreed that Gerry Lam would call
the contracting officer and deal with those Task Orders that are or soon to
be in Liquidated Damages. Well guess what???? As predicted, Gerry Lam has
not completed his part or, at least, notified me of such. I do know that as
of last Friday, I received an e-mail form Gerry that stated he had left calls
to Johanna Mendeola (C. O. ), but no response. Now - It has been 2 weeks.
Do you believe him??

**BioGenesis has projects in liquidated damages with NO effort on Gerry's part
to remedy. How will BioGenesis pay for the work when the Government takes the
money from him for those damages??**

Rhino has no urgency! BioGenesis has all the urgency. Gerry must fix his own
problems, but no, Rhino jumps in and now has liability for those porblems
because Rhino will not get paid.

Rhino will not listen to my advice so, my advice stops. I will no longer
assist on the roofing project.


Michael

Danforth
EXHIBIT NO. 14
DATE 2-21-03
S.L. ROSS

EXHIBIT "A14"
12/11/01

## Michael O'Connell

| | |
|---|---|
| **From:** | <Maxxmgt@aol.com> |
| **To:** | <Bpihawaii@aol.com>; <Keokialoha@aol.com>; |
| **Cc:** | <Rhino1@hawaii.rr.com> |
| **Sent:** | Friday, November 10, 2000 10:38 AM |
| **Attach:** | ATT00109.eml |
| **Subject:** | Fwd: Guam Roof Contract |

Gerry;

I have forwarded my last e-mail to you to remind everyone that I am still
waiting on you to confirm that NO Liquidated Damages will be assessed from
the Government to BPI on Task Orders 1 through 17. Your guarantee not to
assess LDs on RBI is not enough. You and I both know that if the Government
assesses LDs you will not get the money and therefore RBI will not get the
money and this situation only leaves RBI in a legal situation with BPI. You
did respond to this e-mail; however, your response indicated that you have
NOT performed as you agreed to do.

On 29 October 2000, we (Rhino and You) agreed that Rhino will finish all Task
Orders started and we identified those Task Orders specifically **AND that no
other work will be performed by Rhino until a Subcontract Agreement was in
place.** In addition, you agreed to call the Contracting Officer to remediate
those Task Orders in liquidated damages and those pending liquidated damages.
To my knowledge you have NOT performed your part of this agreement. As I made
it clear, until you (BPI) remediate the Task Orders pending LD damages, a
subcontract agreement will not be written.

If you have complied with the preceding, let me know so George can verify
with the Government such remedy is in place.

Yours truly;

Michael

Danforth
EXHIBIT NO. 15
DATE 2-21-03
B.L. ROSS

EXHIBIT "A15" 12/11/01

| To: | Gerald Lam, BioGenesis Pacific, Inc | Fax: | 808/263-0002 |
|---|---|---|---|
| From: | Michael Danforth | Date: | 11/17/00 |
| Re: | Subcontract Agreement & attachments | Pages: | 36 plus cover |
| CC: | Mike O'Connell & George Allen | | |

☐ Urgent     ☐ For Review     ☐ Please Comment     ☐ Please Reply     ☐ Please Recycl

Gerry – Please find the Subcontract agreement with attachments for your review. I consider that all documents are satisfactory since you have not provided response to any requests concerning differences offered at earlier dates.

Please provide lastest update of government acceptance on revised schedules.

Note: Task Orders, 17each, attachment 2, are not included in this fax.

**ENCLOSURE 5**



Danforth
EXHIBIT NO. 16
DATE 2-21-03
S.L. ROSS

EXHIBIT "16"

## SUBCONTRACT AGREEMENT

**CONTRACTOR:**    **BioGenesis Pacific, Inc**
**1604 Ulualana Place**
**Kailua, Hawaii**
**96734**
**(808) 263-7777**
**(808) 263-0002 fax**
**BPIHawaii@aol.com e-mail**

Subcontract Agreement No. <u>BPI-G0425-0001</u>
Subcontract Date      <u>17 November 2000</u>
Prime Contract No.     <u>N62766-99-D-0425</u>
Prime Contract Date

**SUBCONTRACTOR:**    **Rhino Builders, Inc.**
Address          **85-841 B Farrington Highway**
**Waianae, Hawaii**
**96792**
Point of Contact: **George Allen, Director of Operations**
Address:         **790 North Marine Drive, Box 959, Tumon, Guam**
Telephone:     **(671) 632-7653**
Facsimile:      **(671) 637-9618**
Email Address:  **RhinoGWA@ite.net**

Project Title and Location:     <u>**INDEFINITE DELIVERY/INDEFINITE QUANTITY (IDIQ) CONTRACT**</u>
<u>**FOR ROOFING SYSTEM INSTALLATION AND REPAIR, GUAM**</u>

      THIS SUBCONTRACT AGREEMENT (herein "Subcontract") is made on this date as set forth above, between BioGenesis Pacific, INC. (herein referred to as "Contractor") and Rhino Builders, Inc. the SUBCONTRACTOR set forth above (herein referred to as "Subcontractor").

      WHEREAS, this Subcontract Agreement is an Indefinite Delivery Indefinite Quantity (IDIQ) "Master" agreement from which, Task Orders shall be issued to Rhino Builders, Inc. under the "Master" agreement that duplicates in kind and quantity the Delivery Orders issued to BioGenesis Pacific, Inc. The Task Order shall contain the exact scope of work and quantities as described in each Delivery Order issued to the Contractor by the Government. All Terms and conditions applicable to the Task Orders shall derive from this Subcontract agreement.

      WITNESSETH THAT, the Contractor and Subcontractor, in consideration of the mutual covenants contained herein, agree as follows:

      <u>SECTION 1. STATEMENT OF WORK:</u> The terms "Project", "Project Location" and "Owner", as used throughout this Subcontract, shall mean the Project, Project Location, and Owner as set forth above. The Subcontractor agrees to perform the Subcontract Work set forth in "Section 2" hereof at the Project Location, in accordance with the terms and conditions of this Subcontract and all other documents and modifications to date of the Prime Contract, incorporated by reference and made a part of this Subcontract. Subcontractor agrees to bind and obligate himself, in the performance of this Subcontract, to the Contractor by the same terms, conditions, undertakings and obligations that the Contractor is bound and obligated to the Owner by the Prime Contract but, in the event of conflict of the terms thereof with the terms hereof, those terms shall prevail which afford the greater of protection to the Owner under the Prime Contract or to the Contractor under this Subcontract.

      <u>SECTION 2. SCOPE OF WORK.</u> The Subcontractor shall furnish all labor, supervision, materials, tools, equipment and supplies necessary to perform the work specifically described in each Task Order and as detailed in Section 26, "Special Conditions", and in strict compliance with the requirements of this Subcontract and of the Prime Contract, but, in the event of conflict, those terms shall prevail which afford the greater protection to the Owner under the Prime Contract, or to the Contractor under this Subcontract (all of the responsibilities and obligations hereunder collectively are herein referred to as "Subcontract Work"). When the Subcontractor is required under this Subcontract to furnish material not to be installed or utilized by Subcontractor at the Project Location, such material is to be delivered

F.O.B. Project Location, unless expressly herein stated to the contrary.



**SECTION 3. TIME OF PERFORMANCE.** The Subcontractor agrees to keep himself informed as to the progress of the Project and to faithfully prosecute his Subcontract Work, and all parts thereof, at such times and in such order as the Contractor may consider necessary to keep the same sufficiently in advance of the other parts of the Project and to avoid any delay in the completion of the construction as a whole. The scheduled Time of Performance of the Subcontract Work, or any part thereof, is as and when directed by Contractor, as may be modified from time to time.

**SECTION 4. PAYMENTS.** The Contractor agrees to pay the Subcontractor for the Subcontract Work to be performed as provided herein, the sum of _____ (refer to each Task Order for Task Order Value), subject to additions and deductions for subcontract modifications as may be agreed upon, or determined, as provided herein and subject to adjustments from quantity of Subcontract Work performed at Unit Prices set forth under SECTION 26 "Special Conditions", Attachment A. The aforementioned sum (hereinafter called "Subcontract Price") includes all taxes and insurance of any nature whatsoever that may be or should be assessed against or incurred by the Subcontractor in performance of the Subcontract Work.

Simultaneous execution of this Agreement and Task Orders attached to this Agreement shall include a payment to Rhino Builders, Inc. in the amount of $15,029.92 for the verbal agreement to provide Richard Avilla as Project Manager to the Contractor from July to date of this document execution. Cost Details are provided under Section 26, "SPECIAL CONDITIONS", and Attachment 3.

Partial Payments less a retained percentage of _____ (equal to the amount held by the Government on Rhino Builders, Inc.'s work) % will be made to the Subcontractor, provided that the Subcontractor has submitted a Subcontract Request for Payment (form SC0004) to the Contractor's office on or before the twenty-fifth day of each month, at the Unit Prices set forth in each Task Order, for Subcontract Work incorporated into the construction and/or delivered to the Project Location or approved storage site as estimated by the Owner, less the aggregate of previous payments, and provided further that payment for such Subcontract Work has been approved by the Owner and received by the Contractor from the Owner. The Contractor will accept facsimile transmittal/submission of the Subcontract Request For Payment, the date of receipt thereupon shall be accepted as the date of request. Subcontractor shall follow-up with hardcopy submitted via US Postal Service. Upon complete performance of this Subcontract and approval and final acceptance of the Subcontract Work by the Owner, the Contractor shall make final payment to the Subcontractor of the balance due him, within seven days.

