1 | James Lawhn
OLIVER LAU LAWHN OGAWA & NAKAMURA
2 | 707 Richard Street, Suite 600
Honolulu, Hawaii 96813
3 | Telephone No.: (808) 533-3999
Facsimile No.: (808) 533-0144
4 |
Stephen D. Tom
5 | WHITE & TOM
820 Mililani Street, Suite 711
6 | Honolulu, Hawaii 96813-2972
Telephone No.: 808 547 5151
7 | Facsimile No.: 808 599 4517
8 | Louie J. Yanza
VERNIER & MAHER, LLP
9 | 115 Hesler Place, Ground Floor
Governor Joseph Flores Building
10 | Hagåtña, Guam 96910
Telephone No.: (671) 477-7059
11 | Facsimile No.: (671) 472-5487
12 | Attorney for Defendants AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY

FILED
DISTRICT COURT OF GUAM
DEC 24 2003
MARY L. M. MORAN
CLERK OF COURT

301

13

## UNITED STATES DISTRICT COURT OF GUAM

14

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., ) | CIVIL CASE NO. 02-00008 |
| Plaintiff, ) | |
| vs. ) | DECLARATION OF COUNSEL IN SUPPORT OF MOTION TO RECONSIDER COURT'S ORDER OF DECEMBER 23, 2003; OR, IN THE ALTERNATIVE, TO EXCEED PAGE LIMITATION AND REFILE DEFENDANT AIG TECHNICAL SERVICES, INC. AND AMERICAN HOME ASSURANCE COMPANY'S MOTION FOR DISMISSAL OF PLAINTIFF'S BAD FAITH CAUSE OF ACTION FOR FAILURE TO STATE A CLAIM; OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT |
| BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC. and AMERICAN HOME ASSURANCE COMPANY, ) | |
| Defendants. ) | |
| BIOGENESIS PACIFIC, INC., ) | |
| Counterclaimant, ) | |
| vs. ) | |
| RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, AND JOHN DOES 1-10, ) | |
| Counter-Defendant. ) | |

# ORIGINAL

1

| | |
|---|---|
| AMERICAN HOME ASSURANCE COMPANY | ) |
| Cross-Claimant, | ) |
| vs. | ) |
| BIOGENESIS PACIFIC, INC. | ) |
| Cross-Claim Defendant. | ) |

I, LOUIE J. YANZA, hereby declare as follows:

1. I make this declaration on personal knowledge, having personal knowledge of the facts herein contained, and am competent to testify if called upon as a witness at trial of the within entitled-action.

2. I am an individual over the age of 18. I am an attorney licensed to practice law within Guam and before the U.S. District Court of Guam.

3. I am an attorney with the law firm of VERNIER & MAHER, LLP, local counsel for Defendants AMERICAN HOME ASSURANCE COMPANY ("AMERICAN HOME") and AIG TECHNICAL SERVICES, INC. ("AIGTS").

4. On December 5, 2003, our office was able to acquire from the parties to this case, a Stipulation and Order to Extend Page Limitation for the Dispositive Motions to be Filed by Defendants AIGTS and AMERICAN HOME ("Stipulation"), which page limit is set forth by Local Rule 7.1(g).

5. Attached hereto and marked Exhibit "A" is a true and correct copy of the Stipulation and Order to Extend Page Limitation for the Dispositive Motions to be Filed by Defendants AIGTS and AMERICAN HOME, submitted to the U.S. District Court of Guam on December 5, 2003.

2

6.  Along with the Stipulation, we filed Defendants AIGTS and AMERICAN HOME's Motion for Dismissal of Plaintiff's Bad Faith Cause of Action for Failure to State a Claim or, in the Alternative, for Summary Judgment ("Motion"). Upon filing the Motion and Stipulation, we reasonably believed the Court would grant the order permitting Defendants AIGTS and AMERICAN HOME to exceed the 20-page limit since all the parties, including the Plaintiff RHINO BUILDERS, INC. ("RHINO"), had agreed for Defendants AIGTS and AMERICAN HOME to exceed the 20-page limit.

7.  Attached hereto and marked Exhibit "B" is a true and correct copy of Defendants AIGTS and AMERICAN HOME's Motion for Dismissal of Plaintiff's Bad Faith Cause of Action for Failure to State a Claim or, in the Alternative, for Summary Judgment, which we are requesting the Court to permit Defendants to re-file.

I declare under penalty of perjury under the laws of Guam (6 GCA §4308) that the foregoing is true and correct.

Dated this 24th day of December, 2003, in Hagåtña, Guam.

LOUIE J. YANZA

C:\MarieBackup\My Documents\CLIENTS (NON-GIA)\USA-Rhino v BIOGENESIS-AIG\Pleadings\Declaration of Counsel - Ex Parte Mtn to Shorten Time & Mtn to Reconsider 122403.doc

3

1  **James Lawhn**
   **OLIVER LAU LAWHN OGAWA & NAKAMURA**
2  707 Richard Street, Suite 600
   Honolulu, Hawaii 96813
3  Telephone No.: (808) 533-3999
   Facsimile No.: (808) 533-0144
4
   **Stephen D. Tom**
5  **WHITE & TOM**
   820 Mililani Street, Suite 711
6  Honolulu, Hawaii 96813-2972
   Telephone No.: 808 547 5151
7  Facsimile No.: 808 599 4517
8  **Louie J. Yanza**
   **VERNIER & MAHER, LLP**
9  115 Hesler Place, Ground Floor
   Governor Joseph Flores Building
10 Hagåtña, Guam 96910
   Telephone No.: (671) 477-7059
11 Facsimile No.: (671) 472-5487
12 Attorney for Defendants AIG TECHNICAL SERVICES, INC. and
   AMERICAN HOME ASSURANCE COMPANY

13
                  **UNITED STATES DISTRICT COURT OF GUAM**
14

15 UNITED STATES OF AMERICA FOR ) CIVIL CASE NO. 02-00008
   USE AND BENEFIT OF RHINO )
   BUILDERS, INC., )
16                                        )
                  Plaintiff, ) **STIPULATION AND ORDER TO EXTEND**
17           vs. ) **PAGE LIMITATION FOR THE**
                                          ) **DISPOSITIVE MOTIONS TO BE FILED**
18 BIOGENESIS PACIFIC, INC., AIG ) **BY DEFENDANTS AIG TECHNICAL**
   TECHNICAL SERVICES, INC. and ) **SERVICES, INC. AND AMERICAN HOME**
19 AMERICAN HOME ASSURANCE ) **ASSURANCE COMPANY**
   COMPANY, )
20                                        )
                  Defendants. )
21 BIOGENESIS PACIFIC, INC., )
                                          )
22                                        )
                  Counterclaimant, )
23           vs. )
                                          )
24 RHINO BUILDERS, INC., MICHAEL )
   O'CONNELL, MICHAEL DANFORTH, )
25 AND JOHN DOES 1-10, )
                                          )
                  Counter-Defendant. )

**RECEIVED**
DEC 05 2003
CALVO AND CLARK, LLP

RECEIVED
DEC 0 5 2003

*RECEIVED* DEC 0 5 2003

Exhibit
A

Case 1:02-cv-00008    Document 305    Filed 12/24/2003    Page 4 of 50

| | |
|---|---|
| AMERICAN HOME ASSURANCE COMPANY | ) ) ) |
| Cross-Claimant, | ) ) |
| vs. | ) ) |
| BIOGENESIS PACIFIC, INC. | ) ) |
| Cross-Claim Defendant. | ) |

Pursuant to Local Rule (LR) 7.1(g) of the District Court of Guam, and subject to the Court's approval, the parties hereto stipulate and agree that the nature of this case contains matters that are first impressions and complex legal issues. Defendants AIG TECHNICAL SERVICES, INC. ("AIGTS") and AMERICAN HOME ASSURANCE COMPANY ("AMERICAN HOME") will be filing two (2) motions: (i) Motion for Dismissal of Plaintiff's Bad Faith Cause of Action for Failure to State a Claim or, in the Alternative, for Summary Judgment; and (ii) Motion for Partial Summary Judgment, and the parties agree that Defendants AIGTS and AMERICAN HOME may exceed the twenty (20) page limit for each motion set by LR 7.1(g). The parties opposing Defendants AIGTS and AMERICAN HOME's motions may also file oppositions to exceed the 20 page limit.

**STIPULATED AND AGREED:**

**VERNIER & MAHER, LLP**
Attorneys for Defendants AIG TECHNICAL
SERVICES, INC. and AMERICAN HOME
ASSURANCE COMPANY

By: _____
Louie J. Yanza

Dated: _December 3 2003_

**LAW OFFICE OF ANTONIO L. CORTES**
Attorneys for Plaintiff
RHINO BUILDERS, INC.

Original Signed By
ANTONIO L. CORTES

By: _____
**Antonio L. Cortes, Esq.**

Dated: _12/5/03_

2

1 | STIPULATION AND ORDER TO EXTEND PAGE LIMITATION FOR THE DISPOSITIVE
MOTIONS TO BE FILED BY DEFENDANTS AIG TECHNICAL SERVICES, INC. AND
2 | AMERICAN HOME ASSURANCE COMPANY
United States of America for the Use and Benefit of Rhino Builders, Inc.
3 | v. Biogenesis Pacific, Inc., et al.; USDC Civil Action No. 02-00008

**CALVO & CLARK, LLP**
Attorneys for Defendant
**BIOGENESIS PACIFIC, INC.**

**LAW OFFICES OF FREDERICK J. KERLEY**
Attorneys for Counter-Defendant
**MICHAEL O'CONNELL**

Original Signed by:
JANALYNN M. CRUZ, ESQ.
By:_____
Janalynn M. Cruz, Esq.

By:_____
Frederick J. Kerley, Esq.

