ANTONIO L. CORTÉS
Law Office of Antonio L. Cortés
233 Julale Center
424 West O'Brien Drive
P.O. Box BV
Hagåtña, Guam 96932
Telephone No.: (671) 477-1930
Facsimile No.: (671) 477-1933

Attorney for Plaintiff Rhino Builders, Inc.



FILED
DISTRICT COURT OF GUAM
JAN 23 2004
MARY L. M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC., and AMERICAN HOME ASSURANCE CO., <br><br> Defendants. | CIVIL CASE NO.02-00008 <br><br> **OPPOSITION TO THE SURETIES' MOTION FOR SUMMARY JUDGMENT DISMISSING PLAINTIFF'S BAD FAITH CLAIM** |
| BIOGENESIS PACIFIC, INC., <br><br> Counter-Plaintiff, <br><br> vs. <br><br> RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, and JOHN DOES 1-10, <br><br> Counter-Defendants. | |
| AMERICAN HOME ASSURANCE CO., <br><br> Cross-Claimant, <br><br> vs. <br><br> BIOGENESIS PACIFIC, INC., <br><br> Cross-Claim Defendant. | |

**ORIGINAL**

Plaintiff United States of America for use and benefit of Rhino Builders, Inc. ("Plaintiff") most respectfully presents the following points and authorities to support its request that this honorable Court deny the December 31, 2003 motion of American Home Assurance Corporation ("AHAC") and AIG Technical Services ("AIGTS") for summary judgment dismissing Plaintiff's bad faith claims against them.

## I. RHINO'S BAD FAITH CLAIM.

The undisputed evidence is that AHAC and AIGTS worked in concert to create technical and procedural impediments to foreclose Rhino's ability to assert its payment-bond rights under the Miller Act. This was done primarily by denying Rhino's claim even though it knew Rhino had supplied labor and materials for the bonded contract, using, as the basis of denial, a statute of limitations defense for which it had inadequate factual basis,[1] giving Plaintiff reason to think it should bring this action against AIGTS rather than AHAC,[2] noticing that this action was brought against AIGTS rather than AHAC, keeping silent regarding that mistake until an amendment to add AHAC would not relate back to the March 20, 2002 filing date for statute-of-limitations purposes under F.R.Civ. Proc. Rules 15(c)(3) and 4(m),[3] then moving to dismiss Rhino's claim against AIGTS because it is not the surety.[4]

---

[1] See § IV of this brief, *infra*.
[2] See, e.g., Affidavit of Amy Self, filed September 4, 2002.
[3] 120 days after the filing of the complaint was July 18, 2002. AIGTS requested, and Rhino granted, an extension of time allowing AIGTS to respond to the complaint after that date.
[4] See July 26, 2002 Motion to Dismiss.

2

Essentially, Rhino's claim is that AHAC and AIGTS's actions served to trick Rhino out of a recovery to which they knew it was entitled under the Miller Act.

Essentially, Rhino's claim is that such maneuvering, calculated to avoid honoring the Sureties' liability under the payment bond, is in bad faith, wrongful, and tortious. What the Sureties should have done, what the Miller Act intended them to do, was to pay all claims that were justly due to a subcontractor without resort to sharp practice to avoid doing so.

AIGTS and AHAC now move to dismiss this claim on the ground that Guam "will not" recognize such a tort, and that even if Guam did recognize such a tort, AIGTS had a right to deny Rhino's claim because the principal, Biogenesis Pacific, Inc., told them that Rhino should not be paid.[5] Except for the denial of the claim, however, AIGTS and AHAC completely avoid discussing what Rhino actually alleges as the factual basis for its bad faith claim – that it was bad faith to place sharp practice and procedural impediments in the way of a fair evaluation of whether or not Rhino's claims were valid.

Under the prevailing law, with just a few exceptions not applicable in Guam, such a tort does exist. On the facts of this case, AIGTS and AHAC have both acted in bad faith to avoid paying Rhino on the bond.

---

[5]  BPI never did tell the sureties that Rhino did not provide labor and materials in prosecution of the bonded contract. This failure to dispute the substance of Rhino's claim was all the surety needed to know to determine that Rhino was entitled to recover under the bond. 40 USC § 270b.

3

## II. THE PRONOUNCED MAJORITY OF STATES PROPERLY RECOGNIZE THE TORT OF WRONGFUL DENIAL OF THE RIGHTS OF SUBCONTRACTORS BY PAYMENT BOND SURETIES.

