ANTONIO L. CORTÉS
Law Office of Antonio L. Cortés
233 Julale Center
424 West O'Brien Drive
P.O. Box BV
Hagåtña, Guam 96932
Telephone No.: (671) 477-1930
Facsimile No.: (671) 477-1933



FILED
DISTRICT COURT OF GUAM

'JAN 2 3 2004

MARY L. M. MORAN
CLERK OF COURT

317

Attorney for Plaintiff Rhino Builders, Inc.

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., | CIVIL CASE NO.02-00008 |
| Plaintiff, | **DECLARATION OF COUNSEL** |
| vs. | |
| BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC., and AMERICAN HOME ASSURANCE CO., | |
| Defendants. | |
| BIOGENESIS PACIFIC, INC., | |
| Counter-Plaintiff, | |
| vs. | |
| RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, and JOHN DOES 1-10, | |
| Counter-Defendants. | |
| AMERICAN HOME ASSURANCE CO., | |
| Cross-Claimant, | |
| vs. | |
| BIOGENESIS PACIFIC, INC., | |
| Cross-Claim Defendant. | |

# ORIGINAL

I, Antonio L. Cortes, duly declare and say:

1.      I am an attorney licensed to practice law in Guam, and have been since October 21, 1997. I have personal knowledge of the matters stated herein, except those stated on information and belief, and as to those matters I believe them to be true. If called upon to do so, I could and would competently so testify.

2.      Attached hereto as Exhibit 1 is a true and correct copy of portions of the transcript of the April 11, 2003 deposition of Eugene O'Connell, now known as Eugene Patten, that are cited in the accompanying Opposition to Biogenesis Pacific, Inc.'s Motion for Summary Judgment.

3.      Attached hereto as Exhibit 2 is a true and correct copy of portions of the transcript of the October 6, 2003 deposition of George W. Allen that are cited in the accompanying Opposition to Biogenesis Pacific, Inc.'s Motion for Summary Judgment, and Exhibits 4 and 7 thereto.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of January 2004.

ANTONIO L. CORTES

2

# EXHIBIT 1

IN THE DISTRICT COURT OF GUAM

UNITED STATES OF AMERICA FOR USE
AND BENEFIT OF RHINO BUILDERS,
INC.,

      Plaintiff,

        vs.

AIG TECHNICAL SERVICES, INC.,
and AMERICAN HOME ASSURANCE
COMPANY,

      Defendants.

) CIVIL CASE NO. 02-00008

DEPOSITION OF
EUGENE O'CONNELL
APRIL 11, 2003

BIOGENESIS PACIFIC, INC.,

      Counter-Plaintiff

        vs.

RHINO BUILDERS, INC., MICHAEL
O'CONNELL, MICHAEL DANFORTH,
and JOHN DOES 1-10,

      Counter-Defendants,

AMERICAN HOME ASSURANCE
COMPANY,

      Cross-Claimant,

        vs.

BIOGENESIS PACIFIC, INC.

      Cross-Claim Defendant.

Cecilia F. Flores
Freelance Stenotype Reporter
Tel: (671) 632-0727
Fax: (671) 632-5353



1          Q.    At the time he told you, did he mention who had

2    won the contract or who it was awarded to?

3          A.    He may have, I don't recall.

4          Q.    Do you recall when the first time you heard

5    the name BioGenesis?

6          A.    I believe that was before September of that year.

7          Q.    Do you recall how you would have heard it?

8          A.    I believe at the time a company that was also

9    assisting during that time period, an Indian corporation --

10         Q.    Indian corporation?

11         A.    Indian corporation that Mr. Lam was interested

12   in getting involved in that corporation as well.

13         Q.    What corporation was that?

14         A.    I believe it was called Yellow Bird.

15         Q.    And I'm sorry, you said this was some months

16   before September of '99?

17         A.    I don't recall.

18         Q.    Was it in the year 1999?

19         A.    Yes.

20         Q.    Is that also the first time you heard of Mr.

21   Gerald Lam? Or actually let me ask you, did you hear the name

22   Gerald Lam associated with BioGenesis at that time?

23         A.    I honestly don't recall.

24         Q.    Do you recall when the first time you heard the

25   name Gerald Lam?


Eugene O'Connell: April 11, 2003

1    Q.   Can you tell me when you first heard, or if you

2    ever heard, about any arrangement between Rhino and

3    BioGenesis with respect to work that Rhino would be doing on

4    this Navy contract?

5    A.   I believe that was in October.

6    Q.   Of what year, 2000?

7    A.   1999.

8    Q.   And can you tell me who you heard it from?

9    A.   My brother.

10   Q.   Michael?

11   A.   Yes.

12   Q.   And can you tell me what he told you at that time?

13   A.   That he got a call from Gerald Lam to see if we

14   were interested in doing the work, or help him do the work in

15   Guam.

16   Q.   And did he say when he got this call?

17   A.   No.

18   Q.   Just to be clear, your brother told you that he

19   received a call from Gerald Lam, not that he called

20   Gerald Lam?

21   A.   No, my understanding was that he received a call

22   from Gerald Lam.

23   Q.   And did he tell you anything further about the

24   conversation he had with Mr. Lam?

25   A.   No, that -- no, just that he got a call from Gerald

Eugene O'Connell: April 11, 2003

1  Lam and that -- excuse me, yes, that he wanted to work -- have
2  us work on some numbers on materials and labor primarily at
3  that time for the Hydro-Stop project, for the Hydro-Stop
4  portion, I should say, of the job.

5    Q.    So it was your understanding that Mr. Lam had
6  requested Rhino to prepare something in the form of like a
7  proposal or submittal or some numbers and estimates for his
8  consideration?

9    A.    Yes.

10   Q.    And I think you stated the purpose behind his
11 considering this proposal was to, I guess, negotiate some
12 sort of arrangement to have Rhino do the SOC contracting work;
13 is that right?

14   A.    My understanding that time was that it was already
15 a foregone conclusion that we were gonna be doing some work
16 for BioGenesis, and that they were gonna make some
17 arrangements, or they were discussing some arrangements as to
18 what the final outcome was gonna be. But Mr. Lam was
19 requesting some information from us to see what our cost would
20 be to determine whether or not -- or how that would work in
21 with what he had planned to do.

22   Q.    But you said your understanding was it was a
23 foregone conclusion.

24   A.    Yes.

25   Q.    And this is an understanding you received from

Eugene O'Connell: April 11, 2003

1  your brother Michael?

2      A.   Yes.

3      Q.   Did you ever speak to Mr. Lam about this directly?

4      A.   No.

5      Q.   And did Michael tell you what would happen if Mr.

6  Lam didn't like your numbers or your proposals?  Would that

7  have undone the foregone conclusion?

8      A.   No.  My understanding was that he wanted that

9  for reference as an information, and that it was something

10  that could be worked out.

11     Q.   Do you know what kind of information would have

12  been passed on to Mr. Lam by your brother in that initial

13  conversation?

14     A.   No.

15     Q.   Any numbers or estimates or costs or anything

16  during that initial conversation?

17     A.   No.

18     Q.   You don't know or no, you don't think it was

19  communicated?

20     A.   Knowing my brother, it wasn't communicated.

21     Q.   Why do you say that?

22     A.   Because he doesn't have -- I don't feel he has a

23  very good grasp of some of the finer points of understanding

24  overhead and cost allocations.

25     Q.   And he relies on you for that primarily; is that

Eugene O'Connell: April 11, 2003

1    period?

2            MR. CLARK: In the '98 and '99 period, right.

3    BY MR. CLARK: (Continuing)

4        Q.   Who would make the decisions on which projects

5    Rhino would accept?

6        A.   During those times, I believe -- probably a joint

7    consensus between the two, I'm not actually sure.

8        Q.   When I asked you that question earlier before, I

9    pinpointed the date for you or a time period, you said

10   Michael, that you thought Michael made the decisions.  What

11   time period did you have in mind when you said that?

12       A.   Since we've been doing also the 8(a) work, or

13   since I've been with him for that 8(a) portion, he's been

14   making most of the decisions, at least looking over the

15   projects because he's doing most of the marketing and going

16   out trying to get the contracts.  So since he's also out there

17   searching and trying to get the work, he's making a decision

18   on what he wants to do.

19       Q.   And since you guys started taking on the 8(a)

20   workload, what year are we talking about?

21       A.   I don't exactly recall, probably late '99, early

22   2000, to now.

23       Q.   Based upon your experience on the projects your

24   brother has accepted, have they turned out -- well, first of

25   all, I assume he will accept projects assuming that they're

     Eugene O'Connell: April 11, 2003

1    going to be profitable; is that right?

2         A.   Yes.

3         Q.   No one accepts projects thinking they're going to

4    lose money; is that right?

5         A.   That's right.

6         Q.   And based upon your experience with the projects

7    he has accepted, has he ended up being more right than

8    wrong, or more wrong than right?

9         A.   He's been right all the time.

10        Q.   Right all the time?  So you're saying Rhino has

11   made a profit on every project its ever worked on from

12   late '99 to current?

13        A.   Except for BPI.

14             MR. YANZA:  BPI meaning?

15        A.   BioGenesis Pacific, Inc.

16   BY MR. CLARK: (Continuing)

17        Q.   And those profits have been in line with your

18   expectations at the time the projects were accepted?

