ANTONIO L. CORTÉS
Law Office of Antonio L. Cortés
233 Julale Center
424 West O'Brien Drive
P.O. Box BV
Hagåtña, Guam 96932
Telephone No.: (671) 477-1930
Facsimile No.: (671) 477-1933

Attorney for Plaintiff Rhino Builders, Inc.



FILED
DISTRICT COURT OF GUAM
JAN 23 2004
MARY L. M. MORAN
CLERK OF COURT

319

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC., and AMERICAN HOME ASSURANCE CO., <br><br> Defendants. | CIVIL CASE NO.02-00008 <br><br> **OPPOSITION TO BIOGENESIS PACIFIC, INC.'S MOTION FOR SUMMARY JUDGMENT** |
| BIOGENESIS PACIFIC, INC., <br><br> Counter-Plaintiff, <br><br> vs. <br><br> RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, and JOHN DOES 1-10, <br><br> Counter-Defendants. | |
| AMERICAN HOME ASSURANCE CO., <br><br> Cross-Claimant, <br> vs. <br><br> BIOGENESIS PACIFIC, INC., <br><br> Cross-Claim Defendant. | |

ORIGINAL

Plaintiff United States of America for use and benefit of Rhino Builders, Inc. ("Plaintiff") most respectfully presents the following points and authorities to support its request that this honorable Court deny the December 15, 2003 motion of Defendant Biogenesis Pacific, Inc. ("BPI") for Summary Judgment against Plaintiff.

## I. BPI'S ALLEGED FACTS ARE MOSTLY IN DISPUTE.

<u>Plaintiff's Factual Assertions</u>. Plaintiff asserts that the factual allegations of its Second Amended Complaint are true, and disputes many of the key factual contentions asserted in BPI's motion. Contrary to those contentions, Rhino asserts: that BPI did initiate contact with Rhino to negotiate the oral subcontract,[1] that the presidents of BPI and Rhino knew each other from an indigenous rights organization before Mr. Lam called Mr. O'Connell to ask him to do the subcontract work;[2] that BPI knew, without any input from Rhino, that it would need a duly authorized representative in Guam to interact with the Navy, that, when Mr. Lam identified Rhino as "subcontractor consulting representatives," he meant to convey the truth – that Rhino was BPI's subcontractor pursuant to the oral subcontract agreement between BPI and Rhino, that the oral subcontract was indeed agreed to on September 29, 1999, before the award letter arrived in Hawaii, that, at the time the oral subcontract was finalized, Rhino had a little less than two years of experience with federal 8(a) contracts, that most of Rhino's work with the federal government

---

[1] When Mr. Lam called Mr. O'Connell, he said that the Navy had called him and told him he had won the contract. *See, e.g.,* Transcript of Deposition of Eugene O'Connell ("Eugene O'Connell Deposition), Exhibit 1 to Declaration of Counsel filed herewith, at 38:13-40:2.

was negotiating contracts, where an oral agreement was made until the contract or subcontract was finalized, that, in proceeding in the manner BPI and Rhino did proceed, Rhino relied upon Mr. Lam's legal and contracting training and experience with the understanding that he was a judge and attorney with contracting expertise accumulated over many years, that Mr. Lam requested Mr. Garthe to be made available to him to be his representative to the Navy, but that Rhino suggested that he use Mr. Avilla instead,[3] that BPI initially promised to pay one-half of Mr. Avilla's salary, but then persuaded Rhino to carry Mr. Avilla on its payroll with the promise that BPI would reimburse Rhino for the expense of doing so in conformity with the subcontract agreement, that Mr. Lam continually assured Rhino, at every step of the negotiations, from September 29, 1999 through early December 2000, that he would sign a written subcontract agreement to replace the initial verbal agreement, that Rhino relied upon those repeated assurances in taking the steps necessary to get the work done for BPI as promised to BPI and required by it, that if Rhino had not taken those steps, BPI would have lost the Navy Contract, that BPI stayed in constant contact with events on Guam and at the outset was aware of, approved of, and required, the initiation and continuation of work by Rhino on the first Delivery Orders, that BPI was well aware of the start of work, and did not first learn of it in early September 2000 as it now claims,[4] that, as to the assertion that Rhino instructed Mr. Avilla to accept the initial Delivery Orders in May 2000, Rhino contends that BPI

---

[2] Eugene O'Connell Deposition, at 36:3-21.
[3] Eugene O'Connell Deposition, at 47:17-48:11.

