James Lawhn
OLIVER LAU LAWHN OGAWA & NAKAMURA
707 Richard Street, Suite 600
Honolulu, Hawaii 96813
Telephone No.: (808) 533-3999
Facsimile No.: (808) 533-0144

Stephen D. Tom
WHITE & TOM
820 Mililani Street, Suite 711
Honolulu, Hawaii 96813-2972
Telephone No.: 808 547 5151
Facsimile No.: 808 599 4517

Louie J. Yanza
VERNIER & MAHER, LLP
115 Hesler Place, Ground Floor
Governor Joseph Flores Building
Hagåtña, Guam 96910
Telephone No.: (671) 477-7059
Facsimile No.: (671) 472-5487

Attorney for Defendants AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY

## UNITED STATES DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., <br><br>Plaintiff, <br><br>vs. <br><br>BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC. and AMERICAN HOME ASSURANCE COMPANY, <br><br>Defendants. | CIVIL CASE NO. 02-00008 <br><br>**DEFENDANTS AIG TECHNICAL SERVICES, INC. AND AMERICAN HOME ASSURANCE COMPANY'S REPLY IN SUPPORT OF THEIR MOTION FOR DISMISSAL OF PLAINTIFF'S BAD FAITH CAUSE OF ACTION FOR FAILURE TO STATE A CLAIM; OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** |
| BIOGENESIS PACIFIC, INC., <br><br>Counterclaimant, <br><br>vs. <br><br>RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, AND JOHN DOES 1-10, <br><br>Counter-Defendant. | |

| | |
|---|---|
| AMERICAN HOME ASSURANCE COMPANY | ) ) |
| Cross-Claimant, | ) ) ) |
| vs. | ) ) |
| BIOGENESIS PACIFIC, INC. | ) ) ) |
| Cross-Claim Defendant. | ) |

## I. RHINO HAS FAILED TO SHOW THAT GUAM PUBLIC POLICY REQUIRES THAT TORT LIABILITY BE EXTENDED TO MILLER ACT SURETIES.

RHINO's argument that a majority of jurisdictions have extended tort liability to sureties does not withstand examination, and the decisions in <u>Szarkowski</u>, <u>KW Industries</u>, <u>Dodge</u>, and <u>Transamerica Premier</u> are distinguishable and unpersuasive for the reasons stated in AIG TECHNICAL SERVICES, INC.'S ("AIGTS") opening brief at pp. 15-17. Each of these jurisdictions have justified extension of tort liability to sureties based upon what the courts perceived to be the legislatures' public policy decision in favor of such extension evidenced by legislation either non-existent or inconsistent with Guam. Analyzed in this perspective, it is clear that these decisions lend nothing to the analysis before the court. Unlike the jurisdictions from which these decisions come:

1. Guam has no Unfair Settlement Practices Act applicable to sureties;
2. Guam's legislature has made a policy decision to not include surety contracts within the definition of "insurance" in the insurance code and has made a policy decision to limit the definition of "insurance" in the insurance code to contracts for indemnity against contingent and unknown events, a definition which is inapplicable to contracts of suretyship;
3. Guam's insurance regulations distinguish between surety contracts and insurance policies in its regulation of the forms of policies;

1

4. Guam's legislature, like the legislatures of Texas and California, have made a policy decision to allow a surety to <u>require</u> that an action be brought against its principal; and

5. None of these jurisdictions have a decision similar to <u>Markowitz</u> holding that a contract of suretyship is not an insurance policy within the meaning of the jurisdiction's insurance code.

If bad faith tort liability is to attach to a Miller Act Payment bond, it must rest upon a finding that (i) Guam public policy (other than that as expressed by Guam's legislature) requires imposition of such liability in order to deter oppressive claims handling by Miller Act sureties, and (ii) imposition of tort liability would not contravene rights granted to a surety under Guam law. For the reasons stated in AIGTS' opening brief at pp. 18-22, it is doubtful that such findings should be made. The policy considerations articulated in <u>Ehmcke</u>, <u>Cates</u> and <u>Great American</u> argue strongly in favor of rejection of bad faith tort liability in the context of a Miller Act payment bond. The fact that <u>Cates</u> is a performance bond case is not persuasive. The policy considerations in <u>Cates</u> apply for the most part with equal force in a payment bond context. RHINO urges rejection of <u>Great American</u> because it relies upon a Texas statute allowing the surety to require that action be brought against the principal. However, RHINO is in error. Guam's legislature, like Texas and California, has made a policy decision allowing a surety to <u>require</u> that suit be brought against its principal (18 GCA §32302). Imposition of tort liability in the face of this statute would arguably contravene the surety's right to require that its principal be joined in the litigation and the principal's defenses to payment of the bonded debt be adjudicated along with the surety's liability under the bond. RHINO argues that the legislative policy underlying the Miller Act justifies imposition of tort liability. However, nothing in either the Miller Act or its legislative history supports the conclusion that Congress intended to police

2

Miller Act claims handling through imposition of tort liability. If Congress intended that Miller Act sureties be exposed to tort liability in addition to that imposed under the Miller Act, then Congress would have so provided in the statute. Congress made no such provision and the liberal policy in favor of construction and application of the Miller Act cannot be expanded to create a tort cause of action where Congress has failed to do so. No court has so held. The public policy of each state (territory) decides whether or not imposition of tort liability in the context of a Miller Act bond is wise.

