ANTONIO L. CORTÉS
Law Office of Antonio L. Cortés
233 Julale Center
424 West O'Brien Drive
P.O. Box BV
Hagåtña, Guam 96932
Telephone No.: (671) 477-1930
Facsimile No.: (671) 477-1933

Attorney for Plaintiff Rhino Builders, Inc.


FILED
DISTRICT COURT OF GUAM
FEB - 5 2004
MARY L. M. MORAN
CLERK OF COURT

350

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC., and AMERICAN HOME ASSURANCE CO., <br><br> Defendants. <br> BIOGENESIS PACIFIC, INC., <br><br> Counter-Plaintiff, <br><br> vs. <br><br> RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, and JOHN DOES 1-10, <br><br> Counter-Defendants. <br> AMERICAN HOME ASSURANCE CO., <br><br> Cross-Claimant, <br> vs. <br><br> BIOGENESIS PACIFIC, INC., <br><br> Cross-Claim Defendant. | CIVIL CASE NO.02-00008 <br><br> **AFFIDAVIT OF MICHAEL NAWAIKI O'CONNELL** |

# ORIGINAL

I, Michael O'Connell, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1.    I am the President and CEO for Rhino Builders, Inc. (hereinafter "Rhino"), and have been since 1992. I am competent to testify herein, and I make this declaration based on personal knowledge and would so testify.

2.    Gerald Lam, the President of Biogenesis Pacific, Inc., called me on September 29, 1999 directly after he had learned that BPI had won the Navy Contract at issue in this case. I did not contact him. He contacted me by a telephone call initiated by him at between 11:00 a.m. and noon. Hawaii time on that date. I had met Mr. Lam previously at a meeting of a business organization controlled indigenous persons -- Youngbird. In the September 29, 1999 telephone call, Mr. Lam wanted my company, Rhino Builders, Inc. to perform all of certain categories of the contract work, because Rhino had crew, facilities, tools, materials, and licensing on Guam, and because BPI did not. He said that the Navy had contacted him by telephone to inform him of the award. During the telephone conference initiated by Mr. Lam, he promised me he would email me his resume to show his qualifications. After the call, he did email me his resume for me to review to encourage Rhino to accept the subcontract he proposed. A true and correct copy of that email is attached hereto as Exhibit "1."

3.    On behalf of Rhino I did agree with Mr. Lam that Rhino would perform the Navy work as BPI's subcontractor. The terms of the subcontract were: that Rhino would forward the cost of doing the work, that BPI would reimburse Rhino

2

for that cost, that BPI would pay Rhino half of its Guam overhead costs, that BPI would supply safety plans and quality control plans and other contract documentation, and that BPI and Rhino would split the profits derived from the contract on a 50/50 basis. Explaining that he was a lawyer and a judge, Mr. Lam further promised that he would reduce this subcontract agreement to writing. BPI subsequently acknowledged the basic terms of the subcontract in writings signed by Mr. Lam. A true and correct copy of one of those writings are attached hereto as Exhibit 2.

4.    Rhino did not advise Mr. Lam that he needed a contract representative on Guam. It is a contract requirement that BPI have a representative, as well as employees, on Guam, to do the contract work. Rhino did suggest that BPI hire Mr. Avilla to be its Guam representative. It did so in reliance upon BPI's promises in the subcontract agreement between Rhino and BPI. It did so after Mr. Lam requested that the head of Rhino's Guam operations, Mr. Alfred Garthe III, serve as BPI's Guam representative. A few days later, Mr. Lam requested that Rhino pay Mr. Avilla for his service as BPI's Guam representative, and promised that BPI would repay Rhino for doing so, as part of the subcontract agreement that BPI would reimburse Rhino for all expenses. Rhino did pay Mr. Avilla for his work for BPI, but BPI did not repay Rhino for doing so.

5.    In reliance on the subcontract agreement, Rhino did initiate work on the Navy Contract as required by Mr. Lam, BPI. To enable Rhino to do so, BPI repeatedly represented to the Navy that Rhino was its subcontractor and that Mr. Avilla and other Rhino employees were BPI's representatives. True and correct

3

copies of correspondence from BPI to the Navy making those representations are attached hereto as Exhibits 3 and 4. I understand that BPI now claims that the statement to the Navy in Exhibit 3 that Rhino's employees were "Subcontractor Consulting Representatives" was intended to show that Rhino's representatives were not representatives of a subcontractor, which they were. That claim makes no sense, because BPI *did* use the word "subcontractor," because Mr. Garthe and Mr. Williams's names have the word "(sub)" after them, and because it is not common practice for a consultant to: (1) be named as a quality control manager or safety inspector; or (2) to provide equipment, materials, personnel, or office space to their clients, as required of Rhino by BPI under the subcontract agreement.

6.    .From the time of the subcontract agreement on September 29, 1999, until approximately December ___, 2000, Mr. Lam continually and repeatedly confirmed the existence of the oral subcontract, and affirmed his promise to execute a written subcontract agreement to replace it. Rhino relied upon those repeated promises by performing BPI's work on the Navy Contract, by paying Mr. Avilla and others to do BPI's work, by supplying BPI its Guam facilities, vehicles, equipment, materials, and employees to do that work, and by using Rhino's credit line to insure that Rhino met BPI's obligations under the Navy Contract.

7.    Throughout year 2000, Mr. Lam and other BPI officials were in constant contact with Rhino's employees regarding Mr. Avilla's acceptance of Delivery Orders on behalf of BPI and regarding the commencement of work on Delivery Orders 1, 2, 3, 4, 5, and 7. Although BPI has destroyed and converted much

**4**

of Rhino's documentation of those communications, by formatting the hard disk on Rhino's computer, as well as by other acts, Rhino has been able to recover some of that documentation. True and correct copies of eight of those communications occurring prior to the September 2000 date BPI now claims that it first became award that Rhino was working on the Contract are attached hereto as Exhibits 5, 6, 7, 8, 9, 10, 11, and 12. That Mr. Lam was aware of the acceptance of the Delivery Orders by Mr. Avilla in July 2000 is shown by his July 17, 2000 letter to the contract officer asserting that Mr. Avilla was his employee and authorized to accept the Delivery Orders, and that Mr. Lam was in constant contact with Mr. Avilla in this regard, as stated by Mr. Lam in Exhibit 4 to this affidavit. Confirming this, Mr. Garthe told me, on or before May 5, 2000, that Mr. Lam had sent him a fax authorizing Rhino to proceed with the work. BPI took this document, along with other files, in order to deprive Rhino of records it would need to accurately reconstruct and prove what actually transpired between Mr. Garthe and BPI. Mr. Garthe, of course, became employed by BPI soon after Rhino became unable to continue work on the Navy Contract due to lack of payment under the subcontract agreement and BPI's refusal to execute the written subcontract document.

8.     The liquidated damages assessed to BPI were caused solely by BPI's own failure to act. Specifically, BPI was required to provide the contracting officer with required documents, including the quality control and safety plans and Mr. Lam's letter approving those plans. It was not until Rhino supplied templates for these plans that BPI was able to get approval to start work. Prior work had been done

on a temporary basis using the Rhino quality control and safety plans, submitted by Mr. Avilla on June 9, 2000. By June 10, 2000, Mr. Avilla had to email BPI requesting Mr. Lam's approval of those plans. See Exhibit 8 to this affidavit. After initial work had been completed on that basis, the contracting officer required BPI's own plans for work to continue, as shown in further emails between Mr. Avilla and Mr. Lam, true and correct copies of which are attached hereto as Exhibits 13, 14, 15, and 16.

