FILED
DISTRICT COURT OF GUAM

FEB 19 2004

MARY L. M. MORAN
CLERK OF COURT

371

1 | James Lawhn
**OLIVER LAU LAWHN OGAWA & NAKAMURA**
2 | 707 Richard Street, Suite 600
Honolulu, Hawaii 96813
3 | Telephone No.: (808) 533-3999
Facsimile No.: (808) 533-0144
4 |
Stephen D. Tom
5 | **WHITE & TOM**
820 Mililani Street, Suite 711
6 | Honolulu, Hawaii 96813-2972
Telephone No.: (808) 547 5151
7 | Facsimile No.: (808) 599 4517

8 | Louie J. Yanza
**VERNIER & MAHER, LLP**
9 | 115 Hesler Place, Ground Floor
Governor Joseph Flores Building
10 | Hagåtña, Guam 96910
Telephone No.: (671) 477-7059
11 | Facsimile No.: (671) 472-5487

12 | **Attorney for Defendants AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY**

13 |

14 | **UNITED STATES DISTRICT COURT OF GUAM**

15 | UNITED STATES OF AMERICA FOR USE ) CIVIL CASE NO. 02-00008
AND BENEFIT OF RHINO BUILDERS, INC., )

16 | )
Plaintiff, )
17 | vs. ) **DECLARATION OF LOUIE J. YANZA IN**
) **OPPOSITION TO PLAINTIFF'S**
18 | BIOGENESIS PACIFIC, INC., AIG ) **SUBMISSION OF AFFIDAVITS OF**
TECHNICAL SERVICES, INC. and ) **TECHNICAL PATTEN AND MICHAEL**
19 | AMERICAN HOME ASSURANCE ) **O'CONNELL, FILED ON FEBRUARY 18,**
COMPANY, ) **2004; CERTIFICATE OF SERVICE**
20 | )
Defendants. )
21 | _____ )
BIOGENESIS PACIFIC, INC., )
22 | )
Counterclaimant, )
23 | vs. )
)
24 | RHINO BUILDERS, INC., MICHAEL )
O'CONNELL, MICHAEL DANFORTH, AND )
25 | JOHN DOES 1-10, )
)
Counter-Defendant. )
_____ )

1

**ORIGINAL**

| | |
|---|---|
| AMERICAN HOME ASSURANCE COMPANY | ) ) ) |
| Cross-Claimant, | ) ) |
| vs. | ) ) |
| BIOGENESIS PACIFIC, INC. | ) ) |
| Cross-Claim Defendant. | ) ) ) |

I, LOUIE J. YANZA, hereby declare pursuant to 28 U.S.C. §1746, as follows:

1. I make this declaration on personal knowledge, having personal knowledge of the facts herein contained, and am competent to testify if called upon as a witness at trial of the within entitled-action.

2. I am an individual over the age of 18. I am an attorney licensed to practice law within Guam and before the U.S. District Court of Guam.

3. I am an attorney with the law firm of VERNIER & MAHER, LLP, local counsel for Defendants AMERICAN HOME ASSURANCE COMPANY ("AMERICAN HOME") and AIG TECHNICAL SERVICES, INC. ("AIGTS").

4. Attached hereto as Exhibit "A" are true and correct copies of pertinent pages of David P. Ledger's transcript of his deposition taken on September 24, 2003.

5. Attached hereto and marked Exhibit "B" is a true and correct copy of a March 19, 2002 email from Judith Granville of AI Marine Adjusters, Inc. to David Ledger, which email Mr. Ledger testified to in his deposition.

2

6. Attached hereto as Exhibit "C" are true and correct copies of pertinent pages of Terry E. Thomason's transcript of his deposition taken on October 6, 2003, in the above-entitled action.

7. Attached hereto as Exhibit "D" is a true and correct copy of an April 9, 2002 redacted letter from Terry E. Thomason to Michael O'Connell of Rhino Builders, Inc., which letter Mr. Thomason testified to in his deposition.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 19th day of February, 2004, in Hagåtña, Guam.

LOUIE J. YANZA

C:\MarieBackup\My Documents\CLIENTS (NON-GIA)\USA-Rhino v BIOGENESIS-AIG\Pleadings\Declaration of LJY in Oppo to Submission of Patten & O'Connell Affidavits 021904.doc

3

# CERTIFICATE OF SERVICE

I, Louie J. Yanza, hereby certify that on or before February 19, 2004, I will cause to be sent by personal service or by facsimile a copy of the annexed **Declaration of Louie J. Yanza in Opposition to Plaintiff's Submission of Affidavits of Eugene Patten and Michael O'Connell, filed on February 18, 2004,** to the following parties at their place of business:

Ms. Janalynn M. Cruz
**CALVO & CLARK, LLP**
Suite 202, First Savings & Loan Building
655 South Marine Drive
Tamuning, Guam 96911

Ms. Catherine Bejerana Camacho
**BERMAN O'CONNOR MANN & SHKLOV**
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagåtña, Guam 96910

**Mr. Antonio L. Cortes**
Attorney At Law
233 Julale Center
424 West O'Brien Drive
Post Office Box BV
Hagåtña, Guam 96932-8973

**Mr. Frederick J. Kerley**
Suite 907, Pacific News Bldg.
238 Archbishop Flores Street
Hagatña, Guam 96910

Executed this 19th day of February, 2004.

**VERNIER & MAHER, LLP**
Attorney for Defendants
**AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY**

BY: _____
LOUIE J. YANZA

4

# UNITED STATES DISTRICT COURT OF GUAM

UNITED STATES OF AMERICA FOR USE ) CIVIL CASE NO. 02-00008
AND BENEFIT OF RHINO BUILDERS, INC., )
)
Plaintiff, )
)
vs. )  📄 **COPY**
)
BIOGENESIS PACIFIC, INC., AIG )
TECHNICAL SERVICES, INC. and )
AMERICAN HOME ASSURANCE )
COMPANY, )
)
Defendants. )
BIOGENESIS PACIFIC, INC., )
)
Counterclaimant, )
)
vs. )
)
RHINO BUILDERS, INC., MICHAEL )
O'CONNELL, MICHAEL DANFORTH, AND )
JOHN DOES 1-10, )
)
Counter-Defendant. )

## DEPOSITION OF **DAVID P. LEDGER**

Taken on Behalf of the Defendants

BE IT REMEMBERED That, pursuant to the Federal
Rules of Civil Procedure, the deposition of **DAVID P. LEDGER**
was taken before Cecilia F. Flores, a Certified Shorthand
Reporter, on Wednesday, the 24th day of September 2003, at
1:35 p.m. at the law office of Vernier & Maher, Ground Floor,
115 Hesler Place, Governor Joseph Flores Building, Hagatna,
Guam.

Exhibit
**A**

1    A    No, I have not.

2    Q    Two weeks ago?

3    A    I have not.

4    Q    Have you spoken to Don since last week?

5    A    No.

6    Q    Have you spoken to Don at all regarding this case?

7    A    Yes.

8    Q    When?

9    A    Before the Complaint was filed.

10   Q    What was the subject matter of that discussion?

11   A    Well, it was very limited. It involved -- see, Don

12   was the person that came in and asked me if our firm had any

13   connection with an organization he referred to as AIG, and

14   that was -- there was -- so there wasn't any substantive

15   discussion about Rhino Builders' claims or the preparation of

16   the Complaint. It was more like, hey, David, you know, does

17   the firm have a relationship with a company called AIG? Or

18   he may have said something to the effect of, I think we have

19   a relationship with AIG and what do you think about this,

20   meaning this case. So that was the context.

21   Q    What was your response?

22   A    My response was yes, I -- you know, I think that we

23   have done work either directly for AIG as an insurer of some

24   of our clients. And I said that John Osborne in our Saipan

25   office may also have a relationship with AIG or an AIG

1  company. It was a very brief conversation with Don. And I

2  think I finished up by saying, you know, let me think about

3  it and I'll get back to you. And that's been my only

4  conversation with Don Calvo.

5      Q   Well, did you think about it and talk to him later?

6      A   I did think about it, but I didn't talk to Don about

7  -- you know, the results of my thinking about it and the

8  results of what I did subsequent to that conversation --

9  those were -- because those issues involved potential

10  conflicts. My interaction with other partners in the firm

11  was limited to those partners who deal with those kinds of

12  issues.

13      Q   Okay, so let me step back here, Mr. Ledger. You

14  thought about it, you did some research, and you did come to

15  a conclusion?

16      A   I came -- yes, I did some research and I -- I'll

17  make this easy for you, and easy on me. At the time that Don

18  asked me that question, I was representing a company called

19  AI Marine Insurers, and the unique thing about that

20  particular representation was that the insured was Casamar

21  Guam and AI Marine Insurance Company was their liability

22  carrier. And when that case was assigned to me by AI Marine

23  Insurance, they specifically questioned that they, together

24  with Casamar, be identified as a Carlsmith client as opposed

25  to the typical situation where you're representing an insured

1    and an insurance company may be paying the cost of the

2    defense, but the insurance company is not your client.

3         Q    Right.

4         A    In this instance, they made a specific request that

5    we include them in our engagement letter and identify them as

6    a client, and we had done that.  So what I did after Don

7    brought this to my attention was I asked my contacts --

8         Q    Excuse me, Mr. Ledger.  So this AI Marine Insurance

9    Company was already ongoing when Don had approached you?

10        A    Correct.

11        Q    Okay.

12        A    It was ongoing for quite sometime.  So what I did

13   after Don came in and raised that -- raised that issue with

14   me, I contacted my person at AI Marine Insurance --

15        Q    Who was that?

16        A    Judith Granville, it's v-i-l-l-e at the end,

17   Granville.  Judith Granville was the person in charge of my

18   case and she's located in San Francisco.  And so I asked her

19   if AI Marine Insurance Adjusters or Company, I'm not sure, I

20   know it was AI Marine, I asked her if AI Marine Insurance was

21   an AIG company and -- and she said yes.  And then the next

22   thing that I asked her was whether or not she knew if AIG

23   Technical Services was also a company under the AIG umbrella,

24   and she also said yes to that question.  And at that point,

25   like I mentioned earlier, I basically turned over the

1  potential conflict issue and the analysis of what we should

2  or should not do to lawyers in our firm who are tasked with

3  making that determination.

4      Q    And which lawyers are those?

5      A    Primarily Jim Polish.

6      Q    Jim Polish.  From where?

7      A    He's in our Los Angeles office.

8      Q    When you spoke to -- Ms. Granville?

9      A    Granville.

10     Q    Did she say anything to you to the extent that

11  Carlsmith Ball should withdraw from representing Rhino?

12     A    No, she did not.

13     Q    Did she ever raise that issue about Carlsmith Ball

14  having some conflict of interest?

15     A    No.  She simply responded to the questions that I

16  posed to her.  And I think the only other thing -- she said

17  yes to both of those questions that I posed to her, and then

18  she said -- she identified another entity that -- she told me

19  that AI Marine Insurance was one more step removed from AIG,

20  the parent company, and she identified the intermediary

21  company and it was AI Marine-something.  And so that was the

22  chain between AI Marine Adjusters that I was working for and

23  the parent company, AIG; and that's all she said to me.  And

24  I could tell from the response that she was just -- she said,

25  here's the information, you decide what you need to do.

1    Q    Did you tell Ms. Granville that Rhino Builders had

2  filed a claim against AIG Technical Services, Inc?

3    A    No, I didn't because I didn't know the names at that

4  point.  What I recall telling Ms. Granville the purpose of my

5  -- I explained to her why I was asking questions, and what I

6  told her was that a client of Carlsmith had a potential claim

7  that would name or directly involve as a Defendant and surety

8  company that may also be an AIG company.

9    Q    Okay.  And what did she say to that?

10    A    What did she say to that?

11    Q    Yes.

12    A    She didn't say anything.  I was just providing that

13  to her as background so she would understand why I was asking

14  if AI Marine Insurance was an AIG company.

15    Q    You said a potential claim against a surety.  Who,

16  in your knowledge, was the surety at that time when you spoke

17  to Ms. Granville?

18    A    I didn't know.

19    Q    But didn't Mr. Calvo tell you that it was perhaps

20  AIG Technical Services, Inc?

21    A    No, he wasn't that specific.  That's why I just

22  answered your question by saying that the only thing I knew

23  at that point was the surety -- in my mind, there was a

24  chance that the surety may have been an AIG company, and

25  that's what I was trying to figure out.

1    Q    This conversation with Ms. Granville, was it -- is

2  it Granville?

3    A    Granville.

4    Q    Was it memorialized in writing?

5    A    Actually, it was a conversation -- it was an

6  exchange of e-mails.

7    Q    Do you have those e-mails?

8    A    Do I have them with me?

9    Q    Not with you now --

10   A    No.

11   Q    -- but is it still in your computer?

12   A    Yes.  Actually, they're -- Mr. Tolentino has them.

13 The printouts.

14   Q    Okay.

15   A    I think there was -- there was one from me, one back

16 from Judy, and maybe one more.

17   Q    Okay.

18   A    I know there was the question and then there was the

19 answer.

20   Q    So the e-mail was supposed to be provided to us

21 yesterday, but that was still being, I guess, reviewed by

22 your LA office?

