James Lawhn
OLIVER LAU LAWHN OGAWA & NAKAMURA
707 Richard Street, Suite 600
Honolulu, Hawaii 96813
Telephone No.: (808) 533-3999
Facsimile No.: (808) 533-0144

Stephen D. Tom
WHITE & TOM
820 Mililani Street, Suite 711
Honolulu, Hawaii 96813-2972
Telephone No.: (808) 547-5151
Facsimile No.: (808) 599-4517

Louie J. Yanza b
VERNIER & MAHER, LLP
115 Hesler Place, Ground Floor
Governor Joseph Flores Building
Hagåtña, Guam 96910
Telephone No.: (671) 477-7059
Facsimile No.: (671) 472-5487

Attorney for Defendants AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY

FILED
DISTRICT COURT OF GUAM
FEB 19 2004
MARY L. M. MORAN
CLERK OF COURT
312

# UNITED STATES DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., <br><br>Plaintiff,<br>vs.<br><br>BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC. and AMERICAN HOME ASSURANCE COMPANY,<br><br>Defendants. | CIVIL CASE NO. 02-00008 <br><br>**SECOND NOTICE OF SUPPLEMENTAL AUTHORITY** |
| BIOGENESIS PACIFIC, INC.,<br><br>Counterclaimant,<br>vs.<br><br>RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, AND JOHN DOES 1-10,<br><br>Counter-Defendant. | |

| AMERICAN HOME ASSURANCE COMPANY | )<br>)<br>) |
|---|---|
| Cross-Claimant, | )<br>) |
| vs. | )<br>) |
| BIOGENESIS PACIFIC, INC. | )<br>) |
| Cross-Claim Defendant. | ) |

COMES NOW, Defendants AIG TECHNICAL SERVICES, INC. ("AIGTS") and AMERICAN HOME ASSURANCE COMPANY ("AMERICAN HOME") (collectively "Defendants"), through counsel, VERNIER & MAHER, LLP, by Louie J. Yanza, and hereby gives notice of their intent to rely and refer to, and submit supplemental authority in support of their Motion for Dismissal of Plaintiff's Bad Faith Cause of Action for Failure to State a Claim; or, in the Alternative, for Summary Judgment, filed on December 31, 2003.

This supplemental authority consists of:

1. *Masterclean, Inc. v. Star Insurance Co.*, 347 S.C. 405, 556 S.E.2d 371 (S.C. 2001). A copy of said authority is attached hereto for the Court's reference.

2. *Institute of Mission Helpers of Baltimore City v. Reliance Insurance Co.*, 812 F.Supp. 72 (D. Md. 1992). A copy of said authority is attached hereto for the Court's reference.

3. *Bell BCI Co. v. HRGM Corporation*, 276 F.Supp.2d 462 (D. Md. 2003). A copy of said authority is attached hereto for the Court's reference.

Respectfully submitted this 19th day of February, 2004.

**VERNIER & MAHER, LLP**
Attorneys for Defendants
**AIG TECHNICAL SERVICES, INC. and AMERICAN HOME ASSURANCE COMPANY**

BY: _____
LOUIE J. YANZA

2

## CERTIFICATE OF SERVICE

I, Louie J. Yanza, hereby certify that on or before February 19, 2004, I will cause to be sent by personal service or by facsimile a copy of the annexed **Second Notice of Supplemental Authority**, to the following parties at their place of business:

Ms. Janalynn M. Cruz
**CALVO & CLARK, LLP**
Suite 202, First Savings & Loan Building
655 South Marine Drive
Tamuning, Guam 96911

Ms. Catherine Bejerana Camacho
**BERMAN O'CONNOR MANN & SHKLOV**
Suite 503, Bank of Guam Building
111 Chalan Santo Papa
Hagåtña, Guam 96910

**Mr. Antonio L. Cortes**
Attorney At Law
233 Julale Center
424 West O'Brien Drive
Post Office Box BV
Hagåtña, Guam 96932-8973

**Mr. Frederick J. Kerley**
Suite 907, Pacific News Bldg.
238 Archbishop Flores Street
Hagatña, Guam 96910

Executed this 19th day of February, 2004.

**VERNIER & MAHER, LLP**
Attorney for Defendants
**AIG TECHNICAL SERVICES, INC. and
AMERICAN HOME ASSURANCE COMPANY**

BY: _____
LOUIE J. YANZA

3

Supreme Court of South Carolina.

MASTERCLEAN, INC., CPM Environmental, Inc., William B. Smith and Barbara P. Smith, Plaintiffs,
v.
STAR INSURANCE CO., Defendant and Third Party Plaintiff,
v.
Masterclean of North Carolina, Inc., Third Party Defendant.

No. 25379.

Heard Oct. 23, 2001.
Decided Nov. 26, 2001.

Principal brought federal court action against performance bond surety for bad faith failure to pay. The United States District Court for the District of South Carolina, Matthew J. Perry, Senior District Judge, certified questions. The Supreme Court, Burnett, J., held that: (1) as a matter of first impression, principal could not sue surety in tort for bad faith refusal to pay obligee, and (2) the Insurance Trade Practices Act and the Claims Practices Act do not create private causes of action.

Questions answered.

West Headnotes

[1] Principal and Surety ⇐1
309k1

A "surety bond" is a tripartite agreement among the surety company, the principal primarily responsible for performing the contract, and the obligee for whose benefit the agreement is made.

[2] Principal and Surety ⇐1
309k1

"Suretyship" is a contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default, or miscarriage of another, the principal.

[3] Principal and Surety ⇐1
309k1

A "surety agreement" is a credit arrangement where the surety lends credit to the principal who otherwise has insufficient credit to obtain the contract with the obligee.

