ORIGINAL

FILED
DISTRICT COURT OF GUAM
APR 27 2004
MARY L.M. MORAN
CLERK OF COURT
413

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC. | Civil Case No. 02-00008 |
| Plaintiff, | |
| vs. | |
| BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC., and AMERICAN HOME ASSURANCE COMPANY, | |
| Defendants. | **ORDER** |
| BIOGENESIS PACIFIC, INC., | |
| Counter-Plaintiff, | |
| vs. | |
| RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, AND JOHN DOES 1-10, | |
| Counter-Defendants. | |
| AMERICAN HOME ASSURANCE COMPANY, | |
| Cross-Claimant, | |
| vs. | |
| BIOGENESIS PACIFIC, INC., | |
| Cross-Claim Defendant. | |

This matter came before the Court on BioGenesis Pacific, Inc.'s Motion for Summary Judgment. Upon consideration of the record, oral arguments, and relevant case law, the Court orders the following:

## BACKGROUND

Plaintiff Rhino Builders, Inc. ("Rhino")[1] brings this action against Defendants BioGenesis Pacific, Inc. ("BioGenesis")[2], American Home Assurance Company ("AHAC")[3], and AIG Technical Services, Inc. ("AIGTS")[4]. Count I of the Second Amended Complaint states that the defendants' acts or omissions entitle Rhino to recover under a payment bond executed pursuant to the Miller Act, 40 U.S.C. §§ 3131-3133. Count IV states that BioGenesis acted in bad faith by preventing Rhino from realizing the benefits of the subcontract. Count V[5] states that Biogenesis committed fraud by concealing from Rhino its intention to not honor the subcontract. Rhino also asserts that AHAC and AIGTS breached the duty of good faith owed to Rhino and that AIGTS breached the implied warranty of authority.

Around September 1999, BioGenesis entered into a contract with the United States of America to furnish materials and perform labor for the installation of U.S. Navy housing roofing, for a consideration of $4,926,657.00. BioGenesis was to perform under the contract, designated Navy Contract No. N62766-99-D-0425 (the "Navy Contract"), during the period from May 15, 2000, to September 29, 2001. The Navy Contract was continued and, as of June 30, 2003, when BioGenesis filed its Answer to the Second Amended Complaint, was in effect.

---

[1] Rhino is a Hawaii corporation engaged in the business of roofing installation and repairs. At all relevant times, Rhino was also a corporation organized and existing under the laws of Guam, with its principal office and place of business located in Tamuning, Guam.

[2] BioGenesis is a Hawaii corporation.

[3] AHAC is a surety licensed to conduct business in New York and Guam, and is owned by the American International Group ("AIG").

[4] AIGTS is the claims servicing entity of AIG and has the authority to investigate and respond to claims on behalf of the various sureties owned by AIG, including AHAC. AIGTS claims that it is neither a surety nor an insurer, as it does not issue bonds or insurance policies of any type.

[5] In the Second Amended Complaint, Rhino appears to mistype Count V as "Count III." (S. Am. Compl. at 12.)

Around May 2000, Rhino entered into an oral subcontract with BioGenesis. Rhino agreed to perform such contract work that the U.S. Navy might assign to BioGenesis on individual task orders under the Navy Contract. BioGenesis agreed to pay all of Rhino's actual costs of performance plus fifty percent (50%) of BioGenesis' profit upon completion of each task order. While the terms were later recited in a letter from BioGenesis to Rhino, no formal written subcontract was ever executed between the parties.

Rhino claims it performed labor and provided materials at a cost of $310,975.00, which BioGenesis has not fully paid. In addition, Rhino contends that BioGenesis owes Rhino fifty percent of the profits under the Navy Contract, which amounts to $770,906.00.[6] Rhino claims that the date on which Rhino last performed labor and supplied equipment to BioGenesis was not earlier than March 20, 2001. (S. Am. Compl. ¶ 21.) Around October 2001, after BioGenesis' refusal to pay, Rhino contacted surety AHAC to initiate the claims process. AHAC referred Rhino to AIGTS to handle its claim against AHAC. Around January 9, 2002, Rhino sent a Proof of Claim to AIGTS, which denied the claim on about February 21, 2002, due to statute of limitations concerns. Thus, Rhino commenced this action.

