FILED
DISTRICT COURT OF GUAM
APR 29 2004
MARY L. M. MORAN
CLERK OF COURT

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC. | Civil Case No. 02-00008 |
| Plaintiff, | |
| vs. | |
| BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC., and AMERICAN HOME ASSURANCE COMPANY, | |
| Defendants. | **ORDER** |
| BIOGENESIS PACIFIC, INC., | |
| Counter-Plaintiff, | |
| vs. | |
| RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, AND JOHN DOES 1-10, | |
| Counter-Defendants. | |
| AMERICAN HOME ASSURANCE COMPANY, | |
| Cross-Claimant, | |
| vs. | |
| BIOGENESIS PACIFIC, INC., | |
| Cross-Claim Defendant. | |

This matter came before the Court on Counter-Defendant Michael Danforth's Motion for Total or, in the Alternative, Partial Summary Judgment on Amended Counterclaim and Award of Sanctions under Rule 11. Upon consideration of the record, oral arguments, and relevant case law, the Court orders as follows:

## I. BACKGROUND.

Plaintiff Rhino Builders, Inc. ("Rhino") brings this action under the Miller Act, 40 U.S.C. §§ 3131 et seq., for recovery against a payment bond issued for a Navy procurement contract for an indefinite delivery and indefinite quantity of materials and labor for Navy housing roofing system installation and repair. Around September 1999, Defendant/Counter-Plaintiff BioGenesis Pacific, Inc. ("BioGenesis"), a Hawaii corporation, was awarded the contract, identified as Navy Contract No. N62766-99-D-0425 (the "Navy Contract"). For a consideration of $4,926,657.00, the Navy Contract required BioGenesis to furnish materials for the installation of U.S. Navy housing roofing in various locations, during the period from May 15, 2000, to September 29, 2001. The Navy Contract was continued and, as of June 30, 2003, when BioGenesis filed an answer to the second amended complaint, was in effect.

Rhino is a Hawaii corporation engaged in roofing installation and repairs. On July 15, 2003, Rhino filed a Second Amended Complaint, wherein Rhino claims the following: Rhino claims that it entered into an oral subcontract with BioGenesis around May 2000. Pursuant to the subcontract, Rhino agreed to perform such contract work that the U.S. Navy might assign to BioGenesis on individual task orders under the Navy Contract, while BioGenesis agreed to pay all of Rhino's actual costs of performance plus fifty percent (50%) of BioGenesis' profit upon completion of each task order under the Navy Contract. While the terms were later recited in a letter from BioGenesis to Rhino, no formal written subcontract was ever executed between the parties.

Rhino claims that it performed labor and provided materials at a cost of not less than $239,694.47, which BioGenesis has not fully paid. Additionally, Rhino contends that BioGenesis owes it fifty percent of the profits BioGenesis received under the Navy Contract. In sum, Rhino claims entitlement to an amount exceeding $1,264,694.47 under the subcontract.

On July 30, 2003, BioGenesis filed an answer and a counterclaim against Counter-Defendant Michael L. Danforth ("Danforth"). In the counterclaim, BioGenesis asserts that Danforth was a representative of Rhino who committed tortious interference with the Navy Contract as follows: Danforth and Rhino informed BioGenesis that, because it did not have a subcontract with Rhino, Rhino would order its workers to cease work on the accepted delivery orders, thereby causing BioGenesis to suffer liquidated damages under the Navy Contract, unless BioGenesis executed a written, exclusive five-year subcontract with Rhino. After BioGenesis refused to execute the subcontract, Rhino caused its employees to cease work on the delivery orders in order to further bring about BioGenesis' breach and the Navy's termination of the Navy Contract. BioGenesis states that Danforth and Rhino informed it that liens would be placed on the project unless BioGenesis paid Rhino $25,000. BioGenesis then paid $25,000 for the materials and supplies Rhino allegedly purchased for the project. BioGenesis also asked for a full accounting of all supplies ordered for the project, but Danforth and Rhino never provided it with such an accounting.

