Arthur B. Clark, Esq.
Janalynn M. Cruz, Esq.
CALVO AND CLARK, LLP
Attorneys at Law
655 South Marine Drive, Suite 202
Tamuning, Guam 96911
Telephone:    (671) 646-9355
Facsimile:    (671) 646-9403

Attorneys for Defendant/Counter-Plaintiff
BioGenesis Pacific, Inc.

DISTRICT COURT OF GUAM
FILED
AUG 17 2004
MARY L. M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

UNITED STATES OF AMERICA FOR USE
AND BENEFIT OF RHINO BUILDERS, INC.,

               Plaintiff,

vs.

BIOGENESIS PACIFIC, INC.,
AIG TECHNICAL SERVICES, INC., and
AMERICAN HOME ASSURANCE
COMPANY

               Defendants.

BIOGENESIS PACIFIC INC.,

               Counter-Plaintiff,

vs.

RHINO BUILDERS, INC., MICHAEL
O'CONNELL, MICHAEL DANFORTH,
AND JOHN DOES 1-10,

               Counter-Defendants.

AMERICAN HOME ASSURANCE
COMPANY,

               Cross-Claimant,

vs.

BIOGENESIS PACIFIC INC.,

               Cross-Claim Defendant.

CIVIL CASE NO. 02-00008

**DECLARATION OF ARTHUR B. CLARK
IN SUPPORT OF
DEFENDANT/COUNTER-PLAINTIFF
BIOGENESIS PACIFIC, INC.'S
RENEWED MOTION FOR SUMMARY
JUDGMENT**

**DECLARATION OF ARTHUR B. CLARK IN SUPPORT OF
DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC, INC.'S
RENEWED MOTION FOR SUMMARY JUDGMENT**
CIVIL CASE NO. 02-00008
B040813.327-0001.CT (ABC Decl re Renewed).wpd

ORIGINAL 1

Case 1:02-cv-00008    Document 438    Filed 08/17/2004    Page 1 of 60

I, ARTHUR B. CLARK, do declare as follows:

1. I am an attorney duly licensed to practice in Guam and before this Court, a partner of the law firm of Calvo and Clark, LLP, and counsel for BioGenesis Pacific, Inc.

2. I have personal knowledge of the facts stated herein and if called to testify I could and would competently testify thereto.

3. Attached are true and correct copies of excerpts and deposition exhibits from the following sworn deposition transcripts taken in this action:

| Exhibit | Deponent and Date | Transcript Pages | Deposition Exhibit No. |
|---------|-------------------|------------------|------------------------|
| 9 | Gerald Lam – February 19, 2003 | 1, 28, 164 | 1 |
| 10 | Michael O'Connell – March 13, 2003 | 228, 259, 260, 273-277, 294, 295, 349 | 20, 28 |
| 11 | Michael Danforth – February 21, 2003 | 1, 18-20, 34-36, 48-53, 57-61, 74, 75, 77-80, 171 | 3, 5, 14, 15 |
| 12 | George Allen – October 6, 2003 | 1, 17, 18, 43, 112 | 4 |
| 13 | Michael O'Connell – February 20, 2003 | 1, 19, 22, 66-68, 168-170, 227 | 4 |
| 14 | Eugene O'Connell – April 11, 2003 | 1, 26, 27, 159-164, 191-198, 208, 209,  263, 264 | |
| 15 | Richard Avilla – April 10, 2003 | 1, 24, 25, 32, 33, 42, 158, 159, 162, 196, 197 | |
| 16 | Alfred Garthe III - April 3 and 4, 2003 | 1, 125, 175-179, 183, 184 | |
| 17 | Michael O'Connell – April 17, 2003 | 350, 371-373, 460 | |

//
//
//
//
//
//

**DECLARATION OF ARTHUR B. CLARK IN SUPPORT OF
DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC, INC.'S
RENEWED MOTION FOR SUMMARY JUDGMENT**
CIVIL CASE NO. 02-00008
B040813.327-0001.CT (ABC Decl re Renewed).wpd

2

1            4.     Attached as Exhibit CC, is what I believe to be a true and correct copy of an

2 email from George Allen to Michael Danforth, with courtesy copy to Michael O'Connell, dated

3 November 8, 2000. This email was produced by Rhino on February 7, 2003 in response to BioGenesis'

4 Request for Production of Documents.

5            I declare under penalty of perjury under the laws of Guam that the foregoing is true and

6 correct.

7            Executed this 13th day of August, 2004, in Tamuning, Guam.

8                                 CALVO AND CLARK, LLP
Attorneys at Law
9                                 Attorneys for Defendant/Counter-Plaintiff
BioGenesis Pacific, Inc.

10

11

12                          By: _____
                                ARTHUR B. CLARK

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF ARTHUR B. CLARK IN SUPPORT OF**
**DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC, INC.'S**
**RENEWED MOTION FOR SUMMARY JUDGMENT**
CIVIL CASE NO. 02-00008
B040813.327-0001.CT (ABC Decl re Renewed).wpd                  3

# EXHIBIT "9"

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., Plaintiff, vs. BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC., and AMERICAN HOME ASSURANCE COMPANY, Defendants. | ) CIVIL CASE NO. 02-00008 ) ) ) ) ) ) ) ) ) ) |
| BIOGENESIS PACIFIC INC., Counter-Plaintiff, vs. RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, AND JOHN DOES 1-10, Counter-Defendants. | ) ) ) ) ) ) ) ) |
| AMERICAN HOME ASSURANCE COMPANY, Cross-Claimant, vs. BIOGENESIS PACIFIC INC., Cross-Claim Defendant. | ) ) ) ) ) ) ) |

DEPOSITION OF GERALD N.Y.C. LAM

Taken on behalf of the Plaintiff and Counter-Defendant

at the offices of Rhino Builders, Inc., 87-1610 Ulehawa

Road, Waianae, Hawaii, commencing at 9:20 a.m. on

Wednesday, February 19, 2003, pursuant to Notice.

BEFORE:    SHARON L. ROSS, CSR No. 432

probably don't have any problem looking at this and seeing that this would have come from me, from my computer.

Q.    Okay.    Can you think of any reason you might have sent Rhino a resume in September of 1999?

A.    I can't think of any reason why I would unless they asked for it or unless Rhino asked for it. As I said, I have no problem sending a resume.

Q.    Turning to Exhibit 1, is this your resume?

A.    It purports to be my resume, yes.

Q.    Well, what I'm asking you is:  Did you prepare this document?

A.    I don't know, but it looks like my resume. It looks like it would have been prepared.  I mean, I don't --

Q.    Why don't you take your time and look it over and tell me whether or not you prepared it, to the best of your recollection?

A.    To the best of my recollection, I don't know if I prepared this particular document but it is my resume and it seems to be accurate.

Q.    Okay.    The pages are not numbered; but turning to the seventh page, at the top it begins "Environmental & Tax Attorney."  And directing your attention to Item No. 1, it says "May through June,

## C E R T I F I C A T E

1

2  STATE OF HAWAII                    )

3                                     )   SS:

4  CITY AND COUNTY OF HONOLULU )

5       I, SHARON ROSS, Notary Public, State of Hawaii,

6  do hereby certify:

7       That on Wednesday, February 19, 2003, at 9:20

8  a.m., appeared before me GERALD N.Y.C. LAM, the witness

9  whose deposition is contained herein; that prior to

10  being examined he was by me duly sworn;

11       That the deposition was taken down by me in

12  machine shorthand and was thereafter reduced to

13  typewriting under my supervision; that the foregoing

14  represents, to the best of my ability, a true and

15  correct transcript of the proceedings had in the

16  foregoing matter.

17       I further certify that I am not attorney for any

18  of the parties hereto, nor in any way concerned with the

19  cause.

20       DATED this 2nd day of March, 2003, in Honolulu,

21  Hawaii.

22

23                                    _Sharon Ross_

24                                    SHARON ROSS, CSR NO. 432
                                     Notary Public, State of Hawaii
25                                    My Commission Expires:  4/8/05

# Gerald Lam Deposition
# Exhibit No. "1"

# Gerald N.Y.C. Lam
## President & Chief Executive Officer

Mr. Lam has over 20 years of direct experience in designing, building, financing, developing, constructing and selling of residential homes, duplexes, four-plexes, condominiums, and planned unit developments. His construction experience also includes small office buildings and strip shopping malls. Since 1991 through the present, Mr. Lam has fully renovated and managed 23 multi-family, residential apartment buildings in Houston, Texas. Additionally, Mr. Lam is an entrepreneur and management executive with 22 years of experience in business management, mergers & acquisitions, law, real estate development, federal and state taxation, employee benefits and compensation, corporate structuring, strategic planning, finance, and accounting. His education and experience spans the U.S., Pacific Basin, Asia, Europe, and South America. He led the executive development team establishing America's 6th largest outdoor advertising company. He also served as a District Judge in Hawaii from 1982 through 1988.

In 1990, Mr. Lam formed BioGenesis Pacific, Inc. to expand and diversify his interests into environmental services and facilities maintenance. Today, BioGenesis Pacific, Inc., known for cutting-edge technologies and success in federal environmental construction contracting , offers services in building and construction, renovations and multi-trades, heavy construction, environmental technologies and services, and facilities and base support maintenance. Presently, Mr. Lam is heading the technological development of the world medical industry's newest standard of laser corrective eye surgery known as LASIK. He controls the exclusive development rights to the proprietary technology developed by the industry's pioneer and world figure, Dr. Virgilio Galvis.

## EXPERIENCE

**October 1996 - Present:**
- **Sharper Visions Associates:** Co- founder and CEO over proprietary technology in LASIK and responsible for revolutionizing the modern industry of corrective eye surgery.

**September 1990 - Present**
- **Environmental Industry:** Founder and CEO of BioGenesis™ Pacific, Inc. with national award winning technologies for remediation of contaminated soil and water. Cleaned Kaho'olawe Island of ordnance and explosives in 1995 and more recently won the Navy's Kaho'olawe Omnibus Contract.

**September 1976 - Present**
- **Attorney:** Mergers and acquisitions; recapitalization of financial, manufacturing, and service companies; financial structuring of real estate developments; human resources and compensation; pension and benefit plans; and tax litigation.

- **U.S. Corporate Executive (Fortune 1,000 companies):** Cash flow modeling; product marketing; Divisional budget modeling; Strategic financial modeling; Writing and implementing personnel procedures and compensation manuals. Restructured senior and junior debts for U.S. corporations, wrote strategic plans, established profit center budgets, wrote procedures and personnel manuals, and reorganized executive management.

Lam
EXHIBIT NO. 1
DATE 2-19-03
S.L. ROSS

• Management Consulting (Fortune 500 companies): Research and writing of strategic plans for international business. Raised equity financing for real estate development projects, foreign trade, startup ventures. Analysis and reports on profit, cash flow, and investment evaluations for corporations. Developed think tanks for media and real estate businesses. Managed business turnarounds. Provided

litigation support for commercial litigation. Designed and instructed intensive multi-day seminars in marketing, team dynamics and personal empowerment.

**· Residential and Commercial Design/Build and Construction:** 1976 - Present.

*138 multi-family residential apartments, design/build renovation construction - Houston, Texas.
1990 - Present. Okole, Inc. construction and property management.*
>    - *Acquisition, design, engineering, new construction, total renovation, and property
>    management of 23 multi-family apartment buildings in Springbranch District, Houston,
>    Texas. Sole responsibility for project construction management, project design, engineering,
>    scheduling, permits, project Quality Assurance and Quality Control. Sole responsibility for
>    leasing and rental contract management, facilities maintenance and security supervision,
>    move-in and move-out apartment preparation.*

*Condominium renovation and property management - Ogden, Utah. 1982 - 1988 Private
development partnership.*
>    - *Total renovation and repair of 256 residential condominium units. Property management
>    responsibility: lease contracts, facilities maintenance, security, move-in and move-out
>    scheduling and preparation of units. Short term rentals and long-term leasing. Family
>    services.*

*Single Family, Duplex, and Fourplex residential projects - Salt Lake City, Utah. 1976 - 1985 Contour
Development Corporation Joint Venture Partnerships.*
>    - *52 high design homes: new design/build and construction. Project management, site
>    supervision, cost and contract accounting.*
>    - *210 duplex residential complex units: new design/build and construction. Project
>    management, site supervision, cost and contract accounting.*
>    - *76 fourplex residential complex units: new design/build and construction. Project
>    management, site supervision, cost and contract accounting.*

*Condominium P.U.D. projects - Salt Lake City, Utah. 1976 - 1985 Contour Development Corporation
Joint Venture Partnership.*
>    - *167 high design low rise condominium unit developments: new design/build and
>    construction. Project management, site supervision, cost and contract accounting.*
*Office buildings (average 45,000 sq.ft.) - Salt Lake City, Utah. 1976 - 1985 Contour Development
Corporation Joint Venture Partnership.*
>    - *5 low rise office buildings, high design efficiency: new design/build and construction.
>    Project management, site supervision, cost and contract accounting.*
>    - *Urgent Care Medical facility: new design/build and construction. Project management, site
>    supervision, cost and contract accounting.*

*Commercial strip mall shopping centers - Utah, Wyoming, Colorado. 1976 - 1985 Contour
Development Corporation Joint Venture Partnership.*
>    - *5 strip shopping centers with fast food pads: new design, build and construction. Project
>    management, site supervision, cost and contract accounting.*

*Land acquisition, zoning, subdivision, heavy construction site improvements, and real estate sales in
Utah (Park City, Salt Lake City, St. George), and Nevada (Clark County, Henderson, Reno). 1978 -
1988 Contour Development Corporation of Utah, PIC Corporation of Hawaii.*
>    - Strategic budgeting, acquisition, leasing, cash flow analysis, and environmental site
>    management. Zoning, planning, financing, property management, and supervision of
>    marketing. Sole quality control responsibility and management of construction subcontracts.

*Land acquisition, revenue projection and planning, pricing, competitive analysis of real estate
holdings - continental U.S. Reagan National Advertising, Inc. Philadelphia, PA. 1989 - 1990.*

- Real estate acquisitions for outdoor advertising operations in Houston, Austin, San Antonio, Laredo, Corpus Cristi, Baltimore, Philadelphia, New York City, Salt Lake City, Ogden, and Provo. Demographic analyses concerning population growth, income, economics, consumer demand, housing, transportation, and infrastructure.

**Real Estate use planning** - Philadelphia, PA  1987 - 1989

- Developed planning for redevelopment, renovation, and management of mixed use urban locations in Philadelphia. Wrote plans for the development of affordable housing in Philadelphia.

**Resort, commercial, and industrial** - Honolulu, HI  1977 - 1987

- Acquisition, financing, legal structuring, design, leasing and planning of various resort hotels, warehouses, and office buildings in Hawaii. Approved designs. Secured financing. Drafted legal documents and secured permits and licenses. Wrote management plans. Supervised quality assurance managers. Negotiated purchase and sale prices.

• Quantitative analyses: Risk management; Econometrics; Stocastic forecasting; Corporate budgeting; Mergers and acquisitions; Sale and leasebacks; Commercial Real Estate - office buildings, shopping centers, resorts; Impact planning; Global and domestic marketing plans; Equities and debt obligations; Real Estate securitization.

• Project Implementation: Cash flow modeling; product marketing; Divisional budget modeling; Strategic financial modeling; Writing and implementing personnel procedures and compensation manuals.

• Corporate Restructuring: Restructured senior and junior debts for U.S. corporations, wrote strategic plans, established profit center budgets, wrote procedures and personnel manuals, and reorganized executive management.

• Management Consulting: Research and writing of strategic plans for international business. Raised equity financing for real estate development projects, foreign trade, startup ventures. Analysis and reports on profit, cash flow, and investment evaluations for corporations. Developed think tanks for media and real estate businesses. Managed business turnarounds. Provided litigation support for commercial litigation. Designed and instructed intensive multi-day seminars in team dynamics and personal empowerment.

• District Judge: 1982 - 1988: District Judge, Per Diem, First Circuit, State of Hawaii.

**ENVIRONMENTAL SUPPLEMENT**

• Environmental Industry: 1989 - present. Founder and CEO of BioGenesis℠ Pacific, Inc. Global strategy concerning proprietary technologies for waste management, ordnance and explosive waste disposal and remediation of contaminated soil and water. BioGenesis℠ cleaning products are listed on the U.S. National Contingency Plan Product Schedule for use in the EPA Superfund Innovative Technology Evaluation (SITE) Program to remediate contaminated soil and water. On-site operations, site audit, site technological application, and equipment operation in soil cleaning and industrial wastewater remediation. Management of unexploded ordnance disposal, air transportation, ocean barging, base maintenance support operations,

geologic and topographical data processing, surveying, heavy construction, archeological assessments, botanical services, and environmental project planning.

• Environmental & Tax Attorney: 1976 - present. Assessment of corporate environmental liability - Utah, Colorado, Nevada, Philadelphia, Baltimore, Texas, California, Hawaii. Mergers and acquisitions; recapitalization of financial, manufacturing, and service companies; financial structuring of real estate developments; human resources and compensation; pension and benefit plans; and tax litigation.

• Environmental Training and Education: 1989 - 1992.
Mr. Lam spent months in Europe studying, field auditing, and field operating equipment on contaminated soil sites. He studied every aspect of BioVersal Umlatech contaminated soil cleanup projects in Hamburg, Germany and Grotz, Austria acquiring substantial field experience in cutting edge technology unavailable to the U.S.

1.  May - June 1989: Germany, Austria, France, Switzerland - study of carbon filtration, reverse osmosis technology proposed by European companies. Research of soil cleanup technologies. Compilation of technical data and scientific papers regarding cutting edge technology for cleaning contaminated wastewater and contaminated soils.

2.  September 1989 - January 1990: Utah, Colorado - study of the science of water purification methods specifically studying pyrolitic methods and solar/enzyme processing.

3.  September - October 1990: Germany, France, Austria, Switzerland. Research, study of field operation, conducting of field audits, study of specialty equipment engineering, and equipment operation on a contaminated soil site in Hamburg, Germany. Research and study of methods of laboratory engineering of bacteria mutations for remediating hydrocarbons in soil. Studies include:

    a. Hygiene Institute of the Ruhr studies of 1987 concerning technological breakthroughs for rapid biodegradability, low toxicity, ability to remove hydrocarbons from soil, and ability to accelerate the rate of biodegradation.

    b Hygiene Institute of the Ruhr studies of late 1987 concerning technological breakthroughs revalidating the earlier study.

    c. Hygiene Institute of the Ruhr studies of 1989 concerning technological breakthroughs to clean weathered Alaskan crude oil from rocks polluted by the Exxon Valdez spill.

    Hygiene Institute of the Ruhr studies and field tests of late 1989 concerning removal of heavy metals from soil.

    Hygiene Institute of the Ruhr field study of late 1989 concerning the cleaning of earth contaminated with mineral oil and aromatic hydrocarbons at Leverkusen, FRG.

    Hygiene Institute of the Ruhr field study of late 1989 concerning the cleaning of earth contamination at the Shell service station at Dortmund, FRG.

    e. Biomonitoring Services Laboratory (Gulf Breeze, FL) research studies of BioVersal chemicals:
    (1)    Acute toxicity tests minnows and brine shrimp re EPA compliance pursuant 40 CFR 300;
    (2)    Chemical analysis and testing for heavy metals and chlorinated hydrocarbons compliance pursuant 40 CFR 300.
    (3)    Acute toxicity tests #2 fuel oil, minnows and brine shrimp re EPA compliance pursuant 40 CFR 300;

4.  November 17-19, 1992: Technical Paper presentation at the *EPA's Fourth Forum on Innovative Hazardous Waste Treatment Technologies: Domestic and International*, San Francisco, CA.

5. September 20-23, 1993: Paper presentation at the Eight Annual Conference on Contaminated soils, University of Massachusetts at Amherst. <u>Remediation of Contaminated Soil & Sediment Using the Biogenesis washing process.</u>

6. 1991 - 1992: Emerging Technology, Demonstration, and Commercial phases of the *EPA Superfund SITE (Superfund Innovative Technology Evaluation) Program* to completion of the EPA's ITER (Innovative Technology Evaluation Report). "Biogenesis Soil Washing Technology", EPA/540/R-93/510, Risk Reduction Engineering Laboratory, Office of Research and Development, U.S. Environmental Protection Agency, Cincinnati, Ohio.

   May 1992, Site #1 - Santa Maria, CA, cleanup of soil contaminated with No. 6 fuel oil (bunker fuel). November 1992, Site #2 - Minnesota oil refinery, cleanup of soil contaminated with crude oil.
   (a) Project coordination
   (b) Technology application
   (c) Demonstration and field operations of subcontractors, equipment, and permits
   (d) Site security and equipment maintenance
   (e) Daily site audits and lab analyses
   (f) Cost and personnel analyses.

7. Confidential Technical Report - Bench Scale treatability study of a former wood treating facility site contaminated with carcinogenic PAHs, pentachlorophenol, creosote, arsenic, and petroleum waste from vehicle maintenance and fueling.

8. Equipment studies of the following:
   (a) SKIT-aquaclean - wastewater cleaning by automatic breaking and de-oiling of stable technical emulsions from industrial sources.
   (b) RWO COLA Oil/Water Separation System - coalescence stage for the separation of micro-dispersed oil particles from waste water.
   (c) RWO SIKA Aquaclean System - gravity separation.
   (d) SINO System - ring chamber separator for removal of oil and fat from water.
   (e) Oil-in-water monitors, type OCD for industrial applications

9. Publication and submission with the State of Hawaii Department of Health <u>Biogenesis Operations Manual</u> re EPA regulatory field guidelines, site procedures, technology, and compliance.

## EDUCATION

1987-89    **The Wharton School of Business, University of Pennsylvania, M.B.A.**, majors in Real Estate Management and Finance.

1976-78    **The Graduate Tax Law Program, University of Denver Law School, LL.M. in Taxation.**

1973-76    **J. Reuben Clark Law School, Brigham Young University, Utah, Juris Doctor (J.D.)**

1969-73    **Brigham Young University, Provo, Utah, B.A.** in Political Science. Deans List and National Honor Society.

1962-69    **The Kamehameha Schools, Honolulu, Hawaii** High School degree.

## MISCELLANEOUS INFORMATION

NAIA National Volleyball Championship Team member. Gold medals in volleyball, swimming, track & field, snow skiing, fencing, gymnastics, and wrestling. Work and study in human physiology, anatomy, and kinesiology. Fine art commissions and awards for works in watercolors, pastels, charcoals, and ceramics.

Graduate and protégé of Papa Henry Auwae, Po'okel_ Kahuna La'au Lapa'au in the practice of ancient Hawaiian spiritual healing, medicinal herbs, and cultural restoration.

Internships and studies in clinical psychology and human behavior.  Instructor and Senior disciple of Masters Cheuk-Tse and Ho Ngau in the Kung-Fu systems of White Crane, Tibetan Llama Hop Gar, Choi-Li-Fat.  Practitioner of Tao-Gar of Master Lum Dai Yung.  Past articles and monographs: legal aspects of health care; Chinese philosophy, Chinese physical culture, Chi Tao; employee compensation and benefits, corporate tax law; and personnel management and incentives.

Professional Avocations: artworks in portrait and anatomy; iridology; acupuncture/herbs/nutrition; Asian knockout fighting,(ret); aerobatic flying (ret); hanggliding (ret), snow skiing (ret), surfing (ret).
Non-professional:  creative writing, piano, guitar, windsurfing, competitive sports: swimming, volleyball.

# EXHIBIT "10"

1    IN THE DISTRICT COURT OF GUAM

2

UNITED STATES OF AMERICA ) CIVIL CASE NO. 02-00008
3  FOR USE AND BENEFIT OF    )
RHINO BUILDERS, INC.,       )
4          Plaintiff,       )
           vs.              )
5  BIOGENESIS PACIFIC, INC., )
AIG TECHNICAL SERVICES,     )
6  INC., and AMERICAN HOME   )
ASSURANCE COMPANY,          )
7          Defendants.      )
   _____)
8  BIOGENESIS PACIFIC INC.,  )
           Counter-Plaintiff, )
9          vs.              )
RHINO BUILDERS, INC.,       )
10 MICHAEL O'CONNELL, MICHAEL )
DANFORTH, AND JOHN          )
11 DOES 1-10,                )
           Counter-Defendants.)
12 _____)
AMERICAN HOME ASSURANCE     )
13 COMPANY,                  )
           Cross-Claimant,  )
14         vs.              )
BIOGENESIS PACIFIC INC.,    )
15         Cross-Claim      )
           Defendant.       )
16 _____)

17

18        DEPOSITION OF MICHAEL NAWAIKI O'CONNELL
                    VOLUME II

19

20 Taken on behalf of the Defendant, Counter-Plaintiff and
   Cross-Claim Defendant at White & Tom, 820 Mililani
21 Street, Suite 711, Honolulu, Hawaii, commencing at
   12:46 p.m. on Thursday, March 13, 2003, pursuant to
22 Notice.

23

   BEFORE:    SHARON L. ROSS, CSR No. 432
24

25

Case 1:02-cv-00008   Document 438   Filed 08/17/2004   Page 19 of 60

1  received that?

2      A.    In early part of 2001.

3      Q.    Okay.  Thank you.

4            MR. CLARK:  Okay.  If we could go to the next

5  document.

6            MR. TOM:  Okay.  This is an e-mail from

7  George W. Allen to Michael Danforth sent Wednesday,

8  November 8th, 2000.

9            (O'Connell Exhibit No. 15 marked.)

10      Q.    (BY MR. CLARK)  Are you familiar with this

11  document, Mr. O'Connell?

12      A.    Yes.

13      Q.    Okay.  Is this an e-mail from George Allen --

14  I'm sorry.  This purports to be an e-mail from George

15  Allen to Michael Danforth; is that correct?

16      A.    Yes.

17      Q.    And you were cc'd on this; is that correct?

18      A.    Yes.

19      Q.    Do you recall receiving this on or about

20  November 8th, 2000?

21      A.    Yes.

22      Q.    Okay.  In the first paragraph, it says,

23  "Gerry called me after he talked to Michael O.  I told

24  him we could get back to work on a limited basis if he

25  could pay Rhino 25,000 of what is owed by tomorrow."

1          Do you recall ever authorizing George Allen

2   to accept $25,000 from BioGenesis in order to proceed?

3        A.     No.

4        Q.     You never instructed Mr. Allen that he could

5   accept $25,000?

6        A.     Was between Al -- was between -- was

7   between -- George Allen and Alfred Garthe was talking

8   about this.  They called me on this.

9        Q.     Okay.  Did George Allen have the authority to

10  accept $25,000 -- I'm sorry.  Let me back this up.

11         Did George Allen have any contract authority

12  on behalf of Rhino?

13       A.     Try repeat that question again.

14       Q.     Did George Allen have any contract authority?

15  Did he have any authority to contract for Rhino?

16       A.     To -- to do business in Guam?  What you mean

17  "contract"?  Explain "contract."

18       Q.     To bind Rhino to a deal.

19       A.     Yes.  Up there, yes, he had -- he could bind

20  Rhino.  On this matter alone was -- Al gave the

21  authority to go forward.

22       Q.     And to the best of your knowledge, then,

23  you're saying Al Garthe gave George Allen the authority

24  to accept $25,000?

25       A.     Al Garthe accepted $25,000, yes.

1　　　　　　THE WITNESS:　I -- I talking to my -- when I

2　talked to my partner, Al Garthe, they was continue

3　working.　So, I -- I don't know.

4　　　　　　MR. CLARK:　Okay.　Let me -- let me try this,

5　Steve.

6　　　　Q.　　(BY MR. CLARK)　You said that that was a

7　condition recommended to you by Michael Danforth; is

8　that correct?

9　　　　A.　　Yes.

10　　　　Q.　　And you -- when -- did Mr. Danforth have

11　Rhino's authority to send this e-mail off to Gerry Lam?

12　In other words, did he do so with your permission or

13　Rhino's permission?

14　　　　A.　　I don't know.　I....

15　　　　Q.　　Okay.　When Mr. Danforth made the

16　recommendation to you -- or to Rhino to finish the task

17　orders it was working on and to stop working until the

18　subcontract agreement was in place, in your

19　conversations with Mr. Danforth, did you agree to that

20　recommendation?

21　　　　A.　　Yes, I have to say yes.

22　　　　Q.　　Okay.　Let's move on, please.

23　　　　　　MR. CLARK:　Let me go to the next document.

24　　　　　　MR. TOM:　All right.　This is an e-mail

25　that's got a heading on the top that says, "Subject:

1 Guam Roofing Contract - Various" dated 11-14-2000,

2 10:07:50 a.m. West Pacific Standard Time from "Rhino1"

3 to "russ@hgea.org."

4          (O'Connell Exhibit No. 20 marked.)

5      Q.     (BY MR. CLARK)  Are you familiar with this

6 document, Mr. O'Connell?

7      A.     Yes.

8      Q.     Okay.  Have you -- well, actually, let me ask

9 you.  Is this a document that you sent, Mr. O'Connell?

10      A.     Yes.

11      Q.     That would have been on or about November 14,

12 2000?

13          MR. CORTES:  Wait.  It just seems like

14 this -- he sent to who?

15          MR. CLARK:  He sent -- it's addressed from

16 "Rhino1" which is Michael O'Connell to Russ who we've

17 established is Russell Fong, and BPI Hawaii would be

18 Gerry Lam.

19          MR. CORTES:  Okay.  I thought --

20          MR. CLARK:  It's kind of confusing because

21 this is one of the few times where that header box is

22 actually relevant to the e-mail itself.

23      Q.     (BY MR. CLARK)  But, okay, Mr. O'Connell, you

24 said that you recall sending this e-mail; is that

25 correct?

1    A.    Yeah, I -- it looks like it, yes.

2    Q.    Okay.  On or about November 14, 2000; is that

3 correct?

4    A.    Yes.

5    Q.    Okay.  In the first paragraph -- well, first

6 of all, this is addressed to BPI Hawaii, "Gerry."  Would

7 that be Gerry Lam, Mr. O'Connell?

8    A.    Yes.

9    Q.    Okay.  And the first paragraph, the third

10 sentence, it starts, "From now on."  Do you see that

11 sentence, Mr. O'Connell?

12    A.    Yes.

13    Q.    Okay.  It says, "From now on, Mike Danforth

14 is POC contract for all info on roof contract."  Does

15 that "POC" stand for point of contact, Mr. Danforth --

16 Mr. O'Connell?

17    A.    Yeah, pertaining to the written of the

18 contract, yes.

19    Q.    I'm sorry.  Could you repeat that?

20    A.    Pertaining to the written of the proposal,

21 the contract between Gerry and Rhino.

22    Q.    Okay.  So, you meant he was the point of

23 contact for the written subcontract agreement which he

24 was preparing?  Is that what you're saying?

25    A.    Yeah, him and Gerry was preparing, yes.

1    Q.    Okay.  Thank you.

2         MR. CLARK:  Can we go to the next document,

3    please?

4         MR. TOM:  Okay.  The next document is an

5    e-mail that has a header "Fw:  Guan," G-U-A-N, "Roof

6    Subcontract agreement" dated 1-29-01 from Maxx

7    Management to Maxx Management.

8         (O'Connell Exhibit No. 21 marked.)

9    Q.    (BY MR. CLARK)  Are you familiar with this

10   document, Mr. O'Connell?

11   A.    Yes.

12   Q.    It purports to be an e-mail from Maxx to --

13   Maxx, M-A-X-X, Michael Danforth to Russ Fong.  And you

14   were a recipient of this by courtesy copy,

15   Mr. O'Connell, on or about November 15th, 2000; is that

16   correct?

17   A.    Yes.

18   Q.    Okay.  In the earlier exhibit, Mr. O'Connell,

19   we established that Michael Danforth was your point of

20   contact for preparation of the subcontract agreement; is

21   that correct?

22   A.    Yes.

23   Q.    Okay.  So, Michael Danforth then had the

24   authority to negotiate that contract on behalf of Rhino,

25   is that correct, Mr. O'Connell?

1    A.    With our approval, yes.

2         MR. CLARK:  Okay.  Could we go to the next

3    document, please?

4         MR. TOM:  Okay.  The next document is a fax

5    transmittal to Michael Danforth, Rhino Builders, from

6    Gerry -- Gerald Lam dated November 16th, 2000, and

7    appears to be on BioGenesis Pacific transmittal head --

8    letterhead.

9         (O'Connell Exhibit No. 22 marked.)

10   Q.    (BY MR. CLARK)  Are you familiar with this

11   document, Mr. O'Connell?

12   A.    Yes.

13   Q.    Okay.  Could you tell me on or about when you

14   would have received this document?  Is November 16, 2000

15   accurate?

16   A.    November 16 -- November 15 it was faxed.  I

17   don't know.  You asked about -- in November, yes, 2000,

18   yeah.

19   Q.    Okay.  And this is addressed to Michael

20   Danforth from Gerald Lam; but you would have received a

21   copy of this either from Gerald Lam or from Michael

22   Danforth, is that correct, Mr. O'Connell?

23   A.    Yes.

24        MR. CLARK:  Okay.  Can we go to the next

25   document, please?

1  BioGenesis' computerized records up to April 11, 2001,

2  please advise so I can calculate the cost of copying to

3  a new hard drive ready to plug into your office computer

4  in Hawaii."

5      A.    Okay.

6      Q.    Can you tell me whether you requested

7  Mr. Nobles to give you those computerized records?

8      A.    No, we didn't receive none from him.

9      Q.    I'm asking whether you ever asked him for it.

10     A.    No, I didn't.

11     Q.    And you're telling me you never received any

12 computerized records from him?

13     A.    Yes, at all.

14          MR. CLARK:  The next document, please.

15          MR. TOM:  The next document is a -- it's a

16 document that has BioGenesis Pacific, Inc. on the top

17 that says "Guam Roofing Contract."  There's no date on

18 it.

19          (O'Connell Exhibit No. 28 marked.)

20     Q.    (BY MR. CLARK)  Are you familiar with this

21 document, Mr. O'Connell?

22     A.    Yes.

23     Q.    Okay.  You were present, Mr. O'Connell, when

24 I took Mr. Danforth's deposition; is that correct?

25     A.    Yes.

1    Q.    Do you recall my handing this document to

2  Mr. Danforth as an exhibit in his deposition?

3    A.    Yes.

4    Q.    Okay.  At that deposition, Mr. O'Connell,

5  Mr. Danforth said that he prepared this document in

6  order to assist him in preparing a subcontract

7  agreement.  Do you recall his saying that?

8    A.    Yes, I recall.

9    Q.    Okay.  Is that accurate, Mr. O'Connell?  Was

10  this a document prepared by Mr. Danforth, to the best of

11  your knowledge?

12    A.    Yes.

13    Q.    And if you can remember, Mr. O'Connell, was

14  there anything that Mr. Danforth made -- any

15  representations he made with respect to this document

16  which you felt were inaccurate?

17    A.    I don't recall.

18    Q.    Okay.  Thank you.

19        MR. CLARK:  Can we go to the next document,

20  please?

21        MR. TOM:  The next document is a document

22  that has the date "December 8th, 2000" on top.

23        (O'Connell Exhibit No. 29 marked.)

24    Q.    (BY MR. CLARK)  Are you familiar with this

25  document, Mr. O'Connell?

C E R T I F I C A T E

STATE OF HAWAII                    )
                                  )    SS:
CITY AND COUNTY OF HONOLULU )

        I, SHARON ROSS, Notary Public, State of Hawaii,
do hereby certify:

        That on Thursday, March 13, 2003, at 12:46 p.m.,
appeared before me MICHAEL NAWAIKI O'CONNELL, the
witness whose deposition is contained herein; that prior
to being examined he was by me duly sworn;

        That the deposition was taken down by me in
machine shorthand and was thereafter reduced to
typewriting under my supervision; that the foregoing
represents, to the best of my ability, a true and
correct transcript of the proceedings had in the
foregoing matter.

        I further certify that I am not attorney for any
of the parties hereto, nor in any way concerned with the
cause.

        DATED this 20th day of March, 2003, in Honolulu,
Hawaii.

_Sharon Ross_
SHARON ROSS, CSR NO. 432
Notary Public, State of Hawaii
My Commission Expires:  4/8/05

# Michael O'Connell Deposition
# Exhibit No. "20"

Subj:      Guam Roofing Contract - Various
Date:      11/14/00 10:07:50 AM West Pacific Standard Time
From:    rhino1@hawaii.rr.com (Michael O'Connell)
To:    russ@hgea.org, bpihawaii@aool.com
CC:    rhinogum@ite.net (Richard Avilla), RhinoGWA@ite.net (George Allen - Guam), Maxxmgt@aol.com

Gerry;

I have worked with Mike D today and Al regarding the Guam contract. It look
like good new about jobs and schedule. From now on, Mike Danford is POC
contract for all info on roof contract. All leters and calls will be give to
Mike D.

Rhino prepareing invoice to BPI tomorrow for all work todate. Invoice will
be on agree that cost is paid and split profit. I can send 1 invoice or
separate. Let me know.

Mike


----------------- Headers -----------------
Return-Path: <rhino1@hawaii.rr.com>
Received: from rly-yb05.mx.aol.com (rly-yb05.mail.aol.com [172.18.146.5]) by air-yb04.mail.aol.com (v76_r1.23)
with ESMTP; Mon, 13 Nov 2000 19:07:50 -0500
Received: from hawaii.rr.com (hn-mail1.hawaii.rr.com [24.25.227.33]) by rly-yb05.mx.aol.com (v76_r1.19) with
ESMTP; Mon, 13 Nov 2000 19:07:39 -0500
Received: from mike ([24.94.90.15]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.447.44);
    Mon, 13 Nov 2000 14:07:30 -1000
Message-ID: <001701c04dcf$91610ec0$0f5a5e18@hawaii.rr.com>
From: "Michael O'Connell" <rhino1@hawaii.rr.com>
To: <russ@hgea.org>, <bpihawaii@aool.com>
Cc: "Richard Avilla" <rhinogum@ite.net>,
    "George Allen - Guam" <RhinoGWA@ite.net>, <Maxxmgt@aol.com>
Subject: Guam Roofing Contract - Various
Date: Mon, 13 Nov 2000 14:12:25 -1000
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4133.2400
Disposition-Notification-To: "Michael O'Connell" <rhino1@hawaii.rr.com>
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4133.2400


Wednesday, December 20, 2000 America Online: Maxxmgt





O'Connell
EXHIBIT NO. 20
DATE 8-13-02
B.L. ROSS

# Michael O' Connell Deposition Exhibit "28"

Please provide the following information so that I may provide an opinion of the "Health" of the contract.

1. True contract anniversary date. Based on "protest" delays and "others", the anniversary date cannot be the original Notice To Proceed date.
2. Seventeen (17) Task Orders are issued to date: Please provide the following:
   - List of project completed and their respective completions date(s). I am told that 3 are finished but I do not have the Contracting Officers acceptance. We must verify this.
   - Product data and other Task Order submittals such as shop drawings, schedule, etc.. I require information on which T. O. s are complete.
   - Has BPI submitted for Stored materials?????????????

Task Order 0001:
Schedule, Product data, MSDS and AHA complete. <u>Acceptance and Warranty Letter not received.</u>

Task Order 0002:
Schedule, Product data, MSDS and AHA complete. <u>Acceptance and Warranty Letter not received.</u>

Task Order 0003:
Schedule, Product data, MSDS and AHA complete. <u>Acceptance and Warranty Letter not received.</u>
   - <u>Project delayed by Government. Waiting modification on Glue.</u>

Task Order 0004:
   - Schedule, Product data, MSDS and AHA complete.
   - Pre-construction conference held.
   - Gov't accepted extension of time until January 2, 2001. Revised start date is October 31, 2000. Time to install: 14 calendar days.
   - *************Waiting on money to manufacture materials.************** Delivery of materials 14 to 21 days from 50% payment.

Task Order 0005: Order 8/8/00. Delivery Date: 11/6/00
   - Product data & MSDS and AHA complete
   - Pre-construction conference held.
   - *********MATERIAL ORDERED ON 9/14 AND 9/7/2000 One month late****
   - *************** NO SCHEDULE**************************
   - ************ORDER AND DELIVERY OF SAFETY EQUIPMENT*****
   - ************SUBMIT REVISED SCHEDULE************************

Task Order 0006: Order 8/17/00. Delivery Date: 11/15/00





O'Connell
EXHIBIT NO. 28
DATE 2-13-03
S.L. ROSS



************NO ORDER OF MATERIALS***

Task Order 0013: Date of Order: 09/29/00 Date of Delivery: 11/28/00
- ************NO PRODUCT AND MSDS*****************
- ************NO AHA*******************************
- ************NO SCHEDULE**************************
- ************NO ORDER OF MATERIALS**************

Task Order 0014: Date of Order: 9/29/00 Date of Delivery: 11/28/00
- ************NO PRODUCT AND MSDS*****************
- ************NO AHA*******************************
- ************NO SCHEDULE**************************
- ************NO ORDER OF MATERIALS**************

Task Order 0015: Date of Order 9/29/00 Date of Delivery 11/28/00
- ************NO PRODUCT AND MSDS*****************
- ************NO AHA*******************************
- ************NO SCHEDULE**************************
- ************NO ORDER OF MATERIALS**************

Task Order 0016: Date of Order: 9/30/00 Date of Delivery: 3/29/01
- ************NO PRODUCT AND MSDS*****************
- ************NO AHA*******************************
- ************NO SCHEDULE**************************
- ************NO ORDER OF MATERIALS**************

Task Order 0017: Date of Order 9/30/00 Date of Delivery 9/29/00
- ************NO PRODUCT AND MSDS*****************
- ************NO AHA*******************************
- ************NO SCHEDULE**************************
- ************NO ORDER OF MATERIALS**************

# EXHIBIT "11"

```
 1              IN THE DISTRICT COURT OF GUAM

 2
     UNITED STATES OF AMERICA    ) CIVIL CASE NO. 02-00008
 3   FOR USE AND BENEFIT OF      )
     RHINO BUILDERS, INC.,       )
 4           Plaintiff,          )
             vs.                 )
 5   BIOGENESIS PACIFIC, INC.,   )
     AIG TECHNICAL SERVICES,     )
 6   INC., and AMERICAN HOME     )
     ASSURANCE COMPANY,          )
 7           Defendants.         )
     _____)
 8   BIOGENESIS PACIFIC INC.,    )
             Counter-Plaintiff, )
 9           vs.                 )
     RHINO BUILDERS, INC.,       )
10   MICHAEL O'CONNELL, MICHAEL  )
     DANFORTH, AND JOHN          )
11   DOES 1-10,                  )
             Counter-Defendants.)
12   _____)
     AMERICAN HOME ASSURANCE     )
13   COMPANY,                    )
             Cross-Claimant,     )
14           vs.                 )
     BIOGENESIS PACIFIC INC.,    )
15           Cross-Claim         )
             Defendant.          )
16   _____)

17
           DEPOSITION OF MICHAEL LAMAR DANFORTH
18

19   Taken on behalf of the Defendant, Counter-Plaintiff and

20   Cross-Claim Defendant at White & Tom, 820 Mililani

21   Street, Suite 711, Honolulu, Hawaii, commencing at

22   9:34 a.m. on Friday, February 21, 2003, pursuant to

23   Notice.

24

25   BEFORE:    SHARON L. ROSS, CSR No. 432
```

10:07 1    A.    I don't understand the question.

10:07 2    Q.    (BY MR. CLARK)  Okay.  Do you know why they

10:07 3 didn't pay you is really what I'm getting at or maybe

10:07 4 you don't.  That's what I'm saying.  Maybe they just

10:07 5 didn't and --

10:07 6    A.    They just didn't.

10:07 7    Q.    Okay.  So, you left Youngbird sometime in

10:07 8 2000; and then where did you go to work?

10:08 9    A.    For Maxx Management Corporation.

10:08 10    Q.    Okay.  And when was that?

10:08 11    A.    Middle of July, 2000.

10:08 12    Q.    Okay.  Maxx Management is a Nevada

10:08 13 corporation; is that correct?

10:08 14    A.    Correct.

10:08 15    Q.    Are you a shareholder in Maxx Management?

10:08 16    A.    No.

10:08 17    Q.    Are you a director of Maxx Management?

10:08 18    A.    No.

10:08 19    Q.    Have you been a shareholder or a director of

10:08 20 Maxx Management?

10:08 21    A.    Not a shareholder.  I have been a director.

10:08 22    Q.    Okay.  When were you a director?

10:08 23    A.    At its conception.

10:08 24    Q.    How long were you a director?

10:08 25    A.    I don't recall, short period of time.

10:08 1      Q.    Did you hold any other titles with Maxx

10:09 2  Management?

10:09 3      A.    Yes.

10:09 4      Q.    Okay.  Can you tell me what that was?

10:09 5      A.    Vice-president.

10:09 6      Q.    Okay.  And are you still with Maxx

10:09 7  Management?

10:09 8      A.    Yes.

10:09 9      Q.    Are you still vice-president?

10:09 10     A.    No.

10:09 11     Q.    Okay.  What's your current title?

10:09 12     A.    Authorized representative.

10:09 13     Q.    Okay.  How long were you a vice-president of

10:09 14 Maxx Management?

10:09 15     A.    Same period of time I was a director.  It was

10:09 16 a short period of time.  I don't recall.

10:09 17     Q.    Okay.  Would that have ended in the year

10:09 18 2000?

10:09 19     A.    I don't recall.

10:10 20     Q.    After being vice-president, was your title

10:10 21 then authorized representative?

10:10 22     A.    I'm sorry?

10:10 23     Q.    Well, after you -- did you have any other

10:10 24 titles -- currently you said you were an authorized

10:10 25 representative and up through -- for a short period of

10:10  1   time in 2000 you were vice-president.  Between those

10:10  2   periods, now and when you stopped being vice-president,

10:10  3   did you have any other title?

10:10  4        A.     No.

10:10  5        Q.     Okay.  So, after you stopped being

10:10  6   vice-president, your title is authorized -- and has been

10:10  7   and still is authorized representative?

10:10  8        A.     Correct.

10:10  9        Q.     Okay.  And as an authorized representative,

10:10 10   what do you understand your authority to be with the

10:10 11   corporation?

10:10 12        A.     I understand my authority -- I have signatory

10:10 13   authority for the corporation.  I have the authority to

10:10 14   act as consultant.

10:11 15        Q.     I'm sorry.  Consultant to the corporation or

10:11 16   on the corporation's behalf?

10:11 17        A.     At -- on the corporation's behalf.  And I

10:11 18   have duties to manage some of the businesses -- business

10:11 19   activities.

10:11 20        Q.     Okay.  Can you describe for me what types of

10:11 21   businesses Maxx Management does?

10:11 22        A.     Since I have been with Maxx Management, it

10:11 23   has -- its work has been limited to consulting with

10:11 24   other small businesses and some large businesses.

10:11 25        Q.     Okay.  What type of consulting?

10:33 1     MR. TUHY: You'll have to speak audibly so

10:33 2 the court reporter can get it down as opposed to a shake

10:33 3 of the head. I'm sorry, Counsel.

10:33 4    A. Yes. Sorry.

10:33 5    Q. (BY MR. CLARK) Okay. What was their

10:33 6 reaction?

10:33 7    A. I don't recall.

10:34 8    Q. Okay. You said that when you went to Guam

10:34 9 you were asked to look at the roofing contract. Can you

10:34 10 describe exactly what you were asked to do by Rhino with

10:34 11 respect to the roofing contract?

10:34 12    A. Yes, I can. The initial request was: Would

10:34 13 you take a look at the first task orders and give us

10:34 14 your impression or suggestions of their condition? So,

10:34 15 the first thing I did was just a basic evaluation.

10:34 16    Q. Okay. Were you requested to do anything else

10:34 17 with respect to the roofing contract? And, I'm sorry,

10:34 18 let me back up a little bit. When I say "you," are we

10:35 19 talking about All Star -- Maxx Management then? Was

10:35 20 Maxx Management asked to look at the contract?

10:35 21    A. You have to ask that question a different

10:35 22 way. I don't understand that.

10:35 23    Q. Okay. Were you asked to look at the roofing

10:35 24 contract in your capacity as a representative of Maxx

10:35 25 Management?

10:35 1      A.      Correct.

10:35 2      Q.      And were you ever asked to look at the

10:35 3 roofing contract in any other capacity?

10:35 4      A.      No.

10:35 5      Q.      So, going forward from this point, if I refer

10:35 6 to "you" in the context of the work that you did on this

10:35 7 contract, then we'll assume it includes Maxx Management

10:35 8 then, okay, in its corporate capacity?

10:35 9      A.      (Witness nods head.)

10:35 10             MR. TUHY:  Out loud.

10:35 11     A.      Yes.

10:35 12     Q.      (BY MR. CLARK)  Okay.  Aside from looking at

10:35 13 the first task orders, were you asked to do anything

10:35 14 else with respect to the roofing contract?

10:35 15     A.      Yes.  I was asked to evaluate the task

10:36 16 orders, create an impression, basically, an evaluation.

10:36 17 The second step of that is to generate what I thought

10:36 18 were issues that needed addressing.  Third step is I was

10:36 19 provided all the task orders by Richard Avilla.

10:36 20     Q.      When you say "all the task orders," how many

10:36 21 are you talking about?

10:36 22     A.      There were 17 at that time numbered 1 through

10:36 23 17.

10:36 24     Q.      Okay.

10:36 25     A.      And in their folder with supplementary

10:36 1  information such as schedules, all the control plans,

10:36 2  activity hazard analysis, other supplemental submittals

10:36 3  that had or had not been turned in for each task order.

10:37 4      Q.    Okay.  Actually, I'm going to show you a

10:37 5  document here if we can get that marked as an exhibit.

10:37 6              (Danforth Exhibit No. 3 marked.)

10:37 7      Q.    (BY MR. CLARK)  Take a second to look at

10:37 8  that, please.

10:37 9      A.    Uh-huh, yes, I'm familiar with the document.

10:37 10     Q.    Can you tell me if you are the author of this

10:37 11 document?

10:37 12     A.    I am.

10:37 13     Q.    Can you tell me when you authored it?

10:37 14     A.    It was during my visit to Guam.

10:37 15     Q.    Okay.  You say you were in Guam in October of

10:37 16 2000.  How long were you in Guam at that time?

10:38 17     A.    Nine, ten days maybe, two weeks, in that

10:38 18 range.

10:38 19     Q.    So, it was during that two-week period you're

10:38 20 referring to?

10:38 21     A.    Correct.

10:38 22     Q.    Had you been to Guam before October, 2000?

10:38 23     A.    Never.

10:38 24     Q.    Can you tell me to whom this -- well, first

10:38 25 of all, is this a reproduction of an e-mail that you had

11:15 1      Q.     (BY MR. CLARK)  Okay.  Mr. Danforth, you

11:15 2  started to outline the other tasks that you were asked

11:16 3  by Rhino to work on.  You said there was Travis, Army

11:16 4  Corps of Engineers.  Anything else?

11:16 5      A.     Yes.  They asked for me to work with Eugene

11:16 6  O'Connell on their budgeting for year -- for one or two

11:16 7  of the years, the past year and a forthcoming year.

11:16 8      Q.     Okay.  Anything else?

11:16 9      A.     I can't recall.

11:16 10     Q.     Okay.  And all of these additional tasks were

11:16 11 incorporated into the service agreement as the -- I

11:16 12 guess, Maxx Management's job?

11:16 13     A.     Maxx Management accepted them as additional

11:16 14 services and did charge additional money for those

11:16 15 services.

11:17 16     Q.     Okay.  At this time what I would like to do

11:17 17 is I'd like to have this stack of 66 pages submitted

11:17 18 into -- or stamped as an exhibit, please.

11:17 19            (Danforth Exhibit No. 5 marked.)

11:17 20            MR. CORTES:  Are those in chronological

11:17 21 order?

11:17 22            MR. CLARK:  Yes.

11:17 23     Q.     (BY MR. CLARK)  Okay.  Mr. Danforth, this

11:17 24 Exhibit 5, 66 documents in volume, was -- or 66 pages in

11:17 25 this volume was provided to you prior to the start of

11:17  1  this deposition; is that correct?

11:17  2      A.    Correct.

11:17  3      Q.    And you've had a chance to look at these

11:17  4  documents with your counsel, Mr. Tuhy; is that correct?

11:18  5      A.    Correct.

11:18  6      Q.    These documents purport to be correspondences

11:18  7  primarily through e-mail, but I believe there's also a

11:18  8  letter in there that was faxed which you either authored

11:18  9  or which were sent to you or you were -- you're listed

11:18 10  anyway as one of the recipients; is that correct?

11:18 11      A.    I acknowledge that I was listed as a

11:18 12  recipient --

11:18 13      Q.    Okay.

11:18 14      A.    -- or I authored some, yes.

11:18 15      Q.    Okay.  Having had a chance to look at these

11:18 16  documents -- now, with the exception that these

11:18 17  documents have headers apparently and footers from the

11:18 18  computer or whoever owned the computer that was printing

11:18 19  the copy -- but except for those headers and footers,

11:18 20  do -- are you familiar with the -- I guess, the contents

11:19 21  in the context of these documents?

11:19 22      A.    Yes.

11:19 23      Q.    Okay.  All of them?

11:19 24      A.    I did not recognize some of them; but the

11:19 25  content, I recognized or remembered.

11:19  1      Q.    Okay.  Now, I believe the first -- first

11:19  2  seven pages -- if I can have you take a look at those

11:19  3  first seven pages, you will see that the "To" line is

11:20  4  either R. Avilla, Richard Avilla, or -- I'm sorry,

11:20  5  "From" line --

11:20  6      A.    Yes.

11:20  7      Q.    -- is either Richard Avilla or, in the last

11:20  8  document, George Allen; but the author of those

11:20  9  documents is written down as "Michael."  Are you the

11:20 10  author of these documents, with the exception of

11:20 11  anything there that was attached by chain?

11:20 12      A.    This document appears to be incomplete,

11:20 13  Document 3.  This document was -- the original author

11:20 14  was Gerry Lam and a response from me.  That's document

11:20 15  4.  Document 6, I authored.  Document 7, I authored.

11:21 16      Q.    Okay.  As for Document No. 3, you say it

11:21 17  appears to be incomplete.  Do you know for sure it's

11:21 18  incomplete or --

11:21 19      A.    Yes, I know for sure it's incomplete because

11:21 20  this is a duplicate of it with a second page.

11:21 21      Q.    I'm sorry?

11:21 22      A.    Document 4.

11:21 23      Q.    Good catch.  Thank you.  Okay.  And the other

11:21 24  documents that you've had a chance to review where the

11:21 25  "From" line says "Maxx" or "Maxxmgt," would those be

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808) 524-2090
Case 1:02-cv-00008   Document 438   Filed 08/17/2004   Page 45 of 60

11:21 1    documents that you authored?

11:22 2         A.    Once again, I reviewed the body of it.    I

11:22 3    recall the body of it.    As far as the stamp at the top,

11:22 4    I'm not sure; but I don't at this time have a reason to

11:22 5    say no.

11:22 6         Q.    Okay.    That's why we wanted to exclude the

11:22 7    stamp at the top.

11:22 8         A.    That's what you said before.

11:22 9         Q.    I was referring to the body here where it

11:22 10   says "From:   Maxx," okay?   So, do you want to restate

11:22 11   your comment then?   So, are you saying that excluding

11:22 12   the headers here, if we look at the content of the

11:22 13   e-mail --

11:22 14        A.    Reask your question, please.

11:22 15        Q.    Okay.  My question was:  As far as the e-mail

11:22 16   here that has a "From" line, Maxx, M-A-X-X, or some have

11:22 17   Maxx, M-A-X-X, mgt, would those be documents that you

11:22 18   authored?

11:22 19        A.    It appears to be.

11:22 20        Q.    Okay.  And of the documents that appear to

11:23 21   have been authored by you, to the best of your

11:23 22   knowledge, are the documents accurate in their

11:23 23   representation here as far as the date, the time and the

11:23 24   content?

11:23 25        A.    I can't respond to that.  I can't respond

11:23 1   from my memory to these documents.

11:23 2       Q.   Okay.   Well, that's -- the question was to

11:23 3   the best of your knowledge then.  So, you're saying

11:23 4   uncertain?

11:23 5       A.   No, I'm saying you're asking for my memory to

11:23 6   verify these dates and times and I cannot.

11:23 7       Q.   Okay.  Were -- did any of these documents

11:23 8   stand out to you as being something that you did not

11:23 9   recall either authoring or receiving?

11:23 10      A.   No, I recalled the body of the context of

11:23 11  these documents.

11:24 12      Q.   I believe we have them arranged in

11:24 13  chronological order from October 24 through -- it

11:24 14  appears to be December 10, 2000.  So, during this period

11:24 15  of October 24 through December, 2000, were you in

11:24 16  contact with Rhino representatives, BioGenesis

11:24 17  representatives through e-mail?

11:24 18      A.   Yes.

11:24 19      Q.   Okay.  Can you think of whether you would

11:24 20  have started any e-mail correspondence with Rhino

11:24 21  representatives or BioGenesis representatives before

11:25 22  October 24, 2000?

11:25 23           MR. TUHY:  Relative to the roofing contract,

11:25 24  Counsel?

11:25 25           MR. CLARK:  Relative to the roofing contract.

11:25  1      A.     No.

11:25  2      Q.     (BY MR. CLARK)   Okay.   Or after December 10,

11:25  3  2000?

11:25  4      A.     I don't recall.

11:25  5      Q.     Okay.   Having looked at these documents, is

11:25  6  there any document in particular that you would like to

11:25  7  draw our attention to as being inaccurate, that you know

11:25  8  for certain was inaccurate or was a misrepresentation?

11:25  9      A.     As I stated before, I acknowledge the body

11:25  10  and the content.   The specifics of it, I did not --

11:25  11  nothing stood out as inaccurate, to the best of my

11:25  12  knowledge.

11:25  13      Q.     Okay.   Thank you.

11:25  14          MR. TUHY:   Counsel, for assistance, I think

11:25  15  off the record we had indicated that we would not object

11:25  16  on a foundational or authenticity bases as to documents

11:25  17  compiled in Exhibit 5, reserving any objections for

11:26  18  relevance or any other bases.

11:26  19          MR. CLARK:   That's fine.

11:26  20      Q.     (BY MR. CLARK)   Okay.   Now, these next set of

11:26  21  exhibits are also e-mail and correspondence that I would

11:26  22  like to have you look at specifically.   Can I get that

11:26  23  marked as an exhibit?

11:26  24          (Danforth Exhibit No. 6 marked.)

11:26  25      Q.     (BY MR. CLARK)   If you could take a second to

11:35  1    Exhibit 3. We're going to add to Exhibit 3, from

11:35  2    Mr. Danforth's supplemental disclosure, Bates stamp

11:35  3    No. 7852 which purports to be the missing second page of

11:35  4    Exhibit 3. And so, we'll go ahead and modify; and if

11:35  5    everybody will stipulate for the record, that's okay.

11:35  6    Mr. Tuhy?

11:35  7              MR. TUHY:  So agreed.

11:35  8              MR. CORTES:  So agreed.

11:35  9              MR. TOM:  Fine with us.

11:35 10         Q.   (BY MR. CLARK)  So, looking at Exhibit 3 in

11:35 11    reference to Exhibit 7, okay, taking a look at this, I

11:36 12    see that you have in Exhibit 3 task order 1, 2, 3 listed

11:36 13    as -- well, actually maybe you could describe actually

11:36 14    how you have it listed there.  You have "Schedule,

11:36 15    product data, MSDS and AHA complete."  Could you explain

11:36 16    that, please?

11:36 17         A.   Exhibit 3 is a narrative that I produced of

11:36 18    my opinion of the health of the contract.  It was

11:36 19    strictly based on what I gleaned from reading the task

11:37 20    order and whatever I was provided by BioGenesis to

11:37 21    understand what the condition of the contract was.

11:37 22              For each task order to be -- if you reference

11:37 23    task order No. 1, "Schedule, product data" -- "MSDS" is

11:37 24    material safety and data sheets.  "AHA" is activity

11:37 25    hazard analysis complete.  "Acceptance and warranty

11:37 1 letter not received."  Acceptance and warranty letter

11:37 2 would be issued by the government.

11:37 3      Q.   I'm sorry.  What was AHA again?

11:37 4      A.   Activity hazard analysis.

11:37 5      Q.   Does this mean, then, that with the exception

11:37 6 of the Navy's acceptance and warranty letter that the

11:37 7 project itself was complete?  So, the work that was to

11:37 8 be performed by BioGenesis was done?

11:38 9      A.   It appears that's what this is saying.

11:38 10      Q.   Okay.  And that's the same for task order 2

11:38 11 and 3?

11:38 12      A.   Correct.

11:38 13      Q.   Okay.  You notice --

11:38 14      A.   Not correct.

11:38 15      Q.   I was going to refer to task order 3.  It

11:38 16 says, "Project delayed by government, waiting

11:38 17 modification on glue"?

11:38 18      A.   That was a note I picked up that, as I

11:38 19 recall, the project had been completed, had been

11:38 20 completed and had -- there was some extra work required;

11:38 21 and it appeared that there was a modification

11:38 22 forthcoming from the Navy on a different type of glue

11:38 23 or....

11:38 24      Q.   Kind of like a punch list item then?

11:38 25      A.   No.

11:38 1    Q.    No?  So, this is a modification?

11:38 2    A.    Modification would be a change to the task

11:38 3  order to add or delete work.  In this case it appeared

11:38 4  to be to add some additional work.

11:39 5    Q.    Okay.  Task order No. 4, can you explain to

11:39 6  us what your notations there mean?

11:39 7    A.    My evaluation of the file was that the

11:39 8  schedule, product data, MSDS and AHA were complete;

11:39 9  preconstruction conference had been held; government

11:39 10 accepted extension of time until January 2 of 2001;

11:39 11 revised start date is October 1 -- 31, 2000; time to

11:39 12 install, 14 calendar days.

11:39 13       I made a note that I was told that they're

11:39 14 waiting on money to manufacture materials, delivery of

11:39 15 materials 14 to 21 days from 50 percent payment.  So,

11:39 16 the manufacturer was asking a 50 percent up-front value

11:39 17 to begin manufacturing.

11:40 18   Q.    It says that the start date is October 31,

11:40 19 2000 -- or revised start date.  So, as of the date of

11:40 20 this document, the physical work on this project had not

11:40 21 started; is that correct?

11:40 22   A.    The best I can tell from my writing.

11:40 23   Q.    Okay.  Task order No. 5 -- when we talk about

11:40 24 the product data, MSDS and AHA, are we talking primarily

11:40 25 about the submission of documents?

11:40 1     A.    Correct.

11:40 2     Q.    Okay.  So, those terms, then, don't refer to

11:40 3 any actual physical construction work or roofing work

11:40 4 then, correct?

11:40 5     A.    It does not refer to any on-site physical

11:40 6 work.  It does refer to physical work relative to

11:40 7 contract administration.

11:40 8     Q.    Okay.  And that says, "No schedule."  Okay.

11:41 9 I notice in task orders 1, 2, 3 and 4 they reference a

11:41 10 schedule.  Would that schedule also include the start

11:41 11 date and the completion date?

11:41 12     A.    It had to.

11:41 13     Q.    Okay.  So, as far as task order No. 5, then,

11:41 14 if there was no schedule, would it be safe to assume,

11:41 15 then, that the project as far as on-site physical work

11:41 16 was concerned had not started?

11:41 17     A.    I believe that to be true.

11:41 18     Q.    Okay.  At the bottom of the first page, it

11:41 19 refers to task order No. 6 and goes over to the second

11:41 20 page.  That also says "No schedule"; and I think

11:41 21 included in the category of task orders that state "no

11:42 22 schedule" are task orders No. 8, 9, 10, 11, 12, 13, 14,

11:42 23 15, 16 and 17.  So, of those task orders that refer to

11:42 24 "No schedule," it would also be correct that no physical

11:42 25 on-site work had commenced; is that correct?

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808)  524-2090
Case 1:02-cv-00008   Document 438   Filed 08/17/2004   Page 52 of 60

11:42  1          MR. TUHY:  Excuse me.  Counsel, are you

11:42  2  including task order No. 7?

11:42  3          MR. CLARK:  I'm not including No. 7.  I --

11:42  4          MR. TUHY:  Okay.  I'm sorry.  You're going 8

11:42  5  through 17?

11:42  6          MR. CLARK:  8 through 17, yes.

11:42  7      A.    And your question, again, for 8 through 17?

11:42  8      Q.    (BY MR. CLARK)  They also have, under the

11:42  9  task order number, a reference to "No schedule."  So, am

11:42 10  I correct in assuming that that also means that no

11:42 11  physical on-site work had started on those task orders?

11:42 12      A.    I would say that's correct.

11:42 13      Q.    Okay.  And let's look at task order No. 7.

11:42 14  Well, that one actually says "Project complete."  So, we

11:43 15  can assume, then, that the physical on-site work had

11:43 16  been completed; is that correct?

11:43 17      A.    That's what was in the file.

11:43 18      Q.    Okay.  Now, if we can go back to Exhibit 7,

11:43 19  you stated earlier that you believe the performance had

11:43 20  started on all 17 of the task orders.  Yet, for example,

11:43 21  if we look at task orders 8 forward, they say "No

11:43 22  product and MSDS, no AHA, no schedule, no order of

11:43 23  materials."

11:43 24          So, when you said that performance had

11:43 25  started on all the task orders, what work or what

12:04 1     A.    I was referring to operating under a verbal

12:04 2  agreement.

12:04 3     Q.    Do you recall as of October when you were

12:04 4  asked to look at the roofing contract how long Rhino had

12:04 5  been operating under a verbal agreement?

12:04 6     A.    I did not know.

12:04 7     Q.    Okay.  Did anyone at Rhino tell you that they

12:04 8  started with a verbal agreement always intending to

12:04 9  formalize it into a written agreement?

12:04 10     A.    Yes.

12:04 11     Q.    Okay.  And they told you that that was the

12:04 12  original intent?

12:04 13     A.    Yes.

12:04 14     Q.    Okay.  Who told you this?

12:04 15     A.    Michael O'Connell.

12:05 16     Q.    Did they tell you why one had not yet been

12:05 17  prepared as of October, 2000?

12:05 18     A.    No.

12:05 19     Q.    Did they tell you whose responsibility it was

12:05 20  prior to October, 2000, to prepare a written subcontract

12:05 21  agreement?

12:05 22     A.    No.

12:05 23     MR. CLARK:  Next exhibit.

12:06 24     (Danforth Exhibit No. 14 marked.)

12:06 25     Q.    (BY MR. CLARK)  I'm sorry.  Are you familiar

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808) 524-2090
Case 1:02-cv-00008   Document 438   Filed 08/17/2004   Page 54 of 60

12:06 1 with this?

12:06 2     A.    Yes.

12:06 3     Q.    If you can refer to the second paragraph, it

12:06 4 says, "On 29 October, 2000 Al" -- would that be Al

12:06 5 Garthe?

12:06 6     A.    Correct.

12:06 7     Q.    "George," is that George Allen?

12:06 8     A.    Correct.

12:06 9     Q.    "Richard," Richard Avilla?

12:06 10     A.    Correct.

12:06 11     Q.    "And myself conversed with Gerry Lam and

12:06 12 agreed, one, RBI" -- is that Rhino?

12:06 13     A.    Correct.

12:06 14     Q.    -- "would complete all task orders that were

12:06 15 previously started"; and in parenthesis again you have

12:06 16 the same five task orders that were earlier referred to,

12:06 17 task orders 1, 2, 3, 4 and 7.  Okay?

12:06 18     So, as of November 10th, 2000, did you

12:07 19 understand that Rhino had only started working on those

12:07 20 five task orders?

12:07 21     A.    That appears to be what I'm saying.

12:07 22     MR. CORTES:  It doesn't appear.  Never mind.

12:07 23     Q.    (BY MR. CLARK)  Would that be exclusive of

12:07 24 the remaining 12 task orders then?

12:07 25     A.    All the information I provided in these

12:08 1    A.    Yes.

12:08 2    Q.    Okay.

12:08 3    A.    I did continue at the insistence of Michael

12:08 4 O'Connell to get back involved and to continue to advise

12:09 5 on my opinion.

12:09 6              (Danforth Exhibit No. 15 marked.)

12:09 7    Q.    (BY MR. CLARK)  Before we -- I would like to

12:09 8 go back to 14.  I'm sorry.  You refer to this -- to an

12:09 9 October 29th, 2000 conversation.  This was a

12:09 10 conversation -- I'm assuming that Al Garthe, George

12:09 11 Allen and Richard Avilla as well as yourself were on

12:09 12 Guam at the time?

12:09 13   A.    Correct.

12:09 14   Q.    Okay.  And Gerry Lam was participating by

12:09 15 telephone; is that correct?

12:09 16   A.    No, that's not correct.

12:10 17   Q.    Okay.  How was he --

12:10 18   A.    That is not correct.  I was not on Guam at

12:10 19 this time.

12:10 20   Q.    Oh, okay.  Where were you at this time?

12:10 21   A.    I stand corrected.  The paragraph says on

12:10 22 October 29th I was on Guam.  That is correct.

12:10 23   Q.    Okay.  Let me get the time line straight

12:10 24 here.  Let's do that first.  So, you went to Guam in

12:10 25 October; and then you left Guam when?

12:10  1      A.     At the end of the month --

12:10  2      Q.     Okay.

12:10  3      A.     -- or the first of the next month.

12:10  4      Q.     And did you return to Hawaii?

12:10  5      A.     Yes.

12:10  6      Q.     After returning to Hawaii, did you go back to

12:10  7 Guam?

12:10  8      A.     No.

12:10  9      Q.     Okay.  We have, as we stated earlier,

12:10 10 correspondences and e-mail in Exhibit 5 through

12:10 11 December 10 of 2000.  So, from the time that you left

12:11 12 Guam and came back to Hawaii through December 10 of

12:11 13 2000, did you remain in Hawaii?

12:11 14      A.     Correct.

12:11 15      Q.     Okay.

12:11 16      A.     No, no, I did not.

12:11 17      Q.     Okay.

12:11 18      A.     I traveled during that time in November.

12:11 19      Q.     Okay.  Where did you travel to?

12:11 20      A.     Florida.

12:11 21      Q.     Okay.  So, let's go back to Exhibit 14.  So,

12:11 22 the conversation you had on October 29, 2000 with Gerry

12:11 23 Lam, Al, George, Richard and you were on Guam; and Gerry

12:11 24 Lam was on the telephone; is that correct?

12:11 25      A.     That is correct.  It's a telephone conference

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii     (808) 524-2090
Case 1:02-cv-00008    Document 438    Filed 08/17/2004    Page 57 of 60

12:11  1   call.

12:11  2         Q.     Okay.   And you say here that it was agreed

12:11  3   that "RBI would complete all task orders that were

12:11  4   previously started."   What was the understanding with

12:11  5   respect to the other task orders that are not listed?

12:12  6         A.     I don't recall if we addressed them.

12:12  7         Q.     Okay.   There was no discussion about doing

12:12  8   any work on them or starting them at all or specifically

12:12  9   not doing anything on them?

12:12 10         A.     If you refer back to Exhibit 3, it indicated

12:12 11   to me from the file of the ones that were in current

12:12 12   operation.

12:12 13         Q.     And that would be --

12:12 14         A.     And those are the ones we're addressing here.

12:12 15         Q.     1 through 4 and 7?

12:12 16         A.     Correct.

12:12 17         Q.     So, the other task orders didn't come up in

12:12 18   the conversation, to the best of your recollection?

12:12 19         A.     They came up in the conversation because we

12:12 20   were working off of Exhibit 3.

12:12 21         Q.     Okay.

12:12 22         A.     We were reading them.

12:12 23         Q.     All right.   If we can go over to Exhibit 15

12:12 24   now.   Have you had a chance to look at that?

12:13 25         A.     Okay.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii     (808) 524-2090
Case 1:02-cv-00008     Document 438     Filed 08/17/2004     Page 58 of 60

12:13 1     Q.    Okay.  Refer to the second paragraph.  This

12:13 2  says, "On 29 October, 2000, we, Rhino and you, agreed

12:13 3  that Rhino will finish all task orders started and we

12:13 4  identified those task orders specifically."  Then you

12:13 5  start in bold, "and that no other work will be performed

12:13 6  by Rhino until a subcontract agreement was in place."

12:13 7  Okay.  Does that refresh your memory about your

12:13 8  discussion on the additional task orders?

12:13 9     A.    That refreshes my memory of the discussion

12:13 10  between Rhino and Gerry.

12:14 11     Q.    Okay.  And this is the same discussion on

12:14 12  October 29, 2000 that you participated in?

12:14 13     A.    Yes.

12:14 14     Q.    Okay.  So, do you recall then that during

12:14 15  that discussion the parties agreed that Rhino would not

12:14 16  commence work or would not continue any work on the

12:14 17  roofing contract other than, I'm sorry, the task orders

12:14 18  1 through 4 and 7?

12:14 19     A.    That's what I'm saying here.

12:14 20     MR. CLARK:  Next exhibit.

12:15 21     (Danforth Exhibit No. 16 marked.)

12:15 22     Q.    (BY MR. CLARK)  Okay.  Are you familiar with

12:15 23  this document?

12:15 24     A.    Yes, uh-huh.

12:15 25     Q.    It purports to be -- well, the first page

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808) 524-2090
Case 1:02-cv-00008   Document 438   Filed 08/17/2004   Page 59 of 60

# C E R T I F I C A T E

STATE OF HAWAII )

                       )    SS:

CITY AND COUNTY OF HONOLULU )

     I, SHARON ROSS, Notary Public, State of Hawaii, do hereby certify:

     That on Friday, February 21, 2003, at 9:34 a.m., appeared before me MICHAEL LAMAR DANFORTH, the witness whose deposition is contained herein; that prior to being examined he was by me duly sworn;

     That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

     I further certify that I am not attorney for any of the parties hereto, nor in any way concerned with the cause.

     DATED this 2nd day of March, 2003, in Honolulu, Hawaii.

_Sharon Ross_

SHARON ROSS, CSR NO. 432
Notary Public, State of Hawaii
My Commission Expires: 4/8/05

# Michael Danforth Deposition Exhibit No. "3"

**BIOGENSIS PACIFIC INC.**
Guam Roofing Contract – N62766-99-D-0425

Please provide the following information so that I may provide an opinion of the "Health" of the contract.

1. True contract anniversary date. Based on "protest" delays and "others", the anniversary date cannot be the original Notice To Proceed date.
2. Seventeen (17) Task Orders are issued to date: Please provide the following:
   - List of project completed and their respective completions date(s). I am told that 3 are finished but I do not have the Contracting Officers acceptance. We must verify this.
   - Product data and other Task Order submittals such as shop drawings, schedule, etc.. I require information on which T. O. s are complete.
   - Has BPI submitted for Stored materials?????????????

Task Order 0001:
Schedule, Product data, MSDS and AHA complete. <u>Acceptance and Warranty Letter not received.</u>

Task Order 0002:
Schedule, Product data, MSDS and AHA complete. <u>Acceptance and Warranty Letter not received.</u>

Task Order 0003:
Schedule, Product data, MSDS and AHA complete. <u>Acceptance and Warranty Letter not received.</u>
   - <u>Project delayed by Government. Waiting modification on Glue.</u>

Task Order 0004:
   - Schedule, Product data, MSDS and AHA complete.
   - Pre-construction conference held.
   - Gov't accepted extension of time until January 2, 2001. Revised start date is October 31, 2000. Time to install: 14 calendar days.
   - *************Waiting on money to manufacture materials.************** Delivery of materials 14 to 21 days from 50% payment.

Task Order 0005: Order 8/8/00. Delivery Date: 11/6/00
   - Product data & MSDS and AHA complete
   - Pre-construction conference held.
   - *********MATERIAL ORDERED ON 9/14 AND 9/7/2000 One month late****
   - *************** NO SCHEDULE************************
   - ************ORDER AND DELIVERY OF SAFETY EQUIPMENT*****
   - ************SUBMIT REVISED SCHEDULE********************

Task Order 0006: Order 8/17/00. Delivery Date: 11/15/00

Danforth
EXHIBIT NO. 3
DATE 2-21-03
B.L. ROSS

- Product data. & MSDS complete.
- No AHA.
- No Schedule
- Materials ordered and received.
- **************REQUIRE REVISED END DATE*******************

Task Order 0007: Date of Order: 8/21/00 Delivery Date: 9/20/00
- Schedule, Product data, MSDS and AHA complete.
- Pre-construction conference held.
- Project complete.
- **************PRE-FINAL INSPECTION NOT REQUESTED************
- **************TIME EXTENSION REQUEST TO 10/30/00 AND VERBALLY GRANTED, EXTENSION NOT RECEIVED IN WRITING*****************

Task Order 0008: Date of Order: 9/14/00 Date of Delivery: 12/13/00
- ************NO PRODUCT AND MSDS*****************
- ************NO AHA*******************************
- ************NO SCHEDULE***************************
- ************NO ORDER OF MATERIALS***VENDOR WILL NOT SHIP UNTIL PAYMENT IS MADE ON OUTSTANDING ORDER*************

Task Order0009: Date of Order: 9/13/00 Date of Delivery: 12/12/00
- ************NO PRODUCT AND MSDS*****************
- ************NO AHA*******************************
- ************NO SCHEDULE***************************
- ************NO ORDER OF MATERIALS***VENDOR WILL NOT SHIP UNTIL PAYMENT IS MADE ON OUTSTANDING ORDER*************

Task Order 0010: Date of Order: 9/13/00 Date of Delivery: 12/12/00
- ************NO PRODUCT AND MSDS*****************
- ************NO AHA*******************************
- ************NO SCHEDULE***************************
************NO ORDER OF MATERIALS***VENDOR WILL NOT SHIP UNTIL PAYMENT IS MADE ON OUTSTANDING ORDER*************

Task Order 0011: Date of Order 9/29/00 Date of Delivery 10/29/00
- ************NO PRODUCT AND MSDS*****************
- ************NO AHA*******************************
- ************NO SCHEDULE***************************
- ************NO ORDER OF MATERIALS*************

Task Order 0012: Date of Order: 09/29/00 Date of Delivery: 11/28/00
- ************NO PRODUCT AND MSDS*****************
- ************NO AHA*******************************
- ************NO SCHEDULE***************************

**007852**

\*\*\*\*\*\*\*\*\*\*\*NO ORDER OF MATERIALS\*\*\*

Task Order 0013: Date of Order: 09/29/00 Date of Delivery: 11/28/00
- \*\*\*\*\*\*\*\*\*\*\*\*NO PRODUCT AND MSDS\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO AHA\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO SCHEDULE\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO ORDER OF MATERIALS\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Task Order 0014: Date of Order: 9/29/00 Date of Delivery: 11/28/00
- \*\*\*\*\*\*\*\*\*\*\*\*NO PRODUCT AND MSDS\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO AHA\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO SCHEDULE\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO ORDER OF MATERIALS\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Task Order 0015: Date of Order 9/29/00 Date of Delivery 11/28/00
- \*\*\*\*\*\*\*\*\*\*\*\*NO PRODUCT AND MSDS\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO AHA\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO SCHEDULE\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO ORDER OF MATERIALS\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Task Order 0016: Date of Order: 9/30/00 Date of Delivery: 3/29/01
- \*\*\*\*\*\*\*\*\*\*\*\*NO PRODUCT AND MSDS\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO AHA\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO SCHEDULE\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO ORDER OF MATERIALS\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Task Order 0017: Date of Order 9/30/00 Date of Delivery 9/29/00
- \*\*\*\*\*\*\*\*\*\*\*\*NO PRODUCT AND MSDS\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO AHA\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO SCHEDULE\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
- \*\*\*\*\*\*\*\*\*\*\*\*NO ORDER OF MATERIALS\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# Michael Danforth Depostion
# Exhibit No. 5

**From:**    "Richard Avilla" <rhinogum@ite.net>
**To:**      <akitad001@hawaii.rr.com>; <rhino1@hawaii.rr.com>;
**Sent:**    Tuesday, October 24, 2000 11:49 AM
**Subject:**  Richard Avilla - What date did Richard begin with BioGenesis

Good morning - I will resolce BPI and Rhino efforts today and tomorrow. To do so, I must have the following ASAP:

1. Complete (Detailed) cost for each project performed so far by Rhiono for BioGenesis. The cost report must be by project and also, I must have overhead ($dollar)expended during that time.

2. When did Richard go to BPI?  What Date.?

3. I require dollar value, all monies paid to Richard, that BPI owes to Rhino.  This is part of the negotiation.

Please have this information for me in 4 hours from now.  I must prepared a negotiation proposal today and get it to BPI

Thank you for your assistance - Michael

Danforth
EXHIBIT NO. 5
DATE 2-21-03
B.L. ROSS

12/12/00

## Michael O'Connell

**From:** "Richard Avilla" <rhinogum@ite.net>
**To:** "R. Fong" <russ@hgea.org>; "Gerald Lam"
**Cc:** <RhinoGWA@ite.net>; <Rhino1@hawaii.rr.com>
**Sent:** Tuesday, October 24, 2000 10:52 PM
**Subject:** Guam Roofing Contract

Hi Gerry - Just received your e-mail.

I am meeting with Rhino's Owners tongiht regarding the contract and
Rhino'proposal to you. I will propose a solution for your consideration.
Yes - With Subcontract Agreement (Master Agreement) in place with Rhino,
Rhino can go to Bank and finance the project.

Question - Does Rhino need to assist BPI is financing project Overhead?? If
so, I believe that we can work something out.

I will call you tomorrow. It will be in the afternoon. Please call at your
convenience. George's cell is (671)688-2030. We are 20 hours ahead of you.

Speak to you tomorrow. - Michael

*Richard*
*meet*
*Rhino owne*

∂

| From: | "Richard A⬤⬤⬤ <rhinogum@ite.net> |
|---|---|
| To: | "R. Fong" <russ@hgea.org>; |
| Cc: | <RhinoGWA@ite.net>; <Rhino1@hawaii.rr.com> |
| Sent: | Wednesday, October 25, 2000 11:23 AM |
| Attach: | Rhino Proposal Prices.xls; Rhino Proposal.doc |
| Subject: | RE: Guam Roofing Contract |

Good Morning Gerry;

Attached, please find a proposal from Rhino Builders. The purpose of this proposal is to establish the basis of what BPI requires to execute the roofing contract. An Excel file is also attached for your examination of all unit pricing for all work item descriptions, all years.

At your convenience, please call to discuss. It is very important for BPI and RBI to complete on discussions and negotiations today or no later than tomorrow.

On a personal note:

I have traveling a great deal. Doing consulting work with small businesses. I have to spend a lot of time with my mother. She had an emergency colon cancer operation. She is doing very well now.

Talk to you soon. I will return to Hawaii on 30 October. Place me. Cell 788-4614. Let's get together.

Mike O'Connell and I are awaiting your call. (671)632-7653 phone. fax: 637-9618

Mahalo - Michael
-----Original Message-----
From: Bpihawaii@aol.com [mailto:Bpihawaii@aol.com]
Sent: Thursday, October 26, 2000 4:39 AM
To: rhinogum@ite.net
Subject: Re: Guam Roofing Contract


Hey Michael,

I have already approved sufficient line of credit for materials and labor. Just got the word yesterday from Bank of Hawaii and the SBA. It was a bitch and expensive. I am also in good stead with Hawaii National which is my father's banking connection for all future projects and for Guam. I believe that I have enough to finance the work and the payments from the Navy should pick up the cash flow.

I had called you a number of times to plug you into some things but I understood that you were traveling and busy also with some personal matters. I've been in Hilo and Kona a lot the past several months. How long are you in Guam for?

12/12/00

⬤                              ⬤

| | |
|---|---|
| **From:** | "Richard Avilla" <rhinogum@ite.net> |
| **To:** | "R. Fong" <russ@hgea.org>; |
| **Cc:** | <RhinoGWA@ite.net>; <Rhino1@hawaii.rr.com> |
| **Sent:** | Wednesday, October 25, 2000 11:23 AM |
| **Attach:** | Rhino Proposal Prices.xls; Rhino Proposal.doc |
| **Subject:** | RE: Guam Roofing Contract |

Good Morning Gerry;

Attached, please find a proposal from Rhino Builders. The purpose of this proposal is to establish the basis of what BPI requires to execute the roofing contract. An Excel file is also attached for your examination of all unit pricing for all work item descriptions, all years.

At your convenience, please call to discuss. It is very important for BPI and RBI to complete on discussions and negotiations today or no later than tomorrow.

On a personal note:

I have traveling a great deal. Doing consulting work with small businesses. I have to spend a lot of time with my mother. She had an emergency colon cancer operation. She is doing very well now.

Talk to you soon. I will return to Hawaii on 30 October. Place me. Cell 788-4614. Let's get together.

Mike O'Connell and I are awaiting your call. (671)632-7653 phone. fax: 637-9618

Mahalo - Michael
----Original Message----
From: Bpihawaii@aol.com [mailto:Bpihawaii@aol.com]
Sent: Thursday, October 26, 2000 4:39 AM
To: rhinogum@ite.net
Subject: Re: Guam Roofing Contract


Hey Michael,

I have already approved sufficient line of credit for materials and labor. Just got the word yesterday from Bank of Hawaii and the SBA. It was a bitch and expensive. I am also in good stead with Hawaii National which is my father's banking connection for all future projects and for Guam. I believe that I have enough to finance the work and the payments from the Navy should pick up the cash flow.

I had called you a number of times to plug you into some things but I understood that you were traveling and busy also with some personal matters. I've been in Hilo and Kona a lot the past several months. How long are you in Guam for?

12/12/00

aloha,

gerry

## Michael O'Connell

**From:** "Richard Avilla" <rhinogum@ite.net>
**To:** "R. Fong" <russ@hgea.org>; "Gerald Lam"
**Cc:** <Rhino1@hawaii.rr.com>; <RhinoGWA@ite.net>
**Sent:** Thursday, October 26, 2000 9:08 PM
**Attach:** Request for Information.doc
**Subject:** Guam Roofing - Task Order checklist.

Gerry - Great speaking with you today. Attached, I submit my Task Order checklist. Lets use this list in our discussion scheduled for tomorrow at 0800 hours Guam Time.

I will place the call at exactly 0800 hours. That will be 1200 hours, Hawaii time on Friday, 10/27/00..

Yours truly - Michael



12/12/00

**Michael O'Connell**

From: "Georfge Allen" <rhinoGWA@ite.net>
To: "R. Fong" <russ@hgea.org>; "Gerald Lam"
Cc: <Rhino1@hawaii.rr.com>; <Dakita@hawaii.rr.com>
Sent: Friday, October 27, 2000 3:35 PM
Attach: Guam Roofing Contract Status.doc
Subject: Follow-up discussion with Gerald Lam 10/28/00

Gerry;

Attached is a simplified list of issues discussed this morning. I will
return to Hawaii Sunday night and be available to speak with you on Monday.
My new cell is 778-4614. I will look forwared to your call.

Michael

12/12/00

| | |
|---|---|
| Subj: | **Fw: BPI Evaluation (roofing contract)** |
| Date: | 1/29/01 6:43:35 AM Hawaiian Standard Time |
| From: | *maxxmgt@hawaii.rr.com (Maxx)* |
| To: | *maxxmgt@aol.com (Maxx Management)* |
| File: | **T O Price Evaluation REV.xls** (69632 bytes) DL Time (TCP/IP): < 1 minute |

----- Original Message -----
**From:** Maxx
**To:** O'Connell Michael
**Sent:** Monday, October 30, 2000 7:47 AM
**Subject:** BPI Evaluation (roofing contract)

Mike O -

I have attached another version of the BPI vs Rhino pricing of the Guam Roofing Contract. I finished this Sunday night in Guam.

Open the Excel spreadsheet and printout the "BPI Evaluation".
Notice that all 17 Task Orders are evaluated. Of special importance is the first 5 T Os that Rhino has performed. Task Orders 1, 2, 3, 4 and 7). Gene sent me the cost accounting, which shows the value of almost $50,900.00 expenditure. BUT LOOK, at the revised Rhino pricing proposed to BPI, Rhino's revenue is $145,388.60. If this is true, Rhino has made a $95,000.00 gross profit. Is this a correct picture??

I need for Gene to double check the cost accounting, make sure all journal entries are assigned. Some are not assigned and print this out again for us to discuss on Tuesday.

Also, please set up conference call with Al, you and I on our Tuesday (their Wednesday) as early as possible in the morning.

Michael

--------------------- Headers ---------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-yg04.mx.aol.com (rly-yg04.mail.aol.com [172.18.147.4]) by air-yg03.mail.aol.com (v77.31)
ESMTP; Mon, 29 Jan 2001 11:43:35 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yg04.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:42:54 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
Mon, 29 Jan 2001 06:42:39 -1000
Message-ID: <038901c08a12$3f850320$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: BPI Evaluation (roofing contract)
Date: Mon, 29 Jan 2001 06:40:54 -1000
MIME-Version: 1.0
Content-Type: multipart/mixed;
    boundary="-----=_NextPart_000_0385_01C089BE.6DA81F20"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

Subj:    **Fw: BPI Roofing Contract**
Date:    1/29/01 6:41:50 AM Hawaiian Standard Time
From:  *maxxmgt@hawaii.rr.com (Maxx)*
To:   *maxxmgt@aol.com (Maxx Management)*

—— Original Message ——
From: <u>Maxx</u>
To: <u>Allen George - Guam</u>
Sent: Wednesday, November 01, 2000 5:46 PM
Subject: Fw: BPI Roofing Contract

George - Make sure you call me tomorrow on this

Michael
—— Original Message ——
From: <u>Maxx</u>
To: <u>rhinogum@ite.net</u>
Cc: <u>Allen George - Guam</u>
Sent: Wednesday, November 01, 2000 5:38 PM
Subject: Re: BPI Roofing Contract

Richard - As of now, Gerry Lam has not responded to me regarding his responsibility to clear up LD problem.

I recommend that Rhino does NOT move ahead with anything else.

Michael

> —— Original Message ——
> From: <u>Richard Avilla</u>
> To: <u>Maxx</u>
> Sent: Wednesday, November 01, 2000 10:54 AM
> Subject: RE: BPI Roofing Contract
>
> Mike How are you.
> Everything taken care off, I had Warren N. doing paper work and submittals for me.he does have roofing, and
> administrative experience,just want to clear up some missunderstanding. Gov. wants Pre-Con meeting on two
> other T.O. Friday, 0013, 0015
> both have completion time past 10-29 I also feel I can get time extension on both, so no liquidated demages. I'll —
> keep you up.
> Would help if we could pay bills so I can order more,to move on.
> Richard
> ——Original Message——
> From: Maxx [mailto:maxxmgt@hawaii.rr.com]
> Sent: Tuesday, October 31, 2000 10:39 AM
> To: rhinogum@ite.net
> Cc: O'Connell Michael
> Subject: Re: BPI Roofing Contract
>
>> Richard - Thanks for your response. Do not worry about Warren Nobles. I do not know why he is
>> evolved. He has no experience in roofing nor contractor administration. I read his resume. Please move
>> forward.
>>
>> Michael
>>
>>> —— Original Message ——
>>> From: <u>Richard Avilla</u>

9

**To:** Maxx
**Sent:** Monday, October 30, 2000 9:18 AM
**Subject:** RE: BPI Roofing Contract

Good Morning Mike
Spoke to Con-Raps of both Task Orders 1, 2 , I should get letter of acceptance soon, will check into, again today. They said I should have gotten it already. Did not submit revised schedule for T.O. 04 still haven't gotten in touch with Warren Nobles on what he submitted, will attempt to do so today. T.O. 07 need Inspection, submitted request, am waiting for reply from Con-Rap. Will inform you soon as things develops. I want to once again thank you, for your help in all matters.
Richard

-----Original Message-----
**From:** Maxx [mailto:maxxmgt@hawaii.rr.com]
**Sent:** Tuesday, October 31, 2000 3:55 AM
**To:** Rhinogum@ite.net
**Cc:** O'Connell Michael; RhinoGWA@ite.net
**Subject:** BPI Roofing Contract

Richard - Please provide me with status of yesterday's meeting with government regarding Task Orders.

1. Did government issue "Acceptance and Warranty" letters on Task Orders 1, 2 and 3??? If not, is the clock still ticking on Liquidated damages?

2. Did you submit revised schedule for T. O. 0004?

3. Please provide another update on T. O. #7.

Thank you - Michael

——————— Headers ———————
eturn-Path: <maxxmgt@hawaii.rr.com>
eceived: from rly-yg02.mx.aol.com (rly-yg02.mail.aol.com [172.18.147.2]) by air-yg02.mail.aol.com (v77.31) with SMTP; Mon, 29 Jan 2001 11:41:50 -0500
eceived: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yg02.mx.aol.com (v77.27) with SMTP; Mon, 29 Jan 2001 11:41:16 -0500
eceived: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
 Mon, 29 Jan 2001 06:41:12 -1000
essage-ID: <035e01c08a12$0b3d8740$88fe1918@hawaii.rr.com>
rom: "Maxx" <maxxmgt@hawaii.rr.com>
o: "Maxx Management" <maxxmgt@aol.com>
ubject: Fw: BPI Roofing Contract
ate: Mon, 29 Jan 2001 06:39:26 -1000
IME-Version: 1.0
ontent-Type: multipart/alternative;
 boundary="——=_NextPart_000_035B_01C089BE.3966BDC0"
-Priority: 3
-MSMail-Priority: Normal
-Mailer: Microsoft Outlook Express 5.50.4522.1200
-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

**From:** &lt;Maxxmgt@●om&gt;
**To:** &lt;Bplhawaii@aol.com&gt;
**Cc:** &lt;Rhino1@hawaii.rr.com&gt;; &lt;RhinoGum@ite.net&gt;;
**Sent:** Wednesday, November 01, 2000 7:43 AM
**Subject:** Guam Roofing Contract

Gerry - Did you contact the Contracting Officer for the Roofing contract in Guam and address the Liquidated Damages issue? If so, please let me know the result and following I will complete an outline for the subcontract agreement between Rhino and BPI.

If not, I will wait on you to clear the Liquidataed Damages issues.

Aloha, Michael

12/12/00

**From:** <Maxxmgt@a░░░m>
**To:** <Bpihawaii@aol.com>
**Sent:** Wednesday, November 01, 2000 1:26 PM
**Subject:** Guam Roof Contract

Gerry - Please let me know when you speak with the Contacting Officer on those Task Orders subject to liquadated damages.

I am waiting on you before I move forward with Rhino / BPI contract agreement.

Michael

12/11/01

12

## Michael O'Connell

| | |
|---|---|
| **From:** | <Bpihawaii@aol.com> |
| **To:** | <Maxxmgt@aol.com> |
| **Cc:** | <russ@hgea.org> |
| **Sent:** | Monday, November 06, 2000 12:52 PM |
| **Subject:** | Re: Guam Roof Contract |

Mike,

Everything looks acceptable. I will also look forward to the breakdown of Richard's costs (salary, lodging, vehicle). RBI shall not be responsible for liquidated damages for TO 1 - 17. BPI shall guarantee payment to RBI for all completed and accepted work.

The nature of assignment of payments as I understand would be as follows. RBI is a subcontractor to BPI. RBI will need to take its subcontract and TO to their bank. And the bank will need from BPI assignment of payments under the subcontract direct to RBI's bank.

Gerry

13

12/12/00

From: &lt;Maxxmgt@aol.com&gt;
To: &lt;Bpihawaii@aol.com&gt;
Cc: &lt;Rhino1@hawaii.rr.com&gt;; &lt;RhinoGum@ite.net&gt;;
Sent: Friday, November 03, 2000 9:11 AM
Subject: Re: Guam Roof Contract

Gerry - Thanks for your reply. I held a conference with Mike O and Al yesterday. The following issues must be addressed in the Subcontract Agreement.

1) The Subcontract Agreement will be a "Master" with Task Orders issued from BPI to RBI imaging (except for unit pricing) the Task Order issued from the Government to BPI.

2) The Master Subcontract Agreement (MSA) will include (by attachment) the 17 task orders.

3) The MSA will include the unit pricing, base year and all option years, as proposed to BPI.

4) The MSA will include one-half (1/2) of all costs related to Richard, project manager for BPI. From your appointment letter date whereby Richard was acknowledged as BPI project manager, BPI has not paid for Richard's salary, lodging, car, cell, etc., Rhino has paid this. Al's original agreement with you is to share this costs 50/50. So, I am having this cost detailed and 1/2 of the cost and payment thereof, will be a part of the contract execution.

5) From the date of MSA execution, Richard must go on BPI payroll as BPI employee. RBI will not support any part if his salary. Lodging cost, vehicle cost, cell phone will be billed to BPI each month separately from the Task Orders invoicing.

6) Related to #5 supra, RBI unit pricing will be reduced to cover BPI project manager overhead. I will send another unit pricing schedule for RBI.

7} Task Orders 1 through 17 will not be subject to Liquidated Damages form the Government and BPI. Also, BPI must warranty/guarantee to RBI that payment for work in place will not be dependent on payment from Government to BPI and that financing is in place to make same payments.

8) Assignment of payments to Rhino's bank is necessary for RBI's financing.

9) Rhino will take MSA and Task Orders to bank for financing. Once financing is in place, RBI will purchase all stored materials form BPI thus relieving a complicated accounting system for work in place.

10) Payment to RBI will be 7 calendar days after receipt of payment from Owner by BPI except for Task Orders 1 through 17, where receipt of payment from Owner does not apply.

Gerry - Please provide your comments. I will be in Florida on Monday, but will continue to work on this until finished. I will wait on your comments before I begin.

Sincerely - Michael

$1^{4}$

12/12/00

Just got this from Gerry, How do you want me to respond. Obviously, Richard didn't follow my instructions not to tell BPI what we were doing until we got our letter off.

George

-----Original Message-----
From: Bpihawaii@aol.com [mailto:Bpihawaii@aol.com]
Sent: Thursday, November 09, 2000 10:05 AM
To: rhinogwa@ite.net
Subject: Re: Guam Roof Project


George,

I have financing for materials. I am needing richard to do some work so as to placate the Navy. This option year work depends on the goodwill. Rhino won't be held to liq. damages nor for costs of necessary materials used for the roofs. I need to have Richard begin doing something. Michael is busy with his mother which is important. I have left messages for him.

Gerry
(808) 263-7777

12/12/00

15

**From:** "George W. Allen" <rhinogwa@ite.net>
**To:** "Michael Danforth (E-mail)" <Maxxmgt@aol.com>
**Cc:** "Michael O'Connell (E-mail)"
**Sent:** Wednesday, November 08, 2000 8:37 PM
**Subject:** BPI Contract

Gerry called me after he talked to Michael O. I told him we could get back to work on a limited basis if he could pay Rhino $25,000 of what is owed by tomorrow with the idea that he will get with Michael D early next week (monday) to finalize the subcontract agreement.

russell is supposed to contact me tomorrow to confirm that they are able to get a check to Rhino.

Mike D I hope this is OK with you. We were unable to get you again, probably because of how late it was so we had to make a decision. Hope you're mom is OK. Catch me up tomorrow.

Really got some people upset with me today but it had to be done to force the issue. Need the letter of assignment and authority as soon as possible.

Meanwhile, I got further behind on the tank farm proposal with all the time i spent on BPI issues today. Hope I can concentrate on proposal tomorrow. Got one subcontract quote in today for about $259,000 but it excludes all of the pipe supports repais and welded patches.

regards

\16

12/12/00

| From: | &lt;Maxxmgt@aol●●&gt; |
|---|---|
| To: | &lt;rhinogwa@ite.net&gt; |
| Cc: | &lt;Rhino1@hawaii.rr.com&gt; |
| Sent: | Thursday, November 09, 2000 5:36 |
| Subject: | Response: Re: BPI Contract |

George - NO, this is not OK with me, If I cannot be reached, just wait. We are one day minus 9 hours difference, almost half way around the world.

I do not agree to any amount because, as of this time, I have waited for almost two weeks to get 2 simple accounting reports from Rhino's office having to do with this contract. (cost repsort up-to-date with all items assigned - Al is to review his copy and make correction. Has this been done???? and Richards cost form the time he dwent as BPI's manager). When you cannot manage your finances and know where your money is, businessDEATH is a staring you in the face.

I want the agreement to be finalized and all of us know where the money is. BPI's urgency is **not Rhinos urgency.** Rhino's poor business judgment it this matter is the result of more problems currently being experienced. We must stop now and get control of it.

It is obvious that Richard lied to you and Al yesterday. In another e-mail I will address what we agreed on the Saturday that we had a conference call with BPI. Richard should be terminated immediately for lying and misuse of Rhino's trust and funds!

Look for other e-mail entitled - "BPI Tentative Agreement"

Please printout a copy of this mail and hand deliver to Al.

Michael

ι٦
12/12/00

**From:** &lt;Maxxmgt@aol.com&gt;
**To:** &lt;RhinoGWA@ite.net&gt;;
**Sent:** Friday, November 10, 2000 3:24 AM
**Subject:** Guam Roof Project

George / Al / Mike O;

I is evident form the latest mails that no one listens to my advice regarding
Gerry Lam, BioGenesis, Rhino and the Roofing contract.

On 29 October 2000, Al, George, Richard and myself conversed with Gerry Lam
and agreed: 1) RBI would complete all Task Orders that were previously
started (#1, #2, #3, #4 and #7). It was also agreed that Gerry Lam would call
the contracting officer and deal with those Task Orders that are or soon to
be in Liquidated Damages. Well guess what???? As predicted, Gerry Lam has
not completed his part or, at least, notified me of such. I do know that as
of last Friday, I received an e-mail form Gerry that stated he had left calls
to Johanna Mendeola (C. O. ), but no response. Now - It has been 2 weeks.
Do you believe him??

**BioGenesis has projects in liquidated damages with NO effort on Gerry's part
to remedy. How will BioGenesis pay for the work when the Government takes the
money from him for those damages??**

Rhino has no urgency! BioGenesis has all the urgency. Gerry must fix his own
problems, but no, Rhino jumps in and now has liability for those porblems
because Rhino will not get paid.

Rhino will not listen to my advice so, my advice stops. I will no longer
assist on the roofing project.


Michael

12/11/01

١8

## Michael O'Connell

**From:**     <Maxxmgt@aol.com>
**To:**       <Bpihawaii@aol.com>; <Keokialoha@aol.com>;
**Cc:**       <Rhino1@hawaii.rr.com>
**Sent:**     Friday, November 10, 2000 10:38 AM
**Attach:**   ATT00109.eml
**Subject:**  Fwd: Guam Roof Contract

Gerry;

I have forwarded my last e-mail to you to remind everyone that I am still waiting on you to confirm that NO Liquidated Damages will be assessed from the Government to BPI on Task Orders 1 through 17. Your guarantee not to assess LDs on RBI is not enough. You and I both know that if the Government assesses LDs you will not get the money and therefore RBI will not get the money and this situation only leaves RBI in a legal situation with BPI. You did respond to this e-mail; however, your response indicated that you have NOT performed as you agreed to do.

On 29 October 2000, we (Rhino and You) agreed that Rhino will finish all Task Orders started and we identified those Task Orders specifically **AND that no other work will be performed by Rhino until a Subcontract Agreement was in place.** In addition, you agreed to call the Contracting Officer to remediate those Task Orders in liquidated damages and those pending liquidated damages. To my knowledge you have NOT performed your part of this agreement. As I made it clear, until you (BPI) remediate the Task Orders pending LD damages, a subcontract agreement will not be written.

If you have complied with the preceding, let me know so George can verify with the Government such remedy is in place.

Yours truly;

Michael

19

12/11/01

## Michael O'Connell

| | |
|---|---|
| **From:** | <Bpihawaii@aol.com> |
| **To:** | <Maxxmgt@aol.com> |
| **Cc:** | <Bpihawaii@aol.com>; <Keokialoha@aol.com>; <RhinoGum@ite.net>; <Rhino1@hawaii.rr.com>; <russ@hgea.org> |
| **Sent:** | Sunday, November 12, 2000 4:22 PM |
| **Subject:** | Re: Guam Roof Contract |

Michael,

I apparently misunderstood our conversation. It was my understanding that Rhino's concern was not to be held responsible for LDs. My present understanding is that the government will work with BPI on the LD issues which I take to effectively mean no LD charges. However, I will need to inquire further and get back to you. I had called the contracting officer numerous times and left messages. I finally received a message directing me to another officer.

Concerning your proposal then, the only possible avenue of getting to work forthwith is for BPI to instead guarantee Rhino payment in an acceptable manner. per the TOs in question. Alternatively, its still a waiting game on BPI's part.

We agreed Rhino would finish the Task Orders with the intent of moving forward right away. You have mentioned the items of LDs which may frustrate that prior agreement that you and I discussed over specific TOs 1 - 17. Therefore, you proposed a written subcontract of terms of which I awaited. It was my understanding that BPI would agree not to have any LDs affect Rhino who I had earlier relied upon during the course of dealing with the Navy CO. IN MY ESTIMATION, I HAVE NOT FAILED TO PERFORM AS I AGREED. If it is Rhino's concern that LDs on BPI will result in simultaneous damage to Rhino, I now understand. NOW, You want a certification from the Navy CO that the NAVY will not assess LDs on BPI. This position of yours was not clear to me. Therefore, I have no choice but to keep following up on LDs with the contracting officer.

Gerry Lam

$2^0$

12/12/00

| | |
|---|---|
| **From:** | <Maxxmgt@aol.com> |
| **To:** | <Bpihawaii@aol.com> |
| **Cc:** | <RhinoGWA@ite.net>; <russ@hgea.org>; <RhinoGum@ite.net>; |
| **Sent:** | Monday, November 13, 2000 1:26 PM |
| **Subject:** | Response: Re: Guam Roof Contract |

Gerry;

Thank you for your response. I am glad that you now understand what we
expected from our conversation of 29 October 2000. Sorry for any
misunderstanding.

Rhino Builders, INc (RBI) is preceding to organize and prepare a Subcontract
Agreement that will inlcude the following: It will be prsent to you in
hardcopy form.

1. Agreement (Master with Task Order provisions)
2. 17 Task Orders (BPI to RBI) that represent the 17 Task Orders issued
todate.
3. Unit pricing schedule as presented previously to you on 29 October 2000.
4. Special Conditions that include details of what Rhino will provide to
BioGenesis (to inlcude: overhead expenditures of copying, faxing, e-mail,
phone, cell phones, QC and all his overhead, etc.)

If you have any anticipated exceptions to the information listed above,
please  immediately notify me.

Liquadated Damage (LD) Issue;
Yesterday, Al and Richard attended a meeting with the government regarding
LDs and schedules. It is my understanding that Al (speaking strictly as
Rhino, BPI's subcontractor) defended BPI's position on delays from the
government and encouraged "partnering". Al reports that the Government was
upset; however, is willing to examine revised schedules that accurately
portray current status of T. O. s and Al also feels that the Government may
accept the revised schedules therefore eliminating potential L.D. posture.
If this occurs, we as well as you will know the result. The revised schedules
are due on Wednesday, 15 November 2000 GT.

Following the government's review and action, Rhino Builders will know what
to do. Hopefully, this will occur very soon so we can move on with a
simplyfied way of doing business and provide great service to the Government.

One issue is absolutely necessary. Richard must go on BioGenesis Payroll. As
stated before, RBI will provide BioGenesis with support for Richard which,
includes vehicle, cell, fuel, oil, insurance, etc), the cost of which, is
included in the unit pricing. Please prepare to take on this employee
(Richard) immediately upon execution of the Subcontract Agreement.

Yours truly;

Michael Danforth

21

12/12/00

| Subj: | **Guam Roofing Contract - Various** |
|---|---|
| Date: | 11/14/00 10:07:50 AM West Pacific Standard Time |
| From: | *rhino1@hawaii.rr.com (Michael O'Connell)* |
| To: | *russ@hgea.org, bpihawaii@aool.com* |
| CC: | *rhinogum@ite.net (Richard Avilla), RhinoGWA@ite.net (George Allen - Guam), Maxxmgt@aol.com* |

Gerry;

I have worked with Mike D today and Al regarding the Guam contract. It look like good new about jobs and schedule. From now on, Mike Danford is POC contract for all info on roof contract. All leters and calls will be give to Mike D.

Rhino prepareing invoice to BPI tomorrow for all work todate. Invoice will be on agree that cost is paid and split profit. I can send 1 invoice or separate. Let me know.

Mike

———————— Headers ————————
Return-Path: <rhino1@hawaii.rr.com>
Received: from rly-yb05.mx.aol.com (rly-yb05.mail.aol.com [172.18.146.5]) by air-yb04.mail.aol.com (v76_r1.23) with ESMTP; Mon, 13 Nov 2000 19:07:50 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yb05.mx.aol.com (v76_r1.19) with ESMTP; Mon, 13 Nov 2000 19:07:39 -0500
Received: from mike ([24.94.90.15]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.447.44);
   Mon, 13 Nov 2000 14:07:30 -1000
Message-ID: <001701c04dcf$91610ec0$0f5a5e18@hawaii.rr.com>
From: "Michael O'Connell" <rhino1@hawaii.rr.com>
To: <russ@hgea.org>, <bpihawaii@aool.com>
Cc: "Richard Avilla" <rhinogum@ite.net>,
    "George Allen - Guam" <RhinoGWA@ite.net>, <Maxxmgt@aol.com>
Subject: Guam Roofing Contract - Various
Date: Mon, 13 Nov 2000 14:12:25 -1000
MIME-Version: 1.0
Content-Type: text/plain;
   charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4133.2400
Disposition-Notification-To: "Michael O'Connell" <rhino1@hawaii.rr.com>
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4133.2400

Subj:      **Fw: Guam Roof Files**
Date:      1/29/01 6:38:10 AM Hawaiian Standard Time
From:   maxxmgt@hawaii.rr.com (Maxx)
To:    maxxmgt@aol.com (Maxx Management)

----- Original Message -----
From: Maxx
To: keokialoha@aol.com
Sent: Wednesday, November 15, 2000 4:56 PM
Subject: Guam Roof Files

George - I am almost through with the Subcontract Agreement. Please e-mail the CLIN files and a way for me to print the 17 Task Orders as soon as possible.

Mail to my aol.com and hawaii.rr.com addresses.

Michael


----------------- Headers -----------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-yh03.mx.aol.com (rly-yh03.mail.aol.com [172.18.147.35]) by air-yh03.mail.aol.com (v77.31) with ESMTP; Mon, 29 Jan 2001 11:38:10 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yh03.mx.aol.com (v77.27) with ESMTP; Mon, 29 Jan 2001 11:37:42 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:37:39 -1000
Message-ID: <02db01c08a11$8c5917a0$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Guam Roof Files
Date: Mon, 29 Jan 2001 06:35:53 -1000
MIME-Version: 1.0
Content-Type: multipart/alternative;
    boundary="----=_NextPart_000_02D8_01C089BD.BA8B75E0"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

| Subj: | **Fw: BPI Files** |
|---|---|
| Date: | 1/29/01 6:37:08 AM Hawaiian Standard Time |
| From: | *maxxmgt@hawaii.rr.com (Maxx)* |
| To: | *maxxmgt@aol.com (Maxx Management)* |
| File: | **Rhino Proposal Prices.xls** (38400 bytes) DL Time (TCP/IP): < 1 minute |

—— Original Message ——
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Sent: Wednesday, November 15, 2000 6:21 PM
Subject: Fw: BPI Files


>
> —— Original Message ——
> From: "George W. Allen" <rhinogwa@ite.net>
> To: "Michael Danforth (E-mail)" <Maxxmgt@aol.com>
> Cc: <maxxmgt@hawaii.rr.com>
> Sent: Wednesday, November 15, 2000 5:39 PM
> Subject: BPI Files
>
>
> > I am attaching the excel file I told you about.
> >
>


———————————— Headers ————————————
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-yd03.mx.aol.com (rly-yd03.mail.aol.com [172.18.150.3]) by air-yd05.mail.aol.com (v77.31)
ESMTP; Mon, 29 Jan 2001 11:37:08 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yd03.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:36:25 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
Mon, 29 Jan 2001 06:36:13 -1000
Message-ID: <02b101c08a11$59350d20$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: BPI Files
Date: Mon, 29 Jan 2001 06:34:27 -1000
MIME-Version: 1.0
Content-Type: multipart/mixed;
boundary="——=_NextPart_000_02AE_01C089BD.875FCA40"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

24

Subj: **Fw: Update on Email, Network, Phones, Warren Nobles, etc.**
Date: 1/29/01 6:36:01 AM Hawaiian Standard Time
From: *maxxmgt@hawaii.rr.com (Maxx)*
To: *maxxmgt@aol.com (Maxx Management)*

—— Original Message ——
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: <rhinogwa@ite.net>
Cc: "Maxx Management" <maxxmgt@aol.com>; "O'Connell Michael" <Rhino1@hawaii.rr.com>; "Akita Dean" <deanakita@hawaii.rr.com>
Sent: Wednesday, November 15, 2000 7:22 PM
Subject: Re: Update on Email, Network, Phones, Warren Nobles, etc.


> George -See my notes to each paragraph - Michael
>
> —— Original Message ——
> From: "George W. Allen" <rhinogwa@ite.net>
> To: "Michael Danforth (E-mail)" <Maxxmgt@aol.com>; "Michael Road Runner
> Danforth (E-mail)" <maxxmgt@hawaii.rr.com>
> Sent: Wednesday, November 15, 2000 6:52 PM
> Subject: Update on Email, Network, Phones, Warren Nobles, etc.
>
>
> > Email - Just completed the last step in eliminating the email problems.
> It
> > has been frustrating to say the least.  Now, the Rhino network all dials
> out
> > through a used CPU ($300) which will also eventually serve as the
printer
> > server.  Biogenesis has a separate dial in to the ISP and I think it
uses
> > the BioGenesis phone on Richard's desk for that purpose.  Anyway, our
> system
> > can't get messed up when Richard dials in to guamcell.
> >
> > Phones - Right now, the only telephone communication we have is my cell
> > phone except that Aileen is using the Biogenesis phone to make outgoing
> > calls.  When you dial in to Rhino's number you get a busy signal.  When
> you
> > try to dial out you get a message that the service has been temporarily
> > disconnected due to non-payment.  I sent Aileen to the phone company
with
> a
> > SOC account check to pay the bill.
> GEORGE - FROM THE PAYMENT MADE BY SOC CHECK, DO YOU EXPECT THE PHONE TO BE
> BACK ON TOMORROW??
> >
> > Network - Richard is still hooked up to the network by cable so he can
get
> > to the drive that has programs on it but he can't get into the drive
that
> > has our sensitive data on it without a password which only Aileen, Mark
> and
> > I know.
> >
> > Forwarding email -  When we had the problem missing a SOC site visit
> because

$2^5$

> > Richard didn't tell me about my email, I told Richard to forward any email
> > addressed to me. So far I have received none. As of right now, Richard
> > still hasn't told me that I got an email at his address. The email was
> from
> > Hawaii Pacific letting me know that they had received a check from
> > BioGenesis and thanking me for my assistance. He wants to know if we want
> > him to bill Biogenesis or Rhino in the future. I'll wait to answer him
> > after I confront Richard in front of Al and tell him that Ted at Hawaii
> > Pacific told me he had sent me an email at rhinogum@ite.net several days
> > ago.
> >
> > Warren Nobles - I will send the letter to Warren Nobles. I understand
> that
> > Richard has been trying to get copies of submittals, schedules, etc.
> Aileen
> > researched this for me and found that there is no purchase order, no
> > consulting agreement or any other document to support the payments that
> have
> > been made to Warren. She told me that this had come up preciously and
> > Eugene told them that was not proper but I guess it is still going. I am
> > going to have her go back through the check book and find each payment
> that
> > has been made by check and, hopefully we can find some way to tie all of
> > them to some job number. I suspect that he doesn't have a TIN and so we
> > would have to have his SS number, report his income to the IRS and send
> him
> > a 1099. I doubt that any of that has been done either. Could you please
> > have Dean get all of the rules and forms we need for hiring consultants
> and
> > send them to Aileen.
>
> GEORGE - AS I STATED BEFORE AND STATED IN THE COMPANY MEMO WRITTEN TODAY.
> (YOU DO NOT HAVE IT BECAUSE WE CAOULD NOT E-MAIL NOR FAX TO YOU) SEND LETTER
> TO DISMISS HIM AND NOTIFY THE NAVY THAT HE HAS NO FURTHER CONNECTION TO RBI.
> >
> > I have to make a time sheet. Aileen has nothing that will do for
> reporting
> > my time. Meanwhile, I will send Dean an email showing my time to make
> sure
> > that Lealani doesn't go through with her threat to not send me a paycheck.
> > This brings up another subject, she quoted some Rhino rules that said an
> > employee will not be paid without a time sheet. I have checked with
> > everyone here and there are no employee work rules or any other rules. We
> > both know we would be hard pressed to enforce any rules that have never
> been
> > delivered to the employees. If there are some there, we would really
> > appreciate getting a copy.
>
> GEORGE - A NEW TIME SHEET WAS CREATED TODAY. COULD NOT FAX NOR E-MAIL TO
> YOU - SO, I WILL TRY TOMORROW MORNING. DO NOT BOTHER CREATING ONE YOURSELF.
>
> >

26

> > We didn't get the package from Hawaii today so no paychecks yet and no
> > authorization letter. I am going to wait to send my notice to the
> employees
> > so I can attach the authorization letter.
>
> GEORGE - I WILL FIND OUT WHAT IS AND LET YOU KNOW.
>
> >
> > Please confirm that you got the BPI files I sent you.
>
> YES - I RECEIVED THE FILES. THANK YOU VERY MUCH. I SHOULD HAVE ALL THE
> INFORMATION NECESSARY NOW TO PUT THE AGREEMENT TOGETHER. FIND OUT STATUS ON
> REVISED SCHEDULES THAT RICHARD WAS TO SUBMIT. WILL THE GOVERNMENT ACCEPT
> THEM?
>
> >
> > George
> >
> >
> >
> >
> >
> >
>

---------------------- Headers ----------------------

Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-yh05.mx.aol.com (rly-yh05.mail.aol.com [172.18.147.37]) by air-yh04.mail.aol.com (v77.31) with ESMTP; Mon, 29 Jan 2001 11:36:01 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yh05.mx.aol.com (v77.27) with ESMTP; Mon, 29 Jan 2001 11:35:36 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:35:34 -1000
Message-ID: <02a001c08a11$4231a200$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Update on Email, Network, Phones, Warren Nobles, etc.
Date: Mon, 29 Jan 2001 06:33:49 -1000
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

## Michael O'Connell

**From:** "Michael O'Connell" <rhino1@hawaii.rr.com>
**To:** "Gerald Lam" <BPIHawaii@aol.com>; "Russ Fong" <Russ@HGEA.org>
**Cc:** "Michael Danforth" <Maxxmgt@aol.com>; "Richard Avilla" <rhinogum@ite.net>; "George Allen - Guam" <RhinoGWA@ite.net>; "Eugene O'connell" <geneo@pixie.com>; "Akita Dean" <deanakita@hawaii.rr.com>
**Sent:** Wednesday, November 15, 2000 11:02 AM
**Subject:** Richard Avilla - BPI employee

Dear Gerry;

Rhino Builders, Inc. will continue to carry Mr. Richard Avilla on their Guam office payroll until November 30, 2000 at close of business.

If BioGenesis Pacific, Inc, has not employed Mr. Richard Avilla on or before 30 Nov 2000, Rhino Builders will relocate Mr. Avilla to Rhino' s Operation in Hawaii.

Sincerely;

Mike N. O'Connell

2⁸

12/12/00

Date:    1/29/01 6:37:53 AM Hawaiian Standard Time
From:   maxxmgt@hawa●●com (Maxx)
To:   maxxmgt@aol.com●●xx Management)

----- Original Message -----
From: Maxx
To: Russ Fong ; Gerry Lam
Cc: Allen George - Guam ; O'Connell Michael
Sent: Wednesday, November 15, 2000 5:07 PM
Subject: Guan Roof Subcontract agreement

Gerry - I am finished with the agreement for presentation to you except for the following:

1. Date of Prime Contract.
2. Correct name/title of prime contract

I have assigned the subcontract number of: BPI-0425-0001 to the Subcontract Agreement. If this is not satisfactory, please provide one that works for BPI.

The Agreement will include, a) under Attachment A, Rhino's CLIN unit pricing for all years, b) 17 Task Orders for simultaneous execution with the Agreement, c) request for payment for 50% of Richard costs from 12 July 200 to current.

Of course, if you decide to execute this agreement, any prior invoicing from Rhino for the work will be null and void except for Richard's costs.

The Agreement will also include a provision for Rhino to buy from BPI all stored materials. Following, Rhino will invoice BPI for stored materials and BPI can get paid for 90% of stored material value.

Please respond to me at maxxmgt@aol.com. It is imperative that I finish this work tomorrow by 12 noon or it will be delayed for a long time.

Michael

------------------ Headers ------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from  rly-yh03.mx.aol.com (rly-yh03.mail.aol.com [172.18.147.35]) by air-yh05.mail.aol.com (v77.31) with ESMTP; Mon, 29 Jan 2001 11:37:53 -0500
Received: from  hawaii.rr.com (hnimail1.hawaii.rr.com [24.25.227.33]) by rly-yh03.mx.aol.com (v77.27) with ESMTP; Mon, 29 Jan 2001 11:37:23 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com  with Microsoft SMTPSVC(5.5.1877.517.51);
   Mon, 29 Jan 2001 06:37:19 -1000
Message-ID: <02d101c08a11$80b9a0e0$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Guan Roof Subcontract agreement
Date: Mon, 29 Jan 2001 06:35:34 -1000
MIME-Version: 1.0
Content-Type: multipart/alternative;
   boundary="----=_NextPart_000_02CE_01C089BD.AEEBFF20"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

Wednesday, January 31, 2001 America Online: Maxxmgt

2q

**Michael O'Connell**

| | |
|---|---|
| **From:** | "Maxx" <maxxmgt@hawaii.rr.com> |
| **To:** | <Bpihawaii@aol.com> |
| **Cc:** | "O'Connell Michael" |
| **Sent:** | Wednesday, November 15, 2000 7:24 PM |
| **Subject:** | Re: Guan Roof Subcontract agreement |

Hey Gerry - You already have the CLINS. I faxed them to you on October 26th

I will fax another set to you tomorrow along with the subcontract agreement of you provide the prime contract date and correct title.

Michael

----- Original Message -----
From: <Bpihawaii@aol.com>
To: <maxxmgt@hawaii.rr.com>
Sent: Wednesday, November 15, 2000 6:23 PM
Subject: Re: Guan Roof Subcontract agreement

> Michael,
>
> I just logged on and received the messages. Please email me the subcontract
> so that I can review it asap and review the CLINs, costs and other terms with
> you right away.
>
> aloha,
>
> Gerry

12/12/00

Subj: **Fw: Guan Roof Subcontract agreement**
Date: 1/29/01 6:35:38 AM Hawaiian Standard Time
*From: maxxmgt@hawaii.rr.com (Maxx)*
*To: maxxmgt@aol.com (Maxx Management)*

—— Original Message ——
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: <Bpihawaii@aol.com>
Cc: "O'Connell Michael" <Rhino1@hawaii.rr.com>
Sent: Wednesday, November 15, 2000 7:24 PM
Subject: Re: Guan Roof Subcontract agreement


> Hey Gerry - You already have the CLINS. I faxed them to you on October
26th
>
> I will fax another set to you tomorrow along with the subcontract
agreement
> of you provide the prime contract date and correct title.
>
> Michael
>
>
> —— Original Message ——
> From: <Bplhawaii@aol.com>
> To: <maxxmgt@hawaii.rr.com>
> Sent: Wednesday, November 15, 2000 6:23 PM
> Subject: Re: Guan Roof Subcontract agreement
>
>
> > Michael,
> >
> > I just logged on and received the messages. Please email me the
> subcontract
> > so that I can review it asap and review the CLINs, costs and other terms
> with
> > you right away.
> >
> > aloha,
> >
> > Gerry
>


————————————— Headers —————————————
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-zc05.mx.aol.com (rly-zc05.mail.aol.com [172.31.33.5]) by air-zc04.mail.aol.com (v77.31) with
ESMTP; Mon, 29 Jan 2001 11:35:37 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-zc05.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:35:12 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
  Mon, 29 Jan 2001 06:35:11 -1000
Message-ID: <029a01c08a11$3426a980$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Guan Roof Subcontract agreement
Date: Mon, 29 Jan 2001 06:33:25 -1000

MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

37

FAX TRANSMITTAL 

TO:      Michael Danforth, Rhino Builders, Inc.

ATTN:    FAX: 808-668-7024

FROM:    Gerald Lam

DATE:    November 16, 2000

RE:      Guam: Subcontract Agreement and Attachments

Voice Call Back (808) 263-7777.  Fax Back (808) 263-0002

Total Pages including cover sheet:  1

Mike,

Mahalo for faxing a copy of the proposed subcontract and attachments.  I just received them though I am off to a meeting this afternoon.  I will review the documents right away thereafter.  It is my practice to accept provisions by affirmative action than by acts of omission.  I trust you understand that these past 2 weeks have especially been busy for me because of off island commitments and my mother's hospitalization.

*BioGenesis Pacific, Inc.*

1604 Ulualana Place • Kailua, Hawaii 96734 USA • 808-263-7777 • FAX 808-263-0002

| Subj: | **Fw: Guan Roof Subcontract agreement** |
| Date: | 1/29/01 6:34:50 AM Hawaiian Standard Time |
| *From:* | *maxxmgt@hawaii.rr.com (Maxx)* |
| *To:* | *maxxmgt@aol.com (Maxx Management)* |

----- Original Message -----
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: <Bpihawaii@aol.com>
Sent: Thursday, November 16, 2000 5:05 AM
Subject: Re: Guan Roof Subcontract agreement


> Gerry - Not the contract number, I have that. The Prime contract date and
> title. - Michael
>
>
> ----- Original Message -----
> From: <Bpihawaii@aol.com>
> To: <maxxmgt@hawaii.rr.com>
> Sent: Thursday, November 16, 2000 1:15 AM
> Subject: Re: Guan Roof Subcontract agreement
>
>
> > Thanks Michael. I'll dig into my files for the contract number.
> >
> > gerry
>


------------------ Headers ------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-ye01.mx.aol.com (rly-ye01.mail.aol.com [172.18.151.198]) by air-ye01.mail.aol.com (v77.35)
with ESMTP; Mon, 29 Jan 2001 11:34:50 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-ye01.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:34:38 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
   Mon, 29 Jan 2001 06:34:35 -1000
Message-ID: <029001c08a11$1ec555a0$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Guan Roof Subcontract agreement
Date: Mon, 29 Jan 2001 06:32:49 -1000
MIME-Version: 1.0
Content-Type: text/plain;
   charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

34

**From:** "George W. Allen" <rhinogwa@ite.net>
**To:** "Michael Danforth (E-mail)" <Maxxmgt@aol.com>; "Michael O'Connell (E-mail)"
<rhino1@hawaii.rr.com>; "Michael Road Runner Danforth (E-mail)" <maxxmgt@hawaii.rr.com>
**Sent:** Saturday, November 18, 2000 6:05 PM
**Subject:** Update
Regarding BPI:

Work continues with Al's approval. When I tried to get Al to sing the
$25,000 check to transfer funds from the Guam General Account to Hawaii, he
said he would have to make sure we had that much left since he had been
spending some on the BPI jobs. Don't go ballistic, I really think right now
is a time for us to tread lightly with the BPI work and for me to tread
lightly with Al. While I agree that BPI's urgency is not necessarily our
urgency, it does seem prudent to put forth a limited amount of resources to
keep the Navy from becoming agitated enough to just stop the contract. And,
I understand that one of the jobs is for a high ranking officer the OICC was
very interested in seeing go ahead. By all appearances, we are not putting
that much into the jobs since the labor is being paid by BPI and the bulk
materials are coming from BPI.

Regarding the Reaction Invoice, maybe BPI should pay that one rather than
Rhino. Al agrees with this idea as well.

Regarding Richard:

Richard told me last Tuesday that the previous Saturday was his last day on
Rhino's payroll. Al seemed to confirm this the other day. I really don't
know what's going on but I do know that no employee action terminating
Richard has been filled out. This is all confusing since I understand from
your end that Richard is to stay on our payroll until the end of the month.

Would somebody tell me exactly what the situation is? Is Richard still
working for Rhino or not?

If he quit last Saturday then we need to fill out a termination notice to
that effect and get it in the files. Richard's employment status is also
critical to our health insurance.

For my part, I would like to see him gone now. As much as I have tried to
make things as pleasant as possible under the circumstances Richard does not
seem inclined to do so. I am getting more than a little tired of the crap.
In my estimation, Rhino is taking a big risk keeping him around, having him
in our offices and as a signatory on our bank accounts. He has been
dishonest and has shown a complete disloyalty to Rhino in favor of his
loyalty to BPI. He communicated things with BPI that could have seriously
damaged Rhino in our efforts to negotiate. He has constantly thrown a
monkey wrench into my efforts to get things done and get things organized
around here and has gotten us into trouble on the SOC contract. I have no
doubt from the reactions I have seen that he has done a lot of harm to my
standing with other employees.

11/26/00

35

Richard took me to task in front of a full office for having read his "BPI email" about the wire transfer. I don't know who told him that I did so but I really don't appreciate him knowing about it. Is it impossible for me to do things and communicate them to Rhino without Richard knowing about them? It is amazing how he can take something he did that was so absolutely wrong (the wire transfer and not forwarding my mail to me) and try to turn it around to where I did something wrong. I told him I was looking for any messages that had been sent to me via Rhinogum, which I was, and he said it wasn't under Rhinogum. The fact is that the employer had the right to review anything any employee puts on the employer's computer. Unfortunately, I don't know if Richard is an employee although I had been told that he was when I looked at his computer.

I asked Al to talk privately and told him I was depending on him to help make sure that Richard and I could coexist peacefully. I showed him the email I had printed from Richards computer and it was clearly addressed to George Allen at Rhinogum@ite.net. I remind all of you that our letterhead and all of the information on our SOC proposal shows the email address as Rhinogum@ite.net. While we notified OICC of the change of address, we have no assurance that they will not accidentally send an important communication to the Rhinogum address so we must be able to depend on getting any mail sent to that address. I also remind you that Richard failed to pass messages on to me and has done so again with this latest message. Two full days had gone by from the time he received this message until he became aware of the fact that I had gotten it myself but he never mentioned it or forwarded it to me. I am going to have Mark set the Rhinogum address to forward to Rhinogwa and change the password so Richard will no longer be able to use it. Richard needs to be informed of this move so he can make arrangements to notify his correspondents of his change of address.

Al has not intervened once when Richard has gotten on his high horse with me in his presence. Even when Richard lied about the purpose of the stanchions, Al didn't say a word although I am sure at the time that Al knew Richard was lying. When Richard asked, in Al's presence, if I was in charge of everything, Al didn't say a word although that would have been the perfect opportunity for Al to clear up the question once and for all. When Richard took me to task for reading his email, Al didn't say a word. He has failed to take advantage of any of these opportunities to show his support of me and I am sure that makes all of the other employees doubt that I have his support.

Bank Accounts:

The Guam general account has not been transferred to the SOC account and Richard has not been removed from the signature card for the General account and Payroll account. I have no way to do this myself since I have no signatory authority over those accounts. Also, as of this Friday, Al is still co-signing the paychecks since he has not turned in the new signature card for the Payroll account with Michael O'Connell and Dean Akita on it. When you guys bring this up with Al, would you please put it as a question

36

11/26/00

and try to keep me from once again being the informant in the middle?

Health Insurance:

Al and I agreed that Rhino will provide health insurance to it's employees.
The coverage will be for administrative and management employees and Rhino
will only pay the premium for the employee. Spouse and family coverage will
be available to the employees at group rates. The difference between
Employee coverage and Spouse/Family coverage will be paid by the employee
through payroll deduction. Hourly, casual employees (those hired on and
laid off for projects) can buy health insurance by payroll deduction after
completing a thirty day (maybe we should make it 60 day) probationary
period. I think we could make our written policy with a provision that
hourly employees could sign up again without the thirty day probationary
period if it has been less than 90 days (something like that) since they
were laid off.

We have chosen a health insurance carrier that gives us both the best
coverage and the lowest premiums. We are turning in health insurance
applications for Al, Aileen, Wayne and me on Monday (the final deadline to
get insurance effective 1 Dec). I thought Richard would be included and
then be dropped thirty days after he leaves here at the end of November,
however, I understand from Aileen that Richard is not turning in an
application because he doesn't work for Rhino. I am not sure if we will
have a deal without Richard since the quote from the insurance company was
for five employees and that may be the minimum. This is just another
example of how Richard continues to throw a monkey wrench into our efforts
by making decisions and doing things without our knowledge. Basic business
logic: a situation where you have no control or jurisdiction over an
employee is a potentially costly and disruptive situation.

For me personally, this would be very bad because my cancer problem may end
up being a pre-existing condition if the insurance does not go into effect
on 1 Dec since my DZB coverage ran out on 31 Oct. (being covered during the
preceding 60 days keeps it from being pre-existing) This problem has the
potential for costing as much as $50,000 a year. I have already put this
off longer than I should have. To delay until the first of January would be
way too risky. If anything is going to queer this deal going into effect on
1 Dec, then I am going to apply individually without the group rate. I
can't even get an appointment right now without the insurance coverage. I
remind you that Rhino is to cover the cost of my health insurance, with or
without group coverage. I already had to spend $267 on medical expenses
unrelated to by cancer checkup.

Office Move:

I issued a purchase order yesterday to get Lito (the phone system guy) to
setup cables and outlets for the phones in the new office space. The
outlets will have provisions for computers too. He was supposed to do this
today so we could do our next step on Monday but he hasn't done it so far.
Mark is supposed to be here Monday to install the computer cables. We need

11/26/00

another desk so we are going to get one for Aileen on Monday ($400, along with a decent desk chair for me. Then, we would be ready to move everything anytime after Monday. This move is critical to our operation. We can't get organized and avoid the continued loss of incoming messages until we have a properly set up office space.

11/26/00 3b

| Subj: | **Fw: Schedule** |
| Date: | 1/29/01 6:34:21 AM Hawaiian Standard Time |
| From: | *maxxmgt@hawaii.rr.com (Maxx)* |
| To: | *maxxmgt@aol.com (Maxx Management)* |

---- Original Message ----
**From:** Maxx
**To:** Allen George - Guam
**Sent:** Monday, November 20, 2000 6:13 PM
**Subject:** Schedule

George - I will be at Gerry Lam's office at 0800 hours this morning. Gerry confirmed last night. I did not hear back from you about if the Government called the contract or bought revised schedules.

I am going to negotiate substance of Agreement with Gerry. ON pricing, if he has differences, that is Al's department working with you, All in all, I must finish my part today.

George / Mike O - I will call you when I finish with Gerry and let you know how it went.

Michael

----------------- Headers -----------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-yg05.mx.aol.com (rly-yg05.mall.aol.com [172.18.147.5]) by air-yg01.mail.aol.com (v77.31)
ESMTP; Mon, 29 Jan 2001 11:34:21 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yg05.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:33:54 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
   Mon, 29 Jan 2001 06:33:31 -1000
Message-ID: <026801c08a10$f888d240$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Schedule
Date: Mon, 29 Jan 2001 06:31:45 -1000
MIME-Version: 1.0
Content-Type: multipart/alternative;
   boundary="----=_NextPart_000_0265_01C089BD.26B208C0"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

39

Subj: **Fw: Regarding Update**
Date: 1/29/01 6:33:47 AM Hawaiian Standard Time
From: *maxxmgt@hawaii.rr.com (Maxx)*
To: *maxxmgt@aol.com (Maxx Management)*


----- Original Message -----
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: <rhinogwa@ite.net>
Cc: "O'Connell Michael" <Rhino1@hawaii.rr.com>
Sent: Monday, November 20, 2000 2:23 PM
Subject: Re: Regarding Update


> I explained this to you yesterday. Mike O explained to me that if
> BioGenesis hires Richard, he stays in Guam strictly on BPI's payroll. If
> BPI does not hire Richard, he is transferred to Guam, So, you do not have
to
> consider him for insurance.
>
> Michael
> ----- Original Message -----
> From: "George W. Allen" <rhinogwa@ite.net>
> To: "Michael Danforth (E-mail)" <Maxxmgt@aol.com>; "Michael Road Runner
> Danforth (E-mail)" <maxxmgt@hawaii.rr.com>; "Michael O'Connell (E-mail)"
> <rhino1@hawaii.rr.com>
> Sent: Monday, November 20, 2000 10:22 AM
> Subject: Regarding Update
>
>
> > In my email of 11/19 I asked for clarification on Richard's status as a
> > Rhino employee. Please respond. must know today for health insurance
> > reasons.
> >
>


------------------- Headers -------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from  rly-ye05.mx.aol.com (rly-ye05.mail.aol.com [172.18.151.202]) by air-ye02.mail.aol.com (v77.35)
with ESMTP; Mon, 29 Jan 2001 11:33:47 -0500
Received: from  hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-ye05.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:33:10 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com  with Microsoft SMTPSVC(5.5.1877.517.51);
   Mon, 29 Jan 2001 06:33:09 -1000
Message-ID: <025a01c08a10$eb781840$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Regarding Update
Date: Mon, 29 Jan 2001 06:31:23 -1000
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

Wednesday, January 31, 2001 America Online: Maxxmgt

40

41

| | |
|---|---|
| Subj: | **Fw: Subcontract Agreement BPI and RBI** |
| Date: | 1/29/01 6:33:05 AM Hawaiian Standard Time |
| *From:* | *maxxmgt@hawaii.rr.com (Maxx)* |
| *To:* | *maxxmgt@aol.com (Maxx Management)* |

—— Original Message ——
**From:** Maxx
**To:** Allen George - Guam
**Cc:** Gerry Lam ; O'Connell Michael
**Sent:** Monday, November 20, 2000 2:28 PM
**Subject:** Subcontract Agreement BPI and RBI

George - Gerry lam and myself went through the subcontract agreement and everything is agreed upon (changes are highlighted in Yellow) except for the pricing.

For the pricing - Please price a full time QC Manager and Safety Officer. Use what is commonly paid in Guam plus labor burdens. Divide the total yearly costs of the QCM and SO by 2. They will work for both companies. Get two pay checks per week. IF 1/2 the price is, let's say $50K then based on 2.5M per year total gross Delivery Orders, what is percentage. Then reduce all CLIN items unit price by that percentage.

Revise all years. E-mail to me and BPI.

Michael

———————— Headers ————————
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-zc01.mx.aol.com (rly-zc01.mail.aol.com [172.31.33.1]) by air-zc04.mail.aol.com (v77.31) with ESMTP; Mon, 29 Jan 2001 11:33:05 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-zc01.mx.aol.com (v77.27) with ESMTP; Mon, 29 Jan 2001 11:32:44 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
   Mon, 29 Jan 2001 06:32:42 -1000
Message-ID: <025401c08a10$db865e60$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Subcontract Agreement BPI and RBI
Date: Mon, 29 Jan 2001 06:30:57 -1000
MIME-Version: 1.0
Content-Type: multipart/alternative;
   boundary="----=_NextPart_000_0251_01C089BD.09BA4340"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

47

Wednesday, January 31, 2001 America Online: Maxxmgt

bj:       **RE: Richard Avilla**
Date:       11/22/00 12:28:44 PM West Pacific Standard Time
From:    rhinogwa@ite.net (George W. Allen)
ply-to: rhinogwa@ite.net
         Maxxmgt@aol.com, Bpihawaii@aol.com
         DeanAkita@hawaii.rr.com, russ@hgea.org

Mike, Gerry-I have reviewed the planned change regarding the safety officer and believe it should be eliminate
i  :e neither contract requires a dedicated safety officer, therefore, there is not a person paid full time for thes
Iuues. For example, I am the safety officer on the SOC contract and the Roofing contract allows for a
superintendent, project manager, etc. to be the safety officer.

.L. me know so I can finalize the numbers. Dean should be giving me the labor burden to add by tomorrow
norning.

3. ry - Call me about this at (671) 727-8668.

h-nks

> -----Original Message-----
> **From:** Maxxmgt@aol.com [mailto:Maxxmgt@aol.com]
> **Sent:** Tuesday, November 21, 2000 2:29 PM
> **To:** Bpihawaii@aol.com
> **Cc:** DeanAkita@hawaii.rr.com; RhinoGWA@ite.net; russ@hgea.org
> **Subject:** Richard Avilla
>
> Dear Gerry - Thanks very much for your kind asistance in the development of a
> fair agreement with Rhino (RBI).
>
> George is developing another st of unit CLIN pricing sheets, all years, to
> accomodate BPI's overhead for one-half of a Quality Control Manager (QCM) and
> a Safety Officer (SO). As we agreed today, the QCM and SO will be employed by
> both companies. Payment will be based on their employee time sheets for work
> hours for either company.
>
> Gerry, based on the payment to RBI for 1/2 of Richard from 12 July through 17
> Nov, BPI must employ **Richard begining 18 November 2000**. If you cannot do
> this, please call George (671) 727-8668 so the confusion will not continue.
> **GEORGE - PLEASE CALL GERRY TO FINSIH THIS SUBJECT.**
>
> The only other thing I changed in the subcontract agreement is that I remove
> attachment 3, cost details for Richard.
>
> Thank you again Gerry for your assistance. Please make every effort to finish
> with GEORGE in the next two day so Rhino can move forward very quickly.
>
> Michael

----------------- Headers -----------------
P   'm-Path: <rhinogwa@ite.net>
     $ived: from rly-ye05.mx.aol.com (rly-ye05.mail.aol.com [172.18.151.202]) by air-ye01.mail.aol.com (v77.1
v. h ESMTP; Tue, 21 Nov 2000 21:28:44 -0500
Received: from ite.net (ite02.ite.net [205.230.132.3]) by rly-ye05.mx.aol.com (v76_r1.19) with ESMTP; Tue, 2
Nov 2000 21:07:32 -0500
F  :ceived: from rhinoserver (ppp119.JJ.ite.net [202.123.134.119] (may be forged))
  by ite.net (8.10.0/8.10.0) with SMTP id eAM2D1w26448;

| Subj: | (no subject) |
|---|---|
| Date: | 11/23/00 3:50:58 PM Hawaiian Standard Time |
| From: | Maxxmgt |
| To: | RhinoGWA@ite.net, Bpihawaii |
| CC: | DeanAkita@Hawaii.rr.com, Rhino1@hawaii.rr.com, russ@hgea.org |
| BCC: | Keokialoha |

George - Thank you for your detailed report. I have copied a portion of the report for copy to BPI (Gerry and Russ) and will comment on that portion so Gerry and Russ and benefit for the same information rather than mouth to mouth relay. NOTE: Original message written in "BLUE" type. My comments written in "BLACK" type.

Wednesday I left a phone message for Gerry and sent him an email so we could talk about this but haven't heard back from him on either message. I plan to pursue only deducting for the proportionate amount of one half the QCM fully burdened salary, based on 2.5 million annual volume, no more. This should be fairly easy since I only have to change the base year. The option years are automatic calculated from the base year. **Note: This sounds easy enough. FYI - BPI is now into their 1st option year as of 29 September 2000. Gerry allowed me to see the government letter for approval of the 1st option year**

On a further update. Everything is squared away regarding Richard's employment status so that where we are in reality is the same as what you and Michael O have stated. He has decided that he will stay with BPI if he can work things out with them, **(I take this to mean that BPI has not negotiated with Richard at the time of your correspondence. All received an e-mail that BPI must pick up BPI on their payroll starting 18 November 2000. Gerry - Please respond on this)** that he would live in the house next to our office (where he is now) and that his (BPI's) office will be there. One thing I would like to have your blessing on is the idea that Richard and the shared QCM would be on Rhino's group health insurance. **( I have no problem with this and I will let Mike O make the final decision. By doing so, the insurance rates will be lowered for all. Rhino can invoice BPI for the direct cost)** I think this can be done without violating the contractor/subcontractor relationship since the premium would be paid by RBI for the full monthly amount then billed to BPI. This would not be factored into the price adjustment since it would be billed monthly as a recovery to keep the contractor/subcontractor relationship clean. The premium for the QCM will be part of the burden so it will be factored into the price adjustments. The only other change I would like to suggest in the way you worked things out is that we simply split the hours 50/50 **(I have no problem with this. We must has BPI's approval. Gerry - Do you approve??)** on the QCM since this is the way it is being factored in the price adjustment rather than trying to do each pay check based on actual timesheet hours.

Office update - Our phones are installed in the new office so we have the ability to use phones system in either place for now and can move as soon as everything else is in place.. Cabling for the computers will be done this weekend and we should be able to move early next week. Richard will stay behind where he has a dedicated phone line (paid by BPI) and his computer is not connected to our network. The only connection to RBI will be that one of our phone system extensions will be on his desk (to allow us to provide secretarial support to BPI.

Gerry - Please address the matters at hand via e-mail, if you choose or simply call George. I would prefer e-mail so there is no confusiion on what is determined and agreed upon.

I heard from my mother that you tried to call me in Florida. I am traveling abroad (difficult to use the phone) and have my laptop with me so please fell free to e-mail me at maxxmgt@aol.com . I check my mail at least tiwce a day.

I sense that we are close to an agreement. Please expedite with George.

Have you heard from the Government on approved revised schedules?

Yours truly - Michael

Wednesday, December 20, 2000 America Online: Maxxmgt

44

**Michael O'Connell**

| | |
|---|---|
| **From:** | <Maxxmgt@aol.com> |
| **To:** | <Bpihawaii@aol.com> |
| **Cc:** | <Rhino1@hawaii.rr.com>; <RhinoGWA@ite.net>; <DeanAkita@hawaii.rr.com>; |
| **Sent:** | Monday, November 27, 2000 1:13 PM |
| **Attach:** | ATT00650.eml |
| **Subject:** | Adjusted CLIN Prices |

Gerry - No one has heard form you since I left. Please contract George (671)727-8668 to finalize on Wed, 28th.

Michael

45

12/12/00

| Subj: | **Adjusted Prices** |
|---|---|
| Date: | 11/28/00 7:40:52 AM West Pacific Standard Time |
| From: | rhinogwa@ite.net (George W. Allen) |
| Reply-to: | rhinogwa@ite.net |
| To: | Bpihawaii@aol.com |
| CC: | Maxxmgt@aol.com (Michael Danforth (E-mail)), rhino1@hawaii.rr.com (Michael O'Connell (E-mail)) |
| File: | **RBI to BPI Pricing 28 Nov.xls** (114688 bytes) DL Time (TCP/IP): < 1 minute |

Gerry,

I am attaching the spreadsheet with adjusted RBI to BPI prices. The new prices are reduced to credit BPI with 50% of the burdened cost of the Quality Control Manager based on an assumed annual volume of $2,500,000. The burdened QCM was based on $22.50 per hour for 2080 hours per year plus 15% burden which is $26,910.

The tab "Price Calcs" shows the calculations with our original proposed prices and adjusted prices for the base year and then the adjusted prices for all option years. The average total increase in the BPI percentage is 1.08% which results in an increase of $27,000 in the BPI annual net based on $2,500,000 annual volume.

I convinced Michael Danforth, and I hope you will agree that the Safety Officer should not be included in this adjustment because there is no requirement for a full time dedicated Safety Officer for the contract. The Safety Officer can be a collateral duty of someone such as the Project Manager. Considering this, there will not be a single person for whom 40 hours per week is attributed to Safety Officer. On our SOC contract, I am the Safety Officer and I seldom clock 3 hours per week in that capacity.

We also feel that it will be much cleaner if we simply do 50% of the CQM time on BPI payroll and 50% on RBI payroll rather than trying to account for actual hours since the price adjustment is based on an assumed 50% each. Not to mention the potential accounting nightmare.

I need your concurrence on the adjusted prices as soon as possible so I can recalculate the BPI to RBI delivery orders for D.O. 0001 through 0017 and send them to you for approval. The tabs "Base Year", "Option Year 1", "Option Year 2", "Option Year 3", "Option Year 4" will become attachments to the master agreement between BPI and RBI.

If you have any questions or need to discuss, please call me at (671) 632-9653 or on my cell at (671) 727-8668.

Thanks,

George

------------------ Headers ------------------
Return-Path: <rhinogwa@ite.net>
Received: from rly-zc04.mx.aol.com (rly-zc04.mail.aol.com [172.31.33.4]) by air-zc04.mail.aol.com (v77.14) with ESMTP; Mon, 27 Nov 2000 16:40:51 -0500
Received: from ite.net (ite02.ite.net [205.230.132.3]) by rly-zc04.mx.aol.com (v76_r1.19) with ESMTP; Mon, 27 Nov 2000 16:39:28 -0500
Received: from rhinoserver (ppp226.JJ.ite.net [202.123.134.226]) (may be forged))

Wednesday, December 20, 2000 America Online: Maxxmgt

Case 1:02-cv-00008     Document 438-2     Filed 08/17/2004     Page 51 of 61

Cc: "Michael Danforth (E-mail)" <Maxxmgt@aol.com>
Subject: RE: Richard's employment transition to BPI
Date: Wed, 29 Nov 2000 18:11:04 +1000
Message-ID: <000301c059db$ebdfda80$0300a8c0@rhinoserver>
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3 (Normal)
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook CWS, Build 9.0.2416 (9.0.2910.0)
X-MimeOLE: Produced By Microsoft MimeOLE V5.00.2615.200
Importance: Normal
In-Reply-To: <7e.d8073aa.27558144@aol.com>

47

| Subj: | **Re: (no subject)** |
|---|---|
| Date: | 11/29/00 6:56:07 AM West Pacific Standard Time |
| From: | Bpihawaii |
| To: | Maxxmgt |
| CC: | rhinogwa@ite.net |

I just returned from the Big Island and am going over my email. The following is my input to your 11-23-00 discussion.

1. BPI had earlier come to an agreement with Richard as to employment. Aslo Mike O'Connell had notified me earlier that Rhino would be covering Richard until November 30, afterwhich Richard will be either taken up by BPI or else shipped home to Rhino's oiffice in Hawaii. Based upon this, I had agreed with Mike and Richard to take on Richard into BPI.

2. Please arrange for Richard's health insurance under Rhino's policy and invoice BPI accordingly.

3. I have not heard (myself) about the Navy's rescheduling of work as of yet. I don't foresee or expect any difficulties at all if Al and Richard are given the discretion and freedom to "malama" the situation which is to everyone's benefit.

I'll call into George by phone.

Mahalo,

Gerry

Wednesday, December 20, 2000 America Online: Maxxmgt

Michael,

I have been on the Big Island on some emergencies. I just concluded a landmark negotiation successfully the importance of which is significant for me. I just downloaded the spreadsheet and have replied to George and the prior emails. Things with Richard are squared away okay. Mike O had notified me awhile ago that Rhino would be covering Richard to Nove 30 and BPI should take over from there. I cleared that with Richard earlier this month and finalized that long ago.

Though I haven't reveiwed it yet, I don't foresee having any problem with the CLINs and also trust that shoud we need to adjust it fairly for BPI or Rhino that we would be able to do so.

aloha,

Gerry

Case 1:02-cv-00008    Document 438-2    Filed 08/17/2004    Page 54 of 61

Subj: **RE: Richard's employment transition to BPI**
Date: 11/29/00 6:15:36 PM West Pacific Standard Time
From: rhinogwa@ite.net (George W. Allen)
Reply-to: rhinogwa@ite.net
To: Bpihawaii@aol.com
CC: Maxxmgt@aol.com (Michael Danforth (E-mail))

I am going to address all of your emails in this one answer.

Glad to hear everything is coming along. I am pleased that Richard will continue as BPI's project manager. As for timing of transition, that is up to you, Michael O'Connell and Richard. The health insurance is a done deal.

Look over the spreadsheet I sent you as it is the last thing that needs top be accomplished to finalize the agreement and enable me to produce the BPI to RBI delivery orders. Again, what the revised prices accomplish is an increase in BPI's annual net of $27,000 (1/2 QCM) on a volume of $2,500,000.

Al and Richard continue to do the roofing jobs unimpeded. We have hired a new experienced Quality Control Manager today who will be working part time for us while working out two weeks notice to current employer so we should be able to provide additional support in that area.

Looking forward to a profitable and pleasant association.

George

-----Original Message-----
From: Bpihawaii@aol.com [mailto:Bpihawaii@aol.com]
Sent: Wednesday, November 29, 2000 7:45 AM
To: rhinogwa@ite.net
Subject: Richard's employment transition to BPI


George,

I had agreed awhile ago with Mike O'Connell's directive that Rhino would cover Richard to Nov 30 and expect BPI to pick up Richard thereafter. Richard should be covered by Rhino to Nov. 30. BPI will pick it up thereafter. I had later agreed with Michael D. to foot $7,500 concerning Richard's service since July.


Gerry

------------------ Headers ------------------
Return-Path: <rhinogwa@ite.net>
Received: from rly-zd03.mx.aol.com (rly-zd03.mail.aol.com [172.31.33.227]) by air-zd04.mail.aol.com (v77.14)
with ESMTP; Wed, 29 Nov 2000 03:15:36 -0500
Received: from ite.net (ite02.ite.net [205.230.132.3]) by rly-zd03.mx.aol.com (v76_r1.19) with ESMTP; Wed, 29
Nov 2000 03:15:08 -0500
Received: from rhincserver (ppp238.JJ.ite.net [202.123.134.238] (may be forged))
    by ite.net (8.10.0/8.10.0) with SMTP id eAT8Khn24495;
    Wed, 29 Nov 2000 18:20:43 +1000 (GST)
Reply-To: <rhinogwa@ite.net>
From: "George W. Allen" <rhinogwa@ite.net>
To: <Bpihawaii@aol.com>

Cc: "Michael Danforth (E-mail)" <Maxxmgt@aol.com>
Subject: RE: Richard's employment transition to BPI
Date: Wed, 29 Nov 2000 18:11:04 +1000
Message-ID: <000301c059db$ebdfda80$0300a8c0@rhinoserver>
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3 (Normal)
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook CWS, Build 9.0.2416 (9.0.2910.0)
X-MimeOLE: Produced By Microsoft MimeOLE V5.00.2615.200
Importance: Normal
In-Reply-To: <7e.d8073aa.27558144@aol.com>

51

**From:**       <Maxxmgt@aol.com>
**To:**          <Bplhawaii@aol.com>
**Cc:**          <RhinoGWA@ite.net>; <DeanAkita@hawaii.rr.com>; <russ@hgea.org>;
**Sent:**        Wednesday, November 29, 2000 3:58 PM
**Subject:**    Response to your communique`

Gerry - Thanks for the reply.

The only comment I have is that since Mike O'Connell stated to you the 30th,
we must adjust the reimbursement dollar amount for Richard to 30th Nov.
Cut-off we used is 18 Nov.

Thank you - I will be in Hawaii on Thursday.

Mahalo - Michael

$5^2$

12/12/00

Subj:       **BPI Contract Summary**
Date:       12/2/00 12:43:25 PM West Pacific Standard Time
From:   rhinogwa@ite.net (George W. Allen)
Reply-to: rhinogwa@ite.net
To:   Maxxmgt@aol.com (Michael Danforth (E-mail)), maxxmgt@hawaii.rr.com (Michael Road Runner Danforth
(E-mail))
File:       **BPI & RBI CLIN Useage.xls** (1060864 bytes) DL Time (TCP/IP): < 3 minutes

Just to let you know.

I have completed all of the BPI to RBI Delivery Orders with the new prices
adjusted to account for the QCM. I have run a check and a cross check on
these and everything seems to be right.
I have entered the data into my summary sheet and found that BPI's total
take from the first 17 D.O.s is 3.95%. There are many CLINs that went over
the limit for the base year. I have seen no contract modification(s) to
make these changes although I think we heard that BPI agreed to hold the
prices (silly move).

I am sending you the raw summary sheet for your info.

When you say, I will send the delivery orders to BPI.


------------------- Headers -------------------------
Return-Path: <rhinogwa@ite.net>
Received: from rly-yc01.mx.aol.com (rly-yc01.mail.aol.com [172.18.149.33]) by air-yc05.mail.aol.com (v77.14)
with ESMTP; Fri, 01 Dec 2000 21:43:05 -0500
Received: from ite.net (ite02.ite.net [205.230.132.3]) by rly-yc01.mx.aol.com (v76_r1.19) with ESMTP; Fri, 01
Dec 2000 20:48:12 1900
Received: from rhinoserver (ppp118.JJ.ite.net [202.123.134.118] (may be forged))
   by ite.net (8.10.0/8.10.0) with SMTP id eB21p2201237;
   Sat, 2 Dec 2000 11:51:02 +1000 (GST)
Reply-To: <rhinogwa@ite.net>
From: "George W. Allen" <rhinogwa@ite.net>
To: "Michael Danforth (E-mail)" <Maxxmgt@aol.com>,
   "Michael Road Runner Danforth (E-mail)" <maxxmgt@hawaii.rr.com>
Subject: BPI Contract Summary
Date: Sat, 2 Dec 2000 11:40:57 +1000
Message-ID: <000401c05c00$eb6cb7e0$0300a8c0@rhinoserver>
MIME-Version: 1.0
Content-Type: multipart/mixed;
   boundary="----=_NextPart_000_0005_01C05C54.BD18C7E0"
X-Priority: 3 (Normal)
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook CWS, Build 9.0.2416 (9.0.2910.0)
Importance: Normal
X-MimeOLE: Produced By Microsoft MimeOLE V5.00.2615.200

---

Subj: **Fw: Gerry - Please call me - I am back in Hawaii**
Date: 1/29/01 6:31:24 AM Hawaiian Standard Time
*From:* *maxxmgt@hawaii.rr.com (Maxx)*
*To:* *maxxmgt@aol.com (Maxx Management)*

---

----- Original Message -----
**From:** Maxx
**To:** Gerry Lam
**Cc:** Fong Russ
**Sent:** Sunday, December 03, 2000 4:20 PM
**Subject:** Gerry - Please call me - I am back in Hawaii

Gerry - I received your message on my cell when I returned to Hawaii. Please call me as soon as you can. Cell 778-4614 or home 942-7569.

My cell does not work abroad. I left with you my laptop e-address: maxxmgt@aol.com

I will be at Rhino's office tomorrow morning. 778-6020.

Michael

---

---------------- Headers ----------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-yh03.mx.aol.com (rly-yh03.mail.aol.com [172.18.147.35]) by air-yh05.mail.aol.com (v77.31) with ESMTP; Mon, 29 Jan 2001 11:31:24 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yh03.mx.aol.com (v77.27) with ESMTP; Mon, 29 Jan 2001 11:30:59 1900
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51); Mon, 29 Jan 2001 06:30:54 -1000
Message-ID: <021201c08a10$9b331560$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Gerry - Please call me - I am back in Hawaii
Date: Mon, 29 Jan 2001 06:29:09 -1000
MIME-Version: 1.0
Content-Type: multipart/alternative;
    boundary="----=_NextPart_000_020F_01C089BC.C95C4BE0"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

54

Subj:   Fw: Guam Roofing CLINs
Date:   1/29/01 6:29:45 AM Hawaiian Standard Time
From:   maxxmgt@hawaii.rr.com (Maxx)
To:   maxxmgt@aol.com (Maxx Management)

—— Original Message ——
From: Maxx
To: Gerry Lam
Cc: Allen George - Guam
Sent: Wednesday, December 06, 2000 10:52 AM
Subject: Fw: Guam Roofing CLINs

Gerry - this is George's response. I also spoke with him yesterday and realized that the original premise, incorporated in the latest Clines is to provide whatever support the contract requires. So - Rhino will support BPI with secretarial support. If Aileen, George's secretary, cannot keep up, then another will be brought on to maintain solid support.

Michael
—— Original Message ——
From: George W. Allen
To: 'Maxx'
Cc: 'Gerry Lam'
Sent: Tuesday, December 05, 2000 5:32 PM
Subject: RE: Guam Roofing CLINs

The only thing that changed from the original proposed prices to the ones dated 28 Nov is that 1/2 of the QCM was deducted from our prices (based on assumed annual volume of 2,500,000). My understanding was that the original prices included all administrative support, virtually everything, except the cost of the Project Manager's compensation package.

Is that right?

-----Original Message-----
From: Maxx [mailto:maxxmgt@hawaii.rr.com]
Sent: Wednesday, December 06, 2000 11:03 AM
To: Allen George - Guam
Cc: Gerry Lam
Subject: Guam Roofing CLINs

George - I spoke to Gerry (BPI) at length today. Please quickly outline for us what the CLINs as recently presented by you represent in Overhead. For example: 1/2 QCM. 1/2 Safety Officer, 1/2 secretary, etc.

The questions is: Can you spare Aileen 1/2 time for the SOC & Other contracts and 1/2 time for BPI???

If not, please calculate a full time secretary's time and deduct form CLINs. Produce the new excel file with current date so we know which file is latest. If possible, please send new file (CLINs) by Friday, HT.

Michael

————————— Headers —————————
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-zd01.mx.aol.com (rly-zd01.mail.aol.com [172.31.33.225]) by air-zd05.mail.aol.com (v77.31) with ESMTP; Mon, 29 Jan 2001 11:29:45 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-zd01.mx.aol.com (v77.27) with ESMTP; Mon, 29 Jan 2001 11:29:12 -0500

55

Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
   Mon, 29 Jan 2001 06:29:09 -1000
Message-ID: <01bb01c08a10$5c6f9420$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Guam Roofing CLINs
Date: Mon, 29 Jan 2001 06:27:23 -1000
MIME-Version: 1.0
Content-Type: multipart/alternative;
   boundary="----=_NextPart_000_01B8_01C089BC.8AA1F260"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

56

Subj:    **Fw: Guam Roofing CLINs**
Date:    1/29/01 6:30:28 AM Hawaiian Standard Time
*From:*  maxxmgt@hawaii.rr.com (Maxx)
*To:*    maxxmgt@aol.com (Maxx Management)

—— Original Message ——
**From:** Maxx
**To:** Allen George - Guam
**Cc:** Gerry Lam
**Sent:** Tuesday, December 05, 2000 3:02 PM
**Subject:** Guam Roofing CLINs

George - I spoke to Gerry (BPI) at length today. Please quickly outline for us what the CLINs as recently presented by you represent in Overhead. For example: 1/2 QCM. 1/2 Safety Officer, 1/2 secretary, etc.

The questions is: Can you spare Aileen 1/2 time for the SOC & Other contracts and 1/2 time for BPI???

If not, please calculate a full time secretary's time and deduct form CLINs. Produce the new excel file with current date so we know which file is latest.  If possible, please send new file (CLINs) by Friday, HT.

Michael

———————— Headers ————————
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-xd01.mx.aol.com (rly-xd01.mail.aol.com [172.20.105.166]) by air-xd04.mail.aol.com (v77.31) with ESMTP; Mon, 29 Jan 2001 11:30:28 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-xd01.mx.aol.com (v77.27) with ESMTP; Mon, 29 Jan 2001 11:30:09 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:30:08 -1000
Message-ID: <01ef01c08a10$7f6f8a20$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Guam Roofing CLINs
Date: Mon, 29 Jan 2001 06:28:22 -1000
MIME-Version: 1.0
Content-Type: multipart/alternative;
    boundary="——=_NextPart_000_01EC_01C089BC.ADA1E860"
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

57

| Subj: | **Fw: Fw: Guam Roofing CLINs** |
|---|---|
| Date: | 1/29/01 6:29:29 AM Hawaiian Standard Time |
| *From:* | *maxxmgt@hawaii.rr.com (Maxx)* |
| *To:* | *maxxmgt@aol.com (Maxx Management)* |

----- Original Message -----
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: <Bpihawaii@aol.com>
Cc: "Allen George - Guam" <RhinoGWA@ite.net>
Sent: Thursday, December 07, 2000 11:39 AM
Subject: Re: Fw: Guam Roofing CLINs

> Gerry - I understand. You want a full time secretary on BPI's payroll.
>
> George - Please adjust CLINs for the above.
>
> Michael
>
> --- Original Message -----
> From: <Bpihawaii@aol.com>
> To: <maxxmgt@hawaii.rr.com>
> Sent: Thursday, December 07, 2000 10:04 AM
> Subject: Re: Fw: Guam Roofing CLINs
>
>
> > Mike,
> >
> > The reality is that I cannot expect to have a Program Manager on the
Guam
> > Contract without a secretary to man the office. It is a bad precedent
and
> a
> > classic mistake of management to have Richard depend upon another
> company's
> > secretary. Also, I don't Richard or anyone will be able to effectively
> > function without a secretary.
> >
> > I think it more practical that the Guam contract have a dedicated
> secretary.
> > If BPI has to make her parttime then it will have to be. But if work
> > increases, then BPI has a full time available. This will also keep BPI
> > easier in meeting SBA regulations of work performance II can title the
> > secretary anything). Moreso, being long distance, the less worry I have
> the
> > better. The secretary can plug into George and vice-versa for BPI's
> matters.
> >
> > Gerry
>

-------------------- Headers --------------------
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-za05.mx.aol.com (rly-za05.mail.aol.com [172.31.36.101]) by air-za03.mail.aol.com (v77.31)
with ESMTP; Mon, 29 Jan 2001 11:29:28 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-za05.mx.aol.com (v77.27) with

ESMTP; Mon, 29 Jan 2001 11:28:39 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com  with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:28:37 -1000
Message-ID: <01a301c08a10$49a60220$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Fw: Guam Roofing CLINs
Date: Mon, 29 Jan 2001 06:26:52 -1000
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

5 9

Subj:    **Fw: Fw: Guam Roofing CLINs**
Date:    1/29/01 6:28:14 AM Hawaiian Standard Time
From:    *maxxmgt@hawaii.rr.com (Maxx)*
To:    *maxxmgt@aol.com (Maxx Management)*

----- Original Message -----
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: <rhinogwa@ite.net>
Sent: Friday, December 08, 2000 8:09 AM
Subject: Re: Fw: Guam Roofing CLINs


> George - We adjust the CLINs because we have stated to Gerry that RBI will
> supply all Project Office Overhead except Richard.
>
> Michael
> ----- Original Message -----
> From: "George W. Allen" <rhinogwa@ite.net>
> To: "'Maxx'" <maxxmgt@hawaii.rr.com>
> Sent: Thursday, December 07, 2000 4:51 PM
> Subject: RE: Fw: Guam Roofing CLINs
>
>
> > OK. I understand that Gerry wants a full time secretary but why do we
> > adjust the CLINs. In assessing cost, we would have based our annual
cost
> of
> > providing secretarial support on an average of 3 hours per day which is
> > about what Aileen puts in on strictly BPI work. If Gerry chooses to
have
> a
> > full time secretary for his own purposes, rather than just as is
necessary
> > to support the BPI Project Manager then shouldn't that be his cost? I
can
> > also see more office space, furniture, equipment, computers, etc., etc.,
> > being loaded onto us with this move. Do we really want to do this? At
> > best, I think we should credit back $1,600.00 which is the cost of
> secretary
> > for 3 hours per day at $9 per hour. That would mean an adjustment of
> .065%
> > which won't even change most CLINs.
> >
> > Let me know how you want top do it. This last minute change has already
> > cost us because we have paid to have telephones, etc. set up so Aileen
> could
> > answer Richard's phone from our office. But, this will be a positive
for
> > me. If BPI has their own secretary then I can recover two of the Rhino
> > phones and use them in our office although now I will have one too many
> > since I just bought another for $350.
> >
> > -----Original Message-----
> > From: Maxx [mailto:maxxmgt@hawaii.rr.com]
> > Sent: Friday, December 08, 2000 7:40 AM
> > To: Bpihawaii@aol.com
> > Cc: Allen George - Guam
> > Subject: Re: Fw: Guam Roofing CLINs

> >
> >
> > Gerry - I understand. You want a full time secretary on BPI's payroll.
> >
> > George - Please adjust CLINs for the above.
> >
> > Michael
> >
> > — Original Message —
> > From: <Bplhawaii@aol.com>
> > To: <maxxmgt@hawaii.rr.com>
> > Sent: Thursday, December 07, 2000 10:04 AM
> > Subject: Re: Fw: Guam Roofing CLINs
> >
> >
> > > Mike,
> > >
> > > The reality is that I cannot expect to have a Program Manager on the
> > Guam
> > > Contract without a secretary to man the office. It is a bad precedent
> > and
> > a
> > > classic mistake of management to have Richard depend upon another
> > company's
> > > secretary. Also, I don't Richard or anyone will be able to
effectively
> > > function without a secretary.
> > >
> > > I think it more practical that the Guam contract have a dedicated
> > secretary.
> > > If BPI has to make her parttime then it will have to be. But if work
> > > increases, then BPI has a full time available. This will also keep
BPI
> > > easier in meeting SBA regulations of work performance II can title the
> > > secretary anything). Moreso, being long distance, the less worry I
have
> > the
> > > better. The secretary can plug into George and vice-versa for BPI's
> > matters.
> > >
> > > Gerry
> >
> >

————————— Headers —————————
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-ye03.mx.aol.com (rly-ye03.mail.aol.com [172.18.151.200]) by air-ye03.mail.aol.com (v77.35)
with ESMTP; Mon, 29 Jan 2001 11:28:14 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-ye03.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:27:54 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
  Mon, 29 Jan 2001 06:27:52 -1000
Message-ID: <017c01c08a10$2eb38280$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Fw: Guam Roofing CLINs
Date: Mon, 29 Jan 2001 06:26:07 -1000
MIME-Version: 1.0

Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

| Subj: | Fw: Fw: Guam Roofing CLINs |
| Date: | 1/29/01 6:28:10 AM Hawaiian Standard Time |
| From: | maxxmgt@hawaii.rr.com (Maxx) |
| To: | maxxmgt@aol.com (Maxx Management) |

----- Original Message -----
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Sent: Sunday, December 10, 2000 9:15 AM
Subject: Fw: Fw: Guam Roofing CLINs


>
> ----- Original Message -----
> From: "George W. Allen" <rhinogwa@ite.net>
> To: "'Maxx'" <maxxmgt@hawaii.rr.com>
> Sent: Friday, December 08, 2000 12:29 PM
> Subject: RE: Fw: Guam Roofing CLINs
>
>
> > OK. But, in my estimation, our cost for providing secretarial support
to
> > BPI would be far short of a full-time secretary with furniture,
computer,
> > etc., etc. Keep in mind that the lion's share of secretarial work being
> > done for Richard right now will cease when Rhino is hiring all of the
> > workers, buying all of the materials, paying all of the bills, etc. Our
> > plan was that our secretary would do the BPI work along with our work
with
> > only about 2 - 3 hours per day of her time (based on Aileen's input) and
> we
> > would need no extra office furniture, computer, fax machine, copy
machine,
> > transportation, etc., etc. Now, if BPI wishes, for their own purposes,
to
> > have a full-time secretary shouldn't BPI bear that cost? Why don't we
> > suggest that we make the adjustment to the original proposed prices as
> > follows:
> >
> > QCM @ 22.50/hr x 2080 hours x 1.15 (burden) = 53,820
> >
> > Secretary @ 9.00/hr x 2080 hours x 1.15 (burden) = 21,528
> >
> > 53,820 + 21,528 = 74,808 / 2 = 37,404 (each company's 50% share of the
> total
> > cost for both people)
> >
> > 37,404 / 2,500,000 (assumed annual volume) = 1.5% increase in BPI annual
> > net.
> >
> > This only addresses costs for burdened wages, not equipment, furniture,
> > etc., etc. If BPI is going to have a full-time secretary who is going
to
> > provide office furniture, computer, fax machine, copy machine, printer,
> > transportation, etc., etc.? We need to be in agreement on these details
> > before we sign an agreement. This (not for general distribution) is
> because
> > I can see Richard starting to flex his muscles and make demands for more

> and
> > more. Trust me, it is coming. My observation is that he thinks he
> should
> > be getting everything that I am getting.
> >
> > Let me know what you want to do.
> >
> > Actually, I am pleased with the idea that we will gain this separation
> and
> > not be sharing secretaries. It is just that there will be a lot of cost
> > involved in the duplication of facilities. While we are at it, I want
> to
> > make sure that you and Gerry are on board with the idea that BPI should
> > not
> > share our telephone system since they have their own telephone. The
> only
> > reason I had planned to have one of our extensions on Richard's desk was
> > so
> > he could communicate with Aileen for his secretarial work without
> walking
> > next door.
> >
> > George
> >
> > ——Original Message——
> > From: Maxx [mailto:maxxmgt@hawaii.rr.com]
> > Sent: Saturday, December 09, 2000 4:09 AM
> > To: rhinogwa@ite.net
> > Subject: Re: Fw: Guam Roofing CLINs
> >
> >
> > George - We adjust the CLINs because we have stated to Gerry that RBI
> will
> > supply all Project Office Overhead except Richard.
> >
> > Michael
> > —— Original Message ——
> > From: "George W. Allen" <rhinogwa@ite.net>
> > To: "'Maxx'" <maxxmgt@hawaii.rr.com>
> > Sent: Thursday, December 07, 2000 4:51 PM
> > Subject: RE: Fw: Guam Roofing CLINs
> >
> > >
> > > OK. I understand that Gerry wants a full time secretary but why do we
> > > adjust the CLINs. In assessing cost, we would have based our annual
> > cost
> > of
> > > providing secretarial support on an average of 3 hours per day which
> is
> > > about what Aileen puts in on strictly BPI work. If Gerry chooses to
> > have
> > a
> > > full time secretary for his own purposes, rather than just as is
> > necessary
> > > to support the BPI Project Manager then shouldn't that be his cost? I
> > can
> > > also see more office space, furniture, equipment, computers, etc.,
> etc.,
> > > being loaded onto us with this move. Do we really want to do this?
> At
> > > best, I think we should credit back $1,600.00 which is the cost of

64

> > secretary
> > > for 3 hours per day at $9 per hour.  That would mean an adjustment of
> > > .065%
> > > which won't even change most CLINs.
> > >
> > > Let me know how you want top do it.  This last minute change has already
> > > cost us because we have paid to have telephones, etc. set up so Aileen
> > could
> > > answer Richard's phone from our office.  But, this will be a positive
> for
> > > me.  If BPI has their own secretary then I can recover two of the Rhino
> > > phones and use them in our office although now I will have one too many
> > > since I just bought another for $350.
> > >
> > > ———Original Message———
> > > From: Maxx [mailto:maxxmgt@hawaii.rr.com]
> > > Sent: Friday, December 08, 2000 7:40 AM
> > > To: Bpihawaii@aol.com
> > > Cc: Allen George - Guam
> > > Subject: Re: Fw: Guam Roofing CLINs
> > >
> > >
> > > Gerry - I understand.  You want a full time secretary on BPI's payroll.
> > >
> > > George - Please adjust CLINs for the above.
> > >
> > > Michael
> > >
> > > — Original Message —
> > > From: <Bpihawaii@aol.com>
> > > To: <maxxmgt@hawaii.rr.com>
> > > Sent: Thursday, December 07, 2000 10:04 AM
> > > Subject: Re: Fw: Guam Roofing CLINs
> > >
> > >
> > > > Mike,
> > > >
> > > > The reality is that I cannot expect to have a Program Manager on the
> > Guam
> > > > Contract without a secretary to man the office.  It is a bad precedent
> > and
> > > a
> > > > classic mistake of management to have Richard depend upon another
> > > company's
> > > > secretary.  Also, I don't Richard or anyone will be able to
> effectively
> > > > function without a secretary.
> > > >
> > > > I think it more practical that the Guam contract have a dedicated
> > > secretary.
> > > > If BPI has to make her parttime then it will have to be.  But if work
> > > > increases, then BPI has a full time available.  This will also keep
> BPI
> > > > easier in meeting SBA regulations of work performance II can title the
> > > > secretary anything).  Moreso, being long distance, the less worry I

```
> have
> > > the
> > > > better. The secretary can plug into George and vice-versa for BPI's
> > > matters.
> > > >
> > > > Gerry
> > >
> >
>
```

———————— Headers ————————
Return-Path: <maxxmgt@hawaii.rr.com>
Received: from rly-yh03.mx.aol.com (rly-yh03.mail.aol.com [172.18.147.35]) by air-yh03.mail.aol.com (v77.31)
with ESMTP; Mon, 29 Jan 2001 11:28:09 -0500
Received: from hawaii.rr.com (hnlmail1.hawaii.rr.com [24.25.227.33]) by rly-yh03.mx.aol.com (v77.27) with
ESMTP; Mon, 29 Jan 2001 11:27:31 -0500
Received: from LocalHost ([24.25.254.136]) by hawaii.rr.com with Microsoft SMTPSVC(5.5.1877.517.51);
    Mon, 29 Jan 2001 06:27:26 -1000
Message-ID: <016301c08a10$1ec1c8a0$88fe1918@hawaii.rr.com>
From: "Maxx" <maxxmgt@hawaii.rr.com>
To: "Maxx Management" <maxxmgt@aol.com>
Subject: Fw: Fw: Guam Roofing CLINs
Date: Mon, 29 Jan 2001 06:25:40 -1000
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook Express 5.50.4522.1200
X-MimeOLE: Produced By Microsoft MimeOLE V5.50.4522.1200

66

# Michael Danforth Deposition
# Exhibit No. "14"

# Michael O'Connell

**From:** <Maxxmgt@aol.com>
**To:** <RhinoGWA@ite.net>;
**Sent:** Friday, November 10, 2000 3:24 AM
**Subject:** Guam Roof Project

George / Al / Mike O;

I is evident form the latest mails that no one listens to my advice regarding Gerry Lam, BioGenesis, Rhino and the Roofing contract.

On 29 October 2000, Al, George, Richard and myself conversed with Gerry Lam and agreed: 1) RBI would complete all Task Orders that were previously started (#1, #2, #3, #4 and #7). It was also agreed that Gerry Lam would call the contracting officer and deal with those Task Orders that are or soon to be in Liquidated Damages. Well guess what???? As predicted, Gerry Lam has not completed his part or, at least, notified me of such. I do know that as of last Friday, I received an e-mail form Gerry that stated he had left calls to Johanna Mendeola (C. O. ), but no response. Now - It has been 2 weeks. Do you believe him??

**BioGenesis has projects in liquidated damages with NO effort on Gerry's part to remedy. How will BioGenesis pay for the work when the Government takes the money from him for those damages??**

Rhino has no urgency! BioGenesis has all the urgency. Gerry must fix his own problems, but no, Rhino jumps in and now has liability for those porblems because Rhino will not get paid.

Rhino will not listen to my advice so, my advice stops. I will no longer assist on the roofing project.

Michael



Danforth
EXHIBIT NO. 14
DATE 2-21-03
S.L. ROSS

12/11/01

# Michael Danforth Deposition Exhibit No. "15"

# Michael O'Connell

**From:** &lt;Maxxmgt@aol.com&gt;
**To:** &lt;Bpihawaii@aol.com&gt;; &lt;Keokialoha@aol.com&gt;;
**Cc:** &lt;Rhino1@hawaii.rr.com&gt;
**Sent:** Friday, November 10, 2000 10:38 AM
**Attach:** ATT00109.eml
**Subject:** Fwd: Guam Roof Contract

Gerry;

I have forwarded my last e-mail to you to remind everyone that I am still waiting on you to confirm that NO Liquidated Damages will be assessed from the Government to BPI on Task Orders 1 through 17. Your guarantee not to assess LDs on RBI is not enough. You and I both know that if the Government assesses LDs you will not get the money and therefore RBI will not get the money and this situation only leaves RBI in a legal situation with BPI. You did respond to this e-mail; however, your response indicated that you have NOT performed as you agreed to do.

On 29 October 2000, we (Rhino and You) agreed that Rhino will finish all Task Orders started and we identified those Task Orders specifically AND that no other work will be performed by Rhino until a Subcontract Agreement was in place. In addition, you agreed to call the Contracting Officer to remediate those Task Orders in liquidated damages and those pending liquidated damages. To my knowledge you have NOT performed your part of this agreement. As I made it clear, until you (BPI) remediate the Task Orders pending LD damages, a subcontract agreement will not be written.

If you have complied with the preceding, let me know so George can verify with the Government such remedy is in place.

Yours truly;

Michael

Danforth
EXHIBIT NO. 15
DATE 2-21-03
S.L. ROSS

12/11/01

# EXHIBIT "12"

1           IN THE DISTRICT COURT OF GUAM

2

3   UNITED STATES OF AMERICA   ) CIVIL CASE NO. 02-00008
    FOR USE AND BENEFIT OF     )
4   RHINO BUILDERS, INC.,      )
                               )
5               Plaintiff,     )
                               )
6       vs.                    )
                               )
7   BIOGENESIS PACIFIC, INC.,  )
    AIG TECHNICAL SERVICES,    )
8   INC., and AMERICAN HOME    )
    ASSURANCE COMPANY,         )
9                              )
                Defendants.    )
10  _____  ) DEPOSITION OF
                               ) GEORGE W. ALLEN
11  BIOGENESIS PACIFIC INC.,   ) October 6, 2003
                               )
12        Counter-Plaintiff,   )
                               )
13      vs.                    )
                               )
14  RHINO BUILDERS, INC.,      )
    MICHAEL O'CONNELL, MICHAEL )
15  DANFORTH, AND JOHN DOES    )
    1-10,                      )
16                             )
          Counter-Defendants.  )
17  _____  )
                               )
18  AMERICAN HOME ASSURANCE    )
    COMPANY,                   )
19                             )
        Cross-Claimant,        )
20                             )
        vs.                    )
21                             )
    BIOGENESIS PACIFIC INC.,   )
22                             )
        Cross-Claim Defendant. )
23  _____  )

24

25

1    to Metcalf Construction Company?

2         A    Correct.

3         Q    And the name of your company again?

4         A    Professional Estimating Service,

5    Incorporated.

6         Q    You said it's a Nevada company?

7         A    That's true.

8         Q    Okay.  Let's go to your employment with

9    Rhino Builders.  You just said you began working for

10   them around late September, early October, 2000?

11        A    That's correct.  I'm not sure of the exact

12   date that I became an employee for, I think, a matter

13   of a week or a week-and-a-half, two weeks something

14   in that neighborhood.  Before becoming an employee, I

15   worked on, I think, a daily fee as a consultant.

16        Q    I'm sorry, you worked as a what?

17        A    As a consultant.

18        Q    As a consultant to Rhino?

19        A    Yes, on a daily fee for something like a

20   week or so.

21        Q    What was your official title while you were

22   working for Rhino Builders?

23        A    I was the director of operations Guam, and

24   I was also assigned as project manager for their

25   Navy, IDIQ solution order concept contract with the

1   Navy.

2       Q    Okay.  So you were handling Rhino's Guam

3   operations?

4       A    Yes.  Can I backtrack?  I gave you about

5   30-some years of employment information.  I skipped a

6   chunk of it.

7       Q    Oh, go right ahead.

8       A    Okay.  Between working in Dohar, Qatar for

9   EXPORTRAN and going to work for Cochise County, I

10  also went back to work for McDermott, I believe, in

11  1981 through 1983 and Singapore, Indonesia and

12  Malaysia.  And my position with them was senior

13  project engineer on a $150 million oil and gas

14  project.  After that I came back to Arizona and went

15  to work for Cochise County, Arizona.

16      Q    Thank you.  Going back to your employment

17  at Rhino, would you please describe what your duties

18  were as director of operations?

19      A    Well, my initial assignment was to do the

20  startup on the IDIQ solution order.  I'll abbreviate

21  is SOC, S-O-C, contract and startup on those consists

22  of doing all the initial administrative and technical

23  submittals that have to be done prior to being able

24  to go do physical work on the project.  And I was

25  assigned as director of operations Guam because

1    transcript, correct?

2              MS. CRUZ:  Sure.  I'll provide you

3    with a copy or a copy for you to copy.

4    BY MS. CRUZ:

5         Q    Exhibit 4, Mr. Allen?

6         A    Yes.

7         Q    And just so we know we're looking at the

8    same thing, it's from George W. Allen

9    RhinoGWA@ite.net to Michael Danforth Maxxmgt@aol.com.

10   Michael O'Connell, Rhino1@hawaii.rr.com, Michael Road

11   Runner Danforth mxxmgt@hawaii.rr.com.  It's sent

12   Saturday November 8, 2000 at 6:05 p.m. and the

13   subject is update.

14        A    Yes.

15        Q    Okay.  And I don't know have you had an

16   opportunity to read this or --

17        A    I scanned through it.

18        Q    Okay.  Does this look familiar to you,

19   Mr. Allen?

20        A    Yes.

21        Q    And is this an E-mail that you prepared?

22        A    Yes.

23        Q    And sent to Michael Danforth and Michael

24   O'Connell?

25        A    Correct.

1                     C E R T I F I C A T E

2    STATE OF HAWAII            )
                               )   SS:
3    CITY AND COUNTY OF HONOLULU )

4            I, MYRLA R. SEGAWA, Notary Public, State of

5    Hawaii, do hereby certify:

6            That on Monday, October 6, 2003, at

7    10:20 a.m., appeared before me GEORGE W. ALLEN, the

8    witness whose deposition is contained herein; that

9    prior to being examined he was by me duly sworn;

10           That the deposition was taken down by me in

11   machine shorthand and was thereafter reduced to

12   typewriting under my supervision; that the foregoing

13   represents, to the best of my ability, a true and

14   correct transcript of the proceedings had in the

15   foregoing matter.

16           I further certify that I am not an attorney

17   for any of the parties hereto, nor in any way

18   concerned with the cause.

19           DATED this 20th day of October, 2003, in

20   Honolulu, Hawaii.

21

22

23   _____
     MYRLA R. SEGAWA, CSR NO. 397
     Notary Public, State of Hawaii
24   My Commission Exp:  1-27-2005

25

# George Allen Deposition
# Exhibit No. "4"

# GEORGE ALLEN DEPOSITION

# DOCUMENT NO. 6

**EXHIBIT** 4

**Michael O'Connell**

From:      "George W. Allen" <rhinogwa@ite.net>
To:        "Michael Danforth (E-mail)" <Maxxmgt@aol.com>; "Michael O'Connell (E-mail)"
           <rhino1@hawaii.rr.com>; "Michael Road Runner Danforth (E-mail)" <maxxmgt@hawaii.rr.com>
Sent:      Saturday, November 18, 2000 6:05 PM
Subject:   Update

Regarding BPI:

Work continues with Al's approval. When I tried to get Al to sing the
$25,000 check to transfer funds from the Guam General Account to Hawaii, he
said he would have to make sure we had that much left since he had been
spending some on the BPI jobs. Don't go ballistic, I really think right now
is a time for us to tread lightly with the BPI work and for me to tread
lightly with Al. While I agree that BPI's urgency is not necessarily our
urgency, it does seem prudent to put forth a limited amount of resources to
keep the Navy from becoming agitated enough to just stop the contract. And,
I understand that one of the jobs is for a high ranking officer the OICC was
very interested in seeing go ahead. By all appearances, we are not putting
that much into the jobs since the labor is being paid by BPI and the bulk
materials are coming from BPI.

Regarding the Reaction Invoice, maybe BPI should pay that one rather than
Rhino. Al agrees with this idea as well.

Regarding Richard:

Richard told me last Tuesday that the previous Saturday was his last day on
Rhino's payroll. Al seemed to confirm this the other day. I really don't
know what's going on but I do know that no employee action terminating
Richard has been filled out. This is all confusing since I understand from
your end that Richard is to stay on our payroll until the end of the month.

Would somebody tell me exactly what the situation is? Is Richard still
working for Rhino or not?

If he quit last Saturday then we need to fill out a termination notice to
that effect and get it in the files. Richard's employment status is also
critical to our health insurance.

For my part, I would like to see him gone now. As much as I have tried to
make things as pleasant as possible under the circumstances Richard does not
seem inclined to do so. I am getting more than a little tired of the crap.
In my estimation, Rhino is taking a big risk keeping him around, having him
in our offices and as a signatory on our bank accounts. He has been
dishonest and has shown a complete disloyalty to Rhino in favor of his
loyalty to BPI. He communicated things with BPI that could have seriously
damaged Rhino in our efforts to negotiate. He has constantly thrown a
monkey wrench into my efforts to get things done and get things organized
around here and has gotten us into trouble on the SOC contract. I have no
doubt from the reactions I have seen that he has done a lot of harm to my
standing with other employees.

11/26/00

₃5

Richard took me to task in front of a full office for having read his "BPI email" about the wire transfer. I don't know who told him that I did so but I really don't appreciate him knowing about it. Is it impossible for me to do things and communicate them to Rhino without Richard knowing about them? It is amazing how he can take something he did that was so absolutely wrong (the wire transfer and not forwarding my mail to me) and try to turn it around to where I did something wrong. I told him I was looking for any messages that had been sent to me via Rhinogum, which I was, and he said it wasn't under Rhinogum. The fact is that the employer had the right to review anything any employee puts on the employer's computer. Unfortunately, I don't know if Richard is an employee although I had been told that he was when I looked at his computer.

I asked Al to talk privately and told him I was depending on him to help make sure that Richard and I could coexist peacefully. I showed him the email I had printed from Richards computer and it was clearly addressed to George Allen at Rhinogum@ite.net. I remind all of you that our letterhead and all of the information on our SOC proposal shows the email address as Rhinogum@ite.net. While we notified OICC of the change of address, we have no assurance that they will not accidentally send an important communication to the Rhinogum address so we must be able to depend on getting any mail sent to that address. I also remind you that Richard failed to pass messages on to me and has done so again with this latest message. Two full days had gone by from the time he received this message until he became aware of the fact that I had gotten it myself but he never mentioned it or forwarded it to me. I am going to have Mark set the Rhinogum address to forward to Rhinogwa and change the password so Richard will no longer be able to use it. Richard needs to be informed of this move so he can make arrangements to notify his correspondents of his change of address.

Al has not intervened once when Richard has gotten on his high horse with me in his presence. Even when Richard lied about the purpose of the stanchions, Al didn't say a word although I am sure at the time that Al knew Richard was lying. When Richard asked, in Al's presence, if I was in charge of everything, Al didn't say a word although that would have been the perfect opportunity for Al to clear up the question once and for all. When Richard took me to task for reading his email, Al didn't say a word. He has failed to take advantage of any of these opportunities to show his support of me and I am sure that makes all of the other employees doubt that I have his support.

Bank Accounts:

The Guam general account has not been transferred to the SOC account and Richard has not been removed from the signature card for the General account and Payroll account. I have no way to do this myself since I have no signatory authority over those accounts. Also, as of this Friday, Al is still co-signing the paychecks since he has not turned in the new signature card for the Payroll account with Michael O'Connell and Dean Akita on it. When you guys bring this up with Al, would you please put it as a question

36

11/26/00

and try to keep me from once again being the informant in the middle?

Health Insurance:

Al and I agreed that Rhino will provide health insurance to it's employees. The coverage will be for administrative and management employees and Rhino will only pay the premium for the employee. Spouse and family coverage will be available to the employees at group rates. The difference between Employee coverage and Spouse/Family coverage will be paid by the employee through payroll deduction. Hourly, casual employees (those hired on and laid off for projects) can buy health insurance by payroll deduction after completing a thirty day (maybe we should make it 60 day) probationary period. I think we could make our written policy with a provision that hourly employees could sign up again without the thirty day probationary period if it has been less than 90 days (something like that) since they were laid off.

We have chosen a health insurance carrier that gives us both the best coverage and the lowest premiums. We are turning in health insurance applications for Al, Aileen, Wayne and me on Monday (the final deadline to get insurance effective 1 Dec). I thought Richard would be included and then be dropped thirty days after he leaves here at the end of November, however, I understand from Aileen that Richard is not turning in an application because he doesn't work for Rhino. I am not sure if we will have a deal without Richard since the quote from the insurance company was for five employees and that may be the minimum. This is just another example of how Richard continues to throw a monkey wrench into our efforts by making decisions and doing things without our knowledge. Basic business logic: a situation where you have no control or jurisdiction over an employee is a potentially costly and disruptive situation.

For me personally, this would be very bad because my cancer problem may end up being a pre-existing condition if the insurance does not go into effect on 1 Dec since my DZB coverage ran out on 31 Oct. (being covered during the preceding 60 days keeps it from being pre-existing) This problem has the potential for costing as much as $50,000 a year. I have already put this off longer than I should have. To delay until the first of January would be way too risky. If anything is going to queer this deal going into effect on 1 Dec, then I am going to apply individually without the group rate. I can't even get an appointment right now without the insurance coverage. I remind you that Rhino is to cover the cost of my health insurance. with or without group coverage. I already had to spend $267 on medical expenses unrelated to by cancer checkup.

Office Move:

I issued a purchase order yesterday to get Lito (the phone system guy) to setup cables and outlets for the phones in the new office space. The outlets will have provisions for computers too. He was supposed to do this today so we could do our next step on Monday but he hasn't done it so far. Mark is supposed to be here Monday to install the computer cables. We need

11/26/00

another desk so we are going to get one for Aileen on Monday ($400) along with a decent desk chair for me. Then, we would be ready to move everything anytime after Monday. This move is critical to our operation. We can't get organized and avoid the continued loss of incoming messages until we have a properly set up office space.

11/26/00

# EXHIBIT "13"

1        IN THE DISTRICT COURT OF GUAM

2

UNITED STATES OF AMERICA    ) CIVIL CASE NO. 02-00008
3 FOR USE AND BENEFIT OF      )
RHINO BUILDERS, INC.,        )
4            Plaintiff,       )
          vs.                 )
5 BIOGENESIS PACIFIC, INC.,   )
AIG TECHNICAL SERVICES,      )
6 INC., and AMERICAN HOME     )
ASSURANCE COMPANY,           )
7            Defendants.      )
_____)
8 BIOGENESIS PACIFIC INC.,    )
          Counter-Plaintiff, )
9          vs.                )
RHINO BUILDERS, INC.,        )
10 MICHAEL O'CONNELL, MICHAEL )
DANFORTH, AND JOHN           )
11 DOES 1-10,                 )
          Counter-Defendants.)
12 _____)
AMERICAN HOME ASSURANCE      )
13 COMPANY,                   )
          Cross-Claimant,     )
14        vs.                 )
BIOGENESIS PACIFIC INC.,     )
15        Cross-Claim         )
          Defendant.          )
16 _____)

17

         DEPOSITION OF MICHAEL NAWAIKI O'CONNELL

18

19 Taken on behalf of the Defendant, Counter-Plaintiff and

20 Cross-Claim Defendant at White & Tom, 820 Mililani

21 Street, Suite 711, Honolulu, Hawaii, commencing at

22 9:24 a.m. on Thursday, February 20, 2003, pursuant to

23 Notice.

24

25 BEFORE:    SHARON L. ROSS, CSR No. 432

09:48 1          MR. CLARK:  Let's go back on the record.

09:48 2      Q.    (BY MR. CLARK)  Okay.  Are you clear now?

09:48 3      A.    Okay.  The board of directors is the one who

09:48 4  appoint the officers of the corporation.  Am I right?

09:48 5      Q.    Yes, that's right.

09:48 6      A.    Okay then.  Okay.  Okay.  Okay.  Okay.

09:48 7      Q.    Okay.  I'm sorry.  I didn't mean to confuse

09:48 8  you.

09:48 9      A.    Okay.  Because I didn't want to -- I'm

09:48 10 getting confused between -- the board of directors put

09:48 11 the -- the board of directors and the -- okay.  Okay.

09:48 12 Okay.  Okay.  Now, I understand.

09:48 13     Q.    Okay.  So, I'm --

09:48 14     A.    Right now, as of today, I -- as of today, I'm

09:48 15 the president, CEO -- I'm the president, the treasurer,

09:48 16 the secretary as of today.

09:48 17     Q.    Okay.  Thank you.

09:48 18     A.    Okay.

09:48 19     Q.    And --

09:48 20     A.    Can I have a pencil and paper so I don't

09:48 21 forget?  I get mixed up with these officers

09:48 22 corporations.  You know, I'm a layman.

09:48 23     Q.    Okay.  That's fine.  Let's back up a little

09:49 24 bit then and see if you want to change any of your

09:49 25 testimony.

Case 1:02-cv-00008   Document 438-3   Filed 08/17/2004   Page 29 of 65

09:52 1  I'm talking about license or business registration

09:52 2  filings.

09:52 3      A.   Well, our in-house person does that.

09:52 4      Q.   Okay.  Who is that?

09:52 5      A.   That would be Eugene.

09:52 6      Q.   What does your brother Eugene do for the

09:53 7  corporation now?

09:53 8      A.   He's an accountant.  He do our bookkeeping.

09:53 9      Q.   Is he an independent contractor employed by

09:53 10  the corporation?

09:53 11     A.   Yes, right now.

09:53 12     Q.   So, he doesn't have any title with the

09:53 13  corporation?

09:53 14     A.   No, not at present.

09:53 15     Q.   And that would be the case from June or July

09:53 16  of 2001?

09:53 17     A.   Yes.

09:53 18     Q.   Have you given him any authorization to act

09:53 19  as an agent for the corporation?

09:53 20     A.   Yes.

09:53 21     Q.   Okay.  Is this a limited agency or a general

09:54 22  agency?

09:54 23     A.   Well, what --

09:54 24     Q.   Okay.  Let me rephrase that.  Are there only

09:54 25  specific matters that you have authorized him to act as

| 11:13 | 1 | Q. Okay. And how much was his pay? |
| 11:13 | 2 | A. 800 bucks. $800 he was talking home a month. |
| 11:13 | 3 | Q. So, his pay was reduced from 2500 to $800? |
| 11:13 | 4 | A. Yes. |
| 11:13 | 5 | Q. And the other 1700 was supposed to be paid by |
| 11:13 | 6 | BioGenesis? |
| 11:13 | 7 | A. Was supposed to be picked up from BioGenesis, |
| 11:13 | 8 | my understanding. |
| 11:13 | 9 | Q. Do you know if BioGenesis was paying |
| 11:13 | 10 | Mr. Avilla from March of 2000? |
| 11:13 | 11 | A. No, I don't know. I didn't talk to Richard |
| 11:13 | 12 | about that, but Richard was supposed to be on his |
| 11:13 | 13 | payroll. |
| 11:13 | 14 | Q. But he stayed on your payroll, too? |
| 11:13 | 15 | A. Yes. |
| 11:13 | 16 | Q. Okay. He stayed on your payroll -- well, let |
| 11:13 | 17 | me back up. You said you hired Mr. Avilla in 1998? |
| 11:13 | 18 | A. Yes. |
| 11:13 | 19 | Q. Okay. What position was he hired to? |
| 11:13 | 20 | A. In Guam operations. |
| 11:13 | 21 | Q. I'm sorry. Mr. -- |
| 11:14 | 22 | A. I'm sorry. |
| 11:14 | 23 | Q. I don't need you to lean back. It's just you |
| 11:14 | 24 | can't put your hands in front of your mouth. It's -- |
| 11:14 | 25 | A. Supervisor -- he was the supervise -- he was |

11:14 1  the project manager of Guam.

11:14 2      Q.    So, he was hired as Guam project manager?

11:14 3      A.    Yeah.

11:14 4      Q.    In 1998?

11:14 5      A.    Yes.

11:14 6      Q.    And in February, 2000, did he still have that

11:14 7  title?

11:14 8      A.    February -- yes.

11:14 9      Q.    Okay.  After his pay was cut from 2500 to

11:14 10  $800, did he still have that title?

11:14 11     A.    Yes.

11:14 12     Q.    Okay.  And when was he last employed by

11:14 13  Rhino?

11:15 14     A.    Our agreement was on the November 18th or

11:15 15  30th, we paid him all the way through, I think so,

11:15 16  December 15th, 2000.  Our agreement with Gerry Lam, he

11:15 17  would be picked up on BioGenesis' payroll on

11:15 18  November 30th or 18th.

11:15 19     Q.    Okay.  So, you're saying he last worked for

11:15 20  Rhino November 18 or November 30?

11:15 21     A.    It was one of those two days.

11:15 22     Q.    Okay.  As of that date, whichever date it was

11:15 23  that he stopped working for Rhino, did he still have the

11:15 24  title as Rhino Guam project manager?

11:15 25     A.    No.

11:15 1     Q.    Okay.  His title was changed before

11:15 2 November 18?

11:15 3     A.    Well, he was no longer -- he was -- he was

11:15 4 put on BioGenesis' payroll.

11:15 5     Q.    Okay.  I guess -- I'm sorry.  That was my

11:15 6 fault.  I didn't make that clear.  Up to his last day

11:15 7 with Rhino, was he still Guam project manager?

11:16 8     A.    No, up to -- what -- try that again.

11:16 9     Q.    Up to the date that he stopped working for

11:16 10 Rhino -- okay.  So, if you want, the day before he

11:16 11 stopped working for Rhino, was he still the Guam project

11:16 12 manager?

11:16 13     A.    Oh, after the day?

11:16 14     Q.    No, no.  The -- did he continue as Guam

11:16 15 project manager up to his last day with Rhino?

11:16 16     A.    Yes, on the roofing contract, yes.

11:16 17     Q.    Okay.  And you said that BioGenesis agreed to

11:16 18 pick up his pay and put him on its payroll sometime from

11:17 19 November 30?

11:17 20     A.    No, supposed to be 2000.  He supposed to be

11:17 21 getting paid from Gerry for the time he worked on the

11:17 22 job, which Gerry didn't pay him.  So, Rhino went pay him

11:17 23 because Gerry didn't have the money, I guess so, at that

11:17 24 time.

11:17 25     Q.    Okay.  Now, I need to back up a little bit.

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808) 524-2090
Case 1:02-cv-00008   Document 438-3   Filed 08/17/2004   Page 33 of 65

15:40 1   delivery orders 1, 2, 3 and 4, as of November 16, 2000,

15:40 2   do you believe that to be an accurate amount?

15:40 3           MR. CORTES:  Asked and answered.  He said he

15:40 4   didn't know.

15:40 5      Q.   (BY MR. CLARK)  Is that your answer?

15:40 6      A.   I don't know.

15:40 7           MR. CLARK:  Okay.  Have this marked

15:40 8   Exhibit 4.

15:40 9           (O'Connell Exhibit No. 4 marked.)

15:40 10      Q.   (BY MR. CLARK)  Can you take a minute to look

15:40 11   at Exhibit 4, Mr. O'Connell?

15:41 12           MR. CORTES:  Are we going to go all the way

15:41 13   to 5:00?

15:41 14           MR. CLARK:  Oh, yeah.

15:42 15           (Discussion off the record.)

15:42 16      Q.   (BY MR. CLARK)  Just referring to the first

15:42 17   two pages of this exhibit, Mr. O'Connell, does this --

15:42 18   this purports to be a letter from Carlsmith Ball to

15:42 19   American Home Assurance Company dated October 22, 2001.

15:42 20   Does this letter look familiar to you?

15:43 21           MR. CORTES:  He's asking about this letter

15:43 22   (indicating).

15:43 23      A.   This here?  I don't recall.

15:43 24      Q.   (BY MR. CLARK)  Okay.  Can you turn to the

15:43 25   second page of that letter?  Second page.

15:43 1          MR. CORTES:  Here (indicating).

15:43 2     Q.     (BY MR. CLARK)  Do you see on the bottom

15:43 3 left-hand corner of that second page it says there's a

15:43 4 cc to Rhino Builders, Inc.  Do you see that?

15:43 5     A.     Yes.

15:43 6     Q.     Okay.  Do you know whether or not this

15:43 7 document is Rhino Builders' files?

15:44 8     A.     In fact, yes, this is in Rhino's file.  Yes,

15:45 9 this is mine.  Yeah, I recall this.

15:45 10     Q.     Okay.  You recall it now?

15:45 11     A.     Yeah.

15:45 12     Q.     Okay.

15:45 13     A.     But it didn't have the attachments.

15:45 14     Q.     Okay.  This purports to be a letter from

15:45 15 Carlsmith Ball to American Home Assurance referring to

15:45 16 Bond No. 20-80-88, BioGenesis Pacific on Contract

15:45 17 No. N62766-99-D-0425, which is the Navy contract in

15:45 18 question.

15:45 19     A.     Okay.

15:45 20     Q.     Okay?  And it purports to be a cover letter

15:45 21 to a notice of claim on that bond.  Okay.  In October of

15:45 22 2001, was Carlsmith Ball representing Rhino with respect

15:46 23 to a claim on this bond?

15:46 24     A.     Yes.

15:46 25     Q.     Okay.

15:46   1          MR. CORTES:  That would be to the best of

15:46   2  your knowledge, right?

15:46   3          THE WITNESS:  Yeah, to the best of my

15:46   4  knowledge.

15:46   5      Q.    (BY MR. CLARK)  Okay.  Could you turn to

15:46   6  page -- the third page which has a circled five on the

15:46   7  bottom?  This is a "Notice of Claim on Bond."  If you

15:46   8  can, turn to the next page, Page 6.

15:46   9      A.    Okay.

15:46  10      Q.    Well, actually it's the fourth page; but

15:46  11  we'll refer to the page number in the circle.  It says

15:46  12  that it's signed by -- or it has what purports to be the

15:47  13  signature of Michael O'Connell.  Is that your signature?

15:47  14      A.    Yes.

15:47  15      Q.    Okay.  Do you recall signing this Notice of

15:47  16  Claim on Bond on or about October 20, 2001?

15:47  17      A.    Yes, I remember.

15:47  18      Q.    Okay.  If you stay on Page 6, Item No. 2, it

15:47  19  says attached is the "Claimant's final invoice in the

15:47  20  amount of $245,664.43."  Is this the amount that was

15:47  21  owed -- or that Rhino believes was owed to it from

15:47  22  BioGenesis as of October 20, 2001?

15:48  23          (Discussion off the record.)

15:48  24          MR. CORTES:  You're asking about what he

15:48  25  believes now or what he believed at the time he signed

C E R T I F I C A T E

STATE OF HAWAII                    )

                                   )    SS:

CITY AND COUNTY OF HONOLULU )

I, SHARON ROSS, Notary Public, State of Hawaii,

do hereby certify:

That on Thursday, February 20, 2003, at

9:24 a.m., appeared before me MICHAEL NAWAIKI O'CONNELL,

the witness whose deposition is contained herein; that

prior to being examined he was by me duly sworn;

That the deposition was taken down by me in

machine shorthand and was thereafter reduced to

typewriting under my supervision; that the foregoing

represents, to the best of my ability, a true and

correct transcript of the proceedings had in the

foregoing matter.

I further certify that I am not attorney for any

of the parties hereto, nor in any way concerned with the

cause.

DATED this 2nd day of March, 2003, in Honolulu,

Hawaii.

_Sharon Ross_

SHARON ROSS, CSR NO. 432
Notary Public, State of Hawaii
My Commission Expires:  4/8/05

# Michael O'Connell Deposition
# Exhibit No. "4"

# CARLSMITH BALL LLP

OCT 2 6 2001
BOND DEPT.

A LIMITED LIABILITY LAW PARTNERSHIP

PACIFIC TOWER, SUITE 2200
1001 BISHOP STREET
HONOLULU, HAWAII 96813
TELEPHONE (808) 523-2500   FAX (808) 523-0842
WWW.CARLSMITH.COM

DIRECT DIAL NO.
(808) 523-2527

E-MAIL TET@CARLSMITH.COM

OUR REFERENCE NO.
053705-00001

October 22, 2001

**BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

American Home Assurance Company
121 Spear Street
San Francisco, California 94105

Re: <u>Ref. Bond No. 20-80-88 - BioGenesis Pacific, Inc., Prime Contractor on
Contract No. N62766-99-D-0425</u>

Dear Sirs:

On behalf of our client, Rhino Builders, Inc., we are forwarding this
enclosed matter for your consideration and action.

Enclosed with this letter is a Miller Act Notice which this firm caused to be
sent to your attention, whereby Rhino Builders, Inc. gives notice it intends to enforce its
rights under the Miller Act. Contrary to your understanding, BioGenesis Pacific, Inc. is
the prime contractor on Contract No. N62766-99-D-0425, and Rhino Builders, Inc.
provided all labor and materials supporting its claim pursuant to an oral subcontract
between Rhino Builders Inc. and BioGenesis Pacific, Inc.

As the attorneys for Rhino Builders, Inc., we hereby request that American
Home Assurance Company provide us a copy of its Miller Act Proof of Claim form, and
forward any and all future communications to my attention at the above address.

HONOLULU · KAPOLEI · HILO · KONA · MAUI · GUAM · SAIPAN · LOS ANGELES · WASHINGTON D.C. · MEXICO





O'Connell
EXHIBIT NO. 4
DATE 2-20-03
B.L. ROSS

Your immediate attention to this matter is appreciated.

Very truly yours,
Carlsmith Ball L.L.P.

*Terry E. Thomason*
Terry H. Thomason

Enclosures

cc: Rhino Builders, Inc.

1433798.1

## NOTICE OF CLAIM ON BOND
(Miller Act 40 U.S.C. Section 270(a) to 270(e))

Public Agency:      Officer in Charge of Construction
Ms. Bennett Terlaje, Contracting Officer
NAVFACENGCOM Contracts Marianas
PSC455, Box 175
FPO AP 96540-2200

Bonding Company:    American Home Assurance Company
121 Spear Street
San Francisco, California 94105

Prime Contractor:    BioGenesis Pacific, Inc.
1604 Ulualana Place
Kailua, Hawaii 96734

NOTICE IS HEREBY GIVEN, that Rhino Builders, Inc., the undersigned subcontractor to BioGenesis Pacific, Inc. and Claimant, has not been paid in full and is looking to the Prime Contractor for payment of the following claim. This notice is intended as written notice pursuant to 40 U.S.C. Section 270.

Claimant, whose address is: 87-1610 Ulehawa Road, Waianae, Hawaii 96792, has a claim in the amount of $245,664.43 (not including service charges or interest as allowed by law and at the maximum legal charges or interest as allowed by law and at the maximum legal rate) for labor performed and materials provided for the public work of improvement commonly known as Navy Housing Roofing, Various Locations; Contract No. N62766-99-D-0425, upon which BioGenesis Pacific, Inc. is the Prime Contractor.

WE ARE LOOKING TO THE PRIME CONTRACTOR FOR PAYMENT OF THESE DEBTS.

       1.      The total amount of the claim is $245,664.43.

       2.      The name of the party for whom the labor and materials were provided is: BioGenesis Pacific, Inc.

       3.      Rhino Builders, Inc. provided such labor and materials directly to BioGenesis Pacific, Inc. pursuant to an oral subcontract between Rhino Builders, Inc. and BioGenesis Pacific, Inc.

      In support of its claim, Claimant submits the following documents:

       1.      Claimant's initial invoice, which includes a breakdown of reimbursable costs and profit share (Exhibit 1);



1433756.1

2. Claimant's final invoice in the amount of $245,664.43 for BioGenesis Pacific, Inc.'s unpaid billings on all work Claimant performed on Contract No. N62766-99-D-0425 with attached mail receipts reflecting BioGenesis Pacific, Inc.'s refusal to accept business mail sent by Rhino Builders, Inc. (Exhibit 2);

3. A copy of Rhino Builders, Inc.'s Assertion of Nonpayment under FAR 32.112-1 to Ms. Bennett Terlaje, Contracting Officer (Exhibit 3); and

4. A copy Payment Bond No. 20-80-88 sent to Claimant from Ms. Bennett Terlaje, Contracting Officer in charge of construction for Contract No. N62766-99-D-0425 (Exhibit 4).

To the unpaid balance of $245,664.43 (plus penalties and interest), if not paid, Claimant shall also seek attorneys fees and interest at the maximum legal rate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 0 day of October , 2001.

Michael O'Connell
Rhino Builders, Inc.

"Claimant"

1433756.1

# CONTRACT INVOICE #1313

BPI Invoice 11/16/99

## EXHIBIT __I__

⑦

Case 1:02-cv-00008    Document 438-3    Filed 08/17/2004    Page 43 of 65



Rhino Bu... , Inc.
87-1610 U...hawa Road
Waianae, HI 96792

# CONTRACT INVOICE

| | |
|---|---|
| Invoice#: | 1313 |
| Invoice Date: | 11/14/2000 |
| Due Date: | 11/29/2000 |
| Order: | |

License # C-19515

TO  BioGenesis Pacific, Inc.
1604 Ulualana Place
Kailua, Hawaii 96734

PROJECT 69801
N62766-99-D-0425
Navy Housing
Various Locations
Guam

| Description | Amount |
|---|---|
| | 89668. |

Billing for Job Cost & Overhea

Description: Summary of invoicing to BioGenesis through October 31, 2000

Invoicing based on verbal agreement for all Delivery Orders executed under prime contract no. N62766-99-D-0425 of: 1) Payment reimbursement for total cost and overhead to execute work and 2) 50/50 split of profits.

| | |
|---|---|
| A) Original Delivery Order price under the Prime Contract for Delivery Orders 1, 2, 3 and 4: | $138,189.74 |
| B) Change Orders: | 0.00 |
| C) Adjusted Contract Price: | $138,189.74 |
| D) Value of completed work complete: | |
| D. O. 0001 = 100% of $12,129.10 | |
| D. O. 0002 = 100% of $26,445.10 | |
| D. O. 0003 = 100% of $42,454.60 | |
| D. O. 0004 = 90% of $57,160.94 | $132,473.65 |
| E) Less Direct Cost, Attachment A: | $ 49,854.58 |
| F) Less Direct Cost Overhead, Attachment B: | $ 31,202.82 |
| G) Net Delivery Order (1 through 4) profit : D-(E+F) | $ 51,416.25 |
| H) Rhino profit share (50%) | $ 25,708.13 |

| | |
|---|---|
| Sales Tax: $ | 0.0 |
| Invoice Total: $ | 89,668.5 |
| Retention: $ | 0.0 |
| Amount Paid: $ | 0.0 |

*Please Pay This Amount*  | $ 89,668.58 |



Terms: *All invoices are due and payable within 15 days of receipt. A service charge of % per annum will be computed on all amounts overdue on regular statement dates. Please make checks payable to Rhino Builders, Inc.. Thank you for your prompt payment*

(8)


# Contract Invoice
*Continued...*

| Description | Amou |
|---|---|
| TOTAL Balance due: | $106,765.53 |
| Previously invoiced (invoice no. 1288, dated 09/13/00) | $ 17,096.95 |
| TOTAL Amount due this invoice: | $ 89,668.58 |

9.

# STATEMENT of Account

BPI Invoice 11/16/99

10



# Rhino Builders, Inc.
## 87-1610 Ulehawa Road
## Waianae, HI 96792

License # C-19515

# STATEMENT

Statement Date: 11/15/2000

TO    BioGenesis Pacific, Inc.
     1604 Ulualana Place
     Kailua, Hawaii 96734

PROJECT    N62766-99-D-0425
     Navy Housing
     Various Locations
     Guam

| Job# | Name Rec# | Invoice# | Due Date | Description | Amount | Balan |
|------|-----------|----------|----------|-------------|--------|-------|
| 69801 | N62766-99-D-0425 | | | | | |
| | 432 | 1288 | 09/28/00 | Labor Billing Only | 17096.95 | 17096. |
| | 470 | 1313 | 11/29/00 | Billing for Job Cost & | 89668.58 | 89668. |
| | | | | Job Totals: | 106765.53 | 106765. |
| | | | | Grand Totals: | 106765.53 | 106765. |

| Current 89668.58 | 1-30 Days .0.00 | 31-60 Days 17096.95 | 61-90 Days 0.00 | 91+ Days 0.00 | Retention 0.00 |
|---|---|---|---|---|---|

## *Please Pay This Amount*    106765.53

| Contract Summary | | |
|---|---|---|
| Original Contract Amount | | 327981.00 |
| Net Changes to Date | | 0.00 |
| New Contract Amount | | 327981.00 |
| Total Invoiced to Date | | 106765.53 |
| Remaining Balance on Contract | | 221215.47 |

*Terms: All invoices are due and payable within 15 days of receipt. A service charge of %
per anum will be computed on all amounts overdue on regular statement dates. Please make checks payable
to Rhino Builders, Inc.. Thank you for your prompt payment.*



# Allocation of Indirect Costs to The Work

(12)

  
Allocation cost to Biogenesis
July - October

| | |
|---|---|
| Richard Wages w/burden | 14198.78 |
| Rent @ 1100 x 4 months | 4400.00 |
| Small Tools | 859.90 |
| | $ 19,458.68 |

50% shared overhead
Communications (phones,
  cellphones, pages, etc.)

| | |
|---|---|
| Communications (phones, cellphones, pages, etc.) | 4673.67 |
| Postage and Freight | 2733.74 |
| Other Outside Serv. (Yard Cleaning) | 1490.00 |
| Maintenance and Repairs | 265.00 |
| Overhead Insurance | 2252.84 |
| Office Supplies | 1067.46 |
| Other Office Exp | 700.00 |
| Equipment Lease & Rental @ 902 x 4 | 3608.00 |
| Overhead Labor w/burden less Richard | 3056.99 |
| Vehicle Maintenance and Repair | 2659.20 |
| Vehicle Fees | 83.50 |
| Fuel | 309.25 |
| Utilities | 588.62 |
| Guam Overhead less depreciation | $  23,488.27 |
| 50% of Overhead | $ 11,744.14 |
| Total Overhead Biogenesis Share from July to October | $ 31,202.82 |





*Payroll Totals*

## Rhino Builders, Inc.

Totals Page, Employee # 8 Richard Avilla
Check Date 07/12/2000 to 11/17/2000

Report# 5-1-2
November 16,
09:41 AM
supervisor
Page # 1 of 1

Gross Payroll:                                   12,599.98
Add-Ons:

        Total Add-Ons:

        Total Gross + Adds:                     12,599.98

Deductions:
    Employee Fica              781.14
    Employee Medicare          182.73
    Federal Income Tax       2,087.66
                           -------------
        Total Deductions:            3,051.53
        Net Pay:                     9,548.45
        Advances:

        Net + Advances:              9,548.45

Overhead:
    State Disability (SDI)      17.46
    Workers Comp Ins          283.56
    Employer FICA             781.14
    Employer Medicare         182.73
    State Unemployment (SUI)  333.91
                           -------------
        Total Overhead:              1,598.80
                                  -------------
        Total Cost of Payroll:      14,198.78
                                  =============

Funds received through 11/17/2000 – earned through 11/11/2000          (14)



## Payroll Checks

### Rhino Builders, Inc.

Long Form, Employee # 8 Richard Avilla
Check Date 07/12/2000 to 11/17/2000, Tax State GU

Report# 5-1-2
November 13,
08:20 PM
supervisor
Page # 1

| Rec | Check | Date | Period | Type | ID# Employee | | |
|-----|-------|------|--------|------|--------------|-----|-----|
| | Regular | Ovrtime | Premium | Sick | Vactn Holiday | Piece PerDiem | Mi. |

588 9745    07/14/00 07/08/00 Regular        8 Richard Avilla
Hrs                                                    Total Hrs:
Pay
  Gross:    500.00  Add/On:          Deduct:  105.61  NetPay:      394.
Employee Fica    31.00 Employee Medicar    7.25 Federal Income T    67.
State Disablili   1.95 Workers Comp Ins   11.25 Employer FICA      31.0
Employer Medica   7.25 State Unemployme   13.25

605 9750    07/21/00 07/15/00 Regular        8 Richard Avilla
Hrs                                                    Total Hrs:
Pay
  Gross:    500.00  Add/On:          Deduct:  105.61  NetPay:      394.3
Employee Fica    31.00 Employee Medicar    7.25 Federal Income T    67.3
State Disablili   1.95 Workers Comp Ins   11.25 Employer FICA      31.6
  mployer Medica  7.25 State Unemployme   13.25

624 9755    07/28/00 07/22/00 Regular        8 Richard Avilla
Hrs                                                    Total Hrs:
Pay
  Gross:    500.00  Add/On:        ,  Deduct:  105.61  NetPay:      394.3
Employee Fica    31.00 Employee Medicar    7.25 Federal Income T    67.3
State Disablili   1.55 Workers Comp Ins   11.25 Employer FICA      31.0
Employer Medica   7.25 State Unemployme   13.25

639 9757    08/04/00 07/29/00 Regular        8 Richard Avilla
Hrs                                                    Total Hrs:
Pay
  Gross:    500.00  Add/On:          Deduct:  105.61  NetPay:      394.3
Employee Fica    31.00 Employee Medicar    7.25 Federal Income T    67.3
State Disablili   1.95 Workers Comp Ins   11.25 Employer FICA      31.0
Employer Medica   7.25 State Unemployme   13.25

676 9778    08/11/00 08/05/00 Regular        8 Richard Avilla
Hrs                                                    Total Hrs:
Pay
  Gross:    500.00  Add/On:          Deduct:  105.61  NetPay:      394.3
  mployee Fica    31.00 Employee Medicar    7.25 Federal Income T    67.3
  ate Disablili   1.95 Workers Comp Ins   11.25 Employer FICA      31.0
Employer Medica   7.25 State Unemployme   13.25

(15)

Case 1:02-cv-00008    Document 438-3    Filed 08/17/2004    Page 51 of 65

# Payroll Checks
Continued



| lec | Check | Date | Period | Type | | ID# Employee | | |
|---|---|---|---|---|---|---|---|---|
| | Regular | Ovrtime | Premium | Sick | Vactn | Holiday | Piece PerDiem | Misc |

702 9797    08/18/00 08/12/00 Regular    8 Richard Avilla
Hrs
Pay        Total Hrs:

   Gross:    500.00   Add/On:      Deduct:   105.61   NetPay:    .394.39
Employee Fica    31.00 Employee Medicar    7.25 Federal Income T   67.36
State Disablili    1.95 Workers Comp Ins    11.25 Employer FICA   31.00
Employer Medica    7.25 State Unemployme    13.25

735 9819    08/25/00 08/19/00 Regular    8 Richard Avilla
Hrs
Pay        Total Hrs:

   Gross:    738.46   Add/On:      Deduct:   185.99   NetPay:    .552.47
Employee Fica    45.78 Employee Medicar    10.71 Federal Income T   129.50
State Disablili    2.88 Workers Comp Ins    16.62 Employer FICA   45.78
Employer Medica    10.71 State Unemployme    19.57

763 9838    09/01/00 08/26/00 Regular    8 Richard Avilla
Hrs
Pay        Total Hrs:

   Gross:    738.46   Add/On:      Deduct:   185.99   NetPay:    552.47
Employee Fica    45.78 Employee Medicar    10.71 Federal Income T   129.50
State Disablili    2.88 Workers Comp Ins    16.62 Employer FICA   45.78
Employer Medica    10.71 State Unemployme    19.57

794 9853    09/08/00 09/02/00 Regular    8 Richard Avilla
Hrs
Pay        Total Hrs:

   Gross:    738.46   Add/On:      Deduct:   185.99   NetPay:    552.47
Employee Fica    45.78 Employee Medicar    10.71 Federal Income T   129.50
State Disablili      Workers Comp Ins    16.62 Employer FICA   45.78
Employer Medica    10.71 State Unemployme    19.57

808 9856    09/12/00 09/09/00 Regular    8 Richard Avilla
Hrs   40.00
Pay        Total Hrs:   40.00

   Gross:    738.46   Add/On:      Deduct:   185.99   NetPay:    552.47
Employee Fica    45.78 Employee Medicar    10.71 Federal Income T   129.50
Workers Comp In    16.62 Employer FICA    45.78 Employer Medicar   10.71
State Unemploym    19.57

824 9858    09/18/00 09/16/00 (Void)    8 Richard Avilla
857 9876    09/26/00 09/23/00 Regular    8 Richard Avilla
s
.ay        Total Hrs:

   Gross:    738.46   Add/On:      Deduct:   185.99   NetPay:    552.47

Case 1:02-cv-00008    Document 438-3    Filed 08/17/2004    Page 52 of 65

# Payroll Checks
Continued

| Rec | Check | Date | Period | Type | ID# | Employee | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Regular | Ovrtime | Premium | Sick | Vactn | Holiday | Piece | PerDiem | Misc |

Employee Fica 45.78 Employee Medicar 10.71 Federal Income T 129.
Workers Comp In 16.62 Employer FICA 45.78 Employer Medicar 10.7
State Unemploym 19.57

871 9880 10/10/00 09/30/00 Regular 8 Richard Avilla
Hrs Total Hrs:
Pay
Gross: 738.46 Add/On: Deduct: 185.99 NetPay: 552.47
Employee Fica 45.78 Employee Medicar 10.71 Federal Income T 129.50
Workers Comp In 16.62 Employer FICA 45.78 Employer Medicar 10.
State Unemploym 19.57

891 9884 10/13/00 10/07/00 Regular 8 Richard Avilla
Hrs Total Hrs:
Pay
Gross: 738.46 Add/On: Deduct: 185.99 NetPay: 552.
Employee Fica 45.78 Employee Medicar 10.71 Federal Income T 129.
Workers Comp In 16.62 Employer FICA 45.78 Employer Medicar 10.71
State Unemploym 19.57

914 9893 10/20/00 10/14/00 Regular 8 Richard Avilla
Hrs Total Hrs:
Pay
Gross: 738.46 Add/On: Deduct: 185.99 NetPay: 552.47
Employee Fica 45.78 Employee Medicar 10.71 Federal Income T 129.50
Workers Comp In 16.62 Employer FICA 45.78 Employer Medicar 10.
State Unemploym 19.57

919 9858 09/22/00 09/16/00 Regular 8 Richard Avilla
Hrs Total Hrs:
Pay
Gross: 738.46 Add/On: Deduct: 185.99 NetPay: 552.
Employee Fica 45.78 Employee Medicar 10.71 Federal Income T 129.5
Workers Comp In 16.62 Employer FICA 45.78 Employer Medicar 10.71
State Unemploym 19.57

949 9895 10/27/00 10/21/00 Regular 8 Richard Avilla
Hrs Total Hrs:
Pay
Gross: 738.46 Add/On: Deduct: 185.99 NetPay: 552.47
Employee Fica 45.78 Employee Medicar 10.71 Federal Income T 129.50
Workers Comp In 16.62 Employer FICA 45.78 Employer Medicar 10.7
State Unemploym 19.57

(17)

# CONTRACT INVOICE #1288

BPI Invoice 11/16/99

(18)



**Rhino Builders, Inc.**
87-1610 Olehawa Road
Waianae, HI 96792

# CONTRACT INVOICE

| | |
|---|---|
| Invoice#: | 1288 |
| Invoice Date: | 09/13/2000 |
| Due Date: | 09/28/2000 |
| Order: | |

License # C-19515

TO  BioGenesis Pacific, Inc.
1604 Ulualana Place
Kailua, Hawaii 96734

PROJECT  69801
N62766-99-D-0425
Navy Housing
Various Locations
Guam

| Description | Amount |
|---|---|
| Labor Billing Only | 17096.9 |
| | |
| Original Contract Price...........$  Open | |

Delivery Orders:
DO #_____1    $ 8,774.49
DO #_____2    $ 7,901.08
DO #_____3    $   179.87
DO #_____4    $   241.51

Adjusted Contract Price...........$  17,096.95
Open  % Work Completed............$  17,096.95
Less Retainage (0.00%)...........$
Less Previous Billed..............$

Payment Due.....................$  17,096.95

| | |
|---|---|
| Sales Tax: $ | 0.00 |
| Invoice Total: $ | 17,096.95 |
| Retention: $ | 0.00 |
| Amount Paid: $ | 0.00 |

*Please Pay This Amount*    $ 17,096.95

Terms: *All invoices are due and payable within 15 days of receipt.*
*A service charge of % per annum will be computed on all amounts overdue on regular statement*
*dates. Please make checks payable to Rhino Builders, Inc.. Thank you for your prompt payment*

(19)



## Income Statement

### Rhino Builders, Inc.
GUAM Income Statement, Period 7 to 10

*GUAMS OVER HEAD Cost*

**Operating Income**

| | | |
|---|---|---|
| 40000 Contract Income HI | 1,420.90 | |
| 40006 Contract Income Guam | 518,097.27 | |
| Total Operating Income: | -------------- | |
| | | 519,518.17 |

**Other Income**

Total Other Income:                    --------------

Total Income:                                          1,519,518

**Direct Expense**

| | | |
|---|---|---|
| 50001 Material | 36,151.48 | |
| 50004 Subcontracted | 165,319.88 | |
| 50005 Other Job Expense | 2,419.65 | |
| 50007 Bonding | 8,266.00 | |
| 50010 HI/GU Sales Tax | 1,813.83 | |
| 50400 Direct Labor | 23,263.46 | |
| 50410 D/l Payroll Taxes | 1,779.32 | |
| 50420 D/l Workers' Comp | 1,284.90 | |
| 50440 D/l Liab Insurance | 1,115.14 | |
| Total Direct Expense: | -------------- | |
| | | 241,413.66 |

**Shop Expense**

Total Shop Expense:                    --------------

Total Operating Expense:                              241,413.6

Gross Profit:                                         278,104.5

Overhead Expense

(20)

# *Income Statement*
Continued

| | | |
|---|---|---|
| 60000 | Rent | 5,100.00 |
| 60010 | Office Supplies | 1,067.46 |
| 60020 | Utilities | 588.62 |
| 60030 | Communications | 4,673.67 |
| 60050 | Postage & Freight | 2,733.74 |
| 60120 | Other Outside Serv. | 1,490.00 |
| 60150 | Consulting Fees | 4,000.00 |
| 60190 | Gov't License Fees | -50.00 |
| 60200 | Travel Expense | 785.76 |
| 60250 | Dues & Subscript'n | -150.00 |
| 60260 | Continuing Educ | 100.00 |
| 60270 | Seminars | 1,100.00 |
| 60300 | Maintenance & Rep | 265.00 |
| 61000 | Insurance | 2,252.84 |
| 61400 | Other Office Exp | 700.00 |
| 61500 | Equip. Rental/Lease | 631.40 |
| 62000 | Plan Fees | 623.22 |
| 62010 | Blue Print Copies | 228.48 |
| 62100 | Bonding Fees | 5,599.00 |
| 64000 | Overhead Labor | 15,501.43 |
| 64010 | O/H Payroll Taxes | 1,185.52 |
| 64020 | O/H Workers' Comp | 266.88 |
| 64040 | O/H Liab Insur | 301.94 |
| 65000 | Vehicle Maint | 2,911.28 |
| 65100 | Vehicle Fees | 83.50 |
| 65200 | Fuel | 309.25 |
| 65300 | Vehicle Repair | -252.08 |
| 66000 | Small Tools | 859.90 |
| 68100 | Vehicle Dep'n Exp | 3,643.32 |
| 68400 | Office Dep'n Exp | 456.15 |

Total Overhead Expense:            57,306.28

**Admin Expense**

| | | |
|---|---|---|
| 74000 | Admin Salaries | 6,023.02 |
| 74010 | Admin Payroll Tax | 460.77 |
| 74020 | Admin Workers' Cmp | 135.54 |
| 74040 | Admin Liab Insur | 183.05 |
| 77020 | Bank Service Fees | 144.40 |
| 77880 | Misc. Expense | -0.20 |

Total Admin Expense:            6,946.58

Total Indirect Expense:            64,252.86

## Income Statement
Continued

Net Profit Before Tax:                213,851.

**After Tax Income/Expense**

Total After Tax Income/Expense:

Net Profit After Tax:                 213,851.6

# Payroll Checks
## Continued

| Rec | Check | Date | Period | Type | ID# | Employee | | |
|-----|-------|------|--------|------|-----|----------|---|---|
| | Regular | Ovrtime | Premium | Sick | Vactn | Holiday | Piece | PerDiem |

986 9900    11/03/00 10/28/00 Regular       8 Richard Avilla
Hrs                                                Total Hrs:
Pay
    Gross:    738.46  Add/On:              Deduct:   185.99   NetPay:      552.4
Employee Fica       45.78 Employee Medicar    10.71 Federal Income T   129.5
Workers Comp In     16.62 Employer FICA       45.78 Employer Medicar    10
State Unemploym     19.57

996 9903    11/10/00 11/04/00 Regular    ....8 Richard Avilla
Hrs                                                Total Hrs:
Pay
    Gross:    738.46  Add/On:              Deduct:   185.99   NetPay:      552.
Employee Fica       45.78 Employee Medicar    10.71 Federal Income T   129.
Workers Comp In     16.62 Employer FICA       45.78 Employer Medicar    10.7
State Unemploym     19.57

1013 9910    11/17/00 11/11/00 Regular       8 Richard Avilla
Hrs                                                Total Hrs:
Pay
    Gross:    738.46  Add/On:              Deduct:   185.99   NetPay:     552.
mployee Fica        45.78 Employee Medicar    10.71 Federal Income Te  129.50
Workers Comp In     16.62 Employer FICA       45.78 Employer Medicar    10.
State Unemploym     19.57

(23)

ORDER FOR SUPPLIES OR SERVICES

PAGE 1 OF 1

| 1. CONTRACT/PURCH ORDER NO. | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER | 4. REQUISITION/PURCH REQUEST NO. | 5. CERTIFIED FOR NATIONAL DEFENSE UNDER DMS REG |
|---|---|---|---|---|
| N62766-99-D-0425 | 0001 | 5/15/00 | | |

6. ISSUED BY     CODE    C2766

Officer in Charge of Construction
NAVFACENGCOM Contracts, Marianas
PSC 455, Box 175
FPO AP 96540-2200

7. ADMINISTERED BY (if other than 6)    CODE

8. DELIVERY FOB
[X] DEST.
[ ] OTHER (See Schedule if other)

9. CONTRACTOR    CODE      FACILITY CODE

NAME AND ADDRESS

BioGenesis Pacific, Inc.
Corporate & Programs Control
1604 Ulualana Place
Kailua, HI 96734
(TEL: 637-9426 Richard Avila)

COPY

[ ] 8(a) Contractor

10. DELIVER TO FOB POINT (Date)
15 JUN 2000

11. MARK IF BUSINESS
[ ] SMALL
[ ] SMALL DISAD
[ ] WOMEN-OWN

12. DISCOUNT TERMS
NET 30

13. MAIL INVOICES TO
SEE BLOCK 6

14. SHIP TO    CODE

Defense Finance & Accounting Service
Operating Location Oakland, Code FPV
P. O. Box 23870
Oakland, CA 94623-3870

15. PAYMENT WILL BE MADE BY

MARK ALL PACKAGES & PAPERS WIT CONTRACT ORDER NUMB

16.
TYPE OF ORDER

| [ ] DELIVERY | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. |
|---|---|
| [X] PURCHASE | Reference your _____ ACCEPTANCE THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL THE TERMS AND CONDITIONS SET FORTH AND AGREES TO PERFORM THE SAME. |

NAME OF CONTRACTOR    BioGenesis    SIGNATURE   Richard Avila    TYPED NAME AND TITLE   Richard Avila Operation Manager    DATE SIGN 5/

[ ] If this box is marked supplier must sign Acceptance and return the following number of copies

ACCOUNTING AND APPROPRIATION DATA

| 17. ITEM NO. | 18. APPROPRIATION SYMBOL AND SUBHEAD | OBJECT CLASS | BUREAU CONT. NO. | SUB-ALLOT. | AUTH'N ACCTG ACT'Y | TRANS TYPE | PROPERTY ACCT ACT'Y | COUN-TRY | COST CODE | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| AA | 1701804.70FA | 250 | 61755 | 0 | 045924 | 2D | COM109 | | 61755046M71Q | $12,129. |

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY ORDERED/ ACCEPTED* | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | W/R 31973, COMNAVMAR | 1340 | | | |
| 0001 | Roof Repairs at BQ1 through BQ28, COMNAVMAR, Guam | | | | |
| 0002AD | Reseal Construction Joints | 4,080 | LF | $ 0.98 | $ 3,998.40 |
| 0002AE | Replace Expansion Joint Assembly, To 7" Spans, Stainless Steel | 140 | LF | $ 13.26 | $ 1,856.40 |
| 0015AA | Miscellaneous Items; Waterblast Roof Surface in Accordance with Section 07672 | 4,080 | SF | $ 0.15 | $ 612.00 |
| 0017AA | Seal Joints and Penetrations 6" Wide | 4,080 | LF | $ 0.56 | $ 2,284.80 |
| 0021AA | Re-secure Metal Flashing (Spot Repair) | 850 | SF | $ 3.69 | $ 3,136.50 |
| 0022AA | Trim/Dispose Tree Branches Obstructing Roofing Operation | 100 | LF | $ 2.41 | $ 241.00 |

25. TOTAL    $ 12,129.10

| 23. If quantity accepted by the Government is same as quantity ordered, indicate X. If different, enter actual quantity accepted below quantity ordered and encircle | 24. UNITED STATES OF AMERICA   L A Guzman   BY: L. A. GUZMAN | Contracting Officer. Tel: 339-5170 guzmanca@pwcguam.navy.mil | 26. DIFFERENCES |
|---|---|---|---|

| 28. QUANTITY IN COLUMN 20 HAS BEEN [ ] INSPECTED [ ] RECEIVED [ ] ACCEPTED, AND CONFORMS TO THE CONTRACT, EXCEPT AS NOTED | 27. SHIP NO. [ ] PARTIAL [ ] FINAL | 28. D. O. VOUCHER NO. | 30. INITIALS |
|---|---|---|---|
| | 31. PAID BY | | 32. AMOUNT VERIFIED CORRECT FOR |
| DATE   SIGNATURE OF AUTHORIZED GOVERNMENT REP | 33. PAYMENT [ ] PARTIAL [ ] FINAL | | 34. CHECK NUMBER |
| 35.1 I certify this account is correct and proper for pay | | | BILL OF LADING NO. (24) |
| DATE   SIGNATURE AND TITLE OF CERT | | | 38. VOUCHER NO. |
| 37. RECEIVED AT | 38. RECEIVED BY | | |

CD Form 1155 (8PT), MAY 90

S/N 0102-LF-01

Post-it Fax Note 7671   Date 05/15/10   pages ► 5
To Eugene    From Alen
Co./Dept. Khiu    Co. Klimu (Guam)
Phone #    Phone #

1540

## ORDER FOR SUPPLIES OR SERVICES

PAGE OF: 3

| | |
|---|---|
| N62766-95-D-0428 | D003 |
| CODE | C2766 |

29 JUNE 2000 W/R 31836

Officer in Charge of Construction
NAVFACENGCOM Contracts, Marianas
PSC 455, Box 175
FPO AP 96540-2200

03 AUGUST 2000

BioGenesis Pacific, Inc.
Corporate & Program Control
1604 Ulualana Place
Kailua, HI 96734
(TEL: 637-9436 Richard Avila)

SEE BLOCK 6

Defense Finance & Accounting Services
Operating Location Oakland, Code 72??
P. O. Box 23870
Oakland, CA 94623-8870

BioGenesis _Richard Avila_ Operations Manager 6-30-00

| ITEM | APPROPRIATION SYMBOL AND SUBHEAD | OBJECT CLASS | BUREAU CONT. NO. | SUB ALLOT | ACTIVE ACCT'S ACTV | TRANS TYPE | PROPERTY ACCT ACTV | COUN TRY | COST CODE | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| AA | 1701604.70FA | 250 | E1755 | D | 045924 | 2D | CM4113 | | 61753046M59Q | 326,445.19 |

### SCHEDULE OF SUPPLIES/SERVICE

| ITEM | | QUANTITY ORDERED/ACCEPTED | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | Roof Repairs to Bldg. 4433, Reoccuinstall Conn at Points Pt, COMNAVMAR, Guam | | | | |
| 0002AC | Repair Concrete Roof Deck Surface Per Section 03950 and 07920 Crown (Exposed Area) | 796 | SF | $6.99 | $5,562.18 |
| 0003AC | Install Roof Insulation in Accordance with Section 06236 Tapered Insulation 1/16, 1/8, 1/4 Per Ft. | 6,300 | BF | $1.89 | $11,907.00 |
| 0013AA | Install Roofing System Accumulator Treated Wood Class, Nailers and Fasteners per Line Item 0000 Through 0012 Above | 400 | LF | $2.74 | $1,096.00 |
| 0013AA | Miscellaneous Areas Water Nail Roof Surface in Accordance with Section 07572 | 2,240 | SF | $0.35 | $3,110.80 |
| 0012AC | Fluor Applied Roofing Membrane in Accordance with Section 07540, 60 Mils Thick Roof Membrane | 2,200 | SY | $3.45 | $7,596.00 |

Attached in Statement of Work dated 30 May 2000

SA TOTAL $826,445.30

BY: BRIAN M. GILLIGAN (671) 339-2385
Contracts Officer

25

7600 754

# ORDER FOR SUPPLIES OR SERVICES

| | | | PAGE 1 OF |
|---|---|---|---|
| | | | 3 |

| | | | | | NATIONAL DEFENSE UNDER DMS REG 1 |
|---|---|---|---|---|---|
| 1. CONTRACT/PURCH ORDER NO. N62766-99-D-0425 | 2. DELIVERY ORDER NO. 0003 C2786 | 3. DATE OF ORDER 19 JUL Y 2000 | 4. REQUISITION/PURCH REQUEST NO. WJR 31970 | 5. CERTIFIED FOR | |

6. ISSUED BY
Officer in Charge of Construction
NAVFACENGCOM Contracts, Marianas
PSC 455, Box 175
FPO AP 96540-2200

7. CONTRACTOR
BioGenesis Pacific, Inc.
Corporate & Programs Central
1604 Vinajana Place
Kailua, HI 96734
(TEL: 637-9426 Richard Avilla)

8. DELIVER TO FOB POINT BY
17 SEP 2000

9. DISCOUNT TERMS

10. MAIL INVOICES TO
SEE BLOCK 6

11. SHIP TO
Defense Finance & Accounting Service
Operating Location Oakland, Code 977
P. O. Box 23870
Oakland, CA 94623-3870

| | | | ACCOUNTING AND APPROPRIATION DATA | | | | CLER CODE | ACCOUNT |
|---|---|---|---|---|---|---|---|---|
| ITEM NO. | APPROPRIATION SYMBOL AND SUBHEAD | OBJECT CLASS | BUREAU CONT. NO. | SUB ALLOT | AUTH ACCTG ACTY | TRANS TYPE | PROPERTY ACCT ACTY | COST CODE |
| AA | 97X4930.NEIC | 000 | 77777 | 0 | 062365 | 2P | 062365 | 62765R005135 |

| ITEM NO. | SCHEDULE OF SUPPLIES/SERVICE | QUANTITY ORDERED/ ACCEPTED | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | Roof System, Installation and Repairs to Bldg. 1, 2 and 3, Dental Clinic, CONNAVBLAR, Guam | | | | |
| 0001AC | Demolish and Dispose Roofing System Per Section 02220, 13281 and 13282; Single or Multi-Ply Membrane System with Insulation Over 2" Thick | 15,236 | SF | $0.71 | $10,806.30 |
| 000 LAD | Demolish and Dispose Roofing System Per Section 02220, 13281 and 13282; | 178 | SF | $1.00 | $245.27 |
| 0005AN1 | Roof Flashing, Gutters, Downspouts, Hatches or Skylights Install Roof Insulation in Accordance with Section 07220; 2" to 5" Thick (LABOR AND EQUIPMENT ONLY) | 15,219 | LF | $0.80 | $12,175.20 |
| 0014AC | Sheet Metal Flashing, Downspouts, Gutter, Trim and Fascia in Accordance with Section 07600; 0.15 Thick | 178 | SF | $5.31 | $945.18 |
| 0017AC1 | Fluid Applied Roofing Membrane in Accordance with Section 07540; 60 Mils Thick Roof Membrane (LABOR AND EQUIPMENT ONLY) | 15,219 | SF | $1.20 | $18,262.80 |

| | | |
|---|---|---|
| | TOTAL | $42,454.60 |

17. UNITED STATES OF AMERICA
BY: JOHANNA G. MENDIOLA
Contracting Officer
TEL: (671) 339-8098
mendiolaj@nucr.navy.mil

DD Form 1155 (BPT), MAY 90

(26)

| 1. CONTRACT NO. | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER | 4. REQUISITION/PURCHASE REQUEST NO. | 5. CERTIFIED FOR NATIONAL DEFENSE UNDER DPAS (15 CFR 350) RATING |
|---|---|---|---|---|
| N62766-99-D-0429 | 0004 | 31 AUG 2000 | W/R 31965 | |

6. ISSUED BY  CODE  C2766

Officer in Charge of Construction
NAVFACENGCOM Contracts, Marianas
PSC 455, Box 175
FPO AP 96540-2200

7. ADMINISTERED BY (if other than 6)  CODE

8. DELIVERY FOB
[X] DEST
[ ] OTHER
(See Schedule if other)

9. CONTRACTOR  CODE        FACILITY CODE

NAME AND
ADDRESS
BioGenesis Pacific, Inc.
Corporate & Program Control
1604 Ulualana Place
Kailua, HI 96734
(Tel: 637-9426 Richard Avila)

10. DELIVER TO FOB POINT BY (Date)
31 OCT 2000

11. X IF BUSINESS IS
[ ] SMALL
[ ] SMALL DISADVANTAGED
[ ] WOMEN-OWNED

12. DISCOUNT TERMS

13. MAIL INVOICES TO
SEE BLOCK 6

14. SHIP TO  CODE

15. PAYMENT WILL BE MADE BY
Defense Finance & Accounting Service
Operating Location Oakland, Code FPV
P. O. Box 23870
Oakland, CA 94623-3870

MARK ALL
PACKAGES AND
PAPERS WITH
CONTRACT OR
ORDER NUMBER

16. 
TYPE
OF
ORDER
[X] DELIVERY — This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract.

[ ] PURCHASE — 
Reference your
ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME.

BioGenesis Pacific, Inc. [signature] Richard Avila Oper. Mng  2-13-00
NAME OF CONTRACTOR    SIGNATURE    TYPED NAME AND TITLE    DATE SIGNED

[ ] If this box is marked, supplier must sign Acceptance and return the following number of copies.

17. ACCOUNTING AND APPROPRIATION DATA

| 18. ITEM NO. | APPROPRIATION SYMBOL AND SUBHEAD | OBJECT CLASS | BUREAU CONT. NO. | SUB ALLOT | AUTH ACCTG ACTY | TRANS TYPE | PROPERTY ACCT ACTV | COST CODE | COST CODE | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| AA | 97X4930 7FKC | 000 | 77777 | 0 | 062395 | 2F | 062395 | | 62395RC05245 | $57,160.94 |

| ITEM NO. | SCHEDULE OF SUPPLIES/SERVICE | QUANTITY ORDERED/ACCEPTED | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | Replace metal roof at Bldg 521, Camp Covington | | | | |
| 0001AC | Repair metal roof system: Remove and replace with 22 US Std gage per Section 07140; Remove and replace metal support frame | 1,884 | LB | $2.06 | $3,881.04 |
| 0001AD | Sheet Metal Flashing, Downspout, Gutter, Trim and Fasteners in accordance with Section 07600; Galvanized steel 24ga | 1,330 | SF | $2.81 | $3,703.50 |
| NON-PRICED | Repair metal roof system: Remove and replace with 22 US Std gage per Section 07410; Corrugated roofing panels to include demo labor, material and equipment; Fiberglass krafted insulation to 3-1/2" thick (labor and material); Preparation and painting metal surface, 1 coat primer and 1 finish coat (labor and material) | 7,880 | SF | $6.28 | $49,486.40 |

20. TOTAL $57,160.94

21. UNITED STATES OF AMERICA
BY [signature] Johanna M. Mendiola
TEL: (671) 339-8008
mendiolaj@efacmar.navy.mil
Contracting Officer

22. DIFFERENCES

| 23. QUANTITY IN COLUMN 20 HAS BEEN | 24. SHIP NO. | 25. F.O.B. VOUCHER NO. | 27. AMOUNT VERIFIED CORRECT FOR |
|---|---|---|---|
| [ ] INSPECTED [ ] RECEIVED [ ] ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | [ ] PARTIAL [ ] FINAL | 26. PAID BY | |

DATE  SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE

28. PAYMENT
[ ] COMPLETE
[ ] PARTIAL
[ ] FINAL

33. AMOUNT VERIFIED CORRECT FOR
34. CHECK NUMBER
35. BILL OF LADING NO.

DATE  SIGNATURE AND TITLE OF CERTIFYING OFFICER

36. RECEIVED AT | 37. RECEIVED BY | 38. DATE RECEIVED | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO.

DD Form 1155 (EPT), MAY 88    PREVIOUS EDITIONS ARE OBSOLETE    S/N 0102-LF-211-2700

(27)

# ORDER FOR SUPPLIES OR SERVICES

*(Contractor must submit four copies of invoice)*

| | | | | | PAGE 1 OF |
|---|---|---|---|---|---|
| | | | | | 1 |

| 1. CONTRACT/PURCH ORDER NO. | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER | 4. REQUISITION/PURCHASE REQUEST NO. | 5. CERTIFIED FOR NATIONAL DEFENSE UNDER DMS REG 1 |
|---|---|---|---|---|
| N62766-99-D-0425 | 0005 | 03 August 2000 | W/R 31119 | |

6. ISSUED BY    CODE **C2766**

Officer in Charge of Construction
NAVFACENGCOM Contracts, Mariana
PSC 455, Box 175
FPO AP 96540-2200

| 7. ADMINISTERED BY | CODE | 8. DELIVERY FOB |
|---|---|---|
| | | ☒ DEST |
| | | ☐ OTHER |

9. CONTRACTOR    CODE    FACILITY CODE

NAME AND ADDRESS:
BioGenesis Pacific, Inc.
Corporate & Programs Control
1604 Ulualana Place
Kailua, HI 96734
[Tel: 637-9426 Richard Avilla]

| 10. DELIVER TO FOB POINT BY | 11. MARK IF BUSINESS |
|---|---|
| 06 NOV 2000 | ☐ SMALL |
| 12. DISCOUNT TERMS | ☐ SMALL DISADVANTAGED |
| | ☐ WOMEN-OWNED |

13. SHIP TO    CODE

14. SHIP NO. PACKAGE TO

SEE BLOCK 6

15. PAYMENT WILL MADE BY    CODE

Defense Finance & Accounting Service
Operating Location Oakland, Code FFV
P. O. Box 23870
Oakland, CA 94623-5870

MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER

| 16. TYPE OF ORDER | | |
|---|---|---|
| DELIVERY | ☒ | This delivery order or call is in accordance with terms and conditions of above numbered contract. |
| PURCHASE | | Reference your _____ |

ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME.

| BioGenesis Pacific Inc *Richard Avilla* | Richard Avilla Operations Manager | 9-9-00 |
|---|---|---|
| NAME OF CONTRACTOR    SIGNATURE | TYPED NAME AND TITLE | DATE SIGNED |

☐ If this box is marked, supplier must sign Acceptance and return the following number of copies.

17. ACCOUNTING AND APPROPRIATION DATA

| 18. ITEM NO. | APPROPRIATION SYMBOL AND SUBHEAD | OBJECT CLASS | BUREAU CONTROL NO. | SUB ALLOT | AUTH ACCTG ACTIVITY | PROPERTY ACCT'NT | TRANS TYPE | COST CODE | TAXPAYERS | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| AA | 97X4930 WEIC | 000 | 77777 | 0 | 062895 | | 29 | 062895 | 82395RC05146 | $226,501.96 |

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY ORDERED/ ACCEPTED | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| 0001 | Repair roof with Ania Apacoe mobmaco 60 MILS at Bag. 3100, 3B1U-1. COMNAVMAR Saven | | | | |
| 0001AA | Demolish and dispose roofing system per Sections 02739, 15281 and 13481: Single ar multi-ply membrane remove insulation | 54,838 | SF | $.51 | $27,961.38 |
| 0001AD | Dem-lish and dispose roofing system per Sections 02739, 04081 and 13481: Roof flashing Collars: Downspouts flashings or skylights | 2,160 | SF | $1.49 | $3,174.00 |
| 0016AA | Single component acrylic base, elastomeric paint for wet coated roof 48 MILS DFT (2 coats) | 1,010 | SF | $6.90 | $6,762.00 |
| 0017AC | Fluid applied roofing membrane in conformance with Section 07546 60 MILS 2LB's roof membrane | 54,834 | SF | $3.43 | $189,149.70 |

| 25. | UNITED STATES OF AMERICA | 26. TOTAL | $226,501.96 |
|---|---|---|---|
| If quantity accepted by the Government is same as quantity ordered, indicate by X. If different, enter actual quantity accepted below quantity ordered and encircle. | BY: **Brian M. Gilligan, LT, CEC, USN** Tel: (671) 339-2368 | 27. DIFFERENCES | |
| | Contracting Officer    Email: gilligab@navfacpac.navy.mil | | |

| 28. ☐ QUANTITY IN COLUMN 21 HAS BEEN ☐ INSPECTED, ☐ RECEIVED, ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |
|---|---|---|
| | ☐ PARTIAL   ☐ FINAL | |
| DATE    SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | ☐ COMPLETE   ☐ PARTIAL | 34. CHECK NUMBER |
| 30. I certify this account is correct and proper for payment. | ☐ FINAL | 35. BILL OF LADING NO. |
| DATE    SIGNATURE AND TITLE OF CERTIFYING OFFICER | | |

| 37. RECEIVED AT | 38. RECEIVED BY | 39. DATE RECEIVED | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |
|---|---|---|---|---|---|

DD Form 1155 (DPT), MAY 90    Previous editions are obsolete.    S/N 0102-LF-011-3700

(28)

Case 1:02-cv-00008    Document 438-3    Filed 08/17/2004    Page 64 of 65

29



**Rhino Builders, Inc.**
87-1610 Ulehawa Road
Waianae, HI 96792

# CONTRACT·INVOICE

| | |
|---|---|
| Invoice#: | 1366 |
| Invoice Date: | 06/28/2001 |
| Due Date: | 07/13/2001 |
| Order: | |

License # C-19515

TO  BioGenesis Pacific, Inc.
1604 Uluslana Place
Kailua, Hawaii 96734

PROJECT 69801
N62766-99-D-0425 – Roofing
Navy Housing
Various Locations
Guam

| Description | | Amount |
|---|---|---|
| | | 245664.43 |

**Total Billing**

**Total Billing for Delivery Orders # 1 -18**

| | | |
|---|---|---|
| Direct Cost | | |
| Materials | 34,088.17 | |
| Equipment Rental | 9,081.16 | |
| Subcontracted | 1,796.89 | |
| Other Job Exp. | 11,353.96 | |
| Guam GRT | 9,448.63 | |
| Direct Labor w/Burden | 85,346.49 | |
| Interest on Bank Loan | 20,988.33 | |
| Contract Negotiations | 8,250.00 | |
| | | |
| Total Direct Cost | | 180,353.63 |
| | | |
| Total Overhead | 130,621.60 | |
| | | |
| BPI's Share @ 50% | | 65,310.80 |
| | | |
| Total Due from BPI | | 245,664.63 |

| | |
|---|---|
| Sales Tax: $ | 0.00 |
| Invoice Total: $ | 245,664.43 |
| Retention: $ | 0.00 |
| Amount Paid: $ | 0.00 |

*Please Pay This Amount*   $ 245,664.43

*Terms: All invoices are due and payable within 15 days of receipt.
A service charge of % per annum will be computed on all amounts overdue on regular statement
dates. Please make checks payable to Rhino Builders, Inc.. Thank you for your prompt payment*

EXHIBIT 2

(30)

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

BIOGENESIS PACIFIC IN
1604 ULUALANA PLACE
KAILUA, HAWAII 96734

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)   B. Date of Delivery

C. Signature
X                                    ☐ Agent
                                     ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Certified Mail     ☐ Express Mail
☐ Registered         ☐ Return Receipt for Merchandise
☐ Insured Mail       ☐ C.O.D.

Restricted Delivery? (Extra Fee)   ☐ Yes

...eipt                            102595-80-M-0952

---

**CERTIFIED MAIL**

☐ UNCLAIMED

**Rhino Builders, Inc.**
87-1610 Ulehawa Road
Waianae, HI 96792

2099 3220 0002 6687 7749

2nd Notice

☐ UNCLAIMED  Return

License # C-19515

TO   BioGenesis Pacific, Inc.
     1604 Ulualana Place
     Kailua, Hawaii 96734

RMK
7/3/01

U.S. POS...
PAID
HONOLULU...
9673...

$3...

RETURN TO...                    7/2/0?

1st NOTICE
2nd NOTICE

(31)



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)  B. Date of Delivery

C. Signature

X ☐ Agent ☐ Addressee

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

BIOGENESIS PACIFIC INC
215 B KAYSI TRAMAHU ST
DEDEDO, GUAM 96912

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered      ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number (Copy from service label)

7099 3220 0002 6687 7763

PS Form 3811, July 1999     Domestic Return Receipt     102595-00-M-0952

---

**CERTIFIED MAIL**

Columbian® CO159
Dubl-Vue® Check Envelope

7099 3220 0002 6687 7763

RETURN RECEIPT
REQUESTED

245 B KAYSI TRAMAHU ST.
DEDEDO, GUAM 96912

U.S. POSTAGE
PAID
HONOLULU HI
JUL 02 01
AMOUNT
$3.94

(32)

33

# CARLSMITH BALL

### A LIMITED LIABILITY LAW PARTNERSHIP

PACIFIC TOWER, SUITE 2200
1001 BISHOP STREET
HONOLULU, HAWAII 96813
TELEPHONE (808) 523-2500    FAX (808) 523-0842
WWW.CARLSMITH.COM

DIRECT DIAL NO.
(808) 523-2527

E-MAIL: TTHOMASON@CARLSMITH.COM

OUR REFERENCE NO.
053705-00001

### August 15, 2001

Officer in Charge of Construction
ATTN:  Ms. Bennett Terlaje, Contracting
  Officer
NAVFACENGCOM Contracts Marianas
PSC455, Box 175
FPO AP 96540-2200

Re:   Subcontractor Assertion of Non-Payment Under FAR 32.112-1: Contract
      No. N62766-99-D-0425: Navy Housing Roofing, Various Locations

Dear Ms. Terlaje:

This is to follow up on our telephone conversation of August 7, 2001 concerning our client, Rhino Builders, Inc. ("Rhino") and its assertion of non-payment by BioGenesis Pacific, Inc. ("BPI"), the prime contractor on the subject contract.

A.    Requested Actions.

Pursuant to Federal Acquisition Regulation ("FAR") 32.112-1, Rhino asserts that it has not been paid $245,664.43 for work performed as a subcontractor to BPI on the Contract No. N62766-99-D-0425; Navy Housing Roofing, Various Locations (the "Contract").  Accordingly, Rhino requests that the contracting officer do the following:

1.    Address BPI's failure to make payment and assist to the extent possible to ensure BPI fulfills its contractual obligations; and

2.    In accordance with FAR 28.106-6, provide the following information to Rhino if BPI fails to provide proof of full payment to Rhino by September 14, 2001:

HONOLULU · KAPOLEI · HILO · KONA · MAUI · GUAM · SAIPAN · LOS ANGELES · WASHINGTON, D.C. · MEXICO

## EXHIBIT 3

34

Ms. Bennett Terlaje, Contracting
Officer
August 15, 2001
Page 2

      a.  The name and address of the surety on this contract;

      b.  The penal amount of the bond for this contract; **and**

      c.  A copy of the payment bond for this contract.[1]

B.    <u>Additional Background Information.</u>

    As you requested, we provide the following information to assist you in addressing BPI's failure to pay Rhino's invoiced amounts for work performed. We have also included information on other issues you asked us to cover. Please contact me directly at the above phone and facsimile numbers if you have further questions.

    1.    <u>Rhino's Status as a Small and Disadvantaged Contractor Under Section 8(a) of the Small Business Act.</u>

    This portion of our letter is to respond to your concerns about Rhino's separate contract with the Navy and the information you received concerning Rhino's status as an 8(a) contractor. For your information and reference, I have attached as Enclosure 1 a copy of the Small Business Administration ("SBA") regulations governing minority ownership of a business to qualify as an 8(a) Program participant. The regulations provide for 8(a) Program participation by small businesses owned by an individual disadvantaged person or a group of disadvantaged persons. Ownership as described in the SBA regulations is satisfied if the individual disadvantaged person or group of disadvantaged persons owns 51% or more of the small business. The regulations state that an 8(a) Program participant must be "at least 51% unconditionally and directly owned by one or more socially and economically disadvantaged individuals who are citizens of the United States." [13 CFR § 124.105; attached as Enclosure 1].

    In Rhino's case, the SBA has determined that Mr. Michael O'Connell is a disadvantaged citizen of the United States who is of Hawaiian descent. Further the corporate records also show that he owns unconditionally and directly 51% of the shares of Rhino. Based upon SBA's determination that Mr. O'Connell is a qualified disadvantaged individual who owns unconditionally 51% of Rhino, the SBA certified Rhino as an 8(a) contractor.

    As I mentioned in our conversation, there is a current question of the ownership of the remaining 49% of Rhino's shares. The question concerning ownership

---

[1]    Rhino agrees to pay reasonable copying costs for the reproduction of the bond in this matter.


(35)


of the 49% interest in Rhino arose because the record owner of these shares may have transferred his 49% interest in a manner contrary to the controlling Shareholder Agreement. The Shareholder Agreement required the owner of the 49% interest to affording Rhino a "right of first refusal" to purchase these shares before the shares could be transferred to another person. Accordingly, the only open question about ownership in Rhino relates to a minority shareholder and does not affect Rhino's status as an 8(a) Program participant. Mr. O'Connell remains the 51% owner of the shares of Rhino and no action related to the questioned transfer of 49% interest alters that fact or can in any way deprive Rhino of its status as a qualified 8(a) contractor.

In the event anyone raises this question again, we request you require them to provide documentation to demonstrate a reasonable basis for questioning Rhino's status as an 8(a) contractor. In addition, we request that you inform us so that we may take appropriate action with the individuals involved to resolve the matter.

2.    <u>BPI's Failure To Pay Rhino For Work Performed</u>

Rhino and BPI entered into an informal, oral subcontract whereby Rhino agreed to perform such Contract work as the Navy might assign to BPI on individual task orders under the Contract. The subcontract agreement was that BPI would pay Rhino's costs of performance plus 50% of BPI's profit upon completion of each task order. In addition, the oral agreement was necessary initially only because the Contract award date had not afforded BPI sufficient time to establish a written subcontract with Rhino. Both BPI and Rhino agreed that the oral agreement between BPI and Rhino would later be reduced to writing to conform to accepted federal government contract practice.

Rhino has insufficient information or knowledge to address any Navy concerns that BPI may have failed to disclose Rhino as its subcontractor or that, at the time, BPI may not have had adequate manpower, equipment, or financial resources to be a responsible contractor eligible for award of the contract. Based upon the information available to Rhino at the time, the subcontract BPI offered in this case was solely a business opportunity, and Rhino expected that BPI (as the prime contractor through SBA) would fulfill all contract administration responsibilities it had with the Navy.

Rhino performed the Navy assigned Task Orders 1 through 4, and on November 16, 2000, Rhino forwarded its initial invoice for its work on the first four Navy assigned work orders. Rhino's invoice included a breakdown of reimbursable costs and profit share. I have attached a copy of Rhino's November 16, 2000 invoice as Enclosure 2 to this letter.

(36)




Ms. Bennett Terlaje, Contracting
   Officer
August 15, 2001
Page 4

During the time Rhino was performing work on the Navy's assigned Task
Orders 1 through 4, Rhino engaged a consultant experienced in federal procurement to
prepare a written subcontract agreement to formalize the relationship between Rhino and
BPI. The consultant drafted a proposed subcontract agreement consistent with the terms
under which Rhino accepted BPI's offer to perform subcontract work on the Contract.
The consultant provided his initial drafts to BPI for comment and finally submitted the
full document to BPI for review on November 17, 2000. I have attached a copy of the
consultant's facsimile transmittal letter to BPI and the draft subcontract as Enclosure 3 to
this letter.

At this point, BPI failed to pay for Rhino's work to date on the Contract.
BPI also refused to enter into a formal written subcontract with Rhino. Under the
circumstances, Rhino's Chief Executive Officer ("CEO") informed Rhino's Guam office
manager to cease performance on the oral agreement with BPI. Rhino's decision to stop
work was due to BPI's failure to fulfill its obligation to pay for work performed and
refusal to negotiate an acceptable written subcontract. Subsequently, Rhino's CEO
learned that BPI was continuing to use Rhino resources on the Contract without payment.
Accordingly, Rhino's CEO issued a December 14, 2000 official company notice
forbidding BPI's use of Rhino resources to perform its work on the Contract. I have
attached a copy of the December 14, 2000 notice as Enclosure 4 to this letter.

In response to Rhino's action, BPI wrote a January 2, 2001 letter to Rhino
which I have attached for your review as Enclosure 5 to this letter. In the January 2
letter, BPI stated in relevant part:

> [Rhino's] subcontract was subject to verbal agreement which
> provided that 50% of the net profits would be determined
> after all actual costs to both [BPI] and Rhino. In return you
> represented that Rhino was capable and would front all the
> needed facilities, personnel, financing and bonding through
> the term of each task order. Furthermore, Rhino was
> consistently given clear and specific instructions not to cause
> any task orders to be accepted from the Navy unless Rhino
> was certain that each specific task order would result in a
> profit or break even at worst under our said agreement. If
> there was any doubt, Rhino was not to cause any task order to
> be accepted. BPI relied upon Rhino for the acceptance of
> each task order.





Ms. Bennett Terla...Contracting
  Officer
August 15, 2001
Page 5

BPI has been disappointed by Rhino's affirmative and
specific actions to repudiate and breach its subcontract with
BPI. This has been especially damaging since upon Rhino's
urgings BPI had wholly relied on Rhino's management and
facilities on Guam.

The above quoted BPI letter shows unmistakably that an oral agreement
existed and that Rhino was to receive at least 50% of the profit from revenues on each
work order. Further, the BPI letter shows that Rhino performed all work on the Contract
work orders including "all the needed facilities, personnel, financing, and bonding
through the term of each work order." In effect, BPI envisioned the subcontract as a
brokered contract with a *de facto* assignment of the Contract to Rhino. BPI did nothing
more than obtain award of the Contract and then attempt to transfer all performance
requirements to Rhino while refusing to pay for work performed.

      3.    <u>BPI's Description of Subcontract Terms Is Contrary To Federal
Contracting Procedures.</u>

BPI's above description of the subcontract was contrary to Rhino's
understanding of the relationship. Instead of affirming a valid subcontractor relationship,
BPI's own letter shows that BPI was attempting, after the fact, to shift full responsibility
for all contract work to Rhino. Apparently through inexperience in government
contracting, BPI was also demanding that Rhino reject any potentially unprofitable Navy
assignments of task orders. Based upon the BPI letter, it is apparent that BPI was
insisting on shifting all Contract risks and demanding that Rhino "not . . . cause any
[potentially unprofitable] task order to be accepted" even though such an act would
thereby breach the Navy Contract. If Rhino fulfilled the Navy's assigned work order
requirements on any task order BPI found unprofitable, BPI was seeking to require that
Rhino shoulder all costs without reimbursement while BPI received full payment from
the Navy for Rhino's work.

BPI's efforts to evade all Contract work obligations are further confirmed
where BPI's letter states that "BPI relied upon Rhino for the acceptance of each task
order" and that BPI "had wholly relied upon Rhino's management and facilities in
Guam." In effect, BPI did nothing to accomplish the Contract work, and "relied" on
Rhino to do everything the Navy required. BPI sought to establish its role in the venture
solely as the collector of Navy contract payments with no responsibility to perform
Contract work or to pay its subcontractor for performance of the Navy Contract.



Ms. Bennett Terlaje, Contracting
 Officer
August 15, 2001
Page 6

BPI's January 2, 2001 letter is clear evidence of an improper effort to
assign all Contract responsibilities to a subcontractor without providing notice and
obtaining approval of the contracting agency. BPI's letter also improperly demands that
the subcontractor work for free or purposely breach the Navy Contract to prevent any loss
of profit to BPI. BPI's contention that Rhino "repudiated or breached" the subcontract is
patently absurd. Rhino was unwilling to continue work after BPI breached the contract
by failing to make payments due. Rhino was also unwilling to remain in the relationship
when BPI breached its duty to act in good faith by refusing to commit to a written
contract that defined the rights and obligations of the parties.

> 4.    BPI Continues To Act In Bad Faith.

Rhino asks that you review carefully BPI's January 2, 2001 letter and
consider whether BPI's view of the oral agreement with Rhino is reasonable or consistent
with public contract law practice. We believe that the letter itself demonstrates that BPI
does not meet the minimum standards of FAR 9.104-1. Although BPI's actions are
probably based upon ignorance or inexperience in federal government contracting, BPI's
treatment of Rhino here must be corrected.

BPI has continued its failure to pay on any of Rhino's invoices. To resolve
BPI's failure to pay Rhino for work Rhino performed, Rhino forwarded its final
consolidated invoice by U.S. mail to BPI's headquarters on July 21, 2001. However, BPI
refused to accept the mailed invoice, and the invoice was returned as unclaimed.

Rhino also attempted to hand deliver its final invoice to BPI's Guam office.
BPI officials there informed Rhino's Guam office manager that they were not authorized
to accept the Rhino invoice and that Rhino must submit its invoice to the BPI
headquarters address from which the earlier mailed invoice was returned unclaimed. The
BPI Guam office also refused to accept delivery of the Rhino mailed invoice.

Attached as Enclosure 6 to this letter is Rhino's final invoice in the amount
of $245,664.43 for BPI's unpaid billings on all work Rhino performed on the Contract.
Also at Enclosure 6 are the relevant mail receipts reflecting BPI's failure to claim its
business mail.

> C.    Conclusion.

Because BPI refuses to accept mailed invoices and fails to respond to calls
to discuss BPI's failure to make payment, Rhino asks that you address this matter with

(39)

Ms. Bennett Terla... ...Contracting
Officer
August 15, 2001
Page 7

BPI. We also ask that you assist in referring the matter to BPI's surety if BPI continues
to fail to pay for work Rhino performed on the Navy Contract. Please call me directly if
you have any questions of further requirements.

Very truly yours,

Terry E. Thomason

TET:shl
Enclosures
1424206-1

cc:     Rhino Builders, Inc.



(41)

Bond No. 20-80-88

| PERFORMANCE BOND<br>(See instructions on reverse) | DATE BOND EXECUTED (must be same or later than date of contract)<br>**October 6, 1999** | OMB No.: 9000-004 |
|---|---|---|

Public reporting burden for this collection of information is estimated to average 25 minutes per response, including the time for reviewing instructions, searching existing sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVRL), Federal Acquisition Policy Division, GSA, Washington, DC 20405

**PRINCIPAL** (Legal name and business address)

BIOGENESIS PACIFIC, INC.
1604 Ulualana Place
Kailua, Hawaii  96734

| TYPE OF ORGANIZATION ("X" one) |
|---|
| ☐ INDIVIDUAL ☐ PARTNERSHIP |
| ☐ JOINT VENTURE ☒ CORPORATION |

STATE OF INCORPORATION
**Hawaii**

**SURETY(IES)** (Name(s) and business address(es))

AMERICAN HOME ASSURANCE COMPANY
121 Spear Street
San Francisco, California  94105

PENAL SUM OF BOND

| MILLION(S) | THOUSAND(S) | HUNDRED(S) | CENT(S) |
|---|---|---|---|
|  | 500 | 000 | 00 |

| CONTRACT DATE | CONTRACT NO. |
|---|---|
| 09/29/99 | N62766-99-D-0425 |

**OBLIGATION:**

We, the Principal and Surety(ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

**CONDITIONS:**

The Principal has entered into the contract identified above.

**THEREFORE:**

The above obligation is void if the Principal -

(a)(1) Performs and fulfills all the undertakings, covenants, terms, conditions, and agreements of the contract during the original term of the contract and any extensions thereof that are granted by the Government, with or without notice to the Surety(ies), and during the life of any guaranty required under the contract, and (2) performs and fulfills all the undertakings, covenants, terms, conditions, and agreements of any and all duly authorized modifications of the contract that hereafter are made. Notice of those modifications to the Surety(ies) are waived.

(b) Pays to the Government the full amount of the taxes imposed by the Government, if the said contract is subject to the Miller Act (40 U.S.C. 270a-270e), which are collected, deducted, or withheld from wages paid by the Principal in carrying out the construction contract with respect to which this bond is furnished.

**WITNESS:**

The Principal and Surety(ies) executed this performance bond and affixed their seals on the above date.

| PRINCIPAL | | | | |
|---|---|---|---|---|
| SIGNATURE(S) | BIOGENESIS PACIFIC, INC.<br>By [signature] | 2. (Seal) | 3. (Seal) | Corporate Seal |
| NAME(S) & TITLE(S) (Typed) | GERALD H.C. LAM<br>President | 2. | 3. | |

| INDIVIDUAL SURETY(IES) | | |
|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) |
| NAME(S) (Typed) | 1. | 2. |

| CORPORATE SURETY(IES) | | | |
|---|---|---|---|
| SURETY A | NAME & ADDRESS | AMERICAN HOME ASSURANCE COMPANY. San Francisco, CA | STATE OF INC.<br>New York | LIABILITY LIMIT<br>$ |
| | SIGNATURE(S) | By [signature] | 2. | Corporate Seal |
| | NAME(S) & TITLE(S) (Typed) | Swan Lee,<br>Attorney in Fact | 2. | |

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition not usable

STANDARD FORM 25 (REV. 5-96)
Prescribed by GSA-FAR (48 CFR) 53.228(b)

EXHIBIT 4

(42)

Bond No. 20-80-88

| PAYMENT BOND (See instructions on reverse) | DATE BOND EXECUTED (MUST be same as later than date of contract) October 6, 1999 | OMB No.:9000- |
|---|---|---|

Public reporting burden for this collection of information is estimated to average 25 minutes per response, including the time for reviewing instructions, searching existing sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVRS), Federal Acquisition Policy Division, GSA, Washington DC 20405

| PRINCIPAL (Legal name and business address) BIOGENESIS PACIFIC, INC. 1604 Ulualana Place Kailua, Hawaii 96734 | TYPE OF ORGANIZATION ("X" one) ☐ INDIVIDUAL ☐ PARTNERSHIP ☐ JOINT VENTURE ☒ CORPORATION STATE OF INCORPORATION Hawaii |
|---|---|

| SURETY(IES) (Name(s) and business address(es)) AMERICAN HOME ASSURANCE COMPANY 121 Spear Street San Francisco, California 94105 | PENAL SUM OF BOND |  |  |  |
|---|---|---|---|---|
|  | MILLION(S) | THOUSAND(S) 250 | HUNDRED(S) 000 | C... 0 |
|  | CONTRACT DATE 09/29/99 | CONTRACT NO. N62766-99-D-0... |  |  |

## OBLIGATION:

We, the Principal and Surety(ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

## CONDITIONS:

The above obligation is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal or a subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work provided for in the contract identified above, and any authorized modifications of the contract that subsequently are made. Notice of those modifications to the Surety(ies) are waived.

## WITNESS:

The Principal and Surety(ies) executed this payment bond and affixed their seals on the above date.

| PRINCIPAL |  |  |  |  |  |
|---|---|---|---|---|---|
| | 1. BIOGENESIS PACIFIC, INC. | | | | Corporate Seal |
| SIGNATURE(S) | By [signature] (Seal) | 2. (Seal) | 3. (Seal) | | |
| NAME(S) & TITLE(S) (Typed) | GERALD NYC LAM President | 2. | 3. | | |

| INDIVIDUAL SURETY(IES) |  |  |  |
|---|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) | |
| NAME(S) (Typed) | 1. | 2. | |

| CORPORATE SURETY(IES) |  |  |  |  |
|---|---|---|---|---|
| Surety A | NAME & ADDRESS | AMERICAN HOME ASSURANCE COMPANY, San Francisco, CA | STATE OF INC. New York | LIABILITY LIMIT $ | Corporate Seal |
| | SIGNATURE(S) | By [signature] | 2. | | |
| | NAME(S) & TITLE(S) (Typed) | Swan Lee, Attorney in Fact | 2. | | |

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is usable

STANDARD FORM 25A (REV. 10-9...)
Prescribed by GSA-FAR (48 CFR) 53.228(c)

(43)

# EXHIBIT "14"

2

3   UNITED STATES OF AMERICA FOR USE        ) CIVIL CASE NO. 02-00008
    AND BENEFIT OF RHINO BUILDERS,          )
4   INC.,                                   )
                                            )
5            Plaintiff,                      )
                                            )
6            vs.                             )
                                            )
7   AIG TECHNICAL SERVICES, INC.,           )     DEPOSITION OF
    and AMERICAN HOME ASSURANCE             )   EUGENE O'CONNELL
8   COMPANY,                                )    APRIL 11, 2003
                                            )
9                                           )
             Defendants.                    )
10  _____)
                                            )
11  BIOGENESIS PACIFIC, INC.,               )
                                            )
12           Counter-Plaintiff              )
                                            )
13           vs.                            )
                                            )
14  RHINO BUILDERS, INC., MICHAEL           )
    O'CONNELL, MICHAEL DANFORTH,            )
15  and JOHN DOES 1-10,                     )
                                            )
16           Counter-Defendants,            )
                                            )
17  _____)
                                            )
18  AMERICAN HOME ASSURANCE                 )
    COMPANY,                                )
19           Cross-Claimant,                )
                                            )
20           vs.                            )
                                            )
21  BIOGENESIS PACIFIC, INC.                )
                                            )
22           Cross-Claim Defendant.         )
    _____)
23

24

25                  Cecilia F. Flores
             Freelance Stenotype Reporter
                 Tel: (671) 632-0727
                 Fax: (671) 632-5353



1        Q.    Actually, I'm going to backup a little bit before
2    we get into coming over to Guam.  Did you keep the books
3    and the accounting for Rhino Builders?
4        A.    Yes.
5        Q.    And have you been doing that since you joined
6    them in '98?
7        A.    No.
8        Q.    When did you start keeping their books and records?
9        A.    1999.
10       Q.    What did you do for Rhino Builders in '98?
11       A.    Basically the bookkeeping and their computer.
12       Q.    And in 1999, how did your duties change?
13       A.    I took over the accounting full time.
14       Q.    You had an in-house accountant or were you using
15   a firm before that?
16       A.    They were using an accounting firm, I'm not sure
17   how they were using the accounting firm before, but it was
18   just -- they had an accounting firm they sent the records
19   to.  I guess it was just for tax purposes, I don't know.
20       Q.    But it was outsourced then?
21       A.    Yes.
22       Q.    Do you know when in '99 exactly or the month
23   at least that you took over the accounting work full time?
24       A.    I believe it was beginning of the year.
25       Q.    So you prepare all their invoices; is that

Eugene O'Connell: April 11, 2003

1    right?

2          A.    Yes.

3          Q.    You take care of all their financial statements,

4    profit loss statements, balance sheets, and things like that?

5          A.    Yes.

6          Q.    You prepare all those then?

7          A.    Yes.

8          Q.    Do you also prepare their tax returns?

9          A.    No.

10         Q.    Who does that?

11         A.    They have an accounting firm that does that.

12         Q.    What's the name of that firm?

13         A.    Detor & Williams.

14         Q.    D-e-t-e-r?

15         A.    D-e-t-o-r.

16         Q.    D-e-t-o-r, Detor & Williams.  Are you familiar with

17   an annual filing that needs to be filed with the State of

18   Hawaii just to identify who the officers and directors of the

19   corporation are?

20         A.    Yes.

21         Q.    Do you know who prepares that document?

22         A.    Yes.

23         Q.    Can you tell me who that is?

24         A.    Either it would be myself or sometimes we'd have

25   the secretary do it.


Eugene O'Connell: April 11, 2003

1  I know –

2          MR. CLARK:   I use it in the context of what it

3  appears to be.

4          MR. YANZA: Can we go forward, please?

5          MR. CORTES:  Yes.

6  BY MR. CLARK: (Continuing)

7     Q.   It appears to be or purports to be an October 22,

8  2001 claim.  Are you familiar with this document?

9     A.   Yes.

10    Q.   Did you assist in the preparation of the attachments

11 to this document?

12    A.   Yes.

13    Q.   Let's go through these attachments, please.  Can you

14 turn to the fifth page where it starts "CONTRACT INVOICE"

15 1313?  Do you see that?  Okay, let's turn to the next page.

16         MR. YANZA:  I'm sorry, what page?

17         MR.  CLARK:   We're on the sixth page now, the

18 Contract Invoice 1313.

19         MR. YANZA:  Not number 6, but actually sixth page?

20         MR. CLARK:  Yes, page six which actually has an 8

21 circled on the bottom of it.

22 BY MR. CLARK: (Continuing)

23    Q.   Are you familiar with this document?

24    A.   Yes.

25    Q.   Did you prepare this document?

Eugene O'Connell: April 11, 2003

1    A.    Yes.

2    Q.    Did you prepare this document on or about November

3    14, 2000?

4    A.    Yes.

5    Q.    And did you prepare this on behalf of Rhino

6    Builders; is that correct?

7    A.    Yes, I did.

8    Q.    And did you send this invoice off to BioGenesis

9    Pacific on or about November 14, 2000?

10   A.    Yes, I believe I did.

11   Q.    Let's go down to the middle of the document where it

12   starts with the letter "D."

13   A.    Yes.

14   Q.    "Value of completed work complete."

15   A.    Yes.

16   Q.    It says, "D.O. 0001 = 100% of $12,129.10."

17   A.    Right.

18   Q.    So am I correct in assuming that as of November 14th,

19   2000, Rhino believes it completed 100 percent of the scope of

20   work required for Delivery Order 1 for the Navy contract?

21   A.    Yes.

22   Q.    And is that the same for Delivery Order No. 2?

23   A.    Yes.

24   Q.    And Delivery Order No. 3?

25   A.    Yes.


Eugene O'Connell: April 11, 2003

1      Q.   And then with respect to Delivery Order No. 4, it
2  appears that Rhino claims to have completed 90 percent of the
3  work required; is that correct?

4      A.   That was what was reported to me.

5      Q.   Reported to you by whom?

6      A.   I believe -- I think at this time it was reported to
7  me by either Mr. Danforth or -- yeah, Mr. Danforth, and part
8  of it, I believe, also from Mr. George Allen, I'm sorry, Mr.
9  Alfred Garthe, excuse me.

10     Q.   Yesterday during Mr. Avilla's deposition, were you
11 present  when  he  testified  that,  to  the  best  of  his
12 recollection, the only task orders that Rhino worked on were
13 Task Orders or Delivery Orders 1, 2, and 7?

14     A.   Yes.

15     Q.   When you say these numbers were reported to you,
16 with respect to Delivery Orders 3 and 4, how exactly were they
17 reported to you?

18     A.   I believe I was told that the contracts were
19 complete and our work was done, to bill for the project.

20     Q.   By Michael Danforth and Alfred Garthe?

21     A.   I think at that time it was -- actually, I don't
22 recall who at that time told me that. It was either Alfred
23 Garthe, Michael Danforth, or even my brother, Michael
24 O'Connell to go ahead and bill for these projects, that we had
25 done the work, and this is a summary of the invoices up to

Eugene O'Connell: April 11, 2003

1    October 31st.

2        Q.    You were told by one of those three individuals?
3    You can't remember whom?   Or by more than one of those
4    individuals?

5        A.    I think I spoke with all three of them throughout
6    this occasion, and they were providing me some information
7    because I wanted to also get some more cost information from
8    Mr. Garthe.  And I'm sure my brother told me to go ahead and
9    make sure I put the billing out.  As to what the actual
10   numbers were, I believe those were provided by Michael
11   Danforth with the assistance of Alfred Garthe and probably
12   Richard Avilla.  I'm not sure.

13       Q.    Well, are you sure as to who exactly you received
14   the numbers from?

15       A.    No, I don't recall exactly who provided me the
16   numbers.

17       Q.    Were you surprised yesterday to hear Mr. Avilla say
18   that as of October 31, 2000, that no work had started yet on
19   Delivery Orders 3 and 4?

20       A.    Actually yes, I was.

21       Q.    Did you receive any, what's the word I'm looking
22   for, any progress reports or project reports with respect to
23   Delivery Orders 3 and 4 that you relied on to conclude that
24   the projects were 100 percent done and 90 percent done?

25       A.    No.  If I'm not mistaken, all I received was a phone

Eugene O'Connell: April 11, 2003

1  call letting me know that go ahead and bill, this is what we

2  should be billing for, and that's why I don't recall if I

3  spoke with Alfred Garthe or Michael Danforth.

4      Q.   But you didn't see any documentation that you can

5  remember indicating how much work had actually gone into

6  Delivery Orders 3 and 4 as of October 31, 2000?

7      A.   No, I don't recall except for what I was able to

8  printout for job costing.  That was about it.

9      Q.   And these would be some of the items that are

10 attached to this?

11     A.   Well, there's certified payroll attached here.  I'm

12 not sure.

13     Q.   Let's get to those.  The amount stated here is

14 $89,668.58, right?

15     A.   Yes.

16     Q.   Looking at Item E, it says "Less Direct Cost,

17 Attachment A" 49,000 and change.  Item F, Less Direct Cost

18 Overhead, Attachment B, 31,000.  Item G Net Delivery Order (1

19 through 4) profit, and then Item H, Rhino profit share (50%).

20 Is this the formula that you believed was agreed upon between

21 Rhino and BioGenesis with respect to the alleged subcontract?

22     A.   Yes.

23     Q.   So it was to take the total revenue of the project,

24 and you would subtract out the direct cost, direct overhead,

25 whatever was leftover was profit, and that was going to be

Eugene O'Connell: April 11, 2003

1    divided 50 percent; is that right?

2          A.    Yes.

3          Q.    And was this 50 percent profit element, was that

4    supposed to be computed on a per delivery order basis?

5          A.    You know, they didn't tell me and I, based upon what

6    I did, I just did it for all the projects at hand at that

7    point.

8          Q.    That's how you computed it.

9          A.    Yes.

10         Q.    In this invoice, right?

11         A.    Yes.

12         Q.    So you computed it based upon each individual

13   delivery order, computed what the -- actually in this case, I

14   guess it's --

15         A.    It was against all four of those delivery orders at

16   that point.

17         Q.    Combined, right.

18         A.    Based upon whatever costs I had.

19         Q.    Did Michael O'Connell ever talk to you about how

20   losses would be handled?  Well first of all, is it unusual for

21   a contractor to lose money on a project?  Is it rare?

22         A.    For an 8(a) contract, yes.

23         Q.    So they always come out profitable?

24         A.    The government makes sure about that, yes.

25         Q.    Was there any discussion about that?

Eugene O'Connell: April 11, 2003

1    Q.   Does that claim include, then, all of these overhead
2    expenses and charges that are itemized in this last document
3    we just went through, allocation of indirect costs for the
4    work?

5    A.   I believe so.

6    Q.   So now from what I understand, after going through
7    some of these items then, would you agree that that amount is
8    overstated as related to the cost associated just with the
9    BioGenesis project?

10    A.   My understanding at the time was that we would split
11    all the costs for the overhead, so no, I don't believe this is
12    overstated.

13    Q.   So the bonding for the SOC contract you believe was
14    supposed to be picked up as part of the cost of the BioGenesis
15    claim?

16    A.   I said for the overhead.  For the direct cost, no.
17    I think the direct cost itself --

18    Q.   I'll tell you what, can you tell me how -- I'm a
19    little lost here.   I understand the $89,000.00 and I
20    understand the $17,000.00.  At least I understand that they
21    purport to be associated with Delivery Orders 1, 2, 3, and 4,
22    and that number comes up to 106.  How does that number go from
23    106 to $245,000.00?  Can you explain that to me?

24    A.   I included for the 245,000 would also include some
25    of these overhead costs.  And some of the overhead cost that

Eugene O'Connell: April 11, 2003

1   was allocated under overhead, I ended up moving that out to

2   direct cost, and I believe it's not showing here, but I

3   believe the, in some of the other exhibits you may have, it

4   will show the breakdown on a spreadsheet or some other

5   fashion, that it would show how I allocated the costs out.

6       Q.   So this Guam Overhead Cost Statement that we were

7   looking at, the income statement for Periods 7 through 10 --

8       A.   Yes.

9       Q.   -- are you saying not all of that bottom line, which

10  is "Net Profit After Tax" -- I guess this is just an income

11  statement, right?

12      A.   Yes.  Again like I said earlier, I was not always

13  getting my reports from Guam in a timely fashion.

14      Q.   Let's go back to the circled page 8.  Circled page

15  8 says "Less Direct Cost, Attachment A."  Which attachment is

16  that referring to?

17      A.   I don't see that here.

18      Q.   Let's go to circled page 30.

19      A.   All right.

20      Q.   Again this is Invoice Number 1366.  It looks like

21  you've got "Total Direct Cost" now determined to be

22  $180,353.63; is that right?

23      A.   Yes.

24      Q.   And this is the total billing for all Delivery

25  Orders 1 through 18; is that right?


Eugene O'Connell: April 11, 2003

1      A.    For what -- yes, yes.

2      Q.    What does other job expense mean, $11,353.00?

3      A.    That could be miscellaneous consumable items, items
4  that when they reported to me, it could be even some
5  miscellaneous tools. Let's see, it varies depending on what
6  they provide to me. It could also include probably towing, if
7  there were any towing charges, or something of that nature,
8  but I don't believe so, not on the direct cost expense.

9      Q.    Can you explain how the number jumps up from the
10 November of 2000 invoice from 89,000 to the June, 2001 invoice
11 to $245,000.00? That's a difference of about $155,000.00.

12     A.    Right. Well, part of the cost which was allocated
13 to the overhead as a fifty-fifty split, I moved over to direct
14 cost. I believe that's under, let me see, the equipment
15 rental for the white Isuzu flatbed. I brought that more to
16 the top there, since that was -- most of the costs were being
17 allocated, or BioGenesis was using that –

18     Q.    Hold on a second, let's talk about that. $9,000.00
19 for rental of the flatbed?

20     A.    Yes.

21     Q.    Can you tell me what periods we're talking about
22 that the flatbed was being rented?

23     A.    I believe I started off from February when we first
24 was contacted, or second contact by Gerald Lam, and that
25 Richard Avilla was starting to inspect the job sites for him.

Eugene O'Connell: April 11, 2003

1    Q.    This is February, 2000?

2    A.    Yes.

3    Q.    So all the costs associated with your lease, with

4    Rhino's lease of the flatbed from February, 2000 through when?

5    A.    I'm not sure.  That might be to December.

6    Q.    Of 2000?

7    A.    Yes.

8    Q.    Is this 50 percent of the lease price or 100

9    percent?

10   A.    100 percent.  And there's some other equipment

11   leases that they made during that time as well.

12   Q.    I thought you stated that you guys were going to be

13   splitting the cost, so why did you pass 100 percent of the

14   lease expense on to BioGenesis?

15   A.    Because most of the usage was by BioGenesis.

16   Q.    Okay.

17   A.    So I decided to reallocate the cost back up there.

18   Q.    Did BioGenesis use the vehicle in February, 2000?

19   A.    I don't know.

20   Q.    Did they use it in March of 2000?

21   A.    I don't know.

22   Q.    Was Rhino working on the project in March of 2000?

23   A.    They were inspecting the different job sites.

24   Q.    And they were using the vehicle every work day eight

25   hours a day, to the best of your knowledge, in the month of

Eugene O'Connell: April 11, 2003

1   March, 2000?

2        A.    I don't know.

3        Q.    April of 2000?

4        A.    I don't know.

5        Q.    Then how do you know they were using the vehicle
6   then?

7        A.    I don't.

8        Q.    So what prompted you to put that number in your
9   invoice, or who prompted you?

10       A.    Actually, I did it myself.

11       Q.    Nobody instructed you to pass that cost on?

12       A.    No.

13       Q.    You prepared the payroll reports, certified payroll
14  reports, so you know that the field laborers were working on
15  the project from maybe as early as June of 2000, but at least
16  from July of 2000 through September or October of 2000, right?

17       A.    Yes.

18       Q.    Outside of those months, July through October of
19  2000, do you have any reason to believe that BioGenesis was
20  using this flatbed Isuzu pickup truck?

21       A.    I'm sorry, can you rephrase that question or ask it
22  again?

23       Q.    Okay.  You prepared payroll reports to show that
24  Rhino's laborers were working on the Navy contract in the
25  months of July through September of 2000, maybe as early as

Eugene O'Connell: April 11, 2003

1    June, maybe as late as October.  In the year 2000, except for
2    those periods where you had field laborers getting paid, and
3    we're talking February, March, April, May, parts of June,
4    parts of October, November, and December of 2000, that's nine
5    months out of the year where your employees, or eight months
6    out of the year where your employees were not getting paid at
7    least, there was no payroll reports to show them working on
8    the BioGenesis project, so how can you tell me that during
9    these eight months out of the year, BioGenesis was using the
10   flatbed pickup truck for the project?

11          MR. CORTES:  My objection is twofold.  It assumes
12   facts not in evidence, and it's argumentative.  The fact
13   you're assuming it's not in evidence, in fact the evidence is
14   contrary to it, is there's no Rhino employees working on the
15   BioGenesis project, which is not true.  The testimony of all
16   the witnesses has been that there were two Rhino employees
17   working on it the entire year, all the work it was doing.  The
18   second --

19          MR. CLARK:  I'm sorry, which two employees?

20          MR. CORTES:  Richard Avilla and Alfred Garthe.  And
21   the --

22          MR. CLARK:  I'm not aware of that testimony, but go
23   ahead.  That Al Garthe was working on the project for the
24   entire year?

25          MR. CORTES:  Well I mean, I think what you're doing

Eugene O'Connell: April 11, 2003

1    here is, and the reason it's argumentative is you're basing
2    your question on the argumentative assumption that only actual
3    labor where people are out there scraping the roofs and
4    putting stuff on them counts, and that the equipment that's
5    necessary to keep the office running should not be included,
6    and I think that's --

7            MR. CLARK:  Well, we're talking about the flatbed
8    truck.  That's what I'm talking about specifically.

9    BY MR. CLARK:  (Continuing)

10       Q.   My question is, if your laborers are only going to
11   the job site from the months of July through October of 2000,
12   how did you get the impression or where did you get the idea
13   that you were going to charge rental for the flatbed truck or
14   the leased price for the flatbed truck for the entire year?

15           MR. CORTES:  Because they had to have a --

16           MR. CLARK:  I'm sorry, I'm not asking you to
17   testify.  That's my question to your client.  Do you have an
18   objection with that question?

19           MR. CORTES:  No, go ahead and answer the question.
20   That's my objection.  I made the objection.  It's on the
21   record.  You can go ahead and answer the question.

22       A.   I believe that based upon the fact that we were
23   supposed to split the costs, that they should be sharing the
24   cost as well.

25   BY MR. CLARK:  (Continuing)

Eugene O'Connell: April 11, 2003

1      Q.   But you just told me that you weren't splitting or
2   sharing the cost, but you were charging 100 percent of the
3   cost to BioGenesis, at least that's the number that's
4   reflected in this item here "Equipment Rental"; is that right?

5      A.   Yes.

6      Q.   So --

7      A.   Why did I do that?

8      Q.   No, that's fine.  That's good enough for me.  Let's
9   look at other job expense?  What was that?

10     A.   That was a lot of miscellaneous items.  I believe
11  some of that included some cement that they purchased,
12  brushes, some other minor things.  It varies.  I don't have
13  a --

14     Q.   Guam GRT?

15     A.   That is the estimated GRT I would have to pay on the
16  contract based upon the dollar value.

17     Q.   Direct Labor with Burden, would that be all the man-
18  hours associated with the BioGenesis project?

19     A.   Yes.

20     Q.   And that number is supported by the certified
21  payroll reports that you prepared; is that right?

22     A.   Certified payroll, Mr. -- or job cost sheets that
23  was provided to you today, also Mr. Garthe's payroll as well
24  as Mr. Avilla's, a portion of their payrolls were associated
25  to that.

Eugene O'Connell: April 11, 2003

1      A.   We did provide some consumable items as well as --

2      Q.   My question is all materials, do you believe that

3  Rhino provided all the materials necessary to perform work

4  orders 1 through 18?

5      A.   No, not all.

6      Q.   Thank you.  Let's go to Enclosure No. 1.  This is

7  the Proof of Claim form, AIG Technical Services, and do you

8  see in the middle of the page where it says the stated amount

9  of the balance due is $1,081,881.80?

10     A.   Yes.

11     Q.   Now I was confused when the number jumped up from

12  106 to 245.  Now I'm really confused about how we get from 245

13  to a Million 81.  Could you explain to me how the number

14  increased so dramatically?

15     A.   I can give you what I understand that Ms. Self did.

16     Q.   That you understand, what?

17     A.   That Ms. Amy Self did.

18     Q.   And this is your attorney?

19     A.   Yes.

20     Q.   Please do.

21     A.   If you refer back to Enclosure No. 2, I believe

22  that would explain it.

23     Q.   So let me see if I understand what you're telling

24  me.  Referring to Enclosure No. 2 on the third page -- well

25  first of all, Enclosure No. 2 states a Million Eighty-one

Eugene O'Connell: April 11, 2003

1    Thousand, and attached to it appears to be a spreadsheet of
2    all the payments received by BioGenesis for task orders 1
3    through 18.

4           MR. YANZA:  Mr. Clark, just for record purposes,
5    this would be Invoice 1400 dated December 19th, 2001.

6           MR. CLARK:  That's it.

7           MR. CORTES: And an attachment the exhibits.

8    BY MR. CLARK: (Continuing)

9      Q.   It looks to me like, and feel free to disagree with
10   me when I'm done, that she computed that the total revenue was
11   1,852,000, that Rhino's total direct cost was 180,000, Rhino's
12   total overhead was 130,000, and that the total profit on the
13   contract, of course ignoring BioGenesis' cost and overhead
14   apparently, is 1,541,000 and change; is that right?

15     A.   Yes.

16     Q.   And that she multiplied that number by 50 percent to
17   come up with almost $771,000.00; is that right?

18     A.   Yes.

19     Q.   So you believe that this claim for $1,081,000.00
20   includes a profit component of approximately $771,000.00 in
21   addition to -- well actually not in addition to because this
22   includes all the task orders.  So this includes a profit
23   component of $771,000.00; is that what you believe?

24     A.   Based upon the information that I have.

25     Q.   Did you help Ms. Self, assuming she prepared this,

Eugene O'Connell: April 11, 2003

1                          REPORTER'S CERTIFICATE

2

3         I, Cecilia F. Flores, Stenotype Reporter, do hereby

4    certify the foregoing 261 pages to be a true and correct

5    transcript of the stenographic shorthand notes and audio

6    recording taken by me in the within-entitled and numbered case

7    at the time and place as set forth herein.

8         Dated at Hagatna, Guam, this 18th day of April, 2003.

9

10   _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Eugene O'Connell: April 11, 2003

# CLERK'S CERTIFICATE

SUPERIOR COURT OF GUAM             ) ss

I, Cecilia F. Flores, Special Deputy Clerk, Superior Court of Guam, do hereby certify that on the 11th day of April, 2003 at the hour of 9:10 a.m. there appeared before me Eugene O'Connell, at the offices of McKeown Vernier Price & Maher, Ground Floor, Joseph Flores Building, 115 Hesler Place, Hagåtña, Guam, the witness herein, produced to give his deposition in the within-entitled and numbered CIVIL CASE NO. 02-00008; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Cortes' office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 18th day of April, 2003.

SPECIAL DEPUTY CLERK, SUPERIOR COURT OF GUAM

Eugene O'Connell: April 11, 2003

# EXHIBIT "15"



1          IN THE DISTRICT COURT OF GUAM

2

3   UNITED STATES OF AMERICA FOR USE      ) CIVIL CASE NO. 02-00008
    AND BENEFIT OF RHINO BUILDERS,        )
    INC.,                                 )
4                                         )
                                          )
5              Plaintiff,                 )
                                          )
6          vs.                            )
                                          )
    AIG TECHNICAL SERVICES, INC.,         )      DEPOSITION OF
7   and AMERICAN HOME ASSURANCE           )      RICHARD AVILLA
    COMPANY,                              )      APRIL 10, 2003
8                                         )
                                          )
9              Defendants.                )
                                          )
10  ─────────────────────────────────────)
                                          )
11  BIOGENESIS PACIFIC, INC.,             )
                                          )
12             Counter-Plaintiff          )
                                          )
13         vs.                            )
                                          )
    RHINO BUILDERS, INC., MICHAEL         )
14  O'CONNELL, MICHAEL DANFORTH,          )
    and JOHN DOES 1-10,                   )
15                                        )
               Counter-Defendants,        )
16  ─────────────────────────────────────)
                                          )
17  AMERICAN HOME ASSURANCE               )
    COMPANY,                              )
18                                        )
               Cross-Claimant,            )
19                                        )
           vs.                            )
20                                        )
    BIOGENESIS PACIFIC, INC.              )
21                                        )
               Cross-Claim Defendant.     )
22  ─────────────────────────────────────)

23

24

25                  Cecilia F. Flores
              Freelance Stenotype Reporter
                 Tel: (671) 632-0727
                 Fax: (671) 632-5353

1    identification.)

2         A.    (Deponent reviewed document.)

3         Q.    Now do you recognize this document?

4         A.    Yeah.

5         Q.    Is that your signature in the middle of the

6    document?

7         A.    Yes.

8         Q.    At that time were you Operations Manager?  Was

9    your job title Operations Manager?

10        A.    Yeah.

11        Q.    Operations Manager for Rhino?  Or for BioGenesis?

12        A.    BioGenesis.

13        Q.    And what was your job title at Rhino?

14        A.    At where?

15        Q.    At Rhino.

16        A.    Operations Manager.

17        Q.    Same?

18        A.    Yeah.

19        Q.    And who authorized you to sign this task order on

20   behalf of the contractor in this case, BioGenesis?

21        A.    Gerald Lam did.

22        Q.    And he gave you that authorization before you

23   signed it?

24        A.    Yeah.

25        Q.    Now the date on this contract --

Richard Avilla: April 10, 2003

1      A.    He –

2      Q.    -- is not complete.

3      A.    -- I don't know if he did give me -- before I

4  signed this or after I signed 'em, but I think he gave me the

5  authority after I think I signed it.  I'm not sure.  I'm not

6  sure.  I know I had problems with him.

7      Q.    You had problems with Mr. Lam?

8      A.    No, no.  With the -- signing -- the Contract

9  Specialist wanted -- the authorization letter, and I think it

10  was -- the authorization letter was provided after I signed

11  this delivery order.  I'm not sure.  But I know I did

12  something before that.

13      Q.    But at some point BioGenesis provided you an

14  authorization letter?  Or did they provide that directly to

15  the military?

16      A.    I think they did it through the military.

17      Q.    And how did you learn about that letter having

18  been provided to military?

19      A.    Everything went to Hawaii.  Everything went to

20  Hawaii, and then Hawaii arranged everything.  And then they

21  informed Rhino Hawaii.

22      Q.    Did the --

23            MR. CLARK:  I'm sorry; could we have the record

24  reflect that when he says "everything went through Hawaii" he

25  was pointing to Mr. Eugene O'Connell.


Richard Avilla: April 10, 2003

1      Q.    When was this work performed?

2      A.    I think it was performed in -- the beginning of

3   2001.

4      Q.    Okay.  Directing your attention, can you look

5   back at Exhibit 3?  If you look at the work description --

6      A.    3?

7      Q.    Yes. -- did this work ever get done?

8      A.    What's that?

9      Q.    Did this work that's described on Exhibit 3 ever

10  get done?

11     A.    Uhm, I don't even know what job this is.  It's a

12  small job.

13     Q.    Oh, I'm sorry.  Are you looking at the wrong one?

14  I'm sorry.

15     A.    Delivery Order 3?  Or Delivery Order 2?

16     Q.    I'm looking for Delivery Order 1; what exhibit is

17  that?

18          MR. CLARK:  That's Exhibit 5.

19          MR. CORTÉS:  Five; I could not read my own

20  writing.  I apologize.  Okay.  Please find Exhibit 5.

21     A.    Okay.

22  BY MR. CORTÉS: (Continuing)

23     Q.    Looking at the work on Delivery Order 1, Exhibit 5,

24  did this work ever get completed?

25     A.    Yes.


Richard Avilla: April 10, 2003

1    Q.   Who did this work?

2    A.   Rhino did this work.

3    Q.   Okay.  And then looking at Exhibit 6, Delivery

4  Order 2.

5    A.   Delivery Order 2?

6    Q.   Yes.  Who did this work?

7    A.   Rhino did this work.

8             (Plaintiff's Exhibit 11 was marked for

9  identification.)

10   A.   (Deponent reviewed document.)

11   Q.   Do you know somebody named Tedman Jung?

12   A.   Yes.

13   Q.   Who is Mr. Jung?

14   A.   Huh?

15   Q.   Who is Mr. Jung?

16   A.   Tedman Jung works for Hawaii Pacific

17  International, he's a supplier of roofing materials.

18   Q.   Do you recognize this document, Exhibit 11?

19   A.   The what?

20   Q.   Do you recognize this document?

21   A.   Yeah.

22   Q.   Did you write it?

23   A.   I remembered this, yeah.

24   Q.   Do you remember what these materials were for that

25  you were ordering in this?


Richard Avilla: April 10, 2003

1      A.    Yes, I do.

2      Q.    Okay, was he a Contracting Officer?

3      A.    Yes, he is.

4      Q.    Did you get a time extension for that building?

5      A.    Yes, we did.

6      Q.    So you requested an extension until October 28th,

7    according to this document.  Did you get that extension?

8      A.    Yes, I did.

9      Q.    Did you get any further extensions after that?

10     A.    No.  No, the job was completed.

11     Q.    Okay.  Which task order is this; do you know?

12     A.    Seven.

13     Q.    Seven, okay.  So that was completed by Rhino?

14     A.    I mean -- they're not task orders; they're

15   delivery orders.

16     Q.    Yes, you are correct.  I started calling them task

17   orders early in this case because that's what other people

18   were saying.  And I noticed that they are delivery orders;

19   you are correct.

20     A.    Yeah.  The task orders are far different from

21   delivery orders.

22     Q.    So did Rhino complete Delivery Order 7?

23     A.    Yes, they did.

24              (Plaintiff's Exhibit 15 was marked for

25   identification.)


Richard Avilla: April 10, 2003

1      A.    What's that?

2      Q.    If you could you turn to the second page?  Okay,

3   if you look at the last e-mail there, it says original

4   message from Maxx.  Is that Maxx Management, Michael

5   Danforth?

6      A.    That would be Michael O'Connell.  Mac.

7      Q.    I'm sorry, Maxx?

8      A.    I mean, not O'Connell -- but Danforth.

9      Q.    Okay.  Question Number 1 he asks -- if you

10  can refer to that:  Did the government issue acceptance and

11  warranty letters on Task Orders 1, 2, and 3 (question marks)?

12          Right above his e-mail, it looks to be your

13  response, where you say:  Spoke to Con-Raps of both Task

14  Orders 1, 2; should get letter of acceptance soon.  Will

15  check into it again today.

16          You don't refer to Task Order Number 3; is

17  there a reason?

18     A.    It wasn't done.

19     Q.    Okay, so it wasn't done.  So --

20     A.    You get the accepted letter after the contracts.

21     Q.    Okay, so to the best of your knowledge as of the

22  date you received this from Michael Danforth, and he's asking

23  about Task Orders 1, 2, and 3, you only responded about 1 and

24  2, because 3 hadn't been done?

25     A.    Yeah.


Richard Avilla: April 10, 2003

1    Q.    Okay.

2    A.    It hadn't even been started on.

3    Q.    You also mentioned something about preparing a

4    safety plan; you said somebody from Black Construction named

5    Joe worked with you –

6    A.    Samoan Joe.

7    Q.    I'm sorry?

8    A.    Samoan Joe.

9    Q.    Samoan Joe?

10   A.    He's the safety engineer for Black Construction.

11   Q.    It's not the same guy in Lock, Stock and Two

12   Smoking Barrels; is it?  Sorry.  It's a very funny movie.

13   But anywhere there was a gentleman in there, who was Samoan.

14   A.    I guess he's Samoan and his name is Joe.

15   Q.    Okay; that would make sense.  Do you know when you

16   completed that safety plan?

17   A.    Uhm, I think it was sometime in February -- maybe

18   January.  After I got back –

19   Q.    2001?

20   A.    2001.  After I got back -- from my vacation.

21   Q.    Did you ever do any work on Rhino's SOC contract?

22   A.    Never.  I didn't know anything about the SOC

23   contract.

24   Q.    Could you refer to Exhibit 44 please.  This is an

25   e-mail you said you sent to Hawaii Pacific, and I don't

Richard Avilla: April 10, 2003

1        A.    Yeah.

2        Q.    And do you know who left the truck parked there?

3

4        A.    No.

5        Q.    You also mentioned that Michael O'Connell said it

6    was okay for you to continue using the truck that you were

7    using until the end of November; is that right?

8        A.    Yeah.

9        Q.    Which truck was that again?

10       A.    White -- the white king cab.

11       Q.    Nissan?

12       A.    Nissan.

13       Q.    And he understood that you were going to be using

14   it for your personal use; is that right?

15       A.    Yeah.

16       Q.    Do you know if Rhino ever did any work on Delivery

17   Order Number 4?

18       A.    Delivery Order Number 4 would be -- what's the

19   name of the building?

20       Q.    Well, let's -

21       A.    No.  I know for a fact that we only did -- we only

22   did three, three jobs.  That was 1, 2 and 7.

23       Q.    By "we" you mean Rhino?

24       A.    Rhino, yes.

25       Q.    Okay.


Richard Avilla: April 10, 2003

<center>REPORTER'S CERTIFICATE</center>

I, Cecilia F. Flores, Stenotype Reporter, do hereby certify the foregoing 194 pages to be a true and correct transcript of the stenographic shorthand notes and audio recording taken by me in the within-entitled and numbered case at the time and place as set forth herein.

Dated at Hagatna, Guam, this 21st day of April, 2003.



Richard Avilla: April 10, 2003

## CLERK'S CERTIFICATE

SUPERIOR COURT OF GUAM          ) ss

I, Cecilia F. Flores, Special Deputy Clerk, Superior Court of Guam, do hereby certify that on the 10th day of April, 2003 at the hour of 9:20 a.m. there appeared before me Richard Avilla, at the offices of McKeown Vernier Price & Maher, Ground Floor, Joseph Flores Building, 115 Hesler Drive, Hagåtña, Guam, the witness herein, produced to give his deposition in the within-entitled and numbered CIVIL CASE NO. 02-00008; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Clark's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 21st day of April, 2003.

_____
SPECIAL DEPUTY CLERK, SUPERIOR COURT OF GUAM

Richard Avilla: April 10, 2003

# EXHIBIT "16"

■ COPY

IN THE DISTRICT COURT OF GUAM

UNITED STATES OF AMERICA FOR
USE AND BENEFIT OF RHINO
BUILDERS, INC.,

        Plaintiff,

        vs.

BIOGENESIS PACIFIC, INC. and
AIG TECHNICAL SERVICES, INC.

        Defendants.

CIVIL CASE NO. 02-00008

DEPOSITION OF
ALFRED GARTHE III
APRIL 03 & 04, 2003

    The deposition of Alfred Garthe III, called for examination by the Plaintiff, pursuant to Notice and pursuant to the Rules of Civil Procedure, taken at the law office of Antonio Cortes, 233 Julale Center, 424 West O'Brien Drive, Hagatna, Guam, on Thursday, the 3rd day of April, 2003, at the hour of 9:15 a.m. and Friday, the 4th day of April, 2003, at the hour of 10:10 a.m., respectively.

    That at said time and place there transpired the following:

A P P E A R A N C E S:

| | |
|---|---|
| For the Plaintiff | Antonio Cortes, Esq. |
| For Defendant BioGenesis Pacific | Arthur B. Clark, Esq. Calvo & Clark |
| For Defendant AIG Technical Services, Inc. And American Home Assurance | Louie Yanza, Esq. (4/03/03) McKeown Vernier Price & Maher A N D Steven Tom, Esq. (4/04/03) (Telephonic attendance) |
| For the Deponent | Cesar Cabot, Esq. |

Cecilia F. Flores
Freelance Stenotype Reporter

1      A.   Yes, I understand.

2      Q.   If at any time I ask a question that you don't

3 understand, please ask me to explain it or repeat it and I

4 will be happy to do so.  Is that understood?

5      A.   Yes, it is.

6      Q.   If at any time you need to take a break to consult

7 with Mr. Cabot, or for any reason that you need time to take

8 a break, let me know and I'll arrange and accommodate to let

9 you take a break.  Is that understood?

10     A.   That's understood.

11     Q.   Okay.   Mr. Garthe, am I pronouncing your name

12 correctly?

13     A.   Yes, thank you.

14     Q.   When did you arrive in Guam to begin your work for

15 Rhino Builders?

16     A.   December, '97.

17     Q.   And what was your position in Guam for Rhino in '97

18 when you came?

19     A.   I was Vice-President. I was running the Guam office.

20     Q.   Now between 1997 and 2000, did you change your title

21 or duties with Rhino?  Or did it remain Vice-President for

22 Guam operations?

23     A.   It remained.

24     Q.   Are you still working for Rhino today?

25     A.   No, I'm not.


Alfred Garthe III: April 03 and 04, 2003

1      Q.   Okay, when did you do that?

2      A.   When George Allen -- George Allen -- well, I got

3   direction from Mike O'Connell and George Allen, asked for the

4   truck.  To begin with, George Allen told me that it didn't

5   matter, to go ahead and keep it.  But Mike -- Mike had

6   directed me to turn the truck over.  It was a rather nasty

7   letter; I don't remember exactly what it said, but -- I gave

8   it back.  It wasn't worth it.

9      Q.   Okay, and also earlier I think Mr. Cortés asked you

10  about a container I guess in the backyard of the office, where

11  BioGenesis has its office; do you recall that?

12     A.   Yes.

13     Q.   Okay.  And he asked you what materials were in

14  there.  And I think we -- well, let me just ask you, is there

15  a container in the backyard of the BioGenesis office?

16     A.   Two containers.

17     Q.   Okay.  And can you tell me owns either or both of

18  those containers?

19     A.   Rhino.

20     Q.   Rhino owns both of them?

21     A.   Actually there's -- six or seven back there, but

22  Rhino owns two.

23     Q.   Oh, six or seven containers; Rhino owns two?

24     A.   Yes.

25     Q.   Okay.  And can you tell me, to the best of your

Alfred Garthe III: April 03 and 04, 2003

1    knowledge, what is inside the Rhino containers?

2         A.   One container has insulation materials in it, and

3    the other container has equipment.

4         Q.   Okay, and this would be the blowers and scrapers

5    that we talked about earlier?

6         A.   And some of the equipment is sitting outside.

7         Q.   Okay.

8         A.   The scrapers and a hot tar kettle, miscellaneous

9    equipment.

10        Q.   Okay, can you tell me how long have those two Rhino

11   containers been sitting on the property?

12        A.   Since about '98.

13        Q.   Okay.   And that was the time period when the

14   property was being leased by Rhino; is that correct?

15        A.   Yes.

16        Q.   Okay, so after Rhino moved its offices they left the

17   container on the property; is that correct?

18        A.   That's correct.

19        Q.   Okay.  And you also mentioned that some of the Rhino

20   equipment was used for the Navy contract.  Can you tell me by

21   whom it was used?  In other words, was it used by Rhino?  Or

22   were you referring to BioGenesis' use of that equipment?

23        A.   It was used by Rhino.

24        Q.   Okay.  To the best of your knowledge, has BioGenesis

25   ever used any of the equipment in those containers for the

Alfred Garthe III: April 03 and 04, 2003

1    Navy project?

2          A.    After the split?

3          Q.    After the split.

4          A.    No.

5          Q.    Okay, and the split we're talking about was the end

6    of 2000; is that correct?

7          A.    September, October, 2000.

8          Q.    Do you know, is there any reason why Rhino hasn't

9    come by to pick up the containers?

10         A.    We've asked them to.

11         Q.    Any reason why they haven't; do you know?

12         A.    No, I don't know.

13         Q.    Okay, are the containers locked?

14         A.    No.

15         Q.    Okay.  Have you guys ever denied Rhino access to

16   those containers?

17         A.   No.

18                MR. CLARK:  Okay, those are all the questions I have

19   at this time.  Thank you, Mr. Garthe.

20                MR. CORTES:  I've got a couple of questions.

21                      REDIRECT EXAMINATION

22   BY MR. CORTES:

23         Q.    Okay, just a few follow-up questions on what you

24   were just discussing.  Preliminary to that, I'd like to get an

25   idea of how the daily routine would work there at BioGenesis'

Alfred Garthe III: April 03 and 04, 2003

1   office.

2            Would laborers who actually performed the work
3   report to the BioGenesis office there at the location that
4   used to be Rhino's office, and then proceed to perform tasks
5   on the job site from there?

6       A.   They'd report straight to the job.

7       Q.   Now you mentioned a hot tar kettle there that sits
8   in the yard.  Has there ever been occasion to use the hot tar
9   kettle on the Navy project?

10      A.   Not when it was -- not when Rhino was doing the
11  work.

12      Q.   Not when Rhino was doing work?  Does BioGenesis have
13  a hot tar kettle of its own?

14      A.   No.

15      Q.   So BioGenesis did some work on the Navy project with
16  a hot tar kettle?

17      A.   Subcontracted.  We -- BioGenesis subcontracted the
18  hot work out.

19      Q.   So the hot tar kettle that you were describing
20  earlier was not used?

21      A.   No.

22      Q.   Is it possible that any employees -- since the
23  containers are not locked -- is it possible that any
24  BioGenesis employees, knowing the equipment was there readily
25  available, used it just as a convenience, at some point?

Alfred Garthe III: April 03 and 04, 2003

1      A.   I don't think so.

2      Q.   It's possible though?   You don't think it's

3   possible?  Or you don't think they did?

4      A.   I don't they -- I don't think they would.

5      Q.   With respect to the truck you were using that you

6   were talking about earlier, did you use that truck to drive

7   yourself to the job site after the split?

8      A.   No.  I came into the office.

9      Q.   Just come into the office?

10     A.   Yes.

11     Q.   Did you ever inspect the job site after the split?

12     A.   Not using that truck.

13     Q.   What vehicle did you use?

14     A.   I think it's a '97 Nissan pickup -- BioGenesis'

15   vehicle.

16     Q.   Where is that vehicle kept?

17     A.   At the office.

18     Q.   So you drive into the office in the Rhino truck, and

19   then use the BioGenesis truck to go to the job site?

20     A.   I drive to the office and do whatever I needed to do

21   at the office in the mornings, and then run out to the job

22   later on.

23     Q.   And you used the BioGenesis truck every time?

24     A.   Yeah.  Actually, Richard and myself would go out

25   together.


Alfred Garthe III: April 03 and 04, 2003

1                        REPORTER'S CERTIFICATE

2

3        I, Cecilia F. Flores, Stenotype Reporter, do hereby

4   certify the foregoing 181 pages to be a true and correct

5   transcript of the stenographic shorthand notes and audio

6   recording taken by me in the within-entitled and numbered case

7   at the time and place as set forth herein.

8        Dated at Agana, Guam, this 10th day of April, 2003.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


Alfred Garthe III: April 03 and 04, 2003

1                          CLERK'S CERTIFICATE

2    SUPERIOR COURT OF GUAM            ) ss

3

4         I, Cecilia F. Flores, Special Deputy Clerk, Superior

5    Court of Guam, do hereby certify that on the 3rd day of April,

6    2003 at the hour of 9:15 a.m. and the 4th day of April, 2003

7    at the hour of 10:10 a.m. there appeared before me Alfred

8    Garthe III, at the law office of Antonio L. Cortés, 233 Julale

9    Center, 424 West O'Brien Drive, Hagåtña, Guam, the witness

10   herein, produced to give his deposition in the within-entitled

11   and numbered CIVIL CASE NO. 02-00008; that prior to

12   examination the witness was by me duly sworn upon his oath;

13   that thereafter the transcript was prepared by me or under my

14   supervision, and the original deposition transcript was

15   presented to Mr. Cabot's office for the deponent's review,

16   corrections, if any, and execution.

17        I further certify that I am not a relative, employee,

18   attorney or counsel of any of the parties, nor a relative or

19   employee of such attorney or counsel, and that I am not

20   directly or indirectly interested in the matters in

21   controversy.

22        In testimony whereof, I have hereunto set my hand and

23   seal of Court this 10th day of April, 2003.

24

25   _____
     SPECIAL DEPUTY CLERK, SUPERIOR COURT OF GUAM


Alfred Garthe III: April 03 and 04, 2003

# EXHIBIT "17"

1    IN THE DISTRICT COURT OF GUAM

2

3  UNITED STATES OF AMERICA          )  CIVIL CASE NO. 02-0008
   FOR USE AND BENEFIT OF            )
4  RHINO BUILDERS, INC.,             )
              Plaintiff,             )
5        vs.                         )
   BIOGENESIS PACIFIC, INC.,         )
6  AIG TECHNICAL SERVICES,           )
   INC., and AMERICAN HOME           )
7  ASSURANCE COMPANY,                )
              Defendants.            )
8  _____)
   BIOGENESIS PACIFIC, INC.,         )
9           Counter-Plaintiff,       )
        vs.                          )
10 RHINO BUILDERS, INC.,             )
   MICHAEL O'CONNELL, MICHAEL        )
11 DANFORTH, and JOHN DOES 1-10,     )
              Counter-Defendants.    )
12 _____)
   AMERICAN HOME ASSURANCE           )
13 COMPANY,                          )
              Cross-Claimant,        )
14       vs.                         )
   BIOGENESIS PACIFIC, INC.,         )
15           Cross-Claim             )
              Defendant.             )
16 _____)

17

18       DEPOSITION OF MICHAEL NAWAIKI O'CONNELL

19                    VOLUME III

20
   Taken on behalf of the Defendant, Counter-Plaintiff and
21 Cross-Claim Defendant, BioGenesis Pacific, Inc., at the
   Law Offices of White & Tom, 820 Mililani Street, Suite
22 711, Honolulu, Hawaii 96813, commencing at 1:10 p.m., on
   Thursday, April 17, 2003, pursuant to Notice.

23

24
   BEFORE:        PATRICIA RIVERA, CSR 176
25                Notary Public, State of Hawaii

1    split the profits 50/50.

2         A.      Right.

3         Q.      Is that correct?

4         A.      Yes.

5         Q.      What was your understanding if there were

6    no profits but actually losses on the job?  What would

7    happen?  Would you be responsible for some of the losses

8    or not get reimbursed for some of your indirect cost or

9    direct cost?

10        A.      For the -- For -- The SBA rules and

11   regulations states that we need to make a profit on a

12   job.  No matter how much the job takes.  We had a lot of

13   change orders on these jobs.  SBA program, you have to

14   make a profit on a job.  And so as far as I know, no any

15   SBA guy lost money on a job yet.

16        Q.      Well, what if I gave you the example that

17   there were some delays on the job because something

18   wasn't working right in terms of the workers or your

19   organization and there were some liquidated damages

20   assessed by the Navy here.

21             What would happen if that became a point

22   where it would produce no profit and there is actually

23   some loss?  What would be the arrangement that you and

24   Gerry had worked out?

25        A.      We never discussed that.

1    Q.    Okay.  But your understanding is no matter

2  what happened, you would make a profit, that Rhino would

3  be sharing some kind of profit?

4    A.    We would share in our cost.

5    Q.    Okay.  So you would at least get back all

6  your cost; is that your understanding?

7    A.    We'd get back our cost and our overhead.

8  Yes.

9    Q.    Because there's a chance that there may be

10  no profit, but --

11    A.    This job have a lot of change orders.  And

12  with -- if I -- For what I know now, yeah, they had a

13  lot of change orders.  And lot of time extension on the

14  job.

15    Q.    Sure.  Well, I understand that, but --

16    A.    Yeah, but you're talking about --

17    Q.    -- I'm now talking in September 29th --

18    A.    Yeah.

19    Q.    -- '99 and 2000, you didn't know that yet,

20  did you?  You didn't know that yet?

21    A.    Try repeat the question again?  I'm sorry.

22    Q.    Well, I'm just trying to find out what

23  arrangement, if any, that you would -- that you had with

24  Gerry Lam in terms of your oral subcontract about any

25  possible losses on the job.

1    A.    For working on that project, we brung in

2 some people from the Main -- from Hawaii to push the

3 jobs.  It's going to have profit.

4    Q.    You were confident that --

5    A.    Oh, definitely, yeah.

6    Q.    All right.  And but you said earlier that

7 you and Gerry Lam did not discuss the situation if there

8 were any losses on the job?

9    A.    No.

10    Q.    Okay.  Now, the vehicles that you used on

11 the job, the Navy job, did they have any identifying

12 marks that said Rhino Builders on them?

13    A.    When you -- Before you can do any kind of

14 government job, you have to submit your vehicles,

15 registrations, insurance, everything to the federal

16 government before your vehicle can go on base.

17    Q.    And when your Rhino workers were working on

18 this Navy contract, the jobs with the Navy contracts,

19 were you, that is Rhino, paying them their paychecks?

20    A.    When?  On that --

21    Q.    In 2000.

22    A.    Rhino was paying their paychecks up to a

23 certain extent.  Then Gerry said he was going to pick up

24 the payroll because he had a SBA loan, guarantee loan,

25 which he used our reference and credit history for that

C E R T I F I C A T E

STATE OF HAWAII              )
                            ) SS.
CITY AND COUNTY OF HONOLULU  )

I, PATRICIA RIVERA, Notary Public, State of Hawaii, do hereby certify:

That on Thursday, April 17, 2003, at 1:10 p.m., appeared before me MICHAEL NAWAIKI O'CONNELL, the witness whose deposition is contained herein; that prior to being examined, he was from previous volumes duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting under my supervision;

That the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

I further certify that I am not attorney for any of the parties hereto, nor in any way concerned with the cause.

Dated this 17th day of April, 2003, in Honolulu, Hawaii.

_____  CSR 176
Patricia Rivera, CSR 176
Notary Public, State of Hawaii
My commission expires: 4/8/04

# EXHIBIT "CC"

ANTONIO L. CORTÉS
Law Office of Antonio L. Cortés
233 Julale Center
424 West O'Brien Drive
P.O. Box BV
Hagåtña, Guam 96932
Telephone No.: (671) 477-1930
Facsimile No.: (671) 477-1933



Attorneys for Plaintiff Rhino Builders, Inc.

IN THE DISTRICT COURT

OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC., | ) CIVIL CASE NO.02-00008<br>)<br>) **PLAINTIFF'S RESPONSE TO**<br>) **DEFENDANT BIOGENESIS PACIFIC** |
| Plaintiff, | ) **INC.'S REQUEST FOR**<br>) **PRODUCTION OF DOCUMENTS**<br>) |
| BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC., and AMERICAN HOME ASSURANCE CO., | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

Plaintiff Rhino Builders, Inc. ("Plaintiff") responds to Defendant

BioGenesis Pacific, Inc.'s ("BPI's") First Request for Production of Documents,

served January 8, 2003, as follows:

## GENERAL OBJECTIONS

Plaintiff generally objects to Defendants' BPI's Document Requests

because they are overly broad, unduly burdensome, and in several instances request

information that is neither relevant to this case nor reasonably calculated to lead to

admissible evidence. Plaintiff specifically objects to all the document requests

because they purport to require production of "all," "any," or "any and all" documents, or "each and every" document, supporting or relating to a particular allegation or portion of the complaint and are therefore unduly burdensome and overly broad. Plaintiff is still in the process of obtaining and providing counsel with discoverable documents, some of which will undoubtedly be responsive to these requests. Such documents will be produced as soon as practicable as required by Rule 26 (e). Where documents are produced later pursuant to that rule, rather than at this time, that later production shall not be construed as a statement by Rhino that the later produced documents are not responsive to these requests. Nonetheless, NPI will produce such documents as quickly as it reasonably is able in good faith. Documents already produced to BPI in initial disclosure or in response to AIG's discovery requests will not be produced unless re-production is requested by BPI, and that circumstance shall not be taken as an inference that such documents are not responsive to any of these document requests.

Insofar as Document Requests request any privileged information, Plaintiff further objects on that ground and will not produce documents containing privileged information.

## RESPONSES

DOCUMENT REQUEST NO. 1: Any and all documents you intend to introduce as evidence in the trial of this matter.

<u>SPECIFIC OBJECTION</u>: Plaintiff specifically objects that this request seeks information that the parties have stipulated, and the Court has ordered, will be exchanged by all parties on June 23, 2003.

<u>RESPONSE</u>: Subject to its general and specific objections, Plaintiff responds as follows: Plaintiff has responsive documents and they are now available for inspection at the Law Office of Antonio L. Cortes, which will copy them for Defendants' convenience for a reasonable cost.

<u>DOCUMENT REQUEST NO. 2</u>: Any and all documents identified in your responses to BPI's First Set of Interrogatories Propounded on Plaintiff Rhino Builder's [sic] Inc.

<u>RESPONSE</u>: Subject to its general objections, Plaintiff responds as follows: Plaintiff has responsive documents and they are now available for inspection at the Law Office of Antonio L. Cortes, which will copy them for Defendants' convenience for a reasonable cost.

<u>DOCUMENT REQUEST NO. 3</u>: Any and all documents evidencing or pertaining to payments made by BPI to you.

<u>RESPONSE</u>: Subject to its general objections, Plaintiff responds as follows: Plaintiff has responsive documents and they are now available for inspection at the Law Office of Antonio L. Cortes, which will copy them for Defendants' convenience for a reasonable cost.

<u>DOCUMENT REQUEST NO. 4</u>: Any and all documents sent by you to BPI or received by you from BPI in any manner pertaining to the alleged subcontract between BPI and you

3

RESPONSE: Subject to its general objections, Plaintiff responds as follows: Plaintiff has responsive documents and they are now available for inspection at the Law Office of Antonio L. Cortes, which will copy them for Defendants' convenience for a reasonable cost.

DOCUMENT REQUEST NO. 5: Any and all documents relating to negotiations between you and BPI pertaining to the alleged subcontract between you and BPI.

RESPONSE: Subject to its general objections, Plaintiff responds as follows: Plaintiff has responsive documents and they are now available for inspection at the Law Office of Antonio L. Cortes, which will copy them for Defendants' convenience for a reasonable cost.

DOCUMENT REQUEST NO. 6: Any and all documents prepared by you or utilized by you for the purpose of determining the costs to be incurred in connection with your performance of the alleged subcontract between you and BPI.

RESPONSE: Subject to its general objections, Plaintiff responds as follows: Plaintiff has responsive documents and they are now available for inspection at the Law Office of Antonio L. Cortes, which will copy them for Defendants' convenience for a reasonable cost.

Dated: February 7, 2003.

LAW OFFICE OF ANTONIO L. CORTÉS
Attorney for Plaintiff Rhino Builders, Inc.

By: _____
ANTONIO L. CORTÉS

4

# Michael O'Connell

**From:** "George W. Allen" <rhinogwa@ite.net>
**To:** "Michael Danforth (E-mail)" <Maxxmgt@aol.com>
**Cc:** "Michael O'Connell (E-mail)"
**Sent:** Wednesday, November 08, 2000 8:37 PM
**Subject:** BPI Contract

Gerry called me after he talked to Michael O. I told him we could get back to work on a limited basis if he could pay Rhino $25,000 of what is owed by tomorrow with the idea that he will get with Michael D early next week (monday) to finalize the subcontract agreement.

russell is supposed to contact me tomorrow to confirm that they are able to get a check to Rhino.

Mike D I hope this is OK with you. We were unable to get you again, probably because of how late it was so we had to make a decision. Hope you're mom is OK. Catch me up tomorrow.

Really got some people upset with me today but it had to be done to force the issue. Need the letter of assignment and authority as soon as possible.

Meanwhile, I got further behind on the tank farm proposal with all the time i spent on BPI issues today. Hope I can concentrate on proposal tomorrow. Got one subcontract quote in today for about $259,000 but it excludes all of the pipe supports repais and welded patches.

regards

12/12/00