Arthur B. Clark, Esq.
Janalynn C. Damian, Esq.
CALVO AND CLARK, LLP
Attorneys at Law
655 South Marine Drive, Suite 202
Tamuning, Guam 96911
Telephone:  (671) 646-9355
Facsimile:  (671) 646-9403

Attorneys for Defendant/Counter-Plaintiff
BioGenesis Pacific, Inc.

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA FOR USE AND BENEFIT OF RHINO BUILDERS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>BIOGENESIS PACIFIC, INC., AIG TECHNICAL SERVICES, INC., and AMERICAN HOME ASSURANCE COMPANY<br><br>Defendants. | CIVIL CASE NO. 02-00008<br><br>DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC, INC.'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>[Oral Argument Requested] |
| BIOGENESIS PACIFIC INC.,<br><br>Counter-Plaintiff,<br><br>vs.<br><br>RHINO BUILDERS, INC., MICHAEL O'CONNELL, MICHAEL DANFORTH, AND JOHN DOES 1-10,<br><br>Counter-Defendants. | |
| AMERICAN HOME ASSURANCE COMPANY,<br><br>Cross-Claimant,<br><br>vs.<br><br>BIOGENESIS PACIFIC INC.,<br><br>Cross-Claim Defendant. | |

DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC,
INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
B040813.327-0001.CT (Renewed SJ Motion).wpd

ORIGINAL  1

Case 1:02-cv-00008   Document 439   Filed 08/17/2004   Page 1 of 15

# I. INTRODUCTION

On December 15, 2003, BioGenesis filed a motion for summary judgment asking that Rhino's claims be dismissed in their entirety for the reasons stated therein. In the alternative BioGenesis also requested: (1) partial summary judgment as to Rhino's first cause of action (Miller Act claim) excluding from Rhino's claim charges for capital equipment and lost profits and limiting Rhino's claim to $4,667.70; (2) summary judgment as to Rhino's fourth cause of action (bad faith claim); and (3) summary judgment as to Rhino's fifth cause of action (fraud claim).

On April 27, 2004, the Court issued an order ("Court's Order") granting summary judgment in BioGenesis' favor as to Rhino's fourth and fifth causes of action.[1] As for Rhino's first cause of action (Miller Act claim), the Court agreed with BioGenesis that the Miller Act does not entitle Rhino to lost profits or a claim for capital equipment:

> In *Mai Steel* [981 F.2d 414 (9th Cir. 1992)], the Ninth Circuit stated that "a claim for profits does not involve actual outlay and thus falls outside both the letter and the spirit of the Miller Act...." Therefore, the Court holds that the Miller Act *does not* entitle Rhino to lost profits.
>
> Regarding recovery for capital equipment, "the supplying by sale to the contractor of equipment which should last over several jobs is not covered by the bond."

Court's Order at pp. 10-11 (citations omitted) (emphasis added). Notwithstanding this conclusion, the Court declined to specifically address whether partial summary judgment should be granted limiting Rhino's Miller Act claim to a certain sum. In reaching its conclusion to not limit Rhino's Miller Act claim, the Court declined to consider certain documents submitted by BioGenesis in support of its motion on the basis that BioGenesis failed to authenticate said documents.[2]

---

[1] The Court also denied BioGenesis's motion to dismiss the claims in their entirety.

[2] Of the documents challenged as not properly authenticated, the Court considered Exhibits A through D, F, H, K, M, O through Q, S through W, and Y through BB, attached to the Declaration of Arthur Clark filed on December 15, 2003 as amended by the Errata filed on January 30, 2004 (the "First Clark Declaration.") The Court did not consider Exhibits E, G, I, J, L, N, and R attached to the First Clark Declaration. As required herein, BioGenesis has presented to the Court in the Second Clark Declaration properly authenticated documents in support of this renewed motion for summary judgment.

**DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT**
B040813.327-0001.CT (Renewed SJ Motion).wpd

2

Case 1:02-cv-00008   Document 439   Filed 08/17/2004   Page 2 of 15

Accordingly, BioGenesis hereby seeks to renew its motion for partial summary judgment to have the Court limit the amount of Rhino's Miller Act claim based upon an authentication of those documents that the Court earlier declined to consider. *See* accompanying Declaration of Arthur B. Clark in Support of Motion for Partial Summary Judgment ("Second Clark Decl.").