The Subcontractor agrees that the monies received for the performance of this Subcontract shall be used only for the Subcontract Work; that said monies shall not be diverted to satisfy other obligations of the Subcontractor; and that the Subcontractor shall furnish proof (lien waivers: conditional, partial and final) of the foregoing upon written request of the Contractor.

**SECTION 5. LIQUIDATED DAMAGES.** The liquidated damages are as follows:

| Total Value of Delivery Order | | | Liquidated Damages Per Calendar Day |
|---|---|---|---|
| $2,500 | to | $25,000 | $80.00 |
| $25,001 | to | $50,000 | $110.00 |
| $50,001 | to | $100,000 | $140.00 |
| $100,001 | to | $500,000 | $200.00 |
| Each additional $100,000.00 | | | add $50.00 |

EXCEPTION: NO LIQUIDATED DAMAGES SHALL BE ASSESED ON SUBCONTRACTOR FOR TASK ORDERS 001 CONSECUTIVELY THROUGH 0017. THE CONTRACTOR GUARANTEES PAYMENT TO SUBCONTRACTOR EVEN IF GOVERNMENT DOES NOT ISSUE PAYMENT TO CONTRACTOR.

Should the Subcontractor default in the proper performance of the Subcontract Work, thereby causing delay to any part of the entire work under the Project, Subcontractor shall be liable for any and all loss and damages including liquidated damages sustained therefore by Contractor. The Subcontractor shall not be liable under this paragraph if such default is caused by strike, lockout, act of God, or other reason beyond the control of Subcontractor, to the extent that any of the foregoing constitutes valid excuse for delay under the Prime Contract, provided that notice of same shall be furnished in

Case 1:02-cv-00008    Document 284    Filed 12/15/2003    Page 170 of 216



writing by Subcontractor to Contractor within forty-eight hours of occurrence.

**SECTION 6. SUBMITTALS.**   The Subcontractor agrees to submit, to Contractor (or as directed to the Government in behalf of Contractor) within five (5) days of the date of each Task Order, complete detailed shop drawings, lists and brochures (product data), Material Safety Data Sheets, as well as required material samples and color selections, all for approval by Contractor's Authorized Representative and/or Owner's Representative.

**SECTION 7. SCHEDULES.**   In the event that the Job Progress Schedule is a Critical Path Method or similar type Schedule, the Subcontractor agrees to fully cooperate with the Contractor in the preparation of and maintenance of said Schedule.

Upon request by the Contractor, the Subcontractor shall furnish to the Contractor, in writing, a progress schedule covering the Subcontract Work. Such schedule will show in detail the procurement, shop drawing, fabrication, and delivery and installation activities of all the major components of the Subcontract Work. The Subcontractor agrees to meet and keep such schedule and to apprise the Contractor monthly of Subcontractor's progress position.

**SECTION 8. EXTENSION OF TIME.**   No allowance of any extension of time, for any cause whatsoever, shall be claimed by the Subcontractor or be made to him unless the Subcontractor shall have made written request upon the Contractor for such extension, within forty-eight hours after the cause for such extension occurred, and unless the Contractor and Subcontractor have agreed in writing specifically with respect to the allowance of additional time which may be made. If such extension of time is requested as aforesaid and the Contractor and Subcontractor cannot agree thereupon, the Owner's Contracting Officer shall determine by written certificate precisely what, if any, extension of time shall be allowed.

No allowance of any extension of time shall, in any event, be made to the Subcontractor for delay by the Subcontractor in preparing submittals, or in securing approval of the Owner thereto, when such submittals are not properly prepared, or when the Subcontractor by the exercise of reasonable diligence and judgment could have anticipated and avoided the delay.

**SECTION 9. CLEANUP.**   Cleanup and removal from the Project site of Subcontractor's waste materials and refuse will be the full responsibility of the Subcontractor. If Subcontractor fails to do so, after having received 24 hours notice from the Contractor that Subcontractor's cleanup work is not being properly prosecuted, then said cleanup work will be performed by Contractor's own personnel and the expense thereof charged to the Subcontractor and/or deducted from monies due or become due to Subcontractor.

**SECTION 10. CHANGES/MODIFICATIONS.**   The Contractor reserves the right to make changes in the Subcontract Work, in kind and quantity as the Government changes the Contractor's Delivery Orders, as additions thereto or omissions wherefrom, upon written order (Subcontract Modification, form SC0005) to the Subcontractor. Any additions or reductions to be made to or from the amount of the Subcontract Price resulting from changes in the Subcontract Work shall be agreed upon in writing by the parties hereto, such agreement not being valid unless signed by an authorized representative of the Contractor and Subcontractor. No addition or reduction in Subcontract Price shall be binding upon the Contractor unless agreed upon in writing. No change, alteration or modification in the terms and conditions of this Subcontract or in the term or manner of payment shall in any way exonerate or release, in whole or in part, any surety on any bond furnished by or on behalf of the Subcontractor.

**SECTION 11. TERMINATION OF WORK.**   If Owner, with or without cause, terminates the Prime Contract, or shall stop or suspend work under the Prime Contract, Contractor may order Subcontractor to stop or suspend Subcontract Work, and Contractor shall be liable to Subcontractor for any such stoppage or suspension only if and to the extent that Owner shall be liable to Contractor. From funds paid by Owner to Contractor for the Subcontract Work, Contractor will pay to Subcontractor the value of Subcontract Work completed before the work was stopped or suspended.

**SECTION 12. FAILURE TO PERFORM.**   The Subcontractor shall perform the Subcontract Work in a proper, efficient and workmanlike manner and in a prompt, diligent and expeditious manner and so as to promote the general progress of the entire construction and shall not, by delay or otherwise, interfere with or hinder the work of the Contractor or any other subcontractor.

In the event the Subcontractor fails to comply or becomes disabled from complying with the Provisions herein

as to character, quantity or quality of Subcontract Work or time of performance thereof, or refuses to proceed with the Subcontract Work as directed by the Contractor, or fails to perform Subcontract Work in accordance herewith, in whole or in part, or fails to perform any Provision of this Subcontract, the Contractor may, at the Contractor's option and upon 72 hours written notice to the Subcontractor's last known address and without prejudice to any other right or remedy, take any steps the Contractor deems advisable or necessary to secure any labor and/or materials, equipment, tools, supplies, services, etc., necessary to the prosecution of the Subcontract Work, and the Contractor may take over all of the same and prosecute the Subcontract Work to completion, and for such purpose the Subcontractor hereby assigns all of the same to the Contractor; or the Contractor may, without taking over the Subcontract Work, furnish the labor and/or materials, equipment, tools, supplies, services, etc., necessary to remedy the situation. In case the Contractor deems the foregoing procedure necessary, all monies expended and all of the losses, damages and extra expenses shall be deducted from the Subcontract Price herein stated and if such expenditures, together with said losses, damages and extra expenses, exceed the amount otherwise due to the Subcontractor hereunder, the Subcontractor agrees to pay to the Contractor on demand the full amount of such excess, together with interest thereon, from the original billing date until paid, at an interest rate of 18% per annum or, if such interest rate exceeds the maximum permissible interest rate allowed by the laws of the jurisdiction in which the Project is located, then at the maximum rate of interest allowed by such jurisdiction.

      The Subcontractor shall reimburse the Contractor for any loss or damage, including but not restricted to any liquidated damages which may become due the Owner (EXCEPTION: NO LIQUIDATED DAMAGES SHALL BE ASSESSED FOR TASK ORDERS 0001 CONSECUTIVELY THROUGH 0017.) by the Contractor under the Prime Contract, and extra expenses paid or incurred by the Contractor, including attorneys' fees, which are due to: (a) Subcontractor's failure to properly perform any and all Subcontract Work, and/or (b) Subcontractor's failure to properly perform any Provision contained in this Subcontract. It is agreed that the Subcontractor may be considered as disabled from so complying when, among other things, petition under Title 11, U.S.C., or for the appointment of receiver is filed by or against Subcontractor.

      <u>SECTION 13.  INSURANCE.</u>  The Subcontractor shall provide and maintain at all times during the performance of this Subcontract, the following minimum insurance coverage.

    a.     Comprehensive General Liability: $500,000 per occurrence.

    b.     Automobile Liability: $200,000 per person, $500,000 per occurrence, $20,000 per occurrence for property damage.

    c.     Worker's Compensation: As required by Federal and State workers' compensation and occupational disease statutes.

    d.     Employer's Liability Coverage: $100,000, except in states where workers compensation may not be written by private carriers.

      Above stated insurance coverage shall extend to Subcontractor personnel operating contractor- or government-owned equipment and vehicles.