Dated: 12/4/03

Dated: Dec. 3, 2003

**BERMAN O'CONNOR MANN & SKHLOV**
Attorneys for Counter-Defendant
MICHAEL DANFORTH

By: _Catherine M. Bejerana_
Catherine M. Bejerana, Esq.

Dated: 12/4/03

**SO ORDERED.**

DATED:_____

**HONORABLE JOHN S. UNPINGCO
JUDGE, U.S. DISTRICT COURT OF GUAM**

RECEIVED
DEC - 5 2003
DISTRICT COURT OF GUAM
HAGATNA, GUAM

3

James H. Lawhn
OLIVER LAU LAWHN OGAWA & NAKAMURA
707 Richard Street, Suite 600
Honolulu, Hawaii 96813
Telephone No.: (808) 533-3999
Facsimile No.: (808) 533-0144

Stephen D. Tom
WHITE & TOM
820 Mililani Street, Suite 711
Honolulu, Hawaii 96813-2972
Telephone No.: 808 547 5151
Facsimile No.: 808 599 4517

Louie J. Yanza
VERNIER & MAHER, LLP
115 Hesler Place, Ground Floor
Governor Joseph Flores Building
Hagåtña, Guam 96910
Telephone No.: (671) 477-7059
Facsimile No.: (671) 472-5487

Attorney for Defendants AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY

**FILED**
DISTRICT COURT OF GUAM
DEC 05 2003
MARY L. M. MORAN
CLERK OF COURT



## UNITED STATES DISTRICT COURT

## DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC. and AMERICAN HOME ASSURANCE COMPANY,<br><br>Defendants. | ) CIVIL CASE NO. 02-00008<br>)<br>)<br>)<br>) **DEFENDANTS AIG TECHNICAL SERVICES, INC. AND AMERICAN HOME ASSURANCE COMPANY'S MOTION FOR DISMISSAL OF PLAINTIFF'S BAD FAITH CAUSE OF ACTION FOR FAILURE TO STATE A CLAIM; OR, IN THE ALTERRNTAIVE, FOR SUMMARY JUDGMENT**<br>)<br>) **[ORAL ARGUMENT REQUESTED]**<br>)<br>) |

RECEIVED

Exhibit
B
DEC 0 5 2003

KERLEY
RECEIVED DEC 0 5 2003

BIOGENESIS PACIFIC, INC.,            )
                                     )
            Counterclaimant,         )
      vs.                            )
                                     )
RHINO BUILDERS, INC., MICHAEL        )
O'CONNELL, MICHAEL DANFORTH,         )
AND JOHN DOES 1-10,                  )
                                     )
            Counter-Defendant.       )
AMERICAN HOME ASSURANCE              )
COMPANY                              )
                                     )
            Cross-Claimant,          )
      vs.                            )
                                     )
BIOGENESIS PACIFIC, INC.             )
                                     )
            Cross-Claim Defendant.   )
                                     )
                                     )
                                     )
                                     )
                                     )
                                     )
                                     )
                                     )
                                     )
                                     )
                                     )
                                     )
                                     )
                                     )
                                     )
                                     )
                                     )
                                     )
                                     )
                                     )

## NOTICE OF HEARING MOTION

TO:      JANALYNN M. CRUZ, ESQ.
         Calvo & Clark, LLP
         First Savings & Loan Bldg.
         655 South Marine Drive, Ste. 202
         Tamuning, Guam  96913

2

CATHERINE M. BEJERANA, ESQ.
Berman O'Connor Mann & Shklov
Bank of Guam Bldg.
111 Chalan Santo Papa, Ste. 503
Hagåtña, Guam 96910


ANTONIO L. CORTES, ESQ.
Attorney at Law
233 Julale Center
424 West O'Brien Drive
Post Office Box BV
Hagåtña, Guam 96932


FREDERICK J. KERLEY, ESQ.
Reflection Center Building
222 Chalan Santo Papa, Ste. 202
Hagåtña, Guam 96910


NOTICE IS HEREBY GIVEN that Motion of AIG Technical Services, Inc. and American Home Assurance Company for Dismissal of Plaintiff's Bad Faith Cause of Action for Failure to State a Claim; or in the Alternative, for Summary Judgment shall come on for hearing before the Honorable John S. Unpingco , Judge of the above-entitled Court, in his or her courtroom in the United States Courthouse located at 520 West Soledad Ave., Hagatna, GU 96910 , on January 9, 2004 , 2003, at 10:00 a .m., or as soon thereafter as counsel may be heard.

DATED: Honolulu, Hawaii, November 21, 2003.

Of Counsel:
OLIVER, LAU, LAWHN,
    OGAWA & NAKAMURA

JAMES H. LAWHN
Attorney for Defendants
AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY

3

# UNITED STATES DISTRICT COURT

## DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., | )    CIVIL CASE NO. 02-00008 <br> ) <br> ) <br> )    **MOTION OF AIG TECHNICAL** <br> )    **SERVICES, INC. AND** |
| Plaintiff, | )    **AMERICAN HOME ASSURANCE** <br> )    **COMPANY FOR DISMISSAL OF** |
| vs. | )    **PLAINTIFF'S BAD FAITH TORT** <br> )    **CAUSE OF ACTION FOR FAILURE** |
| BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC. and AMERICAN HOME ASSURANCE COMPANY, | )    **TO STATE A CLAIM; OR IN THE** <br> )    **ALTERNATIVE, FOR PARTIAL** <br> )    **SUMMARY JUDGMENT** <br> ) <br> ) |
| Defendants. | ) <br> ) |
| ——————————————— | ) <br> ) |
| BIOGENESIS PACIFIC, INC., | ) <br> ) |
| Counterclaimant, | ) <br> ) |
| vs. | ) <br> ) |
| RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, AND JOHN DOES 1-10, | ) <br> ) <br> ) <br> ) |
| Counter-Defendant. | ) <br> ) |
| ——————————————— | ) <br> ) |
| AMERICAN HOME ASSURANCE COMPANY, | ) <br> ) |
| Cross-Claimant, | ) <br> ) |
| vs. | ) <br> ) |
| BIOGENESIS PACIFIC, INC., | ) <br> ) |
| Cross-Claim Defendant. | ) <br> ) <br> ) |

3852-10

## MOTION OF AIG TECHNICAL SERVICES, INC. AND
## AMERICAN HOME ASSURANCE COMPANY FOR DISMISSAL OF PLAINTIFF'S
## BAD FAITH TORT CAUSE OF ACTION FOR FAILURE TO STATE A CLAIM; OR IN
## THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

AIG Technical Services Inc. ("AIGTS") and American Home Assurance

Company ("AHAC") move as follows:

A.    For partial dismissal of Plaintiff's Second Amended Complaint under

FRCP Rule 12(b) for failure to state a claim upon which relief may be granted with respect

to Plaintiff's allegations of a bad faith tort cause of action against AIGTS/AHAC; or in the

alternative;

B.    For partial summary judgment upon Plaintiff's Second Amended

Complaint pursuant to FRCP Rule 56(b) with respect to Plaintiff's allegations of a bad faith

tort cause of action against AIGTS/AHAC.

This motion addresses the issues of (i) whether or not Guam will extend tort

liability to a breach of the implied covenant of good faith and fair dealing in an action

arising out of a Miller Act payment bond; and (ii) if so, whether the conduct of AIGTS and/or

AHAC met the requisite standard of care as a matter of law.

DATED:  Honolulu, Hawaii, November 21, 2003.

Of Counsel:
OLIVER, LAU, LAWHN,
          OGAWA & NAKAMURA

JAMES H. LAWHN
Attorney for Defendants
AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY

2

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.   THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  FACTS RELATING TO PLAINTIFF'S SUBMISSION OF ITS
     MILLER ACT CLAIM, AND DENIAL OF THE CLAIM . . . . . . . . . . . . . 2

III. GUAM WILL NOT RECOGNIZE A TORT CAUSE OF
     ACTION FOR BAD FAITH ARISING OUT OF A MILLER ACT
     PAYMENT BOND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     1.  Guam's Insurance Code And Relevant Decisions,
         Distinguish Between Insurance Policies and Surety
         Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     2.  The Findings And Conclusions Of The Texas And
         California Supreme Courts Are Consistent With The
         Structure Of Guam's Insurance Code And The
         Ninth Circuit Markowitz Decision . . . . . . . . . . . . . . . . . . . . . . 8

     3.  Decision From Other Jurisdictions Allowing Tort
         Recovery Are Predicated Upon Legislation Either
         Non-Existent In Guam Or Differing In Material
         Respect From Guam's Insurance Code . . . . . . . . . . . . . . . . . 15

     4.  Public Policy Does Not Require That Tort Liability Be
         Extended To Miller Act Payment Bonds . . . . . . . . . . . . . . . . 18

     5.  To Require A Surety To Honor A Claim Where There Is
         A Genuine Issue Of Material Fact, Denies The Surety
         The Right Of Trial Granted By Congress Under The
         Miller Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

     6.  Even If Guam Recognizes A Tort Bad Faith Cause Of
         Action On A Miller Act Payment Bond, The Conduct
         Of AIGTS/AHAC Met The Standard Of Care As A
         Matter Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

         A.  AIGTS/AHAC Had The Right To Deny The Claim
             Under Any Applicable Standard . . . . . . . . . . . . . . . . . . 24

B.   The Specific Allegations Of Bad Faith Are Not
     Supported By Fact Or Law . . . . . . . . . . . . . . . . . . . . . . . .   27

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

# TABLE OF AUTHORITIES

**Page**

## CASES

Brinderson et.al. v. Pacific Erectors, Inc. et.al.,
971 F.2d 272, 283 (9th.Cir 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . .      25

Cates Const. v. Talbot Partners et.al.,
980 P.2d 407, 418-419, 421, 423-424, 427 (Cal. 1999) . . . . . . . .      11, 12, 13,
14, 15, 16,
18, 20, 22,
25