The Supreme Courts of at least six states have recognized that the intended beneficiary, or "obligee," of a surety bond can proceed in tort for a breach of the implied covenant of good faith and fair dealing. Loyal Order of Moose v. International Fidelity Insurance, 797 P. 2d 622 (Alaska 1990) (reversing dismissal upon summary judgment identical to the one sought by the sureties in this case); Dodge v. Fidelity Deposit Company of Maryland, 778 P. 2d 1240, 1244 (Ariz. 1989) ("We hold that a surety has a duty to act in good faith in responding to its obligee's claims that the principle has defaulted. Breach of this duty entitles the obligee to maintain a tort action and recover tort damages."); Transamerica Premier Insurance Company v. Brighton School Dist., 940 P. 2d 348, 351 (Colorado 1997) ("We conclude that the rationale for providing insureds with a cause of action in tort for an insurer's bad faith in processing a claim applies with equal force in the commercial surety context."); Suver v. Personal Service Insurance Co., 462 N.E. 2d 415, 417 (Ohio 1984) ("the issuer of a financial responsibility bond has a duty to act in good faith in the handling and payment of claims by one who may be injured by the principal. Bad faith actions are a breach of this duty and will give rise to a cause of action in tort against the issuer of the bond."); K-W Industries v. National Surety Corp., 745 P. 502 (Mont. 1988) ( a surety, as an insurer, has an implied at law duty to act fairly and in good faith in handling the claim of a Miller Act subcontractor, and can be sued in tort for a breach of that duty); Szarkowski v. Reliance Insurance Co.,

4

404 N.W. 2d 502, 504-505 (N. D. 1987) (Surety is obligated to act in good faith in its relationship with oblige, who can sue in tort for a breach of that obligation).[6]

As set forth below, this majority view is almost completely un-contradicted by State Supreme Courts.

## III. ONLY ONE STATE SUPREME COURT HAS HELD THAT A SUBCONTRACTOR CANNOT RECOVER IN TORT FOR WRONGFUL DENIAL OF A PAYMENT-BOND CLAIM BY A MILLER-ACT SURETY.

As described below, the Texas Supreme Court is the only Court that has held that no tort claim can be pursued for the bad faith denial of benefits under a payment bond, and that decision was based in part on a need not to contravene a statutory provision for which no equivalent exists in Guam. California has made a similar ruling but has explicitly limited it to performance bond claims. No other State Supreme Court appears to have joined this small minority.

### A. The <u>Great American</u> Case Should Not Persuade this Court to Adopt the Minority View as the Law of Guam.

The Sureties' primary authority for urging this Court to adopt, for Guam, a rule contrary to that of the majority of state, is <u>Great American Ins. Co. v. North Austin Mun. Util. Dist.</u>, 908 S. W. 2d 415 (Tex. 1995). That case is not a Miller Act case. That case is based upon a statutory scheme that is markedly

---

[6] The Michigan Supreme Court has also indicated that Michigan regards commercial sureties as insurer, and therefore presumably subject to bad faith claims. <u>Oakland County Bd. of County Rd. Comm'rs v. Michigan Property & Cas. Co.</u>, 575 N. W. 2d 751, 760, fn. 17 (Mich. 1998) ("A special relationship exists between a commercial surety and obligee that is nearly identical to that involving an insurer and an insured").

5

dissimilar to Guam's.[7] Particularly different is the Texas provision, quoted by the Great American Court, requiring a surety to sue on a written contract before the surety is liable. The Texas Supreme Court found that allowing a tort claim for bad faith would directly contravene that statute, which has not been adopted in Guam. 908 S. W. 2d at 419. That decision, concerned as it was with an issue that does not exist in Guam, should not be the guiding light of this Court's decision on this motion.

### B. The Cates Construction Case Should Not Persuade this Court to Adopt the Minority View as the Law of Guam.

In a 4 to 3 decision over a vigorous dissent, the California Supreme Court held that a subcontractor could not sue a surety in tort for bad faith denial of benefits under a performance bond. That decision, reported in Cates Construction, Inc. v. Talbot Partners, 86 Cal. Rptr. 855, 980 P. 2d 407 (Cal 1999), provides the other mainstay of the Sureties' urging that Guam find that no such claim can be made for the bad faith denial of benefits under a Miller Act payment bond.