19        A.   Yes, most of them have been in line, some have been

20   better.

21        Q.   In 1999, what projects was Rhino working on in

22   Guam?

23        A.   BioGenesis, we had some -- few small roofing work.

24        Q.   I'm sorry, in 1999.  Because I don't think anything

25   had started --

Eugene O'Connell: April 11, 2003

1          In addition to that, that the bonding would be

2     cared for by BioGenesis because they already had the bonding

3     in place.

4          Q.   Anything else?  What about the overhead issue?

5          A.   The overhead issue was to be shared 50-50 evenly.

6          Q.   You're saying all of these additional terms you

7     did not become aware of until this case started?

8          A.   Become fully aware of all of them until the case

9     started, yes.

10         Q.   But back in October of '99, you said you were

11    aware of the 50 percent profit portion of the SOC contract?

12         A.   Yes.

13         Q.   What about the arrangement for the sharing of

14    office space, do you know about when you would have become

15    aware of that?

16         A.   Probably in February or March of 2000.

17         Q.   And what about the use of a company employee as

18    a representative?

19         A.   Between September and probably February, between

20    the two months.

21              MR. YANZA: September of 1999?

22         A.   Yes.

23    BY MR. CLARK: (Continuing)

24         Q.   And you understand that this individual was

25    Richard Avilla?


Eugene O'Connell: April 11, 2003

1     A.    It was a decision that Mr. Gerald Lam had to make.
2  It was either between Alfred Garthe or Richard Avilla.   My
3  understanding is that at that time it wasn't decided, and I
4  believe -- I think my brother did ask me who should it be, and
5  I'm trying to recall exactly when that happened and I
6  don't know when.

7     Q.    About February time frame?

8     A.    No, actually I would think it would be closer
9  to October, maybe November.

10    Q.    Of '99?

11    A.    Yeah.

12    Q.    Moving employees to his payroll, to the BioGenesis
13  payroll, when did you become aware that that was one of the
14  term in this alleged SOC contract?

15    A.    Probably closer to February.

16    Q.    Of 2000?

17    A.    Yes.

18    Q.    What about the use of Rhino's credit accounts?

19    A.    Again in February.

20    Q.    And that Bio would be providing all the bonding
21  and financing?

22    A.    That was probably in October.

23          MR. CORTES:   October of what year?   I'm sorry.

24  BY MR. CLARK: (Continuing)

25    Q.    Now I'm a little confused because according to

Eugene O'Connell: April 11, 2003

1    Q.    What exactly is her title?

2    A.    I believe it's operations manager.

3    Q.    And she is still the operations manager, right?

4    A.    Yes.

5    Q.    So she is responsible for getting the information

6    and records to you in 2002 to current, to date?

7    A.    Yes.

8    Q.    Can you tell me, if you recall, when is the first

9    time Rhino or you, let's say you on behalf of Rhino,

10   prepared an invoice for the Navy contract to BioGenesis?

11   A.    I believe that was sometime in September of 2000.

12   Q.    After that?

13   A.    I don't recall if it was October, I believe it

14   was October.

15   Q.    Do you remember how many invoices you would have

16   prepared and sent to BioGenesis, total?

17   A.    I don't recall offhand, I sent several and some

18   of them were -- in fact, all of them were rejected.

19   Q.    What do you mean rejected?

20   A.    They wouldn't accept it, or if they did accept

21   it they wouldn't pay it.

22   Q.    Do you know when Rhino first started working on

23   the Navy contract?

24   A.    I believe it was in February of 2000.

25   Q.    And what's your understanding of the scope of

Eugene O'Connell: April 11, 2003

1    work that was being done in February of 2000?

2        A.    My understanding at that time was that Rhino

3    would be handling, will be in charge of the management

4    oversight for BioGenesis. They would have a titular position

5    with Richard Avilla, and will assist in all the documentation.

6    I mean, he would still be running the project but will assist

7    in the documentation, performing the work, generally from

8    there.

9        Q.    You said a titular position?

10       A.    Well, that was my understanding from what they

11   said, that Richard would still be in charge but they wanted us

12   to -- they primarily wanted Rhino to oversee the whole

13   project. It's just to assist Richard in -- because of some of

14   his experience.

15       Q.    Do you know what, if any, actual physical

16   construction work or roofing work would have happened in

17   February of 2000?

18       A.    None.

19       Q.    Do you know when that first started, that type of

20   work?

21       A.    I believe it was late June.

22             MR. YANZA: Of what year, sir?

23       A.    2000.

24   BY MR. CLARK: (Continuing)

25       Q.    What is Rhino's customary practice with respect

Eugene O'Connell: April 11, 2003

1      to invoicing contractors on projects it had SOC contracts?

2          A.    Customary practice is normally the project

3      manager for Rhino would provide me information for us to

4      produce the invoice, and then I would send the invoice out.

5          Q.    What kind of invoice?

6          A.    Normally, basically what work they did, how

7      much they completed, uh --

8          Q.    Man-hours?

9          A.    Man-hours -- you know, various information,

10     materials, whatever we used they'll let me know what they're

11     billing for.  Normally I get a completion report as to how

12     much they completed, and from that point I'll just produce an

13     invoice.

14         Q.    Did anyone else beside you have to approve or

15     review the invoice before it went out?

16         A.    Normally the project managers, they would --

17     once they provide it to me they had gone over it and I would

18     provide them back either a copy or -- normally either a copy

19     of it or they just review whether the work again to make sure

20     it was okay, and that I had the right numbers.

21         Q.    And then once you got that okay, you sent off

22     the invoice?

23         A.    Send an invoice out, yeah.

24         Q.    And how often would the project manager be

25     required to provide you with these completion reports?

Eugene O'Connell: April 11, 2003

1      A.   They were supposed to provide it to me at least
2 once a month.
3      Q.   So do you recall when you got your first
4 completion report with respect to the Navy project?
5      A.   Never did.
6      Q.   You never got a completion report?
7      A.   Nope.
8      Q.   You said that the project started as far as
9 physical work in June of 2000; is that right?
10     A.   I believe late June, yes.
11     Q.   Were you aware of this then, were you aware that
12 they had started in late June?
13     A.   Yes, I was aware based upon the payroll sheets
14 that were coming in.
15     Q.   You said that the first invoice you sent out though
16 was in September?
17     A.   Yes.
18     Q.   But the work started in June?
19     A.   Yes.
20     Q.   So it might be a little redundant but just so
21 I'm clear, so no invoice in July?
22     A.   Nope.
23     Q.   Of 2000.  No invoice in August of 2000?
24     A.   No, I did not invoice at that time.
25     Q.   Were you concerned that work had started and

Eugene O'Connell: April 11, 2003

1    nobody was providing you with completion reports?

2         A.   Yes.

3         Q.   Did you express this concern to anybody?

4         A.   Yes.

5         Q.   To whom?

6         A.   Both to Mr. Garthe and to Mr. O'Connell, Michael
7    O'Connell.

8         Q.   Can you tell me when you first expressed this
9    concern?

10        A.   I believe in July or August.

11        Q.   You said to Michael O'Connell and Alfred Garthe?

12        A.   Yes.

13        Q.   And what was their response to your expressions
14   of concern?

15        A.   Michael O'Connell told me to call Alfred Garthe
16   to get some information so we can do the billings.

17        Q.   And did you?

18        A.   Yes.

19        Q.   And this would have been in July or August?

20        A.   Yes.

21        Q.   And what did Mr. Garthe say to you?

22        A.   Mr. Garthe said that he had talked to Gerald Lam
23   and they asked that we don't do any billings right now
24   because he didn't have any money.

25        Q.   Let me understand.  Rhino is working on a


Eugene O'Connell: April 11, 2003

1   SOC contract, starting, not getting paid, and you called the

2   contractor and the contractor says he has no money; is that

3   right?

4          A.    That's right.

5          Q.    Did that make you even more concerned at that

6   point?

7          A.    Extremely.

8          Q.    Can you tell me exactly what were your concerns?

9   I mean, it's pretty obvious but I'd like to hear it in your

10  own words.

11         A.    My concern was that we weren't gonna get paid

12  and this guy was gonna stiff us.

13         Q.    Do you remember when you had that conversation

14  with Mr. Garthe?

15         A.    Exactly when, no.

16         Q.    July, August?

17         A.    Exactly when, no, but it was either late July or

18  early August.  I'm not sure when.

19         Q.    Did Mr. Garthe say anything about Mr. Lam being

20  unaware that Rhino had even started the project?

21         A.    No, my understanding at that time was that he

22  was in communication with Mr. Lam for quite a while.