3

contacted it through Mr. Garthe via facsimile and authorized him to proceed with the work, and that Rhino relied upon this facsimile, and verbal authorization from Mr. Lam to Mr. O'Connell and Mr. Garthe, to start work of the first Delivery Orders, which were accepted by Mr. Avilla as BPI's representative, that Mr. Avilla was in frequent if not constant contact with BPI with regard to those events,[5] that Rhino attempted to invoice BPI according to its normal practice, that those attempts were subverted by Mr. Garthe and Mr. Lam,[6] that Mr. Garthe, then or soon thereafter, engaged in secret negotiations with BPI to assist it to take over Rhino's subcontract rights,[7] that the liquidated damages were the result of BPI's own inaction in failing to provide required documents to the contracting officers, that Mr. Garthe withheld information from Rhino that Rhino needed to support its invoice to BPI and its claim to the Surety, that Mr. Garthe paid employees with cash belonging to Rhino to perform work on the Navy Contract for BPI, that BPI used Rhino's equipment without permission on all task orders and has still not returned most of it, that BPI and Mr. Garthe converted that equipment with the intention of furthering their scheme to prevent Rhino from being able to continue its Guam operations, that BPI furthered that scheme by threatening Rhino and Mr. Michael O'Connell with legal action and

---

[4] Eugene O'Connell Deposition, at 193:23-25.
[5] Eugene O'Connell Deposition, at 60:22-24; 61:19-63:9.
[6] Eugene O'Connell Deposition, at 56:8-21, 58:2-63:25, and 107:5-13: Deposition of George W. Allen, Exhibit 2 to Declaration of Counsel filed herewith ("Allen Deposition"), at 49:7-10.
[7] *See* Transcript of Deposition of Alfred Garthe III ("Garthe Deposition"), Exhibit 1 to Declaration of Counsel filed May 29, 2004, at 60:7-63:23; Transcript of Gerald N.Y.C. Lam ("Lam Deposition"), Exhibit 2 to Declaration of Counsel filed May 29, 2004, at 94:12-99:14;

4

bankruptcy,[8] that Rhino had completed Delivery Orders 1, 2, 3, 4, and 7, and possibly 5 and 6, that Rhino had done some work on Delivery Orders 1 through 18, that BPI caused all or almost all of a $25,000 transfer, alleged by BPI to have been a payment, to be expended on BPI's expenses and that consequently Rhino never received the alleged payment of $25,000,[9] that, in November 2000, Rhino's work continued on the Navy Contract, at Rhino's expense as well as BPI's, despite BPI's efforts to undermine Rhino's ability to continue performing that work,[10] that BPI continued to affirm the subcontract until the time it secured financing for the Navy Contract, then disavowed it,[11] that Rhino is owed no less than $239,694.47 for costs and one-half of its overhead, that, even based on the profit figures supplied by BPI during discovery, which Rhino believes are falsely understated,[12] Rhino is owed no less than $89,778.60 as its half of the profits realized by BPI on the Navy Contract prior to the date of commencing this action, that none of these amounts have been paid it by BPI or the Sureties, despite repeated demands therefor.

---

and Transcript of Deposition of Michael Lamar Danforth ("Danforth Deposition"), Exhibit 3 to Declaration of Counsel filed May 29, 2004, at 91:9-94:4.

[8] Danforth Deposition, Exhibit 3 to Declaration of Counsel filed May 29, 2004, at 92:18-93:3.

[9] Allen Deposition at 44:17-47:18; Eugene O'Connell Deposition, at 119:8-110:19.

[10] Exhibit "4" to Allen Deposition, Exhibit 2 to Declaration of Counsel filed herewith, and lines 43:5-25 recording the authentication of that document.

[11] Allen Deposition at 45:8-12.