Guam public policy does not require imposition of tort liability in the context of a Miller Act payment bond.

1. Guam's insurance code differs from those of states where such liability has been imposed, and is more analogous to the insurance codes of Texas and California where courts have held that extension of bad faith liability to sureties would not be justified.

2. There is no element of adhesion under the Miller Act. The form of the bond is specified by the government (see Instructions To Offerors, specifying Standard Form 25A, Lawhn Dec., Ex. A); contrary to RHINO's assertion (Opp. Memo., p. 15-16) the $250,000 penal sum of the bond was specified by the government (see Instructions To Bidders specifying payment bond at 50% of $500,000 performance bond, Lawhn Dec., Ex. A).

3. Under the Miller Act, a commercial surety must be approved by the U.S. Treasury (see Instruction To Bidders, Lawhn Dec. Ex. A); and a subcontractor has the right to enlist the aid of the contracting officer in the event of disputes, a right which RHINO invoked in this case, (see Carlsmith letter of 08/15/01 to contracting officer, Ex. B, p. 30-36 to Kahn 10/03/03 Dec. filed with motion). Safeguards therefore exist to guard against oppressive claims handling.

4. The Miller Act payment bond is purely a commercial instrument.  It is not intended to provide peace of mind against unforseen and unknown calamities such as fire, injury or death.  The "special relationship" which courts rely upon to justify tort liability in the context of typical insurance simply does not exist in the context of a Miller Act payment bond claim which.

5. As pointed out by <u>Cates</u> and <u>Ehmcke</u>, and as illustrated by the facts of this case, construction disputes typically involve claims and counterclaims which are difficult enough to resolve when the parties are on a level playing field.  Imposition of tort liability would make it easier for claimants, such RHINO, to pressure sureties to pay questionable claims or pay more on disputed claims because the surety is reluctant to risk the outcome of tort litigation.

6. As stated earlier, under Guam law a surety has the right to require that its principal be joined in any litigation (18 GCA §32302), and because a surety has all the rights of a guarantor (18 GCA §32301) and a guarantor cannot be liable for any more than the principal (18 GCA §31404) the surety may require that its principal be joined and all defenses, backcharges and counterclaims asserted by its principal in defense of payment be adjudicated before the surety has a duty of payment under the bond.

7. RHINO has presented absolutely no evidence of a compelling need to extend tort liability to Miller Act sureties in Guam.  There is simply no evidence that oppressive claims handling by Miller Act sureties exists on a level such that public policy cries out for judicial intervention in order to encourage Miller Act sureties to act responsibly.  If there is evidence of abuses on a scale suggesting a need for remedial action, this is a matter for Guam's legislature to consider and address through appropriate legislation if the circumstances so warrant.

## II. RHINO HAS FAILED TO SHOW THAT IT IS ENTITLED TO SUMMARY JUDGMENT ON ITS UNDERLYING MILLER ACT CLAIM, AND THEREFORE AS A MATTER OF LAW THERE CANNOT BE ANY BAD FAITH LIABILITY.

In its Opposition Memorandum, RHINO does not dispute application of the Dutton or Brinderson rules under which a surety is entitled to dismissal of any bad faith claim if there is a genuine issue of material fact regarding its principal's liability.

Under these rules, for purpose of ruling on the bad faith claim (assuming the court decides that such a claim is viable under Guam law) the court need not determine whether or not RHINO's claim has merit, or whether or not RHINO's claim was properly perfected under the Miller Act. The court need only determine whether there are genuine issues of material fact regarding these issues. If so, then as a matter of law, there cannot be bad faith.