      9.     I am informed and believe that Rhino employees continued to work on the Navy Contract for BPI in December 2000, and received payment for doing so in cash from Mr. Garthe using Rhino funds. Mr. Garthe removed documentation of this work from Rhino's control. My belief is based on the circumstance that some records that would document the work done by Rhino's employees in December 2000 are missing. True and correct copies of emails I received from Mr. Warren Nobles, a former BPI employee, describing Mr. Garthe's appropriation of documentation of such work, are attached hereto as Exhibits 17, 18, and 19. A true and correct copy of an email I received from Mr. George Allen on this subject is attached hereto as Exhibit 20.

      10.    When Mr. Lam repeatedly failed to make good on his promise to reduce the subcontract to a written document we could both sign, I hired Michael Danforth to do so. Negotiations continued on the structure of that document continued throughout October and early November 2000. Throughout that process, Mr. Lam repeatedly and consistently confirmed his agreement to the terms of the

6

original oral subcontract, and that, as much as possible, the written document was to leave the parties in the same position they were in under the oral subcontract. Throughout the process, Mr. Lam repeatedly reassured Rhino that he would sign the written document when it was completed. In October 2000, he affirmed, in an email message, that the subcontract document was completed to his complete satisfaction and that he would execute that document. A true and correct copy of that email is attached hereto as Exhibit 21.

11.    On or about December 8, 2000, Mr. Lam contacted me and asked me to meet him at Zippy's Restaurant in Honolulu. I did go there as he instructed. When he arrived, he opened the meeting my announcing to me: "I'm a judge. I'm an attorney, and you been notified I own Rhino. I can bankrupt you. I can take everything you own." He then showed me three documents that appeared to show that Mr. Garthe had transferred to Mr. Lam his shares of Rhino Builders, Inc. The meeting ended soon after that because I am not an attorney and know little of the law, and I had no idea what to say to Mr. Lam about his threats or his apparent acquisition of Mr. Garth's shares. Because of this, and because of BPI's and Mr. Garthe's actions to appropriate Rhino's equipment and its business records regarding these issues, I firmly believe that Mr. Garthe and Mr. Lam conspired to deprive Rhino of its ability to realize the benefits it bargained for in the September 1999 subcontract, and also to deprive it of its ability perform roofing work on Guam in competition with BPI. I believe that BPI did this, in part, to follow through on its threat to bankrupt Rhino and myself. BPI has pretty thoroughly succeeded in carrying out that threat, not only

7

through the acts described above, but also through its conduct of this litigation, making third party complaints against me, and also against Mr. Danforth, for whose legal expenses Rhino may have significant liability. That those third party complaints seek $7 million in punitive damages, which I believe is a part of his largely-successful efforts to ruin Rhino and myself.

    12.  In mid-December 2000, shortly after the incident at Zippy's, Mr. Danforth called Mr. Lam, in my presence, to ask him why BPI was using Rhino's equipment and employees to perform the Navy Contract. He also asked Mr. Lam why he had not yet signed the written subcontract agreement with Rhino. At that time, I heard Mr. Lam tell Mr. Danforth that he would not sign the written subcontract, and that he could not do so, already having executed an agreement with Allstar/SAB that prevented BPI from having a subcontract with Rhino. I now understand that BPI may never have signed the partnering agreement with Allstar/SAB.

    13.  When Rhino began to bill BPI for the labor and materials it had provided for the Navy Contract, and for the half of Rhino's Guam overhead BPI had agreed to pay Rhino, BPI refused to pay Rhino, claiming that BPI had clearly instructed Rhino not to accept any delivery orders that would not be profitable. On one hand, that is an admission that BPI authorized the acceptance of delivery orders unless they would be unprofitable. It is also true that on a contract of this sort the contractor must accept the delivery orders regardless of whether they would be profitable, and that the government is always sufficiently flexible to make sure that the contractor makes a profit. I also understand that BPI's accounting of delivery

<div align="center">8</div>

orders 1 through 18, which were all accepted by Mr. Avilla as BPI's representative while he was being paid by Rhino, shows that BPI made a profit on each and every one of those delivery orders. Still, BPI would not pay Rhino.

14. Mr. Lam told me that he had his financing in place when we made the subcontract in September 1999. After that, when we had to begin work, Mr. Garthe called me and told me that BPI did not have its financing in place. This was about August or September 2000. I called Mr. Lam to find out what was happening, but was unable to reach him. After that, Mr. Garthe, who was our point of contact with Mr. Lam, and who was concerned to perform Rhino's obligations under the subcontract, set up a credit line for BPI with our vendors. He also wrote to Mr. Lam's banks informing them that Rhino was the prime sub for BPI on the Navy contract so that BPI could use Rhino's good credit history to obtain financing. In this process, Rhino supplied its employee resumés, the company's job histories, and statements regarding its equipment, facilities, and prior work in Guam, to assist BPI to obtain financing. Due to these efforts, BPI succeeded in obtaining its own financing for the Navy Contract, which it had been unable to do before. At Mr. Garthe's insistence, in order to pay our workers and otherwise finance the work for BPI during the summer and fall of 2000, Rhino borrowed money on Rhino's line of credit established for other contracts. Mr. Lam continued to repeatedly assured us that he would sign the written subcontract until he got his financing in place. As soon as he got his financing in place, he made his deal with Mr. Garthe to acquire ownership of Rhino, and then he

9

threatened me with bankruptcy and financial ruin, and then he refused to sign the

subcontract as promised and as negotiated to his satisfaction.

I declare under penalty of perjury that all of the foregoing statements are

and correct to the best of my knowledge and belief.

EXECUTED this 29th day of January 2004.

_MICHAEL O'CONNELL_

MICHAEL O'CONNELL

_County of Honolulu_ )
                          )      ss:
STATE OF HAWAII.     )


SUBSCRIBED and SWORN on this 29th day of January 2004, in
_Honolulu_, Hawaii, before me, _Carlyn M. Silva_, a Notary
Public, in and for the State of Hawaii, by MICHAEL O'CONNELL, known to me to
be the person whose name is subscribed to the foregoing Declaration, who
acknowledged to me that he executed the same as his free and voluntary act for the
uses and purposes therein set forth.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my
official seal the day and year first above written.

) S E A L (

Notary Public in and for the State of Hawaii
My Commission Expires _5-14-04_

10

# EXHIBIT 1

## Michael Nawaiki O'Connell

**From:** <Bpihawaii@aol.com>
**To:** <rhino1@hawaii.rr.com>
**Sent:** Wednesday, September 29, 1999 11:57 AM
**Attach:** RESUME~1.DOC
**Subject:** Re:

Resume attached converted to Word For Windows 7.0 document.

Gerry Lam

EXHIBIT 1

# Gerald N.Y.C. Lam
### President & Chief Executive Officer

Mr. Lam has over 20 years of direct experience in designing, building, financing, developing, constructing and selling of residential homes, duplexes, four-plexes, condominiums, and planned unit developments. His construction experience also includes small office buildings and strip shopping malls. Since 1991 through the present, Mr. Lam has fully renovated and managed 23 multi-family, residential apartment buildings in Houston, Texas. Additionally, Mr. Lam is an entrepreneur and management executive with 22 years of experience in business management, mergers & acquisitions, law, real estate development, federal and state taxation, employee benefits and compensation, corporate structuring, strategic planning, finance, and accounting. His education and experience spans the U.S., Pacific Basin, Asia, Europe, and South America. He led the executive development team establishing America's 6th largest outdoor advertising company. He also served as a District Judge in Hawaii from 1982 through 1988.

In 1990, Mr. Lam formed BioGenesis Pacific, Inc. to expand and diversify his interests into environmental services and facilities maintenance. Today, BioGenesis Pacific, Inc., known for cutting-edge technologies and success in federal environmental construction contracting , offers services in building and construction, renovations and multi-trades, heavy construction, environmental technologies and services, and facilities and base support maintenance. Presently, Mr. Lam is heading the technological development of the world medical industry's newest standard of laser corrective eye surgery known as LASIK. He controls the exclusive development rights to the proprietary technology developed by the industry's pioneer and world figure, Dr. Virgilio Galvis.