23   A    I'm not sure if it's the LA office that's reviewing

24 them -- reviewing the documents.  Rossi Tolentino has been

25 designated as the Guam Carlsmith attorney that is -- that's

1    been tasked with responding to the question for documents.

2        Q    Okay.

3        A    And he and other lawyers in the firm will make a

4    determination which ones can be produced.  Mr. Cortes, as you

5    know, has waived his client's privilege to a certain extent;

6    and we're also analyzing the other documents in the file for

7    privileged -- content of privileged information.

8        Q    Did you tell Ms. Granville that Rhino Builders was

9    filing a claim, or just a potential client?

10       A    Just a potential client; and I didn't -- it was

11   sometime after that conversation that I first heard the name

12   Rhino Builders.  And at that point I spoke to Ms. Granville,

13   I think -- and I just used the words like a Carlsmith client

14   or a lawyer in one of our other offices representing a client

15   has this potential claim that they may bring in Guam.  It was

16   very, very general and very vague because I just didn't know

17   anything at the time.

18       Q    When was this conversation or this e-mail

19   correspondence?

20       A    I think the best way to put it in -- you would know

21   when we filed the Complaint, and I would say it took place

22   within 60 days, and I'm being -- I'm being very generous with

23   that.

24       Q    Sure.

25       A    It may have been within the 30 days prior to when

1 the Complaint was filed. I don't think it would have been

2 beyond 60 days before the Complaint was filed.

3    Q   Okay. Let me represent to you, Mr. Ledger, that

4 here in Exhibit B is a copy of the Complaint filed by your

5 law firm. Okay?

6    A   Okay.

7    Q   So your conversation or your e-mail correspondence

8 with Ms. Granville took place 30 days before the filing?

9    A   It would have been March 20th, 2000, and it probably

10 would have been -- a reasonable estimate would have been

11 between, I'll say February 20th, 2002 and March 20th, 2002.

12          MR. CORTES: I'm sorry, I didn't get the Exhibit

13 B.

14          MR. YANZA: It's in the packet. I took it out

15 of order, Mr. Cortes.

16    A   But it might have been -- you know, it might have

17 been before February 20th.

18          MR. YANZA: Okay.

19    A   But that's the time frame.

20 BY MR. YANZA: (Continuing)

21    Q   Were you aware when the Complaint was filed? In

22 other words, when the Complaint was filed by your office, did

23 you know which lawyer was taking care of the case and when

24 they filed it?

25    A   No, I didn't. I had -- had no reason to know. I

1   think the only -- the only -- the only thing I knew about the

2   filing of the Complaint is that there was -- there was a

3   concern over a time bar.  And so even though our firm was

4   engaged in a conflict analysis in deciding whether we could

5   continue on the case for Rhino, there was a decision made to

6   protect the interest --

7           MR. CORTES:  Can I just interject here?  I think

8   I'd like to strike the testimony about the concern over the

9   time bar, and object to anything, you know, except the extent

10  of our waiver as outlined in the September 22nd letter.

11  BY MR. YANZA: (Continuing)

12      Q    Okay, so anyway, you still proceeded to file the

13  Complaint?

14      A    Yes, it was obviously filed, but I did not -- I was

15  not involved in that personally.

16      Q    So you were not involved with the decision to file

17  the Complaint?

18      A    I was not.

19      Q    Were you involved with the decision to withdraw from

20  representing Rhino Builders?

21      A    I was not.

22      Q    Who was involved with the decision to withdraw from

23  representing Rhino Builders?  And I'm talking about the Guam

24  office.

25      A    Oh, in the Guam office?  I don't think anybody in

1   the Guam office was involved because we wouldn't make that

2   determination here; that would be made in Honolulu or Los

3   Angeles.

4       Q    Okay.  Who was involved with the decision to

5   withdraw from representing Rhino Builders in LA or in

6   Honolulu?

7       A    Well, I mentioned Jim Polish who was our firm

8   general counsel and -- the only other person that I'm aware

9   of, and it's because of the letter that Mr. Cortes just

10  recently provided to us, is Terry Thomason.  He apparently

11  wrote a letter to his then client or our then client, which

12  Mr. Cortes provided in redacted form, and I read that letter

13  for the first time when Mr. Cortes provided it to me just a

14  couple of days ago.  So that's the basis of my answer.

15      Q    Okay.  Since March 20th, 2002, has any AIG -- for

16  example, American Home Assurance Company, AIG Technical

17  Services, Inc. or any AIG affiliated entity approached you

18  about terminating your representation of Rhino Builders?

19      A    Never.

20      . Q    Would you happen to know if those entities I just

21  named approached any of your members of your law firm here in

22  Guam or in Hawaii or in LA to terminate representing Rhino

23  Builders?

24      A    Could you ask your question again?

25      Q    Sure.

1     A    Okay.

2     Q    Did American Home Assurance Company, AIG Technical

3 Services, Inc. or any AIG affiliated company, to your

4 knowledge, speak to or communicate with your law firm in

5 terminating Carlsmith Ball's representation of Rhino

6 Builders?

7     A    Not to my knowledge.

8     Q    Okay.  Do you think you would know who would have

9 knowledge of that matter?

10    A    Is your question if that had happened, would I have

11 learned about it?

12    Q    No.  If it had happened, who do you think in your

13 law firm would know about it?

14    A    Oh.  Well, my best answer would be Terry Thomason

15 because the relationship with Rhino Builders, he was

16 essentially their lawyer within the firm as far as I knew.

17    Q    Have you represented Rhino Builders before?

18    A    Personally?

19    Q    Yes.

20    A    First time I heard that name was in the context of

21 this case.

22    Q    Okay.

23    A    Whether any other lawyer at Carlsmith or other than

24 Terry Thomason, I don't know, but not me.

25    Q    Going back now to Exhibit A, Mr. Ledger, Paragraph 2

1  of Page 2 of the Subpoena, the 30(b)(6) designee.  Are you

2  the person most knowledgable concerning Carlsmith Ball's

3  communication and contacts with American Home Assurance

4  Company, AIG Technical Services, Inc. and American

5  International Group, Inc. and related and affiliated

6  companies regarding Carlsmith Ball's representation of Rhino

7  Builders, Inc.?

8      A    Yes, I've been designated as that person.

9      Q    So the only AIG affiliated company that you spoke to

10 about this case was AI Marine Adjusters?

11     A    That's correct.

12     Q    And at the time that you spoke to Ms. Granville, you

13 did not know who the potential client was?

14     A    That's correct.  Meaning Rhino Builders?

15     Q    That's correct.

16     A    I didn't know Rhino Builders at that time.

17     Q    Why did you bring that issue up to Ms. Granville?

18         MR. CORTES:  I guess I have a belated objection;

19 fact not in evidence, it's not really a potential client.

20 But go ahead.

21 BY MR. YANZA: (Continuing)

22     Q    Well, why did you bring the issue to Ms. Granville?

23     A    That goes back to what I said, because -- you know,

24 Don Calvo came in and he said words to the effect that, that

25 he had been asked to work on a case to be filed in Guam that

**From:** "Granville, Judeth" <Judeth.Granville@AIG.com>
**To:** 'David Ledger' <dledger@carlsmith.com>, "Granville, Judeth" <Judeth.Granville@AIG.com>
**Date:** 3/19/02 6:42AM
**Subject:** RE: AIG Technical Services

David:

American Home Assurance Company (the insurer), American International Marine Agency (from whose account your fees are paid), and A I Marine Adjusters, Inc. are each member companies of American International Group, as is AIG Technical Services.

So, yes we are all AIG companies.

Trust that this answers your question..

Regards,
Judeth Granville
A I Marine Adjusters, Inc, - San Francisco


> -----Original Message-----
> From:       David Ledger
> Sent:       Monday, March 18, 2002 11:25 PM
> To:   judeth.granville@aig.com
> Cc:   Donald Calvo; Sinforoso Tolentino; Terry Thomason
> Subject:    AIG Technical Services
>
> Judeth - Is AIG Technical Services a company related to the company which
> is paying our fees for our defense of the insured Casamar? I ask because
> a sub contractor client of ours seeks to sue a general contractor and its
> bonding company, apparently AIG Technical Services, for non-payment.   If
> you are able to reply, time is of the essence.  Thank you.
>
> David Ledger
> dledger@carlsmith.com
> Tel: 671-472-6813
> Fax: 671-477-4375


CC:       Donald Calvo <dcalvo@carlsmith.com>, Sinforoso Tolentino
<stolentino@carlsmith.com>, Terry Thomason <tthomason@carlsmith.com>

CBHNL000099

Exhibit
B

1                   UNITED STATES DISTRICT COURT

2                        DISTRICT OF GUAM

3

4         UNITED STATES OF AMERICA FOR   CIVIL CASE NO. 02-00008
          USE AND BENEFIT OF RHINO
5         BUILDERS, INC.,

6                        Plaintiff,

7              vs.

8         BIOGENESIS PACIFIC, INC., AIG
          TECHNICAL SERVICES, INC. and
9         AMERICAN HOME ASSURANCE
          COMPANY,
10
                         Defendants.
11         _____

12        BIOGENESIS PACIFIC, INC.,

13                       Counterclaimant,

14             vs.

15        RHINO BUILDERS, INC., et al.,

16                       Counter-Defendant.
           _____
17        AMERICAN HOME ASSURANCE COMPANY,

18                       Cross-Claimant,

19             vs.

20        BIOGENESIS PACIFIC, INC.,

21                       Cross-Claim
                         Defendant.
22         _____

23

24               DEPOSITION OF TERRY E. THOMASON

25


                    RALPH ROSENBERG COURT REPORTERS, INC.
                              (808) 524-2090

Exhibit

C

2

1       Taken on behalf of Defendants, at the Law Offices of

2  Oliver, Lau, Lawhn, Ogawa & Nakamura, 600 Ocean View
Center,

3  707 Richards Street, Honolulu, Hawaii, commencing at 2:00

4  p.m., on Monday, October 6th, 2003, pursuant to Notice.

5

6

7

8      BEFORE:          HEDY COLEMAN,  CSR  NO. 116
                        Notary Public, State of Hawaii

9                        Certified Shorthand Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

3

APPEARANCES:

For Plaintiff:        ANTONIO L. CORTES, ESQ.
                      233 Julale Center
                      424 West O'Brien Drive
                      Post Office Box BV
                      Hagatna, Guam 96932


For Defendant:        JAMES H. LAWHN, ESQ.
                      Oliver, Lau, Lawhn,
                        Ogawa & Nakamura
                      707 Richards Street
                      600 Ocean View Center
                      Honolulu, Hawaii 96813


For Witness:          GARY GRIMMER, ESQ.
                      Carlsmith Ball, LLP
                      1001 Bishop Street
                      2200 American Savings Tower
                      Honolulu, Hawaii 96813


        Also present:  Eugene Patten
                       Michael O'Connell

4

**I N D E X**

| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Lawhn | 5 |
| Mr. Cortes | 57 |

**EXHIBITS MARKED FOR IDENTIFICATION**

| | | |
|---|---|---|
| Exhibit 1 AFfidavit of Amy G. Self. | | 16 |
| Exhibit 2 Letter dated 10-22-01 to | | 25 |
| American Home Assurance Company from | | |
| Terry E. Thomason with attachments. | | |
| Exhibit 3 Letter dated 10-30-01 to Mr. or | | 28 |
| Ms. Thomasen from Mark Titherington, | | |
| one page. | | |
| Exhibit 4 Letter dated 1-9-02 to Mark | | 33 |
| Titherington from Terry T. Thomason and | | |
| Amy G. Self with enclosures. | | |
| Exhibit 5 Letter dated 1-17-02 to Terry e. | | 35 |
| Thomasen, Esq. at Carlsmith Ball, LLP | | |
| from Bruce Kahn. | | |
| Exhibit 6 Letter dated 2-21-02 to Terry E. | | 36 |
| Thomasen, Esq. at Carlsmith Ball, LLP | | |
| from Bruce Kahn. | | |

RALPH ROSENBERG COURT REPORTERS, INC.
(808) 524-2090

1  Exhibit 7 Letter dated 3-11-02 to Mr.                39
2     Bruce Kahn from Terry E. Thomason and
3     Amy G. Self with Affidavit of Michael
4     O'Connell and other attachments.
5  Exhibit 8 Letter dated 6-21-02 to Terry E.          40
6     Thomasen from Bruce Kahn.
7  Exhibit 9 Complaint in the District Court           40
8     of Guam, Civil Case No. 02-00008,
9     United States of America For Use And
10    Benefit of Rhino Builders, Inc. vs.
11    Biogenesis Pacific, Inc. and AIG
12    Technical Services, Inc.
13 Exhibit 10 Letter dated 4-9-02 to Mr.               44
14    Michael O'Connell fromTerry E. Thomason
15    with attachments.
16 Exhibit 11 Series of e-mails, first is              55
17    from David Ledger to dvc, dated 3-19-02
18    re AIG.

19
20
21
22
23
24
25

1          THE REPORTER: Our disclosure is complete
and

2    available for everyone to review. It will be attached to
the

3    deposition transcript.

4                TERRY E. THOMASON,

5          called as a witness on behalf of the

6    Defendants, after having been first duly sworn to

7    tell the truth, the whole truth, and nothing but the

8    truth, was examined and testified as follows:

9                    EXAMINATION

10   BY MR. LAWHN:

11        Q    Would you state your name and spell your last
name

12   for the reporter.