[4] Principal and Surety ⇐76
309k76

[4] Principal and Surety ⇐185
309k185

A surety must pay the obligee only if the principal defaults, but the surety generally retains a right of indemnification from the principal.

[5] Principal and Surety ⇐66(1)
309k66(1)

At all times, the principal retains the primary obligation to perform the contract and the primary liability for default of the contract.

[6] Insurance ⇐1001
217k1001

[6] Insurance ⇐1003
217k1003

[6] Principal and Surety ⇐65
309k65

Principal could not sue surety in tort for bad faith refusal to pay obligee under performance bond, even though the Insurance Code regulates sureties and the surety's liability was limited to the penal amount of the bond and had an incentive to delay payment; the bond was not insurance, and the surety was not an insurer. Code 1976, § 38-1-20(13, 22, 25, 37).

[7] Principal and Surety ⇐52
309k52

A surety's presence in a regulatory scheme for insurance does not render common law duties of an insurer applicable to a surety. Code 1976, § 38-1-20(13, 22, 25, 37).

[8] Principal and Surety ⇐65
309k65

The surety bond makes the surety and principal responsible to the obligee.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

[9] Principal and Surety ⇌65
309k65

The **surety** bond is designed to protect the obligee, not the principal.

[10] Principal and Surety ⇌65
309k65

A **surety** bond does not exist to protect the principal against an unknown calamity; it exists to protect the obligee against the principal's potential default.

[11] Principal and Surety ⇌185
309k185

A principal is not precluded from using a **surety's bad faith** as a shield in contract against a **surety** seeking indemnification.

[12] Insurance ⇌3379
217k3379

[12] Insurance ⇌3426
217k3426

The Insurance Trade Practices Act and the Claims Practices Act do not create private causes of action. Code 1976, §§ 38-2-10, 38-3-110, 38-57-10 et seq., 38-59-20 et seq.

**\*372 \*407** Robert Bryan Barnes and Kate B. Barroll, of Rogers, Townsend & Thomas, of Columbia, for Plaintiffs.

C. Allen Gibson, Jr., and Jonathan D. Crumly, Sr., both of Buist, Moore, Smythe & McGee, of Charleston, for Defendant/Third Party Plaintiff.

L. Franklin Elmore and Nancy W. Monts, of Ogletree, Deakins, Nash, Smoak & Stewart, **\*373** of Greenville; and Edward G. Gallagher, of Washington, DC, for Amicus Curiae The Surety Association of America.

Justice BURNETT.

We agreed to answer the following questions certified by the United States District Court for the District of South Carolina:

> Does South Carolina recognize a cause of action in tort by a principal against its surety for the surety's bad faith refusal to pay first party benefits to an obligee pursuant to a construction performance bond?
> If so, what are the elements of this cause of action and what legal standards apply to the surety's actions in the investigation and resolution of an obligee's claim against the bond?
> Does a principal have a private right of action against its surety pursuant to S.C.Code. Ann. §§ 38-57-70 & 38-59-20 (1989)?

FACTS

The University of South Carolina ("U.S.C.") contracted with Masterclean, Inc. [FN1] ("Masterclean") to remove asbestos from a **\*408** U.S.C. building. Masterclean obtained a performance bond from Star Insurance Company ("Star") pursuant to South Carolina law for $1,383,214 to assure performance. *See* S.C.Code Ann. § 11-35-3030(2)(i) (Supp.2000).

> FN1. Plaintiffs Masterclean, Inc., CPM Environmental, Inc., William B. Smith and Barbara P. Smith sued Star Insurance Company in state court. Star removed the case to federal court. Star filed a Third Party Complaint against Masterclean for indemnification. For simplicity we refer to Masterclean, Inc., CPM Environmental, Inc., William B. Smith and Barbara P. Smith collectively as Plaintiff.

U.S.C. notified Star in November 1995 of Masterclean's default on the contract and made a claim on the bond. Star began a claim investigation. U.S.C. formally terminated the contract in December 1995.

Star eventually concluded Masterclean defaulted on the contract but refrained from deciding the claim on the bond pending negotiations with U.S.C. As negotiations progressed, U.S.C. hired a replacement contractor to complete the project.

The South Carolina Chief Procurement Officer issued a ruling in May 1996 finding Masterclean in default and ordering it to pay $1,000,000 in damages. All parties entered a negotiated settlement for $900,000 with Star liable for $100,000 and Masterclean paying the difference.

Plaintiff argues Star should have mitigated the damages by performing its bond obligations once it determined Masterclean defaulted and before U.S.C. obtained a replacement contractor. [FN2] Plaintiff alleges Star's failure to take over the project entitles it to damages in

tort for Star's bad faith refusal to honor U.S.C.'s claim under the bond.

> FN2. The bond provided, in part:
> Whenever the Contractor shall be, and declared by Owner to be in default under the Contract, the Owner having performed Owner's obligations thereunder, the Surety may promptly remedy the default, or shall promptly
> 1) Complete the contract in accordance with its terms and conditions, or
> 2) Obtain a bid or bids for completing the Contract in accordance with its terms and conditions, and ... arrange for a contract between such bidder and Owner.

## ISSUE

Can Plaintiff sue Star in tort for its bad faith refusal to pay U.S.C. under the performance bond?

## LAW/ANALYSIS

[1][2][3] A surety is a tripartite agreement among the surety company, the principal who is primarily responsible for performing *409 the contract, and the obligee for whose benefit the agreement is made. 74 Am.Jur.2d *Suretyship* § 3 (1974). "Suretyship is a contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default, or miscarriage of another, the principal." *Id.* § 1; *see also, Philco Fin. Corp. v. Mehlman*, 245 S.C. 139, 139 S.E.2d 475 (1964). South Carolina law treats a surety agreement as a credit arrangement where the surety lends credit to the principal who otherwise has insufficient credit to obtain the contract with **374 the obligee. *Philco Fin. Corp. v. Mehlman, supra*.