On December 15, 2003, BioGenesis filed the present motion, along with a declaration by defense counsel Arthur B. Clark ("Clark"). On January 23, 2004, Rhino filed an opposition, which contained an objection to Clark's declaration and attached Exhibits A through W and Y through BB. BioGenesis filed a reply and errata to Clark's declaration on January 30, 2004. The Court heard oral arguments on February 25, 2004.

## DISCUSSION

Before delving into the merits of BioGenesis' summary judgment motion, the Court addresses Rhino's objection to defense counsel Clark's declaration and particular attached exhibits.

---

[6]Rhino claims that it is owed over $1,264,694.47 pursuant to the oral subcontract with BioGenesis. (S. Am. Compl. ¶ 19.)

3

## I. RHINO'S OBJECTION TO CLARK DECLARATION AND EXHIBITS.

In the opposition to the summary judgment motion, Rhino objects to the Court's consideration of the Declaration of Arthur B. Clark and accompanying Exhibits A through W and Y through BB, offered in support of summary judgment. Rhino raises this objection on the grounds that (1) the statement in the Declaration that the documents are "true and correct copies" of what they purport to be is not made on personal knowledge, as required by Federal Rule of Civil Procedure 56(c), (2) that statement is hearsay, and (3) Clark is not competent to make that statement, not having personal knowledge of the preparation of those documents. In response, BioGenesis states that almost all of the documents challenged by Rhino were produced by Rhino or its agent during discovery, and that, although counsel should have more properly stated that the documents attached are true and correct copies of documents produced in discovery, the declaration itself was unnecessary, thus making inconsequential any defect in the declaration. In any event, says BioGenesis, Clark has filed errata to the earlier declaration.

In ruling on a summary judgment motion, a court can only consider evidence that is admissible. Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002). A "condition precedent to admissibility" is authentication, which is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EVID. 901(a). In determining whether evidence is authenticated, "'the papers supporting the movant are closely scrutinized whereas the opponent's are indulgently treated.'" United States ex rel. Austin v. W. Elec. Co., 337 F.2d 568, 574 (9th Cir. 1964) (quoting Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962)).

Here, defense counsel Clark submitted numerous exhibits through his attached declaration. Although "[d]ocuments must be authenticated by and attached to an affidavit that meets the requirements of [Rule] 56(e)," Canada v. Blain's Helicopters, Inc., 831 F.2d 920, 925 (9th Cir. 1987), 28 U.S.C. § 1746 provides that an unsworn declaration signed under penalty of perjury, dated, and which says that the information is "true," has the same force and effect as an affidavit. Clark's unsworn declaration meets these criteria, thus enabling it to introduce exhibits. However, the mere attachment of a writing to an affidavit or declaration will not effect

4

authentication. United States v. Dibble, 429 F.2d 598, 602 (9th Cir. 1970). Since BioGenesis, in supporting summary judgment, introduces exhibits by attaching them to its counsel's declaration, the exhibits must be authenticated through personal knowledge.[7] FED. R. CIV. P. 56(e); Orr, 285 F.3d at 778 n.24. That is, the declarant, which in this case is Clark, must be "a witness with personal knowledge of the facts who attests to the identity and due execution of the document and, where appropriate, its delivery." Dibble, 429 F.2d at 602. Clark must set forth specific facts from which the Court could infer that he could correctly identify the documents and that he knows the attachments are true and correct copies of the genuine documents. Id.

In this case, Clark does not claim to have personal knowledge of the exhibits attached to his declaration. Nonetheless, since a court may infer from the affiant or declarant's position or participation in the matters at hand that he has the requisite personal knowledge, attorneys are usually found to have personal knowledge of documents generated during litigation. Blount, 2002 U.S. Dist. LEXIS 25553, at *8 (citing Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990); Dibble, 429 F.2d at 602). However, it is usually the case that an attorney has no personal knowledge and is not competent to testify to the authenticity of documents generated prior to litigation or merely produced by his client. Id. Thus, the Court finds that Clark has failed to authenticate Exhibits A and B, which are letters written before commencement of this litigation.