BioGenesis contends that, in doing the above, Danforth and Rhino (1) caused BioGenesis to suffer liquidated damages under the Navy Contract in an amount not less than $3,820, thus entitling BioGenesis to compensatory damages of not less than $3,820 and (2) acted maliciously and willfully and for the purpose of causing BioGenesis to breach the Navy Contract in order for Rhino to take over the Navy Contract, thus entitling BioGenesis to punitive damages in an amount to be proven at trial.

On December 15, 2003, Danforth filed the present motion for summary judgment and award of Rule 11 sanctions, wherein he asserts the following: Danforth claims that he was not an agent of Rhino, but that he came to Guam on behalf of Maxx Management Corporation ("MMC")[1], a Nevada corporation which had entered into a Services Agreement for Contracting and Estimating Services with Rhino. (Tuhy Decl. Exs. A at 26-27 & A1.) Danforth was asked

---

[1] Danforth states that he is neither a director, shareholder, nor officer of MMC. (Mot. at 3.) However, Danforth admits to have been a director of MMC at the very inception of the corporation. (Id. at 3 n.6; Tuhy Decl. Ex. A at 19-20.)

3

by Michael O'Connell ("O'Connell"), Rhino's chief executive officer, to assist in Rhino's start-up of a separate Solution Order Contract ("SOC Contract") with the Navy. (Tuhy Decl. Exs. A at 27 & 41.) Danforth claims that it was only for the SOC Contract that Danforth came to Guam in October 2000, when he was later requested by O'Connell to evaluate the Navy Contract and provide his suggestions and impressions of the conditions of the task orders. (Id. at 35.) Danforth states that he undertook this evaluation for Rhino in his capacity as a representative of MMC.[2] (Id. at 34-35.) Danforth claims that neither MMC nor himself, acting on MMC's behalf, engaged, or were contracted to engage, in the performance or oversight of any Navy contracts. (Mot. at 3.)

Danforth worked for Rhino on the SOC Contract and, by extension of its Service Agreement, the Navy Contract for a total of eleven days, from October 20-31, 2000. (Mot. at 3.) According to Danforth, MMC did only what Rhino instructed it to do, i.e., evaluate what was then seventeen task orders of the Navy Contract, advise Rhino of the requirements of the Navy Contact, determine the status of the task orders, and make recommendations. (Id. at 3-4; Tuhy Decl. Ex. A at 54.)

While on Guam, Danforth prepared a summary of what had been and still needed to be done on the task orders.[3] (Tuhy Decl. Exs. A at 57 & A3.) Danforth also drafted a memorandum which pointed out the need to create and execute a Master Subcontract between BioGenesis and Rhino, which, Danforth argued, had to exclude any liability to Rhino for liquidated damages for the issued task orders. (Id. Ex. A4.) Danforth advised Rhino not to move forward with the preparation of the Master Subcontract Agreement until after the concern over liquidated damages was discussed between Gerald Lam ("Lam"), BioGenesis' principal,

---

[2] The Services Agreement under which MMC was retained by Rhino delineates the services MMC was to provide, which, germane to the SOC Contract and, later, to the Navy Contract, were to give preliminary analyses of the requirements of the contracts. (See Tuhy Decl. Ex. A1 at 2.)

[3] Rhino's time for performance began on the date of the task order, but, for many of the task orders, BioGenesis had not done what was required in the way of submission of material safety and data sheets and completion of activity hazard analysis. (Mot. at 4; Tuhy Decl. Ex. A at 57-63.)