The issue of dispute that BioGenesis seeks to have resolved via this motion, is: *what is the maximum amount that Rhino may claim under the Miller Act*. BioGenesis submits to the Court that upon review of the now authenticated documents, the indisputable facts of this case establish that Rhino has grossly overstated the value of its Miller Act claim. BioGenesis respectfully requests that the Court grant its motion and exclude from Rhino's Miller Act claim all costs associated with lost profits and capital equipment.

## II. FACTUAL BACKGROUND

The essential point of dispute between Rhino and BioGenesis is whether BioGenesis, who is a contractor with the U.S. Navy for certain roofing work and repairs at the U.S. Naval Base on Guam (the "Navy Contract"), entered into a subcontract agreement with Rhino. In a nutshell, both parties admit that Rhino performed work on the Navy Contract. However, Rhino alleges that it performed work on the Navy Contract pursuant to an oral subcontract with BioGenesis. BioGenesis, on the other hand, alleges that while BioGenesis and Rhino were still negotiating a potential subcontract, Rhino misrepresented to BioGenesis' Guam representative, Richard Avilla, who was also an employee of Rhino, that the parties had finalized a subcontract and that he was to start accepting work from the Navy and assigning them to Rhino. BioGenesis did not find out that Rhino had started working on the Navy Contract until months later when Rhino had placed BioGenesis in the position of potential default with its vendors and with the Navy. BioGenesis was thus forced into allowing Rhino to complete those delivery orders that it had started in order to avoid defaulting on the Navy Contract.

During the course of discovery depositions were taken of: Michael O'Connell, Rhino's president (Ex. 13 to the Second Clark Decl. at p.19), Eugene O'Connell, brother to Michael O'Connell and Rhino's accountant responsible for preparing all of Rhino's invoices, balance sheets, profit and loss statements and other financial statements (Ex. 13 to the Second Clark Decl. at p. 22, Ex. 14 to the Second Clark Decl at pp. 26-27), Gerald Lam, chief executive officer of BioGenesis (Ex.9 to the Second

DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC,
INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
B040813.327-0001.CT (Renewed SJ Motion).wpd                                            3

Case 1:02-cv-00008   Document 439   Filed 08/17/2004   Page 3 of 15

Clark Decl. at p. 28 and Depo. Ex. 1), George Allen, Rhino's director of operations for Guam (Ex. 12 to the Second Clark Decl. at pp. 17-18), Richard Avilla, Rhino's Guam project manager from 1998 through November 2000 and BioGenesis representative with respect to the Navy contract (Ex. 13 to the Second Clark Decl. at pp. 66-68; Ex. 15 to the Second Clark Decl. at pp. 24-25), Alfred Garthe III, Rhino's vice-president for Guam operations (Ex. 16 to the Second Clark Decl. at p. 125), and Michael Danforth, an authorized representative of Maxx Management, the consultant retained by Rhino to negotiate a subcontract with BioGenesis (Ex. 11 to the Second Clark Decl. at pp. 18-20; Ex. 10 to the Second Clark Decl. at pp. 276-277).

In its December 15, 2003 Motion for Summary Judgment, BioGenesis provided an extensive factual background section, which section, for the sake of brevity, BioGenesis herein incorporates by reference. Those facts particularly relevant to this motion, supported by both the First and Second Clark Declarations, are hereby restated below:

Some time in August 2000, Rhino hired Michael Danforth to consult with Rhino. (Ex. F to the First Clark Decl.) This relationship expanded to include consultation services on the Navy Contract. (Ex. 6, pp. 26-27 to the First Clark Decl.) Mr. Danforth was designated as Rhino's point of contact with BioGenesis and was authorized to act on Rhino's behalf to negotiate a potential subcontract with BioGenesis. (Ex. 10 to the Second Clark Decl. at pp. 273-277 and Depo. Ex. 20.)

Although BioGenesis and Rhino dispute whether Rhino was ever authorized to commence work on the Navy Contract, Rhino admits that it ***stopped working*** on the Navy Contract in ***September or October 2000.*** (Ex. 2, pp. 156-157 to the First Clark Decl.)[3] According to the certified payrolls provided in Rhino's proof of claim filed with American Home Assurance Company, almost all employee labor stopped by the middle of September 2000. (Ex. H to the First Clark Decl.)