      Subcontractor shall submit insurance certificate(s) to Contractor within five (5) calendar days after award of this Subcontract. The insurance certificate shall include the "INSURANCE - WORK ON A GOVERNMENT INSTALLATION" clause and provide evidence of insurance coverage in amounts not less than the amounts specified above. Certifications evidencing insurance coverage shall contain an endorsement to the effect that cancellation or any material change in the policies adversely affecting the interests of the Owner or Contractor in such insurance shall not be effective for such period as may be prescribed by the laws of the State in which this contract is to be performed and in no event less than thirty (30) days written notice thereof to the Contractor and the Owner. The insurance certificate shall name Rhino Builders, Inc. and all of their affiliates and the Owner as Additional Insured.

      In the event of threatened cancellation or lapse of any policy for nonpayment of premium, Contractor, at its option, may pay for Subcontractor and charge such payment or retain such payment from monies due or to become due to Subcontractor.

      Subcontractor shall insert the substance of this clause, including this paragraph, in all lower tier subcontract(s) under this Subcontract. The Subcontractor shall maintain a copy of all lower tier subcontractor's proof of required



insurance and shall provide copies to the Contractor as soon as possible after award, but in any event, prior to lower tier subcontractor commencing work.

**SECTION 14. INDEMNIFICATION.** The Subcontractor agrees to indemnify the Owner and Contractor, including the agents and employees of Owner and Contractor, against all liability and claims for death of or injury to any person, including but not limited to employees of Subcontractor or of any indemnitee or property damage, including the loss of use of property, all including expenses and attorneys' fees, arising or alleged to arise out of or in any way related to this Subcontract or Subcontractor's performance of the Subcontract Work or other activities of Subcontractor and his agents and employees on or around the premises on which the Subcontract Work is to be performed, regardless of whether such claim or liability is caused in part by the negligence of any indemnity. Subcontractor also agrees to indemnify Contractor and hold Contractor harmless from all expenses, including attorneys' fees, caused by or related to any breach by Subcontractor of any Provision of this Subcontract; or from any and all liability and claims for in-fringement or violation of any patent or patent right, alleged or actual, arising in connection with this Subcontract or anything done thereunder.

**SECTION 15. BONDS.** SECTION 15 IS SPECIFICALLY EXCEPTED FORM THIS AGREEMENT Unless specifically exempted in SECTION 26 "Special Conditions," the Subcontractor agrees, at his expense, to secure and at all times maintain, and to provide the Contractor with payment and performance bonds within ten (10) days from date of this Subcontract; the Performance Bond shall be in the sum of 100% of the Subcontract Price, conditioned for the full and faithful performance of this Subcontract in all of its particulars, and executed in form and content and by a corporate surety, all of which must be acceptable to the Contractor; and the Payment Bond shall be in the sum of 100% of the Subcontract Price, and to be executed in form and content, and by a corporate surety, all of which must be acceptable to the Contractor.

**SECTION 16. EMPLOYMENT, TAXES AND LICENSES.** The Subcontractor specifically agrees that he is, or prior to the start of Subcontract Work will become, an independent contractor and an employing unit subject, as an employer, to all applicable statutes so as to relieve the Contractor of any responsibility or liability for treating Subcontractors' employees as employees of the Contractor for the purpose of keeping records, making reports and payment of taxes or contributions; and the Subcontractor agrees to indemnify and hold the Contractor harmless and reimburse Contractor for any expense or liability incurred in connection with employees of the Subcontractor, including a sum equal to benefits paid to or for those who were Subcontractor's employees, where such benefit payments are charged to the Contractor.

The Subcontractor further agrees as regards (a) the production, purchase and sale, furnishing and delivering, pricing, and use or consumption of materials, supplies and equipment, (b) the hire, tenure or conditions of employment of employees and their hours of work and rates of and the payment of their wages, and (c) keeping of records, making of reports, and the payment, collection and/or deduction of taxes and contributions, that the Subcontractor will keep and have available all necessary records and make all payments, reports, collections and deductions, and otherwise do any and all things so as to fully comply with all applicable laws, ordinances, regulations and rules as they affect or involve the Subcontractor's performance of this Subcontract, all so as to fully relieve Contractor from and protect Contractor against any and all responsibility or liability therefor.

Subcontractor acknowledges that he is duly licensed for the type of work agreed to be performed by him hereunder, having all appropriate licenses, both regulatory and revenue, required by all governmental bodies having jurisdiction. In the event Subcontractor, at any time, shall fail to be so licensed resulting in any loss, cost, damage or expense to Contractor, or so as to make the amount or any part thereof of the Subcontract Price to be nondeductible for transaction, privilege, sales, use or other like taxes, the additional loss, cost, damage or expense or tax occasioned thereby shall be deducted from the Subcontract Price or, on demand, shall be promptly paid to Contractor by Subcontractor. Subcontractor shall provide evidence of licenses and special licenses to Contractor within five (5) calendar days of Subcontract award.

**SECTION 17. ASSIGNMENTS.** The Subcontractor shall not assign this Subcontract or any part thereof without the prior written consent of the Contractor.

**SECTION 18. ASSIGNMENT OF FUNDS.** The Subcontractor requires assignment of funds to facilitate its financial needs as provided by Subcontractor's financial institution and the Contractor shall work diligently to expedite and assist with its lending institution and / or Owner to expedite all assignments.

**SECTION 19. RULI⟨ ⟩** It is agreed that the Subcontractor shall ⟨ ⟩nd by the rulings and decisions of the Contracting Authority of the Prime Contract to the same extent and degree that the Contractor is bound by said rulings and decisions insofar as they may pertain to the work included within this Subcontract.

**SECTION 20. LOWER-TIER SUBCONTRACTORS.** The Subcontractor must obtain prior written approval from Contractor for all proposed lower-tier subcontractors, and Contractor may reject any proposed lower-tier subcontractors. Approval of a lower-tier subcontractor will not imply that Contractor assumes any responsibility for such lower-tier subcontractor or that Subcontractor is relieved of any responsibility with respect to the Subcontract Work. In the event of prior written Contractor approval of a lower-tier subcontractor, Subcontractor shall cause each such lower-tier subcontractor to procure the insurance coverage required under SECTION 13, "INSURANCE", or otherwise covering such liabilities under policies in form, and in amounts and with insurance companies, all as acceptable to Contractor. Subcontractor will obtain said policies or certificates and deliver them to Contractor upon Contractor's request. If evidence of acceptable Subcontractor and lower-tier subcontractor insurance is not acquired by Subcontractor, Contractor shall acquire the required insurance coverage and deduct payments therefore from amounts then or subsequently owing to Subcontractor.

**SECTION 21. COMPLIANCE WITH LAWS; EQUAL EMPLOYMENT OPPORTUNITY.** The Subcontractor agrees to comply fully, at his own expense, with all laws, ordinances, regulations, rules, orders and citations applicable to this Subcontract or Subcontract Work, accident prevention, safety equipment and practices prescribed by Owner or Contractor, either directly or through the Prime Contract, including, but not limited to, the Occupational Safety and Health Act of 1970 (Public Law 91-596), and Construction Safety Act (Public Law 91-54), as the same may from time to time be amended, implemented or succeeded; and the Civil Rights Act of 1970 as amended, as the same may be further amended, implemented or succeeded, including rules and regulations promulgated thereunder and including Executive Order 11246 and any successor Executive Order modifying or superseding that Order. Subcontractor agrees to save and hold harmless the Contractor from any and all liability and damages, fines, costs, and attorneys' fees incurred by Contractor on account of Subcontractor's failure or alleged failure to comply with all applicable laws, ordinances, regulations, rules, orders and citations. In connection with the performance of work under this Subcontract, Subcontractor agrees not to discriminate against any employee or applicant for employment because of sex, race, religion, creed, color or national origin. Subcontractor shall insert the substance of this clause, including this paragraph, in all lower tier subcontract(s) under this Subcontract.

**SECTION 22. RESPONSIBILITY FOR WORK.** Subcontractor shall be responsible for his own work, property and/or materials until completion and final acceptance of the Subcontract Work by the Contractor and/or Owner, and shall bear the risk of any loss or damage from any cause until such acceptance. In the event of loss or damage, Subcontractor shall proceed promptly to make repairs, or replacement of the damaged work, property and/or materials at his own expense, as directed by the Contractor. Should the Subcontractor fail to maintain in full force and effect insurance providing payment for such loss, and should there be in existence other insurance providing payment for such loss but for the provisions of the first two sentences of this Section, then the first two sentences of this Section shall be separable from this Subcontract and of no force and effect; provided, however, that in no event shall the Subcontractor be relieved of his obligation to proceed promptly to make repairs, or replacement of the damaged work, property and/or materials as directed by the Contractor, nor shall Subcontractor be relieved of any other responsibilities or obligations provided for in this Subcontract.