Dodge v. F&D of Maryland,
778 P.2d 1240, 1242 (Ariz. 1989) . . . . . . . . . . . . . . . . . . . . . . . .      16, 18

Ehmcke Sheet Metal Works v. Wausau Ins. Co.,
755 F.Supp. 906, 911, 912-913 (N.D. Cal. 1991) . . . . . . . . . . . .      18, 22

Ellwein v. Hartford Accident & Indem. Co.,
15 P.3d 640 (Wash. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      24

Fraley v. Allstate Ins. Co.,
97 Cal.Rptr. 2d 386 (Ct.App. 2000) . . . . . . . . . . . . . . . . . . . . . .      25

General Ins. Co. of America v. Mammoth Vista Owners Assoc.,
174 Cal. App.3d 810 (Cal.App. 1985) . . . . . . . . . . . . . . . . . . . . .      15, 16

Great American Ins. Co. v. North Austin Mun. Utility Dist.,
908 S.W.2d 415, 419-420 (Tex. 1995) . . . . . . . . . . . . . . . . . . . . .      7, 8, 9, 10,
15, 20

Guebara v. Allstate Ins. Co.,
237 F.3d 987, 992 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . .      25

Hoye v. Westfield Ins. Co.,
487 N.W.2d 838 (Mich.App. 1992) . . . . . . . . . . . . . . . . . . . . . . . .      28

KW Industries v. Nat'l Surety Corp.,
754 P.2d 502, 505 (Mont. 1988) . . . . . . . . . . . . . . . . . . . . . . . . .      15, 16

K-W Industries v. National Surety Corp.,
855 F.2d 640 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . .      5

Page

CASES (cont.)

Lee v. Aiu,
        936 P.2d 655 (Haw. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

Nat'l Sav. Life Ins. Co.,
        419 So.2d 1357 (Ala. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

Odom v. Lee,
        999 P.2d 755 (Alaska 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

Pearlman v. Reliance Ins. Co.,
        371 U.S. 132, 140 n. 19 (1962) . . . . . . . . . . . . . . . . . . . . . . . . .   7

Reliance Ins. Co. v. Barile Excavating & Pipeline,
        685 F.Supp. 839, 840 (DCND Fla. 1988) . . . . . . . . . . . . . . . . . . .   25

Roberto v. Aguon,
        519 F.2d 754, 755 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . .   7

Sessions v. Whitcomb,
        329 S.W.2d 470 (Tex.App. 1959) . . . . . . . . . . . . . . . . . . . . . . . .   28

State Athletic Commission of California v. Massachusetts Bonding
 & Insurance Co.,
        46 Cal.App.2d 823, 829 (Cal. Ct. App. 1941) . . . . . . . . . . . . . . .   7

Szarkowski v Reliance Insurance Company,
        404 N.W.2d 502, 505 (ND 1987) . . . . . . . . . . . . . . . . . . . . . . . . .   15, 16

Transamerica Premier Ins. Co. v. Brighton School Dist.,
        940 P.2d 348, 352 (Col. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

Trust Corporation of Montana v. Piper Aircraft Corp.,
        701 F.2d 85 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

US ex rel. Ehmcke Sheet Metal v. Wausau Ind. Co.,
        755 F.Supp. 906, 911-913 (E.D. Cal. 1991) . . . . . . . . . . . . . . . .   14, 19, 20

US ex.rel. Seaboard Surety v. Joseph Morton Company,
        817 F.2d 956 (2nd.Cir 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

USA f/b/o Celanese Coatings Co. v. Gullard,
        504 F.2d 466,468, fn. 48 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . .   24

CASES (cont.)                                                  <u>**Page**</u>

<u>USA f/b/o Getz v. Markowitz et.al.</u>,
        383 F.2d 595 (9th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7, 11, 17

<u>USA f/b/o Siegal Const. Co. v. Atul Const. Co.</u>,
        85 F.Supp.2d 414 (D.C.N.J. 2000) . . . . . . . . . . . . . . . . . . . . . . . .   18, 19


## <u>STATUTES AND RULES</u>

Administrative Rules & Regulations of the Government of Guam
        Rule 12, §1110 (Vol 3, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

Federal Acquisition Regulations
        §32.112-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

Federal Rules of Civil Procedure
        Rule 9(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
        Rule 11  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24
        Rule 54(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
        Rule 56  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

18 Guam Code Annotated
        §31101-32401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6, 9, 12

20 Guam Code Annotated
        §2120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

28 Guam Code Annotated
        §18308 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

## TREATISES

Restatement (Second) of Torts
    §773 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32

47 Me.L.Rev. (1995) The Surety's Liability for "Bad Faith":
Claims For Extra-Contractual Damages By An Obligee Under
The Payment Bond
    §389 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

Volume XXVII, Number 3 Tort & Ins. Law Journal (1992)
    §665-677 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

## MEMORANDUM IN SUPPORT OF MOTION OF AIG TECHNICAL SERVICES, INC. AND AMERICAN HOME ASSURANCE COMPANY FOR DISMISSAL OF PLAINTIFF'S BAD FAITH TORT CAUSE OF ACTION FOR FAILURE TO STATE A CLAIM; OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

In this action, Plaintiff seeks recovery upon a Miller Act payment bond based upon an alleged oral subcontract between Plaintiff and Defendant Biogenesis Pacific Inc. ("Biogenesis"); the terms and conditions of which are not evidenced by any contemporaneous writing signed by Biogenesis; the exact nature of which is hotly contested by Biogenesis; and with respect to which there is a genuine issue of material fact regarding whether or not Plaintiff has properly invoked the jurisdiction of this Court by filing its Miller Act suit within the one year jurisdictional limit of the Miller Act.

Defendant AIGTS/AHAC denied Plaintiff's Miller Act claim, and Plaintiff filed suit upon the Miller Act payment bond seeking recovery under the Miller Act for labor and materials, and also seeking compensatory and punitive damages based upon the alleged tortious breach of the implied covenant of good faith and fair dealing by AIGTS/AHAC.

The issue in this motion is whether or not Guam will extend tort liability to alleged breaches of the implied covenant of good faith and fair dealing in cases involving Miller Act payment bonds. And, if so, what is the standard of care to be imposed upon the surety in such cases, and did the surety in this case meet that standard as a matter of law.

## I.     THE PARTIES

Plaintiff alleges that it is a subcontractor to Biogenesis with respect to a prime contract between Biogenesis and the United States for work to be performed under Navy Contract No. 62766-99-D-0425 (Navy Housing Various Locations On Guam) (the "Prime Contract").

Defendant Biogenesis is the prime contractor under the Prime Contract as described above and is the Principal under the Miller Act bond at issue in this case.

AHAC is a commercial surety which, jointly with Biogenesis, issued the Miller Act payment bond for the Prime Contract.

AIGTS is a technical services subsidiary of AIG (the parent company of AHAC) which investigates and administers claims arising out of bonds issued by AHAC. AIGTS is not a surety or insurer and does not issue bonds or insurance policies.

## II.  FACTS RELATING TO PLAINTIFF'S SUBMISSION OF ITS MILLER ACT CLAIM, AND DENIAL OF THE CLAIM

Set forth below in chronological order are what AIGTS/AHAC believe to be the undisputed facts regarding the submission and denial of Plaintiff's Miller Act claim.

| Date | Event | Exhibit |
|---|---|---|
| 10-18-01 | Plaintiff's counsel (Ms. Self of Carlsmith-Hawaii) had a telephone conversation with AIGTS' Mr. Titherington asking for a Miller Act Claim form. She was advised by Mr. Titherington to send a notice of nonpayment to him at his office. | Kahn Dec., EX. A, P. 1 |
| 10-22-01 | Plaintiff's counsel (Mr. Thomason of Carlsmith-Hawaii) sent a letter dated 10-22-01 to AHAC's San Francisco underwriting office, transmitting a document entitled "Notice Of Claim On Bond" and requesting a Miller Act Proof of Claim form. | Kahn Dec., EX. B |
| 10-26-01 | The 10-22-01 letter of Plaintiff's counsel was forwarded from AHAC's San Francisco underwriting office to Mr. Titherington at AIGTS in New York. | Kahn Dec., EX. C |
| 10-30-01 | Mr. Titherington of AIGTS responded to Plaintiff's counsel by letter of 10-30-01 acknowledging receipt of the claim and transmitting a Proof of Claim form. | Kahn Dec., EX. D |

| | | |
|---|---|---|
| 10-30-01 | Mr. Titherington of AIGTS notified its Principal [Biogenesis] of Plaintiff's claim; transmitted a copy of the claim to Biogenesis; and asked for Biogenesis' response within 10 days. | Kahn Dec., EX. E |
| 10-30-01 | Mr. Titherington of AIGTS received a telephone call from Mr. Lam, President of Biogenesis, in which Mr. Lam advised Mr. Titherington that he had sent Mr. Titherington a response to Plaintiff's claim and that the claim is refuted. | Kahn Dec., EX. A, P. 1 |
| 11-02-01 | Mr. Titherington of AIGTS received a 5 page letter dated 10-25-01 from Mr. Lam of Biogenesis stating that at best Plaintiff had only an informal oral contract which never matured and enclosing copies of letters from Mr. Lam to Plaintiff dated 1-02-01 and 9-08-01 citing numerous reasons why Plaintiff is not entitled to any money from Biogenesis. | Kahn Dec., EX. A, P. 2; EX. F; EX. G |
| 11-05-01 | Mr. Titherington of AIGTS received a telephone call from Plaintiff's counsel (Ms. Self) asking when the Proof of Claim form would be sent, and Mr. Titherington advised her that he had mailed it on 10-30-01. | Kahn Dec., EX. A, P. 3 |
| 01-01-02 | Responsibility for administering the claim at AIGTS was transferred from Mr. Titherington to Mr. Kahn. | Kahn Dec., Par. 6 |
| 01-15-02 | AIGTS received a letter dated 1-09-02 from Plaintiff's counsel (Mr. Thomason) transmitting the Proof Of Claim form and disagreeing with the position taken by Biogenesis in its letters of 1-02-01 and 12-22-01. The Proof Of Claim affirmatively states that Plaintiff furnished the labor and materials "between the dates of May 2000 and December 2000". | Kahn Dec., EX. J |
| 01-17-02 | AIGTS' Mr. Kahn acknowledged receipt of Plaintiff's Proof of Claim and advised Plaintiff's counsel (Mr. Thomason) that the matter is being taken up with [Biogenesis] to ascertain their position with respect to the claim. | Kahn Dec., EX. K |

| 02-21-02 | AIGTS' Mr. Kahn wrote Plaintiff's counsel advising that the Proof Of Claim states that the labor and materials were last furnished in December 2000 and that therefore the claim was denied due to a failure to file suit within the one year limit prescribed by the Miller Act which would have expired December 31, 2001 based upon the data contained in Plaintiff's Proof Of Claim. | Kahn Dec., EX. M |

| 03-19-02 | AIGTS received a letter dated 3-12-02 from Plaintiff's counsel (Mr. Thomason) asking that the 02-21-02 denial be re-examined based on claims by Plaintiff that: | Kahn Dec., EX. N |