#### 1. The Cates Court Repeatedly Emphasized that Its Ruling Extended Only to Performance Bond Cases.

The Miller Act requires a performance bond as well as a payment bond. The performance bond guaranties completion of the work. The payment bond functions to insure the payment of subcontractors and materialmen. Rhino brought this suit to recover payment. The Cates Court did not hold that California recognized no tort claim for the bad faith denial of a payment bond. Quite to the contrary, at

---

[7] *C.f.* Vernon's Texas Bus. & Comm. C §§ 34.01-34.04, relied upon by the Great American Court, 908 S. W. 2d at 419, *with* 18 GCA §§ 32301-32307.

every juncture that it stated its holding or the issue before it, it very carefully stated that its holding applied only to *performance* bond claims.[8] Because Cates was a hotly contested 4 to 3 decision, with a lengthy dissent by Justice Mosk joined by the other two dissenters, it is at least possible that the explicit and repeated limitation of the majority holding to performance bond claims was a condition for the vote of at least one of the four justices in the slim majority.

Further, the Cates Court acknowledged, without disapproval, two California Court of Appeals cases finding a tort cause of action for the bad faith denial of fidelity bonds. 86 Cal. Rptr., at 866, 980 P. 2d, at 417. A decision barring bad faith tort claims for payment bonds would thus be an extension of the Cates holding.

An examination of the rationale of the Cates majority is also telling on this point. That is, the Court referred to its prior explanations of tort recovery in the insurance context by policy consideration, including adhesion, unequal bargaining power, and public interest. If and when a Miller-Act subcontractor is not paid, he is in a position quite similar to an insured with a claim for a loss – he must negotiate recovery from an entity with infinitely greater financial and legal resources.[9] For policy considerations, we must turn to the Miller Act.

---

[8] *e.g.*, "we must evaluate whether the policy considerations recognized in the common law support the availability of tort remedies in the context of a performance bond." 980 P., at 421, 86 Cal. Rptr., at 871.
[9] This was an explicit concern of the Arizona Supreme Court in Dodge, 788 P. 2d at 1242, and by the Colorado Supreme Court in Transamerica, 940 P. 2d at 353, and of the Ohio Supreme Court in Suver, 462 N.E. 2d at 417. Unequal bargaining power in the claims

7

## 2. Congress Intended Miller-Act Sureties to Have a Strict Duty to Honor Payment-Bond Claims without using Technical and Procedural Niceties to Deny Recovery.

The overriding policy consideration of the Miller Act is to get the subcontractors paid. As stated by the Supreme Court in <u>Clifford MacEvoy Co. v. United States for use and benefit of Calvin Tomkins Co.</u>, 322 U.S. 102, 64 S. Ct. 890 (1944):

> The Miller Act . . . is highly remedial in nature. It is entitled to a liberal construction and application in order properly to effectuate *the Congressional intent to protect those whose labor and materials to into public projects.*

322 U.S. at 107, 64 S. Ct. at 893 [emphasis added]. Similarly, in <u>Illinois Surety Co. v. John Davis Co.</u>, 244 U.S. 376, 37 S. Ct. 614 (1917, Brandeis, J.), the Court held that:

> The *purpose of the act was to provide security for the payment of all persons who provide labor or material on public work.* This was done by giving *a claim under the bond* in lieu of the lien upon land and buildings customary where property is owned by private persons. Decisions of this court have made it clear that the statute and bonds given under it must be construed liberally, in order to effectuate the purpose of Congress as declared in the act.

244 U.S., at 380, 37 S. Ct., at 616 [emphasis added].

Mechanics liens provide immediate relief to a subcontractor because, as soon as he records his lien, there is a cloud on the title. That often results in prompt payment. Even if not, the mechanics lien can normally be foreclosed in a special proceeding. Congress intended to compensate subcontractors on government work

---

context is certainly a factor in this case, as Rhino is all but insolvent and AIG is sufficiently wealthy to pay three attorneys to thwart its admittedly meritorious claim.

8

for not being able to get the swift relief available from such liens. To do so, it provided for the bond. It is inconceivable that Congress did not intend for the bonding company to pay claims promptly and fairly, and to refrain from bad faith denial of *bona fide* claims of subcontractors known to have actually provided labor and material on the bonded government contract. To allow Miller-Act sureties to use sharp practice or deception to avoid paying those the they *know* supplied labor and materials on a government project is contrary to that Congressional intent. The public policy basis of the bad faith denial tort is thus available in Miller-Act payment bond cases such as this one. As succinctly stated by the Suver Court, "to insulate the issuer of a financial responsibility bond is to encourage the routine denial of payment of claims for as long as possible. This court should not provide an incentive to act in bad faith." Suver v. Personal Service Insurance Co., *supra*, 462 N.E. 2d, at 417.