23         Q.    Mr. Garthe was?

24         A.    Yes.

25         Q.    And what do you mean by quite a while?


Eugene O'Connell: April 11, 2003

1       A.   My understanding that I thought he was in contact
2  with Mr. Lam since February of the year 2000.
3       Q.   And how did you end up with this understanding?
4  Or who told you this?  Would it have been Michael O'Connell
5  who told you this?
6       A.   I believe so.  I believe Mr. --
7       MR. CORTES:  Objection, leading.
8       MR. CLARK:  Well, okay.
9       MR. CORTES:  It's the rule.  I mean, I guess
10 the federal rules now, you have to make your objections
11 or waive them.  I believe that's the current rule, unless
12 there's a stipulation otherwise.
13 BY MR. CLARK: (Continuing)
14      Q.   I'm sorry, sir, you can answer that.
15      A.   I believe it was Michael O'Connell, but I also
16 spoke with Al and he said he'll be calling Mr. Garthe --
17 I mean, Mr. Garthe will be calling Mr. Lam or Mr. Fong.  I'm
18 not sure which one.
19      Q.   But this would have been again in late July or
20 early August of 2000?
21      A.   Right.
22      Q.   So I guess my question is, you said up to that
23 point you understood that Mr. Garthe had been in communication
24 for quite a while.  Where did you get that impression?
25      A.   Either from Michael O'Connell or from Alfred

Eugene O'Connell: April 11, 2003

1    Garthe because I did speak with him before July, and I

2    understood from Michael O'Connell that Mr. Lam requested

3    both -- requested from him to be able to contact Alfred Garthe

4    and Richard Avilla.  So the phone number was provided to him

5    for that purpose.

6          Q.    You said that Gerald Lam, through Alfred Garthe,

7    requested that no billings be generated because no money

8    was available.  Is that why you didn't prepare a bill until

9    September?

10         A.    Part of it.

11         Q.    What's the other part?

12         A.    That I was trying to determine with my brother

13   what was our rate of billing; in other words, what can I

14   bill for?  Do I charge you for the overhead now?  How do I

15   determine what our -- you know, the profitability, also the

16   insurance portions, so I could get all the numbers accurate

17   and straight.  Part of it was again my telling him, "get me

18   a SOC contract agreement so I can understand what's going on."

19         Q.    And what did he tell you with respect to a

20   written SOC contract agreement at that time?

21         A.    That he was still trying to get Gerald Lam to

22   provide the agreement, and that he was being a little

23   evasive.

24         Q.    Okay, but –

25         A.    Gerald Lam, I'm saying, was being evasive.


Eugene O'Connell: April 11, 2003

BY MR. CLARK: (Continuing)

Q.   Well, okay, to the best of your knowledge then

A.   To the best of my knowledge, I believe my brother
was handling that situation with whoever was in charge here.

Q.   And that would have been George Allen in 2001 and
Narci from 2002 to present?

A.   Yes.

Q.   Did your brother ever instruct Narci, to the best
of your knowledge, to get a bolt cutter and cut the lock, see
what's inside the container?

A.   I don't know.

Q.   Okay.

A.   The information that I did gather was that during
the time that Mr. Avilla wasn't here, who was on vacation
in Hawaii, that Mr. Garthe was taking the equipment out of the
containers and storing it with BioGenesis' equipment someplace
else.

Q.   Now, you've listed some equipment as being used
by BioGenesis in your claim, in Rhino's claim --

A.   Well, as recently as two months ago, I believe two
months and three months ago, our power scraper for roofs
was returned to us and that was not secured in the container,
it was brought back by Mr. Garthe. So, yes, I believe that
there's other equipment out there that Mr. Garthe appropriated
for the benefit of BioGensis.

Eugene O'Connell: April 11, 2003

1      Q.    Have you or anyone from Rhino seen any of this

2  equipment being used on the Navy project after December of

3  2000?

4      A.    Yes.

5          MR. CORTES: I guess same objection, but go ahead

6  and answer.

7      A.    Yes.

8  BY MR. CLARK: (Continuing)

9      Q.    Okay.

10     A.    Mr. George Allen in some responses to me through

11 telephone calls, also Ms. Narci, and some of the other

12 employees there, did the same thing as well. They talked

13 with Michael O'Connell as well to say that yes, they still see

14 some more equipment out there --

15     Q.    I'm sorry, out where?

16     A.    At the Navy site. Mr. Garthe at one point in late

17 March, early April, said he needed to borrow the white

18 Isuzu vehicle, the flatbed --

19     Q.    2001?

20     A.    2001, to move some things that he had to the

21 dump, we allowed him the use of it, he never returned it for

22 almost two and a half weeks, and it was spotted at the job

23 site for BioGenesis being -- using it during that time period

24 to move around materials. There's a -- I mean, I'm sorry,

25 body harnesses, lanyards, things of that nature, all of that

Eugene O'Connell: April 11, 2003

1  is gonna look pretty much the same.

2      Q.   And that was my next question.  So is there

3  anything unique about the appearance of Rhino's power scraper

4  that would lead Narci or Mr. Allen to conclude that that

5  power scraper belongs to Rhino and not to BioGenesis?  I

6  mean, do you guys have a mark on it, do you have a tag on

7  it?

8      A.   I don't know what was tagged on there, if anything.

9  But, you know, I don't know a lot of companies who would

10  spend another $5,000 or so for a power scraper to bring it out

11  here considering that Mr. Lam was crying he didn't have

12  any money.  So even if he got his Hundred Thousand dollar

13  loan, he's gonna put a lot of that into material cost, that

14  would still give him a lot of -- you know, the return on his

15  money for his project is not gonna give him the cost right

16  away, he's gonna have a lot of lean times.

17      Q.   Okay.

18      A.   Okay.  And also considering the fact that during

19  that same time he had a, what, a lawsuit against himself

20  with -- what's that, the Kahoolawe (phonetic) project so he

21  had other things on his mind.  So I know his cost was going

22  out.

23      Q.   So what you're telling me then is you understand

24  that BioGenesis and Mr. Lam have certain expenses which

25  therefore leads you to conclude that they would not go out

Eugene O'Connell: April 11, 2003

1   and buy their own equipment when they can continue to use

2   Rhino's equipment; is that what you're saying?

3         A.    Yes.

4         Q.    Okay.

5         A.    Or make an appearance of being so. That's just

6   one information that would lead me to conclude that that

7   wasn't done. I had two containers full of equipment, now I

8   don't.

9         MR. CORTES: Arthur, I've got a question, if you

10  would allow it, ask him right now if it's similar to one

11  of yours. Or actually, you asked him, you could ask it

12  yourself, you asked him a minute ago whether anyone at Rhino

13  told him that they saw BioGenesis personnel using any Rhino

14  equipment. You could also, if you wanted to, ask him if

15  someone not an employee of Rhino was using any Rhino

16  equipment.

17        MR. CLARK: Okay.

18  BY MR. CLARK: (Continuing)

19        Q.    Let me ask you, maybe you've answered that. You

20  mentioned George Allen, you mentioned Narci. Anybody else

21  tell you that they've seen BioGenesis using Rhino's equipment

22  after December of 2000?

23        A.    Yes.

24        Q.    Who?

25        A.    Warren Nobles.

Eugene O'Connell: April 11, 2003

1       Q.   Oh, the infamous Mr. Warren Nobles.  Is this the

2   same Warren Nobles who wrote an e-mail to Michael O'Connell

3   offering him copies of all of BioGenesis' hard drive; is this

4   the same person we're talking about?  Are you aware of that?

5       A.   I don't understand the question.  The hard drive

6   --

7       Q.   Are you aware of a letter written by Warren Nobles

8   to Michael O'Connell saying that he had a copy of all of

9   BioGenesis' information that he ghosted from their hard

10  drive, that he was willing to make available to Mr. O'Connell?

11          MR. CORTES:  I have an objection in that it

12  assumes facts not in evidence.  I don't tink that that's a

13  fair characterization of the document.

14      A.   I don't recall a document like that.  I mean, I

15  know of a document in which he said that he did that for

16  BioGensis, he was instructed to do something like that by

17  Russell Fong, I do know that.  It was, you know, my

18  equipment that was delayed in being returned to me.

19  BY MR. CLARK: (Continuing)

20      Q.   And when did --

21      A.   Did he do that for -- no.  Do I have the hard drive?

22  Yes.  Did I recover some of the files in that hard drive?

23  Yes.

24      Q.   Which hard drive do you have?  What hard drive

25  are you talking about?

Eugene O'Connell: April 11, 2003

1      A.   I believe the same one you are.

2      Q.   Let's talk about the one you're talking about.

3 What are you referring to?

4      A.   The equipment -- when one of the computers was

5 returned to us, the hard drive had deleted files on there,

6 some of the files were Rhino's files, some of it I believe

7 was also BioGenesis, and I recovered some of that information.

8      Q.   Okay.

9           MR. CORTES:   It's Rhino's hard drive?

10     A.   Rhino's hard drive, Rhino's equipment, Rhino's

11 files that were also deleted, which we recovered part of it.

12 BY MR. CLARK:  (Continuing)

13     Q.   And BioGenesis' files?

14     A.   And BioGenesis' files were on there as well.

15     Q.   And why were BioGenesis' files on the Rhino

16 hard drive?

17     A.   They were using our computer and our equipment,

18 which was part of the agreement.

19     Q.   Okay.   And when did Mr. Nobles tell you he saw

20 BioGenesis using Rhino's equipment?

21     A.   When did he tell me or when did he see that

22 being occurred?

23     Q.   Both.

24     A.   He told me, I believe, in 2001, late 2001, probably

25 early 2002, we had discussion with him on that.   Also, he

Eugene O'Connell: April 11, 2003

1  said he witnessed this occurring during February -- sorry,

2  December to late March --

3      Q.    December --

4      A.    I'm sorry, excuse me.  He witnessed Al Garthe

5  take Rhino's equipment and store it into BioGensis' locker

6  during December and part of January and on weekends; and since

7  his employment there until sometime in April, middle April

8  when Mr. Nobles was working for BioGenesis he witnessed the --

9      Q.    I'm sorry, let's get the time frame right.

10 December of 2000 and January 2001?

11     A.    Yes, sir.

12     Q.    This was while Al Garthe was still employed with

13 Rhino?

14     A.    Yes.

15     Q.    Okay.

16     A.    That he took Rhino's equipment to be allowed

17 to be used by BioGenesis.