[12] They are suspect because they show that BPI spent substantially more on delivery order nos. 20, 27, and 31 than they were ever paid by the Navy, incredibly more so on delivery order no 31. (See Exhibit X to Clark Declaration filed by BPI on December 15, 2003). In Rhino's experience, such a loss is difficult to believe. *See* Eugene O'Connell Deposition at 42:23-43:20. It is also suspect due to the fact that BPI inexplicably refused to produce it until after discovery was closed, preventing Rhino from deposing the person who prepared it on how it was prepared, or requesting follow up discovery on its contents.

BPI's Evidentiary Deficiency. Rhino objects to the consideration, in deciding BPI's motion, of Exhibits A through W, and to Exhibits Y through BB, to the Declaration of Arthur B. Clark, filed December 15, 2003, on the grounds that: (1) the statement in that Declaration that the documents are "true and correct copies" of what they purport to be is not made on personal knowledge as required by F.R. Civ. Proc. Rule 56(c); (2) that said statement is hearsay; and (3) that Mr. Clark is not competent to make that statement, not having personal knowledge of the preparation of those documents. Rhino is particularly concerned with the Court's potential acceptance of that statement with respect to the "received" stamp on Exhibit A. It is BPI's burden to go forward with evidence of authenticity and truth of that stamp in the form of a competent statement made under oath. F.R. Civ. Proc. Rule 56(c) ("Supporting and opposing affidavits shall be made on personal knowledge . . .").

Plaintiff submits the following legal authority in response to BPI's legal claims.

## II. PLAINTIFF TIMELY FILED THE COMPLAINT.

### A. Even Assuming Plaintiff Provided No Labor or Materials after March 20, 2001, the Complaint Was Timely Filed.

Assuming that the last labor or materials supplied by Plaintiff in prosecution of the Navy Contract was supplied March 20, 2001, this action was timely filed on March 20, 2002.

The Miller Act provides, with respect to actions brought pursuant to 40 USC § 270b, that "no such suit shall be commenced *after* the expiration of one year

6

*after* the date on which the last of the labor was performed or material was supplied." 40 USC § 270b(b). One year after March 20, 2001 is March 20, 2002. The Act says that no such suit shall be commenced "after" that date. Thus, even if the last material supplied was supplied on March 20, 2001, such a suit could be commenced on March 20, 2002, as this one was.

This simple logic has been repeatedly confirmed by Courts applying the one-year statute of limitations as it is worded *in the Miller Act*. <u>United States for use and Benefit of Pre Fab Erectors, Inc. v. A.B.C. Roofing</u>, 193 F. Supp. 465 (S. D. Cal. 1961) (Miller Act action filed May 20, 1960 timely on last action taken May 20, 1959); <u>Baily v. Faux</u>, 704 F. Supp. 1051 (D. Utah 1989) (Under Miller Act, materials supplier's action is timely filed on first court day following anniversary of last day labor or material supplied), <u>United States Navy v. Delta Contractors</u>, 893 F. Supp. 125, 128 (D. Puerto Rico 1995), (one year period "begins to run the day *after* the last day on which labor or materials were supplied and ends the next calendar year on date one day prior to the starting date." [emphasis added]). Applying the <u>Delta</u> restatement of the 270b(b) text to this action, the year in which to file suit began to run "one day after" March 20, 2000, or on March 21, 2000, and ended March 20, 2001, the date this action was filed. All the foregoing cases are in complete accord with the only Miller Act case on this subject cited by BPI in its brief – <u>Magna Masonry, Inc. v. R.T. Woodfield, Inc.</u>, 709 F. 2d 249, 251 (4th Cir 1983) (holding that an action filed for labor or materials last supplied on July <u>23</u>, 1979 was filed one day too late on July <u>24</u>, 1980).