Regarding the merits of RHINO's claim, a comparison of the data submitted on behalf of RHINO through the Carlsmith firm (Kahn 10/03/03 Dec., Ex. J & N), with the data submitted by BIOGENESIS PACIFIC, INC. ("BIOGENESIS') (Kahn Dec., Ex., F, G, & J @ pp. 10-11) show genuine disputes regarding what the terms of the subcontract were; whether RHINO performed its part of the bargain; and how much, if anything, RHINO would be entitled to under the Miller Act. As his declaration states, AIGTS' Mr. Kahn read these documents and concluded that there were genuine disputes regarding the merits of the claim (Kahn 10/03/03 Dec., Par. 7 - 10). BIOGENSIS' motion for summary judgment and RHINO's opposition thereto highlight the existence of factual disputes as well as legal disputes regarding interpretation of the Miller Act and the extent of RHINO's entitlement to recovery, if any. RHINO's assertion that the surety knew that RHINO's claim was valid and therefore proceeded to deny it based on timeliness (RHINO Opp. Memo. @ pp. 13-14) is unsupported by any evidence, and clearly contrary to the evidence before the court.

5

Regarding the timeliness of RHINO's Miller Act action, in its Opposition Memorandum RHINO incorrectly characterizes the Miller Act's one-year requirement for filing suit as a "statute of limitations". This is a fundamental error of law on RHINO's part. The one year requirement is <u>not</u> an affirmative defense analogous to a limitations defense. The surety does <u>not</u> have the burden of pleading and proving that any action was untimely. To the contrary, the Miller Act's one year requirement is a condition precedent to maintaining an action under the Miller Act, and the claimant has the burden of proving that it has complied with the requirement. It is a jurisdictional requirement. <u>Celanese Coatings Company v. Gullard</u> 504 F.2d 466, 468-469 (9th Cir. 1974). RHINO has the burden of proof on this issue and if RHINO cannot prove that it filed its suit within one year after last furnishing labor or materials, this court has no jurisdiction over the Miller Act claim. The undisputed facts before the court show a serious dispute regarding RHINO's compliance with this requirement. As RHINO concedes, its sworn Proof Of Claim (RHINO calls it the O'Donnell affidavit) transmitted to the surety by Carlsmith letter of 1/09/02 states that it furnished labor and materials between May 2000 and December 2000 (Kahn 10/03/03 Dec. Ex. J). AIGTS received it on 1/15/02 (Kahn 10/03/03 Dec. Par. 8). In its Opposition Memorandum, RHINO incorrectly states that the surety prepared the O'Donnell affidavit (Proof Of Claim) (Opp. Memo @ p.14). On the face of it, and without further explanation, this appears to be an affirmative misrepresentation of fact to the court. The Proof Of Claim was submitted to AIGTS in its completed form by Carlsmith letter of 1/09/02. AIGTS had nothing to do with preparation of the Proof Of Claim other than to furnish a blank form to Carlsmith at Carlsmith's request (Kahn Dec. attached). RHINO's attempts to avoid the clear interpretation of its statements to the surety therefore fail. In addition, in documentation previously submitted to AIGTS by Carlsmith on behalf of RHINO, Carlsmith included a letter to the contracting officer from

6

Carlsmith in which it is stated that RHINO ceased work in late November 2000 (Kahn 10/03/03 Dec., Ex. B @ pp 30-36). In concluding that the claim was untimely, Kahn considered the statements made in the Proof Of Claim as well as the statement made by Carlsmith on behalf of RHINO to the contracting officer (Kahn 10/03/03 Dec. Par. 11 & 12). In its Opposition Memorandum RHINO criticizes AIGTS claiming that AIGTS should have contacted RHINO to see if it had furnished labor or materials after December 2000. RHINO's counsel is charged with knowledge of the Miller Act and is charged with knowledge that, at least on the face of the documentation, its claim is untimely because one year after December 2000 is January 01, 2002. Despite this, Carlsmith's letter was not even drafted until 1/09/02 and neither the Proof Of Claim, nor the supporting documentation say anything about furnishing any labor or material after December 2000. Furthermore, in its initial denial letter of 2/21/02 (Kahn 10/03/03 Dec., Ex. M), AIGTS <u>did in fact</u> request that RHINO furnish any additional information regarding the timeliness of its claim. This prompted Carlsmith's letter of 3/11/02 (Kahn 10/03/03 Dec., Ex. N) which for the first time, advised the surety of RHINO's contention that RHINO furnished equipment after Dec. 31, 2000. In its Opp. Memo (p. 15) RHINO asserts that no one submitted a sworn affidavit to the surety contesting RHINO's contention that it furnished equipment after Dec. 31, 2000. While it is true that no affidavit was submitted to the surety, the evidence before the court shows conclusively that AIGTS' counsel investigated RHINO's contention that it furnished equipment after Dec. 2000, and that the surety was advised via a letter from BIOGENESIS' Mr. Lam contesting RHINO's contentions (Kahn 10/03/03 Dec. Ex. O). As shown by counsel's report and Mr. Lam's letter, RHINO's contentions are hotly contested by BIOGENESIS' Mr. Lam, and any implication intended by RHINO that the surety conducted no investigation, is therefore inconsistent with the evidence before the court. The uncontroverted evidence before the

7

court shows that the facts presented to AIGTS showed the existence of a genuine dispute regarding the timeliness of RHINO's claim, and this dispute continues even to this day as shown by BIOGENESIS' pending Motion and RHINO's opposition. Because this dispute goes to the court's jurisdiction, and because the parties have presented differing version of the controlling facts, the question of the court's jurisdiction <u>must</u> be decided on the merits. Parties cannot stipulate to jurisdiction where the facts show none exist.