## EXPERIENCE

October 1996 - Present:
- Sharper Visions Associates:  Co- founder and CEO over proprietary technology in LASIK and responsible for revolutionizing the modern industry of corrective eye surgery.

September 1990 - Present
- Environmental Industry:  Founder and CEO of BioGenesis℠ Pacific, Inc. with national award winning technologies for remediation of contaminated soil and water. Cleaned Kaho'olawe Island of ordnance and explosives in 1995 and more recently won the Navy's Kaho'olawe Omnibus Contract.

September 1976 - Present
- Attorney:  Mergers and acquisitions; recapitalization of financial, manufacturing, and service companies; financial structuring of real estate developments; human resources and compensation; pension and benefit plans; and tax litigation.

- U.S. Corporate Executive (Fortune 1,000 companies):  Cash flow modeling; product marketing; Divisional budget modeling; Strategic financial modeling; Writing and implementing personnel procedures and compensation manuals. Restructured senior and junior debts for U.S. corporations, wrote strategic plans, established profit center budgets, wrote procedures and personnel manuals, and reorganized executive management.

- Management Consulting (Fortune 500 companies): Research and writing of strategic plans for international business. Raised equity financing for real estate development projects, foreign trade, startup ventures. Analysis and reports on profit, cash flow, and investment evaluations for corporations. Developed think tanks for media and real estate businesses. Managed business turnarounds. Provided

litigation support for commercial litigation. Designed and instructed intensive multi-day seminars in marketing, team dynamics and personal empowerment.

- **Residential and Commercial Design/Build and Construction:** 1976 - Present.

*138 multi-family residential apartments, design/build renovation construction - Houston, Texas.*
*1990 - Present. Okole, Inc. construction and property management.*
> - *Acquisition, design, engineering, new construction, total renovation, and property*
> *management of 23 multi-family apartment buildings in Springbranch District, Houston,*
> *Texas. Sole responsibility for project construction management, project design, engineering,*
> *scheduling, permits, project Quality Assurance and Quality Control. Sole responsibility for*
> *leasing and rental contract management, facilities maintenance and security supervision,*
> *move-in and move-out apartment preparation.*

*Condominium renovation and property management - Ogden, Utah. 1982 - 1988 Private*
*development partnership.*
> - *Total renovation and repair of 256 residential condominium units. Property management*
> *responsibility: lease contracts, facilities maintenance, security, move-in and move-out*
> *scheduling and preparation of units. Short term rentals and long-term leasing. Family*
> *services.*

*Single Family, Duplex, and Fourplex residential projects - Salt Lake City, Utah. 1976 - 1985 Contour*
*Development Corporation Joint Venture Partnerships.*
> - *52 high design homes: new design/build and construction. Project management, site*
> *supervision, cost and contract accounting.*
> - *210 duplex residential complex units: new design/build and construction. Project*
> *management, site supervision, cost and contract accounting.*
> - *76 fourplex residential complex units: new design/build and construction. Project*
> *management, site supervision, cost and contract accounting.*

*Condominium P.U.D. projects - Salt Lake City, Utah. 1976 - 1985 Contour Development Corporation*
*Joint Venture Partnership.*
> - *167 high design low rise condominium unit developments: new design/build and*
> *construction. Project management, site supervision, cost and contract accounting.*
*Office buildings (average 45,000 sq.ft.) - Salt Lake City, Utah. 1976 - 1985 Contour Development*
*Corporation Joint Venture Partnership.*
> - *5 low rise office buildings, high design efficiency: new design/build and construction.*
> *Project management, site supervision, cost and contract accounting.*
> - *Urgent Care Medical facility: new design/build and construction. Project management, site*
> *supervision, cost and contract accounting.*

*Commercial strip mall shopping centers - Utah, Wyoming, Colorado. 1976 - 1985 Contour*
*Development Corporation Joint Venture Partnership.*
> - *5 strip shopping centers with fast food pads: new design, build and construction. Project*
> *management, site supervision, cost and contract accounting.*

*Land acquisition, zoning, subdivision, heavy construction site improvements, and real estate sales in*
*Utah (Park City, Salt Lake City, St. George), and Nevada (Clark County, Henderson, Reno). 1978 -*
*1988 Contour Development Corporation of Utah, PIC Corporation of Hawaii.*
> - *Strategic budgeting, acquisition, leasing, cash flow analysis, and environmental site*
> *management. Zoning, planning, financing, property management, and supervision of*
> *marketing. Sole quality control responsibility and management of construction subcontracts.*

*Land acquisition, revenue projection and planning, pricing, competitive analysis of real estate*
*holdings - continental U.S. Reagan National Advertising, Inc. Philadelphia, PA. 1989 - 1990.*

- Real estate acquisitions for outdoor advertising operations in Houston, Austin, San Antonio, Laredo, Corpus Cristi, Baltimore, Philadelphia, New York City, Salt Lake City, Ogden, and Provo. Demographic analyses concerning population growth, income, economics, consumer demand, housing, transportation, and infrastructure.

*Real Estate use planning* - Philadelphia, PA  1987 - 1989

- Developed planning for redevelopment, renovation, and management of mixed use urban locations in Philadelphia. Wrote plans for the development of affordable housing in Philadelphia.

*Resort, commercial, and industrial* - *Honolulu, HI  1977 - 1987*

- Acquisition, financing, legal structuring, design, leasing and planning of various resort hotels, warehouses, and office buildings in Hawaii. Approved designs. Secured financing. Drafted legal documents and secured permits and licenses. Wrote management plans. Supervised quality assurance managers. Negotiated purchase and sale prices.

• Quantitative analyses:  Risk management; Econometrics; Stocastic forecasting; Corporate budgeting; Mergers and acquisitions; Sale and leasebacks; Commercial Real Estate - office buildings, shopping centers, resorts; Impact planning; Global and domestic marketing plans; Equities and debt obligations; Real Estate securitization.

• Project Implementation:  Cash flow modeling; product marketing; Divisional budget modeling; Strategic financial modeling; Writing and implementing personnel procedures and compensation manuals.

• Corporate Restructuring:  Restructured senior and junior debts for U.S. corporations, wrote strategic plans, established profit center budgets, wrote procedures and personnel manuals, and reorganized executive management.

• Management Consulting:  Research and writing of strategic plans for international business. Raised equity financing for real estate development projects, foreign trade, startup ventures. Analysis and reports on profit, cash flow, and investment evaluations for corporations. Developed think tanks for media and real estate businesses. Managed business turnarounds. Provided litigation support for commercial litigation. Designed and instructed intensive multi-day seminars in team dynamics and personal empowerment.

• District Judge:  1982 - 1988:  District Judge, Per Diem, First Circuit, State of Hawaii.

## ENVIRONMENTAL SUPPLEMENT

• Environmental Industry:  1989 - present. Founder and CEO of BioGenesis℠ Pacific, Inc. Global strategy concerning proprietary technologies for waste management, ordnance and explosive waste disposal and remediation of contaminated soil and water. BioGenesis℠ cleaning products are listed on the U.S. National Contingency Plan Product Schedule for use in the EPA Superfund Innovative Technology Evaluation (SITE) Program to remediate contaminated soil and water. On-site operations, site audit, site technological application, and equipment operation in soil cleaning and industrial wastewater remediation. Management of unexploded ordnance disposal, air transportation, ocean barging, base maintenance support operations,

geologic and topographical data processing, surveying, heavy construction, archeological assessments, botanical services, and environmental project planning.

• Environmental & Tax Attorney: 1976 - present. Assessment of corporate environmental liability - Utah, Colorado, Nevada, Philadelphia, Baltimore, Texas, California, Hawaii. Mergers and acquisitions; recapitalization of financial, manufacturing, and service companies; financial structuring of real estate developments; human resources and compensation; pension and benefit plans; and tax litigation.