13        A    Terry Thompson, spelled T-H-O-M-A-S-O-N.

14        Q    And what is your occupation?

15        A    I'm an attorney.

16        Q    How long have you been licensed as a lawyer?

17        A    Since 1978.

18        Q    Where were you first licensed?

19        A    Nebraska.

20        Q    And when did you move to Hawaii?

21        A    I was licensed in Hawaii in 1990. I lived here
in

22   '78 to '81. I returned here permanently in 1993.

23        Q    At one time were you employed by the Carlsmith

24   Ball law firm?

25        A    Yes.

1    Q    And what years was that?

2    A    Beginning 1996 until 1 October 2003, I was a

3    partner at Carlsmith.

4        MR. CORTES: Can I just ask, this is Antonio Cortes

for

5    the record, that you just take a little bit longer between

6    the question and the answer to give my slow mind a chance

to

7    make any objections that might be needed.

8    BY MR. LAWHN:

9        Q    Okay. What did you do prior to coming to

10   Carlsmith?

11   A    I was an attorney for the federal government.

12   Q    And in what division?

13   A    Department of the Army.

14   Q    Procurement?

15   A    Procurement.

16   Q    Were you stationed at Schofield?

17   A    I was stationed at Fort Shafter, but headquarters

18   U.S. Army Pacific.

19   Q    Have we run into each other out there?

20   A    I think we have.

21   Q    Not literally.

22       MR. GRIMMER: Sounds like it was memorable.

23   BY MR. LAWHN:

24   Q    What about Amy Self, do you know a person named

25   Amy Self?

RALPH ROSENBERG COURT REPORTERS, INC.

1    A    Yes, I do.

2    Q    Was she an employee of the Carlsmith law firm, or

3  is she an employee of the Carlsmith law firm?

4    A    She is now and was while I was at Carlsmith an

5  associate, and prior to that a paralegal.

6    Q    I pulled her up on Martindale Hubble and on the

7  Internet. It says that she was admitted in Hawaii in 2001,

8  and that then we checked with the Supreme Court and it's

9  November 1, 2001. Does that jibe with the dates that you

10  recall when she became a licensed lawyer in Hawaii?

11    A    It's very difficult for me to remember. She was

a

12  paralegal, she went to law school. While she was in law

13  school, she was a summer associate, and then she came fully

14  employed. So, I -- I honestly don't know when she was

15  admitted to the bar.

16    Q    Was she working under your direction at the law

17  firm at Carlsmith?

18    A    In -- in some instances, yes.

19    Q    Was she physically in the Honolulu office or in

20  the Hilo office?

21    A    At the time I worked with her she was physically

22  in Honolulu -- the Honolulu office.

23    Q    And what time period would that be?

24    A    I'd say January 2002. I -- I can't recall

25  specifically.

1    Q    In this case there is evidence of a telephone

2    conversation between her and an employee of AIG Technical

3    Services in October of 2001. Does that refresh your

4    recollection as to whether she was in Honolulu office at

5    that time?

6    A    I don't remember. I -- I would trust the

7    Carlsmith records. They can say specifically when she was

8    employed.

9    MR. CORTES: This was October 2001, Jim?

10   MR. LAWHN: October 18, 2001.

11   Q    At the time you were at the Carlsmith firm in
late

12   October 2001, early 2002, did you have access to the

13   Internet on your computer?

14   A    I think I did.

15   Q    And do you know whether or not Amy Self had
access

16   to the Internet on her computer?

17   A    I do not know.

18   Q    Are you aware of a publication by the federal

19   government called the Treasury List?

20   A    No.

21   Q    Have you done Miller Act work before, prior to

22   this present litigation?

23   A    Yes.

24   Q    And you've never run into the Tresury List?

25   A    I've never used it, no.

RALPH ROSENBERG COURT REPORTERS, INC.

1    Q    Are you aware that it exists?

2    A    I used -- the Federal Acquisition Regulation

3 periodically publishes a list of approved sureties, that's

4 what I use. Now, if it's called the Treasury List, I'm not

5 aware of it.

6    Q    That's Circular 570, that's the Treasury List?

7    A    Okay.

8    Q    At some point in time did the Rhino firm retain

9 you with regard to the project in Guam to collect some money

10 they claim is due?

11    A    Yes.

12    Q    And when did that occur?

13    A    I do not recall the specific dates.

14    Q    Was it prior to October 2001?

15    A    I think so.

16    Q    Did you ask Amy Self to help you?

17    A    Yes, I did.

18    Q    At what point in time following the retention did

19 you ask Amy Self to help you?

20    A    Miss Self was assigned to help me on that case by

21 her section chief Analitos Lee, partner in Carlsmith,

22 immediately after she was employed at Carlsmith. The first

23 associate that I was assigned to help was a lady named Dana

24 Gutierrez, who is an attorney in Guam office, who was

25 present in Honolulu office for training. So, the initial

1   assistance I received was from Dana Gutierrez, and then Amy

2   Self.

3       Q    Without getting into any attorney-client
privilege

4   issues, can you tell me what it is that Miss Gutierrez did

5   to help you with the case.

6       A    I could not hear what you said.

7       Q    I'm excluding matters covered by the

8   attorney-client privilege in the scope of my question.  And

9   I would like to know, in general, what it is that

10  Miss Gutierrez did to assist you with the Rhino case?

11      A    Miss Gutierrez was a licensed Guam attorney.  She

12  knew the people that Rhino had in Guam, the folks that
would

13  have the information related to whether work was performed,

14  whether payment was received, and those related matters.

15          My recollection is our first problem was

16  Rhino had not billed the prime contractor, and we

17  needed to have a billing that hopefully would

18  receive -- would receive a payment.  If no payment,

19  then we would go on further and pursue the Miller

20  Act claim.

21      Q    Did you give Miss Gutierrez any assignments with

22  regard to the pursuit of the Miller Act claim?

23      A    Yes.  I asked --

24  MR. CORTES:  That was a yes or no question.

25  MR. GRIMMER:  Yeah, just stay with yes or no for now.

RALPH ROSENBERG COURT REPORTERS, INC.

1    A    Yes.

2    BY MR. LAWHN:

3    Q    The next question is what did you ask her to do?

4    A    I asked her --

5    MR. CORTES:  I think whether or not the answer to that

6    is a privileged communication is difficult for me to know

7    until it's answered.

8    MR. GRIMMER:  So take a break and go confer with

Terry.

9    MR. CORTES:  You could do it that way or you could

10   ask -- if you have something specific on your mind, you

11   could ask that way, give me a chance to object, and we can

12   go from there, either way you like.

13   MR. LAWHN:  Let me withdraw the question then.

14   Q    Did you ask Miss Gutierrez to contact the surety?

15   A    No, because there had been no billings to the

16   prime yet.

17   Q    As far as you know, did Miss Gutierrez have any

18   contact at all with either AIG Technical Services or

19   American Home Assurance Company regarding this matter?

20   A    I don't know.

21   Q    You don't know?

22   A    I -- I do not know.

23   Q    Now, do you have a recollection of Miss Gutierrez

24   telling you that she had some contact with a representative

25   of the surety?

13

1    A    No.

2    Q    Would you care to consult with Mr. Cortes?

3    A    Yeah.

4    MR. CORTES:  Yeah.  As far as any communications with

5    the surety, of course, that's not a privileged communication

6    in the first place.

7    A    What she reported to me was that she was gathering

8    accounting records with the assistance of Mr. Michael

9    O'Connell and Mr. Eugene Patten that would support a billing

10   against the prime and additional records that I needed to

11   evidence some form of contractual agreement.  That's what I

12   recall Miss Gutierrez's effort was focused on.

13   BY MR. LAWHN:

14   Q    Then I take it from the absence of any reference

15   to a contact with the surety, that you have no recollection

16   of her advising you that she ever had any contact with the

17   surety?

18   A    She never told me and I never asked her to.

19   Q    How was it that Miss Self got involved then on

20   this case if you had Miss Gutierrez working on it?

21   A    Miss Gutierrez's period of training ended at

22   the -- I can't recall the exact date.  She was scheduled to

23   return to Guam to her position in our Guam -- in Carlsmith's

24   Guam office.  I continued to need help with Rhino because we

25   were having a lot of trouble getting the account data to --

1  to have a viable invoice claim, so I asked for a new
person,

2  I was assigned Miss Self.

3      Q    Do you remember the month or time frame when this

4  happened?

5      A    No, I'm sorry, I do not.

6      Q    Did you ask Miss Self to contact American Home

7  Assurance Company or AIG Technical Services?

8      A    I asked Miss Self to contact the contracting

9  officer to obtain the surety's name.  When circumstances
led

10  me to leave that BioGenesis, the prime contractor, was not

11  going to be willing to pay Rhino for the work it performed,

12  so I asked her to contact the contracting officer.

13     Q    Did she do that?

14     A    Yes, she did.

15     Q    And what did she report back to you?

16     A    She received a fax transmission -- transmittal of

17  the -- of the identification of the surety.

18     Q    Did she get a copy of the Miller Act bond as well

19  at that time?

20     A    I never -- I can't recall the timing.  The first

21  thing we got was the identification of the surety.  At some

22  point soon thereafter, we received the bond documentation.

23     Q    Do you recall what the name of the surety was
that

24  was included in the fax transmission from the contracting

25  officer?

1    A    My recollection, it was American Home Assurance.

2    Q    There's a declaration that Amy Self prepared in

3 this case.  It might help us short cut this a little bit if

4 I can find it.

5         Did you ask Miss Self to contact the

6 surety and find out what the procedures for making

7 the claim on the bond would be?

8    A    I asked her to contact the surety to obtain a

9 Proof of Claim form and provide -- and any instructions on

10 submission.

11    Q    And to the best of your knowledge, did she do

12 that?

13    A    To the best of my knowledge, she did.

14    Q    Did she report back to you the results of the

15 communications that she had with the surety?

16    A    She -- she reported to me in a series of steps

the

17 progression of her efforts to obtain the forms I had asked

18 her to get.  Eventually, she told me that she had received

19 the Proof of Claim form and that she was preparing the

20 backup documentation.  My recollection, it was fairly quick

21 between when I asked her and when she had actually received

22 the form.

23    Q    And to put this in perspective vis-a-vis the

24 submission claim, was this prior to your preparation of

what

25 has been entitled the Notice of Claim as opposed to Proof

of

1   Claim form?

2      A   I honestly can't recall. The normal sequence was

3   we would be given a notice, and then we would submit the

4   proof.

5      Q   Did she report to you anything that indicated to

6   you at that point in time that she believed the identity of

7   the surety was AIG Technical Services?

8      A   I never understood that the surety was anyone

9   other than American Home Assurance through that entire

time.

10   I do not recall anybody raising the name until we

11   actually -- I signed a letter that went to AIG Technical

12   Services requesting reconsideration of their action on the

13   claim.

14      Q   I found the affidavit.

15      A   Okay.

16      Q   Well, take a second and just peruse it, let me

17   know when you're done.

18      A   I've reviewed it.

19      Q   Have you ever seen --

20      MR. GRIMMER: Wait. Let me just object because it's

21   not complete.

22                   (Whereupon, Exhibit 1 was marked

23                   for identification.)

24   BY MR. LAWHN:

25      Q   I think we're going to find that throughout a

Case 1:02-cv-00008   Document 375   Filed 02/19/2004   Page 34 of 91

1    number of the exhibits because had we included all the

2    exhibits to the exhibits, the pile would have been quite

3    substantial, so --

4          MR. GRIMMER:  Yeah.

5          MR. LAWHN:  -- we have not included them.

6          Q    Anyway, Mr. Thomason, have you seen Exhibit 1

7    prior to today?

8          A    Yes, I have.

9          Q    Under what circumstances and when did you see it?

10         A    After I was given notice of this deposition or

11   after I received the subpoena for this deposition, I asked

12   Carlsmith to assign me an attorney to accompany me to this

13   litigation or to this deposition.  Mr. Grimmer was that

14   attorney and he suggested that I should look at the file

and

15   the file contained this affidavit.

16         Q    I take it then from your answer that you did not

17   assist Amy Self in the preparation of this affidavit?

18         A    Oh, no.  No, I did not.

19         Q    On paragraph three of the affidavit, Exhibit 1,

20   she states "pursuant" to her assistance or "our assistance

21   to Rhino, on or about October 2001, I called long

distance,"

22   et cetera, and I'm not going to read it.

23              Now, was that work being done under your

24   supervision?

25         A    At my direction, yes.


                        RALPH ROSENBERG COURT REPORTERS, INC.

18

1       Q    Can you be a little bit more definitive as to
when

2   in October 2001 Amy Self called long distance directory

3   assistance.

4       A    No, I did not sit and watch her, and I don't know

5   what day she made this call.

6       Q    And if you'll turn the page of Exhibit 1, going
to

7   paragraphs four through 11, were you a party to any of the

8   telephone conversations that she references on page two of

9   Exhibit 1?

10      A    No.

11      Q    Did she prepare any kind of written memorandum to

12  the file or to you perhaps that documents these telephone

13  conversations?

14      A    She prepared handwritten notes that were appended

15  to the -- to the file.  I don't know if they've covered

16  these specific phone calls.

17      MR. CORTES:  Can I go off the record for just a
second?

18      MR. LAWHN:  Sure.

19              (Discussion held off the record.)