[4][5] A surety must pay the obligee only if the principal defaults, but the surety generally retains a right of indemnification from the principal. Restatement (Second) of Security § 82 cmt. b (1974). At all times, the principal retains the primary obligation to perform the contract and the primary liability for default of the contract. 74 Am.Jur.2d *Suretyship* § 3 (1974).

[6] Plaintiff asserts sureties are insurers and a performance bond is insurance. Such a determination would allow Plaintiff to sue in tort for Star's bad faith refusal to pay insurance benefits on a first party claim under *Nichols v. State Farm Mutual Automobile Ins. Co.*, 279 S.C. 336, 306 S.E.2d 616 (1983). This is an issue of first impression in South Carolina. [FN3] A survey of other states shows a split of authority in allowing such suits. *See Transamerica Premier Ins. Co. v. Brighton Sch. Dist. 27J*, 940 P.2d 348 (Colo.1997)(finding an obligee may sue a surety in tort for bad faith refusal); *see also, United States for the Use of Don Siegel Constr. Co., Inc. v. Atul Constr. Co.*, 85 F.Supp.2d 414 (2000)(Federal district court construing New Jersey law to allow an obligee to sue for bad faith damages against a surety); *Loyal Order of Moose, Lodge 1392 v. International Fid. Ins. Co.*, 797 P.2d 622 (Alaska 1990); *Dodge v. Fidelity and Deposit Co.*, 161 Ariz. 344, 778 P.2d 1240 (Ariz.1989); *K-W Indus. v. National Sur. Corp.*, 231 Mont. 461, 754 P.2d 502 *410 (Mont.1988); *Szarkowski v. Reliance Ins. Co.*, 404 N.W.2d 502 (N.D.1987); *cf. Board of Dirs. of Ass'n of Apartment Owners v. United Pac. Ins. Co.*, 77 Hawai'i 358, 884 P.2d 1134 (Haw.1994)(court found a surety owes a duty of good faith to the obligee and principal on the bond, but specifically declined to address whether Hawaii recognized a tort claim against a surety for bad faith refusal); *but see, Cates Constr., Inc. v. Talbot Partners*, 21 Cal.4th 28, 86 Cal.Rptr.2d 855, 980 P.2d 407 (Cal.1999)(California does not recognize an obligee's bad faith tort claim against a surety); *Great American Ins. Co., v. North Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415 (Tex.1995); *Institute of Mission Helpers of Baltimore City v. Reliance Ins. Co.*, 812 F.Supp. 72 (D.Md.1992) (construing Maryland law to not allow a bad faith claim by obligee against surety).

> FN3. While the South Carolina Court of Appeals dealt with this issue in *American Fire and Casualty Co. v. Johnson*, 332 S.C. 307, 504 S.E.2d 356 (Ct.App.1998), it refused to determine whether *Nichols* applied to sureties.

Plaintiff advances three arguments to support the contention that a surety agreement is an insurance contract subjecting the surety to a *Nichols* claim. Initially, Plaintiff asserts the Legislature intended to treat sureties as insurance companies for purposes of *Nichols* liability because they are regulated by the state insurance code. *See* S.C.Code Ann. § 38-1-10, *et. seq.* (Supp.2000). Several courts who find an action for a surety's bad faith refusal to pay an obligee base their decision on similar state laws. *See Transamerica Premier Ins. Co. v. Brighton Sch. Dist. 27J, supra; Dodge v. Fidelity and Deposit Co., supra.*

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

[7] The South Carolina Insurance Code regulates surety companies. *See* S.C.Code Ann. § 38-1-20(13), (22), (25), (37) (Supp.2000). However, the surety's presence in a regulatory scheme does not render common law duties of an insurer applicable to a surety. A bad faith tort action arises from the common law due to special characteristics of the insurance relationship, not simply because it is a regulated industry. *See Nichols v. State Farm Mut. Auto. Ins. Co., supra.* The insurance regulatory scheme provides for administrative penalties, not a *Nichols* common law right of action. *See* S.C.Code Ann. § 38-2-10 (Supp.2000) (providing administrative penalties for violating the insurance laws of this state). In sum, because South Carolina regulates surety companies under the insurance code does not mandate finding a *Nichols* common law action in this case. *Cf. Wilson v. McLeod,* 274 *411 S.C. 525, 265 S.E.2d 677 (1980) (the presence of a business in the insurance code does not necessarily create an insurance relationship).

Next, Plaintiff contends this Court should extend *Nichols* to sureties because courts **375 treat surety agreements as insurance contracts at common law. Plaintiff misconstrues the common law's analogy between surety contracts and insurance contracts. A leading treatise on insurance practice highlights the source of this confusion:

> It has frequently been held that contracts of suretyships are regarded as those of "insurance," where a corporate surety engages in the business for a profit, and that the rights and liabilities of the parties are governed by the rules applicable to contracts of insurance. This is a rule governing the construction of such contracts, however, and is not intended to alter the normal incidents of a suretyship contract, such as the surety's recourse against the principal for losses paid by it. If a compensated surety's contracts were regarded as insurance for all purposes, it is apparent that the surety would not have such right of recourse, together with all the other rights and duties which devolve upon a surety as such.

Appleman, *Insurance Law and Practice,* § 5273 (1981).