Clark also attempts to authenticate numerous documents purportedly produced by Rhino or its agent in discovery. (Errata ¶ 3.) The simple attachment of an attorney's affidavit to documents produced by the opposing party in discovery does not lead to automatic admissibility. Hess v. Multnomah County, 211 F.R.D. 403, 406 (D. Or. 2001). However, where the attorney states that the document was provided to him in response to discovery requests he made to the opposing party, and the document appears to be what the attorney

---

[7] An attorney's affidavit or declaration is treated like all other affidavits or declarations pursuant to Rule 56(e) and must be based on personal knowledge. Blount v. Conn. Gen. Life Ins. Co, No. CV 01-1341-BR, 2002 U.S. Dist. LEXIS 25553, at *8 (D. Or. July 2, 2002) (citing Postscript Enters. v. City of Bridgeton, 905 F.2d 223, 225 (8th Cir. 1990)).

5

asserts it to be, then this is sufficient to show that the document is authentic. <u>San Francisco Baykeeper v. Tidewater Sand & Gravel Co.</u>, No. C 96-01531 CW, 1997 U.S. Dist. LEXIS 22602, at *10 (N.D. Cal. Sept. 9, 1997) (finding authenticity where the documents produced in discovery bore self-explanatory titles containing the opposing party's name). Here, Exhibits C, D, F, H, K, M, O, P, Q, U, V, W, Y, Z, AA, and BB appear to be as Clark claims them, thus the Court finds them to be authentic. However, the Court does not find Exhibits E, G, I, J, L, and R to be self-explanatory, thus making them inauthentic.[8] Also, due to Clark's failure to state the nature and identity of Exhibit N in his declaration, the Court finds this exhibit to be unauthenticated.

Clark also attempts to authenticate Exhibits S and T by stating that they were produced by the United States Navy in response to a Freedom of Information Request made by his office. (Errata ¶ 4.) Since these documents bear a seal purporting to be that of a United States department and bear a signature acting as an execution, the Court finds these documents to be self-authenticating under Federal Rule of Evidence 902(1), which provides that documents bearing a seal purporting to be that of the United States or of a political department thereof, and a signature purporting to be an attestation or execution, do not require extrinsic evidence of authenticity for admissibility.

Furthermore, the Court denies Rhino's hearsay objection to Clark's statement that the exhibits are "true and correct copies" of the named documents, since offering such a statement is standard procedure for authentication.

In summary, the Court will consider BioGenesis' Exhibits A through D, F, H, K, M, O through Q, S through W, and Y through BB, attached to Clark's Declaration. The Court will not consider Exhibits E, G, I, J, L, N, and R for summary judgment purposes.

---

[8]Clark claims that Exhibits E, G, I, J, and L are email messages written by particular persons, other than himself, on particular dates. (Clark Decl. ¶ 2(E), (G), (I), (J), & (L).) However, the Court finds the appearance of these documents insufficient to indicate authenticity. Clark claims that Exhibit R is a status report prepared by Michael Danforth on the health of the Navy Roofing Contract. (<u>Id.</u> ¶ 2(R).) However, this document lacks sufficient indicia of authenticity, especially since the document fails to indicate an author.

6

## II. MOTION FOR SUMMARY JUDGMENT.

### A. Summary Judgment Standard.

BioGenesis moves for summary judgment on Rhino's claims. For a party seeking summary judgment to succeed, he must show that there exists "no genuine issue as to any material fact and that [he] is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Whether a fact is material is determined by the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact that may affect the outcome is material. Id. If a party moves for summary judgment on a claim or defense upon which it bears the burden of proof at trial, it must satisfy its burden by offering affirmative, admissible evidence. But, when the non-moving party has the burden of proving the claim or defense, the movant can meet its burden by pointing out the absence of evidence submitted by the non-moving party. The movant is not required to disprove the other party's case. Khachikian v. Devry Inst. of Tech., No. CV 01-05935 NM, 2002 U.S. Dist. LEXIS 3216, at *13 (C.D. Cal. Jan. 14, 2002) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

If the movant meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). When evaluating whether the non-movant's assertions raise a genuine issue, the court must believe the non-movant's evidence and draw all justifiable inferences in the non-movant's favor. Anderson, 477 U.S. at 255.