4

and the Navy's contracting officer.[4] (Tuhy Decl. Ex. A at 69-70.)[5]

In November 2000, Danforth drafted a proposed Master Subcontract Agreement, which Lam received. (Id. Exs. A16 & A5 at 33.) That month, Danforth and Lam met in Honolulu and agreed upon all the terms of the Subcontract Agreement, except for the matter of pricing, which Danforth sought from George Allen ("Allen"), Rhino's consultant and director of operations in Guam. (Id. Ex. A5 at 42.) Danforth claims that, at O'Connell's direction, Allen drafted a letter to Lam, dated November 9, 2000, notifying him that Rhino employees would no longer be used to perform any work for BioGenesis, and that Rhino would leave the building near the project that Rhino shared with BioGenesis. (Mot. at 6.) In late December 2000, Allen carried out the termination of Rhino workers who had been performing Biogenesis' duties. (Id.; Tuhy Decl. Ex. B at 81-82.)

The decision to stop Rhino's work on the Navy Contract was made exclusively by O'Connell on behalf of Rhino. (Mot. at 6; Tuhy Decl. Ex. D ¶ 4.) Allen also confirmed that Danforth did not give any direction to Rhino's crews relative to any work on the Navy Contract task orders, but that he only evaluated the status of those orders. (Tuhy Decl. Ex. B at 72-73.)

On January 23, 2004, BioGenesis filed a non-opposition to Danforth's motion, while still opposing an award of Rule 11 sanctions. Danforth filed a reply on January 30, 2004. The Court heard oral arguments on the motion on February 25, 2004.

## II. ANALYSIS.

### A. Summary Judgment Standard.

Danforth moves for summary judgment against Biogenesis. For a party seeking summary judgment to succeed, he must show that there exists "no genuine issue as to any material fact and that [he] is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

---

[4] Following Lam's agreement to resolve this issue, Danforth wrote to him and Richard Avilla, the project manager of the Navy Contract, inquiring on the status of their efforts to have liquidated damages waived. (Mot. at 4; Tuhy Decl. Ex. A5 at 9, 11, 12, & 18.) Danforth made it clear to Lam that there would be no Master Subcontract agreement unless and until Lam remedied the liquid damages problem. (Tuhy Decl. Ex. A15.)

[5] These summaries were shared with personnel at Rhino and BioGenesis. (Tuhy Decl. Ex. A at 69.)

5

Whether a fact is material is determined by the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact that may affect the outcome is material. Id. If a party moves for summary judgment on a claim or defense upon which it bears the burden of proof at trial, it must satisfy its burden by offering affirmative, admissible evidence. But, when the non-moving party has the burden of proving the claim or defense, the movant can meet its burden by pointing out the absence of evidence submitted by the non-moving party. The movant is not required to disprove the other party's case. Khachikian v. Devry Inst. of Tech., No. CV 01-05935 NM, 2002 U.S. Dist. LEXIS 3216, at *13 (C.D. Cal. Jan. 14, 2002) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

If the movant meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). When evaluating whether the non-movant's assertions raise a genuine issue, the court must believe the non-movant's evidence and draw all justifiable inferences in the non-movant's favor. Anderson, 477 U.S. at 255.

Here, BioGenesis filed a statement of Non-Opposition to Danforth's motion for summary judgment on the tortious interference with contract claim, but still opposes the imposition of Rule 11 sanctions. Since a motion for summary judgment cannot be granted merely because no opposition has been filed, the Court must adjudicate the merits of Danforth's motion. See Henry v. Gill Indus., Inc., 983 F.2d 943, 950 (9th Cir. 1993).

**B. Tortious Interference with the Navy Contract.**

BioGenesis asserts that Danforth committed tortious interference with the Navy Contract. To prove the tort of intentional interference with contractual relationship[6], the claimant must show the following elements: (1) a valid contract exists; (2) the defendant had

---

[6] Guam recognizes a cause of action on this tort. See, e.g., Brigham Constr. & Dev. v. Lucky Dev. Co., No. CV0078-92, at 4 (Super. Ct. Guam Mar. 17, 1994).