---

[3] Michael O'Connell testified at his sworn deposition as follows:
> Q. So, when you ran out materials in September or October of 2000, you're saying that that is when your employees physically stopped working on the Navy contracts?
> A. The employees, yes.

DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC,
INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
B040813.327-0001.CT (Renewed SJ Motion).wpd                                                    4

Case 1:02-cv-00008    Document 439    Filed 08/17/2004    Page 4 of 15

In October 2000, Michael Danforth was on Guam for a two-week period, during which time he participated in a phone conference between BioGenesis and Rhino representatives on October 29, 2000, *after* Rhino had already stopped working. In this conversation, the parties agreed that since a subcontract agreement was not in place, Rhino would continue working *only* on the delivery orders it had previously started. (Ex. 11 to the Second Clark Decl. at pp. 48-53, 74-75, 77-80 and Depo. Exs. 5 (pp. 18-19), 14 and 15.) In an internal Rhino communique, dated November 10, 2000, Mr. Danforth writes that the only delivery orders commenced by Rhino were delivery orders 1, 2, 3, 4 and 7. (*Id.* at pp. 74-75, 80 and Depo. Ex. 14.)[4] However, BioGenesis asserts that Rhino in fact *only* worked on delivery orders 1, 2 and 7. (Ex. 5, p. 176 to the First Clark Decl.)[5] BioGenesis' position is independently supported by a status report produced by Michael Danforth for Rhino in October 2000 during the same two-week period that he was on Guam. (Ex. 11 to the Second Clark Decl. at p. 34-36

---

[4] Michael Danforth wrote: "On 29 October 2000, Al, George, Richard and myself conversed with Gerry Lam and agreed: 1) RBI would complete all Task Orders that were previously started (#1, #2, #3, #4 and #7)."

In his deposition, Michael Danforth explained his written communication further:

> **Q.** If you can refer to the second paragraph, it says "On 29 October, 2000, Al" . . . "would complete all task orders that were previously started"; and in parenthesis again you have the same five task orders that were earlier referred to, task orders 1, 2, 3, 4 and 7. Okay? So, as of November 10, 2000, did you understand that Rhino had only started working on those five task orders?
> **A.** That appears to be what I'm saying.
> ....
> **Q.** Okay. So, do you recall then that during that discussion the parties agreed that Rhino would not commence work or would not continue any work on the roofing contract other than, I'm sorry, the task orders 1 through 4 and 7?
>
> **A.** That's what I'm saying here.

[5] Richard Avilla testified at his sworn deposition as follows:

> **Q.** You said earlier that Task Orders 1, 2, and 7 was performed by Rhino Builders; is that all?
> **A.** Yes.

DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC,
INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
B040813.327-0001.CT (Renewed SJ Motion).wpd

5

Case 1:02-cv-00008   Document 439   Filed 08/17/2004   Page 5 of 15

and Depo Ex. 3.) Per Rhino's status report, and consistent with the sworn testimony of Richard Avilla, work on delivery orders 3 and 4 had not yet commenced. Delivery order 3 is identified in the status report as being a "project delayed by government," and the start date for delivery order 4 was not scheduled until October 31, 2000. (*Id.* at Depo. Ex. 3.)

On November 14, 2000, Rhino prepared an invoice for all the work it claims to have performed through October 31, 2000, specifically for 100% completion of delivery orders 1, 2 and 3, and for 90% completion of delivery order 4. (Ex. K to the First Clark Decl.) The total invoice to BioGenesis for all the work Rhino claims to have performed on delivery orders 1 through 4 was $106,765.53 (see page 2 of Ex. K to the First Clark Decl.). Per the November 14 invoice, this amount includes reimbursement to Rhino for all its direct and overhead cost and one-half of the profit. However, at the time Rhino sent its November 14 invoice, Eugene O'Connell, Rhino's accountant who prepared the invoice, admits that he did not have any documentation to verify that Rhino had completed delivery orders 3 and 4. (Ex. 14 to the Second Clark Decl. at pp. 159-163.)