Subcontractor agrees that he shall pay for all materials furnished and work or labor performed, and fringe benefits and taxes, penalties, fines and assessments to be paid under or arising or alleged to arise out of or in any way related to this Subcontract, and to satisfy the Contractor thereupon whenever demand is made, and to indemnify the Contractor and Owner against and save them and the premises harmless from any and all claims, suits, or liens in connection with the Subcontract or anything done thereunder.

Subcontractor agrees to obtain and pay for all permits, licenses and official inspections made necessary by this Subcontract Work, and to comply with all laws, ordinances and regulations bearing on the Subcontract Work and the conduct thereof.

Subcontractor warrants and guarantees all Subcontract Work and agrees to make good, at Subcontractor's own expense, any defect in materials or workmanship which may occur or develop within the period of one year from date of acceptance by the Owner of the completed contract, or for a longer period of guarantee if so called for in the Prime Contract, but in no event shall Subcontractor be released from such responsibility prior to the Contractor's release from responsibility to the Owner therefor.



Subcontractor agrees, with respect to the Subcontract Work, to assume toward the Contractor all obligations and responsibilities that the Contractor assumes toward the Owner, as set forth in the Prime Contract.

**SECTION 23. OPERATING INSTRUCTIONS.** The Subcontractor shall furnish all operating instructions, parts lists, and manuals pertinent to requirements of the Subcontract Work.

**SECTION 24. HOISTING.** Should the Subcontractor make use of the Contractor's hoisting facilities, the Subcontractor shall pay for this service unless otherwise stated herein. Hoisting where requested and provided shall be maintained only on a scheduled basis at the convenience of the Contractor.

**SECTION 25. LAYOUT RESPONSIBILITY.** The Contractor shall establish principal axis lines and levels whereupon the Subcontractor shall lay out and shall be strictly responsible for the accuracy of his work and for any loss or damage to the Contractor or to other subcontractors engaged in work on the site by reason of failure of the Subcontractor to set out or perform his work correctly. The Subcontractor shall exercise prudence so that actual final conditions and details shall result in perfect alignment of finish surfaces.

**SECTION 26. SPECIAL CONDITIONS.**

**SAFETY.** Subcontractor shall comply with the health and safety provisions as set forth in 29-CFR-1910, 29-CFR-1926 and COE EM-385-1-1. In the event of conflicting regulations, the more stringent requirement will apply. In addition to all government regulations, the following rules shall apply at all times at the job site:

    A.    Hard hats (meeting ANSI Z89.1) are to be worn as required by the conditions of each Task Order.
    B.    Sturdy leatherwork boots or shoes with steel toe, industrial type, are to be worn at all times.
    C.    Pants must be full length.
    D.    Shirts suitable for the work must be worn at all times. Minimum requirement is 4" for short sleeves and sleeveless shirts are not permitted.

**DRUG FREE ENVIRONMENT.** Subcontractor agrees to advise its employees and employees of its subcontractors and agents that: (1) It is the policy of Contractor that use, possession, sale, transfer, or purchase of illegal drugs on Contractor's property is prohibited; (2) Employees who are under the influence or in possession of alcohol or illegal substances on the project site are subject to dismissal from the premises; (3) Any employee who is found in violation of the policy or who refuses to permit an inspection may be removed and barred from Contractor's property, at the discretion of Contractor; (4) In the event of an injury requiring medical care administered by a physician or property damage in excess of $300.00, the affected employee or employees will submit to drug screening as prescribed by the Contractor and those results shall be submitted to the Contractor in a timely manner; (5) In the event positive results are indicated, the affected employee will be barred from the Contractor's job site until such time as the problem may be resolved; (6) Drug screening cost will be borne by the subcontractor as a condition of this subcontract.

The Department of the Navy has authorized many measures to be taken to identify drug-related offenses on military installations. Subcontractor's employees must be informed that these measures may include routine random inspection of personal possessions and vehicles on entry or exit and that they may be detained if illegal drugs are discovered in the course of an inspection or if there is probable cause.

**STRIKES AND PICKETING.** Subcontractor acknowledges that Contractor intends to employ workers not covered by a Collective Bargaining Subcontract an/or solicit and select subcontractors, suppliers, and vendors without regard to the existence or non-existence of a Collective Bargaining Agreement ("Labor Agreement") between their company and any labor organizations(s). Subcontractor agrees to perform the terms of its Subcontract and to make scheduled progress without regard to any labor dispute, work stoppage and/or picketing of any type without regard to the target of such labor dispute, work stoppage and/or picketing. In the event of picketing by any labor union, Contractor will, upon receipt of written request from subcontractor, establish a separate access gate for subcontractor and any other subcontractors not party to a primary dispute with any labor organization.

**SUBCONTRACTOR'S REPRESENTATIVE.** Subcontractor shall designate in writing a responsible individual who is authorized to act for the Subcontractor as a representative in all matters pertaining to the Subcontract Work (hereinafter "Subcontractor's Representative"). The Subcontractor's Representative shall be available in person, by telephone, or radio to respond to any and all problems during normal working hours.

---

BPI Subcontract Agreement, SC0003       7

SCHEDULE OF VALUE    See Attachment A for subContractor Line Numbers (CLIN) unit pricing for each contract year (base year and 4 option years). Non-prepriced scopes of work and pricing shall be submitted to Contractor for review, evaluation and Contractor mark-up for submission to the Government for inclusion into Contractor's Delivery Order.

BONDS.    The requirement to furnish 100% Performance and 100% Payment Bonds in accordance with SECTION 16 of this Subcontract is *EXCLUDED*. The following payment criteria shall apply:

SCOPE OF WORK. – TASK ORDERS    Subcontractor shall perform the following work according to the terms set forth in SECTION 2 of the Subcontract Agreement:

The Subcontractor shall supply all necessary supervision, quality control, labor, materials and equipment to complete the following specific Scope of Work as identified by the Task Orders issued out this Subcontract Agreement.

The Contractor shall issue one Task Order to Subcontractor for each Delivery Order received by Contractor from the Government.

Each Task Order shall identify itself with this Subcontract Agreement.

Each Subcontractor's Task Order shall duplicate in kind the Contractor Line Item Number(s) (CLINs) and/or Non-prepriced scopes of work and quantity order by the Government from the Contractor.

An authorized representative of the Contractor and Subcontractor shall approve and execute each Task Order. The authorized representatives of each party shall be identified in writing. A copy of every Delivery Order received by the Contractor from the Government shall be provided to Subcontractor for verification.

Each Task Order shall contain a unit price for each Contractor Line Item Number (CLIN) and/or Non-prepriced scopes of work. The Subcontractor unit pricing (Base year and 4 option years) is hereby agreed upon and is made apart of this agreement and provided in Attachment A.

The subcontractor's unit pricing data for all years includes the following:
- Overhead support for scheduling, estimating, faxing, copying, and e-mail.
- Quality control manager (QCM) and all overhead costs associated with the QCM.
- Safety Officer and all overhead costs associated with same.
- Office for Contractor to operate and associated utilities.

The Contractor shall employ its own Project Manager and pay for all salaries and fringes applicable thereto. The Subcontractor will support the Contractor's project manager with all necessary overhead items such as vehicle, fuel, and telephone.

PRODUCTION SCHEDULE

For each Task Order, Subcontractor will submit to the Contractor a scheduled that includes all facets required of the Prime Contract. The same schedule will be submitted to the Government for approval.

Subcontractor shall update and revise each schedule according to all events, foreseen and not foreseen that impact the schedule and its END date as it complies to the Delivery Order received from the Government by the Contractor.

ATTACHMENTS.    The following documents are incorporated into, and made a part of this Subcontract:

1.    Rhino Builders, Inc. CLIN unit pricing, Base Year and 4 Option Years.
2.    Task Orders 0001 consecutively through 0017.
3.    Invoice and details (50% of actual) for Richard Avilla costs from 12 July 2000 to date this Agreement.



**SECTION 27. GENERAL CONTRACT CLAUSES.** The clauses included in this section are from the Prime Contract and are included herein as required in the Prime Contract. Subcontractor shall insert all clauses from this Section and any other provisions specifically required to be inserted in Lower Tier Subcontracts. References in the following clauses to "Contractor" or "Subcontractor" shall apply to all contractors involved in the work, including the Contractor, Subcontractors and lower tier Subcontractors. Subcontractor shall insert the substance of this Section, including this paragraph, in all lower tier subcontract(s) under this Subcontract.

**SECTION 28. INCORPORATED BY REFERENCE (IAW Far 52.107(b)) FEB 1998.** This Subcontract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, Contractor will make their full text available. Also, the full text of a clause may be accessed electronically at this address: www.arnet.gov/far .

**SECTOPM 29. WAIVERS.** Waivers of any breach hereof shall not constitute a waiver of any subsequent breach of the same or any other provision hereof.

**SECTION 30. TERMS OF CONTRACT.** Each of the parties hereto agrees and represents that this Subcontract comprises the full and entire agreement between the parties affecting the work contemplated, and all other previous agreements are hereby null and void. This Subcontract can be modified only by written agreement signed by authorized representatives of each party hereto. The duration and term of this Agreement shall duplicate in kind the duration and term of the Prime Contract.