(i) it leased a truck to Biogenesis which was available for use on the project until -03-20-01;

(ii) it supplied another truck to Biogenesis which was available for use on the project until 01-17-02; and

(iii) Biogenesis has continued to use Plaintiff's safety equipment and various other types of equipment.

| Unknown | Thomason's 3-12-02 letter was referred to counsel (Mr. Tom) for investigation | Kahn Dec., Par. 18 |

| 05-14-02 | AIGTS received a report from its counsel, (Mr. Tom) relating the substance of an interview of Mr. Lam of Biogenesis, and enclosing a copy of a memo prepared by Mr. Lam of Biogenesis refuting the claims made in the 03-12-02 letter from Plaintiff's counsel. In the interview with Mr. Tom and in his memo, Mr. Lam (i) denies that Biogenesis ever used any of Plaintiff's equipment without payment; (ii) denies that the flatbed truck was provided or supplied for use on the Prime Contract, but instead claims that the invoice relates to rental for a test run of the vehicle prior to making a decision on whether to purchase it; and (iii) claims that the Reliable Towing Services invoice had nothing to do with the Prime Contract, and that instead it represented towing charges incurred to remove a pick up from the back yard of a former employee named Aaron Williams. Mr. Lam's memo also questioned the conclusions and arguments of Plaintiff's counsel; specifically denied the existence of any subcontract; and reiterated various reasons why Biogenesis contends that Plaintiff is entitled to no payment. | Kahn Dec., EX. O |

4

| | | |
|---|---|---|
| 06/21/02 | AIGTS' Mr. Kahn advised Plaintiff's counsel that it had reviewed the 03-12-02 letter and its enclosures and continued to believe that the claim was time barred under the Miller Act, and accordingly the AIGTS maintained its position denying the claim. | Kahn Dec., EX. P |
| | At no time did anyone on behalf of AIGTS or AHAC ever object to Carlsmith's representation of Rhino in this matter, or ever ask anyone to make an inquiry of Carslmith on the matter. | Kahn Dec., Par. 21 |
| | At no time prior to filing the Complaint on March 20, 2001 did anyone from Carlsmith or Rhino ever ask for clarification as to the identity of the surety, nor at anytime did anyone on behalf of AIGTS or AHAC ever tell anyone from Carlsmith or Rhino that the surety was AIGTS and not AHAC. Prior to March 20, 2001 AIGTS told Carlsmith three times in writing that the surety was AHAC. | Kahn Dec., Par. 22 |

## III. GUAM WILL NOT RECOGNIZE A TORT CAUSE OF ACTION FOR BAD FAITH ARISING OUT OF A MILLER ACT PAYMENT BOND

This is a case of first impression involving interpretation of Guam law. In the Ninth Circuit, the question of whether or not a bad faith tort cause of action exists on a Miller Act surety bond is an issue of state [territorial] law, K-W Industries v. National Surety Corp. 855 F.2d 640 (9th Cir. 1988).

With limited exception, the jurisdictions which have adopted a bad faith cause of action in cases involving surety bonds have done so based in large part upon legislation regulating insurance companies and sureties which is either non-existent in Guam or is inconsistent with Guam. On the other hand, the jurisdictions declining to extend the tort of bad faith to surety bonds have legislation regulating insurance companies and sureties which is substantially similar to Guam, or identical in some respects. As will be shown by a review of the decisions, there is no basis in Guam's insurance code to infer a legislative intent that sureties be subjected to the same type of tort liability as insurers, nor do the

policy concerns applicable to the insurer-insured relationship compel extension of tort liability in the context of a Miller Act payment bond.

1. **Guam's Insurance Code And Relevant Decisions, Distinguish Between Insurance Policies and Surety Contracts**

Although Guam's insurance code defines "Fidelity and Surety Insurance", it is clear that Guam's legislature has drawn a distinction between "insurers" and "sureties".

For example, Guam has not enacted any version of the Uniform Unfair Settlement Practices Act under which sureties are classified as "insurers" within the meaning of the act. In addition, Guam requires "insurers" to file copies of their policies and obtain administrative approval before issuing them [28 GCA Sec. 18308]. This requirement affords a measure of protection to insureds from unfair policy provisions which might occur through unequal bargaining power. Sureties are, however, expressly excluded from this requirement [See 12 G.A.R. Sec. 1110 (Vol 3, 1997)]. This is reflective of a recognition that suretyship differs significantly from insurance, and that the parties to a contract of suretyship, do not require the same protection as Insureds under a policy of insurance.

In further recognition of the differences between the suretyship relationship and the relationship between an insurer and its insured, Guam has enacted legislation setting forth certain rights of a surety, the most significant of which for purpose of a bad faith analysis is 18 GCA 32302 under which Guam's legislature, like Texas and California, has made a policy decision that:

"A surety may require his creditor to proceed against the principal."

Guam adopted this statute from California, and California decisions interpreting this statute say that it was intended to grant relief from the common law doctrine which permitted the creditor to proceed directly against the surety without reference to the principal.[1] _State Athletic Commission of California v. Massachusetts Bonding & Insurance Co._, 46 Cal.App.2d 823, 829 (Cal. Ct. App. 1941). Extension of the tort of bad faith to sureties is inconsistent with this statutory right [See discussion in <u>Great American Ins. Co. v. North Austin Mun. Utility Dist.</u> 908 S.W.2d 415 (Tex. 1995), infra.].

In addition, the Ninth Circuit has held that a contract of suretyship is not a "policy", nor is a surety an "insurer" for purposes of Guam's insurance code, <u>USA f/b/o Getz v. Markowitz et.al.</u> 383 F.2d 595 (9th Cir. 1967). <u>Markowitz</u> quoted from <u>Pearlman v. Reliance Ins. Co.</u> 371 U.S. 132 (1962) "the usual view, grounded in commercial practice, that suretyship is not insurance", <u>Id</u> @ 140 n.19.

Thus, although "Fidelity and Surety Insurance" is included within Guam's insurance code for certain regulatory purposes, it is clear that Guam's legislature and the Ninth Circuit acknowledge that the relationship between an insurer and its insured differs from that between a surety, its principal and its obligee, and accordingly a surety is exempted from obligations otherwise imposed upon an "insurer" and is granted rights not otherwise granted to an "insurer". The distinctions between sureties and insurers in Guam's insurance code, and the absence of any version of any Uniform Unfair Settlement Practices Act under which sureties are classified as "insurers" with respect to resolution of

---

[1] The construction placed upon the borrowed statute by the courts of the original jurisdiction is adopted along with the statute and treated as incorporated into it. _Roberto v. Aguon_, 519 F.2d 754, 755 (9th Cir. 1975) (prior cases controlling, subsequent cases persuasive).

claims on bonds, leads to the inevitable conclusion that although Fidelity & Surety Insurance is regulated for some purposes under Guam's insurance code, surety bonds are not "insurance" for all purposes under Guam law. Thus the syllogistic logic that "sureties are insurers, insurers are subject to tort liability, therefore sureties are subject to tort liability" applied by the majority of jurisdictions extending tort liability to sureties does not apply with respect to Guam because the underlying premise that "sureties are insurers" is incorrect so far as Guam's statutory regulation of sureties is concerned. To the contrary, the decisions from those jurisdictions finding that "sureties are not insurers" for all purposes and declining to extend the tort of bad faith to surety bonds are more analogous to Guam's regulation of surety bonds.

## 2. The Findings And Conclusions Of The Texas And California Supreme Courts Are Consistent With The Structure Of Guam's Insurance Code And The Ninth Circuit Markowitz Decision

In Great American Ins. Co., 908 S.W.2d 415, Texas declined to extend the tort of bad faith to surety bonds. The Great American court examined the factors relied upon by Texas courts to extend tort liability to insurers and found that none of these factors exist in the suretyship relationship. There was no unequal bargaining power because the surety had no control over the form of the bond because the case [like the instant case] involved a public works project and the form of the bond was prescribed by law and approved by the Attorney General. Concerns over the potential for abuse of the claims resolution process ignored the fundamental differences between a liability insurance contract and a surety bond. While a liability insurance contract involves only two parties, the insurer and the insured, suretyship involves a tripartite relationship between a surety, its principal, and the bond obligee, in which the obligation of the surety is intended to

supplement an obligation of the principal owed to the bond obligee. [citation omitted] Unlike a liability insurance contract, in which the obligation of the insurer to the insured is the primary obligation of indemnity to the insured for loss, the obligation of a surety to a bond obligee is secondary to the obligation owed by its principal. A party sustaining a loss covered under a liability insurance contract can look only to its insurer for recourse. A bond obligee has a remedy against its principal.