### 3. Roberto v. Aguon Does Not Require the Adoption of the Minority Rule of Cates in Guam.

The Guam case of Roberto v. Aguon, 519 F. 2d 754 (9th Cir 1975), does nothing to require Guam to follow the California Supreme Court's decision in the Cates case instead of the majority rule, or to elevate the marginally-prevailing Cates rationale in any way above the contrary decisions of the majority of State Supreme Courts.

The Roberto rule is that "decisions of California courts which predate the enactment of the Territorial Laws are controlling authority on issues of statutory

9

construction and effect of Guam laws, and . . . California cases subsequent to the adoption of Guam codes, while not binding, are persuasive." 519 F. 2d at 755.

Cates does not interpret any particular California statute to mean that a surety cannot, in California, cannot be held liable in tort for the breach of good faith and fair dealing. Rather, although it does cite some code provisions that have been adopted in Guam, its extended rationale constructed in large part upon Cal. Ins. Code §§ 100 and 105,[10] neither of which has been adopted in Guam, upon Cal. Ins. Code §§ 22 and 23,[11] neither of which has been adopted in Guam, upon Cal. Code. Regs, title 10, § 2695.1,[12] which has not been adopted in Guam, upon Cal. Ins. Code § 533, which has not been adopted in Guam,[13] upon Cal. Code. Regs, title 10, §§ 2695.2, 2695.7 & 2695.10,[14] which have not been adopted in Guam,[15] upon Cal. Ins. Code §§ 790.03 through 790.07,[16] none of which has been adopted in Guam, upon Rev. & Tax. Code §§ 13721-13724,[17] none of which has been adopted in Guam, and upon Cal. Civ. Proc. § 704.100, which has not been adopted in Guam.

In sum, Cates carefully made no ruling on payment bonds, is not binding authority in Guam, was the product of a sharply divided Court, and goes

---

[10] 86 Cal. Rptr. at 867.
[11] 86 Cal. Rptr. at 868.
[12] Id.
[13] Id.
[14] Id.
[15] 86 Cal. Rptr. at 869.
[16] Id.
[17] Id.

directly against the pronounced majority of State Supreme Courts who have considered this issue.

        C.     **Getz v. Markowitz Does Not Stand for the Proposition that a Subcontractor Cannot Recover in Tort for Wrongful Denial of a Payment-Bond Claim by a Miller Act Surety.**

The Sureties rely on Getz v. Markowitz, 383 F. 2d 595 (9th Cir. 1967) for the proposition that Guam law is like that of Texas and California, because, in the Sureties' words, the Getz Court "has held that a contract of suretyship is not an insurance policy within the meaning of Guam's Insurance Code." AIG's brief at 18. The implied argument is that, because the Ninth Circuit has already ruled that a contract of suretyship is not an insurance policy in Guam, this Court should adopt the minority rule of the Texas and California. Things are not that simple. Even if they were, Getz does not support such a broad statement.

      In Getz, the Court noted indications that the surety had acted in *good* faith, not denying that compensation was due, but simply alleging uncertainty as to the amount due. There was no alleged sharp practice of the sort Rhino complains of in this case. No bad faith was alleged in the complaint. Over a year had passed since the complaint was filed, the use plaintiff sought to add an additional 12% onto its recovery on the theory that the surety was an insurer for purposes of Government Code § 43407, now 22 GCA § 18608.595. The Getz Court denied the motion to amend on the ground that this *sole* code section was not intended to apply to sureties. The Getz Court did come close to addressing the issue of this motion, whether the obligee of a Miller-Act payment bond is in a position sufficiently akin to that of an

11

insured that, if the surety acts in bad faith with respect to the obligee's claim, the obligee can sue in tort for the breach of the covenant of good faith and fair dealing implied in every contract. It is questionable whether the Getz Court *could*, in 1967, have addressed that issue.[18] Whether or not in *could* have done so, it clearly *did not* do so. It just held that a surety was not liable for the penalty of Government Code § 43407.

Rather than use the inapposite Getz ruling to determine whether a Miller-Act payment bond is like insurance for bad faith purposes, a more general rule should be used. For this purpose Rhino offers the following passage from the Szarkowski decision:

> This court has recognized that a paid surety or bonding company is generally treated as an insurer rather than according to the strict law of suretyship. [citations omitted] *Couch on Insurance* 2d Revised Edition § 15:8 states in relevant part:
>
>> "A bond entered into by a compensated surety and guaranteeing the performance of a contract is a contract of insurance rather than of ordinary suretyship and is to be interpreted according to the rules relating to the former instead of the strict rules applicable to the latter. For most purposes, contracts of guaranty and suretyship are construed by the same principles as apply to insurance contracts, where they are written by companies which engage in the business of suretyship or guaranty, that is, for compensation and profit."