18     Q.    I'm sorry, he took Rhino's equipment and gave it

19 to BioGenesis people for their use?

20     A.    Yes.

21     Q.    What equipment?

22     A.    I believe it was safety harnesses, lanyards,

23 scrapers, other tools, blowers, power washers.

24     Q.    Are we only talking about December 2000, January

25 2001, or is there another period?


Eugene O'Connell: April 11, 2003

1    A.    I don't know -- when he took them, I don't know.

2    I mean, besides that, from my conversation that's what I

3    understand it to be.

4    Q.    So Warren Nobles told you that he witnessed Mr.

5    Garthe lending equipment, Rhino equipment to BioGenesis

6    employees in the period December 2000 and January 2001?

7    A.    No, I didn't say that.

8    Q.    That's why I'm asking you to clarify.  What did

9    you say?

10   A.    I said that Mr. Garthe took Rhino's equipment and

11   gave them or allowed them to be used by BioGenesis without

12   anyone in the corporation knowing he did that.

13   Q.    In December 2000 and January of 2001?

14   A.    That's when he took the equipment, yes.

15   Q.    And do you know how long BioGenesis continued to

16   use the equipment after January 2001?

17   A.    They're still using it.

18   Q.    They're stilling using it today?  How do you

19   know that?

20   A.    Because it's a natural assumption.

21   Q.    So you don't know that?  Knowledge and assumption

22   are two different things.

23   A.    Well, considering the fact that he returned our

24   scraper about two, three months ago, yeah, I could have the

25   knowledge that he was still using it to the end of last

Eugene O'Connell: April 11, 2003

1  year.  And by that, I could also draw a logical conclusion
2  that there's other things that they're still using.
3       Q.   Have you witnessed?
4       A.   Have I witnessed personally? No.
5       Q.   Thank you.  And just to make sure we're clear,
6  you haven't witnessed anyone at BioGenesis using Rhino's
7  safety harnesses, lanyards, scrappers, power washers or
8  blowers; is that correct?
9       A.   That's correct.
10      Q.   And the last information you had of the
11 recent -- power scraper aside -- the last information you
12 had with regard to BioGenesis being provided with Rhino's
13 equipment was Mr. Warren Nobles' statement in late 2001 or
14 early 2002 that he witnessed Al Garthe give this equipment:
15 safety harnesses, lanyards, scrapers, power washers and
16 blowers to BioGenesis employees on or about December 2000 or
17 January of 2001?
18      A.   Right.  I need to clarify something.  I had some
19 conversation with Warren Nobles that did touch on some of
20 these subjects, and I also got a letter from him stating that
21 as well.
22      Q.   But is that accurate, what I just said?
23      A.   Yes.
24      Q.   And that's based upon a conversation and a
25 letter with Mr. Nobles?

Eugene O'Connell: April 11, 2003

1    A.    Yes.

2    Q.    Did Mr. Nobles say anything about seeing anybody

3 at BioGenesis actually using the equipment on the Navy

4 project during December 2000, January 2001?

5    A.    Yes.

6    Q.    After January 2001?

7    A.    Yes.

8    Q.    And how long or up to what period then or what

9 month did he claim to have witnessed BioGenesis employees

10 using Rhino's equipment on the Navy project?

11    A.    Until he left the employment of BioGenesis.

12    Q.    Which was April?

13    A.    I believe it was in April, mid-April.

14    Q.    2001?

15    A.    Yes.

16    Q.    Do you know whether Mr. Nobles worked in the

17 office or worked in the field?

18    A.    I believe he worked in the office and was also

19 project manager so he'll be in the field as well, since

20 he was -- during the time of Mr. Avilla's absence, he was

21 acting on Mr. Avilla's behalf in the same capacity.

22    Q.    That was December of 2000?

23    A.    To beginning of January.

24    Q.    Do you know where Mr. Nobles resides currently?

25    A.    Here on Guam.  The exact address, I don't know

Eugene O'Connell: April 11, 2003

1          MR. CLARK: (To Mr. Cortes)  Is that right?  I

2     thought Warren Nobles was in Florida.  Or do I have him mixed

3     up with somebody?

4          MR. CORTES:  I don't know.

5     BY MR. CLARK: (Continuing)

6          Q.   Do you know if Rhino intends to call Mr. Nobles

7     as a witness during trial?

8          A.   Yes.

9          MR. CORTES: I have an objection. I think we have

10    a --

11         MR. CLARK: I'm waiting for you to state it.

12         MR. CORTES: Yes.  My objection is that we have

13    a date that we've stipulated to, and the court has ordered,

14    and we're going to exchange that information.  And I think I

15    would ask Mr. O'Connell not to answer that question, to

16    allow me the opportunity to decide who's going to go to

17    trial by that date, and we'll exchange that information on

18    that date.

19         MR. CLARK: Fair enough.

20    BY MR. CLARK: (Continuing)

21         Q.   Aside from George Allen, Narci, and Warren Nobles,

22    has there been anyone else who have said they've witnessed

23    BioGenesis using Rhino equipment on the Navy contract?

24         A.   They told me -- I don't recall.  I know from the

25    other -- when I spoke with some of the other Guam employees,

Eugene O'Connell: April 11, 2003

1  layoff the employees because Rhino had no money; is that
2  right?

3      A.    No, I didn't tell him that.

4      Q.    What did you tell him?

5      A.    I told him, I told him or I told Mr. Garthe
6  that, you know, that would -- because we're not getting paid
7  from BioGenesis, that it will be difficult for me to continue
8  paying out the employees so we need to make some kind of
9  arrangement.  And around that time frame was when I wanted
10 to get Mr. Garthe to communicate our need to get paid to Mr.
11 Lam, because he was talking to Mr. Lam.  And at that time,
12 I believe, that's when we agreed to issue the first invoice
13 for about $17,000 which was agreed to by --

14     Q.    Let me backup a little bit on the employee issue.
15 You heard Mr. Avilla's statement that the employees were
16 laid off in September, right, of 2000?  Let me ask, did
17 Rhino layoff its employees in September of 2000?

18     A.    I don't know.

19     Q.    Okay.

20     A.    That was not communicated to me by either Alfred
21 Garthe or Mr. Avilla.

22     Q.    What about Michael O'Connell?

23     A.    Nope.

24     Q.    Whose decision would it have been to layoff the
25 employees?

Eugene O'Connell: April 11, 2003

1          A.    I believe that would have been Al's decision.

2          Q.    But you spoke to either, or both, Al Garthe and

3    Richard Avilla in September of 2000 and told them that

4    Rhino didn't have money to pay its employees; is that

5    correct?

6          A.    Yes.

7          Q.    Do you know whether --

8          A.    Excuse me, actually I would like to clarify that.

9    That was in October.

10         Q.    In the afternoon, we're going to get into some of

11   these exhibits.  But one of the exhibit is a certified

12   payroll report that I think -- well, that was provided as

13   part of the 8(a) claim.  Well you know what, we'll get to

14   it when we get there so let's not worry about that.

15               But you are aware that the employees were paid

16   off because you would have prepared the payroll, correct?

17         A.    Yes.

18         Q.    I just have a couple of more questions and then

19   we'll take a lunch break.  I just wanted to get through the

20   questions and then save the documents for the afternoon,

21   that's what I'm kind of shooting at.

22               Are you aware of a payment by BioGenesis of

23   $25,000 sometime in, I think it was October of 2000?

24         A.    Yes.

25         Q.    So you're aware that BioGenesis made that

Eugene O'Connell: April 11, 2003

1   payment?

2        A.   I was -- at that time, I was aware of a

3   discussion of getting some moneys in and that the moneys

4   would be sent to Hawaii so we could -- actually, my thought

5   at that time was to take care of some of the back taxes

6   and to pay for the payroll that we had so we could -- I

7   could continue paying the employees.

8        Q.   Did BioGenesis pay Rhino $25,000 in the month of

9   October, to the best of your knowledge?

10       A.   They provided Rhino $25,000.

11       Q.   Okay.

12       A.   I don't have any information as to -- if it was

13  a payment to us or anything else, and when I tried to find out

14  I wasn't given any information.

15       Q.   Your answer has me a little confused. My question

16  was, did BioGenesis, to the best of your knowledge, make

17  a payment or a disbursement -- did BioGenesis give $25,000

18  to Rhino?

19       A.   Yes.

20       Q.   Thank you.  And how are you aware of that?

21       A.   I don't recall if I was told by Mr. George Allen or

22  I received a bank statement.  I'm not sure how that --

23  which way it occurred, I'm not sure.

24       Q.   But to the best of your knowledge, this $25,000

25  was deposited into a Rhino account, bank account?

Eugene O'Connell: April 11, 2003

1      A.   Yes, the one that's controlled by Al Garthe.

2      Q.   This is an account with which bank?

3      A.   Bank of Hawaii.

4      Q.   Would you say it was a Hawaii account that they

5  write checks in Guam, or is this an account that was opened in

6  Guam?

7      A.   An account opened in Guam.

8      Q.   But you do recall seeing the bank statement where

9  the $25,000 was deposited into the Bank of Hawaii account,

10 correct?