7

To attempt to argue that Rhino had only until March 19, 2002 to file this action, BPI relies on Mattson v. U.S. West Comm., Inc., 967 F. 2d 259 (8th Cir. 1992). While that case does hold that an action on a cause of action accruing November 27, 1979 had to be brought by November 26, 1980, that holding applied a differently-calculated statute of limitation, that of the Fair Debt Collection Practices Act, which is, for that reason, inapplicable to this case. Under the FDCPA, the action must be brought "*within one year from* the date on which the violation occurs." [emphasis added]. 15 USCA § 1692k(d). Under the Miller Act, suit may be brought one year "after" the anniversary date of the last date a portion of the cause of action accrued. 40 USC § 270b(b). Thus, a decision construing the FDCPA one-year limitation should not be used to contradict the many decisions construing the Miller Act's one-year limitation, which allows suit until "after the expiration of one year after" the last materials were supplied.

### B. Plaintiff Continued to Provide Labor and Materials in Prosecution of the Navy Contract Well after March 20, 2001.

In addition to the truck supplied to BPI until March 20, 2000 for its use on the Navy Contract, Rhino provided other materials to BPI after that date for use on that contract.[13]

---

[13] *See, e.g.,* Deposition George Allen, at 60:17-21 and Exhibit 7 thereto (Rhino supplied GMC truck for BPI's use on the Navy Contract until early July 2001); *id.,* at 63:21 to 65:9 (Rhino supplied containers full of tools that continued to be used for the Navy Contract in 2001 and were never returned); *id.,* at 66:7 to 67:6 and at 83:15-84:20; (BPI used Rhino's safety equipment through April 2001 and charged materials used on the Navy Contract to Rhino's account at Ace Hardware as late as April or May 2001); *id.,* at 79:7-13 (BPI continued to use Rhino's tools through December 2001); Eugene O'Connell Deposition, at 92:13-104:3.

8

### C. Equitable Tolling because of AIG's Actions Applies to BPI's Statute-of-Limitations Arguments.

As set forth in the accompanying opposition to the motion of AHAC and AIGTS to dismiss Plaintiff's Miller Act claims, AHAC and AIGTS are estopped to assert that the statute of limitations bars this action against AHAC because Carlsmith Ball LLP, as Rhino's attorneys, relied upon the acts and statements of AHAC in mistakenly suing the wrong party.[14] 40 USC § 270b actually only imposes the one-year limit on the time to bring suits on suits against the Surety. To the extent BPI has standing to assert an affirmative defense that this action was untimely under § 270b(b), that standing is derivative, due to the circumstance that the Surety can proceed against BPI for any sums it must pay Plaintiff as a result of this suit. Consequently, BPI is subject to the same estoppel, or equitable tolling, arguments raised against the Sureties.

### III. PLAINTIFF IS ENTITLED TO RECOVER FAR MORE THAN THE COSTS OF LABOR AND MATERIALS SUPPLIED FOR DELIVERY ORDERS 1, 2, & 7.

BPI erroneously asserts that Rhino is entitled to no compensation other than compensation for labor and materials provided for three delivery orders it concedes were fully completed by Rhino prior to BPI's takeover of Rhino's Navy Contract activities. That assertion is directly contrary to the express terms of the Miller Act, the United States Supreme Court's declaration of the purpose of that Act,

---

[14] See Plaintiff's accompanying Opposition to the Sureties' Motion for Summary Judgment on Plaintiff's Miller Act Claims, at 3-6.

and the holdings of the United States Court of Appeals for the Ninth Circuit regarding what subcontractors may recover under the Miller Act.

### A. General Principles of Subcontractor Recovery under the Miller Act.

The Miller Act is a remedial statute that explicitly provides that subcontractors on bonded government projects are entitled to recover all "sums justly due" them under their subcontracts. 40 USC § 270b(a). The sole function of the words "has furnished labor and materials" in that section is to define who is entitled to sue for all "sums justly due" so that he will be "paid in full." *id.* There is no textual basis whatever in that section to support BPI's assertion that recovery is limited to "furnished labor and materials." This has been the finding of numerous Courts construing the meaning of these words. *See, e.g.*, Taylor Constr. Inc. v. ABT Service Corporation, Inc., 163 F. 3d 1119, 1122 (9th Cir. 1998) and similar cases cited below. Any such limitations, not having textual support, must be rejected. Similarly, there is not one word in the Act to support BPI's position that Rhino cannot recover "sums justly due" for labor and materials supplied by Rhino in prosecution of the Navy Contract but not in prosecution of Delivery Orders fully completed solely by Rhino. 40 USC § 270b(a).