Thus the conduct of AIGTS/AMERICAN HOME ASSURANCE COMPANY ("AMERICAN HOME") falls within the protective guidelines of <u>Dutton</u> and <u>Brinderson</u>. So far as bad faith is concerned, it is irrelevant whether RHINO's version of the facts is right or whether BIOGENESIS is correct, so long as the facts upon which the surety acted show a genuine dispute. In this case there is no question but that a genuine factual dispute exists over liability, and the extent thereof, as well as the timeliness of RHINO's action. Under these circumstances, as a matter of law, there cannot be any bad faith.

### III. RHINO HAS PRESENTED NO EVIDENCE TO SUPPORT TORT LIABILITY ON ITS REMAINING CLAIMS.

RHINO's remaining argument regarding inducing Carlsmith to sue the incorrect party is factually unsupported, and in any event is an estoppel claim, not an affirmative cause of action. The young Carlsmith lawyer failed to consult her supervising attorney; failed to consult the Treasury List or American International Group's ("AIG") website, ignored the affirmative identification of the surety on the bond, and the affirmative statement of AIGTS' relationship with AIG clearly printed at the bottom of AIGTS' letterhead, and didn't even call the AIGTS claims representative to inquire what the correct entity might be for purpose of filing suit. None of the resources were investigated and she simply made an incorrect decision to name AIGTS instead of AMERICAN HOME

8

apparently based on some telephone operator telling her that the companies were part of AIG or something like that. This is not the stuff that bad faith is made of.

## IV. ALL RELEVANT DISCOVERY HAS BEEN PROVIDED TO RHINO.

Finally, RHINO suggests that summary judgment should not be granted on the bad faith claim because it is entitled to further discovery regarding other cases in which AIGTS/AMERICAN HOME has alleged the one year Miller Act suit limitation as a defense.[1] Again, this demonstrates RHINO's misunderstanding of the one year suit requirement. Because it is an affirmative element of any Miller Act plaintiff's case, compliance with the one year requirement is at issue in <u>every</u> case. In most instances the facts show conclusively that there is no dispute, but in those cases where a dispute exists, Congress has mandated that the plaintiff show that it has properly invoked the jurisdiction of the federal courts through a timely filing. That is why there are reported cases dealing with compliance with this requirement, and as the cases show, courts have not been reluctant to invoke equitable doctrines to excuse non-compliance under appropriate circumstances. These are cases in which the facts are unique to each individual instance and have no relevance to each other. RHINO's discovery request for all other instances in which AIGTS/AMERICAN HOME has relied upon a Miller Act claimant's failure to comply with the one-year suit requirement is not proper. Any Miller Act surety has the statutory right to require that a claimant comply with the statute, and other instances in which a surety may or may not have required a claimant to prove its case are not relevant to the facts of this particular case. RHINO's relief lies in equitable doctrines of tolling if the facts so justify, not in allegations of bad faith for requiring

---

[1] RHINO claims that it is not in possession of a BIOGENESIS letter to RHINO dated January 2, 2001, attached to the Bruce Kahn Declaration as Ex. "G". Opposition, p. 13, fn. 20. This is untrue. RHINO has had possession of the letter since the instant suit was filed. The January 2, 2001 letter was attached as Exhibit "A" to the original Complaint filed March 20, 2002.

9

compliance with what Congress has said must be done in order to collect under a Miller Act bond.

Therefore AIGTS/AMERICAN HOME request that this court grant summary judgment upon the bad faith and punitive damage claims.

Dated this 30th day of January, 2004.

**OLIVER LAU LAWHN OGAWA & NAKAMURA**
Attorneys for Defendants
**AIG TECHNICAL SERVICES, INC. and AMERICAN HOME ASSURANCE COMPANY**

By: _____
JAMES H. LAWHN, ESQ.

C:\MarieBackup\My Documents\CLIENTS (NON-GIA)\USA-Rhino v BIOGENESIS-AIG\Pleadings\Reply in Support of JL Mtn to Dismiss or SJ 012704.doc

10

Case 1:02-cv-00008   Document 339   Filed 01/30/2004   Page 11 of 11