• Environmental Training and Education: 1989 - 1992.
Mr. Lam spent months in Europe studying, field auditing, and field operating equipment on contaminated soil sites. He studied every aspect of BioVersal Umlatech contaminated soil cleanup projects in Hamburg, Germany and Grotz, Austria acquiring substantial field experience in cutting edge technology unavailable to the U.S.

1. May - June 1989: Germany, Austria, France, Switzerland - study of carbon filtration, reverse osmosis technology proposed by European companies. Research of soil cleanup technologies. Compilation of technical data and scientific papers regarding cutting edge technology for cleaning contaminated wastewater and contaminated soils.

2. September 1989 - January 1990: Utah, Colorado - study of the science of water purification methods specifically studying pyrolitic methods and solar/enzyme processing.

3. September - October 1990: Germany, France, Austria, Switzerland. Research, study of field operation, conducting of field audits, study of specialty equipment engineering, and equipment operation on a contaminated soil site in Hamburg, Germany. Research and study of methods of laboratory engineering of bacteria mutations for remediating hydrocarbons in soil. Studies include:

   a. Hygiene Institute of the Ruhr studies of 1987 concerning technological breakthroughs for rapid biodegradability, low toxicity, ability to remove hydrocarbons from soil, and ability to accelerate the rate of biodegradation.

   b Hygiene Institute of the Ruhr studies of late 1987 concerning technological breakthroughs revalidating the earlier study.

   c. Hygiene Institute of the Ruhr studies of 1989 concerning technological breakthroughs to clean weathered Alaskan crude oil from rocks polluted by the Exxon Valdez spill.

   Hygiene Institute of the Ruhr studies and field tests of late 1989 concerning removal of heavy metals from soil.

   Hygiene Institute of the Ruhr field study of late 1989 concerning the cleaning of earth contaminated with mineral oil and aromatic hydrocarbons at Leverkusen, FRG.

   Hygiene Institute of the Ruhr field study of late 1989 concerning the cleaning of earth contamination at the Shell service station at Dortmund, FRG.

   e. Biomonitoring Services Laboratory (Gulf Breeze, FL) research studies of BioVersal chemicals:
      (1)    Acute toxicity tests minnows and brine shrimp re EPA compliance pursuant 40 CFR 300;
      (2)    Chemical analysis and testing for heavy metals and chlorinated hydrocarbons compliance pursuant 40 CFR 300.
      (3)    Acute toxicity tests #2 fuel oil, minnows and brine shrimp re EPA compliance pursuant 40 CFR 300;

4. November 17-19, 1992: Technical Paper presentation at the *EPA's Fourth Forum on Innovative Hazardous Waste Treatment Technologies: Domestic and International*, San Francisco, CA.

5.  September 20-23, 1993:  Paper presentation at the Eight Annual Conference on Contaminated soils, University of Massachusetts at Amherst.  <u>Remediation of Contaminated Soil & Sediment Using the Biogenesis washing process.</u>

6.  1991 - 1992: Emerging Technology, Demonstration, and Commercial phases of the *EPA Superfund SITE (Superfund Innovative Technology Evaluation) Program* to completion of the EPA's ITER (Innovative Technology Evaluation Report).  "Biogenesis Soil Washing Technology", EPA/540/R-93/510, Risk Reduction Engineering Laboratory, Office of Research and Development, U.S. Environmental Protection Agency, Cincinnati, Ohio.

    May 1992, Site #1 - Santa Maria, CA, cleanup of soil contaminated with No. 6 fuel oil (bunker fuel). November 1992, Site #2 - Minnesota oil refinery, cleanup of soil contaminated with crude oil.
    (a) Project coordination
    (b) Technology application
    (c) Demonstration and field operations of subcontractors, equipment, and permits
    (d) Site security and equipment maintenance
    (e) Daily site audits and lab analyses
    (f) Cost and personnel analyses.

7.  Confidential Technical Report - Bench Scale treatability study of a former wood treating facility site contaminated with carcinogenic PAHs, pentachlorophenol, creosote, arsenic, and petroleum waste from vehicle maintenance and fueling.

8.  Equipment studies of the following:
    (a) SKIT-aquaclean - wastewater cleaning by automatic breaking and de-oiling of stable technical emulsions from industrial sources.
    (b) RWO COLA Oil/Water Separation System - coalescence stage for the separation of micro-dispersed oil particles from waste water.
    (c) RWO SIKA Aquaclean System - gravity separation.
    (d) SINO System - ring chamber separator for removal of oil and fat from water.
    (e) Oil-in-water monitors, type OCD for industrial applications

9.  Publication and submission with the State of Hawaii Department of Health <u>Biogenesis Operations Manual</u> re EPA regulatory field guidelines, site procedures, technology, and compliance.

## EDUCATION

1987-89    **The Wharton School of Business, University of Pennsylvania, M.B.A.,** majors in Real Estate Management and Finance.

1976-78    **The Graduate Tax Law Program, University of Denver Law School, LL.M. in Taxation**.

1973-76    **J. Reuben Clark Law School, Brigham Young University, Utah, Juris Doctor (J.D.)**

1969-73    **Brigham Young University, Provo, Utah, B.A.** in Political Science.  Deans List and National Honor Society.

1962-69    **The Kamehameha Schools, Honolulu, Hawaii** High School degree.

## MISCELLANEOUS INFORMATION

NAIA National Volleyball Championship Team member.  Gold medals in volleyball, swimming, track & field, snow skiing, fencing, gymnastics, and wrestling.  Work and study in human physiology, anatomy, and kinesiology.  Fine art commissions and awards for works in watercolors, pastels, charcoals, and ceramics.

Graduate and protégé of Papa Henry Auwae, Po'okel_ Kahuna La'au Lapa'au in the practice of ancient Hawaiian spiritual healing, medicinal herbs, and cultural restoration.

Internships and studies in clinical psychology and human behavior. Instructor and Senior disciple of Masters Cheuk-Tse and Ho Ngau in the Kung-Fu systems of White Crane, Tibetan Llama Hop Gar, Choi-Li-Fat. Practitioner of Tao-Gar of Master Lum Dai Yung. <u>Past articles and monographs</u>: legal aspects of health care; Chinese philosophy, Chinese physical culture, Chi Tao; employee compensation and benefits, corporate tax law; and personnel management and incentives.

Professional Avocations: artworks in portrait and anatomy; iridology; acupuncture/herbs/nutrition; Asian knockout fighting,(ret); aerobatic flying (ret); hanggliding (ret), snow skiing (ret), surfing (ret).
Non-professional: creative writing, piano, guitar, windsurfing, competitive sports: swimming, volleyball.

# EXHIBIT 2



*A Native Hawaiian Company*
**BioGenesis Pacific, Inc.**

Eugene O'Connell
Rhino Builders, Inc.
790 North Marine Drive
Box 959
Tumon, Guam 96911

January 2, 2001

RE: Invoices 1313, 1288

Dear Mr. O'Connell

We are in receipt of your correspondence concerning your Guam subcontract with our company. Your subcontract was subject to a verbal agreement which provided that 50% of the net profits would be determined after all actual costs to both BioGenesis Pacific, Inc. (BPI) and Rhino. In return, you represented that Rhino was capable and would front all the needed facilities, personnel, financing and bonding through the term of each task order. Furthermore, Rhino was consistently given clear and specific instructions not to cause any task orders to be accepted from the Navy unless Rhino was certain that each specific task order would result in a profit or break even at worst under our said agreement. If there was any doubt, Rhino was not to cause any task order to be accepted. BPI relied upon Rhino for the acceptance of each task order.

BPI has been disappointed by Rhino's affirmative and specific actions to repudiate and breach its subcontract with BPI. This had been especially damaging since upon Rhino's urgings BPI had wholly relied upon Rhino's management and facilities on Guam. You ordered all work stopped midway during performance of task orders that caused BPI to default on its general contract with the Navy incurring liquidated damages. Next, without notice or warning, you ordered all equipment to be shutdown, including equipment owned by BPI located at your facilities. And then, you even attempted to evict BPI from the office facilities without proper legal notice. That you have perniciously breached your subcontract with BPI causing much damage it clear.