20  BY MR. LAWHN:

21      Q    Look at paragraph 19, page four.  I think it's

22  page -- yeah, it's page four.

23      A    (Witness complies.)

24      Q    She refers to a process in which Mr. Titherington

25  and everyone she spoke to at American International

1  Companies, et cetera, led her to believe that American Home

2  and AIG Technical Services were all part of the same

3  corporation.

4        Now, how many telephone calls is she

5  referring to in this paragraph 19, if you know?

6     A   I do not know.

7     Q   Do you recall ever being told by her as to how

8  many telephone calls were made between her and the AIG

9  entities, if you want to use it as a group?

10    A   I don't know a specific number. I know that

11  Miss Self was very frustrated and did express to me her

12  views that this was a ridiculous runaround, that she had

13  talked to a number of people.

14    Q   Do you recall on what dates the telephone calls

15  occurred?

16    A   I don't -- I don't know.

17    MR. CORTES:  That's kind of asked and answered.

18  BY MR. LAWHN:

19    Q   When Miss Self expressed her frustration, did you

20  give her any guidance as to what factual research she might

21  be able to do to clarify in her mind who the surety was?

22    MR. CORTES:  I think I'll object on privileged basis.

23  Are you asking for communications between two attorneys on

24  how they were going to conduct the representation?

25    MR. LAWHN:  That's exactly what I'm asking with regard

Case 1:02-cv-00008   Document 375   Filed 02/19/2004   Page 37 of 91

20

1  to identifying the surety, which obviously was
misidentified

2  in the complaint.

3        MR. GRIMMER:  Well, let me object to that

4  characterization and conclusion.

5        MR. CORTES:  Object, and I instruct him.  Yeah, I'm
not

6  going to let Mr. Thomason answer that question.  Rhino has

7  not waived the attorney-client privilege except for a very

8  limited waiver in this case, which does not include that

9  question.

10  BY MR. LAWHN:

11       Q    Mr. Thomason, did you ask her to consult the list

12  issued by the Treasury department to see whether or not

13  American Home or AIG Technical Services was listed as an

14  approved surety?

15       MR. CORTES:  Same objection, instruct the witness not

16  to answer.

17  BY MR. LAWHN:

18       Q    Did you consult the list?

19       A    I did not.

20       Q    Why not?

21       MR. CORTES:  Attorney thought process.

22       MR. LAWHN:  Which I'm going to go over this fairly

23  thoroughly on a number of different items, and I assume

24  you're going to be objecting and instructing.  The only

25  thing I'd put on the record is we obviously will file a

RALPH ROSENBERG COURT REPORTERS, INC.

Mr.

1   motion on this, and it's going to be an inconvenience to

2   Thomason, perhaps, but if we prevail, then I'll come back

3   and do the deposition over again.

4       MR. CORTES:  Well, did you get a copy of our letter to

5   Carlsmith Ball?  I sent one to Louie Yanza, outlining the

6   waiver of the -- the scope of the waiver of the privilege

7   that we've made in this case.  And that is the scope of the

8   waiver that my client has authorized me to make of the

9   attorney-client privilege and the privileged nature of its

10  communications.

11      MR. LAWHN:  I saw the letter, I saw Mr. Yanza's reply

12  disagreeing with the scope.  If that's what your clients

13  have directed you to do, then we simply have to go forward.

14  And if Judge Unpingco upholds the privilege, then we lose;

15  and if he says the waiver is broader, then you lose.

16      MR. CORTES:  I think that the principle here is that

an

17  attorney thought process -- just simply because an

18  allegation is made in a complaint, the attorney's thought

19  process with respect to that allegation is not waived, any

20  more than your thought -- than Rhino's attorney's thought

21  process with respect to the identity of the surety is not

22  waived, any more than your thought process is waived with

23  respect to the allegations you've made in your counterclaim

24  against BioGenesis Pacific.

25              And we need to be careful to produce to

RALPH ROSENBERG COURT REPORTERS, INC.

1   you every scintilla of evidence that we have,

2   privileged or not, that is within the scope of the

3   waiver, but we are quite concerned not to produce or

4   disclose anything of a privileged nature outside the

5   waiver because we don't want you to claim that we've

6   made a broader waiver than we have.

7        MR. LAWHN:  I understand your argument, disagree with

8   it, and will take it up with the judge at the right time.

9        MR. GRIMMER:  The only thing I would add then is if we

10   are concerned with inconvenience, as you've already stated,

11   Mr. Lawhn, then please go through the record making that

you

12   got to make as quickly as possible, because I think the

13   concept of what's waived and isn't waived isn't that

14   complicated.

15   BY MR. LAWHN:

16      Q    When Miss Self expressed her frustration to you,

I

17   had asked about what I called the Treasury List, and you

18   were directed not to answer.  Remember that?

19      A    That's correct.

20      Q    Let me ask the same question with regard to the

21   registration of American Home Assurance Company or AIG

22   Technical Services as a surety within the state of Hawaii,

23   with our insurance commissioner.

24        Did you instruct Miss Self to check with

25   Hawaii's Insurance Commissioner to see if one or

RALPH ROSENBERG COURT REPORTERS, INC.

23

1   other or both of the companies was a registered

2   surety in Hawaii?

3       MR. CORTES:  Same objection, instruct the witness not

4   to answer.

5   BY MR. LAWHN:

6       Q    Did --

7       MR. GRIMMER:  And I would add relevance since the job

8   was in Guam.

9   BY MR. LAWHN:

10      Q    Did you check with the Hawaii insurance

11  commissioner?

12      MR. CORTES:  Hold on a minute.

13      MR. GRIMMER:  I make the same objection.

14      MR. CORTES:  Yeah, same objection.

15  BY MR. LAWHN:

16      Q    And with regard to the insurance commissioner in

17  Guam, when Miss Self expressed her frustration --

18      MR. CORTES:  Same objection.

19  BY MR. LAWHN:

20      Q    -- did you instruct her to check with Guam's

21  insurance commissioner to see if American Home and/or AIG

TS

22  were registered as a surety of Guam?

23      MR. CORTES:  Same objection.  I'm going to try to cut

24  this short if possible by just saying that we're going to

25  object to any question where you're asking what Mr.

Case 1:02-cv-00008    Document 375    Filed 02/19/2004    Page 41 of 91

1    Thomason's instructions to Amy Self were unless they were

2    instructions regarding a contact by your clients to

3    Carlsmith or a representation by your clients to Carlsmith

4    that AIG Technical Services and/or American Home Assurance

5    Company is sufficiently connected to a Carlsmith Ball

client

6    that Carlsmith had withdrawn from its former representation

7    of Rhino; or, if the question requests communication

8    regarding Carlsmith's ultimate refusal to continue to

9    represent Rhino in this matter, any other communication

10   between Rhino's attorneys, we're going to object to as

11   privileged.

12         MR. LAWHN:  I understand your objection, we disagree

13   with it, and I'm going to continue my questioning.

14         Q    I've asked you about the Treasury List, the

Hawaii

15   Insurance Commissioner, the Guam Insurance Commissioner.

16   Did you instruct Miss Self to do any research on the

17   Internet to find out what the American International group

18   or American International companies were and how AIG TS or

19   American Home Assurance company would -- fits into that

20   group?

21         MR. CORTES:  Same objection.

22         MR. LAWHN:  And same instruction, I assume.

23         MR. CORTES:  Same instruction not to answer.

24   BY MR. LAWHN:

25         Q    Did you yourself do any research on the Internet

RALPH ROSENBERG COURT REPORTERS, INC.

1   to determine where American Home Assurance Company and AIG

2   Technical Services fit into the American insurance

3   companies?

4         MR. CORTES:  Same objection, same instruction.

5   BY MR. LAWHN:

6         Q    At some point in time you prepared or, excuse me,

7   Miss Self prepared a letter, according to her affidavit,
    for

8   you which was sent to American Home Assurance Company.
    It's

9   dated October 22, 2001.  And, I'm sorry, we're going to
    have

10  to mark this Exhibit 2, and you, Mr. Grimmer and I will
    have

11  to share a copy.

12                      (Whereupon, Exhibit 2 was marked

13                       for identification.)

14  BY MR. LAWHN:

15        Q    Do you recognize Exhibit 2, Mr. Thomason?

16        A    I recognize my signature, yes.

17        Q    Did you prepare Exhibit 2?

18        A    No.

19        Q    Who prepared it?

20        A    I believe Miss Self prepared it.

21        Q    And was it Miss Self who addressed the letter

22  Exhibit 2 to American Home Assurance Company or was that

23  you?

24        A    It would have been Miss Self.

25        Q    You'll notice there's some exhibit numbers in the

1    lower right-hand corner and page numbers on this Exhibit 2.

2        A    Yes.

3        Q    Now, go to what is marked page three.  And do you

4    recognize page three, it's entitled "Notice of Claim On

5    Bond?"

6        A    Yes.

7        Q    Who prepared the "Notice of Claim On Bond," which

8    is pages three and four?

9        A    Miss Self.

10       Q    Did you have any input in the preparation of the

11   "Notice of Claim On Bond?"

12       A    I reviewed it after she had prepared it in draft.

13       Q    I notice on page three that the "Notice of Claim

14   On Bond" identifies the bonding company as American Home

15   Assurance Company.  Did she do that or was that you?

16       A    It was not me.

17       Q    Was there any discussion between you and Miss
Self
18   with regard to the preparation of Exhibit 2 as to whether
it
19   should be addressed to American Home Assurance Company or

20   AIG Technical Services?

21       MR. CORTES:  Same objection, same instruction.

22   BY MR. LAWHN:

23       Q    At the time that Exhibit 2 was being prepared,
did
24   Miss Self express any concerns, doubts, uncertainty as to

25   the identity of the surety?

1      MR. CORTES:  Same objection, same instruction.

2  BY MR. LAWHN:

3      Q     Was there any doubt in your mind at the time

4  Exhibit 2 was prepared that the surety was American Home

5  Assurance Company?

6      MR. CORTES:  That's a work product -- attorney work

7  product, attorney thought process; instruct the witness not

8  to answer.

9  BY MR. LAWHN:

10     Q     If you look at page -- the Miller Act -- page 37

11  and 38, the Performance Bond is 37, the Payment Bond is 38.

12  Last page.

13            At the time you signed Exhibit 2, did you

14  take a look at page 38, which is the Payment Bond,

15  to confirm that the surety was American Home

16  Assurance Company?

17     MR. CORTES:  Hold on just a minute, let me think about

18  that.

19     MR. GRIMMER:  Isn't it consistent with --

20     MR. CORTES:  Yeah, you're asking what they did and did

21  not do in the course of the representation.  I think that's

22  work product.  And the document speaks for itself with

23  respect to who the surety is, and I don't think that

24  Carlsmith is on trial here.  I don't see why you're asking

25  all these questions.

1      MR. LAWHN: Let's mark the next exhibit, which is a

2  letter dated October 30, 2001 from AIG Technical Services
to
3  Mr. Thomason.

4                    (Whereupon, Exhibit 3 was marked

5                     for identification.)

6  BY MR. LAWHN:

7      Q    Now, in Exhibit 2, Mr. Thomason, you asked for a

8  Proof of Claim form --

9      A    Yes.

10      Q    -- among other things.  Now, Exhibit 3 is the

11  letter from AIG Technical Services which purports to

12  transmit the Proof of Claim form.  Do you recall receiving

13  Exhibit 3?

14      A    Yes.

15      Q    Do you recall noticing that the surety is

16  identified as American Home Assurance Company on Exhibit 3?

17      MR. CORTES: We're not going to object to that because

18  you're asking.

19      MR. GRIMMER:  What he observed.

20      MR. CORTES:  That's a fact -- you're asking him as a

21  percipient witness, I suppose, the noticing, and you're not

22  asking for thought process.  I just want to make a record
of
23  our rationale -- my rationale in making these objections.

24  So, I think that that's not attorney work product because

25  you're not asking for his thought processes in the
rendering

1  of services for his client.

2      A    Yes, it was my understanding that American Home

3  Assurance Company was the surety.

4  BY MR. LAWHN:

5      Q    At the time that you received Exhibit 3?

6      MR. CORTES:  Could I just ask him, Mr. Thomason, to

7  please be careful that he just responds, because what he

8  really asked you was did you notice this, and I guess

that's

9  a yes or no question.  Try to keep it to yes or no when

it's

10  a yes or no question.

11      MR. LAWHN:  I'll try not to ask yes or no questions.

12      Q    At the time you received Exhibit 3 --

13      A    I noticed that the document said American Home

14  Assurance Company was the surety.

15      Q    Now, at the time you received Exhibit 3, which

16  would have been sometime after October 30, 2001, were you

17  aware of any confusion in Amy Self's mind as to who the

18  surety was?

19      MR. CORTES:  Hold off a minute.  I think that's --

I'll

20  go ahead and allow that one.

21      MR. GRIMMER:  No, no, no.  It's privileged.  To me

it's

22  the same.

23      MR. CORTES:  Same question?

24      MR. GRIMMER:  Same question, same rational that you've

25  been using.

1      MR. CORTES:  Okay, you're probably right.  It's just

2  that confusion in her mind isn't really -- but that is her

3  thought process, I think you're correct.