The treatise clearly shows the surety-insurance analogy is intended for purposes of contract construction alone. This analysis is supported by our holding in *State Agricultural & Mechanical Society v. Taylor,* 104 S.C. 167, 88 S.E. 372 (1916). In that case, we examined the difference between a "voluntary" surety and a for-profit surety company. Traditionally, courts viewed sureties as a favorite of the law, construing contracts *strictissimi juris* resolving all doubts and technicalities in the surety's favor. *See* Laurence P. Simpson *Suretyship* 101-12 (1950).

The *State Agricultural & Mechanical Society* rule removes *strictissimi juris* in surety contracts by for-profit companies. Courts now construe for-profit surety contracts similar to insurance contracts, resolving any doubts against the surety. *See, Greenville Airport Commission v. U.S. Fidelity & Guaranty Co. of Baltimore, Md.,* 226 S.C. 553, 86 S.E.2d 249 (1955). Courts analogize insurance with surety for purposes of contract construction, not to expand common law duties in tort.

*412 Finally, Plaintiff attempts to create a common law duty by arguing the public policy reasons articulated in *Nichols* exist in the surety context. These policy considerations are either nonexistent or less persuasive in the surety context.

One public policy rationale the *Nichols* Court relied upon was the existence of a strong public interest in insurance contracts. *Nichols,* 279 S.C. at 340, 306 S.E.2d at 619. A surety agreement affects the public interest, but its interest is significantly less than in insurance. Surety agreements in public construction projects involve commercial entities and do not involve the public's interest as do insurance contracts. *See e.g.,* S.C.Code Ann. § 56-10-20 (Supp.2000)(requiring all motor vehicle owners in South Carolina to maintain liability insurance).

A second public policy reason the *Nichols* court relied upon was an insured lacks bargaining power and must accept policies on an accept or reject basis. *Nichols,* 279 S.C. at 340, 306 S.E.2d at 619. Inequities in bargaining power are largely absent in the surety context because the obligee, not the surety, usually dictates the bond requirements.

A more important distinction is the obligations of each party are set by the underlying construction contract, not the bond. On a public project, the owner sets the terms of the contract and all bidders must agree to it, the surety usually does not participate in these negotiations and has little or no say in the terms of the contract whose performance it guarantees. *See* R. Cooper Shattuck, *Bad Faith: Does It Apply To Sureties In Alabama?,* 57 Ala. Law. 241, 244 (1996). The

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

principal is in position to contractually control the limits of its performance and liability. This process contrasts sharply with insurance where the insurer offers policies on standard forms on an accept or reject basis.

Another public policy reason underlying *Nichols* holding is the understanding an insurer, liable only in contract, may delay and deny a claim with virtual impunity at the risk of only paying the policy limits. *Nichols*, 279 S.C. at 340, 306 S.E.2d at 619. We have previously held a surety's liability cannot extend beyond the penal amount of the bond. *South Carolina Pub. Serv. Comm'n v. Colonial **376 Constr. Co.*, 274 S.C. 581, 266 S.E.2d 76 (1980). This situation may give the surety, *413 like an insurer, the incentive to delay and deny bond claims because it will ultimately only have to pay the bond amount.

We believe this factor alone is insufficient to recognize a bad faith claim for sureties. This determination is strengthened by this Court's reluctance to extend tort actions for violating good faith obligations. *See* F.P. Hubbard & R.L. Felix, *The South Carolina Law of Torts* 54-55 (1990). The presence of a principal's use of bad faith as a defense in contract, discussed below, also mitigates any danger of a surety company acting in bad faith to delay payment under the bond.

The *Nichols* court completed its public policy analysis by noting an "insured does not contract to obtain any kind of commercial advantage or leverage but only to protect himself against the specter of accidental [or unavoidable] loss." *Nichols*, 279 S.C. at 340, 306 S.E.2d at 619 (quoting *Trimper v. Nationwide Ins. Co.*, 540 F.Supp. 1188, 1193 (D.S.C.1982)). A surety bond, unlike insurance, is used to obtain a commercial advantage. "The principal does not seek protection from the surety against calamity ... the principal seeks the commercial advantage of obtaining a contract with the obligee, which requires a performance or payment bond." Bernard L. Balkin & Keith Witten, *Current Developments in Bad Faith Litigation Involving the Performance and Payment Bond Surety*, 28 Tort & Ins. L.J. 611, 624 (1993).

The state requires performance bonds for public construction contracts to protect itself from a principal's breach. The principal obtains the bond merely for the economic advantage of competing for the contract. There is no objective economic reason why a principal would voluntarily choose to provide a bond since it still bears the burden of performing and indemnifying the surety for any default. *See* Simpson, *supra*, at 2-3.

Even if the public policy concerns outlined in *Nichols* were present here, the nature of the principal-surety relationship itself would mandate finding a bad faith cause of action by a principal against its surety does not sound in tort. We note Plaintiff does not cite to any case which a court allowed a principal to sue its surety in tort for a bad faith refusal to pay a claim. In fact, our research indicates no court has held a surety liable to the principal "on the basis of the special *414 relationship that has been found in insurance cases." Balkin & Witten, *supra*, at 623-24; *see e.g., Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276 (Tex.1998).

[8][9] The reason for this absence of support in the case law is the general understanding that a principal cannot maintain a suit against a surety for his own default. 74 Am.Jur.2d *Suretyship* § 205 (1974). The surety bond makes the surety and principal responsible to the obligee. *Tooks v. Indemnity Insurance Co.*, 381 Pa. 607, 610, 114 A.2d 135, 136 (Pa.1955). The bond is designed to protect the obligee not the principal.

The bond's primary obligation rests on the principal to perform the contract. When the principal fails, the surety performs according to the terms of the bond. The surety is then entitled to indemnity from the principal. Once the principal defaults, its interests are tertiary to the obligee and the surety.