### B. Merits of BioGenesis' Motion.

BioGenesis argues that Rhino's claims, as stated in Counts I, IV, and V of the Second Amended Complaint, should be summarily adjudicated in favor of BioGenesis for the following reasons: (1) Rhino failed to commence the action timely under the Miller Act; (2) Rhino's Miller Act claim should be limited to $4,667.70; (3) Rhino cannot recover lost profit and costs for capital equipment under the Miller Act; (4) Rhino's bad faith claim fails to state a cause of

action; and (5) Rhino's claim of fraud lacks the particularity required by Federal Rule of Civil Procedure 9(b).

### 1. Whether Rhino commenced the action timely under the Miller Act.

BioGenesis argues that Rhino failed to commence the action timely under the Miller Act, which requires that suit "be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action." 40 U.S.C. § 3133(b)(4). BioGenesis contends that, assuming it rented a flatbed truck from Rhino on March 20, 2001, (Clark Decl. Ex. P), Rhino only had until March 19, 2002, to file a Miller Act lawsuit. Because Rhino filed its complaint on March 20, 2002, Rhino failed to bring the action timely, according to BioGenesis. However, the cases BioGenesis cites to in support of this argument involve not the Miller Act, but the Fair Debt Collection Practices Act. Instead, Miller Act cases hold that the limitations period under the Act is calculated pursuant to Federal Rule of Civil Procedure 6(a), which provides that "[i]n computing any period of time prescribed ... by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included." See United States ex rel. Pre-Fab Erectors, Inc. v. A.B.C. Roofing & Siding, Inc., 193 F. Supp. 465 (S.D. Cal. 1961); Bailey v. Faux, 704 F. Supp. 1051, 1054 (D. Utah 1989); United States ex rel. N.E.W. Insterstate Concrete, Inc. v. EUI Corp., 93 F. Supp. 2d 974, 982 (S.D. Ind. 2000). But see United States ex rel. Magna Masonry, Inc. v. R.T. Woodfield, Inc., 709 F.2d 249, 250 (4th Cir. 1983) (holding, without explanation or citation, that Rule 6(a) does not apply to the Miller Act). Thus, if the one-year period begins to run the day after Rhino last performed under the subcontract, which arguably was March 20, 2001, then Rhino's filing of the original complaint on March 20, 2002, was indeed timely. See Pre-Fab, 193 F. Supp. at 465 (Miller Act action filed May 20, 1960, was timely where last action occurred on May 20, 1959).

BioGenesis also argues that, assuming Rhino rented out a flatbed truck to BioGenesis for use on the Navy Contract in 2001, this 2001 rental constitutes a separate contract from the alleged oral subcontract at issue, which BioGenesis claims the parties agreed terminated in December 2000. (Clark Decl. Exs. M, O, & Z.) Thus, BioGenesis asserts, the Miller Act's

8

one-year statute of limitations period began after each separate contract. Therefore, according to BioGenesis, Rhino has failed to file suit within one year of last providing labor or materials under the oral subcontract, and so this case, with the exception of the rented truck, is barred by the Miller Act's statute of limitations provision. However, BioGenesis' supporting case law deals with the Miller Act's 90-day notice provision in 40 U.S.C. § 3133(b)(1)[9], and not the one-year statute of limitations provision in 40 U.S.C. § 3133(b)(4). While the notice provision is to be strictly interpreted by courts, "the pragmatic considerations which support a strict interpretation of the ninety day notice requirement [under the Miller Act] are absent in [the statute of limitations] situation." Alaska Helicopters, Inc. v. Hoak Constr. Co., 406 F. Supp. 1008, 1011 (D. Alaska 1976) (citing United States v. Thompson Constr. Corp., 273 F.2d 873, 875 (2d Cir. 1959)). Furthermore, the plain language of § 3133(b)(4) fixes the filing deadline as one year from "the day on which the last of the labor was performed or material was supplied ...." Since this provision is unambiguous, the Court must give effect to its obvious meaning, and find the deadline here to be one year from the day Rhino last provided materials for use on the Navy Project. See GE Supply v. C&G Enters., Inc., 212 F.3d 14, 18 (1st Cir. 2000); Hoak, 406 F. Supp. at 1011; United States ex rel. Pippin v. J.R. Youngdale Constr. Co., 923 F.2d 146, 149 (9th Cir. 1991) (for a plaintiff to recover on a payment bond, his complaint "must have been filed within one year from 'the day on which the last of the labor was performed or material was supplied'" by plaintiff to defendant). Accordingly, the existence of more than one contract between Rhino and BioGenesis to provide labor or materials for use on the Navy Project is immaterial to the setting of a filing deadline for purposes of the Miller Act's statute of

---

[9] 40 U.S.C. § 3133(b)(1) provides:

> Every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3133 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due.