6

knowledge of the contract; (3) the defendant acted with an intent to induce a breach or disruption of the contract; (4) the defendant had no justification for his action, or acted with malice; (5) the contract was actually breached or disrupted; (6) damages were suffered as a result of the breach or disruption. Shaw v. Santa Monica Bank, 920 F. Supp. 1080, 1087 (D. Haw. 1996); Sebastian Int'l, Inc. v. Russolillo, 162 F. Supp. 2d 1198, 1203 (C.D. Cal. 2001); Intrex Corp. v. FMC Corp., No. C-93-2906-MHP, 1996 U.S. Dist. LEXIS 1796, at *7-8 (N.D. Cal. Feb. 15, 1996).[7]

The parties do not dispute elements (1), (2), (5), and (6). As for element (3), Danforth contends that he did not act with the intention to disrupt the Navy Contract or to induce BioGenesis to breach said contract. Danforth claims that he merely pointed out "the true fact to Rhino's [and BioGenesis'] attention" that a "written subcontract between [BioGenesis] and Rhino to perform the work was required by federal regulations." (Mot. at 8 (emphasis in original omitted).) Danforth acted with the intent to formalize a contractual relationship and not to end it. Also, BioGenesis has failed to allege sufficient facts demonstrating Danforth's intent to induce a breach or disruption of the Navy Contract. Thus, the Court finds that BioGenesis has failed to prove this element of the tort. Nevertheless, discussion as to whether BioGenesis can make the case for element (4) ensues.

As used in element (4), "malice" refers to the intentional infliction of harm, without justification. Intrex, 1996 U.S. Dist. LEXIS 1796, at *12. "To show 'malice' the plaintiff must show that the defendant's conduct was 'both injurious and transgressive of generally accepted standards of common morality or of law.'" Id. (quoting Labus v. Navistar Int'l Transp. Corp.,

---

[7]Additionally, section 766 of the Restatement of the Law, Second, Torts, states that

[o]ne who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another person and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

RESTATEMENT (SECOND) OF TORTS § 766 (1979).

7

740 F. Supp. 1053, 1064 (D.N.J. 1990) (internal quotations omitted)).[8] Here, Danforth justifies his actions by stating that "[t]he social importance of MMC, through Danforth, carrying out its own contractual obligations[9] to Rhino are certainly of equal or greater importance than [BioGenesis] insisting on Rhino continuing to operate without payment on the [Navy] Contract." (Mot. at 9.) Also, Danforth states that he was "clearly acting within the scope and course of his agency for MMC and there is complete dearth of evidence that he was acting solely for selfish motives." (Id. at 10; Tuhy Decl. Ex. C ¶ 2.) Danforth states that he "drew on his extensive experience in federal contracting and opined that a written subcontract was necessary and should not initially be executed until the liquidated damages applicable were removed."[10] (Id.) Danforth was seeking to formalize a contractual relationship, since Danforth's client enjoyed absolutely no protection as a subcontractor having no privity of contract with the Navy. Since Danforth, as a representative of MMC, merely performed contractual duties to Rhino, the Court finds that BioGenesis has failed to prove malice, or absence of justification. Thus, BioGenesis has also failed to prove element (4). Accordingly,

---

[8]"The Restatement [of Torts] equates the malice requirement with an inquiry into whether the defendant's interference with the contract was 'improper.'" Intrex 1996 U.S. Dist. LEXIS 1796, at *13 (citing RESTATEMENT (SECOND) OF TORTS § 767 cmts. b & k (1979)). In determining whether the "improper" interference occurred, the Restatement considers the following factors:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

RESTATEMENT (SECOND) OF TORTS § 767 (1979).

[9]Pursuant to the Services Agreement for Contracting and Estimating Services, entered between MMC and Rhino, MMC was to "[c]onduct preliminary analysis of the requirements and design of Targeted Projects," among other duties. (Tuhy Decl. Ex. A1 at 2; Mot. at 3.)

[10]Danforth also discusses a qualified privilege extended to a managers, which does not apply to the facts of this case. (See Mot. at 10.)