In November 2000, BioGenesis paid Rhino $25,000 for the work it had already performed. (Ex. 3, pp. 133-135 to the First Clark Decl.) (Ex. CC to the Second Clark Decl; Ex. 10, to the Second Clark Decl. at pp. 259-260.)[6] Rhino has admitted receiving this payment. (Second Amended Complaint ¶17). Despite the $25,000 payment, Rhino did not proceed to do any further work on the delivery orders. It is undisputed that Rhino *did not* provide any labor or materials for the Navy Contract after October 2000 despite receiving payment in November. (Ex. 2, pp. 156-157 to the First Clark Decl.) (Ex. 5, p. 53 to the First Clark Dec.) (Ex. H to the First Clark Decl.) In an internal communique dated November 18, 2000, Rhino's director of operations for Guam, George Allen, admitted that Rhino was doing next to nothing on the Navy Contract and suggested that Rhino should

---

[6] George Allen wrote in an email dated November 8, 2000, to Michael Danforth and Michael O'Connell: "Gerry called me after he talked to Michael O. I told him we could get back to work on a limited basis if he could pay Rhino $25,000 of what is owed . . ."
Michael O'Connell testified about George Allen's authority to contract on behalf of Rhino:
    **Q.** Did George Allen have any contract authority? Did he have any authority to contract for Rhino?
    . . . .
    **A.** Yes. Up there, yes, he had – he could bind Rhino.

**DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT**
B040813.327-0001.CT (Renewed SJ Motion).wpd

6

Case 1:02-cv-00008   Document 439   Filed 08/17/2004   Page 6 of 15

do just enough to give the appearance of working on the delivery orders. (Ex. 12 to the Second Clark Decl. at p. 43 and Depo. Ex. 4.) Thus, it is undisputed that by November 2000, BioGenesis had mobilized its own work force and was performing work on the Navy Contract without Rhino. (Ex. 2, p. 155 to the First Clark Decl.)[7] (Ex. 12 to the Second Clark Decl. at p. 43 and Depo. Ex. 4.)

On October 22, 2001, Rhino filed a claim with BioGenesis' surety, American Home Assurance Company ("AHAC"). (Ex. 13 to the Second Clark Decl., at pp. 168-170 and Depo. Ex. 4) In its claim, Rhino states that it is owed $245,664.43. (*Id.*) Rhino's president testified that Rhino's claim increased from its November 14, 2000 invoice amount to $245,664.43 because they were advised by legal counsel to include all overhead expenses and start up costs for Guam (Ex. 2, pp. 171-172 to the First Clark Decl.), which Rhino did by including even those costs unrelated to the Navy Contract. In particular, Rhino has included expenses dating back to as early as 1998 and including, among other things, Rhino's capital equipment and utilities bill, even though Rhino's AHAC claim alleges to be for the labor and materials provided between May and December 2000. (Ex. 8, pp. 20-27 to the First Clark Decl)

On January 9, 2002, Rhino filed an amended claim against BioGenesis' surety. (Ex. O to the First Clark Dec.) This time, the claim increased to $1,081,881.80. In this case, the increase is the result of a claim for lost profits (expectation damages), despite that such damages are not permitted under the Miller Act. (Ex. 14 to the Second Clark Decl. at pp. 208-209.) Based upon the undisputed facts of this case, it is clear Rhino's claim includes charges for lost profits and capital equipment, which are not allowed under the Miller Act. Accordingly, Rhino's claim should be limited to a certain amount, which BioGenesis submits is $4,667.70, subject to proof.

---

[7] Michael O'Connell testified at his deposition as follows:
Q. Okay. So, from November, 2000, the only employees working on the Navy contracts were employees on BioGenesis' payroll? Is that what you're saying?
A. I guess so, yes.

**DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT**
B040813.327-0001.CT (Renewed SJ Motion).wpd

7

Case 1:02-cv-00008   Document 439   Filed 08/17/2004   Page 7 of 15

## III. THE STANDARD FOR A SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure ("FRCP"), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2558 (1986). This burden may be discharged by showing to the court "that there is an absence of evidence to support the nonmoving party's case." 477 U.S. at 325, 106 S.Ct. at 2554.