IN WITNESS WHEREOF, the parties hereto have executed this Subcontract by their proper officers duly authorized herein.

CONTRACTOR:                                    SUBCONTRACTOR:

RHINO BUILDERS, INC.

_____

By: _____                    By: _____

Title: _____                    Title: _____

# EXHIBIT

# "B"

1              IN THE DISTRICT COURT OF GUAM

2

3   UNITED STATES OF AMERICA    ) CIVIL CASE NO. 02-00008
    FOR USE AND BENEFIT OF       )
4   RHINO BUILDERS, INC.,        )
                                 )
5              Plaintiff,        )
                                 )
6        vs.                     )
                                 )
7   BIOGENESIS PACIFIC, INC.,    )
    AIG TECHNICAL SERVICES,      )
8   INC., and AMERICAN HOME      )
    ASSURANCE COMPANY,           )
9                                )
               Defendants.       )
10  _____ ) DEPOSITION OF
                                 ) GEORGE W. ALLEN
11  BIOGENESIS PACIFIC INC.,     ) October 6, 2003
                                 )
12         Counter-Plaintiff,    )
                                 )
13       vs.                     )
                                 )
14  RHINO BUILDERS, INC.,        )
    MICHAEL O'CONNELL, MICHAEL   )
15  DANFORTH, AND JOHN DOES      )
    1-10,                        )
16                               )
           Counter-Defendants.   )
17  _____ )
                                 )
18  AMERICAN HOME ASSURANCE      )
    COMPANY,                     )
19                               )
         Cross-Claimant,         )
20                               )
         vs.                     )
21                               )
    BIOGENESIS PACIFIC INC.,     )
22                               )
         Cross-Claim Defendant.  )
23  _____ )

24

25

              RALPH ROSENBERG COURT REPORTERS, INC.

EXHIBIT "B"

1

2   Taken on behalf of the Defendant BIOGENESIS PACIFIC,

3   INC., at the law offices of Stanton, Clay, Tom,

4   Chapman & Crumpton, Amfac Tower, 700 Bishop Street,

5   Suite 2100, Honolulu, Hawaii 96813, commencing at

6   10:20 a.m., on Monday, October 6, 2003, pursuant to

7   Notice.

8

9           BEFORE:  MYRLA R. SEGAWA, CSR No. 397

10          Notary Public, State of Hawaii

11

12

13

14  APPEARANCES:

15      For Plaintiff UNITED STATES OF AMERICA FOR USE
    AND BENEFIT OF RHINO BUILDERS, INC.:

16

17          ANTONIO CORTES, ESQ.
            233 Julale Center
            424 West O'Brien Drive

18          Hagatna, Guam 96910

19

20      For Defendant BIOGENESIS PACIFIC, INC.:
        (VIA TELEPHONE)

21          JANALYNN M. CRUZ, ESQ.
            Calvo and Clark, LLP

22          655 South Marine Drive, Suite 202
            Tamuning, Guam 96911

23

24

25

1   APPEARANCES (Cont.)

2

3       For Counter-Defendant MICHAEL DANFORTH:

            ALAN H. TUHY, ESQ.
4           Law Offices of Alan Tuhy
            75-1000 Henry Street, Suite 201
5           Kailua-Kona, Hawaii 96740

6

7       For Defendant AIG TECHNICAL SERVICES, INC., and
    AMERICAN HOME ASSURANCE COMPANY:

8
            STEPHEN D. TOM, ESQ.
9           White & Tom
            820 Mililani Street, Suite 711
10          Honolulu, Hawaii 96813

11
        For GEORGE W. ALLEN:
12
            CHARLES W. CRUMPTON, ESQ.
13          Stanton Clay Chapman
              Crumpton & Iwamura
14          Amfac Tower Suite 2100
            700 Bishop Street
15          Honolulu, Hawaii 96813

16

17      Also present:   MICHAEL O'CONNELL
                        GENE O'CONNELL
18

19

20

21

22

23

24

25

1    to Metcalf Construction Company?

2        A    Correct.

3        Q    And the name of your company again?

4        A    Professional Estimating Service,

5    Incorporated.

6        Q    You said it's a Nevada company?

7        A    That's true.

8        Q    Okay.  Let's go to your employment with

9    Rhino Builders.  You just said you began working for

10   them around late September, early October, 2000?

11       A    That's correct.  I'm not sure of the exact

12   date that I became an employee for, I think, a matter

13   of a week or a week-and-a-half, two weeks something

14   in that neighborhood.  Before becoming an employee, I

15   worked on, I think, a daily fee as a consultant.

16       Q    I'm sorry, you worked as a what?

17       A    As a consultant.

18       Q    As a consultant to Rhino?

19       A    Yes, on a daily fee for something like a

20   week or so.

21       Q    What was your official title while you were

22   working for Rhino Builders?

23       A    I was the director of operations Guam, and

24   I was also assigned as project manager for their

25   Navy, IDIQ solution order concept contract with the

1       A    There were various summary letters, and I
2    can't tie these two together.
3       Q    Do you know if -- okay.  Just to clarify,
4    you don't recall which letter you are referring to in
5    this E-mail?
6       A    I'm sorry?
7       Q    Just to clarify, you do not recall which
8    letter you are referring to in this E-mail?
9       A    I would probably have to tie letters to the
10   dates so that I could be absolutely sure.
11              MS. CRUZ:  Okay.  If I can have the
12   court reporter mark document No. 4 as Exhibit 3.
13                    (Exhibit No. 3 was marked for
14                     identification.)
15   BY MS. CRUZ:
16      Q    Mr. Allen, do you have in front of you what
17   looks like a letter on Rhino Builder's letterhead?
18      A    Yes.
19      Q    Dated November 9, 2000 to Gerald Lam?
20      A    Yes.
21      Q    And just for reference, the Bates numbers
22   on the bottom I believe were marked by Mr. Danforth,
23   Mr. Tuhy, just by Mr. Tuhy?
24              MR. TUHY:  That's our Bates stamp.
25              MS. CRUZ:  Okay.

1  BY MS. CRUZ:

2      Q    And Mr. Allen, if you could just read

3  through this letter, please, and let me know when

4  you've read the letter.

5      A    Okay.  Kind of long winded.

6      Q    Is this letter familiar to you?

7      A    Yes.

8      Q    Okay.  Did you prepare this letter?

9      A    I'm sorry?

10     Q    Did you prepare this letter?

11     A    Prepared this letter in consultation with

12  Mr. O'Connell and Mr. Danforth.

13     Q    Okay.  Now that you've read the letter and

14  if you can refer back to Exhibit 2, do you know if

15  this is the letter that you were referring to in the

16  E-mail?

17     A    I don't know if this is the final version

18  of the letter referred to in the E-mail.

19     Q    Okay.

20     A    My signature is not on it for one thing; so

21  I don't know if that's still a draft.

22     Q    Okay.

23     A    Or the final version or not.

24     Q    Okay.  So do you know if this letter was

25  ever sent to Mr. Lam?

1          MR. TUHY:  This specific letter?

2          MS. CRUZ:  This specific letter.

3          THE WITNESS:  I don't know if this

4  specific letter was sent to Mr. Lam because this side

5  does not have my signature on it so I don't know if

6  this was the final version but something of this

7  nature, I believe, was sent to Mr. Lam.

8  BY MS. CRUZ:

9      Q    Okay.  So is it -- do you recall -- is it

10  your recollection that this letter was finalized?

11     A    Actually, it's not my -- I don't have that

12  recollection.  I'm not absolutely sure.  In looking

13  at the E-mail, apparently Mr. Avilla had already

14  jumped the gun and told Mr. Lam what our intentions

15  were, and I simply do not know at this point in time

16  whether this letter was ever sent.  It may be that

17  one, you know, that Mr. Lam's E-mail to me may have

18  caused us to not send it or discussions with him may

19  have caused us to not send it.  I really can't say.

20     Q    Okay.  That's okay.  I don't have any

21  questions about that.

22     A    If I could clarify about the letter itself,

23  when doing these letters you prepare a draft, you

24  prepare several versions of them, you save each

25  version of it, some of them go back and forth for a

1   review. Because again, I was working under

2   Mr. O'Connell's direction, and there may have been a

3   half a dozen of these in the computer and this may

4   have been any of those versions. Again, I can't tell

5   if it was the final version or not because my

6   signature is not on it.

7       Q    All right. Do you recall ever signing a

8   letter similar to this one to Mr. Lam informing him

9   generally of the things that are stated in this

10  letter?

11           MR. CRUMPTON: This is Chuck. My

12  question is, Counsel, when you say generally, there's

13  a lot of stuff in this letter in single space. Do

14  you want to pick out some things in particular? I

15  don't know if he can answer the question that way,

16  the way the letter is set out.

17           THE WITNESS: There were, I believe,

18  two occasions when we determined that we needed to

19  stop working because of Biogenesis's nonpayment and

20  failing to meet several -- Mr. Lam failing to meet

21  several promised signature dates on the written

22  contract agreement.

23           I don't know if this was one of those

24  stoppages. Putting the dates together is very

25  difficult for me. There was, I believe, a plan

1  stoppage, and I don't remember if it happened or not.