In addition, the <u>Great American</u> court noted "[a]nother significant difference between sureties and an insurer is that sureties traditionally are entitled to rely upon all defenses available to their principal as to the debt owed to the bond obligee. [citations omitted] ". The court then referred to the Texas statute which, [similar to Guam's 18 GCA Sec. 32302], allows the surety to compel the obligee to sue the principal, and the court concluded that "[i]mposing a duty on a surety because it is allegedly in a position to delay paying claims could directly contravene a surety's express statutory right to require an obligee to file suit against the principal, obtain a judgment, and execute on that judgment." <u>Great American</u>, at 419. The court found that imposition of a common law duty similar to that imposed on insurers would be inconsistent with the rights available to a surety under the Texas statute. <u>Id</u>.

The <u>Great American</u> court then examined whether sureties were included in the "business of insurance" for purposes of Texas' Deceptive Trade Practices Act forming a part of Texas' insurance code. After examining the legislative history, intent and the fundamental structure of Texas' insurance code, the Texas court concluded that "... the express inclusion or exclusion of suretyship as the "business of insurance" in other sections of the Code is not determinative of the scope of [the Deceptive Trade Practices

Act"]. The court held that sureties are not within the scope of the Texas Deceptive Trade

Practices Act, reasoning that:

> "Given the unique character, rights and obligations of suretyship, and the complexities that would result by the imposition of liability under [the Deceptive Trade Practices Act] we cannot conclude that the Legislature intended to include suretyship in the definition of the business of insurance under [the Act]. Absent a clear legislative directive, we conclude that suretyship, as historically understood in the insurance and surety fields, does not constitute the business of insurance under [the Act]."

The <u>Great American</u> court concluded:

> "We recognize that some jurisdictions have imposed a duty of good faith and fair dealing upon commercial sureties in favor of bond obligees.

\* \* \* \*

> We conclude in Section III, infra, that the Texas Legislature did not intend to include suretyship as the "business of insurance" for all purposes under the Insurance Code. The differences between suretyship and insurance merit consideration, and we therefore find the reasoning of Dodge and similar cases unpersuasive.

\* \* \*

> The contract between [the Obligee] and [the Principal] in this case was an arm's length transaction, entered into after an open bidding process. No special relationship between [the Obligee] and [the Principal] exists. The derivative nature of a surety's liability and its right to rely upon the defenses of its principal compel the conclusion that a surety, like its principal, should be able to test the merits of an obligee's claim without the imposition of extracontractual duties to the bond obligee."
> <u>Great American</u>, supra at 419-420

California reached a similar conclusion in <u>Cates Const. v. Talbot Partners et.al.</u> 980 P.2d 407 (Cal. 1999).

The <u>Cates</u> court first noted that, with only one exception, breach of the implied covenant of good faith and fair dealing has been limited to contractual remedies rather than tort remedies. The one exception is for breach of the covenant in cases involving insurance policies with respect to which, extension of tort remedies to contracts of insurance is justified by a variety of policy reasons.

Before addressing the public policy issues, the <u>Cates</u> court considered whether inclusion of suretyship in California's insurance code was dispositive of the matter. The court referred to the definition of surety insurance [which is strikingly similar to Guam's], and like the Ninth Circuit in <u>Markowitz</u>, the <u>Cates</u> court noted, by italicizing the phrase "other than insurance policies" (see fn 11 at 418), that the legislature had drawn a distinction between contracts of suretyship and insurance policies. The <u>Cates</u> court referred to the definition of "insurance" which [like Guam's] defines insurance as a contract to "indemnify", whereas the court noted that a contract of suretyship is a contract whereby one promises to answer for the debt, default of miscarriage of another." <u>Id</u> @ 418. The <u>Cates</u> court noted that sureties are entitled to certain rights and defenses not enjoyed by insurers in the typical insurance relationship, including (i) the right of subrogation against its insured even if the negligence of its insured contributed to the losses; (ii) the right of reimbursement for its losses from its principal; (iii) the right to assert all defenses available to its principal; (iv) the right to assert its own independent defenses unique to sureties such as discharge due to material alteration of the bonded obligation. <u>id</u> @ 418-419. The court noted that many of these unique aspects of the surety relationship are included within

California's Civil Code provisions [in a manner similar to Guam's 18 GCA §31101-32401]. The Cates court then noted that sureties are exempted from a variety of regulations applicable to traditional insurers.

In response to an argument that despite the fact that surety bonds have been distinguished from insurance policies in statutory, regulatory and decisional law, tort remedies are appropriate simply because surety bonds are categorized and regulated as a class of insurance under the insurance code, the Cates court reviewed various treatises and decisions on the subject and concluded:

> "In short, the mere inclusion of surety arrangements in the Insurance Code should not be determinative of the issue before us. Rather, we must evaluate whether the policy considerations recognized in the common law support the availability of tort remedies in the context of a performance bond." Id at 421.

The Cates court then examined the policy reasons which have justified extension of tort remedies to policies of insurance.

> "... tort recovery is considered appropriate in the insurance policy setting because such contracts are characterized by elements of adhesion and unequal bargaining power, public interest and fiduciary responsibility." Id at 421.

Regarding adhesion and unequal bargaining power, the Cates court noted that while most insurance policies are written on a "take it or leave it basis" obligees generally have the right to negotiate the terms of a bond, or may negotiate more favorable terms and conditions in the underlying contract. The typical bond bears no indicia of adhesion or unequal bargaining power that might support tort recovery.

12

Regarding public interest, the Cates court drew a distinction between obtaining a policy of insurance to protect against accidental and generally unforeseeable losses caused by a calamitous or catastrophic event, and obtaining a bond under which the surety "merely lends its credit so as to guarantee payment in the event that the principal defaults" on the contract. The court contrasted the situation faced by an insured who cannot go to the marketplace to obtain insurance for a loss already incurred, with the situation in which breach of a commercial contract merely has adverse financial significance to the nonbreaching party. " A contracting party's unjustified failure or refusal to perform is a breach of contract, and cannot be transmuted into tort liability by claiming that the breach detrimentally affected the promisee's business." Cates, at 423 (additional citations omitted). Unlike insureds whose sole right of recovery may be against the insurer, an obligee has a right of recovery against its principal which is meaningful due to the practice of withholding retention. Consequently, it should not be common for an [obligee] to confront the sort of economic dilemma that an insured faces after a catastrophic loss or accident, or for an [obligee] to be particularly vulnerable to a surety's inaction, Id at 424. Regarding fiduciary responsibility, the Cates court found that the conditional nature of the surety's obligation, and its right to assert the defenses of its principal distinguish the surety-obligee relationship from the insurer-insured relationship. In addition, whereas the insurer assumes the defense of its insured and control of the settlement negotiations, the surety has no such duty or right. Thus, the Cates court concluded that the factors supporting a fiduciary relationship in the typical insurer/insured setting are not present in the suretyship relationship.

The court noted that other courts have attempted to justify imposition of tort liability on sureties by finding that imposition "compels sureties to handle claims responsibly" and that "contract damages do not compensate for the sureties misconduct and have no deterrent effect to prevent such misconduct in the future." The <u>Cates</u> court concluded that extension of tort liability to surety bonds was not necessary to achieve the desired results, noting (i) the absence of the type of unequal bargaining power found in traditional insurance policies, and the ability to negotiate terms for attorney fees and interest in the underlying contracts; (ii) in commercial transactions, contract remedies providing for damages within the contemplation of the parties or which were foreseeable provide adequate compensation for breach of the bond; (iii) the potential of administrative sanctions and potential suspension or revocation of a surety's license encourages the surety to administer claims in a responsible manner; (iv) the typical construction disputes involves claims, counterclaim, charges and countercharges and [s]eldom will any party be altogether in the right; and (v) the imposition of tort liability would allow obligees to pressure sureties into paying more on properly contested claims because sureties will be reluctant to risk the outcome of tort litigation, citing <u>US ex rel. Ehmcke Sheet Metal v. Wausau Ind. Co.</u> 755 F.Supp. 906 (E.D. Cal. 1991) [finding the potential for unwarranted settlement demands and inflated settlements in the context of tortious breach actions premised upon federal Miller Act surety bonds]. The <u>Cates</u> court concluded:

> "After carefully reviewing the foregoing authorities, we find ourselves unpersuaded by the decisions that allow tort recovery, for they fail to give appropriate consideration to the material differences between insurance policies and the performance bonds and the differing relations between the parties thereto. In addition, many of the decisions place undue emphasis upon statutes regulating suretyship as a class of insurance.

14

..... A construction performance bond is not an insurance policy. Nor is it a contract otherwise marked by elements of adhesion, public interest or fiduciary responsibility, such that an extracontractual remedy is necessitated in the interests of social policy. Obligees have ample power to protect their interests through negotiation, and sureties, for the most part, are deterred from acting unreasonably by the threat of stiff statutory and administrative sanctions and penalties, including license suspension." <u>Cates,</u> supra at 427.

A brief review of the decisions from jurisdictions extending the tort of bad faith to sureties will show that the reasoning and conclusions in <u>Great American</u> and <u>Cates</u> are the more persuasive with respect to Miller Act payment bonds.