---

[18] The existence of the implied covenant of good faith and fair dealing was recognized by California Courts in 1942. Universal Sales Corp. v. California Press Mfg. Co., 20 Cal. 751, 128 P. 2d 665 (Cal. 1942). Development of claims for the tortious breach of such covenants, however, appears not to have been significant until the early 1970s. *see, e.g.*, Silberg v. California Life, 11 Cal 3d 452, 521 P.2d 1103, 113 Cal Rptr. 711 (Cal 1974); Gruenberg v. Aetna Life Ins. Co., 9 Cal 3d 660, 510 P. 2d 1032, 108 Cal. Rptr. 480 (Cal. 1973).

12

> See also, *Appleman, insurance Law & Practice*, § 5273. The foregoing authorities support the conclusion that Reliance, in issuing performance bonds for profit, is engaged in the business of insurance . . .

Szarkowski v.Reliance Insurance Co., *supra*, 404 N.W. 2d, at 504.

In sum, this Court should decline the Sureties' invitation to view <u>Getz</u> as a reason to follow Texas rather than the majority of States.

## IV. WHEN IT DENIED RHINO'S CLAIM, AIGTS HAD *NO EVIDENCE* OF ANY DISPUTE OVER WHETHER OR NOT RHINO HAD SUPPLIED LABOR AND MATERIALS IN PROSECUTION OF THE NAVY CONTRACT.

A review of the correspondence between AIGTS and BPI shows that BPI *never* disputed that Rhino had supplied labor and materials in prosecution of the Navy Contract, and was thereby entitled to payment by AHAC under the Miller Act. To the contrary, that correspondence *confirmed* to AIGTS that Rhino *did* work on the Navy Contact. It simply disputed the terms of the subcontract between BPI and Rhino.[19] Although entitled to recovery on the payment bond even without any contract at all, BPI actually *admitted* to AIGTS that "Rhino *did* have contract obligations to BPI to complete performance of jobs that BPI had authorized under the first two task orders."[20] Consequently, the evidence shows that AIGTS *knew* that Rhino had a valid claim, and therefore proceeded to deny that claim on a statute-of-

---

[19] See exhibits F & G to the Kahn Declaration, bound to the Sureties' motion

[20] See exhibit F to Kahn Declaration bound to the Sureties' motion, at 2 [emphasis added]. AIGTS also was apparently provided a BPI letter to Rhino acknowledging the existence of the subcontract and the 50% profit obligation of BPI. Exhibit G to Kahn Declaration. Plaintiff notes that, although this correspondence was requested in formal

13

limitations claim – the only available excuse for not paying Rhino under the Miller Act on the uncontroverted facts known to AIGTS – that Rhino had supplied labor and materials in the prosecution of the Navy Contract covered by the payment bond.

AIGTS, however, had to almost manufacture support for its initial denial of Rhino's claim on statute-of-limitations grounds. That denial states that "the sworn affidavit of Michael O'Connell, identified as claimant's chief executive officer, included in the Proof of Claim, admits and conclusively establishes that the last day claimant performed labor or provided material on the above project was before December 31, 2000." Strong words. What the O'Connell affidavit, which was prepared by AIGTS and therefore must be construed against it where unclear,[21] actually says, is that Rhino did supply roofing work and materials between May 2000 and December 2000.[22] It says nothing at all about supplying no materials or labor after that. That came only from AIG's reading of its own words it required Mr. O'Connell to sign in order to make a claim at all.

Upon reading that inconclusive statement, rather than jumping to the conclusion that Rhino supplied no materials or labor after December 31, 2000, AIGTS could and should have contacted Rhino to see of that was so. It did not. It simply denied the claim, asserting that Mr. O'Connell's statement says something it really does not say. Then, when Rhino responded with a thorough showing that it had

---

discovery in October 25, 2002, it was not included in the Sureties' Rule 26(a) disclosures and was never provided Plaintiff by the Sureties until the filing of this motion.
[21] 18 G. C. A. § 87120.
[22] Exhibit J to Kahn Affidavit, at 6.