11     A.   Yes.

12     Q.   And that would have been about October 2000? Maybe

13 November 2000?

14     A.   Around that time period, yes.

15     Q.   And who else were the signatories for this bank

16 account?

17     A.   I believe Richard Avilla.

18     Q.   Only Richard and Al Garthe?

19     A.   I believe so at that time, yes.

20          MR. CLARK: I think those are all the questions I

21 want to ask without the assistance of documents at this

22 point.  So now is a good time to take a break, so we'll break

23 for lunch.

24          (Lunch break was taken at 12:05 p.m.)

25     / / /.

Eugene O'Connell: April 11, 2003

1    A.    For what -- yes, yes.

2    Q.    What does other job expense mean, $11,353.00?

3    A.    That could be miscellaneous consumable items, items

4    that when they reported to me, it could be even some

5    miscellaneous tools. Let's see, it varies depending on what

6    they provide to me. It could also include probably towing, if

7    there were any towing charges, or something of that nature,

8    but I don't believe so, not on the direct cost expense.

9    Q.    Can you explain how the number jumps up from the

10   November of 2000 invoice from 89,000 to the June, 2001 invoice

11   to $245,000.00?  That's a difference of about $155,000.00.

12   A.    Right. Well, part of the cost which was allocated

13   to the overhead as a fifty-fifty split, I moved over to direct

14   cost.  I believe that's under, let me see, the equipment

15   rental for the white Isuzu flatbed.  I brought that more to

16   the top there, since that was -- most of the costs were being

17   allocated, or BioGenesis was using that -

18   Q.    Hold on a second, let's talk about that. $9,000.00

19   for rental of the flatbed?

20   A.    Yes.

21   Q.    Can you tell me what periods we're talking about

22   that the flatbed was being rented?

23   A.    I believe I started off from February when we first

24   was contacted, or second contact by Gerald Lam, and that

25   Richard Avilla was starting to inspect the job sites for him.

Eugene O'Connell: April 11, 2003

**EXHIBIT 2**

1          IN THE DISTRICT COURT OF GUAM

2

3   UNITED STATES OF AMERICA    ) CIVIL CASE NO. 02-00008
    FOR USE AND BENEFIT OF      )
4   RHINO BUILDERS, INC.,       )
                                )
5              Plaintiff,        )
                                )
6       vs.                     )
                                )
7   BIOGENESIS PACIFIC, INC.,   )
    AIG TECHNICAL SERVICES,     )
8   INC., and AMERICAN HOME     )
    ASSURANCE COMPANY,          )
9                               )
               Defendants.  )
10  _____) DEPOSITION OF
                                ) GEORGE W. ALLEN
11  BIOGENESIS PACIFIC INC.,    ) October 6, 2003
                                )
12         Counter-Plaintiff,   )
                                )
13      vs.                     )
                                )
14  RHINO BUILDERS, INC.,       )
    MICHAEL O'CONNELL, MICHAEL  )
15  DANFORTH, AND JOHN DOES     )
    1-10,                       )
16                              )
           Counter-Defendants.  )
17  _____)
                                )
18  AMERICAN HOME ASSURANCE     )
    COMPANY,                    )
19                              )
        Cross-Claimant,         )
20                              )
        vs.                     )
21                              )
    BIOGENESIS PACIFIC INC.,    )
22                              )
        Cross-Claim Defendant.) )
23  _____)

24

25

1  transcript, correct?

2           MS. CRUZ:  Sure.  I'll provide you

3  with a copy or a copy for you to copy.

4  BY MS. CRUZ:

5       Q    Exhibit 4, Mr. Allen?

6       A    Yes.

7       Q    And just so we know we're looking at the

8  same thing, it's from George W. Allen

9  RhinoGWA@ite.net to Michael Danforth Maxxmgt@aol.com.

10  Michael O'Connell, Rhino1@hawaii.rr.com, Michael Road

11  Runner Danforth mxxmgt@hawaii.rr.com.  It's sent

12  Saturday November 8, 2000 at 6:05 p.m. and the

13  subject is update.

14       A    Yes.

15       Q    Okay.  And I don't know have you had an

16  opportunity to read this or --

17       A    I scanned through it.

18       Q    Okay.  Does this look familiar to you,

19  Mr. Allen?

20       A    Yes.

21       Q    And is this an E-mail that you prepared?

22       A    Yes.

23       Q    And sent to Michael Danforth and Michael

24  O'Connell?

25       A    Correct.

1    Q    And if I can just refer you to the first

2  paragraph.

3    A    Okay.

4    Q    And I want to refer you to the last line of

5  that first paragraph it says "by all appearances."

6  Do you see where I am, the last sentence of the first

7  paragraph?

8    A    Yes, yes.

9    Q    "By all appearances, we are not putting

10  that much into the job since the labor is being paid

11  by BPI and the bulk of the materials are coming from

12  BPI."

13    A    Yes.

14    Q    Can you explain to me what you meant?

15    A    Well, are you finished?

16    Q    Yes, go ahead.

17    A    Okay.  At this point in time -- and I'm

18  trying to put the date together with events that were

19  ongoing -- I believe that this was a point in time

20  after we had stopped expending Rhino resources on the

21  project.  The $25,000 check that I'm referring to

22  there that has to do with that earlier -- looking

23  back at the exhibits -- okay.

24          Now, that $25,000 was where I had a

25  discussion with Mr. O'Connell and then with Mr. Lam

1  and my discussion with Mr. O'Connell was hey look,

2  Gerry seems inclined to sign the written subcontract

3  agreement.  He told me that -- well, last few little

4  things we'd make some adjustments in regard to the

5  way that the cost of project manager and I think

6  quality control manager were split out.  And as a

7  result of that, I had to change all of those hundreds

8  of line items to adjust for it.  And Gerry told me on

9  the phone that he was happy with the contract as it

10  was written and that everything was okay.  He was

11  just trying to get with Danforth so they could

12  finalize and sign, and what do we need to do to get

13  people back to work or keep people working.  And I

14  suggested to him that maybe he could make a good

15  faith payment to Mr. O'Connell or to Rhino for the

16  outstanding labor and material that Rhino had spent.

17  And at that point in time I really didn't have enough

18  funds in my bank account in Guam to keep operating on

19  the Biogenesis work and need an infusion of funds so

20  we can just keep going.

21       I told him that if he was agreeable to

22  that, we could get the contract signed in a week,

23  then everything would be okay.  And I told them that

24  I would have to check with Mr. O'Connell to see if

25  the $25,000 figure was acceptable, and I asked

1   Mr. Lam to call me the next morning at seven o'clock

2   Hawaii time or three o'clock in the morning Guam

3   time.

4           Mr. Lam was going on a retreat so he wasn't

5   going to be available, and he told me that he was

6   going to have someone else call. He had someone else

7   we dealt with quite frequently in his absence whose

8   name I can't remember right now, and he was supposed

9   to call me in the morning so that I could tell him if

10  the $25,000 was acceptable to Mr. O'Connell and tell

11  him how Mr. O'Connell wanted the payment made.

12          The next morning I was unable -- I didn't

13  get any calls or was unable to reach Mr. Lam's

14  second, and eventually I reached Mr. Lam on a cell

15  phone that Rhino's secretary in Hawaii provided me

16  the number for, and very upset that I interrupted him

17  at his retreat and told me the payment had already

18  been made. And I told him we didn't agree on a

19  payment. We agreed to discuss it this morning after

20  I got Mr. O'Connell's okay. Eventually after we

21  checked everywhere to try to find out how the payment

22  had been made, we found out it had been wire

23  transferred to what we call our general account in

24  Guam, and I happened to, strictly by accident, find

25  out that the night before Mr. Avilla had, in response

1   to Mr. Lam's request, sent him the account number for

2   that account.

3           The fact that the money was deposited in

4   that account was significant in that I had no

5   signature authority or access to those funds.

6   Mr. Garthe and Mr. Avilla did, and they kept the BPI

7   projects going by spending the money on BPI projects

8   and not transferring it to the account over which I

9   had signature authority.

10          So BPI was -- had taken over employees.

11  Apparently they were buying materials, but they were

12  paying for them with what -- and by the way, it was

13  supposed to have been a payment on an account or good

14  faith payment, but on the wire transfer under the

15  purpose it said loan, but he loaned money to us that

16  we never had access to because Mr. Garthe and

17  Mr. Avilla were working on doing Biogenesis projects

18  and using those funds for that purpose.

19      Q    Okay.  Mr. Allen, it says, "We are not

20  putting that much into the job, and the bulk of the

21  materials are coming from BPI."

22      A    That's right at that point that was

23  correct.  We didn't have any money to put into the

24  jobs.

25      Q    Biogenesis was paying for everything?

1      A    Yes, with the $25,000 loan they made to us

2 and put in an account that only Al Garthe and Richard

3 Avilla could sign on.

4      Q    Thank you.

5      A    I would like to also try to explain why my

6 E-mail was in the -- I'm reading it now and things

7 are coming, flooding back. During a discussion I had

8 on the phone with Mr. Lam during that period of time,

9 I had told Al Garthe and Richard Avilla that we were

10 trying to get this contract signed so we could keep

11 going forward but that Mr. Lam seemed to be dodging

12 my phone calls, dodging Mr. O'Connell's phone calls,

13 and dodging Mr. Danforth's phone calls. And I recall

14 I said seemed to be.

15      I probably could have skipped the seemed to

16 be because it was obvious he was dodging our phone

17 calls, not returning voicemail messages and never

18 being there when we called.