Further, to read either of those textually-unsupported limitations into § 270b(a) would directly contravene the Congressional policy of the Miller Act as enunciated by the United States Supreme Court. In Clifford MacEvoy Co. v. United

10

States for use and benefit of Calvin Tomkins Co., 322 U.S. 102, 64 S. Ct. 890 (1944), for example, the Supreme Court held that:

> The Miller Act . . . is highly remedial in nature. It is entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials to into public projects.

322 U.S. at 107, 64 S. Ct. at 893. Similarly, in Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 37 S. Ct. 614 (1917, Brandeis, J.), the Court held that:

> The purpose of the act was to provide security for the payment of all persons who provide labor or material on public work. This was done by giving a claim under the bond in lieu of the lien upon land and buildings customary where property is owned by private persons. Decisions of this court have made it clear that the statute and bonds given under it must be construed liberally, in order to effectuate the purpose of Congress as declared in the act.

244 U.S., at 380, 37 S. Ct., at 616. Limiting recovery to compensation for "materials and labor," rather than "sums justly due" and payment "in full" as specifically stated by the Act, is not a liberal construction and application of the Act to protect Rhino.

Consequently, the Court of Appeals for the Ninth Circuit has held that "'Sums justly due' refers back to the term 'paid in full' contained in the earlier part of the same sentence" of 40 USC § 270b(a) and that, consequently, "a provider of labor and materials is entitled to *all sums justly due*, meaning that the provider is entitled *to be paid in full under the subcontract*." Taylor Constr. Inc. v. ABT Service Corporation, Inc., 163 F. 3d 1119, 1122 (9th Cir. 1998) [emphasis added].

11

B. **Specific Types of "Sums Justly Due" Recoverable the Miller Act.**

The following are just a few examples of items of recovery found by the Courts to be recoverable under the Miller Act as "sums justly due."

1. **Contracted-for Profits.**

As alleged in the Complaint, and as acknowledged by BPI's President in his letter attached as Exhibit "A" to the original complaint, BPI was obligated under the subcontract to pay Rhino for the actual cost of the work, and one half of the profits BPI realized. As set forth above, that share of profits, as well as the cost of the work, is recoverable by Rhino under the Miller Act as one of the "sums justly due" Rhino in order for it "to be paid in full under the subcontract." Taylor Constr. Inc. v. ABT Service Corporation, Inc., 163 F. 3d 1119, 1122 (9th Cir. 1998)

Where part of the amount due a Miller-Act subcontractor is a share of the contractor's profits, that profit element is recoverable under the Miller Act as a sum justly due the subcontractor even though it "exceeds the cost of labor, materials, and overhead." United States for the use and benefit of Woodington Electric Co., Inc. v. United Pacific Ins. Co., 545 F. 2d 1381, 1383 (4th Cir. 1976); *accord* Burton v. Frank A. Seifert Plastic Relief Co., 61 S.E. 936, 942 (Va. 1908) (Surety's argument that subcontractor cannot recover "profits and gains" under the act is completely refuted by the "provisions of the act of Congress itself."); United States for use and benefit of Reichenbach v. Montgomery, 155 F. Supp. 384, 386 (E.D. Pa. 1957) ("The surety's contention that it is entitled to judgment because the subcontract, the

12

supplement thereto, and the verdict included subcontractor's profit misconceives both the language and the purpose of the Miller Act and the decisions which the surety cites."); Taylor Constr. Inc. v. ABT Service Corporation, Inc., 163 F. 3d 1119, 1122 (9th Cir. 1998) ("Miller Act clearly requires a surety to pay the entire amount due under the contract with the prime contractor defaults."); *accord*, Central Steel Erection Co. v. Will, 304 F. 2d 548, 555 (9th Cir. 1962) (even when recovering under Miller Act on a *quantum meriut* theory "some allowance for profit is permissible and proper.").