For these reasons, your invoices are unacceptable as well as premature. I am shocked over your actions for it seems obvious that you intended to cause BPI to fail with the Navy allowing Rhino to succeed in the Navy roofing contract? While I hope this is not the case, BPI has to first determine the actual costs after completion of the all task orders. Secondly, BPI must determine Rhino's performance on its subcontracting. Then BPI must determine fair damages incurred by Rhino's breaches.

As BPI yet looks forward to an amicable relationship, any misunderstandings must be settled and matters handled fairly.

Very truly yours,

Gerald Lum

Corporate and Programs Control • 1604 Ulualana Place • Kailua, Hawaii 96734 USA • 808-263-7777 • FAX 808-263-0002

EXHIBIT 2

10A

**EXHIBIT 3**

From: Bpihawaii@aol.com
Sent: Tuesday, February 08, 2000 11:36 AM
To: tarltonj@pwcguam.navy.mil
Subject: Site Visit: Roof Repair N62766-99-D-0425

Ms. Jean Tarlton, Contracting Officer
Facilities Support
Contracts-Construction Branch

Dear Jean,

PLEASE DISREGARD THE PREVIOUS CORRESPONDENCE. A CORRECTION IS MADE
BELOW. CONCERNING OUR REPRESENTATIVES FOR THE SITE VISIT. The names for
Mr.Tanisiro and Mr. Williams were inadvertantly mixed. The correction is below.

Per our conversation today, we must consider the notice from the attorneys for Hawpe Construction,
Inc. that a complaint and a petition for preliminary injunction protesting the award of N62766-99-D-
0425 will be filed in the future. I must assume that the complaint is asking for an award to Hawpe.
Because a trial hearing is not prompt, Hawpe is asking for a preliminary injunction to freeze further
actions under the current contract award to BioGenesis Pacific, Inc. However, to date, I have no
knowledge of an actual filing.

Last week, I received both of your notices for pricing and confirmation of scope of work. To minimize
the financial risks, I would like to direct my current, local Guam project representative to schedule a
site visit with Mr. Ron Larrew tomorrow. I would then like to immediately process his information here
in Honolulu and expedite my response and confirmation for the tasks with your office. I would also
like to direct one of my subcontractor consulting representatives to also attend this initial site
visit at the same time. The individuals are as follows:

Mr. Richard Avilla, Estimator, BioGenesis Pacific, Inc.
      ss#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  DOB: 08-22-43

Mr. Tarko Tanisiro, Project Supervisor, BioGenesis Pacific, Inc.
      ss#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  DOB: 01-26-62

Mr. Alfred Garthe III, VP, Rhino Builders, Inc. (sub)
Mr. Aaron Williams, Supervisor, Rhino Builders, Inc. (sub)

Should you have any questions or concerns please call me at (808) 263-7777 or
my cellular phone at (808) 754-3322.

Mahalo,
Gerald N.Y.C. Lam, President
BioGenesis Pacific, Inc.

EXHIBIT 3

File   Edit   View   Favorites   Tools   Help

Address  □ - Lam\BIOGENESIS File retrived from Hard disk\Site Visit Roof Repair N62766-99-D-0425 ▼    ⟳ Go    Back

| Name / | Size | Type | Modified |
|---|---|---|---|
| Site Visit Roof Repair N62766-99-D-0425.txt | 3 KB | Text Document | 2/8/2000 12:13 PM |

1 object(s)                                                      2.12 KB        Local intranet

# EXHIBIT 4



**A Native Hawaiian Company**
**BioGenesis Pacific, Inc.**

Ms. Rose Dejapa

**DEPARTMENT OF THE NAVY**
U.S. NAVY PUBLIC WORKS CENTER
PSC 455, BOX 195
FPO AP 96540-2937
OFFICER IN CHARGE OF CONSTRUCTION
PSC 455, BOX 175
FPO AP 96540-2200

July 17, 2000

RE: Letter of Appointment

Dear Ms. Dejapa,

I had sent letters of appointments previously and am sending another pursuant to your latest request. Mr. Richard Avilla is authorized as our Project Manager to execute and sign contract documents on behalf of BioGenesis Pacific, Inc. He works for BioGenesis Pacific, Inc. and is compensated as such. I supervise him regularly.

The inordinate delay of the stop work orders due to the Hauwpe Construction protest and again the later complaint in the U.S. Court of Claims has required that I organize my efforts to accommodate the Navy's most immediate desires. Meeting procedural deadlines of the Court of Claims was a priority and original documents were sent to my counsel with respect to the action in Washington D.C. Furthermore, your office had misplaced some of its various documents and correspondence. Consequently, we cannot locate your office's approvals of the Safety and QC Plans originally received.

We have since hired Mr. Avilla there as the quickest convenience to service your needs. As we are a small company, we look forward to gearing up to the demands of the contract. The circumstances of the protest and Court of Claims petition in questioning and delaying this contract imposes a gigantic financial risk to my company. We look forward to coordinating closely with your staff so that I can prepare my finances, materials and labor effectively while performing efficiently for you. It is still my goal to utilize as much local services and labor as possible.

Thank you for your consideration. Please call me for any questions that you might have.

Very truly yours,

*Gerald N.Y.C. Lam*

Gerald N.Y.C. Lam
President

**EXHIBIT 5**



## FAX TRANSMITTAL

TO:        Rhino Builders    Mike O'Connell  668-7024  FAX

FROM:      Gerald N.Y.C. Lam

DATE:      February 7, 2000

RE:        Guam Roofing N62766-99-D-0425 Task Order Subcontract Solicitation   TOTAL PGS: 1

### TASK 1:

SCOPE OF WORK:  Scrape off existing fluid type roofing system appx 500 SF.  Clean concrete roof and grout depressed areas creating crickets to roof drains and install fluid applied roofing membrane.

LOCATION:  SE corner above DRMO office spaces, BLDG 631, COMNAVMAR, Main Base

| 0001AA | Demolish & dispose roofing system per sections 02220, 13281, 13282: single or multi-ply membrane without insulation | 500 SF | 0.51 | $   255 |
| 0002AC | Repair concrete roof deck surface per sections 03930, 07920; grout depressed areas | 500 SF | 6.99 | $3,495 |
| 0015AA | Misc:  Waterblast roof surface per section 07572 | 500 SF | 0.15 | $    75 |
| 0017AB | Fluid applied roofing membrane per section 07540; 45 mils thick roof membrane | 500 SF | 2.91 | $1,455 |

### TASK 2:

SCOPE OF WORK:   Repair / replace stainless steel expansion joints, waterblast/clean and reseal all construction joints on all breezways at location.