4      MR. GRIMMER:  It's her thought process and what he

5  would have only found out from her.

6      MR. CORTES:  I think we have to stick with our

7  objection to keep with waiving everything in that subject.

8  BY MR. LAWHN:

9      Q    At the time that you received Exhibit 3, had she

10  told you that she thought the surety was AIG Technical

11  Services?

12      A    No.

13      Q    When was the first time you found out that Miss

14  Self apparently thought the surety was AIG Technical

15  Services?

16      MR. CORTES:  I guess that assumes facts not in

17  evidence, and I suppose it's speculative.  The fact that it

18  assumes in evidence is Miss Self's thought process as an

19  attorney in rendering services for Rhino, so I don't think

20  we can really go there.

21  BY MR. LAWHN:

22      Q    Did she ever tell you she thought the surety was

23  AIG Technical Services?

24      MR. CORTES:  Same objections, same instruction.

25      MR. LAWHN:  You're instructing him not to answer that

1   on the basis of work product?

2       MR. CORTES:  What she thought?  Let's go off the
record

3   for a little bit.

4       MR. LAWHN:  Okay.

5               (Discussion held off the record.)

6       MR. CORTES:  Instruct him not to answer.

7   BY MR. LAWHN:

8       Q   When was the first time you learned that AIG

9   Technical Services had been identified as the surety by

10  anyone in the Carlsmith firm?

11      MR. CORTES:  Could you clarify that question so I know

12  whether I have an objection, because do you mean in the

13  complaint or --

14      MR. LAWHN:  In the complaint.

15      MR. CORTES:  -- internally within Carlsmith?

16      MR. LAWHN:  Any writing.

17      MR. CORTES:  We object to any response to that
question

18  that reveals the state of mind of anyone at Carlsmith with

19  respect to that question except as reflected in the

20  complaint, which is a public record.

21  BY MR. LAWHN:

22      Q   We obviously feel we have the right to go beyond

23  the complaint.  This is an estoppel issue, basically.

24  Whether there is a right to reasonably rely on whatever

25  communications may have occurred I think has to be flushed

RALPH ROSENBERG COURT REPORTERS, INC.

1   out by examination of all of the facts, including dialog .

2   that a first-year associate might have had with her

3   supervisor regarding the issue, or perhaps didn't have with

4   her supervisor regarding the issue.

5           In any event, let's continue on, because

6   if he's going to be instructed, let's just not to

7   answer, let's just get it on the record.

8       MR. GRIMMER:  The one thing you can examine on is what

9   Amy may have told him about what -- well, you correct me if

10  I'm wrong -- what she heard from people at AIG or American

11  Home Assurance.

12      MR. LAWHN:  We'll get to that.

13      MR. CORTES:  That's correct, and that's the sole basis

14  of our allegation.

15      MR. GRIMMER:  Okay.

16      MR. LAWHN:  But I want to lay a whole -- I want this

17  audit trail very carefully laid out for the judge when we

go

18  in on the motion --

19      MR. GRIMMER:  Yeah.

20      MR. LAWHN:  -- so let me give you the next.

21      MR. GRIMMER:  Do it whatever way you want.

22      MR. LAWHN:  The next letter, Mr. Thomason, is a letter

23  dated January 9, 2002 from your firm to Mr. Titherington

and

24  we'll mark this Exhibit 4.

25                      (Whereupon, Exhibit 4 was marked


RALPH ROSENBERG COURT REPORTERS, INC.

                              for identification.)

2   BY MR. LAWHN:

3       Q    Have you had a chance to look at Exhibit 4?

4       A    Yes, I have.

5       Q    Do you recognize Exhibit 4?

6       A    Yes, I do.

7       Q    Who prepared Exhibit 4?

8       A    Amy Self.

9       Q    And would it be accurate then to state that Amy

10  Self is the one who addressed the letter to Mark

11  Titherington at American Home Assurance Company?  Did she

do

12  that or was that done at your direction?

13      A    I directed her to complete the claims process.

14  She prepared this letter, that's -- that's all I know.

15      Q    At the time you signed the letter, had the

16  addressee of the letter already been typed in?

17      A    I don't think I signed this letter.

18      Q    Did you review the letter before it went out?

19      A    Yes, I did.  I did not sign this letter.

20      Q    That's correct, Amy Self signed the letter.

21  Again, I would ask a series of questions regarding whether

22  or not Amy Self expressed to you any uncertainty as to the

23  identity of the surety at the time Exhibit 4 was prepared

24  and sent out.

25      MR. CORTES:  We'll object to all those questions and

1    instruct the witness not to answer them.

2    BY MR. LAWHN:

3         Q    At the time Exhibit 4 was sent out, were you
aware

4    of any uncertainty in Amy Self's mind regarding the
identity

5    of the surety?

6              Again, I expect you'll object to that.

7         MR. CORTES:  It's the same objection.  You're asking

8    for the attorney's thought process of one of Rhino's

9    attorneys.  It's a simple matter of you're asking for the

10   attorney's thought processes that went into a non-
privileged

11   communication.  The non-privileged nature of this

12   communication is simply not privileged, and the attorney's

13   thought processes are not accessible.

14   BY MR. LAWHN:

15        Q    The letter Exhibit 4 is signed by Amy Self,

16   correct, as you recall?

17        MR. CORTES:  You're asking him?

18        MR. GRIMMER:  For the third time.

19        MR. CORTES:  You're asking him if he recognizes her

20   signature?

21        A    Yeah, I recognize that signature to be the

22   signature of Amy Self.

23   BY MR. LAWHN:

24        Q    At the time Exhibit 4 went out, did she tell you

25   she believed the surety was American Home Assurance
Company?

1        MR. CORTES:  Same objection, same instruction.

2                (Whereupon, Exhibit 5 was marked

3                for identification.)

4  BY MR. LAWHN:

5     Q    Next exhibit, Exhibit 5 is a letter dated January

6  7, 2002.  Do you have Exhibit 5 in front of you?

7     A    I do.

8     Q    And do you recall receiving Exhibit 5?

9     A    Yes.

10     Q    You'll notice it identifies the surety as American

11  Home Assurance Company in the heading.  Do you see that?

12     A    I see that.

13     Q    Did you give Exhibit 5 to Amy Self?

14     A    Yes, I did.

15     Q    At what point in time did you give --

16        MR. CORTES:  Slow down here.  I guess we're going to

17  make an objection to that.

18        MR. GRIMMER:  Yeah.

19        MR. LAWHN:  Would you like to move to strike the

20  answer?

21        MR. CORTES:  I would, move to strike it as an

22  inadvertent disclosure of privileged information.  And on

23  that note, I think it's about time that I object to your

24  continuing to go over all of these questions that we've

25  already told you we're going to object to, and I'm sure that

36

1    you understand that we're going to object to.

2            And, you know, one of the reasons that I

3    object to your continuing like this and working on

4    the basis that it's vexatious and harassing,

5    possibly even a continued -- what we would view as a

6    continued effort to litigate in bad faith, is that

7    if you keep asking these questions, some privileged

8    information is going to slip out and we're going to

9    have to have it stricken.

10            So, I think you understand the scope of

11    our position on the scope of the waiver, and I think

12    that there's plenty of information on the record if

13    you want to go to the judge with it.

14        MR. LAWHN:  I'm going to continue to ask my questions,

15    lay my record.  I will give you every opportunity,
hopefully

16    before Mr. Thomason replies, to interpose your objection
and

17    your instruction.

18        MR. LAWHN:  The next exhibit is a letter from AIG

19    Technical Services dated February 21, 2002, and that will
be

20    Exhibit 6.

21                        (Whereupon, Exhibit 6 was marked

22                        for identification.)

23    BY MR. LAWHN:

24        Q    Do you recall receiving Exhibit 6?

25        A    Yes.

1    Q    And, again, Exhibit 6 identifies the surety as

2  American Home Assurance Company in the heading, doesn't it?

3        MR. CORTES:  Objection; the document speaks for
itself.

4  BY MR. LAWHN:

5    Q    Do you see that?

6    A    Yes.

7    Q    Now, please give Mr. Cortes a chance to object
and

8  instruct you before you answer.

9        Did you give a copy of Exhibit 6 to Amy

10 Self upon your receipt of Exhibit 6?

11       MR. CORTES:  Same objection, same instruction.

12       MR. LAWHN:  And if I were to ask the witness as to

13 whether at the time Exhibit 6 was received he was aware of

14 any ambiguity regarding the identity of the surety, either

15 in his mind or Amy Self's mind, Mr. Cortes, would you

16 instruct him not to answer as well?

17       MR. CORTES:  That's correct.

18       MR. GRIMMER:  One way we can do this is you could just

19 leave, and then you can put them all on the record if you

20 want to.

21       MR. LAWHN:  Well, there's others that he will probably

22 be able to answer.

23       MR. GRIMMER:  Okay.

24       MR. LAWHN:  For example, there's an e-mail that just

25 cropped up this morning that I got from Guam that I don't

RALPH ROSENBERG COURT REPORTERS, INC.

1  understand.

2      MR. GRIMMER:  Okay.  Well, go ahead then.

3      MR. LAWHN:  I need to find out whether -- I don't think

4  it even got to him.

5      MR. GRIMMER:  Okay.

6      MR. LAWHN:  What I'm trying to do is take this

7  chronologically as it occurred.

8      MR. GRIMMER:  I know, but my only point was we can

9  leave and you can do it anyway, since we're not going to

10  answer them.

11      MR. LAWHN:  One of the problems you got with that, in

12  some of the courts, unless you specifically ask the

13  question, the courts will not allow you to pursue a Motion

14  to Compel an answer, and that's why I'm asking the question

15  and giving you the opportunity to give the instruction.

16      MR. GRIMMER:  Okay.

17      MR. LAWHN:  I don't know about Guam, frankly, but I do

18  know some courts require you to specifically ask the

19  question and have a specific instruction not to answer.

20      MR. GRIMMER:  Okay.

21      MR. CORTES:  I don't know either what Judge Unpinko's

22  practice is on that.  However, one way we could do it is I

23  think that if judge overrules our objection for some

24  unforeseen reason, and I don't think he should, then we're

25  going to need to continue the deposition anyway.

1    And you will still be in a position of

2  having that ruling.  And once that ruling is made,

3  if it is made in your favor, and I do not think it

4  should be, then we would at that time not make the

5  objection, and you can ask Mr. Thomason the question

6  if you felt you still needed to.

7    MR. LAWHN:  Let's get up through the filing of the

8  complaint.

9    Next exhibit, March 11, 2002, Carlsmith

10  letter to AIG Technical Services, Exhibit 7.

11    (Whereupon, Exhibit 7 was marked

12    for identification.)

13    MR. LAWHN:  Exhibit 7 bears Amy Self's signature.

14  You'll see that on page four.

15    Q    Did you prepare Exhibit 7 and have her sign it or

16  did she prepare it and sign it herself?

17    A    I did not prepare the letter.

18    Q    Did you review the letter before it went out?

19    A    I think I did.  I do not recall.

20    MR. LAWHN:  Okay, let's go to the next exhibit.  It's

a

21  letter dated June 21, 2002, Exhibit 8, from AIG Technical

22  Services to Mr. Thomason.

23    (Whereupon, Exhibit 8 was marked

24    for identification.)

25  BY MR. LAWHN:

1  Q Do you recall receiving Exhibit 8?

2  A Yes.

3  Q This is dated June 21st, 2002.  Do you see that?

4  A Yes.

5  Q By that time the complaint had already been
filed?

6  A Yes.

7       (Whereupon, Exhibit 9 was marked

8       for identification.)

9 BY MR. LAWHN:

10  Q The Complaint, according to the one that we have,

11 was filed on March 20, Guam time, 2002, and it names AIG

12 Technical Services as the surety.  Who drafted Exhibit 9?

13  A My recollection is that Miss Self and Mr. Calvo

14 worked together to write the complaint.

15  Q Mr. Calvo's in Guam, isn't he?

16  A Yes, he is.

17  Q Was Miss Self in Guam at the time?

18  A No, she was in Honolulu.

19  Q How did they communicate with each other,
assuming

20 that they did?

21  A We frequently spoke by telephone and with using

22 e-mail.  My understanding was that they were working by

23 telephone and e-mail.

24  Q Was the Complaint reviewed by you prior to its

25 being filed?

RALPH ROSENBERG COURT REPORTERS, INC.

1    A    My recollection is that I showed Miss Self
Moore's

2    Federal Practice Form for the Miller Act claim.

3    MR. CORTES:  Could you just answer the question.  I'm

4    sorry, just -- the question was did --

5    A    Did I review the form?

6    MR. CORTES:  No.  What was your question again,
please?

7    BY MR. LAWHN:

8    Q    The question was did you review Exhibit 9 prior
to

9    Exhibit 9 being filed in the U.S. District Court of Guam?

10   A    I do not recall.

11   Q    Were you aware at the time that Exhibit 9 was

12   being drafted that AIG Technical Services, Inc. was being

13   named or identified as the surety in the Complaint?

14   MR. CORTES:  I'll instruct him not to answer; that's

15   attorney thought process in the course of rendering legal

16   services for the client.

17   BY MR. LAWHN:

18   Q    Did you instruct anybody to name AIG Technical

19   Services, Inc. as a defendant in Exhibit 9?

20   MR. CORTES:  Same objection, same instruction.

21   BY MR. LAWHN:

22   Q    When was the first time you became aware that AIG

23   Technical Services, Inc. had been identified as the surety

24   in Exhibit 9?