[10] Regardless of *Nichols* ' public policy applicability, the bond does not exist to protect the principal against an unknown calamity but to protect the obligee against the principal's potential default. It cannot be said a principal is the true intended beneficiary of the bond.

[11] In holding that a principal cannot sue a **surety** in tort for a **bad faith** refusal to pay a first party claim, it is important to note we do not preclude a principal from using a **surety's bad faith** in all instances. Several courts, including those not recognizing a principal's right to sue on **bad faith** in tort, allow the principal to assert a **surety's bad faith** as a defense to indemnification. Balkin & Witten, *supra*, at 623; *see, e.g., Associated Indem. Corp. v. CAT Contracting, Inc., supra*. Our Court of Appeals dealt with this issue in dicta in *American Fire and Casualty Co. v. Johnson, supra*. While a principal may not use **bad faith** as a sword to extract damages from a **surety** in tort, a principal is not precluded from using **bad faith** as a **377 shield in

contract against a surety seeking indemnification. [FN4]

> FN4. Although we conclude a principal cannot assert a *Nichols* action against its surety, we do not decide whether an obligee may institute such an action against its surety.

***415** Having answered the first question in the negative, the second question is moot.

## ISSUE

Do S.C.Code. Ann. §§ 38-57-70 & 38-59-20 (1989) provide a private right of action?

## LAW/ANALYSIS

[12] Plaintiff asserts the Insurance Trade Practices Act, S.C.Code Ann. §§ 38-57-10, *et seq.* (1989), and the Claims Practices Act, S.C.Code Ann. §§ 38-59-20, *et seq.* (1989), create private causes of action. We disagree.

The Insurance Trade Practices Act prohibits insurers from misrepresenting an insurance policy with the intent to settle the claim "on less favorable terms than those provided in and contemplated by the contract or policy." S.C.Code Ann. § 38-57-70 (1989). The statute mandates the penalties for violating the statute. S.C.Code Ann. § 38-2-10 (1989). The Department of Insurance is vested with determining whether an insurer has violated the insurance code. *See* S.C.Code Ann. § 38-3-110. The statute clearly manifests legislative intent to create an administrative remedy and not a private right of action.

The Claims Practice Act provides relief for a third party victim of an improper claims practice. S.C.Code Ann. § § 38-59-10, *et seq.* (Supp.2000). This relief is important because South Carolina does not recognize a third party action for bad faith refusal to pay insurance benefits. *Kleckley v. Northwestern Nat'l Cas. Co.*, 330 S.C. 277, 498 S.E.2d 669 (1998).

Third parties do not have a private right of action under S.C.Code Ann. § 38-59-20. *Gaskins v. Southern Farm Bureau Cas. Ins. Co.*, 343 S.C. 666, 541 S.E.2d 269 (Ct.App.2000). Instead, third parties are entitled to administrative review before the Chief Insurance Commissioner. *See Kleckley v. Northwestern National Casualty Company, supra*; S.C.Code Ann. § 38-59-30 (Supp.1999).

Certified Questions Answered

TOAL, C.J., MOORE, WALLER and PLEICONES, JJ., concur.

556 S.E.2d 371, 347 S.C. 405

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

United States District Court,
D. Maryland.

INSTITUTE OF MISSION HELPERS OF
BALTIMORE CITY AKA Mission Helpers of the
Sacred Heart
v.
RELIANCE INSURANCE COMPANY.

Civ. No. HM-92-1285.

Dec. 11, 1992.

Owner sued surety on performance and payment bonds, asserting breach of contract, breach of fair dealing and good faith, and conversion. On motions to dismiss in part and for stay pending arbitration, the District Court, Herbert F. Murray, Senior District Judge, held that: (1) breach of contract under Maryland law does not give rise to claim in tort for either breach of fair dealing and good faith or for conversion; (2) incorporation by reference into bonds of construction contract whereby contractor accepted duty of good faith and fair dealing did not indicate intention of parties to assign such a duty to the surety; and (3) stay pending arbitration initiated by the contractor would be granted.

Motions granted.

West Headnotes

[1] Principal and Surety 1
309k1

Under Maryland law, "contract of suretyship" is tripartite agreement between principal obligor, his obligee, and surety, whereby surety becomes liable to obligee at once upon failing of principal to perform.

[2] Principal and Surety 59
309k59

Traditional rules of contract interpretation determine liability of surety under Maryland law.

[3] Principal and Surety 142
309k142

Under Maryland law, obligee could not assert tort of bad faith breach of performance and payment bond contracts even though construction contract incorporated by reference into the bonds provided that contractor "accepts the relationship of trust and confidence established by this Agreement"; incorporation by reference did not indicate intention of the parties to assign such a duty to the surety.

[4] Action 27(1)
13k27(1)

Breach of contract under Maryland law does not give rise to claim in tort of breach of fair dealing and good faith.

[5] Action 27(1)
13k27(1)

Breach of contract under Maryland law does not give rise to conversion; to establish conversion growing out of contract, positive tortious act beyond mere breach of contract is necessary.

[6] Trover and Conversion 7
389k7

Any unjustifiable withholding of payments by surety did not constitute conversion under Maryland law.

[7] Arbitration 23.9
33k23.9

Where construction contract provided for arbitration of any controversy arising out of the contract, and arbitration proceedings had been commenced by contractor, owner's suit against surety for breach of contract would be stayed pending arbitration.

*73 Read K. McCaffrey, Marc S. Rosen, Andrew J. Toland, Roberta L. Kienast Daghir, Patton, Boggs & Blow, Baltimore, MD, for plaintiff.

Daniel E. Toomey, Michael A. Gatje, Donald G. Gavin, Wickwire Gavin, P.C., Vienna, VA, for defendant.