9

limitations provision.[10]

In summary, BioGenesis has failed to prove that Rhino untimely brought this Miller Act lawsuit.

### 2. Whether Rhino's Miller Act claim should be limited to $4,667.70.

Although Rhino claims entitlement to $1,264,694.47 in damages, (S. Am. Compl. Prayer ¶ 1), BioGenesis contends that Rhino's Miller Act claim should be limited to $4,667.70, which purportedly represents the balance owed on Rhino's performance on Delivery Orders 1, 2, and 7. BioGenesis claims that Rhino only worked on these three deliver orders, and, thus, it can only recover costs for those orders.[11] However, in a November 14, 2000, invoice prepared by Rhino for BioGenesis, Rhino claims entitlement to $89,668.58 due to Rhino's completion of 100% of the work on Delivery Orders 1, 2, and 3, and 90% of the work on Delivery Order 4, (Clark Decl. Ex. K), yet BioGenesis argues that Rhino did not complete Delivery 3 or even 90% of Delivery Order 4, (id. Exs. S & T). Since Rhino and Biogenesis quarrel over what work and materials Rhino provided under the subcontract, as well as the terms of the oral subcontract, there exists a genuine issue as to these material facts. Thus, the Court will refrain from determining what recovery Rhino should be awarded until trial.

### 3. Whether Rhino can recover lost profits and costs for capital equipment under the Miller Act.

BioGenesis contends that Rhino cannot recover lost profits or costs for capital equipment under the Miller Act. While the Court is unaware of any case law barring recovery of lost profits specifically from a Miller Act contractor, the Court considers Ninth Circuit case Mai Steel Serv. Inc. v. Blake Constr. Co., 981 F.2d 414 (9th Cir. 1992) to be dispositive. In Mai

---

[10]BioGenesis also argues that Rhino is a materialman rather than a subcontractor. However, such a distinction has no relevance to the Miller Act's statute of limitations provision, as it makes no distinctions between the filing deadline for a materialman or a subcontractor. See 40 U.S.C. § 3133(b)(4).

[11]As BioGenesis claims the total value of these three delivery orders to be $43,854.20, (Clark Decl. Exs. U, V, & W), and BioGenesis paid $14,186.50 for materials used in orders 1, 2, and 7, (id. Ex. X), and BioGenesis already paid Rhino $25,000.00, (S. Am. Compl. ¶ 17), the maximum amount of damages BioGenesis states Rhino can claim is $4,667.70.

10

Steel, the Ninth Circuit stated that "'[a] claim for profits does not involve actual outlay and thus falls outside both the letter and the spirit of the [Miller] Act.'" 981 F.2d at 418 (quoting United States ex rel. T.M.S. Mech. Contractors, Inc. v. Millers Mutual Fire Ins. Co. of Texas, 942 F.2d 946, 953 (5th Cir. 1991)) (internal quotations omitted). Although Mai Steel involved a subcontractor seeking from a surety lost profits caused by construction delays, and the instant case involves neither recovery from a surety nor construction delays, the Court is persuaded by the case's treatment of lost profits. Furthermore, in Consol. Elec. & Mechs., Inc. v. Biggs Gen. Contracting, Inc., the Eighth Circuit interpreted Mai Steel as holding that "the Miller Act does not contemplate lost profits." 167 F.3d 432, 435-36 (8th Cir. 1999).[12] Therefore, the Court holds that the Miller Act does not entitle Rhino to lost profits.