8

the Court GRANTS Danforth's motion for summary judgment.[11]

### C. Rule 11 Sanctions.

Danforth claims entitlement to an award of attorney fees and costs pursuant to Federal Rule of Civil Procedure 11. "Rule 11(c)(1)(A) provides strict procedural requirements for parties to follow when they move for sanctions under Rule 11." Radcliffe v. Rainbow Constr. Co., 254 F.3d 772, 788 (9th Cir. 2001). To comply with the Rule, a motion for Rule 11 sanctions "shall be made separately from other motions or requests," FED. R. CIV. P. 11(c)(1)(A), and not as part of an additional request for relief in another motion, otherwise, the motion must be denied, see Rosenberg v. Neubeck, No. 960-20174 SW, 1996 U.S. Dist. LEXIS 22461, at *7-8 (N.D. Cal. May 30, 1996) (citing FED. R. CIV. P. 11 advisory committee's note); Arellano v. Home Depot U.S.A., Inc., 245 F. Supp. 2d 1102, 1108-09 (S.D. Cal. 2003) (denying Rule 11 request because it was made in an opposition to a motion to remand). Also, a Rule 11 motion "shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected." FED. R. CIV. P. 11(c)(1)(A). Under this "safe harbor" provision, an informal warning by telephone or letter of a request for Rule 11 sanctions cannot serve as a substitute for the service of a Rule 11 motion. Barber v. Miller, 146 F.3d 707, 710 (9th Cir. 1998). In this case, Danforth failed to comply with the strictures of Rule 11 by (1) failing to file the Rule 11 request separate from other motions, as he included his prayer for Rule 11 sanctions in his motion for summary judgment, and (2) failing to serve the Rule 11 motion to BioGenesis and to give it 21 days thereafter to withdraw its claim against Danforth, as, prior to filing this motion with the Court, he only informally warned BioGenesis, via letter, of the request for Rule 11 sanctions.[12] (Mot.

---

[11] In the alternative, Danforth moves for summary judgment on BioGenesis' claim to punitive damages for tortious interference with contract. Because BioGenesis has failed to satisfy all the elements of the tort, requiring summary adjudication, the Court need not address this request, as it is now moot.

[12] BioGenesis also challenges the validity of Danforth's Rule 11 warning via letter, as it was sent by Danforth's pro hac counsel Alan Tuhy prior to his admission before the Court. BioGenesis believes that the notice was ineffective for this additional reason. However, the Court need not address this issue, as Danforth's warning

9

at 11[13]; Tuhy Decl. ¶ 5.) Therefore, the Court DENIES Danforth's prayer for Rule 11 sanctions.[14]

### III. CONCLUSION.

For the foregoing reasons, Counter-Defendant Michael Danforth's Motion for Total or, in the Alternative, Partial Summary Judgment on Amended Counterclaim and Award of Sanctions under Rule 11 is ORDERED GRANTED IN PART and DENIED IN PART.

**IT IS SO ORDERED** this 28th day of April, 2004.

JOHN S. UNPINGCO
Chief Judge, District Court of Guam

Notice is hereby given that this document was entered on the docket on 04/29/04.
No separate notice of entry on the docket will be issued by this Court.
Mary L. M. Moran
Clerk, District Court of Guam
By: _____ 04/29/04
Deputy Clerk    Date

---

fails in other respects.

[13] Danforth admits: "On March 12, 2003, counsel for Danforth wrote to [BioGenesis'] counsel to request that it dismiss Danforth within twenty one (21) days pursuant to the 'safe harbor' provisions of Rule 11 ...." As noted earlier, notice of a Rule 11 request via letter is only an informal warning and does not trigger the 21-day safe harbor. See Barber, 146 F.3d at 710.

[14] In the alternative, Danforth requests that the Court impose, sua sponte, Rule 11 sanctions against BioGenesis. However, the Court declines Danforth's invitation, as the record reveals no errors by BioGenesis egregious enough to deserve such a penalty.

10