Once the initial burden is met by the movant, "the nonmoving party must set forth by affidavit, or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Assn.*, 809 F.2d 626, 630 (9th Cir. 1987). The nonmoving party may not rely on allegations in the pleadings, nor the statement that "it will discredit the moving party's evidence at trial and proceed in the way of evidence to support its claim." *Id.* "The resisting party must respond with more than mere hearsay and legal conclusions." *Kaiser Cement Corp. v. Fischbach and Moore, Inc.*, 793 F.2d 1100, 1104 (9th Cir. 1986). The non-moving party must produce at least some "significant probative evidence tending to support the complaint." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511 (1986).

Additionally, partial summary judgment is proper to establish damages. Rule 56(d) provides that in ruling on a summary judgment motion, the court may "make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy . . ." Fed. R. Civ. Proc. 56(d); 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.40 (3d ed. 2004) ("it is now well-established that a court may 'grant' partial summary 'judgment' that establishes the existence or non-existence of certain facts, even though no actual judgment is entered on a claim.").

DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC,
INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
B040813.327-0001.CT (Renewed SJ Motion).wpd

8

Case 1:02-cv-00008   Document 439   Filed 08/17/2004   Page 8 of 15

## IV. ARGUMENT

### A. Rhino's Miller Act Claim Should Be Limited to $4,667.70

In its Miller Act claim, Rhino claims that it entitled to $1,264,694.47 in damages. (Second Amended Complaint Prayer ¶1). However, there is no factual or legal basis to support its claim since Rhino's first cause of action includes claims for lost profit and capital equipment, which are legally impermissible under the Miller Act. The Court already held that the Miller Act does not entitle Rhino to lost profits:

> While the Court is unaware of any case law barring recovery of lost profits specifically from a Miller Act contractor, the Court considers Ninth Circuit case *Mai Steel Serv. Inc. v. Blake Constr. Co.*, 981 F.2d 414 (9th Cir. 1992) to be dispositive. In *Mai Steel* the Ninth Circuit Stated that "'[a] claim for profits does not involve actual outlay and thus falls outside both the letter and spirit of the [Miller] Act.'" 981 F 2d at 418 (quoting *United States ex rel. T.M.S. Mech Contractors, Inc. v. Millers Mutual Fire Ins. Co. of Texas*, 942 F.2d 946, 953 (5th Cir. 1991)) (internal quotations omitted).... Therefore, the Court holds that the Miller Act does not entitle Rhino to lost profits.

Court's Order at p.11.

On November 14, 2000, Rhino prepared an invoice claiming that it had completed 100% of the work on delivery orders 1, 2 and 3, and 90% of the work on delivery order 4. Rhino's total for this work is $106,765.53. (Ex. K to the First Clark Decl.) However, through discovery, it is undisputed that Rhino ***did not*** perform any labor or provide any materials for delivery orders 3 or 4. (Ex. 5, p. 176 to the First Clark Decl.; Ex. 11 to the Second Clark Decl. at p. 36 and Depo Ex. 3; Ex. 15 to the Second Clark Decl. at pp.158-159, 162.)

In October 2000, Michael Danforth confirmed the status of Rhino's work on the Navy Contract. (Ex. 11 to the Second Clark Decl. at p. 36 and Depo Ex. 3.) This report was prepared some time between the middle and end of October 2000.[8] Since Rhino has confirmed that it ***did not*** provide any labor or materials for the Navy Contract after October 2000, when the status report was prepared, we can conclude that the status report summarizes the status of ***all*** work performed by Rhino on the

---

[8] We know this because Michael Danforth stated in his deposition that he prepared the report while he was on Guam during the same two-week period in which he participated in the October 29, 2000 phone conference between Rhino and BioGenesis.

DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC,
INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
B040813.327-0001.CT (Renewed SJ Motion).wpd

9

Case 1:02-cv-00008   Document 439   Filed 08/17/2004   Page 9 of 15

Navy Contract. (Ex. 2, pp. 156-157 to the First Clark Decl.) (Ex. 5, p. 53 to the First Clark Dec.) (Ex. H to the First Clark Decl.)  The accuracy of Mr. Danforth's report is confirmed by Mr. Danforth and Michael O'Connell. (Ex. 11 to the Second Clark Decl. at p. 36, 57-61; Ex. 10 to the Second Clark Decl. at pp. 294-295, Depo. Ex. 28.)[9]

Per the status report, except for documentation preparation, physical labor on delivery orders 3 and 4 had not yet commenced. (Ex. 11 to the Second Clark Dec. at pp. 59-60, Depo Ex. 3)[10] Delivery order 3 was identified as being a "project delayed by government," and the start date for delivery order 4 was not scheduled until October 31, 2000. (*Id.* at Depo. Ex. 3.) In addition, the Navy has confirmed that delivery order 3 was not completed until March 15, 2001, and delivery order 4 on April 4, 2001. (Ex. S and Ex. T, respectively, to the First Clark Decl.) Accordingly, both the start dates noted by Rhino's agent and the completion dates noted by the Navy make it indisputable that Rhino had not even started delivery order 3 or 4, much less completed them.