2  And as a result of discussions I had with Mr. Lam and

3  Mr. O'Connell, we continued working again based on

4  his commitment to meet certain conditions eventually

5  we stopped again because he failed to meet those

6  conditions.

7  BY MS. CRUZ:

8      Q    Okay.  With reference to the time period

9  made of this letter November 9, 2000?

10     A    Okay.

11     Q    Were there discussions to stop work

12  completely?

13     A    Yes, we had discussed them, were

14  considering stopping work.  We had been working for a

15  considerable period of time where we were providing

16  all labor, all equipment, all materials, office

17  rental, computers, telephones, gas, everything for

18  the project and had not been paid.  And we were also

19  working under a verbal agreement wherein Richard

20  Avilla was assigned by Mr. Lam.  Mr. Lam told the

21  United States Government Mr. Avilla is my project

22  manager, and yet I found that Mr. Avilla was on

23  Rhino's payroll which is not kosher and does not

24  fulfill Mr. Lam's or Biogenesis's requirement to

25  quote "employ" a project manager for the project

1    full-time.

2          These were things that needed to be

3    straightened out to get the project Biogenesis's

4    contract in compliance with the contract in federal

5    acquisition requisitions; and as I had advised

6    Mr. O'Connell, he and his standing with the Navy were

7    in jeopardy if they, you know, if problems came up

8    regarding this, quote "verbal agreement" under which

9    Rhino was doing all of Biogenesis's work.  By not

10   formalizing that agreement, Mr. O'Connell could not

11   fulfill the requirements of a subcontractor to submit

12   insurance certificates, statements of acknowledgement

13   SF1413, et cetera, et cetera.  And we felt it was

14   absolutely necessary to formalize the agreement,

15   having Mr. Avilla become an employee of Biogenesis.

16   This is not just to protect Rhino but also protect

17   Biogenesis, and all of these things that we were

18   saying we were going to do were things that Mr. Lam

19   had previously agreed to.

20   BY MS. CRUZ:

21        Q    Isn't it true -- I mean, based on

22   Exhibit No. 1 that the week before on October 29, on

23   or about October 29, Rhino had agreed with Biogenesis

24   that they would complete task order 1, 2, 3, 4 and 7?

25        A    That's considerably more than a week

1  before.  We had agreed to do that.  Mr. Lam had

2  agreed to try to get the problem with liquidated

3  damages and rescheduling straightened out.  These

4  were key in our considerations on whether or not it

5  was in Rhino's best interest to continue to pursue a

6  contract agreement with Biogenesis because if

7  Biogenesis did not straighten out these problems, we

8  would actually be advising Mr. O'Connell to enter

9  into a contract that was inheriting some very serious

10 problems.

11        Under the terms of that IDIQ contract,

12 going into liquidated damages on those delivery

13 orders could have caused them to not exercise the

14 other four options, and four options on a contract

15 that has a base contract and four options are

16 extremely important because you very seldom recover

17 all of your startup costs during the first year.  You

18 make all of your profit on the option years.

19        So we were looking at a contract that could

20 very well have been -- that we might have been

21 inheriting some serious problems, and Mr. Lam hadn't

22 taken any action to correct those problems as agreed.

23     Q    Wasn't it that Rhino was paying all labor

24 and materials performed the task orders under the

25 Navy roofing contract; is that right?

1    A    That's correct, and that was verified for

2   me by checking the certified payrolls that were

3   submitted to the United States Navy on the contract.

4                MS. CRUZ:   If I can ask the court

5   reporter to mark document No. 6 as Exhibit 4.

6                MR. CORTES:   Could we go off the

7   record for just a minute, Janalynn?   I've got a

8   logistical problem I need to discuss with you.

9                MS. CRUZ:   Sure.   We'll go off the

10  record.

11                    OFF THE RECORD.

12                    (Exhibit No. 4 was marked for

13                        identification.)

14           (Recess from 12:10 p.m. to 12:16 p.m.)

15                MS. CRUZ:   Back on the record.   We

16  agreed that I would continue until one o'clock Hawaii

17  time and that Mr. Tuhy and Mr. Cortes would then ask

18  their questions of Mr. Allen and would not be present

19  for the remainder of Mr. Allen's deposition?

20                MR. TUHY:   Correct.   This is Alan

21  Tuhy, correct.

22                MR. CORTES:   Yeah.

23                MS. CRUZ:   Okay.

24                MR. CORTES:   But you're going to get

25  me a copy of the deposition or let me copy your

1    Q    And if I can just refer you to the first

2   paragraph.

3    A    Okay.

4    Q    And I want to refer you to the last line of

5   that first paragraph it says "by all appearances."

6   Do you see where I am, the last sentence of the first

7   paragraph?

8    A    Yes, yes.

9    Q    "By all appearances, we are not putting

10  that much into the job since the labor is being paid

11  by BPI and the bulk of the materials are coming from

12  BPI."

13   A    Yes.

14   Q    Can you explain to me what you meant?

15   A    Well, are you finished?

16   Q    Yes, go ahead.

17   A    Okay.  At this point in time -- and I'm

18  trying to put the date together with events that were

19  ongoing -- I believe that this was a point in time

20  after we had stopped expending Rhino resources on the

21  project.  The $25,000 check that I'm referring to

22  there that has to do with that earlier -- looking

23  back at the exhibits -- okay.

24        Now, that $25,000 was where I had a

25  discussion with Mr. O'Connell and then with Mr. Lam

Case 1:02-cv-00008    Document 284    Filed 08/15/2003    Page 192 of 216

1   and my discussion with Mr. O'Connell was hey look,

2   Gerry seems inclined to sign the written subcontract

3   agreement.  He told me that -- well, last few little

4   things we'd make some adjustments in regard to the

5   way that the cost of project manager and I think

6   quality control manager were split out.  And as a

7   result of that, I had to change all of those hundreds

8   of line items to adjust for it.  And Gerry told me on

9   the phone that he was happy with the contract as it

10  was written and that everything was okay.  He was

11  just trying to get with Danforth so they could

12  finalize and sign, and what do we need to do to get

13  people back to work or keep people working.  And I

14  suggested to him that maybe he could make a good

15  faith payment to Mr. O'Connell or to Rhino for the

16  outstanding labor and material that Rhino had spent.

17  And at that point in time I really didn't have enough

18  funds in my bank account in Guam to keep operating on

19  the Biogenesis work and need an infusion of funds so

20  we can just keep going.

21          I told him that if he was agreeable to

22  that, we could get the contract signed in a week,

23  then everything would be okay.  And I told them that

24  I would have to check with Mr. O'Connell to see if

25  the $25,000 figure was acceptable, and I asked

1    Mr. Lam to call me the next morning at seven o'clock
2    Hawaii time or three o'clock in the morning Guam
3    time.

4         Mr. Lam was going on a retreat so he wasn't
5    going to be available, and he told me that he was
6    going to have someone else call.  He had someone else
7    we dealt with quite frequently in his absence whose
8    name I can't remember right now, and he was supposed
9    to call me in the morning so that I could tell him if
10   the $25,000 was acceptable to Mr. O'Connell and tell
11   him how Mr. O'Connell wanted the payment made.

12        The next morning I was unable -- I didn't
13   get any calls or was unable to reach Mr. Lam's
14   second, and eventually I reached Mr. Lam on a cell
15   phone that Rhino's secretary in Hawaii provided me
16   the number for, and very upset that I interrupted him
17   at his retreat and told me the payment had already
18   been made.  And I told him we didn't agree on a
19   payment.  We agreed to discuss it this morning after
20   I got Mr. O'Connell's okay.  Eventually after we
21   checked everywhere to try to find out how the payment
22   had been made, we found out it had been wire
23   transferred to what we call our general account in
24   Guam, and I happened to, strictly by accident, find
25   out that the night before Mr. Avilla had, in response

1      A     Yes, with the $25,000 loan they made to us

2    and put in an account that only Al Garthe and Richard

3    Avilla could sign on.

4      Q     Thank you.

5      A     I would like to also try to explain why my

6    E-mail was in the -- I'm reading it now and things

7    are coming, flooding back.  During a discussion I had

8    on the phone with Mr. Lam during that period of time,

9    I had told Al Garthe and Richard Avilla that we were

10   trying to get this contract signed so we could keep

11   going forward but that Mr. Lam seemed to be dodging

12   my phone calls, dodging Mr. O'Connell's phone calls,

13   and dodging Mr. Danforth's phone calls.  And I recall

14   I said seemed to be.

15        I probably could have skipped the seemed to

16   be because it was obvious he was dodging our phone

17   calls, not returning voicemail messages and never

18   being there when we called.

19     Q     Mr. Allen, I'm sorry.  What are you

20   referring to?

21     A     I'm referring to attempts to reach Mr. Lam

22   to hammer out this agreement and find out why he had

23   missed another deadline to sign, and Mr. Lam called

24   me and --

25     Q     Mr. Allen?

1    A    Yes.

2    Q    And that's in this E-mail?

3    A    No, that's part of the reason for the tone

4  of the E-mail and the level of frustration I'm

5  expressing in the E-mail.