3. **Decision From Other Jurisdictions Allowing Tort Recovery Are Predicated Upon Legislation Either Non-Existent In Guam Or Differing In Material Respect From Guam's Insurance Code**

In 1987 North Dakota extended tort liability to sureties based upon North Dakota's version the Unfair Settlement Practices Act. "We conclude that (North Dakota's Unfair Settlement Practices Act) is applicable to Reliance in its transaction of insurance and bonding business within this State, including its dealings with the performance bonds involved in this case". <u>Szarkowski v Reliance Insurance Company</u> 404 N.W.2d 502, 505 (ND 1987). In addition, the <u>Szarkowski</u> court quoted, adopted and relied upon California's <u>General Ins. Co. of America v. Mammoth Vista Owners Assoc.</u> 174 Cal. App.3d 810 (Cal.App. 1985) decision, the reasoning of which was subsequently rejected by the California supreme court in <u>Cates</u> . The next year (1988) Montana, in <u>KW Industries v. Nat'l Surety Corp.</u>, 754 P.2d 502 (Mont. 1988) and invoking similar logic, held that "It follows therefore that if a surety, transacting the business of insurance, violates the provisions of [Montana's Unfair Settlement Practices Act] the claimant, in addition to his

15

or her contract remedies, may be compensated under tort law."Id at 505, and also adopted, quoted and relied upon the subsequently rejected reasoning in California's General Ins. Co. decision. The following year (1989) Arizona, in Dodge v. F&D of Maryland 778 P.2d 1240 (Ariz. 1989) decided that because "surety insurance" is a kind of insurance included within Arizona's insurance code, and included within the defined scope of transaction of insurance business within Arizona, the Arizona legislature intended to include sureties within the coverage of the insurance statutes.   Like KW Industries and Szarkowski, the Dodge court quoted and adopted the following reasoning of California's  General Ins. decision which was specifically rejected in Cates:

> "We recognize liability insurance is not identical in every respect with suretyship.  But we are not concerned with the differences between suretyship and liability insurance. We are concerned with whether the Legislature included suretyship among the classes of business it intended to regulate under the Insurance Code.  It clearly did so."  Id at 1242 .

KW Industries and Szarkowski are predicated upon a statute not enacted in Guam with respect to sureties, (the Uniform Unfair Settlement Practices Act) and are therefore distinguishable.  In addition, both decisions attempt to bootstrap their result by favorably citing and quoting from the now rejected California General Ins. Co. decision. Dodge is likewise distinguishable because it rests upon a finding that Arizona's legislature intended that contracts of suretyship be regulated in the same manner as insurance policies for all purposes, and also rests upon reasoning adopted from California's General Ins. Co. decision  which was subsequently rejected by the California supreme court in Cates.

16

<u>Transamerica Premier Ins. Co. v. Brighton School Dist.</u> 940 P.2d 348 (Col. 1997) [a split 3-2 decision with a strong dissenting opinion], is likewise distinguishable because it is founded upon express findings of (i) "a legislative intent to include sureties as part of the regulatory scheme governing insurance; (ii) the inclusion of "surety" within the definition of "insurer"; (iii) the inclusion of "surety agreements" within the terms "insurance policy" and "insurance agreement"; (v) Colorado's Deceptive Practices Act and its express application to commercial sureties; and (vi) the legislature's provision in the insurance code for a jury instruction regarding bad faith in actions against an insurance company. With this background it is not surprising that the <u>Transamerica</u> court found that "[t]hese statutes indicate persuasive legislative support for treating a commercial surety contract as a form of insurance agreement and for treating a commercial surety which fails to settle its obligations in good faith in the same way our tort law treats insurers who process a claim in bad faith." <u>Id</u>., at 352. None of the factors relied upon by the foregoing courts are present with respect to Guam's insurance code. Guam does not have an Unfair Settlement Practices Act applicable to sureties; Guam's insurance code does not include surety contracts within the definition of "insurance" and limits the definition of "insurance" to contracts for indemnity against contingent or unknown events; Guam distinguishes between surety contracts and insurance policies in its regulation of the forms of policies; unlike the foregoing jurisdictions, but similar to California, Guam's legislature has granted special rights to a surety; Guam, like California and Texas, but unlike any of the foregoing jurisdictions allows a surety to require that an action be brought against its principal; and the Ninth Circuit, in the <u>Markowitz</u> decision, unlike any decision from the supreme courts

17

of those other jurisdictions, has held that a contract of suretyship is not an insurance policy within the meaning of Guam's insurance code.

Thus the syllogistic logic adopted in Dodge, and expressly or implicitly by the other foregoing courts, that "sureties are insurers; insurers are subject to bad faith tort liability; therefore sureties are subject to bad faith tort liability." does not apply with respect to Guam. In Guam it is clear that, like California and Texas, the mere inclusion of suretyship in the insurance code for certain regulatory purposes is not determinative of the issue. To paraphrase the language of the Cates court, the issue must be determined by an evaluation of whether the policy considerations which justify extension of tort liability to insurers in the context of the insurer-insured relationship, justify extension of tort liability to sureties in the context of Miller Act payment bonds.

### 4. Public Policy Does Not Require That Tort Liability Be Extended To Miller Act Payment Bonds

The court is invited to compare the reasoning in Ehmcke Sheet Metal Works v. Wausau Ins. Co. 755 F.Supp. 906 (N.D. Cal. 1991) declining to extend tort liability to Miller Act payment bonds, with the reasoning in USA f/b/o Siegal Const. Co. v. Atul Const. Co. 85 F.Supp.2d 414 (D.C.N.J. 2000) predicting that New Jersey law would extend tort liability to Miller Act payment bonds. In Atul, the court justified its decision upon (i) a finding that New Jersey's insurance code defined "insurance", "insurance policy" or "insurance contract" to include surety bonds, and "Policy of insurance" to include guaranty and surety bonds; and (ii) an implicit finding (without any detailed discussion) that surety bonds are analogous to insurance contracts, and the purpose of the bond would be defeated if a surety could refuse to respond to a legitimate claim in a timely fashion and incur liability

solely for the amount of the bond plus interest. Compare the absence of any significant policy analysis in <u>Atul</u> with <u>Ehmcke</u> in which the court examined the various policy reasons justifying tort liability on insurance policies, and found them inapplicable to Miller Act payment bonds. <u>Ehmcke</u> found that (i) extending bad faith tort claims to Miller Act payment bonds could create multiple lawsuits; (ii) the threat of punitive damages, inherent in a bad faith claim, could induce litigants to assert unwarranted settlement demands, and ultimately coerce inflated settlements, something which would increase bonding costs and run contrary to the public interest in protecting against increased costs of bonding; (iii) such a cause of action would create an unresolvable conflict of interest for the surety by causing it to prefer the interests of the claimant over that of its principal; (iv) extending tort liability to Miller Act bonds is not necessary to effect the purposes of the Miller Act, and if additional remedies are required, such remedies should be by the Congress, not the individual state courts; and (iv) finally, and perhaps most importantly, there is no compelling reason to extend tort liability in the context of surety bonds on federal projects. "... there is a regulatory scheme in place to sanction bad faith conduct by sureties towards subcontractors. First, the surety is subject to administrative sanctions by federal agencies for failing to properly perform its duties on the bond. [citation omitted] United States Treasury Department regulations require surety companies to be certified, to promptly resolve claims, to be licensed in the State where the bond is executed, and to be subject to Treasury Department review if unfavorable reports are received. [citation omitted] The Secretary of the Treasury has authority to revoke or refuse to renew a surety's certificate of authority to engage in government contract bonds when the surety fails to properly

perform. [citation omitted] Moreover, the surety is subject to further oversight by state insurance regulators in the state where it is licensed. [citation omitted]" *Ehmke*, at 911.

In addition, <u>Ehmcke</u> court also considered whether a "special relationship" existed with respect to surety bonds, and concluded, after examining the criteria established by earlier California cases for determining a "special relationship", that although suretyship is treated as "insurance" in some respects, the factors for determining a "special relationship" stress vulnerability, and a noncommercial context and motivation. These factors do not exist with respect to the typical claimant on a Miller Act payment bond. *Id.*, at 912-913.

The policy examinations in <u>Ehmcke</u>, <u>Cates</u> and <u>Great American</u> highlight the significant differences between the insurer-insured relationship and suretyship relationship and support the conclusion that a claimant under a Miller Act payment bond does not require the special protection that an insured requires under a policy of insurance. Unlike insurance policies, the Miller Act payment bond is a statutory bond, the form and contents of which are prescribed by statute or regulation. There is no negotiation on the form of the bond, and hence no unequal bargaining power in the hands of the surety with respect to its terms and conditions. Indeed it is the claimant under the bond which has the upper hand in this respect. The claimant has the opportunity to negotiate attorney fee, interest and damages clauses in the contract pursuant to which the labor or materials are furnished, as well as the price to be paid to the claimant. The surety has no participation or control in these negotiations. The elements of adhesion or unequal bargaining power are absent with respect to Miller Act payment bonds.

The typical Miller Act claimant does not buy the bond for a non profit motive such as peace of mind. The Miller Act payment bond is not intended as insurance against an unknown or unforeseeable calamity. The Miller Act surety lends its credit so as to guarantee payment if the principal defaults. The Miller Act bond comes as a legislatively mandated incident of doing federal construction, and the typical Miller Act claimant, to the extent it relies upon the existence of the bond in furnishing its labor or materials, does so out of a pure commercial motive.

The Miller Act claimant does not face the "economic dilemma" resulting resulting from accidental and generally unforeseeable losses caused by a calamitous or catastrophic event that an insured faces when denied benefits under a policy of insurance. To the contrary, a Miller Act claimant is assured that, assuming its claim is valid and timely, it will be paid the price agreed to be paid; plus interest either at the rate stipulated in the contract or the rate specified by state law; and attorney fees if so stipulated in the contract. In addition, whereas an insured can only look to its insurer, a Miller Act claimant can also look to the party with which it contracted for the goods and services for recovery of damages arising from non payment. In addition, a Miller Act claimant is afforded special remedies under the Federal Acquisition Regulations ("FAR"). Under FAR §32.112-1, a claimant is given the right to invoke assistance of the Contracting Officer in obtaining payment. Indeed Rhino availed itself of this right (see Kahn Dec., Ex. B, PP. 30-36). Thus, while delayed payment under a Miller Act payment bond might have adverse economic consequences, the plight of an insured faced with refusal of payment by its insurer is simply not analogous to that faced by a Miller Act payment bond claimant who (i) may obtain assistance of the Contracting Officer in obtaining payment; (ii) is assured of

payment for a timely, valid claim, plus interest, and perhaps attorney fees, and (iii) may pursue other remedies against the party with whom it contracted.