14

continued to supply labor or materials well after December 31, 2000,[23] and supplied an affidavit of Mr. O'Connell to that effect,[24] AIGTS waited for several months, then denied the claim again on the same ground, after Rhino had been forced to commence this action to avoid additional statute-of-limitations fights.[25] If anyone presented AIGTS with a sworn affidavit to the contrary of Mr. O'Connell's, the Sureties have not produced it in discovery. Plaintiff assumes that no one was willing to provide a false oath to that effect, and that AIGTS simply did not want to consider that fact to not be genuinely controverted, as it should have. Apparently, Mr. O'Connell's affidavits are only credible when they can be twisted into saying something that might support the denial of a claim, but when they clearly state the claim is good, cannot be accepted.

It is in this context that Rhino asks the Court to view AHAC's complained-of behavior: inducing Rhino to file its claims against AIGTS rather than AHAC, noting Rhino's mistake in filing suit against AIGTS rather than AHAC (if it was a mistake), waiting until it was too late to amend the complaint, then filing a motion to dismiss on the grounds that (1) AHAC is not the surety; and (2) it was too late to add AHAC as a defendant.

It is also in this context that Rhino points out that the only bond produced to it in discovery has a penal amount of only $250,000, and that the Miller

---

[23] Exhibit N to Kahn Affidavit.
[24] *Id.,* at 5-12.
[25] Exhibit P to Kahn Affidavit.

15

Act requires a payment bond in the amount of 40-50% for this multi-million dollar[26] contract. 40 USC § 270a. Rhino would certainly like to question AIGTS regarding this circumstance at trial.

V.  **THIS MOTION SHOULD NOT BE GRANTED ON FACTUAL GROUNDS UNTIL PLAINTIFF IS ALLOWED TO DISCOVER WHETHER OF NOT THE COMPLAINED-OF PROCEDURAL HURDLES IMPOSED BY AIGTS AND AHAC WERE INTENTIONALLY INTERPOSED TO DENY OTHERWISE VALID CLAIMS.**

Again, the Sureties argue that, even if Rhino's tort claim can be pursued in Guam as a matter of law, it lacks factual basis because they denied Rhino's claim in good faith. Whether their denial, and their subsequent maneuvering, were in good faith should depend to some extent on what the Sureties intended to accomplish with that denial and maneuvering.

The intent of an adversary must usually be proven by circumstantial evidence. To acquire evidence that might prove or disprove that the Sureties engaged in the actions underlying Rhino's bad faith claims with an intent to maliciously deprive Rhino of the recovery justly due it under the payment bond, Rhino has requested AIGTS and AHAC to identify all recent civil actions brought in which a claim was made upon a surety bond issued by AHAC, and for each such action to state whether or not an affirmative defense was asserted based on a statute of limitations, whether AIGTS was named as a defendant, whether AHAC was named as a defendant, whether, prior to the litigation, the claimant was directed to make its

---

[26] BPI admits to profits of nearly $1 million as of the date of suit. Declaration of

claim through AIGTS, whether, prior to the commencement of the civil action, AIGTS or AHAC denied a pre-litigation claim on the basis of a statute of limitations, whether, prior to the commencement of the civil action, AIGTS or AHAC denied a pre-litigation claim on any other basis.[27] The Sureties have refused to reveal that information on relevance grounds.[28] They now argue that this Court should dismiss Rhino's bad faith claims because they acted in good faith, without allowing Rhino or the Court to have that information. First, even if this Court finds no evidence of bad faith at this point (and the above facts show it should not do so) it should not make any good-faith finding unless and until Rhino is able to acquire this information. If Rhino is not able to acquire it, the Rhino should be entitled to a presumption that the withheld information supports a finding that AIGTS and AHAC deliberately engaged in the complained-of acts with the intention of wrongfully depriving Rhino of the compensation due it from them under the Miller Act, and the motion should be denied.

## Conclusion

For the foregoing reasons, Plaintiff United States of America for the use and Benefit of Rhino Builders, Inc. most respectfully requests this honorable Court to deny the December 31, 2003 motion of American Home Assurance Company and

---

Counsel, filed herewith.
[27] *See* Exhibits B & D to Declaration of Louie Yanza, filed January 6, 2004, at Interrogatory Nos. 12 & 13..
[28] *Id.*

AIG Technical Services, Inc. to dismiss Plaintiff's bad faith claims or for summary judgment denying them.

Respectfully submitted this 20th day of January 2004.

_____
Antonio L. Cortes, counsel for Plaintiff
United States of America for use and benefit
of Rhino Builders, Inc.