19      Q    Mr. Allen, I'm sorry. What are you

20 referring to?

21      A    I'm referring to attempts to reach Mr. Lam

22 to hammer out this agreement and find out why he had

23 missed another deadline to sign, and Mr. Lam called

24 me and --

25      Q    Mr. Allen?

1       A       Yes.

2       Q       And that's in this E-mail?

3       A       No, that's part of the reason for the tone

4   of the E-mail and the level of frustration I'm

5   expressing in the E-mail.

6       Q       Okay.

7       A       And the fact that I'm having to deal with

8   Al Garthe and Richard Avilla, who were at one point

9   involved in Rhino and who seemed to be working in

10  concert with Mr. Lam to undermine Rhino's position.

11      Q       Did Rhino receive the $25,000?

12      A       The $25,000, which was never ever agreed

13  finally to be accepted by us, was sent by wire

14  transfer to an account number that Mr. Avilla

15  provided to Mr. Lam.

16      Q       Okay.

17      A       Over which I had no signature authority.

18      Q       Okay.  Thank you, Mr. Allen.  I'm going to

19  refer you --

20      A       Excuse me a second.  I want to consult with

21  counsel.

22                      OFF THE RECORD.

23                      THE WITNESS:  I want to clarify the

24  answer about the payment.

25  BY MS. CRUZ:

1      Q    And did they return the key with the

2  vehicle?

3      A    Yes.

4      Q    On February 23, 2001?

5      A    Yes.  To the best of my recollection, they

6  did.  If they returned the vehicle, I wrote them an

7  invoice, I'm sure I had the key back.

8      Q    And this invoice was paid by Biogenesis?

9      A    It's stamped as paid, and it's got a check

10  number on it.  I believe it was paid.

11              MS. CRUZ:  Okay.  Can we go to

12  document No. 16.

13                   (Exhibit No. 6 was marked for

14                    identification.)

15  BY MS. CRUZ:

16      Q    This is invoice, Rhino Builders invoice

17  0301-002 dated March 21, 2001?

18      A    Yes.

19      Q    Okay.  To the best of your recollection,

20  who, from Biogenesis, approached you on this

21  particular occasion?

22      A    I can't really say.

23      Q    Okay.  Do you recall when the request was

24  first made to rent the Isuzu flatbed whether the

25  agreement was to rent for one week and two days or

1   was it on a day-by-day basis?

2       A    I had established a weekly rental rate with

3   them and a daily rental rate.  The daily rental rate

4   was greater than the weekly rate if you know what I

5   mean.

6       Q    But do you recall --

7       A    I don't recall.

8       Q    Do you recall who gave possession of the

9   keys of the vehicle to?

10      A    I'm a little bit unsure of which invoice

11  this is.  One of these rentals -- and it may have

12  been the two days on this invoice.  I'm not sure --

13  but one of these rentals was made without me giving

14  the keys to anyone at Biogenesis.  We had reached a

15  point where I said no, I'm not renting it to you

16  anymore.  You haven't paid me, and I came to work on

17  a Monday morning, the truck was gone.  I called

18  Mr. Garthe.  Mr. Garthe said he was using it to do

19  some work at his church.

20          Later that morning my superintendent on our

21  swimming pool project at the big Navy base called me

22  and told me he saw Biogenesis people delivering

23  materials on that flatbed truck to a barracks job

24  they had right up the street from our swimming pool

25  job.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI  (808) 524-2090

1          When I confronted Mr. Garthe with his lie,

2   he said yeah, well, Biogenesis is using it and that

3   they would pay rental for it, and I told him I wanted

4   it back, and I wanted the second set of keys back as

5   well.

6          Q     You don't recall when that was?

7          A     It would be the last time they rented it

8   because I refused to rent it again.  That was the

9   first time I ever had two sets of keys to the flatbed

10  truck.

11         Q     From March 12 to 17 -- on March 17, did

12  Biogenesis return the keys to you?

13         A     I have no idea.  Again, I don't know if

14  this entire period of time was done, and I don't know

15  if this was the last one.  All I know is that the

16  last one, if this is the last one, was done -- it

17  started initially with a midnight requisition of the

18  vehicle.  I don't know if that was the last two days

19  of this in which case they would have returned it to

20  me the previous Friday or if the entire one week and

21  two days was done under those circumstances.

22         Q     Okay.  Just so I'm clear, there's at least

23  one occasion where you invoiced Biogenesis for a

24  rental and you found that the truck was no longer

25  parked in the parking lot, in Rhino's parking lot?

1    A    I'm sorry.  That wasn't very clear.  Are

2  you asking if I invoiced and then it disappeared?

3    Q    No, no, no.  I'll withdraw the question.

4  Let me rephrase that for you.

5        You testified that there was one Monday

6  morning you were not sure of the date when you came

7  to Rhino's offices and the Isuzu flatbed was not in

8  Rhino's parking lot; is that correct?

9    A    That's correct.

10    Q    And you're not sure of the date when that

11  occurred?

12    A    No, I'm not sure of the date.  At this

13  point in time since, you know, I've been looking at

14  what is going on here, I believe what happened here

15  was that I told them on this initial thing look, I'll

16  rent it to you for a week.  At the end of the week

17  you pay me for it and I'll rent it to you for another

18  week.  And I believe what happened here was I rented

19  it to them for a week, they brought it back, and the

20  deal was you can't rent it for another week until you

21  pay me for that week.  And then I think the Monday,

22  Tuesday, March 19 and 20 is probably the one that

23  started with them taking the vehicle without

24  permission.

25        Mr. Garthe agreed that they would pay

1  rental for it because I called when I found out what
2  it was being used for and I called him and he
3  admitted that it was being used on one of
4  Biogenesis's Navy projects specifically the barracks
5  job near the swimming pool and he agreed he would pay
6  rental for it, and he would bring it back and he
7  would give me the second set of keys, and I agreed
8  not to call the police and report the vehicle stolen.
9      Q    And then on the 21st you issued this
10  invoice?
11      A    Yes, and that is my signature.
12      Q    To the best of your recollection, did
13  Biogenesis pay for this invoice?
14      A    I don't recall them ever paying for that
15  invoice.
16      Q    Okay.  Let's move on to document No. 17.
17  You can mark that as Exhibit 7.
18                    (Exhibit No. 7 was marked for
19                     identification.)
20  BY MS. CRUZ:
21      Q    Do you have Exhibit 7?
22      A    Yes.
23      Q    And on it is an invoice from Reliable
24  Towing Service dated May 21, '01?
25      A    Yes.

1      Q    And a Rhino roofing and repairs --

2      A    Yes.

3      Q    -- check, check No. 1150?

4      A    Yes.

5      Q    Also dated May 21, 2001?

6      A    Right.

7      Q    If you can take a look at that towing

8    invoice?

9      A    Okay.

10     Q    And it has your name on it, and it refers

11   to a '91 GMC pickup?

12     A    Yes.

13     Q    Color red?

14     A    Yes.

15     Q    Can you explain to me the details of this

16   towing invoice?

17     A    One of my superintendents was driving this

18   vehicle which had previously been a vehicle driven by

19   Mr. Garthe, and the vehicle broke down, and I went up

20   to check him out and we couldn't do anything with it.

21   We had to call a towing company to tow it back and

22   have repairs done to it.

23     Q    Sorry, just so I'm clear, I don't know if I

24   heard everything you said.  One of your

25   superintendents was driving this pickup and it broke

1    down and you had it towed?

2         A    Yes, the first day he drove it.

3                   MS. CRUZ:   Okay.   Can we go to

4    document No. 18.

5                        (Exhibit No. 8 was marked for

6                         identification.)

7    BY MS. CRUZ:

8         Q    Mr. Allen, actually if I can refer you back

9    do Exhibit No. 7.

10        A    Okay.

11        Q    On the check?

12        A    I'm sorry?

13        Q    On the check do you know whose signature

14   that is?

15        A    That's my signature.

16        Q    Okay.   Thank you.

17        A    I'm sorry.   The only significance I see

18   here as far as my recollection is that that was right

19   after we were finally able to get that vehicle back

20   to Mr. Garthe who was using it to drive around and

21   attend meetings for Biogenesis with the Navy.

22        Q    To the best of your recollection, did Rhino

23   ever invoice specifically the use of this vehicle?

24        A    I don't know.

25        Q    Okay.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI (808) 524-2090

1    A    I didn't do most of the invoicing.  There

2  were only certain local things like the truck rental

3  that I invoiced for out of the Guam office.

4    Q    Referring to Exhibit No. 8?

5    A    Okay.

6    Q    Another towing invoice dated July 5, 2001?

7    A    Right.

8    Q    And let's see if we could read this.  It's

9  for a GMC?

10   A    Yes, the same piece of junk.

11   Q    It's the same vehicle?

12   A    Yes, same vehicle.

13   Q    Okay.  And there's also a check dated

14  July 6, 2001?

15   A    Right.

16   Q    In the amount of $45.00?

17   A    Right.

18   Q    Is that your signature on the check?

19   A    Correct.

20   Q    Okay.  So this is the same GMC referred to

21  in Exhibit 7?