Here, Rhino was entitled under its subcontract with BPI to one-half of the profits realized from the entire Navy Contract – not just the first 18 Delivery Orders. When BPI failed to pay Rhino, Rhino was entitled to stop work on the contract and sue for the profit it would have made if allowed to complete the entire contract as agreed. *See, e.g.,* Acret, *California Construction Law Manual*, 5th ed., § 2.74 ("Subcontractor may stop work if any progress payment in not made when due . . . " and "could also sue for lost profits."); Connell v. Higgens, 150 P. 769, 772 (Cal. 1915) (building contractor prevented from performing was entitled to damages consisting of "the profits he would have made if had had been permitted to complete the work according to the contract."); Restatement of Contracts, Second, § 242(2) (". . . a breach by non-performance accompanied or followed by a repudiation gives rise to a claim for damages for total breach."); *accord,* Simon, 2 *Construction Law Claims and Liability*, § 15.1. The measure of damages due Rhino for BPI's breach of its promise to pay Rhino includes, but is not limited to "the amount necessary to

13

compensate [Rhino] for all detriment proximately caused by the breach or which, in the ordinary course of things, would be likely to result from the breach." 20 G.C.A. § 2201. BPI admits that, as of the date this action was filed, it had realized profits of $179,557.20 on the Navy Contract.[15] Consequently, just the profit element alone[16] of Plaintiff's recovery should not be less than half of that, and Plaintiff's total recovery should not be limited to $4,667.70 as BPI erroneously argues in its motion.

BPI offers Mai Steel Service Inc. v. Blake Constr. Co., 981 F.2d 414 (9th Cir. 1992) as contrary authority. In Mai Steel, however, the Court of Appeals only disallowed a claim by a subcontractor for compensation for a reduction in its profits *caused by the delay of the claiming subcontractor himself*, through no fault of the general contractor. 981 F. 2d at 461 & 418. That holding does not in any way contradict the several foregoing decisions that a subcontractor *can* claim for the profits the general contractor promised the subcontractor would realize if able to provide all labor and materials for the government contract, as agreed. It just wasn't entitled to them in those circumstances. Further, where the claiming subcontractor has not himself been at fault for delays, Courts *have* allowed recovery of delay-caused losses of profits. United States for use and benefit of D&P Corporation v. Transamerica Insurance Co., 881 F. Supp. 1505, 1509 (D. Kans. 1995) ("the rule in this circuit is that a use plaintiff is entitled to recover for overhead and profit.").

---

[15] See Exhibit X to Declaration of Arthur B. Clark, filed December 15, 2003.

14

### 2. Overhead.

BPI incorrectly argues that expenditures for "overhead" cannot be recovered under the Miller Act. As set forth in the <u>Woodington</u> case, supra, "the cost of . . . overhead" is recoverable under the Miller Act as well as the cost for labor, materials, and contracted-for profits. 545 F. 2d, at 1383.

In this case, BPI agreed to pay Rhino one-half of its Guam overhead, and Rhino therefore seeks to recover that sum as one that is justly due it from BPI and the Surety under the Miller Act. That sum is recoverable from BPI and the Surety under the Miller Act. <u>Taylor Constr. Inc. v. ABT Service Corporation, Inc.</u>, 163 F. 3d 1119, 1122 (9th Cir. 1998) ("Miller Act clearly requires a surety to pay the entire amount due under the contract with the prime contractor defaults."); <u>United States for the use and benefit of Woodington Electric Co., Inc. v. United Pacific Ins. Co.</u>, 545 F. 2d 1381, 1383 (4th Cir. 1976); <u>United States for use and benefit of D&P Corporation v. Transamerica Insurance Co.</u>, 881 F. Supp. 1505, 1509 (D. Kans. 1995) ("the rule in this circuit is that a use plaintiff is entitled to recover for overhead and profit.").

### 3. Use of Capital Equipment.

BPI argues that Rhino's claim includes capital equipment but does not specify what that equipment is or how much of Rhino's claim it asserts is for "capital equipment." Thus, on this issue, Rhino will simply note that the *use* or rental of capital equipment "furnished . . . in the prosecution of the work" can be recovered

---

[16] Under the verbal subcontract, Plaintiff is also entitled to recover all of its direct costs and also half of its Guam overhead.