LOCATION:  All breezeways from BQ1a to BQ20, COMNAVMAR. Main Base

| 0002AD | Reseal construction joints | 4081 LF | 0.98 | $3,998.40 |
| 0002AE | Replace expansion joint assembly, to 2" space, stainless steel | 140 LF | 13.26 | $1,856.40 |
| 0015AA | Misc:  Waterblast roof surface per section 07572 | 4080 SF | 0.15 | $  612.00 |
| 0017AA | Seal Joints and penetrations 6" wide | 4080 LF | 0.56 | $2,284.80 |
| 0021AA | Resecure metal flashing (spot repair) | 850 SF | 3.69 | $3,136.50 |
| 0022AA | Trim / Dispose tree branches obstructing roofing operation | 100 LF | 2.41 | $ 241.00 |

My contact is Mr. Ron Larrew (671) 339-4846 for site visit.  I must confirm my prices with the CO as listed above or change the scope of work as we deem necessary.  **My deadline to confirm is this week Guam time.**

### BioGenesis Pacific, Inc.

1604 Ululana Place • Kailua, Hawaii  96734 USA • 808-263-7777 • FAX 808-263-0002

## EXHIBIT 5

**EXHIBIT 6**

# D. Moana Silva

| | |
|---|---|
| **From:** | Richard Avilla [rhinogum@ite.net] |
| **Sent:** | Sunday, April 30, 2000 7:38 PM |
| **To:** | russ@hgea.org |
| **Subject:** | FW: Up Date |

Russell
Let me know about camera . when I can expect
Richard
-----Original Message-----
From: Richard Avilla [mailto:rhinogum@ite.net]
Sent: Monday, May 01, 2000 8:31 AM
To: Bplhawaii@aol.com
Subject: Up Date

Hi Gerald:
We are waiting on Edward Ballesta, He is in contact with customer on Bldg. 3,000 who wants to know more about fluid applied system. should be soon, will keep you informed. I picked up a scanner. cost 170 dollars. Russ says you will pick up camera. I've USB ports in my computer.

Ed B. says there are 4 more bldgs to look at but I think they want to settle the bldgs we already looked at first.

Navy wants you here for pre-con meeting and said they will hold off meeting until you are able to be here. I'm waiting to hear from them when that will be. Will keep you informed.
Richard

EXHIBIT 6

1

# EXHIBIT 7

## D. Moana Silva

**From:** Richard Avilla [rhinogum@ite.net]
**Sent:** Friday, May 12, 2000 9:41 AM
**To:** Bpihawaii@aol.com
**Subject:** FW: WR #31970, RPR ROOF AT DENTAL CLINIC

**Importance:** High

  

Microsoft Word -
31970.rfp.pdf...

31970SOW.pdf

31970.pdf

Having problems opening this attachments, ACDSee.

new roofs to look at this monday, tuesday.
Richard

-----Original Message-----
From: Mendiola, Johanna G. (OICC) [mailto:mendiolj@pwcguam.navy.mil]
Sent: Friday, May 12, 2000 1:45 PM
To: rhinogum@ite.net
Cc: Suh, Youngtae LTJG (PWCGU); Ballesta, Edward R. (PWCGU); Dejapa,
Rosita (OICC); Terlaje, Bennett M. (OICC); Motsko, Matt LT, USN (OICC);
Fontanilla, Jess (OICC); Lujan, Jose S.N. (OICC); Hipp, Michael LT, USN;
n461@guam.navy.mil; n4616@guam.navy.mil
Subject: WR #31970, RPR ROOF AT DENTAL CLINIC
Importance: High

Site visit scheduled Tuesday, 05/16/00 at 09:00 a.m. Meet at Dental Clinic
Bldg 1.

<<Microsoft Word - 31970.rfp.pdf>>   <<31970SOW.pdf>>
<<31970.pdf>>

Johanna G. Mendiola
Contract Specialist
Tel: (671) 339-8098
Fax: (671) 339-4231
mendiolj@pwcguam.navy.mil

EXHIBIT 7

2

**EXHIBIT 8**

## D. Moana Silva

**From:**       Richard Avilla [rhinogum@ite.net]
**Sent:**       Monday, May 29, 2000 11:05 AM
**To:**         russ@hgea.org
**Subject:**    FW: W/R 31965 Roof Repair to Bldg. 521 Camp Covington, Guam.


RFP 0425 Roofing B
521.doc


31965SOW.pdf

Please Advise, also note time to submitt

Richard
-----Original Message-----
From: Dejapa, Rosita (OICC) [mailto:dejapar@pwcguam.navy.mil]
Sent: Thursday, May 25, 2000 5:09 PM
To: bpihawaii@aol.com; rhinogum@ite.net
Cc: Ballesta, Edward R. (PWCGU); Suh, Youngtae LTJG (PWCGU);
gilbertj40@hotmail.com; N4611@guam.navy.mil
Subject: W/R 31965 Roof Repair to Bldg. 521 Camp Covington, Guam.

All,

See attached RFP and Statement of Work. Reply for any further questions.

  <<RFP 0425 Roofing B 521.doc>>      <<31965SOW.pdf>>

R/

Rose N. Dejapa
Tel: 339-8475
Fax: 339-7245
E-mail: (dejapar@pwcgaum.navy.mil)

EXHIBIT **8**

# EXHIBIT 9

# D. Moana Silva

**From:**        Richard Avilla [rhinogum@ite.net]
**Sent:**        Thursday, June 08, 2000 11:11 AM
**To:**          R. Fong
**Subject:**     RE; Pre-Con. Meeting

Russ
(671) 632-7653 Phone
I check no Plans were approved from this end. If BPI submitt with the origenal bid thats all it was and just a general Plan. I submitted the safety plan Gerry sent me with the required Information, Hopefully they will approve that. waiting on word from them. I've Not submitted no CQC plan only responsability chart and authorization letter.designating Alfred Garthe III as CQC manager with AAron William and Tarko Tanisiro as CQC agents. I need you to send me the CQC plan Gerry submitted, I dont want to make any mistakes that will cause any delays. I've ask for time extention also.
Again I want you to know no plans was approved.It is after the pre-con meeting phase plans are submitted for approval and activity hazard analysis spacific to job is submitted.
If there is anything else call or E mail
Richard

-----Original Message-----
From: R. Fong [mailto:russ@hgea.org]
Sent: Friday, June 09, 2000 4:37 AM
To: Richard Avilla
Subject: RE: Pre-Con. Meeting

Hi Richard,

I lost your phone number -- please e-mail or call me at 808-754-4822 Cell
Ph. and my voice mail kicks in -- leave a message where I can reach you.

This message you sent to me about the CQC plans & Safety plans -- were you checking to see if BPI previously submitted the CQC & safety plans to be approved when the bid was submitted, or did you submit your own CQC & Safety plans. Please advise.

Call me
Thanks. Russell

-----Original Message-----
From: Richard Avilla [mailto:rhinogum@ite.net]
Sent: Wednesday, June 07, 2000 10:46 AM
To: russ@hgea.org
Subject: Pre-Con. Meeting

Hi Russ
We had the pre-con meeting yesterday for BioGenesis W/R 31973 It seems the CQC plans and Safety Plans have not been approved while I have Bio safety I don't Have the CQC plan. we cant start work with out first approval of both.
If plans have been approved send me the approval sheet. should have both .
If not im asking for time extension. until both plans can be submitted and approved. I don't want to do anything to jeopardize this contract so please advise as to what you folks want done.
Richard

EXHIBIT 9

# EXHIBIT 10

## D. Moana Silva

**From:** Richard Avilla [rhinogum@ite.net]
**Sent:** Tuesday, June 20, 2000 6:20 PM
**To:** Gerald Lam
**Subject:** WR#31063

All looks good will submitt RFP today
did site visit. This job is a rush.
need the letters of exceptence on Safety, CQC plans.
Richard

EXHIBIT *18*

**EXHIBIT 11**

# D. Moana Silva

**From:**       Richard Avilla [rhlnogum@ite.net]
**Sent:**       Friday, June 23, 2000 10:15 AM
**To:**         Bpihawaii@aol.com
**Subject:**    RE: Safety,CQC approval Letter

Gerry
I do have a plan ready to go but It'll be diffrent from the one you submitted with the bid. Will that make a diffrence?
Richard

-----Original Message-----
From: Bpihawaii@aol.com [mailto:Bpihawaii@aol.com]
Sent: Friday, June 23, 2000 9:16 PM
To: rhlnogum@ite.net
Subject: Re: Safety,CQC approval Letter

Richard,

You have any useful forms of QC plans relevant to the work there around?