25   A    I'm going to answer.  When I saw the file form.

1     Q     You mean the form with the file mark stamp on the

2   front?

3     A     When I saw the filed Complaint.

4     Q     That would have been sometime after March 20,

5   2002, I'm assuming?

6     A     I was -- I was aware -- I learned, I believe the

7   day preceding, that there was a concern.

8   MR. CORTES:  Excuse me.

9     A     This is going to be -- I need to talk to my

10  counsel.

11  MR. CORTES:  Can we go off the record for a little

bit.

12  MR. LAWHN:  Sure.

13  MR. CORTES:  Okay.

14          (Discussion held off the record.)

15                  (Record read.)

16    A     After consulting with counsel, I learned that

17  there was a question about the name of the surety when I

18  received a telephone call at my home from Rossi Tolentino,

19  an attorney in the Guam office.  Mr. Tolentino told me that

20  there was a conflict between AIG Technical Services and one

21  of my partner's clients, a company named   A I Marine,

22  because they're all part of AIG.

23          My response was that I didn't understand

24  that because the surety was American Home Assurance,

25  and that my understanding was that would be the

Case 1:02-cv-00008     Document 375     Filed 02/19/2004     Page 60 of 91

1  surety in this case.  But because Mr. Tolentino

2  assured me they checked into it, it was the same

3  company, I went back to my firm to consult with our

4  internal counsel about resolution of the conflict.

5       I learned only when I received a copy of

6  the filed Complaint that only AIG Technical Services

7  had been named.

8  BY MR. LAWHN:

9       Q    Can you give us a time frame?

10      A    It was very close to March 20th, the filing date

11  that we were facing under the -- to assert the Miller Act

12  claim.

13           I want to make sure my answer is clear,

14  that the telephone was shortly before March 20th.  I

15  received a copy of the filed complaint shortly after

16  March 20th.

17      Q    Was any consideration given at that point in
time,

18  March 20th, simply amending the Complaint to name as a

19  defendant both AIG Technical Services and American Home

20  Assurance Company?

21      MR. CORTES:  Same objection.

22      MR. LAWHN:  Same instruction?

23      MR. CORTES:  Instruction not to answer.

24      MR. LAWHN:  The next exhibit has attorney-client

25  privileged stuff on it.  Excuse me while I purge the file

Case 1:02-cv-00008    Document 375    Filed 02/19/2004    Page 61 of 91

1   from the attorney-client privileged matter.

2      MR. CORTES:  This is your attorney-client privileged

3   matter?

4      MR. LAWHN:  Apparently.

5         (Discussion held off the record.)

6      MR. LAWHN:  Let me give you what will be marked as

7   Exhibit 10, the April 9, 2002 withdrawl letter that was

8   written in this matter.

9             (Whereupon, Exhibit 10 was

10              marked for identification.)

11  BY MR. LAWHN:

12    Q   Did you prepare Exhibit 10?

13    A   Yes I did.

14    Q   Exhibit 10, on page two -- excuse me, I guess it's

15   page three because page two is all redacted.  Under the

16   heading "Potential Challenge to Carlsmith," second paragraph

17   starts the "potential challenge," do you see that paragraph?

18    A   Yes.

19    Q   There's a sentence in here that reads -- that

20   shows "the surety has identified itself as AIG Technical

21   Services."  Do you see that --

22    A   Yes.

23    Q   -- sentence?  What was the basis of your making

24   that statement?

25    A   My understanding from Mr. Tolentino and Miss Self

45

1  was that AIG Technical Services had said or led them to

2  believe that they were the surety.

3      Q   Can you tell me exactly what Mr. Tolentino and

4  Miss Self told you with regard to statements allegedly made

5  on behalf of AIG Technical Services.

6      A   No, I can't.

7      Q   Did they give you any specifics other than what

8  you've just told me?

9      A   The essence of my conversations with them were

10 generally that AIG Technical Services had -- was the
surety.

11 It was satisfied that they were the surety.

12     Q   Did you explain to them the correspondence that
we

13 have reviewed in this deposition that shows AIG -- excuse

14 me -- American Home's identified as the surety?

15     MR. CORTES:  I need to back up here and let me think

16 about that last exchange.  I'm really unclear from his

17 answer.  I did not object because he was talking about a

18 conversation that he had with other Carlsmith lawyers on
the

19 subject of conflict that led to Carlsmith's withdrawl as

20 Rhino's counsel.

21         And, of course, any identification by AIG

22 TS as the surety would not be a privileged

23 communication within Carlsmith because that was

24 outside -- it's not a privileged communication

25 because it's a communication from AIG TS.  So, I

46

1  guess we have no objection.

2       MR. LAWHN:  Let's back up a little bit.

3       Q    Mr. Tolentino and Miss Self told you that AIG

4  Technical Services led them to believe that AIG Technical

5  Services was the surety.  Is that what you testified to?

6       A    That's my recollection.

7       Q    Did Mr. Tolentino or Miss Self tell you whether

8  this representation was oral or in writing?

9       A    I don't think they told me.  I don't recall being

10 told exactly what it was.

11      Q    Did you ask them to show you anything that they

12 might have received from AIG Technical Services in writing

13 which identifies the surety as American Home?

14      A    No.

15      Q    Excuse me, as AIG Technical Services?  The answer

16 didn't --

17      A    I did not ask them, no.

18      Q    At the time that Miss Self and Mr. Tolentino told

19 you this, did you mention to Miss Self and Mr. Tolentino
the

20 letters that you had received from AIG Technical Services

21 which identified the surety as American Home Assurance

22 Company?

23      A    No.

24      MR. CORTES:  You know, we're getting -- that one
should

25 have been objected to.

RALPH ROSENBERG COURT REPORTERS, INC.

1    MR. CORTES: I think I will object to that and ask for

2    it to be stricken. And the reason is because we're getting

3    away from the reason to withdraw, and we're getting back

4    into the state of mind of Mr. Thomason and Carlsmith

5    attorneys, their communications in the course of rendering

6    the representation. And those communications are not

within

7    the scope of discussing the conflict. That's simply you

8    digging into attorney thought processes regarding who the

9    surety wasp, or Carlsmith's analysis of who the surety was,

10   which was an analysis they may or may not have made.

11   MR. LAWHN: We disagree with that. We feel that the

12   opportunity to correct the mistake was on the table on or

13   about March 20th. And under mitigation theory, had it been

14   brought up, perhaps they could have amended the Complaint,

15   properly named the surety within 24 hours.

16   MR. GRIMMER: Well, we don't --

17   MR. LAWHN: And that's a mitigation theory. That's a

18   mitigation theory. But, you know, we don't even begin with

19   the beginning theory, which is that it matters.

20   MR. LAWHN: I'm not so sure it matters, either.

21   MR. GRIMMER: Okay.

22   MR. LAWHN: But we're here, and at some point in time

23   we're going to to have to get to the bottom of it.

24   MR. GRIMMER: Okay.

25   MR. CORTES: So I think that last response, we would

48

1    like to waive it as an inadvertent waiver of the

2    privilege -- of the privileged nature of the communication

3    described.

4    BY MR. LAWHN:

5        Q    In Exhibit 10, your withdrawl letter, you attach

a

6    printout of the 10-K which is filed on behalf of the

7    American International Group of Securities And Exchange

8    Commission.   The pages aren't numbered.   If you'll go

9    through that, you'll find it.

10       MR. GRIMMER:   Yeah.

11   BY MR. LAWHN:

12       Q    And you make reference to it in the body of

13   Exhibit 10.   Do you see the 10-K?

14       A    Yes, sir.

15       Q    How did you get the 10-K?

16       A    Mr. Steve Egesdal, a partner in the law firm of

17   Carlsmith Ball, showed it to me.

18       Q    And if you look at the first page of the 10-K,

you

19   see the name American Home Assurance Company has a circle

20   drawn around it.

21       A    This has extra pages, and I -- it's not part of

my

22   letter.

23       MR. CORTES:   The fifth-to-the-last page is a

24   transmission report.   It comes under the waiver of the

25   privilege because this is the letter by which --

1      MR. GRIMMER:  Okay.  So the --

2      MR. CORTES:  -- Carlsmith withdrew.  So, we waive the

3  privilege with respect to the fifth-to-the-last page.  The

4  last four pages are other documents.

5      MR. LAWHN:  It's all irrelevant to my questioning.

You

6  want to pull it off, that's fine.

7      A    Yeah.

8      MR. GRIMMER:  Okay, so we'll pull it off.

9  BY MR. LAWHN:

10     Q    What I'm asking about is on the 10-K.  Someone's

11  drawn a circle around American Home Assurance.

12     A    I drew those circles.

13     Q    And why did you draw the circles?

14     A    This issue was presented to me as a conflicts

15  issue.  And I circled American Home Assurance when I

16  reviewed the document that Mr. Egesdal had provided me.

17     A    I recognized it, I circled it.

18     Q    What relevance did it have to you, if any?

19      MR. GRIMMER:  Keep --

20      MR. CORTES:  I'll instruct him not to answer the

21  question unless he had acceptance except insofar as it had

22  relevance to the conflict.

23      MR. LAWHN:  Well, my question goes to the identity of

24  the surety, actually.

25      MR. CORTES:  And we object to that.

1     MR. LAWHN: Let me ask the question, and you can
object

2     and instruct him not to answer.

3        Q    Did it have any relevance to you insofar as the

4     identity of the surety? Please don't answer till Mr.
Cortes

5     has a chance to object.

6        MR. GRIMMER: Just object and instruct not to answer.

7        MR. CORTES: Yeah, we object on the privilege. It's

8     privileged, asks for attorney thought process, instruct the

9     witness not to answer.

10    BY MR. LAWHN:

11       Q    You, in your Exhibit 10, where you say the surety

12    identified itself as AIG Technical Services, you told me

13    about Mr. Tolentino and Miss Self discussing this with you

14    insofar as what they believe AIG Technical Services had
told

15    them. Was it your understanding that Mr. Tolentino had
some

16    type of contact with a representative of AIG Technical

17    Services?

18       A    No.

19       Q    Well, then how would he know?

20       A    He's responsible in the Guam office for

21    addressing, resolving conflicts of interest, professional

22    conflicts, and he brought it to my attention as a conflict

23    issue, saying we could not sue any of these parties because

24    they were all part of AIG, and he had checked.

25            That sentence is a -- my understanding

51

1   based upon what I was told by Miss Self and

2   Mr. Tolentino concerning the conflict and our

3   inability to go forward with the case.

4       Q   Well, tell me to the best of your recollection

5   exactly what Miss Self told you.

6       MR. GRIMMER:  What Miss Self told Terry?

7       MR. CORTES:  About what?

8       MR. LAWHN:  About the surety having identified itself

9   as AIG Technical Services.

10      MR. GRIMMER:  Okay, okay.

11      A   I can't recall exactly what she said.

12  BY MR. LAWHN:

13      Q   Did she tell you that someone from AIG Technical

14  Services had told her that the surety was AIG Technical

15  Services?

16      A   My understanding from several conversations with

17  her was that AIG Technical Services was either part of or

in

18  the same corporation as the surety --

19      Q   Okay?

20      A   -- as a conflict matter.

21      Q   Did she tell you, though, that AIG Technical

22  Services had told her that the surety was AIG Technical

23  Services and not American Home Assurance Company?

24      MR. CORTES:  Why don't you just --

25      A   No.

52

1    MR. CORTES: -- avoid, you know, confusing the

2    privilege issue, why don't you just ask Miss Self these

3    questions, and then we won't get into the possibility that

4    we're waiving something by allowing Mr. Thomason to answer,

5    you know, what the communications were between Miss Self
and

6    him on the this subject. Because the communication between

7    AIG and Miss Self is not a privileged communication, and

8    that way you can ask -- if you ask her, then we won't have
a

9    problem with any risk that someone might claim that we've

10   waived the privilege with respect to communications on the

11   subject of who the surety is.

12       MR. LAWHN: We may well have to depose Miss Self on

13   this.

14       Q    Did Miss Self tell you whether these alleged

15   representations on behalf of AIG Technical Services were

16   oral, in writing, or perhaps some combination of the two?

17       MR. CORTES: Same objection. I think we have to
object

18   to that. Well, slow down. I'm sorry. Can you repeat the

19   question.

20       MR. LAWHN: I'm trying to find out whether the alleged

21   representations were made orally or were they made in

22   writing or perhaps is it a combination of both.

23       MR. CORTES: Okay. That's within the scope of the

24   waiver then.

25       A    My understanding was that they were oral.

1   BY MR. LAWHN:

2      Q   And were they made face-to-face or were they made

3   on a telephone call? What is your understanding?

4      MR. CORTES: No, I'm sorry, I have to correct myself.

5   Are you asking about the communications -- which

6   communications are you asking about?

7      MR. LAWHN: The communication --

8      MR. GRIMMER: Miss Self or the AIG?

9      MR. LAWHN: Communications -- AIG Technical Services

10  and Amy Self, the communications where the discussion that

11  Mr. Thomason had with Amy Self which were the basis of his

12  comment, and withdrawl letter which is Exhibit 10.