MEMORANDUM

HERBERT F. MURRAY, Senior District Judge.

The plaintiffs, Institute of Mission Helpers of Baltimore City ("Mission Helpers"), a religious order organized under the laws of Maryland, filed this diversity action against Reliance Insurance Company ("Reliance"), a Pennsylvania corporation, based on two surety bonds

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

executed by the parties. Presently before this Court are the motions of the defendant to dismiss several counts from the complaint and for a stay pending arbitration.

I. MOTION TO DISMISS

A court may grant a motion to dismiss "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spaulding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). For the purposes of deciding the instant motion, this Court must take the material allegations of the complaint as admitted, *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969), and further must construe those allegations favorably to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

In October 1989, Mission Helpers engaged Kasco-Chesapeake Builders, Inc. ("Kasco") to construct a new convent in Towson, Maryland. In connection with that project, the parties entered into a Labor and Material Payment Bond and a Performance Bond, with Reliance as the Surety, Kasco as the Principal, and Mission Helpers as the Obligee and Owner.

Because the convent was not substantially complete by the deadline set in the construction contract, Mission Helpers gave Kasco notice of its default and demanded that Reliance take over and complete the project under the terms of the Performance Bond. Reliance refused. Subsequently, as subcontractors made claims against Mission Helpers for payment of monies owed to them by Kasco, Mission Helpers demanded that Reliance pay those claims under the terms of the Labor and Material Payment Bond. Again, Reliance refused, and this litigation followed.

The plaintiff asserts six claims in its complaint--three causes of action for each of the two bonds at issue. Counts I and II each state a claim for breach of contract, and Reliance does not at this time seek dismissal of those claims. Each of the remaining claims lie in tort; Counts III and IV assert causes of action for breach of fair dealing and good faith, and Counts V *74 and VI assert causes of action for conversion. This Court will address those causes of action in turn.

A. *Breach of Fair Dealing and Good Faith*

Mission Helpers argues in Counts III and IV that Reliance breached its duty of fair dealing and good faith when it refused either to take over the construction project or to satisfy the claims of the various subcontractors. Although charges of "bad faith" from an order of nuns would bring some defendants to their knees in supplication, Reliance has responded with a motion to dismiss for failure to state a claim.

[1][2] Under Maryland law, which the parties agree applies in this case, a contract of suretyship is a tripartite agreement between a principal obligor, his obligee, and a surety, whereby the surety becomes liable to the obligee at once upon the failure of the principal to perform. *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 259, 492 A.2d 1306 (1985). The traditional rules of contract interpretation determine the liability of a surety. *Republic Ins. Co. v. Board of County Comm'rs*, 68 Md.App. 428, 431, 511 A.2d 1136 (1986) ("*Republic I*"); *Hospital for the Women of Maryland v. United States Fidelity & Guaranty Co.*, 177 Md. 615, 619, 11 A.2d 457 (1940) ("an ordinary covential [sic] bond is a simple contract").

[3] In *Republic I*, the County as obligee demanded that Republic Insurance Co. as surety honor its obligations under a performance bond. The resulting litigation proceeded to trial on the Board's claim of "bad faith on the insurance company." Reversing a jury verdict in favor of the County, the Maryland Court of Special Appeals wrote:

> Maryland does not recognize failure to perform a contract as giving rise to a tort action for "bad faith." Indeed, if the County were successful in its attempt, practically every breach of contract would give rise to an action in tort for "bad faith." Every breach of contract could, and probably would, result in claims in both contract and tort. The "bad faith" allegation would likely become a "boiler plate" averment in every suit for breach of contract.
> We refuse to employ some supposed "public policy" argument which would obfuscate the distinction between contract and tort by intertwining one with the other. Instead, we hold that a breach of contract does not, under the circumstances of this case, give rise to a tort action for "bad faith."

*Republic I*, 68 Md.App. at 432, 511 A.2d 1136. Finding that the circumstances in *Republic I* closely parallel the circumstances of this case, this Court concludes that this action sounds in contract alone and will dismiss the plaintiff's claims for breach of fair dealing and good faith.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 1:02-cv-00008    Document 376    Filed 02/19/2004    Page 11 of 15

In opposition to the motion to dismiss, the plaintiffs argue first, that the existence of a contract is not an absolute bar to an action in tort, and second, that under the language of the bonds at issue Reliance assumed a fiduciary relationship to the plaintiffs. With regard to the former argument, in certain cases involving both a breach of contract and a serious risk of death, Maryland courts have allowed plaintiffs to bring actions in tort. *E.g., Council of Co-Owners Atlantis Condominium, Inc. v. Whiting-Turner Contracting Co.*, 308 Md. 18, 35, 517 A.2d 336 (1986). Of course, as the United States Supreme Court noted in the context of admiralty law, without limitations to distinguish the two, "contract law would drown in a sea of tort." *East River Steamship Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1985).

Apparently conceding the fact that it cannot assert either a tort claim or a hybrid tort/contract claim for breach of an *implied* covenant of fair dealing, *see Yuen v. American Republic Ins. Co.*, 786 F.Supp. 531 (D.Md.1992), the plaintiff maintains in its latter argument that the bonds affirmatively establish a fiduciary duty sufficient to support a claim for breach of fair dealing and good faith. In particular, the construction contract provides that Kasco "accepts the relationship of trust and confidence established by this Agreement ...," *75 Complaint, Ex. A, ¶ 3.1, by which language Kasco accepted a duty of good faith and fair dealing toward Mission Helpers. *Jones v. J.H. Hiser Constr. Co.*, 60 Md.App. 671, 676-77, 484 A.2d 302 (1984). Because both of the bonds incorporate the construction contract by reference, the plaintiff argues, those bonds establish the same duty on behalf of Reliance. This Court disagrees.