Regarding recovery for capital equipment, "the supplying by sale to the contractor of equipment which should last over several jobs is not covered by the bond ...." Mass. Bonding & Ins. Co. v. United States ex rel. Clarksdale Mach. Co., 88 F.2d 388, 389 (5th Cir. 1937). However, where the capital equipment used on the federal construction project is only being rented from the supplier, the Miller Act entitles a supplier to recover payment. Id. Since neither Rhino nor BioGenesis specify how Rhino supplied capital equipment to the construction project (i.e., via rental agreement or sale), the Court looks no further to this issue until trial.

### 4. Whether Rhino's bad faith claim fails to state a cause of action.

BioGenesis contends that Rhino's bad faith claim[13] fails to state a cause of action and

---

[12] The Eighth Circuit stated that "[t]he Miller Act was not meant to replace subcontractors' state law contract remedies, which allow for recovery of lost profits. Rather it provides subcontractors an additional remedy to recover costs expended in furnishing 'labor or material in the prosecution of the work provided for in [a public construction] contract.'" Biggs, 167 F.3d at 436 (quoting 40 U.S.C. § 270b(a)).

[13] Count IV states the following: Rhino, relying on the subcontract with BioGenesis, performed on the subcontract since it had a business license, facilities, equipment, materials, and employees in Guam, while BioGenesis lacked these accoutrements. (S. Am. Compl. ¶¶ 48-49.) BioGenesis had an obligation to Rhino to refrain from using tactics intended to deprive Rhino of the benefit of the oral subcontract in order to appropriate these benefits unto BioGenesis. (Id. ¶ 50.) Around November 2000, BioGenesis breached the obligation by secretly negotiating with the head of Rhino's Guam operations, Alfred Garthe III, to convert Rhino's Guam assets including its Guam facilities, equipment, materials, and employees, to BioGenesis' own use, and thereby deprive Rhino of the profits it was entitled to realize under the subcontract with BioGenesis. (Id. ¶ 51.) Around November 2000, BioGenesis further breached the obligation by secretly negotiating with Rhino's 49% holder, Alfred Garthe,

11

must be dismissed for four reasons. Regardless of the merits of BioGenesis' arguments for dismissal, the Court GRANTS summary judgment since Guam does not recognize a bad faith cause of action to exist between "'sophisticated commercial entities dealing at arms length,'" such as Rhino and BioGenesis here. Guam Rock Prods., Inc. v. Sumitomo Constr. Co., No. CV0331-93, at 8 (Super. Ct. Guam Mar. 30, 1994) (finding no special relationship between a general contractor and a subcontractor) (quoting Microsoft Corp. v. BEC Computer Co., 818 F. Supp. 1313, 1318 n.1 (C.D. Cal. 1992).[14]

### 5. Whether Rhino's claim of fraud lacks particularity.

BioGenesis contends that Rhino's fraud claim should be dismissed for failing to state the fraud with particularity, as required by Federal Rule of Civil Procedure 9(b). "It is well settled that a claim for fraud must be pled with specificity, and it is further well settled that there are certain elements[15] which must be proven in order to succeed on a claim for fraud." Estate of

---

to acquire his shares so that it could intimidate Rhino into quiescence with respect to its takeover of Rhino's Guam facilities, equipment, materials, and employees, including Alfred Garthe III. (S. Am. Compl. ¶ 52.) BioGenesis also violated the obligation by denying the existence of the subcontract with Rhino when doing so would facilitate BioGenesis' efforts to take back Rhino's right to half of the profits realized from the Navy Contract. (Id. ¶ 53.) These actions by BioGenesis prevented Rhino from being able to perform its duties under the subcontract and effectively stopped Rhino from performing. (Id. ¶ 54.) These actions by BioGenesis were intended to, and did, deprive Rhino of one-half of the profits realized by BioGenesis on the Navy Contract, which Rhino believes substantially exceeds $2.1 million. (Id. ¶ 55.) Rhino has suffered injury from those actions in an amount to be proven at trial to exceed $1,264,694.47. (Id. ¶ 56.) Because these actions by BioGenesis were the product of its malice and bad faith toward Rhino, and because the complained-of tactics of BioGenesis were completely outside the scope of the subcontract, Rhino claims entitlement to exemplary damages in an amount to be determined at trial. (Id. ¶ 57.)