---

[9] With respect to the status report, Michael O'Connell testified at his sworn deposition as follows:
> Q. And if you can remember, Mr. O'Connell, was there anything that Mr. Danforth made – any representations he made with respect to this document [status report] which you felt were inaccurate?
> A. I don't recall.

[10] With respect to delivery orders 3 and 4, the status report provides that product data, MSDS, and AHA were complete. Michael Danforth explained at his sworn deposition that those terms refer only to the submission of documents and not to the performance of physical labor:
> Q. It says that the start date is October 31, 2000 – revised start date. So, as of the date of this document, the physical work on this project [task order 4] had not started; is that correct?
> A. The best I can tell from my writing.
> Q. Okay. Task order No. 5 – when we talk about the product data, MSDS, AHA, are we talking primarily about the submission of documents?
> A. Correct.
> Q. Okay. So, those terms, then, don't refer to any actual physical construction work or roofing work then, correct?
> A. It does not refer to any on-site physical work. It does refer to physical work relative to contract administration.

DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
B040813.327-0001.CT (Renewed SJ Motion).wpd

10

Case 1:02-cv-00008   Document 439   Filed 08/17/2004   Page 10 of 15

Also, Rhino's accountant Eugene O'Connell, who prepared the November 14, 2000 invoice, testified that at the time he prepared the invoice he did not have any documentation to support Rhino's claim to having worked on delivery orders 3 and 4. (Ex. 14, pp. 159-163 to the Second Clark Decl.)[11] Finally, Richard Avilla also confirmed that Rhino only completed delivery orders 1, 2 and 7. (Ex.15 to the Second Clark Decl. at pp. 32-33, 42, 158-159, 162.)

Based upon this indisputable evidence, Rhino's Miller Act claim should be limited to Delivery Orders 1, 2 and 7. The total contract value of these three delivery orders is $43,854.20. (Ex. U, V and W to the First Clark Decl.) Per the Court's Order, Rhino's Miller Act claim cannot exceed its actual outlay, i.e., the amount actually expended in labor and materials to complete delivery orders 1, 2 and 7. Since the $43,854.20 figure is the gross amount of the three delivery orders (i.e., includes profit), BioGenesis submits that it is impossible for Rhino's claim to exceed the actual contract value of these three delivery orders.[12]

Moreover, in an admission by Rhino that value of its work would not exceed the Navy Contract value for each delivery order, Rhino's November 14, 2000 invoice values the completed work on delivery orders 1 and 2 at $12,129.10 and $26,445.10, respectively, which are the identical values contained in the Navy Contract. (Ex. K, U and V of the First Clark Decl.) Furthermore, the November 14 invoice clearly includes **direct and overhead costs as well as the profit** Rhino claims was agreed to in the alleged subcontract. (Ex. K to the First Clark Decl.; Ex. 14 to the Second Clark Decl. at pp. 159-

---

[11] Eugene O'Connell testified at his sworn deposition as follows:

> **Q.** Did you receive any, . . . progress reports or project reports with respect to Delivery Orders 3 and 4 that you relied on to conclude that the projects were 100 percent done and 90 percent done?
> **A.** No. If I'm not mistaken, all I received was a phone call letting me know that go ahead and bill, this is what we should be billing for, and that's why I don't recall if I spoke with Alfred Garthe or Michael Danforth.

[12] Rhino admits that the parties understood that the Navy Contract price included a profit element. As Michael O'Connell testified, all SBA contractors, which Rhino and BioGenesis were, always make a profit on their jobs. (Ex. 17 to the Second Clark Decl. at pp. 371-373.)

DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
B040813.327-0001.CT (Renewed SJ Motion).wpd

11

Case 1:02-cv-00008   Document 439   Filed 08/17/2004   Page 11 of 15

164)[13] Rhino's now-interpretation that it should be reimbursed for essentially every expenditure it ever made on Guam since its inception is disingenuous, contrary to law and patently false, and it directly contradicts Rhino's stated understanding in its November 14 invoice that Rhino was to *only* be reimbursed for those direct costs and overhead expenses related to the work actually being performed on the Navy Contract. As Rhino has already admitted, the increase in its claim to over $245,000 was not due to any belief as to terms of the alleged oral subcontract, rather it was based upon a suggestion by its legal counsel to include all overhead and start-up costs for Guam (Ex. 2, pp. 171-172 to the First Clark Decl.) and its decision to include such costs as capital equipment charges that are not permitted under the Miller Act. (Ex. 8, pp. 20-27 to the First Clark Decl.) Thus, the maximum value of Rhino's outlay for delivery orders 1, 2 and 7 would have been $43,854.20.

---

[13] In explaining the November 14, 2000 invoice, Eugene O'Connell testified as follows:
Q. Let's go through these attachments, please. Can you turn to the fifth page where it starts "CONTRACT INVOICE" 1313? Do you see that? Okay, let's turn to the next page.
. . . .
Q. Are you familiar with this document?
A. Yes.
Q. Did you prepare this document?
A. Yes.
Q. Did you prepare this document on or about November 14, 2000?
A. Yes.
Q. And did you prepare this on behalf of Rhino Builders; is that correct?
A. Yes, I did.
. . . .
Q. Looking at Item E, it says "Less Direct Cost, Attachment A" 49,000 and change. Item F, Less Direct Cost Overhead, Attachment B, 31,000. Item G Net Delivery Order (1 through 4) profit, and then Item H, Rhino profit share (50%). Is this the formula that you believed was agreed upon between Rhino and BioGenesis with respect to the alleged subcontract?
A. Yes.
Q. So it was to take the total revenue of the project, and you would subtract out the direct cost, direct overhead, whatever was leftover was profit, and that was going to be divided 50 percent; is that right?
A. Yes.

DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
B040813.327-0001.CT (Renewed SJ Motion).wpd

12

Case 1:02-cv-00008   Document 439   Filed 08/17/2004   Page 12 of 15

However, it is also clear that this amount should be further reduced. First, the November 14 invoice shows that there was a profit component imbedded in the Navy Contract value of the delivery orders. (Ex. K, line H to the First Clark Decl.) Second, Rhino admits that BioGenesis paid Rhino $25,000. (Second Amended Complaint ¶17). This payment was in consideration of the work that Rhino had performed up to that point. (Ex. 3, pp. 133-135 to the First Clark Decl. Ex. CC to the Second Clark Decl.) Thus, subtracting $25,000 from the value of the three delivery orders leaves a balance of $18,854.20. The indisputable evidence, therefore, is that the most that Rhino could claim under the Miller Act is $18,854.20. However, BioGenesis also offers the declaration of BioGenesis' controller, Russell Fong, that BioGenesis paid $14,186.50 for the materials provided in delivery orders 1 and 2. (Ex. X to the First Clark Decl.) Further subtracting the material cost from the contract value of delivery orders 1, 2 and 7 leaves a balance of ***$4,667.70.*** This should be the maximum amount of Rhino's claim under the Miller Act, although Rhino may not even be entitled to that much since Rhino alleges that it agreed to split profits with BioGenesis.[14]

The evidence is clear and convincing: Rhino ***did not*** start, much less complete, delivery order 3 or 90% of delivery order 4 as the November 14 invoice falsely claims. Accordingly, BioGenesis requests that partial summary judgment be granted in BioGenesis' favor as to Rhino's first cause of action and that the value of the claim be limited accordingly. Per BioGenesis' calculations, Rhino's Miller Act claim should be limited to $4,667.70, subject to proof by Rhino. However, even if the Court were to conclude that the $14,186.50 payment for materials made by BioGenesis for