6    Q    Okay.

7    A    And the fact that I'm having to deal with

8  Al Garthe and Richard Avilla, who were at one point

9  involved in Rhino and who seemed to be working in

10  concert with Mr. Lam to undermine Rhino's position.

11    Q    Did Rhino receive the $25,000?

12    A    The $25,000, which was never ever agreed

13  finally to be accepted by us, was sent by wire

14  transfer to an account number that Mr. Avilla

15  provided to Mr. Lam.

16    Q    Okay.

17    A    Over which I had no signature authority.

18    Q    Okay.  Thank you, Mr. Allen.  I'm going to

19  refer you --

20    A    Excuse me a second.  I want to consult with

21  counsel.

22              OFF THE RECORD.

23              THE WITNESS:  I want to clarify the

24  answer about the payment.

25  BY MS. CRUZ:

1    Q    Mr. Allen?

2    A    Yes.

3    Q    Hold on one second.  Okay.  We're going to

4  go back on the record.

5    A    Yes.

6    Q    Okay.  And I'm done with my questions

7  regarding that payment.  I'm going to move on to

8  document number --

9         MR. CRUMPTON:  Before you do that,

10 Counsel, he's going to complete his answer to your

11 past question as to whether money was paid into a

12 Rhino account.

13        MS. CRUZ:  Oh.

14        MR. CRUMPTON:  I mean, you can wait

15 and have another attorney ask the question and do it,

16 but it just makes a lot of sense to put it together

17 with the information that's on the point.

18 BY MS. CRUZ:

19   Q    Okay.

20   A    The money was transferred to an account

21 over which Al Garthe and Mr. Avilla had signature

22 authority, and at that point in time they were

23 working almost or I would say exclusively for the

24 benefit of Biogenesis, and the funds were used to pay

25 payroll and materials used by Biogenesis on

1  Biogenesis's projects probably less than $1,000 was

2  ever transferred to where Rhino could use that money.

3      Q    Okay.  Thank you.  I'm going to refer you

4  to document No. 15.

5                    (Exhibit No. 5 was marked for

6                     identification.)

7  BY MS. CRUZ:

8      Q    Mr. Allen?

9      A    Yes.

10     Q    Do you have Exhibit No. 5?

11     A    Yes, I do.

12     Q    And just so I know we're looking at the

13 same thing it's invoice -- it's a Rhino Builders

14 invoice.  It's invoice No. 0201-001?

15     A    Correct.

16     Q    Are you familiar with this invoice?

17     A    Yeah, I recall that there was a rental of

18 the Isuzu flatbed, and it's got my signature on it.

19     Q    That was my next question.  Is that your

20 signature on the bottom?

21     A    Yes, it is.

22     Q    It is?

23     A    Yes.

24     Q    Okay.  Can you explain to me what this

25 invoice is for?

1  way of a court document or declaration or something
2  like that, we can take that up; but my personal
3  preference would be for everybody to have a chance to
4  at least confer with their clients about that
5  particular communication because it isn't, frankly,
6  my understanding that that has any effect on
7  Mr. Allen's substantive testimony here.
8          MR. CORTES:  Well, we view it as
9  substantive testimony, but if you're -- if we can
10  obtain it at a later date and if Mr. Allen is
11  uncomfortable presenting it today or if you have
12  reservations as his attorney and you want to discuss
13  with him about presenting it today, maybe you could
14  talk with him for just a minute.  I think it would be
15  a brief answer that we would get or no answer and I
16  don't want to get into much of your time here, Alan.
17          Do you want to go off the record.
18          MR. CRUMPTON:  Real quickly.
19              OFF THE RECORD.
20          MR. TUHY:  I just have a few questions
21  of Mr. Allen.
22          MS. CRUZ:  Okay.  Back on the record.
23              EXAMINATION
24  BY MR. TUHY:
25      Q    Mr. Allen, I'm Alan Tuhy.  We've been

1  introduced.  I represent Mr. Michael Danforth who is

2  designated as a counterclaimant in this matter.  I

3  just have a couple questions of you, Mr. Allen.

4           One is your initial contact with

5  Mr. Danforth relating to the Navy roofing job, did

6  that occur after you had landed in Guam, did I

7  understand that, in October of 2000?

8       A    Actually, not in relation to that

9  particular contract because we had -- we had worked

10  as All Star SAB on preparing portions of the proposal

11  towards that contract.

12      Q    You had talked about a bid.  Did you mean

13  to say there was a proposal that All Star SAB had

14  presented?

15      A    All Star SAB under a teaming agreement I

16  believe it was with Biogenesis, and my function was

17  simply to pull together -- to build a spreadsheet to

18  take costs for each individual item provided by

19  Mr. Lam and mark those up to produce the price bid to

20  the government based on markups Mr. Lam provided,

21  general conditions Mr. Lam provided for Biogenesis,

22  markups that All Star SAB provided, and general

23  conditions that SAB provided for their side of it, of

24  the equation.

25      Q    And my question is whether or not you are

1  aware today whether the proposal which was the result

2  of this teaming arrangement between SAB and

3  Biogenesis actually came to fruition?

4      A    I've thought at the time that I was in Guam

5  that All Star SAB or SAB were involved still in some

6  way.  I believe I remember talking to Mr. Bland SAB

7  at one point during the time I was there.  And it

8  seemed like they did have some involvement.  Maybe

9  they had provided bond or something like that.  I'm

10  not sure.

11      Q    Now, you discussed in direct examination by

12  Ms. Cruz two occasions on which work was stopped on

13  the task orders.  Do you recall that?

14      A    Yes.

15      Q    On either of those occasions, did

16  Mr. Danforth give any direction for any of the crews

17  of Rhino Builders to stop work on the task orders?

18      A    No.

19      Q    Okay.  Did he, at any time, give any

20  direction to any Rhino Builders's crews relative to

21  carrying out work on the task orders?

22      A    No.

23      Q    Would it be fair to say that his role, as

24  you were aware of it when you were in Guam in October

25  and November of 2000, was limited to evaluation of an

1   assessment of the health and status of the task

2   orders which had been undertaken by Rhino to that

3   date?

4          A    Please repeat that.

5                MR. TUHY:  Read it back.

6                (Whereupon the record was read.)

7                THE WITNESS:  While he was in Guam,

8   yes.  I think there was some more involvement because

9   he and I worked hand in hand, and we did discuss with

10  Mr. O'Connell and with Mr. Lam and Garthe and Avilla

11  about starting to develop terms and conditions and

12  pricing for some contract agreement as well.

13  BY MR. TUHY:

14         Q    Okay.  And the contract matters that came

15  up that was in November, you think, after

16  Mr. Danforth returned from Guam back over here to --

17         A    Actually, we started the process there.

18  Our initial discussions were sitting in the office in

19  Guam on the speakerphone with Mr. O'Connell,

20  Mr. Danforth, Mr. Avilla, Mr. Garthe, myself and

21  Mr. Lam on the other end of the phone.

22         Q    All right.

23         A    But those were the initial parts.  I know

24  that, as you can tell from the E-mail that we've even

25  seen here, that a lot of the communication back and

1  us back in about ten minutes.

2          MS. CRUZ:  Ten minutes?

3          MR. TOM:  What does that mean?  Do you

4  want to take a break or do you want to go through?

5          THE WITNESS:  No, I'm able to go

6  through.

7          MR. CRUMPTON:  Oh, okay.  George said

8  no, let's just go ahead and do it.

9          THE WITNESS:  If it's only going to be

10  half an hour, let's do it.

11                    EXAMINATION

12  BY MR. TOM:

13     Q    Okay.  Mr. Allen, I'm Steve Tom, and I

14  represent AIG Technical Services and American Home

15  Assurance Corporation in this case, and I do have

16  some questions for you.

17          I'm going to pick up where Ms. Cruz

18  finished off.  She talked to you before she spoke

19  about your leaving Rhino, she talked about when did

20  Rhino stop work on the Navy roofing contract, and you

21  talked about the December, 2000 is when you thought

22  Rhino stopped work on that Navy roofing contract and

23  you said you stopped the workers; is that correct?

24     A    I believe that what the instruction was

25  from Mr. O'Connell was to stop expending our

1   resources.  The workers were easy to stop expending.

2       Q    Okay.

3       A    All they had to do was be laid off.

4       Q    Okay.

5       A    The other resources were not so easy

6   because I didn't have so much control over them.

7       Q    Let me try to break it down, then, in terms

8   of what you're referring to as resources.  One

9   resource is the workers that would be the labor pool,

10  correct?

11      A    Correct.

12      Q    Did you terminate any workers that were

13  working on the roofing contract, the Navy roofing

14  contract in December formal termination notices?

15      A    I believe it was in December, yes.

16      Q    So they did.  They left your payroll in

17  December, 2000 is your belief?

18      A    Again, I believe it's in December.

19      Q    2000, okay.  Let's go to another category

20  of resources that would be expended how about

21  materials and by that I mean roofing shingles,

22  mastic, that type of stuff.  Did that end your

23  expenditures in December, 2000?