Nor, is there any basis for finding any fiduciary or quasi fiduciary status. Unlike an insurer, a Miller Act payment bond surety has no right or duty to defend a claimant, nor does the Miller Act surety control any settlement negotiations between the claimant and any third parties.

The surety's right to rely upon any defenses of its principal distinguishes the surety-claimant relationship from the insurer-insured relationship. This case highlights the observation in <u>Cates</u> that construction disputes typically involve claims, counterclaims, charges and countercharges and are complicated enough to resolve when all parties are on a level playing field. In this case, Plaintiff's Miller Act claim is based upon an alleged oral subcontract, the terms of which are disputed and uncertain, and the performance of which is contested; and with respect to which the facts regarding Plaintiff's timeliness of filing suit are disputed. As the court in <u>Ehmcke</u> found, the potential of tort liability on the Miller Act payment bond surety may make it easier for claimants, such as Plaintiff in this case, to pressure sureties into paying questionable claims, or paying more on properly disputed claims because the surety is reluctant to risk the outcome of tort litigation. This is not good policy. It is inconsistent with the surety's right to assert all defenses of its principal; inconsistent with the surety's statutory right in Guam [like California and Texas] to require the claimant to proceed against the principal; and ultimately increases the cost of public works through increased bond premiums.

A Miller Act surety needs no inducement to handle claims reasonably beyond that provided by the Miller Act and federal law and regulations relating to

procurement. There are sufficient safeguards in place through the federal regulation of sureties to provide adequate encouragement for a surety to act reasonably in its administration of Miller Act claims. The claimant's right to seek assistance of the Contracting Officer in obtaining payment coupled with the potential of being de-listed by the US Treasury, and thus being disqualified from writing bonds on any US Gov't. project, are powerful inducements to encourage reasonable conduct with respect to valid, timely claims.

A comprehensive discussion of the foregoing cases and policy issues in the context of a surety payment bond is found in 47 Me.L.Rev. 389 (1995) <u>The Surety's Liability for "Bad Faith": Claims For Extra-Contractual Damages By An Obligee Under The Payment Bond</u>. In the article, the author concludes that Maine will not extend the tort of bad faith to payment bond sureties.

Therefore, AIGTS/AHAC requests that this court rule that the tort of bad faith does not apply with respect to Miller Act payment bonds, and that Plaintiff's Second Amended Complaint fails to state a claim upon which relief may be granted to the extent it seeks recovery against AIGTS/AHAC based thereon.

5.  **To Require A Surety To Honor A Claim Where There Is A Genuine Issue Of Material Fact, Denies The Surety The Right Of Trial Granted By Congress Under The Miller Act**

Congress, in enacting the Miller Act, granted the Miller Act claimant, as well as the surety the right of trial in the US District Court. Nothing in the Miller Act or its legislative history indicates that the surety's right of trial with respect to disputed facts was intended to be any greater or less than the right of the claimant. This is particularly true

with respect to the statutory requirement that suit be brought by the claimant within one year after last furnishing the labor or materials. In the Ninth Circuit failure to comply with this statutory requirement is jurisdictional in nature and there is no presumptive truthfulness to the plaintiff's allegations. <u>USA f/b/o Celanese Coatings Co. v. Gullard</u> 504 F.2d 466,468, fn. 48 (9th Cir. 1974). Nothing in the Miller Act can be read to require the surety to honor a claim where there is a genuine dispute over the timeliness of the claimant's suit. Rule 56 in conjunction with Rule 11 are the governing standards, and any other criteria denies the surety of its right of trial granted by the statute and wrongfully shifts the burden of proof on this jurisdictional issue.

6. **Even If Guam Recognizes A Tort Bad Faith Cause Of Action On A Miller Act Payment Bond, The Conduct Of AIGTS/AHAC Met The Standard Of Care As A Matter Of Law**

In many jurisdictions which have adopted a bad faith cause of action, courts have expressed concerns over preserving the insurer/surety's "right to be wrong" - a right to challenge coverage and lose without being found automatically to have acted in bad faith. This has led most jurisdictions to adopt varying tests of reasonableness to rein in bad faith claims and to allow methods for their summary disposition.

A. **AIGTS/AHAC Had The Right To Deny The Claim Under Any Applicable Standard**

By far, the test adopted by most jurisdictions is the "Dutton Rule", sometimes called the "Directed Verdict" rule, <u>Nat'l Sav. Life Ins. Co.</u> 419 So.2d 1357 (Ala. 1982). Simply stated, the Dutton Rule <u>requires</u> summary dismissal of a bad faith cause of action unless the claimant/insured is entitled to a directed verdict on coverage, <u>Ellwein v. Hartford Accident & Indem. Co.</u> 15 P.3d. 640 (Wash. 2001). The Dutton Rule is discussed in

Volume XXVII, Number 3 <u>Tort & Ins. Law Journal</u>, 1992 at 665-677. As shown by the Appendix in the article, as of the date of writing the article (1992), the Dutton Rule was applied in one form or another in 32 jurisdictions.

A somewhat similar test is the "Genuine Issue" rule. This test is applied in California, <u>Fraley v. Allstate Ins. Co.</u> 97 Cal.Rptr. 2d 386 (Ct.App. 2000) and by the Ninth Circuit interpreting California law, "[u]nder California law, a bad faith claim can be dismissed on summary judgment if the defendant can show that there was a genuine dispute as to coverage." <u>Guebara v. Allstate Ins. Co.</u>, 237 F.3d 987, 992 (9th Cir. 2001). Under the Genuine Issue rule, the insurer is entitled as a matter of law, to summary judgment on the bad faith claim if a "genuine issue as to the insurer's liability" exists. The Genuine Issue rule arguably differs from the Dutton Rule in that the Genuine Issue rule allows the insurer to obtain dismissal of a bad faith claim by affirmatively demonstrating issues of disputed fact with regard to <u>any</u> grounds for denial of coverage, irrespective of whether or not the grounds were relied upon by the insurer.

In Florida, the surety is entitled to summary judgment if the claim is "fairly debatable". "A claim is not "fairly debatable" <u>only</u> where there is an absence of a reasonable basis for denial of policy benefits." <u>Reliance Ins. Co. v. Barile Excavating & Pipeline</u>, 685 F.Supp. 839, 840 (DCND Fla. 1988). (Underscore added)

As applied to sureties, the Ninth Circuit's decision in <u>Brinderson et.al. v. Pacific Erectors, Inc. et.al.</u> 971 F.2d 272 (9[th.Cir] 1992), interpreting California law prior to the <u>Cates</u> decision illustrates the application of these rules. In <u>Brinderson</u>, the surety was confronted with conflicting versions regarding interpretation of the bonded contract. The surety, after a limited investigation, determined that a genuine dispute existed concerning

interpretation of the contract, and refused to pay the claim until liability was established.

The obligee brought suit claiming that the surety had acted in bad faith because it adopted

its principal's version of the contract. As it turned out, the trial court sided with the obligee

on the contract interpretation issue. However, as to the bad faith issue, the Ninth Circuit

affirmed the trial court's directed verdict in favor of the surety, stating:

> Once [the surety] understood [its principal's] interpretation of
> the contract, and a genuine dispute over liability existed, [the
> surety] was under no further obligation to investigate [the
> obligee's] claim on the bond.

> *      *      *

> We agree that [the surety's and its principal's] interpretation of
> the contract is incorrect. As a matter of law, however, the
> interpretation is not so unreasonable as to be a mere pretext
> for avoiding further investigation; a genuine issue did exist
> concerning liability. *Brinderson*, at 283.

As applied to the instant case, the undisputed facts show that at the time the

claim was denied, AIGTS/AHAC was faced with genuine issues of material fact regarding

not only the merits of the claim, but its timeliness as well. Plaintiff's Proof Of Claim (Kahn

Dec., Ex. J, page 6) stated on its face that materials were last furnished in Dec. 2002 which

required suit to have been filed no later than Dec. 31, 2002, a date which had passed.

When confronted with this, (Kahn Dec., Ex. M) Plaintiff then contended that the one year

limitation had been extended by certain equipment alleged to have been rented for the

project (Kahn Dec., Ex. N). In response to Plaintiff's contention, Defendant Biogenesis

adamantly denied Plaintiff's contention that the subject equipment was furnished or used

on the project. See, Kahn Dec. Ex. O.

Regarding the merits of Plaintiff's claim, a comparison of the contentions

offered by Carlsmith on behalf of Plaintiff in its letters (Kahn Dec., Ex. J and N) with the

contentions of Biogenesis in its letters (Kahn Dec., Ex. F, G, and J @ PP. 10-11) illustrate the genuine issues of material fact regarding (i) what the terms and conditions of the alleged oral subcontract between Plaintiff and Defendant Biogenesis really were, (ii) whether Plaintiff performed its part of the bargain; and (iii) how much, if anything, Plaintiff is entitled to under the Miller Act.

Under these circumstances, Plaintiff would not have been entitled to either a directed verdict or summary judgment on coverage under the Miller Act bond, whether one applies the Dutton Rule, the Genuine Issue Rule, the Fairly Debatable Rule or the Brinderson standard. Therefore, as a matter of law, AIGTS/AHAC had every right to deny the claim and require that these factual disputes be put to the trier of fact for resolution.

### B. The Specific Allegations Of Bad Faith Are Not Supported By Fact Or Law

As explained above, Plaintiff's allegations (2$^d$ Am. Comp., Paras. 34 and 37) that AIGTS acted in bad faith by denying Plaintiff's claim despite its timeliness cannot survive summary disposition because of the genuine issues of material fact regarding the timeliness and merits of Plaintiff's claim.

Plaintiff alleges (2$^d$ Am. Comp., Par. 33) that AIGTS lacked authority to deny Plaintiff's claim. This is factually incorrect. AIGTS had authority to deny the claim on behalf of AHAC. (Kahn Dec., Par. 3).