22   A    Correct.

23   Q    Can you explain to me the details of this

24  towing invoice, do you recall?

25   A    Well, the vehicle broke down again.  We had

1  it repaired.  It broke down again.

2      Q    And who was driving the vehicle?

3      A    I'm not sure.  At that time it may have

4  been myself.  I know that I wanted to drive it.  At

5  one point I wanted to drive it for a few days to see

6  if it was doing okay.  It didn't make the first day.

7      Q    Go to document No. 19 which is Exhibit 9

8  now.

9                        (Exhibit No. 9 was marked for

10                        identification.)

11  BY MS. CRUZ:

12      Q    It's another Reliable Towing Services

13  invoice.  It's dated October 10, 2001 for a '91 Chevy

14  truck?

15      A    Okay.

16      Q    I believe that this is the same truck

17  referred to in Exhibit 7 and 8.  Mr. Allen?

18      A    I'm sorry.  I'm trying to --

19      Q    Okay.  Let's look at the --

20      A    I'm looking at the license numbers, and

21  they're a little difficult.  They appear that they

22  might be the same.  I know they all end in PDE, but

23  it's also called a Chevy truck, not a GMC truck.  I

24  don't know about the significance of it is.  I don't

25  even recall --

1     Q    Recall this invoice?

2     A    I don't even recall this invoice.

3             MR. TUHY:  Can we go off the record a

4  minute, Janalynn?

5             MS. CRUZ:  Sure.

6             OFF THE RECORD.

7               (Exhibit A was marked for

8               identification.)

9             EXAMINATION

10  BY MR. CORTES:

11     Q    So Mr. Allen, you may or may not have seen

12  this Exhibit A before.  I noticed you're reviewing it

13  now.  I just want to use this as a reference and ask

14  you some questions about the matters that appear to

15  be described in this document.  I noticed on the

16  third paragraph it says, "On weekends when George was

17  not there, Rhino trucks were used to transport

18  equipment off the property and moved into storage."

19          Do you have any knowledge about such a

20  statement?

21     A    From the beginning of the time when we were

22  no longer expending Rhino resources for Biogenesis's

23  work, in an earlier exhibit I said Rhino was paying

24  for the labor but they were driving -- I mean, that

25  Biogenesis were paying for the labor after a certain

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, HI (808) 524-2090

1   point that but they were driving Rhino vehicles.

2   They were using all Rhino's tools and equipment.  I

3   was making an effort to get those back.  The effort

4   took some weeks.  There were containers that

5   Mr. O'Connell had told me and his brother Gene had a

6   lot of equipment, tools, parts, et cetera.  I could

7   never get the keys to these containers.

8           When I was finally able after some weeks to

9   look in the containers, they were empty.  We had

10  other equipment parked outside that disappeared.

11  Unfortunately I was not able to get anyone to produce

12  for me a complete inventory of all of the equipment

13  so I couldn't just simply go in there and say I want

14  Rhino's equipment, number this, this, and this.  I

15  had no proof that it was ours except that Rhino had

16  been operating there as a sole operator at that point

17  in time.

18      Q    On the second page at the top of the page

19  it says big diesel air compressor owned by Rhino is

20  presently up for sale by Al.

21          When you were able to marshal equipment to

22  the extent you were able to do so for Rhino, you were

23  you able to get possession of the big diesel air

24  compressor?

25      A    No, I was not.

Q    At Rhino did you ever see a record that
there was a big diesel air compressor?

A    I did not see a record of a big diesel air
compressor.  I had been told about the big diesel air
compressor, and I was looking for it and couldn't
find it.

Q    By whom were you told?

A    One of the hands.  I don't recall who, but
one of the hourly hands.

Q    Were you aware of any -- of Al Garthe
selling any containers to Tar Co.?

A    During the time I was there, none of the
containers left so none were sold.  Or if they were
sold, they were still sitting on that property.

Q    At the bottom of the first page, can you
tell me were there any fire stations that were
subject of this Navy roofing contract?

A    I seem to recall that there was one of the
task orders that was for a fire station, but I can't
be absolutely sure.

Q    Do you know anything about Rhino, the paint
that Rhino purchased being used for that purpose, for
roofing those fire stations?

A    We did have a large invoice from Paint Co
for some paint that was purchased.  I'm not sure if

1  it was paint or Hydrostop or what.  There were some

2  materials purchased through Paint Co. for which we

3  received a large invoice at a time when we still had

4  not started any work on the field on our Navy

5  contract.  In other words, we were not buying paint.

6      Q    Do you know anything about Rhino's safety

7  equipment still being used by Biogenesis in 2002?

8      A    I don't know anything about it being used

9  in 2002, but it was still being used in 2000 when it

10  was still being used at the time that I was there

11  working on the SOC contract after Biogenesis and

12  Rhino had stopped cooperating.  As a matter of fact,

13  there was, in one instance, lanyards that were bought

14  on a Rhino account by a Biogenesis employee whose

15  name was still on the account as late as March and

16  April of that year after we had basically stopped

17  cooperating in December.  I had to go through -- as a

18  matter of fact, I had many, many accounts that

19  Biogenesis employees continued buying materials from

20  as I believe as late as April, maybe May it took me

21  that long to close the loan because Mr. Garthe was

22  the authority on the account who had to go through

23  Mr. O'Connell and Eugene as well to get all the

24  accounts together and get letters written to all of

25  the vendors taking Mr. Garthe off of authority so I

1    could re-establish who the signatories were on the

2    accounts.  But I believe as late as April and maybe

3    even May that they were still charging materials and

4    equipment including some fall resting harnesses and

5    lanyards that were being bought for by Biogenesis

6    employees and they weren't for my projects.

7        Q    Turning your attention to more recent

8    times, did Gerald Lam have occasion to contact you

9    recently about your testimony here today?

10       A    Yes.

11       Q    Can you --

12            MS. CRUZ:  If I can just for the

13   record here I know Mr. -- I just want to disclose to

14   the parties about contact by Mr. Lam, and I just want

15   to put on the record that we haven't spoken to our

16   client about those incidents and this is the first

17   time that it's been raised, and we believe that

18   you'll have statements to refute and we object to

19   characterizations made.

20            MR. CORTES:  Okay.

21            MS. CRUZ:  We will consider, of

22   course, Mr. Crumpton's request and speak to our

23   client about the no-contact agreement.

24            MR. CORTES:  Good.  Well, as a

25   separate issue, Rhino wants to put a couple of things

1  because Mr. Garthe ignored the original. So I can't

2  really pin it down.

3       Q    And is this December of 2000 or what year?

4       A    Yeah, I'm working on it. December, 2000,

5  correct. That's just really to the best of my

6  recollection. I know when I left at the end of

7  December, 2000 that I had been -- I was trying to get

8  equipment and tools from Biogenesis.

9       Q    You said earlier that you stopped working

10  for Rhino in December, 2001; is that correct?

11                 MR. TOM: 2000, oh, yeah, I'm sorry.

12                 THE WITNESS: Yeah, end of December,

13  2001. I don't know. I may have actually been paid

14  for a day or two in January 2002.

15  BY MS. CRUZ:

16       Q    Why did you leave Rhino?

17       A    Combination of circumstances. They were

18  really having cash flow problems, it was affecting

19  the work I was doing on the SOC contract,

20  subcontractors were being late, paid late. I had

21  brought in some really good subcontractors and

22  brought them in on the basis that they were going to

23  get paid very quickly and dealt with well and really

24  starting to make things difficult for me.

25            I had gone through a tremendous amount of

1    Q    Okay.

2    A    Biogenesis people, Mr. Avilla and

3    Mr. Garthe and later Mr. Nobles who they brought in

4    to work in December had control over those materials.

5    Q    Okay.  Did you eventually get the material

6    expenditures under control or terminated so that

7    Biogenesis could not further make any charges on

8    Rhino accounts for materials?

9    A    Eventually, yes.  And I think it was as

10   into March and possibly April of 2001.

11   Q    Okay.  Could you give me some examples of

12   materials that were being charged on Biogenesis by

13   Biogenesis employees on the Rhino accounts in between

14   January to April, 2001?

15   A    Cell phones were being used that I couldn't

16   get a hold of, and I couldn't cancel the accounts

17   because Mr. Garthe had set up the accounts, gasoline

18   cards for two different vendors, I think, Shell and

19   Mobile gasoline cards were continuing to be used.

20   Ace Hardware account was being used.  I recall -- it

21   seems like one of the latest purchases was some

22   harnesses and lanyards that were purchased.

23        It's really -- it's almost too numerous to

24   remember all of them.  It was one of those things

25   where you just could not believe that you don't work

1   for this company.  Why are you going and buying

2   materials for it?  And we weren't prepared for it,

3   and it took a while to react because Mr. Garthe was

4   the authority on the accounts.  I had to get him

5   removed before I could take over authority and

6   eliminate that.  So it took some time.

7       Q    One of the reasons I'm asking you this is

8   because we have a lot of documents received from

9   Rhino Builders, and so I'm interested in the

10  categories and the vendors that would be involved

11  with supplying materials off of Rhino accounts by

12  Biogenesis employees in that time period.  I'm

13  talking about January through April of 2001; so

14  you've identified gas, cell phones and Ace Hardware.

15          Any other vendors that you can tell us of

16  or general subjects of materials that would be

17  acquired during that period?

18      A    I know there was some paint acquired on our

19  account, but I can't remember the vendor.  I really

20  can't.  I just know there were a series of them.

21      Q    Now, we've established, I think, that at

22  least by the end of December, 2000 that Rhino was no

23  longer supplying workers or labor to the Navy roofing

24  contract?

25      A    Labor, no.  Mr. Garthe was still on our

# GEORGE ALLEN DEPOSITION

# DOCUMENT NO. 6

**EXHIBIT** <u>4</u>

## Michael O'Connell

| | |
|---|---|
| **From:** | "George W. Allen" <rhinogwa@ite.net> |
| **To:** | "Michael Danforth (E-mail)" <Maxxmgt@aol.com>; "Michael O'Connell (E-mail)" <rhino1@hawaii.rr.com>; "Michael Road Runner Danforth (E-mail)" <maxxmgt@hawaii.rr.com> |
| **Sent:** | Saturday, November 18, 2000 6:05 PM |
| **Subject:** | Update |

Regarding BPI:

Work continues with Al's approval. When I tried to get Al to sing the
$25,000 check to transfer funds from the Guam General Account to Hawaii, he
said he would have to make sure we had that much left since he had been
spending some on the BPI jobs. Don't go ballistic, I really think right now
is a time for us to tread lightly with the BPI work and for me to tread
lightly with Al. While I agree that BPI's urgency is not necessarily our
urgency, it does seem prudent to put forth a limited amount of resources to
keep the Navy from becoming agitated enough to just stop the contract. And,
I understand that one of the jobs is for a high ranking officer the OICC was
very interested in seeing go ahead. By all appearances, we are not putting
that much into the jobs since the labor is being paid by BPI and the bulk
materials are coming from BPI.

Regarding the Reaction Invoice, maybe BPI should pay that one rather than
Rhino. Al agrees with this idea as well.

Regarding Richard:

Richard told me last Tuesday that the previous Saturday was his last day on
Rhino's payroll. Al seemed to confirm this the other day. I really don't
know what's going on but I do know that no employee action terminating
Richard has been filled out. This is all confusing since I understand from
your end that Richard is to stay on our payroll until the end of the month.

Would somebody tell me exactly what the situation is? Is Richard still
working for Rhino or not?

If he quit last Saturday then we need to fill out a termination notice to
that effect and get it in the files. Richard's employment status is also
critical to our health insurance.

For my part, I would like to see him gone now. As much as I have tried to
make things as pleasant as possible under the circumstances Richard does not
seem inclined to do so. I am getting more than a little tired of the crap.
In my estimation, Rhino is taking a big risk keeping him around, having him
in our offices and as a signatory on our bank accounts. He has been
dishonest and has shown a complete disloyalty to Rhino in favor of his
loyalty to BPI. He communicated things with BPI that could have seriously
damaged Rhino in our efforts to negotiate. He has constantly thrown a
monkey wrench into my efforts to get things done and get things organized
around here and has gotten us into trouble on the SOC contract. I have no
doubt from the reactions I have seen that he has done a lot of harm to my
standing with other employees.

11/26/00

35

Richard took me to task in front of a full office for having read his "BPI email" about the wire transfer. I don't know who told him that I did so but I really don't appreciate him knowing about it. Is it impossible for me to do things and communicate them to Rhino without Richard knowing about them? It is amazing how he can take something he did that was so absolutely wrong (the wire transfer and not forwarding my mail to me) and try to turn it around to where I did something wrong. I told him I was looking for any messages that had been sent to me via Rhinogum, which I was, and he said it wasn't under Rhinogum. The fact is that the employer had the right to review anything any employee puts on the employer's computer. Unfortunately, I don't know if Richard is an employee although I had been told that he was when I looked at his computer.

I asked Al to talk privately and told him I was depending on him to help make sure that Richard and I could coexist peacefully. I showed him the email I had printed from Richards computer and it was clearly addressed to George Allen at Rhinogum@ite.net. I remind all of you that our letterhead and all of the information on our SOC proposal shows the email address as Rhinogum@ite.net. While we notified OICC of the change of address, we have no assurance that they will not accidentally send an important communication to the Rhinogum address so we must be able to depend on getting any mail sent to that address. I also remind you that Richard failed to pass messages on to me and has done so again with this latest message. Two full days had gone by from the time he received this message until he became aware of the fact that I had gotten it myself but he never mentioned it or forwarded it to me. I am going to have Mark set the Rhinogum address to forward to Rhinogwa and change the password so Richard will no longer be able to use it. Richard needs to be informed of this move so he can make arrangements to notify his correspondents of his change of address.

Al has not intervened once when Richard has gotten on his high horse with me in his presence. Even when Richard lied about the purpose of the stanchions, Al didn't say a word although I am sure at the time that Al knew Richard was lying. When Richard asked, in Al's presence, if I was in charge of everything, Al didn't say a word although that would have been the perfect opportunity for Al to clear up the question once and for all. When Richard took me to task for reading his email, Al didn't say a word. He has failed to take advantage of any of these opportunities to show his support of me and I am sure that makes all of the other employees doubt that I have his support.

Bank Accounts:

The Guam general account has not been transferred to the SOC account and Richard has not been removed from the signature card for the General account and Payroll account. I have no way to do this myself since I have no signatory authority over those accounts. Also, as of this Friday, Al is still co-signing the paychecks since he has not turned in the new signature card for the Payroll account with Michael O'Connell and Dean Akita on it. When you guys bring this up with Al, would you please put it as a question

36

11/26/00

and try to keep me from once again being the informant in the middle?

Health Insurance:

Al and I agreed that Rhino will provide health insurance to it's employees.
The coverage will be for administrative and management employees and Rhino
will only pay the premium for the employee. Spouse and family coverage will
be available to the employees at group rates. The difference between
Employee coverage and Spouse/Family coverage will be paid by the employee
through payroll deduction. Hourly, casual employees (those hired on and
laid off for projects) can buy health insurance by payroll deduction after
completing a thirty day (maybe we should make it 60 day) probationary
period. I think we could make our written policy with a provision that
hourly employees could sign up again without the thirty day probationary
period if it has been less than 90 days (something like that) since they
were laid off.

We have chosen a health insurance carrier that gives us both the best
coverage and the lowest premiums. We are turning in health insurance
applications for Al, Aileen, Wayne and me on Monday (the final deadline to
get insurance effective 1 Dec). I thought Richard would be included and
then be dropped thirty days after he leaves here at the end of November,
however, I understand from Aileen that Richard is not turning in an
application because he doesn't work for Rhino. I am not sure if we will
have a deal without Richard since the quote from the insurance company was
for five employees and that may be the minimum. This is just another
example of how Richard continues to throw a monkey wrench into our efforts
by making decisions and doing things without our knowledge. Basic business
logic: a situation where you have no control or jurisdiction over an
employee is a potentially costly and disruptive situation.

For me personally, this would be very bad because my cancer problem may end
up being a pre-existing condition if the insurance does not go into effect
on 1 Dec since my DZB coverage ran out on 31 Oct. (being covered during the
preceding 60 days keeps it from being pre-existing) This problem has the
potential for costing as much as $50,000 a year. I have already put this
off longer than I should have. To delay until the first of January would be
way too risky. If anything is going to queer this deal going into effect on
1 Dec, then I am going to apply individually without the group rate. I
can't even get an appointment right now without the insurance coverage. I
remind you that Rhino is to cover the cost of my health insurance, with or
without group coverage. I already had to spend $267 on medical expenses
unrelated to by cancer checkup.

Office Move:

I issued a purchase order yesterday to get Lito (the phone system guy) to
setup cables and outlets for the phones in the new office space. The
outlets will have provisions for computers too. He was supposed to do this
today so we could do our next step on Monday but he hasn't done it so far.
Mark is supposed to be here Monday to install the computer cables. We need

11/26/00

another desk so we are going to get one for Aileen on Monday ($400) along with a decent desk chair for me. Then, we would be ready to move everything anytime after Monday. This move is critical to our operation. We can't get organized and avoid the continued loss of incoming messages until we have a properly set up office space.

11/26/00 36

# GEORGE ALLEN DEPOSITION

# DOCUMENT NO. 17

**EXHIBIT** 7

RHINO ROOFING & REPAIRS INC
790 N MARINE DR BOX 999
TAMUNING, GUAM 96911

1150

DATE _5/21/01_

PAY TO THE
ORDER OF _Reliable Towing_                    $ _55.00_

_Fifty Five & °°/100_ _____ DOLLARS

Bank of Hawaii

⑆001150⑆ ⑉121405018⑉ 0045=01096⑈

_NOT NEGOTIABLE_

---

RHINO ROOFING & REPAIRS INC
TAMUNING, GUAM 96911

RETAIN AND DETACH THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW
IF NOT CORRECT, PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 5/21/01 | Reliable Towing | 55.00 |
| | Tow GMC 91 Sierra | |

---

RELIABLE TOWING SERVICES

P.O. Box 8465, Tamuning, GU 96931 • Tel: 646-4TOW (2869) • Fax: 646-4890

Nº 0957

Thank You

TOWING CHARGE  55 °°

TOTAL  55 °°