15

under the Miller Act. 40 USC § 270b(a); <u>United States Navy for benefit of Andrews v. Delta Contractors Corporation</u>, 893 F. Supp. 125 (D. P. R. 1995) (unpaid rent for crane provided by verbal contract recoverable under Miller Act). Further, due to the mandate that the Miller Act be liberally construed and applied to remedy subcontractor losses, "When the question has been whether materials were actually used in a job, it has been held that the claimant need not so prove, but only that in good faith he reasonably believed that the materials were so intended." <u>United States for use and benefit of Industrial Lumber Co. v. Rich</u>, 473 F. 2d 720 725 (9th Cir. 1973).

4. **Consequential Damages Caused by Loss of Bonding.**

Rhino also seeks to recover from BPI heavy losses it incurred due to the loss of its bonding as a direct result of BPI's failure to pay it and the Surety's failure to pay Rhino's claim on the payment bond. At trial, Rhino will show that it actually won a number of federal contracts, but could not obtain the bonding necessary to perform those contracts due to those failures of BPI and the Surety. Because the amount of this loss, in excess of $6.5 million, can be proven with reasonable certainty, and is clearly ascertainable both in its nature and its origin, it is recoverable from BPI under 20 GCA §§ 2201-2202. Because it is due Rhino from BPI as a result of BPI's breach of the subcontract, Rhino should also be found entitled to recover those recoverable consequential damages from the Surety. <u>Benjamin v. Hillard</u>, 64 U.S. 149, 16 L. Ed. 518 (1859) (If the terms of the engagement of a surety are general and unrestricted, and they embrace the entire subject, his liability will be measured by that

16

of the principal and embrace the same *accessories and consequences*); *accord* Gaussen v. U.S., 97 U.S. 584, 24 L. Ed. 1009 (1878) (Generally, the extent of a surety's obligation is the same as that of the principal); Cage v. Cassidy, 64 U.S. 109, 16 L. Ed. 430 (1859) (the natural limit of the obligation of a surety is found in the obligation of the principal and when that is extinguished the surety is in general liberated). Such losses are recoverable by Plaintiff to the extent it can satisfy this honorable Court that they are "necessary to compensate [Rhino] for all detriment proximately caused by [BPI's] breach or which, in the ordinary course of things, would be likely to result from the breach." 20 G.C.A. § 2201.

### 5. Interest on Past-Due Amounts.

Pre-judgment interest can be recovered at the statutory rate of 6% for construction supplies. 18 G.C.A. § 47106 (in the absence of a written agreement on prejudgment interest, interest is recoverable at rate of 6% for "forbearance of any money" and for "goods or things in action"); Guam United Warehouse v. DeWitt Transportation, 2003 Guam 20, 2003 WL 22715619 (Guam Terr.); Phoenix Engineering & Supply v. Universal Electrical, 882 F. Supp. 956 (D. Guam App. Div. 1995). Such interest is recoverable from the contractor or the surety in an action under the Miller Act from the time demand is made. Sam Macri & Sons v. U.S.A. for the use of Oaks Construction Co., 313 F. 2d 119, 130 (9th Cir. 1963).

In sum, BPI concedes Plaintiff is entitled to some recovery, but the amount of recovery is in dispute. *See* BPI's December 15, 2003 Points and

17

Authorities, at 9. Rhino submits that it is entitled, at least, to the foregoing types of recovery.

## IV. RHINO'S FRAUD CLAIM IS PLEADED WITH ADEQUATE SPECIFICITY.

BPI presents numerous authorities citing specifics of fraud that must be alleged. Simply put, Rhino's fraud allegations are specific in all the ways those authorities require. BPI's actual fraudulent statements are alleged in ¶¶ 14,[17] 59, 60, 61, and 62[18] of the Second Amended Complaint, filed July 15, 2003. The reason for the falsity of those statements is alleged in ¶ 15.[19] Intent is alleged in ¶ 60.[20] Reasonable reliance is alleged at ¶ 62. Injury proximately caused by that reasonable reliance is alleged at ¶¶ 17, 63, and 64. These are specific allegations of fraud, and are as specific as can be made without running afoul of the requirement of F. R. Civ. Proc. Rule 8(e)(1) that "Each averment of a pleading shall be simple, concise, and

---

[17] Paragraph 14 states that BPI "agreed that the oral subcontract between Defendant Contractor and use Plaintiff would later be reduced to writing to conform to accepted federal government contract practice." Paragraph 60 alleges that BPI intended not to do that when it made that agreement. Taken together, these are a specific allegation of fraud as defined by 18 GCA § 90103(4).

[18] Paragraphs 61 and 62 actually allege fraud by concealment of information rather than by fraudulent statement. There is therefore no actual fraudulent statement to set forth in the complaint at to this element of fraud, which is essentially a fraudulent silence. This concealment is nevertheless an actionable fraud, properly pled. 18 GCA §§ 85308(3) & 90103(3). For purposes of this portion of Guam's fraud and deceit statute, BPI was "bound" to disclose the concealed fact, that "it intended not to reimburse Plaintiff its actual costs or performance and . . . half of [BPI's] profits," pursuant to 18 GCA § 90101. This was also fraud under 18 GCA § 85308(4).

[19] "Defendant Contractor later refused to enter into a formal written subcontract with use Plaintiff."

[20] "At the time Defendant Contractor made that proposal to Plaintiff, it intended not to honor any agreement to compensate Plaintiff for providing the performance of Navy Contract No. N62766-99-D-0425 that Defendant Contractor was unable to provide."

18

direct. No technical forms of pleading ... are required." The Rule 9(b) requirement that fraud be pled with particularity must be applied in a manner that gives effect that requirement of Rule 8(e)(1). *See, e.g.,* Annotation, *Construction and Application of Provisions of Rule 9(b), Federal Rules of Civil Procedure, that Circumstances Constituting Fraud or Mistake Be Stated with Particularity*, 27 ALR Fed 407, § 2[a] ("The courts have held that these two Rules must be read together, and that the particularity requirement of Rule 9(b) does not abrogate the provisions of Rule 8.").

The following Miller-Act case synopsis from that same annotation underscores the adequacy of the particularity of Plaintiff's fraud allegations in this case:

> In an action alleging fraudulent misrepresentation by a contractor which induced the plaintiff subcontractor to enter into an agreement, it was held in United States use of Meva Corp. v. Northeast Constr. Co., (1969, DC Ga) 298 F. Supp. 1135, that the specificity required by Rule 9(b), Federal Rules of Civil Procedure, had been met by allegations that the contractor represented that the work could be completed at a specified cost with a nominal profit, that the contractor knew that this representation was false, that it was intended to deceive the subcontractor, that there was reasonable reliance by the subcontractor upon the representation, and that as a proximate result of that reliance, damages were sustained.

27 ALR, at 483.

## V. BPI IS INCORRECT TO ARGUE THAT RHINO'S BAD FAITH CLAIM HAS INADEQUATE LEGAL SUPPORT.

It is bad faith, and a tort action lies, where a party to a contract attempts to avoid liability under it by denying, in bad faith and without probable cause, that the contract exists. Seaman's Direct Buying Service v. Standard Oil Co., 206 Cal Rptr.

19

354, 686 P.2d 1158 (Cal. 1984). The evidence will show that BPI affirmed the existence of the subcontract until Rhino became unwilling to continue performing for lack of payment,[21] and at that time then denied it and threatened retaliation if Rhino persisted in asserting its contract rights.[22]

## Conclusion

For the foregoing reasons, Plaintiff United States of America for the use and Benefit of Rhino Builders, Inc. most respectfully requests this honorable Court to deny the December 15, 2003 motion of Biogenesis Pacific, Inc.. for Summary Judgment against Plaintiff on its Miller Act claims.

Respectfully submitted this 23rd day of January 2004.

_____
Antonio L. Cortes, counsel for Plaintiff
United States of America for use and benefit
of Rhino Builders, Inc.

---

[21] Allen Deposition at 45:8-12.
[22] *See, e.g.*, Danforth Deposition, Exhibit 3 to Declaration of Counsel filed May 29, 2004, at 91:9-94:4.

20