Gerry

*EXHIBIT II*

**EXHIBIT 12**

## D. Moana Silva

**From:**          Richard Avilla [rhinogum@lte.net]
**Sent:**          Monday, July 10, 2000 1:44 PM
**To:**            Russell
**Cc:**            Gerald Lam
**Subject:**       Safety Plan

Hey guys I really need some help here!!
Time running on this job 60 days to do, and still need approval on Plans, both QC and SP.
Contact me soon.
Richard

EXHIBIT 12

1

# D. Moana Silva

**From:** Richard Avilla [rhinogum@ite.net]
**Sent:** Friday, July 14, 2000 2:23 PM
**To:** Bpihawaii@aol.com
**Subject:** RE: Labor Prices

How's the safety plan coming? I Think we'll be getting Bldg 3000 soon, within the week. We will need safety equipment, Railings, cables and such. along with safety, CQC plans. I cant feagure out why plans was approved for Polaris point, except its a rush order. I'm kind of confused on this. How ever will continue to do my best.
Richard

-----Original Message-----
From: Bpihawaii@aol.com [mailto:Bpihawaii@aol.com]
Sent: Saturday, July 15, 2000 7:48 AM
To: rhinogum@ite.net
Subject: Re: Labor Prices

Richard,

Go ahead with the pricing that you have figured.

Gerry

1

**EXHIBIT 13**

## Dean Akita

**From:**     Richard Avilla <bpiguam@guamcell.net>
**To:**       <Bpihawaii@aol.com>
**Cc:**       R. Fong <russ@hgea.org>
**Sent:**     Saturday, November 04, 2000 10:19 AM
**Subject:**  Safety,CQC Plans

Good Morning
I was able to find Disk with CQC and Safety Plans for BioGenesis, But there are no signed Cover sheet by
Government as Gerry stated. Thats what I need, sheet that the Gov. Accepted both plans. with that I'm good
to go.
Richard

EXHIBIT *13*

12/26/02

# EXHIBIT 14

## Dean Aklta

**From:**     <Bpihawall@aol.com>
**To:**       <bpiguam@guamcell.net>
**Sent:**     Monday, November 06, 2000 12:42 PM
**Subject:**   Re: CQC Plan, Safety Plan

Richard,

I will have to sort through the boxes to find the Safety and QC plans. I'll
send them to you. I didn't get any approval letters for them of course as
you would have had that record there in Guam. You didn't send approval
comments to me.

aloha,

gerry

EXHIBIT *14*

# EXHIBIT 15

## Michael Nawaiki O'Connell

**From:** "Richard Avilla" <bpiguam@guamcell.net>
**To:** <Bpihawaii@aol.com>
**Sent:** Wednesday, November 08, 2000 11:32 AM
**Subject:** Re: CQC Plan, Safety Plan

Hi Gerry
I found The Plans, on a disk I saved Too. What I need is the Cover sheet for
both plans that the Government Signed Accepting them, when you sent in your
bid .As for the approval I got, was a plan I put together, before you sent
me Bios .only work because of emergency jobs.and Job specific. now there
looking real close, I do have your plans. If you got the cover pages with
some official signature. If not I'll work something out. Had a meeting with
the heads of Dept Bennette, Matt They'll work with us on getting D.O. on
track. How are things coming with Rhino?
Richard
----- Original Message -----
From: <Bpihawaii@aol.com>
To: <bpiguam@guamcell.net>
Sent: Tuesday, November 07, 2000 8:42 AM
Subject: Re: CQC Plan, Safety Plan


> Richard,
>
> I will have to sort through the boxes to find the Safety and QC plans.
I'll
> send them to you.  I didn't get any approval letters for them of course as
> you would have had that record there in Guam.  You didn't send approval
> comments to me.
>
> aloha,
>
> gerry
>

EXHIBIT *15*

12/27/02

**EXHIBIT 16**

## Dean Akita

**From:** <Bpihawaii@aol.com>
**To:** <bpiguam@guamcell.net>
**Sent:** Sunday, November 12, 2000 4:24 PM
**Subject:** Re: CQC Plan, Safety Plan

Richard,

I do not have the cover pages with the Navy approvals. Please help me work
this out with the Navy once and for all so that we can get it out of our
hair. Let me know what you need from me up here.

aloha,

gerry

EXHIBIT _16_

12/18/02

# EXHIBIT 17

Warren Nobles, *Consultant*
1270 N. Marine Drive. Suite 453
Tamuning, Guam 96912
Phone /Fax: 671-734-1388
Email: wnobles@guamcell.net

Friday, December 07, 2001

Mr. Eugene O'Connell
Rhino Builders Inc.
87-1610 Ulehawa Rd.
Waianae, Hawaii 96792

Dear Sir;

In response to your inquiry as to the events that occurred after my services were acquired to manage Biogenesis Inc. during Richard Avilla' s vacation last December and the subsequent separation of Biogenesis and Rhino Builders.

Please note that this took place one year earlier and some of the details may be approximated but as a whole are accurate to the best of my knowledge.

Prior to actually being hired directly by Richard Avilla to stand in for him while he was on vacation I had been assisting Alfred Garthe and Richard Avilla on a number of issues on the Biogenesis Contract known as IDIQ N62766-99-D-0426. So I was well aware of all the 18 delivery orders and status on all 18 active and open work orders.

Specifically when I assumed Richards position when he left for vacation I was informed to communicate with Russell Fong an assistant to Mr. Lam for my direction. Upon being given a advanced notice by George Allen that his instructions were to remove all possessions belonging to Rhino Builders and retrieve all vehicles and cell phones, I

2 ¥ o ¼ ¢ 8 ¼ ²

2. ¢ / ~ ~

EXHIBIT *17*

contacted Russell by phone and informed him of the upcoming events. I was instructed to do the following;

1. Go through all files in the filing cabinets and remove any documentation that referred to the Biogenesis IDIQ contract. This was done and the files that pertained to the IDIQ contract were packed in a box.

2. Further go through all files in the filing cabinets and remove any documentation that referred to Alfred Garthe III personal business. This was done and the files that pertained to Alfred Garthe III were packed in a box.

3. The next thing is was instructed to do was to purchase an new hard drive and find a computer technician that could Ghost or copy the complete hard drive in the computer that Richard Avilla had been using but which belonged apparently to Rhino Builders. This was done and the original hard drive was reinstalled back into the computer and the new copied drive was installed into a new computer purchased by Biogenesis.

4. The final order in conjunction with the turn over was to remove any files on the original hard drive that pertained to the Biogenesis, Al Garthe, and Richard Avilla. This was done but no Rhino roofing documents or spread sheets were removed.

5. After the removal of all Rhino Builders possessions I was instructed to change the locks on the premises.

During the entire transition Al Garthe was present and directly communicating with Gerald Lam and Russell Fong. During Richard Avillas absence while on vacation all money transfers were directed to Alfred Garthe for disbursement and purchasing. Further, I was informed that the Biogenesis office lease was solely in Al Garthe name and Biogenesis is and was authorized to use and control the premises. I was also instructed by Alfred Garthe that he was still the legal half owner of Rhino Builders Inc. This I didn' t question as it was Alfred Garthe that I dealt with when

Rhino Builders first came to Guam and I gave them their first contract on island. The Re-roofing sub-contract at the Guam Reef hotel.

Should you have further questions or need further assistance in this matter contact me by email. I re-iterate that this is a very week avenue to pursue.

Yours truly,

Warren Nobles

**EXHIBIT 18**

Warren Nobles
1270 North Marine Dr. Ste. 453
Tamuning, Guam 96912
734-1388 home phone and fax
wnobles@guamcell.net
689-5500 cell phone

3/7/2002 7:48:26 AM

Michael O'Connell
87-1610 Ulehawa Rd.
Waianae, Hawaii 96792

Good Morning Michael;

EXHIBIT *13*

Warren Nobles
1270 North Marine Dr. Ste. 453
Tamuning, Guam 96912
734-1388 home phone and fax
<u>wnobles@guamcell.net</u>
689-5500 cell phone

3/7/2002 7:48:26 AM

Michael O'Connell
87-1610 Ulehawa Rd.
Waianae, Hawaii 96792

Good Morning Michael;

My Goodness, I must say your phone call this morning was quite a co-incidence as I had a lunch meeting yesterday morning with Bill Mann Vice President of United Coating as he is on his semi-annual trip to Guam and at least half the conversation was spent discussing your Partner & Biogenesis and more specifically Contract Number: N62766-99-D-0425 No.0016 WR No. 32236 Title: Roof Coating at Harbor / View Housing 300 ComNavMar, Guam. M. I.

The main focus of our discussions was how your partner with the assistance of Richard Avila and Wayne Lassitar have been able to manipulate all the military work on the military contracts for the last three years for their personal gain at your companies expense at my expense and more so the militaries expense.

For the record and to establish a time line I was a paid consultant with Biogenesis from December 15, 2000 to April 09,2001 unpaid from October 15,2000 to December 15, 2000. During that period of time I was absolutely a witness to the fact that Biogenesis was utilizing 100% all Rhino Builders equipment. From vehicles, Office equipment, safety equipment and roofing installation and demolition equipment.

Further upon the separation of Biogenesis and Rhino Builders the majority of the equipments were claimed as being lost but in reality were moved to Biogenesis storage facilities which Al and Richard were in control of. I am also aware that during the first week of January those materials were purposely charged on the Rhino accounts for the purpose of completing roofing work on the Navy roofing contract.

I was witness to Rhino files being disseminated prior to the turn over to George Allen for all employee files and files that related to the military work.

The termination of my consulting services was based on the facts that your partner was receiving large sums of money from the supplier of Hydrostop. He was unwilling to change products (although that it was clearly evident that the product was incompatible with the existing roof system on the 300FHU on the above listed work order) Due to his personal gain and not in the best interest of the company he was working for, and/or the Navy's best interest proceeded to purchase and install a product which was clear to fail at others expense. I am fully aware that Al personally received close to $50,000 in kick backs on the Navy hospital renovation and the AFFB projects while I was actively involved with him.

It is my intention in assisting you in this matter that the present local management of Biogenesis be changed and that Mr. Lam be made aware of how his company is being run so that he might make a change. Further and most important is the fact that my involvement with your partner has left my credibility in question.

Should you wish a complete copy of all Rhinos and Biogenesis computerized records up to April 11, 2001 please advise so I can calculate the cost of copying to a new hard drive ready to plug into your office computer in Hawaii.

Please be advised that should you want these statements listed in an affidavit and notarized that will be no problem.

Yours Truly

Warren Nobles

# EXHIBIT 19

## Michael Nawaiki O'Connell

**From:** "Warren Nobles" <wnobles@guamcell.net>
**To:** "Michael O'Connell" <rhino1@hawaii.rr.com>
**Sent:** Wednesday, March 13, 2002 1:13 PM
**Subject:** More information

March 14,2002 8:50

Good Morning Michael;

I have in with me this morning someone that did some side jobs directly for Al and also will do an affidavit to provide proof
of atleast another $35,000.00 that went directly into Al's pocket and also helped in removing two Gravely machine, Two Rebuilt Motors, Door opening equipment, and three stray rigs, and all hand tools and scrappers, that Rhino Roofing Purchased that Al disposed of.

Further we have proof that Al was bidding against Rhino using another company to enter the bids. Also during the falling out he was being paid for by the by both Rhino and Biogenesis. Also all badges were under Rhino Roofing and were being paid by Rhino while working for Biogenesis. Thus the liability is on Rhino insurance and reputation. Further at the transition point all employees were given the opportunity to be Biogenesis employee's or fired.

On weekends when George was not there Rhinos trucks were used to transport equipment off the property and moved into storage.

Three jobs that George bid Al got the price and had Keith at Sundance Construction underbid the job approximately 90,000 was won by Sundance. Absolute Bid Rigging on Military Contracts.

All Rhino's safety equipment to include lanyards, harnesses are still being used by Biogenesis.

All the paint that was purchased through Paint Co was charged under Rhino Roofing was used on the fire stations and Biogenesis was paid for.

Big diesel air compressor owned by Rhino is presently up for sale by Al.

One of your containers was sold by Al to Tarco. One of your

4/2/02

EXHIBIT /9

company vehicles is still in Biogenesis Possession.

I now have atleast four other individual besides myself that have good information about what you need.

Let me know how you want me to proceed. Also at this time i can be of most value if you do not disclose who is and can feed you this information.

Warren

4/2/02

# EXHIBIT 20



# Rhino Builders, Inc. HUBZone & 8 (a) SBA Certified

**790 North Marine Drive, Box 959, Tumon, Guam 96911**
Phone: (671) 632-7653 - Fax: (671) 637-9618 - Email: Rhinogwa@ite.net

**85-841 B Farrington Highway, Waianae, Hawaii 96792**
Phone: (808) 668-8878 - Fax: (808) 668-7024 - Email: Rhino1@Hawaii.rr.com

Warren Nobles
BioGenesis Pacific, Inc.

January 3, 2001

Dear Warren;

This is our official notification that BioGenesis, Pacific, Inc. (BPI) is still in posession of and is using valuable property that belongs to Rhino Builders, Inc. (RBI). We want to make something perfectly clear. BioGenesis Pacific, Inc. and employees of BioGenesis, Inc. have no legal right to use property that belongs to Rhino Builders, Inc. We have been patiently waiting for BPI to return all RBI and are not willing to allow BPI to continue their unauthorized posession and use of this property.

All property was to have been turned over to me as RBI's representative on December 22, 2000. No vehicles were turned over at that time but I you told me that they would be delivered on December 26. As of now, three vehicles still have not been delivered to Rhino and we assume they are posessed by and being operated by BPI employees. In addition, none of the keys for these vehicles have been turned over to Rhino.

Any vehicle that is not in my posession at 8:00 AM January 4, 2001, will be reported as stolen property and we will pursue all legal remedies, civil and criminal, necessary for us to recover our property. We will be forced to make arrangements to have lock and ignition changes made to any vehicle which was in BPI's posession for which the keys have not been turned over by 8 AM January 4, 2001, and will hold BPI responsible for the cost of said lock and ignition changes.

On December 22, two cell phones from GuamCell were turned over to me and I was told that one was out with an employee but would be turned over on December 26, 2000. Our inventory shows that an aditional four phones are unaccounted for. The phone numbers for these phones are 688-1369, 687-0358, 688-6914, and 688-2030. Your employees are continuing to use some of these phones as of today, twelve days after you said everything would be turned over. They are accruing charges for which RBI will be responsible and they have no legal right to do so.

On December 22, we took posession of a computer that had previously been used by Richard Avilla and moved said computer to our office. You entered our office without our permission or knowledge and took the computer after we had already said that BPI could no longer use said property. This could be construed as a criminal act. I am consulting our office in Hawaii to see if they want to pursue it as such. I want it returned <u>immediately</u> upon your receipt of this letter.

George W. Allen
Director of Operations, Guam

EXHIBIT **20**

# EXHIBIT 21

**From:** &lt;Bpihawaii@aol.com&gt;
**To:** &lt;Maxxmgt@aol.com&gt;
**Cc:** &lt;russ@hgea.org&gt;
**Sent:** Monday, November 06, 2000 12:52 PM
**Subject:** Re: Guam Roof Contract

Mike,

Everything looks acceptable. I will also look forward to the breakdown of Richard's costs (salary, lodging, vehicle). RBI shall not be responsible for liquidated damages for TO 1 - 17. BPI shall guarantee payment to RBI for all completed and accepted work.

The nature of assignment of payments as I understand would be as follows. RBI is a subcontractor to BPI. RBI will need to take its subcontract and TO to their bank. And the bank will need from BPI assignment of payments under the subcontract direct to RBI's bank.

Gerry

EXHIBIT 21