13     MR. GRIMMER: It's okay.

14     MR. CORTES: Okay.

15     A   My understanding they were oral.

16  BY MR. LAWHN:

17     Q   Was it a telephone call or face-to-face, as far as

18  you know?

19     A   I don't know.

20     Q   Did you ever have any oral discussions with any

21  representative of AIG Technical Services regarding this

22  claim?

23     A   No.

24     Q   Did you ever have any discussions with anybody

25  from American Home Assurance Company regarding this claim?

Case 1:02-cv-00008   Document 375   Filed 02/19/2004   Page 71 of 91

1      A    An attorney whose name I cannot recall at this

2  moment came to visit Carlsmith to discuss our claim.

3      Q    That was after the Complaint was filed?

4      A    No, this was well before, several months before

5  when we initially filed. My recollection is that he was an

6  attorney for -- he represented himself as being an attorney

7  for a cosigner. Miss Self and I both talked with this

8  attorney. And that's the only contact I had with any

9  representative or any person who said they represented any

10 party to this claim.

11     Q    Did this attorney say anything to you which led

12 you to believe that the surety was AIG Technical Services

13 and not American Home Assurance Company?

14     A    No, it was an informal meeting. He told me that

15 he wanted to make peace between Rhino Builders and

16 BioGenesis. He had relationship with Gerald Lam, the owner

17 of BioGenesis, that's the only reason I talked to him.

18     MR. LAWHN: The next exhibit is a series of e-mails

19 which we obtained in Guam from the Carlsmith office that I

20 got this morning. I'm just going to have the whole package

21 marked, if we could.

22     A    While you're doing that, may I take a brake.

23     MR. LAWHN: Of course. Let's go off the record.

24     (At 3:33 p.m., a recess was taken until 3:36 p.m.)

25                 (Whereupon, Exhibit 11 was

Case 1:02-cv-00008    Document 375    Filed 02/19/2004    Page 72 of 91

1                    marked for identification.)

2    BY MR. LAWHN:

3        Q    Have you got Exhibit 11 in front of you?

4        A    No, I don't.

5        Q    It's pretty thick.

6        A    Oh.

7        Q    Mr. Thomason, Exhibit 11 is a series of e-mails

8    that were produced by Carlsmith's firm's office in Guam.

9    And if you go to page four, look in the lower right-hand

10   corner, do you see the 004?

11       A    Yeah.

12       Q    And you see an e-mail from David Ledger.  Now, is

13   David Ledger an employee in the Guam office of Carlsmith?

14       A    David Ledger is a partner in the Guam office of

15   Carlsmith.

16       Q    Have you ever seen the e-mail that's under the

17   heading "Original Message" at the bottom of page four of

18   Exhibit 11?

19       A    Yes, I saw that.

20       Q    Now, at the top of page four of Exhibit 11,

21   there's a response from Judy Granville at AIG dot com to

22   David Ledger.  And in the response, Ms. Granville tells

23   Mr. Ledger that American Home Assurance Company, the

24   insurer, identifies it as the insurer, and then goes over

25   various other AIG entities.

Case 1:02-cv-00008    Document 375    Filed 02/19/2004    Page 73 of 91

1          Did you see the response from Miss

2   Granville to David Ledger?  It's at the top of page

3   four of Exhibit 11.

4          A     I don't recall seeing that response.

5          Q     Let me shift gears, shift your focus a little bit

6   away from this identity of the surety issue to the withdrawl

7   issue.

8              At any time did anybody from any of the

9   AIG group of companies ask you to withdraw from the

10  representation of Rhino in this matter?

11         A     No.

12         Q     At any time did any representative of the AIG

13  group of companies even suggest to you that Carlsmith should

14  withdraw from this case?

15         A     Not to me, no.

16         Q     Are you aware of any economic pressure being put

17  on the Carlsmith firm by any of the AIG group of companies

18  to encourage Carlsmith to withdraw from the representation

19  of Rhino in this case?

20         A     I'm not aware of any, no.

21         MR. LAWHN:  Mr. Cortes, that's all I have this

22  afternoon.  I do, of course, want to reserve my right in the

23  event that Judge Unpingco says I can ask the questions that

24  have been objected to ask instructed not to answer.

25         MR. CORTES:  If the judge instructs us to answer any

1    questions, of course, then we won't make any objections

2    contrary to his ruling.

3          I would suggest, however, that if you

4    think that we've objected improperly, that we meet

5    and confer at least via mail.  And I think that it

6    would be fair in this instance if we exchanged the

7    authority that we based our positions on prior to

8    bringing the motion.

9          MR. LAWHN:  I think the rules may require us to do

10   something along those lines.

11         MR. CORTES:  And the rules require us to meet and

12   confer, and I don't think the judge would really appreciate

13   it if we don't bother him unnecessarily.

14         MR. LAWHN:  We'll do our best to comply with the

spirit

15   and the literal wording of the rules.  Off the record.

16              (Discussion held off the record. )

17                     EXAMINATION

18   BY MR. CORTES:

19         Q    Mr. Thomason, thank you for being here today.

20   Toward the end of your testimony, you testified, according

21   to my notes, something to the effect that an attorney whose

22   name you cannot recall came to visit Carlsmith Ball, an

23   attorney for the cosigner on the bond, I believe.

24         A    (Witness nods head.)

25         Q    Could that have been Steven Tom?

1   A    That's -- I think that's correct.

2   Q    Okay.  You think so?

3   A    Yes, I do.

4   Q    And earlier you also said that you had arranged

5   for Mr. Grimmer to come to defend you in this matter.  Do

6   you have a formal attorney-client relationship with

7   Mr. Grimmer or with Carlsmith Ball with respect to this

8   deposition?

9   A    No, I have not signed an engagement letter.

10  Q    Turning to -- what was the last exhibit number?

11  MR. GRIMMER:  Eleven.

12  BY MR. CORTES:

13  Q    Turning to pages that are Bates numbered nine, 10

14  and 11 of Exhibit 11, do you recognize these?

15  A    Yes.

16  Q    What are they?

17  A    These are the results of computerized searches

18  that the Carlsmith business office runs to assist attorneys

19  in questions concerning conflicts in matters.

20  Q    Do you have any knowledge about when this

21  particular conflicts check was run?

22  A    No, I don't.  No, I don't.

23  Q    And then on page one of Exhibit 11, this is an

24  e-mail dated March 19, 2002.  Do you know who Vince would

be

25  that's referred to in the second sentence there?  Would

that

1    be Vince Leon Guerrero?

2        A    Yes, Vince Leon Guerrero.  He was an attorney

3    affiliated in the Guam office.

4        Q    Is he still at Carlsmith, do you know?

5        A    My understanding is that he -- he has since gone

6    to another firm.

7        Q    Do you know what sort of practice Mr. Leon

8    Guerrero had at Carlsmith?

9        A    I believe he was primarily commercial litigation

10   attorney.

11       Q    Do you have any knowledge of Mr. Leon Guerrero

12   representing any AIG entities -- AIG-affiliated entities

13   while at Carlsmith?

14       A    I do not, no.

15   MR. CORTES:  That's all I have.

16   MR. LAWHN:  No further questions.

17       (The deposition was concluded at 3:46 p.m.)

18                        -oOo-

19

20

21

22

23

24

25

Case 1:02-cv-00008    Document 375    Filed 02/19/2004    Page 77 of 91

1

2                           C E R T I F I C A T E

3

4                   I, HEDY COLEMAN, CSR, in and for
5    the State of Hawaii, do hereby certify:

6                   That I was acting as shorthand
     reporter in the foregoing matter on the 6th day of
7    October, 2003;

8                   That the proceedings were taken
     down in machine shorthand by me and were thereafter
9    reduced to typewriting by me; that the foregoing
     represents, to the best of my ability, a correct
10   transcript of the proceedings had in the foregoing
     matter;

11

12                  I further certify that I am not
13   counsel for any of the parties hereto, nor in any
     way interested in the outcome of the cause named in
14   the caption.

15

16

17

18

19

20          DATED:_____

21

22

23          _____
            HEDY COLEMAN, CSR #116
24          Notary Public, State of Hawaii
            My commission expires: 9-14-05

25

                      RALPH ROSENBERG COURT REPORTERS, INC.
                             (808) 524-2090

61

```
 1                    C E R T I F I C A T E
 2              I, TERRY E. THOMASON, do hereby certify
that I
 3    have read the foregoing pages 1 through 61, inclusive, and
 4    corrections, if any, were noted by me; and that same is now
a
 5    true and correct transcript of my testimony.
 6                    Dated
_____
 7
 8
_____
                          TERRY E. THOMASON
 9
10
11              Signed before me this _____
12         day of _____, 2003.
13
14
15         _____
16
17
18
19
20
21
22         United States of America For Use And Benefit of Rhino
23    Builders, Inc. vs. BioGenesis Pacific, Inc, et al, Civil
No.
24    02-00008, Hedy Coleman, 10-6-03.
25
```



# CARLSMITH BALL LLP

### A LIMITED LIABILITY LAW PARTNERSHIP

PACIFIC TOWER, SUITE 2200
1001 BISHOP STREET
HONOLULU, HAWAII 96813
TELEPHONE (808) 523-2500 FAX (808) 523-0842
www.carlsmith.com

DIRECT DIAL NO.
(808) 523-2522

E-MAIL TTHOMASON@CARLSMITH.COM

OUR REFERENCE NO.
053705-00001

April 9, 2002

<u>CONFIDENTIAL</u>
<u>ATTORNEY-CLIENT PRIVILEGE</u>
<u>VIA FACSIMILE & U.S. MAIL</u>

Mr. Michael O'Connell
President
Rhino Builders, Inc.
85-841 Farrington Highway #B
Waianae, Hawaii 96792

Re: Status of Work and Recommendations

Dear Mr. O'Connell:



EXHIBIT
10

HONOLULU · KAPOLEI · HILO · KONA · MAUI · GUAM · SAIPAN · LOS ANGELES · WASHINGTON, D.C. · MEXICO

Exhibit
D

Mr. Michael O'Connell
April 9, 2002
Page 2

2.  Transfer Of The Miller Act Claim.

We also have advised Rhino to transfer the BPI Miller Act claim to another firm in Guam. Our recommendation arose from the discovery of a possible challenge the surety may assert against Carlsmith's involvement in the case.

a.  Potential Challenge To Carlsmith.

This potential challenge would be based upon the rule of professional conduct for attorneys that precludes an attorney or law firm from representing one client in a matter that conflicts with the interests of another client. We are concerned that BPI's surety may claim that it is one of Carlsmith's clients and that Carlsmith cannot represent Rhino in the suit.

The potential challenge grows from the complex nature of the surety's corporate structure. In Rhino's Miller Act claim, the surety has identified itself as AIG Technical Services. AIG Technical Services is reportedly related in some manner to American International Group, Inc.

American International Group, Inc. is a very large company with one-hundred and thirty-six reported subsidiaries. For your review and information, we have enclosed a printout of the American International Group, Inc. reported list of subsidiaries as filed with the U.S. Securities and Exchange Commission.

BPI's supposed surety, AIG Technical Services is not listed among American International Group, Inc.'s subsidiaries, but it may be owned by one of the subsidiaries. In the Miller Act suit, Rhino's claim against BPI must also be asserted against AIG Technical Services as the surety for BPI. If BPI fails to pay Rhino for proven contract obligations, the surety must pay in BPI's place. Consequently, Rhino's interests and the interests of AIG Technical Services are adverse to each other.

At the time of our filing of Rhino's complaint, a company doing business in Guam under the name of A I Marine Adjusters was using the services of one of our trial attorneys in Guam. The services consisted of the defense of marine insurance claims. Although A I Marine Adjusters is also not listed on the American International Group, Inc.'s list of subsidiaries, a representative of A I Marine Adjusters told our trial attorney that A I Marine Adjusters is related in some way to American International Group.

The exact relationship among AIG Technical Services, Inc., A I Marine Adjusters and the various other companies of American International Group, Inc. remains unclear. Before an actual conflict would arise, A I Marine Adjusters and AIG Technical Services, Inc. must have shared management officials, boards of directors, or otherwise be so closely affiliated that Carlsmith would need to treat them as a single client.

We do not believe that an actual conflict has arisen. However, we are concerned that the surety could challenge Carlsmith's representation of Rhino during the suit. Such a challenge could come at any time, and Rhino should anticipate that the surety would use the challenge at the most inopportune time for Rhino to delay and increase the expenses of the suit. Even though the court may find no conflict exists, the presence of the issue could significantly increase Rhino's costs in pursuing the suit.

     b.    Recommendation To Avoid The Problem.

Questions concerning whether one law firm or another may represent Rhino in this suit are completely irrelevant to Rhino's Miller Act claim. Fighting the potential conflict issue will not promote Rhino's chances of recovery, and will do nothing more than impose an unnecessary cost of litigation. Because Rhino had planned to transfer the

litigation of the case to different attorneys in Carlsmith's Guam office anyway, the transfer to another attorney (not from within Carlsmith) will not cause any significant disruption or delay. Carlsmith remains prepared to ensure all case files, evidence and other materials in Carlsmith's Honolulu office are delivered without delay to an attorney outside of Carlsmith that Rhino may select.

Under the circumstances, we recommend Rhino transfer the Miller Act claim to another Guam attorney to avoid unnecessary litigation and expense. As we have informed you, Anita Arriola is prepared to take the Miller Act claim if you elect to transfer the case to her. Ms. Arriola is a very experienced and highly qualified Guam litigation attorney. At this stage of the case, we believe transfer of the case to Ms. Arriola is in Rhino's best interests.

Mr. Michael O'Connell
April 9, 2002
Page 6

Mr. Michael O'Conn●●
April 9, 2002
Page 7

D. Conclusion.

For the foregoing reasons, we recommend Rhino:

~~Retain Anno Arnold as soon as possible to pursue Rhino's USHs~~
Act Claim; .

Please call if you have any questions concerning the above matters.

Very truly yours,

Terry E. Thomason

TET:shl
Enclosure
1454296-1

VIEW DOCUMENT

## AMERICAN INTERNATIONAL GROUP INC
### 10-K - EX-21, EX-21 SUBSIDIARIES OF REGISTRANT filed 04/02/01

Review Settings

View Filing

---

Page 1 – 10-K – EX-21 – Filed by AMERICAN INTERNATIONAL GROUP INC

1

Exhibit 21

Subsidiaries of Registrant

| Name of Corporation(1) | Jurisdiction of Incorporation | % of Voting Securities Owned by its Immediate Parent(2) |
|---|---|---|
| American International Group, Inc. (Registrant) | Delaware | (3) |
| AIG Aviation, Inc. | Georgia | 100% |
| AIG Bulgaria Insurance and Reinsurance Company AD | Bulgaria | 100% |
| AIG Capital Corp. | Delaware | 100% |
| AIG Capital Management Corp. | Delaware | 100% |
| AIG Claim Services, Inc. | Delaware | 100% |
| AIG Consumer Finance Group, Inc. | Delaware | 100% |
| AIG Bank Polska S.A. | Poland | 97.23% |
| AIG Credit S.A. | Poland | 100% |
| Compania Financiera Argentina S.A. | Argentina | 95.62% |
| AIG Credit Corp. | Delaware | 100% |
| A.I. Credit Corp. | New Hampshire | 100% |
| Imperial Premium Finance, Inc. | California | 100% |
| Imperial Premium Finance, Inc. | Delaware | 100% |
| AIG Finance Holdings, Inc. | New York | 100% |
| AIG Finance (Hong Kong) Limited | Hong Kong | 100% |
| AIG Financial Products Corp. | Delaware | 100% |
| AIG Matched Funding Corp. | Delaware | 100% |
| Banque AIG | France | 90%(4) |
| AIG Funding, Inc. | Delaware | 100% |
| AIG Global Investment Group, Inc. | Delaware | 100% |
| AIG Capital Partners, Inc. | Delaware | 100% |
| AIG Global Investment Corp. | New Jersey | 100% |
| AIG Global Real Estate Investment Corp. | Delaware | 100% |
| AIG Global Trade & Political Risk Insurance Company | New Jersey | 100% |
| AIG Golden Insurance Company | Israel | 50.1% |
| AIG Life Insurance Company | Delaware | 79.9%(5) |
| AIG Life Insurance Company of Canada | Canada | 100% |
| AIG Life Insurance Company of Puerto Rico | Puerto Rico | 100% |
| AIG Marketing, Inc. | Delaware | 100% |
| AIG Memsa, Inc. | Delaware | 100% |
| Tata AIG General Insurance Company Ltd. | India | 26% |
| AIG Private Bank Ltd. | Switzerland | 100% |
| AIG Risk Management, Inc. | New York | 100% |
| AIG Trading Group Inc. | Delaware | 100% |
| AIG International Inc. | Delaware | 100% |
| AIU Insurance Company | New York | 52%(6) |
| AIG North America, Inc. | New York | 100% |
| American Home Assurance Company | New York | 100% |

|  |  |
|---|---|
| AIG Hawaii Insurance Company, Inc. | Hawaii 100% |
| American International Insurance Company | New York 100% |
| American International Insurance Company of California, Inc. | California 100% |
| American International Insurance Company of New Jersey | New Jersey 100% |
| Minnesota Insurance Company | Minnesota 100% |
| American International Realty Corp. | Delaware 31.47%(7) |
| Pine Street Real Estate Holdings Corp. | New Hampshire 31.47%(8) |
| Transatlantic Holdings, Inc. | Delaware 33.77%(9) |
| Transatlantic Reinsurance Company | New York 100% |
| Putnam Reinsurance Company | New York 100% |
| Trans Re Zurich | Switzerland 100% |

II-10

## Page 2 – 10-K – EX-21 – Filed by AMERICAN INTERNATIONAL GROUP INC

2

Subsidiaries of Registrant -- (continued)

| Name of Corporation(1) | Jurisdiction of Incorporation | % of Voting Securities Owned by its Immediate Parent (2) |
|---|---|---|
| American International Group Data Center, Inc. | New Hampshire | 100% |
| American International Life Assurance Company of New York | New York | 77.52%(10 |
| American International Reinsurance Company Limited | Bermuda | 100% |
| American International Assurance Company, Limited | Hong Kong | 100% |
| American International Assurance Company (Australia) Limited | Australia | 100% |
| American International Assurance Company (Bermuda) Limited | Bermuda | 100% |
| American International Assurance Co. (Vietnam) Limited | Vietnam | 100% |
| Tata AIG Life Insurance Company Ltd. | India | 26% |
| Naa Shan Life Insurance Company, Ltd. | Taiwan | 95% |
| American International Underwriters Corporation | New York | 100% |
| American International Underwriters Overseas, Ltd. | Bermuda | 100% |
| AIG Europe (Ireland) Ltd. | Ireland | 100% |
| AIG Europe (U.K.) Limited | England | 100% |
| AIG Interamericana Companhia de Seguros Gerais (Brazil) | Brazil | 50% |
| Universal Insurance Co., Ltd. | Thailand | 100% |
| La Seguridad de Centroamerica, Compania de Seguros, Sociedad Anonima | Guatemala | 100% |
| American International Insurance Company of Puerto Rico | Puerto Rico | 100% |
| La Interamerica Compania de Seguros Generales S.A | Colombia | 100% |
| American International Underwriters G.m.b.H | Germany | 100% |
| Underwriters Adjustment Company, Inc. | Panama | 100% |
| American Life Insurance Company | Delaware | 100% |
| AIG Life (Bulgaria) Z.O. A.D. | Bulgaria | 100% |
| AIG Participacoes do Brasil, S.A. | Brazil | 100% |
| ALICO, S.A. | France | 89% |
| American Life Insurance Company (Kenya) Limited | Kenya | 100% |
| Pharaonic American Life Insurance Company | Egypt | 71.6% |
| American Security Life Insurance Company, Ltd. | Switzerland | 99.8% |
| American Security Life Insurance Company | Lichtenstein | 100% |
| Birmingham Fire Insurance Company of Pennsylvania | Pennsylvania | 100% |
| China America Insurance Company, Ltd. | Delaware | 50% |
| Commerce and Industry Insurance Company | New York | 100% |
| Commerce and Industry Insurance Company of Canada | Ontario | 100% |
| Delaware American Life Insurance Company | Delaware | 100% |
| Hawaii Insurance Consultants, Ltd. | Hawaii | 100% |
| HSB Group, Inc. | Delaware | 100% |
| The Hartford Steam Boiler Inspection and Insurance Company | Connecticut | 100% |
| Allen Insurance Company Ltd. (Bermuda) | Bermuda | 100% |
| The Hartford Steam Boiler Inspection and Insurance Company of Connecticut | Connecticut | 100% |
| The Hartford Steam Boiler Inspection and Insurance Company of Texas | Texas | 100% |
| HSB Engineering Insurance Limited | England | 100% |
| The Boiler Inspection and Insurance Company of Canada | Canada | 100% |
| The Insurance Company of the State of Pennsylvania | Pennsylvania | 100% |
| Landmark Insurance Company | California | 100% |
| Mt. Mansfield Company, Inc. | Vermont | 100% |

National Union Fire Insur~ce Company of Pittsburgh, Pa.      Pennsylvania    100%
American International Specialty Lines Insurance Company      Alaska    70% (1
International Lease Finance Corporation      California    100%
Lexington Insurance Company      Delaware    70% (1
JT Accident & Fire Insurance Co. Ltd.      Japan    50%

II-11

3

Subsidiaries of Registrant--(continued)

| Name of Corporation | Jurisdiction of Incorporation | % of Voting Securities Owned by its Immediate Parent(2) |
|---|---|---|
| National Union Fire Insurance Company of Louisiana | Louisiana | 100% |
| 21st Century Insurance Group | California | 33.07%(12) |
| 21st Century Insurance Company | California | 100% |
| 21st Century Casualty Company | California | 100% |
| Starr Excess Liability Insurance Company, Ltd. | Delaware | 100% |
| Starr Excess Liability Insurance International Limited | Ireland | 100% |
| NHIG Holding Corp. | Delaware | 100% |
| Audubon Insurance Company | Louisiana | 100% |
| Audubon Indemnity Company | Mississippi | 100% |
| Agency Management Corporation | Louisiana | 100% |
| The Gulf Agency, Inc. | Alabama | 100% |
| New Hampshire Insurance Company | Pennsylvania | 100% |
| AIG Europe, S.A | France | (13) |
| A.I. Network Corporation | New Hampshire | 100% |
| American International Pacific Insurance Company | Colorado | 100% |
| American International South Insurance Company | Pennsylvania | 100% |
| Granite State Insurance Company | Pennsylvania | 100% |
| New Hampshire Indemnity Company, Inc. | Pennsylvania | 100% |
| AIG National Insurance Company, Inc. | New York | 100% |
| Illinois National Insurance Co. | Illinois | 100% |
| New Hampshire Insurance Services, Inc. | New Hampshire | 100% |
| Pharsanic Insurance Company, S.A.E. | Egypt | 90% |
| The Philippine American Life and General Insurance Company | Philippines | 99% |
| Pacific Union Assurance Company | California | 100% |
| The Philippine American General Insurance Company, Inc. | Philippines | 100% |
| Philam Insurance Company, Inc. | Philippines | 100% |
| Risk Specialist Companies, Inc. | Delaware | 100% |
| SunAmerica Inc. | Delaware | 100% |
| SunAmerica Investments, Inc. | Georgia | 100% |
| SunAmerica Financial Network, Inc. | Maryland | 100% |
| Advantage Capital Corp. | New York | 100% |
| FSC Securities, Inc. | Delaware | 100% |
| Sentra Securities Corp. | California | 100% |
| Spelman & Co., Inc. | California | 100% |
| SunAmerica Securities, Inc. | Delaware | 100% |
| Resources Trust Company | Colorado | 100% |
| SunAmerica Life Insurance Company | Arizona | 100% |
| First SunAmerica Life Insurance Company | New York | 100% |
| Anchor National Life Insurance Company | Arizona | 100% |
| Royal Alliance Associates, Inc. | Delaware | 100% |
| SunAmerica Asset Management Corp. | Delaware | 100% |
| SunAmerica Capital Services, Inc. | Delaware | 100% |
| 21st Century Insurance Company of Arizona | Arizona | 51%(14) |

II-12

| Name of Corporation | Incorporation | % of Voting Securities Owned by its Parent(2) |
|---|---|---|
| United Guaranty Corporation | North Carolina | 36.31%(15) |
| United Guaranty Insurance Company | North Carolina | 100% |
| United Guaranty Mortgage Insurance Company | North Carolina | 100% |
| United Guaranty Mortgage Insurance Company of North Carolina | North Carolina | 100% |
| United Guaranty Residential Insurance Company of North Carolina | North Carolina | 100% |
| United Guaranty Residential Insurance Company | North Carolina | 75%(16) |
| United Guaranty Commercial Insurance Company of North Carolina | North Carolina | 100% |
| United Guaranty Mortgage Indemnity Company | North Carolina | 100% |
| United Guaranty Credit Insurance Company | North Carolina | 100% |
| United Guaranty Services, Inc. | North Carolina | 100% |

----------

(1) All subsidiaries listed are consolidated in the accompanying financial statements. Certain subsidiaries have been omitted from the tabulation. The omitted subsidiaries, when considered in the aggregate as a single subsidiary, do not constitute a significant subsidiary.

(2) Percentages include directors' qualifying shares.

(3) The common stock is owned 13.6 percent by SICO, 2.0 percent by Starr and 2.7 percent by The Starr Foundation.

(4) Also owned 10 percent by AIG Matched Funding Corp.

(5) Also owned 21.1 percent by Commerce & Industry Insurance Company.

(6) Also owned 8 percent by The Insurance Company of the State of Pennsylvania, 32 percent by National Union, and 8 percent by Birmingham.

(7) Also owned by 11 other AIG subsidiaries

(8) Also owned by 11 other AIG subsidiaries

(9) Also owned 26.19 percent by American International Group, Inc.

(10) Also owned 22.48 percent by American Home.

(11) Also owned 20 percent by The Insurance Company of the State of Pennsylvania and 10 percent by Birmingham.

(12) Also owned 16.87 percent by American Home, 6.34 percent by Commerce & Industry Insurance Company and 6.34 percent by New Hampshire.

(13) 100 percent to be held with other AIG companies.

(14) Also owned 49 percent by 21st Century Insurance Group.

(15) Also owned 45.88 percent by National Union, 16.95 percent by New Hampshire