The Performance Bond provides in part:
> KNOW ALL MEN BY THESE PRESENTS:
> That Kasco Chesapeake Builders, Inc., 25 Main Street, Suite 300, Reisterstown, Maryland 21136, as Principal, hereinafter called Contractor, and Reliance Insurance Company, A Pennsylvania Corporation, Philadelphia, PA, as Surety, hereinafter called Surety, are held and firmly bound unto Mission Helpers of the Sacred Heart, 1001 West Joppa Road, Baltimore, Maryland 21204, as Obligee, hereinafter called Owner, in the amount of Three Million, Six Hundred and Ninety Seven Thousand, Three Hundred and Seven Dollars ($3,697,307.), for the payment whereof Contractor and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.
> WHEREAS, Contractor has by written agreement dated October 25, 1989, entered into a contract with Owner for Construction of a new Center for the Mission Helpers of the Sacred Heart, Joppa Road & Chestnut Ave., Towson, Maryland 21204, in accordance with drawings and specifications prepared by Meyers & D'Aleo, Inc.--Architect, 1106 North Charles Street, Baltimore, Maryland 21201, which contract is by reference made a part hereof, and is hereinafter referred to as the Contract.
> NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if Contractor shall promptly and faithfully perform said contract, then this obligation shall become null and void; otherwise it shall remain in full force and effect.

Complaint, Ex. C. The Labor and Material Payment Bond contains substantially similar language. Complaint, Ex. B. Nothing in either bond explicitly assigns to Reliance a duty of good faith and fair dealing, and the simple incorporation by reference of the construction contract does not indicate an intention of the parties to assign such a duty to Reliance.

Finally, perhaps because the surety here is an insurance company, or perhaps because Reliance in its motion to dismiss drew an analogy to insurance law, the plaintiffs argue that the duty of an *insurer* to exercise good faith when settling third party claims applies equally to the duty owed by sureties to obligees. In *Republic Ins. Co. v. Prince George's County*, 92 Md.App. 528, 608 A.2d 1301 (1992) ("*Republic II*"), the court applied insurance law principles to a surety agreement. However, that court did not permit the *obligee* to assert a claim of bad faith against the surety; instead, the surety could not collect indemnification from the *principal* because of a bad faith failure to settle the claims of the obligee. *Id.* at 538, 608 A.2d 1301. As in this case, the obligee in that case could recover only under a contract claim. Finding nothing in the opinion in *Republic II*, or any of the other cases cited to this Court, to indicate that a Maryland court would permit Mission Helpers to assert its hybrid tort/contract claim, this Court will dismiss Counts III and IV.

B. *Conversion*

[4][5][6] Just as a breach of contract under Maryland law does not give rise to a claim in tort for breach of fair dealing and good faith, it does not give rise to a claim for conversion. *Fink v. Pohlman*, 85 Md.App. 106, 112-15, 582 A.2d 539 (1990). As the court in *Fink*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

noted, "to establish a conversion growing out of a contract, a positive tortious act beyond a mere breach of the contract is necessary." *Id.* at 115, 582 A.2d 539. Here, Mission Helpers cites no such positive tortious act; consequently, the plaintiff's claims for conversion must fail.

*76 Citing *Caruso v. Republic Ins. Co.*, 558 F.Supp. 430 (D.Md.1983), the plaintiff argues that any unjustifiable withholding of payments constitutes conversion. *Id.* at 435. To the extent that the decision in *Caruso* supports such hybrid tort/contract claims based on an implied covenant to deal in "good faith," however, this Court has expressly disapproved it. *Yuen*, 786 F.Supp. at 533. The current law, as stated in *Pohlman*, requires dismissal of the plaintiff's conversion claims.

## II. MOTION FOR STAY

[7] The construction contract provides for arbitration of "any controversy or Claim arising out of or related to the Contract, or the breach thereof." Arbitration proceedings in this matter commenced on November 6, 1991, when Kasco filed a demand for arbitration with the American Arbitration Association. Time and again, the Supreme Court and the Fourth Circuit have emphasized a federal policy that favors expeditious resolution of disputes through arbitration. *See, e.g., Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989); *Gilmer v. Interstate/Johnson Lane Corp.*, 895 F.2d 195, 196 (4th Cir.1990). On the authority of those cases, and finding that a stay would conserve judicial resources and avoid anomalous results, this Court will grant the stay.

## III. CONCLUSION

In sum, this Court will grant the motion to dismiss Counts III, IV, V and VI, and will also grant the motion to stay pending arbitration.

The Court will execute an Order on this date in accordance with the foregoing Memorandum.

812 F.Supp. 72

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

United States District Court,
D. Maryland.

BELL BCI COMPANY
v.
HRGM CORPORATION
and
Atlantic Mutual Insurance Company

No. CIV. JFM-03-1357.

Aug. 5, 2003.

General contractor on federal government project brought diversity action against subcontractor/principal and against subcontractor's surety after declaring subcontractor in default, alleging breach of subcontract against subcontractor, breach of performance bond against both defendants, and breach of fair dealing and good faith against surety. Surety moved to dismiss bad-faith claim. The District Court, Motz, J., held that under applicable state law general contractor had no cause of action against surety for breach of fair dealing and good faith.

Motion granted.

West Headnotes

Principal and Surety ⚖136
309k136

Under Maryland law, general contractor/obligee had no cause of action against surety of subcontractor/principal for breach of fair dealing and good faith, arising from surety's refusal to honor performance bond following subcontractor's default; rather, general contractor was limited to contractual remedy.

*462 Richard O. Wolf, Moore and Lee LLP, McLean, VA, for Plaintiff.

Craig Alan Holman, Kara L. Daniels, Holland and Knight LLP, Washington, DC, for Defendants.

MEMORANDUM

MOTZ, District Judge.

BELL BCI Co. ("BELL") initiated this suit against Atlantic Mutual Insurance Co. ("Atlantic") and HRGM Co. ("HRGM") alleging breach of contract and breach of fair dealing and good faith. Now pending before me is Atlantic's motion to dismiss Count III of the complaint. For the reasons that follow, the motion will be granted.

I.

BELL entered into a contract with the United States Department of the Navy for the construction and renovation of certain facilities at the Patuxent River Naval Air Station in St. Mary's County, Maryland. On January 7, 2002, BELL entered into a subcontract with HRGM whereby HRGM was to "provide all labor, materials, equipment etc. to complete the Tank and Steel Coatings work." (Compl.¶ 7.) According to BELL, the subcontract work of HRGM was critical to the successful and timely completion of the project.

Pursuant to the subcontract agreement, HRGM was required to obtain a performance bond. On February 21, 2002, Atlantic, as a surety, provided a bond in the amount of $409,000 to HRGM. The bond expressly limits Atlantic's liability to the reasonable cost of completing the subcontract and caps Atlantic's liability at the amount of the bond. (Compl. Ex. 2 at 2.)

According to BELL, HRGM subsequently failed to timely, fully, and properly perform under the subcontract. On September 27, 2002, due to HRGM's repeated failure to take steps necessary to complete its work, BELL declared HRGM in default and terminated the subcontract. BELL also requested that Atlantic fulfill its obligations under the bond. Atlantic, however, refused to recognize and honor its obligation under the bond.

*463 In May 2003, BELL filed this suit. In its complaint, BELL includes three counts: (1) Count I against HRGM for breaching the subcontract; (2) Count II against HRGM and Atlantic for breaching the performance bond; and (3) Count III against Atlantic for breach of fair dealing and good faith. In Count III, BELL is essentially seeking consequential damages in excess of the $409,000 cap stated in the bond.

II.

Atlantic asserts that a claim for breach of fair dealing and good faith is not recognized under Maryland law. Under Maryland law, "a contract of suretyship is a tripartite agreement between a principal obligor, his obligee, and a surety, whereby the surety becomes liable to the obligee at once upon the failure of the principal to

perform." *Inst. of Mission Helpers of Baltimore City v. Reliance Ins. Co.*, 812 F.Supp. 72, 74 (D.Md.1992). Thus, "[t]he traditional rules of contract interpretation determine the liability of a surety." *Id.*

In *Republic Ins. Co. v. Bd. of County Comm'rs of St. Mary's County*, 68 Md.App. 428, 511 A.2d 1136 (1986) ("*Republic I*"), the Maryland Court of Appeals stated:

> Maryland does not recognize failure to perform a contract as giving rise to a tort action for "bad faith." Indeed, if the [obligee] were successful in its attempt [to plead a failure to perform a contract claim as a tort action for bad faith], practically every breach of contract would give rise to an action in tort for "bad faith." Every breach of contract could, and probably would, result in claims in both contract and tort. The "bad faith" allegation would likely become a "boiler plate" averment in every suit for breach of contract.
> We refuse to employ some supposed "public policy" argument which would obfuscate the distinction between contract and tort by intertwining one with the other. Instead, we hold that a breach of contract does not, under the circumstances of this case, give rise to a tort action for "bad faith."

*Id.* at 1138; *see also Mission Helpers*, 812 F.Supp. at 74.

BELL, relying solely on *Republic Ins. Co. v. Prince George's County*, 608 A.2d 1301 (Md.App.1992) ("*Republic II*"), argues that Maryland courts do, in fact, recognize claims for breach of fair dealing and good faith in the context of surety contracts. In *Mission Helpers*, the Court addressed that identical argument:

> In [*Republic II*], the court applied insurance law principles to a surety agreement. However, that court did not permit the *obligee* to assert a claim of bad faith against the surety; instead, the surety could not collect indemnification from the *principal* because of a bad faith failure to settle the claims of the obligee. As in this case, the obligee in that case could recover only under a contract claim.

*Mission Helpers*, 812 F.Supp. at 75 (emphasis in original). Thus, *Republic II* does not give rise to a "bad faith" tort action by the obligee against the surety. Accordingly, Count III will be dismissed. [FN1]

> FN1. BELL also argues that its claim in Count III is a contract claim, rather than a tort claim. This argument also fails. First, if Count III is merely a breach of contract claim, it is duplicative of Count II. Second, BELL's complaint makes clear that Count III is not a contract claim. (*See, e.g.,* Compl. ¶ 35 ("Atlantic Mutual's refusal to honor its obligations under Bond 4 was done intentionally, in bad faith, with malice, with the intent to injure BELL, and/or in wanton disregard and/or willful ignorance of BELL's rights.").) Finally, to the extent BELL relies upon Count III to receive consequential damages in excess of the stated limit in the bond, such damages are not available. As the Court stated in *Republic I*:
> 
> [T]he bond, itself, clearly defined the total financial obligation of the surety. That obligation, as so defined, was accepted by the [obligee]. In accepting the bond with its condition of limited liability unambiguously stated thereon, the [obligee] passively consented to the liability limitation on the face value of the bonds.
> 
> 511 A.2d at 1138.

*464 A separate order is being entered herewith.

ORDER

For the reasons stated in the accompanying memorandum, it is, this 5th day of August 2003,

ORDERED that Atlantic's motion to dismiss Counts III is granted.

276 F.Supp.2d 462

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works