[14]A bad faith cause of action can only exist if the contracting parties have a "special relationship." Guam Rock, No. CV0331-93, at 7 (citing Harris v. Atlantic Richfield Co., 14 Cal.App.4th 70, 78 (1993)). A "special relationship" exists if the following are present:

> (1) the parties are in inherently unequal bargaining positions; (2) there was nonprofit motivation for entering the contract such as peace of mind, security, future protection; (3) ordinary contract damages are inadequate because they do not require the party in the superior position to account for its actions and they do not make the inferior party "whole"; (4) one party is especially vulnerable because of the type of harm it may suffer and of necessity places trust in the other party; and (5) the other party is aware of this vulnerability.

Id. at 7 (quoting Wallis v. Superior Court, 160 Cal.App.3d 1109, 1118 (1984)).

[15]Regarding fraud in contracts, Guam law provides that

12

Benavente v. Maquera, No. CV924-90, at 14 (Super. Ct. Guam Mar. 16, 1998). The Ninth Circuit requires that a plaintiff's fraud allegations must state the time, place, and nature of the defendant's alleged fraudulent acts in order for the defendant to identify the statement. In re GlenFed, Inc., Sec. Litig., 42 F.3d 1541, 1547-48 (9th Cir. 1994). "To allege fraud with particularity, a plaintiff must set forth *more* than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." Id. at 1548. Conclusory allegations of fraud will not suffice. Id.

Here, Rhino's Second Amended Complaint provides the nature of BioGenesis' alleged fraudulent activity, i.e., fraudulent statements that BioGenesis, under the subcontract, would pay Rhino actual costs and half of the profit earned on the Navy Contract, and fraudulent concealment of BioGenesis' intent to not fully perform its duties under the subcontract, in paragraphs 14 and 59 through 62. The time of BioGenesis' fraudulent acts is stated in paragraph 59. The reason why BioGenesis' acts are fraudulent is stated in paragraph 15. BioGenesis' fraudulent intent is stated in paragraph 60. Rhino's reasonable reliance is stated in paragraph 62. Rhino's injury from BioGenesis' fraudulent acts is stated in paragraphs 17, 63, and 64. However, the place of BioGenesis' fraudulent activity, i.e., where BioGenesis made its fraudulent statements or concealments, or where BioGenesis was when it entered the subcontract with Rhino, is not specifically stated in the Second Amended Complaint.[16]

---

> [a]ctual fraud ... consists of any of the following acts committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:
>     1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true.[sic]
>     2. A positive assertion in a manner not warranted by the information of the person making it, of that which is not true, though he believed it to be true;
>     3. The suppression of that which is true, by one having knowledge or belief of the fact;
>     4. A promise made without any intention of performing it; or,
>     5. Any other act fitted to deceive.

18 GUAM CODE ANN. § 85308.

[16]Rhino does state BioGenesis' principal office and place of business in paragraphs 3 and 4. However, the Court finds this insufficient to state the place where BioGenesis committed the alleged fraud.

13

Therefore, the Court DISMISSES WITHOUT PREJUDICE Rhino's fraud claim against BioGenesis. The Court GRANTS Rhino leave to amend this portion of the complaint.[17]

## CONCLUSION

For all the above reasons, BioGenesis Pacific, Inc.'s Motion for Summary Judgment is ORDERED GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED this 27th day of April, 2004.

*/s/ John S. Unpingco*

JOHN S. UNPINGCO
Chief Judge, District Court of Guam

Notice is hereby given that this document was entered on the docket on APR 2 7 2004. No separate notice of entry on the docket will be issued by this Court.
Mary L. M. Moran
Clerk, District Court of Guam
By: _____ APR 2 7 2004
Deputy Clerk    Date

---

[17] Pursuant to Federal Rule of Civil Procedure 15(a), the Court may grant Rhino leave to amend its complaint, recognizing that "leave shall be freely given when justice so requires." FED. R. CIV. P. 15(a). However, BioGenesis asserts that leave should not be granted because it would be futile, as Rhino's pleadings form no basis to support its claim of fraud. The Court rejects BioGenesis' futility argument, since, with the exception of the place of BioGenesis' alleged fraud, all fraud elements are specifically pled in the Second Amended Complaint.