---

[14] Based upon Rhino's November 14, 2000 invoice, Rhino computes the profit component from delivery orders 1 through 4 to be $51,416.25 (line (G) of said invoice) from a total contract value of $132,473.65 (last line of (D) of said invoice), which equates to a profit percentage of 38.8% (i.e., $51,416.25 ÷ $132,473.65). When this percentage is applied to the total value of delivery orders 1, 2 and 7, the profit for those three delivery orders should have been $17,015.43 ($43,854.20 x 38.8%). If Rhino and BioGenesis were to split this profit per the alleged oral subcontract, BioGenesis and Rhino would have each been entitled to half that amount ($17,015.43 ÷ 2 = $8,507.72). Thus, Rhino should only have received ***$21,159.98*** ($43,854.20 (total contract price for D.O. 1, 2 and 7) - $14,186.50 (cost of materials) - $8,507.72 (BioGenesis' half of the profits)). Thus, using the formula Rhino said was agreed to, it was ***overpaid*** by $3,840.02 ($25,000 - $21,159.98).

**DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT**
B040813.327-0001.CT (Renewed SJ Motion).wpd

13

Case 1:02-cv-00008   Document 439   Filed 08/17/2004   Page 13 of 15

delivery orders 1 and 2 as stated in Russell Fong's declaration is a disputable fact, then the maximum value of Rhino's claim would instead be $18,854.20.

### B. Charges for Capital Equipment Are Not Allowed Under the Miller Act

Rhino's excessive claim for over a million dollars admittedly includes a claim for costs for capital equipment, which is not permitted under the Miller Act. Regarding recovery for capital equipment, the Court stated that:

> "The supplying by sale to the contractor of equipment which should last over several jobs is not covered by the bond...." However, where the capital equipment used on the federal construction project is only being rented from the supplier, the Miller Act entitles a supplier to recover payment. Since neither Rhino nor BioGenesis specify how Rhino supplied capital equipment to the construction project (i.e., via rental agreement or sale), the Court looks no further to this issue until trial.

Court's Order at p.11. (Citations omitted). BioGenesis respectfully submits that in deferring its decision and concluding that neither party identified how Rhino supplied the capital equipment to the project, the Court overlooked certain evidence provided in the original summary judgment motion.

First, BioGenesis has repeatedly asserted that Rhino never provided BioGenesis with any capital equipment for use on the Navy Contract. (Ex. 16 to the Second Clark Decl. at pp. 175-179.) Second, and more importantly, **Rhino has affirmed** that its Miller Act claim includes the *full retail value* of the capital equipment used by Rhino on the project *not its rental value*. (Ex. 8, p. 23 to the First Clark. Decl.)[15] Accordingly, such charges must be excluded from Rhino's claim.

### CONCLUSION

Rhino's claim for over a million dollars includes claims for capital equipment and overhead expenses pre-dating the alleged subcontract by at least a year-and-a-half, none of which is permitted under the Miller Act. As for those charges that may be claimed under the Miller Act, Rhino's November 14, 2000 invoice for labor and materials its patently false. Rhino claims to have completed

---

[15] At his deposition, Eugene O'Connell testified as follows:

> **Q.** Okay. So your $239,000 claim includes the full retail value for every piece of equipment that you claim was never returned to Rhino; is that right?
> **A.** Whatever Rhino paid for, I believe that's what I did, yes.

**DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC, INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT**
B040813.327-0001.CT (Renewed SJ Motion).wpd

14

Case 1:02-cv-00008   Document 439   Filed 08/17/2004   Page 14 of 15

100% of the work on delivery order 3 and 90% on delivery order 4 before work was scheduled to start on either order, and four to five months prior to when the Navy confirms the work was completed. Accordingly, BioGenesis respectfully requests that this Court grant partial summary judgment in BioGenesis' favor and limit Rhino's claim to $4,667.70 or, if it may be argued that Russell Fong's declaration is disputable, then to $18,854.20.

Dated this 13th day of August, 2004.

CALVO AND CLARK, LLP
Attorneys at Law
Attorneys for Defendant/Counter-Plaintiff
BioGenesis Pacific, Inc.

By: /s/ Arthur B. Clark
ARTHUR B. CLARK

DEFENDANT/COUNTER-PLAINTIFF BIOGENESIS PACIFIC,
INC.'S RENEWED MOTION FOR SUMMARY JUDGMENT
B040813.327-0001.CT (Renewed SJ Motion).wpd

15

Case 1:02-cv-00008   Document 439   Filed 08/17/2004   Page 15 of 15