24      A    No, it did not because I didn't have

25  control over materials.

Case 1:02-cv-00008    Document 264    HFiled 02/15/2003209Page 204 of 216

# EXHIBIT

# "C"

BERMAN O'CONNOR MANN & SHKLOV

MICHAEL J. BERMAN, ESQ.
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagatna Guam 96910

Attorneys for Counterclaim Defendant
MICHAEL DANFORTH

## DISTRICT COURT OF GUAM

### TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., | ) ) ) CIVIL CASE NO.: 02-00008 |
| Plaintiff, | ) ) |
| vs. | ) **DECLARATION OF MICHAEL LAMAR** |
| | ) **DANFORTH IN SUPPORT OF** |
| BIOGENESIS PACIFIC, INC., AIG | ) **COUNTER-DEFENDANT MICHAEL** |
| TECHNICAL SERVICES, INC., and | ) **DANFORTH'S MOTION FOR SUMMARY** |
| AMERICAN HOME ASSURANCE | ) **JUDGMENT** |
| COMPANY, | ) |
| | ) |
| Defendants | ) |
| | ) |
| BIOGENESIS PACIFIC INC., | ) |
| Counter-Plaintiff, | ) |
| vs. | ) |
| RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, AND JOHN DOES 1-10, | ) ) ) |
| Counter-Defendants, | ) |
| AMERICAN HOME ASSURANCE COMPANY, | ) ) |
| Cross-Claimant | ) |
| vs. | ) |
| BIOGENESIS PACIFIC, INC., | ) |
| Cross-Claim Defendant | ) ) ) |

**EXHIBIT** "C"

## DECLARATION OF MICHAEL LAMAR DANFORTH IN SUPPORT OF COUNTER-DEFENDANT MICHAEL DANFORTH'S MOTION FOR SUMMARY JUDGMENT

I, MICHAEL LAMAR DANFORTH, hereby declare as follows:

(1)   That I am the Counter-Defendant designated herein, and was at all material times stated in the Second Amended Complaint, an authorized representative of Maxx Management, Corporation. ("MMC"), and make this Declaration on personal knowledge, having personal knowledge of the facts contained herein, and I am competent to testify if I were called upon as a witness at the trial of this matter.   I am authorized by MMC to make the statements set out in this Declaration.

(2)   At all times stated in the Counterclaim filed herein on July 30, 2003 by BioGenesis Pacific, Inc. ("BPI"), I was an authorized representative of MMC and was acting within the scope and course of my agency for them.   MMC was engaged by Use-Plaintiff Rhino Builders, Inc. ("Rhino") to consult with Rhino on a Solution Order Contract ("SOC") for the federal government, and I was assigned the consulting work by MMC.

(3)   I came to Guam for the purposes stated in Paragraph 2 above and spent the majority of my stay in Guam, which was approximately ten (10) days, consulting on the SOC contract.   Mr. Michael O'Connell of Rhino asked me after I arrived in Guam to also evaluate and provide recommendations to Rhino on the Navy's Roof Contract (Navy Contract No. N62766-99-D-0425), which on behalf of MMC was done and to which I have testified by

2

deposition, exerpts of which are submitted with my Motion for Summary Judgment.

(4) At Mr. O'Connell's request, I provided by recommendations to Rhino and also advised the representatives of BPI what I saw lacking in the performance of the Roof Contract, including the exposure to liquidated damaged by BPI for failing to have undertaken essential actions on certain task orders. I was not requested to, nor did I, direct any work on the task orders or make any decisions on Rhino's behalf as to Rhino's participation in performance of the task orders on the Roof Contract.

(5) I was not aware of nor did I have any participation in the stoppage of work BPI claims occurred on the task orders; my last participation in the consulting for MMC on the Roof Contract was in December, 2000 and at that time, to my knowledge, work was continuing by Rhino crews on the task orders.

(6) I have been required to retain the services of counsel to defend against the claims made against me by BPI, which claims are unfounded in fact and are contrary to the evidence; I also told counsel for BPI at my deposition on February 21, 2003 that I was a representative of MMC and not acting on my own behalf on the above matters and directed my attorney to demand that the original counterclaim be dismissed; instead, BPI filed a new and modified Counterclaim on July 30, 2003 for which I have continued to incur defense costs to defend.

3

I declare under penalty of perjury under the laws of Guam (6 GCA §4308) that the foregoing is true and correct.

DATED this 30<sup>TH</sup> day of November 2003.


_____
MICHAEL LAMAR DANFORTH

4

# EXHIBIT

# "D"

BERMAN O'CONNOR MANN & SHKLOV

MICHAEL J. BERMAN, ESQ.
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagatna Guam 96910

Attorneys for Counterclaim Defendant
MICHAEL DANFORTH

## DISTRICT COURT OF GUAM

### TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., ) ) ) | CIVIL CASE NO.: 02-00008 |
| Plaintiff, ) ) ) | **DECLARATION OF MICHAEL O'CONNELL IN SUPPORT OF COUNTER-DEFENDANT MICHAEL DANFORTH'S MOTION FOR SUMMARY JUDGMENT** |
| vs. ) ) ) | |
| BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC., and AMERICAN HOME ASSURANCE COMPANY, ) ) ) ) | |
| Defendants ) ) ) | |
| _BIOGENESIS PACIFIC INC., ) ) | |
| Counter-Plaintiff, ) ) | |
| vs. ) ) | |
| RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, AND JOHN DOES 1-10, ) ) ) | |
| Counter-Defendants, ) ) | |
| AMERICAN HOME ASSURANCE COMPANY, ) ) | |
| Cross-Claimant ) ) | |
| vs. ) ) | |
| BIOGENESIS PACIFIC, INC., ) ) | |
| Cross-Claim Defendant ) | |

**EXHIBIT "D"**

## DECLARATION OF MICHAEL O'CONNELL IN SUPPORT OF COUNTER-DEFENDANT MICHAEL DANFORTH'S MOTION FOR SUMMARY JUDGMENT

I, MICHAEL O'CONNELL, hereby declare as follows:

(1)   That I am and was at all material times stated in the Second Amended Complaint, the president and a principal shareholder of the Use-Plaintiff, Rhino Builders, Inc. ("Rhino"), and make this Declaration on personal knowledge, having personal knowledge of the facts contained herein, and I am competent to testify if I were called upon as a witness at the trial of this matter.    I am authorized by Use-Plaintiff to make this Declaration.

(2)   Rhino retained the services of Maxx Management Corporation (MMC) to provide consulting on a federal Solution Ordering Contract ("SOC") which was conducted on Guam and in October, 2000 asked that Mr. Danforth, a representative of MMC come to Guam to provide that consulting.

(3)   After Mr. Danforth arrived in Guam, I also requested that on behalf of MMC the current situation with the Roof Contract (Navy Contract No. N62766-99-D-0425) with the Navy be reviewed and to evaluate the current status of certain task orders which had been issued under the Roof Contract.   Following receipt of the evaluation of task orders submitted by MMC, I requested that MMC draft a written subcontract agreement for Rhino to be submitted to BPI Biogenesis Pacific, Inc. (BPI) for review and approval. MMC developed the agreement draft and submitted to Rhino and BPI for

2

review and changes. Execution of this proposed agreement never occurred by Rhino nor BPI. I did not authorize nor did I request that Mr. Danforth direct any of the work on the task orders or any other aspect of the Roof Contract, nor to make any decisions on what actions, if any, Rhino should take on the recommendations and evaluation undertaken.

(4) Mr. Danforth provided certain evaluations to me (acting for Rhino) on the Roof Contract task orders in October and November, 2000; I also received advice from Richard Avilla, who originally was a Rhino employee but who later began work for BioGenesis Pacific, Inc. ("BPI"), Alfred Garthe and others. The services of MMC regarding the Roof Contract came to an end in December, and at no time did Mr. Danforth direct or demand that Rhino pull its crews off of the task orders. Instead, after MMC ceased consulting on the Roof Contract, I made the decision on behalf of Rhino to cease work on the task orders because Rhino was not being paid and assurances of payment to Rhino from BPI were not forthcoming. In addition, liquidated damages which had already accrued on certain task orders against BPI were to have been resolved by Mr. Gerald Lam, the principal of BPI, but were not, and Mr. Lam refused to execute a written Master Subcontract Agreement with Rhino for the Navy Contract.

(5) No intimidation, demands, compulsion or improper conduct of any sort was used or exerted on me by Mr. Danforth in his making of recommendations and evaluating the Roof Contract for

3

Rhino.    Mr. Danforth neither acted to, nor did he advise that Rhino, interfere with the Roof Contract or cause any alleged breach of it by Rhino.    Neither MMC nor Mr. Danforth had any personal stake or interest, to my knowledge, on whether or how Rhino performed work on the Roof Contract.

I declare under penalty of perjury under the laws of Guam (6 GCA §4308) that the foregoing is true and correct.

DATED this ___ day of November 2003.

MICHAEL O'CONNELL

4