Plaintiff alleges (2$^d$ Am. Comp., Par. 37) that AIGTS acted in bad faith by filing a motion to dismiss and citing arguably distinguishable authority. The allegation lacks factual merit. AIGTS is not the surety on the bond. AIGTS is not a surety nor is it an insurer. It is a claims servicing entity of American International Group Inc.. (Kahn Dec.

Par. 3 & 4). AIGTS' motion was well brought. If Plaintiff believes that improper authority was cited, the remedy is Rule 11 sanctions, not a cause of action for tortious breach of the implied covenant of good faith and fair dealing.

Plaintiff's alleges that AHAC acted in bad faith be referring the claim to AIGTS (2ᵈ Am. Comp., Par. 36); and that AIGTS acted in bad faith by allegedly inducing Plaintiff to file suit against AIGTS instead of AHAC (2ᵈ Am. Comp., Par. 37). A surety's referral of a claim to a claims adjuster, followed by a denial of that claim, does not constitute bad faith. <u>US ex.rel. Seaboard Surety v. Joseph Morton Company</u>, 817 F.2d 956 (2ⁿᵈ·ᶜⁱʳ 1987). These allegations are relevant to the issue of whether or not Plaintiff filed suit within the one year limitation of the Miller Act and are equitable estoppel defenses to AHAC's reliance on the one year limitation period of the Miller Act, not a cause of action. "Estoppel is a protective and not an offensive weapon and it is not a cause of action and does not give or create one;" <u>Sessions v. Whitcomb</u> 329 S.W.2d 470 (Tex.App. 1959); accord, <u>Hoye v. Westfield Ins. Co.</u> 487 N.W.2d 838 (Mich.App. 1992). Nor do the underlying facts raise any inference of "oppression, fraud or malice" as required under 20 GCA §2120 to justify exemplary damages. What happened is that Carlsmith sued AIGTS instead of AHAC because the Carlsmith attorney (Amy Self) <u>assumed</u>, from a telephone conversation with a representative of AIGTS that AIGTS and AHAC were the same corporation after being told that they were part of the AIG group of companies. The Carlsmith attorney (Self) had just graduated from law school, was not licensed at the time of the telephone conversation, and she was supposed to have been working under the supervision of a senior attorney (Thomason) with substantial experience in federal procurement law (Lawhn Dec. Ex. 1 ; Thomason Depo., @ p. 6-8). There is no evidence

that she discussed her assumption with her supervisor (Thomason), who always believed that the surety was AHAC (Thomason Depo., @ p. 16 ). Nor, does it appear that the Carlsmith attorney (Self) conducted any independent factual research to verify her assumption despite there being a wealth of resources available to her.

1.    There is no evidence that she ever discussed the issue with her supervising attorney (Thomason) who was experienced in federal procurement law, and who always believed that AHAC was the surety;

2.    She did not call AIGTS and ask what the correct corporate identity of the surety was (Kahn Dec. Par. 22);

3.    There is no evidence that she discussed the three letters from AIGTS to Carlsmith with her supervising attorney (Thomason), all of which specifically identify the surety as AHAC, not AIGTS; all of which call the readers attention to "the above referenced surety"; and in the bottom left corner of all three letters identify AIGTS as "A Member Company of American International Group, Inc." (Kahn Dec., EXHS. D, K, M);

4.    There is no evidence that she consulted the Treasury List (of which the Carlsmith supervising attorney (Thomason) was aware) and which shows that AHAC but not AIGTS were approved to write Miller Act bonds (See printout of portions of Treasury List as printed on Treasury website, Lawhn Dec., Ex. 2 );

5.    There is no evidence that she consulted the records of the insurance commissioners of Hawaii or Guam which show that AHAC but not AIGTS were licensed as sureties (Lawhn Dec., Ex. 3);

6. There is no evidence that she consulted the SEC 10K filing, which Carlsmith itself (Egesdal) consulted in connection with its decision to withdraw, and which shows that AHAC is a subsidiary of AIG, and is a New York corporation (See printout of SEC 10K contained in documents produced by Carlsmith, Lawhn Dec. Ex. 4);

7. There is no evidence that she consulted AIG's website, another resource which Carlsmith consulted in connection with this matter and which shows that AHAC is an insurer, and AIGTS is a claims handling entity (See printout of AIG's website contained in documents produced by Carlsmith, Lawhn Dec., Ex. 5, p. 7 & 14);

8. There is no evidence that she was even aware of the Mar. 28, 2001 email from Ledger of Carlsmith's Guam office to Granville of an AIG related entity, asking about the relationship of AIGTS to another AIG related entity, and Granville's Mar. 30, 2001 reply to the Carlsmith firm (Ledger) advising that AHAC described as ("insurer") and AIGTS were "member companies of the American International Group" (Lawhn Dec., Ex. 6).

Instead, the Carlsmith attorney (Self) claims to have been led to believe that AIGTS and AHAC were part of the same corporation based upon a telephone conversation (Self Affidavit, Par. 19 , copy attached as EX. 7 to Lawhn Dec.), and without there being any evidence at all that she did even minimal factual research to verify her assumption, or that she ever discussed her assumption with her supervising attorney who admittedly knew AHAC was the surety. She drafted the Complaint which named AIGTS and not AHAC,

and it was filed Mar. 20, 2001 because of a perceived statute of limitations problem (Ledger Depo. @ p. 15 ).

There is no evidence that anyone from AIGTS (or any AIG related entity) ever specifically told the Carlsmith lawyer (Self) that AIGTS and AHAC were part of the same corporation. To the contrary, all of the written evidence authored on behalf of AHAC or AIGTS specifically identifies the surety as AHAC, not AIGTS (the bond and the three AIGTS letters to Carlsmith) and all three of the letters from AIGTS to Carlsmith specifically state that AIG Technical Services, Inc. is a "Member Company of American International Group, Inc." (See Ex. D, K & M to Kahn Depo., lower left corner). Use of the phrase "Inc." is sufficient to charge an attorney with notice that a corporate entity is being referred to. The Carlsmith lawyer (Self) made an incorrect assumption without reviewing all of the available facts and without making further inquiry. There is no factual or legal basis for any type of affirmative bad faith, or punitive damages claim to be made against AIGTS or AHAC under these facts. Whether there is a case to be made for equitable estoppel with regard to the one year limitation period is a matter which will be dealt with in another motion.

Plaintiff alleges (2$^d$ Am. Comp., Par. 38) that AIGTS/AHAC induced the Carlsmith firm's withdrawal by claiming a conflict of interest. This claim never should have been brought. Even if an AIG entity had inquired into whether Carlsmith's prior or current representation of an AIG entity required withdrawal from the instant litigation, the inquiry would not be actionable because it is privileged. A client is entitled to object to an attorney representing an opposing party on the grounds of conflict of interest. _Trust Corporation of Montana v. Piper Aircraft Corp._, 701 F.2d 85 (9th Cir. 1983). AIGTS/AHAC, have been

unable to find any reported case in which a court has imposed liability upon clients [or former clients] for asking a lawyer who has represented them in the past whether or not there is a potential of a conflict of interest. By analogy, decisions on interference with contractual relationships recognize that the existence of privilege (justification) precludes liability Odom v. Lee 999 P.2d 755 (Alaska 2000); Lee v. Aiu 936 P.2d 655 (Haw. 1997). Asserting in good faith one's legally protected interests is not improper interference, Restatement (Second) of Torts §773. A client's right to inquire into the potential of a conflict of interest is a legally protected interest, the exercise of which must be protected. Nor do the facts support the allegation. All of the Carlsmith attorneys have testified that no one on behalf of any AIG entity even inquired into the possibility of a conflict, and certainly did not ask Carlsmith to withdraw from this case, nor did any AIG entity pressure Carlsmith into withdrawing. It was Carlsmith which made the inquiry in-house after Ledger of Carlsmith in Guam raised the issue of a possible conflict, and it was Carlsmith which made the decision to withdraw. Neither AIGTS nor AHAC had anything to do with it (See Thomason Depo. @ p. 56; Ledger Depo. @ p. 1-17 and Egesdal Depo. @ p. 5-11). The claim was legally improper to start with; has been found to be absolutely untrue through discovery; and should have been voluntarily dismissed.

IV.    CONCLUSION

For the foregoing reasons AIGTS and AHAC request this court:

1.    To rule as a matter of law that Guam will not extend tort liability to the implied contractual covenant of good faith and fair dealing in the context of a Miller Act payment bond, and accordingly AIGTS and AHAC are entitled to dismissal of Plaintiff's claims seeking punitive and tort damages (Count II);

2.     Alternatively, if this court rules that Guam will extend tort liability to Miller Act payment bonds, to rule that because the undisputed facts show that there are genuine issues of material fact regarding (i) the timeliness of Plaintiff's suit and (ii) the existence, interpretation, terms and performance of Plaintiff's alleged oral subcontract with BioGenesis, AIGTS and AHAC are entitled as a matter of law to summary dismissal of Plaintiff's tort allegations and claims for punitive and tort damages (Counts II and III);

3.     To rule that Defendants AIGTS and AHAC are entitled to judgment on the specific allegations of Par. 32 through 38 of the Second Amended Complaint;

4.     To the extent Plaintiff may be alleging fraud against AIGTS or AHAC, to dismiss any such allegation for failure to plead with particularity as required by FRCP Rule 9(b); or in the alternative to grant summary judgment in favor of AIGTS and AHAC ;

5.     To dismiss Plaintiff's claims for exemplary or punitive damages against Defendants AIGTS and AHAC; and

4.     To rule that there is no just reason for delay and enter final judgment pursuant to FRCP Rule 54(b).

DATED:  Honolulu, Hawaii, November 21, 2003.

Of Counsel:
OLIVER, LAU, LAWHN,
    OGAWA & NAKAMURA

JAMES H. LAWHN
Attorney for Defendants
AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY